## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| Personal Audio, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Apple Inc., | ) | Case 9:09-cv-00111-RC |
| | ) | |
| Sirius XM Radio, Inc., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Coby Electronics, Corp., | ) | **ORAL HEARING: AUGUST 31, 2010** |
| | ) | |
| Archos, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## PERSONAL AUDIO, LLC'S OPENING CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

BACKGROUND OF THE INVENTION ..................................................................................... 1

I.    The Problem ................................................................................................................. 1

II.   The Solution ................................................................................................................ 2

III.  The Marketplace Following the Invention .................................................................. 3

CONSTRUCTION OF DISPUTED TERMS ............................................................................. 4

I.    The Structural Limitations .......................................................................................... 4

     A.    "Player" / "Audio Program Player" ('076, Cl. 1; Ex. A, Ref. No. 1; '178, Cls. 1 & 14; Ex. B, Ref. No. 1) ................................................................ 4

     B.    "Programmed Digital Computer" ('076, Cl. 14; Ex. A, Ref. No. 16) ................... 6

     C.    "Sequencing File" / "Playback Session Sequencing File" ('076, Cls. 1 & 14; '178 Patent, Cls. 1 & 14, Ex. B, Ref. No. 4) ........................................... 7

     D.    "Receiving" ('076, Cl. 1, Ex. A, Ref. No. 4) ...................................................... 10

     E.    "Data Communications Link" ('178, Cl. 1, Ex. B, Ref. No. 2) ........................... 10

     F.    Downloading … from one or more server computers ('178, Cls. 1 & 14; Ex. B, Ref. No. 3) ............................................................................................... 12

     G.    "Selected Audio Program Segments" / "Collection" ('076, Cl. 1, Ex. A, Ref. No. 2; '178, Cls. 1 & 14, Ex. B, Ref. No. 5) .................................................. 13

II.   Claim Elements Involving Means-Plus-Function Format ............................................... 15

     A.    Claim Elements for Which Applicability of 35 U.S.C. §112(6) is Disputed ........ 15

          1.    Claim Elements Without "Means" Are Presumed Not to Be Controlled by 35 U.S.C. §112(6) .............................................................. 16

          2.    Claim Elements Including a Processor Are Not in Means-Plus-Function Format ...................................................................................... 16

3.   To the Extent Claim Elements Including a Processor Are Determined to Be Means-Plus-Function Format, Personal Audio Proposed the Correct Corresponding Structure ........................................ 18

B.   Claim Elements Governed by 35 U.S.C. §112(6)................................................. 19

1.   Accepting/Inputting and Outputting Means.............................................. 20

2.   The Specification Discloses Algorithms and Corresponding Text.............. 22

a.   The law allows algorithms in flowcharts to constitute corresponding structure for software functions ........................... 22

b.   Means for Continuously Reproducing Said Program Segments . . . ................................................................................. 24

c.   Means for Detecting a Control Command Indicative of a Request to Skip Forward or Backward ..................................... 26

d.   Means Responsive to a Control Command . . . ........................... 27

e.   Means for Storing and Receiving … .......................................... 29

CONCLUSION.................................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## Cases

*Aguayo v. Universal Instruments Corp.*,
    No. H-02-1747, 2003 U.S. Dist. LEXIS 27846 (S.D. Tex. June 10, 2003)........................ 17, 18

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
    504 F.3d 1236 (Fed. Cir. 2007)................................................................................. 22

*Arbitron, Inc. v. Int'l Demographics Inc.*,
    No. 2:06-V-434, 2009 U.S. Dist. LEXIS 1382 (E.D. Tex. Jan. 8, 2009) ................................. 23

*Ariba, Inc. v. Emptoris, Inc.*,
    No. 9:07-CV-90, 2008 U.S. Dist. LEXIS 59862 (E.D. Tex. Aug. 7, 2008) ...................... 23, 28

*Asyst Techs., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001)................................................................................. 20

*Better Education, Inc. v. Einstruction Corp.*,
    No. 2:08-CV-446-CE, 2010 U.S. Dist. LEXIS 40972 (E.D. Tex. Apr. 27, 2010) .................. 23

*Candela Corp. v. Palomar Med. Techs., Inc.*,
    No. 9:06-CV-277, 2008 U.S. Dist. LEXIS 59860 (E.D. Tex. Aug. 6, 2008) ........................ 5, 7

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)................................................................................. 16

*Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.*,
    145 F.3d 1303 (Fed. Cir. 1998)................................................................................. 21

*Digital Tech. Licensing, LLC v. Cingular Wireless, LLC*,
    No. 2:06-CV-156, 2007 U.S. Dist. LEXIS 57492 (E.D. Tex. Aug. 7, 2007) .......................... 25

*Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.*,
    292 Fed. Appx. 931 (Fed. Cir. 2008)......................................................................... 17

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008)............................................................................ 23, 30

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)................................................................................. 29

*Kinik Co. v. Int'l Trade Comm'n*,
   362 F.3d 1359 (Fed. Cir. 2004)..................................................................................... 6

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
   453 F.3d 1364 (Fed. Cir. 2006)................................................................................... 17

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
   382 F.3d 1354 (Fed. Cir. 2004)................................................................. 16, 17, 18

*Linear Tech. Corp. v. Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004)......................................................................... 17, 18

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003)................................................................................... 19

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005)..................................................................................... 8

*Mettler-Toledo, Inc. v. Fairbanks Scales Inc.*,
   551 F. Supp. 2d 576 (E.D. Tex. 2008)............................................................... 22, 23

*Micro Chem. Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999)......................................................................... 19, 21

*Motorola, Inc. v. VTech Commc'ns, Inc.*,
   No. 5:07-CV-171, 2009 U.S. Dist. LEXIS 59226 (E.D. Tex. July 6, 2009) ........................... 18

*Network Appliance, Inc. v. Bluearc Corp.*,
   No. C 03-5665 MHP, 2004 U.S. Dist. LEXIS 28344 (N.D. Cal. Nov. 30, 2004) .................... 18

*Omega Eng'g, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)................................................................................... 15

*Palmtop Productions, Inc. v. Lo-Q PLC*,
   450 F. Supp. 2d 1344 (N.D. Ga. 2006) ................................................................... 18

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
   161 F.3d 696 (Fed. Cir. 1998)..................................................................................... 17

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)........................................................................... passim

*Polycom, Inc. v. Codian Ltd*,
   No. 2:05-CV-520-DF, 2007 U.S. Dist. LEXIS 97892 (E.D. Tex. Oct. 19, 2007).............. 21, 25

*Prima Tek II, LLC v. Polypap, S.A.R.L.*,
    412 F.3d 1284 (Fed. Cir. 2005).............................................................................. 13

*Trinity Industries, Inc.. v. Road Systems, Inc.*, 121 F. Supp. 2d 1028 (E.D. Tex. 2000)............. 21

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999).......................................................................... 22, 23

## Statutes

35 U.S.C. §112(6) .............................................................................. 15, 16, 17, 18, 23

## INDEX OF APPENDICES AND EXHIBITS

### APPENDICES

| Appendix | Appendix Description | Pages |
|----------|---------------------|-------|
| A | Disputed Terms in Claim 1 of Asserted Patents | 4 |
| B | Grouping of Means-Plus-Function Claim Elements | 15, 19, 20, 24, 26-28 |
| C | Grouped Claim Terms and Personal Audio's Proposed Constructions and Supporting Evidence | 15 |

