# Exhibit A

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF TEXAS
 3                     LUFKIN DIVISION
 4   ----------------------------------------------------
 5   Personal Audio, LLC,
 6                  Plaintiff,
 7      vs.                          Case 9:09-cv-00111-RC
 8   Apple Inc., Sirius XM Radio, Inc.,
 9   Coby Electronics, Corp.,
10   Archos, Inc.,
11                  Defendants.
12   ----------------------------------------------------
13
14
15              VIDEOTAPED DEPOSITION OF
16                  DR. KEVIN ALMEROTH
17
18                 Taken July 28, 2010
19                Commencing at 8:53 a.m.
20
21
22
23
24
25        REPORTED BY:  SHEILA D. FORD
```

Page 5

```
 1                     P R O C E E D I N G S
 2                  VIDEOGRAPHER:  We are on the record.
 3      Here begins tape No. 1 in the deposition of
 4      Dr. Kevin Almeroth in the matter of Personal Audio
 5      versus Apple Inc., et al.  Today's date is July 28,
 6      2010.  The time is 8:53 a.m.  The video operator is
 7      Kyle Peterson representing U.S. Legal Support.
 8      Would counsel please identify themselves and state
 9      whom they represent.
10                  MR. MORTON:  This is Cyrus Morton of
11      Robins, Kaplan, Miller & Ciresi on behalf of
12      Personal Audio.
13                  MR. STEPHENS:  Garland Stephens of
14      Fish & Richardson, LLC, representing Apple Inc.
15                  VIDEOGRAPHER:  The court reporter
16      today is Sheila Ford of Paradigm Reporting &
17      Captioning.  Would the reporter please swear in the
18      witness.
19                  DR. KEVIN ALMEROTH,
20      duly sworn, was examined and testified as follows:
21                        EXAMINATION
22      BY MR. STEPHENS:
23         Q.   Good morning, Dr. Almeroth.
24         A.   Good morning.
25         Q.   Thanks for coming today.  Recently you
```

Page 56

1  conventional PC with a sound card and speakers so
2  that it could actually reproduce audio, the only
3  other thing you would need is software to perform
4  the steps of Figure 3, right?
5              MR. MORTON: Objection. Form.
6     A.   As long as that software did all of the
7  things that were required by the claims, then that
8  software, plus the PC and the hardware, should be
9  sufficient.
10 BY MR. STEPHENS:
11    Q.   Okay.  And there's nothing about those
12 things that are required by the claims that would
13 require any additional hardware as long as you had
14 the right software, right?
15             MR. MORTON: Objection. Form.
16    A.   Well, assuming you had the right
17 hardware --
18 BY MR. STEPHENS:
19    Q.   I want to be clear.  The right hardware
20 we're talking about is a conventional laptop or
21 desktop PC with a sound card and a speaker.
22    A.   Right.  So assuming that you did have all
23 of the right hardware and that you did have all of
24 the right software by following the instructions
25 here, that could perform the steps of Claim 1.

Page 69

1    that's described elsewhere in the patent.
2         Q.   But I'm focusing on the magnetic disk
3    memory.
4         A.   Okay.  I just want to make that clear.
5         Q.   Understand.  Conventional laptop or desktop
6    PCs came with magnetic disk memory in 1996 when you
7    went to a store and bought one typically, right?
8         A.   Generally, yes.
9         Q.   Okay.  And what kind of capacity did a
10   conventional laptop or desktop PC have in 1996?
11        A.   It ranged over a fairly wide range.
12        Q.   And what's that range?
13        A.   Roughly speaking, it was generally on the
14   order of megabytes.  On the low end it would be hard
15   to say with any specificity, but tens of megabytes
16   on the low end.  Generally the upper end might be at
17   hundreds of megabytes.
18        Q.   Okay.  And is that appropriate for storing
19   a plurality of songs?
20        A.   Yes.
21        Q.   And a person of ordinary skill in the art
22   would have understood that in 1996?
23        A.   Yes.
24        Q.   Now, one of the things that -- bear with me
25   one second here.

Page 92

1	MR. MORTON: Objection. Form.
2	A.  I still don't understand the question.  Are
3	you asking about 261 and how you determine that a
4	command has been received?
5	BY MR. STEPHENS:
6	Q.  I'm asking where in Figure 3 is the receipt
7	of a command evaluated.
8	MR. MORTON: Objection. Form.
9	A.  I don't understand the question.  I don't
10	understand whether you're talking about whether a
11	command has been received or you're talking about
12	evaluating the command.
13	BY MR. STEPHENS:
14	Q.  Okay.  What do you understand the patent to
15	be referring to when it says:  "As indicated at 261,
16	the receipt of a command, which may interrupt the
17	playback of the current selection, and the character
18	of the command is evaluated"?  I'm asking
19	specifically about the words in that sentence, the
20	receipt of the command is evaluated, what do you
21	understand those to mean?
22	MR. MORTON: Objection. Form.
23	A.  I think a person of ordinary skill in the
24	art, as well as myself, would understand that to
25	mean whether or not a properly formatted command had

1    been received.  If in implementing the invention
2    that requires a check of whether or not the command
3    is valid up until that part, box 261 may not know
4    what the possible set of commands are.  You may just
5    need to evaluate whether or not, you know, it's
6    received correctly, whether or not there is actually
7    a command that's been issued.  That would happen at
8    box 261.  And then that could be implemented by any
9    of a variety of ways as I think a person of ordinary
10   skill in the art would understand.
11        Q.   Okay.  Now, I'd like to go back to the
12   joint -- I'm sorry, we should take a break to change
13   the tape.
14             VIDEOGRAPHER:  We are going off the
15   record.  The time now is 10:54 a.m.
16             (Recess taken.)
17             VIDEOGRAPHER:  We are back on the
18   record.  This marks the beginning of tape No. 2 in
19   the deposition of Dr. Kevin Almeroth.  The time now
20   is 11 a.m.
21   BY MR. STEPHENS:
22        Q.   Dr. Almeroth, going back to Almeroth
23   Exhibit 3, which is the Joint Proposed Claim
24   Constructions, Exhibit A for the '076 patent, I'd
25   like to look back at the means for accepting again,

Page 148

