1

```
 1              UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF TEXAS
 2                    LUFKIN DIVISION

 3   PERSONAL AUDIO, LLC          |  DOCKET 9:09CV111
                                  |
 4                                |  AUGUST 31, 2010
     VS.                          |
 5                                |  10:04 A.M.
                                  |
 6   APPLE, INC., ET AL           |  BEAUMONT, TEXAS

 7   ----------------------------------------------------

 8          VOLUME 1 OF 1, PAGES 1 THROUGH 150

 9    REPORTER'S TRANSCRIPT OF CLAIM CONSTRUCTION HEARING

10          BEFORE THE HONORABLE RON CLARK
               UNITED STATES DISTRICT JUDGE
11
     ----------------------------------------------------
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:    JACOB M. HOLDREITH
                           CYRUS A. MORTON
15                         PATRICK M. ARENZ
                           ROBINS, KAPLAN, MILLER & CIRESI
16                         800 LASALLE AVENUE
                           SUITE 2800
17                         MINNEAPOLIS, MINNESOTA  55402

18                         LAWRENCE LOUIS GERMER
                           CHARLES W. GOEHRINGER, JR.
19                         GERMER GERTZ
                           550 FANNIN
20                         SUITE 400
                           BEAUMONT, TEXAS  77701
21
                           JIM LOGAN
22                              (CLIENT REPRESENTATIVE)

23                         DR. KEVIN ALMEROTH
                                (TECHNICAL ADVISOR)
24

25
```



1  FOR THE DEFENDANT APPLE, INC.:
                         GARLAND T. STEPHENS
2                        BENJAMIN C. ELACQUA
                         WASIF H. QURESHI
3                        FISH & RICHARDSON
                         1221 MCKINNEY
4                        28TH FLOOR
                         HOUSTON, TEXAS  77010
5
                         JAYNA WHITT
6                             (CLIENT REPRESENTATIVE)

7                        DR. STEVE WICKER
                              (TECHNICAL ADVISOR)
8

9

10
   COURT REPORTER:       CHRISTINA L. BICKHAM, CRR, RMR
11                       FEDERAL OFFICIAL REPORTER
                         300 WILLOW, SUITE 221
12                       BEAUMONT, TEXAS  77701

13

14
      PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
15   TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

16

17

18

19

20

21

22

23

24

25

3

1                              INDEX

2

3                                              PAGE

4    "person of ordinary skill in the art"       6

5    "player" and "audio program player"        14

6    "audio playback unit"                      31

7    "programmed digital computer"              33

8    "file of data establishing a sequence"     36

9    "sequencing file"                          36

10   "playback session sequencing file"         36

11   "receiving"                                40

12   "data communications link"                 97

13   "downloading...from one or more server     97
     computers"

14
     "selected audio program segments"         116

15
     "a collection"                            116

16
     "means for storing a plurality of program 126
17   segments, each of said program segments
     having a beginning and an end"

18
     "output means for proceeding audible sounds 139
19   in response to analog audio signals"

20

21

22

23

24

25

4

# INDEX OF EXHIBITS

| | PAGE |
|---|---|
| Court's Exhibit 1 | 6 |
| Court's Exhibit 1 | 6 |
| Court's Exhibit 1 | 13 |
| Court's Exhibit 2 | 27 |
| Court's Exhibit 4 | 34 |
| Court's Exhibit 5 | 43 |
| 5A | 50 |
| 5 | 50 |
| 5A | 51 |
| 5A | 53 |
| Court's Exhibit 6 | 76 |
| Court's Exhibit 7 | 77 |
| Court's Exhibit 6A | 78 |
| Court's Exhibit 6A | 88 |
| 7A | 91 |
| Court's Exhibit Number 10 | 119 |
| Court's Exhibit 10 | 125 |
| Court's Exhibit 11 | 136 |

1              (REPORTER'S NOTES 8-31-2010\PA V APPLE

2    MARKMAN, 10:04 A.M., TUESDAY, 08/31/2010, BEAUMONT,

3    TEXAS, HON. RON CLARK PRESIDING)

4              (OPEN COURT, ALL PARTIES PRESENT)

5              THE COURT:  All right.  I call *Personal Audio*

6    *versus Apple*, Number 9:09cv111.  Who is here for Personal

7    Audio?

8              MR. HOLDREITH:  Your Honor, Jake Holdreith

9    from Robins Kaplan.  With me is my colleague, Cy Morton,

10   who will also be addressing the court today if the court

11   has questions about some of the terms.  Also at counsel

12   table is our colleague, Patrick Arenz; and Larry Germer

13   and Charlie Goehringer are here with us as well.

14             THE COURT:  Good morning.

15             All right.  And for Apple --

16             Well, wait a minute.  You also have some of

17   your experts here?

18             MR. HOLDREITH:  Yes, sir.  Dr. Kevin Almeroth

19   is in the gallery here and also our client, Mr. Jim

20   Logan, who is one of the inventors named on the patent.

21             THE COURT:  Okay.  And who do we have here for

22   appeal?

23             MR. STEPHENS:  Your Honor, Garland Stephens of

24   Fish & Richardson representing Apple.  With me today is

25   my colleague, Ben Elacqua; our parallel, Khoa Nguyen; our

6

1  technical expert, Dr. Steven Wicker.  From the client we

2  have Jayna Whitt, who is in-house counsel for Apple, and

3  Katie Prescott, also in-house counsel for Apple.  A law

4  student is with us today, Claire Devine --

5                  THE COURT:  Welcome.

6                  MR. STEPHENS:  -- and my colleague, Wasif

7  Qureshi.

8                  MR. QURESHI:  Good morning, your Honor.

9                  THE COURT:  All right.  Very good.

10                 Why don't we go ahead and start with the

11 "person of ordinary skill in the art"?  There seems to be

12 some agreement on the definition.

13                 So, Ms. Mullendore, let's go ahead and put

14 that up; and we'll label this as Court's Exhibit 1.

15                 And just for the record, from time to time,

16 I'm going to have proposed definitions and other items

17 which I'll label or designate as court's exhibits; and

18 they'll be part of the record to make it easier for one

19 reading the transcript to follow.

20                 But this, I think, is basically the proposal

21 of Personal Audio that Apple agreed to with some caveats.

22 Let me first -- there shouldn't be any objection to it.

23 But any objection to this definition of "one of ordinary

24 skill in the art" as shown on Court's Exhibit 1 from

25 Personal Audio?

7

1        MR. HOLDREITH:  No, your Honor.  You're right.

2  We have no objection.

3        THE COURT:  Okay.  In Federal court, you will

4  want to stand.

5        MR. HOLDREITH:  Yes, sir.

6        THE COURT:  Okay.  Let me ask Apple.  You had

7  a couple of things that you called "caveats."

8        Let's put the first one up on the screen if we

9  could.

10        And your first caveat -- and this would be at

11  Document 175 -- was that (reading) Apple denies that such

12  a person would have the expertise to design and develop

13  audio compression algorithms or speech recognition

14  algorithms that would be required to build the preferred

15  embodiment if it were to be adapted to play music other

16  than player piano-type music using the musical instrument

17  digital interface described in the patent.

18        Well, counsel, let me ask first:  Are you

19  saying that audio compression such as MP3 files weren't

20  known back in 1996?

21        MR. STEPHENS:  Your Honor, that is almost

22  correct.  So, MP3 was brand-new in 1996.  It was

23  developed by a research institute in Germany called the

24  "Fraunhofer Institute."  It was not widely deployed at

25  the time.

1      THE COURT:  But it was a known technology.

2      MR. STEPHENS:  It existed --

3      THE COURT:  And there were other compression

4 files at the time, weren't there?

5      MR. STEPHENS:  So, there are a variety of

6 different types of compression.  There were certainly

7 general purpose compression algorithms that were known

8 that were, for example, not specifically adapted to

9 audio.  MP3, your Honor, was the first really popular

10 compression mechanism for audio specifically that relied

11 on a model of hearing to throw away some of the

12 information to greatly increase the amount of compression

13 that was achievable while still having a good quality of

14 audio.  That technology was very new in 1996.  It was

15 also heavily protected by patents.

16      THE COURT:  Well, isn't what somebody -- I

17 mean, when one of skill in the art supposedly reads the

18 journals and reads what's going on, we're -- I have not

19 seen a case talking about the dumb person of skill in the

20 art or the illiterate person of skill in the art.  It's a

21 hypothetical construct.  But at some point don't I, as a

22 court, have to assume that -- just like we assume that I

23 have read all of the recent Federal cases, it may not be

24 actually true that every single judge and lawyer has read

25 every single thing the Supreme Court wrote in the last

1  two weeks.  But at some point -- I mean, we're certainly

2  responsible for knowing it.

3         MR. STEPHENS:  Your Honor, I certainly think

4  it's true that a person of ordinary skill in the art in

5  1996, if they were investigating compression algorithms,

6  could have learned about MP3.

7         THE COURT:  Well, and then -- are you saying

8  that after a patent application is made or after a patent

9  is issued, the fact that a new accused device may

10 incorporate some other new technology together with the

11 patent art, somehow that doesn't make it infringing?

12        MR. STEPHENS:  No, your Honor.  Actually the

13 point that we're making is a bit different; and that is

14 that if you look at what's disclosed in the

15 patents-in-suit, the compression algorithms that are

16 present there are not suited to achieving high levels of

17 audio compression while still having a reasonable quality

18 for anything other than speech.

19        THE COURT:  All right.  Let me be very clear,

20 then.  And this is what concerns me.  I understand that

21 later on you may have an enablement argument or in terms

22 of means-plus-function you may have, you know, a limited

23 structure as disclosed.  But what concerns me is you're

24 bringing it up at this point of "person of ordinary skill

25 in the art" and I'm not hearing a good reason for taking

1   up time in your brief and taking up my time to -- with

2   this caveat.

3              MR. STEPHENS:  Fair enough, your Honor.  I

4   think that it doesn't directly affect the "person of

5   ordinary skill in the art" itself; so, we do agree to the

6   definition that you proposed.  We raised that caveat

7   because I think it does relate somewhat to the written

8   description and some of the arguments that Personal Audio

9   have made about what a person of ordinary skill in the

10  art would read into the specification.

11             But I also understand what you're saying about

12  enablement, and we're not making enablement arguments

13  here today.

14             THE COURT:  Or, for that matter -- well, okay.

15             And then your second caveat --

16             And go ahead and put that up, please,

17  Ms. Mullendore.

18             -- was that (reading) Apple denies that a

19  person described above would have been able to design and

20  develop the iPod -- and this one, I guess, concerns me

21  even more.  Actually your brief says (reading) would be

22  able to design and develop the iPod, which required

23  numerous innovations and a wide range of technologies to

24  become a reality in 2001.

25             What does that little remark have to do with

1  anything?  I mean, surely -- well, let me ask.  I mean,

2  are you going to argue that a complicated technological

3  device can't possibly be infringing if it has more than

4  one technology in it?

5          MR. STEPHENS:  Not at all, your Honor.  The

6  real issue, I think, is whether or not some of the

7  constructions that are being urged by Personal Audio,

8  which appear to us to be directed at a device that they

9  were not capable of building, are appropriate given the

10 level of ordinary skill in the art and the disclosure of

11 the patent.

12         THE COURT:  Okay.  I guess partly for your

13 benefit and partly for the benefit of general counsel of

14 Apple since I don't believe they've been in my court

15 before, you run the risk of burying some good arguments

16 under a load of "difficult to wade through" things.

17         I don't see that this -- I mean, I do

18 understand -- believe it or not, I really do understand

19 that at some point you're going to be raising enablement,

20 inadequate description, and so forth.  But this

21 particular argument, especially this second caveat,

22 starts to me to run very close to a violation of Rule 11.

23         I mean, I don't know of any authority for the

24 proposition that just because someone couldn't build the

25 iPod, that affects the person of ordinary skill back in

12

1  1986 of this particular patent or the fact that iPod has

2  other technologies doesn't make it noninfringing.  If

3  you've got some authority for that proposition, fine, let

4  me see it; but I've not seen that case.

5        And, so, I'm going to caution you.  Let me see

6  your -- and I think you've got some good arguments

7  somewhere there, but it takes a long time to get to them.

8  I want to see those up-front, and you're well advised to

9  focus in on those and not try to raise them over and over

10 and over again.  This is just a suggestion.

11       I understand a Court of Appeals will sometimes

12 look at that last point of error, but sometimes they

13 don't.  And this -- I mean, to toss out something like

14 someone in 1996 couldn't build the iPod, well, yeah,

15 right.  If they could have, they would have built it.

16       MR. STEPHENS:  Your Honor, if I may, I don't

17 want to belabor this; but I do feel the need to justify

18 this at least a little bit.  There is a construction of

19 "player" being urged by the plaintiff in this case that I

20 think reflects a device that they were not capable of

21 building.

22       THE COURT:  Okay.  Well, then make that

23 argument to me when we get to "player" but not -- I mean,

24 we're talking about who as one of ordinary skill in the

25 art in 1996 would understand this particular patent, not

1  who could build the iPod, unless there's been some change

2  in the law of what one of ordinary skill in the art is.

3  I mean, maybe a recent case came out and I missed it; but

4  I don't see how whether you could build that or not has

5  anything to do with who was of ordinary skill in 1996.

6          MR. STEPHENS:  Well, your Honor, the point is

7  only that you can't tailor your claim to a device you

8  were --

9          THE COURT:  Sure.

10          MR. STEPHENS:  -- not capable of building.

11  That really is the premise for this statement, and that's

12  all.

13          THE COURT:  Okay.  Again, raising that

14  argument at this point seems to me to be coming very

15  close to almost frivolous when -- and more importantly

16  from your point of view, it's burying perhaps a good

17  argument in something that just, in my view, kind of

18  wastes my time.

19          I'm reading through it and thinking, "Okay.

20  They've got a good argument here because it's right

21  up-front"; and I go, "Wait a minute.  What is this?"

22          All right.  So, both sides agree to what was

23  on Court's Exhibit 1 as "one of ordinary skill in the

24  art."  Apple, for what it's worth, has pointed out some

25  facts that don't seem to have much to do with anything

1  with what one of ordinary skill in the art is.  Maybe

2  those theories will come up later in other arguments.

3          Why don't we now take a look at the

4  definitions of "player" and "audio program player."  Now,

5  I understand that Apple has included in that the

6  "programmed digital computer."  I'm going to first

7  separate those out, and let's look at "player" and "audio

8  program player."

9          Just to be sure -- and I think this might not

10  even need a question, but it's easier to nail it down.

11  Do both sides agree that what we're talking about here

12  are devices or apparatus claims?  Personal Audio?

13          MR. HOLDREITH:  Yes, sir.

14          THE COURT:  And Apple?

15          MR. STEPHENS:  Yes, your Honor.

16          THE COURT:  Okay.  Now, the specification

17  describes an audio player device shown at Figure 1 of --

18  in Figure 1; and it's at 103.  I think it's Item 103 in

19  Figure 1 -- has a number of components that are described

20  at Column 4, includes a player software.

21          Let me ask Personal Audio.  I understand that

22  you've dropped the idea of being self-contained because

23  it's got all those things in it, right?

24          MR. HOLDREITH:  Yeah.  Apple pointed out to us

25  that there is an embodiment that has a separate keyboard,

1  a separate monitor.  And that's not what we intended by

2  "self-contained," but we understood the ambiguity they

3  were raising so --

4          THE COURT:  Okay.  So, I don't have to worry

5  about that part anymore?

6          MR. HOLDREITH:  Correct.

7          THE COURT:  All right.  Tell me what

8  "personal" adds to the definition.  You want "personal"

9  in there.  And this may also tie into "individual

10 listener."  But why does it have to be "personal"?

11         MR. HOLDREITH:  It does tie into "individual

12 listener" as well.  And the dispute that we're asking the

13 court to resolve over claim scope is that Apple contends

14 that the "player" claims read on a prior art device that

15 was for broadcasting.  It was used in a radio station by

16 a DJ to send music out over the airwaves to a general

17 audience.

18         In the specification of the patent, the

19 inventors were very clear that they were criticizing

20 broadcasting and they viewed broadcasting as a problem

21 they wanted to overcome.  And, so, we've pointed out a

22 case, the *Kinik* case, that holds when you demean prior

23 art, criticize prior art, characterize it as a problem,

24 the court can take into account the goals of the

25 invention.

Claim Construction Hearing

16

1        THE COURT:  Okay.  Let me hear from Apple.

2   Exactly what is this prior art device that you think --

3   in other words, they're trying to distinguish; and I was

4   trying to figure out what are the various things that are

5   used in radio broadcasting that you think are involved

6   here.

7        MR. STEPHENS:  Okay, your Honor.  There is a

8   device called the "digital audio delivery work station."

9   It ran on a PC very, very much like the preferred

10  embodiment.  It was used to play back playlists.  You

11  could download playlists.  The Patent Office has rejected

12  all of the claims of the '178 patent over that piece of

13  prior art.  I don't think there is much dispute that all

14  of the elements of the claims are present in that

15  particular piece of prior art.

16       THE COURT:  Okay.  Describe -- and I think I

17  know what you're talking about because in '96 I was

18  actually placing radio ads.  So, tell me, just for record

19  purposes and to be sure I'm not -- I'm not supposed to be

20  reading in my own information into these things; so, give

21  me a little bit more information on how this radio system

22  worked.

23       MR. STEPHENS:  Okay.  Before I do that, your

24  Honor, I would just like to say I think it is

25  inappropriate to construe the claims to avoid prior art.

Claim Construction Hearing

17

1          THE COURT:  Oh, I understand that.  But the

2    arguments have been made focusing in on this; so, I want

3    to find out what it is you're talking about.

4          MR. STEPHENS:  Fair enough, your Honor.  Like

5    I said, it's a player that looks very much like the

6    system that's described in the patent.  It ran on a PC.

7    It had a sound card.  It was not used only in

8    broadcasting, although certainly that was a common use

9    for it.

10          THE COURT:  Okay.  Let me -- is this the --

11    about that time there were a number of small radio

12    stations.  Basically they became one-person operations

13    and the mother station basically downloaded information

14    and then that one DJ actually sounded or acted like it

15    was a huge, normal station and they were able to run

16    those playlists and so forth.

17          MR. STEPHENS:  That's correct, your Honor.

18    So, this system was, I think, probably around this time,

19    in the mid Nineties and early Nineties, the most popular

20    radio automation system in existence; and it did exactly

21    that.  You could control a number of radio stations from

22    a central location, download playlists to them, transfer

23    audio over very expensive but existing high-speed data

24    links to the machines around the country.

25          They stored the audio on hard drives which

1 were pretty expensive in those days to store that much

2 information but available and then were used to play back

3 playlists, essentially to automate all of the both

4 programming content and advertisements and the like that

5 a radio station would normally play.

6          THE COURT:  Okay.  And, so, this is what

7 you're trying to make sure that your -- or you're saying

8 that the patent doesn't cover that because it was

9 criticized in the opening part of the patent itself.

10          MR. HOLDREITH:  Your Honor, that's correct;

11 and we're relying on the same law that Apple cites in its

12 brief at page 14 where they say (reading) the purpose of

13 the invention should not be disregarded when construing

14 claim terms.  They cite a case where they made this law.

15 It's called *Apple Computer versus Articulate Systems*."

16          So, I want to be clear.  We're not just asking

17 the court, "Gee, we'd like to be given a defense against

18 prior art here for the sake of having a defense."  But,

19 rather, we're relying on a claim construction canon that

20 both sides agree on; and that is that when the inventors

21 criticize prior art and state a purpose of the

22 invention -- here, individual personalized customized

23 listening -- and when they criticized the broadcasting

24 prior art, it is, in fact, appropriate to take that into

25 account in construing claims.

1          THE COURT:  Well, take a look, if you would,

2     at the preferred embodiment, Figure 1.

3          Can we put Figure 1 up on the screen?

4          I mean, Figure 1 has at -- and I believe it's

5     Item 113 -- a speaker, or speakers.  And at --

6          Yeah.  It's right up there at the top, and I

7     don't think you even have to flip it.

8          And then if you take a look at Column 7,

9     lines 49 to 51 and then 61 to 63, it talks about the

10    invention being used in the car.  And I would assume that

11    everybody in the vehicle can hear what's being said; so,

12    why should I put in the definition "personal" or

13    "individual" when even in a little sports car there is

14    likely to be two people there and in a lot of cars

15    there's going to be four people.

16          And this is not embedded in the ear or just

17    coming through earphones; these are speakers.  Anybody

18    who happens to be -- I mean, the speaker may be little;

19    but the automobile embodiment that you talk about,

20    clearly it's going to be heard by the people in the

21    vehicle.  So, what does "personal" mean or what does

22    "individual listener" mean?

