**United States District Court**
**Eastern District of Texas**
**Lufkin Division**

| | | |
|---|---|---|
| Personal Audio, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case 9:09-cv-00111-RC |
| Apple Inc., | ) ) | **Jury Trial Demanded** |
| Defendant. | ) ) ) | |

---

**Personal Audio, LLC's Motion for Judgment as a Matter of Law**

Personal Audio hereby moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). Apple has failed to provide sufficient evidence such that a reasonable jury could find in its favor on the issues of anticipation, obviousness, failure to mark, written description, and lump-sum damages.

## <u>LEGAL STANDARD</u>

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1). A JMOL motion should be granted where the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A complete failure of proof concerning an essential element of the nonmoving party's case is fatal. *Gen. Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1359 (Fed. Cir. 1999).

<u>**ARGUMENT**</u>

I. **Personal Audio Is Entitled to Judgment As a Matter of Law That Claims 1, 6, 13, and 14 of the '178 Patent and Claims 1, 3, and 15 of the '076 Patent Are Not Anticipated by the DAD Manual or Demonstrated DAD System.**

No reasonable juror could conclude that claims 1, 6, 13, and 14 of the '178 patent and claims 1, 3, and 15 of the '076 patent are anticipated by the DAD Manual or the demonstrated DAD System. Apple must demonstrate that the asserted claims are anticipated by clear and convincing evidence regardless of whether the asserted prior art was before the patent office. *Microsoft Corp. v. i4i Ltd. P'ship*, No. 10-290, slip op. at 14-15 (U.S. June 9, 2011). Sufficient evidence concerning anticipation "must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference." *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002). "An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). Apple cannot meet its burden of clear and convincing evidence based on its submitted record evidence.

 A. **The DAD System and DAD Manual do not anticipate the asserted claims.**

The DAD System and DAD Manual do not anticipate claims 1, 6, 13, and 14 of the '178 patent and claims 1, 3, and 15 of the '076 patent.  Apple has failed to provide particularized testimony supported by documentary evidence that establishes an anticipatory disclosure in either the DAD System or the DAD Manual. Individual claim limitations that the record evidence does not show as anticipated include '076 patent limitations 1.a, 1.b, 1.d, 1.f, 2.a, 2.b,

3.a, 14.a, 14.e, 14.f, and 15.a, as well as '178 patent limitations 1.a, 1.b, 1.e, 4.a, 5.a, 6.a, 14.a, 14.b, 14.c, 14.d, 14.e, 14.f, 14.h, 14.i, 14.j, 14.k, 14.l, 14.m, and 14.n.

**B.     The DAD Manual and the DAD System do not disclose downloading audio program files and a separate sequencing file as claimed in '178 patent claim limitations 1.a and 14.e.**

To anticipate a claim, a reference must contain all of the limitations of the claim arranged or combined in the same way as in the claim. *Net Moneyin, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed Cir. 2008). Where different embodiments are disclosed in a prior art reference, the prior art reference only anticipates if *one* disclosed embodiment discloses all limitations of the claimed invention. *Id.* A party may not pick and chose and combine "various disclosures not directly related to each other by the teachings in the cited reference." *Id.* Apple violates this rule by improperly mixing-and-matching features of the separate "stand-alone" and "networked" configurations of the DAD System and DAD Manual.

        1.     <u>There is no record evidence of a single embodiment disclosed in the DAD Manual or demonstrated with the DAD System that downloads both audio program files and a separate sequencing file.</u>

No reasonable juror could conclude that the DAD Manual or the DAD System disclose a player that may download both audio program files and a sequencing file upon a request by the player. Instead, Apple presented evidence of two separate embodiments of the DAD System performing the functions identified as performed by the claim. Mr. Novacek demonstrated the DAD system's capability of two separate commands – the PLAYBACK LOOKAHEAD command and the IMPORT playlist command. *See* Trial Tr. at 1914:22-1917:18. Mr. Novacek initiated these commands from two separate instances of the DAD executable software. In the case of the PLAYBACK LOOKAHEAD command, Mr. Novacek launched the DAD executable from the network server computer F:\ drive. *Id.* at 1908:6-16, 1910:18-21, 1971:9-10. The result of the PLAYBACK LOOKAHEAD command was downloading to the C:\ drive on the local

DAD Machine several audio files.[1] *Id.* at 1914:22-1915:25. Mr. Novacek then closed the DAD program launched from the F:\ drive. *Id.* at 1916:1-12. Thereafter, Mr. Novacek opened the DAD program from the C:\ drive and selected the IMPORT playlist function. *Id.* at 1916:20-1918:12, 1971:6-7. The IMPORT playlist function transferred a playlist from the F:/ drive to the C:\ drive. *Id.*

Instances of the DAD executable launched from separate drives would comprise, if compared to claims 1 and 14 of the '178 patent, separate players. One DAD player embodiment transferred audio files to a separate hard drive using the PLAYBACK LOOKAHEAD command. A separate DAD player embodiment transferred a playlist file to its own associated hard drive using the IMPORT command. No one player embodiment discloses downloading *both* audio files and a separate sequencing file upon a request by the player.

The evidence regarding the DAD Manual likewise reflects using separate embodiments to try to satisfy the limitation of downloading both audio files and a sequencing file. The disclosed IMPORT command at page 91 of DX-001 does not identify whether the DAD system was launched from a local drive or a network drive. PLAYBACK LOOKAHEAD, disclosed at page 283 of DX-001, only identifies PLAYBACK LOOKAHEAD being used in network mode. The command cannot be used to download a playlist. Trial Tr. at 1973:14-19. As the description of the IMPORT command is ambiguous regarding what mode in which the described DAD system is operating, the DAD Manual likewise does not disclose one embodiment downloading *both* audio files and a separate sequencing file upon a request by the player.

