IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| PERSONAL AUDIO, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION No. 9:09CV111 |
| v. | § | |
| | § | |
| APPLE, INC., | § | JUDGE RON CLARK |
| | § | |
| *Defendant*. | § | |
| | § | |

## MEMORANDUM AND ORDER Re: LUMP SUM DAMAGES

Plaintiff Personal Audio brought suit against Defendant Apple alleging infringement of two patents directed toward an audio program player that will play a sequence of audio program files and accept commands from the user to skip forward or backward in the sequence. At trial, the jury found that the asserted claims of the patents-in-suit were infringed, and did not find that any of the asserted claims are invalid.

Both parties relied on the *Georgia-Pacific* hypothetical negotiation approach to determining reasonable royalty damages. The jury was given a choice of awarding damages in the form of a per unit running royalty for both past and future infringing sales, as requested by Personal Audio, or in the form of a lump sum royalty, as espoused by Apple. The jury chose the lump sum option, albeit in the amount of $8 million, rather than the $5 million suggested by Apple's damages expert.

This order addresses whether the lump sum royalty awarded by the jury is supported by the evidence, and whether it may fairly be construed as granting Apple a fully paid up license for all past and future sales of Apple products that incorporate the patented technology. Personal

Audio asserts that the lump sum award should apply only to those accused products actually tried before the jury, arguing that the jury did not hear evidence of sales of other current allegedly infringing Apple products, nor evidence of projected sales of products that Apple might develop in the future. Personal Audio also complains of the wording of the jury instructions and of the verdict question dealing with lump sum damages.

Personal Audio had the burden to prove the amount of its damages and may not now complain that the jury did not consider evidence that Personal Audio did not offer. Having chosen to rely on the hypothetical negotiation approach to damages, Personal Audio cannot complain that the jury's or the court's attention should not have focused primarily on factors that would have been known and considered by reasonable negotiators on the date of first infringement. There is sufficient evidence in the record from which the jury could have concluded that a lump sum royalty would have been considered and accepted by reasonable and well-informed negotiators at the time of first infringement. Further, the amount of the jury's award is not so low as to be unsupported by the evidence. Both the form and amount of the jury's award meet the statutory requirement of 35 U.S.C. § 284—an adequate award, not less than a reasonable royalty.

The jury was instructed on the effect of a lump sum award. Personal Audio's post-verdict objections to the jury instructions and verdict question are untimely. Further, the court finds that, in light of the jury instructions and verdict form, the presentations of the parties' respective damages experts, and the closing arguments of counsel, there was no confusion on the part of the jury that selection of a lump sum royalty would cut Personal Audio off from additional recovery

for Apple's future use of the patented technology. In light of the history of this case, the court finds no unfairness to Personal Audio in entering judgment on the jury's verdict.

## I. BACKGROUND

### A. Patent Background and Technology

Plaintiff Personal Audio, LLC ("Personal Audio") filed suit against Defendant Apple, Inc. ("Apple") claiming infringement of United States Patent Nos. 6,199,076 ("the '076 patent") and 7,509,178 ("the '178 patent"). Personal Audio asserted claims 1, 3, and 15 of the '076 patent and claims 1, 6, 13, and 14 of the '178 patent. The patents-in-suit are directed toward an audio program player that will play a sequence of audio program segments or files and accept commands from the user to skip forward or backward in the sequence. A "sequencing file," which is "received" or "downloaded" from outside the player, defines the sequence of audio program files, i.e. the order in which the files will be played or what file comes next when the user issues a command to skip forward or backward in the sequence. In some claims, the audio program files themselves are also downloaded from outside the player.

### B. Separate Trials

The two patents-in-suit stem from the same application and share the same forty-five-column specification, which was described by both sides at trial as "dense, mind-numbing text." The claims of the patents are technically complex and include computer-implemented means-plus-function limitations with software algorithms as corresponding structure. Personal Audio accused multiple generations of Apple devices across various product lines of infringement. The accused products included the iPod Classic, iPod

Mini, iPod Nano, and iPod Shuffle product lines ("iPod products"), as well as the iPod Touch, iPhone, and iPad product lines ("iOS products").

The case was originally set to be tried in March 2011. At a hearing in January 2011, continuance of the trial date was discussed, and the court suggested to the parties that, given the complexity of the infringement and validity issues and the number of accused devices, it would be prudent to bifurcate certain issues or products and hold separate trials in order to make the case more understandable to the jury. [Doc. #305, Jan. 11, 2011 Hr'g Tr. p. 26, l. 8 to p. 27, l. 13; *id.* at p. 30, ll. 7-22.] The court instructed the parties to meet and confer regarding the possibility of separate trials, and to submit proposals to the court. [Doc. #305 at p. 41, l. 13 to p. 43, l. 4; *id.* at p. 45, l. 12 to p. 46, l. 5; *id.* at p. 47, l. 24 to p. 50, l. 1; *id.* at p. 52, l. 9 to p. 53, l. 18.]