### EXHIBITS

| Exhibit | Exhibit Description | Pages |
|---------|--------------------|-------|
| A | Patent Rule 4-3 Joint Statement Chart ('076 Patent) | 4, 6, 10, 13, 20, 24, 26, 27 |
| B | Patent Rule 4-3 Joint Statement Chart ('178 Patent) | 4, 7, 10, 12, 13, 15, 19 |
| C | '076 Patent File History, March 3, 2000 Response | 7, 9 |
| D | '178 Patent File History, October 28, 2001 Amendment | 7, 9, 15 |
| E | '076 Patent File History, June 17, 1999 Amendment | 10 |
| F | Barron's Dictionary of Computer and Internet Terms (5th ed. 1996) | 12, 13 |
| G | Microsoft Press Computer Dictionary (3d ed. 1997) | 12 |

## BACKGROUND OF THE INVENTION

The invention in this case relates to a personal audio player that can download and store digital audio files from a separate computer, receive one or more separate "sequencing files" to organize the audio files according to a listener's interests, and then play the audio files back in the order specified by the separate sequencing file, subject to the listener's control. An important aspect of the invention is the use of a separate sequencing file that software in the player can reference to determine—and change—the order in which the audio files are played. Another important disclosure was the use of a system with easy and intuitive controls to select audio files on the player without the need to look at a display screen, for example, while driving. Dependent claims relate to specific features that are common in players today such as downloading episodes of serialized programs, paying for the audio files, providing information back to a seller as to the listener's habits and preferences, and providing audio files selected for the listener based on information about the listener such as past listening choices.

## I.     The Problem

Although personal digital players with separate sequencing files and simple navigation controls are common today, they did not exist at the time the patent application was filed in October 1996. Instead, in 1996, the dominant forms for providing audio content to listeners were broadcast radio, CDs, and cassette tapes. *See* '178 patent, Col. 1, ll. 20-24.[1] "Internet radio" had also been introduced. *See* Col. 1, ll. 56-62. These forms of audio content delivery suffered from similar problems. They could not receive audio files and a separate sequencing file in order to provide a personalized playback session, and they did not give a user the ability to easily navigate within that ordered sequence of audio files. For example, as described in the patent, broadcast radio played content suited for a general audience and did so at times scheduled by the

---

[1]      All references to the specification are to the '178 patent.

broadcast station, not the listener. *See* Col. 1, ll. 26-37. The listener, moreover, was unable to interrupt the schedule chosen by the broadcaster and skip ahead or play back the content he had just heard. *See* Col. 1, ll. 34-37.

While CD and cassette tape players allowed a listener more control over the playback of content, those players were limited in that they did not and could not handle sequencing files separate from the content on a cassette or disc. The listener was bound by the order of the tracks on the CD or cassette tape, and could not add, delete or re-order tracks without replacing the CD or tape. *See* Col. 1, ll. 43-49 (noting need for many discs, and problems with updating information). Sellers of content selected the content and the order of the content on the tapes and CDs they offered for sale, and could not personalize the content for individual listeners. Internet radio provided a few advantages that broadcast radio and the CD or cassette players did not, such as the ability to search and play specific content over the World Wide Web, but it still failed to solve the general problem identified above because the content was streamed in and not stored locally, and because the need to use a web browser to search for and play selections made internet radio unusable for a mobile user such as a driver in a car. *See* Col. 1, l. 56 – Col. 2, l. 2. The user therefore lacked the ability to easily move around the content and access the content at a time best suited for him. *See id.*

## II.    **The Solution**

The named inventors, James Logan, Charles Call, and Daniel Goessling, solved this set of problems by inventing a personal audio player that could, *inter alia*, receive and store (i) a selection of audio programs and (ii) a separate file of data ("a sequencing file") that determines the sequence in which those programs would play. *See* Col. 2, ll. 48-51. This sequencing file established two significant advantages over the state of the art. First, the sequencing file

organizes separately stored audio files into a playback session that is personal to a user, who can listen to it in the order, manner, and at the time of his choosing. *See.* Col. 2, ll. 54-58; *see also* Col. 30, ll. 28-54. Second, the sequencing file allows a user to navigate easily through the programming with simple controls. *See* Col. 2, ll. 3-23. The customized content can still be provided by a separate computer—including one operated by a business that sells content or advertising—but the user can easily select specific audio within the sequence, skip, rewind, and otherwise control playback. *See* Col. 2, ll. 3-9 & 59-66. Moreover, only the sequencing file needs to be changed to customize a playback session to a user; there is no need to change the location or order in which the separate content files are stored on the player, as there would have been with a CD or tape. *See, e.g.,* Col. 9, ll. 6-12.

## III.     The Marketplace Following the Invention

In 1998, two years after the patents' original filing date, Rio offered the first portable MP3 player—the Rio PMP300—for sale. About two years after that, Apple first started its work on developing a portable player, which became the ubiquitous iPod product line. In the years that followed, MP3 players such as the iPod and those offered by Sirius XM have become some of the most popular consumer products of all time. All the accused players in this case include the ability to receive a file of data establishing a playback sequence of personalized audio content, referred to colloquially as a "playlist," along with simple controls for an individual user to navigate through that content. Apple's products are also known for features like serialized programming (including "podcasting"), and content based on the individual habits and preferences of a listener. The claimed inventions provided some of the core foundation for the extreme popularity and financial success of the iPod brand of personal audio players.

## CONSTRUCTION OF DISPUTED TERMS

Personal Audio proposes the following definition of a person of ordinary skill in the art of the claimed player:

> A person of ordinary skill in the art in 1996 would have the equivalent of a four-year degree from an accredited institution (usually denoted as a B.S. degree) in either computer science or computer engineering with a concentration of courses in programming and the development and use of hardware and software, and approximately two to three years of programming experience. Additional graduate education might substitute for experience, while significant experience in the field of computer programming might substitute for formal education.

The disputed claim terms should be construed as they would be understood by such a person, in light of the intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

## I.      The Structural Limitations

The parties dispute seven structural limitations in the asserted patents. These disputed limitations occur in claim 1 of the two asserted patents, except for "programmed digital computer," which only appears in claim 14 of the '076 patent. Appendix A sets forth claim 1 of each patent with the structural terms in dispute highlighted.

### A.       "Player" / "Audio Program Player"
('076, Cl. 1; Ex. A, Ref. No. 1; '178, Cls. 1 & 14; Ex. B, Ref. No. 1)

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A self-contained personal audio playback device for an individual listener | Desktop or laptop computer with a soundcard and appropriate software to playback audio program files |

The term "player" is set forth in the preamble of the asserted independent claims (except claim 14 of the '076 patent). Although "player" is an ordinary word, there is a genuine dispute as to its meaning in this case because Defendants seek to limit the "player" to two of the preferred embodiments—a desktop or laptop computer—apparently for no reason other than to avoid

infringement.[2] Personal Audio's construction reflects ordinary meaning that is consistent with the specification, and recognizes that the inventors disclaimed mass broadcasting as a problem.