```
 1    I've said that, you know, evaluating the character
 2    of the command, the third command, skip command,
 3    that those things identified here, provide
 4    additional detail beyond what's described as the
 5    function.
 6                   (Almeroth Exhibit 5 marked.)
 7    BY MR. STEPHENS:
 8        Q.   I'm handing you what's been marked as
 9    Exhibit 5.  Can you tell me what that is?
10                MR. MORTON:  This is the part of the
11    deposition that we've talked about.  I'm not going
12    to let you ask him about his reexamination
13    declaration.  So as I indicated in my e-mail
14    yesterday, we're going to -- we're about at our half
15    day, anyway.
16                MR. STEPHENS:  Let's ask how many
17    minutes we have on the record.
18                VIDEOGRAPHER:  19 left.
19                MR. STEPHENS:  Okay.  So you're
20    basically saying I can't ask him a single question
21    about this declaration; right, otherwise you're
22    going to terminate the deposition?
23                MR. MORTON:  That's right, as I
24    indicated in my e-mail to you yesterday.
25                MR. STEPHENS:  Okay.  Yeah, I mean,
```

1  it's clear we didn't reach agreement.  My position
2  is I'm entitled to ask him whatever I want in this
3  deposition and your position is that you can exclude
4  clearly relevant testimony by just saying I can't
5  ask questions.
6              So with that on the record we'll put
7  this to one side.  I do want to ask one other
8  question on the record, though.  Well, let me ask it
9  differently.
10 BY MR. STEPHENS:
11     Q.   Dr. Almeroth, are you available for a
12 deposition next week?  Do you have time in your
13 schedule to accommodate it?
14     A.   I would have to look at my schedule to
15 see --
16     Q.   Okay.
17     A.   -- whether or not I had a block of enough
18 time.
19     Q.   Does anything come to mind that would
20 interfere with it?
21     A.   I do have a number of scheduled meetings --
22     Q.   Okay.
23     A.   -- that may or may not be moveable.  I
24 would have to check just to make a determination.
25     Q.   Well, if we do it in Santa Barbara or

Page 165

```
 1                REPORTER'S CERTIFICATE
 2    STATE OF MINNESOTA )
                         ) ss.
 3    COUNTY OF HENNEPIN )
 4
           I hereby certify that I reported the deposition of
 5    DR. KEVIN ALMEROTH, on the 28th day of July, 2010, in
      Minneapolis, Minnesota, and that the witness was by me
 6    first duly sworn to tell the whole truth;
 7         That the testimony was transcribed by me and is a
      true record of the testimony of the witness;
 8
           That the cost of the original has been charged to
 9    the party who noticed the deposition, and that all
      parties who ordered copies have been charged at the
10    same rate for such copies;
11         That I am not a relative or employee or attorney or
      counsel of any of the parties, or a relative or
12    employee of such attorney or counsel;
13         That I am not financially interested in the action
      and have no contract with the parties, attorneys, or
14    persons with an interest in the action that affects or
      has a substantial tendency to affect my impartiality;
15
           That the right to read and sign the deposition by
16    the witness was not waived.
17         WITNESS MY HAND AND SEAL THIS 29th day of July,
      2010.
18
19
20    _____
      Sheila D. Ford
21    Notary Public, Hennepin County, Minnesota
      My commission expires January 31, 2010
22
23
24
25
```