23          MR. HOLDREITH:  "Personal" and "individual

24    listener" means that the person who has control over the

25    playback, who can decide to skip back, skip forward,

1  choose this song and not that song, choose this

2  collection and not that collection -- that's the person

3  listening to the music coming out of the player.

4          In a broadcasting situation you have a DJ who

5  is choosing music for a general audience.  That general

6  audience has no control over what they're hearing.  They

7  can't skip back.  They can't skip forward.  They can't

8  tell that DJ, "We'd like to listen to a different kind of

9  programming or listen to this content in a different

10  order."

11          So, "personal" and "individual" means it's a

12  player that I control and I'm the consumer of the music.

13  And I think that's a meaningful distinction that a jury

14  can sort out pretty easily.  You're --

15          THE COURT:  Maybe the user listening?

16          MR. HOLDREITH:  Yes, sir.

17          THE COURT:  Or the user who is listening?

18          MR. HOLDREITH:  That's right.

19          THE COURT:  Okay.  Now, Apple wants this

20  limited, it seems, to desktop and laptop computers.  But

21  if we take a look at Column 4, lines 25 through 35, I

22  mean, we have -- right there in -- I mean, we have this

23  language of, you know, "illustrative embodiment," "host

24  computer," "audio player device," "advantageously

25  implemented."  I mean, when you have things like

1  "illustrative embodiment" and "advantageously

2  implemented," those aren't exactly language of

3  requirement as we see in some of the cases.  Those seem

4  to be "here are some examples" language.

5          So, where do you come up with or how do I get

6  away with -- let's say you want me to write the opinion

7  in your favor that the Federal Circuit won't just start

8  to laugh when it shows up on their doorstep.  And you

9  know on appeal they're going to be saying, "Well, your

10 Honor's illustrative embodiment advantageously

11 implemented" -- and then we can go on to Column 7.

12          That next slide, Laura.

13          At lines 41 to 44, lines 53 to 57, lines 63 to

14 66, it talks about "alternatively" and "may be

15 implemented."  I mean, there is just endless language of

16 giving choices.  So, where do we get off saying, "Oh,

17 just laptops, just desktops"?

18          MR. STEPHENS:  Your Honor, if I may, I want to

19 say one quick thing about broadcast; and then I'll

20 address your point.

21          THE COURT:  Sure.

22          MR. STEPHENS:  I would like to point out that

23 in the original application that led to both of the

24 patents-in-suit -- because the later one is a divisional

25 of the earlier -- there were claims specifically directed

1  to broadcasting.  So, this notion that broadcasting was

2  disclaimed directly conflicts with the file history of

3  both patents.

4          Those claims were divided out in response to a

5  restriction requirement and prosecuted separately for a

6  number of years and then ultimately canceled in their

7  entirety; and a whole new set of claims was put into the

8  applications, I think in roughly 2007, which are almost

9  identical to the ones in the original '076 patent.

10         So, basically you had a division between the

11 client side of the system and the server side.  The

12 server side was described as a broadcasting system.  So,

13 I think this notion that broadcasting has been disclaimed

14 just makes no sense in view of the file history.

15         Now, with respect to the preferred and

16 alternate embodiments, your Honor, it is true that there

17 are a number of embodiments that are described; but all

18 of the hardware embodiments, including the ones that

19 your Honor has identified, those are all generic PC

20 hardware.  Most of the embodiments that are described in

21 the patents are a variation in software and, in fact,

22 there really is no technology in the patent other than

23 generic PC hardware plus software.  So, things like IrDA

24 were standard laptop and desktop hardware in 1996.

25         I don't think there's any statement in the

1  patent anywhere that a PDA could be used to implement the

2  invention.  Given that Dr. Almeroth has opined that even

3  a regular desktop computer didn't really have enough

4  space to store songs, it's a little hard to see how

5  something you could stick in your pocket at the time

6  could do that.  So, I don't think that really was an

7  alternative embodiment for the player.

8          THE COURT:  Well, except that they talk

9  about -- I'm looking at Column 7, line 57, where it

10  actually talks about -- it starts at 56 -- (reading)

11  standard feature in all notebook computers and PDAs.  So,

12  we're already talking about PDAs specifically being

13  mentioned, which is a little bit different than notebooks

14  and desktops.

15          But I guess more importantly is -- I mean,

16  there are cases that say if the only thing described is a

17  specific embodiment and that's all it is and the language

18  makes it clear like "the invention is" when you start off

19  in the summary or -- as opposed to "illustrative

20  embodiment," "advantageously implemented" -- I mean,

21  you've got to agree, I think, they are using some pretty

22  broad opening language here in terms of what -- you know,

23  the concept they're talking about.

24          MR. STEPHENS:  I will agree with that, your

25  Honor.  I would point out, though, that the PDA -- again,

1    I don't think the patent is ever talking about that being

2    the player.  It's a remote control or an example of the

3    device that has the IrDA in it, not something that could

4    actually play back audio.

5           But regardless of that, I understand your

6    point.  There are a number of embodiments described in

7    the patent, and we're not saying they're limited to a

8    single one of those embodiments.  What we're saying is

9    the range of embodiments that they're entitled to is

10   really defined by software plus generic laptop or desktop

11   hardware because that -- all of the embodiments are

12   implemented on a laptop or desktop.

13          Now, I do understand your Honor's concern

14   about limiting even to that.  Our concern, I think, is

15   more that a jury is going to find a word like "player"

16   confusing; and it suggests an interpretation of the

17   claims that actually excludes that preferred embodiment

18   that's based on a laptop or desktop.

19          THE COURT:  Well, I mean, I'll ask the

20   question maybe a different way.  You've got embodiments

21   and they're shown as not the only embodiment but typical

22   embodiments and you've got a device -- I mean, clearly,

23   you know, chips have become -- you know, the size has

24   become smaller.  I mean, what used to be in a room got

25   down to a small desktop thing or the size of a desk and

1   is now -- we can hold it in our hand.  Better chips,

2   better technology, and so forth.

3          But if all we have is a device of just modern

4   equivalents to the components disclosed, why should that

5   be limited out in my definition of "player" by saying,

6   "Oh, it has to be a laptop or a desktop"?

7          I mean, I understand that you can come up with

8   a better way of implementing a patented idea.  You can

9   make the chip smaller.  You can make the -- well, I'll

10  give you an example.  Someone invents the airplane wing

11  in the days of wood covered with fabric and it gives lift

12  because it's got a curved top surface and the air

13  brushing over it provides lift.  Two years later somebody

14  invents aluminum.  Suddenly you've got stronger wings.

15  You can put on a stronger -- because the air frame is

16  aluminum, you can put in a stronger engine and you can go

17  faster.  I mean, are you going to argue, "Oh, well,

18  that's not a violation of the patent on the shape of the

19  wing because it's now made of a different material"?

20  It's still the shape of the wing.

21          MR. STEPHENS:  Well, that depends, your Honor.

22  If the claims say that they are -- say, for example, to a

23  jet plane.  You could not build the jet plane out of the

24  wood that was available at the time the patent was --

25          THE COURT:  Yeah, but I'm talking about a

Claim Construction Hearing

26

1  claim to a wing, the wing design.  And then they give a

2  description of "and one way of doing it would be wooden

3  struts covered with cloth" and what we're really talking

4  about is the airfoil shape.

5          And later, you know, within two years --

6  obviously this didn't happen.  But within two years

7  someone comes up and says, "Oh, aluminum is now invented;

8  and we can make the struts stronger.  The air frame can

9  hold larger engines, can take more stress.  The aluminum

10 covering is stronger."

11         Sure, it's -- the shape isn't the be-all and

12 end-all; it's just a part of the new device; but you're

13 still going to wind up facing an infringement suit and a

14 claim for some royalty over that shape, it would seem to

15 me.  You don't just get to say, "Oh, we've come up with a

16 new material for the same old shape; we don't infringe."

17         MR. STEPHENS:  We're not arguing that at all,

18 your Honor.

19         I think our concern really about the

20 construction of "player" is primarily one of jury

21 confusion, and I think we would be prepared to concede

22 that the claims can cover something beyond a desktop or a

23 laptop.

24         But it is necessary, I think, for the jury to

25 avoid confusion that the construction that your Honor

1  gives them make clear that the preferred embodiment --

2  i.e., a laptop or desktop -- is part of what's claimed.

3  A player, in other words, is not some personalized

4  playback device for an individual listener that you can

5  stick into your pocket that was not disclosed and not

6  enabled by the patent; but, instead, it's player software

7  that runs on a laptop or desktop.

8             And maybe there is some limited range of

9  hardware embodiments that might also be included even

10  though there is really no non-PC hardware disclosed in

11  the patent that would be potentially an embodiment of a

12  player.

13             Like I said, our primary concern is that if

14  you adopt a construction like what Personal Audio has

15  proposed, not only do you incorporate the plaintiff's

16  name into the construction, which seems a little odd to

17  say the least, you also strongly suggest something like a

18  portable player which -- there is really no dispute -- is

19  not described in the patent other than a notebook

20  computer.

21             THE COURT:  All right.  Well, let me suggest

22  this construction.

23             And, Laura, go ahead, if you would, and put up

24  the...

25             And this is in Court's Exhibit 2.  (Reading)

1  "Player" and "audio program player" mean a device that

2  reproduces sound from digital audio content.

3         Now, it seems to me, taking a look at the

4  claims -- and I'll just take claim 1, for example -- all

5  the different things it has and does, the means for

6  storing programs, the means for receiving and so forth,

7  all of the other things that go on are set out in the

8  various claims; and the preamble is just talking about

9  what is a player.

10         I don't see why or how I should try in

11  "player" to define the entire invention.  It seems to me

12  what a player actually does is going to be in all of

13  these other elements of each individual claim.  I'm not

14  sure that just limiting it to one kind of laptop or

15  whatever is going to make it, given the language used,

16  the "advantageously," the "such as," and so forth

17  language.

18         But let me hear first from Personal Audio.

19  What objections do you have to this definition?

20         MR. HOLDREITH:  Your Honor, this is not

21  exactly our construction and -- the main dispute that it

22  leaves potentially open is we may be arguing to the jury

23  about whether the player has to be controlled by the

24  listener, the personal -- the individual who is listening

25  to the music.  I can argue that to the jury.  It's

1  probably a fine line whether that's claim construction or

2  whether that is a necessary consequence of all the

3  limitations in the claim.  But I think that's the issue

4  that's not finally resolved by this construction.

5           I do certainly agree with the court that a

6  player can't be limited to a desktop or a laptop.  And

7  Mr. Stephens may have overlooked, for example, Column 7,

8  line 66, specifically says (reading) a portable computer

9  or simplified player; and, so, we certainly agree that it

10 would be error to limit it to a desktop or a laptop.

11          THE COURT:  All right.  You think that this

12 should somehow --

13          All right.  Well, let me first hear from

14 Apple.  What objections do you have to this definition of

15 "player"?

16          MR. STEPHENS:  Your Honor, the problem we have

17 with this is that it suggests that there is an actual

18 hardware invention here.  Remember, this is the first

19 limitation that the jury is going to hear about.  And "a

20 device" sounds like a portable player, which isn't

21 disclosed.

22          If your Honor were prepared to include, for

23 example, exemplary language -- "a device, for example, a

24 laptop or desktop" -- just so the jury would be clear

25 that it includes the preferred embodiment and is not

1  limited to some sort of special purpose hardware device,

2  then I think we might be prepared to live with it.

3          My concern is that "a device" sounds like

4  something other than a laptop or desktop computer.

5  That's the preferred embodiment, and the jury would be

6  confused.

7          I also do have some grave reservations about

8  Mr. Holdreith's comment that he's going to argue a claim

9  construction that he's apparently prepared to surrender

10  now to the jury at a later date.  Your Honor --

11          THE COURT:  So, I take it that, Personal

12  Audio, you would prefer it to say something like "a

13  device used by a listener that reproduces sound from

14  digital audio content"?

15          MR. HOLDREITH:  Yes, sir, something like that.

16          THE COURT:  And let me hear from Apple.  I

17  mean, I already understand your objections to this.  But

18  if I put in the words "used by a listener," how much,

19  from your point of view, more wrong would that be than is

20  already up there?

21          MR. STEPHENS:  Your Honor, I would say "one or

22  more listeners" might be okay.  I think this --

23          THE COURT:  Well, "a" is one or more.

24          MR. STEPHENS:  I don't think a jury

25  necessarily will appreciate that.  I understand the

1 point, and I agree with you as a matter of patent law.

2          THE COURT:  Okay.  I -- all right.  I may have

3 to make sure they understand that in patent language "a"

4 can mean one; it could mean a whole carful.

5          MR. STEPHENS:  Sure.

6          If I may, your Honor, just put up one quick

7 slide --

8          THE COURT:  All right.

9          MR. STEPHENS:  -- to suggest what my concern

10 is about the "device" language.

11          This is what I think a jury thinks a "player"

12 is, not a laptop or a desktop computer.  It's just not

13 the first thing that comes into mind.  If you pick a man

14 off the street and say, you know, "Have you seen a

15 player," they don't think of a laptop or desktop

16 computer; but that's the preferred embodiment.

17          The same thing with "a device," right, a

18 device for playing audio.  You don't normally think of

19 your laptop or desktop computer first even though, again,

20 that's the preferred embodiment.  So, I'm concerned that

21 both the word "player" and the word "device" alone

22 without some indication that it must cover the preferred

23 PC embodiment is going to be confusing.

24          THE COURT:  All right.  Okay.  Let's go ahead,

25 then, into the next one, "audio playback unit."  This is

32

1  at claim 178 -- I'm sorry -- patent '178, claim 14.

2         I guess the first thing I noted is that this

3  seems to have been withdrawn because it's no longer in

4  the joint claim construction chart; but on the other

5  hand, it's still in the briefing.  So, have we reached an

6  agreement that I don't know about?  Like I say, it's not

7  on the chart anymore; but there still seems to be a

8  little dispute in the briefing.  Where are we on this

9  one?

10         MR. HOLDREITH:  Your Honor, my understanding

11  is Apple withdrew that request for construction; but

12  I'll --

13         MR. STEPHENS:  That's correct, your Honor.  We

14  no longer request it to be construed, and we think the

15  ordinary meaning is sufficient.

16         THE COURT:  Well, what is the ordinary -- I

17  mean, earlier you were arguing it's the same thing as the

18  player and the audio program player.  Of course it's part

19  of comprising language; so, what --

20         MR. STEPHENS:  I'll be honest, your Honor.

21  That construction was driven by one of the defendants

22  that's no longer in the case.

23         THE COURT:  Okay.  So, I'm not going to run

24  into a problem later on with the respective experts in

25  this case arguing over it.  Is there any really

1  disagreement that in that claim 14, the audio playback

2  unit has to be part of or some component of that player,

3  however I define "player"?

4          MR. STEPHENS:  We would not argue otherwise.

5          THE COURT:  Okay.  And, Personal Audio, you're

6  the same, right?

7          MR. HOLDREITH:  We agree, your Honor.

8          THE COURT:  Okay.  We'll be out of here before

9  lunch if they're all that easy.

10          Next, we get to "programmed digital computer";

11  and this is in the '076 patent, Claims 14 and 15.

12  Personal Audio says don't need a construction.  Apple

13  wanted it to be the same as the "player" and the "audio

14  program player."

15          The term only appears in the claims and not in

16  the specification; so, why would "programmed digital

17  computer," which is kind of a basic, almost elementary

18  kind of a word or construct -- why should that be

19  anything other than what we find in any standard

20  dictionary from Apple's point of view?

21          MR. STEPHENS:  Your Honor, I concede that our

22  concerns here are substantially less.  I do think that a

23  programmed digital computer comes closer to invoking, in

24  an ordinary juror's mind, the embodiment that is

25  disclosed.  I think our primary concern was to try to

1  sort of develop a uniform construction here; but again, I

2  think exemplary language about a laptop or desktop would

3  satisfy us.

4         THE COURT:  Okay.  Laura, go ahead and put up

5  the proposal we're thinking of.

6         Okay.  This will be under Court's Exhibit 4.

7  I have (reading) "programmed digital computer" means a

8  computer that consists of one or more associated

9  processing units and that is controlled by internally

10 stored programs.

11        And I think that is just almost a basic

12 textbook definition of what a programmed digital computer

13 is because that's a fairly simple, basic word or term.

14 Any objection -- there doesn't seem to be a lot of

15 dispute at this point; but just to avoid any later

16 problems, any objection to that, from Personal Audio?

17        MR. HOLDREITH:  No objection from Personal

18 Audio, your Honor.

19        THE COURT:  Okay.  What about from Apple?

20        MR. STEPHENS:  Your Honor, honestly I think

21 that we would prefer the ordinary language to that.  I

22 just think it's a bit confusing.  Our concern was really

23 about just making clear that a laptop or desktop is

24 within the scope of the preamble.

25        THE COURT:  Well, I guess when you talk

1  about -- actually this is about as ordinary a definition

2  as I could come up with since it's, I think, the IEEE

3  standard definition for "programmed digital computer."

4  And the first thought I had when I heard you were

5  fighting about this is, "What?  They think there is going

6  to be an analog computer involved here somehow?"

7            I mean, obviously it's digital.  And

8  programming -- the only thing is since it's programmed,

9  it has -- that has some meaning there.  But what other

10  objection do you have to -- I mean, if someone really

11  wants to know what this one means --

12            MR. STEPHENS:  Let me explain the concern I

13  have, your Honor.

14            THE COURT:  Okay.

15            MR. STEPHENS:  I guess the reason why we still

16  think that the exemplary language would be useful is that

17  today "computer" means something different than it did in

18  1996.  People weren't carrying around smartphones that

19  they could use to send and receive email and play video

20  games and things like that in 1996.  Granted, PDAs

21  existed; but they were extremely limited.

22            So, I think a "programmed digital computer"

23  does -- or did in 1996 -- evoke the thought of the

24  preferred embodiment, a PC.  I don't think in 1996 a

25  "programmed digital computer" really invoked the motion

1  of a PDA which was physically incapable of doing what the

2  preferred embodiment did and, I think, even physically

3  incapable of performing what's claimed.

4          Today that's different.  Today the technology

5  has changed dramatically, and the iPhone is a far more

6  powerful computer than the desktop that's described in

7  the patent.  So, that's why we have this concern that we

8  just want to make sure that the jury understands that the

9  preferred embodiment is within the scope of the preamble.

10          THE COURT:  Okay.  All right.  Let's move on,

11  then, to Number 7; and this would be -- or what I --

12  those numbers are just numbers in the listing that I

13  have.  I don't think they really come from anywhere else.

14  And it's this group, the "file of data establishing a

15  sequence" which is in the '076 patent at claims 1 and 14,

16  and the "sequencing file" which is in the '178 patent at

17  claim 1, and "playback session sequencing file" in the

18  '178 patent at claim 14.

19          Let me ask Personal Audio.  Now, you seem to

20  want to make it clear that a sequencing file is not just

21  a playlist.  But aside from the fact that maybe you're

22  concerned that jurors don't understand that data

23  underlying a list of names that identifies them allows

24  them to be manipulated.  In other words, there is not

25  just a list of names in a playlist; there's actually

1 other data there.  Isn't it really just a playlist?

2          MR. HOLDREITH:  It can function a lot like a

3 playlist, your Honor.  That's right.  Our concern is

4 exactly what you just said, your Honor.  But the

5 sequencing file is -- we focused on that because it

6 appears in so many limitations, and it was discussed

7 significantly in the file history as something the

8 examiner wanted to hear about and the patent attorney

9 talked about.  It's not familiar to, I don't think,

10 laypeople.  It certainly had to be explained to me.

11          And what we're trying to do is make it

12 understandable to the jury that the reason the sequencing

13 file comes up so often in the claims is that the computer

14 goes back to the data in that file when it's making

15 decisions about what to play next, either because it gets

16 to the end of a song or because somebody pushes a

17 command, like a skip or a skip back.

18          THE COURT:  But in each of the individual

19 claims -- and I'll take Number 1 as an -- claim 1 of the

20 '076 patent as an example.  What is done to this sequence

21 file is set out in other claim elements.  So, for

22 example, in claim 1 you have, in the second element,

23 (reading) a means for receiving and storing a file of

24 data establishing a sequence.  And then later on you have

25 (reading) means for reproducing the programs established

1  by the sequence.  And you have other things that can be

2  done to the sequence, but that's set out in the

3  individual claim.  The other claims have slightly

4  different things that are done to the sequence.  Why

5  should I define "sequence" as including the things that

6  are actually done to it when the things that are done to

7  it are set out in other claim elements in each individual

8  claim?