For these reasons no reasonable juror could find that the DAD Manual or DAD System anticipates claims 1, 6, 13, and 14 of the '178 patent.

---

[1]     PLAYBACK LOOKAHEAD activated in network mode does not cause a playlist to be copied from the network drive to the local drive. *See* Trial Tr. at 1973:14-19.

2.    The DAD Manual does not disclose downloading a sequencing file from outside the player with the IMPORT command.

The DAD Manual does not anticipate claims 1 and 14 of the '178 patent because the identified IMPORT command does not result in a download of the received file. The record reflects that when a user selects the IMPORT command, the command will "read and translate[] [the file] into a DAD playlist[]." *See* DX-001 at 191; Trial Tr. at 1976:19-1977:7. The file selected and requested for download by the user is not the file that is thereafter stored in the persistent storage of the DAD system.

The DAD Manual further does not anticipate because the manual does not identify whether the IMPORTed file comes from outside the player. Mr. Novacek confirmed that the DAD Manual's disclosure of the IMPORT command does not specify whether the imported file comes from the same machine on which the DAD program is running, or a different machine. *See* Trial Tr. at 1978:3-24. For these reasons no reasonable juror could find that the DAD Manual anticipates claims 1, 6, 13, and 14 of the '178 patent.

3.    The record evidence does not disclose a single embodiment in the DAD Manual that uses the DOWNLOAD PLAYLIST command.

The DAD Manual does not anticipate claims 1 and 14 of the '178 patent because the identified DOWNLOAD PLAYLIST command is not used with the identified communications port. The DOWNLOAD PLAYLIST command is for "SERIAL USE ONLY." *See* DX-001 at 244. Apple's technical expert testified that the DAD Manual and demonstrated system used an "Ethernet cable with an RG-58 coax connection . . . back in '94-'95, that would have been a typical Ethernet connection for networking workstations." Trial Tr. at 2142:10-13. The identified Ethernet network connection is not the same as the serial connection used with the DOWNLOAD PLAYLIST command. The connections are employed by separate embodiments

of the system disclosed in the DAD Manual. For this reason no reasonable juror could find that the DAD Manual anticipates claims 1, 6, 13, and 14 of the '178 patent.

**C.      DAD Manual and DAD System do not anticipate claims 1 and 3 of the '076 patent because the embodiment alleged to disclose a "means for receiving" is ambiguous.**

DAD Manual does not anticipate claims 1 and 3 of the '076 patent because it is ambiguous whether the identified structure that purportedly corresponds to the means for receiving structure – replaceable media – is used in the cited embodiment. The record evidence reflects opinion testimony unsupported by documentation regarding the disclosure of the DAD Manual. *See* Trial Tr. 2168:14-2169:19. The testimony further does not distinguish what embodiment uses replaceable media – whether the stand alone or network instances of the described DAD. As for the demonstration of the DAD System, that demonstration did not show the use of replaceable media.  Accordingly, the evidence regarding whether a specific embodiment of the DAD as disclosed in the DAD Manual is ambiguous.

The record evidence also reflects the incorporation of testimony regarding the '178 patent claim 1.a for communications port.  The record reflects the communications port is an "Ethernet cable with an RG-58 coax connection … back in '94-'95, that would have been a typical Ethernet connection for networking workstations." Tr. Trans. 2142:10-13. There is no testimony regarding whether this structure is identical or equivalent to the corresponding structure identified by the court.

Accordingly, for the foregoing reasons no reasonable juror could find based on record evidence that the DAD Manual or DAD System anticipates claims 1 and 3 of the '076 patent.

**D.      There is no record evidence of structure in the DAD Manual or DAD System that is identical or equivalent to the construed playback and navigation limitations of the '076 and '178 patents.**

There is no record evidence that the DAD Manual or DAD System employ identical or equivalent algorithmic structure to the construed structure for means plus function limitations 1.d, 1.f, 2.a, 2.b, 3.a, 14.e, 14.f, and 15.a of the '076 patent and 1.e, 4.a, 5.a, 6.a, 14.k, 14.l, 14.m, 14.n of the '178 patent. The construed structures comprise physical structures and algorithms. As noted in the glossary to the jurors' notebooks, "an algorithm may be expressed in many ways, such as in a mathematical formula, in computer code, in words, or as a flow chart." There is no record evidence of any document describing by any of these ways how the DAD source code operates. The source code has not been produced. *See* Trial Tr. at 1957:22-1958:3. There is no record evidence describing any algorithm the DAD uses to perform the construed playback and navigation limitations of the '076 and '178 patents. The record solely comprises conclusory expert testimony, unsupported by documentary evidence.[2] This record is insufficient for a reasonable juror to find the DAD Manual or DAD System anticipates claims 1, 3, and 15 of the '076 patent and claims 1, 6, 13, and 14 of the '178 patent.