Each side then submitted a letter to the court regarding the possibility of splitting the case into two trials. The parties agreed that dividing the case would simplify presentation to the jury, although they disagreed on the exact split of accused products. [Doc. #480-2, Jan. 18, 2011 Letter from Apple's Counsel to Court; Doc. #480-3, Jan. 18, 2011 Letter from Personal Audio's Counsel to Court.] After considering the parties' proposals, the court held a second hearing at which it ordered that the case would be tried in two parts, with the first trial addressing infringement by the iPod products,[1] as well as Apple's allegations of invalidity and unenforceability, and the second trial addressing infringement by the iOS products. [Doc. #306, Jan. 20, 2011 Hr'g Tr. p. 14, ll. 17-20; *id.* at p. 17, ll. 2-3; *see also* Doc. #293, Am. Scheduling Order.]

---

[1] Personal Audio dropped its claims against the iPod Shuffle prior to trial, so the iPod products considered at the first trial consisted of various generations of the iPod Classic, iPod Mini, and iPod Nano product lines.

## C. Development of Damage Issues at Trial

At trial, Personal Audio's damages expert, James Nawrocki, testified that, based on the *Georgia-Pacific* factors, the result of a hypothetical negotiation occurring at the time of first infringement would be a running royalty of $0.90 per infringing product sold.[2] [Trial Tr. p. 1393, ll. 2-3.] There was evidence that Apple sold over 93 million of the iPod products [Trial Tr. p. 1392, ll. 23-25], although the contribution of the patented technology to the operation and success of the accused products was hotly contested by the parties.

During the testimony of Personal Audio's technical expert, Kevin Almeroth, the court had instructed the jury that while they might hear evidence about other non-accused items that are related to the accused products, such as Apple's iTunes software, they must determine infringement by comparing the asserted claims only against the accused products themselves. [Trial Tr. p. 669, ll. 7-18; *see also id.* at p. 960, l. 24 to p. 962, l. 11.] However, Mr. Nawrocki's explanation of the portion of Apple's profits from the iPod products that was, in his opinion, attributable to the patented technology could have been understood to include value contributed by iTunes, which operates on a computer separate from the accused iPod products and was not itself an accused product. [Trial Tr. p. 1523, l. 19 to p. 1524, l. 3; *id.* at p. 1524, l. 12 to p. 1527, l. 5; *id.* at p. 1562, ll. 18-24.]

Apple's damages expert, Keith Ugone, also used the *Georgia-Pacific* analysis, but opined that at the hypothetical negotiation, the parties would have negotiated a lump sum license for a

---

[2] Mr. Nawrocki's scant testimony that if only the '178 patent was found to be infringed, the negotiated reasonable royalty would be $1.30 per infringing product sold, and his brief remarks that $0.66 to $1.32 per unit would be a reasonable future royalty, were not convincing. [*See* Trial Tr. p. 1486, l. 17 to p. 1487, l. 14 (only '178 patent infringed); *id.* at p. 1487, l. 20 to p. 1488, l. 21 (ongoing royalty).]

payment of no more than $5 million. [Trial Tr. p. 2348, l. 22 to p. 2349, l. 13; *id.* at p. 2432, l. 19 to p. 2433, l. 4.] Dr. Ugone further opined that this lump sum license would be what he called a "freedom-to-operate" license, meaning that in exchange for the $5 million lump sum payment, Apple would be granted a fully paid up license giving it the freedom to incorporate the patented technology in any product currently existing or developed in the future. [Trial Tr. p. 2350, l. 17 to p. 2352, l. 9.]

In support of his opinion, Dr. Ugone testified that:

– Apple likes to make a splash in the marketplace by introducing new products and would "want[] the freedom to, in a sense, take a technology off the shelf and put it into various products; and that's easiest to do when you have a freedom to operate license, rather than just specifying what products the technology will be used in, especially in cases where companies are changing their products frequently, coming out with new models." [Trial Tr. p. 2349, l. 21 to p. 2350, l. 8.]

– A so-called "freedom-to-operate" license would apply to the accused products in suit and "would also apply to any other product that Apple choses [sic] to use the technology in." [Trial Tr. p. 2351, ll. 1-9.]

– In 2004, Apple entered into a comparable "freedom-to-operate" patent license with a company called E-Data for $500,000. [Trial Tr. p. 2378, l. 22 to p. 2382, l. 4 (E-Data license covered "any product, hardware service, or software that is or was made, used, sold, offered for sale, leased, licensed, imported or otherwise disposed of by Apple or an Apple subsidiary at any time").]

– In 2006, Apple entered into a comparable "freedom-to-operate" patent license with a company called Diego for $1.75 million. [Trial Tr. p. 2382, l. 6 to p. 2383, l. 10 (Diego license covered "any Apple-branded or Apple affiliate-branded (including co-branded) product, service, device, system, hardware, software, or other offering").]

– At the time of the hypothetical negotiation in 2001, it was unclear whether the iPod would be a commercial success. [Trial Tr. p. 2392, l. 19 to p. 2393, l. 10.]

– In 2008, Mr. Logan, one of the named inventors on the patents-in-suit, sold another patent on which he is also the named inventor at an auction for $400,000. [Trial Tr. p. 2395, l. 3 to p. 2399, l. 3.] Dr. Ugone testified that, according to Mr. Logan, the auctioned patented was "complementary" to the patents-in-suit and covered "methods

for creating, distributing, and managing playlists." [Trial Tr. p. 2395, ll. 3-8; *see also* DX 169 (U.S. Patent No. 6,665,659).]