The structure of the claimed "player" is nothing more or less than "an audio program player," as set forth in the "Summary of the Invention." Col. 2, ll. 11-12. The word "player" does not imply, much less demand, a desktop or laptop computer. Not only does the Summary use the unqualified term "player," but the specification discloses other embodiments such as "a portable computer or simplified player for mobile use." Col. 8, ll. 7-8 (emphasis added).

Not only have Defendants selected two particular embodiments to the exclusion of others, but it would be error to limit an ordinary term like player to the preferred embodiments at all. In *Phillips*, the Federal Circuit explained that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." 415 F.3d at 1323. In this case, the detailed description of the invention clearly states that the player "may be advantageously implemented by a conventional laptop or desktop." Col. 4, ll. 43-44 (emphasis added). This is language of preference rather than requirement and therefore cannot be read into the claim. *See, e.g.*, *Candela Corp. v. Palomar Med. Techs., Inc.*, No. 9:06-CV-277, 2008 U.S. Dist. LEXIS 59860, at *13 (E.D. Tex. Aug. 6, 2008). More particularly, the specification does not state that the player is a conventional laptop or desktop, or that it must be implemented by a conventional laptop or desktop. Similarly, the Court should not read a "sound card" limitation into claims that do not recite it simply because a sound card is recited in the description of preferred embodiments.

---

[2]     Defendants also urge this court to adopt an identical construction for "audio program player" and "audio playback unit." Such a construction would cause a nonsensical result. For example, Claim 14 of the '178 patent states that an audio program player comprises: "a memory unit . . . one or more controls . . . a display screen . . . an audio playback unit . . . [and] a processor." Col. 48, ll. 1-33 (emphasis added). Obviously, if an audio program player includes an audio playback unit as one of a number of components, the two terms cannot be given an identical construction.

The inventors made clear in the specification, moreover, that the meaning of "player" is broader than a desktop or laptop. For instance, the specification discloses a "portable computer <u>or</u> simplified player for mobile use." Col. 8, ll. 7-8 (emphasis added). Limiting "player" to a desktop or laptop would erroneously exclude this "simplified player" embodiment.

While the inventors did not limit the player to a desktop or laptop, they did limit their player to a personal device for an individual listener. The background section of the patents specifically distinguishes the claimed player from prior audio broadcast systems including broadcast radio. Col. 1, l. 20 – Col. 1, l. 37. The very first problem the inventors describe in the "Background of the Invention" is that broadcast radio is "limited," "inconvenient," offers programming that attempts to appeal to the "same general listening audience," and "must be listened to when it is broadcast, that is, at times chosen by the broadcaster and not the listener." *Id.*

Personal Audio believes that Defendants will contend that prior art radio broadcast systems anticipate the "player" and therefore Personal Audio seeks a construction that makes it clear—as the inventors did—that the player is not a broadcast device for a mass of people but a personal device for an individual listener. *See, e.g., Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("Claims cannot be construed as encompassing the prior art that was distinguished in the specification and disclaimed during prosecution.").

## B.    "Programmed Digital Computer" ('076, Cl. 14; Ex. A, Ref. No. 16)

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| This element does not require construction and should be given its plain and ordinary meaning | Desktop or laptop computer with a soundcard and appropriate software to playback audio program files |

"Programmed digital computer" appears in the preamble of claim 14 of the '076 patent, which does not recite a "player." "Programmed digital computer" is readily understandable to

anyone and requires no construction. *See, e.g., Phillips*, 415 F.3d at 1314; *Candela Corp*, 2008 U.S. Dist. LEXIS 59860, at *13 ("Claim construction is an exercise in interpreting, not rewriting, claim language."). It is improper to limit the "programmed digital computer" to the laptop or desktop computers that are selected preferred embodiments for the same reasons it is improper to limit a "player" to those selected preferred embodiments.

C.     **"Sequencing File" / "Playback Session Sequencing File"**
       **('076, Cls. 1 & 14; '178 Patent, Cls. 1 & 14, Ex. B, Ref. No. 4)**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A file that is received by the player and used by the processor to both control playback of each song in the ordered sequence and respond to control commands | A file specifying the predetermined playback order. |

"Sequencing file" was not a term of art in 1996, but it received particular attention during prosecution, and is readily understandable to one of skill in the art in light of the intrinsic evidence. Throughout the claims, specification, and file history, the sequencing file is received by the player, stored, and later used when the player responds to a control command during playback. It is used to determine, for instance, what song is to be played next if the user wishes to skip forward or back or select a specific song. *See, e.g.,* Col. 12, ll. 16-19; Col. 34, ll. 17-23; Ex. C, at 4-5; Ex. D, at 16-17.

Personal Audio seeks construction to make it clear for the jury that the sequencing file is not simply a playlist, but rather a file of data that the player references when the player is deciding what audio segment to play in response to the presence or absence of a control command. Personal Audio's definition captures these fundamental characteristics and functions of the sequencing file in the context of the overall claimed invention. The Federal Circuit has endorsed this approach, explaining that "the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and

intended to envelop with the claim." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

The claims of both asserted patents reference the sequencing file repeatedly. *See Phillips*, 415 F.3d at 1314 ("claims themselves provide substantial guidance as to the meaning of particular claim terms."). In claim 1 of the '178 patent, the file is downloaded to the player (Col. 45, ll. 61-64), stored in memory (Col. 45, l. 65-67), and the processor plays audio programs in the order specified by the sequencing file (Col. 46, ll. 9-13). In addition, when each control command is received and acted upon, the "reproduction" of audio programs is always continued in accordance with "said ordered sequence specified by said sequencing file," or similar language. *See, e.g.,* Col. 46, ll. 38-40. Independent claim 14 is the same, only with all of the control commands included in the independent claim, further demonstrating that the same file is downloaded, stored and used during a "personalized playback session" to play audio programs in the specified order and determine which audio program to play when the user enters a command.

The specification confirms how the sequencing file is used. *See Phillips*, 415 F.3d at 1316 ("[T]he specification necessarily informs the proper construction of claims."). "The player obtains information from the selections file [sequencing file] which identifies the individual program segments to be fetched from mass storage and played for the user." Col. 12, ll. 16-19. More specifically, during playback and following control commands "[t]he playback operation itself continues from the designated point in the selections file." Col. 12, ll. 27-28. When describing the sequencing file more specifically, the specification notes that "the user may navigate the playback session between playback positions designated by the selection [sequencing] file." Col. 34, ll. 17-19. The precise details of the contents of the file are, in the words of the specification, "illustrative." Col. 34, l. 15. But what the sequencing file does is

clear—the file that is downloaded is used to control the playback session, and navigation within the playback session.

Finally, the file history is consistent with the rest of the intrinsic evidence. *See Phillips*, 415 F.3d at 1317. In the '076 file history the patentees distinguished the Fisch and Okada references on the basis of receiving and storing a sequencing file separate from the program segments. The use of the sequencing file during playback control was specifically used to distinguish Okada as follows:

> . . . even if Okada did disclose a skip forward feature, it plainly would not <u>operate in combination with a separately received and stored data file</u> for establishing which one of the other program segments is to be deemed the "next" segment in the sequence.

Ex. C, at 4 (emphasis added). Thus, the received and stored sequencing file is the file used to determine the next segment during playback. Referring to additional control functions, and distinguishing CD players, eight-track tapes and VCRs, the patentees continued:

> None of these, however, accomplishes these functions <u>by making use of, or operating in combination with</u>, a file of data which establishes the sequence in which program segments are scheduled to be reproduced.