9           MR. HOLDREITH:  Yeah.  I think that's an

10 excellent question.  That's exactly -- we agree with your

11 understanding of the claim; and this is only intended as

12 an aid to the jury, not to define the sequencing file so

13 much but to just crystalize for them in an easy way what

14 the sequencing file is and what it does, that it's

15 something -- the computer uses that data to make

16 decisions about what to play next.

17          Once you understand that, it's much easier to

18 follow through the rest of the claim.  I think it can be

19 difficult -- I mean, I can certainly explain this to a

20 jury; and Dr. Almeroth can explain it in terms of the

21 other limitations.  But it makes it so quick and easy to

22 crystalize and understand what that sequencing file is

23 and what it does if you just get the short explanation

24 that it's a file of data that the computer uses to play

25 back songs and to respond to commands.  And if you have

1 that knowledge when you go through the claim, it is far

2 easier to understand.  So, it's intended to be an aid to

3 the jury so they can understand this claim quickly and

4 easily.

5          THE COURT:  Okay.  So, I take it, then, when I

6 ask you almost the exact same question, you have in your

7 proposed definition the -- this emphasis on the file that

8 is received by the player.  And actually that's right

9 there in the claim language and in the descriptions of

10 these things, that it is being downloaded from the host

11 computer or the server or so forth.  You're just trying

12 to re-include that back into the definition to make it

13 easier to explain?

14          MR. HOLDREITH:  Yeah.  It's solely intended to

15 make it easy for the jury here, your Honor.

16          There is a dispute -- I'll anticipate a little

17 bit -- about whether the player has to access the file or

18 use the data as it goes.  That's in the argument, not in

19 the proposed construction.  I just wanted to make it very

20 clear we disagree with that proposal.

21          THE COURT:  Okay.  Let me ask Apple.  You seem

22 to argue that the phrase "a file that is received" that

23 they use broadens the claim somehow.  But isn't that

24 language about being received right there in claim 1 of

25 the '076 patent?

1           And take a look -- I guess we can put it up on

2    the screen, Column 46.  If you take about line 18 -- and

3    this is just an example -- "means for receiving."  So,

4    while on one hand I've discussed with Personal Audio the

5    fact that I'm not likely to put being received in the

6    definition, it's one of the other claim elements.  How --

7    are you going to argue that in this particular claim

8    that's not one of the things that's described as being in

9    there?

10           MR. ELACQUA:  Your Honor, Ben Elacqua for

11   Apple.

12           No, we're not.  And it says "means for

13   receiving" and -- "means for receiving and storing," part

14   of the means-plus-function limitations.  Later on we'll

15   get into the structure for what does the receiving; and

16   there is no question, I think, that the structure for

17   "receiving" dictates that the sequence file is going to

18   be received.

19           Now -- if we could have the slides back for

20   one second.

21           What Personal Audio is attempting to do here

22   is now bring back in the word it struck out in the file

23   history as part of their amendment to this particular

24   claim, to the '178 claim 1, where they crossed out

25   "receiving" and added this (reading) data communications

1   link for downloading a separate sequencing file.

2           Now with the construction that they are

3   proposing, this sequencing file would simply be received,

4   which I think is confusing because they struck

5   "receiving" out and replaced that with this particular

6   method for receiving, downloading via a data

7   communications link.

8           And I'd also point out, your Honor, that it's

9   exactly the contents of the sequencing file that is

10  downloaded that we're trying to convey to the jury here.

11  And if you go to claim 1 of the '178 patent, I think this

12  is a good place to look at it.

13          Khoa, could I have Slide 13?

14          And here, your Honor, we know that, tracing

15  back the said sequencing file, (reading) a processor for

16  delivering a succession of audio program files in the

17  collection in said ordered sequence specified by said

18  sequencing file.  And if you trace that back to the

19  (reading) said sequencing file containing data specifying

20  the ordered sequence, this is the same file that's

21  downloaded which contains the specified sequence of

22  playback.

23          THE COURT:  All right.  Are you concerned

24  about the problem of the difference between downloading

25  which means something, I guess, from one computer to

1  another as opposed to received, which I guess could be --

2  oh, I guess you could set up a tape recorder and receive

3  audio over a telephone line; or you could have a VCR

4  receiving audio and maybe even visual, which is not

5  downloading.  It's just copying.  Is that the -- you're

6  wanting to be sure that this is focused in on downloading

7  as we understand that with computers?

8          MR. ELACQUA:  Downloading is in the claim here

9  in --

10          THE COURT:  Right.

11          MR. ELACQUA:  -- the '178, and in the '076 the

12  structure for the receiving is what would be a typical

13  download via modem and Internet connection.

14          THE COURT:  I guess what I'm getting at,

15  though, is at the beginning you showed me the slide; and

16  I recall that from the prosecution history, where they

17  take out "receiving" and they put "downloading."  Is your

18  point you want to keep them focused on downloading and

19  not let them broaden it back out to a general reception?

20          MR. ELACQUA:  Yes.

21          THE COURT:  Okay.

22          MR. ELACQUA:  The point is, your Honor, they

23  surrendered the scope of receiving from an external

24  source, downloading via data communications link, via

25  server, the sequencing file.

1          THE COURT:  Okay.

2          MR. ELACQUA:  And this is the sequencing file

3  that specifies the playback order.

4          THE COURT:  All right.  Let me suggest --

5          And if you'll give the control back to Laura.

6          Let me suggest a -- and this would be Court's

7  Exhibit 5.  And here I'm focusing on not so much where it

8  comes from or whether it's downloaded or receiving or

9  whatever because I think those terms are already in there

10  and just what it is.  And in Court's Exhibit 5 I have

11  suggested (reading) file of data establishing a sequence,

12  comma, sequencing file, comma, and playback session

13  sequencing file mean, quote, a file that identifies the

14  order in which audio program segments are to be played

15  and that -- I guess that should be -- contain information

16  about the sequence of events that occur during playback.

17          In other words, we're focusing on what those

18  things are as opposed to how they get there or

19  necessarily maybe how they're used because I think those

20  are in other elements.  So, if we're looking at just the

21  definition of these terms -- let me hear from Personal

22  Audio.

23          And if you would, go ahead and correct that

24  "contains" to "contain," if you can.

25          Okay.  Ms. Mullendore pointed out to me that

1 grammatically "contains" is correct.  It's a file that

2 contains, yes.

3          So, any objections or -- what objections might

4 you have from Personal Audio to this definition of those

5 three terms?

6          MR. HOLDREITH:  Your Honor, we have no

7 objection to removing the language in our proposed

8 definition, which is "received by the player."

9 "Downloaded" is recited in the claim; so, we're not

10 trying to get away from "downloaded" or strike that term

11 or replace it.

12          Sequencing file -- it occurs in claims that

13 recite receiving, and it occurs in claims that recite

14 downloading; so, that's why we said "receiving" would

15 then cover both.  But we're happy to strike that

16 language; so, that's not a problem for us.

17          The two things that I see in this

18 construction -- it's not our construction; so --

19          THE COURT:  No.  It's mine.  That's what I'm

20 asking, are you going to object to it.  I mean, I --

21          MR. HOLDREITH:  Yeah.

22          THE COURT:  Just so you know because I'm not

23 sure you've been before me before, I spend a lot of time

24 going over the briefs in advance and start drafting out

25 what I want to do.  I expect you, as good experienced

1  counsel, to help point out possible errors in what I

2  have.  If you don't point them out, you may wind up

3  waiving them.  But this is your chance to help me come up

4  with a proper construction.  So, I understand it's not

5  your construction.  It the one that I've been working on

6  with Dr. Shipman and Ms. Mullendore, both of whom are

7  engineers.

8           MR. HOLDREITH:  I understand, your Honor; and

9  I will be very specific --

10          THE COURT:  Okay.

11          MR. HOLDREITH:  -- about two things that I

12 see.  One is that as the claim reads, it's the data that

13 identifies the order rather than the file.  And it's a

14 nuance, but I think Apple is trying to craft either a

15 noninfringement argument or some kind of argument that I

16 don't fully appreciate yet by somehow suggesting that

17 it's different for the file to establish the order versus

18 the data in the file establishing the order.

19          So, if we want to be strictly accurate to the

20 claim language, it would be a "file of data" that

21 identifies the order.  And that's just using the actual

22 language of the claim itself.

23          The other thing that I see in this

24 construction is in the last clause, "that contains

25 information about the sequence of events that occur

1  during playback," that's certainly something the file can

2  contain; but as I read the specification, there are

3  embodiments where the sequencing file consists only of a

4  series of integers that establish the order of playback.

5  So, there is no other information in that file.

6            So, we would certainly agree that the file can

7  contain information about the sequence of events that

8  occur during playback; but we would not agree that it's

9  limited to that, it must contain that information.

10            THE COURT:  Well, isn't that language taken

11  right out of the specification itself?

12            MR. HOLDREITH:  There are doubtless preferred

13  embodiments that do contain other information in the

14  sequencing file.  Absolutely true.  But I don't think

15  every embodiment is required to include that information.

16            THE COURT:  Well, I guess I'm trying to figure

17  out if there is no information about the sequence, if it

18  just says "identify the order," what that gives you.  I

19  mean, from a technical perspective, if you wind up with

20  just a file that identifies the order in which audio

21  program segments are to be played and that's it -- I

22  mean, you're saying there are some embodiments and that's

23  it, there is no information about the sequence of events

24  that occur during playback.  Are you sure that's what you

25  want?  Do you want to discuss that with your expert?

47

1          MR. HOLDREITH:  May I?  Yes.  Thank you, your

2  Honor.

3          Your Honor, what was just pointed out to me is

4  I'm probably construing "events" here a little bit; and

5  it depends on what "events" mean.  If events are things

6  like the song ends, the counter is reset, the computer

7  keeps track of where it is in the sequence, that's

8  absolutely correct.

9          THE COURT:  Yes.  If you don't have that, you

10  don't have much, do you?

11          MR. HOLDREITH:  That's true.  Yeah.  My

12  misunderstanding -- I was thinking of events as -- there

13  is an embodiment where there are announcements of what

14  the available topics are and there are hyperlinks to

15  those topics and that is a preferred embodiment that I

16  think doesn't --

17          THE COURT:  Well, that one may have more

18  information than another one.

19          MR. HOLDREITH:  Right.  Right.

20          THE COURT:  But if you don't have any of that,

21  then you almost have nothing.

22          MR. HOLDREITH:  I agree with that.

23          THE COURT:  Okay.  So, based on that,

24  understanding that in some cases it may be more

25  information and some cases it may be less information, it

1   does contain some information.

2          MR. HOLDREITH:  Your Honor, on that basis we

3   would have no objection --

4          THE COURT:  Okay.  All right.  Let me hear --

5          MR. HOLDREITH:  -- to that part.

6          THE COURT:  Let me hear from Apple, then, on

7   your thoughts.  Again, focusing in on just these terms,

8   what objections you have to this proposed definition?

9          MR. ELACQUA:  Your Honor, I think the first

10  part, "a file that identifies the order in which audio

11  program segments are to be played" -- I think we're okay

12  with that.

13         On the second part, I guess my concern is it

14  says "and that contains information about the sequence of

15  events that occur during playback," specifying that the

16  information about the sequence is -- information about

17  the order and not necessarily -- I guess where I'm going

18  is that there would be some sort of relationship between

19  the information about the sequence of events and the

20  order.

21         THE COURT:  Well, isn't that going to depend

22  on what is in the other claim elements?  In other words,

23  again, I'm defining these particular terms.  When we take

24  a look at, say, claim -- you know, a particular claim

25  then and then that will -- in some cases you might have a

1  great deal of information and -- I mean, one of the

2  embodiments that we had in the specification -- I think

3  the actual word was "contains detailed information."

4  Well, in some embodiments it may be detailed.  In some

5  embodiments it may be pretty sparse.

6          But I think, as I just discussed with

7  Mr. Holdreith, I don't see -- it does disclose and the

8  specification does disclose some kind of information

9  about the sequence of events.  It may just say "end,"

10 "start," whatever; but there is something there.  It's

11 not just a list of segments.

12         MR. ELACQUA:  I agree.  I think, your Honor, I

13 guess where I'm trying to articulate is the file that

14 identifies the order and the information about the

15 sequence -- I think the information about the sequence of

16 events has to be information about the actual order

17 within the file and not some other information not

18 relating to the order.

19         THE COURT:  Well, I guess we're kind of on

20 the -- you want to limit how much information is in

21 there.  And I guess in my mind when you're setting

22 something like this up, you've got a sequence.  You're

23 going to have to have somewhere in the program "start,"

24 "stop," "pause."  The way they've tried to set it up --

25 and I understand you maybe disagree that they could

1   actually do it, but there may be a way -- when you say,

2   "skip," there's got to be a way for the program to

3   identify what it is you're talking about.

4          I mean, there's, I mean, almost in the nature

5   of, I guess, address information, that kind of a thing,

6   that is going to be in there.  I mean, that's what I'm

7   trying to get across in this -- and I'm trying part of

8   this language straight from the specification at '076

9   patent, Column 12, lines -- looks like -- about 3 through

10  15 as one embodiment gave me part of that language.

11         But what is it that you're -- I mean, you seem

12  to have some concern.  Tell me what it is.

13         MR. ELACQUA:  Your Honor, I think we can live

14  with this construction.

15         THE COURT:  Okay.  Now, Personal Audio brought

16  up the idea that it should start off with "a file of data

17  that identifies the order" as opposed to "a file that

18  identifies the order."

19         Go ahead and put that in and mark it as 5A.

20         All right.  This is what Personal Audio talked

21  about when they were discussing it with me.  Let me see,

22  from Apple's point of view, if you have any concern

23  between this version as opposed to the one I just had in

24  5, the difference between -- this starts off with the

25  three terms mean "a file of data that identifies the

1  order."  The previous one just said that it was "a file

2  that identifies the order."  Any concern about that from

3  Apple's point of view?

4          MR. ELACQUA:  Both would be acceptable, your

5  Honor.

6          THE COURT:  Okay.  All right.  Then probably

7  we'll wind up going -- and that's the one I think

8  Personal Audio preferred; is that correct?

9          MR. HOLDREITH:  "A file of data" is what we

10  preferred.

11          THE COURT:  Okay.  And that will probably be

12  the one we will use, 5A.

13          All right.  We're going to take a short

14  recess.  I will ask you to be back at 20 past, and we'll

15  be using the clock up there.

16          (Recess, 11:10 a.m. to 11:21 a.m.)

17          (Open court, all parties present.)

18          THE COURT:  Just -- let me ask both sides a

19  question on this last term or set of terms we went over,

20  "a file of data," "establishing a sequence," and a

21  "sequencing file" -- or a "playback session sequencing

22  file."  At a very basic level, would it be enough to just

23  have the addresses of the segments?  I mean, from a

24  technical point of view, is that enough?

25          And let me ask first Personal Audio whether

1   you think that's enough.

2           MR. HOLDREITH:  May I have just a moment?

3           THE COURT:  Sure.

4           And same from Apple's point of view and if you

5   need to discuss it with your technical advisor.  I mean,

6   do you think that just a list of addresses is enough in

7   the context of this patent or these claims?

8   Understanding that on certain claims much more

9   information may be implied; but in the basic definition,

10  is that enough?

11          We'll start off with Personal Audio.  What's

12  your thought?

13          MR. HOLDREITH:  Your Honor, I think that if

14  the data just had identifiers of the songs -- and I think

15  I understood the court to say they would be, for example,

16  the memory locations of the songs --

17          THE COURT:  Well, a list of addresses, right,

18  so they know where they -- and that's all there is, just

19  a list of addresses.

20          MR. HOLDREITH:  I think that could be adequate

21  to describe the sequencing file; although, it does

22  cooperate with other limitations.

23          THE COURT:  Right.  There have to be other

24  limitations.  But if we're just talking about "sequencing

25  file" at the basic level, in some circumstances could

1  that be enough?

2         MR. HOLDREITH:  I think the answer is yes.

3  It's a nuance question and we've just chatted about it

4  here to a second, but I think the answer is yes, that

5  could be enough.

6         THE COURT:  Okay.  What about from Apple's

7  point of view?

8         MR. ELACQUA:  Your Honor, I think if the

9  addresses specify on the mass storage device where the

10  program segments are stored, I think that would be

11  enough.

12         THE COURT:  Okay.  So, would that indicate,

13  then, when we're looking at the definition --

14         Go ahead and put up 5A, if you would, please,

15  Laura.

16         -- that -- and I'm taking a look at the last

17  three lines where it says (reading) program segments are

18  to be played and that "may" contain information about the

19  sequence of events that occur during playback.  Would

20  that then bring in that possibility that all we have is

21  the list of addresses and -- if I change it to that,

22  "that may contain information," does that -- what are

23  Personal Audio's thoughts about that?

24         MR. HOLDREITH:  Your Honor, that was my

25  original suggestion; and I think, as I stand here, that

54

1  sounds like a reasonable construction.

2           THE COURT:  Okay.

3           MR. HOLDREITH:  You know, if I just --

4  provided it's understood we think there are other

5  limitations that have to cooperate with the file.

6           THE COURT:  Well, each claim has its own

7  limitations.  I'm focusing on these terms here.

8           Let me hear from Apple about that one.

9           MR. ELACQUA:  Your Honor, I think if you

10 insert "may," I guess my read of that would be it might

11 cause that last clause there to essentially fall out.

12          THE COURT:  In certain circumstances --

13          MR. ELACQUA:  It may have them or may not.

14          THE COURT:  Right, in certain circumstances.

15 You're exactly right.  That's why I asked the question

16 earlier about is it enough to just have the list of

17 addresses, which is that first part, the order.

18          MR. ELACQUA:  I guess that's where I'm coming

19 back to in the first part where -- and maybe this is what

20 we were talking about before, about the information --

21 the information has to be linked to the order in which

22 the segments are to be played.

23          THE COURT:  Right.

24          MR. ELACQUA:  And I think if you insert "and

25 may contain information about the sequence of events," I

1  guess I would view that last part as at that point maybe

2  unnecessary.  Because if you only may have it, then --

3         THE COURT:  Well, it could be there in some

4  circumstances; and it could be there -- and not be there

5  in other circumstances.  I mean, we know the sequence has

6  to have -- basically the way this definition would work

7  is that it has to identify the order in which the audio

8  program segments are to be played.  In other words,

9  you've got to have the address information.

10        And then it may have some additional

11 information such as the sequence but -- in other words,

12 you could, for example, I guess, get to a -- I don't

13 know -- some kind of a choice or a stop here or something

14 like that.  I mean, that's the question is does it do any

15 violence to your idea of the definition or cause a

16 problem if we put in "that may contain" as opposed to the

17 way it is now, must contain.

18        MR. ELACQUA:  Yeah.  There's definitely no

19 violence in patent litigation.  That's for sure.  So --

20        THE COURT:  You've been in some of the trials

21 where we've actually had some violence practically in

22 this court.

23        MR. ELACQUA:  That's right.  There's nothing

24 violent about this type of profession.

25        Could I have a second?

56

1        THE COURT:  Sure.

2        MR. ELACQUA:  Your Honor, I would say I think

3 if you're going to add the "may," I don't think the last

4 part is necessary.  So, our preference -- I understand

5 what you were talking about before, about the address

6 information.  So, I would say as is or without the "may."

7 And if you are inclined to add the "may," I would say

8 that we don't need the last section.

9        THE COURT:  Okay.  All right.  Thank you.

10        All right.  Let's now go on to the next -- and

11 this would be the "receiving" in the '076 patent,

12 claims 1 and 14, "means for receiving and storing a file

13 of data establishing a sequence"; and that's the '076

14 claim 1.

15        Interesting enough, from the briefing it

16 appears that Personal Audio focuses heavily on the

17 receiving and Apple focuses heavily on the storing, but

18 the definitions seem to have both.  Maybe I -- you know,

19 maybe this was just the emphasis that was being given.

20        So, let me start off with on the receiving

21 part of this.  Apple seems to reject Personal Audio's

22 proposal that receiving comes from outside of the player

23 itself, or that second device.  But just looking at

24 claim 1, it starts off with -- and we talked a little bit

25 about this before.  I mean, it's a player comprising; and

57

1  one of the things it's comprised is "means for

2  receiving." So, how -- maybe I just misunderstood, but

3  why would you reject a proposal that this receiving has

4  to come from something other than the player itself?