**E.      There is no record evidence of functions in the DAD Manual or the DAD System that are identical to the construed navigation limitation functions of the '076 and '178 patents for SKIP, BACK, and double BACK.**

There is no record evidence that the DAD Manual or the DAD System perform identical functions for means-plus-function navigation limitations 1.f, 2.b, 3.a, 14.e, 14.f, and 15.a of the '076 patent and 4.a, 5.a, 6.a, 14.l, 14.m, 14.n of the '178 patent. The record does not reflect any detailed analysis of whether the claimed functions are identically present in the DAD Manual or

---

[2]      *See* Trial Tr. at 2147:10-2153:15 and 2153:20-2155:10 ('178.1.e); 2157:11-2159:13 ('178.4.a); 2159:14-2160:2 ('178.5.a); 2160:3-24 ('178.6.a); 2160:25-2161:22 (testimony applying to '178.4.a, 5.a, 6.a); 2166:9-2167:5 ('178.14.k, 14.l, 14.m, 14.n); 2167:15-2168:15 ('076.1.d, 1.f); 2170:22-2171:12 ('076.2.a, 2.b, 3.a); 2173:4-2174:5 ('076.14.e, 14.f, 15.a).

the DAD System. In particular, there is no specific testimony or other evidence that addresses limitations 5.a, 6.a, 14.m, and 14.n regarding a BACK command function based on an elapsed amount of time. The testimony in total consists of expert conclusory statements unsupported by documentary evidence.[3] On this record no reasonable juror could find that the DAD Manual or the DAD System anticipate claims 1, 3, and 15 of the '076 patent and claims 1, 6, 13, and 14 of the '178 patent.

> **F.     There no record evidence that the DAD Manual or DAD System discloses Claim 13 of the '178 patent.**

There is no record evidence that the DAD Manual or the DAD System disclose a server computer selecting audio files for inclusion in a collection specified by the sequencing file. Neither piece of art discloses that the server computer makes selections of audio files on behalf of the user. The DAD System demonstration reflected the selection of audio files by the user while the DAD program was launched from the local C:\ drive. The selection of audio files was not performed on the server computer, nor was the select performed on behalf of the user. *See* Trial Tr. at 1923:16-1924:17, 1978:25-1979:23. In fact, as the user, Mr. Novacek selected the audio files himself. *Id*. This demonstration was performed when the local DAD machine was not connected to the network. *Id.* at 1925:3-4. The selection could not be made by a server computer.

Similarly, the record evidence of the DAD Manual's disclosure does not reflect a server computer making selections of audio files on behalf of the user. The testimony of Apple's technical expert merely reflects the disclosure of DX-001, pages 93 and 111. *See* Trial Tr. at 2163:3-18. Both pages reflect search capability that the user may use to find audio files, not selections made by the server on behalf of the user. Moreover, there is no disclosure from where

---

[3]     *See* Trial Tr. at 2157:11-2159:13 ('178.4.a); 2159:14-2160:2 ('178.5.a); 2160:3-24 ('178.6.a); 2166:9-2167:5 ('178.14.k, 14.l, 14.m, 14.n); 2167:15-2168:15 ('076. 1.f); 2170:22-2171:12 ('076.2.a, 2.b, 3.a); 2173:4-2174:5 ('076.14.e, 14.f, 15.a)

the audio files are selected or what computer, either local or network, the selection comes from. Accordingly, for the foregoing reasons and on this record no reasonable juror could find that the DAD Manual or the DAD System anticipate claims 1, 3, and 15 of the '076 patent and claims 1, 6, 13, and 14 of the '178 patent.

      **G.**    **There is no record evidence that the DAD Manual or the DAD System disclose claims 1 and 14 of the '076 patent.**

No reasonable juror could conclude that the DAD Manual or DAD System anticipates claims 1 and 14 of the '076 patent because Apple has failed to submit evidence on the following limitations:

'076 patent claim 1 – there is no record evidence that the player is for reproducing "selected audio program segments" as the term is construed by the Court;

'076 patent claim 2 – there is no record evidence that the DAD Manual or DAD System perform the means for detecting limitation of claim 2.a with structure that performs the identical function with identical or corresponding structure. Apple fails to identify any algorithm performed in the DAD System or identified in the DAD Manual that relates to the means for detecting step construction.

'076 patent claim 14.a – there is no record evidence that that the mass storage device identified in the DAD Manual and DAD System has the capability for "receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be played[.]"

'076 patent claim 15 – there is no record evidence that the DAD Manual or the DAD System disclose this limitation.

**H.     The DAD System as demonstrated is not prior art.**

The DAD System does not anticipate the asserted claims because it is not prior art. The record evidence does not establish that the DAD System as demonstrated was in existence prior to the priority date of the patents-in-suit. The DAD System software was separately obtained and loaded on the hardware computer. Trial Tr. at 1938:8-1940:2 Apple cannot demonstrate by clear and convincing evidence that the DAD System existed in its demonstrated state before the priority date.

**II.     Personal Audio Is Entitled to Judgment As a Matter of Law That 1, 6, 13, and 14 of the '178 Patent and Claims 1, 3, and 15 of the '076 Patent Are Not Rendered Obvious by Apple's Prior Art Combinations.**

No reasonable juror could conclude that claims 1, 6, 13, and 14 of the '178 patent and 1, 3, and 15 of the '076 patent are rendered obvious by Apple's prior art combinations. Apple must demonstrate that the asserted claims are obvious by clear and convincing evidence. No reasonable jury could find that Apple has met this high standard. Apple's proof on obviousness fails as a matter of law at least because it has ignored the algorithmic structure identified by the Court, omitted critical elements of the legal test for obviousness, and provided no reason why a person of skill in the art would combine any of its prior art references. Consequently, Personal Audio is entitled to judgment as a matter of law that the asserted claims are not obvious.