– In 2008, Mr. Logan offered to sell the '076 patent and the pending '178 application to a patent holding company called Concert Technology for $5 million. [Trial Tr. p. 2416, l. 6 to p. 2417, l. 15; *see also* DX 51.]

The verdict form that was submitted to the jury allowed the jury to elect between a per unit running royalty and a lump sum royalty to cover "all past and future sales of Apple products." [Doc. #470, Jury Verdict Form at 8, 10.] The jury found that all eight accused product groups infringed all of the asserted claims, and did not find that any asserted claim is invalid. [Doc. #470 at 2-7.] The jury then found that a lump sum was the appropriate form of royalty in this case, and awarded a lump sum royalty of $8 million to Personal Audio. [Doc. #470 at 8, 10.]

## II. DISCUSSION

### A. A lump sum can be a lawful and sufficient form of reasonable royalty.

Just like parties in a real-world transaction, a hypothetical licensor and licensee may agree to a lump-sum payment or to a running royalty based on ongoing sales or usage, with each type of license having certain risks and benefits. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009); *see also Regents of the Univ. of Cal. v. Monsanto Co.*, No. C 04-0634 PJH, 2005 WL 3454107, at *26 to *28 (N.D. Cal. Dec. 16, 2005) ("As a review of the case law makes clear, . . . a fully paid up royalty spanning the life of the patent is an allowable form of damages." (collecting cases)). In spite of its objections, Personal Audio admits that a lump sum royalty is a permissible form of damages. [Trial Tr. p. 2790, ll. 24-25 ("We're not contesting that Apple has the right to try to pre[s]ent a lump-sum theory.").] But Personal Audio asserts that the lump sum verdict in this case should not bar infringement claims against products that use the patented technology but were not considered by the jury.

Once a jury has found infringement and has failed to find invalidity, the fact of damages is presumed, and 35 U.S.C. § 284 requires an award of damages that is no less than a reasonable royalty. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003). However, if legally adequate damages may legitimately be determined by focusing on the form and amount of royalty that would be agreed upon by a reasonable licensor and licensee *at the time of first infringement*, we must accept that a reasonable jury may base its decision almost entirely on what the parties would have known at that time.[3] Given that a lump sum is a valid form of royalty that may be awarded by a jury, why should the defendant in suit be treated differently than any other licensee who has negotiated a lump sum license "capping its liability and giving it the ability . . . for the remainder of the patent term . . . [to] use the patented technology in its own products without any further expenditure"? *Lucent*, 580 F. 3d at 1326. There is always the possibility that such a licensee or defendant may develop a new product or market a new generation of an old product without paying additional royalties.

---

[3] *Georgia-Pacific*'s approach based on a hypothetical negotiation occurring at the time of first infringement is not fundamentally unfair, even though later events might support a different result. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384-85 (Fed. Cir. 2001) (affirming damages award based on sales projections prepared two months before infringement first began, and finding fact that defendant did not subsequently meet those projections irrelevant to defendant's state of mind at hypothetical negotiation). In eminent domain, where just compensation is constitutionally, not just statutorily, required, courts instruct the jury that the property owner is to be put in same monetary position as he would have been but for the taking. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74, 93 S. Ct. 791, 794 (1973) ("To determine such monetary equivalence, the Court early established the concept of 'market value': the owner is entitled to the fair market value of his property *at the time of the taking*. And this value is normally to be ascertained from 'what a willing buyer would pay in cash to a willing seller.'" (emphasis added) (citations omitted)); *City of N.Y. v. Sage*, 239 U.S. 57, 61, 36 S. Ct. 25, 26 (1915) ("[W]hat the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact,—not what a tribunal at a later date may think a purchaser would have been wise to give . . . .").

Aside from Personal Audio's post-verdict objections to the wording of the instructions and a verdict question, the issues to be determined in this case are: (1) whether the jury's lump sum verdict represents a license covering all past and future use of the patented technology by Apple, even in products that were not before the jury; (2) if so, whether the verdict is supported by the evidence or is so outrageously low as to be unsupportable; and (3) whether Personal Audio was unfairly precluded from presenting evidence about other non-accused Apple products that may infringe, i.e. the iOS products. For the reasons set out below, the court finds that the jury's selection of lump sum as the appropriate form of reasonable royalty clearly represents a damages award giving Apple a fully paid up license that covers all past and future use of the patented technology; that sufficient evidence supports the jury's $8 million lump sum verdict; and that there is no unfairness to Personal Audio in entering judgment on the jury's verdict.

**B. Personal Audio did not timely raise its current objections as to the wording of the jury instructions and Verdict Question No. 8.**

A party objecting to a jury instruction must "state[] distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). A party satisfies Rule 51 by specifically objecting to an instruction prior to the jury's deliberation and stating the reason for the objection. *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citing *Baumstimler v. Rankin*, 677 F.2d 1061, 1069 (5th Cir. 1982)).[4]

"The purpose of the rule is to enable the trial court to correct any error it may have made before the jury begins its deliberations and thus avoid the necessity of a new trial." *Lang v. Tex.*

---

[4] The Federal Circuit looks to regional circuit law to determine whether a party has satisfied the requirements of Rule 51. *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1372 (Fed. Cir. 2010).