*Id.* at 5 (emphasis added). Finally, when distinguishing the prior art in the '178 patent file history, the patentees explained:

> The downloaded sequencing file thus automates a personalized playback session by reproducing the collection of identified program files in the ordered sequence specified by the sequencing file, and allows the listener to jump to the beginning of a different audio program in that playback sequence at any time during the automated session.

Ex. D, at 16-17. The quoted passage makes it clear that the "downloaded sequencing file" is what "allows the listener to jump." The file history makes it unmistakable that the sequencing file is used to respond to control commands like jump, skip, and skip backwards. Personal

Audio's definition is consistent with intrinsic evidence, easy for the jury to understand, and should be adopted.

### D.      "Receiving" ('076, Cl. 1, Ex. A, Ref. No. 4)

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Receiving" means the file of data comes from outside the player. | No construction is necessary for the phrase "receiving." |

The claimed player in the '076 patent has a mass storage device for "receiving" the file of data establishing the sequence for playback. The word "receiving" was added to the claims, in addition to simply storing, and argued to further distinguish the prior art that did not receive a file. Ex. E, at 1, 3. The ordinary meaning of "receiving" is that the file comes from somewhere else. When used in the specification to refer to the sequencing file, the word "receiving" is used in context that makes clear that the sequencing file comes from outside the player. *See, e.g.,* Col. 2, l. 56 ("session schedule received from the server.") In the context of the whole specification, it is clear that the player communicates with a physically separate host from which it obtains the audio segments and the scheduling file. Defendants appear to contend that the "file of data" could be created on the player in the first instance, rather than be received, or come from outside the player. Personal Audio's construction captures the simple fact that the player receives the file of data from an external source, as consistently described throughout the specification.

### E.      "Data Communications Link" ('178, Cl. 1, Ex. B, Ref. No. 2)

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| This element does not require construction and should be given its plain and ordinary meaning. | "Data communications link" means network connection. |

Not all claim terms require construction. In this case, "data communications link" should be given its plain and ordinary meaning. *Phillips*, 415 F.3d at 1314. The term appears as part of claim 1 of the '178 patent, which recites "a communications port for establishing a data

communications link for downloading a plurality of separate digital compressed audio program files and a separate sequencing file from one or more server computers." Col. 45, ll. 61-64. In this context, "data communications link" simply means a link through which data can be communicated. *See Phillips*, 415 F.3d at 1314 (explaining that "the context in which a term is used in the asserted claim can be highly instructive").

Defendants' proposed construction of "network connection" merely substitutes other words having their own plain and ordinary meaning, rather than providing a meaningful definition of the term. It appears Defendants wish to argue they do not infringe because a link from a home computer to an iPod is not a "network connection." However, the word "network" does not appear a single time in the patent. Instead, the specification of the '178 patent states that "numerous other information storage, processing and communications schemes may be substituted for the preferred Internet server and PC client player architecture." Col. 7, ll. 50-53. This includes "a conventional high speed data modem" (Col. 5, ll. 44-45), "cellular radio" (Col. 7, l. 55), "cable modem" (Col. 7, l. 56), "satellite links" (Col. 7, l. 56), "radio or infrared link" (Col. 7, l. 61), "the Cellular Digital Packet Data (CDPD) service" (Col. 8, ll. 9-10), and "a communication pathway such as the Internet" (Col. 14, l. 66). This wide range of suggested methods indicates that the patentees intended for "data communications link" to be construed broadly, and not restricted beyond the plain and ordinary meaning of the term. Thus, "data communications link" does not require construction, and certainly should not be limited to whatever Defendants will later contend "network connection" means.

**F.     Downloading … from one or more server computers
        ('178, Cls. 1 & 14; Ex. B, Ref. No. 3)**

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Downloading" means transferring or transmitting data | "Downloading" means requesting and receiving . . . transmitted from a remote computer(s) |

"Downloading" is a term in common usage that is clear and should be given its plain and ordinary meaning. Col. 7, ll. 50-53. It appears Defendants wish to narrow the term in two ways: (1) by requiring a "request," which is not required by the ordinary meaning of "downloading" or anything in the intrinsic evidence; and (2) by importing the characterization that there must be a "remote" computer, which may be confusing to jurors.

One contemporary dictionary defines download as "to transmit a file or program from a central computer to a smaller computer <u>or</u> a computer at a remote site." Ex. F, at 115 (emphasis added). This definition does not require requesting, only transmitting. Even Defendants' chosen dictionary gives a second definition of download as "to send a block of data…to a dependent device." Ex. G, at 160. Clearly the plain and ordinary meaning is broader than Defendants' proposal that there must be a "request."

The specification supports the plain meaning that no "request" is required. The summary of invention provides that the server "periodically transmits" the schedule to the player. Col. 2, l. 53. At one point the specification equates downloading with receiving, reciting "a high speed data modem 115 for receiving (downloading) the program information 107 from the remote server." Col. 5, ll. 44-46. At another point the specification notes the recommended schedule "is transferred to the subscriber, along with program segments, during the download transfer." Col. 18, ll. 32-34. None of these descriptions requires a "request."

The detailed description of a preferred embodiment also provides that the player can issue requests to the server in order to download information, but the disclosure of that option should not be read into the claims. *See, e.g., Prima Tek II, LLC v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed. Cir. 2005) ("We have repeatedly made clear that limitations cannot be imported from the specification into the claims.").

Defendants' definition also replaces the word "server" with the word "remote." While "remote" can simply mean a separate device to one of skill in the art, it may imply physical distance to lay jurors. If that is not Defendants' intention, there is no need for the term "remote." If Defendants intend to imply physical distance, however, there is no basis in ordinary meaning or in the specification to limit "downloading" to devices that are physically distant from one another. The Barron's dictionary definition is clear that the receiving computer can be a "smaller computer <u>or</u> a computer at a remote site;" thus "remote," is not a requirement but merely an option for downloading. *See* Ex. F, at 115.

### G. "Selected Audio Program Segments" / "Collection" ('076, Cl. 1, Ex. A, Ref. No. 2; '178, Cls. 1 & 14, Ex. B, Ref. No. 5)

| Personal Audio's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Selected audio program segments" and "a collection" mean the files are chosen by or for an individual listener or subscriber | No construction is necessary for the phrases "selected audio program segments" or "a collection" |

These related terms have a specific meaning in the claims of these patents by virtue of a specific definition given by the patentee in the file history during prosecution and in the specification. The set of audio program files to be played in a certain order in these claims are not chosen at random. Nor are they compiled intentionally based upon what the general public, or even segments of the general public, may want to hear. Rather, the collection of audio program segments or files are chosen by or for an individual listener or subscriber.

As the patents point out, the problem with broadcast radio is it attempts "to appeal to the same general listening audience, much of the programming is duplicative and special interest programs are broadcast on a limited basis." Col. 1, ll. 27-30.