5          MR. STEPHENS:  Your Honor, if I may, I guess

6  first I would say that it's odd to say that exactly the

7  same mass storage device performs the two different

8  claimed functions of storing versus receiving and

9  storing.  But, secondly, I think I can put up a slide

10 that will help --

11          THE COURT:  All right.

12          MR. STEPHENS:  -- kind of explain our issue.

13          Here we go.  So, the issue here really is,

14 your Honor, that the structure that Personal Audio

15 identifies as the means for receiving and storing is

16 inside the player and can't receive data from outside the

17 player.  It receives data from the CPU which is inside

18 the player.  So, by the time the persistent mass storage

19 device can receive the data, it's already inside the

20 player.

21          So, if you want to say that "receiving" means

22 it comes from outside the means for receiving and

23 storing -- in other words, from outside the persistent

24 mass storage device -- that's at least consistent.  I

25 think that Personal Audio's construction is internally

1  inconsistent because they're saying "receiving" means it

2  comes from outside the player rather than outside the

3  means for receiving and storing.

4          And the means for receiving and storing that

5  they identify is incapable of receiving information

6  that's not already inside the player because it comes

7  from the CPU according to Figure 103.

8          So, if we could --

9          THE COURT:  Wait a minute.  When you go

10  through their description, their detailed description

11  just at Figure 1 -- and you're showing a part of Figure 1

12  up there -- doesn't it come through the modem which --

13          MR. STEPHENS:  That's correct, your Honor.

14  So, it's the modem actually that receives things from

15  outside the player.  And that, of course, is what we

16  contend would be the means for receiving because it is

17  true ultimately that the sequencing file comes from

18  outside the player.  But because the persistent mass

19  storage device can only receive data that's already in

20  the player, it doesn't make sense for it to be the means

21  for receiving.

22          Instead, the thing that's specifically

23  identified as receiving in the specification is the

24  modem.  So, it says, at Column 5, lines 44 to 46, that

25  the player (reading) includes a conventional high-speed

1  data modem for receiving the program information from the

2  remote server.  So, it's the modem that does the

3  receiving.

4           THE COURT:  But that's getting into structure.

5  Right now, I mean --

6           MR. STEPHENS:  Well, but --

7           THE COURT:  When we get into the "means for

8  receiving and storing a file of data establishing a

9  sequence" or the receiving part, is there really any

10  question that this is -- I mean, they're talking about

11  the player, second device, whatever you -- and I

12  understand there is a dispute over use of the word

13  "player" even.

14           But the way it's described is it comes in from

15  this first device or what they describe, when they're

16  explaining Figure 1, as the server.  I mean, it comes

17  from the -- I mean, the information comes from the

18  outside.  Sure, it may travel around inside the player

19  device itself from place to place; but even you seem to

20  be agreeing that it comes to the modem from outside.

21           MR. STEPHENS:  All my point is, your Honor, is

22  that the structure has to be consistent with the

23  function.  And if you're going to construe the function

24  of receiving to be it comes from outside the player, then

25  it has to be the modem that does the receiving.

1    THE COURT:  Okay.  We'll -- okay.  All right.

2    MR. STEPHENS:  So, if you're going to argue

3  that the structure is the mass storage device, then you

4  can't construe "receiving" to be coming from outside the

5  player; you have to construe it to be coming from outside

6  the mass storage device, i.e., the means for receiving

7  and storing, according to Personal Audio.

8    They just have to be consistent.  That's the

9  argument I'm making.  We contend, of course, that the

10  modem is the thing that does the receiving and that, you

11  know, therefore, it comes from outside the player because

12  only the modem could do that.  And, again, the modem, of

13  course, is explicitly described as doing the receiving in

14  the spec.

15    THE COURT:  I mean, are you arguing that the

16  means for receiving and storing have to be the exact same

17  thing?  I mean --

18    MR. STEPHENS:  No, no.

19    THE COURT:  It seems to me you're arguing the

20  means for receiving has to be whatever they've described

21  as a modem and then the means for storing has to be

22  whatever they describe as their -- looks like "program

23  data," I guess, up there in -- what is it?  107?

24    MR. STEPHENS:  Our position is, your Honor, it

25  has to be all those things that are necessary to receive

Claim Construction Hearing

61

1  the information and then represented appropriately on the

2  mass storage device.  So, it would include the mass

3  storage device, the modem, and software for representing

4  it in a format that can be recovered from the disk.

5           THE COURT:  Okay.  And I think -- and this may

6  actually go back a little bit to what we talked about in

7  the previous one.  But if I'm recalling in your brief, in

8  this connection -- and I may misremember this -- here's

9  where you were arguing there was a difference between

10  receiving a file and downloading a file.  Now, here they

11  do use "receiving" -- or is that just dealing with '178?

12           MR. STEPHENS:  So, the means for receiving,

13  your Honor, is in the '076 only; and the '178 explicitly

14  requires downloading.

15           THE COURT:  Okay.  So that particular argument

16  is just focused on the '178, then?

17           MR. STEPHENS:  Well, they are related,

18  obviously, because the means for receiving that is

19  described and disclosed in the patent is a way of

20  downloading.

21           THE COURT:  Downloading, okay.  All right.

22           Well, just focusing in on what the function is

23  of this term -- I mean, I've gone ahead; and let's assume

24  I have defined what "a file of data establishing a

25  sequence" is.  That's the previous one.  For function, is

1  there any reason I can't just go ahead and plug in

2  "receiving and storing" and then just put in the

3  definition for "file of data establishing a sequence"?

4          MR. STEPHENS:  I think you could do that.  If

5  you construe the "file of data establishing a sequence,"

6  it would be appropriate to use it in the --

7          THE COURT:  Function.

8          MR. STEPHENS:  -- means for receiving and

9  storing that particular file.

10          THE COURT:  What about from Personal Audio's

11  point of view?  That would seem to me to be the logical

12  thing if we're just looking at function.  Because I've

13  first got to establish the function.  Then we've got to

14  look at the structure, right?

15          MR. HOLDREITH:  I agree with that analogy,

16  yes, sir.

17          THE COURT:  Okay.  We just finished defining

18  "file of data establishing a sequence."  So, to come up

19  with a function here on this term, it should just be

20  "receiving and storing"; and then I just plug in that

21  definition, right?

22          MR. HOLDREITH:  I agree that that's correct,

23  your Honor.

24          THE COURT:  Okay.

25          MR. HOLDREITH:  There may be a dispute between

1  us and Apple -- I'm hearing maybe there is not -- about

2  the scope of "receiving."  We were asking for a

3  construction of "receiving" because it wasn't clear to us

4  if Apple conceded that "receiving" means it comes from

5  outside the player, and I'm --

6             THE COURT:  Well --

7             MR. HOLDREITH:  I'm not sure if that --

8             THE COURT:  Okay.  Well, let me ask Apple just

9  to be sure on this.  I don't see any way, given how the

10  claims are set up, that the receiving portion of this

11  isn't talking about receiving from the -- what they

12  identify as the server.  It's downloaded and maybe --

13  now, we can argue about the structure.  The structure

14  probably has to be the modem for the receiving part of

15  it, but I don't see where receiving is something that

16  goes on inside the -- what they identify as the player.

17             MR. STEPHENS:  Your Honor, I agree.  The

18  appropriate construction of "receiving" is -- or at least

19  the appropriate reading of the entire claim and the

20  specification is that it comes from outside --

21             THE COURT:  Okay.

22             MR. STEPHENS:  -- the player we're talking

23  about.

24             My point is that it has to be -- the structure

25  has to be consistent with that, and Personal Audio's

1  proposal is not.

2          THE COURT:  Okay.  All right.  We'll get to

3  the structure.  But we agree, then, on the function; and

4  we agree where this reception is coming from.

5          MR. STEPHENS:  Your Honor, if I could add one

6  point of clarification --

7          THE COURT:  Sure.

8          MR. STEPHENS:  -- on your earlier question

9  about plugging in the construction for the sequencing

10  file.  I would like to --

11          Khoa, if we could go to Slide 50.

12          -- just point out that there are some

13  variations in this "means" language; and I don't think it

14  would be appropriate to take out, for example, the

15  "scheduled" language there by simply plugging in the

16  "file of data establishing a sequence," right?  It's

17  further qualified by the "in which said program segments

18  are scheduled to be reproduced by" --

19          THE COURT:  Wait, wait.

20          MR. STEPHENS:  I'm sorry.  The claim language

21  is on the left.  That's for '076, claim 1.  And then the

22  other two columns are just the parties' proposed

23  constructions, including the structure.

24          So, if you just focus on the left column

25  there, your Honor, the language I'm talking about is "in

65

1  which said program segments are scheduled to be

2  reproduced by said player."

3          THE COURT:  All right.  What is that -- you've

4  lost me on what you're trying to change.

5          MR. STEPHENS:  I'm not trying to change

6  anything.

7          THE COURT:  Oh, okay.

8          MR. STEPHENS:  I just wanted to make a point

9  of clarification that when I said it would be appropriate

10  to construe "a file of data establishing a sequence" in

11  accordance with the construction, whichever it is that

12  you ultimately adopt --

13          THE COURT:  Right.

14          MR. STEPHENS:  -- I don't think it would be

15  appropriate to drop the rest of that qualifying language

16  in this claim as a part of that.

17          THE COURT:  Oh, no.  And just to be clear,

18  when I define a word or a term, I don't think it's proper

19  to just drop out other language in the claim.  Each

20  element and each limitation have to be read in there.

21          What we're trying to do here is if there is a

22  dispute or a potential dispute over certain words or

23  certain phrases, what do they mean.  And then, yes, after

24  you plug that language back in, you've got to read the

25  whole claim.

1          MR. STEPHENS:  I assumed that, your Honor.  I

2   was just being excessively cautious probably.

3          THE COURT:  All right.

4          Okay.  So, we have, then, the function.  We've

5   agreed on that.  Now let's take a look at the

6   corresponding structure.  And Personal Audio's proposed

7   structure, I think, is the "persistent mass storage

8   device or equivalents."  That takes care of storage.

9   What about receiving?

10          MR. MORTON:  Yes, your Honor.  Mr. Morton.

11  I'll respond to that.

12          When we looked at this and tried to look at

13  all of the claims as a whole --

14          And if I could get control of the overhead.

15          And this is in, you know, the other

16  independent claim.  It's in claim 14.  This is the way

17  this claim set was drafted.  There is "a mass storage

18  device for storing," and then it says -- it's

19  highlighted -- "and further receiving and storing a file

20  of data establishing a sequence."  So, that was the

21  initial basis of our construction on this, that the mass

22  storage device itself can receive and store.  It actually

23  comes into the mass storage device, and then the mass

24  storage device stores it.

25          We also, your Honor, if I could --

1        THE COURT:  Well, wait a minute.  Wait a

2  minute.

3        MR. MORTON:  Yes.

4        THE COURT:  So, you're saying that when I'm

5  defining -- and keep in mind paragraph --

6        All right.  This slide you have -- just for

7  the record, this is your Slide 151?

8        MR. MORTON:  Yes, your Honor.

9        THE COURT:  Okay.  You're saying that when I'm

10  trying to define -- or identify the function and

11  structure for the "means for receiving and storing a file

12  of data establishing a sequence" in claim 1 of the '076

13  file *[sic]*, I should look to claim 14 and say that that's

14  just a mass storage device?

15        MR. MORTON:  Essentially --

16        THE COURT:  Claim 14 -- the mass storage

17  device is a device.  It's an apparatus.  Isn't it?  I

18  mean, that's what claim 14 starts off with.

19        And, so, I'm to take that as being what the

20  structure is in that means-plus-function claim in -- or

21  means-plus-function element in claim 1?

22        MR. MORTON:  Your Honor, it certainly is a

23  canon of claim construction to consider the other claims

24  and how they are drafted and how the words are used in

25  the other claims.  So, that's the legal basis for looking

1  at claim 14.

2        Claim 14 does call for a mass storage device.

3  That's the structure there.  That's, I think, the same as

4  persistent mass storage that we've identified as

5  corresponding structure for claim 1.

6        THE COURT:  Well, aren't claims allowed to

7  claim different things?

8        MR. MORTON:  Certainly.

9        THE COURT:  I mean, isn't that what they

10  usually do is in 14 we have a structure that does

11  thus-and-so and maybe in claim 1 we have a

12  means-plus-function that maybe is a little different so

13  we cover the waterfront?

14        Are you telling me what you want me to do --

15  and I guess maybe this is what you actually meant in your

16  brief, that I'm supposed to say that a mass storage

17  device is the means for receiving and storing?

18        MR. MORTON:  I do think a mass storage device

19  can receive and store information.

20        THE COURT:  Well, in that case that's not

21  necessarily from the outside.  That's right inside the

22  player itself, and we don't even need the server -- what

23  the patent identifies as the server or that first device.

24        MR. MORTON:  And I've been sensing that

25  tension as the argument has progressed here, your Honor.

1        THE COURT:  So, why would you want to go

2  there?

3        MR. MORTON:  This was our position based on

4  the claim language and the way the words have been used.

5  If your Honor is telling me --

6        THE COURT:  I'm not -- I mean, no, you tell me

7  what your argument is.  I'm wondering why you want to go

8  into that trap, but go ahead.

9        MR. MORTON:  I don't want to go into a trap,

10  your Honor.  I mean, our argument was simply that

11  claim 14 says the mass storage device can receive and

12  store; and that just is, you know, education for one of

13  skill in the art of how the language is used in this

14  patent.

15        And we also looked at a prior case from this

16  district -- this court, I think -- that had a mass

17  storage device that would receive and store.  And between

18  those two things, I mean, that was the basis for our

19  position.

20        THE COURT:  All right.  Well, let me ask

21  Apple.  You give a proposed structure being very defined

22  that, you know, the "1996 high-speed data modem as

23  depicted at 115 at Figure 1 connected via dial-up

24  telephone to an Internet service provider."  Now, you're

25  taking that -- you're interpolating the date, 1996

1  high-speed data modem, from the language of the

2  specification that actually says "a conventional modem."

3         What's the case authority that I now start

4  imposing or importing or applying date of manufacture

5  limitations on a word like, you know, "a conventional

6  modem"?  I mean, I'm not sure of a case that would say

7  when you're talking about something like a modem being

8  the means of receiving, that there can't be any advances

9  in modem technology.  They might get smaller -- well, in

10 computer technology things seem to get faster all of the

11 time.  The amount of information that can be stored

12 increases all the time.

13        But in terms of the patent, to say, oh, no,

14 you can only use the 1996 -- well, heck, if this was back

15 in the old days, you could only use vacuum tubes.  I

16 mean, that's not -- where are we getting that it has to

17 be a 1996 high-speed data modem as opposed to modems?

18        MR. STEPHENS:  Your Honor, may I briefly

19 address the argument that Personal Audio made; and then,

20 of course, I'll turn to the question you just raised?

21        THE COURT:  Yeah.  Maybe you can explain to me

22 what they're saying.  Go ahead.

23        MR. STEPHENS:  I don't understand it, your

24 Honor.  I think it would be inconsistent with the law of

25 means-plus-function claims to look to an apparatus claim

1  to say that defines the scope of a means-plus-function

2  claim.

3           It's clear you look to the function that's

4  described in the means-plus-function claim and then to

5  the structure in the patent that's tied to that

6  particular function and performs that function in the

7  spec, and that's clearly the modem and the related

8  software for downloading over the Internet in the

9  specification.

10          But that brings us then back to the point

11 your Honor is making.  And the law that I would rely on,

12 your Honor, is the law that says you look to the

13 structure that's actually disclosed, right?  And the

14 modem that was disclosed is a modem that was available in

15 1996 because the modems that we have today hadn't been

16 invented yet.

17          So, the question that your Honor raises is one

18 of equivalents, right?  You look to the technology that

19 might be used today to perform a similar function, and

20 you say is that equivalent to the technology that's

21 described in the patent in such a way that I make the

22 determination that that limitation is met.

23          You can't read technology of the future into

24 the structure for performing the function in a patent

25 because that technology of the future is not disclosed.

1  We can only look at the technology that's actually

2  disclosed.  And the modems that were available in 1996

3  were roughly 28.8 thousand bits per second; whereas,

4  today there are modems out there that will do a thousand

5  times that speed.

6           So, whether or not that's equivalent is a

7  legitimate question and is answered when you're making an

8  assessment of whether that limitation is actually present

9  in a modern-day device.  But that technology is not

10 disclosed in the patent and, therefore, can't be read

11 into it by abstracting the structure that actually is

12 disclosed to ignore those differences.

13          THE COURT:  Well, it seems to me you're almost

14 back to the -- well, the very simple analogy I'm using of

15 the airplane wing; and, so, some new technology comes

16 along -- I mean, a faster modem comes along.  Let's say

17 use a modem, use a conventional modem, use modems -- I

18 mean, that's just a way of getting it in there.  It

19 really is not the key idea or the germ of this patent.

20          Now, I understand you have arguments maybe,

21 you know, later on about validity and so forth.  But

22 you've got an idea or a series of ideas that are

23 patented, and exactly what kind of modem it is doesn't

24 seem to -- to be talking in terms of, "Oh, well, we came

25 up with a much faster modem; so, therefore, that's not

73

1  disclosed" --

2           MR. STEPHENS:  Your Honor, I fundamentally

3  disagree and for the following reason.  Dr. Almeroth has

4  urged to the Patent Office that there is a patentable

5  invention here precisely because one in 1996 would have

6  expected that a modem was too slow to download audio

7  files.

8           So, the notion that you should read into the

9  specification, via this abstraction, all that matters is

10 you're moving data would ignore something that they claim

11 to be essential to not being able to come up with this

12 invention in 1996.  Right?

13          They've said that, you know, somebody wouldn't

14 have thought of this because modems were too slow.  Well,

15 that means that you have to be limited to the structure

16 that's disclosed, which was a slow modem, because that's

17 all that was available at the time.

18          If you say that I'm not limiting the structure

19 to a 1996 modem, then you eliminate the argument that

20 this invention wasn't obvious at the time because you

21 could pop your audio files over the modem very quickly,

22 of course.

23          THE COURT:  I mean, there what you're saying

24 is that, "Gee, if we had just waited, it would become

25 obvious the world was -- you know, Columbus gets no

1   credit because once we had astronauts, we would have all

2   known the world was round."

3          I mean, sure, when technology gets bigger and

4   faster, then suddenly everything becomes obvious.  But

5   obviousness is was it obvious then.  And maybe -- I mean,

6   you're talking, no, it wasn't obvious because everyone

7   thought it was too slow.  Sure, maybe in 2008 or whatever

8   it becomes clearly obvious.  But so what?  They thought

9   of it back when things were slow.

10          And then you're saying, "Well, in that case

11  just because we figured out a way to do it faster, they

12  lose"?  I mean, that's just --

13          MR. STEPHENS:  No, no, no, your Honor.  That's

14  why it's a question of equivalents, right?  That's why

15  you look to see whether there is an actual substantial

16  difference between the technology of today versus what's

17  disclosed in the patent.

18          So, you have to look at the technology that

19  was available to determine what the invention is and what

20  the scope of it is in a means-plus-function claim.  The

21  issue of whether or not later developed technology is

22  within the scope of that is determined by equivalents.

23          THE COURT:  Okay.  All right.  Well, let me go

24  back to Personal Audio.  You seem to just want something

25  called "persistent mass storage device or equivalents."

Claim Construction Hearing

75

1  And that's the structure.  I mean, that's my

2  understanding.  That's what you want, and you take that

3  just because claim 14 describes a mass storage device.

4  And how is that an adequate disclosure?  I mean, what is

5  this mass storage device?

6          MR. MORTON:  I'm not sure I understand

7  your Honor's question.

8          THE COURT:  Well, I mean, you're just saying I

9  should -- my definition for structure should just be "a

10  mass storage device" or "a persistent mass storage device

11  or equivalents"?

12          MR. MORTON:  I think that a mass storage

13  device can receive and store.  And, again, the other

14  thing that I was mentioning on this point was the prior

15  case; and it's the *Finisar* case, your Honor.  And in that

16  case it was talking about receiving and storing video,

17  satellite feed video; and I think it was not disputed and

18  it was not appealed that various forms of storage could

19  receive and store that video feed.  So, that was the

20  basis, you know, for this position.

21          THE COURT:  Okay.

22          MR. MORTON:  I do -- if your Honor would give

23  me the opportunity, I do fundamentally disagree with

24  Apple's proposal and all the details that are in there.

25          THE COURT:  All right.  Laura, go ahead and

1  put up on screen what we started to look at.

2          We start off with the "means for receiving,"

3  and it is probably -- maybe not as date controlled as

4  Apple wants, but it does seem to me that one of the

5  things I should look at is go through the specifications

6  and pick out specifically what the specifications

7  identify.  I mean, that's a typical way of doing a --

8  identifying the structure in a means-plus-function term.