**A.     Apple has provided no evidence that the DAD System or DAD Manual can be combined with a prior art reference to render a patent claim obvious.**

On March 28, 2011, Apple was required to disclose to this Court the combinations of prior art references that it contended rendered the claims of the patents-in-suit obvious. In addition to asserting that the DAD System and DAD Manual both anticipated all asserted claims of the patents-in-suit, Apple also disclosed the following prior art combination:

**2.**     Claims 4-9 of the '178 Patent and claims 1-3 and 14-15 of the '076 Patent are invalid under 35 U.S.C. § 103 as being rendered obvious by the DAD Manual or DAD System, in combination with each of the Sony Discman/Sony Minidisc/Opcode Music Shop references (claims 4-7 and 14 of the '178 patent; claims 1-3 and 15 of the '076 patent) and the Loeb article (claims 8-9 and 13 of the '178 patent)

Dkt. #323 at 2. At trial, however, Apple did not introduce any evidence that the DAD Manual or DAD System could be combined with any specific prior art reference to render any specific claim obvious. Dr. Wicker only opined that the DAD System and DAD Manual anticipated the patents-in-suit. And while Dr. Wicker provided a generalized discussion of other prior art references like the Loeb article, the Sony Discman, and Opcode Music Shop, he never actually opined that any of these prior art references could be combined with the DAD System or DAD Manual to satisfy any specific claim limitation. The closest he came was a boilerplate declaration that combining references was obvious:

> Q:     Now, we've just talked about a handful of references, the Loeb article, the Discman, the Discman manual, and some other playlist and things like that. Dr. Wicker, do you have an opinion as to whether some of these references and concepts could be combined with the DAD manual or DAD system and Sound Blaster?
> A:     Yes.
> Q:     And what is that?
> A:     What these show is generally what was known in the art at the time the patent was applied for. All these concepts were known, as we've shown here; so, they all were available to a person of skill to put together with Sound Blaster, for example, to realize the asserted claims in this case.
>        All of this stuff was known. A person of skill would have known how to put these things together to find each and every one of the asserted claims in this case.

Trial Tr. at 2219:16-2220:7. A blanket declaration that the DAD System or DAD Manual could be combined with any of a half-dozen prior art references to satisfy undisclosed claim limitations does not satisfy Apple's burden to show obviousness by clear and convincing evidence. Consequently, Personal Audio requests that the Court enter judgment as a matter of law that the DAD manual and DAD system do not render the claims of the patents-in-suit obvious when combined with other prior art references.

     **B.**     **No combination of prior art references contains all elements of the asserted claims.**

No reasonable jury could find that Apple has established the obviousness of any of the asserted claims because no possible combination of Apple's prior art references disclose all the limitations of the asserted claims. In every possible combination of Apple's prior art references—the DAD Manual, the DAD System, Sound Blaster, Sony Discman, Windows 95 Resource Kit, Opcode Music Shop, and the Loeb article—Apple is missing critical claim limitations, most notably the algorithmic structure identified by the Court for playback and navigation, and the function of skipping backwards based on an elapsed amount of time from the start of playback of a program segment.

As Dr. Wicker explained at length in the portion of his testimony directed to non-infringement, the patents-in-suit do not simply claim a player for playing and navigating through an ordered sequence of program files. They claim a player that plays and navigates through an ordered sequence of program files <u>using a specific algorithm</u>. As explained in more detail in Section I.D, *supra*, Dr. Wicker did not identify any of the playback or navigation algorithms in the DAD Manual or DAD System. Dr. Wicker did not even attempt to find the algorithms of the patents-in-suit in Apple's other primary prior art reference, Sound Blaster. Nor did he fill in this missing structure for Sound Blaster with other references that do disclose the algorithms of the patents-in-suit. Instead, Dr. Wicker simply stated that a person of ordinary skill in the art would know about programming concepts like a CurrentPlay variable:

> Q:    Now, I noticed you have here – it says "CurrentPlay variable was Obvious." What does that mean? There's not another reference we're talking about here like the Windows Resource Kit?
> A:    That's right. One way that one can find something obvious is to use what a person of skill in the art would have known. This is a person who's got a certain amount of education and a certain amount of experience in industry. That person would have known just from their tool kit, just from what they know in their head from their experience, that

> given what we see here, the incorporation of a CurrentPlay variable would be an obvious thing to do.

Trial Tr. at 2191:21-2192:8. Apple offered similarly superficial testimony for other programming constructs like LocTypes. *See id.* at 2189:21-2191:6. Apple cannot simply fall back on "knowledge of one of ordinary skill in the art" as a catch-all for obviousness. At the point where entire multi-step algorithmic structures are disclosed only through the nebulous knowledge of a person of ordinary skill, the obviousness determination becomes meaningless. Any claim limitation can be obvious if all it takes is a wave of the hand and an incantation of the words "knowledge of one of ordinary skill in the art." Apple's burden is higher than that. Apple must show obviousness by clear and convincing evidence, and absent any evidence of algorithmic structures present in the prior art besides a cursory explanation from Dr. Wicker, no reasonable jury could find that Apple has met that burden.

Moreover, irrespective of a person of skill's knowledge of individual programming constructs, Dr. Wicker made no attempt to locate the actual algorithm—i.e., the actual series of steps identified by the Court—anywhere in Apple's prior art devices and references. Even if Apple were correct that a person of ordinary skill in the art would know of concepts like LocTypes and Current Play variables, Apple would still have to show that it would be obvious to arrange those programming constructs into the algorithms identified by the Court. Apple has not even attempted to do that. Similarly, Apple has not even attempted to show where in the prior art discloses the function of skipping backwards based on the time elapsed between the start of a program segment and the entrance of a back command. Because of these deficiencies, Apple's obviousness arguments fail as a matter of law.

### C.       Apple did not apply the correct legal test for obviousness.

Dr. Wicker's obviousness testimony also fails because he did not use the correct test for obviousness. In *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (U.S. 2007), the Supreme Court reaffirmed that obviousness must be evaluated under the four-part test set forth in *Graham v. John Deere*. Under *Graham*, the obvious determination turns on four underlying factual inquiries involving: 1) the scope and content of the prior art; 2) the differences between the claimed invention and the prior art; 3) the level of ordinary skill in the pertinent art; and 4) secondary considerations such as commercial success, long-felt but unsolved needs in the art, and the failure of others to solve the problem solved by the inventors. *Graham,* 383 U.S. 1, 17 (1966). The Federal Circuit has recently emphasized that the fourth factor in the *Graham* analysis—secondary considerations—must be assessed when making a determination as to obviousness. *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) ("To be clear, a district court must always consider any objective evidence of nonobviousness presented in a case").