& *Pac. Ry. Co.*, 624 F.2d 1275, 1279 (5th Cir. 1980). Objections that were not timely raised

before the jury retired to deliberate are reviewed for plain error, and are overturned only for "an

obviously incorrect statement of law that 'was probably responsible for an incorrect verdict,

leading to substantial injustice.'" *Tompkins v. Cyr*, 202 F.3d 770, 784 (5th Cir. 2000) ("Few jury

charges in cases of complexity will not yield 'error' if pored over, long after the fact in the quiet

of the library—if such an enterprise is to be allowed. It is not. The reality is that most such

'errors' will be washed away if the trial court is given a fair opportunity to consider them.").

*1. Personal Audio's post-verdict objection to the jury instructions.*

The jury was instructed that "[i]n a lump sum royalty agreement . . . the licensee is

granted a license to use the patented technology for the remainder of the patent term without any

further expenditure." [Doc. #469, Jury Instructions at 32.] After the jury returned its verdict,

Personal Audio argued that a particular instruction indicated to the jury that it could only find

damages for the infringement of the iPod products in suit and not any other Apple products.[5]

[Trial Tr. p. 3256, l. 17 to p. 3257, l. 20.] At trial, post-verdict, Personal Audio pointed to the

following sentence from the jury instructions: "You must disregard any testimony or evidence

that Personal Audio is entitled to any damages based on technology incorporated in, or profits

received from, iTunes or any other Apple product that is not included in the eight groups of

accused products that I listed for you above." [*See* Trial Tr. p. 3256, ll. 17-25; Doc. #469 at 37.]

That particular instruction was not intended to address the effect of a lump sum royalty.

Rather, it was included in response to the testimony of Personal Audio's damages expert, who

---

[5] Subsequently, Personal Audio has pointed out other sentences in the instructions that it now objects to on the same basis. [Doc. #480-1, July 14, 2011 Letter from Personal Audio's Counsel to Court at 2-3.]

had implied that the per unit running royalty rate he advocated included value added by Apple's iTunes software, which was not an accused product [Trial Tr. p. 1524, l. 12 to p. 1527, l. 6; *id.* at p. 1562, ll. 18-24]. After Personal Audio rested, Apple moved for judgment as a matter of law ("JMOL") on damages, arguing that Mr. Nawrocki had improperly included damages attributable to iTunes. [Trial Tr. p. 1869, ll. 3-18; *id.* at p. 1871, l. 14 to p. 1872, l. 3.] At that time, the court asked Personal Audio if it was satisfied with the damages testimony, but no motion to reopen and clarify was made. [Trial Tr. p. 1871, ll. 3-10.] The question was a close one, and the court concluded that justice would be better served by allowing the jury to consider the option of a running royalty, with a cautionary instruction.

Perhaps the instruction could have been more precisely worded, and limited to iTunes only. But, it was the testimony of Personal Audio's expert that necessitated the instruction. More importantly, Personal Audio did not object to the wording of that instruction, or any of the other instructions it points to in its July 14, 2011 letter to the court, prior to the jury's deliberations.

*2. Personal Audio's post-verdict objection to the wording of Verdict Question No. 8.*

Verdict Question No. 8 asks: "What sum of money, in the form of a reasonable *lump sum royalty* covering all past and future sales of Apple products, do you find is adequate to compensate Personal Audio for the conduct you found to infringe?" [Doc. #470 at 10.] At the charge conference, Personal Audio's objection to this question was:

> Your Honor, the section that I want to talk about is C, on a lump sum. So, if they check the box that says "lump sum," then it says to proceed to Question C—and this is an issue that I highlighted yesterday. That says, "What sum, in the form of a reasonable lump sum royalty covering all past and future sales of Apple products, do you find is adequate to compensate," *et cetera*.

This would give Apple a freedom-to-operate license. There's no testimony about other products that, in fact, have been accused of infringing . . . .

[Trial Tr. p. 2781, l. 16 to p. 2782, l. 1 (emphasis added).]

As discussed in detail below, there was no doubt that the intent of the lump sum royalty option provided in Verdict Questions No. 6 and No. 8 was to allow the jury to determine a reasonable lump sum royalty for all past and future use of the patented technology. As discussed on the record at trial and elsewhere in this order, the court denied the objection that was made at the charge conference because lump sum awards are permitted, there was sufficient evidence to support a lump sum award, Apple's position was no surprise to Personal Audio, and Personal Audio had not attempted to offer evidence regarding other Apple products that might have affected the hypothetical negotiation.

Personal Audio now points to other language in Verdict Question No. 8, which, at the charge conference, it glossed over with "et cetera." Only after the verdict was returned did Personal Audio assert that the jury would interpret the language "for the conduct you found to infringe" as limiting a lump sum damages award to only the iPod products in suit. [*See* Trial Tr. p. 3257, ll. 1-14.] This is despite the fact that the verdict question explicitly describes a lump sum royalty as "covering all past and future sales of Apple products."