The specification makes it clear that the sequence file and corresponding collection of program segments are chosen by or for the individual listener in the disclosed embodiments. In a first embodiment "the initial selection and sequence [is] established based on user preference data by the download compilation processing mechanism." Col. 8, ll. 51-53. Thus, a collection of audio programs specific to an individual listener's preference data is selected. In a second embodiment, the individual user or listener makes specific selections. For instance, "the user data 143 further contains additional data describing the preferences, demographic characteristics and program selections unique to each subscriber." Col. 6, ll. 54-56 (emphasis added); *see also* Col. 9, l. 39 – Col. 10, l. 3 ("subscriber is given the opportunity at 217 to select programming which should be included in the next programming download"). Either way the selection is personalized.

Later in the detailed description of the preferred embodiment it explains that "the user's initial selection of a sequence of desired programs" is supplemented, and "if the subscriber provides no selections at all, the host will prepare a Schedule Table 307 containing program segment [sic] selected entirely by the host on the subscriber's behalf." Col. 18, ll. 24-36. There is no disclosure of a "selection" that is not personal to the user or listener. Thus, the selection of audio program segments, or the collection of audio programs to be played, are chosen by or on behalf of an individual user or subscriber.

The file history confirms this understanding of the claimed invention. The inventors described all of the pending claims as follows:

> The downloaded sequencing file thus automates a <u>personalized</u> playback session by reproducing the collection of identified program files in the ordered sequence specified by the sequencing file.

Ex. D, at 15-16 (emphasis added). After making that statement to distinguish all of the pending claims from the prior art, the patentees clearly limited the "collection of identified program files" to a personalized collection. This clear and unambiguous statement in the file history simply precludes any broader meaning for the claims in this regard. *See, e.g., Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). For instance, the claims cannot be interpreted to encompass a generalized collection for a broader audience. The collection must be selected by or on behalf of an individual listener or it cannot be used with a sequencing file to produce a personalized playback session. Personal Audio's construction captures this limitation on the claims, and should be adopted.

## II.    Claim Elements Involving Means-Plus-Function Format

A threshold dispute is whether seven terms in the '178 patent that recite "a processor"— and do not use "means"—are governed by 35 U.S.C. §112(6). A second dispute involves the correct corresponding structure for sixteen claim elements in the '076 patent, which the parties agree are written in means-plus-function format. These sixteen terms are grouped in five categories, as addressed below. If corresponding structure is also required for the "processor" limitations that do not recite "means," those arguments are grouped with the sixteen terms of the '076 patent for economy and convenience. *See* Appendix B.

### A.    Claim Elements for Which Applicability of 35 U.S.C. §112(6) is Disputed.

Seven limitations of the '178 patent recite "a processor for…" or "said processor."[3] The law is clear that a "processor" is structure and not governed by the means-plus-function rules of

---

[3]        Exh. B, Ref. Nos. B6-B12; Appendix C, pp. 12-22.

35 U.S.C. § 112(6).[4] This is a threshold issue that, if the Court agrees with Personal Audio, resolves these terms entirely because no further claim construction is requested if the terms are structural.

1. <u>Claim Elements Without "Means" Are Presumed Not to Be Controlled by 35 U.S.C. §112(6)</u>.

A claim term recites sufficient structure to avoid the application of § 112(6) if the claim term "is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359-60 (Fed. Cir. 2004). "What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'" *Id.* at 1360. Courts "have not required the claim term to denote a specific structure." *Id.* at 1359.

Because the '178 claims do not use the word "means," Defendants have the burden to overcome the presumption that § 112(6) does not apply. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). This presumption is "a strong one that is not readily overcome." *Lighting World*, 382 F.3d at 1358.

2. <u>Claim Elements Including a Processor Are Not in Means-Plus-Function Format</u>.

The specification itself clearly indicates that a "processor" is a definite structure, for example by using the term in series with other definite structures that may be included in the player, and without the word "means." Specifically, the specification enumerates "a processor," a "clock," and a "data storage system consisting of both high speed RAM storage and a persistent

---

[4]     Defendants contend that the "processor" is a means-plus-function limitation to set up an indefiniteness argument that the Court has ordered them to brief in a simultaneous motion for summary judgment.

storage device." Col. 4, ll. 43-48. Like a clock or a data storage system, a "processor" is structure. Defendants themselves use the word as a definite structure in their proposed constructions. For example, in their proposed construction ('076 patent, claim 14d, at Ref. No. A19) in the joint claims construction chart, Defendants recite "an algorithm that could be executed by a 'general purpose processor'. . . ." Defendants here implicitly recognize that a "general purpose processor" is a structure in the more general class of all "processors." Therefore, the intrinsic evidence and admission of the defendants establishes that a "processor" is a structure.

The Federal Circuit has not ruled directly on the term "processor," but has found that all of the following terms, standing alone, denote sufficient structure to avoid the application of § 112(6) where the word "means" is not present: "connector," "manipulator," "control unit," "circuit," and "digital detector."[5] Under this standard, the word "processor" clearly denotes sufficient structure to avoid the imposition of § 112(6) on the disputed claims. "Processor" is no less definite than any of these structures.

Moreover, several district courts have expressly ruled that a "processor" is a structure. In *Aguayo v. Universal Instruments Corp.*, No. H-02-1747, 2003 U.S. Dist. LEXIS 27846, at *35 (S.D. Tex. June 10, 2003), the defendant argued that "information processor" was a means term. The court rejected this argument, finding that:

> The term processor has a well-known meaning to those of skill in the electrical and computer arts. Although the term does not connote a precise physical structure, it does connote sufficient structure to avoid the application of *section 112*, P 6.

---

[5]    *See Lighting World*, 382 F.3d at 1363 ("connector"); *Duratech Indus. Int'l, Inc. v. Bridgeview Mfg., Inc.*, 292 Fed. Appx. 931, 934 (Fed. Cir. 2008) ("manipulator"); *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1372-73 (Fed. Cir. 2006) ("control unit"); *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320-21 (Fed. Cir. 2004) ("circuit"); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704-05 (Fed. Cir. 1998) ("digital detector").

*Id.* at *36. The Southern District of Georgia has similarly rejected an argument that "[the term] 'request processor' does not connote any structure to one of ordinary skill in the art." *See Palmtop Productions, Inc. v. Lo-Q PLC*, 450 F. Supp. 2d 1344, 1368-69 (N.D. Ga. 2006) ("in the computer science field, a 'processor' is the part of a computer that does data processing . . . [t]his connotes some structure"). District courts have also found that the terms "processing unit" and "processor element" denoted sufficient structure to avoid the ambit of § 112(6).[6]

The logic in *Aguayo* and the other cases cited above compels the same result here. "Processor" has a well-understood meaning in the electrical and computer fields. This is not a case of a plaintiff fashioning a "nonce word" to stand in for the phrase "means for." *See Lighting World*, 382 F.3d at 1360. The well-understood meaning for "processor," "coupled with the qualifying language of [the claims]," is recognizable as structure to a person of ordinary skill in the art. *See Linear Tech.*, 379 F.3d at 1320. Defendants therefore cannot meet their burden to rebut the presumption that § 112(6) does not apply to the disputed "processor" claims.

3.     <u>To the Extent Claim Elements Including a Processor Are Determined to Be Means-Plus-Function Format, Personal Audio Proposed the Correct Corresponding Structure</u>.