9          And I guess the question I'm going to have is

10  are there any that are missing or any of these that you

11  think are incomplete?  We're coming up on the lunch

12  break; and, so, what I'll probably do is give you copies

13  of these so you can take a closer look at them.  It's a

14  little difficult to read these all right now.

15          But before we get there -- because I'm going

16  to give you a chance to look at this other -- go ahead

17  and put up "means for storing" because that's, I think,

18  the second structure.

19          I think I have to identify a means for

20  receiving and a means for storing.  And I understand

21  Personal Audio thinks one thing does both of them, but

22  this is -- and I've got the -- and this would be -- the

23  previous one was Court's Exhibit 6; so, that was up there

24  with the -- a draft of what the "means for receiving"

25  would be or the structure identified.  And then this

77

1  second one on Court's Exhibit 7 sets out the structure

2  for storage, and I identify there the parts of the

3  specification that cover that.

4         And I think the easiest way to do this,

5  because it's a lot of information and I don't think it's

6  fair in this particular case to have you just give me

7  your thoughts immediately because especially Number 6 is

8  a rather long list, is I'd like you to take a look at

9  these two over lunch; and then when we get back, we'll go

10 into -- and this may be more, from Personal Audio's point

11 of view, what additions should be made and then, maybe

12 from Apple's point of view, what subtractions should be

13 made or changes should be made.

14        I gather that Apple wants a much more closely

15 defined set of words, and I'm gathering that Personal

16 Audio may want to go to something just as bold or broad

17 as just "persistent mass storage" and that's it.  And

18 I've got some concern about that, but I'll give you

19 copies of these two so you can take a look at them.

20        It is about 12:00 right now; and I will ask

21 you to be back, then, at 1:15.  That should give

22 everybody a chance to get to lunch and get back here, and

23 we'll go on with the remaining terms.  So, we'll be in

24 recess at this time.

25        (Recess, 12:01 p.m. to 1:20 p.m.)

1              (Open court, all parties present.)

2              THE COURT:  All right.  We're back on the

3   record, and before lunch I had given each side a copy of

4   one of the proposals for the "means for receiving and

5   storing" and the "means for receiving" and then the

6   "means for storing."

7              Over lunch as we were taking a look at it, we

8   realized I had missed one that was at column 10 which

9   added another description of "means for receiving."  And,

10  so, it's -- basically what you've got in front of you

11  right now is Court's Exhibit 6A as opposed to what was

12  previously up as Court's Exhibit 6.  It's basically the

13  same identification of structure except a sixth one that

14  would be as defined there at Column 10, the "higher speed

15  access, such as an ISDN or cable modem link."  And you

16  see that as column 10, lines 1 through 6 of the '076

17  patent.

18             All right.  So, let me start off with Personal

19  Audio.  What other structures do you say are identified

20  as the means for receiving?

21             MR. MORTON:  Yes, your Honor.  We did take a

22  close look at your proposals, and I have some comments on

23  all of these.

24             THE COURT:  Okay.

25             MR. MORTON:  If you want me to start with -- I

1  do have one other spot in the specification that we

2  wanted to point out.

3          THE COURT:  Okay.

4          MR. MORTON:  So, I can start with that and

5  that's at Column 14, lines 66 to 67, and it calls for a

6  communication --

7          THE COURT:  Let me get there first, please.

8          MR. MORTON:  Yes.  Sorry, your Honor.

9          THE COURT:  Line *[sic]* 14, 66 through 67?

10         MR. MORTON:  I'm concerned.  I'm in the '076.

11         THE COURT:  "Placing the downloaded

12  information into a memory buffer"?

13         MR. MORTON:  No.  That's citing the '178

14  patent.  I apologize, your Honor.

15         THE COURT:  Okay.  The specification should be

16  the same; although, the page and line numbers may be

17  different, right?

18         MR. MORTON:  It is, and I just to find it.

19         THE COURT:  Well, I've got both patents up

20  here.

21         MR. MORTON:  Okay.

22         THE COURT:  Column 14, you say?

23         MR. MORTON:  Yeah.  In the '178 it's

24  Column 14, lines 66 and 67.

25         THE COURT:  Okay.  "When a communications

1  pathway such as an Internet or cellular phone link is

2  available" --

3          MR. MORTON:  Right.

4          THE COURT:  -- "to connect the player."

5          Okay.  And that may be covered in Items 1 and

6  2.  Item 2 does say "cellular" -- I guess it says

7  "cellular radio"; so, maybe we need to have "cellular

8  phone."

9          All right.  What else?

10          MR. MORTON:  Well, backing up to just kind of

11  discuss each of these, I mean, I think in general it's,

12  of course, the law that we have to focus on the claimed

13  function, which is just the receiving and storing by the

14  player.

15          THE COURT:  Well, okay, again, I think you've

16  got to divide out -- I mean, you could have some things

17  that receive and other things that store.  I mean, you

18  might have a combination thing; but at the same time, I

19  think I also should be able to identify or would have to

20  identify the various means --

21          I mean, let's say component X does all the

22  receiving and then component Y does all the storing.

23  That's a means of receiving and a means of storing that

24  would be covered, I think, by that claim term, isn't it?

25          MR. MORTON:  Sure, your Honor, and I'm --

81

1          THE COURT:  Okay.

2          MR. MORTON:  I'm not taking issue with that

3   right now.

4          THE COURT: All right.  Go ahead.

5          MR. MORTON:  I was just going to make the

6   general point that we -- and we can limit it to receiving

7   right now -- that we want to include only the details

8   that are necessary to receive and not extra details and

9   that we need to stick to the player and not other things

10  such as the server computer or specific protocols or what

11  have you.  We have to stick to -- it's the claim to a

12  player.

13         And I think if we do that, going through these

14  four things, at least that's my view and my look at these

15  as to how I would adjust these a little bit.

16         THE COURT:  All right.

17         MR. MORTON:  That's to focus on the player.

18         And I can go through them in order, I think,

19  is fine with me.

20         THE COURT:  All right.

21         MR. MORTON:  So, for the first one, I think,

22  you know, all that's in there that's in the player is the

23  modem.  And, so, "modem" or "conventional high-speed data

24  modem," I think, is all you need for one.  I don't think

25  you need the host server, and I don't think you need the

Claim Construction Hearing

82

1  protocols.  And, again, a part of that is just not

2  putting in detail that's unnecessary for performing

3  the --

4        THE COURT:  Well, what about the high-speed

5  modem -- and it talks about particularly (reading) a

6  high-speed modem connected via a conventional dial-up

7  telephone SLIP or PPP TCP/IP series data communication

8  link to an Internet service provider.  I mean, isn't that

9  one of the things that's identified?

10        MR. MORTON:  Potentially if it was written to

11  say the player has to have a modem -- for this one, a

12  modem "for" connecting to those things.  I mean, maybe

13  it's an esoteric distinction, your Honor, but the

14  telephone is not part of the player and the Internet

15  service provider is certainly not part of the player.

16        So, you know, there could be a way of

17  including that as long as we were saying maybe for each

18  of these there is some structure of the player that's

19  "for connecting" via some link to get the information,

20  receive the information the player needs.

21        THE COURT:  All right.  Again, I'm not -- I

22  guess I understand maybe you want to leave out, on

23  Item 1, the sentence starting with "the service provider

24  is in turn connected."  Is that what you're talking

25  about?

83

1          MR. MORTON:  Certainly that would be one of

2  the things, yes, your Honor.

3          THE COURT:  All right.  But take a look at

4  that first -- and then the second sentence, "the host

5  server provides" -- all right.  I can follow your

6  argument there.  But in the first sentence where it's

7  talking about how it's connected, I mean, you are talking

8  about how it receives it.  It's a (reading) high-speed

9  data modem connected via conventional dialup telephone

10  SLIP or PPP TCP/IP series data communication link to an

11  Internet provider.  That's how it's receiving it.  Why

12  would you say that's not in there?

13          MR. MORTON:  It's just the point that I'm

14  trying to limit it to just the structure in the player.

15  That's why I said it would really be a high-speed

16  modem -- even if you just put the word "for" in there,

17  then that would be clearer it's for connected *[sic]*.

18          THE COURT:  "For connected"?

19          MR. MORTON:  "For connecting."

20          THE COURT:  All right.  And what's your

21  next...

22          MR. MORTON:  In the second one -- I mean,

23  there is a similar issue where this is calling for the

24  dedicated host computer.  And, I mean, in this one I

25  think the client stations are the player; and, so, really

1  what you need to have here is, I mean, the -- I mean, the

2  structure is the client station has dialup telephone

3  facilities, cellular radio, cable modem, or satellite

4  link.

5          THE COURT:  Okay.

6          MR. MORTON:  In the third one -- this is again

7  similar.  I mean, I think the structure we're trying to

8  get at here is a radio or infrared link for connecting to

9  a local communications server.  Whereas this is

10 describing a link -- you know, there the Internet and

11 a link and then the local communications server, and then

12 that is linked to the player.  So, from the player

13 standpoint, this would have a radio or infrared link for

14 connecting to a local communications server.

15         THE COURT:  Speaking of links, mine seems to

16 have come unconnected.

17         (Brief off-the-record discussion.)

18         THE COURT:  All right.  Go ahead.

19         MR. MORTON:  I think Number 4, "replaceable

20 media, such as an optical disk cartridge," is fine.

21         Number 5.  On this one I just want to, you

22 know, have fidelity to the patent specification itself.

23 It calls for a direct link between the player and then

24 says (reading) which may be implemented using the

25 Cellular Digital Packet Data service.

1           And I guess my proposal here would either be

2    to just say one structure is a direct link or to put in

3    "direct link between the player which may be implemented

4    using a Cellular Digital Packet Data service."

5           THE COURT:  Well, now, let's be careful

6    because I'm supposed to list the structures that are

7    identified in the specification.  And what this does say

8    is (reading) a direct link between a mobile client

9    player, such as a laptop, may be implemented using the

10   Cellular Digital Packet Data service presently available

11   and so on and so forth.  It doesn't describe other kinds

12   of direct links; and it doesn't say "direct links such

13   as."  I mean, it's just listing one more kind of link.  I

14   mean, some of these others are fairly direct links, too,

15   I guess.

16          MR. MORTON:  Well, and that's -- I mean, most

17   of these are links; and I think a link, a data

18   communications link or direct link, is all you need to

19   establish the receiving.

20          THE COURT:  Well, again, we're doing a

21   means-plus-function.  Aren't I first supposed to identify

22   or list out exactly what's identified and then it's "or

23   equivalents"?  And you may by able to argue about

24   something being equivalent, but you don't get it at the

25   first shot.  You're going to have to show that it's

1  equivalent, right?

2          I mean, I think that's -- just as a matter of

3  law I don't get to, when I'm defining this, broaden it

4  out.  I put in very specifically what's in the

5  specification.  You may then be able to argue that, well,

6  A equals B or A is the same as equivalent to B under the

7  means-plus-function doctrine; but I don't put that there

8  in the definition, do I?

9          MR. MORTON:  Well, to be clear on this one,

10  your Honor, I think "a direct link," period, is enough

11  structure for a person of skill in the art and that when

12  you're looking at what's the necessary corresponding

13  structure for receiving, that "a link" or "a direct link"

14  is sufficient structure.  And these are all different

15  examples of links that are also provided.  We're okay

16  with listing them but --

17          THE COURT:  Well, you would have to give me

18  some authority for the proposition that in a

19  means-plus-function construction when the specification

20  identifies -- or has a sentence like "a direct link may

21  be implemented using thus-and-so," I am then to take that

22  as giving a broad structure going far beyond what's

23  actually identified.  I'm not saying it can't be -- that

24  may be an equivalent; but that seems to me that's going

25  to fall under the "or equivalent" which will be the

1 argument you make to a jury, isn't it?

2          MR. MORTON:  And I understand the "or

3 equivalent" point; and if that's where we end up, we're

4 certainly prepared to make that argument, your Honor.

5          THE COURT:  Okay.  But what I'm saying here is

6 if you've got some authority to the contrary -- I mean, a

7 case that falls in with what you're talking about very

8 closely -- you're going to want to cite that case to me.

9 I mean, maybe not while you're standing there but before

10 I finish writing the order because -- and each one of

11 these -- and we can all cite, in this area of the law, a

12 case for almost anything.  You're going to want to look

13 for a case that's very close on point but -- I mean,

14 let's go ahead.  What other comments do you have, and

15 what other additions do you want to make?

16          MR. MORTON:  I could belabor that point, your

17 Honor, but I don't need --

18          THE COURT:  Sure.

19          MR. MORTON:  -- to right now.  That was the

20 extent of my comments.

21          THE COURT:  All right.  So, we have column --

22 the addition, of course, is the Column 10 addition that

23 we were able to find.  So, any other -- I'm supposed to

24 be identifying the structure for "receiving."  Any other

25 structures you think should be in there?

88

1          MR. MORTON:  Additional structures, no.

2          THE COURT:  Okay.  All right.  Let me hear

3  from Apple, then, on this proposal that I've put up as

4  Court's Exhibit 6A.

5          MR. STEPHENS:  Your Honor, we think you've

6  done an admirable job of going through the spec and

7  finding the disclosed structures that correspond to the

8  means for receiving.

9          On Number 6 that you've found over lunch, I

10  would point out that if you look at that portion of the

11  specification, you'll see that it's really talking about

12  a high-speed service that would function in place of the

13  telephone modem.

14          THE COURT:  Right.

15          MR. STEPHENS:  So, I think the right way to do

16  that, your Honor, if I may, is to put it into Number 1,

17  probably after the "TCP/IP series data communication

18  link," say "or high-speed access, such as ISDN or cable

19  modem, to an Internet service provider," because that's

20  what I think is really being disclosed in the portion

21  that you identified in the specification.

22          THE COURT:  Yeah.  I mean, it may go in there;

23  or it may -- one conventional way of doing it is you just

24  go through the spec and pick them out one after the

25  other, and that makes it very easy for the Court of

1  Appeals to find them and anybody else.  So, that's --

2          MR. STEPHENS:  I understand the --

3          THE COURT:  But I understand the way you're

4  talking about it.  That was the first question we had was

5  haven't we already covered this.

6          MR. STEPHENS:  I don't disagree with adding

7  the ISDN and cable modem link.  I just think that in this

8  separate Alternative 6, it opens grounds for argument

9  that that is a direct link apart from ISDN and cable

10  modem or in place of the conventional dialup, in other

11  words, any link will -- any high-speed link will satisfy

12  Number 6.  That's the concern I have because I don't

13  think that's a fair reading of what the spec actually

14  discloses at that point.

15          THE COURT:  Well, no, ISDN is a particular

16  protocol or a particular -- I guess it's the system the

17  phone people used to have, I guess, before they had DSL.

18          MR. STEPHENS:  That's right.  But it's the

19  "such as" language that concerns me.  So, the argument I

20  could imagine coming from Personal Audio would be --

21          THE COURT:  Oh, okay.  All right.  The "such

22  as."  You're right.

23          MR. STEPHENS:  So, the argument would be any

24  high-speed link will do; and I don't think that captures

25  the structure that's --

1          THE COURT:  Okay.  You're probably right.  I'm

2   probably going to pull out "such as."  That may wind up

3   being an equivalent argument that can be made later on.

4          What about his comments -- and I think he may

5   have -- Mr. Holdreith *[sic]* made some comments -- and I

6   think he may be correct -- on, for example, on Number 1

7   that last couple of sentences talking about "the service

8   provider is in turn connected to" and so on, that really

9   doesn't have much to do with the means for receiving at

10  the player end.

11         MR. STEPHENS:  Well, it does, your Honor, in

12  one particular respect.  So, the player clearly uses the

13  FTP protocol as well.  That's disclosed in the

14  specification, and it also is just the way FTP works.

15  You have to have an FTP client and an FTP server.  So,

16  the FTP belongs in that Section 1, I think; and that, of

17  course, would apply as well to ISDN and cable modem.

18  That's the way you use an Internet connection to transfer

19  files in this specification is through FTP so --

20         THE COURT:  Well, what about the sentence in

21  particular "the service provider" -- and that is -- "is

22  in turn connected to the host server" --

23         MR. STEPHENS:  Well, if you look at the player

24  that's claimed and the player that's disclosed, you'll

25  see it's a part of a system, right?  The player gets its

1  audio from somewhere.  So, having just the means for

2  receiving isn't going to make the audio magically appear

3  on your device.  So, I don't think it's inappropriate to

4  have something in the structure that refers to the

5  source; but I do understand the concern.

6             THE COURT:  Okay.  All right.  Okay.  So, that

7  then goes over the structure for the receiving; and then

8  we have the storing.

9             And if Ms. Mullendore will provide that...

10             And this is on -- and actually it's 7A, and we

11  put in a -- rather than "is," I changed it to "may be" to

12  be more consistent because it can be one or the other.

13             All right.  Again, other than that one change,

14  it's the same as what you were looking at over lunch.

15  Let me hear from Personal Audio.  Any changes,

16  corrections, additions or whatever to the storing part?

17             MR. MORTON:  No, your Honor.

18             THE COURT:  All right.  What about from Apple?

19             MR. STEPHENS:  First just a question for

20  clarification.  Is this means for storing going to be the

21  construction for both the means for storing that is

22  recited separately from the means for receiving and

23  storing or just for the means for receiving?

24             THE COURT:  Well, actually I was going to put

25  down a means for receiving and a means for storing.

92

1          MR. STEPHENS:  I understand.  So, that would

2   then cover both limitations because there are, in fact,

3   two different means for storing limitations.

4          THE COURT:  Okay.  I guess I'm not

5   understanding your question.  What --

6          MR. STEPHENS:  So, there's a means for storing

7   program segments in claim 1 and a means for storing the

8   sequencing file.  They're separately recited.  And it

9   matters for a reason I'll explain.

10          THE COURT:  Okay.

11          MR. STEPHENS:  So, I don't think that a disk

12   by itself can store either program segments or a

13   sequencing file.  You've got to have a file system.  All

14   right?  A disk only stores bits.

15          And in order to represent something other than

16   a block of 256 bits or however the physical disk is

17   organized, you need software that organizes the data on

18   there in such a way that you can store something that is

19   a file.  A file is a logical construct that organizes the

20   bits on the disk so that you can apply a name to it and

21   retrieve it using the name.  That's kind of what a file

22   is.  I'll defer to the experts on that, but that's sort

23   of what a file is.

24          So, in order to store a file on a disk, you've

25   got to have a file system.  And in order to store audio

1  in a file, you need a format that is capable of

2  representing sound waves of one sort or another as bits

3  in a file.

4          So, our view, your Honor, is that the means

5  for storing the program segments, for example, needs to

6  include the disclosed formats for storing audio, in

7  particular the TrueSpeech and MIDI file formats; and the

8  means for storing the sequencing file needs to include

9  the format for storing sequencing information as

10  disclosed.

11          The disk can store bits, but it needs this

12  logical organization overlaid on it to actually store the

13  particular types of information that are recited as a

14  part of these functions.

15          THE COURT:  Okay.  I thought -- and maybe this

16  is the answer because a little bit later we will be

17  getting into the "means for storing a plurality of

18  program segments."

19          MR. STEPHENS:  That's the other means for

20  storing I was talking about, your Honor.

21          THE COURT:  Right.

22          MR. STEPHENS:  So, I agree.  The structure I'm

23  talking about --

24          THE COURT:  And we will be getting to that.

25          MR. STEPHENS:  Okay.  Fair enough.  I was

1  concerned that maybe this means for storing was going to

2  cover both.

3          THE COURT:  No.  No, no.  There is a separate

4  means for storing the plurality of program segments, and

5  we get to that a little bit later.

6          MR. STEPHENS:  Okay.  Now, I do think,

7  however, that the same concerns with different

8  corresponding structure will go apply to the sequencing

9  file, right?  To store a file, you still need a file

10 system which doesn't come with a disk, right?  You have

11 to compose one.

12         And you also need a particular way of

13 representing sequencing information or at least a

14 sequencing file, and one is disclosed at some length in

15 the patent.

16         THE COURT:  And, so, you're talking about

17 the -- your proposal involving "configured with a *Windows*

18 *95* file system" and continuing on through there?

19         MR. STEPHENS:  That's right, your Honor.

20         And I think it's worth pointing out that, you

21 know, you might debate a bit about whether these

22 structures belong in the "means for storing" or in the

23 "means for reproducing."  In fact, I think they belong

24 both places because you need to be able to read a

25 sequencing file and use that file to locate on the disk

1 where the next program segment that you're going to play

2 on the list is.  And those things implicate these

3 structures I'm talking about directly, how do you find

4 the program segment on the disk if you don't have a file

5 system, all you have is a big bag of bits.