Apple's evidence of obviousness fails as a matter of law because it completely disregards the fourth factor of the *Graham* test: secondary considerations of nonobviousness. While Dr. Wicker made cursory references in his testimony to devices that arose before the patents-in-suit, such as jukeboxes and Sony Walkmen, he did not provide any evidence of secondary considerations of obviousness or nonobviousness. Without addressing the correct legal test for obviousness, Apple cannot meet its burden to show that the patents-in-suit are obvious by a preponderance of the evidence.

Nor could this problem be fixed by reopening Apple's case. Personal Audio provided evidence of secondary considerations in November 2010, through Dr. Almeroth's expert report.

Dr. Wicker had five months to consider this evidence and evaluate secondary considerations before filing his amended expert report on March 14, 2011. Nevertheless, despite spending over eight hundred paragraphs laying out his opinions on invalidity in that report, Dr. Wicker failed to so much as mention secondary considerations. He cannot now exceed the bounds of his report in order to apply the correct framework for obviousness. Due to this fatal flaw in Apple's evidence, Apple's obviousness defense fails as a matter of law.

### D. Apple offered no reason to combine its prior art references.

Apple's obviousness case also fails as a matter of law because it has offered the jury no reason why a person of ordinary skill in the art would combine any of its prior art references. In *KSR v. Teleflex*, 550 U.S. 298, 419 (U.S. 2007), the Supreme Court rejected the formalistic application of the "teaching, suggestion, or motivation" test. However, the Supreme Court's holding in *KSR* does not entirely obviate the analysis of whether and why a person of ordinary skill in the art would combine prior art references to render a claim obvoius. The Federal Circuit has since noted that an inquiry into the motivation for a person of skill in the art to combine prior art "provides helpful insight into the obviousness question so long as it is not applied rigidly." *See Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). Accordingly, after *KSR*, it is still necessary to provide the jury with *some* basis for combining two prior art references to show obviousness. For example, in the context of a chemical case, "it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound." *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007). Similarly, it was imperative that Apple identify some motivation that would have led a person of ordinary skill in the art to combine Apple's primary references—the DAD System,

DAD Manual, and Sound Blaster—with secondary references such as the Windows 95 Resource Kit and Loeb article.

Dr. Wicker, however, offered the jury no reason which would have led a person of ordinary skill in the art to combine multiple references in order to meet the limitations of the claims of the patents-in-suit. For example, when talking about combining the Sound Blaster and Windows Resource Kit references, Dr. Wicker had the following exchange with Apple's attorney:

> Q:    Now, I notice you put these two references together. Why would you put these two references together?
> A:    Well, this is something that a person of ordinary skill would have known to do. They would have been motivated to do this. Once again, I'll point out that Sound Blaster ran on Windows 95. So, if a person of skill was looking to add to Sound Blaster, he or she would have automatically looked to the Windows Resource Kit to see what Windows 95 could do.

Trial Tr. at 2184:19-2185:3. Dr. Wicker's explanation was even more threadbare for Apple's other references:

> Q:    Now, we've just talked about a handful of references, the Loeb article, the Discman, the Discman manual, and some other playlists and things like that. Dr. Wicker, do you have an opinion as to whether some of these references and concepts could be combined with the DAD manual or DAD system and Sound Blaster?
> A:    Yes.
> Q:    And what is that?
> A:    What these show is generally what was known in the art at the time the patent was applied for. All these concepts were known, as we've shown here; so, they all were available to a person of skill to put together with Sound Blaster, for example, to realize the asserted claims in this case.
>       All this stuff was known. A person of skill would have known how to put these things together to find each and every one of the asserted claims in this case.

Trial Tr. at 2219:16-2220:7.

In essence, Dr. Wicker's testimony boils down to "a person of skill in the art would have combined these references because that's what a person of skill would do." This sort of tautology does not constitute an actual reason to combine prior art references. It is not enough that more

than one prior art references be known to exist; there must be some reason given to combine these references. Because Apple gave no reason for combining references beyond the cursory explanation offered by Dr. Wicker, the jury was left with nothing more than Dr. Wicker's unsupported testimony from which to infer a motivation to combine prior art references.

**III.    Personal Audio Is Entitled to Judgment As a Matter of Law That No Gotuit Entity Was Required to Mark the SongCatcher Product with the '076 Patent.**

No reasonable juror could conclude that Gotuit was required to mark the SongCatcher software before the '076 patent issued on March 6, 2001. Section 287(a) requires patent holders and their licensees to mark any "patented article" with any patent numbers covering the article. 35 U.S.C. §287(a). The patentee bears the burden to prove compliance with the marking statute. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996). The extent of this burden is unclear, although in instances such as this case, it makes sense that Apple bears at least the burden of production to establish that marking is genuinely in dispute. Regardless, the record evidence unequivocally compels the conclusion that no reasonable jury could find a marking obligation in this case for three independent reasons.

**A.    SongCatcher is not a patented article because it was only software and not a hardware player.**

Neither Personal Audio nor Gotuit was required to mark products that did not embody at least one claim in the '076 patent. The marking obligation applies only to a "patented article." 35 U.S.C. §287(a). In contrast, section 292 creates a cause of action for false marking, which arises when someone marks an "unpatented article" with a patent number. 35 U.S.C. §292. Notably, an "unpatented article" under the statute "means that the article in question is not covered by at least one claim of each patent with which the article is marked." *Clontech Labs., Inc. v. Invitrogen*

*Corp.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005). A patented article, therefore, is necessarily covered by at least one claim of a patent. Here, SongCatcher does not fit that description.