Personal Audio was fully aware of the effect of the "all past and future sales" language in the verdict question at the time of the charge conference. Personal Audio objected to that language on the basis that it would in fact "give Apple a freedom-to-operate license." [Trial Tr. p. 2781, ll. 16-25.] Discussing Personal Audio's objection at that time, the court noted, and Personal Audio did not disagree, that Personal Audio had not attempted to offer sales projections or other evidence regarding the iOS products or any potential future Apple products that might

incorporate the patented technology, nor had Personal Audio otherwise raised or asked the court to address this issue prior to the close of evidence. [Trial Tr. p. 2783, ll. 15-17; *id.* at p. 2785, ll. 12-16; *id.* at p. 2786, l. 12 to p. 2787, l. 7; *id.* at p. 2790, ll. 6-18.] The court overruled Personal Audio's pre-deliberation objection to the court's proposed verdict form, stating that "one reason I wanted to put it in the jury instruction and the question is so the jurors would understand very clearly it's going off into the future." [Trial Tr. p. 2793, ll. 21-23.]

Personal Audio did not raise its current objection to the words "for the conduct you found to infringe" in the verdict question until after the verdict returned. By that time it was too late for the court to consider alternative language.

## C. The jury was not confused about the effect of its verdict.

As discussed in Part I.C above, Dr. Ugone was very clear in his testimony as to the effect of the "freedom-to-operate" license that he was advocating, namely that such a license would give Apple the freedom to incorporate the patented technology into future products without any further expenditure. [*See* Trial Tr. p. 2349, l. 18 to p. 2352, l. 9.] Personal Audio's own counsel drove home the effect of a "freedom-to-operate" license on cross-examination of Dr. Ugone:

> Q.     And what you are suggesting in this case, though, is that Apple gets what's called a "freedom-to-operate license," correct?
> A.     Yes.
> Q.     And a freedom-to-operate license extends beyond merely a digital audio player, right?
> A.     Well, they were licensing basically the technology, yes.
> Q.     And, so, it would cover basically everything Apple sold at that point and into the future, correct?
> A.     It would cover the products if they chose to put the technology in their products, yes.
> Q.     And, so, what you have at this bargaining table is you've got Mr. Logan saying, "I've got these patents." And you've got Apple saying, "Great. We'll pay for these patents, but we're not going to limit what they"—"they go in any product we've got"—or "can go in any product we've got."

A.    That's right. They would negotiate for the option to put it in products that would be developed in the future, yes.

[Trial Tr. p. 2457, l. 12 to p. 2458, l. 7.]

If any juror had the slightest question about the instructions, the verdict form, or the effect of awarding a lump sum royalty to Personal Audio, that question disappeared when, in closing argument, Personal Audio's counsel advocated a per unit running royalty, noting that

> [Y]ou're going to be asked per-unit running royalty or lump sum. If you want to check the box "lump sum," which they're going to ask you to check, that's it. There's—Apple can use this technology and they can sell a hundred million, 200 million, a billion units. *They can incorporate it into new devices in the future and everything else; and whatever that lump sum, that's it.*

[Trial Tr. p. 3001, ll. 7-12 (emphasis added).]

Because district courts witness and participate directly in the jury trial process, they have broad discretion to interpret the jury's verdict form, including "assess[ment] [of] whether the verdict figure represent[s] past infringement as well as ongoing infringement." *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378 (Fed. Cir. 2010). In the context of this trial as a whole, the court has no doubt that a "freedom-to-operate" license is exactly what the jury intended to award when it selected lump sum as the appropriate form of reasonable royalty. The jury's verdict clearly represents a lump sum award giving Apple a fully paid up license that covers all past and future use of the patented technology in Apple products.

## D.  The evidence presented at trial is sufficient to support a lump sum of $8 million, representing a fully paid up license to use the patented technology in all past and future Apple products.

While the fact of infringement and no invalidity establishes a presumption of damages, *Dow Chem.*, 341 F.3d at 1381-82, the patentee bears the burden of proving the amount of damages, *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., Harris Press & Shear*

14

*Div.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990). "A party challenging a jury damages verdict 'must show that the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty.'" *Spectralytics, Inc. v. Cordis Corp.*, — F.3d —, Nos. 2009-1564 & 2010-1004, 2011 WL 2307402, at *7 (Fed. Cir. June 13, 2011) (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc)). The court "must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied, while keeping in mind that a reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Id.* (quoting *Lucent*, 580 F.3d at 1336).

Personal Audio asserts that Dr. Ugone did not present sufficient evidence of Apple's expected sales of infringing products at the time of the hypothetical negotiation. [Trial Tr. p. 2791, ll. 4-24; *id.* at p. 2795, ll. 4-9; Doc. #460, Pl.'s Mot. for JMOL at 21-22.] Relying on *Lucent*, Personal Audio argues that Apple was required to support the lump sum award it advocated with more evidence of the parties' expectations about future sales at the time of the hypothetical negotiation, and that the jury's $8 million lump sum award must therefore be overturned on that basis. [Doc. #460 at 21-22.] In *Lucent*, the Federal Circuit actually stated that "[p]arties agreeing to a lump-sum royalty agreement *may*, during the license negotiation, consider the expected or estimated usage (or, for devices, production) of a given invention," not

15

that such evidence was the only evidence that might provide support for a lump sum award.[6] 580 F.3d at 1327 (emphasis added).