If the Court were to determine that the processor claims are controlled by 35 U.S.C. §112(6), Personal Audio has identified the correct and necessary corresponding structure. The structure for five of the terms is similar to the corresponding structure of the "processing means" limitations of the '076 patent and is presented together with them in the following section of this brief for economy. The exact grouping of the processor claims with the '076 patent's means-

---

[6]     *See Network Appliance, Inc. v. Bluearc Corp.*, No. C 03-5665 MHP, 2004 U.S. Dist. LEXIS 28344, at *46-48 (N.D. Cal. Nov. 30, 2004) ("'processing unit' recites sufficiently definite structure to avoid construction as a means-plus-function claim element"); *Motorola, Inc. v. VTech Commc'ns, Inc.*, No. 5:07-CV-171, 2009 U.S. Dist. LEXIS 59226, at *41-43 (E.D. Tex. July 6, 2009) ("The term in question recites a 'processor element' which in light of the governing presumption the Court finds sufficiently definite such that *§ 112*, P6 does not apply").

plus-function elements can be found in Appendix B, and the constructions are found in Exhibit B, Ref. No. 6-12. For the two remaining "processor for" terms, if the Court determines §112(6) applies, Personal Audio's proposed corresponding structure is provided in Exhibit B, Ref. No. 11-12.

### B.    Claim Elements Governed by 35 U.S.C. §112(6).

The '076 patent contains sixteen claim elements that the parties have agreed are written in means-plus-function format. As Personal Audio has previously suggested, these sixteen claim elements can be organized into distinct groups for purposes of construction. The five groups of means-plus-function terms to be construed are set out in Appendix B, and comprise: (1) accepting/inputting and outputting means, (2) means for continuously reproducing, (3) means for detecting a control command, (4) means for responding to a control command, and (5) means for receiving and storing.

This Court has clearly laid out the correct procedure for construing a means-plus-function claim in compliance with Federal Circuit law. First, when identifying the function, a court may not improperly narrow or limit the function beyond the scope of the claim language. *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Second, structure disclosed in the specification is "corresponding structure" if "the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). Corresponding structure is limited to necessary "structure that actually performs the recited function." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). "Structural features that do not actually perform the recited function do not

constitute corresponding structure and thus do not serve as claim limitations." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001).

Personal Audio has followed this Court's guidance in identifying functions and corresponding structures for the means-plus-function claims at issue in this case as set forth in Personal Audio's column of the Joint Claims Construction Statement. The functions proposed by Personal Audio are simply the unambiguous functions recited in the claims themselves. The corresponding structure proposed by Personal Audio is directly linked to the claimed function, and includes only those structural elements necessary to perform the stated function.

As set forth below in more detail, Defendants' proposed constructions suffer from two fundamental flaws. First, Defendants repeatedly propose painstakingly detailed embodiments— such as specific models of commercial sound cards and integrated chips—as corresponding structure. This is done for the apparent purpose of manufacturing non-infringement positions. Second, Defendants' excessively detailed and long constructions will do little to assist any jury in this case, further frustrating a purpose of claims construction.

### 1. Accepting/Inputting and Outputting Means

The first group of means-plus-function claim elements to be construed are those relating to means for <u>accepting</u> or <u>inputting</u> control commands (as opposed to the separate element of <u>detecting</u> a command and <u>responding</u> to a command), or to outputting audible sound.[7] Personal Audio has set forth verbatim from the specification the multiple alternative structures the inventors described to accomplish accepting or inputting commands, such as a small number of buttons (Col. 14, l. 32; Col. 36, ll. 29-30), keyboard (Col. 5, l. 37), mouse (Col. 5, l. 38), trackball (*Id.*), touchpad (*Id.*), or microphone (Col. 13, l. 56). Defendants ignore a number of

---

[7]      Ex. A, Ref. Nos.: A6, A17, and A18. *See* Appendix B. "Accepting" is found in claim 1 of the '076 patent whereas claim 14 uses "inputting." The parties agree these words do not change the function, and each party proposes the same corresponding structure for both claim elements.

these embodiments, and instead propose a construction that just includes a keyboard and microphone. This approach conflicts with the Federal Circuit's directive that a means-plus-function element encompasses <u>each structure in the specification</u> that performs the recited function. *See Micro Chem.*, 194 F.3d at 1258.

At the same time, however, Defendants want to add detail far beyond that which is necessary to accept or input a command. By way of example, Defendants' construction requires very specific hardware and software, such as "an Intel 486 DX2-66 CPU running Windows 95, a Windows 95 keyboard driver . . . and sound card compliant with the recommendations detailed in Hardware Design Guide for Microsoft Windows 95, by Doug Klopfenstein, Microsoft Press (1994), ISBN 1-55615-642-1." This approach is wrong as a matter of law. As this Court explained in *Trinity Industries, Inc.. v. Road Systems, Inc.*:

> If a structure in the embodiment is defined or elaborated in ways unrelated to the recited function, those additional details should not be read as limiting the scope of the means clause. Such additional structural aspects are not what the statute contemplates as structure <u>corresponding</u> to the recited function and should not be construed as corresponding structure.

121 F. Supp. 2d 1028, 1036 (E.D. Tex. 2000) (citing *Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308-09 (Fed. Cir. 1998)); *see also Polycom, Inc. v. Codian Ltd*, No. 2:05-CV-520-DF, 2007 U.S. Dist. LEXIS 97892, at *138-39 (E.D. Tex. Oct. 19, 2007) (rejecting defendant's proposed corresponding structure where it included "the specific brand of DSP and the bus"). Because the details added the corresponding structure by Defendants are similarly irrelevant, they should be rejected.

Defendants' proposal for outputting means also includes unnecessary structure and surplusage including a sound card. The parties largely agree that the structure may be a speaker or headphones. Personal Audio disputes Defendants' attempt to unnecessarily read in a sound

card to this structure. The claim recites that "output means" is "in response to <u>analog</u> audio signals." '076 patent, claim 14 (emphasis added). Analog signals are the same signals that a stereo produces without use of a computer at all. A sound card does not "respond" to analog signals and certainly is not necessary once an analog signal already exists, and should not be included. *See* Almeroth Decl, at ¶ 8.

2. <u>The Specification Discloses Algorithms and Corresponding Text<br>that Constitute Sufficient Structure for the Continuously<br>Reproducing Means, Detecting Means, and Means for Responding</u>.

a. <u>The law allows algorithms in flowcharts to constitute<br>corresponding structure for software functions</u>.

For means-plus-function claims involving software, the Federal Circuit has stated that the corresponding structure cannot be framed as simply "a processor," or "a computer," but is rather "the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). An algorithm is commonly defined as "a process, or set of rules." *See Mettler-Toledo, Inc. v. Fairbanks Scales Inc.*, 551 F. Supp. 2d 576, 589 (E.D. Tex. 2008). To satisfy the definiteness requirement of § 112, "algorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." *See AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007).

For the limitations that include a processor and an algorithm, the Court can see, for the most part, the steps of the relevant algorithm laid out in Figure 3 of the patent, which names the function generally ("start playback at menu" at 233, "skip" at 275, "back" at 278, "continue playback" at 235, "command?" at 261, etc.), and then lays out the relevant steps in the algorithm that corresponds to the function. The specification includes clear language that briefly explains the steps of the algorithm in narrative form. Personal Audio has proposed for its construction of

corresponding structure those steps that perform the function, and the narrative that explains the steps.