6       So, I think that the "means for storing"

7 properly requires both a file system and a particular way

8 of representing the kind of information that's recited in

9 that particular function.  So, in the "means for

10 receiving and storing," it's a sequencing file.  In the

11 "means for storing program segments," it's an audio

12 format.

13       THE COURT:  All right.  Let me hear the

14 response from Personal Audio.  In other words, I guess

15 it's akin to you've got to show the algorithm or how it's

16 being done on the machine.

17       MR. MORTON:  Well, your Honor, this is one I

18 don't think that got a lot of time and attention in any

19 of the briefing.  My reaction to it is that it's

20 definitely going much deeper into the detail that's

21 unnecessary for performing the claimed function.  And, of

22 course, that's what they want to do is get down to these

23 minutiae.  For a person of ordinary skill in the art to

24 receive and store a sequencing file, all you need to say

25 you have is what you've said here, memory.  So, that's my

1 basic response to that.

2          MR. STEPHENS:  Your Honor, if I may briefly,

3 that's the same error I think that you pointed out

4 earlier.  You don't abstract from the structure that's

5 there; you take the structure that's disclosed.  And

6 that's what we're talking about is the structure that's

7 disclosed.

8          THE COURT:  Well, I guess I'm wondering --

9 and, of course, I'm pretty familiar with if all you have

10 is a general purpose computer to do such-and-such, then

11 the cases say, well, you have to give some kind of

12 algorithm.  But on the other hand, this is talking about

13 individual -- I mean, we're talking about a device here,

14 not just method; and we're talking about what it takes,

15 not so much as to what is in it.  So, it sounds to me

16 that you may be pushing the envelope on what must be

17 identified as structure.

18          MR. STEPHENS:  I understand what you're

19 saying, I think, your Honor; and I think your analogy is

20 an apt one.  It is somewhat like the processor situation

21 because you have a general purpose digital storage

22 device.

23          If you're going to have a means for storing

24 audio or speech in a closet, right, and it's a

25 means-plus-function claim for storing audio in a closet,

1 you need some physical medium to store it on and a way of

2 putting on and recovering the sound from that.

3          This is sort of like that, right?  You have a

4 general purpose storage device that's capable of storing

5 any kind of bits.  By itself it is not capable of storing

6 audio.  You have to organize the information in such a

7 way that you can retrieve it as audio, and the disk

8 itself doesn't provide that structure.

9          The same is true for sequencing information.

10 You need some logical structure provided by software or

11 at least a format of data on the disk that allows you to

12 say this bit of information represents a portion of a

13 sound wave, the next one represents the next portion of

14 the sound wave, and so on in order to recover a program

15 segment from that disk or to store it on there in the

16 first place.

17          THE COURT:  Okay.

18          MR. STEPHENS:  It's not like a record that's,

19 you know, a single purpose storage device, a vinyl record

20 that just identifying record itself tells you how to do

21 it.

22          THE COURT:  All right.  Let's go on to the

23 next -- the next one is the "data communications link"

24 and "downloading...from one or more server computers."

25 And Personal Audio says that "data communications link"

1  does not require construction; give it its plain and

2  ordinary meaning.  And Apple wants it to be a network

3  connection.

4          So, let me ask Apple why it has to be a

5  network connection.  Are you trying to claim there's got

6  to be two different networks here or -- why does it have

7  to be a network connection?

8          MR. STEPHENS:  Not at all, your Honor.  The

9  issue is this.  We're not asking for a separate

10  construction of "data communications link."  We're

11  asking, in effect, for the construction of the entire

12  phrase, "a data communications link for

13  downloading...from one or more server computers."  And we

14  have kind of broken it out as a way of addressing them,

15  but what we're really after is a construction of that

16  entire phrase.

17          And the reason we say that the data

18  communications link needs to be a network connection is

19  that it really doesn't make sense to download something

20  from a server over a link that isn't a network, right?  A

21  server is designed to respond to requests from multiple

22  clients, and to do that it needs to be on a network where

23  it can be accessed by --

24          THE COURT:  Well, let me ask your expert.

25  Mr. Wicker?

1          DR. WICKER:  Yes, your Honor.

2          THE COURT:  Would you step to one of the

3   microphones, please.

4          All right.  Dr. Wicker, help me out.  And this

5   is just on the technology.  You don't have to have a

6   network to have a client -- a host/client-type

7   relationship or a server/client-type relationship, do

8   you?  I mean, you can have it without a conventional

9   network.

10         DR. WICKER:  Well, your Honor, the concept of

11  server/client architecture does imply a network.  The

12  server is there to serve many clients and --

13         THE COURT:  Well, it doesn't have to.  It

14  could be one, right?  I mean, you've got a computer; and

15  its client, say, is the disk that goes into a camera

16  or -- I mean, I understand that many times that's true.

17  But when you just talk in general of a client and a

18  server, it's not always true, is it?

19         DR. WICKER:  Well, generally speaking when we

20  use the terms "client" and "server," we are talking about

21  something a little larger that than a single-purpose

22  server connected to a single client.  Otherwise, we would

23  talk more about the disk that's associated with a CPU, in

24  which case you would have a one-to-one relationship.

25         THE COURT:  And what are you basing that on, I

100

1  mean, other than that's what you're here to say?  I mean,

2  I'm taking a look at 1996 and the idea of -- you know,

3  you've got this architecture; and if you have it drawn

4  out there, you've got the server -- in fact, I think the

5  IEEE talks about in terms of the server being relatively

6  larger than the client.  And that's basically the

7  distinction they make; one is bigger than the other and

8  provides services or information or data or whatever to

9  the other.

10         DR. WICKER:  That's certainly true, your

11  Honor.  But I think it goes a little bit more beyond

12  that.  If we're thinking about 1996, the Internet had

13  just begun to switch over from a research tool to a

14  public commercial network.  Servers provided information

15  to multiple users over the Internet.  That was the term

16  we used in '96, and it clearly implied a device that

17  served many clients as opposed to a single one.

18         THE COURT:  Well, now, you could actually have

19  clients and server process on the same computer, couldn't

20  you?

21         DR. WICKER:  Yes, sir, you could.

22         THE COURT:  All right.  Thank you.

23         Well, other than -- and let me go back to

24  Mr. Stephens.  Other than there's going to be two

25  computers -- and that shows in, I guess, their preferred

1  embodiment in Figure 1; and there they specifically say

2  they're using the Internet.  Is there anything else that

3  this has to be a network other than -- I mean, why can't

4  it just be two computers, the larger one the server,

5  whatever -- and it may be hooked into the whole world to

6  bring in stuff, to bring in neat programs and so forth.

7  But what it's downloading it to or giving information to

8  what they call their "player" or, as you like to call it,

9  their "laptop," why does that have to be some kind of a

10 network connection?

11       MR. STEPHENS:  Well, your Honor, it goes

12 directly to what it means to download.

13       And if we could have Slide 20.

14       It's not enough to just transfer or move a

15 file from one computer to another.  That was explicitly

16 given up in the prosecution of these claims.  The notion

17 of downloading from a server means that you're sending a

18 request to another computer, a remote computer over a

19 network, and getting back information from it.  That's

20 what --

21       THE COURT:  You're going to try to tell me

22 that push technology was unknown in 1996?

23       MR. STEPHENS:  Your Honor, push technology in

24 1996 used a request and a response just like we're

25 talking about here.  It was called "push"; but, in fact,

1  what happened was you had a timer that sent repeated

2  requests.  I've litigated cases on this; and I should

3  point out, your Honor, I have a master's in electrical

4  engineering which I got at the time.

5          THE COURT:  That's exactly why I've got

6  Dr. Shipman and Ms. Mullendore here is --

7          MR. STEPHENS:  Understood.

8          THE COURT:  I don't have a master's in

9  engineering, but that's why I rely -- and that's -- I'm

10  hoping that you and your experts will help educate me.

11          MR. STEPHENS:  Understood, your Honor.

12          THE COURT:  But I guess I'm concerned with

13  this idea -- and I understand that when we get into

14  infringement, yes, it would be very nice to avoid -- or

15  to have them pinned down to "network."  I'm having a

16  problem, though, seeing why I should pull that out of the

17  specifications or the -- or put that kind of limitation

18  based on the claim language and specifications.

19          MR. STEPHENS:  I understand, your Honor.  And,

20  you know, honestly, as long as it's clear that we have a

21  client/server relationship between the player and the

22  server that it's downloading from, I think that is more

23  what we are after here.  But I do think that part of what

24  was meant in 1996 by "downloading from a server" was

25  reaching out and requesting something over the network

1  and getting back.

2          Now, there were things called "push," like I

3  said; but by and large those were just a request on a

4  timer.  And in any event, it's not disclosed here.

5  What's disclosed here is exactly what I -- exactly the

6  same thing, a timer that says, I'm going to dial up the

7  IFP and use FTP to download a file to save time.

8          So, the impetus behind our proposed

9  construction on "network" is the phrase as a whole, not

10 separately just "communications link" but the fact that

11 you have a communications link for downloading from a

12 server.  In 1996 what that implied was connecting to a

13 network using sending a request to a server and receiving

14 back a file in response to that request.

15         And doing that on a point-to-point link, for

16 example, you know, from a local hard drive to a computer

17 sitting next to it, you're transferring information from

18 one device to another or, let's say, even two computers

19 sitting next to each other via -- well, a lot of disk

20 drives have microprocessors and the like.  That's not

21 downloading.  Right?  And yet if you --

22         THE COURT:  Well, no -- and this, I guess,

23 gets into it.  You want -- I mean, you want the request.

24 You want it to be -- you want "network."  You want

25 something else.  But if you take a look at just what

1  "download" was back in 1996 with the IEEE dictionary,

2  (reading) to transfer some collection of data from the

3  memory of one computer to the memory of a second computer

4  that is relatively smaller than the first or to transfer

5  some collection of data from computer memory to another

6  storage collection.

7         Those were known -- I'm not saying they're the

8  only definition, but those were known definitions of

9  "download" --

10         MR. STEPHENS:  But, your Honor, that's picking

11  "download" by itself; and that's why I keep saying --

12         THE COURT:  Well --

13         MR. STEPHENS:  -- what we're talking about is

14  the whole phrase, a communications link for downloading

15  from a server.  So, the downloading that's described by

16  the IEEE dictionary is not talking about downloading from

17  a server.  Just moving things from one computer to

18  another does not necessarily imply that one of them is a

19  server.

20         THE COURT:  No, it doesn't necessarily apply;

21  but if one of them is a server, then you've got -- or --

22  I understand that what you're saying could be a

23  possibility.  But I also believe the courts say that I'm

24  not supposed to try to build in limitations or read in

25  limitations from, say, Figure 1, which clearly is an

Claim Construction Hearing

105

1   Internet kind of a setup, more like, I think, what you're

2   looking at.  But it's not the only possibility.

3            MR. STEPHENS:  And we're not saying it's

4   limited to the Internet.  But we are saying that this

5   phrase, to one of ordinary skill in the art in 1996,

6   applies to client/server architecture and that that

7   client/server architecture implies the construction that

8   we've proposed, a network, a request, and receiving from

9   a server.  It doesn't have to be --

10           THE COURT:  Well, is there anything in the

11  specification or the intrinsic evidence other than what

12  you think the ordinary meaning of "download" is --

13  anything else that gets into this request?

14           MR. STEPHENS:  Oh, sure.

15           THE COURT:  I mean, you --

16           MR. STEPHENS:  We've cited a bunch of them in

17  our brief, your Honor.  There is a number of places where

18  the client is described as requesting.  I mean, that's

19  inherent in the FTP --

20           THE COURT:  Well, it can request.  But when

21  you get to the claims, does it have to request?

22           MR. STEPHENS:  Absolutely, your Honor.  That's

23  what it means to download from a server.  You have to

24  send a request to the server for service.  The server

25  responds by giving you that service.

1          And in the case of a request to download, that

2   service is sending the file, transmitting it from the

3   server to the client in response to the request.

4          THE COURT:  Do you think it has to be -- you

5   had earlier indicated you were familiar with the time

6   system of push technology.  I mean, do you think it has

7   to be more than that, just a "it's time to do it" signal?

8          MR. STEPHENS:  I'm not following you.

9          THE COURT:  Well, you indicated before that

10  you were familiar with push technology but, at the very

11  least, it had to have some kind of a timing mechanism.

12  When you're talking about this, do you mean that in this

13  particular patent it has to have anything more than the

14  client, the player, doing anything more than sending out

15  its "I'm ready," its -- you know, on a regular timed

16  basis, anything more than that?

17         MR. STEPHENS:  I think as long as it was

18  sending a request to the server to download the file, I

19  think that would be okay whether it's -- I'm not trying

20  to read a timer into the claim or anything like that,

21  your Honor.  All I'm saying is that --

22         THE COURT:  Well, can it be a manual?  In

23  other words, the operator says, "Okay.  I want this"?

24         MR. STEPHENS:  Sure.  I don't see a

25  restriction in this limitation on what initiates the

1  download.

2          THE COURT:  Okay.

3          MR. STEPHENS:  All we're saying is that the

4  thrust of this limitation as a whole, the link for

5  downloading from a server, implies a client/server

6  architecture and that implies a server that responds to

7  requests from multiple clients and that suggests --

8          THE COURT:  Well, does it have to be multiple?

9  I mean, you can't -- I mean, where in this system does it

10 have to be multiple?  Why can't you just have you've got

11 a -- you've got your desktop, and you've got your laptop?

12         MR. STEPHENS:  It's a fair point, your Honor.

13 I guess what I'm getting at is that "server" means it's a

14 device that's capable of responding to requests from

15 multiple clients, not necessarily that you have more than

16 one client.  So, I'm not suggesting that this limitation

17 couldn't be met unless you have a bunch of clients on

18 that particular --

19         THE COURT:  Okay.  So, even under their -- or

20 the way you want their system with the desktop/laptop,

21 the desktop -- it may be you're the only one smart enough

22 in town to have a laptop so you use it; or you and all

23 your brothers and sisters or everybody in the office

24 could have laptops and use that same desktop.

25         MR. STEPHENS:  And those both would fit.

Claim Construction Hearing

108

1         THE COURT:  Okay.

2         MR. STEPHENS:  As long as you're sending a

3    request over a network to the server.  So, you're right.

4    I'm not suggesting that it depends on the number of

5    actual users.  It's really a matter of what the server is

6    capable of doing.

7         THE COURT:  All right.

8         MR. STEPHENS:  And again, your Honor, I do

9    want to emphasize that this is claim scope that was given

10   up in prosecution.  Right?  This notion that just

11   transferring from one computer to another or from an

12   external source to the player --

13        THE COURT:  Well, you're basing that on the

14   change from "receiving" to "downloading"?

15        MR. STEPHENS:  Yes.  And in -- from an

16   external source to one or more server computers.  The

17   reason these three pieces of this limitation need to be

18   construed together is they are all part of a single

19   amendment, right?  "A communications port for

20   establishing a data communications link for

21   downloading...from one or more server computers," that

22   was all added in a single amendment; and that amendment

23   was intended to distinguish simply transferring from one

24   device to another and require the client/server network

25   architecture that we're suggesting.

1            THE COURT:  Well, you're reading an awful lot

2    into all -- I mean, I understand the -- because keep in

3    mind when you're talking about disclaimers, it has to be

4    very, very clear.  And just the fact that you change from

5    "receive" -- which could conceivably be something like,

6    well, I had my tape recorder going and a little

7    microphone and I tape-recorded the audio and then

8    transferred that -- I mean, you're talking about

9    downloading because it's pretty clearly from one computer

10   to another; and it's digital.

11           MR. STEPHENS:  Well, the digital was already

12   there, your Honor.  The digital compressed audio program

13   files was there.  So, this was always about moving

14   digital audio files; and they gave up the very broad

15   notion that just receiving was enough and, instead, said,

16   "What we're after here, PTO, is this client/server

17   architecture."  And they did that by --

18           THE COURT:  And the citation to their quote,

19   "We're after client/server architecture," is where; or is

20   that your rephrasing of what they actually said?

21           MR. STEPHENS:  Well, it's a bit of a

22   rephrasing, I grant you that.

23           THE COURT:  Okay.

24           MR. STEPHENS:  But the server was explicitly

25   added, as was "download."  And that means, to one of

1   ordinary skill in the art, a client/server architecture

2   because you have to -- in order to download from a server

3   you need to send a request and get the file back.  And,

4   of course, that's the only thing that's disclosed, right,

5   is using file transfer protocol over a network to get

6   files from a remote computer.

7                Now, there is more file history here that I

8   think we should look at.  They also explicitly gave up

9   "transmitting," which, of course, is something they are

10   now asking to have back.  So, claim 54 was amended as a

11   part of this same response to an Office Action; and in

12   this claim "transmitting" is a synonym for "downloading."

13                THE COURT:  Well, now, keep in mind also when

14   we go into all this -- let me just be sure --

15                MR. STEPHENS:  One other --

16                THE COURT:  Well, and just to be very sure

17   because we don't want to get ourselves confused, all of

18   this discussion is just dealing with the '178 patent,

19   right?

20                MR. STEPHENS:  The '178 is the patent that has

21   downloading in it, your Honor.

22                THE COURT:  And it also has this prosecution

23   history applicable to it.

24                MR. STEPHENS:  I'm sorry?

25                THE COURT:  These disclaimers that you're

1  talking about were in connection with the '178

2  prosecution history, not with the earlier '176 *[sic]*.

3          MR. STEPHENS:  Yeah.  The '076 doesn't have

4  that --

5          THE COURT:  Have that word.  Right.  Okay.  Go

6  ahead.

7          MR. STEPHENS:  This is strictly about the

8  '178.

9          Another piece of file history that we should

10  look at is the remarks that accompany the amendment.  So,

11  they're saying that downloading is from a remote server

12  via the player's communications port.  Again, this is an

13  argument made to the Patent Office to get the claims

14  allowed; and it was successful.  The reasons for

15  allowance talk about the downloading from a server is one

16  of the reasons the claims were allowed.

17          So, this is an express disclaimer of

18  transferring a file from another computer that's sitting

19  right next to me to the player.  It requires downloading

20  from a remote server and, hence, our proposed

21  construction.

22          THE COURT:  Well, I guess I've not seen

23  anything that says "remote" has to be X feet or in the

24  next room.  It's separate.

25          MR. STEPHENS:  You know, I grant you that

1  "remote" is maybe not the most precise term.  They chose

2  it, not us.  I don't think "remote" means it's sitting

3  right next to it; but I'll grant you that how far you

4  have to go to become remote, it may be a matter of

5  some -- in the description of the patent, it's pretty

6  clear we're talking about a server located on some other

7  premises connected via an IFP.

8         THE COURT:  All right.  Well, Personal

9  Audio -- I mean, let me go ahead; and I'll give you the

10 last word on this.  Any comment you want to make?

11        MR. HOLDREITH:  Yes, sir.  The court, I think,

12 has very clearly studied these related issues.

13        THE COURT:  Doesn't mean I understand them

14 yet.

15        MR. HOLDREITH:  But you have articulated the

16 questions that we would pose to Mr. Stephens; so, I'll

17 try to be very brief in responding.

18        First of all, I'll start with this file

19 history.  And there is no disclaimer anywhere in the file

20 history.  Prior art under consideration was prior art

21 that did not have any kind of sequencing file at all, and

22 the distinction that the applicant was making was saying

23 that's a phone message machine.  It's a digital tape

24 recorder.  It doesn't have any sequencing file at all.

25 So, the distinction wasn't downloading or not

1 downloading; it was sequencing file or no sequencing

2 file.

3         You can read those file histories all day

4 long, and there is no disclaimer that says the

5 downloading must be over a network connection or the

6 downloading must be over some geographic distance or the

7 downloading must --

8         THE COURT:  Well, what about the idea, though,

9 when you start getting into servers and clients that

10 typically -- not always but pretty typically that you are

11 talking about some kind of a network?

12         MR. HOLDREITH:  Good question, sir.  And the

13 court has already correctly pointed out it is a

14 server/client relationship when you have a single

15 dedicated local device serving a smaller device, and that

16 comes straight out of the specification.  We don't even

17 have to go to extrinsic evidence on --

18         THE COURT:  All right.  Which part of the

19 specification, just to make it easier?

20         MR. HOLDREITH:  Sure.  It's Column 7, lines 57

21 to 62.  And I'm looking at the '178 patent.

22         If I can have the presentation screen, I've

23 got it called out here.

24         There is an example here, Column 7 at line 57;

25 and it's the one where you have the player in the car.