The '076 patent includes apparatus claims. Independent claim 1 claims a player, and independent claim 14 claims a programmed digital computer. The Court has construed each of these terms to be a hardware device. SongCatcher is not a hardware device. The undisputed record evidence establishes that SongCatcher was only software. This evidence comes from James Logan and Gotuit Media CEO Mark Pascarella. For instance:

> James Logan
> Q:    What was SongCatcher?
> A:    It was a software product.
>
> [Trial Tr. at 395:16-17]
>
> Q:    Did Gotuit ever sell a piece of hardware with SongCatcher preinstalled on it?
> A:    Oh, no. No.
> Q:    Did Gotuit ever sell a player?
> A:    No. It was simply software that downloaded to your system.
>
> [Trial Tr. at 397:10-15; *see also id.* at 396:7-20]
>
> Mark Pascarella
>
> Q:    Do you know the means by which a consumer would receive the [SongCatcher] product?
> A:    Again, my recollection is that it was downloaded from the Internet.
>
> [Trial Tr. at 1381:19-22]

There is no record evidence that SongCatcher met the first claim element of either independent claim—e.g., that it was a player or a programmed digital computer, as defined by this Court. Therefore, SongCatcher is not a "patented article" and Personal Audio is entitled to judgment as a matter of law that no entity was required to mark it.

### B.     Gotuit was not a licensee of the '076 patent.

Personal Audio is also entitled to judgment as a matter of law on marking because Gotuit was not a licensee of the '076 patent. Section 297(a) does apply to licensees. *See, e.g., K&K Jump Start/Chargers, Inc. v. Schumacher Electronic Corp.*, 2002 U.S. App. LEXIS 25391 at *16 (Fed. Cir. Nov. 25, 2002). But no reasonable juror could conclude from the record evidence that Gotuit licensed the '076 patent. Mr. Logan testified that Gotuit did not license the '076 patent. Trial Tr. at 403:12-17. Mr. Pascarella testified similarly when he was asked by Apple's counsel whether any Gotuit entity exclusively licensed the '076 patent. *Id.* at 1380:17-1391:1. Furthermore, Apple has argued in its damages case that no one licensed the '076 patent between issuance and this lawsuit. *See, e.g.*, Trial Tr. at 197:23-24 ("There weren't any licenses during this period."). Thus, no basis exists for the jury to find that Gotuit had a license and, therefore, an obligation to mark any product with the '076 patent.

### C.     Gotuit did not make, use, or sell SongCatcher after the '076 patent issued.

Section 287 does not create an obligation to mark a product with a patent application number. Instead, section 287 only applies to issued patents. Here, the record evidence establishes that Gotuit stopped making, using, or selling SongCatcher after February 2001. Mr. Logan testified that to the best of his recollection Gotuit stopped downloads for the SongCatcher software by February 2001. Trial Tr. at 401:18-402:17. Apple has not offered any contrary evidence. Because SongCatcher was not made, used, or sold by Gotuit after March 6, 2001, when the '076 patent issued, there can be no duty to mark. Personal Audio is therefore entitled to judgment as a matter of law on this marking issue.

**IV.    Apple Adduced No Evidence About Its Written Description Defense.**

Apple opposed Personal Audio's summary judgment of no written description, but offered no evidence at trial on that defense. Importantly, to invalidate a patent claim for lack of written description, a defendant must show by clear and convincing evidence that the written description requirement has not been satisfied. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005). In order to meet this burden, Apple was required to prove that the specification does not reasonably convey to those skilled in the art that the inventors had possession of the claimed subject matter as of the filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350-51 (Fed. Cir. 2010). In this case, Apple's expert, Dr. Wicker, offered no opinion at trial on written description. Apple has a complete failure of proof on this defense— which it bears a high burden on; and, therefore, Personal Audio is entitled to judgment as a matter of law on Apple's written description defense.

**V.    Apple Has Failed to Support Its Requested Lump-Sum Damage Award.**

35 U.S.C. § 284 guarantees a patentholder "damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." In limited situations, the Federal Circuit has found that a lump-sum damage award may satisfy Section 284's guarantee of a reasonable royalty. However, a lump-sum question is only justifiable when it is supported by the evidence. Specifically, the Federal Circuit has required a defendant seeking a paid-up lump-sum royalty to support that award with evidence of: 1) the parties' expectations about how often the patented invention would be used by consumers; 2) other comparable lump-sum licenses; or 3) a standard practice in the industry of entering into lump-sum licenses. In this case, Apple has not introduced sufficient evidence on any of those three points. As a result, Apple's lump-sum damages theory does not fulfill the criteria set forth

by the Federal Circuit, and Apple should not be allowed to argue to the jury that a lump-sum damages award is reasonable or would have been agreed to by Personal Audio.