The patentee in *Lucent* presented a running royalty theory of damages to the jury. *Id.* at 1325. The jury chose a lump sum award as requested by the defendant. *See id.* But in that case, it was the defendant who challenged the jury's $358 million lump sum award, while the patentee defended the award, arguing that substantial evidence supported it. *See id.* at 1324, 1327. The court in *Lucent* held that the patentee had not carried its burden at trial, finding that the jury's damages award was not supported by substantial evidence. *See id.* at 1327-35.

In the present case, as in *Lucent*, both sides chose to use the *Georgia-Pacific* hypothetical negotiation approach to determine a reasonable royalty. As in *Lucent*, the patentee's running royalty proposal was rejected by the jury in favor of the defendant's lump sum theory. However, unlike in *Lucent*, the patentee now argues that sufficient evidence does *not* support the jury's damages award. To successfully challenge the jury's award, Personal Audio must show "that the award is, in view of all the evidence, . . . so outrageously low as to be unsupportable as an estimation of a reasonable royalty." *Spectralytics*, 2011 WL 2307402, at *7. The court finds that Personal Audio did not offer evidence so convincing or overwhelming that it demonstrates the jury's award was outrageously low.

---

[6] Personal Audio's argument on this point is an example of the all too common practice of arguing that a single phrase or portion of a higher court's opinion has become the "test" for analysis. The newer and more non-obvious an invention—the more revolutionary the inventor's concept—the less likely it is that the negotiators considering a lump sum royalty at the time of first infringement can project all future uses of the invention. It is also less likely they will have exactly comparable licenses to consider in determining a reasonable royalty. Nevertheless, given infringement of a valid claim, damages must be calculated. *See* 35 U.S.C. § 204. In the end, "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent*, 580 F.3d at 1325.

Personal Audio is correct that Dr. Ugone's lump sum opinion was premised in large part on facts and evidence other than Apple's sales projections for the iPod at the time of the hypothetical negotiation in 2001. However, Dr. Ugone explained that at the time of the hypothetical negotiation, there was uncertainty whether the iPod would be successful in the marketplace. [Trial Tr. at p. 2392, l. 22 to p. 2393, l. 10 ("[Apple] had operating losses in 2001, and there was [a] divergence of opinion . . . about whether [the iPod] would be a commercial success.").] Even Anthony Fadell, the Apple engineer who led the team that designed the first iPod, testified that when the iPod was launched, while he believed the product would be a critical success, he was unsure whether it would be a commercial success. [Trial Tr. p. 1094, l. 6 to p. 1095, l. 10.]

Dr. Ugone testified that Apple would have desired a license that gave it the freedom to introduce new products incorporating the patented technology. [Trial Tr. p. 2349, l. 18 to p. 2350, l. 16.] He stated that such licenses are "not an uncommon license." [Trial Tr. p. 2472, l. 7.] In lieu of sales projections, he based his opinion on other "indicators of value," namely several transactions occurring after the hypothetical negotiation date—the E-Data license, the Diego license, Mr. Logan's sale of a complementary patent, and Mr. Logan's offer to sell the patents-in-suit to Concert Technology. The hypothetical negotiation methodology "permits and often requires" consideration of such "events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575-76 (Fed. Cir. 1988) (citing *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698-99, 53 S. Ct. 736, 739 (1933)), *overruled on other*

*grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337

(Fed. Cir. 2004).

Personal Audio argues that Dr. Ugone's opinion did not take into account Apple's

expected use of the patented technology in later versions of the iPod and iOS products that had

not been introduced at the time of the 2001 hypothetical negotiation. But Dr. Ugone explained

that he did not consider later iPod and iOS product sales to be a proper consideration because the

parties to the hypothetical negotiation would have known that those later sales would be driven

by contributions made by Apple, such as marketing, the introduction of additional non-patented

features, and R&D, rather than by the contribution of the patented technology to the later

products. [Trial Tr. p. 2370, l. 22 to p. 2373, l. 5.]

Personal Audio also argues that Apple did not demonstrate that the E-Data and Diego

licenses relied upon by Dr. Ugone were sufficiently comparable to the hypothetical negotiation

in suit. [*See* Doc. #460 at 23-26.] The court addressed largely identical arguments in its order on

Personal Audio's *Daubert* motion concerning Dr. Ugone, finding the E-Data and Diego licenses

to be sufficiently comparable for purposes of admissibility. [Doc. #418 at 9-13.] Further, the jury

was given detailed instructions on evaluating the comparability of amounts paid under other

patent licenses. [*See* Doc. #469 at 34-35.]

In analyzing the sufficiency of the evidence, the court concludes that, even setting aside

the E-Data and Diego licenses, the jury could, and should, have given substantial weight to

Mr. Logan's 2008 offer to sell the '076 patent and pending '178 application for $5 million. This

was an offer to sell, not merely to license, the actual patents-in-suit, not merely comparable

technology. *Cf. Endress Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 892 F. Supp. 1123,

1131-32 (S.D. Ind. 1995) (value given in exchange for patent may bear on amount that might have been accepted by prudent patentee engaging in hypothetical negotiation), *aff'd*, 122 F.3d 1040 (Fed. Cir. 1997).