Importantly, the algorithm requirement does not require a patentee to disclose specific source code or mathematical signals. The Federal Circuit "permits a patentee to express [an] algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citations omitted). This Court has consistently held that when a flow chart or textual description in the specification provide a meaningful limitation on claim scope, they constitute sufficient corresponding structure within the meaning of *WMS Gaming*. For example, in *Better Education, Inc. v. Einstruction Corp.*, No. 2:08-CV-446-CE, 2010 U.S. Dist. LEXIS 40972, at *14-15 (E.D. Tex. Apr. 27, 2010), this Court found that "flowcharts that correspond to the claimed functions" containing simple descriptive steps[8] were sufficient corresponding structure for a software term under § 112(6). *See also Mettler-Toledo*, 551 F. Supp. 2d at 589 (approving sufficient disclosure where flow chart and text described the algorithm). In other cases, a mere textual description of the algorithm has been found sufficient. *See, e.g., Arbitron, Inc. v. Int'l Demographics Inc.*, No. 2:06-V-434, 2009 U.S. Dist. LEXIS 1382, at *50 (E.D. Tex. Jan. 8, 2009) ("The Court believes that the textual description provided in the specification of the '276 patent is sufficient to render the bounds of the claim understandable to one of ordinary skill in the art"); *Ariba, Inc. v. Emptoris, Inc.*, No. 9:07-CV-90, 2008 U.S. Dist. LEXIS 59862, at *34 (E.D. Tex. Aug. 7, 2008).

Personal Audio has for each function identified the two or three steps in the flowchart in Figure 3 that are identified with the function in the specification, and has quoted verbatim the

---

[8]    For example, the two steps of "Ask a Question?" and "Give a Quiz?" were held to constitute a sufficient algorithm for the function of "allowing the teacher to initiate . . . student tasks on said interactive electronic classroom system." *See id.*

portion of the specification that explains the steps. These steps provide a meaningful limitation on the boundaries of the claims and would enable a person of ordinary skill in the art to understand those boundaries. *See* Almeroth Decl., at ¶ 7. Section 112 requires no more than that.

        b.    <u>Means for Continuously Reproducing Said Program Segments . . .</u>

This function essentially calls for playing audio programs in the order specified by the sequence.[9] Personal Audio's construction provides the basic necessary hardware components (processor, sound card, speaker or headphones) and portions of processing logic shown in Figure 3 and described in the patent for playing audio programs in order. Defendants' proposal includes the same structure, including the same identified portions of Figure 3 (items 233, 235, 237, 239, 261 and arrows in between). The player continues playback at 235, identifies a new program segment at 237, handles the new segment at 239, and if no command occurs at 261, the arrow loops back to continue playback at 235 again, as called for by the function. Thus, at least the structure proposed by Personal Audio is undisputed. However, Defendants go much further, identifying incorrect structure, and structure at a level of detail that is unnecessary to perform the claimed function.

Defendants' proposal is wrong for several reasons. First, they contend the structure includes "a laptop or desktop personal computer." Of course, they have already said, incorrectly, that a "player" can only be a laptop or desktop computer, and the claim says the player "comprises" several elements including this one. Thus, this element of a player cannot also be a laptop or desktop.

---

[9]      In full, the claim recites "means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command." '076 patent, claim 1. The parties have each made the same proposal for "means for continuously reproducing" in claim 1 as "for means for translating" in claim 14 so they are treated together. *See* Ex. A, Ref. Nos. A7 and A15; Appendix B.

Second, for hardware components, Defendants have attempted to incorrectly import unnecessary details from a specific embodiment in the specification, rather than using the clearly described general structure. *See* Almeroth Decl., at ¶ 9. For example, the patents call for a processor (col. 4, l. 45), but Defendants insist on a 486-DX2-66 processor. The patents call for a sound card (col. 4, l. 53), but Defendants insist on a sound card as detailed in "Hardware Design Guide for Microsoft Windows 95, by Doug Klopfenstein, Microsoft Press, ISBN 1-55615-642-1," and software for decoding a program segment "into 16-bit audio data at 8, 11, 22 or 44KHz and providing the decoded data to the soundcard at an corresponding appropriate rate." This approach is clearly incorrect. *See, e.g.*, *Polycom*, 2007 U.S. Dist. LEXIS 97892, at *138 (rejecting defendant's proposed corresponding structure where it included "the specific brand of DSP and the bus"); *Digital Tech. Licensing, LLC v. Cingular Wireless, LLC*, No. 2:06-CV-156, 2007 U.S. Dist. LEXIS 57492, at *28-29 (E.D. Tex. Aug. 7, 2007) (rejecting defendant's attempt to limit structure to a preferred embodiment using a 24-bit processor when a 16 bit processor could perform the recited function).

Third, the relevant steps of Figure 3 provide an algorithm that can be implemented in software for continuously reproducing program segments in order. Nevertheless, for each step Defendants contend there must be yet another "algorithm" for performing that step. This approach leads Defendants to propose roughly nine algorithms within the algorithm. For example, where Figure 3 provides step 239 "Handle New Segment," further described at Col. 13, ll. 6-8, Defendants propose:

> the new segment handling software/algorithm 239 further comprises software for reading and interpreting the pascal records defined at '178 patent, col. 33, l. 51-col. 34, l. 12 and performing as algorithm for determining a location in the mass storage device where a program segment can be found from the Location integer specified in at [sic] '178 patent col. 31, l. 65, and software for

performing algorithms for retrieving the segment from mass storage and determining how to decode the segment.

That is not what is disclosed in the patent as necessary to perform the "continuously reproducing" function, as further evidenced by the fact that Defendants have authored much of their own language and only cited, inaptly, to the patent for support.

Fourth, Defendants incorporate a number of very specific details of the preferred sequencing file shown in Figure 5, including, for instance, "the number of the particular Selection Record in the selections file" and "an 'R' record, which includes the Location value 1." The claimed function requires no such detail.

Personal Audio's structure is exactly what the specification provides, at an appropriate level of detail for use by the Court and the jury in this case.

c.      Means for Detecting a Control Command Indicative of a Request to Skip Forward or Backward.

A second group of means-plus-function terms centers around the various "means for detecting . . . command(s)."[10] A person of ordinary skill in the art knows how to, colloquially speaking, figure out which button was pressed, and to what command it corresponds. That is a basic function of any computerized device. Nevertheless, the inventors covered this step as well. With reference to Figure 3, the specification provides, "as indicated at 261, the receipt of a command . . . and the character of the command is evaluated at 262." (Col. 13, ll. 58-61). This description is sufficient to inform a person of ordinary skill in the art to implement the claimed function, and provides a meaningful limitation on the claim.

---

[10]      This group involves the means for detecting a control command. Depending on the claim element, the detection can be for a control command to skip forward to the next program segment or to skip backward to the beginning of the program segment currently playing or the program segment before the currently playing program segment. *See* Ex. A, Ref. Nos.: A8 and A10; Appendix B.