1  And it says (reading) to facilitate use of the system in

2  an automobile, a player computer may be linked to the

3  Internet via a local communications server computer via a

4  radio or infrared link.

5          So, we can't construe the claim to exclude a

6  local communications server talking to a player, in this

7  instance over a radio or infrared link.  And I really

8  don't know what Apple is trying to do by substituting

9  "network" and by talking about the client/server

10 relationship.  I mean, they're, I think, trying to create

11 a noninfringement argument; and they want to suggest that

12 the way their device works is not a client/server.

13 That's the genesis of the argument, but they haven't been

14 very clear about.  The example given in the specification

15 here, I think, absolutely precludes any construction that

16 would read out a local communications server with a

17 direct link to the dependent device.

18          I'd also like to point out the dictionary

19 definitions.  The court gave the IEEE one.  That's

20 absolutely right.  The parties' dictionary definitions

21 also do not require a request, do not require geographic

22 distance.  It's just the opposite.  And, in fact, even

23 Apple's definition includes moving blocks of data from

24 one device to another.

25          THE COURT:  And this definition again, just to

1  make it easier when I'm going back, is which?

2          MR. HOLDREITH:  I can show you that on a slide

3  here, your Honor.

4          THE COURT:  I've read your materials.  I don't

5  have them memorized.  So, anytime you can give me a quick

6  pinpoint citation, it will make it easier when I go back

7  through the transcript.

8          MR. HOLDREITH:  Yes, sir.  It's Apple's

9  Exhibit E, and it's the *Microsoft Press Computer*

10 *Dictionary*.  I have it on the screen here.

11         Apple in the brief discussed the first

12 definition of these two, which is where they get

13 "request" and "network."  They didn't discuss the second

14 definition, which is (reading) to send a block of data --

15 it uses the example of a PostScript file -- to a

16 dependent device.  That's a definition Apple has

17 sponsored of "downloading," and it doesn't require a

18 request.  It doesn't require a network connection.

19         THE COURT:  Okay.

20         MR. HOLDREITH:  The last point I guess I would

21 make is we're not trying to avoid "download" or "server."

22 Those terms are in the claim.  They will be read to the

23 jury.  So, the suggestion that this is some nefarious

24 effort to get away from claim language is just wrong.

25         THE COURT:  No, but you're trying to keep

116

1  the -- I mean, they're trying to avoid infringement;

2  you're trying to prove infringement.  I mean, that's -- I

3  don't regard any of those as evil.  That's kind of what

4  you're trying to do here --

5              MR. HOLDREITH:  Yes.

6              THE COURT:  -- both sides.

7              All right.  Then we get to the next one,

8  "selected audio program segments" and then -- and that's

9  in the '076, claim 1 -- and "a collection."  That's in

10  the '178, claims 1, 14 through 19, and 25 through 29 and

11  here, oddly enough, it seems that Personal Audio wants to

12  be limited to the preferred embodiment.  Apple seems to

13  want the more broad term.

14              So, let me ask Personal Audio.  Your

15  definition seems to be just, you know, "the audio program

16  segments/files are chosen by or for an individual

17  listener."  But that's just one embodiment.  Why is it --

18  why do we limit it to just that?

19              MR. HOLDREITH:  Yes, your Honor.  We

20  definitely do not want to suggest that the claim should

21  be limited to a preferred embodiment, and that's not a

22  canon of claim construction we're relying on here.

23              Our basis for understanding the claim that way

24  comes from -- it is the description certainly of, I

25  believe, all embodiments.  I'm not sure I saw any

1  embodiment of the player -- maybe Mr. Stephens can point

2  one out to me if I'm mistaken, but there is not an

3  embodiment where the collection of programs on the player

4  is anything other than specific to the individual who is

5  operating that player and personal --

6           THE COURT:  Well, I thought that the host

7  could sometimes just send a -- it doesn't think but I

8  guess what it decides, what it so-called "thinks" that

9  the player wants.

10          MR. HOLDREITH:  That's true.

11          THE COURT:  And it may not be any choice at

12  all.  I mean, it's just here, you get this ten country

13  western songs or you get this 25 big band swing songs;

14  and then whoever is operating -- the user of the player

15  might rearrange them and delete some, skip some,

16  whatever.  So, there isn't a choice in the first instant

17  necessarily.

18          MR. HOLDREITH:  That is an embodiment, your

19  Honor.  The way I understand that embodiment, at least

20  from reading the specification, is the server does form

21  its collection that it's pushing with some information

22  about that user, demographic information, something

23  that's unique to that individual.  And the specification

24  gets lots of examples of what could be used as a basis

25  for assembling the collection.  It could be specific

1  interests expressed by the user.  It could be

2  demographic.  It could be specific program selections

3  made in the past.  It could be other information sent to

4  the server about usage of the device.  But in all

5  instances, it seems to me, the server has some

6  information specific to the user that it uses in making

7  the collection.

8          What we're really doing here is just

9  distinguishing broadcasting again.  The direct canon of

10 construction we are relying on relies on a statement in

11 the file history.  It's in the October 28, 2008,

12 amendment which happens to be Exhibit D to our briefing

13 at pages 16 and 17.  And that's where the attorney

14 explained that the sequencing file automates what you

15 call a "personalized playback session" by reproducing --

16 and he used the words "the collection" -- by reproducing

17 the collection of identified program files.

18         So, the basis here really is, as far as I can

19 tell, all embodiments take into account the individual

20 user in forming the collection; and the file history

21 characterizes the collection as a personalized playback

22 session.

23         THE COURT:  All right.  Well, let me ask

24 Apple.  You think it's plain and ordinary meaning; so,

25 what is the plain and ordinary meaning?

1            MR. ELACQUA:  Your Honor, I think what

2    we'll -- I think we've talked about this before which --

3    "individual listener" in none of these appear anywhere --

4    none of these terms appear anywhere in the specification

5    or in the claims particularly.

6            And, so, "selected audio program segments"

7    would be just that, whether they're program segments or

8    audio program segments that are selected.  And "a

9    collection" would have the plain and ordinary meaning of

10   a group or -- some sort of grouping.  But they definitely

11   are not limited to -- or I should say "a collection"

12   is -- if you read Personal Audio's construction, the

13   files are chosen by or for an individual listener or

14   subscriber.

15            THE COURT:  All right.  What about "may be"

16   instead of "are"?  They could be.  I mean, the way I read

17   it is sometimes the host is going to send a group.  And

18   in other occasions the way they describe this, whoever is

19   operating -- the user of the player, the listener, the

20   user of the player might make some choices.  So --

21            Well, Laura, go ahead and put up the proposal

22   we were working on.

23            And maybe this solves your problem,

24   Mr. Elacqua, in terms of that it's not always.  And, so,

25   we now have Court's Exhibit Number 10, (reading)

1  "selected audio program segments" means audio program

2  segments that may be chosen by, or personalized for, a

3  user.

4            And then (reading) "a collection of audio

5  program files" means a group of audio program files that

6  may be chosen by, or personalized for, a user.

7            Does that get around the concern that it's

8  completely listener- or user-driven?

9            MR. ELACQUA:  Your Honor, I don't think it

10 does.  I think if you go to claim 14 of the '178 patent,

11 for example --

12            THE COURT:  All right.  Let me get there.

13            MR. ELACQUA:  Sure.

14            THE COURT:  All right.

15            MR. ELACQUA:  And right in the preamble, it

16 says (reading) an audio program player for automatically

17 playing a collection of audio program files selected by a

18 listener; and I think this construction would eliminate

19 the "selected by a listener."

20            THE COURT:  Well, except in that particular

21 case, aren't they -- I mean, that limitation of "selected

22 by a listener" is different than maybe in other areas.  I

23 guess -- well, let's see.

24            MR. ELACQUA:  Yeah.  I guess if you --

25            THE COURT:  "May be chosen by, or

1  personalized" --

2          MR. ELACQUA:  "May be chosen by, or

3  personalized for, a user" I think would eliminate the

4  fact that audio program files would be selected by a

5  listener.

6          THE COURT:  All right.  So, you just think it

7  ought to be basically a group of audio programs and then

8  the claim itself say it may be selected by a listener or

9  is selected by a listener?

10          MR. ELACQUA:  Correct.  I think the claim

11  would dictate.

12          THE COURT:  All right.  What about the first

13  part, the "selected audio program segments," which I

14  think goes back to claim 1?

15          MR. ELACQUA:  And I think you're -- you're on

16  claim 1 of the '076?

17          THE COURT:  I think that's where that term

18  appears, yes.

19          MR. ELACQUA:  I would say that it stays the

20  same.  "Selected audio program segments" stays as

21  "selected audio program segments."  If you want to say --

22  if I'm hearing you right, I think you said "group of

23  audio program segments."

24          THE COURT:  Well, except that in claim 1 we

25  don't have that language that you pointed out to me in

1   claim 14 of the '178.  I mean, you just pointed out

2   claim 14 of the '178 patent does have that "selected by a

3   listener" language; and, so, what I propose might be

4   contradictory.  That same "selected by a listener"

5   language doesn't seem to be in claim 1; so, let's focus

6   on my first definition up there.  Doesn't the

7   specification indicate that they may be chosen by, or

8   personal used for, a user; whereas, in claim 14 maybe

9   it's they are selected by?

10          MR. ELACQUA:  Can I confer with my colleague?

11          THE COURT:  Sure.

12          MR. ELACQUA:  Thanks.

13          Your Honor, I think the problem with the first

14   definition is that it suggests that the device or the

15   player must be capable of -- because of the "may"

16   language, that the device must be capable of being able

17   to choose by, or personalize for, a user.

18          So, I think that would suggest to the jury

19   that if a device is not capable of doing this, then it

20   wouldn't meet the limitation.

21          THE COURT:  Well, I mean, that sounds more

22   like an argument that they would make because it -- I'm

23   limiting what they've got.

24          MR. ELACQUA:  I guess I'm back to -- by

25   putting "may" in here, I understand that it may or may

1 not; but by saying "may," I do think it could confuse the

2 jury into trying to figure out exactly whether the device

3 has to or does not have to.  And, so, that's why I would

4 say the plain and ordinary meaning of "selected audio

5 program segments" is enough.

6          THE COURT:  Well, the problem we get into,

7 especially under the $O_2$ case, is when I ask what the

8 plain and ordinary meaning is and there gets to be a

9 debate, then I need to deal with it early rather than

10 later.  So, that's why I'm dealing with it.

11          MR. ELACQUA:  I understand.

12          THE COURT:  All right.  Let me hear from

13 Personal Audio.  On the second one, on dealing with the

14 '178 patent, I think Mr. Elacqua makes a good point.  It

15 does say in that particular case -- and this may tie in

16 with what you were arguing anyway that -- the "collection

17 of audio program files selected by a listener."  So, in

18 that case it's selected by the listener.  So, that is

19 almost self-explanatory.

20          What about on the '076 patent, claim 1 where

21 it's not so clear?

22          MR. HOLDREITH:  Exactly, your Honor.  It is a

23 limitation of the '178, claim 14.  I agree with that, and

24 that's a more specific instance than a general case.

25          In '076, claim 1, we are concerned about

1    making clear to the jury that this player is not a

2    broadcasting device.  It really boils down to that same

3    issue that we discussed with respect to individual or

4    personal player.

5              That is a dispute, I think, that we have with

6    Apple about claim scope.  And the two places where we've

7    tried to make sure that is clear based on the file

8    history, based on the specification, based on the

9    language is the "player" term and the "selected audio

10   program segments" term.

11             THE COURT:  Okay.  Well, let's start off --

12   I've got your definition here.  You say "are chosen by or

13   for" and I start off by changing that to "may be."  Now,

14   I've done that because it appears to me in the

15   specification that it's -- at least in some embodiments,

16   it starts off the host or the server gives a bunch of

17   program statements.  Those aren't chosen; they just come.

18   Now, later on they can manipulate them; so, that's why I

19   say "may be."  Do you have any disagreement with that?

20             MR. HOLDREITH:  Your Honor, we would accept

21   that construction.

22             THE COURT:  Okay that part.

23             And what about the -- so, you would accept

24   also, then, the personal used for a user -- "chosen by,

25   or personalized for, a user"?

1           MR. HOLDREITH:  Yes.

2           THE COURT:  Oh, okay.  So, you have no

3  problem, then, with the first definition there in Court's

4  Exhibit 10, the "selected audio program segments"?

5           MR. HOLDREITH:  That's correct, your Honor.

6           THE COURT:  Okay.  And just to be very sure,

7  looking at Apple, I understood that you weren't satisfied

8  with that first definition in Court's Exhibit 10

9  because...

10          MR. ELACQUA:  Your Honor, I want to point out

11 one point here.  The statement "or personalized for a

12 user," I've heard Personal Audio's argument here; but

13 inserting those words into this limitation, I think, is

14 reading words into this limitation that don't belong

15 there and that don't appear in the claims.  So, I don't

16 think that's appropriate.  I do think that --

17          THE COURT:  Well, they do come from the

18 specifications.  I mean, the specification makes pretty

19 clear whoever is using that player does the choosing or

20 personalizing it.  I mean, I don't know how else you're

21 going to describe the user of the player or the listener

22 to -- I mean, they were trying to get it to be "a

23 listener" or the "single listener"; and we went over the

24 fact that, well, if you're in a car, you've got everybody

25 in the car listening to the thing so --

1          MR. ELACQUA:  I understand.  So, one

2  alternative I think we could agree to would be "audio

3  program segments that may be chosen by or for a user" --

4  "by or for" -- I'm sorry -- "one or more users,"

5  incorporating that it's not just limited to a single

6  individual listener or user.  As your Honor pointed out,

7  there is nothing that limits this to a single person.

8          THE COURT:  Okay.  And that gets back to what

9  does "a" mean in patent speech, and --

10          MR. ELACQUA:  Understood.

11          THE COURT:  -- then you're trying to explain

12  it to the jury.

13          Okay.  Other than that, then -- you're

14  concerned, then, about "a" and how a jury might look at

15  the word "a"?

16          MR. ELACQUA:  I think we're concerned with

17  "a," and I also think "personalized" is not necessary for

18  "selected audio program segments."  I don't think it's

19  necessary to read in the word "personalized."

20          THE COURT:  Okay.  All right.

21          Then we -- let's go ahead and take a recess.

22  I'll ask you to be back at quarter of 3:00.

23          (Recess, 2:32 p.m. to 2:46 p.m.)

24          (Open court, all parties present.)

25          THE COURT:  Okay.  Now we get to the "means

1  for storing a plurality of program segments, each of said

2  program segments having a beginning and an end."  And I

3  think we see that in the '076 patent, claim 1.

4          Personal Audio says this should be "storing a

5  plurality of program segments," for the function anyway;

6  and Apple says that the function should be exactly what

7  it says.  There doesn't seem to be much difference

8  between the two.  I guess one way of looking at it is the

9  function is the "storing of a plurality of program

10  segments" and maybe the "beginning and an end" part is a

11  different limitation, or maybe counsel can help me out.

12  Are you really much -- is there really much fight here

13  over what the function is?  Go ahead.

14          MR. MORTON:  I'll raise my hand if I can, your

15  Honor.  I don't think there is much of a fight about the

16  function.  I think it is exactly what your Honor

17  suggested, that function is for "storing a plurality of

18  program segments"; and then the rest of this is actually

19  additional refinement of what is a program segment.  But

20  it's not a big dispute.

21          THE COURT:  Mr. Stephens?

22          MR. STEPHENS:  I agree, your Honor.  I don't

23  think it is a dispute worth spending a lot of time on.

24          THE COURT:  Okay.

25          MR. STEPHENS:  But if it's part of "program

1  segment" that you've got to store it, it seems to me that

2  it's part of the function.

3           THE COURT:  All right.  So, we know that it

4  can't store infinite program segments; they have to be

5  limited.  They've got a beginning and an end?

6           MR. STEPHENS:  It doesn't have to be infinite

7  to not have a beginning and an end; it could be circular.

8  But, again, I don't think this is a dispute really we

9  need to spend much time on.

10          THE COURT:  All right.  So, what we're really

11  looking at is the corresponding structure.  Personal

12  Audio goes with the "persistent mass storage device."

13  And this goes back to, I think, your earlier argument and

14  slide about claim 14.  And I guess what I'm wondering

15  about is why would I take what's in claim 14, which might

16  be a subset or a more narrow claim, and apply that to the

17  means structure in claim 1?

18          MR. MORTON:  Your Honor, I don't think for

19  this limitation that you do need to look to claim 14.

20  That really related to the other issue we already

21  discussed.  For this one it's simply "means for storing a

22  plurality of program segments," et cetera; and I think

23  the structure that's provided in the specification is a

24  persistent mass storage device.  It's introduced in --

25          THE COURT:  Column 4?

1          MR. MORTON:  -- Column 4.

2          THE COURT:  Well, I guess that's one

3   possibility.  The means could be a mass storage device of

4   some kind.

5          Now, Apple wants it to be "a magnetic disk or

6   optical disk cartridge configured with a *Windows 95* file

7   system and *Windows 95* TrueSpeech or Musical Instrument

8   Device Interface file formats."  And, so, help me out.

9   Where in the specification requires that the means be

10  configured with a particular file format?

11         MR. STEPHENS:  Your Honor, if we could put up

12  our Slide 48, it's a reproduction of '178, Column 6,

13  lines 3 and 8.

14         So, it says "The compressed audio segments" --

15  there is a typo there clearly -- "program segments

16  comprise audio voice music files"; and then the only

17  actual way to store music in files or voice in files

18  that's disclosed is the TrueSpeech and MIDI file formats.

19  So, that's where the corresponding structure in the spec

20  that we're talking about comes from.

21         Now, I'll grant you it doesn't say "*Windows 95*

22  file system" here; but you have to have a file system.

23  And the only file system described in the patent is the

24  one that comes with *Windows 95*, which is also called the

25  FAT, F-A-T, file system.

1            So, it's saying that audio program segments

2  have to be stored in files.  That requires a file system.

3  And then it says the way that they are stored in files is

4  using the TrueSpeech compression and MIDI file.

5            THE COURT:  But, I mean, you're one of skill

6  in the art and you're trying to put together this device

7  and they're using some components.  I mean, they're not

8  claiming to invent the basic hard disk or hard drive.

9  They're not claiming to invent the basic computer.

10 They're claiming to have invented putting together some

11 components and using them in a certain way.

12           So, exactly how the -- I mean, you get a

13 computer, a hard disk.  It will hold file segments of one

14 kind and file segments of another kind and all kinds of

15 different files using different kinds of data -- or not

16 data but different systems.  And, so, what -- given the

17 kind of patent this is, where is the authority for that,

18 well, I've got to have them say it's exactly one kind of

19 system or another?  I mean, they're just saying this is

20 an off-the -- I mean, in effect they could be saying this

21 is an off-the-shelf.  You get a high-speed RAM, for

22 example, or mass storage disk -- and they give several

23 examples -- and put the files on it.

24           MR. STEPHENS:  Again, your Honor, this is the

25 structure that's disclosed.  They chose it.

1          THE COURT:  Well, but the structure is not --

2  I mean, it says "such as TrueSpeech compression."

3  They're not -- it's not so much that that's the key.  The

4  key is here's how to put these -- basically, for want of

5  another word, we're showing, we're disclosing we've

6  invented how to use several components that admittedly we

7  didn't invent, admittedly other people make.  We don't

8  even make them.  But we're showing you how to put this

9  together to come up with, in effect, a new device or a

10  new combination.  And I think the patent law allows new

11  combinations.  You can obviously try to show they're

12  obvious.  But exactly how the computer -- exactly what

13  system, whether it uses *Windows 95* or *Windows XP* or

14  whatever, I'm not seeing how that's something that I've

15  got to put into as a limitation in the

16  means-plus-function.

17          MR. STEPHENS:  Your Honor, we're not arguing

18  that they are restricted to only those, right?  That's

19  why equivalents are part of the 112 ¶6 analysis.  But the

20  law does require that you identify the structure that

21  corresponds to the function, and this is the structure

22  that is used to perform the function of storing audio

23  program segments.  You store them as files; that's what

24  it says.  And then you -- in order to store files on a

25  disk, you have to have a file system.  If you don't have

1  an operating system with a file system, you can't store a

2  file on a disk.

3         THE COURT:  Okay.  And, so, let me hear your

4  response to that, Mr. Holdreith.  I mean, the patent

5  identifies a particular system, in this case, say,

6  *Windows 95.*  You get that plus equivalents, and then the

7  fight becomes is this an equivalent.  Why isn't that

8  correct?