> **A.**     **Apple has not introduced evidence of the parties' expectations regarding use of the patent technology.**

The Federal Circuit has made it clear that a lump-sum damage award cannot stand unless it is supported by sufficient evidence. The most important piece of evidence justifying a lump-sum damage award is the parties' expectations about future sales at the time of the hypothetical negotiation. For example, in *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001), the Federal Circuit affirmed a damage award of "a lump sum royalty payment *based on an infringer's expected sales*." (emphasis added). The court specifically noted that the patentee's "business plan and its projections for future sales . . . prepared by [the patentee] two months before infringement began" was necessary to support the jury's lump-sum verdict. This type of evidence is necessary because, as explained by the Federal Circuit, "the more frequently most inventions are used, the more valuable they generally are and therefore the larger the lump sum payment. Conversely, a minimally used feature, with all else being equal, will usually command a lower lump-sum payment." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009). For this reason, it is critical to present the jury evidence regarding the parties' reasonable expectations as to the use of the patent invention by the alleged infringer at the time of the hypothetical negotiation. Indeed, the Federal Circuit has struck down a lump-sum damage award where "no evidence of record establishes the parties' expectations about how often the patented method would be used by consumers." *Id.*

Apple has failed to introduce evidence relating to the estimated use of the patented invention at the time of the hypothetical negotiation between the parties. Just like the plaintiff in *Lucent*, Apple has identified virtually "no documentary evidence or testimony showing the

parties' expectations as to usage of the claimed [invention]." *Id.* The only document from Apple even remotely related to the parties' expectations at the time that infringement began is Defense Exhibit 42, entered during the testimony of Stan Ng. This document, authored in 2001, purports to estimate sales of the first generation iPod classic for the first two quarters after that product's release.

This single exhibit cannot support a lump-sum damages award. To begin with, Apple will ask the jury to award a lump-sum license that would cover "all past and future sales of Apple products." *See* Dkt. #410-2 at 6. Defense Exhibit 42 covers only the expected sales of the first generation of the iPod Classic, a device for which Personal Audio is not even seeking damages. The estimate also does not address the expected usage of the patented invention, i.e., downloading navigable playlists. And because this document contains projections only for six months, it does not reflect the parties' expectations for the use of the patented invention over the lifetime of the patent. Most troublingly, DX-42 does not address the expected usage of later generations of the iPod for which Personal Audio is seeking damages. It provides the jury no guidance whatsoever for the other infringing Apple devices, such as the iPhone, iPod Touch, or iPad, that will be the subject of a second jury trial in a month's time. And it does not address other Apple products, like computers and iTunes, that have not yet been the subject of a patent infringement action.

Apple has not offered any other sales projections or market forecasts which would fulfill the vital function of informing the jury of the parties' reasonable expectations at the time of the hypothetical negotiation. In light of this glaring deficiency in Apple's proof, judgment as a matter of law is appropriate. Without some specific evidence tied to Apple's expected usage of the patented invention in products covered by Apple's requested lump-sum license, the jury

simply has no evidence by which it can determine what a reasonable paid-up lump-sum license would constitute.

**B.      Apple has not given the jury a basis to conclude that the E-Data or Digeo licenses are comparable to the hypothetical negotiation.**

1.      <u>Dr. Wicker did not explain technological comparability.</u>

Through its damages expert, Apple has attempted to support its requested lump-sum damage award with evidence of two "comparable" licenses—the E-Data license and the Digeo license—between Apple and third parties. Federal Circuit law is clear that only licensing agreements comparable to the hypothetical negotiation between the parties are relevant to the determination of a reasonable royalty. In order to be comparable, these licenses must cover comparable technology. *See Lucent*, 580 F.3d at 1331. The Federal Circuit has struck down a lump-sum award predicated on licenses where the defendant did not offer "any document or testimony upon which a jury could have considered how similar or dissimilar the patent technology of the [licensing] agreement is to the invention of [the patents-in-suit]." *Id.*

Just like the defendant in Lucent, Apple has failed to give the jury any basis on which to evaluate the comparability of the E-Data and Digeo licenses to the technology at issue in this case. Apple's expert, Dr. Wicker, did not provide a detailed description of the technology involved in those licenses, nor did he explain *how* that technology is comparable to an audio player capable of downloading or receiving navigable playlists. Instead, he merely read the title of the patents and made the conclusory statement that the licenses were comparable, without further explanation:

Q:      What did you look at first with E-Data?
A:      What I looked at, I was simply looking to see if the technology was comparable. In other words, was this something that was comparable to what's being discussed here in court for the last week or two.

> Q:      Okay. And do you have an opinion as to whether the E-Data license has comparable technology to the patents-in-suit?
> A:      Yes. In my opinion it does.
>  . . .
> Q:      Okay. Let me just back up real quick with the E-Data patent. Why is it your opinion that the E-Data is comparable?
> A:      Okay. Same reason. E-Data is a "System for Reproducing Information in Material Objects at a Point of Sale Location." So, basically it's distributing information from a centralized point to a point of sale location.

Trial Tr. at 2225:12-2226:12. Dr. Wicker's testimony about the patents involved in the Digeo license was similarly conclusory. In fact, he did not even attempt to describe the technology involved in the Digeo '891 patent:

> Q:      Okay. And I think there was another patent on the Digeo, is that right?
> A:      Yes, there is.
> Q:      And what's your opinion with respect to this patent, Dr. Wicker?
> A:      Okay. This is the Digeo '891 patent, and my conclusion was the same. I think the technology that's described in the Digeo '891 is comparable to what we're discussing here in court.

Trial Tr. at 2226:13-21. The above exchange constituted the entirety of Dr. Wicker's testimony regarding the Digeo '891 patent.

The mere statement from Apple's expert that technology is comparable is not enough to provide the jury with the opportunity to judge the comparability of the licenses with the patented technology. "[A] lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers . . . particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here." *Lucent*, 580 F.3d at 1329. Apple has failed to offer anything more than conclusory statements from its technical expert to support its argument that the patents involved in those two licenses involve technology comparable to the invention claimed in the patents-in-suit. Federal Circuit law is clear that this is not enough to support a lump-sum award.

2.      Dr. Ugone did not provide economic details concerning the licenses [subject to revision based on Ugone testimony].