Also important to the court's analysis is the fact that the 2008 offer was made some seven years after the introduction of the first iPod in October 2001. During that seven years, Apple's iPod products became well known, and Apple introduced new generations of the iPod Classic as well as various new models such as the Mini, Nano, and Shuffle, and in 2007, the iPhone and iPod Touch. During this time, the patent holder and Mr. Logan were unable to license the patented technology or to develop a commercial product of their own. The 2008 offer was not made by an inventor who had no opportunity to consider the potential of his invention or who was tricked or forced into accepting a nominal sum before realizing the full value of the patented technology.

Personal Audio asserts that Apple should have presented more evidence to support its lump sum theory of damages; but the burden to prove the amount of damages was on Personal Audio, not Apple. Personal Audio's choice to present only a running royalty theory, and to not even suggest by testimony, cross-examination, or attorney argument an alternative amount for a lump sum award in the event the jury found that to be the appropriate form of royalty, was a bold tactical move. But a patentee who puts on little or no evidence of an appropriate lump sum royalty is not in a good position to complain that the amount awarded by the jury is not reasonable. *See Dow Chem.*, 341 F.3d at 1382. And, the jury may simply have found that Personal Audio's expert, Mr. Nawrocki, lacked credibility.

The court concludes that there was sufficient evidence for the jury to find that at the time of first infringement, the parties would have negotiated a lump sum license, and further concludes that there was sufficient evidence to support the jury's verdict of $8 million. A lump sum award of $8 million, giving Apple a fully paid up license that covers all past and future use of the patented technology in Apple products, is adequate compensation and is not so outrageously low as to be unsupportable as an estimation of a reasonable royalty.

**E.  Personal Audio was not unfairly surprised.**

In response to the court's inquiry about separate trials, Apple's letter proposal stated:

> All of the relevant licenses in evidence are lump-sum, paid-up licenses that permit the licensee freedom to operate under the licensed patents. Accordingly, Apple will seek a verdict form in each trial that includes a question for an award of a lump sum covering all past and future sales of all accused devices.

[Doc. #480-2 at 6.] Thus, Personal Audio was on notice of Apple's damages position at the time that bifurcation was being considered. There was not a bat-squeak of a suggestion in Personal Audio's letter proposal that holding separate trials on different accused products would be problematic in terms of Apple's argument for a lump sum royalty to cover all past and future product sales.[7] Nor did Personal Audio complain that Apple's lump sum damages position might affect a bifurcated trial during the hearing at which separate trials were ordered.

At the time the decision to hold separate trials was made, Personal Audio was fully aware of Apple's position on damages. In addition to Apple's statement in its letter proposal to the court, Personal Audio had been in possession of Apple's expert report from Dr. Ugone since

---

[7]  Personal Audio's proposal simply stated that "Apple may argue any . . . damages defense in the second trial, even if substantially the same issue was decided in the first trial." [Doc. #480-3 at 1.]

November 2010.[8] [*See* Doc. #209 at 1.] Dr. Ugone stated throughout his report his opinion that the parties to the hypothetical negotiation would have agreed to a lump sum payment of no more than $5 million granting Apple a fully paid up "freedom-to-operate" license. [*See, e.g.*, Ugone Rep. ¶¶ 61, 191, 208, 268.c(ii); *see also* Trial Tr. p. 2782, l. 19 to p. 2783, l. 4.]

Personal Audio argues that "justice and fairness" require that it be allowed to go forward with the second trial addressing the iOS products, or in the alternative that it be granted a new trial on damages. [Doc. #480-1 at 1.] Personal Audio asserts that it was denied the opportunity to present evidence of Apple's sales of the allegedly infringing iOS products. [Doc. #480-1 at 4.] But, as the court stated during trial without contradiction, Personal Audio never even attempted to offer sales projections or other evidence regarding the iOS products or any potential future Apple products that might incorporate the patented technology. [*E.g.*, Trial Tr. p. 2783, ll. 15-17; *id.* at p. 2790, ll. 6-18; *id.* at p. 3261, l. 17 to p. 3262, l. 10; *id.* at p. 3263, ll. 2-8.] Nor did Personal Audio otherwise raise this issue prior to the close of evidence. [*See* Trial Tr. p. 2786, l. 12 to p. 2787, l. 7; *id.* at p. 2790, ll. 6-18.]

Personal Audio justifies its failure to offer the evidence and obtain a ruling by noting that in response to Apple's objection "to all of Personal Audio's exhibits that referenced the iPhone, iPad or iPod Touch products," Personal Audio "agreed that iOS products that were not accused in the first trial would 'not be the subject of evidence of infringement or damages.'" [Doc. #480-1 at 4 (citing Doc. #398 at 10).] Personal Audio also states that during trial, in

---

[8] In fact, Personal Audio had already filed a motion to exclude Dr. Ugone's testimony on the basis that Dr. Ugone relied on several non-comparable licenses and transactions in support of his lump sum damages opinion. [Doc. #240, Mot. to Exclude Ugone (filed Dec. 10, 2010).]

response to objections by Apple, it agreed to redact portions of certain exhibits that referenced the iOS products. [Doc. #480-1 at 4-5.]