Defendants seek to limit the claims far beyond simply detecting a skip function. According to Defendants, there must be a highly detailed algorithm for distinguishing the claimed command from every other command disclosed in the patent including "GO, RETURN, SKIP, BACK, MARK MENU and an arbitrary number of integers (such as "FIVE") and an arbitrary number of categories (such as "NEWS") and compound commands (such as "SKIP TOPIC," SKIP SUBJECT, "BACK SUBJECT," AND "BACK SEGMENT")." It is not necessary for this algorithm to differentiate between dozens of other commands, most of which are not found anywhere in the asserted claims. The function is simply detecting the claimed command, and the inventors disclosed all a person of skill in the art needs to know to understand the scope of the claims. Personal Audio's construction for the "means for detecting" terms should be adopted.

        d.      <u>Means Responsive to a Control Command . . .</u>

Also at issue are a series of means-plus-function elements that call for the player to respond to various control commands—something that happens after detecting them—by navigating forward and backward through program segments in a sequence. This general function is found in six claim elements.[11] More specifically, the function of responding to one or more control commands allows a user to skip forward to the next program segment in the sequence (ref. nos.: A9, A20), skip backward to the beginning of the currently playing program segment (ref. nos.: A11, A21), or skip backward to the beginning of the program segment before the currently playing segment (ref. nos.: A12, A22). While Defendants and Personal Audio generally agree on the functions associated with these terms, there are significant differences in the proposed corresponding structure.

---

[11]       Ex. A, Ref. Nos.: A9, A11, A12, A20, A21, and A22.; Appendix B.

Personal Audio has identified the correct corresponding structure for responding to each control command. The Court can follow the algorithm for these functions by tracing the steps that occur after the function appears in Figure 3 of the specification. For example, for responding to a skip forward command, Personal Audio has proposed the relevant portions of processing logic that follow "skip" at item 275 shown in Figure 3, which are items 269 ("Reset to Next Program Start") and 235 ("Continue Playback") and the connecting arrows.[12] As the language of the specification makes clear, "the SKIP command indicated at 275 in FIGURE 3 causes the player to advance to the beginning of the next program segment in the program sequence . . . resetting the playback position at 269." Col. 15, ll. 25-29. After this, "playback operation itself continues from the designated playback point in the selections file." Col. 12, ll. 27-29. This series of steps identified in Figure 3 and explained in the text of the specification clearly inform one of ordinary skill in the art in how to perform the recited function. The other "means responsive" terms in the '076 patent should each be construed in the same straight-forward fashion, as provided in Appendix B.

Defendants have once again proposed structure that is not necessary to implement the function of responding to control commands. Using skip forward as an example again, it is not necessary to include an algorithm "for reading and interpreting the pascal records" or for "determining how to decode the segment." The proposed limitations of an Intel 486 DX2-66 CPU, or a *Klopfenstein*-compliant sound card are similarly superfluous. Defendants' proposed constructions are also far too long and complex to realistically aid a jury in interpreting the limitations of the claims at issue. For example, in *Ariba*, this Court found that a "proposed construction containing ninety-four words would do little to assist any jury, as those without

---

[12]     The "Record Segment End . . . " step 267 is an optional logging step that is not necessary to the function of skipping. Col. 14, l. 35.

advanced degrees would be hard-pressed to decipher such a lengthy paragraph." 2008 U.S. Dist. LEXIS 59862, at *37. In comparison, Apple's proposed corresponding structure for "means responsive to said first command for discontinuing the reproduction . . . " in claim 1 of the '076 patent is more than three times that length, and calls for no fewer than <u>nine separate "algorithms"</u> that Defendants contend are necessary to perform <u>a single function related to skipping between audio program segments</u>. Defendants' proposed corresponding structures simply would not help a jury understand the boundaries of the claimed invention.

e. <u>Means for Storing and Receiving …</u>

The "means for storing and receiving" the sequencing file and program segments in claim 1 of the '076 patent parallels the same structural limitation in claim 14. Personal Audio's proposal is premised on the consistent use of language across claims. Claim 14 recites "a mass storage device for storing a plurality of digitally recorded audio program segments . . . and further receiving storing a file of data establishing a sequence." Thus, the structure for storing program segments, and for receiving and storing a file of data is the same—a mass storage device. Claim 1 recites "means for receiving and storing a file of data establishing a sequence." Clearly, the "mass storage device is the identified and sufficient structure to "receive and store" the file of data. Personal Audio's proposal is premised on the consistent use of language across claims. *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[W]hen different claims of a patent use the same language, we give that language the same effect in each claim.").

Defendants again seek to import a plethora of specific and unnecessary structure including, *inter alia*, various data communications means, software for transferring data, and a magnetic disk or optical disk cartridge configured with a Windows 95 file system. Here, not only

29

does the reasoning set forth above apply, but this Court's construction of "means for receiving and storing" in *Finisar v. DirecTV Group, Inc.*, 416 F. Supp. 2d 512 (E.D. Tex. 2006), is also instructive. In *Finisar*, the Court properly recognized that the <u>means in which information is transferred</u> from a host computer to a separate device that receives and stores information is not necessary structure. *Id.* at 520-21. Instead, the necessary structure was the structure which actually performed the receiving and storing function. *Id.* at 521. In that case, it was a variety of different storage mechanisms disclosed in the specification.[13] *Id.* Here, the structure is just a persistent mass storage device.

## <u>CONCLUSION</u>

For the foregoing reasons, Personal Audio respectfully requests that the Court adopt its proposed constructions for the disputed terms and phrases of the '076 and '178 patents.

---

[13]     "Hence, this term will be defined as follow: 'means for receiving and storing video program materials' can be: '1. A ring buffer with or without additional random access memory; 2. Fast disk storage device; 3. Conventional VHS video recorder; 4. Random access memory and/or disk; 5. Digital tape recorder.'" *Id.*. Of course, this Court did not identify any specific brand or model of VHS recorder or other mechanism, as Defendants have repeatedly pressed in their constructions in this case.

Dated: June 30, 2010

Respectively submitted,

By:____/s/ Cyrus A. Morton_____
**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
Ronald J. Schutz   (MN Bar No. 130849)
(Eastern District of Texas Member) (Lead Counsel)
Jake M. Holdreith  (MN Bar No. 211011)
(Eastern District of Texas Member)
Cyrus A. Morton (MN Bar No. 287325)
(Eastern District of Texas Member)
Patrick M. Arenz  (MN Bar No. 0386537)
(Eastern District of Texas Member)
Daniel R. Burgess (MN Bar No. 0389976)
(Eastern District of Texas Member)
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
Telephone: (612) 349-8500
Facsimile:  (612) 339-4181
E-mail:   RJSchutz@rkmc.com
          JMHoldreith@rkmc.com
          CAMorton@rkmc.com
          PMArenz@rkmc.com
          DRBurgess@rkmc.com

**GERMER GERTZ, L.L.P.**
Lawrence Louis Germer   (TX Bar # 07824000)
Charles W. Goehringer, Jr. (TX Bar # 00793817)
550 Fannin, Suite 400
P.O. Box 4915
Beaumont, Texas 77701
Telephone: (409) 654-6700
Telecopier: (409) 835-2115
E-Mail:   llgermer@germer.com
          cwgoehringer@germer.com
**Attorneys for Plaintiff Personal Audio, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2010, I caused a true and correct copy of this document (Personal Audio, LLC's Opening Claim Construction Brief) to be served on all counsel of record via Electronic Case Filing (ECF) pursuant to Local Rule CV-5(a).


Date:   June 30, 2010                      /s/ Cyrus A. Morton
                                           Cyrus A. Morton