9         MR. MORTON:  Well, your Honor, I mean, in

10 general on all of these, I think we have a fundamental

11 dispute with Apple over identifying the minimum necessary

12 structure for the function versus identifying everything

13 that might say in the patent about this issue.

14        For this particular one it does introduce, in

15 Column 4, a persistent mass storage device for storing

16 audio.  It's directly linked to what this function calls

17 for in the claim; and for a person of skill in the art,

18 that's all that you need to know.  To go beyond that -- I

19 think the Federal Circuit has repeatedly said it's

20 incorrect to get into too much detail.

21        I think it's also the case that this is just a

22 structural component of the player, a storage device; and

23 they're trying to get into what's really more

24 software-based issues and file systems and what have you

25 that's well beyond what a person of skill in the art

1   would associate with simply a function for storing.

2              THE COURT:  But I guess their argument is

3   that, well, if you can't say how to store it, how is it

4   enabled?  How do you build it?  I mean, why -- and it

5   doesn't -- there's some issue to be careful, is it a

6   written description, is it enablement.  But they're going

7   to bring up one or all of these kinds of arguments.  So,

8   why shouldn't I say, "Well, wait a minute.  You've got

9   this device.  Don't you have to have some way of doing

10  things with it, some kind of system on it, like

11  *Windows 95* in this case"?

12             MR. MORTON:  Right.  And I think this just

13  gets back to a general principle.  I mean, patents often

14  do this where they disclose generically what you need and

15  they'll then go into greater detail.  And the law -- the

16  Federal Circuit precedent on that does not put in that

17  greater detail if it's unnecessary.

18             And I think, I mean, if you're looking for a

19  public policy reason for that, your Honor, it's that that

20  would discourage putting in the extra detail.  A patentee

21  would think, well, if I want to use a means-plus-function

22  claim, I have to just put in the barest essentials in my

23  patent and not put in all this detail that I might get

24  limited to later.

25             And, of course, that's the exact opposite of

1  what the patent system is supposed to be about.  You're

2  supposed to put in everything that you've thought of as a

3  quid pro quo for getting your limited monopoly.  So, I

4  think that's why the law is the way it is and doesn't

5  allow going to details that are at a level that's

6  unnecessary for performing the claimed function.

7          THE COURT:  Okay.

8          MR. STEPHENS:  Your Honor, if I may?

9          THE COURT:  Yeah, sure.

10         MR. STEPHENS:  This notion that you can take

11 out part of the structure that's disclosed is not present

12 in the law the way you've just heard from Personal Audio.

13         You look to the structure that's disclosed for

14 performing the claimed function, and here the claimed

15 function is storing audio program segments.  It's not for

16 storing data or bits which a mass storage device might be

17 able to do on some.  In other words, to store a program

18 segment, it's essential that you have some means of

19 representing those program segments as bits that the mass

20 storage device can actually store.

21         The specification is clear how you do that.

22 You store it as a file using these particular file

23 formats.  Now, there may be others disclosed here.  I

24 don't see any but -- these, in fact, are the only two

25 that I believe are actually disclosed.

1       They're entitled to equivalents of those,

2  right?  There is, I think, going to be a real dispute

3  about whether things that are actually capable of storing

4  songs in a modest amount of space are equivalent to

5  TrueSpeech which can only store voice in a modest amount

6  of space or equivalent to a MIDI file which is a player

7  piano-type format and can't store, for example, a

8  recorded human voice.

9       So, the equivalents issue is fundamentally

10  important to what they invented; and these structures are

11  essential to performing the recited function of storing

12  audio program segments as opposed to some more generic

13  form of data.

14       THE COURT:  Well, in the specification it

15  talks about Item 107 in Figure 1, which I think you've

16  got right up there.  Yeah, you've got Figure 1 up there.

17  It's got Item 107; and it specifically says in the

18  specification this is for storing audio, text, and image

19  data and that this data storage system consists of both

20  high-speed RAM storage and persistent mass storage

21  device.  So, why wouldn't I include that as a structure

22  in the claim construction?

23       MR. STEPHENS:  That's a fair point, your

24  Honor.  I think it's reasonable to include that

25  structure.  I'm not saying you should exclude it.  All

1  I'm saying is that that by itself isn't enough, that you

2  also need these other pieces that the specification

3  identifies for storing audio program segments.

4           THE COURT:  Okay.  Well, let me -- I'm

5  probably going to get some objection to this from Apple,

6  but just I want to hear what they are from both sides.

7           Go ahead and put up Exhibit 11, please, from

8  the court.

9           And I have Court's Exhibit 11 up there.

10  (Reading) "Means for storing" is a data storage system

11  consisting of both high-speed RAM storage and a

12  persistent mass storage device, such as a magnetic disk

13  memory.  And I cite the reference at Column 4.  And then

14  in the alternative, (reading) a means for storing may be

15  a replaceable media, such as an optical disk cartridge;

16  and I have that cited at Column 7.

17           Any other references that Personal Audio -- or

18  any other means or structures that Personal Audio thinks

19  ought to be identified?

20           MR. MORTON:  I don't think so.  Can I have

21  just one second with my expert, your Honor?

22           THE COURT:  You may.

23           MR. MORTON:  Thank you, your Honor.  I think

24  that this construction is fine with us.

25           THE COURT:  Okay.  And then -- and that's, of

1  course, a description of the preferred embodiment; so,

2  that lists that possibility.

3         And now from Apple's point of view.  And you

4  wanted the, I guess, more complete; but taking a look at

5  that first citation, Column 4, lines 36 through 38, I'm

6  not seeing the kind of language you talked about that may

7  be at other places where they're -- they set out specific

8  examples.  So, why wouldn't that be -- in the traditional

9  way of noting various structures are identified, why

10  wouldn't that be sufficient?

11         MR. STEPHENS:  Again, your Honor, I don't

12  think it's enough to just identify this as one way of

13  doing it.  I think you need to identify the structure

14  that the specification identifies for storing the audio

15  program segments; and that necessarily, for this type of

16  a storage device, requires the file system and the file

17  formats that we've mentioned as identified at '178,

18  Column 6, lines 3 to 8.

19         So, while I don't disagree that these

20  structures are appropriate to include in the

21  construction, I think they are not sufficient and that

22  you must include the file system and the particular file

23  formats for storing the recited audio program segments.

24         Again, if it was for storing data, you

25  wouldn't necessarily have to have the file system because

1  you might store data that's not in a file.  Or if you

2  were going to store data, you might not need to store

3  audio data that requires some particular representation.

4  But because the recited function is storing audio program

5  segments and because the specification explicitly ties

6  that to files and particularly the TrueSpeech and MIDI

7  files, we think that structure belongs in the

8  construction in addition to the structures that

9  your Honor has identified.

10          THE COURT:  Okay, in addition to them.

11          MR. STEPHENS:  Yes.

12          THE COURT:  All right.

13          MR. STEPHENS:  Not in place of them.

14          THE COURT:  Okay.  And that TrueSpeech

15  reference was at column what now?

16          MR. STEPHENS:  In the '178 patent -- that's

17  the only cite I have.

18          THE COURT:  Okay.

19          MR. STEPHENS:  It's Column 6, lines 3 to 8.

20          Your Honor, the parties, maybe unwisely, had

21  agreed to cite the '178 as a matter of course.  You

22  probably picked the '076.

23          THE COURT:  Maybe I missed that in your

24  briefing; but yes, I went with the first one since it was

25  written first.

1        MR. STEPHENS:  I had the same problem.  We

2   made this agreement after I had already marked up my

3   '076.  You have my sympathy.

4        THE COURT:  Well, just so you know, I've been

5   going along with the '076 all through this; and that's

6   the one I've been following.

7        All right.  Then we get to "output means for

8   proceeding audible sounds in response to analog audio

9   signals."  And Personal Audio just seemed to -- and I

10  don't know if it's a typo or what, but your proposal is

11  "output means for producing."  Well, that's not the

12  function.  I mean, the function doesn't start off with

13  "output means."  It's got to -- I guess if you took off

14  the first two words, then that would be a function, in

15  which case it would be exactly the same as Apple's,

16  "producing audible sounds in response to analog audio

17  signals."  Is that what you meant?

18       MR. MORTON:  Yes.  That's correct, your Honor.

19  It's a typo.

20       THE COURT:  Okay.  So, that will be the

21  function.  And then the corresponding structure --

22  Personal Audio proposes the "speaker," which I think is

23  identified in Figure 1; and Apple wants "a speaker

24  connected to a speaker-out port or headphones connected

25  to a headphone-out port."  Audio is speaker or

1   headphones.  Is there any real difference between what

2   Personal Audio is saying?  They want "speaker" out of

3   Column 4 and "headphones" out of Column 5; and you want

4   Figure 1 and the text and then "speaker," "speaker-out

5   port," "headphone," "headphone-out port."  What is the

6   difference between the two?

7               MR. STEPHENS:  There is no difference, your

8   Honor.  We're okay with "headphone" or "speaker."

9               THE COURT:  Okay.

10              MR. STEPHENS:  This is no longer a live

11  dispute.

12              THE COURT:  All right.  Well, let's see, what

13  do we have?  Well, you agree, then, the output -- the

14  structure is either going to be a speaker or headphones?

15              MR. STEPHENS:  That's right.

16              THE COURT:  And Personal Audio agrees also?

17              MR. MORTON:  Yes, your Honor.

18              THE COURT:  Okay.  Then that's what we'll

19  have.

20              Let's change it to that.

21              Okay.  I think that gets us through all of the

22  structure terms and the ones that we -- or the

23  means-plus-function terms that have been identified where

24  there was a fight over it.

25              And then we have a number of others that Apple

Claim Construction Hearing

141

1   is claiming are indefinite; and those you have submitted

2   in your motion for summary judgment, correct?

3          MR. STEPHENS:  That's correct, your Honor.

4          THE COURT:  Is there any other -- I'll start

5   off with Personal Audio.  Any other terms that you --

6   have I missed any of your items or missed any of the

7   disputed terms that you think?  I'll ask that first.  I

8   think I've gone over them all.

9          MR. MORTON:  If I understand what your Honor

10  is saying correctly, I think all the remaining disputes,

11  Apple's opening position is that the claims are

12  indefinite.  And then they have alternate positions, in

13  case they're wrong about that, where they've proposed

14  different alternate corresponding structure.

15         THE COURT:  And that's a group of

16  means-plus-function terms, correct?

17         MR. MORTON:  Right.  And then there is the one

18  other kind of overarching issue, that they have said that

19  the '178 patent is all means-plus-function terms where it

20  says "processor."  We disagree with that, saying there is

21  not a 112 ¶6 claim in the '178 patent.

22         THE COURT:  Okay.  But am I correct,

23  Mr. Stephens, those are all in your motion for summary

24  judgment?

25         MR. STEPHENS:  That's correct, your Honor.

1  I'm not sure that we actually articulate the alternative

2  proposed structure in the motion for summary judgment.

3  That, we put in the joint claim construction statement.

4          THE COURT:  Right.  Well, I think the easier

5  thing for me to do is to take a look at the motion for

6  summary judgment first.  There doesn't seem to be a lot

7  of point in going through trying to define all of them

8  and then go back and then decide -- I guess it's six in

9  one, half a dozen in the other.

10          I'll look at the summary judgment on those

11  first; and then after I get through that, if we have to

12  have another short *Markman* based on what's left, we'll do

13  that.  For the most part, as you can tell, what I'm

14  looking at is what's in the specifications to see what's

15  there.  And if I need oral argument or some explanation

16  on the summary judgment, we'll deal with it then.

17          Okay.  There are some other things coming up

18  but -- and this is partly for the benefit of clients.

19  Each court is different, and you've seen your lawyers

20  present -- or prepare these, you know, fairly large

21  presentations.  They've brought their experts.  Quite

22  bluntly, they've got no idea what questions I'm going to

23  ask.

24          Some judges just say, "Okay.  Go ahead and

25  make your presentation"; and it's possible I might do

1  that, too.  My general practice is to study this and then

2  ask the questions that are bothering me because that is

3  where I'm having problems.  It's not that your lawyers

4  are wasting their time.  Like I say, they've really got

5  no idea -- or very little idea what I'm likely to ask.

6  They have to be prepared on all of it.

7           On the other hand, it's possible that I have

8  missed some important -- something that one of you thinks

9  is an important point or an important issue or something.

10  So, I'll start off with Personal Audio.  Going over the

11  claim construction area that we've dealt with, are there

12  any particular points you want me to focus on, something

13  you think I've missed, something in your presentation,

14  you're sitting there thinking, "Why didn't the judge get

15  into this?"  Go ahead.

16           MR. MORTON:  May we confer about that for a

17  moment?

18           MR. HOLDREITH:  Is this addressed to the

19  lawyers, your Honor?

20           THE COURT:  Yes.  I've explained why -- I

21  mean, partly -- I know you do a lot of preparation.  And

22  the way I run this, by asking you questions, I might have

23  missed something that you've done a lot of preparation on

24  and thought was really important because I'm focusing in

25  on the things that caught my eye as I went through all of

144

1 this.

2          So, if there is some part of your presentation

3 that you think needs to be made or something you really

4 want to direct my attention to, even if it's just a

5 matter of, you know, "Please take a close look at

6 pages -- or Slides 100 and 102 because we think they

7 really make the point about thus-and-so," here is your

8 chance.

9          MR. HOLDREITH:  Your Honor, we're content to

10 rest on the briefs and the arguments that we've made

11 today.

12          THE COURT:  Okay.  And the same from Apple.

13 Is there something -- I'm sure you've done a lot of

14 preparation.  If there is something that you think I've

15 missed or something you really want me to focus on, what

16 would it be?

17          MR. STEPHENS:  Your Honor, I think you've done

18 an excellent job; and your questions have been very

19 interesting and clearly well prepared.  What I would

20 suggest is that we might hand up our slides.

21          THE COURT:  Yes.  I do want the slides, by the

22 way; and that's -- I mean, if there is -- in particular,

23 if there are some slides you think are very important or

24 might be helpful, give me the numbers so I'm not

25 searching.

1           MR. STEPHENS:  Okay.

2           THE COURT:  You know, if there's something

3  there we think, "Boy, we think your question on X, Y, and

4  Z is really answered by Slide Pages 25, 26," tell me that

5  so that it makes it easy for Ms. Mullendore and I to go

6  back and say, "Oh, let's take a look at 25 and 26."

7           MR. STEPHENS:  Otherwise, your Honor, I think

8  we've had the opportunity to present the major points.

9           THE COURT:  Okay.  All right.  There are a

10  couple -- all right.  Then in that case -- and I

11  appreciate the presentations you've made.  You seem to

12  have focused in very clearly on the issues, and that

13  obviously -- in some ways it makes it harder, but in many

14  ways it makes it much easier for me.

15           We've got a motion on filing supplemental

16  infringement contentions and a motion to strike

17  infringement contentions.  Tell me how, from Apple's

18  point of view since you're opposing it -- you're saying

19  you would be prejudiced.  What -- of any of these

20  proposed amendments, how would that affect your claim

21  construction position?  Specifically, which claim

22  construction position is going to be changed by a

23  proposed amendment to infringement contentions?

24           MR. STEPHENS:  Okay, your Honor.  So, what

25  happened is the infringement contentions have progressed.

Claim Construction Hearing

1  We've seen a movement not only in a complete replacement

2  of the source code that was identified for the iPhone

3  from none at all to 100 percent iPhone code but also in

4  particular a changing sands, if you will, on the

5  construction or the argument about infringement for the

6  "sequencing file."

7          So, it started out with an allegation that

8  there was a play list file that was transferred.  That

9  later morphed into a database file being the basis for

10  the allegation of infringement.  And now -- I think you

11  heard Mr. Holdreith allude to it earlier today.  Now the

12  argument is that, no, it's not the file itself that has

13  to be used; it's data from that file that might be

14  present elsewhere in the system.  And there's profound

15  contradiction between that position that they are now

16  taking and positions they've taken in the Patent Office

17  in reexamination.  So, had we had that allegation

18  up-front, it may well have affected the way we argued

19  "sequencing file."

20          THE COURT:  Well, I thought, I mean, reading

21  through this, this "sequencing file" idea was kind of the

22  germ of the patent.  I mean, the thing that they seemed

23  to say they did differently than people in the past is

24  they've got this sequencing file that allows somebody

25  using the player, whether it's a laptop or something

1  else, to skip, go forward, go backward, or whatever.  I

2  mean, that's kind of the whole -- not the complete patent

3  but kind of the guts, the new thing.  At least that's

4  what they claim, and it appears that that's what the PTO

5  seemed to be looking at.

6             So, what's the big surprise that they are

7  focusing on the sequencing file; and how would that

8  change -- we're looking at prejudice now, unfair

9  prejudice.  How would that change any of the claim

10  constructions we went through today?

11             MR. STEPHENS:  Well, so, very specifically,

12  your Honor, it looked like they were going to take the

13  position that you had to use the sequencing file in order

14  to skip forward, right?  That was their proposed

15  construction.  And what we've seen instead is a morphing

16  by Personal Audio to remove this object that is discussed

17  at great length in the specification almost entirely from

18  the claims, right, and end up with something --

19             THE COURT:  What object?  The sequencing file?

20             MR. STEPHENS:  The sequencing file, right.

21             THE COURT:  Sequencing file.

22             MR. STEPHENS:  So, there is a particular

23  sequencing file structure that's described in the patent;

24  and now they're saying you don't even have to use that

25  when you're playing back.  All you've got to do is take

 1  some data from it and it can be in a different form

 2  somewhere else in the computer and that's enough.

 3       And that's the morphing that we've seen happen

 4  over time that, if it had been done right up-front in the

 5  original 3-1(g) in a timely fashion, I think we might

 6  have taken a different approach to claim construction

 7  here today.

 8       THE COURT:  All right.  And then -- now, I'm

 9  not sure that -- your letter regarding the possibility of

10  early equitable trial has come in I can't remember how

11  many days ago.  Have you responded to that yet?

12       MR. HOLDREITH:  No, sir.

13       THE COURT:  And I'm not looking for a long

14  response, but you may want to get that in fairly quickly.

15       MR. HOLDREITH:  Yes, sir.  We oppose it, but

16  we'll put in a very short response to the letter.

17       THE COURT:  Anything else that Personal Audio

18  thinks needs to be covered or would just -- since we're

19  all here together would be helpful to have covered at

20  this time?

21       MR. HOLDREITH:  Nothing for today, your Honor.

22       THE COURT:  All right.  What about Apple?

23  Again, it needs to be covered or would just be helpful to

24  be covered since we're all here to discuss?

25       MR. STEPHENS:  A helpful point since we're all

Claim Construction Hearing

1   here, something we were intending to raise with the other

2   side and haven't yet; and I'm hopeful it will be a matter

3   of agreement.  It's just to change slightly the

4   scheduling of expert reports to space the opening and

5   response to expert reports apart a little bit.  I don't

6   think it will affect the schedule in a meaningful way

7   otherwise.  But we can confer with counsel and hopefully

8   put in a --

9           THE COURT:  Okay.  I generally -- that does

10  not bother me.  Just so you know, I'm concerned about the

11  timing of dispositive motions.  If you want an answer

12  before you spend all your money on preparing for trial,

13  you need that in time for me to look at them.  There is

14  no point in a couple, four weeks before trial submitting

15  some massive complicated motion and, given all my other

16  cases, expect an answer.

17          And there is also not much point in submitting

18  these on the idea of you're going to educate the judge.

19  It's -- and the other thing is I don't want whatever you

20  do to wind up us moving the trial date.  I think I'm

21  going to -- unless we get a hurricane or something, the

22  trial date is firm.  And if you want motions dealt with,

23  get them in in time.  But your discovery of the

24  experts -- you're experienced counsel.  If you can work

25  it out, great.  You know, talk about it.  It's almost

1   sauce for -- you know, they want a little extension, then

2   I'll -- either side gets some extra time probably.  So, I

3   don't have a problem with that.

4            Anything else, then, from Apple's point of

5   view?

6            MR. STEPHENS:  Not from Apple's point of view.

7   Thank you.

8            THE COURT:  All right.  Again, I appreciate

9   very much the presentations both sides have made; and

10  I'll take a look at your slides.  You're excused.  I hope

11  you have a safe trip home, and the court is adjourned.

12           (Proceedings concluded, 3:20 p.m.)

13  COURT REPORTER'S CERTIFICATION

14           I HEREBY CERTIFY THAT ON THIS DATE,

15  SEPTEMBER 8, 2010, THE FOREGOING IS A CORRECT TRANSCRIPT

16  FROM THE RECORD OF PROCEEDINGS.

17       _Christina Bickham_____
         CHRISTINA L. BICKHAM,    CRR,    RMR

19

20

21

22

23

24

25