In addition to evidence of technological comparability, Apple must provide evidence of other factors necessary for the jury to make an informed decision. First and foremost, Apple must provide evidence of what products it manufactured under the terms of these licenses. *See Lucent*, 580 F.3d at 1328 (rejecting lump-sum award where "Lucent's expert supplied no explanation to the jury about the subject matter or patents covered by those agreements."). Apple must also show that the technology covered by the licenses relied upon by Dr. Ugone is similarly essential to Apple's other products as the patented inventions are to the iPod. *See Lucent*, 580 F.3d at 1330 (rejecting lump-sum award where "Lucent's expert never explained to the jury whether the patented technology is essential to the licensed product being sold, or whether the patented invention is only a small component or feature of the licensed product."). Apple must also provide evidence of the number of patents licensed under an agreement, and the sales figures for products sold under that agreement. *See Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1309, 1320 (Fed. Cir. 2010) (finding that plaintiff's lack of evidence regarding "the licensees' intended products [and] how many products each license expected to produce" left the jury with "no basis for comparison"); *see also Lucent*, 580 F.3d at 1330-31.

Dr. Ugone did not address any of these factors. He offered no opinion about what Apple products use the technology of the E-Data or Digeo licenses. Neither Dr. Wicker nor Dr. Ugone provided any testimony about whether the inventions covered by the E-Data and Digeo licenses were essential to Apple's products. And no Apple witness ever provided evidence about how many products Apple sold under these licensing agreements.

This failure of proof has left the jury without any way of judging the comparability of these licenses. All they know is that two licenses called the "E-Data license" and the "Digeo license" exist, and that Apple paid $500,000 and $1.75 million, respectively, under these licenses. The jury does not know whether the products covered by these licenses were expensive or cheap, popular or unpopular, simple or complex. The jury does not know whether Apple's products desperately needed the technology licensed under these patents or not. Apple has left the jury completely in the dark without a way to judge the comparability or non-comparability of the E-Data and Digeo licenses. Consequently, these licenses cannot support a lump-sum damage award as a matter of law.

### C.      Lump-sum licenses are not standard in the industry.

Apple has also failed to establish that lump-sum licenses are common in the music player industry. If it is standard practice in the defendant's industry to enter into fully paid-up lump-sum agreements, courts have allowed the jury to award damages on a lump-sum basis. *See Celeritas Techs. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1359 (Fed. Cir. 1998) (allowing lump-sum award where "[t]he evidence established that lump-sum paid-up licenses based on projected royalties were common in the industry"). Conversely, where there is no evidence that lump-sum licenses are standard in the industry, this undercuts any proposed lump-sum award. *See Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (reversing a reasonable royalty damage award based on upfront royalty where industry practice did not include upfront licensing fees).

Apple has not introduced any evidence that lump-sum licenses are standard practice in the music player industry. Indeed, there is evidence on the record that lump-sum licenses are not standard procedure. James Nawrocki, Personal Audio's damages expert, provided testimony that

when designing the iPod, Apple considered licensing costs on a per-unit basis. *See* Trial Tr. at 1461:2-1463:12; PX-745. Apple has not rebutted this evidence.

Apple has failed to provide the type of evidence necessary to support a lump-sum jury award. In light of this failure of proof, Personal Audio requests that the Court find as a matter of law that Apple is not entitled to a lump-sum damage award.

## CONCLUSION

Apple has failed to introduce sufficient evidence such that a reasonable jury could find in its favor on the issues of anticipation, obviousness, marking, written description, and lump-sum damages. Consequently, Personal Audio respectfully requests that this Court enter judgment as a matter of law in Personal Audio's favor on those issue.

Dated:  July 5, 2011                 Respectfully submitted,

By:___/s/ Patrick M. Arenz_____
**Robins, Kaplan, Miller & Ciresi L.L.P.**
Ronald J. Schutz   (MN Bar No. 130849)
(Eastern District of Texas Member)
(Lead Counsel)
Jake M. Holdreith  (MN Bar No. 211011)
(Eastern District of Texas Member)
Cyrus A. Morton (MN Bar No. 287325)
(Eastern District of Texas Member)
David A. Prange (MN Bar No. 329976)
(Eastern District of Texas Member)
Patrick M. Arenz  (MN Bar No. 0386537)
(Eastern District of Texas Member)
Daniel R. Burgess (MN Bar No. 0389976)
(Eastern District of Texas Member)
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
Telephone: (612) 349-8500
Facsimile:  (612) 339-4181
E-mail:   RJSchutz@rkmc.com

JMHoldreith@rkmc.com
CAMorton@rkmc.com
DAPrange@rkmc.com
PMArenz@rkmc.com
DRBurgess@rkmc.com

Annie Huang   (MN Bar No. 0327979)
(Eastern District of Texas Member)
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: 212-980-7400
Facsimile: 212-980-7499
E-mail:   AHuang@rkmc.com

**Germer Gertz, L.L.P.**
Lawrence Louis Germer
(TX Bar # 07824000)
Charles W. Goehringer, Jr.
(TX Bar # 00793817)
550 Fannin, Suite 400
P.O. Box 4915
Beaumont, Texas 77701
Telephone: (409) 654-6700
Telecopier: (409) 835-2115
E-Mail:   llgermer@germer.com
          cwgoehringer@germer.com

**Attorneys for Plaintiff Personal Audio, LLC**

## Certificate of Service

I hereby certify that on July 5, 2011, I caused a true and correct copy of this document (Personal Audio's Motion for Judgment as a Matter of Law) to be served on all counsel of record via Electronic Case Filing (ECF) pursuant to Local Rule CV-5(a).

Date:   July 5, 2011                          /s/  Patrick M. Arenz
                                              Patrick M. Arenz