However, Personal Audio was under no obligation to make such agreements if it believed iOS exhibits to be relevant evidence. Despite being well aware of Apple's damages position, Personal Audio never attempted to offer the iOS evidence at trial. An exhibit is not normally considered excluded when it has never been offered. *See MCI Commc'ns Servs., Inc. v. Hagan*, 641 F.3d 112, 118 (5th Cir. 2011) (error may not be predicated upon exclusion of evidence unless substance of the evidence was made known to the court by offer); *Injection Research Specialists, Inc. v. Polaris Indus., L.P.*, 168 F.3d 1320, 1998 WL 536585, at *7 (Fed. Cir. 1998) (unpublished table decision) (exhibit was not considered excluded by district court where defendants had not even offered it into evidence). Personal Audio never attempted to utilize the iOS evidence in support of an alternative opinion by its damages expert regarding the amount of a lump sum award in the event the jury found that a lump sum was the appropriate form of royalty.

Personal Audio's assertion of lack of fairness and due process after failing to at least offer the iOS exhibits or testimony about future infringement is particularly troubling because the court's position on the effect of a lump sum verdict was clear, and the court twice raised the possibility of reopening evidence with respect to damages. After Personal Audio rested, Apple moved for JMOL on damages, arguing that Mr. Nawrocki had improperly included damages attributable to iTunes in his opinion. [*See* Trial Tr. p. 1869, ll. 3-18; *id.* at p. 1871, l. 14 to p. 1872, l. 3.] The court asked Personal Audio if it was satisfied with the evidence it had presented on damages, and Personal Audio said yes. [Trial Tr. p. 1871, ll. 3-10.]

Then, after Apple rested, Personal Audio moved for JMOL that there was insufficient evidence to support Dr. Ugone's opinion that damages should be in the form of a lump sum "freedom-to-operate" license. [*See* Trial Tr. p. 2566, l. 15 to p. 2571, l. 8.] Personal Audio argued that any lump sum license awarded should not extend beyond the specific products tried in the first trial. [*See* Trial Tr. p. 2570, l. 22 to p. 2571, l. 8.] After questioning Personal Audio's counsel regarding the legal authority for the motion [Trial Tr. p. 2564, l. 2 to p. 2571, l. 8], the court stated: "I am going to deny JMOL on lump sum, I mean, unless you're going to ask to reopen at this point based on some flaw that's just been pointed out" [Trial Tr. p. 2571, ll. 16-19]. Normally it would be the defendant asking to reopen at this point; however, nothing stopped Personal Audio from making a request to reopen, and Personal Audio subsequently put on additional testimony regarding infringement and invalidity without ever attempting to fill in or supplement its damages evidence.

Personal Audio could, and should, have raised this issue at the time the decision to bifurcate was made, or at the very least offered evidence on the iOS products prior to closing.[9] *Phillip M. Adams & Assocs., LLC v. Winbond Elecs. Corp.*, No. , 2010 WL 3448611, at *1 (D. Utah Sept. 1, 2010) ("Neither [Defendant] alerted the Court of their current position that bifurcation would require an order that Plaintiff's expert use a per unit royalty rate in order to

---

[9] The only hint that Personal Audio gave regarding this issue prior to trial was in the parties' joint proposed jury instructions, in which Personal Audio objected to Apple's proposed lump sum instruction. [Doc. #410 at 27 n.30 ("Any suggestion that a damages award applies to unaccused products is improper and violates Personal Audio's due process rights.").] But this objection did not specify *why* a lump sum award would violate due process, or that it would be unfair to enter such an award without allowing Personal Audio to introduce evidence regarding the iOS products. Personal Audio did not file any motion on the issue or otherwise bring the issue to the court's attention prior to the verdict, and never attempted to offer such iOS evidence during trial.

apportion damages between the use of Winbond and ITE chips rather than [the] lump sum royalty used in his expert report and deposition testimony. [Defendants] now argue that . . . they . . . will be unfairly disadvantaged by the bifurcation. The Court does not agree . . . . [K]nowing [Plaintiff's] [lump sum] theory of damages . . . [Defendant] chose not to raise its current positions on unfairness in opposition to bifurcation.").

The court finds it difficult to believe that Personal Audio was surprised by Dr. Ugone's opinion at trial or that it did not anticipate that Apple would argue that a lump sum verdict would eliminate the need for a second trial on the iOS products. In light of the history of this case, the court finds no unfairness in entering judgment on the jury's verdict, which represents a lump sum award giving Apple a fully paid up license to the patents-in-suit, covering all past and future use of the patented technology in Apple products.

### III. CONCLUSION

It is **ORDERED** that Personal Audio's motion for JMOL that Apple failed to support its damages position regarding a lump sum license is **DENIED**. It is further **ORDERED** that Personal Audio's July 14, 2011 letter request that the court hold the scheduled second trial on the iPod Touch, iPhone, and iPad product lines, or in the alternative a new trial on damages, is likewise **DENIED.**

So **ORDERED** and **SIGNED** this **29** day of **July, 2011.**

_____

Ron Clark, United States District Judge