1262

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF TEXAS
2    LUFKIN DIVISION

3    PERSONAL AUDIO, LLC          |  DOCKET 9:09CV111
                                  |
4                                 |  JUNE 29, 2011
     VS.                          |
5                                 |  8:30 A.M.
                                  |
6    APPLE, INC., ET AL           |  BEAUMONT, TEXAS

7    ------------------------------------------------------------

8         VOLUME 5 OF __, PAGES 1262 THROUGH 1649

9         REPORTER'S TRANSCRIPT OF JURY TRIAL

10        BEFORE THE HONORABLE RON CLARK
          UNITED STATES DISTRICT JUDGE, AND A JURY

11   ------------------------------------------------------------

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:     RONALD J. SCHUTZ
                            JACOB M. HOLDREITH
16                          CYRUS A. MORTON
                            ROBINS KAPLAN MILLER & CIRESI - MN
17                          800 LASALLE AVENUE
                            SUITE 2800
18                          MINNEAPOLIS, MINNESOTA  55402

19                          ANNIE HUANG
                            ROBINS KAPLAN MILLER & CIRESI - NY
20                          601 LEXINGTON AVENUE
                            SUITE 3400
21                          NEW YORK, NEW YORK  10022

22                          LAWRENCE LOUIS GERMER
                            GERMER GERTZ
23                          550 FANNIN
                            SUITE 400
24                          BEAUMONT, TEXAS  77701

25

1263

```
 1  FOR THE DEFENDANTS:     RUFFIN B. CORDELL
                            FISH & RICHARDSON - WASHINGTON DC
 2                          1425 K STREET NW
                            SUITE 1100
 3                          WASHINGTON, DC  20005

 4                          GARLAND T. STEPHENS
                            BENJAMIN C. ELACQUA
 5                          FISH & RICHARDSON
                            1221 MCKINNEY
 6                          28TH FLOOR
                            HOUSTON, TEXAS  77010
 7
                            KELLY C. HUNSAKER
 8                          FISH & RICHARDSON
                            500 ARGUELLO STREET
 9                          SUITE 500
                            REDWOOD CITY, CALIFORNIA  94063
10
                            JUSTIN BARNES
11                          FISH & RICHARDSON
                            12390 EL CAMINO REAL
12                          SAN DIEGO, CALIFORNIA  92130

13                          J. THAD HEARTFIELD
                            THE HEARTFIELD LAW FIRM
14                          2195 DOWLEN ROAD
                            BEAUMONT, TEXAS  77706
15

16
    COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RMR
17                          FEDERAL OFFICIAL REPORTER
                            300 WILLOW, SUITE 221
18                          BEAUMONT, TEXAS  77701

19

20
      PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
21    TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

22

23

24

25
```

1264

1           INDEX

2                                                   PAGE

3    CONTINUED CROSS-EXAM OF KEVIN C. ALMEROTH      1272

4    REDIRECT EXAMINATION OF KEVIN C. ALMEROTH      1350

5

6    DEPOSITION TESTIMONY OF MARK PASCARELLA        1379

7

8    DIRECT EXAMINATION OF JAMES NAWROCKI           1386

9    CROSS-EXAMINATION OF JAMES NAWROCKI            1491

10   REDIRECT EXAMINATION OF JAMES NAWROCKI         1557

11

12   DIRECT EXAMINATION OF DAVID HELLER             1567

13   CROSS-EXAMINATION OF DAVID HELLER              1594

14

15   CONCORDANCE INDEX                              1602

16

17

18

19           INDEX OF EXHIBITS

20

21   Plaintiff's Exhibit 1                          1294

22   Plaintiff's Exhibit 488A through C             1322

23   Plaintiff's Exhibit 488A                       1323

24   Plaintiff's Exhibit 510A                       1323

25   Plaintiff's Exhibit 510A                       1325

Jury Trial, Volume 5

1265

| 1 | Plaintiff's Exhibit 1 | 1351 |
| 2 | Plaintiff's Exhibit 1 | 1351 |
| 3 | Plaintiff's Exhibit 1 | 1352 |
| 4 | Plaintiff's Exhibit 1 | 1352 |
| 5 | Plaintiff's Exhibit 103 | 1357 |
| 6 | Plaintiff's Exhibit 346 | 1362 |
| 7 | Plaintiff's Exhibit 346 | 1362 |
| 8 | Plaintiff's Exhibit 346 | 1363 |
| 9 | Plaintiff's Exhibit 346 | 1364 |
| 10 | Plaintiff's Exhibit 346 | 1365 |
| 11 | Plaintiff's Exhibit 1 | 1366 |
| 12 | Exhibit 408 | 1386 |
| 13 | Plaintiff's Exhibit 408 | 1386 |
| 14 | Exhibit 710B | 1402 |
| 15 | Exhibit 640B | 1404 |
| 16 | Exhibit 640B | 1404 |
| 17 | Plaintiff's Exhibit 640B | 1405 |
| 18 | Plaintiff's Exhibit 710B | 1405 |
| 19 | Plaintiff's Exhibit 789 | 1405 |
| 20 | Plaintiff's Exhibit 789 | 1406 |
| 21 | Plaintiff's Exhibit 710B | 1407 |
| 22 | Plaintiff's Exhibit 789 | 1407 |
| 23 | Plaintiff's Exhibit 710 | 1407 |
| 24 | Plaintiff's Exhibit 640B | 1408 |
| 25 | Plaintiff's Exhibit 789 | 1408 |

1266

| | | |
|---|---|---|
| 1 | 640B and 710B | 1408 |
| 2 | Plaintiff's Exhibit 789 | 1408 |
| 3 | 640B and 710B | 1408 |
| 4 | Plaintiff's Exhibit 789 | 1408 |
| 5 | Plaintiff's Exhibit 789 | 1408 |
| 6 | Plaintiff's Demonstrative | 1409 |
| 7 | Plaintiff's Exhibit 1073-0005 | 1410 |
| 8 | Plaintiff's Exhibit 377 | 1417 |
| 9 | Plaintiff's Exhibit 565 | 1419 |
| 10 | Plaintiff's Exhibit 565 | 1425 |
| 11 | Plaintiff's Exhibit 565 | 1426 |
| 12 | Plaintiff's Exhibit 652A | 1436 |
| 13 | Plaintiff's Exhibit 652A | 1437 |
| 14 | Plaintiff's Exhibit 148 | 1438 |
| 15 | Plaintiff's Exhibit 149 | 1441 |
| 16 | Plaintiff's Exhibit 149 | 1441 |
| 17 | Plaintiff's Exhibits 148 and 149 | 1444 |
| 18 | Plaintiff's Exhibit 431 | 1444 |
| 19 | Plaintiff's Exhibit 432 | 1445 |
| 20 | Plaintiff's Exhibit 432 | 1445 |
| 21 | Plaintiff's Exhibit 431 | 1446 |
| 22 | 432 | 1446 |
| 23 | Plaintiff's Exhibit 431 and 432 | 1446 |
| 24 | Plaintiff's Exhibit 477 | 1446 |
| 25 | Plaintiff's Exhibit 477 | 1447 |

1267

| | | |
|---|---|---|
| 1 | Plaintiff's Exhibit 39 | 1455 |
| 2 | Plaintiff's Exhibit 39 | 1455 |
| 3 | Plaintiff's Exhibit 39 | 1455 |
| 4 | Plaintiff's Exhibit 39 | 1457 |
| 5 | Plaintiff's Exhibit 39 | 1457 |
| 6 | Plaintiff's Exhibit 39 | 1458 |
| 7 | Plaintiff's Exhibit 745 | 1461 |
| 8 | Plaintiff's Exhibit 745 | 1461 |
| 9 | Plaintiff's Exhibit 745 | 1461 |
| 10 | Plaintiff's Exhibit 745 | 1462 |
| 11 | Plaintiff's Exhibit 488A | 1463 |
| 12 | Plaintiff's Exhibit 488A | 1463 |
| 13 | Plaintiff's Exhibit 510B | 1465 |
| 14 | Plaintiff's Exhibit 488A | 1468 |
| 15 | Plaintiff's Exhibit 510B | 1468 |
| 16 | Plaintiff's Exhibit 33 | 1474 |
| 17 | Plaintiff's Exhibit 33 | 1474 |
| 18 | Plaintiff's Exhibit 445 | 1479 |
| 19 | Exhibit 445 | 1479 |
| 20 | Plaintiff's Exhibit 33 | 1517 |
| 21 | Plaintiff's Exhibit 33 | 1517 |
| 22 | Plaintiff's Exhibit 33 | 1517 |
| 23 | Plaintiff's Exhibit 431 | 1541 |
| 24 | Plaintiff's Exhibit 431 | 1542 |
| 25 | PX 432 | 1544 |

Jury Trial, Volume 5

1268

| | | |
|---|---|---|
| 1 | Plaintiff's Exhibit 472 | 1553 |
| 2 | Plaintiff's Exhibit 472 | 1554 |
| 3 | Plaintiff's Exhibit 433 | 1559 |
| 4 | Plaintiff's Exhibit 433 | 1559 |
| 5 | Plaintiff's Exhibit 433 | 1560 |
| 6 | Plaintiff's Exhibit 477 | 1560 |
| 7 | Plaintiff's Exhibit 433 | 1560 |
| 8 | Plaintiff's Exhibit 433 | 1560 |
| 9 | Plaintiff's Exhibit 477 | 1560 |
| 10 | Plaintiff's Exhibit 477 | 1561 |
| 11 | Plaintiff's Exhibit 433 | 1561 |
| 12 | Plaintiff's Exhibit 33 | 1563 |
| 13 | Plaintiff's Exhibit 1 | 1594 |
| 14 | | |
| 15 | | |
| 16 | Defendant's Exhibit 115 | 1302 |
| 17 | Defendant's Exhibit 115 | 1302 |
| 18 | Defendant's Exhibit 115 | 1303 |
| 19 | Defendant's Exhibit 115 | 1305 |
| 20 | DX 115 | 1308 |
| 21 | DX 115 | 1310 |
| 22 | DX 115 | 1310 |
| 23 | Defendant's Exhibit 116 | 1339 |
| 24 | Defendant's Exhibit 116 | 1339 |
| 25 | DX 100 | 1394 |

1269

| | | |
|---|---|---|
| 1 | Defendant's Exhibit 108 | 1396 |
| 2 | Defendant's Exhibit 108 | 1415 |
| 3 | Defendant's Exhibit 103 | 1459 |
| 4 | Defendant's Exhibit 105 | 1459 |
| 5 | Defendant's Exhibit 108 | 1459 |
| 6 | Exhibit DX 34 | 1575 |
| 7 | Defendant's Exhibit 34 | 1575 |
| 8 | Defendant's Exhibit 34 | 1575 |
| 9 | Defendant's Exhibit 34 | 1576 |
| 10 | Defendant's Exhibit 102 | 1584 |
| 11 | Defendant's Exhibit 195 | 1591 |
| 12 | Defendant's Exhibit 170 | 1592 |
| 13 | Defendant's Exhibit 197 | 1592 |
| 14 | Defendant's Exhibit 34 | 1595 |
| 15 | Defendant's Exhibit 197 | 1597 |
| 16 | Defendant's Exhibit 197 | 1599 |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1          (REPORTER'S NOTES PERSONAL AUDIO V. APPLE,

2  JURY TRIAL, VOLUME 5, 8:30 A.M., WEDNESDAY, JUNE 29,

3  2011, BEAUMONT, TEXAS, HON. RON CLARK PRESIDING.)

4          (OPEN COURT, ALL PARTIES PRESENT, JURY NOT

5  PRESENT.)

6          MR. CORDELL:  Your Honor, before the jury

7  comes in, we had some discussion yesterday about trying

8  to come up with an interim instruction for the jury on

9  equivalents and both sides have come up with proposals.

10 The bad news is they're fairly lengthy.  The good news is

11 I think they're close, but we do have some differences.

12         THE COURT:  All right.  If you give me a copy

13 of that, Ms. Mullendore will give you a copy of one where

14 they can be compared and perhaps that could bridge the

15 gap.  But, yeah, if I could have a copy of what you're

16 working on, that might give me an idea of what you're

17 looking at anyway.

18         And keep in mind what I'm trying to do is

19 during the testimony give the jury -- kind of like I did

20 in the preliminary instructions -- a preliminary basic

21 outline and then tell them in the final instructions I'll

22 give them a more complete, detailed instruction on not

23 only the concepts but how they're used and how they're to

24 be applied.  So, when you look at the proposal I've given

25 you, keep in mind that's not all that's going to be in

1271

1  the jury instructions; but I think we've got to have some

2  way of making them focus on the differences between

3  doctrine and structure.

4          MR. CORDELL:  Absolutely, your Honor.

5  Absolutely.  Thank you.

6          MR. STEPHENS:  Your Honor, there is one other

7  matter before I begin -- or resume my cross-examination

8  of Dr. Almeroth.  If you could just remind him again not

9  to mention the reexamination or the Patent Office when I

10 ask him about his declaration in connection with that.

11 I'm not going to mention it myself.  I'm just going to

12 ask him some questions about simple --

13         THE COURT:  Things he's said in the past.

14 Okay.  So, we keep out the fact that that's gone through

15 that.

16         THE WITNESS:  Yes, sir.

17         MR. HOLDREITH:  We're not going to mention any

18 Patent Office proceedings at all, as I understand it,

19 just did you make these statements.

20         MR. STEPHENS:  In connection with that.

21         MR. HOLDREITH:  Sure.

22         MR. STEPHENS:  I have another line of

23 questioning on the file history, but that's separate

24 entirely.

25         THE COURT:  Okay.  Bring in the jury.

Jury Trial, Volume 5

1272

1      (The jury enters the courtroom, 8:32 a.m.)

2      THE COURT:  Good morning, ladies and

3 gentlemen.  Welcome back.  We're going to continue on

4 with the cross-examination of Dr. Almeroth.

5      Mr. Stephens.

6      MR. STEPHENS:  Thank you, your Honor.

7      If we could have up Plaintiff's Demonstrative

8 Exhibit 1010, please.

9      <u>CONTINUED CROSS-EXAMINATION OF KEVIN C. ALMEROTH</u>

10 BY MR. STEPHENS:

11 Q.    Dr. Almeroth, we're going to take up where we left

12 off yesterday.  Your counsel correctly pointed out that

13 the court's citations for the go command were to the

14 '178 patent; whereas, the citations on your chart were to

15 the '076 patent.  So, we're going to compare those

16 citations in the patents themselves.

17      MR. STEPHENS:  Mr. Barnes, if you could bring

18 up the '076 patent, Column 34, lines 24 to 28.

19      And then the '178 patent, Column 34, line 19

20 through the rest of that column.

21      Actually, if you could -- yeah, that's right.

22 BY MR. STEPHENS:

23 Q.    Dr. Almeroth, the '178 patent is a division of the

24 '076 patent; is that right?

25 A.    That's correct.

1273

1   Q.      So, the specifications have the identical language

2   in them; is that right?

3   A.      That's correct.  The line numbers are off

4   slightly.

5   Q.      That's right.  So, the point I was trying to get

6   at here was that your citations for the description of

7   the go command in the '076 patent do not match the

8   language that the court cites as the corresponding

9   structure in the juror notebooks, correct?

10  A.      That's correct.  This demonstrative was meant to

11  be a description.  It wasn't meant to suggest that the

12  court's claim construction was wrong or that I didn't use

13  the court's claim construction.

14  Q.      Okay.  Thank you.

15  A.      It was really just an introduction to the jury on

16  what some of the commands were and where it could be

17  found in the patent.

18  Q.      Okay.  But you didn't point to the structure the

19  court identified as performing those particular

20  functions, right?

21  A.      I absolutely did.

22  Q.      Well, not in this demonstrative.

23  A.      Not in this demonstrative, not --

24  Q.      Okay.  Thank you.

25  A.      -- in this example, but as part of the --

1274

1  Q.    My question was as to this demonstrative, sir.

2  Thank you.

3  A.    But I did point to the court's claim construction

4  later when I --

5            THE COURT:  Okay.  There is not a question on

6  the floor quite yet.

7            Go ahead, Mr. Stephens.

8            MR. STEPHENS:  Thank you, your Honor.

9            All right.  Now, Mr. Barnes, if you could blow

10 up on Plaintiff's 1010, the citation for the skip

11 command.  Thank you.

12           And if we could then compare that with the

13 juror notebook claim terms section for "skip" which,

14 Mr. Barnes, I believe in yours is page 3, which I think

15 unfortunately is the previous version.  It doesn't match

16 exactly what's in the jurors' notebook by page number,

17 but it's the "means responsive to said first command for

18 discontinuing the reproduction of the currently playing

19 program segment."

20           THE COURT:  That would be in the jurors'

21 notebook, page 3?

22           MR. STEPHENS:  Well, your Honor, unfortunately

23 the version I have is the version before you updated it.

24 I apologize for that.

25           THE COURT:  Okay.

1          MR. STEPHENS:  So, it's for the skip command.

2  It's for '076 patent claims 1 and 3.

3          And then, Mr. Barnes, on the next page is the

4  citation to the claim language.

5  BY MR. STEPHENS:

6  Q.    And the court cited Column 15, lines 21 to 25 and

7  Column 34, line 28 to Column 35, line 48.  Not the same

8  section that you cited, Dr. Almeroth, correct?

9  A.    It is slightly different for that particular

10  figure.

11  Q.    Thank you.

12          MR. HOLDREITH:  Again, your Honor, I object.

13  All of the citations in the court's definitions are from

14  the '178 patent.

15          MR. STEPHENS:  That's not true.  This is

16  related to the '076.

17          THE COURT:  I think on this one he's taking it

18  out of my '076.  I'm comparing them here, and I believe

19  Mr. Stephens is correct.

20          MR. HOLDREITH:  All right.  If that's right, I

21  withdraw the objection.

22          MR. STEPHENS:  Thank you, your Honor.

23          And then, Mr. Barnes, if we could highlight on

24  Plaintiff's Demonstrative Exhibit 1010 the back command

25  and compare that with the juror notebook for the back

1276

1  command -- sorry.  I don't think that's it.  It's the

2  "means responsive to a single one of said second

3  commands."

4             That's it.  And then it continues on to the

5  next page.  Could we get both of those up there so we

6  have complete citations?

7             Sorry.  I think you have the wrong one,

8  Mr. Barnes.  It's the bottom of your page 4 and the top

9  of your page 5.

10            You still have the wrong one.  Bottom of your

11  page 4.

12            There we go.

13  BY MR. STEPHENS:

14  Q.    So, again, Dr. Almeroth, you cite '076 patent

15  Column 15, lines 43 to 44 and 49 to 53; Column 34,

16  lines 24 to 28.  What the court cites is Column 15,

17  lines 49 to 59, correct?

18  A.    My -- that's correct.  My --

19  Q.    Thank you.

20  A.    -- demonstrative was to help the jury understand.

21            MR. STEPHENS:  Lastly, if we could have 1010,

22  the double back command.  Mr. Barnes, this is the next

23  one down on the same page we were just looking at, the

24  "means responsive to the detection of two consecutive

25  ones of said second commands."

1277

1  BY MR. STEPHENS:

2  Q.    And, again, Dr. Almeroth, you cite '076 patent

3  Column 15, lines 43 to 44, 49 to 55 and Column 34,

4  lines 24 to 28, while the court cites Column 15, lines 49

5  to 59 and Column 34, line 28 to Column 35, line 53,

6  correct?

7  A.    Yes.  And that Figure 3 still is a demonstrative

8  to help the jury understand.

9  Q.    Thank you.

10        MR. STEPHENS:  Now if we could have up

11 Plaintiff's Demonstrative 1009, page 4.

12 BY MR. STEPHENS:

13 Q.    Dr. Almeroth, you testified on Friday about this

14 PDA.  Do you remember that?

15 A.    Yes, I did.

16 Q.    Now, this is not a real PDA, right?  I think you

17 testified this did not represent any particular PDA.

18 A.    The second part is true.  This doesn't represent

19 any actual PDA.

20 Q.    Okay.  So, it's fictitious, right?

21 A.    That's correct.

22 Q.    Thank you.

23        Now, if we could go to page 6 of Plaintiff's

24 Exhibit 1009.

25                          *

Jury Trial, Volume 5

1278

1  BY MR. STEPHENS:

2  Q.    This is kind of a cutaway diagram of that

3  fictitious PDA, correct?

4  A.    That's correct.  It's instructive of what's

5  described in the patent.

6  Q.    Okay.  There's no battery here, right?

7  A.    I'd have to look at the circuit board more

8  closely, but that clearly wasn't the point of this

9  slideware.

10  Q.    Well, you'd need a battery if it was going to

11  work, right?

12  A.    It's meant to be an icon representing a patent;

13  so, this wasn't supposed to be something that works.

14  It's a representation of a concept that's described in

15  the patent.

16        As an icon, I'm not sure how you would expect

17  it to work.

18  Q.    Okay.  So, it's a fictitious PDA that would not

19  work, right?

20  A.    No.  It's an icon simply representing the concepts

21  that are described in the patent.

22  Q.    Okay.  It's an icon representing a fictitious PDA

23  that would not work, right?

24  A.    Those are not the words I'm using.  That's not the

25  description I would use.  I want to be very --

Jury Trial, Volume 5

1279

1  Q.      Well, that's what I'm asking you.

2  A.      Correct.  It's what I described.

3  Q.      Okay.

4  A.      It's what's in the patent.  It's representative of

5  the PDA that's described in the patent.

6  Q.      Now, you've previously submitted a declaration

7  under oath that in the mid 1990s typical storage

8  requirements for a reasonably sized library would be far

9  greater than what was commonly available on a personal

10 computer, correct?

11 A.      That's part of a declaration that I submitted.  I

12 think that there were other sentences around that that

13 put that sentence into context.

14 Q.      Okay.  But --

15 A.      In fact, there is a full paragraph in which that

16 sentence has appeared.

17 Q.      But those are your words, right?

18 A.      They are.  But I think those words as you read

19 them are being taken out of context.

20 Q.      Okay.  Typical desktops in the mid 1990s used

21 3-and-a-half-inch disk drives, right?

22 A.      Could you say that again?

23 Q.      Typical desktop computers in the mid 1990s used

24 3-and-a-half-inch disk drives?

25 A.      No, not necessarily.  I disagree with that

1280

1 characterization.

2 Q.    Okay.  They used commonly three-and-a-half or

3 2-and-a-half-inch disk drives, right?

4 A.    No.  I would disagree with that.

5 Q.    Okay.  What size did they use?

6 A.    It ranged.  They had 3 and a half, 5 and a

7 quarter.

8 Q.    Okay.  Now, both of those, 3-and-a-half and

9 5-and-a-quarter-inch disk drives, are larger than a

10 PalmPilot, right?

11 A.    I'm not sure what you mean by "larger."  You mean

12 physical size?

13 Q.    Physical size.

14 A.    I believe the 5 and a quarter is larger, but the 3

15 and a half would either be about the same size or

16 smaller.

17 Q.    Okay.  Well, let's take a look at that.

18         MR. STEPHENS:  Your Honor, may I approach?

19         THE COURT:  You may.

20 BY MR. STEPHENS:

21 Q.    Dr. Almeroth, I'm handing you a disk drive.  Is

22 that approximately the size of a standard

23 3-and-a-half-inch disk drive in the mid 1990s?

24 A.    See, you're talking about a hard disk drive.

25 Q.    That's right.

1  A.     I thought you were talking about a floppy disk

2  drive.

3  Q.     No.  I'm talking about a hard disk drive.

4  A.     Okay.  You just said "a disk drive."  I don't

5  think you distinguished between the different kinds of

6  disk drives that could have existed.

7  Q.     Okay.  Well, let me be clear.  I'm talking about

8  the kind of storage that a personal computer would use in

9  the mid 1990s.

10  A.     Okay.  There's lots of different kinds of storage

11  a personal computer in the mid Nineties could use.

12  Q.     And what you're holding in your hands is one of

13  those, right?

14  A.     This is a hard disk drive.  This is one of a very

15  large range of different kinds of storage devices.

16  Q.     Okay.  But that would be commonly found in a

17  desktop computer in the mid 1990s, something that size,

18  correct?

19  A.     Well, I haven't looked at it to see how big it is.

20         It doesn't say how much it stores.

21  Q.     I'm offering it -- I'm handing it to you only to

22  show the size, not the capacity.

23  A.     Oh, okay.

24         All right.  So, what are you trying to

25  represent this as?

1282

1   Q.    I'm asking you whether it's the size of a typical

2   3-and-a-half-inch disk drive for a desktop computer in

3   the mid 1990s.

4   A.    Typically 3 and a half inches refers to a floppy

5   drive.

6   Q.    Three and a half inches also refers to a hard

7   drive -- well, let's forget about 3 and a half inches for

8   a minute, Dr. Almeroth.  Is that the size of a typical

9   hard drive that you might find in a desktop computer in

10  the mid 1990s?

11  A.    It is the size of one of the kinds of hard drives

12  that could appear.

13  Q.    Okay.

14  A.    Again, there were many other sizes and types

15  depending on devices and --

16  Q.    And typically for hard drives, larger size drives

17  have larger capacities, right?

18  A.    No.

19  Q.    Okay.  Well --

20  A.    That's not true.

21  Q.    -- at any rate, Dr. Almeroth, you would agree that

22  if a personal computer in the mid 1990s could not hold a

23  reasonable size library, then a PalmPilot could not hold

24  a reasonable size library, right?

25  A.    Well, I would disagree with the first part of the

1  question; and I would disagree with the second part of

2  the question.

3  Q.    So, you would disagree with your own statement

4  that typical storage requirements for a reasonable size

5  library would be far greater than what was commonly

6  available on a personal computer?

7  A.    No.  I think you're being very careful with your

8  language, and you said that it wasn't possible.  And if

9  you look at the statement that I wrote, I used qualifiers

10 like "typical."

11 Q.    Yeah.  And that's what I'm asking about.  Typical

12 storage requirements for a reasonable sized library would

13 be far greater than what was commonly available on a

14 personal computer.  Those are your words, right?

15 A.    That's right.  And it's not a blanket statement

16 that says there was no storage device available.  It's

17 not a blanket statement that says you couldn't have a

18 smaller library.  It's not a blanket statement about the

19 kinds of encoding that you could have.  That statement is

20 being taken out of context, given the other words around

21 it in the paragraph.

22 Q.    Okay.  Now, you haven't identified in your

23 testimony here in court any storage device that was

24 available in the mid 1990s that would fit inside of a

25 PalmPilot and store a reasonable sized library of music,

1284

 1  correct?

 2  A.    Do you mean like a specific model number?

 3  Q.    Exactly.

 4  A.    That was available in 1996 that --

 5  Q.    Well, I think you testified 1995 is when the

 6  PalmPilot was available, right?

 7  A.    Certainly there were PalmPilots available then.

 8  Q.    Okay.  And you haven't identified here in court

 9  any disk drive that would fit inside a PalmPilot that

10  would store a reasonable sized library of music, correct?

11  A.    I will agree I have not identified a particular

12  make, model, size, or the specific details.  That wasn't

13  required for my analysis.

14  Q.    Thank you.

15        Now, you also testified in that same

16  declaration that in the mid 1990s content files were

17  quite large, especially for a decent level of quality,

18  correct?

19  A.    Again, I think that that was in a particular

20  context.  Given that I think I have that declaration, I'd

21  just like to look at the sentences around it.

22  Q.    Sure.  It's tabbed at "Almeroth Declaration," and

23  I'm referring to paragraph 5.

24        I'll just read your statement, the whole

25  paragraph.  (Reading) In those early years downloading

1285

1  was dismissed as a technique for delivering multimedia

2  content.  The content files were still quite large,

3  especially for any decent level of quality.  Computer

4  networks, especially the last mile for users, were quite

5  slow and downloading content took, on the order of many

6  minutes to download a single song, to create a compelling

7  user experience and there was limited storage on user's

8  PCs.  Disk sizes were measured in hundreds of megabytes

9  as compared to today's PCs which have thousands of times

10  more capacity.

11        Those are your words, right?

12  A.    That's correct.  That gives it a little bit more

13  context.  I think that's a little bit more accurate

14  representation of what I said.

15  Q.    Okay.  Now if we could have up Defendant's

16  Demonstrative 1009, page 4.

17  BY MR. STEPHENS:

18  Q.    Now, Dr. Almeroth, you relied on a Web site called

19  "pdadb.net" in your report on infringement in this case,

20  correct?

21  A.    I don't recall that Web site specifically, but if

22  you say that it's in my report -- it was 25,000 pages

23  long -- I'll represent that that was in there.

24  Q.    Okay.  And if you'd like to check, it's at

25  paragraph 190.

1  A.     Let me just see, then, since I have that report --

2  part of it at least.

3  Q.     It's in the binder that you have.

4  A.     Yes.  I see that.

5  Q.     Okay.  And in your experience, is the pdadb.net

6  Web site a reliable source for information about PDA?

7  A.     Generally.  I made sure that the documents that I

8  was looking at were correct, and I had cross-referenced

9  those with other documents.

10  Q.     Okay.  Now, in your binder there is a tab called

11  "Palm Article from pdadb.net."

12  A.     Okay.

13  Q.     Do you see that?

14  A.     I do.

15         MR. HOLDREITH:  Just give me a second to catch

16  up, if you would.

17         MR. STEPHENS:  Sure.

18         MR. HOLDREITH:  Thank you.

19  BY MR. STEPHENS:

20  Q.     Now, that is a couple of pages from the pdadb.net

21  Web site describing the PalmPilot 1000.  Do you see that?

22  A.     I see those pages, if that's what you're -- if

23  you're telling me that's where those pages come from,

24  then --

25  Q.     It is.

1287

1   A.     Okay.

2   Q.     Do you have any reason to believe that what's

3   described there is not an accurate description of the

4   PalmPilot 1000?

5   A.     I don't have any reason, but I haven't confirmed

6   this data.

7   Q.     Okay.  Fair enough.

8          It describes the PalmPilot as being released

9   in June of 1996.  Do you see that?

10  A.     I do.

11  Q.     Not 1995.

12         MR. HOLDREITH:  Your Honor, I have an

13  objection to reading from the document.  We've objected

14  to the document based on authenticity.  Reading it into

15  the record is the same thing.

16         MR. STEPHENS:  Your Honor, he just

17  confirmed --

18         THE COURT:  Overruled.

19         MR. STEPHENS:  Thank you.

20  BY MR. STEPHENS:

21  Q.     And it gives its dimensions there as 3.2 inches by

22  4.7 inches by 0.7 inches, right?

23  A.     That's what it says.

24  Q.     And it gives its memory capacity there.  Do you

25  see that?  .125 megabytes?

1288

1  A.     Yes.  I think it says "MI bytes."

2  Q.     And that refers to megabytes, right?

3  A.     Generally it's just M for megabytes, but that --

4  Q.     Did you investigate the PalmPilot before you

5  testified about it last Friday?

6  A.     Just based on general knowledge about it.

7  Q.     And 125 kilobytes, or .125 megabytes, is the

8  correct capacity for the Palm 1000, right?

9  A.     I don't remember exactly what it was.

10  Q.     Okay.  Well, do you have any reason to believe

11  that's not right?

12  A.     I don't for the Palm 1000.  Obviously there were

13  numerous other Palm devices available.

14  Q.     They all came later, right?

15  A.     No, not necessarily.

16  Q.     Okay.  Do you have reason to believe there were

17  other Palm devices available in 1995?

18  A.     I do.

19  Q.     And what basis is that?

20  A.     The page that you're showing me here says the U.S.

21  Robotics PalmPilot 5000.

22  Q.     Okay.

23  A.     It's in the bottom.

24  Q.     So, there's a 1000 and a 5000; and the 5000 was

25  the same except it had more memory, right?

1289

1  A.    Well, that's at least one of the differences; and

2  that says the release date was also June, 1996.

3  Q.    Okay.

4  A.    I'm not sure if there might have been other

5  devices like PalmPilots that were available at the time

6  that might have had more memory.

7  Q.    Okay.  Well, let's focus on these for a moment.

8         The Palm 1000 had 128 kilobytes of memory.

9  That's less than a second of CD-quality audio, right?

10 A.    Oh --

11 Q.    If you -- I'm talking about stored as it is on a

12 CD.

13 A.    You mean not compressed?

14 Q.    Not compressed.

15 A.    Okay.  That's generally not how we think about it,

16 but 44.1 kilohertz at 16 samples per second --

17 Q.    In stereo.

18 A.    Okay.  I'm sorry.  2 -- I have to have a

19 calculator to do the exact math.

20 Q.    Okay.  Well, you can multiply it out pretty

21 easily.  44,000 times 16 bits per sample, right?

22         You're an expert on multimedia.  You don't

23 remember what CDs --

24 A.    Well, I told you what the numbers were.  Just

25 doing the math on the top of my head here --

1  Q.     All right.  Well, let me -- I've done the math,

2  and it works out to about 1.4 million bits per second; is

3  that right?  Would you say that's roughly correct?

4  A.     That's actually about correct.

5  Q.     Okay.  And that's about 176,000 bytes per second,

6  right?

7  A.     Assuming you calculated it correctly.

8  Q.     You just divide by 8, right?

9  A.     That's correct.

10  Q.     So, if you were to store that in a PalmPilot with

11  128 kilobytes, you'd get about three-quarters of a second

12  of sound, right?

13  A.     Again, if you've done the math right.

14  Q.     Okay.  And if you used the Palm 5000 with

15  512 kilobytes of memory, you'd get about three and a half

16  seconds, right?

17  A.     If you've done the math right.  And, again, just

18  for these two examples of devices.

19  Q.     Okay.  Now, the PalmPilot didn't have a USB port,

20  right?

21  A.     No, it did not.

22  Q.     And the original PalmPilot did not have an

23  infrared port, right?

24  A.     That's correct.  And, again, these are the dates

25  in 1996.

1291

1   Q.      That's right.

2   A.      Okay.

3   Q.      And it had no headphone jack, right?

4   A.      I believe that's correct as well.

5   Q.      And it used two double A batteries, correct?

6   A.      I'm assuming you're reading from this page.  I

7   don't recall specifically.

8   Q.      Okay.  Well, it used batteries, right?

9   A.      And this says it used triple A batteries, and it

10  doesn't say how many.  So, I just -- you're asking

11  questions that some of which are inconsistent with the

12  information that's here, and then I don't have recall of

13  exactly what its capabilities were.

14  Q.      Whether it's double A or triple A isn't my point.

15  The point is it used batteries, right?

16  A.      I believe it did, yes.

17  Q.      And you can see there on the back a port that

18  looks like a place you would put batteries, right?

19  A.      I believe that's correct.

20  Q.      Now, you didn't describe a PDA with a disk drive

21  anywhere in your reports, correct?

22  A.      I don't think I used the words -- or offered a

23  description of a PDA that included a disk drive.  But I

24  think generally in describing the characteristics of a

25  PDA and the kinds of storage it would have, for example,

1292

1 clearly I think a person of ordinary skill in the art --

2 Q.    Dr. Almeroth, I'm not asking for your opinion.

3 I'm just asking you whether or not you identified one;

4 and I think you said you did not, correct?

5 A.    Well, I'm not exactly sure that that's the case.

6 Q.    Okay.  Can you --

7 A.    I think in references to a PDA --

8 Q.    Show me where in your report you identified a

9 particular PDA with a disk drive.

10 A.    Oh, you mean -- now a particular PDA.

11 Q.    Yes.

12 A.    You mean a particular brand of PDA?

13 Q.    Any PDA with an actual disk drive in it.

14 A.    Paragraph 191.  It says, "By 2001 touchscreen

15 devices were well-known on the market.  There was a

16 variety of" --

17 Q.    Dr. Almeroth, let me stop you right there.  I

18 meant to ask you about in 1996 or 1995.

19 A.    Oh, okay.

20       And other than the fact that someone would

21 know that a PDA could have a disk drive, you want --

22 Q.    I'm not asking --

23 A.    -- an explicit description.

24 Q.    -- what other people would know.  I need an

25 explicit description of a PDA in 1995 or 1996 with a disk

1293

1  drive.

2  A.    Okay.  I don't recall it being in there

3  specifically, but I can certainly scan through just to

4  make absolutely certain.

5  Q.    Are you going to scan through all 25,000 pages?

6  A.    That was not the plan.

7  Q.    Okay.

8  A.    But you've asked me a question to look through my

9  report.

10  Q.    Take a look.  Go ahead.

11  A.    I want to make sure that there isn't something in

12  there.

13          I see numerous mentions to PDA but not one

14  from 1995, not one that mentions specifically a brand and

15  model number and then attributes a particular disk drive

16  in the '95 to '96 time frame.  I don't see anything with

17  those exact --

18  Q.    Okay.

19  A.    -- requirements.

20  Q.    Thank you.

21          Now, the only mention of PDA is in the

22  patent --

23          MR. STEPHENS:  Mr. Barnes, if you could bring

24  up PDX 1 at Column 7, lines 53 to 57.

25                              *

1294

1  BY MR. STEPHENS:

2  Q.    Dr. Almeroth, that's the '076 patent, Column 7,

3  lines 53 to 57.

4           And it says "The Infrared Data Association's

5  (IrDA) wireless infrared (IR) standard provides a highly

6  effective, low-cost communications pathway rapidly

7  becoming a standard feature in all notebook computers and

8  PDAs," correct?

9  A.    That's correct.

10 Q.    And that is the only sentence that mentions a PDA

11 in the entire patent, correct?

12 A.    I believe that's the only place it uses the term

13 "PDA."  I believe there are other places where it

14 discusses things that are similar to PDAs.

15 Q.    Okay.  But that's the only mention of an actual

16 PDA, right?

17 A.    Of that acronym, I believe that's correct.

18 Q.    Okay.

19           MR. STEPHENS:  Now if we could pull up

20 Figure 1 of Plaintiff's Exhibit 1.

21 BY MR. STEPHENS:

22 Q.    Now, the player is shown on the right side and

23 labeled as 103 in Figure 1, right?

24 A.    Figure -- it is 103 in the example that is

25 Figure 1.

1295

1  Q.    And that's described in the description of the

2  preferred embodiment, Column 4.

3         MR. STEPHENS:  Mr. Barnes, if we could go to

4  Column 4, lines 25 to 40.

5  BY MR. STEPHENS:

6  Q.    It says there about halfway down, at line 33, that

7  "The player 103 may be advantageously implemented by a

8  conventional laptop or desktop personal computer."  Do

9  you see that?

10 A.    I do see that.

11 Q.    Okay.  And it does not say that the player may be

12 advantageously implemented by a conventional laptop or

13 desktop personal computer or a PDA, does it?

14 A.    No.

15 Q.    Okay.  Thank you.

16         In fact, the patent never says anywhere that

17 the Player 103 may be implemented by a PDA, correct?

18 Those words don't appear in the patent.

19 A.    Those exact words do not appear in the patent.  I

20 think the concept is there.

21 Q.    And there's no description in the patent of how to

22 build a PDA, correct?

23 A.    I want to be clear what you mean by that.

24 Instructions for --

25 Q.    For building a PDA.  They don't appear.

Jury Trial, Volume 5

1296

1   A.     Well, instructions for taking the components and

2   putting them together into an actual device?

3   Q.     Right.

4   A.     I mean, the components are mentioned and --

5   Q.     The only processor mentioned is an Intel

6   microprocessor, right?

7   A.     Again, you're focusing on particular

8   manufacturers.

9   Q.     That's right.

10  A.     Okay.

11  Q.     And there's no example of a specific PDA.  There

12  is no example of a specific design for a PDA, correct?

13  A.     That's correct.  Those words don't appear.

14  Q.     Okay.

15         MR. STEPHENS:  And if we look again,

16  Mr. Barnes, back in Figure 1.

17  BY MR. STEPHENS:

18  Q.     That doesn't look like the PDA that you talked

19  about on Friday, right?

20  A.     Again, Mr. Stephens, this is an example of a

21  preferred embodiment --

22  Q.     Just answer the question, please.

23  A.     I am answering your question, I believe.

24  Q.     It does not look like the PDA that you used in

25  your -- the fictitious PDA you used in your demonstrative

1297

1  on Friday, right?

2  A.     It's a different picture, different --

3  Q.     Okay.  Thank you.

4  A.     -- part of the patent.

5  Q.     And we don't see any PDA in Figure 2, right?

6  A.     No.  That's a flow chart.

7  Q.     Okay.  And we don't see one in Figure 3?

8        MR. STEPHENS:  Mr. Barnes, if you could pull

9  up Figure 3.

10        There we go.  Thank you.

11  A.     Again, a flow chart.

12  BY MR. STEPHENS:

13  Q.     Figure 4, not a picture of a PDA, right?

14  A.     That is not a picture of a PDA.

15  Q.     Figure 5, not a picture of a PDA?

16  A.     We've talked about this quite a bit.  It's

17  certainly not a picture of a PDA.

18  Q.     Figure 6, no PDA shown there, right?

19  A.     That's another flow chart.

20  Q.     Figure 7, no PDA in that picture, right?

21  A.     That is an example of another kind of sequencing

22  file, I believe.  Not a PDA.

23  Q.     Okay.  And that's all the figures in the patent,

24  right?

25  A.     That's correct.

1298

1  Q.     Okay.  Now, you -- the PalmPilot had a

2  touchscreen, right?

3  A.     I want to make sure that it's characterized

4  directly.  I believe that that's correct.

5  Q.     Now, the patent doesn't mention a touchscreen

6  anywhere, does it?

7  A.     I would have to look at what it says about the

8  display.  I remember it mentions a number of

9  touch-sensitive devices.

10  Q.     It mentions a touchpad; but it never mentions a

11  touchscreen, right?

12  A.     Could you point me to where that is?  Because I

13  believe there are some examples there.

14  Q.     I don't have it handy because my point is that it

15  doesn't mention a touchscreen anywhere.

16  A.     Again, I don't think it uses that specific word;

17  but it --

18  Q.     Okay.

19  A.     -- uses other touch-type devices that are very

20  similar.

21  Q.     Okay.  Were you aware that Mr. Call testified as a

22  corporate representative of Personal Audio on the topic

23  of the conception and reduction to practice of the

24  invention and the prosecution of the patents?

25  A.     I believe that's correct.  I understood that.

1  Q.    Okay.  Are you aware that Mr. Call testified in

2  that capacity, as a representative of Personal Audio,

3  that it never occurred to him and as far as he knew

4  nobody ever suggested that it would be a good use for a

5  touchscreen in the patent?

6  A.    I do not recall that testimony.

7  Q.    Okay.  You don't dispute that he said that, right?

8  A.    I don't recall that testimony.

9  Q.    Well, let's take a look.  So, you have his

10 deposition in your binder; and it's at page 220, starting

11 at line 24.  And I asked him to look at the '178 patent,

12 Column 5.

13           MR. HOLDREITH:  Your Honor, Mr. Call was here

14 in court testifying.  I'm not sure if it's appropriate to

15 use his deposition with a different witness.

16           THE COURT:  Was this a 30(b)(6) witness?

17           MR. STEPHENS:  It was, your Honor.  So, this

18 is a --

19           THE COURT:  Overruled.

20           MR. STEPHENS:  -- party admission.

21           THE COURT:  That's under the rules of federal

22 civil procedure that a deposition of a 30(b)(6) can be

23 used for any purpose.

24           Go ahead, Mr. Stephens.

25           MR. STEPHENS:  Thank you, your Honor.

1  BY MR. STEPHENS:

2  Q.    And I asked the question, again with reference to

3  Column 5 of the '178 patent, I said to Mr. Call, "Around

4  line 35 it says the personal computer CPU 105 is also

5  preferably connected to a conventional personal computer

6  video Display 118 and a standard keyboard 119 as well as

7  a pointing device such as a mouse, trackball, or touchpad

8  not shown.

9              "Do you see that?

10             "Answer:  I do.

11             "Question:  Now, you testified earlier that

12  Mr. Logan had found it and was running a large

13  manufacturer/seller of touchscreens, right?

14             "Answer:  Yes.

15             "Question:  How come touchscreen isn't on the

16  list here?

17             "Answer:  I think it didn't occur to me; and

18  as far as I know, nobody suggested this would be a good

19  use for a touchscreen -- touchscreen device."

20             That's Mr. Call's testimony, correct?

21  A.    That's only part of it.  He said right after that,

22  "You could have used one, but I -- you know, it's -- that

23  would have been kind of a sideshow to use a touchscreen.

24  The touchpad I know as of -- as a pointing device

25  would -- those were commonly used and that would

1  happen -- and what would happen is the software that

2  we're proposing could be used with any computer.  Really

3  doesn't matter which kind of pointing device you used.

4  Different people had different preferences.  Some people

5  liked mice.  Some people liked touchpads.  Some people

6  liked trackballs."

7           And then the answer continues on page 222.

8  "Most people picked their favorite and used that and they

9  were commonly used with *Windows* programs.  You really --

10 to use a *Windows* program, you really needed it -- needed

11 to use it efficiently.  It was a graphical user

12 interface, and a lot of it worked by pointing and

13 clicking."

14 Q.    Okay.  So, he's saying you could use a mouse to

15 point and click with *Windows*; but the first thing he said

16 was that nobody suggested this would be a good use for a

17 touchscreen, right?

18 A.    I think that's taking his answer out of context.

19 I think you have to consider his whole answer.

20 Q.    You're not denying those are his words, right?

21 A.    I am not denying that those are his words.  What

22 I'm disagreeing with and denying is that that was all of

23 his answer to that question.

24 Q.    And you read the rest of his answer in, correct?

25 A.    That's correct.

Jury Trial, Volume 5

1302

1  Q.     Thank you.

2           All right.  Now, you have reviewed the '076

3  and '178 patents and their prosecution histories in

4  detail, correct?

5  A.     Yes, I have -- well, let me -- I've read them in

6  detail for their technical content.  And part of that

7  reading was in the context of -- before the court had

8  issued its claim construction, the different parties had

9  proposed claim constructions; and some of that was based

10 on the prosecution history.

11          I think now that the court has issued its

12 claim construction, some of that material becomes

13 irrelevant.

14 Q.     You're saying the prosecution history is

15 irrelevant?

16 A.     No.  That's not what I said.

17 Q.     Okay.  If you would turn in your binder to

18 Defendant's Exhibit 115 at page 177.  So, there is a

19 separate tab for that excerpt from the file history.

20          I'm sorry.  Bear with me.  I think I'm

21 pointing you to the wrong place.  Page 206 is the one I

22 want, near the back of your binder.  Are you with me?

23 A.     Just to make sure, this is Defendant's

24 Exhibit 115, pages 206 to 219?

25 Q.     That's correct.

1303

1 A.     Okay.

2          MR. STEPHENS:  And, Mr. Barnes, if we could

3 have Defendant's Exhibit 115 at page 206 on the screen.

4 BY MR. STEPHENS:

5 Q.     This is a --

6          THE COURT:  Excuse me, Mr. Stephens.  You

7 started off with 177.  We're now moving to 206?

8          MR. STEPHENS:  Yeah, your Honor.  I just

9 identified the wrong page.  I apologize.

10          THE COURT:  Okay.

11 BY MR. STEPHENS:

12 Q.     This is a brief on appeal that was filed by the

13 patent owner during the prosecution of the '076 patent in

14 the Patent Office, correct?

15 A.     I don't remember what this document is exactly,

16 this part of the prosecution history.

17 Q.     Okay.  Well --

18          MR. STEPHENS:  If we could scroll down just a

19 little bit, Mr. Barnes.

20 BY MR. STEPHENS:

21 Q.     It says "The real party in interest is Gotuit

22 Media."  Do you see that?

23 A.     Yes.

24 Q.     Okay.  So, Gotuit Media was the real party in

25 interest at this point during the prosecution of the

1304

1  '076 patent, correct?

2  A.    I have no idea.  This isn't a technical part of

3  the prosecution history.  I didn't look at this to

4  determine who the real party of interest was or anything

5  other than what's related to the technical content of

6  this prosecution history.

7  Q.    Okay.  On the next page, which is page 207, there

8  is a Summary of the Invention at the top.

9          MR. STEPHENS:  Mr. Barnes, if you could blow

10 up -- yeah, about there.  Thank you.

11 BY MR. STEPHENS:

12 Q.    The first sentence in the second paragraph says,

13 "In the absence of a command from the user, the audio

14 player continuously plays back the program segments in an

15 endless loop in the order established by the stored file

16 of sequencing data."  Do you see that?

17 A.    Yes.  I see those words.

18 Q.    So, that's part of what the patent owner was

19 telling the Patent Office was the invention, correct?

20 A.    Well, as we've discussed and as we've heard

21 testimony, there are a number of inventions that are

22 described in the patent.  I recognize part of what's

23 described here as something we've talked extensively

24 about, but there's also part of this that isn't

25 something -- for example, the "endless loop" part is not

1    something that we've really talked about with respect to

2    any of the asserted claims.

3    Q.    Well, in fact, the court construed the claims as

4    requiring playing back in an endless loop, correct?

5    A.    I think you have to point me to the claim

6    construction that's relevant.

7    Q.    Well, it's the claims that referred to "means for

8    continuous reproduction."

9          That's all right.  We're not going to take a

10   side track for that.  You don't remember that?

11   A.    Well, I need to look at it if you're going to ask

12   me that question.  I think --

13   Q.    Okay.

14   A.    -- it's important if you've asked me that question

15   that I look at it and answer it.

16   Q.    I want to continue looking at this document, sir.

17   A.    So, you're withdrawing that question?

18   Q.    Yes.

19   A.    Okay.

20   Q.    If you'd turn now to page 210 of Defendant's

21   Exhibit 115.  This is in the argument section of the

22   patent owner's brief to the Board of Patent Appeals

23   during prosecution of the '076 patent.  Do you have that

24   in front of you?

25   A.    You've characterized it as arguing it to the board

1306

1  of appeals.  I don't know if that's the context for this

2  particular page.

3  Q.    Well, take a minute and look through the document

4  and see if you can refresh your recollection.  You said

5  you had studied the prosecution history, and this was an

6  appellant's brief on appeal after rejection of some of

7  the claims.  Right?

8  A.    I would have to look through -- I mean, the file

9  history is 400-some-odd pages.  I don't remember this one

10 specifically.  It's a fairly long document -- or nine

11 pages.  I'd have to take some time to refresh any memory

12 I have about this document.

13 Q.    It's nine pages long; and on page 214 it was

14 signed by Mr. Call, correct?

15 A.    That, I will agree with.

16 Q.    Okay.  So, Mr. Call submitted this to the Patent

17 Office on behalf of the patent owner at the time, right?

18 A.    Again, that's a characterization of this document.

19 I haven't looked at it in quite some time.  I don't

20 remember what it was about.  It would be hard for me to

21 accept a characterization of this document without

22 looking through it.

23 Q.    Okay.  Now, in the second sentence of the part we

24 have up on the screen there from page 210, the patent

25 owner refers the Patent Office to the description --

1307

1  well, let me just read it.  He says, "As described in the

2  written description at page 12, line 12 *et seq*, the

3  recommended order and the identification of the program

4  files making up an individual playback session are stored

5  in a session schedule file (described in detail in

6  connection with Figure 5) which contains program

7  identifiers which specify the program segments to be

8  played during an upcoming session."

9          Did I read that correctly?

10  A.     I believe you read it correctly.

11  Q.     So, Mr. Call was referring the Patent Office to

12  Figure 5 as a description of the session schedule file,

13  right?

14  A.     I think that sentence is out of context.  I think

15  if you read the first sentence, "The claims should be

16  given the broadest reasonable interpretation consistent

17  with the written description" -- I think this in part

18  goes to claim construction, and I think the court has

19  issued its claim construction.

20          We've talked in great detail about Figure 5 as

21  an example of a kind of a sequence file, but I think --

22  he said those words.  I'm not sure how you want me to

23  respond other than to say he said those words but the

24  court's issued its claim construction and that's what

25  I've been using.

1  Q.    Okay.  And then Mr. Call went on to say that "The

2  player downloads the session schedule file and then

3  issues download requests for those identified program

4  segment files which are not already available in the

5  player's local storage unit," right?

6  A.    That's what the words on the page say.

7  Q.    Okay.  And you considered all of this in forming

8  your opinions that are expressed in your report and the

9  ones you've testified about here, right?

10 A.    No, not necessarily, because this part goes to

11 claim construction and my opinions with respect to

12 infringement used the court's claim construction.  And

13 this is more about how the claims should be construed or

14 what Mr. Call's description of at least one part of the

15 invention is.

16        I think it's a little confusing to look at

17 this and then try and understand that as being consistent

18 or different than the court's claim construction.  I

19 think it's important to really just use the court's claim

20 construction at this point.

21 Q.    Now if you'd turn to the tab that says "DX 115" at

22 page 171 to 175.

23        MR. STEPHENS:  Mr. Barnes, if you could pull

24 up page 171.

25                              *

Jury Trial, Volume 5

1309

1   BY MR. STEPHENS:

2   Q.    Dr. Almeroth, this is a Office Action, right?

3   A.    I don't have complete understanding of the patent

4   prosecution histories.  It says it's an office

5   communication.  I believe that that's an Office Action.

6   Q.    And at page 173, the Patent Office required the

7   patent owner to restrict the claims of the patent to one

8   of several groups.  Do you see that?

9         MR. STEPHENS:  If you could scroll up just a

10  little bit there, Mr. Barnes, to show the

11  "Election/Restriction."  Thank you.

12  A.    At least this Office Action and this part of the

13  document, the best I can do is point to the words that

14  are on the page.

15  BY MR. STEPHENS:

16  Q.    Do you understand what these mean?

17  A.    In my mind this doesn't really relate to the

18  technical aspects of the claims with respect to

19  infringement.

20  Q.    So, you don't understand this part of the file

21  history?

22  A.    No, I'm not saying that.  I'm just saying I have

23  fairly limited understanding of this part of the file

24  history.  To the extent that it may or may not relate to

25  infringement, I can answer questions about that.  But

1310

1   with respect to the election and restriction and what

2   that's supposed to mean or do, I don't have -- it hasn't

3   really informed my opinion with respect to infringement.

4   Q.    Okay.  Well, just one more question on this point.

5          MR. STEPHENS:  If you could go to the tab that

6   says "DX 115" at page 177.

7   BY MR. STEPHENS:

8   Q.    This is where Mr. Call elected, on behalf of

9   Gotuit Media, claims 1 through 17, Group 1.  Do you see

10  that?

11  A.    Okay.  I see that.

12         MR. HOLDREITH:  Objection to form, your Honor.

13  I'm not sure if counsel has established anything about

14  Gotuit Media in this document.

15         MR. STEPHENS:  Well, your Honor, the brief on

16  appeal that we'd looked at was about Gotuit Media; but I

17  can ask the question differently.

18  BY MR. STEPHENS:

19  Q.    Dr. Almeroth, in this document at DX 115,

20  page 177, Mr. Call elects, on behalf of the patent owner,

21  to pursue only claims 1 through 17 for Group 1 in

22  response to that restriction requirement we looked at,

23  right?

24  A.    I haven't really looked through this part of it

25  and what claims Mr. Call is choosing to pursue or not.  I

1311

 1  don't think that those kinds of issues relate to my

 2  technical opinion.

 3  Q.     So, you don't understand this part of the file

 4  history?

 5  A.     Well, I don't have a deep understanding; and I'm

 6  not clear, just looking at the documents as you've

 7  presented them -- or at least in this exhibit -- how it

 8  relates to the question of infringement or my

 9  understanding of the patent.

10              THE COURT:  Okay.  Excuse me, counsel.

11              Now, I'm sure we're not trying to confuse the

12  jury about the idea that the numbers that are used in the

13  various applications necessarily are going to be the same

14  numbers of the claims as set out in the patent.

15              When the patent comes out, ladies and

16  gentlemen, the first claim that is allowed in the patent

17  is Number 1.  Now, during the application process -- and

18  I think you'll agree, Mr. Stephens, that might have been

19  claim 15 on the application.  But just because something

20  is moved out in the application process doesn't mean that

21  that somehow affects what's in the patent.  The patent is

22  what was issued.  The numbers -- this can sometimes be

23  confusing -- could be different in the application

24  process.  When they get there, the fact that old claim 1

25  was somehow eliminated doesn't mean that the claim 1 that

1312

1  was issued is that same one.  The numbering changes, in

2  other words.

3           And I think you would agree with that,

4  Mr. Stephens.

5           MR. STEPHENS:  Absolutely.  Thank you for that

6  clarification, your Honor.

7  BY MR. STEPHENS:

8  Q.    Dr. Almeroth, do you understand that the claims

9  that were ultimately elected were renumbered when the

10 patent issued?

11 A.    I do.

12 Q.    Thank you.  Now, Dr. Almeroth, I took your sworn

13 testimony in deposition in this case, right?

14 A.    Yes, you did.

15 Q.    And you had formed your opinions of infringement

16 before the most recent deposition, correct?

17 A.    I had written a report, and most of my

18 infringement opinions were in there at the time.  Now,

19 the court's issued some new claim construction rulings.

20 I believe that's covered in my report as well, but I want

21 to be clear about the fact that there was still the

22 process of forming opinions.  But I believe that document

23 pretty thoroughly sets out my opinions.

24 Q.    Okay.  So -- and just to be clear, the deposition

25 I'm talking about occurred on May 11th of this year,

1  right?

2  A.     Yes.

3  Q.     And you had served your expert reports that set

4  out your opinions on infringement before that date,

5  right?

6  A.     That's correct.

7  Q.     At that deposition you told me you didn't know

8  whether the word "playlist" appeared in the patents,

9  right?

10  A.     I was being very careful.  I hadn't -- or didn't

11  recall searching through the patent to find the word

12  "playlist," whether it was separated by a space or not.

13  That was basically what I think we were discussing in my

14  deposition.

15  Q.     Okay.  When you formed your opinions in this case,

16  you didn't realize that the word "playlist" does not

17  appear in the patents-in-suit, right?

18  A.     No.  That's not what I was saying at all.

19  Q.     Okay.  Well, it doesn't, in fact, appear in the

20  patents, right?

21  A.     I don't believe it does but --

22  Q.     Okay.

23  A.     But, again, I haven't searched through it and

24  looked word-for-word.

25  Q.     And, again, you didn't know that when I took your

1  deposition on May 11th, right?

2  A.    No.  What I was saying is I didn't recall whether

3  or not that specific word appeared somewhere in the 45

4  columns of text.

5  Q.    Okay.  "USB" also doesn't appear anywhere in the

6  patents, right?

7  A.    I believe that that's true as well.

8  Q.    And "USB" stands for "universal serial bus,"

9  right?

10 A.    That's correct.

11 Q.    And USB was known when the patents were filed in

12 October of 1996, right?

13 A.    I believe that's correct.

14 Q.    Okay.  Now, in your report you didn't identify any

15 computer code that makes a request to a computer running

16 *iTunes*, right?

17 A.    That's right.  The argument that I had used was

18 based on the deposition of Apple engineers and that they

19 said they had --

20 Q.    My question --

21 A.    -- conformed to the USB specification.

22 Q.    My question was whether or not you identified any

23 code.  I think you've answered that question.  Thank you.

24          And you contend that connect signaling is part

25 of the request, right?  That it happens when you plug in

1315

1  the USB plug into a computer?

2  A.      That is the first communication that happens.

3  Q.      Okay.  And that connect signaling happens whenever

4  you plug in a USB-compliant device into a USB connection,

5  right?

6  A.      The connect signal happens when you plug the USB

7  connection into a device.

8  Q.      Okay.  And that happens with all USB-compliant

9  devices except maybe for some oddball exceptions you

10 testified, right?

11 A.      I believe that that's correct.

12 Q.      And you have not cited any code in your report

13 that programs an accused device to make that USB connect

14 signaling a request, right?  You told me that in your

15 deposition.

16 A.      That's correct.  I used other evidence for that

17 support.

18 Q.      Now, you also told me that the voltage that's

19 changed in the connect signaling is actually supplied by

20 the host computer, right?

21 A.      That's correct.  The change -- well, the voltage

22 is provided by the host computer; and then as part of the

23 signal, the device changes that voltage.  And that change

24 in voltage is what's described in, for example, the USB

25 spec as a connect signal.

1316

1  Q.      Okay.  If you plug an accused device into a

2  computer running *iTunes* that is configured for manual

3  synchronization and you don't subsequently manually

4  initiate synchronization, then no file that you allege to

5  be a sequencing file is transferred, right?

6  A.      That's correct.  The connect signal -- the request

7  still goes over the --

8  Q.      Now, you touch classes in networking to

9  upper-level undergraduates and graduate students, right?

10 A.      That's correct.

11 Q.      And when I asked you in your deposition, you

12 didn't remember ever teaching your students that USB

13 connect signaling is a request to a server, right?

14 A.      That's correct.  We don't talk a lot about the USB

15 protocol specifics in the kinds of courses that I teach.

16 Q.      And you also testified that you didn't remember

17 ever reading any academic publication that USB connect

18 signaling is a request to a server, right?

19 A.      That's correct.  It's a very specific instance

20 that's -- of the kind of request that's described in the

21 patent.

22 Q.      Now, you also testified that you did not recall

23 ever reading any publication, outside the context of this

24 litigation, that a USB host controller receives requests

25 from clients, right?

1317

1  A.    I would have to see the context for that because I

2  believe that the idea of a request is certainly the kind

3  of thing that can be sent over from a device as a connect

4  signal.  That's certainly a type of request.

5  Q.    Well, let's take a look.  This is -- I'm sorry.

6  Bear with me one second.

7           168 of your deposition, page 168, starting at

8  line 12.  My question to you was:  Have you ever read in

9  any publication outside of the context of this litigation

10  that a USB host controller receives requests from

11  clients?

12           Your answer was:  I don't recall specifically.

13  Not something I was asked to do.

14  A.    Wait.  I'm sorry.  168, line 12?

15  Q.    Yes.

16  A.    Oh, okay.

17  Q.    Now, you continued on and said, "I think I could

18  find this or any of the others fairly easily."  But the

19  fact was you didn't remember ever seeing it at the time,

20  right?

21  A.    I want to make sure about the context of what we

22  were talking about with respect to "request."  I think

23  the kinds of requests that we're talking about here is

24  requests for content, and I don't recall that

25  specifically.  But what I've identified for infringement

1318

1   is the request for a connection and that's --

2   Q.    My question did not use the words "request for

3   content," correct?

4   A.    Well, in looking at my answer, it's clear that

5   that's what I understood.

6   Q.    You didn't say that, right?

7         My question to you was:  Have you ever read in

8   any publication outside of the context of this litigation

9   that a USB host controller receives requests from

10  clients?

11        Again, the word "content" doesn't appear in my

12  question, you'd agree, right?

13  A.    Well, this was part of a discussion that continues

14  on and at least on to page 169.

15  Q.    And your answer was:  I don't recall specifically.

16  Not something I was asked to do.  I think I could find

17  this or any of the others fairly easily.

18        You didn't mention the word "content" in your

19  answer either, right?

20  A.    Well, then afterwards you said "I'm not asking if

21  you did.  I asked whether you recall any."

22        And I said I disagree.

23        So, I think you're taking this question and

24  answer out of context.  I think I was really trying to

25  get a point -- across the point that I disagree.  Now --

1319

1  Q.    No, no, sir.  Thank you.  We're not going to read

2  your whole deposition into the -- go ahead.  If you want

3  to continue, go ahead.

4  A.    I'm just saying that -- on page 168, line 24, I

5  say I disagree and then --

6  Q.    You didn't say --

7  A.    -- you continue to ask the question again at 169,

8  and I say I disagree again.

9         So, there's a part of this I need to read to

10 really get to your answer.  I think reading just the part

11 that you said -- I think in the context, I believe that

12 "request" was a request for content.

13 Q.    Now, when you said you disagree, that was not in

14 response to a question about USB host controller -- was

15 not in response to a question about whether you had read

16 in any publication outside the context of this litigation

17 that a USB host controller receives requests from

18 clients, right?  It was a different question.

19 A.    Well, you asked the question "I'm not asking if

20 you did.  I asked whether you recalled any."

21         And then you said, "Thank you."

22         And I said --

23 Q.    And then I asked another question, right?  A

24 different question.

25 A.    Right.  And I disagree on that.

1  Q.     Okay.  Thank you.

2  A.     And --

3          THE COURT:  Okay.  Counsel, we're going to

4  take a break.

5          Ladies and gentlemen, I'll ask you to be back

6  at quarter of.

7          (The jury exits the courtroom, 9:31 a.m.)

8          THE COURT:  All right.  We'll be in recess

9  until quarter of.  And if you would, take a look, if you

10 haven't already, at those proposals on kind of a

11 guideline interim instruction on the doctrine of

12 equivalents versus structural equivalents.

13         (Recess, 9:32 a.m. to 9:41 a.m.)

14         (Open court, all parties present, jury not

15 present.)

16         THE COURT:  Okay.  I understand that there are

17 some concerns or objections dealing with Mr. Nawrocki who

18 may be the next witness and may come on before the next

19 break.

20         We've already had, of course, the opportunity

21 to file objections to the experts and I've ruled on all

22 of those.  We've had motions *in limine* and I've ruled on

23 all of those.  Is there something new or are we trying to

24 just re-go over what we've already done?  What's --

25         MS. HUNSAKER:  Your Honor, if I could, there

1 are actually three issues that I wanted to raise before

2 Mr. Nawrocki took the stand.  The first is to renew

3 Apple's motion to exclude Mr. Nawrocki and the motions *in*

4 *limine* related to Mr. Nawrocki as well as the *Daubert* and

5 motions *in limine* with respect to Dr. Peterson.

6         When Mr. Nawrocki takes the stand, I will

7 object to specific documents and specific questions; but

8 given the nature of our objection to the entirety of his

9 testimony, I wanted to also seek some guidance from the

10 court with respect to some sort of continuing objection

11 regarding the testimony as a whole.

12         THE COURT:  Okay.  I think your *Daubert* or

13 objection to his ability to testify -- although you or

14 whoever your appellate people are will have to confirm

15 this because they call those things the "traps" rather

16 than the "FRAPs" for a reason, those rules.

17         You have the motion on file, and I guess that

18 point may be preserved.  But keep in mind my rulings on

19 particular evidence -- exhibits and so forth I've said in

20 the past are in the nature of *in limine*.  And if there is

21 a particular objection, you need to go ahead and make it.

22         Your request is somewhat vague.  I'm not at

23 this time going to revisit my orders in writing.  I've

24 set out the reasons for those, but those that are *in*

25 *limine* are *in limine*.

1322

1      MS. HUNSAKER:  And I understand, your Honor;

2  and in large part I'm restating our objections for the

3  record prior to his testimony.

4      THE COURT:  Okay.  Well, for whatever value

5  that is, then on the -- my rulings will be the same as

6  they have been up to now, to the extent I understand your

7  objections as being restated; and they will be the same

8  kinds of rulings; namely, most of them are *in limine* type

9  rulings.  Okay?

10      MS. HUNSAKER:  Yes.  Thank you, your Honor.

11      There's two other issues.

12      THE COURT:  All right.

13      MS. HUNSAKER:  One is in relation to

14  redactions of proposed exhibits for Mr. Nawrocki,

15  specifically Plaintiff's Exhibit 488A through C.

16      THE COURT:  Okay.  Do I -- I'm not sure I have

17  Version A on my list up here; so, I guess I need to see

18  copies of those.

19      I'm gathering that, Personal Audio, when you

20  labeled something as "A," it is similar to but may be

21  redacted or something from the original version, perhaps

22  based on a ruling or something like that?

23      MS. HUANG:  It's a native file and we've not

24  used the entire native file; so, we've taken a portion of

25  it.

1     THE COURT:  Okay.  But I guess what I'm asking

2  is is --

3     MR. SCHUTZ:  Yes, your Honor.  As a general

4  convention, that's what we've done.  When there is an A,

5  there has been some modification, redaction, or

6  something.

7     THE COURT:  Just to show the difference

8  between what was originally presented which may already

9  be on file and what's actually being used in case a

10  dispute comes up between the two of them, you've done

11  that, right?

12     MR. SCHUTZ:  Correct.

13     THE COURT:  And that's a good idea.

14     So, counsel, go ahead.  Tell me -- you're

15  objecting to 488 and -- I'm sorry.  You're objecting to

16  Plaintiff's Exhibit 488A and Plaintiff's Exhibit 510A,

17  right?

18     MS. HUNSAKER:  488A through C and 510A and B.

19     THE COURT:  All right.  And the problem is?

20     MS. HUNSAKER:  The basis of the objection is

21  402 and 403.  Your Honor, this is -- I call it a

22  "reincarnation" of our dispute over Table 5.  These are

23  the underlying gross margin summary reports that forecast

24  iPod gross margins by SKU number, by individual iPods.

25     Personal Audio represented to the court that

1  they would not be using these documents or the royalty

2  line items in these documents to reflect the value or the

3  amount of a per-unit royalty.  And of the range of

4  43 cents to $18 that were in the body -- the universe of

5  these types of documents, they've selected for submission

6  to the jury royalty line items that are .92 and $1.30

7  which coincidentally are very close to Mr. Nawrocki's

8  opinion regarding the appropriate amount of a reasonable

9  royalty.

10          So, we requested that they redact --

11          THE COURT:  Okay.  You're going to need to

12  show me -- give me an example.  You're throwing out

13  numbers there that -- this .92, for example, appears

14  where?

15          MS. HUNSAKER:  In the bottom quarter of the

16  page, there is a line item --

17          THE COURT:  Which page?

18          MS. HUNSAKER:  Excuse me, 488A.

19          THE COURT:  Okay.

20          MS. HUNSAKER:  The bottom quarter of the page

21  there is a line item for royalty underneath E and O.

22          THE COURT:  Okay.  It says "royalty" and then

23  A-M-E-R?

24          MS. HUNSAKER:  Yes, at 92 cents.

25  Mr. Nawrocki's opinion for a reasonable royalty in this

 1  case is 90 cents.

 2          And with respect to 510A, on the second page

 3  of that exhibit, also in the bottom -- about fifth from

 4  the bottom line is a line item for royalties at $1.29.

 5  Mr. Nawrocki's opinion on the amount of a reasonable

 6  royalty for the '178 patent is $1.30.  So, we believe --

 7          THE COURT:  Okay.  Hold up one minute.  Did

 8  you just say Plaintiff's Exhibit 510A?

 9          MS. HUNSAKER:  Was the second exhibit I was

10  referring to, yes, your Honor.

11          THE COURT:  Right.  And I'm looking at that.

12  Where --

13          MS. HUNSAKER:  If you turn to the second page

14  of that document, the fifth line from the bottom is the

15  royalty line item.

16          THE COURT:  Okay.  All right.  I think that

17  Personal Audio and Personal Audio's counsel should be

18  well aware of the recent cases that have come out of the

19  Federal Circuit and should be well aware of their concern

20  of attempts to basically take a total amount and then

21  just assign some royalty number and then just say, "Oh,

22  okay.  We've got a low number; so, that makes up for it."

23          I mean, it's quite clear that there has to be

24  a focus upon the contribution of the claimed invention, a

25  very close contribution.  And clearly Apple would be

1 correct.  Any inference or hint or statement that, "Well,

2 gee, they're paying this royalty" or, "Boy, that's a

3 royalty; so, why shouldn't we get the same," when for all

4 we know that's -- well, it's probably not oil and gas

5 royalties, but it could be almost anything in there the

6 way it's written.

7          So, I'm not going to sustain the objection on

8 that; but if at some point Mr. Nawrocki starts to testify

9 or give that inference, then raise your objection and the

10 jury may very well be instructed that that's not what

11 they can do.  So, again, Mr. Nawrocki has to be very

12 careful to stay within the bounds of my previous orders;

13 and obviously counsel want to be very careful to stay

14 within the bounds of the case law as set out by the

15 higher courts since that's what governs me and will

16 obviously be governing you as you go up there.  Unless

17 y'all are going to settle.

18          So, I'm not going to keep out the exhibit; but

19 I do understand Apple's concern.  And if it appears that

20 that is coming up or coming out in the testimony, then

21 make your objection.  Okay?

22          MS. HUNSAKER:  Thank you.

23          THE COURT:  What's the next?  You said this

24 was a third.

25          MS. HUNSAKER:  Yes, your Honor.  And I believe

1327

1  this one will be short.  We have met and conferred with

2  Personal Audio, but this -- it's really just to alert the

3  court to an ongoing issue with respect to three

4  particular noncomparable licenses that were either not

5  produced in the litigation or produced late and --

6          THE COURT:  Okay.  Are these three I've

7  already looked at, or are these three new ones?

8          MS. HUNSAKER:  Two came out in spontaneous

9  testimony from Mr. Logan, but they were subject of Motion

10 *in Limine* Number 21.  And that is the MicroTouch license

11 which was not produced in the litigation, and that was

12 Motion *in Limine* 21C.

13         And Mr. Logan also testified with respect to a

14 Motorola license to a different patent that likewise was

15 not produced to us in this case; so, we think that would

16 be covered by the court's ruling with respect to

17 unproduced licenses in Motion *in Limine* 21C.

18         THE COURT:  Okay.  Now, I remember there was

19 some discussion about him talking about that in different

20 contexts.  Is it Personal Audio's intention to now have

21 Mr. Nawrocki use those licenses as part of his damage

22 analysis?

23         MS. HUANG:  No, your Honor.

24         THE COURT:  Okay.

25         MS. HUNSAKER:  And we did meet and confer with

1 Personal Audio about that, also with respect to the Made

2 for iPod license which came in through Mr. Logan but

3 which there was no substantive testimony about.  So,

4 Personal Audio has represented they are not going to

5 elicit testimony about any of these three licenses from

6 Mr. Nawrocki; but we expect the issue may arise again

7 with respect to cross-examination of Dr. Ugone.

8          THE COURT:  Well, in all fairness, what

9 happens if you were to say, "Well, Dr. Ugone" or

10 "Mr. Nawrocki" or whatever, "isn't it true that Apple has

11 never, never, never done any kind of a license involving

12 a running royalty?"  Aren't you kind of begging for

13 someone to say, "Well, that's not exactly true.  They do

14 these other licenses all the time"?

15          MS. HUNSAKER:  I won't be asking Mr. Nawrocki

16 that, your Honor.

17          THE COURT:  Well, and the same with Dr. Ugone.

18 I think you want to be a little bit careful how you

19 phrase your questions because -- and I also think -- I

20 mean, the comparability of licenses is important; but

21 then you also have the factors that are talking about

22 what a reasonable businessperson -- it's what the parties

23 would do, but it's also what a reasonable businessperson

24 would do at the time.

25          And the idea that somehow people don't know

1   about lump sum or don't know about running royalties or

2   don't know about combinations of the two and couldn't

3   figure out that this might be a reasonable way to do

4   it -- yeah, the fact that it hasn't been done before is

5   something I think the jury needs to look at in the

6   context of these parties; but the fact that it couldn't

7   possibly be done is something different.  I mean, these

8   are not concepts unknown.  They're well-known and

9   depending on the circumstances, it would seem to the

10  court there could be, hypothetically, evidence that would

11  show, you know, in this particular case, although they

12  had never done one, a lump sum looks like a pretty good

13  way to do it.  And I'm not sure I'd keep that out if

14  there was a basis for it, and *vice versa*.

15          So, I understand your difficulty because on

16  one hand you've got the comparability issue; but on the

17  other hand you've got some of those other factors where

18  some of this evidence might come in.

19          MS. HUNSAKER:  And with respect -- I

20  understand your Honor's point.  And with respect to these

21  three licenses in particular, there's also discovery

22  issues that create more problems than they otherwise

23  would on their own.

24          THE COURT:  Well, and, again, I think they've

25  agreed they're not going to -- he's not going to try to

1 bring that into his testimony; and I'm just saying that

2 one might wish to be careful not to open the door by

3 attempting to guild your lily by saying, "Oh, we've never

4 even heard of such a thing."  Even if you've never done

5 one, you've heard of it.

6          MS. HUNSAKER:  Understood, your Honor.

7          THE COURT:  Okay.  All right.

8          MS. HUNSAKER:  Thank you.

9          THE COURT:  Okay.  What about the suggestions

10 for a preliminary or interim instruction on the

11 difference between structure -- equivalent structures and

12 doctrine of equivalents?

13          All right.  We'll do that later.  Let's bring

14 in the jury if they're out there.

15          COURT SECURITY OFFICER:  They're not, your

16 Honor.

17          THE COURT:  Oh, okay.  All right.  Go ahead,

18 then.  Someone told them we were doing some objections,

19 right?

20          COURT SECURITY OFFICER:  Yes, sir.

21          THE COURT:  Okay.  Good.

22          MR. MORTON:  Your Honor, I think this is

23 pretty close as far as an interim statement.  There's one

24 line in here that I have some concern about, especially

25 given Mr. Fadell's testimony yesterday; and it's the line

1331

1  down in the means-plus-function part, second paragraph,

2  last line that says, "The substitute structure must have

3  been available at the time the patent issued."

4           I'm not sure if that's straight out of a case.

5  I don't think it is.  And the issue that I have is I

6  think where this argument is going is that if there is

7  some component that wasn't technically built by the time

8  the patent issued, then they would say, "Well, it wasn't

9  available when the patent issued," this particular

10  processor or this number or this particular hard drive.

11  And, so, I don't think that's the right question.

12           Almost by definition, your Honor, infringing

13  or potentially infringing products will be built or put

14  together after the patent issues.  That's why you have a

15  patent infringement suit.  And the question is really

16  simply whether looking at that, would a person of

17  ordinary skill in the art judging the equivalents

18  question as of the time the patent issued think it was

19  equivalent.  That's the correct legal question, not

20  whether a specific component had actually been built at

21  the time the patent issued.

22           THE COURT:  All right.  Well, the language

23  comes straight from *A1-Site Corporation versus VSI*

24  *International*, 174 F.3d 1308, specifically at page 1320.

25           MR. MORTON:  And we --

1            THE COURT:  Wait.  Let me just take a look at

2     this again.

3            All right.  Any other objections that you have

4     on this?

5            MR. MORTON:  My only other proposal on that

6     would be if that sentence is going to stay in, that it

7     has some way to address the objection I just raised such

8     as that the substitute structure has to be technically

9     available, not commercially available, if you understand

10    where I'm going with that.

11           THE COURT:  Okay.  All right.

12           And let me hear from Apple, then.

13           MR. CORDELL:  So, your Honor, we support the

14    court's instantiation of that particular part of the

15    instruction.  The case clearly says "must have been

16    available at the time of the issuance of the claim."  So,

17    we are foursquare with the court on that.

18           I will say this.  We would actually ask -- and

19    I know that I'm sort of going against the trend of the

20    law here -- that that timing be fixed at the time of the

21    filing rather than the issuance.

22           THE COURT:  Even though the case is real clear

23    that it says the date of the issuance?

24           MR. CORDELL:  I acknowledge that right

25    up-front, your Honor.  But let me make my argument, and

1333

1  it's this --

2          THE COURT:  This may be the wrong court to

3  make that argument.

4          MR. CORDELL:  I want to make it so that I

5  could perhaps -- some might suggest that we could help

6  the Federal Circuit get all of this --

7          THE COURT:  You give them all the help you

8  wish.  I try to do what they tell me to do.

9          MR. CORDELL:  But the point is just this.  In

10  112 ¶6, the scope of the claim is not fixed when it's

11  issued.  It's fixed when the specification is filed,

12  because we are forced to go back to the spec; and that's

13  what limits the claim.  So, when you choose 112 ¶6, what

14  you've done is said, "I'm going to fix my claim based on

15  the specification."  That is actually fixed as of the

16  date of filing; and, therefore, we believe that's the

17  most appropriate date.

18          We have a case, *Frank's Casing Crew*, that sort

19  of gets close to that.  It doesn't quite get all the way

20  there, but I'd like to just preserve that.  So, let me

21  move off of that.

22          THE COURT:  You've preserved your point, and I

23  can see the argument being made.  The Federal Circuit

24  evidently has also carefully considered it.  And since

25  this was an *en banc* -- well, it was *en banc* denied but

1334

1  this opinion has come out fairly recently and we've

2  checked.  It hasn't been overruled.  I'm going to go

3  ahead and follow the law as they put it out.

4          I will note that the opinion was written by

5  then Circuit Judge Rader, who is now Chief Judge Rader.

6  And this is the kind of issue he is known to be really

7  focusing on at this particular time.  So, I think that

8  this is a proper statement of the law at the time the

9  patent issued.

10         MR. CORDELL:  Thank you, your Honor.

11         THE COURT:  But you've preserved the point if

12 you want to try to argue later, should that be needed on

13 that one.

14         MR. CORDELL:  Excellent.  Thank you.

15         And then I have just two other small --

16         THE COURT:  All right.

17         MR. CORDELL:  -- glosses; and that is that

18 perhaps it might be helpful to point out to the jury,

19 again just to try to help give them a road map, that the

20 doctrine of equivalents is relevant to the '178 patent

21 that requests for downloading from a server limitation,

22 just to fix in their minds kind of where they are in the

23 case.

24         I think part of the problem we had yesterday

25 was that it was hard to tell when we were shifting from

1 one to the other.  It's just a suggestion.  It's more of

2 a stylistic kind of thing that at the beginning of the

3 doctrine of equivalents section you could introduce the

4 fact that yesterday we heard testimony about this thing

5 called the "doctrine of equivalents" with respect to this

6 request for downloading from a server limitation.

7        And then the same could be true in the

8 structural equivalents part.  We could introduce it as

9 "You also heard lots of testimony about these strange

10 things called 'means-plus-function limitations' in both

11 patents," and then you would go into the explanation with

12 respect to the means-plus-function.

13        THE COURT:  Okay.  My point at this time is to

14 try to give them something fairly short and -- so that

15 they have a way of following -- the next time I do one of

16 these, I might even consider putting this in the glossary

17 just to give them an idea of why there are two words that

18 are spelled the same but have different meanings.

19        What you're talking about, I think, is more

20 appropriate for the final instructions; and as I tell

21 them, it's going to be more complete instructions.

22        I do believe that that last sentence, "the

23 substitute structure must have been available technology

24 at the time the patent is issued" fits in with what's

25 there on page 1320 because it says there under

1  headnotes 1314, (reading) as this court has recently

2  clarified, a structural equivalent under Section 112 must

3  have been available at the time of the issuance of the

4  claim -- I'll omit the citation -- an equivalent

5  structure or act under Section 112 cannot embrace

6  technology developed after the issuance of the patent

7  because the literal meaning of a claim is fixed on its

8  issuance.

9           So, I'm going to go ahead and put in

10 "available technology"; and that is how I'm going to go

11 ahead and give them to the jury.  That will at least give

12 them some -- perhaps some guideline on that.

13          What I'm planning on doing -- and it would

14 probably be easiest to give this to them when they break

15 for lunch.  Otherwise, they're likely to be reading this

16 while cross-examination or redirect is going on.  Any

17 objection to the timing of giving it to them?

18          MR. CORDELL:  Not from Apple.

19          MR. MORTON:  No, your Honor.

20          THE COURT:  Okay.  And that's all your

21 objections from Personal Audio, right?

22          MR. MORTON:  Yes.  I'm done --

23          THE COURT:  Just on that one.

24          And that's all your objections from Apple,

25 then, correct?

1337

1          MS. HUNSAKER:  It is, your Honor.  I was just

2    passed a note that perhaps at the very end of the

3    passage --

4          THE COURT:  Which passage?

5          MR. CORDELL:  The structural equivalents

6    passage.

7          THE COURT:  Okay.

8          MR. CORDELL:  That we perhaps should add a

9    phrase that makes clear that "a substitute structure with

10   a different number of component parts may still be a

11   structural equivalent if it complies with the other

12   requirements of a structural equivalent."

13         THE COURT:  All right.  I think a better way

14   would be "a substitute structure with different numbered

15   component parts may still be a structural equivalent if

16   it complies with the requirements set out above."

17         MR. CORDELL:  Excellent, your Honor.  Thank

18   you.

19         THE COURT:  Any objection to that, from

20   Personal Audio?

21         MR. MORTON:  No, your Honor.

22         THE COURT:  Okay.  All right.  I think we've

23   covered all of that.  Bring in the jury, please.

24         (The jury enters the courtroom, 10:06 a.m.)

25         THE COURT:  And, ladies and gentlemen, as I've

1338

1  mentioned on the very first day of instructions,

2  occasionally there are some objections that need to be

3  taken up.  I've asked the lawyers to do that at break so

4  that you're not going back and forth.  That's what

5  happened here.  We managed to get rid of a number of

6  issues that needed to be dealt with on legal grounds.

7  Now we'll move forward with the cross-examination.

8            Go ahead.

9            MR. STEPHENS:  Thank you, your Honor.

10 BY MR. STEPHENS:

11 Q.    Dr. Almeroth, before the break you and I had an

12 interchange where I think you were disagreeing with which

13 question you were answering in a question-and-answer set

14 from your deposition.  So, I just wanted to go back to

15 that briefly and read in both questions and answers.

16            So, the first question was:  Have you ever

17 read in any publication outside of the context of this

18 litigation that a USB host controller receives requests

19 from clients?

20            I'll give you a second to get with me.  We're

21 at page 168 of your deposition, line 12.  Are you with

22 me?

23 A.    Yes, sir.

24 Q.    Okay.  And then your answer to that question was,

25 "I -- I don't recall specifically.  Not something I was

1339

1  asked to do.  I think I could find this or any of the

2  others fairly easily."

3            And then I asked you the question, "I'm not

4  asking if you did.  I asked whether you recalled any.

5  Thank you.

6            "Now in your report you offer no examples of

7  any requests of a physical layer other than the connect

8  signaling that you allege is a request in this case,

9  right?"

10           And then you said, "I disagree."

11           Did I correctly read both questions and

12  answers?

13  A.    Yes, you did.

14  Q.    Okay.  Thank you.

15           Now I'd like to move to Defendant's

16  Exhibit 116.  This is the '178 file history, and we'll

17  just talk briefly about that.  I'm sorry.  Bear with me

18  one second here.

19           There is an Office Action starting at page 296

20  of Defendant's Exhibit 116, in the file history in the

21  Patent Office, the '178 patent.  Do you have that in

22  front of you?

23  A.    I do.

24  Q.    Do you recall that Office Action?

25  A.    Not the details of it.

1  Q.     Okay.  Well, I'll give you a second to look

2  through it; and then I'm going to ask you to take a look

3  at page 318.

4  A.     Okay.  I'm on page 318.

5  Q.     Okay.  At the bottom there it talks about "Double

6  Patenting."  Do you see that?

7  A.     Yes.

8  Q.     And then on the next page that continues and then

9  gets down to a double-spaced portion about the middle of

10  the page where it says, "Claim 34 is rejected on the

11  ground of nonstatutory obviousness-type double patenting

12  as being unpatentable over claim 1 of U.S. Patent Number

13  6,199,076."

14           Do you see that?

15  A.     I do see that.

16  Q.     And the U.S. patent referred to there, that's the

17  '076 patent in this case, right?

18  A.     Yes, it is.

19  Q.     And it continues on saying, "Although the

20  conflicting claims are not identical, they are not

21  patentably distinct from each other because claim 1 of

22  the '076 patent anticipates all limitations of claims 34

23  and 47 of the instant application except the audio output

24  unit including at least one speaker or headset for

25  reproducing said audio program files in audible form

1341

1  perceptible to a user."  Did I read that right?

2  A.    I believe you did.

3  Q.    And the claim 34 that the examiner was referring

4  to here, that's the claim that issued as claim 1 of the

5  '178 patent, correct?

6  A.    I don't recall that specifically.  I'd have to

7  look and see what claim 34 was.  There are several

8  back-and-forths that happened here.  I didn't look to see

9  if this was a final Office Action or really remember

10 where in the context of the prosecution of the patent

11 that this comes in, and I'd want to double-check that to

12 make sure before going further.

13 Q.    Okay.  Well, you're familiar with what a double

14 patenting rejection is, right?

15 A.    I have a very high-level understanding.

16 Q.    Okay.  And you understand what the examiner meant

17 when he said claim 34 is not patentable over claim 1 of

18 the '076 patent, right?

19          MR. HOLDREITH:  Objection to the form.  The --

20          THE REPORTER:  I'm sorry?

21          THE COURT:  Wait.  First of all, it's a

22 federal court.  You'll want to stand.

23          And, second, you'll want to speak loudly

24 enough so that the court reporter can hear.  Go ahead.

25          MR. HOLDREITH:  I apologize, your Honor.  I

1  object to form.  The language exactly is patentably

2  distinct.

3          MR. STEPHENS:  I'll just read the language I

4  was referring to, your Honor, rather than having you

5  address the objection.

6          THE COURT:  Okay.

7  BY MR. STEPHENS:

8  Q.    It says "Claim 34 is rejected on the ground of

9  nonstatutory obviousness-type double patenting as being

10 unpatentable over claim 1 of U.S. Patent Number

11 6,199,076."

12         Do you understand what the patent examiner is

13 talking about there, Dr. Almeroth?

14 A.    To be clear, I understand the technical parts

15 which are going to come after that.  The decisions that

16 are made by the Patent Office, you know, the legal basis

17 for it, that's not really the focus of why I looked at

18 the prosecution history.  I just want to make very clear

19 about the claims that you're talking about and how they

20 relate.  I mean, I see the words on the paper; but this

21 part of the prosecution history is not the kinds of thing

22 I was relying on.

23 Q.    Okay.  But you read it and understood it when you

24 were working on your report, right?

25 A.    I did read and understand the technical parts that

1  related to informing my opinion about the patent --

2  Q.    Okay.

3  A.      -- and especially, for example, with respect to

4  the claim construction issues that have now been settled.

5  Q.    And you understand that Mr. Call responded to this

6  by disclaiming any term of the '178 patent that would

7  have extended beyond the life of the '076 patent?  That's

8  called a "terminal disclaimer," right?

9  A.    I don't recall.  There are hundreds, if not

10  thousands, of pages in this prosecution history.  I don't

11  have the back-and-forth, the numerous parts of this

12  back-and-forth memorized.

13  Q.    Okay.  We'll change topics now, Dr. Almeroth.  In

14  your report on infringement, you said that (reading)

15  instead of scanning forward in the sequencing file to

16  locate the next record and then incrementing the

17  CurrentPlay variable, the device increments the

18  CurrentPlay variable to fetch the next record, right?

19  A.    I believe you're reading from one of the

20  appendices or at least part of one of the appendices.  I

21  think, again, that that whole paragraph that relates to

22  that should be taken into context.

23  Q.    Okay.  But those are your words, right?

24  A.    I don't remember if they are verbatim.  We'd have

25  to go and look at that exhibit to see.

1  Q.     All right.  Well, let's do this.  It's in the

2  third binder you have up there.

3  A.     Yes.

4  Q.     You have four.

5         And it's in Appendix A to Exhibit 21.  So, you

6  really have to start from the back to get to it

7  correctly.

8  A.     Yes.  What page of that Appendix A?

9  Q.     It's at page 65.  Are you with me, Dr. Almeroth?

10 A.     Yes, I am.

11        THE COURT:  I'm not.

12        MR. STEPHENS:  Okay.  I'll wait for you.

13        THE COURT:  Volume 3?

14        MR. STEPHENS:  Volume 3, Exhibit 21.

15        THE COURT:  Okay.

16        MR. STEPHENS:  And then you need to start from

17 the back of that exhibit, your Honor, because there is an

18 Appendix A to that exhibit.

19        THE COURT:  All right.

20        MR. STEPHENS:  And look for page 65.

21        THE COURT:  Starting from 463 and go back to

22 65?

23        MR. STEPHENS:  No, your Honor.  If you start

24 at Tab 23 --

25        THE COURT:  Oh, so, it's in Tab 23?

1    MR. STEPHENS:  No, in -- it's in Tab 23, but

2   it's at the very end of that exhibit.  And unfortunately

3   the appendix starts at the very end, and it's numbered

4   separately.

5           THE COURT:  It may have been left out in my

6   copy because mine starts at page 464.  Go ahead.  Just

7   put it up on the screen, whatever you're talking about;

8   and we'll deal with it then.

9           MR. STEPHENS:  Okay.  We'll use the Elmo.

10  BY MR. STEPHENS:

11  Q.    Okay.  And in the right column there, you say,

12  "The iPod nano performs all three steps of the algorithm,

13  but essentially combines Steps 1 and 2.  Instead of

14  scanning forward in the sequencing file to locate the

15  next record and then incrementing the CurrentPlay

16  variable, the device increments the CurrentPlay variable

17  to fetch the next record."

18           Do you see that?

19  A.    I do see that language.

20  Q.    So, you're saying that instead of doing two

21  things, scanning forward in the sequencing file to locate

22  the next record and then incrementing the CurrentPlay

23  variable, what it does instead is one thing; and that is

24  just increment the CurrentPlay variable to fetch the next

25  record, right?

1346

1  A.    I don't think that's quite what that says.  And,

2  again, if you look at the subsequent paragraphs, they all

3  talk about Steps 1 and 2.  The next paragraph begins with

4  Steps 1 and 2.  The paragraph after that talks about the

5  scanning step.

6          I don't think that that's what this says, and

7  I think you have to take the whole part of this

8  discussion of Steps 1 through 3 into context.

9  Q.    Okay.  But those are your words, right?

10 A.    Those are my words that are highlighted, yes.

11 Q.    Okay.

12          MR. CORDELL:  Your Honor, would you like a

13 paper copy?

14          THE COURT:  No.  That's fine.

15 BY MR. STEPHENS:

16 Q.    Now, Dr. Almeroth, you demonstrated a "repeat all"

17 mode when you were demonstrating the iPod.  Do you recall

18 that?

19 A.    Yes, I did.  I demonstrated both.

20 Q.    And that was -- and "repeat all" was when the

21 playlist would play all the way through and when it got

22 to the end, it started back at the beginning, right?

23 A.    That's correct -- well, yes.  That's correct.

24 Q.    And similarly, if you skipped past the end, it

25 would skip to the beginning of the playlist?

1347

1  A.      That's correct.

2  Q.      Now, that was a mode that you had to configure the

3  device to do, right?

4  A.      It was a mode, but the device is specifically

5  programmed to support that mode.

6  Q.      But it doesn't do that when you buy it, right?

7  You have to go in and change some settings to make it

8  work that way, right?

9  A.      It does have that capability and so --

10 Q.      But it does -- that capability is not turned on

11 when you buy the device, correct?

12 A.      That capability is not turned on.  It's on the

13 device.

14 Q.      And you had to configure it to turn it on, right?

15 A.      I had to set that menu setting.

16 Q.      Okay.  Now, in your report you admitted that the

17 iPods which use the *iTunes* database only reads the *iTunes*

18 database for mass storage once when they boot, right?

19 A.      I think you'd have to show me that part of the

20 report.

21 Q.      Paragraph 207.

22          You say, "As a preliminary point, the accused

23 devices" --

24 A.      Wait.  I'm sorry.  I'm on paragraph 207.  You're

25 reading from the beginning.  Okay.

1  Q.    Yes.  "As a preliminary point, the accused devices

2  operate by loading the playlist audio file sequence into

3  volatile memory at some point during operation.  For

4  devices that use the *iTunesDB* database structure, this

5  load occurs when the device boots."

6           Do you see that?

7  A.    Yes, I do.

8  Q.    And then a little further down -- I mean, next you

9  talk about a different database which we'll talk about in

10 a moment.

11          A little further down you say, "During

12 playback, the accused devices rely on the data stored in

13 volatile memory as opposed to returning to the

14 persistently stored sequencing file data," right?

15 A.    Yes.

16 Q.    Okay.  So, what happens in the iPods is that when

17 you finish synchronizing or when you boot the device, it

18 reads the *iTunes* database from the persistent mass

19 storage into RAM and then never looks at the file on the

20 disk again, right, until you synchronize or boot again?

21 A.    No.  That's not what I'm saying.

22 Q.    That's true, isn't it?

23 A.    I don't recall specifically that it ever doesn't

24 read back from the disk.  So, I just want to make that

25 clear that -- I mean, my opinion is what's reflected in

1  paragraph 207.

2  Q.    I understand that.  So, you don't recall whether

3  it ever accesses the disk again to read the *iTunes*

4  database during normal use, correct?

5  A.    I don't recall if it reads it again from the

6  persistent mass storage, but it certainly uses the

7  version that's in memory as it's taken from persistent

8  mass storage.

9  Q.    Okay.  Now, you also said that for devices that

10 use the --

11         THE COURT:  Excuse me, counsel.  Just to

12 clarify the record, are you saying by your question that

13 the player -- that the synchronized library is kept on

14 RAM even when it's turned off?

15         MR. STEPHENS:  That's correct, your Honor --

16 well, the device isn't turned off.  It normally goes to

17 sleep, which is a little different.

18         THE COURT:  All right.

19         MR. STEPHENS:  And there will be testimony

20 about this from Apple witnesses later.

21 BY MR. STEPHENS:

22 Q.    Dr. Almeroth, you also said that (reading) for

23 devices that use the SQL, or sequel database structure,

24 this load occurs when a playlist is selected and the

25 listener initiates playback, right?

1350

1  A.    That's what it says.

2  Q.    And by "this load," you meant loading the sequel

3  database structure into volatile memory, right?

4  A.    Or at least the parts that are relevant.

5  Q.    Okay.  And during playback of that playlist, that

6  sequel database structure isn't loaded again, right?

7  A.    Well, I think that for purposes of my opinion,

8  both the *iTunesDB* and the sequel database are --

9  Q.    Dr. Almeroth, I asked you a specific question.

10  The sequel database on the disk is not accessed again

11  when the playlist is being played by the user, right?

12  It's only accessed when the playlist is loaded, right?

13  A.    I have not offered that opinion.  I'm not 100

14  percent sure.  I just know that it is loaded into memory.

15  Q.    Okay.  Thank you.

16        MR. STEPHENS:  I have no more questions.

17        MR. HOLDREITH:  Your Honor, may I proceed?

18        THE COURT:  You may.

19        MR. HOLDREITH:  Thank you.

20        REDIRECT EXAMINATION OF KEVIN C. ALMEROTH

21  BY MR. HOLDREITH:

22  Q.    Dr. Almeroth, I just want to clear up a few things

23  that were discussed with Mr. Stephens.  Let me start, if

24  I may, with questions that Mr. Stephens asked about the

25  Palm device in 1995.  Okay?

1351

1  A.    Yes.

2  Q.    Do you recall that he asked you if a Palm in 1995

3  could have certain kinds of things like a disk drive that

4  could store music?

5  A.    Yes, I do.

6  Q.    And he spent some time on that.

7  A.    He did.

8  Q.    Now, Dr. Almeroth, is the point -- or at least one

9  point of a patent to describe something new?

10 A.    That's absolutely the case.

11 Q.    And if a Palm in 1995 couldn't store songs, is

12 that relevant to what the patent describes?

13 A.    No.

14 Q.    Now, does the patent, in fact, mention a PDA?

15 A.    It does.

16 Q.    And does the patent, in fact, describe a new kind

17 of audio player?

18 A.    It does.

19 Q.    I'd like to ask you about, in particular,

20 something that Mr. Stephens drew your attention to in the

21 patent.  So, it's Plaintiff's Exhibit 1.  And if you

22 still have the binder that Mr. Stephens provided that's

23 Number 1 --

24 A.    Yes.

25 Q.    -- there is a tab that's Plaintiff's Exhibit 1.

1352

1 That's the patent.  Do you have that in front of you?

2 A.    I do.

3 Q.    If you could turn, please, to Column 4 at line 32.

4 That's on Plaintiff's Exhibit 1 at page 11.

5 A.    Okay.

6 Q.    I've put that up on the screen.

7         Now, Mr. Stephens asked you about this text

8 here starting at about line 33 that says, "The player 103

9 may be advantageously implemented by a conventional

10 laptop or desktop personal computer."  Do you recall

11 that?

12 A.    I do.

13 Q.    What does "advantageously implemented" mean here?

14 A.    It means that for the preferred embodiment it's

15 one way of doing the implementation.  It's not the only

16 way that the patent is limited to.

17 Q.    And when Mr. Stephens showed you Figure 1, do you

18 remember that?

19 A.    Yes, I do.

20 Q.    That's page 3 of Plaintiff's Exhibit 1.

21         Is this Figure 1?

22 A.    Yes, sir, it is.

23 Q.    And Mr. Stephens asked you if in Figure 1, this

24 Part 103 that's the player, has something to do with this

25 preferred embodiment; is that right?

1353

1  A.      That's correct.

2  Q.      Does the patent say this is the only way to do the

3  player?

4  A.      No.  In fact, the description of this figure is

5  the illustrative embodiment of the invention shown in

6  Figure 1.

7  Q.      I'd like to show you now again Plaintiff's

8  Exhibit 1009 at page 2.  This was a demonstrative.

9          Is this one of the charts that you used when

10 you were talking about how the patent describes the

11 player?

12 A.      It is.

13 Q.      And is this chart relevant to the question of what

14 kinds of forms and shapes the patent says the player can

15 have?

16 A.      It is.

17 Q.      Can you explain that, please?

18 A.      Sure.  That first line up there, "It should be

19 understood that numerous other information storage,

20 processing and communications schemes may be substituted

21 for the preferred Internet server and PC client player

22 architecture shown in Figure 1."  That was what I was

23 trying to communicate to Mr. Stephens in answer to his

24 question about how these examples were illustrative and

25 that the patent uses words like "exemplary" and

1354

1    "illustrative" and a "preferred embodiment" because it

2    will then tie in this kind of language and then list some

3    alternatives that allow different kinds of size and shape

4    and composition devices.

5    Q.     Okay.  Are any of those alternatives reflected in

6    your chart here, Plaintiff's Exhibit 1009, page 2?

7    A.     That's correct.  This is where it mentions the

8    PDA, and then also in the bottom it's the simplified

9    player for mobile use.

10   Q.     And what line in the patent, and column, is the

11   PDA mentioned at?

12   A.     At Column 7, lines 53 through 57.

13   Q.     That's the '076 patent?

14   A.     Yes, sir.

15   Q.     And in what lines is the simplified player for

16   mobile use mentioned?

17   A.     That's Column 7, lines 63 through 66.

18   Q.     And, again, that's the '076 patent?

19   A.     Yes, sir.

20   Q.     All right.  Now, Dr. Almeroth, Mr. Stephens was

21   asking you about a PalmPilot PDA in 1995; is that right?

22   A.     That's correct.  He was.

23   Q.     What is the date that structural equivalents

24   should be measured by?

25   A.     It is the date of the patent issue.

1  Q.     And when was --

2  A.     So, that's in 2001.

3  Q.     So, when you considered structural equivalents,

4  were you measuring that by what a PalmPilot could do in

5  1995?

6  A.     No.  It's by what devices could do and what the

7  available technology was in 2001.

8  Q.     All right.  I'd like to talk about that in a

9  little more detail.  Now, there was some discussion of

10 some corresponding structure that is a persistent mass

11 storage; is that right?

12 A.     Yes.

13 Q.     And I'm showing you Plaintiff's Exhibit 1033.

14 This is a demonstrative.  Is this the court's -- one of

15 the court's definitions that explains corresponding

16 structure that is "high-speed RAM storage and a

17 persistent mass storage device"?

18 A.     Yes.

19 Q.     All right.  In 2001 -- well, let me back up for a

20 minute.

21        Now, the iPods have what for this persistent

22 storage?

23 A.     They have either a hard disk drive or NAND flash

24 memory.  That's a kind of persistent mass storage.

25 Q.     Is a hard disk drive literally a persistent mass

1356

 1  storage device?

 2  A.     Yes.

 3  Q.     Is a NAND flash literally a persistent mass

 4  storage device?

 5  A.     Yes, it is.

 6  Q.     And were there hard drives in 2001?

 7  A.     There were.

 8  Q.     And specifically in March of 2001 were there hard

 9  drives?

10  A.     Yes, absolutely.

11  Q.     And in March of 2001, were there NAND flash

12  storage devices?

13  A.     Yes, there were.

14  Q.     Now, does Judge Clark's definition say the

15  persistent storage has to be any certain size?

16  A.     It does not.

17  Q.     And were there different sizes of hard drives in

18  March of 2001?

19  A.     Yes.  Different sizes with respect to their

20  physical dimensions and then also their capacity.  There

21  were very many different sizes and shapes and capacities.

22  Q.     Let me ask about NAND flash now and cost.  Was

23  there NAND flash available in 2001 for mass storage?

24  A.     Yes, there was.

25  Q.     Does Judge Clark's definition say that the

1 persistent mass storage has to be any particular cost or

2 price?

3 A.    It does not.

4 Q.    Does it say it has to be cheap?

5 A.    It does not.

6 Q.    All right.  There was also some discussion of the

7 corresponding structure which is the CPU or the computer.

8 Do you recall that?

9 A.    Yes, I do.

10 Q.    And were there, in March of 2001, processors that

11 could be used to implement a general purpose computer?

12 A.    Absolutely.

13 Q.    And I'm going to show you Plaintiff's Exhibit 1038

14 now.  Is this one of Judge Clark's definitions that talks

15 about a general purpose computer?

16 A.    Yes, it is.

17 Q.    And does Judge Clark's definition say the general

18 purpose computer can't be a System-on-Chip?

19 A.    It does not.

20 Q.    Or can't include a System-on-Chip?

21 A.    It does not.

22 Q.    All right.  Dr. Almeroth, you were asked about the

23 request part of these claims.  Do you recall that?

24 A.    I was, yes.

25 Q.    You were asked if there are two different

1358

1  definitions of a request.  Do you remember that?

2  A.    I do.

3  Q.    Now, Dr. Almeroth, can computers make different

4  kinds of requests?

5  A.    Yes.  There are different kinds, different types

6  of requests.

7  Q.    And there's more than one way to make a request?

8  A.    Yes, there is.

9  Q.    All right.  Let's look at the court's definition

10 of "request."  I'm showing you Plaintiff's Exhibit 1028A.

11 Is this the court's definition of the request?

12 A.    Yes, it is.  "A communication to initiate the data

13 transfer."

14 Q.    And does this definition identify a particular

15 kind of request?

16 A.    Yes, it does.  And it's to initiate the data

17 transfer.

18 Q.    Now, did you conclude that iPods do make a

19 communication to initiate something?

20          MR. STEPHENS:  Objection, your Honor.  This is

21 outside the scope of cross.

22          THE COURT:  Overruled.

23 A.    Yes, they do.  They do make a communication to

24 initiate something, not the data transfer but a

25 connection request.  That's the signaling request that's

1  part of USB.

2  BY MR. HOLDREITH:

3  Q.     And you concluded that -- or what did you conclude

4  about whether that communication to initiate the

5  connection is literally this request to initiate data

6  transfer?

7  A.     It's not literally.  But under the doctrine of

8  equivalents it is equivalent to that request.

9  Q.     And let's be clear.  When we're talking about a

10  request, did you find that the communication to initiate

11  a connection is an equivalent request to a communication

12  to initiate a data transfer?

13             MR. STEPHENS:  Your Honor, I object to the

14  attempt to supplement Dr. Almeroth's opinions about

15  equivalents.  They were what they were on direct.  I

16  didn't ask him about that on cross.  I think they're

17  trying to fix the record here.  This is outside the

18  scope.

19             THE COURT:  All right.  I believe you did

20  actually cross him on this area.  I'm going to overrule

21  that.

22             But that last question -- I want you to be

23  very careful not to mix up your questions in structural

24  terms versus doctrine of equivalents terms.  And that

25  last question appears to me to do that.

1360

1    MR. HOLDREITH:  All right.  I'll try to ask it

2  to make that very clear, your Honor.

3    THE COURT:  Okay.

4  BY MR. HOLDREITH:

5  Q.    Dr. Almeroth, in -- I'm just going to phrase it

6  this way to avoid any confusion about equivalents.  In

7  considering the request limitation as defined by the

8  court, did you follow the court's construction?

9  A.    I did.

10  Q.    And did you conclude that the request limitation

11  is met by all of the eight groups of iPods that you

12  analyzed?

13  A.    Yes.  It is met.

14  Q.    All right.  Dr. Almeroth, you were also asked

15  about this chart that you made to illustrate some of the

16  algorithms that are described in the patent.  Do you

17  recall that?

18  A.    Yes, sir, I do.

19  Q.    Is this the chart?

20  A.    That's correct.

21  Q.    All right.  I'm showing you Plaintiff's

22  Exhibit 1010.

23    Now, Mr. Stephens spent some time with you

24  trying to match up citations in this chart 1010 to the

25  court's claim constructions.  Do you recall that?

1  A.      I do.

2  Q.      When you made this chart, were you trying to match

3  up these citations to the court's claim constructions?

4  A.      No, sir.  That wasn't the intention.

5  Q.      And did you ever say on direct that that's what

6  you were trying to do?

7  A.      No, I did not.

8  Q.      What was the purpose of this chart?

9  A.      This was the purpose of the chart.  If you

10  remember, it came at the end of the components board.  It

11  was that eighth panel and it talked about algorithms and

12  I wanted to use this to describe what algorithms were,

13  the fact that this was a flow chart here and then some of

14  the places in the patent that talked about some of these

15  steps.  By no means was it meant to represent what the

16  court had construed for the software algorithms.

17  Q.      All right.  So, let me move on to the next topic

18  here.  You were asked about the infrared link during your

19  testimony; is that correct?

20  A.      Yes, sir.

21  Q.      And you were asked about speeds of that infrared

22  link; is that correct?

23  A.      That's correct.

24  Q.      Now, have you studied what the speeds of the

25  infrared link were in 2001?

1  A.     Yes, sir.

2  Q.     And did you find any publications that addressed

3  that subject?

4  A.     I did.  And this is an instance for structural

5  equivalents where not only did I use my own knowledge but

6  this is where I went off and looked at other documents to

7  support the opinions I was reaching with respect to

8  structural equivalents.

9  Q.     Now I'm going to show you Plaintiff's Exhibit 346.

10 What is this?

11 A.     This is --

12        MR. STEPHENS:  Your Honor, objection.  I

13 didn't ask him about this.  That exceeds the scope.

14        THE COURT:  I'm sorry.  I think I recall you

15 asking about the infrared.  I'm going to overrule that.

16        MR. STEPHENS:  I never asked him about this

17 evidence.  That was my point, your Honor.  I'm sorry.

18        THE COURT:  Well, I understand that.  But you

19 cross-examined him on the infrared and the speed.  I'm

20 going to allow him to come back and explain.

21        MR. STEPHENS:  Thank you, your Honor.

22        THE COURT:  I'll overrule that.

23 BY MR. HOLDREITH:

24 Q.     Dr. Almeroth, what is Plaintiff's Exhibit 346?

25 A.     346 is an article that appears in a technical

1  journal.  If you blow up the very bottom left, this

2  portion right here (indicating), it says that it's --

3          THE COURT:  Is this on the admissible list?

4          MR. SCHUTZ:  Yes.

5          THE COURT:  Okay.

6          MR. STEPHENS:  Your Honor, it was not

7  discussed in direct either, though.

8          THE COURT:  Well, I'll overrule that.

9  A.      And this appears in a journal called "IEEE

10 Personal Communications."  That's one of the journals

11 that's produced by IEEE.  The date is February, 2000.

12          And the title then is called "IR:  Past,

13 Present and Future"; and it's written by an author from

14 HP Labs.

15 Q.      And what did you determine from your background

16 and from this article?

17 A.      This article has information about the state of

18 the art of IrDA, the infrared that existed in February of

19 2000, so a little bit more than a year before the date

20 that the '076 patent issued.

21          There's two things that I would like to point

22 out.  On page 12 of the document, which is page 2 of

23 Plaintiff's Exhibit 346, it's talking about IrDA and its

24 capabilities down here (indicating) in this portion.  And

25 this is specifically with respect to the speed of IrDA.

1    The earliest version of IrDA, which goes back

2  to the early Nineties, did 115,000 bits per second.  What

3  this now does is saying this platform has been extended

4  three times.  And this is by February, 2000.  It can go

5  up to 1.152 megabits per second and 4 megabits per

6  second.  And then there's also the addition of a

7  16-megabit-per-second rate that's also part of the

8  standard by February, 2000.

9    What that means is for a communication that

10  might take 160 minutes at 115,000 bits per second, you

11  could do in one minute using 16-megabit-per-second IrDA.

12  What that means is IrDA was known to be a very fast

13  standard.

14  Q.    Was there something else you wanted to point out

15  in this article?

16  A.    Yes.  On the next page, page 13, which is

17  Plaintiff's Exhibit 346, page 3, there is a table at the

18  bottom.  And this is a nice table because it puts into

19  context some of the different dates.

20    You have over here in mid 1995 this discussion

21  about 115 kilobits per second.  But what you also have

22  here is that by mid 1996, which was before the patent was

23  filed, you already have 4-megabit-per-second portable

24  PCs.  There is a Nokia 9000 communicator that has IrDA.

25  And then this extends over here up into early 1999, and

1  then this article was written later.  What that means is

2  that IrDA was known to have a high-speed capability.

3          And now that I think about it, there is one

4  other thing I'd like to show you from this article; and

5  this is Plaintiff's Exhibit 346, towards the back, on

6  page 8 of -- PX 346, page 8.  And there is a paragraph

7  right here (indicating) that I would like you to blow up.

8  Q.     Is it the one that says I-R --

9  A.     A little further up, right here (indicating).

10 Q.     Oh, sorry.  This one here?

11 A.     No, the one right above it.

12 Q.     I'll get it right this time.

13          Right here at the top?

14 A.     Yes.

15 Q.     How is that?

16 A.     That's fine.  Yes.

17          The IrDA standard had a number of parts and

18 one of those standards was IrOBEX and it says "is

19 defining semantics for sequences of PUT and GET

20 operations to achieve such objectives as address book and

21 diary synchronization between phones, smartphones, PDAs,

22 portable PCs, and pagers."

23          And that's consistent with the other document

24 I showed from the PortalPlayer and also the Cirrus Logic

25 document, to demonstrate that people of skill in the art

1  in 2001 would understand IrDA to be structurally

2  equivalent to USB.

3  Q.    And is that also relevant to -- I'm sorry.  Can

4  you just explain -- I'll withdraw that question.  Let me

5  move on.

6         You were asked some questions about a sound

7  card.  Do you recall that?

8  A.    Yes.

9  Q.    And you made some reference to something in the

10  patent, the '076 patent, at Column 4 at about line 50; is

11  that right?

12  A.    Yes, sir.

13  Q.    I'm going to show you that.  That's Plaintiff's

14  Exhibit 1 at page 11.

15         And I'm not sure that you were allowed to

16  finish your answer on this.  What were you trying to

17  explain about what the patent says here that has

18  something to do with sound cards?

19  A.    In response to a question about whether or not for

20  sound card like for IrDA and other things -- whether or

21  not I had considered and identified other evidence for if

22  the sound card was not literally the same structure, that

23  it was structural equivalents for what's used in the

24  devices.

25         What I wanted to point to was, in fact, this

1 *Hardware Design Guide* that's referred to in the patent

2 and (reading) the sound card is conventional and

3 preferably complies with the recommendations detailed in

4 this *Hardware Design Guide* from 1994.  I went and bought

5 that book, and inside it lays out the hardware

6 requirements.  And in addition to describing that the

7 sound card could be specifically a board, it also

8 described it as being a DSP, a digital signal processor,

9 a kind of chip that goes on a board.  So, I, in fact, did

10 look at other evidence to support my opinion with respect

11 to sound card.  And this was the part about -- I thought

12 it was literally present; but if somebody disagreed, that

13 I would disagree with their disagreement and that it was

14 structurally equivalent and it was based on this

15 reference.

16 Q.    And does that have to do with the discussion you

17 had about cards and boards and chips?

18 A.    Yes, sir, it does.

19 Q.    And can you just -- just to relate it to the cards

20 and boards and chips, what did you conclude from the

21 *Hardware Design Guide* about boards and chips and sound

22 card?

23 A.    That the concept of a sound card -- that the

24 function that's important for these claims can be

25 implemented in a board or a chip or a chip on a board or

1368

1  a board that fits into -- or a card that fits into a

2  chip, that the specific construction of that sound card

3  wasn't limited to just a square thing that you would slot

4  into a computer.

5  Q.     All right.  Dr. Almeroth, just a couple more areas

6  quickly.  Mr. Stephens showed you some excerpts of what

7  he called "file history."  This was stuff that happened

8  in the Patent Office.  Do you recall that?

9  A.     Yes, I do.

10  Q.     How many pages are there in a file history?

11  A.     Hundreds if not thousands of pages.  The file

12  history covers from the time the application is submitted

13  to the time the patent is granted, all of the

14  communication that goes back and forth, some of it

15  technical, some of it legal.  It includes the whole set

16  of pages.

17  Q.     And when you read the file history, were you

18  trying to read every word and understand the legal parts

19  in addition to the technical parts?

20  A.     No.  I was reading it to figure out what were the

21  legal parts.  I skimmed them but don't really understand

22  a lot of it, the legal parts.

23         But then looking more specifically at the

24  technical parts, at the parts where the written

25  description was discussed in the patent and the claims

1    and what was happening with respect to those.

2    Q.    Now, Mr. Stephens showed you some parts where

3    there was a discussion between the patent attorney and

4    the Patent Office about what these claims say, right?

5    A.    Yes.

6    Q.    Now, have you been provided, as you've testified,

7    definitions from Judge Clark about what these claims

8    mean?

9    A.    Exactly, yes.

10   Q.    And are you following Judge Clark's instructions

11   about what these claims mean?

12   A.    Yes, sir, to the letter.

13   Q.    And, so, when there's pieces of the file history

14   that talk about what the claims mean, do you look at that

15   file history; or do you look at what Judge Clark said

16   they mean?

17   A.    Once Judge Clark issued his ruling on what the

18   claims meant, that's what I used.

19   Q.    Okay.  I'll turn now to just a quick question.

20   There was something Mr. Stephens showed you that said a

21   claim was -- in the '178 patent was unpatentable because

22   of a claim in the '076 patent.  Do you recall that?

23   A.    I do.

24   Q.    Now, after that conversation in the Patent Office,

25   did the patent go ahead and issue the '178 patent?

1  A.    Yes, they did.  The '178 patent has at the back

2  the claims, and those are the claims that issued when the

3  patent issued.

4  Q.    And, so, is it your understanding that whatever

5  that conversation was about, eventually the Patent Office

6  decided that the claims of the '178 patent are

7  patentable?

8  A.    Yes, sir.  That's correct.

9  Q.    Two quick technical details.  You were asked if a

10 file is kept in RAM -- or, rather, you were asked

11 something about whether a file is kept in RAM even when

12 the device is turned off.  Do you recall that?

13 A.    I do.

14 Q.    Now, did you find that the eight groups of iPods

15 store the sequencing file, or the file of sequencing

16 data, in persistent storage?

17 A.    Yes.  That is correct.

18 Q.    And is that the RAM?

19 A.    No.  That is either the hard disk drive or the

20 NAND flash.  That's the requirement of the claim, and

21 that's what I looked for in the devices.

22 Q.    Now, there comes a time when all or part of that

23 sequencing file is read into the RAM and it's also in the

24 RAM in addition to the persistent storage; is that right?

25           MR. STEPHENS:  Objection, your Honor.  That's

1371

1    an ambiguous question.  It's not clear what he's

2    referring to there, the patent, the product...

3              MR. HOLDREITH:  I'm happy to clarify that

4    question.

5              THE COURT:  All right.

6    BY MR. HOLDREITH:

7    Q.    Did you find, Dr. Almeroth, that in the eight

8    groups of iPods that there comes a time when all or part

9    of that file of sequence data is read into the RAM and

10   it's both in the RAM and in the persistent storage at

11   that time?

12   A.    Yes, sir, that's correct.

13   Q.    Okay.  Just real quickly, Mr. Stephens asked you

14   if you had to configure that iPod to be in repeat mode.

15   A.    Yes.  I remember that.

16   Q.    Just quickly, can you explain what a user has to

17   do to make an iPod repeat?

18   A.    There is a menu option that you go down and it

19   says, "repeat" and you can click the "select" button.

20   You can repeat one or repeat all.

21   Q.    Does that involve knowing anything about software

22   or having expertise in computer science?

23   A.    No.

24   Q.    Is this just a normal selection that's offered to

25   the user on the iPod?

1  A.      It is.

2  Q.      Dr. Almeroth, I have one housekeeping issue.

3  Exhibit 748A is your index of documents you looked at.

4  A.      It is.  It's here somewhere but -- -- I recall.

5  Q.      I'll just ask my question quickly.  Did you --

6          MR. STEPHENS:  Your Honor, I didn't ask him

7  about his index of documents or anything like that.

8          THE COURT:  Overruled.

9  BY MR. HOLDREITH:

10 Q.      Did you notice a couple of typos in the exhibit

11 numbers when you were reviewing this document?

12 A.      Yes, I did.

13 Q.      Did you have a substitute prepared to correct

14 those?

15 A.      Yes, I did.

16 Q.      All right.

17         MR. HOLDREITH:  I'd like to offer that

18 substitute.  It just corrects two typographical errors,

19 and I will provide the court with a substituted copy if

20 that's acceptable.

21         THE COURT:  Any objection?

22         MR. STEPHENS:  Well, your Honor, I guess I

23 haven't seen it; so, I'd like to know what changes --

24         THE COURT:  All right.  At a break we'll let

25 counsel look at it and we'll take that up.

 1              MR. STEPHENS:  Yes, sir.

 2   BY MR. HOLDREITH:

 3   Q.    All right, Dr. Almeroth.  Here's my last question

 4   for you -- or last topic.  Having now considered

 5   Mr. Stephens' questions to you and having analyzed all of

 6   the materials you testified you analyzed, for all of the

 7   eight groups of iPods that you analyzed, for the -- I

 8   want to talk about the functions now and the

 9   means-plus-function terms.

10   A.    Yes.

11   Q.    Not the structure yet but the functions.

12   A.    Yes.

13   Q.    For the functions the court identified in the

14   means elements, did you find that the iPods performed the

15   identical function as instructed by the court?

16   A.    Yes, I did, as to the function which was the top

17   part --

18              MR. STEPHENS:  Your Honor, this is outside the

19   scope, too.

20              THE COURT:  I'm sorry?

21              MR. STEPHENS:  They're just trying to

22   supplement the record here, your Honor.  I did not ask

23   him about the functions, whether they were found

24   identically or anything else.

25              THE COURT:  Okay.  I'm going to allow the

1374

1  ending question.  Overruled.

2  BY MR. HOLDREITH:

3  Q.     Do you want me to repeat the question,

4  Dr. Almeroth?

5  A.     As to the function, the identical function is

6  present for all of the means-plus-function claims for all

7  of the devices.

8  Q.     All right.  And for the structures identified by

9  the court in the means-plus-function elements, for all

10  eight groups of iPods, did you find that the structures

11  are present in all eight groups of iPods, either

12  identically or by equivalents?

13  A.     Yes, I did.

14  Q.     And having considered Mr. Stephens' questions in

15  addition to everything you've testified about, what is

16  your conclusion about infringement in this case?

17         MR. STEPHENS:  Objection, your Honor.  Outside

18  the scope.

19         THE COURT:  Overruled.

20  A.     That for these seven claims, claims 1, 3, and 15

21  of the '076 patent and for claims 1, 6, 13, and 14 of the

22  '178 patent -- actually, let me break it apart.  Let me

23  start over.

24         For claims 1, 3, and 15 of the '076 patent,

25  the classic 1 through 6, the mini 1 through 2, and the

1 nano 1 through 5 infringe those claims.

2           For the classic 6, nano 4 and 5, they infringe

3 claims 1, 6, 13, and 14 of the '178 patent.

4 Q.     Thank you, Dr. Almeroth.

5           THE COURT:  All right.  Ladies and gentlemen,

6 we're going to take a break.  Because of all this

7 discussion and I'd mentioned before I was going to give

8 you a definition on the difference between equivalents as

9 used in the doctrine of equivalents and equivalents as

10 used when there is structural equivalents, we've prepared

11 a pair of definitions which you can compare.

12 Ms. Mullendore is going to hand those to you.  Those

13 should go in the instruction part of your book.

14           And I'm going to ask you to be back at ten

15 past.  Keep in mind that these are basically interim

16 instructions.  You're going to get a complete set of

17 written instructions telling you more about how to apply

18 those later.

19           You're excused at this time until ten past.

20           (The jury exits the courtroom, 10:55 a.m.)

21           THE COURT:  Okay.  You may step down, sir.

22           Let's see if we can get everything changed

23 around for the next expert.  Is that who we're getting,

24 Mr. Nawrocki?

25           MR. SCHUTZ:  Actually, your Honor, the next

1376

1   witness will be a short -- I think it's 9 minutes --

2   7-minute video deposition.

3            THE COURT:  Then let's get it queued up and

4   ready to go.

5            MR. SCHUTZ:  Okay.  And Mr. Nawrocki after

6   that.

7            THE COURT:  We're in recess.

8            (Recess, 10:56 a.m. to 11:11 a.m.)

9            (Open court, all parties present, jury not

10  present.)

11           MR. STEPHENS:  Your Honor, one point before

12  the jury comes in.

13           THE COURT:  Go ahead.

14           MR. STEPHENS:  I just wanted to renew my

15  motion; and I'd like to, I guess, move to strike the

16  testimony about IrDA.  I checked.  The only question I

17  asked Dr. Almeroth about IrDA was to confirm that the

18  only mention of a PDA in the entire patent was a sentence

19  that had the word "IrDA" in it.

20           I think what your Honor may have been

21  remembering -- and I was frankly a little unsure myself.

22  The only testimony -- there was some testimony earlier

23  about IrDA, but that was from Mr. Fadell, not any

24  questioning that I did of Dr. Almeroth.

25           THE COURT:  Okay.  Overruled.

1            MR. STEPHENS:  Thank you.

2            (The jury enters the courtroom, 11:12 a.m.)

3            THE COURT:  Go ahead, counsel.

4            MR. SCHUTZ:  Thank you, your Honor.

5            Personal Audio calls as its next witness, by

6    deposition, Mark Pascarella.  I'm not sure if your Honor

7    has an instruction for the jury on depos.

8            THE COURT:  Yes.

9            Ladies and gentlemen, we're going to see now a

10   witness --

11           This is going to be by video, right?

12           MR. SCHUTZ:  Yes, your Honor.

13           THE COURT:  This testimony will be presented

14   to you by a video deposition, and that's -- a deposition

15   is where the lawyers and the witness are present and they

16   have a videographer.  The witness is sworn to tell the

17   truth and can't be present here.

18           Now, a court reporter was present and took it

19   down; and those questions are going to be shown to you.

20   The testimony is entitled to the same weight and

21   consideration, as much as possible, as if the person is

22   live.  You'll get to see them on the screen.  That's not

23   quite the same as seeing them live; but as much as

24   possible, you are to give the witness and evaluate that

25   witness' testimony as though they were testifying before

1 you live.  And you should know that they were

2 testifying -- they were sworn to tell the truth.  Counsel

3 for both sides were there, and there were opportunities

4 before it came here to have objections made and for me to

5 rule on it.  So, as much as possible consider this as

6 though the witness was here.  Go ahead.

7          MR. SCHUTZ:  Thank you.  I'd also like to make

8 a brief interim statement, your Honor.

9          THE COURT:  You may.

10          MR. SCHUTZ:  Ladies and gentlemen, the witness

11 you are about to see is Mark Pascarella.  He, at the

12 relevant time, was the CEO of Gotuit Media.  The issue

13 for which this is being played is that Apple has asserted

14 that the SongCatcher product about which there has been

15 some testimony is, Number 1, covered by the patent, which

16 is an issue in dispute, and, Number 2, should have

17 been -- that Gotuit was a licensee and, thus, was

18 required to mark if it was covered by the patent.  That's

19 what this testimony goes to, and that's it.

20          Your Honor, there is also Exhibit 448 that's

21 referred to.  We can either stop the video and show it at

22 the time or after I'm -- I'll do whatever opposing

23 counsel would like with regard to that.

24          THE COURT:  It's up to you.  Perhaps

25 afterwards?

1379

1    MR. SCHUTZ:  Okay.  That's fine, your Honor.

2  Thank you.

3    (The following testimony was presented via

4  videotape.)

5    <u>DEPOSITION TESTIMONY OF MARK PASCARELLA</u>

6  Q.    Good morning, Mr. Pascarella.  Can you please give

7  your name and spell your last name for the record?

8  A.    Yes.  My name is Mark Pascarella,

9  P-A-S-C-A-R-E-L-L-A.

10  Q.    Okay.  And where do you currently work?

11  A.    I'm currently employed by Gotuit Media

12  Corporation.

13  Q.    And what's your title there?

14  A.    I'm the chief executive officer.

15  Q.    So, roughly 2001 to 2006, you were the executive

16  vice-president of Gotuit?

17  A.    Yes.

18  Q.    Are you familiar with a product -- or at least a

19  concept called "SongCatcher"?

20  A.    Yes.

21  Q.    Did you ever discuss the SongCatcher project with

22  Mr. Logan?

23  A.    I'm sure at some point we discussed it, yes.

24  Q.    Do you recall any of those conversations?

25  A.    Not in any detail.

1  Q.    If you look at Number 5, the -- one, two, three,

2  four -- fifth bullet down, it says, "The Personal Audio

3  patents would likewise be exclusively licensed to GA on

4  some basis."

5         Was "GA" Gotuit Audio?

6  A.    Again, as the recipient and not the author of this

7  email, I can only assume, yes, that's the case.

8  Q.    Okay.

9  A.    Don't know that to be true.

10 Q.    If you look above -- I should have pointed this

11 out first.  But on the first bullet under 5, it says

12 "Gotuit Audio" and then in parens "GA."

13 A.    Yeah, I think that solves it.

14 Q.    Do you know if the Personal Audio patents were

15 ever exclusively licensed to Gotuit Audio?

16 A.    Not to my knowledge.

17 Q.    Okay.  How about Gotuit Media, Incorporated?  Were

18 the Personal Audio patents ever exclusively licensed to

19 Gotuit Media?

20 A.    Not to my knowledge.

21 Q.    How about Gotuit corp -- Media Corp?

22 A.    Not to my knowledge.

23 Q.    Okay.  Gotuit Video?

24 A.    Not to my knowledge.

25 Q.    Do you recall -- you started at Gotuit Media,

1  Inc., in 2001; is that right?

2  A.      That's correct.

3  Q.      So, after you came onto Gotuit Media, Inc., in

4  2001, what happened to the SongCatcher project?

5  A.      Again, as I had suggested to you earlier, it

6  was -- it was wound down and shelved, if you will.

7  Q.      Okay.  Are you aware of any prototypes or anything

8  like that, actual computer code or source code or

9  anything relating to SongCatcher that still exists today?

10 A.      Again, I have no knowledge of what might exist

11 today.  I know that at some point in time it did exist in

12 the 2000-2001 time frame.  But I have no knowledge

13 whatsoever what might exist or not exist today.

14 Q.      Okay.  Do you know if SongCatcher was ever sold

15 commercially?

16 A.      My recollection is that it was offered for free.

17 So, I don't know if your term "sale" is appropriate.  But

18 I do think it was made available to users.

19 Q.      Do you know the means by which a consumer would

20 receive the product?

21 A.      Again, my recollection is that it was downloaded

22 from the Internet.

23 Q.      Okay.  Do you have any -- are you aware if there's

24 any working copies of SongCatcher at Gotuit today, at

25 Gotuit Media Corp?

1  A.    Not that I'm aware of.

2  Q.    Okay.  Do you know if SongCatcher was -- the

3  product SongCatcher was ever marked with any patent

4  numbers?

5  A.    I don't recall.

6  Q.    Okay.  Is there anyone at Gotuit Media Corp that

7  would have more knowledge than you about the -- about

8  SongCatcher?

9  A.    I don't know.

10  Q.    Is there anybody from Gotuit Media Corp today that

11  still works at the company that was there in 2001?

12  A.    No.

13  Q.    Was there a formal corporate decision made at

14  Gotuit Media, Inc., to wind down the audio initiative?

15  A.    My recollection is that there was -- there was

16  likely no formal corporate decision -- it was a small

17  start-up without a lot of management or bureaucracy or

18  oversight -- and that at some point we reached the

19  conclusion that it was the best interest of shareholders

20  to pursue the video market.  And, no, I don't recall that

21  there was a formal corporate decision.

22  Q.    Who would have been part of making the decision to

23  wind down the audio part of Gotuit?

24  A.    The board of directors.

25  Q.    Okay.  And at the time in 2001, who was on the

1383

1  board of directors?  Do you recall?

2  A.    I don't recall specifically; but my best

3  recollection would be that myself, James Logan -- those

4  are the best names I can come up with at the moment.

5  Q.    Did he at any time not agree with you?

6  A.    I think we had a series of discussions regarding

7  the timing of that move; but, you know, ultimately the

8  decision was to wind down the business.

9  Q.    Okay.  As far as the timing goes in 2001, was

10 there something about that time frame, that year, or the

11 industry that made your decision -- that drove your

12 decision to go to video as opposed to audio?

13 A.    I don't know that there was one single event or

14 item or issue that drove that thinking.

15 Q.    Did you do any sort of research in the market

16 about that that assisted you in making the decision?

17 A.    I don't recall any formal research.  I mean, I

18 suppose that it was our gut feel that, yeah, the market

19 for video products was evolving and had opportunity.

20 Q.    What made you think that the market for video was

21 evolving and had opportunity?

22 A.    Well, we could see sales numbers for devices like

23 video recorders.  We could see initiatives from the cable

24 television industry regarding video on demand, and we

25 could see a seriously challenged and struggling business

1  related to SongCatcher that made those choices quite

2  easy.

3  Q.    Okay.  Do you have any general idea about how much

4  money Gotuit Media, Inc., invested in the SongCatcher

5  project?

6  A.    I could -- I could hazard a guess, which is

7  approximately $2 million.

8                (Video presentation concluded.)

9                THE COURT:  That's it?

10               MR. SCHUTZ:  Yes, your Honor.

11               THE COURT:  All right.  Ladies and gentlemen,

12  you'll notice that there were breaks and jumps there.

13  One of the reasons for that is out of a

14  four-to-seven-hour deposition, I've told the lawyers,

15  "Cut it down."  And you can imagine why.

16               And, also, if they make objections, I go ahead

17  and deal with those and then tell them to cut them out of

18  the video so you don't have to waste your time with it.

19  We're not trying to hide things from you.  It does

20  sometimes make it jumpy, but we want you to have the

21  questions and the answers and not all of the comments

22  about "I'm hungry" or "It's lunch" or "I've got an

23  objection" or his family or anything else.  We're just

24  getting to the basics.  That's not the lawyers trying to

25  hide things.  That's my instructions to move this thing

1  along.

2          Where is the next witness?

3          MS. HUANG:  Your Honor, Personal Audio calls

4  Mr. James Nawrocki.

5          (The oath is administered.)

6          MS. HUANG:  Your Honor, permission to make a

7  brief interim statement.

8          THE COURT:  You may.

9          MS. HUANG:  Good morning, ladies and

10 gentlemen.  My name is Annie Huang.  The last witness

11 Personal Audio will be calling in its case-in-chief is

12 Mr. James Nawrocki.  Mr. Nawrocki is a certified public

13 accountant -- that's a "CPA" for short -- and a financial

14 consultant from Houston.  He will be testifying about his

15 opinion in this case and his calculation of damages.  You

16 will hear him testify that he has to assume that Personal

17 Audio's claims are correct, that the patents are valid,

18 enforceable, and infringed.  You will also hear him talk

19 about a case called "*Georgia-Pacific*."  *Georgia-Pacific*

20 is a case commonly used for determining damages in cases

21 like this.  He will walk you through his analysis

22 step-by-step.  In the end he will provide you with a

23 range of per-unit royalty amounts per iPod product sold

24 that he believes would compensate Personal Audio for the

25 use of the patented technology by Apple.

1    I want to thank you in advance for your

2  attention to Mr. Nawrocki's testimony.

3          DIRECT EXAMINATION OF JAMES NAWROCKI

4          CALLED ON BEHALF OF THE PLAINTIFF

5  BY MS. HUANG:

6  Q.    Mr. Nawrocki, please state your full name.

7  A.    James J. Nawrocki.

8  Q.    And what is your occupation?

9  A.    I'm a CPA, a certified public accountant; and I

10 also provide financial analyst type services, a financial

11 consultant.

12 Q.    Do you have a resumé?

13 A.    Yes, I do.

14          MS. HUANG:  Your Honor, there is --

15 Exhibit 408 has been provided to counsel without

16 objection.  Permission to publish Mr. Nawrocki's resumé?

17 It's Plaintiff's Exhibit 408.

18          THE COURT:  All right.

19 BY MS. HUANG:

20 Q.    Is this your resumé, Mr. Nawrocki?

21 A.    Yes, it is.

22 Q.    At the very top it says -- you mentioned that you

23 were a CPA.  Where are you licensed?

24 A.    I'm licensed in the state of Texas as well as the

25 state of Illinois.

1  Q.     And what company do you currently work for?

2  A.     I work for a company -- if you go a little bit

3  higher in the document, you'll see the logo for my

4  company.

5            Just move up a little bit.  There you go.

6            The name of my company is IPFC.  "IPFC" stands

7  for "Intellectual Property and Financial Consulting."

8  Intellectual property includes things like patents,

9  trademarks, copyrights, things such as that.  And we

10 provide financial consulting services relating to

11 intellectual property as well as other types of assets

12 that people are involved in.

13 Q.     Where is your company IPFC located?

14 A.     We're located in Houston.

15 Q.     And how long have you been in the financial

16 consulting profession?

17 A.     Really most of my career.  I started -- I

18 graduated from St. Mary's University in San Antonio and

19 began working in 1979.  Spent time with a variety of

20 consulting accounting firms but really was doing

21 financial consulting work most of my career.

22            I've worked in a variety of different

23 industries but I've done audit work, tax work; but a

24 majority of the work has been financial consulting in

25 nature, which is working with companies not specifically

1  on an audit but really more consulting with them on their

2  financial operations.

3  Q.    And in your resumé do you list the various

4  industries you've worked in?

5  A.    Yes.  If you look at the bottom portion there,

6  you'll see a variety of industries.  It's a pretty good

7  load; but I guess in the last 30 years or so there's a

8  lot of industries, everything from airline and aircraft

9  to chemicals, semiconductors, telecommunications.  I

10  began my career in more what I call the "Rust Belt-type

11  industries," working for companies like GM, International

12  Harvester you might remember was a big harvesting

13  manufacturing company, and that's evolved over a period

14  of time.

15        Things like patents certainly exist in those

16  industries; but now it's in industries that are more

17  electronic-related, semiconductors, Internet, multimedia.

18  So, I've worked with a variety of companies in those

19  areas.

20  Q.    As part of your professional work, do you ever

21  give speeches or presentations?

22  A.    Yes, I do.  I've been asked to speak at different

23  legal groups as well as universities.  I've spoken at the

24  University of Houston involving intellectual property

25  valuation.  You'll see at the top there "Financial

1  Valuations of Intellectual Property" is the first item.

2  That was for the University of Houston LLM program.

3          I've also been a lecturer at The University of

4  Texas, their law school, involving patent damages, as

5  well and several other type of presentations that I've

6  done, generally related to financial analysis as it

7  relates to intellectual property matters.

8          THE COURT:  All right, sir.  Would you pull

9  the microphone a little closer to you, please?

10          THE WITNESS:  Sure.

11  BY MS. HUANG:

12  Q.    As a part of your profession, do you also serve on

13  any boards or associations?

14  A.    Yes.  I'm also involved in the Licensing

15  Executives Society and a member of several different CPA

16  organizations, for example, the America Institute of

17  CPAs, the Illinois CPA Society, the Texas CPA Society.

18          I was also on the board for -- the University

19  of Houston had a board called "Intellectual Property

20  Advisory Board," and for several years I was on that

21  board.

22          And then I've been actively involved in

23  different seminars done either by the University of

24  Houston or Licensing Executives Society.

25  Q.    Tell us a little bit more about your involvement

1 with the Licensing Executives Society.

2 A.    Well, I joined the Licensing Executives Society in

3 the early Eighties.  I had started doing some financial

4 consulting work in the intellectual property area more

5 than 25 years ago, and one of the members -- it was a

6 small organization at the time.  It was a few hundred

7 people and they asked me to join and, so, I joined the

8 organization.

9        Now it's several thousand people worldwide.

10 Memberships in many different countries.  We have

11 workshops and seminars that are offered throughout the

12 course of the year.  There's a big annual meeting, and

13 I've been a lecturer at that meeting.  I've also put

14 together seminars and been the program director for

15 certain of the meetings that they have.  And these

16 meetings are attended by -- the smaller meetings have a

17 couple hundred people that are involved in licensing or

18 valuation.  Some of the larger meetings have hundreds of

19 people that attend these meetings.

20 Q.    Have you served as a damages expert on behalf of

21 both plaintiffs and defendants?

22 A.    Yes, I have.  As part of the work in intellectual

23 property relating to patent matters, I've worked for

24 people that own patents as well as people that aren't --

25 do not own patents and are being accused of infringement.

1  So, I've seen the analysis from both sides.

2  Q.    Can you give us a few short examples of cases

3  you've worked on?

4  A.    Yes.  I've worked really across the country in

5  different matters.  I've worked for large companies such

6  as Texas Instruments.  I've worked for HP.  Some of the

7  large chemical companies, Exxon Chemical, people like

8  that.

9          I've also worked for various Internet

10  companies.  I was involved in a case involving *Yahoo!*

11  that you're probably familiar with and *Google*.  They had

12  a dispute involving patents.

13          I've also worked in the multimedia area for

14  companies like DirecTV.  I worked on video games

15  involving Xbox products.

16          So, a fairly dispersed group of industries, if

17  you will; but it's, again, evolved.  I've worked for

18  medical product companies.  But in the last ten years, a

19  lot of it's been the electronics and Internet-type area

20  or software areas.

21  Q.    Mr. Nawrocki, what have you been asked to do in

22  this case?

23  A.    What I've been asked to do is review the

24  information produced by the parties and render my opinion

25  in terms of what the damages are as a result of the

1  alleged infringement by Apple in this case.

2  Q.    And have you reached a conclusion?

3  A.    Yes, I have.

4  Q.    And what is your conclusion?

5  A.    My conclusion is that based upon the patents in

6  this case being valid, enforceable, and infringed, that

7  the damages in this case would be approximately

8  $84 million.

9  Q.    And did you have charts prepared to summarize your

10 opinion as to the amount of damages Personal Audio should

11 receive in this case?

12 A.    Yes.  There's been a series of charts that we've

13 had prepared that summarize my analysis.

14          MS. HUANG:  Your Honor, permission to publish

15 Demonstratives PX 1073.  They've been shown to --

16          THE COURT:  Go ahead, counsel.

17 BY MS. HUANG:

18 Q.    What is this chart, PX 1073, Mr. Nawrocki?

19 A.    So, this is a summary of Personal Audio's damages

20 as a result of the infringement of the '076 and the

21 '178 patents that have been discussed.  And what this

22 shows, it shows a calculation of the damages using a

23 royalty base, which we'll talk about.  The amount there

24 is 93,795,429.  That's the amount of units, the accused

25 units.  That represents the units of all of these iPod

1  devices that Dr. Almeroth was talking about.

2          So, 93 million units times the royalty rate

3  that I've determined of 90 cents per unit, to arrive at a

4  total royalty damages of 84,415,886.

5  Q.    Mr. Nawrocki, did you also prepare a chart that

6  separates out the amount of units per -- for the

7  different products that are at issue in this case?

8  A.    Yes, I did.  So, this is an overall summary.  I've

9  also got a chart that breaks it down by model so you can

10 take a look at the various models, the nano and classic

11 and mini as well.

12          MS. HUANG:  Your Honor, may I enter the well

13 to show another demonstrative?

14          THE COURT:  You may.

15          MS. HUANG:  Thank you.

16 BY MS. HUANG:

17 Q.    Is this the chart, Mr. Nawrocki?

18 A.    Yes, it is.

19 Q.    Mr. Nawrocki, I've just shown you Demonstrative

20 PX 1073-34.  And what does that demonstrative show?

21 A.    That's the chart that shows the damages calculated

22 by product class.  By "product class" that I'm referring

23 to are the different devices.

24          So, the iPod classic is the first item; and

25 you see a copy I think Dr. Almeroth was referring to as

1  an example.  DX 100 is an example.  So, that represents

2  all of the different generations for the iPod classic

3  that are accused of infringement.  There's 30 million --

4  more than 30 million units for the iPod classic.

5            It also includes the iPod mini --

6            THE COURT:  Wait a minute.  Are we looking at

7  the same exhibit?  You're talking about the chart.

8            MS. HUANG:  The chart.

9            THE COURT:  All right.  Go ahead.

10  A.    This shows -- the chart shows the iPod mini of

11  more than 6.2 million units and then the iPod nano, which

12  is this much smaller device (indicating).  There was more

13  than 57 million -- specifically 57,491,837 -- of that

14  device.

15            So, the total on that blowup chart down in the

16  well is 93,795,429; and that's the same as shows on the

17  overhead screen there.  So, I've just simply broken it

18  down by unit.

19  BY MS. HUANG:

20  Q.    Before we go into more detail as to how you

21  arrived at your royalty rate, did you review any

22  information in coming to determine what your conclusions

23  would be in this case?

24  A.    Yes, I did.  I reviewed a variety of information

25  that was produced by the parties in this case.  Apple

1  produced a variety of electronic data that included sales

2  information.  I reviewed various license agreements that

3  were produced, marketing documents that identified the

4  different features, market requirement documents, in

5  other words, what the people were looking for when they

6  introduced this device, several PowerPoint presentations

7  that you've seen thus far that talk about the different

8  components of the device, as well as information from

9  Personal Audio and Logan Family Trust.  I've seen that

10 side as well.

11       And then we also looked at a variety of

12 information available from the Internet.  There was

13 certain information we obtained from the Internet as

14 well, and I reviewed that as well.

15 Q.    Did you review any surveys in this case?

16 A.    Yes.  There's a couple -- well, several surveys.

17 Apple had a whole variety of surveys they had done

18 internally, which we'll talk about the different usages

19 of the products, the different features that people used

20 from the product that you'll see.

21       And then there was also a survey that was

22 done -- commissioned on Personal Audio's behalf by a

23 professor at The University of Texas.  His name was

24 Dr. Peterson, and he did a survey as well.  So, I

25 reviewed that survey as well.

 1  Q.    And do you own any iPods yourself, Mr. Nawrocki?

 2  A.    You know, between myself and my kids that I've

 3  purchased for, various graduation gifts, I would have to

 4  say there's probably about ten.  But myself, I probably

 5  have -- I have this nano-type device which is Defendant's

 6  Exhibit 108.  My son, I know, has a classic device.  They

 7  make a whole variety of different devices.  I think

 8  there's a mini device that we have as well.  My wife has

 9  a shuffle product.  So, there's a variety of products

10  that we own that are iPods.

11        They're oftentimes a good graduation gift, but

12  I start using them myself as well.

13  Q.    Okay.  I want to talk a little bit about just

14  general damages and want to find out whether or not you

15  follow any legal authority to help guide your analysis.

16  What's this next chart, PX 1073-002?

17  A.    So, this is a section of the U.S. Code and it

18  provides the overall guidance for the analysis that I

19  conducted and it talks about this section, "Upon finding

20  for the claimant, the court shall award the claimant

21  damages adequate to compensate for the infringement but

22  in no event less than a reasonable royalty" -- so,

23  reasonable royalty represents the floor -- "for the use

24  made of the invention by the infringer."

25  Q.    So, let's talk about the parts that you've

1 highlighted in red.  What is a royalty?

2 A.    Well, a reasonable royalty is a payment for use of

3 a piece of property.  That could be a patent, payment for

4 a patent, or payment for a song or payment for a movie.

5 It's a royalty for this type of property.

6         What this chart shows here is an example of

7 that.  It's similar to a rent payment; so, if you have

8 real property -- that would be like a house or land or

9 something like that -- there would be a relationship

10 between a landlord who owns the property and a tenant.

11 The tenant wouldn't own the property.  He would just be

12 using the property; so, he's paying something for that

13 use.  They would enter into a lease agreement ideally,

14 and then they would pay a rent per month.

15         Well, it's a similar context for intellectual

16 property.  You own a patent; and if somebody wants to use

17 that patent, they would have to pay you a rent for that

18 or a royalty.  They don't own it.  They're just going to

19 pay a rent for it.  And, so, the relationship there is

20 called the "licensor," who is the owner, and a

21 "licensee."  They would enter into a license agreement,

22 and then they would pay a royalty.  That royalty could be

23 on a per-unit basis, could be on a per-month basis

24 similar to rent payments.  It could be a percentage of

25 sales.  Another way to do it is a lump sum where

1  everything is paid up-front.  And there's also

2  combinations of those, up-front with running.  There's a

3  whole series of combinations.

4          But this is an example of how intellectual

5  property -- there's payment for use of it, but you don't

6  own it.  You're just paying to use it.

7  Q.    Are there other examples of royalties?

8  A.    Yeah.  I think lump sums, running royalties, a

9  combination of up-fronts with running.  Commensurate with

10 use is oftentimes -- in other words, what ties with use

11 is a concept that's oftentimes used; and that could be

12 called a "running royalty rate" or a "per-unit" type of

13 royalty.

14 Q.    Using this example you have on Demonstrative

15 1073-3, what would a lump-sum royalty be?

16 A.    Right.  So, how a lump sum would work is -- let's

17 give a couple examples.  Let's say we first start with a

18 per-month rent example.  I'll use it in a rent context.

19 And, so, if you're paying $500 a month rent, that would

20 be what the royalty is, $500 a month.

21          And up-front would be, well, instead of paying

22 per month, you'd take 12 months, if you had a 1-year

23 lease, and you would pay $6,000 up-front.  So, that would

24 be an up-front lump-sum payment.  You'd pay it all at

25 once.

1    Or if you had a 5-year amount, you might pay

2  $30,000 for the next 5 years.  Well, most people don't do

3  that.  Most people will pay it on a monthly basis as an

4  example.  But lump sums you'll see are sometimes used in

5  industry and sometimes they're not.  But as part of a

6  lump sum, you want to be able to anticipate what that

7  usage is to determine what amount are you talking about,

8  what's that extent of use, so you would know what amount

9  you'd want to pay for that up-front payment or that

10  lump-sum amount.

11  Q.    And what is your opinion as to the appropriate

12  type of royalty in this case?

13  A.    My opinion is that the royalty should be based

14  upon a running royalty rate, or commensurate with use,

15  taking a look at what the extent of use of Apple's sales

16  were, these products that are at issue, and have a

17  royalty based upon that extent of use.

18  Q.    Let's talk about what the components of a running

19  royalty are.  What is this next chart, PX 1073-4?

20  A.    This is similar to the other chart.  This kind of

21  gives you an overview of how the calculation works.  In

22  that first blue box, you have a royalty base.  That's the

23  amount of units or the amount of sales that might be at

24  issue.  Here what I've used is the amount of units that

25  you saw in the blowup chart that's in the well there.

1400

1  You can either use number of units.  You could use the

2  accused revenue and calculate a percentage on that.  How

3  that would work is let's say there is a thousand dollars

4  of sales and you want to apply a 1 percent royalty rate

5  to that.  That would equal $10, would be the percentage.

6  On a per-unit basis, if there is a thousand units times

7  $1, that would be a thousand dollars basically.  So,

8  per-unit, percentage of sales, those are a couple

9  different ways you can calculate the running royalty as

10  I've done here.

11 Q.     And what have you chosen to use in this case?

12 A.     So, what I've used is the top one, the accused

13 units times the dollar amount per unit.  The 90 cents is

14 the per-unit royalty, and the accused units is the

15 93 million units that I've identified.

16 Q.     Let's talk about the royalty base first.  What

17 made up your royalty base?

18            Let's take a look at this chart.  What is this

19 chart, PX 1073-5?

20 A.     So, what this chart shows is the extent of use,

21 also called the "royalty base," for the accused units

22 sold by Apple.  What I've done on this chart, you've got

23 the years on the left side and it starts in June of 2003

24 and goes through June, 2010, the most recent period for

25 which Apple provided information.

1       And I've broken it along the top between the

2  different models again, the iPod classic, the mini, and

3  the nano; and then the total is on the right side.

4       So, what you'll see is for all the different

5  years, what the amount of iPod classic sales are,

6  totalling more than 30 million units; for the mini, again

7  6.2 million; and then for the iPod nano, more than

8  57 million units.  So, this represents the extent of use.

9       One thing I noticed is that the accused

10  products were sold throughout this period of time, all

11  the way through 2010, again the most recent period we had

12  information for.  But certain of the technologies that I

13  think have been talked about, things like FireWire and

14  things like that, as I understand, have been removed from

15  some of the products.  However, these products, based

16  upon the testimony of Dr. Almeroth, have been accused of

17  infringement throughout the various generations of all

18  these iPod products.

19       This includes the sales of all of these

20  products here in the U.S.

21  Q.    I see there are a few figures up there with

22  parentheses around them.  What does that mean?

23  A.    That's kind of an accounting sort of -- just a

24  function of showing negative numbers with parentheses.  I

25  could have put a minus there, but in accounting we use

1  brackets to show negative numbers.  So, those relatively

2  small units are units that have been returned or other

3  adjustments have been made through Apple's own sales

4  records.

5  Q.    Where did you get the figures on PX 1073?

6  A.    Well, this came from some of the electronic data

7  that Apple produced.  They produced their sales by unit

8  and then all of the way down to a specific model basis.

9  There was a lot of different generations of models that

10 Dr. Almeroth had talked about, and we won't be getting

11 into that granular level of detail a lot.  But I had that

12 information and walked through that and then summarized

13 it in this fashion.

14 Q.    Let's take a look at where you got some of these

15 figures from.  Do you have your binder in front of you?

16 A.    Yes, I do.

17 Q.    Let's take a look at Exhibit 710B.

18 A.    Okay.  I have that.

19 Q.    What is this document?

20 A.    This is an Apple document which shows the detail

21 unit sales of the audio player devices, the various iPod

22 mini and nano products that are at issue in this case.

23        And if you blow it up, maybe what makes sense,

24 if you can go to, I think, the -- I think the second page

25 makes sense.

1        The next page, if you could pull that one up

2   and maybe go to the middle of the box to the left side

3   there.  Just show maybe the first year.

4        Yeah, that would be good.  And then go over

5   just one year.  There you go.  Just so you can see it on

6   the board here.

7        What that shows, on the left side you'll see

8   iPod nano; and it shows up a whole variety of line items.

9        The next column over shows the different

10  specific models or generations.  The M26 is an example.

11  It shows for September, '05.  And then for the first

12  quarter there -- and that would represent the first

13  quarter of '06.  It shows unit sales of 3.9 million

14  units.  That's 3.9 million units just in one quarter.

15       And then the next quarter would be

16  2.1 million, 2.3, 1.4 million for that year 2006, fiscal

17  year 2006.

18       So, those are millions of units every quarter.

19  So, a quarter is three months.  So, every three months

20  they're selling millions of units of these devices; and

21  that's just for the nano device.  And that same thing

22  exists for these other products as well.  So, again,

23  millions of units of sales you'll see.

24  Q.   And next to the line items, there is a description

25  of each product that says "iPod nano" and then an "M26."

1404

1  Do you see that?

2  A.     Yes.  The M26 and 36 is an example.  Those are

3  different model numbers that Apple uses.

4  Q.     Can you turn to Exhibit 640B in your binder?

5  A.     Okay.  I have that.

6  Q.     How are you able to tell what a product called

7  "M25" relates to?

8  A.     Which product did you specifically ask about?  I'm

9  sorry.

10  Q.     M25 -- well, first, what's Exhibit 640B?

11  A.     640B is an interrogatory answer.  I believe they

12  were discussed.  These are answers that Apple submitted

13  as part of this case.  They're legal submissions by the

14  parties.  And it's a response from Apple identifying what

15  the different models are and what their names are and

16  then which generations they have.

17  Q.     So, if you could turn to page 8 of 640B.

18  A.     Yes.  I have that.

19  Q.     What's on this page?

20  A.     So, what this shows, if you blow up that bottom

21  portion of the page, it shows the model on the left.

22  That's the iPod mini as an example, the iPod nano.

23  That's the first column.

24         The next column shows the different

25  generations.  Generation 1 is an example for the first

1  line item, and then Generation 2 is the next line item.

2  So, that represents the different generations that

3  Dr. Almeroth was talking about.

4          And then the code name are the different names

5  that are showing up in these sales documents.  So, if you

6  look at the very bottom of that code name column, you'll

7  see N46, N36.  Those are some of the items that we saw on

8  that computer sheet.

9          And then they have different model numbers

10  that are given to the right side as well.  And this type

11  of information is used to identify which products they

12  relate to, are they a nano product, are they a mini; and,

13  if so, which generation are they.

14  Q.     Just so the record is clear, I just want to make

15  sure that the exhibit we're looking at is Plaintiff's

16  Exhibit 640B; is that correct?

17  A.     640B, that's what I have, yes.

18  Q.     And the previous exhibit we were looking at is

19  Plaintiff's Exhibit 710B?

20  A.     That's correct.

21  Q.     Okay.  I turn your attention to Plaintiff's

22  Exhibit 789.

23  A.     Okay.  I have that.

24  Q.     What is Plaintiff's Exhibit 789?

25  A.     Exhibit 789, Plaintiff's Exhibit 789, is a summary

1 that my firm prepared which summarizes all that detailed

2 spreadsheet information.  If you blow up again maybe

3 the -- instead of the -- maybe you can blow up the right

4 side of the page -- or you know what?  I'm sorry.  Maybe

5 go to the next page.  Might be easier on the next page.

6 Just let me describe it.  So, blow up maybe the top

7 left-hand corner there, all of the way including there.

8 There you go.

9         This is a summary that my firm prepared

10 summarizing the computer information, and you have the

11 different quarterly information shown you.  This section

12 is referring to the iPod classic; so, you see there is a

13 whole series of different model numbers that show up

14 there.

15         And then again the next column is the

16 generations relating to those products, taken right from

17 the interrogatory answers.

18         And then the various unit sales, shown in

19 quarter, are shown there as well.

20         If you go over just a little bit to the right,

21 you'll see the total for the year, as an example for

22 2004.  So, I've also put in totals here by year; and

23 that's similar to the other totals on the year that we

24 had on the other schedule that we had talked about.

25 Q.    So, is the information on Plaintiff's Exhibit 789

1 a summary of the information you just saw in Plaintiff's

2 Exhibit 710B?

3 A.     That's correct.  Plaintiff's Exhibit 789 is a

4 summary that I prepared.  It has the generation numbers

5 on it, and that's a summary of Plaintiff's Exhibit 710,

6 which came from Apple.

7 Q.     And did you --

8              THE COURT:  Hold on.

9              MS. HUNSAKER:  Your Honor, consistent with the

10 agreement that we have with counsel to seal confidential

11 documents, there will be a number of highly confidential

12 Apple financial documents; and we'll work with Personal

13 Audio to agree which of those will be sealed.

14             THE COURT:  Right.  And I had previously

15 ordered they would be sealed.

16             And, ladies and gentlemen, as you can imagine,

17 a lot of these financial documents on both sides, while

18 they'll have to be shown to you in a trial, I'm going to

19 seal them as far as everything else other than use for

20 in-court purposes.  That's all that's about, but you will

21 get to see them and have copies back there.

22             Go ahead, counsel.

23 BY MS. HUANG:

24 Q.     Mr. Nawrocki, you were going to talk about where

25 you got the generation of products?

1  A.     Yes.  So, the generation column again came from

2  that interrogatory answer that we referred to earlier.

3  Q.     And that was Plaintiff's Exhibit 640B?

4  A.     That's correct.

5         MS. HUANG:  Your Honor, I move for the

6  admission of Plaintiff's Exhibit 789, 640B and 710B.

7         THE COURT:  Are they on the admissible list?

8         MS. HUNSAKER:  They were exchanged last night,

9  and we have no objection to --

10        THE COURT:  Okay.  Then those are admitted.

11  That would be Plaintiff's Exhibit 789, 640B and 710B.

12        MS. HUANG:  Thank you, your Honor.

13  BY MS. HUANG:

14  Q.     So, let's go back to your chart Plaintiff's

15  Exhibit 1073-0005.  Just to summarize, Mr. Nawrocki, so

16  the figures you have on this chart were obtained from the

17  documents we just discussed, Plaintiff's Exhibit 789; is

18  that correct?

19  A.     That's correct.  And they show the information by

20  year.  So, what I did is I took the yearly information

21  from Plaintiff's Exhibit 789 and showed the yearly

22  information here as opposed to showing it all by the

23  specific detailed models and generations.  This shows a

24  summary of that information, and this is what we'll be

25  using for the majority of my discussion here.

1409

1  Q.    You titled this chart "Extent of Use."  Why is

2  this called "extent of use"?

3  A.    Well, previously we had talked about the code

4  which mentioned use made of the invention.  This talks

5  about the use made of the invention in terms of number of

6  players that are at issue.  These are all the various

7  players that are accused of infringement, and that's what

8  this shows.  So, this extent of use is significant and

9  again not only in total numbers of units but also the

10  fact that this technology, if it's found to be used by

11  Apple, has been used for the years throughout this

12  period, all of the way from '03 through, again, 2010, the

13  most recent period we had information from Apple.

14        MS. HUANG:  Your Honor, at this time I'd like

15  to offer Plaintiff's Demonstrative Exhibit 1073-5 as a

16  1006 summary.

17        MS. HUNSAKER:  Your Honor, I believe this is

18  properly a demonstrative.  I don't believe it's properly

19  a 1006 summary.

20        THE COURT:  Overruled.

21        MS. HUANG:  Thank you, your Honor.

22  BY MS. HUANG:

23  Q.    Now that we've talked about the royalty base,

24  Mr. Nawrocki, I want to focus on the royalty rate.

25  A.    Okay.

1    THE COURT:  And just for the record, then,

2  that will be Plaintiff's Exhibit 1073 --

3    MS. HUANG:  Dash 0005.

4    THE COURT:  -- dash 0005 is admitted.

5  BY MS. HUANG:

6  Q.    Are there any guidelines that you followed --

7  legal guidelines you followed in terms of how to

8  determine a royalty rate?

9  A.    Yes.  In order to determine a reasonable

10  royalty -- we talked about the reference to the overall

11  code guidelines; but there is also a case called

12  "*Georgia-Pacific*" which identified 15 factors that are

13  considered as part of a royalty analysis.

14    What you have on the board here on the

15  overhead shows that case.  It's *Georgia-Pacific versus*

16  *U.S. Plywood*, and it's a case that has been used in

17  damages for many years.  This case is actually fairly

18  old.  It's all of the way back from the Seventies, and it

19  dealt with plywood and serrated plywood.  But it's been

20  used by damage experts.  It's been used in the valuation

21  area.  It's been used by many courts to talk about the

22  types of factors that should be considered as part of a

23  damage analysis in terms of what a royalty would be.  So,

24  I used this as part of the factors that I've considered

25  in this case.

1411

1  Q.     Do you have a way of categorizing these factors?

2  A.     Yes.   There's 15 factors there; and as a way of

3  summarizing those factors in our discussion, what I've

4  prepared is a chart that summarizes them in several

5  different buckets, if you will.  And I believe there is a

6  chart that summarizes those.

7           MS. HUANG:  And just so the record is clear,

8  the chart with the *Georgia-Pacific* factors was

9  PX 1073-006.

10 BY MS. HUANG:

11 Q.     So, what is this chart, PX 1073-007?

12 A.     So, this is an overview of the buckets that we'll

13 be using for our discussion.  Several of the factors

14 relate to technical issues.  So, you've heard some stuff

15 from -- some testimony from Dr. Almeroth on some

16 technical issues.  There's also licensing factors, what

17 sort of information exists on licensing; financial

18 factors, a variety of information on profitability and

19 things like that, the commercial success of the product.

20 And then they all inform -- those type of factors all

21 inform a decision on a hypothetical negotiation.  So,

22 that's why the arrow is kind of showing it down towards a

23 hypothetical negotiation.

24           What that represents is what the parties would

25 have agreed to in a negotiation.  If they weren't here

1  litigating this and they would have gone back in time and

2  had negotiation, what would they have agreed to at the

3  time.  So, those are all *Georgia-Pacific* factors; and

4  this is a summary that we'll be using to go through the

5  various information that I've seen as part of my analysis

6  here.

7  Q.    Let's talk about the hypothetical negotiation a

8  little more.  You mentioned a little bit more about it,

9  but what time period are you looking at for the

10 hypothetical negotiation?

11 A.    So, for the hypothetical negotiation, we go back

12 to the date of first infringement -- and in this case it

13 would be October, 2001; that's when Apple introduced one

14 of the first classic products -- and what would be agreed

15 upon at that point in time.

16         We have a variety of information that's

17 happened after that period of time and, so, that, to some

18 extent, can inform the decision; but we ideally go back

19 in time to what the parties would have agreed to at that

20 point.

21         If you go on the slideware, it builds on

22 itself.  The parties that were there would be the Logan

23 Family Trust.  They would be the licensor.  They were who

24 owned the patents at the time on one side.

25         On the other side it would be Apple.  So,

1413

1  those would be the parties that would be ideally trying

2  to work out an agreement.

3         The next portion of the slideware, if you go,

4  there is an assumption in this negotiation now.  It's

5  that both parties need to assume that the patents are

6  valid, they're enforceable, and they're infringed or that

7  Apple will be using that technology.  So, we go back in

8  time before they introduced the product; and there is

9  this assumption of validity and use of the technology or

10  infringement by Apple.

11        And, so, that differs from a real-world

12  negotiation.  In the real world people sometimes question

13  validity.  They might question, "Well, I don't think I'm

14  infringing"; and they can kind of walk away from a

15  negotiation, say, "I don't want to use your stuff."

16        But in a hypothetical negotiation in a damages

17  context, the parties can't walk away.  They have to work

18  out an agreement.  And what our mission here is to find

19  out what they would agree to, what's fair and

20  reasonable --

21        MS. HUNSAKER:  Objection, your Honor.  It's

22  misstating the law.

23        THE COURT:  In what way?  What precise -- he

24  said quite a bit there so...

25        MS. HUNSAKER:  Regarding the effect of the

1    presumption of infringement invalidity, the law doesn't

2    say that it means that a party can't walk away.

3            THE COURT:  Okay.  You might want to clarify

4    that, counsel, because they could choose just not to use

5    the technology or product at all.

6            Is that your point?

7            MS. HUNSAKER:  Yes, your Honor.

8            THE COURT:  Okay.

9            MS. HUANG:  Thank you, your Honor.

10   BY MS. HUANG:

11   Q.    So, Mr. Nawrocki, can a party choose not to use

12   the technology in a hypothetical negotiation?

13   A.    Well, in a negotiation you have an assumption that

14   that technology they have would be using the patented

15   technology.  From a damages context we assume that

16   infringement and validity have been shown, however.

17   Q.    So, in a hypothetical negotiation there is the

18   assumption -- if the two parties are at the table, there

19   is an assumption that the party is using the technology?

20   A.    Right.  If they're not infringing, then we

21   wouldn't be calculating damages as an example.  So, you

22   have to go through an assumption of validity and

23   infringement and then under that construct what would

24   make sense for payment for that use.

25   Q.    Let's now talk about the different *Georgia-Pacific*

1  factors.  You mentioned you have these three different

2  categories, and let's start with the technical factors.

3  What are your considerations under the technical factors?

4  What is your understanding of the technology?

5  A.    The technology at issue here has been talked about

6  at length by Dr. Almeroth.  Again, it relates to an audio

7  player device such as the classics, the minis, and the

8  nanos that are at issue here.  I'll use the nano, which

9  is Defendant's Exhibit 108, as an example.

10         It's a audio player device that can receive or

11 download playlists from outside the iPod.  So, there's a

12 lot of discussion about playlists being created or

13 generated on a computer and then downloaded to the iPod

14 device.  What the issue is in this case is the player

15 device basically.  There's been a lot of discussion about

16 playlists and sequential files.  Well, I'm not the

17 technical expert.  I would defer to Dr. Almeroth and

18 Dr. Wicker on those issues.  But the device, again, is

19 the player device; and it has certain capabilities.

20 Those are the capabilities that have been discussed at

21 length.

22 Q.    And what are some of the benefits or advantages of

23 the technology?

24 A.    Well, as was discussed, prior-type technology that

25 people were used to were things like the Sony Walkman

1  where you had CDs -- you could certainly take music with

2  you, but they were fairly big.  You might have a disk

3  with you.  There were certain devices that I've heard

4  talked about, such as jukeboxes; and those were somewhat

5  bulky as well.

6          So, several things about this is that these

7  were smaller devices; but as it relates to the

8  technology, it allows people to navigate through -- have

9  playlists with them, navigate through those playlists,

10  and be able to access the music.

11          If you put a thousand songs -- or some people

12  put thousands of songs on this -- the playlist provided

13  means for users to go ahead and put a collection -- a

14  sub-collection of those items together, download that

15  information to your iPod, and then have those playlists.

16          On mine I don't have one playlist; I have

17  several playlists.  So, I might have one that's either

18  ease of listening -- candidly one my wife likes versus

19  one that I like.  She shares iPods with me, and sometimes

20  I lose my iPod to my wife.  So, there are some playlists

21  for her; there are some playlists for me, as an example.

22          So, those are the types of things that are

23  part of the technology as well as again being able to

24  navigate through, to skip forward if you don't like the

25  song, go ahead.  My wife uses it quite a bit for working

1  out.  I tend to use it more on the airplane when I'm

2  traveling.  So, there's different sort of music that you

3  might like.

4  Q.     Earlier you mentioned you looked at some documents

5  in this case.  So, let's walk through some of those

6  documents.  Can you take a look at Plaintiff's

7  Exhibit 377?  It's a previously-admitted exhibit.

8  A.     Let me see if I can find that here.

9            Okay.  Yes, I have that.

10 Q.     What is this document?

11 A.     So, this is a document that shows a press release

12 from Apple when they introduced the iPod.  It's called

13 "Apple Presents iPod."  So, this goes back in time,

14 October, 2001, and starts at October -- October 23rd.

15 Starts out saying (reading) Apple today introduced the

16 iPod, a breakthrough MP3 music player that packs up to

17 1,000 songs into an ultra portable device.

18            It talks about several aspects of it.  It

19 mentions the fact that -- if you go down a few lines, it

20 says (reading) which automatically downloads -- the last

21 part of that paragraph -- (reading) which automatically

22 downloads all of your *iTunes* songs and playlists into

23 your iPod.

24            So, one of the things they're promoting is

25 that you have all of this music that you can store on

1418

1  this device -- that's one thing that needs to be

2  considered -- and then you can download the songs as well

3  as the playlists into your iPod and keep them

4  up-to-date -- if you go to the rest of that paragraph --

5  it keeps them up-to-date whenever you plug your iPod into

6  your Mac.

7            So, what I understand from the testimony is

8  that you can download the playlist but then whenever you

9  sync it back to your computer, it also updates the music

10  and any other playlists that you have as well.  So, that

11  downloading process, as I understand, is one of the

12  things that have been discussed thus far.

13  Q.    And further down in the document, is there more

14  discussion about playlists?

15  A.    Yes.  It talks about the Auto-Sync, as an example,

16  in the second-to-last portion.  And they mention several

17  things.  They talk -- near the bottom end of it, it

18  says -- if you'd go to maybe the third line from the

19  bottom -- "whenever you plug your iPod back into your

20  Mac" -- they were using a Mac as an example here; but

21  since it's been introduced, it's used in PCs as well --

22  (reading) it will be automatically updated with your

23  latest songs and playlists, usually in seconds.  There

24  has never been a faster and easier way to have your

25  up-to-the-minute music and playlists with you wherever

1  you go.

2          So, talking about the music capabilities,

3  download capabilities, the quick transfer as well as

4  playlists.  Those are all things that I considered as

5  part of my analysis.

6  Q.    Was there also information about the price of the

7  original iPod?

8  A.    Yes.  If you go just down below there, it talks

9  about the fact that -- here they were talking about being

10  introduced right before the Christmas shopping season,

11  Saturday, November 10th, for a suggested retail price of

12  399 from the Apple Store, as an example.

13  Q.    Now I want to draw your attention, Mr. Nawrocki,

14  to Plaintiff's Exhibit 565.

15          THE COURT:  Okay.  Counsel, we're going to go

16  ahead and break for lunch.

17          Ladies and gentlemen, I'll ask you to be back

18  at 1:00.  Again, please remember my instructions.  Do not

19  discuss the case even among yourselves while you're back

20  there in the jury room.

21          (The jury exits the courtroom, 12:05 p.m.)

22          THE COURT:  Personal Audio had a --

23          And you can step down, sir.

24          THE WITNESS:  Thank you, your Honor.

25          THE COURT:  -- one of these demos that had, I

1  guess, all of the checks that I think was used to show

2  that everything has been checked off; but then you had

3  the blank space in the lower left corner because those

4  products weren't covered or weren't being sold back then?

5            MR. HOLDREITH:  Yes, sir.

6            THE COURT:  All right.  Can I see a copy of

7  that?  Evidently we've misplaced ours, if we didn't give

8  it back.

9            MR. HOLDREITH:  Yes, sir.  Would you like me

10 to supply a copy to the court?

11           THE COURT:  I'd like to see it right now if I

12 could, yes, and then later on get a copy.

13           MR. HOLDREITH:  All right.

14           THE COURT:  I don't believe it was admitted.

15 I think it was just a demo.

16           MR. HOLDREITH:  I think that's true, your

17 Honor.

18           I've got it.  Your Honor, it is Number 1061.

19           THE COURT:  I'd just like to see a copy of it.

20           MR. HOLDREITH:  Yes, sir.  I have a

21 quarter-size version of it.  Is that acceptable?

22           THE COURT:  That's fine.

23           MR. HOLDREITH:  Okay.

24           THE COURT:  All right.  I guess what I'm

25 concerned about is I'm comparing the testimony we've had

1  so far with his report and we've got -- and this may come

2  out later with the experts and I'm not trying to

3  anticipate, but the '076 patent -- and he's got that

4  90 cents or whatever, which is, I think, what his opinion

5  was in '076 -- are we now going to have a different

6  number for the year or couple of years -- I guess it's a

7  year and a half based on what he's got -- after the '178

8  came out; or is that being reserved for the next trial?

9            MS. HUANG:  Your Honor, there will be a

10  different royalty rate for the '178 patent.  It will be

11  a -- if only the '178 patent is found to be -- is at

12  issue.  But the one 90-cent royalty rate would cover both

13  patents if --

14            THE COURT:  I'm sorry.  The 197?

15            MS. HUANG:  '178 patent.

16            THE COURT:  Okay.  Back up.

17            MS. HUANG:  Okay.

18            THE COURT:  Now say that again.

19            MS. HUANG:  Okay.  There is one -- the 90-cent

20  rate would cover both the '076 and '178 patents.

21            THE COURT:  All right.  So, all products sold

22  would have that royalty rate as long as the '076 patent

23  is valid and infringed.

24            MS. HUANG:  Correct.

25            THE COURT:  And at that point the '178 becomes

1422

 1    irrelevant, in effect.

 2                MS. HUANG:  Correct.

 3                THE COURT:  But there's going to be testimony

 4    that if the '076, for example, is invalidated, then there

 5    would be a different amount for the products sold after

 6    2009 when -- or after the issuance date on 2009, right?

 7                MS. HUANG:  Correct.

 8                THE COURT:  Okay.  That's what I wanted to be

 9    sure of.

10                All right.  In that case, we are going to be

11    in recess until 1:00.

12                (Recess, 12:10 p.m. to 1:00 p.m.)

13                (Open court, all parties present, jury not

14    present.

15                MR. CORDELL:  Your Honor, while we have a

16    moment, has the court had any directions on when we would

17    put on the equitable part of the case, the *laches*?

18                THE COURT:  As soon as the jury goes out --

19    well, we'll probably take a break for coffee or

20    something; but generally I try to do it -- we take a

21    little break and then start right on in because that way

22    we're not -- otherwise you're all just sitting around

23    here waiting for the jury anyway for maybe as much as a

24    day or two.

25                MR. CORDELL:  And again while they're out, we

1  understand that the plaintiffs will actually rest after,

2  I think, Jesse Boettcher, one of our engineers testifies,

3  which we believe will be tomorrow.  What's the court's

4  preference on Rule 50 motions?

5          THE COURT:  If we're at a break, I'd like to

6  make them.  If there is no objection, I would like to

7  move -- I mean, if we're in the middle of, say, an hour,

8  if it's agreeable, all motions will be considered timely

9  made if we make them at the next, say, lunch or other

10  convenient time so we're not inconveniencing the jury.

11          MR. CORDELL:  Thank you.

12          THE COURT:  Is that acceptable to plaintiffs?

13          MR. SCHUTZ:  It is, your Honor.

14          THE COURT:  And to defendants?

15          MR. CORDELL:  Yes, your Honor.

16          THE COURT:  Okay.  Is the jury there?

17          COURT SECURITY OFFICER:  Yes, sir.

18          THE COURT:  Bring them in, please.

19          (The jury enters the courtroom, 1:02 p.m.)

20          THE COURT:  Ma'am, go ahead.

21  BY MS. HUANG:

22  Q.    Mr. Nawrocki, before we move on to the next

23  exhibit, I want to talk to you a little bit more about

24  the hypothetical negotiation.

25  A.    Okay.

1  Q.     Earlier we were looking at slideware PX 1073, and

2  you were describing the components of a hypothetical

3  negotiation.  Where did you get your authority for the

4  hypothetical negotiation?

5  A.     Well, the hypothetical negotiation is one of the

6  *Georgia-Pacific* factors.  We mentioned those 15 factors.

7  Factor 15 is actually referred to as the "hypothetical

8  negotiation factor," if you will.  It's actually on the

9  bottom right-hand portion of that list of factors, if you

10  blow that up.

11         There we go.

12  Q.     And what is Factor 15?

13  A.     Again it relates to the hypothetical negotiation.

14  And I won't read the whole thing; but it basically says

15  (reading) the amount that a licensor (such as the

16  patentee) -- in this construct that would be Personal

17  Audio or the Logan Family Trust -- and a licensee -- that

18  would be Apple -- would have agreed upon (at the time the

19  infringement began).  That's the 2001 we talked about on

20  the prior slideware.

21         And then later on it talks about "to obtain a

22  license to manufacture and sell a particular article

23  embodying the patented invention."  So, it would be them

24  seeking to get a license to make this product that they

25  were embarking upon making, that they would have been

1425

1  paid a royalty yet make a reasonable profit which would

2  have been acceptable by a prudent patentee; so, basically

3  has to be agreeable by both sides, which sometimes

4  is easier said than done.

5         The other part of the construct is that both

6  sides have complete information.  You know, in other

7  words, how the product's going to be introduced, that

8  type of information can't be hidden from the other side

9  in a hypothetical negotiation.  In the real world you

10 might hold some of the cards to yourself.  Well, some of

11 the things they say -- some of the decisions talk about

12 the cards are dealt faceup where both parties are aware

13 of each other's news, basically, and, you know, what the

14 market is, things like that.

15 Q.    Just to be clear, so, the parties at the

16 hypothetical negotiation can -- one side, the licensee --

17 claim that the patents are valid at the hypothetical?

18 A.    No.  Both parties -- they're not forced into

19 agreement, but they basically have to reasonably agree to

20 an agreement.  It has to be agreeable to both sides.  So,

21 again, we talked about you can't walk away from the

22 agreement.  You have to work something out.

23 Q.    Thank you, Mr. Nawrocki.

24        Now I want to turn your attention to

25 Plaintiff's Exhibit 565.  Do you have that in your

1  binder?

2  A.    Yes, I do.

3  Q.    Before the lunch break we were talking about some

4  of the technical factors you took into account, and we

5  were starting to look at some documents.  What is

6  Plaintiff's Exhibit 565?

7  A.    So, this is another Apple press release.  This is

8  again Apple promoting some of the capabilities as they

9  introduce new products.

10        Previously we had talked about their first

11  introduction in 2001.  Now they're talking about

12  introducing a new iPod, a nano device.  And this is the

13  fourth generation.

14        If you highlight that top portion line, it

15  says (reading) Apple introduces the new fourth generation

16  iPod nano.  And then later on it says, "The new iPod nano

17  incorporates Apple's breakthrough Genius technology which

18  automatically creates playlists from songs in your music

19  library that go great together, with just one click."

20        And it goes on to continue talking about the

21  different features within the product.

22  Q.    What is Genius?  What's a Genius Playlist?

23  A.    There's a couple different -- there are several

24  different types of playlists, a Genius Playlist, a Smart

25  Playlist -- I think there's been some testimony about

1  that.  How a Genius Playlist works -- this is from a

2  general standpoint -- it's just one of the additional

3  features you have.  Let's say you have a song by Garth

4  Brooks among your thousand songs here and you want to

5  create songs that are kind of like Garth Brooks.  You

6  click on that song; and it creates a playlist for you

7  with all songs that are maybe country songs or modern

8  country songs, something like that.  So, that's kind of a

9  Genius Playlist.  It creates that as a separate playlist.

10         And then mine, if I recall, gives it the name

11 or the title of that song.  So, if you have a rock and

12 roll, like Led Zeppelin, you might like a certain song;

13 and it'll give you songs that sound like that.

14         So, that creates the playlist.  Either you can

15 create it on your computer or you can create it on your

16 device and then that playlist will be transferred to the

17 computer the next time you sync with your computer, as an

18 example.

19 Q.    And what about Smart Playlist?  Were Smart

20 Playlists available at that time?

21 A.    Smart Playlists were also available.  That's

22 somewhat similar.  What it does for that, you identify a

23 certain genre.  Instead of a song, you identify something

24 like blues or jazz or maybe a number of beats per song,

25 something like that.  And then it will go through that

1 criteria based upon the user's preference, whatever they

2 decide, and then create a playlist from that.  So, it

3 goes to your collection and identifies songs and puts

4 them in a separate playlist.

5 Q.    And how did your consideration of these sort of

6 technical factors influence your opinion?

7 A.    Well, what we saw is that the playlists are

8 certainly something that was promoted by Apple up-front.

9 I listened to Dr. Almeroth's testimony, and he talked

10 about all the specifics on it which I won't get into the

11 details of certainly.  But the technology here is

12 important.  We'll see from the various surveys that we'll

13 talk about how much playlists are used.  So, we'll be

14 talking about that.  But certainly the functionality that

15 was provided by this was a very useful technology.  It

16 allowed people to access their playlists and navigate

17 through their playlists, so a useful technology.

18 Q.    Now I want to move on to licensing factors, sort

19 of the next circle you have there.  Did you consider the

20 licensing perspectives of the parties?  And let's start

21 with the Logan Family Trust, which is the predecessor to

22 Personal Audio.

23 A.    Yes, I did.  I considered the licensing from both

24 Apple's perspective and the Logan Family Trust, Personal

25 Audio's perspective in this case.

1  Q.     And what did you consider for Personal Audio's

2  perspective?

3  A.     Well, there were some agreements.  None of them

4  were specifically comparable to the situation that we

5  have here with Apple.  They weren't -- they didn't have

6  the same type of parties, the same type of use.  There

7  wasn't an extensive amount of those type of agreements,

8  and they related to settlements of litigation; so, they

9  would be further discounted.

10         So, I saw that information from Logan.

11         Additionally, however, what I considered was

12  Mr. Logan's testimony, discussion with Mr. Logan about

13  what he would be looking for if he was sitting in a

14  negotiation with Apple.  And as he mentioned, what he'd

15  be looking for is basically the share in the success.  If

16  they were successful, he would like to share in that

17  success.  If they weren't successful and wouldn't use the

18  technology, then he would get less payment.

19         So, this concept of a running royalty where

20  you get it commensurate with use, each and every unit,

21  that makes sense in that scenario.  You share in the

22  success, or you share in the failure.  Both Mr. Logan and

23  Mr. Fadell talked about the fact that they had some great

24  successes, and they had some things that weren't

25  successful.  And, so, again, a running royalty is

1430

1  commensurate with use.  The more you use, the more you

2  pay; the less you use, the less you pay.  So, I

3  considered that from the Logan Family Trust perspective

4  that Mr. Logan would want to share in that success, as an

5  example, and the fact that a running rate, be it on a

6  percentage of sales or per unit, would make the most

7  sense.

8  Q.     In looking at the Logan Family Trust perspectives,

9  from Personal Audio's perspective, did you find anything

10 that showed an established rate that the trust would

11 agree to?

12 A.     Nothing that I saw from all the information I

13 looked at suggested there would be an established rate

14 for these patents.

15 Q.     And what about from Apple's perspective?  What did

16 you consider there?

17 A.     Well, I looked at Apple's licenses as well.  They

18 produced some agreements.  Some agreements they didn't

19 produce and we had certain cost information on.  But none

20 of those were specifically comparable to the situation we

21 have here, either.  Either different technology or if

22 there was any type of comparable technology, it was not a

23 technology that was sufficiently comparable to the

24 situation here relating to an audio player device such as

25 the nano or the classic or the mini that we have here.

1    Some of them were on a per-unit basis.  Some

2  of them had rates based on songs.  Some of them had

3  tiered rates.  But nothing, again, from Apple's

4  perspective gave me an indication of "Here is the rate we

5  should use in this case."  I looked at the information.

6  A lot of them related to settlements of litigation that

7  Apple was involved in.  So, I didn't get --

8    MS. HUNSAKER:  Objection, your Honor.  This is

9  covered by the motions *in limine*.

10    THE COURT:  Well, we're not going to go into

11  any more detail on that.

12    MS. HUANG:  No, your Honor.

13  BY MS. HUANG:

14  Q.   What else did you consider from Apple's

15  perspective?

16  A.   Well, the other thing I considered is Apple's

17  financial condition at the time.  We all know Apple is a

18  very popular company.  They make iPhones and all those

19  other products.  But ten years ago -- it's hard to look

20  back, but I remember fairly specifically because I had an

21  Apple II product back in the Seventies.  So, I remember

22  following Apple's success.

23    But in 2001 Mr. Fadell referred to the fact

24  that the bubble had just burst and Apple's sales were

25  really flat.  It's amazing when you look at it; but they

1  were selling Macintosh products and even though a lot of

2  people used Macs, their sales were relatively flat for

3  several years.  They had gone through several different

4  CEOs.  Steve Jobs had left, came back.

5           Their sales right before the hypothetical

6  negotiation in this case, September '01, had just

7  decreased.  They had losses in that year.  A couple years

8  before that they had lost significant money as well.  So,

9  it wasn't the robust Apple that we know now.  There was a

10 lot of uncertainty not only about the company but more

11 specifically even about a product like this that they

12 were introducing.  It wasn't the nano product, but it was

13 certainly like the classic-type products they were

14 introducing.  I don't remember exactly which model, but

15 the early classic-type models they began introducing.

16 And there would be significant uncertainty as to what

17 their use would be, you know, would they have significant

18 sales, would they not have significant sales.

19           I read Mr. Fadell's testimony, heard him

20 testify here in court as well; and he referred in his

21 deposition as to they had blind ambition, in other words,

22 high hopes but not exactly knowing how it would work out.

23 They had gone through a few products in the past that

24 didn't work out; and, so, that was certainly something I

25 considered as well.

1  Q.    What were some of those products that didn't work

2  out?

3  A.    Well, recently they've had a lot of success; and

4  everything seemed to work out that they put out.  But

5  there was a product called, the "Cube," called the "Apple

6  Cube product"; and you might not even remember.  It was a

7  PC.  They sold a few hundred thousand of them.  It was

8  somewhere between a Macintosh product, and they were

9  trying to bridge the gap between a consumer product and a

10 business product.  They only sold a few hundred thousand

11 and in the year --

12             MS. HUNSAKER:  Objection, your Honor.  This is

13 beyond the scope of his expert report.

14             THE COURT:  I don't recall that in the report

15 anywhere, about the Cube.  If you can point me to it --

16             MS. HUANG:  It was discussed in --

17 Mr. Nawrocki discussed the financial condition about

18 Apple, and you might have specifically --

19             THE COURT:  Right but --

20             MS. HUANG:  Okay.  We can move on.  No

21 problem.

22             THE COURT:  All right.

23 BY MS. HUANG:

24 Q.    How did your consideration of the licensing

25 factors influence your opinions?

1434

1  A.    Well, now that we're on the second circle here,

2  what my -- my conclusion after looking at the licensing

3  factors was what makes sense in this context.  And what

4  makes sense is due to the uncertainty of Apple, not

5  having really provided any forecast of what their future

6  sales are, so we couldn't estimate what that future use

7  was at that point in time, because of Mr. Logan's desire

8  to obtain a share in the success and -- therefore, what I

9  concluded is that a running royalty makes sense, based

10  upon that condition, based upon the newness of the

11  product -- this wasn't a product that had a long life

12  behind it.  It was just being introduced.  Therefore, to

13  get a certain amount per unit, that would be fair to both

14  sides.  So, that would be my conclusion after looking

15  through the licensing factors.

16  Q.    So, we've gone through two of those circles.  So,

17  let's talk about your financial considerations.  What

18  does this next slideware show, PX 1073-0017?

19  A.    So, this is several of the *Georgia-Pacific* factors

20  dealing with the financial factors, some of the ones

21  dealing with financial factors.  So, Factor 8, Factor 11

22  and 13.

23        Now, I won't read them all in detail; but you

24  can see the items that I've identified in red deal with

25  the profitability, talks about the established

1435

1 profitability of the product, its commercial success, its

2 popularity. That's one thing we'll be talking about.

3          And then we talk about, in Factor 11, the

4 extent to which the infringer has made use of the

5 invention and what's the value of that use.

6          And the last factor talks about the portion of

7 the realizable profit that should be credited to the

8 invention, how much relates to the invention as

9 distinguished from all the other nonpatented elements,

10 manufacturing processes, et cetera. So, this aspect of

11 my analysis really deals with a lot of detailed

12 information in terms of costs and profitability which

13 we'll be talking about. And these are the factors that

14 related to that analysis that I did.

15 Q.    So, let's start by talking about commercial

16 success and popularity. Did you review any information

17 that talked about Apple's market share?

18 A.    Yes. There was information, through some of their

19 earnings calls, where they have discussions with their

20 shareholders and they talk about the fact of what their

21 market share was.

22          And recently in 2010, they mentioned their

23 market share was as high as 70 percent of the MP3 market.

24 So, they've been very successful certainly with these

25 devices that are at issue here. And I think you can see

1  that also with the sales that we talked about earlier.

2  Q.    And did you also receive some information about

3  playlists specifically?

4  A.    Yes.  If you take a look at -- there's really a

5  variety of depositions as well as their presentations.

6  We saw a glimpse of those in some of those promotional

7  materials when they introduced the product.  You saw them

8  talking about playlists and syncing with your product.

9  There is also information in the documents as well.

10 Q.    I'd like to turn your attention to Plaintiff's

11 Exhibit 652A, Mr. Nawrocki.

12 A.    Okay.

13 Q.    And specifically -- what is this document?

14 A.    What this is is it's a request for admission.  If

15 you'd blow up the center portion of the document there,

16 it will say that it's a request for admission.  So, this

17 is a document that the other side -- I'm sorry -- that

18 Personal Audio submitted to Apple to admit certain

19 things; and there are certain comments that -- in this

20 instance, that Apple made that they were admitting to.

21 Q.    I would like to turn your attention to page 10.

22 What is this?

23 A.    This is a response to Request Number 12.  It talks

24 about what the request was.  It says that (reading) admit

25 Steve Jobs made the following statement.

1    And what it says Steve Jobs said was that

2   (reading) nobody thinks of albums anymore.  People think

3   of playlists and mixes.

4         So, again, in the olden days, certainly within

5   my age, you'd get either 45s or albums.  That eventually

6   worked its way to CDs.  And what he's referring to here

7   is that, you know, people think of playlists.

8         The bottom end, he says, "They'll organize

9   them into customized playlists in their computers and on

10  their iPods."  So, again talking about the playlists and

11  usefulness of playlists as an example.

12  Q.    And if you turn to the next page -- what's stated

13  in the next page?

14  A.    And, so, it says -- that was the statement and

15  then that was being requested and Apple says they

16  admitted Steve Jobs made the statement basically in a

17  certain *Fortune Magazine* article in May, 2003.  So, a

18  couple years after it was introduced, they're certainly

19  talking about playlists.

20         MS. HUANG:  Your Honor, I move for the

21  admission of Plaintiff's Exhibit 652A.

22         MS. HUNSAKER:  No objection.

23  BY MS. HUANG:

24  Q.    So, let's talk a little bit about whether or not

25  people are thinking about playlists instead of albums.

1 Did you see any documents that support Mr. Jobs'

2 statement?

3 A.    Yes.  When you take a look at some of the

4 information such as the surveys -- we're going to get

5 into a lot more detail here.  There were surveys that

6 Apple had.  They looked at what the usefulness of some of

7 this information was.  And what you'll see is there was

8 surveys that talk about how much people use playlists to

9 access their music versus other ways, as an example.

10 Q.    I'd like to turn your attention to Plaintiff's

11 Exhibit 148.

12 A.    148?

13 Q.    Yes.

14 A.    Okay.

15 Q.    What is Plaintiff's Exhibit 148?

16 A.    So, this is an example of the surveys produced by

17 Apple.  So, this is one of the many documents I talked

18 about that Apple produced.  And it relates to the iPod

19 and the iPod mini device; so, the larger devices and then

20 the next -- these (indicating) type devices.

21        They were surveying that for Mac users as well

22 as *Windows* users because the device could be used with

23 both type of computers as an example.  And this was done

24 in June, 2004; so, about three years into the products'

25 introduction at this point.

1  Q.    Turn to the next page, please, of Exhibit 148.

2  What's discussed here?

3  A.    And, so, if you take a look -- yeah.  The top

4  portion will talk about several things.  It gives you

5  basically a little background.  It talks about the fact

6  that in October, 2001, Apple introduced the product.

7  That's at the very top.

8            And then if you go into the middle section

9  there, the methodology, it talks about the fact that they

10 did a telephone survey and they mentioned the period of

11 May through June of 2004.  A total of 2,007 interviews

12 were completed; and they mention the specifics in terms

13 of how much for the iPod and the mini.  They mentioned

14 that it was 12 minutes in length.  So, 12 minutes in

15 length is, you know, fairly long in terms of use of the

16 device; but then they also had over 2,000 people they had

17 surveyed.  So, a fairly extensive survey.  And there's a

18 number of these surveys you'll see that we'll talk about.

19 We're not going to go through every one, but this is an

20 example of one.

21 Q.    Let's go to page 26 of Plaintiff's Exhibit 148.

22 A.    Okay.  I have that.

23 Q.    What's described here on page 26 of Plaintiff's

24 Exhibit 148?

25 A.    So, what this shows, if you look at the very

1  bottom there, that's one of the questions as part of the

2  survey, "Which one of the following ways do you most

3  often use to access music you wish to play?"

4          And then there is a little asterisk for the

5  small items.  But if you see, "playlist" shows up on the

6  top of the list with either the largest or one of the top

7  two ways in which people access their music.

8          So, if you're not familiar with the device,

9  there are several different things.  There's artists.

10 You can look at it by album or song; but playlist,

11 according to this survey, is one of the most popular --

12 if not the most -- one of the most popular ways people

13 access their music.  So, this is starting to un-tell the

14 story a little bit.  Now that you've heard about

15 playlists, how often do people actually use it to access

16 it.  You can see here it's fairly popular.

17 Q.    Further down the list there is something called

18 "albums," correct?

19 A.    Yes.

20 Q.    And that's listed with what we just saw, with

21 Mr. Jobs' quote about no one thinking of albums anymore?

22 A.    Yes.  He was actually talking about -- well, I'll

23 let the statement speak for itself.  He was saying people

24 don't talk about albums.  Albums can be a way to access

25 information here because theoretically you could put an

1  album in here or CD in here and you could access it that

2  way if you like or you can access it by playlist as an

3  example.

4  Q.     And it looks like in this survey there was a

5  comparison between an earlier time period; is that

6  correct?

7  A.     Yes.  So, basically you've got two periods that

8  are mentioned here.  This was the June, '04, report; but

9  it also goes all of the way back to November, '03, as

10  well.  The numbers that you see at the very top in the

11  parentheses, those represent the people participating in

12  that survey at those different points in time.

13  Q.     Now I'd like to take a look at another survey,

14  Plaintiff's Exhibit 149.  Can you turn to that page,

15  Mr. Nawrocki?

16  A.     Okay.

17  Q.     What is Plaintiff's Exhibit 149?

18  A.     This was done in January, 2005; so, the next year.

19  And again it is a survey of iPod and iPod mini buyers

20  basically.

21         And they asked similar-type questions and

22  similar methodology.

23  Q.     I want to turn your attention to page 24 of

24  Plaintiff's Exhibit 149.

25  A.     Page 24, yes, I have that.  Okay.

1  Q.     And what's this table here?

2  A.     So, there's a couple things within this

3  document -- there are several things.  But this table

4  shows again the method of listening to music.  And if you

5  look at the top, it says, "Generally iPod and iPod mini

6  owners most frequently use playlists, artists, or

7  shuffling to listen to their music."

8             And then the table below -- it's a little bit

9  grainy, but if you look at the top -- maybe blow up that

10 whole table.  I don't know if you can do it separately

11 within a box.

12            But the first entry there is for playlists.

13            So, again it's titled "Most frequently used

14 method of listening to music for Mac and *Windows* users";

15 and they list playlists with 35 percent, 29 percent,

16 again one of the most popular ways in which people access

17 their music.  They show some of the other ways people

18 access it as well.  They separate it between Mac users

19 and *Windows* users because you can plug your device into

20 either type of computer.

21 Q.     Then further in this document there is another

22 chart.  What's this?

23 A.     Well, the top portion of the page -- you know,

24 what?  Maybe if you would just blow it up a little bit

25 larger to show the narrative right above the table.

1443

```
 1        Yeah.   That's perfect.
 2   Q.    There we go.  Okay.  What's here?  What's in this
 3   table?
 4   A.    So, what this shows is this shows the frequency of
 5   syncing.  There has been some discussion about syncing
 6   the device, as an example, with your computer, plugging
 7   it into your computer and syncing it.  That's where the
 8   playlists and other content can be downloaded to the
 9   device.
10        It says "Nearly two-thirds of iPod and iPod
11   mini owners sync at least once a week.  81 percent sync
12   at least every two to three weeks."
13        So, this syncing with the computer which was
14   talked about at length in Dr. Almeroth's testimony is
15   fairly popular.  Not everybody syncs it every week or
16   every day.  The table shows the specific results.
17        If you look at the table, it shows every day,
18   11 percent of the people; and then the next entry is 2 to
19   3 times a week, 21 percent.
20        If you take a look at the table, if you just
21   go to, you know -- how about once a month, at least once
22   a month.  So, you add up all of those items, you get
23   basically approximately 95 percent of the people.
24   95 percent of the people sync their device to the
25   computer at least once a month.  So, it's updated, again,
```

1444

1  not every day necessarily but, as shown by this example,

2  at least once a month.

3  Q.     Thank you, Mr. Nawrocki.

4        MS. HUANG:  At this time, your Honor, I'd like

5  to move for the admission of Plaintiff's Exhibits 148 and

6  149.

7        MS. HUNSAKER:  No objection.

8        THE COURT:  Plaintiff's Exhibit 148 and 149

9  are admitted.

10        MS. HUANG:  Thank you.

11 BY MS. HUANG:

12 Q.     Mr. Nawrocki, you mentioned that you also saw a

13 lot more surveys; is that correct?

14 A.     Yes.

15 Q.     And did you -- can you turn to Exhibit 431 in your

16 binder, please?

17 A.     Okay.

18 Q.     And what is Plaintiff's Exhibit 431?

19 A.     This is a summary that we prepared of the various

20 surveys.  Instead of walking through each one of them,

21 this gives you a summary of the information that we

22 looked at.

23        And, so, we looked at -- the middle one is

24 June, 2004; but if you look at the top row there, you'll

25 see that playlists are shown as well as all the other

1  methods of accessing.  And, again, playlists show up as

2  one of the top one or two ways or manners in which people

3  access their music.  So, playlists are popular.  And then

4  syncing with the computer where the downloaded playlist

5  and music content can be done is often done as well,

6  either daily or certainly once a month for 95 percent,

7  based upon the survey.

8              This specific chart talks about the usefulness

9  of playlists in accessing the music.

10 Q.    So, you prepared this chart based on similar

11 surveys that we just looked at in Plaintiff's Exhibits

12 148 and 149?

13 A.    That's correct.  The sources are at the bottom.

14 It shows the specific document numbers, and you can see

15 the various respondents to those surveys.  And again

16 these are Apple surveys.  You'll see 730 in the first one

17 and several other -- you know, hundreds of people,

18 sometimes over a thousand people, were surveyed; so, a

19 fairly extensive survey.

20 Q.    I'd like to turn your attention now to Plaintiff's

21 Exhibit 432.

22 A.    Okay.

23 Q.    What is Plaintiff's Exhibit 432?

24 A.    So, this is another summary of the survey

25 information.  Apple produced another set of surveys; and

1 they called them "waves," like they were doing one wave

2 and then another wave and another wave, similar

3 information in terms of the methods most used or used

4 most often to access music.  And again playlists show up

5 as one of the top manners in which people access their

6 music.  And you can see the number of respondents there,

7 1500, 1500.  Most of those are all over a thousand.

8 Q.    And did you also prepare this chart by looking

9 through Apple's surveys and taking out information from

10 those surveys similar to what we looked at in Plaintiff's

11 Exhibits 148 and 149?

12 A.    Yes.  Again, this was not my survey.  This was

13 Apple's survey, and I'm just summarizing the information

14 here.

15           MS. HUANG:  Your Honor, at this time I move

16 for the admission of Plaintiff's Exhibit 431 and 432 as

17 1006 summaries of Apple's surveys.

18           THE COURT:  Any objection?

19           MS. HUNSAKER:  No objection.

20           THE COURT:  Plaintiff's Exhibit 431 and 432

21 are admitted.

22 BY MS. HUANG:

23 Q.    We'll take a look at another survey, Mr. Nawrocki.

24 I'd like to turn your attention to Plaintiff's

25 Exhibit 477.

1447

1  A.    477, okay.

2  Q.    And what is this?

3  A.    This is a survey.  It's called the "tracker

4  program"; but it gets into information in terms of people

5  creating playlists and syncing playlists, how often they

6  do that.  So, it's a fairly lengthy survey, almost a

7  hundred pages long.  We're not going to talk about all

8  hundred pages.  We'll talk about a few pages to keep it

9  moving.

10           But there's information within this survey

11  that I used as well and summarized as well, talking about

12  how often people are using certain features of *iTunes* to

13  create playlists and then to sync as well.

14  Q.    I'd like to turn your attention, Mr. Nawrocki, to

15  page 142 of --

16  A.    Page 142?

17  Q.    Excuse me, page 42 of Plaintiff's Exhibit 477.

18  A.    Okay.  I have that.

19  Q.    What is on page 42?

20  A.    So, again, this is a multipage survey.  This is

21  page 42.  And here it's talking about what the usage of

22  *iTunes* jukebox features are.  Jukebox is one of the

23  aspects of the software program on the computer in which

24  you can kind of create playlists and you can look at your

25  music.

1    And this specifically gets into how often you

2  can do certain capabilities.  What the question asks --

3  you can barely see it, but let me see if I can read it on

4  the original.  It says how often --

5         MS. HUNSAKER:  Objection, your Honor.

6         THE COURT:  What's your objection?

7         MS. HUNSAKER:  It's a nonaccused product, your

8  Honor.

9         THE COURT:  Let's pull that down for a minute.

10        How would that be relevant to be going over

11  the features of nonaccused products?

12        MS. HUANG:  Your Honor, I'll make it clear

13  with Mr. Nawrocki.  We're not accusing *iTunes*; but as

14  part of creating playlists, *iTunes* is -- we've talked

15  about in the case that -- from a computer containing

16  *iTunes*.  We're not accusing *iTunes* as --

17        THE COURT:  Well, I understand that; but why

18  would we need usage of *iTunes* versus anything else?  I

19  mean, you've gone over the usages and so forth and the

20  charts dealing with the accused devices.  Why do we need

21  similar information on --

22        MS. HUANG:  Your Honor --

23        THE COURT:  -- on nonaccused items?

24        MS. HUANG:  -- this is not duplicative

25  information.  This is based on -- there's part of the

1  claims that talk about receiving a playlist, and this

2  is -- these surveys are about what's being done with

3  *iTunes* on a computer and it talks about syncing

4  playlists.

5         THE COURT:  Okay.  Maybe I'm not making myself

6  clear.  What is the relevance of the -- tell me again the

7  page number there.

8         MS. HUANG:  Page 42 of plaintiff's exhibit --

9         THE COURT:  Okay.  Why would you -- I'm going

10  to sustain the objection as to that page.

11  BY MS. HUANG:

12  Q.    Earlier, Mr. Nawrocki, you also discussed a survey

13  commissioned in this case by Dr. Peterson; is that

14  correct?

15  A.    Yes, that's correct.

16  Q.    What was that survey -- what did that survey

17  entail?

18  A.    That survey was done by a professor at University

19  of Texas.  He was in the marketing department, and he

20  conducted a survey working with some other companies and

21  individuals to conduct a survey that was a nationwide

22  survey.  Again, it wasn't done for Apple.  It was done

23  specifically for this case.  And I used that survey to

24  confirm some of the results I saw in Apple's documents.

25         So, he interviewed, via either focus group

1450

1  that he did, Internet survey, as well as he did a

2  shopping mall survey as well.  So, there's a couple

3  different aspects of the survey; and it related to a

4  couple things, related to the use of playlists as well as

5  it related to other features people like on the different

6  devices.

7          So, it compared other things like the buttons,

8  the battery, other features that have been talked about;

9  and that was part of the analysis of his survey.

10 Q.     I'm showing you Demonstrative 1073-19.  What does

11 this chart show, Mr. Nawrocki?

12 A.     So, this shows a table from his report and it

13 summarizes the playlist feature utilization and it talks

14 about what percentage of the time are people using these

15 devices to listen to music, what percentage of time

16 they're listening to playlists, which is 50 percent.  And

17 then he multiplies those to arrive at the playlist

18 utilization based upon these different surveys that he

19 did.  He conducted a couple different Internet surveys

20 where people respond to questions over the Internet, and

21 there were a couple thousand people he interviewed

22 through the Internet over this -- or I should say

23 questionnaires they filled out over the Internet.  And

24 this is the result of that survey.  So, this was further

25 confirmation of some of the information that I saw in

1  Apple's own survey.

2  Q.    And how did your review of all the surveys --

3  Apple's surveys and Dr. Peterson's survey -- affect your

4  analysis in this case?

5  A.    A couple ways.  When looking at some of the

6  information from a financial standpoint, there's no doubt

7  that the product's been successful, these iPods -- minis,

8  classics, nanos -- have been successful.  You saw the

9  units.  One of the things I wanted to see is, well, okay,

10 how about use of playlists.  They could have some type of

11 feature on there; but if nobody is using it, maybe it's

12 not all that valuable.

13         So, what I used these surveys to do is to look

14 at how much playlists were used in conjunction with the

15 amount of times that they were sync'd back to the

16 computer.  We talked about the syncing back to the

17 computer.  So, there were several things there.

18         Additionally, I needed to take a look at some

19 of the relative value of playlists compared to some of

20 the other capabilities -- the battery life, the size, the

21 capacity -- that are other features that aren't

22 specifically accused, but I needed to assess that as part

23 of the whole value of the overall product.

24 Q.    And we'll discuss a little bit more about

25 Dr. Peterson's survey.  What were the figures that

1  Dr. Peterson came up with with the playlist utilization

2  of each of the devices?

3  A.     So, those are the figures on the right side.  The

4  playlist utilization would be 42 percent for the classic

5  and nano and then 45 percent for the mini, which are in

6  the rough range of those percentages that we saw.  Those

7  percentages jumped around between the 30s and 40s.  Here

8  you'll see his survey that was done last fall was in the

9  low to mid 40s.

10  Q.     And how did he calculate those playlist

11  utilization figures, the 42 to 45 percent figures?

12  A.     That's what I mentioned earlier, that he took the

13  percentage of time they listened to music and then

14  applied it to the percentage of time that they were using

15  playlists when they were listening to music to arrive at

16  those numbers.

17  Q.     Thank you.

18         Now I want to talk a little bit about

19  profitability.  We had talked about the commercial

20  success.  And, also, the profitability covers more than

21  one factor, is that correct, Mr. Nawrocki?

22  A.     Yeah.  Profitability is mentioned in several of

23  the factors.  It's mentioned in 8, established

24  profitability, and then, also, the portion of the profit.

25  It's also mentioned in Factor 15 that we talked about

1 earlier as well.

2 Q.    And before we even actually move to profitability,

3 let's talk a little bit about Factor 11.  What is

4 Factor 11?

5 A.    So, Factor 11 talks about the extent to which the

6 infringer has made use of the invention and the evidence

7 probative of the value of that use.

8 Q.    And did we see some evidence of the extent of use?

9 A.    Yes.  And, so, a couple things we saw there were

10 the unit sales but then also the usefulness of playlists,

11 how often playlists are used, how often they're sync'd.

12 We saw that information as well through the surveys we

13 just discussed.

14 Q.    Now let's focus on profitability.  What's this

15 next demonstrative, Mr. Nawrocki, 1073-21?

16 A.    So, now we're going to embark a little bit of a

17 number-crunching exercise but I'll try to walk through it

18 with kind of an overview and then we'll get in some

19 specifics.

20         What this chart shows, it shows the overall

21 projected profit in October, 2001.  So, going back to the

22 hypothetical, this is an estimate of what the

23 profitability would be for the iPod device as it was

24 being introduced.

25         I've taken this from certain information from

1454

1 Apple that was produced, and what you'll see there on the

2 left side is the price that was estimated.  It was 327 to

3 347.

4           Earlier you saw a price of 399.  That was the

5 retail store price.  This represents the price that Apple

6 would be selling it for, or estimating to sell it for.

7 So, the 327 to 347 is on the left side.

8           And then what I've shown on the right is

9 different costs to arrive at a profit calculation.  The

10 manufacturing costs are shown here at 75 percent.  And,

11 so, when we take a look at the device, there are several

12 components that make this up.  We'll see the details.

13 There is a processor.  There is a hard drive, battery.

14 All those costs added together were estimated to be

15 75 percent.

16           And then the operating costs, those represent

17 things like selling costs, advertising.  You might have

18 seen ads for the iPod device.  Those types of costs are

19 estimated here to be 15 percent, to arrive at the profit

20 at the time of 10 percent.  Again, that's not what they

21 actually made.  This represents when they were looking

22 forward, what they were estimating to make.  So, this is

23 a projection of their profitability.

24           If you take the 10 percent and apply it to the

25 327 and 347, you'll show an estimated profit here of

1455

1  32.70 to 34.70.  So, that's what this chart shows.

2  Q.    Let's talk about where you got some of these

3  numbers.  I'd like to turn your attention to Plaintiff's

4  Exhibit 39.

5  A.    Let me just refer to that document.  It's

6  Exhibit 39?

7  Q.    Correct.

8  A.    Okay.  I have that.

9  Q.    What is Plaintiff's Exhibit 39?

10  A.    So, "Dulcimer" was kind of a code name; and

11  "Dulcimer P68" was a code name for the product as they

12  were introducing it.  It talks about a readiness review.

13  Down in the bottom portion of the document you'll see it

14  was dated September, '01.  So, there was a few of these

15  that were done.  This one was in September, '01, about a

16  month before the product was introduced.

17          So, this would be something that you could

18  look at for -- at the hypothetical, we go back in time --

19  what was the mind-set at that point in the time when

20  Apple was introducing this product.

21  Q.    Turn your attention to page 9 of Plaintiff's

22  Exhibit 39.  And what information is shown on here?

23  A.    So, again, this is a multipage document.  They

24  look at various things within the document in terms of

25  market introduction, things such as that.

1         This page specifically refers to the financial
2    aspect.  It shows the cost and shows the margin at the
3    bottom.
4         You probably don't have to blow it up.  I'll
5    probably just go ahead and identify some of the things.
6    If you look at the top portion there, it talks about
7    digital, enclosure, disks.  They also mention keyboard,
8    et cetera.  And then they have various cost items showing
9    there, $52.55, $38, disks for $110.  They come up with a
10   total standard cost; and then they have some other costs
11   that's called "other COGS" there, which represents "other
12   costs of goods sold," is what that stands for.  You'll
13   see those are about $11.
14        Comes to a grand total cost of 257 for the one
15   product, and then they talk about opportunities where
16   they could drive down the costs if they wanted to.
17        I looked at all of this information, but I
18   looked at the details and then also looked at the bottom
19   portion of the page.  You'll see a couple different sets
20   of information there.  There is something called "SSP,"
21   and that's basically "suggested selling price."  That's
22   the 399 we talked about earlier.  That's 399 across.
23        And then there is basically either an average
24   selling price or Apple selling price of 347, 327.  We saw
25   that earlier in the prior chart.

1    And here you see their gross margin.  They had

2  gross margins, 25.9, 28.2 they were talking about here.

3  What I used was the target gross margin, that 25 percent

4  across the board.  I said, "Okay.  That's what they're

5  targeting.  They're going to be targeting a gross margin

6  of approximately 25 percent."  It looks like from their

7  costs here sometimes they were estimating a little bit

8  above, sometimes a little bit below.  But that was the

9  starting point for my profitability analysis that I did

10  on the prior chart.

11  Q.    Let's take a look at that prior chart again just

12  to make sure we know what the numbers are there.

13    Demonstrative PX 1073, you got the 327 to 347

14  price from Plaintiff's Exhibit 39?

15  A.    That's right.  That represents that Apple sales

16  price or average selling price for Apple of 327 to 347

17  and then the top box on the right, the manufacturing

18  costs of 75 percent.  Well, that's kind of the opposite

19  of the 25 percent margin they had.  They showed a

20  25 percent margin; so, the inverse of that is the

21  manufacturing costs they were estimating or targeting at

22  75 percent.

23    MS. HUANG:  Your Honor, at this time I move

24  for the admission of Plaintiff's Exhibit 39.

25    MS. HUNSAKER:  No objection.

1    THE COURT:  Plaintiff's Exhibit 39 is

2  admitted.

3  BY MS. HUANG:

4  Q.    Mr. Nawrocki, did you also take a look at Apple's

5  actual profitability?

6  A.    Yes.  So, what we were talking about was their

7  projected.  Now I've also looked at their actual, which

8  is shown on this chart.

9  Q.    This chart is Plaintiff's Demonstrative 1073-22?

10  A.    Yes.  That's correct.

11  Q.    And what's shown on this chart?

12  A.    So, what we showed here is the information in the

13  projected column is the October, 2001, that we just

14  talked about.  I show the average selling price of 327 to

15  347.  So, that's the average price they were looking for

16  for introducing the classic product at that point.

17         I show the gross margin -- that's the margin

18  they make after you subtract all of the costs of just

19  making the device, again the disks, the batteries and

20  things like that, so 25 percent, to arrive at the

21  contribution margin of 10 percent.

22         So, then that first column is the 32.70 and

23  34.70.  That was their projection.

24         I also looked at their actual information for

25  fiscal '02 through 2010, and the right column shows what

1 they actually did.  So, it's kind of interesting to show

2 what actually happened.

3         If you look at it, the price is actually lower

4 than they anticipated.  The price overall for that period

5 is down to 199; and that's in part due to the fact that

6 they had this product (indicating) which is the classic,

7 then they introduced a mini product which according to

8 this (indicating) is Defendant's Exhibit 103 as an

9 example or Defendant's Exhibit 105, and then the nano

10 product is a little bit smaller yet, Defendant's

11 Exhibit 108.  And, so, some of the prices of these were a

12 little bit smaller.  And, so, the overall average for all

13 of these products is what's shown there of 199.79, almost

14 $200.

15         And then the next item shows what actual gross

16 profits they made.  They actually -- on a percentage

17 basis, they actually made more profits than they thought.

18 They were shooting for 25, and they made 34 percent.

19         And then the contribution margin, that's after

20 subtracting all of their costs, all advertising,

21 development, everything else, was the 21 percent which is

22 a -- on a per-unit basis, $41.16.

23         So, if you look at all of the devices that

24 they've made, all the accused devices for the period '02

25 through 2010, that's their overall profitability of 41.16

1  and a percentage, again, 21 percent.

2  Q.     The figure you used in the previous exhibit we

3  saw, PX 1073-21, was 10 percent; is that correct?

4  A.     That's correct.  And you'll see that in the column

5  right next to it.  That's the projected column of 32.70

6  to 34.70.

7  Q.     Why didn't you use the actual profitability?

8  A.     Well, I referenced both here.  What I'll use in

9  the rest of my analysis, however, is the projected.

10 You've got both sets of information here.  But looking

11 back at the hypothetical, the actual didn't take place

12 yet even though they were slightly more profitable even

13 on a per-unit basis.  I looked towards the hypothetical

14 in October, 2001, and based the rest of my analysis on

15 the information of what they were projecting.  So, I was

16 conservatively using the projected; but it also coincides

17 with what their mentality was, what their expectations

18 were at the hypothetical in 2001.

19 Q.     Did you look at some documents around the 2001

20 time period that looked at Apple's profitability?

21 A.     Yes.  So, there was various other documents that

22 we could take a look at that show the specifics.  I don't

23 want to get into a lot of details, but I'll at least show

24 you a little flavor for some of the manufacturing costs

25 as an example and other costs that they have relating to

1461

1  their projection.

2  Q.    I'd like to turn your attention to Plaintiff's

3  Exhibit 745.

4  A.    745?

5  Q.    Correct.

6  A.    Okay.  I have that.

7  Q.    What is Plaintiff's Exhibit 745?

8  A.    So, this is another product review.  It talked

9  about Apple's opportunity under the Dulcimer product.  I

10  think Mr. Fadell talked about this.  He mentioned that he

11  put together a presentation that was either used with

12  Mr. Jobs, the CEO Steve Jobs, or something like this

13  basically.

14         This goes through various aspects of what the

15  market landscape was, what the opportunity was; and it

16  gets into various cost items as well.

17  Q.    I'll turn your attention specifically to page 9 of

18  Plaintiff's Exhibit 745.

19  A.    Okay.

20  Q.    What's discussed on page 9?

21  A.    So, this talks about the audio player device.

22  Again we talked about the audio player device is an

23  accused device, and it mentions several things.  I think

24  there's already been some discussion on this.  It talks

25  about the suggested selling price of 399, mentions

1  different components, like the processor, the display,

2  the battery, the thin Lithium battery is an example I

3  think Mr. Fadell talked about, talked about input/output

4  devices.

5          On the right side they talk about software.

6  They mention audio players with playlists.  They talk

7  about firmware, decoders.  They mention *iTunes* software

8  down at the bottom.  So, various different components, if

9  you will, related to the audio player they're identifying

10  here.

11  Q.     And if you go further into Plaintiff's

12  Exhibit 745, did you find cost information, too?

13  A.     Yes.  I believe just a few pages later, page 15,

14  gets into some specific cost information; and this is

15  basically called "device cost analysis."

16  Q.     What cost information did you take a look at and

17  consider?

18  A.     And, so, there's several different columns.  They

19  talk about the cost estimates for a hard disk drive at

20  the 5-gigabyte level and 10-gigabyte level, SDRAM.

21  Processor, as an example, has $13.  Storage, that's

22  basically, as I understand, the hard drive components.

23  It was $120; so, a fairly expensive item.

24          The battery, a couple lines down, is $11.

25          Power supply, a couple lines below that, is

1   $12.25.

2           They've got manufacturing and testing.  In the

3   bottom you'll see licenses at $1.70.  And the total built

4   cost on a per-unit basis varies from 232 to $255.  So,

5   all of this information looking at it on a per-unit basis

6   as they were introducing this product.

7   Q.    Did you see information more recently about the

8   gross margin of the accused products?

9   A.    Yes.  I also looked at some of the information

10  they put in their forecasts over the last several years

11  in terms of cost information.  We had that information as

12  well.

13  Q.    I turn your attention to Plaintiff's Exhibit 488A.

14          MS. HUNSAKER:  Your Honor, I'm going to object

15  to use of this document for the reasons that we discussed

16  on the break.

17          THE COURT:  Overruled.

18  BY MS. HUANG:

19  Q.    Mr. Nawrocki, what is Plaintiff's Exhibit 488A?

20  A.    So, what this shows is this is a gross margin

21  summary; and if you see at the very top of the column

22  iPod -- actually that and the item down is a -- it's

23  mentioned as a P95 or a P98.  That's a specific model

24  number.  So, one, a model number.  This is looking at the

25  cost information for that.

1        And you can see there's various things -- if
2  you would maybe blow up one column would be helpful, all
3  the way down.

4        Yeah.  So, you can take a look; and you'll see
5  that again they show the selling prices there.  They show
6  various components down below.  And then this gets into
7  some of the manufacturing costs.  You'll see a RAM for
8  $4.09.  That's about the middle of the page.

9        A couple down you'll see a HD, for a hard
10  drive, of $111 and $160 --

11        MS. HUNSAKER:  Objection.  This is outside the
12  scope of his report, your Honor.  He didn't rely on this
13  document for his profit margin analysis.

14        THE COURT:  Overruled.

15  BY MS. HUANG:

16  Q.    Were there other items you took a look at?

17  A.    Yes.  If you show -- maybe what you could do is
18  break up the -- go down -- maybe you can scan down lower
19  to the bottom because we'll see the margin information at
20  the bottom half of the page.

21        So, here you'll see that there are various
22  other cost of sales.  There's freight, distribution,
23  scrap -- they cover most things.  There's royalty there.
24  You'll see there's gross margin, total of $145 they have.
25  And then the gross margin percentage here they're

1  estimating in this forecast of between 34 and a half and

2  35.8 percent.  So, you'll see that there's various

3  percentages.  This was a little bit higher than that

4  25 percent they were anticipating, and again this was a

5  2004 document.

6  Q.    And did you see gross margin reports for other

7  products that are accused in this case?

8          I want to turn your attention to Plaintiff's

9  Exhibit 510B.

10 A.    Okay.  And if you'll blow up that whole portion.

11         This is a summary of their costs.  It's fairly

12 small, but you can take a look at the -- this is a

13 summary of their costs and sales and it relates to one of

14 the specific nano products as an example.

15 Q.    And you know it's a nano product because?

16 A.    Because if you take a look at the product

17 identification there, the identification is N33.  That's

18 one of the nano products as an example.

19         And the date of this is up at the top.  It's

20 basically May, 2010, to the right side there.  It's a

21 gross margin -- I'm sorry.  It's a prior file.  This

22 relates to June, 2010.  So, what you'll see here is

23 there's various cost information for processor again

24 under the first line item.  That's 7.59.  An ASIC, that's

25 an "application specific integrated circuit," which is a

1  long name for a circuit that's on the device.  That's

2  $3.60.

3           There's other things that are interesting.

4  The battery pack is on there for $2.19.  They have a

5  camera for $2.46.  Earbuds, the earphones that you plug

6  in, those are only $1.57.  So, you see those in the

7  commercials all of the time; but it's $1.57 for it.

8           And then it comes to a total material cost at

9  the very bottom there of $62.51 or 74.92, as an example.

10 And, again, this is a summary.

11          If you go to the next page, there's a little

12 bit more details on each one of the items just as an

13 example.

14          MS. HUNSAKER:  Your Honor, I'm going to object

15 on the basis of 402, for the same reasons stated before.

16          THE COURT:  Overruled.

17 BY MS. HUANG:

18 Q.    Would you like me to show just the top portion, or

19 which portion would you --

20 A.    I think we could do it in two pieces.  Maybe go

21 all of the way down to about half of the page.  We'll do

22 the top portion and then the bottom portion.

23 Q.    Sure.

24 A.    So, now what you'll see is more specific

25 information.  They specifically identify these specific

1  type of processor.  Again, that's the 7.59.  The ASIC is

2  there of 69 cents -- I shouldn't say the "ASIC."  There

3  are several ASICs that make it up.

4          If you scan on down, down below you'll see

5  earbuds again, about four or five lines from the bottom.

6  Q.    Okay.

7  A.    $1.57 is earbuds, as an example.  Again there are

8  other items.

9          This comes to a total material cost of $62.51

10 in the first column.  And that's not all their costs.

11 That's not all their manufacturing costs that they

12 identify.

13         If you go down through the second piece, they

14 go through freight and the other line items as well.

15 And, so, what you see here is they have logistics --

16 that's moving the product around -- Apple Care.  It's one

17 of their customer service sort of functions.  So, if you

18 just buy a product, you can be part of the Apple Care

19 program.  Again they do this all on a per-unit basis to

20 estimate what those costs are.  They have royalties down

21 at the bottom of $1.29, for a total -- "OCOGS," which is

22 other cost of sales, 9.54, to arrive at a total cost of

23 $81.98 and $94.38 per unit.  So, every device at that

24 point in time, they're estimating it cost that for the

25 specific model.

1  Q.    How did your consideration of these gross margin

2  reports and other cost information influence your

3  opinion?

4  A.    Well, what this shows -- this is consistent with

5  some of the information that I showed on the prior

6  document.  It says they were projecting their cost and

7  their margin to be about 25 percent.  Those margins then

8  went up.  This generally shows a little bit higher

9  margins.

10        It also shows some of the relative values, if

11  you will, of, you know, what the battery costs, what the

12  different items -- the earbuds and everything else cost.

13  Those are all part of what's sold here.  So, this gives

14  me an appreciation of what some of those components are

15  as an example.

16        MS. HUANG:  Your Honor, at this time I move

17  for the admission of Plaintiff's Exhibit 488A and

18  Plaintiff's Exhibit 510B.

19        MS. HUNSAKER:  We object for the same reasons

20  stated before, your Honor.

21        THE COURT:  Overruled.  510B and 488A are

22  admitted.

23        MS. HUANG:  Thank you, your Honor.

24  BY MS. HUANG:

25  Q.    Mr. Nawrocki, so, now that we've looked at some

1469

1  documents, I want to go back to this slideware,

2  PX 1073-24.  Now that we've kind of seen some of the

3  documents as to where some of the manufacturing costs

4  come from, what do you do next after you've got this

5  information?

6  A.    So, the next thing I did -- I'll use the pointer

7  here.  We started with the 327, the 347 sales price as of

8  October, 2001, calculated the estimated profit of

9  approximately 10 percent, applied that to the price, to

10 get the 32.70 and the 34.70.

11          And again this is the projected profit.

12 Remember, we're not going to use the actual.  We're just

13 going to use the projected at this time.

14          I then took that profit and then need to

15 determine within the device what sort of function -- how

16 can we kind of peel that back into specific components.

17 So, a little bit of a difficult exercise; so, I'll kind

18 of walk through it here.

19          But I use that as a starting point basically,

20 started with the profit and then tried to apportion it to

21 the functionality that's at issue in this case.

22 Q.    So, what you're going to be apportioning is the

23 figure down at the very bottom?

24 A.    That's right, the 32 -- right.  So, that's the

25 starting point basically to take a look at.  We

1  considered all of the different elements and now we're

2  going to take a look and they make this estimate amount

3  of profit, how do we apportion it to the features at

4  issue here.

5          THE COURT:  All right.  Counsel, we're going

6  to take a break.

7          Ladies and gentlemen, I'll ask you to be back

8  at quarter past.

9          (The jury exits the courtroom, 2:00 p.m.)

10          THE COURT:  We'll be in recess until quarter

11  past.

12          (Recess, 2:00 p.m. to 2:15 p.m.)

13          (Open court, all parties present, jury not

14  present.)

15          THE COURT:  Okay.  And just in case there is

16  any question about the bringing in Dr. Peterson's

17  report -- and I think I'd done a written order on that.

18  But just for record purposes, I have determined that the

19  probative value of that in assisting the jury in

20  determining issues here substantially outweighs any

21  prejudicial effect of that coming in because in some --

22  although I don't think the precise objection of hearsay

23  was made, that would be the typical objection.  But that

24  would be the court's finding on that, that it's probative

25  value does substantially outweigh any prejudicial effect.

1      Yes?

2           MS. HUNSAKER:  I'm sorry.  Were we talking

3  about an exhibit?

4           THE COURT:  Dr. Peterson's -- the charts from

5  Dr. Peterson's survey came in.

6           MS. HUNSAKER:  Yes.  That's okay.

7           THE COURT:  And I had written a -- had a

8  written order on it, but I just was making clear for the

9  record that that is my finding or conclusion on that.

10           MS. HUNSAKER:  Okay.  And -- yes.  Thank you,

11  your Honor.

12           THE COURT:  They're already in.  I'm just

13  clarifying the record.

14           MS. HUNSAKER:  I understand.  Thank you.

15           (The jury enters the courtroom, 2:16 p.m.)

16           THE COURT:  Go ahead, counsel.

17           MS. HUANG:  Thank you, your Honor.

18  BY MS. HUANG:

19  Q.    Before the break, Mr. Nawrocki, we were going to

20  talk about your profit apportionment; and you had taken

21  out 10 percent of the profit of the price of the iPod; is

22  that correct?

23  A.    Yeah.  I used 10 percent to come up with the

24  profit of 32.70 to 34.70, correct.

25  Q.    What does this chart, PX 1073-26, show?

1  A.     What this is is this is the beginning of profit

2  apportionment.  I started with estimated profitability,

3  and then I began breaking it into two pieces.  You buy an

4  iPod for various reasons, as talked about in their

5  documents.  Some of it are the device features, the

6  ability to have songs, the battery life, a whole bunch

7  of -- the design, all sorts of things.  Some of those are

8  device features.

9          Some of those relate to Apple, Apple's brand

10 name, their customer loyalty, the business risks that

11 they took to go through this.  I mean, that's part of

12 what generates profit, their industrial design they came

13 up with.

14         So, I start splitting the profit saying so

15 much goes to Apple and so much goes to buying the device.

16 It's kind of like a restaurant.  You go to a restaurant

17 and buy the food because it's good, and you keep going to

18 the restaurant again.  Part of it is because it's the

19 restaurant you always go to; but the other is, well, they

20 always have good food.  It's interrelated.  That's what

21 this is.

22         Apple has a popular brand name even though we

23 talked about in 2001 they were a little more flat and

24 going through a difficult time, but I gave them credit

25 and then I realized there is so much that relates to the

1473

1    device.  This is the beginning of that analysis.

2    Q.     How much credit did you give to each of these

3    categories?

4    A.     What I did is I gave Apple the lion's share, 50 to

5    75 percent of the profits, saying, "Let's give them the

6    lion's share for their name, their customer loyalty."

7    Mr. Fadell was talking about in his deposition as well as

8    here about the different efforts they went through.  So,

9    they take that right off the top.

10            The remaining amount, the 50 to 25 percent,

11   goes to the device.  And if you go all the way over, it's

12   for things like the capacity, the navigation access,

13   having the ability to handle songs, accessing those

14   songs, portability, battery, sound quality, seamless

15   integration with the Mac and *iTunes* and things like that.

16   So, those are some of the major components in there.

17   Q.     And what did you do next?

18   A.     So, the next step I did, I then focused on this

19   bottom portion.  So, what you'll see on this chart, this

20   shows the overall information on the left, the price, the

21   profit.

22            Now what I'm going to do is taking that next

23   slice, that 25 to 50 percent, and coming up with $8.18

24   and $17.35.  And I'm now going to spread that amongst the

25   different components, major components that make this up.

1 And those are the four components.

2         The blue boxes there represent some of the

3 areas that start talking about the features of playlists

4 and things you'll see as we walk through this.  But keep

5 your eye on the blue.  The portability and battery and

6 sound quality, I gave credit to those; but they basically

7 don't really implicate the specific technology at issue

8 here based on my valuation analysis here.

9 Q.    Where did you get the four categories that you

10 have on the right?

11 A.    So, based upon all the deposition testimony I

12 read, the documents I read, these were some of the

13 features that were talked about; but there was

14 actually -- at the time there was a document that did a

15 fairly good job of talking about what are some of the

16 major messages they had.  I think if you remember,

17 Mr. Fadell talked about kind of a magic formula.  These

18 are some of the things he identified, you know, in that

19 magic formula.  But the document is consistent with what

20 he talked about as well.

21 Q.    I want to turn your attention, Mr. Nawrocki, to

22 Plaintiff's Exhibit 33.  What is this Plaintiff's

23 Exhibit 33?

24 A.    So, this is a product brief.  It's done again in

25 2001, around the time of the hypothetical, July of '01,

1  done by Stan Ng.  And it basically goes through various

2  features and important parts as they were looking at

3  introducing the product.

4         If you go within the document, it talks about,

5  on page 9, some of the key messages.  That's what we have

6  on the screen right now.  So, it identifies what are some

7  of the things we want to have out there.  What you see

8  here, it says some of the primary messages are (reading)

9  holds all your music, the high-capacity hard drive that

10  there has been discussion about, storing up to a thousand

11  songs.  You want it to be portable, pocket-sized; they

12  gave credit for that.  Best sound quality, integrates

13  seamlessly with your Mac.  So, they identify these as the

14  primary messages.  Those are consistent with what we've

15  seen, and I've seen that type of information in some of

16  the documents and some of the surveys that we talked

17  about as well.

18         And then it further goes on to identify other

19  parts of the survey, but this is what I used to identify

20  those four major boxes.

21  Q.    You mean "document," not "survey," correct?

22  A.    I'm sorry, within the document.

23  Q.    And further on in the document, did they talk

24  about these key messages a little more?

25  A.    Yes, they do.  And if you look at actually that

1  set right there (indicating), it gets more specific into

2  what they mean by "holds all your music" or what it has.

3  They say it's a high-capacity hard drive for storing a

4  thousand songs.

5         If you look to the second box there, it

6  mentions the *iTunes* software.  It says (reading) it's

7  easy to navigate through your entire music collection on

8  P68 by song, artist, or custom playlists.

9         The fourth one talks about four simple buttons

10 for easy operation.  (Reading) Uses only four buttons for

11 easy operation -- play/pause, menu, forward, and back,

12 et cetera.

13         So, what you're seeing here is not only having

14 the ability to handle a thousand songs but being able to

15 access that music as well, talk about playlists and talk

16 about the buttons that can be used with playlists or can

17 be used without playlists as well.

18 Q.    Further in the document -- this table goes on to

19 the next page; is that correct?

20 A.    That's correct.

21 Q.    So, what's discussed on the next page?

22 A.    So, this identifies some of the more specifics.

23 If you go through, the truly portable -- we won't spend a

24 lot of time there.  They talk about the weight of the

25 device, the size, battery life, things like that.

1           And these are various subcomponents within all

2   of the features.

3           If you go to the very last box, the last box

4   within this set of documents here, that talks about sound

5   quality; but actually it's on the next page.

6   Q.    Okay.  This box (indicating)?

7   A.    Yes, uh-huh.

8           So, this talks about integrating seamlessly --

9   or "integrates seamlessly with your Mac."  And they

10  identify several things here.  It identifies, on the left

11  side, integration with *iTunes*.  And then they talk about

12  some specific things.  For example, they talk about

13  creating playlists on the beneficial information.  You

14  can bring them with you wherever you go.

15          The next box says "Just plug in your P68 and

16  *iTunes* will automatically synchronize new songs that have

17  been added.  *iTunes* can either synchronize all of your

18  music or specific playlists that you set up."

19          So, again, there's been a lot of discussion

20  about how that syncs and obtains the music and playlists.

21  This is specifically identifying that.

22          And then they talk about other aspects as

23  well.  If you go down to the bottom left there, they talk

24  about FireWire.  That's another capability.

25          So, I needed to make an assessment of all

1 these things and identify where in those boxes the

2 technology that is being discussed -- playlists and

3 syncing and control of your music -- was identified; and

4 that's what I used to obtain that information.

5 Q.    How did you attribute value to the four different

6 categories?

7 A.    Okay.  So, if we go back to the prior chart which

8 was the set of boxes, what I then did -- I believe this

9 builds up -- if you go to the next slideware, what I did

10 was I attributed value.  I could have split them equally,

11 25 percent apiece.  But instead, from the information I

12 saw, is that the capacity, the ability to hold music, and

13 access your music, was prominently talked about; and then

14 the portability and the battery was popular as well.

15         All of these are interrelated.  They all

16 relate together.  I think there was some deposition

17 testimony that says you really need all them to work

18 together.  So, all of them have value.  I gave 30 percent

19 value to the top two boxes and then 20 percent to the

20 next two boxes, keeping in mind that the blue ones there

21 are where we've got the identification of some of the

22 playlists either creation or the playlist syncing that

23 was talked about or using your playlists.

24 Q.    Did you consider any survey that -- Dr. Peterson's

25 survey in determining how to apportion your value?

1479

1  A.    Yes.  Dr. Peterson's survey also talked about some

2  relative values of some of the different features.  So,

3  not only did I see the document, but I saw it in the

4  survey as well.

5  Q.    I want to turn your attention to Exhibit 445.

6  What is this Plaintiff's Exhibit 445?

7          MS. HUNSAKER:  I'll object as hearsay.  I

8  believe counsel and I agreed she would use this as a

9  demonstrative.

10          THE COURT:  You haven't offered it yet, have

11 you?

12          MS. HUANG:  No, I haven't offered it.

13 BY MS. HUANG:

14 Q.    What is this Exhibit 445?

15 A.    This is a summary table from Dr. Peterson's survey

16 from U.T. and it identifies what are the -- they took a

17 hundred-point scale -- the survey people and they're

18 taking the survey questionnaire.  They were given a

19 hundred points; and out of the hundred points, they were

20 going to assess the value amongst the different features

21 that they had value for and what the relative value was.

22          So, what you'll see here is things like

23 battery life and storage capacity.  Those show at 19.25

24 and 23.93.  That's a summary of what all these values

25 were that they assigned using kind of an index of 100

1480

1    points.

2              Playlists is third -- or fourth on there, at

3    11.73.

4              And then the easy navigation/controls were at

5    12.17.

6              Other things, such as the color screen,

7    viewing photos, et cetera, were given lesser weight.

8              So, some of this type here is generally

9    consistent with some of the information we saw about what

10   people care about, what people wanted from the iPod

11   device, and what was being promoted.

12   Q.    So, going back to your apportionment -- to

13   Demonstrative PX 1073-28, what did you do next to decide

14   what values -- what portion to attribute to each of these

15   categories?

16   A.    As I mentioned, if you go through the next portion

17   of this slideware, it will put values of 30 percent, as

18   an example, on the top two, 20 percent --

19   Q.    Mr. Nawrocki, can you identify what 30 percent is,

20   what category?

21   A.    Sure.  The 30 percent of value is associated with

22   capacity, navigation, and access.  And then the next one,

23   30 percent is portability and battery life.  The next one

24   is 20 percent for sound quality.  And the next one is

25   seamless integration and syncing basically with the

1 computer and *iTunes*, at 20 percent.

2        How those percentages work, I'll use just the

3 top example.  You take the 30 percent and apply it to the

4 $8.18 on the left side there -- let me just use the

5 pointer here to briefly explain this.

6        So, you take the 30 percent times the $8.18 of

7 the profit that's already been apportioned down to arrive

8 at the 2.45.  30 times $8 equals the 2.45.  The same

9 works for the 30 percent times the 17 to get to the 5.21.

10 So, that's coming up with a range of profit related to

11 the capacity, navigation, and access.

12        I did the same thing down at the bottom, blue

13 box for seamless integration using 20 percent times the

14 8.18 to get $1.64 and 20 percent times the 17 to get to

15 $3.47.  That's just the first step in the process.  We'll

16 go through a couple more steps here on the right side,

17 but this first major step is putting into those groups.

18 Q.    And what is the next step?

19 A.    So, now -- again it's like -- we're talking about

20 a recipe.  This is kind of the secret formula we talked

21 about.  Now we're going to try to sub-break this down

22 into further components and further reduce the

23 profitability all of the way down.

24        The next component takes a look at storage

25 capacity and easy navigation, your ability to store

1 songs, your ability to navigate amongst those songs and

2 access those songs through playlists or albums or

3 anything else.  And what I do is I say they're both

4 equally important; so, I split it 50/50 between storage

5 capacity and easy navigation.

6          And then I did a similar analysis for seamless

7 integration.  Seamless integration refers to the fast

8 transferring and charging that they talked about, through

9 plugging your device in and charging it up, as well as

10 integration and sync.  And I split those equally.

11 They're both important.  Split them up equally, 50/50, to

12 arrive at these numbers here (indicating), the 1.23 and

13 2.60 and 82 cents and $1.74, again following the blue

14 boxes as we go through.

15 Q.     So, you multiplied the 50 percent then by the

16 figure that came before under capacity, navigation, and

17 access?

18 A.     That's correct.  So, the 50 percent is applied to

19 the 2.45 to get to the $1.23, et cetera.  50 percent here

20 to the 1.64 to get to the 82 cents, as an example.

21 Q.     Did your apportionment stop there, Mr. Nawrocki?

22 A.     No, because once I have easy navigation and access

23 and integration, I then said, "Okay.  Let's now try to

24 carve it down to where the technology is used."  And I

25 now identified playlists and controls and playlists and

1 syncing.  One is accessing your music through playlists.

2 You can access it through the use of the downloaded

3 playlists.  We've talked about some surveys relating to

4 that.

5        The other is syncing or creating the

6 playlists, creating the playlists and syncing the

7 playlists.

8        This information I developed the 35 percent

9 for playlists and controls and 25 percent based upon the

10 surveys we talked about before lunch.  We talked about

11 some surveys.  This (indicating) is the basis for this

12 split (indicating), how often people are using playlists

13 to access their music and again how often they're using

14 playlists to create playlists or to sync as well.

15        All of these boxes, therefore, consider a

16 couple things, the use of playlists as well as the amount

17 of syncing that's done of those playlists.  And every

18 time something is sync'd back to the computer, as I

19 understand it, the playlists can come back to the iPod

20 device.

21        So, to finish this up, this chart, I, first of

22 all, apportioned this 32.70 down to the $8.18.  That

23 number was then further subdivided or sub-broken down to

24 these blue boxes to get to 43 cents and 91 cents.

25        And along this line or this pattern, that was

1484

1  then multiplied times the 20 percent, 50 percent, and 25

2  to get to the 20 cents and 43 cents.  So, 25 percent

3  times 82 equals 20 cents, et cetera.

4  Q.    Just so the record is clear, Mr. Nawrocki, the

5  chart you're talking about is Plaintiff's

6  Demonstrative 1073-31.

7  A.    Okay.

8  Q.    What happens next after you make this

9  apportionment?

10 A.    Okay.  So, now that I've gone through this

11 apportionment, taking a look at the iPod device and

12 trying to figure out what amount of profit would be

13 related to these playlists -- because there's no

14 accounting document you can say "How much do the

15 playlists cost" or "How much are people paying for the

16 playlists."  I've got to make these approximations.

17        I then summarized this here (indicating) from

18 the prior chart.  If you don't mind, just flip back to

19 the prior chart quickly.

20        So, the 43, 91 and the 20 cents to 43 cents

21 goes to the next chart that you had.

22 Q.    This is Plaintiff's Demonstrative 1073-32.

23 A.    That's correct.

24        So, I summarize those here.  I come up with

25 43 cents and 91 cents for the playlists, using playlists

1485

1  to access your music and controlling it.  And the

2  playlists and syncing of 20 cents to 43 cents to come up

3  with a total range of 63 cents to 1.34, just adding those

4  together.  This gave me then a range of profits

5  associated with this type of capability or this

6  functionality.  Again we're trying to estimate something

7  that's not in the accounting system.  They don't have an

8  account for how much playlists cost or how much they sell

9  playlists for.  It's embodied in each one of these

10 devices, and this is an estimate of what that profit

11 would be associated with this functionality.

12 Q.    Mr. Nawrocki, did you have an opinion as to what

13 the royalty rate should be within this range?

14 A.    Yes.  So, the next step I did -- and this is

15 pulling it all together -- is I then used that range and

16 came up with the fact that 90 cents per unit, I think,

17 would be a fair, reasonable range based upon the

18 hypothetical negotiation in 2001.

19          The range that we had, if you go back to the

20 prior chart briefly, was 63 cents to 1.34.  The midpoint

21 of that amount is a little bit more than 90 cents.  I

22 felt that 90 cents would be a reasonable expectation for

23 what the parties would have agreed to to be commensurate

24 with use.  They didn't know, Mr. Logan wouldn't know,

25 Apple wouldn't know what the future would be but they

1  would sit there and say, "Well, what portion of this

2  device should we use as a royalty" and I felt that

3  90 cents would be appropriate.

4  Q.    And once you reached 90 cents, what did you do

5  next?

6  A.    So, then we're basically just about complete with

7  the analysis.  We then apply that 90 cents to the royalty

8  base that we talked about.  So, we're kind of going full

9  circle back to where we started from.

10 Q.    And did you apply the base to the demonstrative

11 here?

12 A.    Yes.  So, the 90 cents is the royalty rate that I

13 used and applied it to the royalty base that we started

14 out with to obtain the total calculation of

15 $84.4 million.

16 Q.    This is Plaintiff's Demonstrative 1073-34.

17        Mr. Nawrocki, were you also asked to provide

18 an opinion if only the '178 patent was at issue in this

19 case?

20 A.    Yes, I was.

21 Q.    What is your opinion?

22 A.    This is a -- my opinion is that the royalty rate

23 would be slightly higher if it was just the '178 patent,

24 which initially is a little confusing because there is

25 only one patent at issue here as opposed to the two

1  patents here (indicating).

2          However, what happens is that the negotiation

3  time period changes from October, 2001.  We now -- if

4  only the '178 patent is valid, we go to negotiation in

5  March, '09.

6          I basically did a similar analysis just taking

7  a look at what profitability information we had.  And as

8  we mentioned earlier, we now have some actuals.  The

9  profitability was a little bit higher, 48 versus 32.70 to

10 34.70, to arrive at a range that was a little bit higher,

11 83 cents to $1.67 than was the 63 to 1.34.

12         And, so, based upon that higher profitability,

13 higher range, I came up with a royalty rate for just the

14 '178 of $1.30 per unit.

15 Q.     And the only products, Mr. Nawrocki, that would be

16 involved with the '178 patent -- if that was the only

17 patent at issue -- would be the nano 4 and 5 and

18 classic 6; is that correct?

19 A.     That's my understanding.

20 Q.     Mr. Nawrocki, were you also asked to provide an

21 opinion as to what an ongoing royalty rate would be in

22 this case?

23 A.     Yes, I was.

24 Q.     And what is your opinion?

25 A.     My opinion -- I provided a similar chart -- is

1 that for ongoing royalty rate -- and this would be for a

2 rate -- if it's determined there is validity and

3 infringement, a rate going forward for these products.

4 It would consider a negotiation that ideally would happen

5 at the time of judgment in this case, which would be in

6 2011.  As I mentioned, we only had June, 2010,

7 information.  So, I looked at similar information in

8 terms of profitability, came up with what the device

9 price was, the device profit for periods at around that

10 time to arrive at a range to be considered for that

11 royalty of 66 cents to $1.32.  The final rate would be

12 based upon the determination either by the court or jury

13 as instructed by the court.  So, this would be at least a

14 range to consider for the ongoing rate; and it would be

15 applied to whatever products would be sold after the time

16 of this case.

17 Q.    So, Plaintiff's Demonstrative PX 1073-37

18 represents what your opinion as to an ongoing royalty

19 rate would be?

20 A.    I'd say it's the range of profit to consider for

21 that rate.

22 Q.    Okay.  Mr. Nawrocki, have you reviewed the report

23 of Dr. Ugone, Apple's damages expert in this case?

24 A.    Yes, I did.

25 Q.    And you've been in the courtroom and heard a lot

1489

1  of testimony about a discussion Mr. Logan had with

2  Concert?

3  A.     Yes.

4  Q.     How does that discussion with Concert factor into

5  your analysis?

6  A.     Well, there is some discussion that -- in

7  reference to a discussion that Mr. Logan had with a

8  company called "Concert Technology."  I believe it was on

9  the first day or second day -- maybe the first day of

10 testimony.  And this was a discussion.  There weren't

11 specific terms that were agreed upon or anything else.

12 There wasn't a final dollar amount that was agreed to.

13 There was some discussion back and forth.

14       And though I considered that, I dismissed that

15 from my analysis as, first of all, Concert was a

16 different company.  Concert was not using this to make

17 audio players.  The product at issue here is audio

18 players.  Concert was not, to my knowledge, using it to

19 make audio players.  They were going to seek to try to do

20 something else, maybe license it to others.  So, my

21 understanding was that the discussions Mr. Logan had with

22 them were at a greatly discounted rate, as was talked

23 about.  I think he said ten cents on a dollar.  But call

24 it two cents on a dollar, ten cents on a dollar, he

25 really had a discussion there.  As I understand it, no

1490

1 money exchanged hands.  It was something that he had

2 considered as an alternative to pursuing the matter

3 against Apple.

4         And as I mentioned here, I think that what

5 makes the most sense is a running rate that would be

6 commensurate with Apple's use.

7 Q.    Mr. Nawrocki, it was your opinion that a 90-cent

8 per-unit royalty rate comes out to about $84 million.

9 That's a really large -- that's a large figure.  What's

10 driving that 84-million-dollar figure?

11 A.    Two things.  There's the rate, but more

12 importantly is the base as we talked about, those amount

13 of units, more than 90 million units, is really the

14 significant driver.

15         The fact that, as we talked about at the front

16 end -- that this technology was incorporated into

17 generation after generation after generation if the

18 patent's held valid and infringed speaks for itself.  In

19 terms of high technology where things are changing all of

20 the time, things can be taken off and put on.  Here,

21 they've kept that technology on.

22         I listened to Mr. Fadell when he said if they

23 didn't have the downloadable playlists, they wouldn't be

24 competitive.  So, that's a lot of money certainly in

25 royalties; but it's most dependent upon that significant

1  use that Apple had.

2  Q.    Thank you, Mr. Nawrocki.

3         MS. HUANG:  I pass the witness, your Honor.

4         MR. CORDELL:  Your Honor, may I make a brief

5  transitional statement to introduce my partner?

6         THE COURT:  Why doesn't she just introduce

7  herself?

8         MR. CORDELL:  Well, that's fine.

9         MS. HUNSAKER:  Good afternoon, ladies and

10  gentlemen.  We met about a week ago.  Seems like a lot

11  longer than that right now.  My name is Kelly Hunsaker,

12  and I'm here representing Apple.  I'm handling some of

13  the financial issues in this case.

14         Since everybody else has talked about where

15  they're from, I'll do the same.  I actually grew up in

16  Houston, lived there for about 20 years before moving to

17  Austin for college and then out to California.  I

18  currently live out in California.  I have two kids and am

19  just a few miles away from Apple's headquarters in

20  Cupertino, California.

21         <u>CROSS-EXAMINATION OF JAMES NAWROCKI</u>

22  BY MS. HUNSAKER:

23  Q.    Good afternoon, Mr. Nawrocki.

24  A.    Good afternoon.

25  Q.    How are you?

1492

1  A.     I'm good.

2  Q.     Now, early in your testimony you spoke about some

3  assumptions of infringement and validity.  Do you recall

4  that?

5  A.     Yes.

6  Q.     And in this case you don't actually have any

7  opinions yourself whether the patents-in-suit are, in

8  fact, infringed; is that correct?

9  A.     That's correct.  That was a matter for the other

10  expert.

11  Q.     And you also have no opinion of your own that the

12  patents-in-suit in this case are, in fact, valid; is that

13  right?

14  A.     That's correct.  I don't have an opinion on that.

15  Q.     And for that matter, you really don't have an

16  opinion one way or the other whether Dr. Almeroth's

17  opinions on infringement or validity are, in fact,

18  correct; is that true?

19  A.     I don't have an opinion.  That's a matter for the

20  court and the jury to determine.

21  Q.     And that's not your area of expertise.

22  A.     That's correct.

23  Q.     And, so, those are simply assumptions that you're

24  required to make and that Dr. Ugone is required to make

25  so that we can have this discussion and so ultimately the

1493

1  ladies and gentlemen of the jury can decide what a

2  reasonable royalty, based on the facts of this case, are;

3  isn't that right?

4  A.     That's right.  In order to calculate damages, you

5  assume that there is validity and infringement; but

6  that's a matter for the jury, as is the damages

7  calculation.

8  Q.     Okay.  And the negotiation here is, in fact, a

9  hypothetical one; isn't that right?

10  A.     That's correct.

11  Q.     And Mr. Logan didn't actually come to Apple in

12  2001 to negotiate a license, did he?

13  A.     I know there were some discussions or some --

14  Q.     Mr. Nawrocki, my question is:  Mr. Logan did not

15  come to Apple in 2001 to negotiate a license; is that

16  right?

17  A.     I don't know if he did or not.  I saw some

18  correspondence, but I don't know when that was.

19  Q.     Now, you testified earlier that there was no

20  established royalty for the '076 or the '178 patents,

21  correct?

22  A.     That's correct.

23  Q.     And that's because in the ten years since the '076

24  patent has been issued, Mr. Logan has not licensed that

25  patent to anyone; is that correct?

1  A.      Well, there's been some agreements.

2             MS. HUANG:  Objection, your Honor.  It is not

3  accurate to say that the patents are not licensed.

4             THE COURT:  Well, it was a question.  He can

5  answer it.

6             You need to ask the question.

7             MS. HUNSAKER:  Okay.

8             THE COURT:  Go ahead.

9  BY MS. HUNSAKER:

10 Q.      So, you agree that there is not an established

11 royalty in this case; is that right?

12 A.      That's correct.

13 Q.      Okay.  Now, Mr. Logan or Personal Audio also has

14 not made a commercial product that practices the

15 inventions in the '076 or the '178 patent; is that

16 correct?

17 A.      Not to my knowledge.

18 Q.      And, so, whether it's in 2001 or whether it's in

19 2009, at this hypothetical negotiation Apple is not

20 sitting across the table from Mr. Logan as a competitor

21 in the same marketplace; isn't that correct?

22 A.      That's correct.  Mr. Logan wasn't making a player

23 himself that was competing with Apple.  He was more of a

24 licensor and a licensee relationship.

25             MS. HUNSAKER:  Your Honor, I realize I did not

1   give the binder of exhibits to opposing counsel or to the

2   court.  So, may I do that now?

3          THE COURT:  You may.

4          MR. CORDELL:  May I approach, your Honor?

5          THE COURT:  You may.

6          MR. CORDELL:  Your Honor, may I take this down

7   so that we can see the witness?

8          THE COURT:  You may.

9   BY MS. HUNSAKER:

10  Q.    You testified earlier regarding the

11  *Georgia-Pacific* case.  Do you remember that?

12  A.    Yes.

13         MS. HUNSAKER:  And I'd like to ask to put up

14  Slide DDX 302.  And this is just one of the

15  *Georgia-Pacific* factors.

16  BY MS. HUNSAKER:

17  Q.    Now, first of all, you mentioned that this case

18  discussed 15 factors that you may consider in talking or

19  thinking about what an appropriate royalty would be.  Do

20  you remember that?

21  A.    Yes.  That's correct.

22  Q.    And those 15 factors are not an exclusive list of

23  considerations.  Would you agree with me on that?

24  A.    It's been referred to as not necessarily an

25  exclusive list, but it's -- there are specifically 15

1  factors.  Some other considerations sometimes people

2  consider.

3  Q.    But it's not an exclusive list and your Honor

4  would not instruct the jury that it's an exclusive list;

5  is that correct?

6  A.    I haven't seen it referred to as "exclusive."  I

7  think I've heard it referred to as "exhaustive."  It says

8  it's not an exhaustive list, I think is what some of the

9  cases refer to but --

10  Q.    Well, in fact, the *Georgia-Pacific* case says that

11  a willing licensee and a willing licensor can take into

12  consideration any economic facts that a reasonable

13  businessperson would consider; is that right?

14  A.    That's right.  As we talked about under Factor 15,

15  what a prudent person would agree to in an agreement

16  between a licensor and a licensee, what would make

17  business sense.

18  Q.    So, *Georgia-Pacific* --

19          THE COURT:  Excuse me, counsel.

20          Have you provided me with a copy of the

21  demonstratives?  You don't have to.  I'm just wondering

22  if they're in this book or not.

23          MS. HUNSAKER:  I apologize, your Honor.  May I

24  approach?

25          THE COURT:  Please.

1          Thank you.

2     BY MS. HUNSAKER:

3     Q.     So, *Georgia-Pacific* Factor Number 5 says "The

4     commercial relationship between the licensor and the

5     licensee, such as whether they are competitors in the

6     same territory and in the same line of business"; is that

7     right?

8     A.     Yes, "or whether they are inventor and promoting."

9     Q.     Right.

10          Now -- so, to use an analogy, you referred to

11    use of a piece of land earlier.  And if you own a piece

12    of land and have a fruit stand on that land and I want to

13    open a competing fruit stand on that land -- are you

14    following me?

15          Now, you may want a royalty for every orange

16    that I sell because that might mean one less orange that

17    you sell.  Is that a fair statement?

18    A.     You know, a royalty could be based upon orange

19    sales or could be based upon the plot of land that you're

20    using.  It could be based upon whatever you would like.

21    Q.     And, so, the fact that you're competitors in the

22    same marketplace, you would certainly take into account

23    that if someone made a sale of a particular volume of

24    units, that that might be volume of units that you,

25    yourself, are not going to make; and you would take that

1498

1   into account in a hypothetical negotiation.  Would you

2   agree that someone might consider that?

3   A.     That would be a consideration.  Then you'd be

4   looking at more towards what is called "lost sales,"

5   taking a look at have you lost sales as a result of that.

6   And that's not the case here, but that's something to

7   consider.

8   Q.     Well, actually, Mr. Nawrocki, in the

9   *Georgia-Pacific* case, the court did consider direct

10  competitors under a reasonable royalty theory and the

11  fact that the licensor would consider individual sales

12  from the competitor, not in a lost profit scenario but a

13  reasonable royalty; isn't that right?

14  A.     Right.  There's a couple of different ways it

15  could be considered.  One would be in a lost profit

16  calculation or in terms of determining the royalty.  If

17  I'm going to lose sales to you, that would be a

18  consideration as well; and then we'd look at the higher

19  levels of gross margin that we talked about as an

20  example.

21  Q.     And, so, Mr. Logan would not be in the

22  hypothetical negotiation with Apple in that scenario that

23  we just described; is that fair?

24  A.     That's correct.  And that's why I didn't use the

25  gross margin.  I used the lower number.

1499

1  Q.     Thank you, Mr. Nawrocki.

2         Now, whatever -- actually, let me move on.

3         MS. HUNSAKER:  If you could pull up

4  Plaintiff's Exhibit 1073-3, Slideware Number 3.

5  BY MS. HUNSAKER:

6  Q.     Now, you referred to the house rent analogy.  Do

7  you recall that?

8  A.     Yeah, house or land, yeah, as an example.

9  Q.     Okay.  And this was your slideware from the

10 presentation?

11 A.     Yes, it was.

12 Q.     Now, over in the top right-hand column you refer

13 to monthly rent as an example of what a royalty -- an

14 analogy of a royalty; is that right?

15 A.     Right, like a monthly rent or a rent -- you can

16 rent a car on a daily basis.  Some type of rent, yes.

17 Q.     Okay.  And the monthly rent in a landlord-tenant

18 situation, that's not based on the extent of use, is it?

19 A.     Yes, it is.  If you use it every month, you pay

20 per month.  So, if you're going to have it for three

21 months, you'd pay a certain rent per month basically.

22 Q.     It's a fixed installment payment; isn't that

23 right?

24 A.     I wouldn't say a rent is a fixed installment

25 payment.  That would be more of a mortgage perhaps.  But

1  what a rent would be is, as we're familiar with, so much

2  per month, $500 a month; and that would coincide with the

3  extent that you're using it, three months or a year would

4  be 12 months -- I believe the example I gave was $500 for

5  12 months, as an example.

6  Q.    So, a one-year lease of $500 a month would be a

7  fixed amount of $6,000 for that year; isn't that right?

8  A.    If you wanted to pay a fixed or a lump sum, that

9  would be 6,000 if you paid it at one time or $500 a

10  month.

11  Q.    And it wouldn't matter how many nights you slept

12  there, right?

13  A.    Right.  If you're renting it per month, you're

14  renting it per month.

15  Q.    It wouldn't matter if you had one kid or two kids

16  or four kids.

17  A.    That's right.

18  Q.    It wouldn't matter if you hosted the family every

19  4th of July.

20  A.    No.  You could -- yeah.  You could do with it what

21  you wanted as long as you paid the rent.  That's the

22  clearance for using the lease.

23         Now, presumably there are some restrictions on

24  your rent agreement in terms of you might not be able to

25  run a business out of there or something.  But within the

1  general context of a rental agreement, you could use it

2  or not use it as you see fit, as long as you paid the

3  rent.

4  Q.    So, just to stay with this analogy a little bit

5  more, when you're negotiating for a patent license, you

6  don't actually get the house; is that correct?

7  A.    Yeah.  Well, in either one you don't.  You don't

8  own the house.  You don't own the patent.  You're renting

9  it.  You're paying for renting it.

10         So, Mr. Logan would still own the patent and

11 he could license it or lease it out, rent it to Apple or

12 other companies if he wanted to.

13 Q.    So, it's more like a deed to land.  You get a

14 document with the metes and bounds, right?

15 A.    The patent is?

16 Q.    Yes.

17 A.    Yeah.  The patent gives you the -- without getting

18 too technical, within the claims it would tell you what

19 the boundary lines are for your property.

20 Q.    And, so, to get the house that you have up in the

21 top left-hand corner --

22 A.    Yes.

23 Q.    -- you'd still have to hire the contractor, right?

24 A.    You mean to build the house?

25 Q.    Yes.

1  A.    Yeah.  If you owned the house, you would have to

2  build a house or buy the house on the marketplace.

3  Q.    But as the licensee in your analogy, you'd still

4  have to hire the contractor, buy the materials, build the

5  house, right?

6  A.    No, not -- in the first one somebody owns a house.

7  I don't want to get too confusing here.  In the first

8  analogy somebody owns a house, and you're just going to

9  rent the house.  It's pretty straightforward.  It doesn't

10 have to deal with building the house or anything else.

11          The renter is just coming in and leasing the

12 house, just --

13 Q.    All right.  Maybe we should leave the analogy and

14 go to the bare patent license.

15 A.    Okay.

16 Q.    How about that?

17 A.    All right.  That's fine.

18 Q.    Now, with a bare patent license, the kind that

19 would be the subject of negotiation between Apple and

20 Mr. Logan, you wouldn't get any working software with

21 that; is that correct?

22 A.    Not to my knowledge.  A license should be just for

23 clearance to use the patent, clearance to use the rights

24 to the patent, not exclusively but just as one of the

25 users.

1503

1  Q.    So, you don't get any software.  You don't get any
2  operating technology; is that right?
3  A.    Not generally in a bare patent license.  Usually
4  it refers --
5  Q.    That's not what Apple would be paying for; is that
6  correct?
7  A.    Just paying for the use of the patent.
8  Q.    So, Apple would still have to design and engineer
9  a product?
10 A.    Yes, and they'd still have to put the batteries
11 and everything else together with it as well.
12 Q.    And they'd have to make the product work, yes?
13 A.    Yes, absolutely.
14 Q.    Would they have to build the player that the
15 battery goes into?
16 A.    Yes.
17 Q.    They'd have to write the software code?
18 A.    Yes -- well, write it or pay someone else to write
19 it or what have you.
20 Q.    So, they'd have to make that work with the rest of
21 the system; is that right?
22 A.    Make what?  The patent work?
23 Q.    All of the components that you're talking about.
24 A.    Yeah.  All of the components that Apple puts
25 together would have to be put together in a working

1  product like you have here.  And that's one of the

2  reasons why, in my profit apportionment, they get 50 to

3  75 percent right off the top, before we get into the

4  specific components.

5  Q.     And they'd have to market it, and they'd have to

6  sell it?

7  A.     Yes.  And that's why I deducted the operating

8  costs.

9  Q.     So, all 10 or 15 of those iPods that you and your

10 family have, Apple would have to do all of that to make

11 that come to fruition; is that right?

12 A.     And they would have to do it 90 million times for

13 all those different devices they sold, right.

14 Q.     Okay.  Now, you agree you're not a legal expert;

15 is that right?

16 A.     That's correct.  I'm not an attorney.  I'm a CPA.

17 Q.     Okay.

18        MS. HUNSAKER:  Could you pull up Plaintiff's

19 Slide 2, please?

20 BY MS. HUNSAKER:

21 Q.     Now, you put up this slideware; and you told the

22 ladies and gentlemen of the jury that the statute says

23 "in no event less than a reasonable royalty for the use

24 made of the invention."  Remember that?

25 A.     Right.  I was just asked for what the guidance was

1  that I considered; and this is one of the guidances, that

2  for use made of the invention by the infringer in part,

3  no less than a reasonable royalty for use made of the

4  invention by the infringer.

5  Q.    So, you weren't suggesting to the jury when you

6  said that that anything about this statute requires them

7  to award a per-unit royalty, were you?

8  A.    In terms of the instructions for the jury, I'll

9  leave that to the court.  This is the overall guidance

10  that I certainly considered as part of my overall

11  analysis.  I'd say this is an overview for my analysis.

12  The court can provide whatever guidance they certainly

13  deem fit.

14  Q.    So, if the statute doesn't require a per-unit

15  royalty, "use made of the invention" could, for example,

16  mean does the patent cover the entire product and

17  everything that's put into it or does it cover a very,

18  very, very small part of a product.  That could also be

19  use of the invention; isn't that true?

20  A.    I won't interpret what that is, but I'll mention

21  one of the things I considered was what aspect -- when I

22  whittled all of that down, I tried to get to the smaller

23  part, not the entire device.  That's what that whole

24  exercise was with the blue boxes that I put up there.

25          MS. HUNSACKER:  So, why don't we go on to 302,

1  DDX 302 -- 301.  I apologize.

2  BY MS. HUNSAKER:

3  Q.    And we talked a little bit about *Georgia-Pacific*.

4  We talked about the hypothetical negotiation; and your

5  slideware there reflects the handshake, the willing

6  licensor and the willing licensee; is that right?

7  A.    Yes.  That's what that represents as an agreement

8  basically.

9  Q.    Okay.  And the law and this whole construct that

10  you're relying on of two willing parties entering into an

11  agreement, it assumes that both parties are going to act

12  reasonably in their negotiations; is that right?

13  A.    Yeah.  I believe when I'm looking at the factor

14  itself, it says that if both had been reasonably and

15  voluntarily trying to reach an agreement.

16  Q.    Okay.  So --

17  A.    Well, that didn't happen; and, so, that's why it's

18  a hypothetical.

19        MS. HUNSAKER:  Why don't you go ahead and put

20  up 304, please.

21        THE COURT:  Now, is that plaintiff's or

22  defendant's?

23        MS. HUNSAKER:  That was defendant's --

24        THE COURT:  No, this 304.

25        MS. HUNSAKER:  304 is defendant's.

1507

1  BY MS. HUNSAKER:

2  Q.    So, in fact, Factor Number 15 of

3  *Georgia-Pacific* --

4  A.    Yes.

5  Q.    -- specifically tells us and tells the ladies and

6  gentlemen of the jury that you're supposed to assume that

7  both parties are acting voluntarily?

8  A.    Yes.  That's what I was just referring to.  And

9  this is actually the section you have up there.  If they

10 had been -- reasonably and voluntarily tried to reach an

11 agreement at the time that the first infringement began.

12 Q.    Okay.

13 A.    So, I agree.

14 Q.    So, you -- in a hypothetical negotiation, if a

15 patent holder was not being reasonable, then someone

16 making a product could decide to do the same thing in a

17 substantially different way.  Isn't that a possible

18 scenario in a hypothetical negotiation?

19 A.    Certainly happens in real world.  In a

20 hypothetical for a damages construct, you're trying to do

21 things reasonably.  You can't pull one way or the other;

22 and that's one of the reasons why the per-unit makes

23 sense to say, "Well, no one's going to win and no one's

24 going to lose if we do a lump sum.  We're not trying to

25 guess.  Let's just pay -- whatever happens happens.

1  We'll get the same amount" --

2  Q.    So, Mr. Nawrocki --

3  A.    Yes.

4  Q.    I'm sorry to interrupt you --

5  A.    Sure.  Okay.

6  Q.    -- but that wasn't my question.

7  A.    I'm sorry.  Go ahead.

8  Q.    My question is:  In the hypothetical

9  negotiation --

10 A.    Yes.

11 Q.    -- one of the things that the parties could

12 consider is what alternatives are there and what

13 different ways, what alternate ways could this same thing

14 be done if the other side's not being reasonable.  That's

15 something that this construct allows you to consider,

16 isn't it?

17 A.    Alternatives might be considered in a negotiation,

18 be it a real world or if there are some alternatives that

19 could be used that might be a consideration for a damage

20 analysis as well.

21 Q.    Okay.  And, so, if that were to happen, if the

22 patent holder was demanding too much and the cost was

23 substantially more than what you could do something else

24 for, then the patent holder stands the risk of not

25 getting anything; isn't that true?

1   A.      The patent holder?  Yes.  If someone walks the

2   negotiation, then the licensee walks, he doesn't get the

3   technology and then the licensor loses because he doesn't

4   get the license fee.  So, what you're trying to determine

5   is what rate is fair to both parties and what's the

6   fairest way to calculate that.

7   Q.      And, so, ultimately, in this construct it's not

8   simply what damages Personal Audio would ask for.  It's

9   what damages the ladies and gentlemen of the jury think

10  are a reasonable royalty in this case; is that right?

11  A.      They and the court have the final determination of

12  damages.  Absolutely.

13  Q.      Now, you know what the entire market value rule

14  is; is that correct?

15  A.      Yes.  I've heard it discussed, and --

16  Q.      Okay.

17  A.      -- I think the court's made some rulings relating

18  to that as well.

19  Q.      Okay.  And I'm not trying to -- generally

20  speaking, do you understand that that means you can only

21  base damages on the entire market value of the iPod if

22  the patented feature is the basis of customer demand for

23  the whole thing?

24  A.      Yes.  In way of example, in other words, this

25  device, I think we said, sold at a price of $327.  If

1  we're going to take a percentage of that, let's say

2  2 percent, that would be $6.  That would be based upon

3  the entire market value because that would be based on

4  the whole device as opposed to just a portion of the

5  device, which is what I've done here.

6  Q.    So, you've elected not to use the entire market

7  value rule in this case.  Is that your position?

8  A.    That's correct.  I've --

9  Q.    Okay.

10  A.    -- apportioned the profits down to --

11  Q.    Now --

12  A.    -- what I estimate to be the specific units at

13  issue or the specific features at issue.

14  Q.    Now, you also understand, Mr. Nawrocki, that the

15  law requires -- and particularly some of the recent

16  law -- that damages in a patent case actually be tied to

17  the value of the claimed invention?

18  A.    Yes.

19  Q.    Not to features that are already in the prior art,

20  correct?

21  A.    Well, you get damages on what's infringing, what

22  the infringing functionality provides.

23  Q.    Well, but you don't get damages, for example, on

24  aspects that have been in the prior art for many, many

25  years; is that right?

1 A.    Well, I can't say from a legal standpoint that

2 answer.  I know you get damages based upon what those --

3 infringing features the infringing functionality

4 provides.  Here I understand it's the player.

5 Q.    So --

6 A.    I'm sorry.  It's the player.  But what I've done

7 is estimated the value by --

8 Q.    So --

9 A.    -- knocking it down to features.

10 Q.    Mr. Nawrocki --

11          MS. HUNSAKER:  Your Honor, nonresponsive and

12 move to strike.

13          THE COURT:  Overruled.

14 BY MS. HUNSAKER:

15 Q.    So, my question, Mr. Nawrocki, is that you are not

16 entitled to get damages for contributions of others,

17 whether it's Apple or whether it's somebody else.  Do you

18 agree with that?

19 A.    By "you," you're talking about Mr. Logan?

20 Q.    Yes.

21 A.    He should only get damages for his technology

22 that's found valid and infringed.

23 Q.    That is in the claimed invention?

24 A.    That's in the claimed invention or inventions.

25 Q.    Okay.  So, this is the last bit of law.

1512

1  A.      Okay.

2  Q.      Now, isn't it true Personal Audio has the burden

3  of proving damages to the jury?  Is that right?

4  A.      I'll leave that for the court.  I mean, I've made

5  my calculation; but in terms of the burdens, I'm not a

6  legal expert to say whose burden it is.

7  Q.      Well --

8  A.      We've introduced my testimony to provide some

9  guidance in terms of what calculations I think are

10 reasonable.

11 Q.      Well, you've certainly testified in court a number

12 of times; isn't that right?

13 A.      Yes.

14 Q.      And you do understand that you're here to prove

15 Personal Audio's damages case.  Do you understand that?

16 A.      To show what my opinion is on their damages.

17 Q.      Okay.  And do you understand that you're required

18 to prove the amount of damages with reasonable certainty?

19 A.      Again, I'll leave the legal matter for the court.

20 But I feel I've used reasonable certainty to calculate

21 the damages I have here.

22 Q.      And do you understand that damages can't be based

23 on speculation and guesswork?

24 A.      Yes.

25 Q.      Let's turn to your apportionment, sir.

1513

1  A.      Okay.

2              MS. HUNSAKER:   Could you bring up Plaintiff's

3  Slide Number 27, please?

4  BY MS. HUNSAKER:

5  Q.      Now, this was the first step that you apportioned

6  after you arrived at the forecasted profit margin for the

7  iPod; is that correct?

8  A.      Yes.

9  Q.      And this particular apportionment, you allocated

10  somewhere between 50 and 75 percent to non-device

11  contributions?

12  A.      Yes.  I'd say a range of 50 to 75 percent to Apple

13  and --

14  Q.      And a range --

15  A.      -- and to non-device contributions.

16  Q.      And a range of 25 to 50 percent to device

17  contributions; is that correct?

18  A.      That's right.

19  Q.      And that's a fairly large range, isn't it,

20  Mr. Nawrocki?

21  A.      Yes, it is.  It's basically providing a -- it's a

22  large range, and it's actually a lot of money to give to

23  Apple separate and apart from the product.

24  Q.      So --

25              MS. HUNSAKER:   Move to strike as

1  nonresponsive, your Honor.

2          THE COURT:  Overruled.

3  BY MS. HUNSAKER:

4  Q.    So, 50 to 75 percent, that's, you know, kind of an

5  order of magnitude different.  Is that more like a guess?

6  A.    No.  It's based upon the information that I

7  reviewed in terms of what would be very conservative to

8  give Apple credit for.  If I was doing it specifically in

9  October, 2001, I would have used actually probably a

10 lower amount to Apple; but I looked at that and I also

11 looked over the period of time and said, "Well,

12 conservatively let me give them one-half to

13 three-quarters, 50 to 75 percent, for their brand, their

14 customer loyalty, all the efforts they went through,

15 right off the top before we start the rest of this

16 analysis."

17 Q.    So, Mr. Nawrocki, I'm sure Apple appreciates you

18 giving them that; but do you have any particular

19 documents that you can show the ladies and gentlemen of

20 the jury that provide 50 to 75 percent to non-device

21 contributions?

22 A.    Well, what I would refer to is various things.  I

23 looked at the various surveys they had which talked about

24 the importance of brand, they talked about the importance

25 of the Apple design, they talked about how many customers

1 they had that were Apple customers versus PC customers

2 and whether or not there was any transfer over from the

3 PC customers to the Apple product line.  I --

4 Q.    And, Mr. Nawrocki, my question is actually very

5 specific.

6 A.    Well, that's what I'm referring to, is the surveys

7 as an example.

8 Q.    Is there any survey you saw that allocated 50 to

9 75 percent to Apple and to non-device contributions,

10 including brand name, customer loyalty, business risks,

11 and industrial design?

12 A.    Not that high a percentage.  The ones that I

13 recall from the surveys --

14 Q.    So --

15 A.    -- came up with lower percentages.  So, I gave

16 them more credit than the surveys showed.

17 Q.    And you've not shown that documentation to the

18 ladies and gentlemen of the jury, have you?

19 A.    We talked about the surveys but we didn't mention

20 the brand, but they're in the surveys as well.  And I

21 would also reference the different deposition testimony

22 that talked about the importance of this as well.

23 Q.    So, you can't point to any single document that

24 lists 50 to 75 percent to these matters, can you?

25 A.    No.  The ones that I recall from the survey

1   dealing with brand gave them some portion but not as high

2   as the amount that I gave them.

3           MS. HUNSAKER:  Can we go on to Slide 29,

4   please?

5   BY MS. HUNSAKER:

6   Q.    Now, we've heard a lot of testimony so far about

7   these four key messages of the iPod; isn't that right?

8   A.    Yes.  I believe they were called "magic formula,"

9   I guess, in Mr. Fadell's testimony; but it was also key

10  messages in the Apple documents.

11  Q.    But there is no document that you have cited in

12  your expert report that suggests 30 percent of the value

13  is attributable to the capacity, 30 percent is

14  attributable to portability and battery, 20 percent to

15  sound quality, and 20 percent to seamless integration?

16  There is nothing that you can provide the ladies and

17  gentlemen of the jury that sets forth the numbers that

18  you came up with; isn't that right?

19  A.    No.  I disagree with that.  There's a couple of

20  things -- several things.

21          There's Mr. Fadell's testimony where he talked

22  about the identification of these items.

23          As far as the percentages, that's one thing I

24  considered within Dr. Peterson's analysis where he came

25  up with relative values that people in his survey had

1  placed on different capabilities.

2          Additionally, there was testimony of Stan Ng

3  that talked about which features were important.  So --

4  Q.    So --

5  A.    -- this was an allocation of percentages based

6  upon my consideration of Mr. Fadell's testimony in his

7  deposition which was consistent with what he said in

8  court as well as the surveys of Dr. Peterson as well as

9  other information like the product review reports we

10 talked about which were Plaintiff's Exhibit 33.

11 Q.    Why don't we pull up Plaintiff's Exhibit 33.

12 A.    Okay.

13 Q.    So, Plaintiff's Exhibit 33 is the Hardware Product

14 Brief; is that correct?

15 A.    Yes.

16 Q.    And I believe you were testifying regarding Page

17 Number 9.

18 A.    Yeah -- well, several pages.  As an example,

19 starting on page 9.

20 Q.    Okay.  So, the key messages that we're talking

21 about are at Page Number 9?

22 A.    Yes.

23 Q.    Okay.  Now, can you point to anywhere in this

24 document to show the ladies and gentlemen of the jury

25 that the values you have assigned in this step of the

1518

1  apportionment are based, in fact, in the data?

2  A.    The 30 percent and the 20 percent?

3  Q.    Yeah.

4  A.    No.  The 30 percent and 20 percent don't show up

5  in these documents.  You'd have to read this document in

6  conjunction with the other information in deposition

7  testimony to say, well, they identify four criteria at

8  the top -- holds all your music, truly portable --

9  Q.    Mr. Nawrocki --

10 A.    -- best sound quality, and integrates music.

11 Those four were the four groups that I thought of.  The

12 specific percentages weren't provided here.  You need to

13 take a look at the other information and try to estimate

14 do you allocate them equally or do you give more weight

15 to some, less to the other.  What I did is I gave more

16 weight to some, less to the others.

17 Q.    So, the answer is no, you can't point the ladies

18 and gentlemen of the jury to any specific document or any

19 specific data that provides for the percentages that

20 you've allocated at this step; is that correct?

21 A.    This document will be the starting point for that,

22 and then I would look in conjunction with the surveys as

23 well as some of the testimony which -- surveys provide

24 some numeric information.  The testimony does it more in

25 a subjective way, saying we really wanted to have

1 capacity.  Battery was a big deal.  So, I gave that

2 higher weighting as an example.

3 Q.    But is it safe to say that if there was some

4 document or some specific testimony that you relied on

5 that had these percentages in them, that we would have

6 seen it and that you would have showed it to the ladies

7 and gentlemen of the jury?  Is that correct?

8 A.    No.  I would say that there was testimony that

9 talked about it.  There's nothing that gives you the

10 exact 20 percent and 30 percent.  That was a weighting

11 that I gave it, putting more weight on the songs as well

12 as the battery, because that's the way -- when I read all

13 of the documents and presentations, they were putting

14 that as a more emphasized capability.

15 Q.    And, so, sir, is the answer no, that you cannot

16 provide a specific document that provides the percentages

17 you've allocated in this step?

18 A.    Not those specific percentages --

19 Q.    Okay.  Thank you.

20 A.    But it would show the range of importance --

21        MS. HUNSAKER:  Could we go on to

22 Slide Number 30, please?

23 A.    Okay.

24 BY MS. HUNSAKER:

25 Q.    I'm sorry to --

1520

1  A.     I'm sorry.

2  Q.     -- interrupt, Mr. Nawrocki --

3  A.     I'm sorry.

4  Q.     -- but we've got to move on.

5  A.     What exhibit did you say?  I'm sorry.

6  Q.     This is plaintiff's demonstrative at page 30.

7  A.     Yes, I have that.

8  Q.     Okay.  So, in this step you allocate, in the first

9  blue box, 50 percent to storage capacity and 50 percent

10 to easy navigation and access.  And, Mr. Nawrocki, is

11 there any documents that you can point to that provide

12 those percentages for those features?

13 A.     They wouldn't have the specific percentages.  They

14 would put importance on both of those.  As I mentioned,

15 what I gave them is equal importance saying they're both

16 important in terms of what the capacity is as well as

17 being able to navigate that.

18          It considers things like the capacity relates

19 to the hard drive, as an example, which was a fairly

20 high-cost item but that as I understand it Apple bought

21 from Toshiba, as an example.

22          So, there is some value to that but not

23 necessarily on the costs.  When we walked through all of

24 those cost items, that gave some recitation of what

25 different cost items ran.  Storage capacity costs a lot

1 but from a profitability standpoint, I gave it a chunk --

2 half of it right there -- but I considered the fact that

3 Apple didn't manufacture this themselves.  They were, as

4 I understand, buying it from Toshiba or one of the other

5 hard drive manufacturers.

6 Q.    So, Mr. Nawrocki, there is not a specific document

7 cited in your report and there's not a specific document

8 that you can point us to that makes these allocations.

9 Those are allocations that you have given or credited to

10 certain features of the device.  Is that -- yes or no?

11 A.    Yes, those --

12 Q.    I'm just asking --

13 A.    Yes, those are --

14 Q.    -- if --

15 A.    Yes, those are estimates I've done based upon the

16 information I reviewed.

17 Q.    Okay.  Now, I'm going to ask you the same

18 question --

19 A.    Okay.

20 Q.    -- about the box at the bottom.

21 A.    Okay.

22 Q.    In this one you've allocated for the key message

23 of seamless integration 50 percent between fast transfer

24 and charging and 50 percent between integration and

25 syncing.  And, again, Mr. Nawrocki, I ask you:  Is this

1  based on the amalgamation of everything, or can you point

2  the ladies and gentlemen of the jury to specific data

3  that shows these percentage allocations that are in your

4  chart?

5  A.    I'd say it's an overall estimate based upon

6  various information -- sometimes subjective, sometimes

7  depositions, and sometimes the surveys -- which you would

8  have to take a look at the specific components which

9  sometimes talk about things like syncing.  It doesn't

10  give you the specific 50 percent, but it gives you an

11  impression that you can form based upon a culmination of

12  all this information.

13  Q.    Okay.  So, you cannot point us to a specific

14  document or specific testimony from anyone with these

15  percentages that you have allocated in this step of your

16  apportionment; is that right?

17  A.    Unfortunately they didn't provide the percentages;

18  so, I had to come up with percentages based upon my

19  review of the information.

20  Q.    And you've shown us the best information that you

21  have to persuade the jury about that; is that right?

22  A.    I would say that I've shown examples of

23  information; but by far, we didn't go into all the

24  details.

25          MS. HUNSAKER:  Why don't we go to Plaintiff's

1  Demonstrative Number 31, Slide 31, please.

2  BY MS. HUNSAKER:

3  Q.    Now, at this step over on the far right, we have

4  further breakdowns of "easy navigation" and "access," at

5  the top.  Do you see that?

6  A.    That's right.

7  Q.    Okay.  And the top box -- or I should say the box

8  all the way to the right -- says "playlists" and

9  "controls," 35 percent.

10  A.    Yes.

11  Q.    Okay.  And then everything else in easy navigation

12  and control is 65 percent.

13  A.    That's right.  So, that involves a variety of ways

14  people --

15  Q.    There is not a question --

16  A.    I'm sorry.

17  Q.    -- pending right now.

18  A.    I was just hoping to explain.

19  Q.    Okay.  So, now at the bottom half of the chart,

20  integration and syncing, you've broken that up between

21  "playlists" 25 percent and "other" 75 percent; is that

22  right?

23  A.    Yes.

24  Q.    And, so, you're counting playlists in both the top

25  section of your apportionment and the bottom section of

1  your apportionment; is that correct?

2  A.     Yes, two different aspects of playlists, though.

3  One is creating; one is using.

4  Q.     So, Mr. Nawrocki, you count those; and then you

5  add those together; is that correct?

6  A.     I come up with a range of the 43 cents to 91 and

7  add that to the 20 cents and 43, to come up with the

8  overall range.  That's correct.

9  Q.     So --

10         MS. HUNSAKER:  Why don't we go to Slide 32.

11  BY MS. HUNSAKER:

12  Q.     So, this is the range that you're talking about?

13  A.     Yes, the 63 cents to $1.34.

14  Q.     And this is by adding the two splits -- percentage

15  splits of playlists together; is that right?

16  A.     Yes.  Let's say the very end of whittling --

17  whittling all of this down --

18  Q.     So --

19  A.     -- to the very end, it results in these ranges;

20  and that's what I've included here.

21  Q.     Okay.  Thank you.

22         So, in the part in which you're counting

23  creating playlists, are you referring to creating

24  playlists in *iTunes*?

25  A.     Creating playlists on your computer, where they

1   create them, and then they're sync'd with the iPod

2   device.  After you create them on your computer, you sync

3   them to your iPod device.  And the top portion is

4   actually using the playlist once it's on your iPod

5   device.

6   Q.    And, so, you've been here throughout the whole

7   trial, haven't you?

8   A.    Through most of it.  I haven't been through every

9   hour, but I've been through most of it.

10  Q.    Okay.  And I think everybody knows at least one

11  thing by now, and that's that *iTunes* is not accused; is

12  that right?

13  A.    *iTunes* is not -- I haven't calculated any damages

14  relating to *iTunes*.  That's correct.

15  Q.    But you did calculate damages for one of your

16  playlist components with respect to creating playlists on

17  your computer on *iTunes*; is that right?

18  A.    Right, because part of what happens is they're

19  created on the computer and then they're transferred down

20  to the iPod device.  So, the creating it is one aspect of

21  what I've included there.

22  Q.    Okay.  So, you count both activities that happen

23  on a nonaccused product with activities that happen on

24  the iPod to get to your total number; isn't that right?

25  A.    To find out where the functionality is used,

1 creating playlists on the device and then transferring

2 those to the iPod.

3 Q.    Well, you're not doing it to find out where the

4 functionality is used.  You're doing it to add the

5 numbers together, right?

6 A.    Well, it's to take a look at the creation of

7 playlists and the syncing of them and then once you have

8 them here in the iPod, going to the top box, and using

9 those playlists to control around, to skip forward, to go

10 through your music and have them on your playlist.  So,

11 the survey in the top that we used in reference was --

12 that was based upon customer use, how did they access

13 their music.  The bottom one was more where they created

14 the playlist, as an example.

15 Q.    Okay.  So, you count those twice?

16 A.    Yes, for two different functions that are

17 provided.

18 Q.    One on *iTunes* and one on the iPod?

19 A.    As I understand, the playlists are created on

20 *iTunes*.  That's correct.

21 Q.    Okay.  And of the two, which ones are created on

22 *iTunes*?

23 A.    The 25 percent represents what's created on

24 *iTunes* -- I shouldn't say "created on *iTunes*," but that's

25 where the playlists are created.  That represents the

1527

1  creation part of the playlist on the computer.

2  Q.    Well, they actually are created on the computer

3  using *iTunes*, right?

4  A.    That's my understanding, yes.  We talked about

5  that.

6  Q.    Okay.

7         MS. HUNSAKER:  Why don't we go on to -- if you

8  could go back to Slide 32.

9  BY MS. HUNSAKER:

10 Q.    So, once again, you've come up with a range that

11 varies all the way from 63 cents a unit to $1.34 a unit.

12 So, you can double 63; and that's the wide range of

13 possible profit apportionments that you've come up with

14 through this multistep process; is that right?

15 A.    I'm sorry.  Say that again.  I didn't follow that

16 question.

17 Q.    You've come up with a really wide range as a

18 result of the methodology that you used to calculate

19 damages in this case, right?

20 A.    Yes.  It's a range of consideration.  But keep in

21 mind the starting point was the $32, and I've whittled

22 that down to this range based upon various

23 considerations.

24         So, it is wide.  60 cents to a $1.30 is more

25 than double the amount.  But that's trying to get a range

1  around what are the playlists' functionality as related

2  to the patents at issue related to that overall

3  profitability.  It relates to that factor that says what

4  portion of profit is related to that functionality versus

5  the whole device.

6            So, this whittles the $32.70 down to 63 and

7  1.34.  There are some judgments and some estimates that

8  I've made to get there, but that's why there is a range.

9  Q.    And that's not speculation and guesswork?

10 A.    Not in my opinion at all.  I've used basically as

11 many tools as I could, based on the Apple documents and

12 their testimony, to get there, as well as the surveys and

13 all of the other information I've considered.

14 Q.    So, why don't we go on to --

15            THE COURT:  Okay.  Counsel, we're going to

16 take a break.

17            Ladies and gentlemen, I will ask you to be

18 back at 20 of.

19            (The jury exits the courtroom, 3:23 p.m.)

20            THE COURT:  Okay.  We'll be in recess until 20

21 of.

22            (Recess, 3:23 p.m. to 3:39 p.m.)

23            (Open court, all parties present, jury

24 present.)

25            MS. HUNSAKER:  Let's go ahead and split slides

1  32 and 33.  These are plaintiff's slides.

2  BY MS. HUNSAKER:

3  Q.    So, Mr. Nawrocki, after you do your apportionment

4  or your percentage splits on the left-hand side of the

5  screen and you come up with this range of 63 cents to

6  $1.34 per unit, then your next slideware is a 90-cent per

7  unit.  Is that an average of the two numbers?

8  A.    No.  The midpoint of those numbers is a little bit

9  above 90 cents.  It's about 93 or '4 cents; so, it's a

10 little bit below the midpoint of that range to basically

11 accommodate any kind of consideration from the

12 negotiation between the parties.

13         I took a look at the range; and said I think

14 it would come within 90 cents, give or take, in that

15 area.  And, so, I think 90 cents is fair.  One of the

16 things on hypothetical to look at is the parties might

17 not have all of these analytical tools available to them.

18 What we're trying to do is estimate, and I think my rate

19 of 90 cents would be what they would come up with at that

20 point in time.

21 Q.    So, the midpoint is about 96; is that right?

22 A.    Yeah.

23 Q.    And in your expert report, the range that you have

24 on the left-hand side of the screen, this is what you say

25 is the portion of the iPod profits attributable to the

1  patented invention; is that right?

2  A.    That's right.  This identifies the profitability,

3  the ranges for the functionality identified.  And then I

4  developed from that range what rate would develop from

5  that range.

6  Q.    But when you get to the portion of the iPod

7  profits attributable to the patented invention, you take

8  100 percent of that; isn't that correct?

9  A.    Ask your question again.  I'm sorry.

10 Q.    When you get to the portion of profits that you

11 have attributed to the patented invention in this case,

12 you then give to Personal Audio as a royalty 100 percent

13 of that amount; isn't that right?

14 A.    Well, no.  I take the midpoint of the range that I

15 come up with.  I don't further whittle it down.  What I

16 did is I took the midpoint of the range.

17 Q.    And you testified earlier that the reason for the

18 range started off with the difference in forecasted price

19 of the product; is that right?

20 A.    Two things.  One is the difference in forecast

21 price.  The other is how much credit to give to Apple,

22 the 50 to 75 percent as an example.

23 Q.    And, so, at 90 cents per unit, if you're at the

24 low end of the range of profit, you're actually taking

25 more than 100 percent royalty if you're talking about

1531

1 63 cents that's attributable to the patented invention;

2 is that right?

3 A.     90 is above 63 and below the 1.34.

4 Q.     Okay.  So, what you don't do is you don't reach

5 the profit attributable to the patented invention and

6 then apply a royalty rate to that; is that correct?

7 A.     I developed the royalty rate from the amount of

8 profit that I calculated for the functionality for this

9 functionality that I've identified here.

10 Q.    But once you get solely to the profit attributable

11 to the patent claims, you don't then apply a royalty so

12 that Personal Audio and Apple would share in those

13 profits; is that right?

14 A.    Well, I disagree with what you said.

15 Q.    I've not seen a calculation of a royalty rate past

16 the 90 cents.  Is there one that --

17 A.    There's not a reduction from the 90 cents.  But

18 keep in mind at the front the first piece that I take is

19 the 50 to 75 percent to Apple.

20       Additionally, they have all the remaining

21 profit -- I take the $32 and $34, give 50 to 75 percent

22 for Apple plus all the remaining profit on all the other

23 functionality and devices that we have.

24 Q.    So, you have, in your analysis, given to Apple

25 everything that Personal Audio didn't contribute; is that

1 right?

2 A.     That's what the estimate is, is giving -- either

3 Apple or it relates to the other devices.  Some of those

4 might relate to other technology they're using or what

5 have you.  But --

6 Q.     Okay.

7 A.     -- Apple gets 50 to 75 off the bat plus all of the

8 other profits as well.

9 Q.     And those are all for contributions to the iPod

10 that were contributed by Apple and by others and by the

11 prior art.  So, those aren't something that Personal

12 Audio would get a royalty on anyway; is that right?

13 A.     Well, I don't know what it has to do with prior

14 art; but it's basically giving so much to Apple and so

15 much to the other devices that aren't relating to the

16 playlists that are downloaded to the iPod device and that

17 functionality.

18 Q.     So, when you come to the amount that you have

19 attributed to the patent claims and you've set aside

20 everything else, all of the other profits that Apple

21 contributed to the iPod, at that point you give all of

22 those profits to Personal Audio and do not apply a

23 royalty rate to that apportioned amount; is that right?

24 A.     Right.  It's already been apportioned --

25 Q.     I'm sorry.  Did you say "right"?

1  A.     It's correct that it's been apportioned all of the

2  way down to this level of profitability; and that

3  relates, based upon my estimates, to the claims at issue

4  and that would remain with and what would be paid to

5  Personal Audio.

6  Q.     So, you gave Apple what Apple contributed; and you

7  gave Personal Audio 100 percent of the profits for the

8  patented invention; is that right?

9  A.     Well, it's a range; and it's the midpoint of that

10  range.  But I didn't further whittle it down.  That's

11  correct.

12  Q.     So, sometimes that midpoint is higher than and

13  more than 100 percent royalty; and sometimes it's just

14  under that?

15  A.     I wouldn't say 100 percent royalty.  100 percent

16  royalty, if you're using that term correctly, that would

17  be in this instance $327.  That's not what I'm asking

18  for.  I'm asking for a 90-cent royalty.  100 percent

19  royalty on the 327-dollar sale price would be a

20  327-dollar royalty.  That's not what I'm asking for.

21  Q.     But it's a 100 percent of the value of the patent,

22  right?  You can't get damages on what Apple contributed;

23  is that right?

24  A.     Well, whether or not you can get damages or not,

25  that's another matter.  I haven't calculated damages.  I

1534

1  have apportioned to Apple basically approximately

2  97 percent of the profits.  This represents approximately

3  3 percent of the profits.

4  Q.    So, if Apple is sitting at the hypothetical

5  negotiation table negotiating with Mr. Logan, why would

6  Apple enter that deal?

7  A.    If they want the functionality and, as Mr. Fadell

8  said, if they didn't have this type of downloadable

9  playlist, they wouldn't be competitive.  That's something

10 that would impact them and might impact in terms of sales

11 if they wouldn't be competitive.  And, so, you'd have to

12 assess is 90 cents fair when you take a look at what this

13 functionality provides.

14        Based upon my review, I think absolutely it's

15 a reasonable royalty for the use made as well as all the

16 different functionality that's accommodated here.  If

17 this is so important that it would -- they wouldn't be

18 competitive without it, that's a fairly important

19 technology; so, that's why I think Apple would --

20 Q.    So, let's talk about that a little bit.

21 A.    Okay.

22 Q.    So, I'm pretty sure when you got on the stand you

23 said that one of the things that you considered is the

24 benefits and the advantage of the patented invention.

25 A.    Yes.

1535

1   Q.     Okay.

2   A.     I considered as my understanding of the patent

3   technology --

4   Q.     Okay.  You look at the benefits and advantages,

5   and you said that the benefit here is that the patent --

6   the Personal Audio patents-in-suit here, they allow you

7   to navigate through playlists.  They allow you to skip

8   forward and skip back through playlists.  Do you remember

9   that testimony?

10  A.     What I recall saying is that they relate to an

11  audio player device that has the ability to receive or

12  download navigable playlists from outside the player

13  device.  When you sync them, they download the playlist;

14  and that playlist is carried then on the iPod device, or

15  the accused device.

16  Q.     So, you didn't say that the benefit here was that

17  the Personal Audio patents allowed you to navigate

18  through playlists, allowed you to skip forward and skip

19  back?

20  A.     Yes.  Navigable playlists, meaning you can

21  navigate through those playlists.  You can have the

22  playlists and navigate through those playlists, skip

23  forward, skip back, and go through the specific songs

24  you'd like.

25  Q.     And none of the documents that you've put up and

1 that you've showed the jury with respect to the surveys

2 from Apple and the surveys from Dr. Peterson and the

3 press releases and the interrogatories quoting Steve Jobs

4 say anything about skipping forward within a playlist or

5 skipping back within a playlist, do they?

6 A.    I don't recall if they do it at that level of

7 granularity.  They talk about certainly buttons and

8 controls and playlists.  If you can't use them or you

9 can't go through them, wouldn't seem like much use.

10 You'd need to be able to use them and be able to go

11 through them.

12 Q.    Well -- or you can just play them, right?  You

13 don't necessarily have to skip forward if you've created

14 a playlist, right?

15 A.    Presumably you could play them if you'd like, yes.

16 Q.    Okay.  And when you say you didn't go to that

17 level of granularity, you mean the level of granularity

18 of the claims, right?

19 A.    Well, no.  The granularity we were talking about

20 was in the documents.  I don't recall in the documents --

21 in the surveys they said a specific skip forward or skip

22 back within the surveys.  They were talking about

23 playlists and syncing and navigation button, things like

24 that.

25 Q.    But you recall that skipping forward or skipping

1 back is part of the claims in the patents that we're all

2 here for, right?

3 A.    I've heard certainly discussion about the

4 different features and how you can kind of move through

5 the playlists, yes.

6 Q.    Mr. Schutz talked about it in his opening

7 statement, that Personal Audio's patents are about

8 navigable playlists, right?

9 A.    Yeah, navigable playlists.  That's what I referred

10 to.

11 Q.    Dr. Almeroth demonstrated the playlists and

12 skipping forward and skipping back and skipping back

13 twice?

14 A.    Yes.  Absolutely.  Saw that as well.

15 Q.    So, you don't disagree that that is part of the

16 patents and the patent claims in this case, right?

17 A.    Well, I'm generally familiar with that.  I would

18 defer to the technical experts for a specific

19 interpretation of that.  But navigable playlist, as I

20 understand it, is one of the things that are covered by

21 the patents, that are downloaded from outside the player.

22 Q.    Okay.

23         MS. HUNSAKER:  I want to go back to Slide 35,

24 please.  So, I'm looking at PX 1073-0035.

25         That's right.

1 BY MS. HUNSAKER:

2 Q.    Now, this was your slideware to show the ladies

3 and gentlemen of the jury what they're supposed to do

4 with respect to both patents found -- if they found to

5 infringe versus the '178 patent; is that right?

6 A.    I wouldn't say it's what they're supposed to do.

7 It's my considerations of the profitability, the price,

8 and what the royalty rates are under those two different

9 negotiations.

10 Q.    Fair enough.  I wasn't trying to characterize that

11 actually.  I was just trying to set up the slideware.

12 A.    Okay.

13 Q.    Okay.  So, in the column all the way to the right,

14 there is a $1.30 per unit for the '178 patent.  Do you

15 see that?

16 A.    Yes.

17 Q.    And in the column that says '076 and '178, it's

18 90 cents per unit.

19 A.    That's correct.

20 Q.    And, so, you've actually concluded that the

21 royalty should be more for one patent than it would be

22 for two patents; is that right?

23 A.    As I mentioned on direct, it's an unusual scenario

24 based upon this later hypothetical and the higher profits

25 they made.

1539

1  Q.    And Personal Audio didn't contribute anything

2  additional to the iPod between 2001 or 2009 under your

3  scenario, did it?

4  A.    Well, the March, '09, negotiation deals with the

5  '178 patent which, as I understand, has features that we

6  talked about, such as the Smart and the Genius Playlists.

7  So, that's an additional consideration.

8            But this is related to the same type of

9  analysis that I did.  So, for the '178, that didn't issue

10 at the time of October, 2001.  It issued in March of '09,

11 and it did have some additional claims.

12 Q.    Now, you didn't actually separately analyze what a

13 royalty would be if one claim or another is found to be

14 noninfringed or is found to be valid.  You didn't

15 separate your analysis by claim; is that right?

16 A.    Just within the '178.

17 Q.    And --

18 A.    Within the '178 by claim, as an example.

19 Q.    Within the '178 what?

20 A.    There's '178 patent.  That's a separate patent;

21 so, I have a separate royalty rate for that.  And to the

22 extent there are certain claims, there is a calculation

23 of that as well.

24 Q.    Okay.  To the extent there's claims of the

25 '178 patent, you've separated that out from the '076?

1540

1  A.     Yes.  That's correct.

2  Q.     Now, just to be very clear about this, you're not

3  suggesting that these numbers should be added together;

4  is that right?

5  A.     Which numbers?  The 90 and the 1.30?

6  Q.     Correct.

7  A.     No.  90 cents would be relevant if both patents

8  are held valid and infringed; and that would be applied

9  to all of the units that you saw in the sales schedule.

10  And if just the '178 patent, then my suggestion here is

11  the 1.30, based upon that range, would be applied to just

12  the sales for that period starting in March, '09.  The

13  various schedules I gave have it all broken out by year

14  and by specific month if necessary -- or quarter if

15  necessary.

16  Q.     So, the answer is no, they're not supposed to add

17  them together?

18  A.     That's correct.  They're not --

19  Q.     Okay.

20  A.     -- supposed to be added together.

21  Q.     And I'm just not quite sure I understand the 1.30

22  per unit.  Now, if Apple earned higher profits on the

23  iPod over time because of their own contributions,

24  Mr. Logan or Personal Audio -- the amount that they've

25  contributed hasn't increased; isn't that right?

1541

1  A.    Well, you asked that question already.  That's why

2  I said in March, '09, there is a different patent and

3  there are different claims.  So, that's a consideration

4  certainly.

5        And then there's also a different negotiation

6  later in time which would generate the higher

7  profitability expectations.  The expectations in October,

8  2001, are actually somewhat muted.  Their actual

9  profitability was a lot higher.  If you recall, I used

10 the projection of 10 percent profit for that '01.  Their

11 actual profitability was a lot higher.

12       So, it doesn't get into where the

13 contributions are more or less, though that to some

14 extent happens with the '178 patent.  The issue is the

15 different time periods show a different profitability

16 picture for Apple.

17 Q.    Okay.  Let's move on to Plaintiff's Exhibit 431.

18 A.    You know, the binder I have doesn't have exhibit

19 numbers.  It's got tabs, but it only has a 1 through 20

20 or 1 through 30 so --

21 Q.    This was a plaintiff's exhibit.  I'm sorry for not

22 clarifying that.

23 A.    Oh, sorry.

24       MS. HUNSAKER:  If we could bring this up a

25 little closer to the front.

1542

1  BY MS. HUNSAKER:

2  Q.    This was Apple's survey results that you relied on

3  that said the "Method Used Most Often to Access Music."

4  Is that right?

5  A.    This is a summary that we created based upon

6  Apple's surveys.

7  Q.    Okay.  Based upon Apple's surveys, not

8  Dr. Peterson's surveys but Apple's surveys.

9  A.    That's correct.

10  Q.    Okay.  Now, this document is from '03 to '05?

11  A.    Yes.

12  Q.    Okay.  And you used this document to show that 33

13  to 37 percent of the survey respondents used playlists

14  the most often to access music, right?

15  A.    I used this document as well as another set of

16  summaries for the surveys to show the range of people

17  that accessed playlists.  Playlists are the most often

18  method used to access music from these surveys.

19  Q.    But playlists aren't the only way to access music

20  on the iPod; is that right?

21  A.    That's my understanding.

22  Q.    And, in fact, Plaintiff's Exhibit 431 shows a

23  variety of other ways that people access their music

24  besides playlists that are not accused of infringement in

25  this case, right?

1543

A.     Well, I don't know if they're accused of
infringement; but I didn't include them in my analysis
for the functionality relating to playlists and the
downloadable playlist here.  I've included the playlist
column.  There's artists and shuffle and a variety of
other things.  I don't have an opinion on whether or not
those infringe or not.

Q.     And you haven't heard any testimony in the court
that they do; is that right?

A.     Well, I heard a lot of testimony; but generally it
involved the situation of setting up playlists and
downloading the playlists or syncing with your computer
and downloading to your iPod.

Q.     Okay.  And, so, besides using playlists, people
that have a thousand songs in their pocket can access
their music by artist.  They can access it in shuffle
mode.  They can access it by album.

A.     Right.

Q.     They can access it just by songs, by genres, by
composers.  And, so, while about a third of the survey
respondents said they access music via playlists,
two-thirds of the respondents accessed music in ways
other than playlists; isn't that correct?

A.     It varies, but approximately that.  That's why I
gave the split between 65 and 35 on the apportionment

1  chart that I did, 35 for playlists.

2  Q.    And, so, if you added up all those other columns

3  in the right of people who access music through artists

4  and shuffle and albums and songs, you've got about

5  67 percent that don't use playlists to access their

6  music, right?

7  A.    Based upon these surveys, let's say more than --

8  60 percent or more based upon these surveys, which is,

9  again, consistent with the apportionment that I did,

10 giving 65 percent to other and only 35 percent to the

11 playlist.

12 Q.    And none of these surveys asked how frequently

13 iPod users use the "skip forward" or the "skip back"

14 button when they're accessing their playlists; is that

15 right?

16 A.    Not that I recall.  As I mentioned, I don't recall

17 the surveys being at that granularity level.

18 Q.    Why don't we pull up PX 432, which is the other

19 survey you were referring to.

20 A.    Okay.  It's 432?

21 Q.    Yes.

22       And, so, once again, this summary shows that

23 about a third of the survey respondents say that they

24 access their music on their iPods using playlists; and,

25 again, about 67 percent of the respondents do not use

1 playlists when accessing their music; is that right?

2 A.    It varies by period, but in that instance I'd say

3 between -- 67 percent for that column that you've

4 highlighted is right.  67 percent nonplaylist.

5 Q.    And, so, we've heard a lot from you about the

6 royalty needing to be commensurate with the extent of

7 use.  And you did not in your calculations, Mr. Nawrocki,

8 reduce the number of units that you're applying a royalty

9 to based on these surveys by two-thirds; is that right?

10 A.    I did not reduce the number of units.  That's

11 correct.  What happened --

12 Q.    But you are supposed to consider the extent of use

13 of the invention, right?

14 A.    Right, because each one of the units, each one of

15 the players are accused of infringement and have that

16 ability to download and receive navigable playlists.

17 Q.    Excuse me, sir.  You're not a technical expert,

18 are you?

19 A.    My understanding is that's what's been discussed,

20 is each one of the devices, each one of those generations

21 are accused.  So, that's what's included.

22        The rate accommodates this difference of the

23 67 percent by including 35 percent for playlists.

24 Q.    But wouldn't the extent to which Apple's customers

25 supposedly use the invention -- wouldn't that matter for

1  the value to them?  And if two-thirds of iPod users did

2  not access their music using playlists, isn't that

3  something that *Georgia-Pacific* tells us to consider, the

4  extent of use of the invention?

5  A.    First of all, this talks about -- the survey is

6  talking about the method used most often.  It doesn't say

7  they're not using playlists.

8  Q.    But this is the basis of your opinion, right?

9  A.    That's right, but it says which method is used

10 most often.

11        Playlist is the top method or one of the top

12 two methods used most often.  The question didn't ask do

13 you ever use it or not ever use it.  I don't recall that

14 being -- as part of their question if they've never used

15 a playlist.

16 Q.    Okay.  Now, we've heard testimony that the patent

17 in this case doesn't cover all playlists; is that right?

18 A.    I understand there is some discussion about that,

19 yes.

20 Q.    Okay.  And we've heard how the word "playlist"

21 doesn't appear in the patent; is that right?

22 A.    I heard that testimony, yes.

23 Q.    And, in fact, Mr. Call, when he was in the

24 courtroom, testified as to why the word "playlist" does

25 not appear in the patent; is that right?

1  A.     I don't recall him saying that, but if you could

2  refer me to what he said.

3  Q.     Sure.

4         So, "Why didn't you use the term 'playlist'?"

5         "Well, 'playlist' is a more generic term."

6         And then going down to the next highlight,

7  "You might have a playlist that does control things, but

8  that's too generic for what I wanted.  It doesn't convey

9  what I wanted.  Somebody might get confused and think

10 that means any old playlist, and that's not what I

11 meant."

12        Do you recall that testimony?

13 A.     I recall there being some discussion about it.  I

14 think that's in the transcript.  I'll take that.

15 Q.     And, so, your calculations are based on playlists

16 generically when Mr. Call has come and told the ladies

17 and gentlemen of the jury that that's not what his

18 invention was about.

19 A.     No.  That's not correct in terms of what my

20 analysis is.  My analysis looks at playlists and looks at

21 syncing as well.

22        If you recall, the surveys talked about the

23 fact that it relates to playlists, using playlists to

24 access your music as well as syncing with the computer.

25 I believe that we had that chart that said more than

1  95 percent of the people sync at least once a month as an

2  example.

3  Q.    Those are the ones that create the playlists on

4  *iTunes*, correct?

5  A.    I don't think that -- well, they're created where

6  they're created.  This talked about the syncing from the

7  computer to the iPod device, the syncing to the iPod

8  device.

9  Q.    So, let's talk about Dr. Peterson's survey for a

10 moment.  Okay?

11 A.    Okay.

12 Q.    Now, Dr. Peterson was a consultant hired by

13 Personal Audio, right?

14 A.    Yes.  He was -- yeah.  He's a professor.  I

15 believe he was hired by either Personal Audio or by the

16 plaintiffs in this case.

17 Q.    And his survey also did not tie the "playlist"

18 term to the patent claims in this case; is that right?

19 A.    His survey discussed playlists and playlists

20 compared to other features of the iPod.

21 Q.    So, one of the materials that you reviewed in this

22 case was Dr. Peterson's deposition; is that right?

23 A.    Yes.

24 Q.    And, in fact, Dr. Peterson testified in

25 deposition:

1    "Question:  And, so, it's fair to say then,

2  isn't it, that the results of the questionnaire that was

3  administered over the Internet would not provide results

4  that are specific to the patent claims of the Personal

5  Audio patents?  Is that fair?

6    "Answer:  Correct.  The focus was on the

7  playlist.  It didn't go into anything in more detail."

8    Do you recall reading that?

9  A.    I recall reading something along those lines in

10  the deposition, yes.  He was talking about the playlists

11  and the playlists used within the iPod device.

12  Q.    And then the next question:  "But the results

13  would not distinguish between parts of playlists that

14  were contributed by the Personal Audio patents as opposed

15  to parts that were contributed by Apple, for example; is

16  that correct?

17    "Answer:  That's correct.

18    "Question:  And the results of the Internet

19  survey would not distinguish between parts of the

20  playlists that were contributed by the Personal Audio

21  patents as opposed to, for example, what was already in

22  the technological field before Personal Audio; is that

23  correct?

24    "Correct."

25    Do you recall reading that, Mr. Nawrocki?

1550

1  A.     I don't recall it as you've read it.  I'd have to

2  either see it -- but I don't recall that exact statement.

3  I recall there was some discussion in his deposition

4  about playlists and the fact that people used playlists

5  X percent of the time as was shown, 50 percent of the

6  time.  That, in conjunction with the information we saw

7  in syncing from the Apple surveys, was part of what led

8  to the conclusion or was further confirmation to the

9  conclusion that people do use playlists to access their

10  music on the iPod device.

11  Q.     So, iPod plays movies, too, right?

12  A.     IPod -- through podcasts or movies, it can play --

13  it depends on the -- I shouldn't say it plays movies.

14  Some of the devices have, as I understand it, the

15  capability to play movies.  Some don't.

16  Q.     And you didn't show us any deduction from the

17  profits for the technologies on the iPod that play

18  movies; is that right?

19  A.     My recollection is at the time of the hypothetical

20  that functionality of movie playing, I don't believe, was

21  incorporated into that first generation when they were

22  sitting down, that four key messages didn't talk about

23  movies or extra features.  So, later generations might

24  have that; but in my later calculations I accommodate

25  different percentages for different functionality.

1551

1  Q.     The graphics that you had up on the screen

2  earlier --

3  A.     Yes.

4  Q.     -- those showed that iPods hold and show photos;

5  is that right?

6  A.     Some iPods show photos, yes.  Some of the iPods I

7  have show photos.  Some don't, I don't think.

8  Q.     And you didn't apportion any portion of the iPod

9  to photos or to camera or to games or to other features

10 that were present in the iPod; is that right?

11 A.     Not other than the 97 percent that Apple has and

12 what it relates to for that functionality.

13 Q.     So, Mr. Nawrocki, do you have your expert report

14 up there?

15 A.     Yes.  I believe -- is that in the binder you gave

16 me?

17 Q.     It is.

18 A.     Yes, I have it.

19 Q.     Can you turn to paragraph 103 of your expert

20 report?

21 A.     Yes.  I see that.

22 Q.     Now, as part of coming up with your

23 84-million-dollar damages number, you said that (reading)

24 the accused products allow a listener to easily manage,

25 navigate, and access preferred content that is received

1 from one or more separate server computers through the

2 use of a wide variety of playlists that may be created

3 for the listener.

4          Do you see that?

5 A.     "Created by or for the listener" it says, yeah.

6 Q.     Created by the listener.

7          Why don't you read the next sentence for me.

8 A.     It says, "Created by or for the listener."

9 Q.     And then the next sentence, please?

10 A.     (Reading) Because so much content can be stored on

11 the accused device, the ability to easily manage,

12 navigate, and access that content is critical.

13 Q.     Now, in the next paragraph, paragraph 104 of your

14 expert report, you suggest that buying songs and creating

15 playlists is the heart of online music in the future.  Do

16 you see that?

17 A.     I was quoting an analyst's report that says,

18 (reading) in addressing the importance of playlists in

19 general in 2004, the research director of industry

20 analyst GartnerG2 commented that "Being able to purchase

21 songs and make playlists easily on a portable device is

22 the heart of online music in the future."  One iPod owner

23 took this comment literally, creating --

24 Q.     Wait.  I'd like you to slow down at that part.

25 A.     I'm sorry.

1  Q.     This is the part I was getting to.

2  A.     Okay.

3  Q.     Okay.  So, this is in the context of discussing

4  the benefits of the invention, right?

5  A.     This is within Factors 9 and 10.

6  Q.     Okay.  And go ahead and read that last sentence.

7  A.     So, this is quoting another, I believe, Apple

8  document.  It says (reading) one iPod owner took this

9  comment literally, creating a playlist that he could

10 easily listen to during his own open-heart surgery.

11 Q.     And, so, Mr. Nawrocki, can you explain to the

12 ladies and gentlemen of the jury how an iPod owner was

13 able to navigate his playlist during open-heart surgery?

14 A.     How he could navigate his playlist?  I don't know

15 how that specific individual navigated, but you can --

16 when you have a playlist on your iPod, you can navigate

17 through it by pushing the buttons, as an example.

18 Q.     So, why don't we pull up the exhibit that you

19 cited.

20 A.     Okay.

21 Q.     That's Plaintiff's Exhibit 472.

22         So, this was produced by Apple in the case;

23 and it's an email -- if you look down where the email

24 starts -- from a Mr. Donahoe, July 6, 2004.  Do you see

25 that?

Jury Trial, Volume 5

1554

1  A.     Yes, uh-huh.

2  Q.     And do you have that in your binder and do you

3  need that to read or can you see it okay?

4  A.     I should be able to see it on the screen.  Is

5  there a tab in the binder where it is just so I see the

6  whole context?

7  Q.     Yes, sir.  Towards the back of your binder is

8  Plaintiff's Exhibit 472.  It looks like the third tab

9  from the back.

10  A.     Oh, I see.

11         THE COURT:  It's probably hidden under PX 110.

12         THE WITNESS:  I see that.

13  BY MS. HUNSAKER:

14  Q.     So, why don't you read the first paragraph of this

15  to the jury, relied on in your expert report.

16  A.     Okay -- well, this is from the document of my

17  report, are you saying?

18  Q.     This is the document you cited in your report.

19  A.     Yeah.  Let me just reconfirm.

20         (Perusing documents.)

21         Okay.  So, the first paragraph says, "You

22  would be hard-pressed to find a bigger fan of *iTunes* and

23  the iPod than me.  I even love the stunning graphics that

24  accompany the products' marketing campaign.  I want to

25  share with you my recent experience with my iPod and

1  *iTunes* to give you an appreciation for how the products

2  are being used in ways that you would never have imagined

3  as they were being designed."

4  Q.   So, now, go ahead and look at the document for

5  context.

6            MS. HUNSAKER:  And if we could split it to the

7  next page so we can read what he says after this.

8  BY MS. HUNSAKER:

9  Q.   In the next couple of paragraphs Mr. Donahoe goes

10 on to describe his preparations for this open-heart

11 surgery, including research that he'd done listening to

12 positive messages under anesthesia and the idea to bring

13 music into the operating theatre that he would find

14 calming and reassuring.

15           I didn't read that completely, but is that the

16 gist of those paragraphs?

17 A.   Having -- well, he talks about several things,

18 patients wearing headphones in which positive messages

19 were broadcast.  Yes, I see that.

20 Q.   Okay.  And then going down to the next paragraph,

21 he says that (reading) reading this article prompted him

22 to think about bringing music into the operating theatre

23 that he would find calming and reassuring.  Do you see

24 that?

25 A.   Yes.  I see the next paragraph, yes.

1  Q.    And then he goes on and says "Days later, I used

2  *iTunes* to create my four-hour playlist"; is that right?

3  A.    That's what he says there, yes.

4  Q.    And iPod's storage capacity and its ability to

5  hold four hours worth of music seems to be a benefit to

6  Mr. Donahoe, doesn't it?

7  A.    Well, he seems to like his playlist, which is

8  good.  He creates his playlist, and presumably it's

9  transferred to his iPod device then.

10  Q.    Okay.  So, why don't we go on to the next

11  paragraph.  And in the middle of the next paragraph it

12  says, "As I was wheeled into ICU, my wife reports that my

13  iPod was on my chest, hermetically sealed in a material

14  waste bag."  Do you see that?

15  A.    Yes.

16  Q.    Is there any reason to think that Mr. Donahoe used

17  the "skip back" button to listen to his playlist during

18  that surgery?

19  A.    I don't know if he was skipping through or not.

20  It shows that basically the playlists were transferred to

21  the iPod.  Whether he was skipping through or -- I don't

22  know if he was skipping through during this use or not.

23  Q.    Okay.

24  A.    Presumably he skipped through some songs.  In his

25  past he might have done it at some point in time, but

1 maybe not during surgery.

2 Q.    And then he goes on, "After eight hours, five in

3 surgery and then three in the ICU, my iPod battery

4 finally drained; but by that time I was already on the

5 way to recovery."

6         Did I read that correctly?

7 A.    Yes.

8 Q.    And does it seem there that the battery life of

9 the iPod, that he could play his playlist songs for eight

10 hours without draining the battery, is a benefit that

11 Mr. Donahoe appreciated about his iPod?

12 A.    Yes.  And their battery is one of the things we

13 talked about.  Their battery has a lot of benefits to the

14 product.  I agree.

15         MS. HUNSAKER:  I don't have anything further,

16 Mr. Nawrocki.

17         THE WITNESS:  Thank you.

18         REDIRECT EXAMINATION OF JAMES NAWROCKI

19 BY MS. HUANG:

20 Q.    Mr. Nawrocki, counsel had asked you about

21 Dr. Peterson's survey.  Did Dr. Peterson survey playlists

22 that were on an iPod?

23 A.    Yes, on an iPod device.

24 Q.    His survey did not encompass surveys on *iTunes*; is

25 that accurate?

1  A.     That's correct.  It was related to the iPod and

2  users of iPods.

3  Q.     Earlier Ms. Hunsaker was asking you about iPod

4  syncing and your apportionment to iPod syncing; is that

5  correct?

6  A.     Yes.

7  Q.     Do you have any information about iPod syncing?

8  A.     Yes.  Various surveys that we talked about mention

9  iPod syncing as one of the most common things that are

10 done within the jukebox as an example, or iPod syncing is

11 done.  So, that information shown here for the

12 integration/syncing is syncing the iPod to the iPod

13 device basically, from the computer to the iPod device

14 that's at issue in this case.

15 Q.     Is that an exhibit you have in your binder --

16 A.     Yes, it is.

17 Q.     -- Mr. Nawrocki?

18 A.     So, one of the things it mentions is one of the

19 top features that are used is iPod sync, approximately

20 31 percent of the time for the U.S., by talking with

21 approximately 1900 -- almost 2,000 survey participants.

22         MS. HUANG:  Your Honor, permission to --

23         THE COURT:  Wait.

24         MS. HUNSAKER:  Objection, your Honor.

25 Mr. Nawrocki is testifying about the same *iTunes* surveys

1  that you sustained my objection to.

2          THE COURT:  Well, actually we don't know what

3  he's talking about because no one's said what he was

4  talking about.  So, I'll sustain the objection.

5          If you're going to have him read from

6  something, let's identify it first.

7  BY MS. HUANG:

8  Q.    Mr. Nawrocki, what document that you reviewed did

9  you see information about iPod syncing?

10 A.    Several of the surveys talked about iPod syncing

11 as an example, and those were summarized on the table

12 that I had as part of my report.

13 Q.    Is there an exhibit in your binder that discusses

14 iPod syncing?

15 A.    Yes.  So, if you go to -- Exhibit 433 is an

16 example -- I'm sorry -- Plaintiff's Exhibit 433.

17         MS. HUANG:  Your Honor, permission to

18 publish --

19         MS. HUNSAKER:  What number is it?

20         MS. HUANG:  Plaintiff's Exhibit 433.

21         MS. HUNSAKER:  I object to this -- publishing

22 this exhibit, your Honor.  This relates to *iTunes*.

23         THE COURT:  Is this a summary, or is this the

24 document from the Apple survey?

25         MS. HUANG:  Exhibit 433 is a summary, but

1 Exhibit 477 is one example of the survey that's

2 summarized in Plaintiff's Exhibit 433.

3         The specific page of Plaintiff's Exhibit 477

4 is page 42.

5         THE COURT:  And has the witness established

6 exactly what this is a summary of?  I'm talking about

7 Plaintiff's Exhibit 433.

8         MS. HUANG:  I can have the witness establish

9 that.

10 BY MS. HUANG:

11 Q.    Mr. Nawrocki, what is Plaintiff's Exhibit 433?

12 A.    So, 433 is a summary of the various Apple surveys

13 that talk about iPod syncing and all of the other uses of

14 jukebox basically from --

15         MS. HUANG:  Your Honor --

16         THE COURT:  Can you give me -- you say

17 "various surveys."  Like which exhibits are we talking

18 about?

19         MS. HUANG:  An example is Plaintiff's

20 Exhibit 477 on page --

21         THE COURT:  Okay.  Give me another example.

22 Or perhaps the witness can.

23         Where does this summary come from?  That's one

24 of the predicate elements that you first want to

25 establish.

1    MS. HUANG:   The summary --

2         THE COURT:   No, your witness is going to have

3    to do that.

4         MS. HUANG:   Okay.

5    BY MS. HUANG:

6    Q.    Mr. Nawrocki, where did the surveys in Exhibit 433

7    come from?

8    A.    Those are produced by Apple; and as an example,

9    Plaintiff's Exhibit 477, page 42, shows the various use

10   of the jukebox by country -- what you've used is the

11   U.S. -- showing iPod syncing at 31 percent and various

12   other capabilities that are talked about within the

13   jukebox.

14        THE COURT:   Okay.  And your objection?

15        MS. HUNSAKER:   They're surveys regarding use

16   of an unaccused product, which is *iTunes*.

17        THE COURT:   Okay.  If that's your objection,

18   overruled.  Plaintiff's Exhibit 433 is admitted.

19   BY MS. HUANG:

20   Q.    Mr. Nawrocki, what is Exhibit 433; and what

21   information is shown on Exhibit 433?

22   A.    So, what this shows is various uses of the jukebox

23   capability and iPod syncing shows up as one of the top

24   uses of the jukebox capability.

25        So, on the computer syncing with the iPod is

Jury Trial, Volume 5

1562

1  almost always the top thing that's been done, 31 percent

2  in fourth quarter of 2004 to as high as 31 percent the

3  next quarter, 28, 30 percent.  So, this is one of the

4  types of considerations for how often the iPod is

5  sunk *[sic]* by people in terms of the uses.

6            And you'll see at the bottom there are many

7  respondents, as many of --

8            MS. HUNSAKER:  Your Honor?

9            THE COURT:  Wait.  What's your objection?

10            MS. HUNSAKER:  This is an improper 1006

11  summary.  There is no foundation for it.

12            THE COURT:  Overruled.

13  BY MS. HUANG:

14  Q.    Mr. Nawrocki, you were going to say respondents --

15  A.    And the respondents at the bottom portion shows

16  approximately 2,000 in each one of the quarters were

17  surveyed to come up with that amount of iPod syncing.

18  Q.    Did you use this information from the Apple

19  surveys in doing your apportionment analysis related to

20  syncing?

21  A.    Yes.  That's one of the considerations, was the

22  syncing.  We mentioned earlier creating playlists as

23  well.  Those functionalities are talked about here in

24  this survey.

25  Q.    This is what you're -- is this what you're

1    referring to, Mr. Nawrocki?

2    A.     That's right.  That's one of the considerations in

3    terms of assessing that 25 percent that we talked about

4    in terms of that synchronization from the computer to

5    your iPod device.

6    Q.     Thank you, Mr. Nawrocki.

7              MS. HUANG:  One housekeeping matter, your

8    Honor.  I don't believe I moved in the admission of

9    Plaintiff's Exhibit 33.

10             THE COURT:  Was it on the admissible list?

11             MS. HUANG:  Yes, your Honor.

12             THE COURT:  Well, if it's admissible and

13   you've talked about it and there has been no objection,

14   it's in.

15             MS. HUANG:  Thank you, your Honor.

16             MS. HUNSAKER:  No objection.

17             THE COURT:  You've got no follow-up?  You

18   don't have to.

19             MS. HUNSAKER:  I --

20             THE COURT:  It's not required.

21             MS. HUNSAKER:  No, thank you, your Honor.

22             THE COURT:  Okay.  All right.  You may step

23   down.

24             THE WITNESS:  Thank you, your Honor.

25             THE COURT:  Next witness?

1    MR. CORDELL:  Thank you, your Honor.  Apple

2 calls Mr. David Heller at this time.

3    THE COURT:  Wait.  Wait.

4    Okay.  This is the out of order?

5    MR. CORDELL:  No, it's not, your Honor.  I --

6 well --

7    THE COURT:  They haven't rested yet.

8    MR. CORDELL:  They have not rested.  You are

9 correct.  And, so, pursuant to the court's procedures, we

10 will begin calling our witnesses that they had questions

11 for but we'll call them on direct.

12    THE COURT:  Okay.  So, we're still in Personal

13 Audio's case-in-chief; is that right?

14    MR. SCHUTZ:  Technically we are, your Honor.

15 We had an agreement that --

16    THE COURT:  Okay.  The agreement you're -- all

17 right.  We've reached that part of the case.  Okay.

18    MR. SCHUTZ:  Yes.

19    THE COURT:  And, so, your agreement is since

20 they're your people, you're going to call them, put them

21 on.  And then you're going to cross them so that their

22 evidence is in before you have to rest.

23    MR. SCHUTZ:  That's correct, your Honor.

24    THE COURT:  Fine.  Very good.

25    MR. CORDELL:  Thank you, your Honor.  Apple

1    then would go ahead and call Mr. David Heller.

2           THE COURT:  And, ladies and gentlemen, the

3    reason this is a little unusual is that when the

4    plaintiff rests, certain motions have to be made, under

5    Federal Rules, by both sides.  And that will happen.  But

6    on the other hand, plaintiff needs to get in certain

7    testimony to establish their case and, in fairness,

8    especially on someone like who is a corporate

9    representative, Apple wants to introduce them and get

10   them to go first.

11          So, in a way it's a little bit out of order.

12   You're going to get the same testimony.  We'll come to a

13   point where their case is over and at that point you will

14   be on a break somewhere and we will handle those motions

15   outside of your presence.  So, that's what's going on

16   here.  And this partly has to do with the lawyers

17   actually working together.  They actually are working

18   together to accommodate the witnesses and accommodate

19   each other.

20          Go ahead, counsel -- first of all, let's go

21   ahead and swear in the witness.

22          (The oath is administered.)

23          MR. CORDELL:  Your Honor, may I make a brief

24   interim statement?

25          THE COURT:  You may.

1    MR. CORDELL:  Thank you, ladies and gentlemen,

2 for all of your attention over the last week or so.  We

3 certainly do appreciate all the hard work; and, again, we

4 know that this is a burden on all of your lives.

5    We're now moving -- as his Honor explained,

6 we're moving into part of the case where Apple gets to

7 tell our side of the story.  We appreciate your keeping

8 an open mind, and I know you've been through kind of a

9 dizzying array of evidence.  We started with lots of

10 discussion about things that maybe did or didn't seem to

11 be germane to the patent case.

12    We're now going to focus in on a little bit of

13 what Apple does and then we're going to take you through

14 exactly what the products are, exactly how they operate,

15 and then we're going to tell you a little bit about the

16 validity case and we'll show you some evidence that I

17 talked about in opening with respect to why we believe

18 these patents are not valid.

19    And then we'll turn to our technical expert

20 who will tie it all together, and I believe he'll do a

21 good job -- I hope he'll do a good job -- of showing you

22 how all of this evidence is really relevant to the

23 infringement and validity determinations that you have to

24 make.  So, with that, I'll turn to Mr. Heller; and we'll

25 get started.  Thank you.

1    Your Honor, may we approach?

2    THE COURT:  You may.

3         DIRECT EXAMINATION OF DAVID HELLER

4         CALLED ON BEHALF OF THE DEFENDANT

5  BY MR. CORDELL:

6  Q.    Good afternoon, Mr. Heller.

7  A.    Good afternoon.

8  Q.    Could you please introduce yourself to the ladies

9  and gentlemen on the jury?

10 A.    My name is David Carl Heller, and I'm a director

11 of engineering for the *iTunes* desktop application

12 software.

13 Q.    And is that part of Apple?

14 A.    Yes.

15 Q.    And how long have you worked at Apple?

16 A.    I've been there ten years.

17 Q.    Where were you born?

18 A.    I was born in Ames, Iowa.

19 Q.    And is that where you grew up?

20 A.    No.  I grew up in Phoenix, Arizona.

21 Q.    Okay.  Did you attend college?

22 A.    Yes, I did.

23 Q.    And which one?

24 A.    University of Arizona.

25 Q.    Where is the University of Arizona?

1568

```
 1  A.      That's in Tucson.
 2  Q.      And what did you study at the University of
 3  Arizona?
 4  A.      I studied electrical engineering, and I received a
 5  Bachelor of Science in Electrical Engineering in 1991.
 6  Q.      Tell the jury a little bit about some of the jobs
 7  you had after leaving college.
 8  A.      Most of my career after college has been around
 9  what I would call "consumer software," the kind of
10  software you would buy in a box at the store or
11  mail-order, for the Macintosh.  My career has been
12  centered entirely around the Macintosh computer.  I got
13  one in 1984 when it first came out, and I've been
14  doing -- professionally I've been doing software for it
15  ever since.
16  Q.      So, just to make sure it's clear, what is
17  software?
18  A.      Software is a -- the computer you buy at the
19  store, the software are programs you run on it.  Could be
20  games, could be a word processor.  In my case it's been
21  mostly what I'll call "utility software."
22  Q.      Give the jury an example of one of the jobs you
23  had designing software.
24  A.      Out of college, I came out to California in 1991;
25  and the first product I worked on was a compression
```

1  product called *"AutoDoubler*."  It would go through your

2  hard drive and compress all the files on it and save

3  space on the hard drive so you wouldn't have to buy a new

4  hard drive maybe as soon as you would normally have.  It

5  would do it in the background.  It was all seamless.  You

6  didn't really notice it was going on.

7  Q.    So, it basically took big files and smushed them

8  into smaller spaces?

9  A.    Yes, it did.

10  Q.    Can you give the jury another example of the jobs

11  you had after college?

12  A.    Another software product I worked on was called

13  *"Pretty Good Privacy,"* and it was a data encryption

14  product to encrypt your email or encrypt files on your

15  hard drive for privacy and data protection reasons.

16  Q.    And what was that software used for?

17  A.    Mostly encrypting emails, was the primary reason

18  for -- that most people would use it.  Emails sent over

19  the Internet are not particularly secure.

20  Q.    And encryption is a way to keep something secret?

21  A.    Yes, it is.

22  Q.    Now let's talk a little bit about Apple.  Do you

23  like working for Apple?

24  A.    I do.

25  Q.    How many people currently work for Apple?

A.      It's about 60,000.

Q.      And how many of those folks are here in the United States?

A.      It's about 42,000.

Q.      Now I'd like to put up a timeline that we prepared and just ask you a few questions about these products, Mr. Heller.  What is the Apple I we see in the upper left-hand corner?

A.      The Apple I was the first product that Apple sold. It was a very limited product.  It was hand-built by Steve Wozniak, one of the cofounders of Apple.  He hand-built the motherboards.  And it required some assembly on the part of the person buying them.  There weren't that many of them made, but it was Apple's first commercial computer product.

Q.      Does Apple make any wooden computers today?

A.      I don't think so, no.

Q.      It might catch on.  You never know.

        All right.  Then what's the Apple II?

A.      So, the Apple II was Apple's first commercial success; and arguably it ushered in the personal computer era.  It was a mass-produced for the most part personal computer although some businesses used it, and it was released in the late 1970s.

Q.      All right.  Now take us up to 1984 with the

1 Macintosh.  What's the Macintosh?

2 A.    So, the Macintosh was certainly at the time very

3 revolutionary.  It contained elements of what we

4 considered to be sort of just in every computer today.

5 It was the first commercial computer to have a mouse,

6 graphical user interface, folders, sort of the things we

7 all take for granted in *Windows* and Mac today; but that's

8 where it was first introduced.

9 Q.    So, what do you mean by a "graphical user

10 interface"?

11 A.    You didn't have to type commands on the command

12 line.  You'd use the mouse to manipulate items on the

13 screen, move windows around --

14          THE REPORTER:  Could you please slow down a

15 little bit?

16          THE WITNESS:  Okay.  My apologies.

17 A.    Move the mouse to manipulate windows and things on

18 the screen, had multiple fonts.  It was very good for

19 doing art and artwork painting, those kinds of things.

20 BY MR. CORDELL:

21 Q.    And let me just have you just clarify.  When you

22 say, you know, you could move the mouse, was it like a

23 point-and-click system?

24 A.    Yes.

25 Q.    And had any of those ever been made before?

1572

1  A.      Not as a commercial computer.  They were -- for

2  the most part they were in academia or research projects.

3  Q.      Okay.  Did the Macintosh in 1984 have any ability

4  to play sound?

5  A.      It did, yes.

6  Q.      Can you describe that, again slowly for the jury?

7  A.      It had a built-in, high-quality sound capability

8  and it -- there were -- after it came out, there were

9  several programs written for doing things like music

10 composition as well as games and other stuff that

11 employed high-quality sound.

12 Q.      What is that big blue thing that you've labeled as

13 an "iMac"?

14 A.      So, an iMac was sort of another revolutionary

15 computer from Apple.  It was the first computer

16 commercially to really get rid of the floppy drive.  It

17 was a big gamble on Apple's part.  It was an all-in-one

18 unit like the original Mac, and it just employed a very

19 unique industrial design.  It was a translucent blue

20 plastic enclosure.  But it was sort of the first computer

21 that Apple released after -- new computer after Steve

22 Jobs came back.

23 Q.      And it looks like just a computer monitor.  Is

24 that the whole computer?

25 A.      That is the whole computer.

1573

1  Q.     Okay.  All right.  And then in 2001 we have the

2  iPod.  I think we've heard about that.

3  A.     We have, yes.

4  Q.     Could you tell the jury a little bit about it?

5  A.     So, the iPod was Apple's sort of first foray into

6  the MP3 player market.  It was -- as we've heard much in

7  this trial, it was a portable player, high capacity, good

8  battery life; and it turned out to be a great success.

9  Q.     We're not going to talk about it after this, but I

10 just want to have you just touch on the last two

11 products.  What's an iPhone?

12 A.     An iPhone is -- it's a cell phone.  It's Apple's

13 cell phone product.  It's got a touchscreen.  It's got --

14 it can do music as well.  It's got a lot of the iPod

15 functionality in it.  It also -- you can load up what we

16 call "applications," which are little programs that can

17 do anything from shopping lists to games to sports

18 tickers, weather, stocks.  There are hundreds of

19 thousands of programs that you can download, many of them

20 free, to put on the phone.

21 Q.     All right.  And then what's an iPad?

22 A.     So, an iPad is a very large screen device.  Many

23 of those same applications that you can run on your phone

24 work on the iPad as well.  There are also applications

25 written specifically for the iPad.  It is a great

1574

1   Internet browsing device.  You can play movies on it.

2   You can play games.  It is a touchscreen in-your-lap

3   computer.  It can do word processing.  You can print from

4   it.  And it can replace a computer for many people out

5   there.

6            MR. CORDELL:  And for the record, your Honor,

7   that was DDX 201.

8            I'd now like to move to DDX 208.

9   BY MR. CORDELL:

10  Q.    Mr. Heller, has Apple won any awards for the iPod?

11  A.    Apple won a Technical GRAMMY in 2002.  It was for

12  more than just the iPod.  It was a GRAMMY Award given to

13  Apple for its role in music overall.  That would be music

14  as done on the Macintosh computer, *iTunes*, the Jukebox

15  software, and then the iPod.

16  Q.    And the court correctly instructed us all earlier

17  that the number of patents on both sides isn't really

18  what we're here to talk about; but since we've gone down

19  that road, I'm going to ask you:  How many patents does

20  Apple have?

21  A.    Apple has over 3,000 patents.

22  Q.    Thank you.

23           Where did you work before you came to Apple?

24  A.    Right before I came to Apple, I was working at a

25  company called "SoundStep Software."

1  Q.     And what did SoundStep make?

2  A.     SoundStep made a digital jukebox program for the

3  Macintosh called "SoundJam MP."  You could use the

4  program to import your CDs onto your computer.  You would

5  feed them into your computer.  It would copy the music

6  off.  It would compress it into MP3 files and allow you

7  to organize and play back your music all in one spot on

8  your computer.

9  Q.     Okay.

10         MR. CORDELL:  Let me have Exhibit DX 34.

11  BY MR. CORDELL:

12  Q.     And I'm sorry.  What was the program called in

13  Sound --

14  A.     SoundJam MP.

15  Q.     And when was SoundJam MP released?

16  A.     1998.

17  Q.     Okay.  And in your binder you'll find Defendant's

18  Exhibit 34.  What is Defendant's Exhibit 34, Mr. Heller?

19  A.     It is the manual for one version of SoundJam MP.

20  Q.     Okay.  And I think you said that you could put CDs

21  into your computer using SoundJam?

22  A.     Yes, you could.

23  Q.     Could you explain to the jury a little more about

24  how that worked?

25  A.     In SoundJam you would put the CD in your computer.

1  At that point you had the Option 6 of just playing the

2  music on the CD like you would any other CD player or you

3  had the option of what we called "ripping" it which would

4  copy the audio off the CD onto your computer and it would

5  compress it.

6          Prior to that, one of the things it would do

7  would be to go look up the information about the CD on

8  the Internet.  So, audio CDs that you buy at the store do

9  not have the artists on them.  There is no machine

10  readable data on them that has things like the artist or

11  album name.  So, that has to be acquired elsewhere.  So,

12  SoundJam would do that and then copy those files onto

13  your computer, at which point you could play them from

14  your computer.  You no longer needed to have the CD in

15  the CD drive.

16  Q.    Did SoundJam have the ability to create a

17  playlist?

18  A.    Yes, it did.

19  Q.    Let me direct you to page 14 of the document.

20          MR. CORDELL:  I think it's the Bates number

21  that ends in 104.  And can I have the bottom of that page

22  and the top of page 15 of Defendant's Exhibit 34?

23  BY MR. CORDELL:

24  Q.    Is this the part of the manual that talks about

25  playlists, Mr. Heller?

1  A.     Yes, it is.

2  Q.     And what is the figure we see in the right-hand

3  corner of the upper part of page 15?

4  A.     It is an example playlist window in SoundJam.  It

5  was actually something we called the "Master Playlist."

6  Q.     Okay.  I'm struggling to read the titles of those

7  songs.  Can you read a couple for us?

8  A.     I can read them out of the book actually -- or

9  maybe not.  "Mairzy Doats," "Teddy Bear's Picnic," "I'm

10 Proud to be a Moose" -- I don't know where these came

11 from.

12 Q.     Mr. Heller, was that yours?

13 A.     I did not write this manual, no.  I don't know

14 where this came from.

15 Q.     I'm sure it's a fine work.

16         Did SoundJam have the ability for you to

17 rearrange those selections?

18 A.     Yes, it did; and that's what this figure is

19 showing.  It's a representation of grabbing the file and

20 dragging it down farther in the list.

21 Q.     And did people at the time use them to make

22 playlists?

23 A.     Yes.

24 Q.     Okay.  Would the SoundJam system allow you to sort

25 of create a music library out of all your CDs?

1  A.      Yes.  And, in fact, if you were importing the CDs

2  sort of one after another, they would all end up in this

3  master playlist which is a library construct.  And then

4  you could make new playlists and drag into those and

5  reorder those and play them in whatever order you

6  desired.

7  Q.      Did SoundJam have "skip" buttons?

8  A.      Yes, it did.

9  Q.      Could you skip forward?

10  A.      Yes.

11  Q.      Could you skip back?

12  A.      Yes.

13  Q.      Where did you get the idea for "skip" buttons in

14  SoundJam?

15  A.      Those were the standard controls on CD -- audio CD

16  players at the time and some tape players as well.

17  Q.      And did SoundJam work with any portable audio

18  players?

19  A.      It did.

20  Q.      Tell the jury about that.

21  A.      So, SoundJam originated as an attempt to work with

22  a portable player that was only available for PCs at the

23  time.  It was called the "Rio 300."  And the two

24  gentlemen that started SoundStep, Bill Kincaid and Jeff

25  Robbin, were working on a hardware product to try and get

1579

1    that device to attach to a Mac.  They were Mac people.

2    They wanted this player to work with a Mac.

3    Q.     Let me just stop you.  What's a Mac?

4    A.     Macintosh.  I apologize.

5    Q.     Go ahead.

6    A.     They got a cable sort of working, but it was

7    really slow.  And in the end, they abandoned that; but in

8    the meantime, they had started some software because once

9    they got the cable working, the thought was they would

10   need some software on the Mac to do the playback and to

11   do the functionality that SoundJam ended up doing.  And,

12   so, the project sort of transitioned from a hardware

13   product that they thought they could sell to a software

14   product that became a very big commercial success on the

15   Macintosh.

16   Q.     And what portable players could SoundJam

17   ultimately work with?

18   A.     The two companies at the time that had most of the

19   portable players -- and these were fairly limited

20   products -- were Diamond Multimedia, which eventually

21   became a company called "SONICblue," and Creative Labs.

22   So, Diamond Multimedia had a line of products called the

23   "Rio," Rio 500 and Rio 600; and Creative Products had a

24   line of products called the "NOMAD," NOMAD Jukebox.

25   Q.     Okay.  Now, how did you come to work for Apple?

A.     So, Apple in 2000 was looking to get into this

market.  Apple did not have an MP3 player program or

anything that would create MP3 files, and they were

looking to either acquire another company that already

had some proven technologies or develop it in-house.  And

I don't know how they ended up making that decision, but

the decision they came to was to acquire us.  They

approached SoundStep, and we ended up selling the company

to them in 2000.

Q.     And how much did Apple pay for SoundStep?

A.     Apple paid $10 million.

Q.     And what did Apple get for its money?

A.     They got SoundJam MP, which at that time was

Version 2.5, I think.  So, they had a product that had

been shipping to customers.  It was already a proven

product.  And then they got the services and employment

of Bill Kincaid, Jeff Robbin, and myself.

Q.     And was any technology included in the deal?

A.     The software and the source code for SoundJam MP.

Q.     And just remind us.  At the time of the

acquisition, was SoundJam MP a working product?

A.     Yes, it was.

Q.     Okay.  Now, what was the first thing -- the first

project you did when you got to Apple?

A.     So, sort of the first project was to take

1581

1   SoundJam MP and turn it into an Apple product.  That was

2   a product that looked like other Apple products and as

3   well as change -- add functionality that SoundJam MP

4   didn't have.  We ended up removing a little bit of

5   functionality.  And that product eventually became

6   *iTunes*.

7   Q.    And just remind me.  You joined Apple in the fall

8   of 2000?

9   A.    September of 2000, yeah.

10  Q.    And when did you complete *iTunes* at Apple?

11  A.    It shipped to customers in January of 2001.

12  Q.    Okay.  So, you had *iTunes* in January of 2001; is

13  that right?

14  A.    Yes.

15  Q.    So, how did that then relate to the iPods that you

16  see in front of you?

17  A.    So, *iTunes* was released in January of 2001.  Early

18  2001 Apple, as we've heard, started to embark on an

19  investigation and a project that eventually became the

20  iPod.  And at some point in early 2001, Jeff Robbin

21  brought me in and told me about this project; and we knew

22  that *iTunes* was going to be the software that interfaced

23  with the device to put content onto it.

24  Q.    And did you contribute any technology to the iPod?

25  A.    Yes, we did.  So, my team contributed -- well, I

1  say "my team."  It's my team now.  At that time I was an

2  individual engineer.  So, some of the software that we've

3  seen, some of the source code we've seen in this trial so

4  far, the PlayerNext and the PlayerDone functionality, was

5  software out of *iTunes* that was given to the iPod team.

6          We also gave them code and specifications for

7  the databases that live on the iPod.  So, while the iPod

8  hardware team was working on the device, *iTunes*

9  engineers, in conjunction with engineers on the iPod

10 team, were figuring out how we were going to communicate

11 with the device and laying the groundwork for the file

12 formats and other things on the device.

13 Q.    So, you mentioned Mr. Robbin.  Tell the jury what

14 Mr. Robbin's role was at Apple at the beginning of 2001.

15 A.    At the beginning of 2001, our team was three

16 people.  Mr. Robbin was the manager of the two of us.

17 And then right in February or March, we gained two more

18 engineers.  But he was the manager of the *iTunes* software

19 program.

20 Q.    So, he had then the job you have now?

21 A.    Basically, yes.

22 Q.    Okay.  And what part of the system did

23 Mr. Robbin's work relate to?

24 A.    I'm sorry.  Which system?

25 Q.    Was he on the *iTunes* side, on the iPod side, or

1  some other product?

2  A.    He was -- I'm sorry.  He was also interfacing

3  with, like, Tony Fadell as part of the iPod development.

4  Q.    Okay.  And another name that I mentioned earlier

5  was a fellow by the name of Chris Wysocki.  Tell the jury

6  who Chris Wysocki is.

7  A.    Chris Wysocki is a software engineer and a

8  manager.  He works for me.  His role and responsibility

9  today is he runs the subgroup within my team that deals

10 with iPods and other devices.  So, his people are

11 responsible for user interface for segments for the iPod

12 as well as the communication and other features.  Any

13 feature where *iTunes* is going to talk to another device,

14 that is his role and his responsibility.

15 Q.    And who is Chris Wysocki's boss?

16 A.    I am his boss.

17 Q.    And are you generally knowledgeable about his

18 work?

19 A.    Yes.

20 Q.    And when did Mr. Wysocki join Apple?

21 A.    It was late 2003.

22 Q.    Okay.  And what product did he work on originally?

23 Do you remember?

24 A.    At Apple he was hired to do -- Apple actually had

25 a prior phone product prior to the iPhone in a sense.  We

1  had a relationship with Motorola; and Chris Wysocki was

2  hired to put a version of *iTunes* onto the phone, onto a

3  Motorola phone called the "Rokr," and *iTunes* would sync

4  to it.  And, so, he was hired to do that work and staff

5  up a team to work at putting *iTunes* onto various phones

6  with various manufacturers.

7          But in the end, the Rokr was the only one we

8  did and that relationship was dissolved and we never did

9  another phone product other than the iPhone.

10 Q.    And, mercifully, you've heard nothing about the

11 Rokr during this trial, correct?

12 A.    That's correct.

13 Q.    So, let me ask you to -- do you have an iPod with

14 you, Mr. Heller?

15 A.    I do.

16 Q.    I'm going to ask you to just demonstrate its

17 functions for the jury, if you can.

18 A.    Okay.

19 Q.    First of all, can you tell us which iPod model you

20 have?

21 A.    This is the sixth generation classic.

22 Q.    Okay.  Does that match one of the exhibits that's

23 in front of you?

24 A.    Yes, it does.  It's the same as this one

25 (indicating), Defendant's Exhibit 102.

1  Q.    Thank you.

2        So, we don't have the camera anymore; so,

3  you'll just have to hold it up high.

4        MR. CORDELL:  I apologize, your Honor, for

5  that but --

6        THE COURT:  You can stand up if you need to.

7        THE WITNESS:  Thank you.

8  BY MR. CORDELL:

9  Q.    So, tell the jury what you're doing.

10 A.    I am hooking up a set of speakers to the iPod, and

11 we've got some songs on here.

12 Q.    Whose songs are those?

13 A.    They're my songs, some of my personal songs.

14 Q.    Okay.

15 A.    And I put them on here myself.

16 Q.    All right.  So, the iPod, is it just asleep right

17 now?

18 A.    It's not.  It's actually paused on a song and

19 there is a picture of the album cover here and it happens

20 to be "Crazy" by Patsy Cline.

21 Q.    Okay.  Can you go ahead and make it play music?

22 A.    Sure.  Hopefully it's not too loud here.

23 (Demonstrating).  So, it's playing.  I can adjust the

24 volume by turning the wheel.  I don't want to go too loud

25 here.

1    I can go to the next track by hitting the

2 "next" button, which is "Yo-Yo Ma."  I think we're

3 playing the songs in alphabetical order; so, it's going

4 to kind of skip across several artists.  Elvis.  I can go

5 back to the previous song or the beginning of the current

6 song.

7 Q.    So, let me just take it one step at a time.  In

8 order to make the iPod play music, what button do you

9 press?

10 A.    I hit the "play/pause" button at the bottom.

11 Q.    Okay.  And what does that look like, for the

12 jury's purposes?

13 A.    A right-facing triangle and two vertical lines,

14 the same kind of control you would see on an audio CD

15 player.

16 Q.    Okay.

17 A.    When I picked up this iPod, it was sitting there

18 paused on the Patsy Cline song.  I did not, in this

19 particular case, navigate it to play it.  That just

20 happened to be where it was.

21 Q.    Okay.  And if you're tired of Patsy and you want

22 to go to -- did you say "Yo-Yo Ma"?

23 A.    "Yo-Yo Ma."

24 Q.    Okay.  If you want to go to -- that's a classical

25 piece of music?

1587

1  A.     Yes, it is.

2  Q.     Okay.  If you wanted to do that, what button would

3  you press?

4  A.     It depends where I am.  If I'm looking at the list

5  of songs -- so, if I go to hit the "menu" button, I can

6  go back to the list of songs; and there is a list of --

7  we have 182, I think, on here right now.

8  Q.     Let me just stop you right now.  So, you're moving

9  your finger around that big circle.  What's happening?

10 A.     That's the Clickwheel.  If I go counterclockwise,

11 I go up in the list --

12          THE REPORTER:  I'm sorry.  You're going to

13 have to slow down a little bit.  Okay?

14          THE WITNESS:  Okay.

15 A.     If I go clockwise, it goes downward in the list;

16 and this is a standard feature of all iPods since the

17 very first one.

18 BY MR. CORDELL:

19 Q.     Okay.  And is that how you scroll through the

20 songs?

21 A.     Yes, it is.

22 Q.     Okay.  Is there another name for that wheel?

23 A.     We just call it the "Clickwheel."

24 Q.     Okay.  And let me ask you this, Mr. Heller:  Is

25 there any way for you to press the button and have it

1  skip six songs ahead?

2  A.     There is not.

3  Q.     Is there any way for you to press the button and

4  have it skip from Patsy Cline to the next country and

5  western song in the list?

6  A.     No, there's not.

7  Q.     Is there any way for you to press the button and

8  have it skip to the Elvis song?

9  A.     To the which song?

10  Q.     The Elvis song.

11  A.     No, there's not.

12  Q.     Well, why not?  I mean, that sounds like that

13  would be a good feature.

14  A.     It just does not do that.

15  Q.     Okay.  Work on that one.  That would be good.

16         All right.  Well, thank you.  I think we can

17  put that down now.

18         Let me ask you this:  Does the music come

19  already loaded on the iPod when the customer goes out and

20  buys it from the store?

21  A.     It does not.

22  Q.     Okay.  And when you connect your iPod to a

23  computer, describe what you see on the face of the iPod.

24  A.     So, when you connect it to a computer and it shows

25  up on the desktop on the computer, the screen changes.  I

1 think Mr. Fadell testified to this.  It goes into disk

2 mode.  It becomes basically just a hard drive.

3        And on the screen it says something like

4 either "Syncing.  Do Not Disconnect" or just simply "Do

5 Not Disconnect."

6 Q.    Now, you said it becomes basically a hard drive.

7 Tell the jury what a hard drive is.

8 A.    It is -- there is -- as we know, there is a hard

9 drive in this particular unit, a little 1.8-inch drive.

10 And to the computer, it is something where you can put

11 your files.  It shows up on the desktop and you can copy

12 down your *Word* -- I mean, you can use this as a hard

13 drive if you want.  You can put your *Word* files on it or

14 your other documents.  But it's a storage device.  From

15 the computer standpoint, as far as the computer knows,

16 it's a storage device.

17 Q.    Okay.  And when it goes into disk mode, when you

18 see that thing on the screen, if you press the buttons,

19 does anything happen?

20 A.    Nothing will happen, no.

21 Q.    Why not?

22 A.    The player part of the iPod has been unloaded from

23 memory.  There is no more audio player.  There is no more

24 program that does music.  It is simply there to display a

25 message that says "Do Not Disconnect" and to wait for

 1  *iTunes* to be done with it.

 2  Q.     If you touch the scroll wheel when it's in that

 3  disk mode, what happens?

 4  A.     Nothing.

 5  Q.     Okay.  Does the iPod ever request music from

 6  *iTunes*?

 7  A.     It does not.

 8  Q.     Does the iPod ever request playlists from *iTunes*?

 9         MR. SCHUTZ:  Your Honor, I'm going to object.

10  It's a disputed -- it's a construed term.  He's not an

11  expert, and he can -- I have no objection to him

12  describing generically how it works, but request --

13         THE COURT:  Sustained.  You're getting into

14  claim construction at this point.  I don't believe he's

15  been identified as an expert to go into that term as I've

16  construed it to the jury.  You have the experts to do

17  that.

18         MR. CORDELL:  Thank you, your Honor.

19         THE COURT:  And, ladies and gentlemen, again,

20  we have under our rules certain witnesses who are allowed

21  to give opinions on whether the accused device, these

22  iPods, are infringing the claim terms as I have defined

23  them.  But the other witnesses are fact witnesses.  They

24  can talk about what's actually -- the building of the

25  device, for example, the backgrounds and so forth.  But

1    when we get into claim interpretation, there are limits

2    on that, including the instructions that I'll wind up

3    giving you.

4              Go ahead, counsel.

5              MR. CORDELL:  Thank you, your Honor.

6    BY MR. CORDELL:

7    Q.    Let me ask you this, Mr. Heller:  When the device

8    is in disk mode, are any of the programs on the iPod

9    still running?

10   A.    I do not believe so, no, other than a program that

11   implements disk mode.

12   Q.    The one that flashes the --

13   A.    Yes.

14   Q.    -- "Do Not Disconnect"?

15             Okay.  Thank you.

16             Let me ask you a couple questions.  Do you

17   have patents, Mr. Heller?

18   A.    I do.

19   Q.    And, again, I understand the court's concerns

20   about that.  But just tell us how many you have.

21   A.    26.

22   Q.    Okay.  I'd like to just direct your attention to

23   three of them, if I can.

24             MR. CORDELL:  Can I have Defendant's

25   Exhibit 195?

1  BY MR. CORDELL:

2  Q.    Mr. Heller, tell the jury what this patent is all

3  about.

4  A.    This is what we call the "Smart Playlist patent";

5  and this patent is about how in this particular case

6  *iTunes*, which has a Smart Playlist feature -- Smart

7  Playlists are playlists where you can set a criteria or a

8  condition and the playlist will be updated automatically.

9  *iTunes* ships, with a few of these, "Nineties Music,"

10 "Recently Added."  And, so, as you add songs to your

11 libraries, for example, that are from the Nineties, they

12 will automatically appear in the Nineties Music playlist.

13 Q.    All right.  Let me now show you Defendant's

14 Exhibit 170, which is Patent Number 7,680,849.  Can you

15 explain what this patent is all about to the jury?

16 A.    Yes.  This is a patent that describes how *iTunes*

17 detects what kind of things an iPod can accept.  The

18 various iPods over the years -- the first iPod, this iPod

19 here (indicating), was music only.  And then if you go

20 out to the latest classic, this one can do games, photos,

21 movies, as well as clearly music.  And, so, there has to

22 be a way for *iTunes* to determine what kind of media is

23 appropriate -- can be appropriately displayed and played

24 on an iPod.

25 Q.    Let me try one more, Defendant's Exhibit 197.

1 That's U.S. Patent 6,799,226.  What is this patent all

2 about, Mr. Heller?

3 A.    This patent is about how *iTunes* keeps the device

4 in a state so that if *iTunes* isn't actually talking to

5 the device, you can just yank the cable and walk away.

6 That is not something you can do with a normal hard disk

7 and, in fact, on both Mac and *Windows* you'll get an angry

8 dialogue that comes up and says you did the wrong thing.

9 Usually you must put the disk drive away or eject it or

10 unmount it.

11         And *iTunes* does some extra-special stuff to

12 this so that if you're not actually copying to it and

13 it's in automatic sync mode, you can just yank the cable

14 and walk away, start listening to your music.

15 Q.    Mr. Heller, before this case had you ever heard of

16 Personal Audio, LLC?

17 A.    I had not.

18 Q.    Before this case had you ever heard of the two

19 asserted patents?

20 A.    I had not, no.

21 Q.    Before this case had you ever heard of Mr. Logan,

22 Mr. Jim Logan, James Logan?

23 A.    No.

24 Q.    Had you ever heard of Mr. Charles Call?

25 A.    No, I had not.

 1  Q.     How about Mr. Dan Goessling?

 2  A.     No.

 3         MR. CORDELL:  Thank you, your Honor.  Nothing

 4  further.  Pass the witness.

 5         THE COURT:  We might as well get started.

 6  We'll go for a minute or two and then...

 7         MR. SCHUTZ:  Great.

 8         <u>CROSS-EXAMINATION OF DAVID HELLER</u>

 9  BY MR. SCHUTZ:

10  Q.     Good afternoon, Mr. Heller.

11  A.     Good afternoon.

12  Q.     Prior to this trial, you and I had never met, had

13  we?

14  A.     I don't believe so, no.

15  Q.     All right.  And you said you had never heard of

16  Mr. Logan or Mr. Call or Mr. Goessling; is that right?

17  A.     That's correct.

18  Q.     All right.

19         MR. SCHUTZ:  Jeff, will you pull up

20  Plaintiff's Exhibit 1, the patent, please?

21  BY MR. SCHUTZ:

22  Q.     Mr. Heller, you've been sitting here the whole

23  time, right, and you heard opening statements and you

24  heard the experts testify, correct?

25  A.     Yes.

1  Q.    And you know that the key -- one of the key dates

2  in this case is the date of October 2nd, 1996, correct?

3  A.    I know that date has been brought up several

4  times, yes.

5  Q.    Right.  And that's the date that the inventors in

6  this case went to the Patent Office and applied for

7  the -- made an application that resulted in the two

8  patents-in-suit in this case, correct?

9  A.    I know they did for that patent, yes.

10 Q.    And you know that for the second patent-in-suit it

11 has the benefit of this same filing date, October 2nd,

12 1996, correct?

13 A.    I believe that's the case, yes.

14 Q.    And when you were working at SoundJam and you --

15 I'm now referring to -- you have this in your book.  I

16 believe it's Defendant's Exhibit 34.

17        You talked about that on direct, correct?

18 A.    Yes.

19 Q.    And that document and that product -- actually the

20 product came into being in 1998, correct?

21 A.    The first version was shipped to customers in

22 1998.

23 Q.    Two years after the inventors in this case went to

24 the Patent Office and filed their patent application,

25 correct?

1  A.      Yes.

2  Q.      And, you know, I went through this; and this

3  particular manual that was supplied here says that the

4  copyright is 1999.  Do you see that?

5  A.      That, I believe, is the copyright either for the

6  manual or for that version of the software.

7  Q.      And that's three years after the inventors went to

8  the Patent Office, correct?

9  A.      Yes.

10 Q.      Now, I've been looking through here -- and it's

11 your document.  I know you're familiar with it, and it's

12 your company.  I couldn't find anywhere in here where it

13 said that you can take an audio player and plug it into a

14 computer with SoundJam on it and download navigable

15 playlists.  I didn't see that in here.  Did I miss that?

16 A.      The functionality was specific to certain players,

17 and I don't know that that was called out in the manual.

18 Q.      I mean, I couldn't find it and -- like I said.

19 But it's your manual and I see there is some discussion

20 of playlists in there, but the discussion seems to be

21 that you could, within a confined box here, get music on

22 the box with SoundJam on it and make playlists.  You

23 could do that, right?

24 A.      You could do that, yes.

25 Q.      Right.  And that's discussed in here, right?

Jury Trial, Volume 5

1597

 1  A.    Yes.

 2  Q.    All right.  But again, that's still two years at

 3  least after the inventors here applied for their patent,

 4  correct?

 5  A.    Yes.

 6  Q.    All right.  Now let's go to one of the patents

 7  that you talked about.  I think it's -- it's Defendant's

 8  Exhibit 197.  Do you see that?  That's one of the patents

 9  you just talked about, right?

10  A.    Yes.

11  Q.    And that's your patent, correct, sir?

12  A.    I am a co-inventor on this.

13  Q.    You're a co-inventor and you went to the Patent

14  Office and you disclosed certain technology to them,

15  correct?

16  A.    Yes.

17  Q.    Now, you're --

18  A.    I'd like to -- not myself literally.

19  Q.    Well, you and the other co-inventors.

20  A.    Yes.  This was filed -- we were working for Apple.

21  This was filed by Apple on our behalf.

22  Q.    All right.  Now, when you went to the Patent

23  Office to seek this patent application, you and your

24  co-inventors told the Patent Office that you've got some

25  technology here that relates to a host computer and a

1  media player, right?

2  A.     Yes.

3  Q.     And in describing that technology of the host

4  computer and the media player, you discussed how those

5  can be connected, right?

6  A.     Yes.

7  Q.     And one of the ways in which those can be

8  connected is by a cable, right?

9  A.     Yes.

10  Q.     A USB cable is one way, correct?

11  A.     Yes.  I don't know if USB was mentioned in this.

12  I would have to go through --

13  Q.     We'll get to that.

14  A.     Okay.

15  Q.     And a FireWire cable was mentioned, correct?

16  A.     FireWire is another way to do it.

17  Q.     And, yet, another way to do it was by a wireless

18  link, right?

19  A.     That is another way to do it.

20  Q.     And, so, if we go here to -- if you would turn to

21  the page that's Column 5.  You told the Patent Office --

22  I'll enlarge this.  You talk about "A peripheral cable

23  212" --

24             THE COURT:  Do you want to put in a line

25  number, just for the record, on Column 5?

1             MR. SCHUTZ:  I will, your Honor.

2  BY MR. SCHUTZ:

3  Q.     It begins at line 50.  Column 5, line 50, in

4  Defendant's Exhibit 197.

5           And here it talks about "A peripheral cable

6  212" -- and just so we make sure we know what we're

7  talking about here, if we go to the drawings, we can

8  find -- we're going to come back to this page in just a

9  second.  But if you go to Figure 2, what you have here is

10  a media player and a personal computer, right?

11  A.     Yes.

12  Q.     And 212 is the link between them, right?

13  A.     Yes, it is.

14  Q.     And it's just illustrated as a line.  You can't

15  tell really what it is other than it's a link, correct,

16  of some type?

17  A.     Yeah.  It is a line, yes.

18  Q.     And, so, when you go back to Column 5, what you

19  see here in Column 5 is a discussion that there are a

20  couple different ways that this 212 can be either a

21  FireWire cable, a USB, or it can be a wireless link,

22  right?

23  A.     Those are some examples listed, yes.

24  Q.     Okay.  Now, you've sat here during the entire

25  trial; and you know that there is an issue in this case

1  as to whether a wireless link is a structural equivalent

2  to USB.  You're aware of that, correct?

3  A.    Are you referring to the IrDA?

4  Q.    Or a wireless link.

5  A.    I don't recall a discussion of wireless links in

6  general in this trial.

7  Q.    All right.  Well, let me see if I can refresh your

8  recollection about that.  Let's go to -- let me see if I

9  can get up here Plaintiff's Exhibit 1027.  It's a

10 demonstrative exhibit that was used in some of the

11 discussion with Dr. Almeroth.

12 A.    Okay.

13 Q.    And this is the court's claim construction for

14 "means for receiving and storing a file."  And among the

15 structure in the patent is "A radio or infrared link for

16 connecting to a local communications server computer

17 linked to the Internet."  Do you see that?

18 A.    Yes, I do.

19 Q.    A wireless link is a radio link, right?

20 A.    Yes.

21 Q.    Thank you.

22        THE COURT:  Okay.  Counsel, we're going to go

23 ahead and break for the evening.

24        Again, ladies and gentlemen, remember my

25 instructions.  Don't discuss the case with anybody.

1601

1   Don't let them discuss it with you.  I will see you back

2   here tomorrow at 8:30.

3                (The jury exits the courtroom, 5:08 p.m.)

4                THE COURT:  You may step down, sir.

5                Anything to be taken up outside the presence

6   of the jury, by Personal Audio?

7                MR. SCHUTZ:  My crack team is telling me no,

8   your Honor.

9                THE COURT:  Good.

10               And Apple?

11               MR. CORDELL:  Not from Apple, your Honor.

12  Thank you.

13               THE COURT:  Okay.  Well, if Ms. Chen isn't

14  telling you something is needed, then it probably isn't.

15  I'm sure she's got it covered.

16               MR. CORDELL:  She'll yell at me later.  That's

17  the way it works.

18               THE COURT:  All right.  In that case -- well,

19  let me ask -- let's go off the record.

20               (Proceedings adjourned, 5:09 p.m.)

21  COURT REPORTER'S CERTIFICATION
              I HEREBY CERTIFY THAT ON THIS DATE, JUNE 29,
22  2011, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
    RECORD OF PROCEEDINGS.
23        *Christina Bickham* (signature)
24  CHRISTINA L. BICKHAM,    CRR,    RMR

25

## $

**$1.23** [1] - 1482:19
**$1.29** [2] - 1325:4, 1467:21
**$1.30** [5] - 1324:6, 1325:6, 1487:14, 1527:24, 1538:14
**$1.32** [1] - 1488:11
**$1.34** [3] - 1524:13, 1527:11, 1529:6
**$1.57** [3] - 1466:6, 1466:7, 1467:7
**$1.64** [1] - 1481:14
**$1.67** [1] - 1487:11
**$1.70** [1] - 1463:3
**$1.74** [1] - 1482:13
**$10** [2] - 1400:5, 1580:11
**$11** [2] - 1456:13, 1462:24
**$110** [1] - 1456:9
**$111** [1] - 1464:10
**$12.25** [1] - 1463:1
**$120** [1] - 1462:23
**$13** [1] - 1462:21
**$145** [1] - 1464:24
**$160** [1] - 1464:10
**$17.35** [1] - 1473:24
**$18** [1] - 1324:4
**$2.19** [1] - 1466:4
**$2.46** [1] - 1466:5
**$200** [1] - 1459:14
**$255** [1] - 1463:4
**$3.47** [1] - 1481:15
**$3.60** [1] - 1466:2
**$30,000** [1] - 1399:2
**$32** [2] - 1527:21, 1531:21
**$32.70** [1] - 1528:6
**$327** [2] - 1509:25, 1533:17
**$34** [1] - 1531:21
**$38** [1] - 1456:9
**$4.09** [1] - 1464:8
**$41.16** [1] - 1459:22
**$500** [6] - 1398:19, 1398:20, 1500:2, 1500:4, 1500:6, 1500:9
**$52.55** [1] - 1456:9
**$6** [1] - 1510:2
**$6,000** [2] - 1398:23, 1500:7
**$62.51** [2] - 1466:9, 1467:9
**$8.18** [4] - 1473:23, 1481:4, 1481:6, 1483:22
**$81.98** [1] - 1467:23
**$84** [2] - 1392:8, 1490:8
**$94.38** [1] - 1467:23

## '

**'01** [5] - 1432:6, 1455:14, 1455:15, 1474:25, 1541:10
**'02** [2] - 1458:25, 1459:24
**'03** [3] - 1409:12, 1441:9, 1542:10
**'04** [1] - 1441:8
**'05** [2] - 1403:11, 1542:10

**'06** [1] - 1403:13
**'076** [36] - 1272:15, 1272:18, 1272:24, 1273:7, 1275:2, 1275:16, 1275:18, 1276:14, 1277:2, 1294:2, 1302:2, 1303:13, 1304:1, 1305:23, 1340:17, 1340:22, 1341:18, 1343:7, 1354:13, 1354:18, 1363:20, 1366:10, 1369:22, 1374:21, 1374:24, 1392:20, 1421:3, 1421:5, 1421:20, 1421:22, 1422:4, 1493:20, 1493:23, 1494:15, 1538:17, 1539:25
**'09** [5] - 1487:5, 1539:4, 1539:10, 1540:12, 1541:2
**'178** [45] - 1272:14, 1272:19, 1272:23, 1275:14, 1299:11, 1300:3, 1302:3, 1325:6, 1334:20, 1339:16, 1339:21, 1341:5, 1343:6, 1369:21, 1369:25, 1370:1, 1370:6, 1374:22, 1375:3, 1392:21, 1421:7, 1421:10, 1421:11, 1421:15, 1421:20, 1421:25, 1486:18, 1486:23, 1487:4, 1487:14, 1487:16, 1493:20, 1494:15, 1538:5, 1538:14, 1538:17, 1539:5, 1539:9, 1539:16, 1539:18, 1539:19, 1539:20, 1539:25, 1540:10, 1541:14
**'95** [1] - 1293:16
**'96** [1] - 1293:16
**'means** [1] - 1335:10
**'means-plus-function** [1] - 1335:10
**'playlist'** [2] - 1547:4, 1547:5

## 0

**0.7** [1] - 1287:22
**0005** [2] - 1410:3, 1410:4

## 1

**1** [54] - 1265:1, 1265:2, 1265:3, 1265:4, 1265:11, 1268:13, 1275:2, 1293:24, 1294:20, 1294:23, 1294:25, 1296:16, 1310:9, 1310:21, 1311:17, 1311:24, 1311:25, 1340:12, 1340:21, 1341:4, 1341:17, 1342:10, 1345:13, 1346:3, 1346:4, 1346:8, 1351:21, 1351:23, 1351:25, 1352:4, 1352:17, 1352:20, 1352:21, 1352:23, 1353:6, 1353:22, 1366:14, 1374:20, 1374:21, 1374:24, 1374:25, 1375:1, 1375:3, 1378:15, 1400:4, 1400:7, 1404:25, 1541:19, 1541:20, 1594:20
**1,000** [1] - 1417:17
**1-year** [1] - 1398:22
**1.152** [1] - 1364:5
**1.23** [1] - 1482:12
**1.30** [3] - 1540:5, 1540:11, 1540:21
**1.34** [5] - 1485:3, 1485:20, 1487:11, 1528:7, 1531:3
**1.4** [2] - 1290:2, 1403:16

**1.64** [1] - 1482:20
**1.8-inch** [1] - 1589:9
**10** [11] - 1436:21, 1454:20, 1454:24, 1458:21, 1460:3, 1469:9, 1471:21, 1471:23, 1504:9, 1541:10, 1553:5
**10-gigabyte** [1] - 1462:20
**100** [13] - 1268:25, 1350:13, 1394:1, 1479:25, 1530:8, 1530:12, 1530:25, 1533:7, 1533:13, 1533:15, 1533:18, 1533:21
**1000** [6] - 1286:21, 1287:4, 1288:8, 1288:12, 1288:24, 1289:8
**1006** [4] - 1409:16, 1409:19, 1446:17, 1562:10
**1009** [5] - 1277:11, 1277:24, 1285:16, 1353:8, 1354:6
**1010** [6] - 1272:8, 1274:10, 1275:24, 1276:21, 1360:22, 1360:24
**102** [2] - 1269:10, 1584:25
**1027** [1] - 1600:9
**1028A** [1] - 1358:10
**103** [10] - 1265:5, 1269:3, 1294:23, 1294:24, 1295:7, 1295:17, 1352:8, 1352:24, 1459:8, 1551:19
**1033** [1] - 1355:13
**1038** [1] - 1357:13
**104** [2] - 1552:13, 1576:21
**105** [3] - 1269:4, 1300:4, 1459:9
**1061** [1] - 1420:18
**1073** [6] - 1392:15, 1392:18, 1402:5, 1410:2, 1424:1, 1457:13
**1073-0005** [2] - 1266:7, 1408:15
**1073-0017** [1] - 1434:18
**1073-002** [1] - 1396:16
**1073-0035** [1] - 1537:24
**1073-006** [1] - 1411:9
**1073-007** [1] - 1411:11
**1073-19** [1] - 1450:10
**1073-21** [2] - 1453:15, 1460:3
**1073-22** [1] - 1458:9
**1073-24** [1] - 1469:2
**1073-26** [1] - 1471:25
**1073-28** [1] - 1480:13
**1073-3** [2] - 1398:15, 1499:4
**1073-31** [1] - 1484:6
**1073-32** [1] - 1484:22
**1073-34** [2] - 1393:20, 1486:16
**1073-37** [1] - 1488:17
**1073-4** [1] - 1399:19
**1073-5** [2] - 1400:19, 1409:15
**108** [6] - 1269:1, 1269:2, 1269:5, 1396:6, 1415:9, 1459:11
**10:06** [1] - 1337:24
**10:55** [1] - 1375:20
**10:56** [1] - 1376:8
**10th** [1] - 1419:11
**11** [8] - 1352:4, 1366:14, 1434:21, 1435:3, 1443:18, 1453:3, 1453:4, 1453:5
**11.73** [1] - 1480:3

**110** [1] - 1554:11

**112** [4] - 1333:10, 1333:13, 1336:2, 1336:5

**115** [15] - 1268:16, 1268:17, 1268:18, 1268:19, 1268:20, 1268:21, 1268:22, 1302:18, 1302:24, 1303:3, 1305:21, 1308:21, 1310:6, 1310:19, 1364:21

**115,000** [2] - 1364:2, 1364:10

**116** [4] - 1268:23, 1268:24, 1339:16, 1339:20

**118** [1] - 1300:6

**119** [1] - 1300:6

**11:11** [1] - 1376:8

**11:12** [1] - 1377:2

**11th** [2] - 1312:25, 1314:1

**12** [12] - 1307:2, 1317:8, 1317:14, 1338:21, 1363:22, 1398:22, 1436:23, 1439:14, 1500:4, 1500:5

**12.17** [1] - 1480:5

**125** [3] - 1287:25, 1288:7

**128** [2] - 1289:8, 1290:11

**12:05** [1] - 1419:21

**12:10** [1] - 1422:12

**13** [4] - 1364:16, 1374:21, 1375:3, 1434:22

**1302** [2] - 1268:16, 1268:17

**1303** [1] - 1268:18

**1305** [1] - 1268:19

**1308** [2] - 1268:20, 1331:24

**1310** [2] - 1268:21, 1268:22

**1314** [1] - 1336:1

**1320** [2] - 1331:24, 1335:25

**1339** [2] - 1268:23, 1268:24

**1351** [2] - 1265:1, 1265:2

**1352** [2] - 1265:3, 1265:4

**1357** [1] - 1265:5

**1362** [2] - 1265:6, 1265:7

**1363** [1] - 1265:8

**1364** [1] - 1265:9

**1365** [1] - 1265:10

**1366** [1] - 1265:11

**1386** [2] - 1265:12, 1265:13

**1394** [1] - 1268:25

**1396** [1] - 1269:1

**14** [3] - 1374:21, 1375:3, 1576:19

**1402** [1] - 1265:14

**1404** [2] - 1265:15, 1265:16

**1405** [3] - 1265:17, 1265:18, 1265:19

**1406** [1] - 1265:20

**1407** [3] - 1265:21, 1265:22, 1265:23

**1408** [7] - 1265:24, 1265:25, 1266:1, 1266:2, 1266:3, 1266:4, 1266:5

**1409** [1] - 1266:6

**1410** [1] - 1266:7

**1415** [1] - 1269:2

**1417** [1] - 1266:8

**1419** [1] - 1266:9

**142** [2] - 1447:15, 1447:16

**1425** [1] - 1266:10

**1426** [1] - 1266:11

**1436** [1] - 1266:12

**1437** [1] - 1266:13

**1438** [1] - 1266:14

**1441** [2] - 1266:15, 1266:16

**1444** [2] - 1266:17, 1266:18

**1445** [2] - 1266:19, 1266:20

**1446** [4] - 1266:21, 1266:22, 1266:23, 1266:24

**1447** [1] - 1266:25

**1455** [3] - 1267:1, 1267:2, 1267:3

**1457** [2] - 1267:4, 1267:5

**1458** [1] - 1267:6

**1459** [3] - 1269:3, 1269:4, 1269:5

**1461** [3] - 1267:7, 1267:8, 1267:9

**1462** [1] - 1267:10

**1463** [2] - 1267:11, 1267:12

**1465** [1] - 1267:13

**1468** [2] - 1267:14, 1267:15

**1474** [2] - 1267:16, 1267:17

**1479** [2] - 1267:18, 1267:19

**148** [12] - 1266:14, 1266:17, 1438:11, 1438:12, 1438:15, 1439:1, 1439:21, 1439:24, 1444:5, 1444:8, 1445:12, 1446:11

**149** [10] - 1266:15, 1266:16, 1266:17, 1441:14, 1441:17, 1441:24, 1444:6, 1444:8, 1445:12, 1446:11

**15** [24] - 1275:6, 1276:15, 1276:16, 1277:3, 1277:4, 1311:19, 1374:20, 1374:24, 1410:12, 1411:2, 1424:6, 1424:7, 1424:12, 1452:25, 1454:19, 1462:13, 1495:18, 1495:22, 1495:25, 1496:14, 1504:9, 1507:2, 1576:22, 1577:3

**1500** [2] - 1446:7

**1517** [3] - 1267:20, 1267:21, 1267:22

**1541** [1] - 1267:23

**1542** [1] - 1267:24

**1544** [1] - 1267:25

**1553** [1] - 1268:1

**1554** [1] - 1268:2

**1559** [2] - 1268:3, 1268:4

**1560** [5] - 1268:5, 1268:6, 1268:7, 1268:8, 1268:9

**1561** [2] - 1268:10, 1268:11

**1563** [1] - 1268:12

**1575** [3] - 1269:6, 1269:7, 1269:8

**1576** [1] - 1269:9

**1584** [1] - 1269:10

**1591** [1] - 1269:11

**1592** [2] - 1269:12, 1269:13

**1594** [1] - 1268:13

**1595** [1] - 1269:14

**1597** [1] - 1269:15

**1599** [1] - 1269:16

**16** [2] - 1289:16, 1289:21

**16-megabit-per-second** [2] - 1364:7, 1364:11

**160** [1] - 1364:10

**168** [5] - 1317:7, 1317:14, 1319:4, 1338:21

**169** [2] - 1318:14, 1319:7

**17** [4] - 1310:9, 1310:21, 1481:9, 1481:14

**170** [2] - 1269:12, 1592:14

**171** [2] - 1308:22, 1308:24

**173** [1] - 1309:6

**174** [1] - 1331:24

**175** [1] - 1308:22

**176,000** [1] - 1290:5

**177** [4] - 1302:18, 1303:7, 1310:6, 1310:20

**182** [1] - 1587:7

**19** [1] - 1272:19

**19.25** [1] - 1479:23

**190** [1] - 1285:25

**1900** [1] - 1558:21

**191** [1] - 1292:14

**195** [2] - 1269:11, 1591:25

**197** [7] - 1269:13, 1269:15, 1269:16, 1421:14, 1592:25, 1597:8, 1599:4

**1970s** [1] - 1570:24

**1979** [1] - 1387:19

**1984** [3] - 1568:13, 1570:25, 1572:3

**199** [1] - 1459:5

**199.79** [1] - 1459:13

**1990s** [11] - 1279:7, 1279:20, 1279:23, 1280:23, 1281:9, 1281:17, 1282:3, 1282:10, 1282:22, 1283:24, 1284:16

**1991** [2] - 1568:5, 1568:24

**1994** [1] - 1367:4

**1995** [12] - 1284:5, 1287:11, 1288:17, 1292:18, 1292:25, 1293:14, 1350:25, 1351:2, 1351:11, 1354:21, 1355:5, 1364:20

**1996** [10] - 1284:4, 1287:9, 1289:2, 1290:25, 1292:18, 1292:25, 1314:12, 1364:22, 1595:2, 1595:12

**1998** [3] - 1575:16, 1595:20, 1595:22

**1999** [2] - 1364:25, 1596:4

**1:00** [3] - 1419:18, 1422:11, 1422:12

**1:02** [1] - 1423:19

## 2

**2** [16] - 1289:18, 1297:5, 1345:13, 1346:3, 1346:4, 1353:8, 1354:6, 1363:22, 1374:25, 1378:16, 1384:7, 1405:1, 1443:18, 1504:19, 1510:2, 1599:9

**2,000** [3] - 1439:16, 1558:21, 1562:16

**2,007** [1] - 1439:11

**2-and-a-half-inch** [1] - 1280:3

**2.1** [1] - 1403:16

**2.3** [1] - 1403:16

**2.45** [3] - 1481:8, 1482:19

**2.5** [1] - 1580:14

**2.60** [1] - 1482:13

**20** [21] - 1478:19, 1480:18, 1480:24,

1481:1, 1481:13, 1481:14, 1484:1, 1484:2, 1484:3, 1484:20, 1485:2, 1491:16, 1516:14, 1516:15, 1518:2, 1518:4, 1519:10, 1524:7, 1528:18, 1528:20, 1541:19

**2000** [8] - 1363:11, 1363:19, 1364:4, 1364:8, 1580:1, 1580:9, 1581:8, 1581:9

**2000-2001** [1] - 1381:12

**2001** [49] - 1292:14, 1355:2, 1355:7, 1355:19, 1356:6, 1356:8, 1356:11, 1356:18, 1356:23, 1357:10, 1361:25, 1366:1, 1379:15, 1381:1, 1381:4, 1382:11, 1382:25, 1383:9, 1412:13, 1439:6, 1453:21, 1458:13, 1460:14, 1460:18, 1460:19, 1469:8, 1472:23, 1474:25, 1485:18, 1487:3, 1493:12, 1493:15, 1494:18, 1514:9, 1539:2, 1539:10, 1541:8, 1573:1, 1581:11, 1581:12, 1581:17, 1581:18, 1581:20, 1582:14, 1582:15

**2002** [1] - 1574:11

**2003** [3] - 1400:23, 1437:17, 1583:21

**2004** [8] - 1406:22, 1438:24, 1439:11, 1444:24, 1465:5, 1552:19, 1553:24, 1562:2

**2005** [1] - 1441:18

**2006** [3] - 1379:15, 1403:16, 1403:17

**2009** [4] - 1422:6, 1494:19, 1539:2

**201** [1] - 1574:7

**2010** [9] - 1400:24, 1401:11, 1409:12, 1435:22, 1458:25, 1459:25, 1465:20, 1465:22, 1488:6

**2011** [3] - 1270:3, 1488:6, 1601:22

**206** [4] - 1302:21, 1302:24, 1303:3, 1303:7

**207** [4] - 1304:7, 1347:21, 1347:24, 1349:1

**208** [1] - 1574:8

**21** [7] - 1275:6, 1327:10, 1344:5, 1344:14, 1443:19, 1459:21, 1460:1

**210** [2] - 1305:20, 1306:24

**212** [4] - 1598:23, 1599:6, 1599:12, 1599:20

**214** [1] - 1306:13

**219** [1] - 1302:24

**21C** [2] - 1327:12, 1327:17

**220** [1] - 1299:10

**222** [1] - 1301:7

**23** [3] - 1344:24, 1344:25, 1345:1

**23.93** [1] - 1479:24

**232** [1] - 1463:4

**23rd** [1] - 1417:14

**24** [7] - 1272:18, 1276:16, 1277:4, 1299:11, 1319:4, 1441:23, 1441:25

**25** [21] - 1275:6, 1295:4, 1390:5, 1457:3, 1457:6, 1457:19, 1457:20, 1458:20, 1459:18, 1465:4, 1468:7, 1473:10, 1473:23, 1478:11, 1483:9, 1484:1, 1484:2, 1513:16, 1523:21,

1526:23, 1563:3

**25,000** [2] - 1285:22, 1293:5

**25.9** [1] - 1457:2

**257** [1] - 1456:14

**26** [3] - 1439:21, 1439:23, 1591:21

**27** [1] - 1513:3

**28** [6] - 1272:18, 1275:7, 1276:16, 1277:4, 1277:5, 1562:3

**28.2** [1] - 1457:2

**29** [4] - 1270:2, 1442:15, 1516:3, 1601:21

**296** [1] - 1339:19

**2:00** [2] - 1470:9, 1470:12

**2:15** [1] - 1470:12

**2:16** [1] - 1471:15

**2nd** [2] - 1595:2, 1595:11


# 3

**3** [20] - 1274:14, 1274:21, 1275:2, 1277:7, 1280:6, 1280:14, 1282:4, 1282:7, 1297:7, 1297:9, 1344:13, 1344:14, 1346:8, 1352:20, 1364:17, 1374:20, 1374:24, 1443:19, 1499:4, 1534:3

**3,000** [1] - 1574:21

**3-and-a-half** [1] - 1280:8

**3-and-a-half-inch** [4] - 1279:21, 1279:24, 1280:23, 1282:2

**3.2** [1] - 1287:21

**3.9** [2] - 1403:13, 1403:14

**30** [22] - 1388:7, 1394:3, 1394:4, 1401:6, 1478:18, 1480:17, 1480:19, 1480:21, 1480:23, 1481:3, 1481:6, 1481:8, 1481:9, 1516:12, 1516:13, 1518:2, 1518:4, 1519:10, 1519:22, 1520:6, 1541:20, 1562:3

**30(b)(6** [2] - 1299:16, 1299:22

**300** [1] - 1578:23

**301** [1] - 1506:1

**302** [3] - 1495:14, 1505:25, 1506:1

**304** [3] - 1506:20, 1506:24, 1506:25

**30s** [1] - 1452:7

**31** [6] - 1523:1, 1558:20, 1561:11, 1562:1, 1562:2

**318** [2] - 1340:3, 1340:4

**32** [5] - 1352:3, 1469:24, 1524:10, 1527:8, 1529:1

**32.70** [7] - 1455:1, 1458:22, 1460:5, 1469:10, 1471:24, 1483:22, 1487:9

**327** [8] - 1454:2, 1454:7, 1454:25, 1456:24, 1457:13, 1457:16, 1458:14, 1469:7

**327-dollar** [2] - 1533:19, 1533:20

**33** [16] - 1267:16, 1267:17, 1267:20, 1267:21, 1267:22, 1268:12, 1295:6, 1352:8, 1474:22, 1474:23, 1517:10, 1517:11, 1517:13, 1529:1, 1542:12, 1563:9

**34** [24] - 1269:6, 1269:7, 1269:8,

1269:9, 1269:14, 1272:18, 1272:19, 1275:7, 1276:15, 1277:3, 1277:5, 1340:10, 1340:22, 1341:3, 1341:7, 1341:17, 1342:8, 1459:18, 1465:1, 1575:10, 1575:18, 1576:22, 1595:16

**34.70** [6] - 1455:1, 1458:23, 1460:6, 1469:10, 1471:24, 1487:10

**346** [12] - 1265:6, 1265:7, 1265:8, 1265:9, 1265:10, 1362:9, 1362:24, 1362:25, 1363:23, 1364:17, 1365:5, 1365:6

**347** [8] - 1454:3, 1454:7, 1454:25, 1456:24, 1457:13, 1457:16, 1458:15, 1469:7

**35** [11] - 1275:7, 1277:5, 1300:4, 1442:15, 1483:8, 1523:9, 1537:23, 1543:25, 1544:1, 1544:10, 1545:23

**35.8** [1] - 1465:2

**36** [1] - 1404:2

**37** [1] - 1542:13

**377** [2] - 1266:8, 1417:7

**39** [13] - 1267:1, 1267:2, 1267:3, 1267:4, 1267:5, 1267:6, 1455:4, 1455:5, 1455:9, 1455:22, 1457:14, 1457:24, 1458:1

**399** [5] - 1419:12, 1454:4, 1456:22, 1461:25

**3:23** [1] - 1528:19, 1528:22

**3:39** [1] - 1528:22


# 4

**4** [13] - 1276:8, 1276:11, 1277:11, 1285:16, 1295:2, 1295:4, 1297:13, 1352:3, 1364:5, 1366:10, 1375:2, 1487:17, 1529:9

**4-megabit-per-second** [1] - 1364:23

**4.7** [1] - 1287:22

**40** [1] - 1295:4

**400-some-odd** [1] - 1306:9

**402** [2] - 1323:21, 1466:15

**403** [1] - 1323:21

**408** [4] - 1265:12, 1265:13, 1386:15, 1386:17

**40s** [2] - 1452:7, 1452:9

**41.16** [1] - 1459:25

**42** [8] - 1447:17, 1447:19, 1447:21, 1449:8, 1452:4, 1452:11, 1560:4, 1561:9

**42,000** [1] - 1570:4

**43** [11] - 1276:15, 1277:3, 1324:4, 1483:24, 1484:2, 1484:20, 1484:25, 1485:2, 1524:6, 1524:7

**431** [11] - 1266:18, 1266:21, 1266:23, 1267:23, 1267:24, 1444:15, 1444:18, 1446:16, 1446:20, 1541:17, 1542:22

**432** [11] - 1266:19, 1266:20, 1266:22, 1266:23, 1267:25, 1445:21, 1445:23, 1446:16, 1446:20, 1544:18, 1544:20

**433** [18] - 1268:3, 1268:4, 1268:5,

1268:7, 1268:8, 1268:11, 1559:15, 1559:16, 1559:20, 1559:25, 1560:2, 1560:7, 1560:11, 1560:12, 1561:6, 1561:18, 1561:20, 1561:21
**44** [2] - 1276:15, 1277:3
**44,000** [1] - 1289:21
**44.1** [1] - 1289:16
**445** [5] - 1267:18, 1267:19, 1479:5, 1479:6, 1479:14
**448** [1] - 1378:20
**45** [3] - 1314:3, 1452:5, 1452:11
**45s** [1] - 1437:5
**463** [1] - 1344:21
**464** [1] - 1345:6
**47** [1] - 1340:23
**472** [4] - 1268:1, 1268:2, 1553:21, 1554:8
**477** [12] - 1266:24, 1266:25, 1268:6, 1268:9, 1268:10, 1446:25, 1447:1, 1447:17, 1560:1, 1560:3, 1560:20, 1561:9
**48** [2] - 1275:7, 1487:9
**488** [1] - 1323:15
**488A** [11] - 1267:11, 1267:12, 1267:14, 1322:15, 1323:16, 1323:18, 1324:18, 1463:13, 1463:19, 1468:17, 1468:21
**49** [4] - 1276:15, 1276:17, 1277:3, 1277:4
**4th** [1] - 1500:19

## 5

**5** [24] - 1270:2, 1276:9, 1280:6, 1280:14, 1284:23, 1297:15, 1299:12, 1300:3, 1307:6, 1307:12, 1307:20, 1323:22, 1375:1, 1375:2, 1380:1, 1380:11, 1399:2, 1487:17, 1497:3, 1598:21, 1598:25, 1599:3, 1599:18, 1599:19
**5-and-a-quarter-inch** [1] - 1280:9
**5-gigabyte** [1] - 1462:20
**5-year** [1] - 1399:1
**5.21** [1] - 1481:9
**50** [31] - 1366:10, 1423:4, 1450:16, 1473:4, 1473:10, 1473:23, 1482:15, 1482:18, 1482:19, 1484:1, 1504:2, 1513:10, 1513:12, 1513:16, 1514:4, 1514:13, 1514:20, 1515:8, 1515:24, 1520:9, 1521:23, 1521:24, 1522:10, 1530:22, 1531:19, 1531:21, 1532:7, 1550:5, 1599:3
**50/50** [2] - 1482:4, 1482:11
**500** [1] - 1579:23
**5000** [4] - 1288:21, 1288:24, 1290:14
**510A** [4] - 1323:16, 1323:18, 1325:2, 1325:8
**510B** [5] - 1267:13, 1267:15, 1465:9, 1468:18, 1468:21
**512** [1] - 1290:15
**53** [5] - 1276:15, 1277:5, 1293:24,

1294:3, 1354:12
**55** [1] - 1277:3
**565** [6] - 1266:9, 1266:10, 1266:11, 1419:14, 1425:25, 1426:6
**57** [5] - 1293:24, 1294:3, 1354:12, 1394:13, 1401:8
**57,491,837** [1] - 1394:13
**59** [2] - 1276:17, 1277:5
**5:08** [1] - 1601:3
**5:09** [1] - 1601:20

## 6

**6** [9] - 1277:23, 1297:18, 1374:21, 1374:25, 1375:2, 1375:3, 1487:18, 1553:24, 1576:1
**6,000** [1] - 1500:9
**6,199,076** [2] - 1340:13, 1342:11
**6,799,226** [1] - 1593:1
**6.2** [2] - 1394:11, 1401:7
**60** [2] - 1527:24, 1544:8
**60,000** [1] - 1570:1
**600** [1] - 1579:23
**63** [11] - 1354:17, 1485:3, 1485:20, 1487:11, 1524:13, 1527:11, 1527:12, 1528:6, 1529:5, 1531:1, 1531:3
**640B** [15] - 1265:15, 1265:16, 1265:17, 1265:24, 1266:1, 1266:3, 1404:4, 1404:10, 1404:11, 1404:17, 1405:16, 1405:17, 1408:3, 1408:6, 1408:11
**65** [6] - 1344:9, 1344:20, 1344:22, 1523:12, 1543:25, 1544:10
**652A** [4] - 1266:12, 1266:13, 1436:11, 1437:21
**66** [2] - 1354:17, 1488:11
**67** [5] - 1544:5, 1544:25, 1545:3, 1545:4, 1545:23
**69** [1] - 1467:2

## 7

**7** [5] - 1293:24, 1294:2, 1297:20, 1354:12, 1354:17
**7,680,849** [1] - 1592:14
**7-minute** [1] - 1376:2
**7.59** [2] - 1465:24, 1467:1
**70** [1] - 1435:23
**710** [2] - 1265:23, 1407:5
**710B** [10] - 1265:14, 1265:18, 1265:21, 1266:1, 1266:3, 1402:17, 1405:19, 1407:2, 1408:6, 1408:11
**730** [1] - 1445:16
**74.92** [1] - 1466:9
**745** [9] - 1267:7, 1267:8, 1267:9, 1267:10, 1461:3, 1461:4, 1461:7, 1461:18, 1462:12
**748A** [1] - 1372:3
**75** [18] - 1454:10, 1454:15, 1457:18, 1457:22, 1473:5, 1504:3, 1513:10,

1513:12, 1514:4, 1514:13, 1514:20, 1515:9, 1515:24, 1523:21, 1530:22, 1531:19, 1531:21, 1532:7
**789** [17] - 1265:19, 1265:20, 1265:22, 1265:25, 1266:2, 1266:4, 1266:5, 1405:22, 1405:24, 1405:25, 1406:25, 1407:3, 1408:6, 1408:11, 1408:17, 1408:21

## 8

**8** [7] - 1290:8, 1365:6, 1404:17, 1434:21, 1452:23, 1481:8
**8.18** [1] - 1481:14
**81** [1] - 1443:11
**82** [3] - 1482:13, 1482:20, 1484:3
**83** [1] - 1487:11
**84,415,886** [1] - 1393:4
**84-million-dollar** [2] - 1490:10, 1551:23
**84.4** [1] - 1486:15
**8:30** [2] - 1270:2, 1601:2
**8:32** [1] - 1272:1

## 9

**9** [9] - 1376:1, 1455:21, 1461:17, 1461:20, 1475:5, 1517:17, 1517:19, 1517:21, 1553:5
**9.54** [1] - 1467:22
**90** [25] - 1325:1, 1393:3, 1400:13, 1421:4, 1485:16, 1485:21, 1485:22, 1486:3, 1486:4, 1486:7, 1486:12, 1490:13, 1504:12, 1529:9, 1529:14, 1529:15, 1529:19, 1530:23, 1531:3, 1531:16, 1531:17, 1534:12, 1538:18, 1540:5, 1540:7
**90-cent** [5] - 1421:12, 1421:19, 1490:7, 1529:6, 1533:18
**9000** [1] - 1364:24
**91** [4] - 1483:24, 1484:20, 1484:25, 1524:6
**92** [3] - 1324:6, 1324:13, 1324:24
**93** [3] - 1393:2, 1400:15, 1529:9
**93,795,429** [2] - 1392:24, 1394:16
**95** [4] - 1443:23, 1443:24, 1445:6, 1548:1
**96** [1] - 1529:21
**97** [2] - 1534:2, 1551:11
**9:31** [1] - 1320:7
**9:32** [1] - 1320:13
**9:41** [1] - 1320:13

## A

**A.M** [1] - 1270:2
**a.m** [9] - 1272:1, 1320:7, 1320:13, 1337:24, 1375:20, 1376:8, 1377:2

**abandoned** [1] - 1579:7
**ability** [14] - 1321:13, 1472:6, 1473:13, 1476:14, 1478:12, 1481:25, 1482:1, 1535:11, 1545:16, 1552:11, 1556:4, 1572:3, 1576:16, 1577:16
**able** [12] - 1399:6, 1404:6, 1416:10, 1416:23, 1476:14, 1500:24, 1520:17, 1536:10, 1552:20, 1553:13, 1554:4
**absence** [1] - 1304:13
**absolutely** [12] - 1271:4, 1271:5, 1273:21, 1293:4, 1312:5, 1351:10, 1356:10, 1357:12, 1503:13, 1509:12, 1534:14, 1537:14
**academia** [1] - 1572:2
**academic** [1] - 1316:17
**accept** [2] - 1306:21, 1592:17
**acceptable** [4] - 1372:20, 1420:21, 1423:12, 1425:2
**access** [46] - 1416:10, 1428:16, 1438:9, 1440:3, 1440:7, 1440:13, 1440:15, 1440:24, 1441:1, 1441:2, 1442:16, 1442:18, 1445:3, 1446:4, 1446:5, 1473:12, 1476:15, 1478:13, 1480:22, 1481:11, 1482:2, 1482:17, 1482:22, 1483:2, 1483:13, 1485:1, 1520:10, 1523:4, 1526:12, 1542:14, 1542:18, 1542:19, 1542:23, 1543:15, 1543:16, 1543:17, 1543:19, 1543:21, 1544:3, 1544:5, 1544:24, 1546:2, 1547:24, 1550:9, 1551:25, 1552:12
**Access** [1] - 1542:3
**accessed** [4] - 1350:10, 1350:12, 1542:17, 1543:22
**accesses** [1] - 1349:3
**accessing** [6] - 1445:1, 1445:9, 1473:13, 1483:1, 1544:14, 1545:1
**accommodate** [4] - 1529:11, 1550:24, 1565:18
**accommodated** [1] - 1534:16
**accommodates** [1] - 1545:22
**accompany** [1] - 1554:24
**according** [2] - 1440:11, 1459:7
**account** [4] - 1426:4, 1485:8, 1497:22, 1498:1
**accountant** [2] - 1385:13, 1386:9
**accounting** [5] - 1387:20, 1401:23, 1401:25, 1484:14, 1485:7
**accurate** [4] - 1285:13, 1287:3, 1494:3, 1557:25
**accused** [30] - 1315:13, 1316:1, 1347:22, 1348:1, 1348:12, 1390:25, 1392:24, 1394:3, 1400:2, 1400:12, 1400:14, 1400:21, 1401:9, 1401:16, 1409:7, 1448:20, 1451:22, 1459:24, 1461:23, 1463:8, 1465:7, 1525:11, 1535:15, 1542:24, 1543:1, 1545:15, 1545:21, 1551:24, 1552:11, 1590:21
**accusing** [2] - 1448:13, 1448:16
**achieve** [1] - 1365:20
**acknowledge** [1] - 1332:24
**acquire** [2] - 1580:4, 1580:7

**acquired** [1] - 1576:11
**acquisition** [1] - 1580:21
**acronym** [1] - 1294:17
**act** [2] - 1336:5, 1506:11
**acting** [1] - 1507:7
**Action** [6] - 1309:2, 1309:5, 1309:12, 1339:19, 1339:24, 1341:9
**actively** [1] - 1389:22
**activities** [2] - 1525:22, 1525:23
**actual** [14] - 1277:19, 1292:13, 1294:15, 1296:2, 1381:8, 1458:5, 1458:7, 1458:24, 1459:15, 1460:7, 1460:11, 1469:12, 1541:8, 1541:11
**actuals** [1] - 1487:8
**add** [8] - 1337:8, 1443:22, 1524:5, 1524:7, 1526:4, 1540:16, 1581:3, 1592:10
**Added** [1] - 1592:10
**added** [5] - 1454:14, 1477:17, 1540:3, 1540:20, 1544:2
**adding** [2] - 1485:3, 1524:14
**addition** [5] - 1364:6, 1367:6, 1368:19, 1370:24, 1374:15
**additional** [4] - 1427:2, 1539:2, 1539:7, 1539:11
**additionally** [4] - 1429:11, 1451:18, 1517:2, 1531:20
**address** [3] - 1332:7, 1342:5, 1365:20
**addressed** [1] - 1362:2
**addressing** [1] - 1552:18
**adequate** [1] - 1396:21
**adjourned** [1] - 1601:20
**adjust** [1] - 1585:23
**adjustments** [1] - 1402:3
**administered** [3] - 1385:5, 1549:3, 1565:22
**admissible** [2] - 1363:3, 1408:7, 1563:10, 1563:12
**admission** [10] - 1299:20, 1408:6, 1436:14, 1436:16, 1437:21, 1444:5, 1446:16, 1457:24, 1468:17, 1563:8
**admit** [2] - 1436:18, 1436:24
**admitted** [11] - 1347:16, 1408:10, 1410:4, 1417:7, 1420:14, 1437:16, 1444:9, 1446:21, 1458:2, 1468:22, 1561:18
**admitting** [1] - 1436:20
**ads** [1] - 1454:18
**advance** [1] - 1386:1
**advantage** [1] - 1534:24
**advantageously** [4] - 1295:7, 1295:12, 1352:9, 1352:13
**advantages** [2] - 1415:22, 1535:4
**advertising** [2] - 1454:17, 1459:20
**Advisory** [1] - 1389:20
**affect** [1] - 1451:3
**affects** [1] - 1311:21
**afternoon** [7] - 1491:9, 1491:23, 1491:24, 1567:6, 1567:7, 1594:10, 1594:11

**afterwards** [2] - 1318:20, 1378:25
**age** [1] - 1437:5
**ago** [3] - 1390:5, 1431:19, 1491:10
**agree** [19] - 1282:21, 1284:11, 1306:15, 1311:18, 1312:3, 1318:12, 1383:5, 1407:13, 1413:19, 1425:19, 1430:11, 1494:10, 1495:23, 1496:15, 1498:2, 1504:14, 1507:13, 1511:18, 1557:14
**agreeable** [3] - 1423:8, 1425:3, 1425:20
**agreed** [10] - 1329:25, 1411:25, 1412:2, 1412:14, 1412:19, 1424:18, 1479:8, 1485:23, 1489:11, 1489:12
**agreement** [18] - 1397:13, 1397:21, 1407:10, 1413:2, 1413:18, 1425:19, 1425:20, 1425:22, 1496:15, 1500:24, 1501:1, 1506:7, 1506:11, 1506:15, 1507:11, 1564:15, 1564:16, 1564:19
**agreements** [6] - 1395:2, 1429:3, 1429:7, 1430:18, 1494:1
**ahead** [12] - 1274:7, 1293:10, 1299:24, 1319:2, 1319:3, 1321:21, 1323:14, 1330:17, 1334:3, 1336:9, 1336:11, 1338:8, 1341:24, 1345:6, 1369:25, 1376:13, 1377:3, 1378:6, 1384:16, 1392:16, 1394:9, 1407:22, 1416:13, 1416:25, 1419:16, 1423:20, 1456:5, 1471:16, 1494:8, 1506:19, 1508:7, 1528:25, 1553:6, 1555:4, 1565:1, 1565:20, 1565:21, 1579:5, 1585:21, 1588:1, 1591:4, 1600:23
**aircraft** [1] - 1388:8
**airline** [1] - 1388:8
**airplane** [1] - 1417:1
**AI** [1] - 1331:23
**AI-Site** [1] - 1331:23
**album** [5] - 1440:10, 1441:1, 1543:17, 1576:11, 1585:19
**albums** [9] - 1437:2, 1437:5, 1437:25, 1440:18, 1440:21, 1440:24, 1482:2, 1544:4
**alert** [1] - 1327:2
**algorithm** [1] - 1345:12
**algorithms** [4] - 1360:16, 1361:11, 1361:12, 1361:16
**ALL** [1] - 1270:4
**all-in-one** [1] - 1572:17
**allege** [2] - 1316:4, 1339:8
**alleged** [1] - 1392:1
**allocate** [2] - 1518:14, 1520:8
**allocated** [6] - 1513:9, 1515:8, 1518:20, 1519:17, 1521:22, 1522:15
**allocation** [1] - 1517:5
**allocations** [3] - 1521:8, 1521:9, 1522:3
**allow** [8] - 1354:3, 1362:20, 1373:25, 1535:6, 1535:7, 1551:24, 1575:6, 1577:24
**allowed** [6] - 1311:16, 1366:15, 1428:16, 1535:17, 1535:18, 1590:20

**allows** [2] - 1416:8, 1508:15
**Almeroth** [53] - 1271:8, 1272:4, 1272:11, 1272:23, 1275:8, 1276:14, 1277:2, 1277:13, 1280:21, 1282:8, 1282:21, 1284:22, 1285:18, 1292:2, 1292:17, 1294:2, 1309:2, 1310:19, 1312:8, 1312:12, 1338:11, 1342:13, 1343:13, 1344:9, 1346:16, 1349:22, 1350:9, 1350:22, 1351:8, 1354:20, 1357:22, 1358:3, 1360:5, 1360:14, 1362:24, 1368:5, 1371:7, 1372:2, 1373:3, 1374:4, 1375:4, 1376:17, 1376:24, 1393:1, 1393:25, 1401:16, 1402:10, 1405:3, 1411:15, 1415:6, 1415:17, 1537:11, 1600:11
**ALMEROTH** [2] - 1272:9, 1350:20
**Almeroth's** [4] - 1359:14, 1428:9, 1443:14, 1492:16
**almost** [6] - 1326:5, 1331:12, 1447:6, 1459:13, 1558:21, 1562:1
**alphabetical** [1] - 1586:3
**alternate** [1] - 1508:13
**alternative** [1] - 1490:2
**alternatives** [5] - 1354:3, 1354:5, 1508:12, 1508:17, 1508:18
**amalgamation** [1] - 1522:1
**amazing** [1] - 1431:25
**ambiguous** [1] - 1371:1
**ambition** [1] - 1432:21
**AMER** [1] - 1324:23
**America** [1] - 1389:16
**Ames** [1] - 1567:18
**amount** [41] - 1324:3, 1324:8, 1325:5, 1325:20, 1392:10, 1392:23, 1392:24, 1393:6, 1399:1, 1399:7, 1399:8, 1399:10, 1399:23, 1399:24, 1400:13, 1401:5, 1422:5, 1424:15, 1429:7, 1434:13, 1451:15, 1470:2, 1473:10, 1483:16, 1484:12, 1485:21, 1489:12, 1490:12, 1500:7, 1508:1, 1512:18, 1514:10, 1516:2, 1527:25, 1530:13, 1531:7, 1532:18, 1532:23, 1540:24, 1562:17
**amounts** [1] - 1385:23
**analogy** [7] - 1497:10, 1499:6, 1499:14, 1501:4, 1502:3, 1502:8, 1502:13
**analysis** [40] - 1284:13, 1327:22, 1385:21, 1389:6, 1391:1, 1392:13, 1396:15, 1396:18, 1410:13, 1410:23, 1412:5, 1419:5, 1435:11, 1435:14, 1450:9, 1451:4, 1457:9, 1460:9, 1460:14, 1462:15, 1464:13, 1473:1, 1474:8, 1482:6, 1486:7, 1487:6, 1489:5, 1489:15, 1505:11, 1508:20, 1514:16, 1516:24, 1531:24, 1539:9, 1539:15, 1543:2, 1547:20, 1562:19
**analyst** [2] - 1386:10, 1552:20
**analyst's** [1] - 1552:17
**analytical** [1] - 1529:17
**analyze** [1] - 1539:12
**analyzed** [4] - 1360:12, 1373:5, 1373:6,
1373:7
**anesthesia** [1] - 1555:12
**angry** [1] - 1593:7
**Annie** [1] - 1385:10
**annual** [1] - 1390:12
**Answer** [5] - 1300:10, 1300:14, 1300:17, 1549:6, 1549:17
**answer** [25] - 1296:22, 1301:7, 1301:18, 1301:19, 1301:23, 1301:24, 1305:15, 1309:25, 1317:12, 1318:4, 1318:15, 1318:19, 1318:24, 1319:10, 1338:13, 1338:24, 1353:23, 1366:16, 1404:11, 1408:2, 1494:5, 1511:2, 1518:17, 1519:15, 1540:16
**answered** [1] - 1314:23
**answering** [2] - 1296:23, 1338:13
**answers** [5] - 1338:15, 1339:12, 1384:21, 1404:12, 1406:17
**anticipate** [2] - 1399:6, 1421:3
**anticipated** [1] - 1459:4
**anticipates** [1] - 1340:22
**anticipating** [1] - 1465:4
**Antonio** [1] - 1387:18
**anyway** [3] - 1270:17, 1422:23, 1532:12
**apart** [2] - 1374:22, 1513:23
**apiece** [1] - 1478:11
**apologies** [1] - 1571:16
**apologize** [7] - 1274:24, 1303:9, 1341:25, 1496:23, 1506:1, 1579:4, 1585:4
**appeal** [3] - 1303:12, 1306:6, 1310:16
**appeals** [1] - 1306:1
**Appeals** [1] - 1305:22
**appear** [12] - 1282:12, 1295:18, 1295:19, 1295:25, 1296:13, 1313:17, 1313:19, 1314:5, 1318:11, 1546:21, 1546:25, 1592:12
**appeared** [3] - 1279:16, 1313:8, 1314:3
**appellant's** [1] - 1306:6
**appellate** [1] - 1321:14
**appendices** [2] - 1343:20
**Appendix** [3] - 1344:5, 1344:8, 1344:18
**appendix** [1] - 1345:3
**APPLE** [1] - 1270:1
**Apple** [171] - 1314:18, 1325:25, 1328:10, 1332:12, 1336:18, 1336:24, 1349:20, 1378:13, 1385:25, 1392:1, 1394:25, 1395:17, 1400:22, 1400:25, 1402:7, 1402:20, 1404:3, 1404:12, 1404:14, 1407:6, 1407:12, 1409:11, 1409:13, 1412:13, 1412:25, 1413:7, 1413:10, 1417:12, 1417:13, 1417:15, 1419:12, 1424:18, 1426:7, 1426:8, 1426:15, 1428:8, 1429:5, 1429:14, 1431:7, 1431:17, 1431:21, 1432:9, 1433:5, 1433:18, 1434:4, 1436:18, 1436:20, 1437:15, 1438:6, 1438:17, 1438:18, 1439:6, 1445:16, 1445:25, 1449:22, 1454:1, 1454:5, 1455:20,
1456:24, 1457:15, 1457:16, 1467:16, 1467:18, 1472:9, 1472:15, 1472:22, 1473:4, 1485:25, 1490:3, 1491:1, 1491:12, 1493:11, 1493:15, 1494:19, 1494:23, 1498:22, 1501:11, 1502:19, 1503:5, 1503:8, 1503:24, 1504:10, 1511:17, 1513:12, 1513:23, 1514:8, 1514:10, 1514:17, 1514:25, 1515:1, 1515:3, 1515:9, 1516:10, 1520:20, 1521:3, 1528:11, 1530:21, 1531:12, 1531:19, 1531:22, 1531:24, 1532:3, 1532:7, 1532:10, 1532:14, 1532:20, 1533:6, 1533:22, 1534:1, 1534:4, 1534:6, 1534:19, 1536:2, 1540:22, 1541:16, 1549:15, 1550:7, 1551:11, 1553:7, 1553:22, 1559:24, 1560:12, 1561:8, 1562:18, 1564:1, 1564:25, 1565:9, 1566:6, 1566:13, 1567:13, 1567:15, 1569:22, 1569:23, 1569:25, 1570:7, 1570:9, 1570:11, 1570:16, 1570:19, 1570:20, 1572:15, 1572:21, 1574:10, 1574:11, 1574:13, 1574:20, 1574:21, 1574:23, 1574:24, 1579:25, 1580:1, 1580:2, 1580:10, 1580:11, 1580:12, 1580:24, 1581:1, 1581:2, 1581:7, 1581:10, 1581:18, 1582:14, 1583:20, 1583:24, 1597:20, 1597:21, 1601:10, 1601:11
**Apple's** [37] - 1321:3, 1326:19, 1399:15, 1402:3, 1426:17, 1428:24, 1430:15, 1430:17, 1431:3, 1431:14, 1431:16, 1431:22, 1431:24, 1435:17, 1446:9, 1446:13, 1446:17, 1449:24, 1451:1, 1451:3, 1458:4, 1460:20, 1461:9, 1472:9, 1488:23, 1490:6, 1491:19, 1542:2, 1542:6, 1542:7, 1542:8, 1545:24, 1570:14, 1570:20, 1572:17, 1573:5, 1573:12
**application** [11] - 1311:17, 1311:19, 1311:20, 1311:23, 1340:23, 1368:12, 1465:25, 1567:11, 1595:7, 1595:24, 1597:23
**applications** [4] - 1311:13, 1573:16, 1573:23, 1573:24
**applied** [10] - 1270:24, 1452:14, 1469:9, 1482:18, 1486:13, 1488:15, 1540:8, 1540:11, 1595:6, 1597:3
**apply** [9] - 1375:17, 1400:4, 1454:24, 1481:3, 1486:7, 1486:10, 1531:6, 1531:11, 1532:22
**applying** [1] - 1545:8
**apportion** [4] - 1469:20, 1470:3, 1478:25, 1551:8
**apportioned** [8] - 1481:7, 1483:22, 1510:10, 1513:5, 1532:23, 1532:24, 1533:1, 1534:1
**apportioning** [1] - 1469:22
**apportionment** [18] - 1471:20, 1472:2, 1480:12, 1482:21, 1484:9, 1484:11, 1504:2, 1512:25, 1513:9, 1518:1, 1522:16, 1523:25, 1524:1, 1529:3,

1543:25, 1544:9, 1558:4, 1562:19
**apportionments** [1] - 1527:13
**appreciate** [2] - 1566:3, 1566:7
**appreciated** [1] - 1557:11
**appreciates** [1] - 1514:17
**appreciation** [2] - 1468:14, 1555:1
**approach** [4] - 1280:18, 1495:4, 1496:24, 1567:1
**approached** [1] - 1580:8
**appropriate** [6] - 1299:14, 1324:8, 1333:17, 1335:20, 1381:17, 1399:11, 1486:3, 1495:19, 1592:23
**appropriately** [1] - 1592:23
**approximations** [1] - 1484:16
**architecture** [1] - 1353:22
**area** [7] - 1359:20, 1390:4, 1391:13, 1391:19, 1410:21, 1492:21, 1529:15
**areas** [4] - 1368:5, 1388:19, 1391:20, 1474:3
**arguably** [1] - 1570:21
**argue** [1] - 1334:12
**arguing** [1] - 1305:25
**argument** [6] - 1305:21, 1314:17, 1331:6, 1332:25, 1333:3, 1333:23
**arise** [1] - 1328:6
**Arizona** [3] - 1567:20, 1567:24, 1567:25, 1568:3
**array** [1] - 1566:9
**arrive** [11] - 1393:3, 1450:17, 1452:15, 1454:9, 1454:19, 1458:20, 1467:22, 1481:7, 1482:12, 1487:10, 1488:10
**arrived** [2] - 1394:21, 1513:6
**arrow** [1] - 1411:22
**art** [9] - 1292:1, 1331:17, 1363:18, 1365:25, 1510:19, 1510:24, 1532:11, 1532:14, 1571:19
**Article** [1] - 1286:11
**article** [9] - 1362:25, 1363:16, 1363:17, 1364:15, 1365:1, 1365:4, 1424:22, 1437:17, 1555:21
**artist** [3] - 1476:8, 1543:16, 1576:10
**artists** [6] - 1440:9, 1442:6, 1543:5, 1544:3, 1576:9, 1586:4
**artwork** [1] - 1571:19
**ASIC** [3] - 1465:24, 1467:1, 1467:2
**ASICs** [1] - 1467:3
**aside** [1] - 1532:19
**asleep** [1] - 1585:16
**aspect** [4] - 1435:10, 1456:2, 1505:21, 1525:20
**aspects** [8] - 1309:18, 1417:18, 1447:23, 1450:3, 1461:14, 1477:22, 1510:24, 1524:2
**assembly** [1] - 1570:13
**asserted** [3] - 1305:2, 1378:13, 1593:19
**assess** [3] - 1451:22, 1479:20, 1534:12
**assessing** [1] - 1563:3
**assessment** [1] - 1477:25
**assets** [1] - 1387:11

**assign** [1] - 1325:21
**assigned** [2] - 1479:25, 1517:25
**assisted** [1] - 1383:16
**assisting** [1] - 1470:19
**associated** [3] - 1480:21, 1485:5, 1485:11
**Association's** [1] - 1294:4
**associations** [1] - 1389:13
**assume** [6] - 1380:7, 1385:16, 1413:5, 1414:15, 1493:5, 1507:6
**assumes** [1] - 1506:11
**assuming** [2] - 1290:7, 1291:6
**assumption** [6] - 1413:4, 1413:9, 1414:13, 1414:18, 1414:19, 1414:22
**assumptions** [2] - 1492:3, 1492:23
**asterisk** [1] - 1440:4
**attach** [1] - 1579:1
**attempt** [2] - 1359:14, 1578:21
**attempting** [1] - 1330:3
**attempts** [1] - 1325:20
**attend** [2] - 1390:19, 1567:21
**attended** [1] - 1390:16
**attention** [22] - 1351:20, 1386:2, 1405:21, 1419:13, 1425:24, 1436:10, 1436:21, 1438:10, 1441:23, 1445:20, 1446:24, 1447:14, 1455:3, 1455:21, 1461:2, 1461:17, 1463:13, 1465:8, 1474:21, 1479:5, 1566:2, 1591:22
**attorney** [2] - 1369:3, 1504:16
**attributable** [7] - 1516:13, 1516:14, 1529:25, 1530:7, 1531:1, 1531:5, 1531:10
**attribute** [2] - 1478:5, 1480:14
**attributed** [3] - 1478:10, 1530:11, 1532:19
**attributes** [1] - 1293:15
**audible** [1] - 1340:25
**audio** [28] - 1289:9, 1304:13, 1340:23, 1340:25, 1348:2, 1351:17, 1382:14, 1382:23, 1383:12, 1402:21, 1415:6, 1415:10, 1430:24, 1461:21, 1461:22, 1462:6, 1462:9, 1489:17, 1489:19, 1535:11, 1576:4, 1576:8, 1578:15, 1578:17, 1586:14, 1589:23, 1596:13
**AUDIO** [1] - 1270:1
**Audio** [49] - 1298:22, 1299:2, 1322:19, 1323:25, 1325:17, 1327:2, 1328:1, 1328:4, 1336:21, 1337:20, 1377:5, 1380:2, 1380:5, 1380:12, 1380:14, 1380:15, 1380:18, 1385:3, 1385:11, 1385:24, 1392:10, 1395:9, 1407:13, 1419:22, 1424:17, 1428:22, 1436:18, 1494:13, 1509:8, 1512:2, 1530:12, 1531:12, 1531:25, 1532:12, 1532:22, 1533:5, 1533:7, 1535:6, 1535:17, 1539:1, 1540:24, 1548:13, 1548:15, 1549:5, 1549:14, 1549:20, 1549:22, 1593:16, 1601:6
**Audio's** [11] - 1325:17, 1327:20, 1385:17, 1392:19, 1395:22, 1428:25,

1429:1, 1430:9, 1512:15, 1537:7, 1564:13
**audit** [2] - 1387:23, 1388:1
**Austin** [1] - 1491:17
**authenticity** [1] - 1287:14
**author** [2] - 1363:13, 1380:6
**authority** [2] - 1396:15, 1424:3
**Auto** [1] - 1418:15
**Auto-Sync** [1] - 1418:15
**AutoDoubler** [1] - 1569:1
**automatic** [1] - 1593:13
**automatically** [7] - 1417:20, 1417:21, 1418:22, 1426:18, 1477:16, 1592:8, 1592:12
**available** [28] - 1279:9, 1283:6, 1283:13, 1283:16, 1283:24, 1284:4, 1284:6, 1284:7, 1288:13, 1288:17, 1289:5, 1308:4, 1331:3, 1331:9, 1332:9, 1332:16, 1335:23, 1336:3, 1336:10, 1355:7, 1356:23, 1381:18, 1395:12, 1427:20, 1427:21, 1529:17, 1578:22
**average** [6] - 1456:23, 1457:16, 1458:14, 1458:15, 1459:12, 1529:7
**avoid** [1] - 1360:6
**Award** [1] - 1574:12
**award** [2] - 1396:20, 1505:7
**awards** [1] - 1574:10
**aware** [9] - 1298:21, 1299:1, 1325:18, 1325:19, 1381:7, 1381:23, 1382:1, 1425:12, 1600:2

## B

**Bachelor** [1] - 1568:5
**back-and-forth** [2] - 1343:11, 1343:12
**back-and-forths** [1] - 1341:8
**background** [3] - 1363:15, 1439:5, 1569:5
**backgrounds** [1] - 1590:25
**bad** [1] - 1270:10
**bag** [1] - 1556:14
**banc** [2] - 1333:25
**bare** [3] - 1502:14, 1502:18, 1503:3
**barely** [1] - 1448:3
**Barnes** [16] - 1272:17, 1274:9, 1274:14, 1275:3, 1275:23, 1276:8, 1276:22, 1293:23, 1295:3, 1296:16, 1297:8, 1303:2, 1303:19, 1304:9, 1308:23, 1309:10
**base** [11] - 1392:23, 1399:22, 1400:16, 1400:17, 1400:21, 1409:23, 1486:8, 1486:10, 1486:13, 1490:12, 1509:21
**based** [57] - 1287:14, 1288:6, 1302:9, 1314:18, 1322:22, 1333:14, 1367:14, 1392:5, 1399:13, 1399:17, 1401:15, 1421:7, 1428:1, 1431:2, 1434:9, 1434:10, 1445:7, 1445:10, 1448:25, 1450:18, 1460:14, 1474:8, 1474:11, 1483:9, 1485:17, 1487:12, 1488:12, 1493:2, 1497:18, 1497:19, 1497:20,

1499:18, 1510:2, 1510:3, 1511:2, 1512:22, 1514:6, 1517:5, 1518:1, 1521:15, 1522:1, 1522:5, 1522:11, 1522:18, 1526:12, 1527:22, 1528:11, 1533:3, 1534:14, 1538:24, 1540:11, 1542:5, 1542:7, 1544:7, 1544:8, 1545:9, 1547:15

**basic** [1] - 1270:20

**basics** [1] - 1384:24

**basis** [22] - 1288:19, 1323:20, 1329:14, 1342:16, 1380:4, 1397:23, 1399:3, 1400:6, 1402:8, 1431:1, 1459:17, 1459:22, 1460:13, 1463:4, 1463:5, 1466:15, 1467:19, 1483:11, 1499:16, 1509:22, 1546:8

**bat** [1] - 1532:7

**Bates** [1] - 1576:20

**batteries** [7] - 1291:5, 1291:8, 1291:9, 1291:15, 1291:18, 1458:19, 1503:10

**battery** [27] - 1278:6, 1278:10, 1450:8, 1451:20, 1454:13, 1462:2, 1462:24, 1466:4, 1468:11, 1472:6, 1473:14, 1474:5, 1476:25, 1478:14, 1479:23, 1480:23, 1503:15, 1516:14, 1519:1, 1519:12, 1557:3, 1557:8, 1557:10, 1557:12, 1557:13, 1573:8

**bear** [3] - 1302:20, 1317:6, 1339:17

**Bear's** [1] - 1577:9

**beats** [1] - 1427:24

**BEAUMONT** [1] - 1270:3

**became** [4] - 1579:14, 1579:21, 1581:5, 1581:19

**becomes** [4] - 1302:12, 1421:25, 1589:2, 1589:6

**becoming** [1] - 1294:7

**began** [5] - 1387:19, 1388:10, 1432:15, 1472:3, 1507:11

**began)** [1] - 1424:19

**begging** [1] - 1328:12

**begin** [2] - 1271:7, 1564:10

**beginning** [9] - 1335:2, 1346:22, 1346:25, 1347:25, 1472:1, 1473:1, 1582:14, 1582:15, 1586:5

**begins** [3] - 1346:3, 1599:3

**behalf** [6] - 1306:17, 1310:8, 1310:20, 1390:20, 1395:22, 1597:21

**BEHALF** [2] - 1386:4, 1567:4

**behind** [1] - 1434:12

**believes** [1] - 1385:24

**below** [8] - 1419:8, 1442:8, 1457:8, 1462:25, 1464:6, 1467:4, 1529:10, 1531:3

**Belt** [1] - 1388:10

**Belt-type** [1] - 1388:10

**beneficial** [1] - 1477:13

**benefit** [5] - 1535:5, 1535:16, 1556:5, 1557:10, 1595:11

**benefits** [5] - 1415:22, 1534:24, 1535:4, 1553:4, 1557:13

**best** [7] - 1309:13, 1382:19, 1383:2,

1383:4, 1475:12, 1518:10, 1522:20

**better** [1] - 1337:13

**between** [32] - 1271:2, 1281:5, 1323:8, 1323:10, 1330:11, 1365:21, 1369:3, 1375:8, 1396:2, 1397:10, 1401:1, 1433:8, 1433:9, 1441:5, 1442:18, 1452:7, 1465:1, 1482:4, 1496:16, 1497:4, 1502:19, 1513:10, 1521:23, 1521:24, 1523:20, 1529:12, 1539:2, 1543:25, 1545:3, 1549:13, 1549:19, 1599:12

**beyond** [2] - 1343:7, 1433:13

**big** [10] - 1281:19, 1388:12, 1390:12, 1416:2, 1519:1, 1569:7, 1572:12, 1572:17, 1579:14, 1587:9

**bigger** [1] - 1554:22

**Bill** [2] - 1578:24, 1580:17

**binder** [20] - 1286:3, 1286:10, 1299:10, 1302:17, 1302:22, 1344:2, 1351:22, 1402:15, 1404:4, 1426:1, 1444:16, 1495:1, 1541:18, 1551:15, 1554:2, 1554:5, 1554:7, 1558:15, 1559:13, 1575:17

**bit** [50] - 1285:12, 1285:13, 1297:16, 1303:19, 1309:10, 1328:18, 1363:19, 1387:2, 1387:5, 1389:25, 1396:13, 1406:20, 1412:8, 1413:24, 1416:25, 1423:23, 1437:24, 1440:14, 1442:8, 1442:24, 1451:24, 1452:18, 1453:3, 1453:16, 1457:7, 1457:8, 1459:10, 1459:12, 1465:3, 1466:12, 1468:8, 1469:17, 1485:21, 1487:9, 1487:10, 1501:4, 1506:3, 1511:25, 1529:8, 1529:10, 1534:20, 1565:11, 1566:12, 1566:15, 1568:6, 1569:22, 1571:15, 1573:4, 1581:4, 1587:13

**bits** [4] - 1289:21, 1290:2, 1364:2, 1364:10

**blank** [1] - 1420:3

**blanket** [3] - 1283:15, 1283:17, 1283:18

**blind** [1] - 1432:21

**blow** [16] - 1299:4, 1304:9, 1363:1, 1365:7, 1402:23, 1404:20, 1406:2, 1406:3, 1406:6, 1424:10, 1436:15, 1442:9, 1442:24, 1456:4, 1464:2, 1465:10

**blowup** [2] - 1394:15, 1399:25

**blue** [11] - 1399:22, 1474:2, 1474:5, 1478:20, 1481:12, 1482:13, 1483:24, 1505:24, 1520:9, 1572:12, 1572:19

**blues** [1] - 1427:24

**board** [16] - 1278:7, 1305:25, 1361:10, 1367:7, 1367:9, 1367:25, 1368:1, 1382:24, 1383:1, 1389:18, 1389:19, 1389:21, 1403:6, 1410:14, 1457:4

**Board** [2] - 1305:22, 1389:20

**boards** [4] - 1367:17, 1367:20, 1367:21, 1389:13

**body** [1] - 1324:4

**Boettcher** [1] - 1423:2

**book** [6] - 1365:20, 1367:5, 1375:13,

1496:22, 1577:8, 1595:15

**boot** [3] - 1347:18, 1348:17, 1348:20

**boots** [1] - 1348:5

**born** [2] - 1567:17, 1567:18

**boss** [2] - 1583:15, 1583:16

**bottom** [44] - 1276:8, 1276:10, 1288:23, 1324:15, 1324:20, 1325:3, 1325:4, 1325:14, 1340:5, 1354:8, 1363:1, 1364:18, 1388:5, 1404:20, 1405:6, 1418:17, 1418:19, 1424:9, 1437:8, 1440:1, 1445:13, 1455:13, 1456:3, 1456:18, 1462:8, 1463:3, 1464:19, 1464:20, 1466:9, 1466:22, 1467:5, 1467:21, 1469:23, 1473:19, 1477:23, 1481:12, 1521:20, 1523:19, 1523:25, 1526:13, 1562:6, 1562:15, 1576:21, 1586:10

**bought** [2] - 1367:4, 1520:20

**boundary** [1] - 1501:19

**bounds** [3] - 1326:12, 1326:14, 1501:14

**box** [18] - 1399:22, 1403:2, 1442:11, 1457:17, 1476:5, 1477:3, 1477:6, 1477:15, 1481:13, 1520:9, 1521:20, 1523:7, 1526:8, 1568:10, 1596:21, 1596:22

**boxes** [10] - 1474:2, 1475:20, 1478:1, 1478:8, 1478:19, 1478:20, 1482:14, 1483:15, 1483:24, 1505:24

**Boy** [1] - 1326:2

**brackets** [1] - 1402:1

**brand** [9] - 1292:12, 1293:14, 1472:9, 1472:22, 1514:13, 1514:24, 1515:10, 1515:20, 1516:1

**break** [21] - 1320:4, 1320:19, 1336:14, 1338:3, 1338:11, 1372:24, 1374:22, 1375:6, 1419:16, 1422:19, 1422:21, 1423:5, 1426:3, 1463:16, 1464:18, 1470:6, 1471:19, 1481:21, 1528:16, 1565:14, 1600:23

**breakdowns** [1] - 1523:4

**breaking** [1] - 1472:3

**breaks** [2] - 1384:12, 1393:9

**breakthrough** [2] - 1417:16, 1426:17

**bridge** [2] - 1270:14, 1433:9

**brief** [9] - 1303:12, 1305:22, 1306:6, 1310:15, 1378:8, 1385:7, 1474:24, 1491:4, 1565:23

**Brief** [1] - 1517:14

**briefly** [4] - 1338:15, 1339:17, 1481:5, 1485:20

**bring** [11] - 1271:25, 1272:17, 1293:23, 1330:1, 1330:13, 1337:23, 1423:18, 1477:14, 1513:2, 1541:24, 1555:12

**bringing** [2] - 1470:16, 1555:22

**broadcast** [1] - 1555:19

**broadest** [1] - 1307:16

**broken** [5] - 1394:17, 1401:1, 1483:23, 1523:20, 1540:13

**Brooks** [2] - 1427:4, 1427:5

**brought** [2] - 1581:21, 1595:3
**browsing** [1] - 1574:1
**bubble** [1] - 1431:24
**buckets** [2] - 1411:5, 1411:12
**build** [5] - 1295:22, 1501:24, 1502:2, 1502:4, 1503:14
**building** [3] - 1295:25, 1502:10, 1590:24
**builds** [2] - 1412:21, 1478:9
**built** [7] - 1331:7, 1331:13, 1331:20, 1463:3, 1570:10, 1570:12, 1572:7
**built-in** [1] - 1572:7
**bulky** [1] - 1416:5
**bullet** [2] - 1380:2, 1380:11
**bunch** [1] - 1472:6
**burden** [3] - 1512:2, 1512:6, 1566:4
**burdens** [1] - 1512:5
**bureaucracy** [1] - 1382:17
**burst** [1] - 1431:24
**bus** [1] - 1314:8
**business** [8] - 1383:8, 1383:25, 1433:10, 1472:10, 1496:17, 1497:6, 1500:25, 1515:10
**businesses** [1] - 1570:23
**businessperson** [3] - 1328:22, 1328:23, 1496:13
**button** [12] - 1371:19, 1536:23, 1544:14, 1556:17, 1586:2, 1586:8, 1586:10, 1587:2, 1587:5, 1587:25, 1588:3, 1588:7
**buttons** [9] - 1450:7, 1476:9, 1476:10, 1476:16, 1536:7, 1553:17, 1578:7, 1578:13, 1589:18
**buy** [11] - 1347:6, 1347:11, 1467:18, 1472:3, 1472:17, 1502:2, 1502:4, 1568:10, 1568:18, 1569:3, 1576:8
**buyers** [1] - 1441:19
**buying** [4] - 1472:15, 1521:4, 1552:14, 1570:13
**buys** [1] - 1588:20
**BY** [105] - 1272:10, 1272:22, 1275:5, 1276:13, 1277:1, 1277:12, 1278:1, 1280:20, 1285:17, 1286:19, 1287:20, 1294:1, 1294:21, 1295:5, 1296:17, 1297:12, 1300:1, 1303:4, 1303:11, 1303:20, 1304:11, 1309:1, 1309:15, 1310:7, 1310:18, 1312:7, 1338:10, 1342:7, 1345:10, 1346:15, 1349:21, 1350:21, 1359:2, 1360:4, 1362:23, 1371:6, 1372:9, 1373:2, 1374:2, 1386:5, 1386:19, 1389:11, 1392:17, 1393:16, 1394:19, 1407:23, 1408:13, 1409:22, 1410:5, 1411:10, 1414:10, 1423:21, 1431:13, 1433:23, 1437:23, 1444:11, 1446:22, 1449:11, 1458:3, 1463:18, 1464:15, 1466:17, 1468:24, 1471:18, 1479:13, 1491:22, 1494:9, 1495:9, 1495:16, 1497:2, 1499:5, 1504:20, 1506:2, 1507:1, 1511:14, 1513:4, 1514:3, 1516:5, 1519:24, 1523:2, 1524:11, 1527:9, 1529:2, 1538:1,

1542:1, 1554:13, 1555:8, 1557:19, 1559:7, 1560:10, 1561:5, 1561:19, 1562:13, 1567:5, 1571:20, 1574:9, 1575:11, 1576:23, 1585:8, 1587:18, 1591:6, 1592:1, 1594:9, 1594:21, 1599:2
**bytes** [2] - 1288:1, 1290:5

# C

**cable** [11] - 1383:23, 1579:6, 1579:9, 1593:5, 1593:13, 1598:8, 1598:10, 1598:15, 1598:22, 1599:5, 1599:21
**calculate** [8] - 1400:2, 1400:9, 1452:10, 1493:4, 1509:6, 1512:20, 1525:15, 1527:18
**calculated** [6] - 1290:7, 1393:21, 1469:8, 1525:13, 1531:8, 1533:25
**calculating** [1] - 1414:21
**calculation** [10] - 1385:15, 1392:22, 1399:21, 1454:9, 1486:14, 1493:7, 1498:16, 1512:5, 1531:15, 1539:22
**calculations** [4] - 1512:9, 1545:7, 1547:15, 1550:24
**calculator** [1] - 1289:19
**California** [4] - 1491:17, 1491:18, 1491:20, 1568:24
**call's** [2] - 1300:20, 1308:14
**CALLED** [2] - 1386:4, 1567:4
**calming** [2] - 1555:14, 1555:23
**camera** [3] - 1466:5, 1551:9, 1585:2
**campaign** [1] - 1554:24
**candidly** [1] - 1416:18
**cannot** [3] - 1336:5, 1519:15, 1522:13
**capabilities** [11] - 1291:13, 1363:24, 1415:19, 1415:20, 1419:2, 1419:3, 1426:8, 1448:2, 1451:20, 1517:1, 1561:12
**capability** [11] - 1347:9, 1347:10, 1347:12, 1365:2, 1477:24, 1485:5, 1519:14, 1550:15, 1561:23, 1561:24, 1572:7
**capacities** [2] - 1282:17, 1356:21
**capacity** [25] - 1281:22, 1285:10, 1287:24, 1288:8, 1299:2, 1356:20, 1451:21, 1473:12, 1475:9, 1476:3, 1478:12, 1479:23, 1480:22, 1481:11, 1481:25, 1482:5, 1482:16, 1516:13, 1519:1, 1520:9, 1520:16, 1520:18, 1520:25, 1556:4, 1573:7
**car** [1] - 1499:16
**card** [10] - 1366:7, 1366:20, 1366:22, 1367:2, 1367:7, 1367:11, 1367:22, 1367:23, 1368:1, 1368:2
**cards** [5] - 1366:18, 1367:17, 1367:19, 1425:10, 1425:12
**care** [1] - 1480:10
**Care** [2] - 1467:16, 1467:18
**career** [5] - 1387:17, 1387:21, 1388:10, 1568:8, 1568:11

**careful** [7] - 1283:7, 1313:10, 1326:12, 1326:13, 1328:18, 1330:2, 1359:23
**carefully** [1] - 1333:24
**Carl** [1] - 1567:10
**carried** [1] - 1535:14
**carve** [1] - 1482:24
**case** [108] - 1285:19, 1292:5, 1312:13, 1313:15, 1323:9, 1325:1, 1326:14, 1327:15, 1329:11, 1331:4, 1332:15, 1332:22, 1333:18, 1334:23, 1339:8, 1340:17, 1351:10, 1374:16, 1380:7, 1385:11, 1385:15, 1385:19, 1385:20, 1391:10, 1391:22, 1392:1, 1392:6, 1392:7, 1392:11, 1393:7, 1394:23, 1394:25, 1395:15, 1399:12, 1400:11, 1402:22, 1404:13, 1410:11, 1410:15, 1410:16, 1410:17, 1410:25, 1412:12, 1415:14, 1417:5, 1419:19, 1422:10, 1422:17, 1428:25, 1431:5, 1432:6, 1448:15, 1449:13, 1449:23, 1451:4, 1465:7, 1469:21, 1470:15, 1486:19, 1487:22, 1488:5, 1488:16, 1488:23, 1491:13, 1492:6, 1492:12, 1493:2, 1494:11, 1495:11, 1495:17, 1496:10, 1498:6, 1498:9, 1509:10, 1510:7, 1510:16, 1512:15, 1527:19, 1530:11, 1537:16, 1542:25, 1546:17, 1548:16, 1548:18, 1548:22, 1553:22, 1558:14, 1564:13, 1564:17, 1565:7, 1565:13, 1566:6, 1566:11, 1566:16, 1568:20, 1586:19, 1592:5, 1593:15, 1593:18, 1593:21, 1595:2, 1595:6, 1595:8, 1595:13, 1595:23, 1599:25, 1600:25, 1601:18
**case-in-chief** [2] - 1385:11, 1564:13
**cases** [4] - 1325:18, 1385:20, 1391:2, 1496:9
**Casing** [1] - 1333:18
**catch** [2] - 1286:15, 1570:18
**categories** [5] - 1415:2, 1473:3, 1474:9, 1478:6, 1480:15
**categorizing** [1] - 1411:1
**category** [1] - 1480:20
**CD** [13] - 1289:9, 1289:12, 1441:1, 1575:25, 1576:2, 1576:4, 1576:7, 1576:14, 1576:15, 1578:15, 1586:14
**CD-quality** [1] - 1289:9
**CDs** [8] - 1289:23, 1416:1, 1437:6, 1575:4, 1575:20, 1576:8, 1577:25, 1578:1
**cell** [2] - 1573:12, 1573:13
**center** [1] - 1436:15
**centered** [1] - 1568:12
**cents** [52] - 1324:4, 1324:24, 1325:1, 1393:3, 1400:13, 1421:4, 1467:2, 1482:13, 1482:20, 1483:24, 1484:2, 1484:3, 1484:20, 1484:25, 1485:2, 1485:3, 1485:16, 1485:20, 1485:21, 1485:22, 1486:3, 1486:4, 1486:7, 1486:12, 1487:11, 1488:11, 1489:23, 1489:24, 1524:6, 1524:7, 1524:13,

1527:11, 1527:24, 1529:5, 1529:9,
1529:14, 1529:15, 1529:19, 1530:23,
1531:1, 1531:16, 1531:17, 1534:12,
1538:18, 1540:7

**CEO** [2] - 1378:12, 1461:12

**CEOs** [1] - 1432:4

**certain** [26] - 1293:4, 1351:3, 1356:15,
1390:15, 1395:13, 1401:12, 1415:19,
1416:3, 1427:12, 1427:23, 1430:19,
1434:13, 1436:18, 1436:19, 1437:17,
1447:12, 1448:2, 1453:25, 1499:21,
1521:10, 1539:22, 1565:4, 1565:6,
1590:20, 1596:16, 1597:14

**certainly** [28] - 1284:7, 1293:3,
1297:17, 1317:2, 1317:4, 1349:6,
1388:15, 1416:1, 1428:8, 1428:11,
1428:14, 1432:13, 1432:24, 1435:24,
1437:4, 1437:18, 1445:6, 1490:24,
1497:22, 1505:10, 1505:12, 1507:19,
1512:11, 1536:7, 1537:3, 1541:4,
1566:3, 1571:2

**certainty** [2] - 1512:18, 1512:20

**CERTIFICATION** [1] - 1601:21

**certified** [2] - 1385:12, 1386:9

**CERTIFY** [1] - 1601:21

**cetera** [6] - 1435:10, 1456:8, 1476:12,
1480:7, 1482:19, 1484:3

**challenged** [1] - 1383:25

**change** [5] - 1315:21, 1315:23,
1343:13, 1347:7, 1581:3

**changed** [2] - 1315:19, 1375:22

**changes** [5] - 1312:1, 1315:23,
1372:23, 1487:3, 1588:25

**changing** [1] - 1490:19

**characteristics** [1] - 1291:24

**characterization** [3] - 1280:1, 1306:18,
1306:21

**characterize** [1] - 1538:10

**characterized** [2] - 1298:3, 1305:25

**charging** [3] - 1482:8, 1482:9, 1521:24

**Charles** [1] - 1593:24

**chart** [65] - 1272:14, 1297:6, 1297:11,
1297:19, 1353:13, 1354:6, 1360:15,
1360:19, 1360:24, 1361:2, 1361:8,
1361:9, 1361:13, 1392:18, 1393:5,
1393:9, 1393:17, 1393:21, 1394:7,
1394:8, 1394:10, 1394:15, 1396:16,
1397:6, 1399:19, 1399:20, 1399:25,
1400:18, 1400:19, 1400:20, 1400:22,
1408:14, 1408:16, 1409:1, 1411:4,
1411:6, 1411:8, 1411:11, 1442:22,
1445:8, 1445:10, 1446:8, 1450:11,
1453:20, 1455:1, 1456:25, 1457:10,
1457:11, 1458:8, 1458:9, 1458:11,
1471:25, 1473:19, 1478:7, 1483:21,
1484:5, 1484:18, 1484:19, 1484:21,
1485:20, 1487:25, 1522:4, 1523:19,
1544:1, 1547:25

**charts** [5] - 1353:9, 1392:9, 1392:12,
1448:20, 1471:4

**cheap** [1] - 1357:4

**check** [2] - 1285:24, 1341:11

**checked** [3] - 1334:2, 1376:16, 1420:2

**checks** [1] - 1420:1

**chemical** [1] - 1391:7

**Chemical** [1] - 1391:7

**chemicals** [1] - 1388:9

**Chen** [1] - 1601:13

**chest** [1] - 1556:13

**Chief** [1] - 1334:5

**chief** [3] - 1379:14, 1385:11, 1564:13

**Chip** [2] - 1357:18, 1357:20

**chip** [4] - 1367:9, 1367:25, 1368:2

**chips** [3] - 1367:17, 1367:20, 1367:21

**choices** [1] - 1384:1

**choose** [3] - 1333:13, 1414:4, 1414:11

**choosing** [1] - 1310:25

**chosen** [1] - 1400:11

**Chris** [5] - 1583:5, 1583:6, 1583:7,
1583:15, 1584:1

**Christmas** [1] - 1419:10

**chunk** [1] - 1521:1

**circle** [4] - 1428:19, 1434:1, 1486:9,
1587:9

**circles** [1] - 1434:16

**Circuit** [4] - 1325:19, 1333:6, 1333:23,
1334:5

**circuit** [3] - 1278:7, 1465:25, 1466:1

**circumstances** [1] - 1329:9

**Cirrus** [1] - 1365:24

**citation** [3] - 1274:10, 1275:4, 1336:4

**citations** [8] - 1272:13, 1272:14,
1272:16, 1273:6, 1275:13, 1276:6,
1360:24, 1361:3

**cite** [2] - 1276:14, 1277:2

**cited** [7] - 1275:6, 1275:8, 1315:12,
1516:11, 1521:7, 1553:19, 1554:18

**cites** [3] - 1273:8, 1276:16, 1277:4

**civil** [1] - 1299:22

**claim** [50] - 1273:12, 1273:13, 1274:3,
1274:13, 1275:4, 1302:8, 1302:9,
1302:12, 1305:5, 1307:18, 1307:19,
1307:24, 1308:11, 1308:12, 1308:18,
1308:19, 1311:16, 1311:19, 1311:24,
1311:25, 1312:19, 1332:16, 1333:10,
1333:13, 1333:14, 1336:4, 1336:7,
1340:12, 1340:21, 1341:3, 1341:4,
1341:7, 1341:17, 1342:10, 1343:4,
1360:25, 1361:3, 1369:21, 1369:22,
1370:20, 1425:17, 1539:13, 1539:15,
1539:18, 1590:14, 1590:22, 1591:1,
1600:13

**Claim** [2] - 1340:10, 1342:8

**claimant** [1] - 1396:20

**claimed** [4] - 1325:24, 1510:17,
1511:23, 1511:24

**claims** [50] - 1275:2, 1305:2, 1305:3,
1305:7, 1306:7, 1307:15, 1308:13,
1309:7, 1309:18, 1310:9, 1310:21,
1310:25, 1311:14, 1312:8, 1340:20,
1340:22, 1342:19, 1357:23, 1367:24,

1368:25, 1369:4, 1369:7, 1369:11,
1369:14, 1369:18, 1370:2, 1370:6,
1374:6, 1374:20, 1374:21, 1374:24,
1375:1, 1375:3, 1385:17, 1449:1,
1501:18, 1531:11, 1533:9, 1533:3,
1536:18, 1537:1, 1537:16, 1539:11,
1539:22, 1539:24, 1541:3, 1548:18,
1549:4

**clarification** [1] - 1312:6

**clarified** [1] - 1336:2

**clarify** [4] - 1349:12, 1371:3, 1414:3,
1571:21

**clarifying** [2] - 1471:13, 1541:22

**CLARK** [1] - 1270:3

**Clark** [3] - 1369:7, 1369:15, 1369:17

**Clark's** [5] - 1356:14, 1356:25,
1357:14, 1357:17, 1369:10

**class** [2] - 1393:22

**classes** [1] - 1316:8

**classic** [20] - 1374:25, 1375:2, 1393:10,
1393:24, 1394:2, 1394:4, 1396:6,
1401:2, 1401:5, 1406:12, 1412:14,
1430:25, 1432:13, 1432:15, 1452:4,
1458:16, 1459:6, 1487:18, 1584:21,
1592:20

**classic-type** [2] - 1432:13, 1432:15

**classical** [1] - 1586:24

**classics** [2] - 1415:7, 1451:8

**clear** [25] - 1281:7, 1295:23, 1311:6,
1312:21, 1312:24, 1318:4, 1325:23,
1332:22, 1337:9, 1342:14, 1342:18,
1348:25, 1350:22, 1359:9, 1360:2,
1371:1, 1405:14, 1411:7, 1425:15,
1448:12, 1449:6, 1471:8, 1484:4,
1540:2, 1568:16

**clearance** [3] - 1500:22, 1502:23

**clearly** [5] - 1278:8, 1292:1, 1325:25,
1332:15, 1592:21

**click** [5] - 1301:15, 1371:19, 1426:19,
1427:6, 1571:23

**clicking** [1] - 1301:13

**Clickwheel** [2] - 1587:10, 1587:23

**client** [1] - 1353:21

**clients** [5] - 1316:25, 1317:11, 1318:10,
1319:18, 1338:19

**Cline** [3] - 1585:20, 1586:18, 1588:4

**clockwise** [1] - 1587:15

**close** [5] - 1270:11, 1324:7, 1325:25,
1330:23, 1333:19

**closely** [1] - 1278:8

**closer** [2] - 1389:9, 1541:25

**co** [4] - 1597:12, 1597:13, 1597:19,
1597:24

**co-inventor** [2] - 1597:12, 1597:13

**co-inventors** [2] - 1597:19, 1597:24

**code** [15] - 1314:15, 1314:23, 1315:12,
1381:8, 1405:4, 1405:6, 1409:3,
1410:11, 1455:10, 1455:11, 1503:17,
1580:19, 1582:3, 1582:6

**Code** [1] - 1396:17

**coffee** [1] - 1422:19
**cofounders** [1] - 1570:11
**COGS** [1] - 1456:11
**coincide** [1] - 1500:2
**coincidentally** [1] - 1324:7
**coincides** [1] - 1460:16
**collection** [4] - 1416:13, 1416:14, 1428:3, 1476:7
**college** [6] - 1491:17, 1567:21, 1568:7, 1568:8, 1568:24, 1569:11
**color** [1] - 1480:6
**Column** [28] - 1272:18, 1272:19, 1275:6, 1275:7, 1276:15, 1276:16, 1277:3, 1277:4, 1277:5, 1293:24, 1294:2, 1295:2, 1295:4, 1299:12, 1300:3, 1352:3, 1354:12, 1354:17, 1366:10, 1598:21, 1598:25, 1599:3, 1599:18, 1599:19
**column** [22] - 1272:20, 1345:11, 1354:10, 1403:9, 1404:23, 1404:24, 1405:6, 1406:15, 1408:1, 1458:13, 1458:22, 1458:25, 1460:4, 1460:5, 1463:21, 1464:2, 1467:10, 1499:12, 1538:13, 1538:17, 1543:5, 1545:3
**columns** [3] - 1314:4, 1462:18, 1544:2
**combination** [1] - 1398:9
**combinations** [3] - 1329:2, 1398:2, 1398:3
**combines** [1] - 1345:13
**coming** [8] - 1326:20, 1394:22, 1470:21, 1473:23, 1481:10, 1502:11, 1551:22
**command** [10] - 1272:13, 1273:7, 1274:11, 1274:17, 1275:1, 1275:24, 1276:1, 1276:22, 1304:13, 1571:11
**commands** [4] - 1273:16, 1276:3, 1276:25, 1571:11
**commensurate** [7] - 1398:9, 1399:14, 1429:20, 1430:1, 1485:23, 1490:6, 1545:6
**comment** [2] - 1552:23, 1553:9
**commented** [1] - 1552:20
**comments** [2] - 1384:21, 1436:19
**commercial** [11] - 1411:19, 1435:1, 1435:15, 1452:19, 1494:14, 1497:4, 1570:15, 1570:20, 1571:5, 1572:1, 1579:14
**commercially** [3] - 1332:9, 1381:15, 1572:16
**commercials** [1] - 1466:7
**commissioned** [2] - 1395:22, 1449:13
**common** [1] - 1558:9
**commonly** [8] - 1279:9, 1280:2, 1281:16, 1283:5, 1283:13, 1300:25, 1301:9, 1385:20
**communicate** [2] - 1353:23, 1582:10
**communication** [11] - 1309:5, 1315:2, 1358:12, 1358:19, 1358:23, 1359:4, 1359:10, 1359:11, 1364:9, 1368:14, 1583:12

**Communications** [1] - 1363:10
**communications** [3] - 1294:6, 1353:20, 1600:16
**communicator** [1] - 1364:24
**companies** [11] - 1387:25, 1388:11, 1388:18, 1391:5, 1391:7, 1391:10, 1391:14, 1391:18, 1449:20, 1501:12, 1579:18
**company** [16] - 1382:11, 1387:1, 1387:2, 1387:4, 1387:6, 1387:13, 1388:13, 1431:18, 1432:10, 1489:8, 1489:16, 1574:25, 1579:21, 1580:4, 1580:8, 1596:12
**comparability** [2] - 1328:20, 1329:16
**comparable** [4] - 1429:4, 1430:20, 1430:22, 1430:23
**compare** [2] - 1272:15, 1274:12, 1275:25, 1375:11
**compared** [5] - 1270:14, 1285:9, 1450:7, 1451:19, 1548:20
**comparing** [2] - 1275:18, 1420:25
**comparison** [1] - 1441:5
**compelling** [1] - 1285:6
**compensate** [2] - 1385:24, 1396:21
**competing** [1] - 1494:23, 1497:13
**competitive** [4] - 1490:24, 1534:9, 1534:11, 1534:18
**competitor** [2] - 1494:20, 1498:12
**competitors** [3] - 1497:5, 1497:21, 1498:10
**complete** [8] - 1270:22, 1276:6, 1309:3, 1335:21, 1375:16, 1425:6, 1486:6, 1581:10
**completed** [1] - 1439:12
**completely** [1] - 1555:15
**compliant** [2] - 1315:4, 1315:8
**complies** [3] - 1337:11, 1337:16, 1367:3
**component** [5] - 1331:7, 1331:20, 1337:10, 1337:15, 1481:24
**components** [23] - 1296:1, 1296:4, 1361:10, 1395:8, 1399:18, 1424:2, 1454:12, 1462:1, 1462:8, 1462:22, 1464:6, 1468:14, 1469:16, 1473:16, 1473:25, 1474:1, 1481:22, 1503:23, 1503:24, 1504:4, 1522:8, 1525:16
**composers** [1] - 1543:20
**composition** [2] - 1354:4, 1572:10
**compress** [3] - 1569:2, 1575:6, 1576:5
**compressed** [2] - 1289:13, 1289:14
**compression** [1] - 1568:25
**computer** [98] - 1279:10, 1281:8, 1281:11, 1281:17, 1282:2, 1282:9, 1282:22, 1283:6, 1283:14, 1285:3, 1295:8, 1295:13, 1300:4, 1300:5, 1301:2, 1314:15, 1315:1, 1315:20, 1315:22, 1316:2, 1352:10, 1357:7, 1357:11, 1357:15, 1357:18, 1368:4, 1371:22, 1381:8, 1405:8, 1406:10, 1415:13, 1418:9, 1427:15, 1427:17,

1442:20, 1443:6, 1443:7, 1443:13, 1443:25, 1445:4, 1447:23, 1448:15, 1449:3, 1451:16, 1451:17, 1481:1, 1483:18, 1524:25, 1525:2, 1525:17, 1525:19, 1527:1, 1527:2, 1543:12, 1547:24, 1548:7, 1558:13, 1561:25, 1563:4, 1568:12, 1568:18, 1570:15, 1570:21, 1570:23, 1571:4, 1571:5, 1572:1, 1572:15, 1572:20, 1572:21, 1572:23, 1572:24, 1572:25, 1574:3, 1574:4, 1574:14, 1575:4, 1575:5, 1575:8, 1575:21, 1575:25, 1576:4, 1576:13, 1576:14, 1588:23, 1588:24, 1588:25, 1589:10, 1589:15, 1596:14, 1597:25, 1598:4, 1599:10, 1600:16
**computers** [7] - 1279:23, 1294:7, 1358:3, 1437:9, 1438:23, 1552:1, 1570:16
**concept** [6] - 1278:14, 1295:20, 1367:23, 1379:19, 1398:11, 1429:19
**conception** [1] - 1298:23
**concepts** [3] - 1270:23, 1278:20, 1329:8
**concern** [3] - 1325:19, 1326:19, 1330:24
**concerned** [1] - 1420:25
**concerns** [2] - 1320:17, 1591:19
**Concert** [4] - 1489:2, 1489:4, 1489:8, 1489:15
**concert** [2] - 1489:16, 1489:18
**conclude** [4] - 1358:18, 1359:3, 1360:10, 1367:20
**concluded** [4] - 1359:3, 1384:8, 1434:9, 1538:20
**conclusion** [10] - 1374:16, 1382:19, 1392:2, 1392:4, 1392:5, 1434:2, 1434:14, 1471:9, 1550:8, 1550:9
**conclusions** [1] - 1394:22
**condition** [4] - 1431:17, 1433:17, 1434:10, 1592:8
**conduct** [1] - 1449:21
**conducted** [3] - 1396:19, 1449:20, 1450:19
**confer** [1] - 1327:25
**conferred** [1] - 1327:1
**confidential** [2] - 1407:10, 1407:11
**configure** [3] - 1347:2, 1347:14, 1371:14
**configured** [1] - 1316:2
**confined** [1] - 1596:21
**confirm** [3] - 1321:14, 1376:17, 1449:24
**confirmation** [2] - 1450:25, 1550:8
**confirmed** [2] - 1287:5, 1287:17
**conflicting** [1] - 1340:20
**conformed** [1] - 1314:21
**confuse** [1] - 1311:11
**confused** [1] - 1547:9
**confusing** [4] - 1308:16, 1311:23, 1486:24, 1502:7

confusion [1] - 1360:6
conjunction [5] - 1451:14, 1518:6, 1518:22, 1550:6, 1582:9
connect [13] - 1314:24, 1315:3, 1315:6, 1315:13, 1315:19, 1315:25, 1316:6, 1316:13, 1316:17, 1317:3, 1339:7, 1588:22, 1588:24
connected [3] - 1300:5, 1598:5, 1598:8
connecting [1] - 1600:16
connection [9] - 1271:10, 1271:20, 1307:6, 1315:4, 1315:7, 1318:1, 1358:25, 1359:5, 1359:11
consecutive [1] - 1276:24
conservative [1] - 1514:7
conservatively [2] - 1460:16, 1514:12
consider [24] - 1301:19, 1335:16, 1378:5, 1428:19, 1429:1, 1430:16, 1431:14, 1462:17, 1478:24, 1483:15, 1488:4, 1488:14, 1488:20, 1495:18, 1496:2, 1496:13, 1498:2, 1498:7, 1498:9, 1498:11, 1508:12, 1508:15, 1545:12, 1546:3
consideration [13] - 1377:21, 1428:5, 1433:24, 1468:1, 1496:12, 1498:3, 1498:18, 1508:19, 1517:6, 1527:20, 1529:11, 1539:7, 1541:3
considerations [9] - 1415:3, 1434:17, 1495:23, 1496:1, 1527:23, 1538:7, 1562:4, 1562:21, 1563:2
considered [32] - 1308:7, 1333:24, 1355:3, 1366:21, 1373:4, 1374:14, 1410:13, 1410:22, 1410:24, 1418:2, 1419:4, 1423:8, 1428:23, 1429:11, 1430:3, 1431:16, 1432:25, 1470:1, 1488:10, 1489:14, 1490:2, 1498:15, 1505:1, 1505:10, 1505:21, 1508:17, 1516:24, 1521:2, 1528:13, 1534:23, 1535:2, 1571:4
considering [1] - 1360:7
considers [1] - 1520:18
consistent [10] - 1307:16, 1308:17, 1365:23, 1407:9, 1468:4, 1474:19, 1475:14, 1480:9, 1517:7, 1544:9
construct [8] - 1414:23, 1424:16, 1425:5, 1506:9, 1507:20, 1508:15, 1509:7, 1578:3
construction [19] - 1273:12, 1273:13, 1274:3, 1302:8, 1302:12, 1305:6, 1307:18, 1307:19, 1307:24, 1308:11, 1308:12, 1308:18, 1308:20, 1312:19, 1343:4, 1360:8, 1368:2, 1590:14, 1600:13
constructions [3] - 1302:9, 1360:25, 1361:3
construed [5] - 1305:3, 1308:13, 1361:16, 1590:10, 1590:16
consultant [3] - 1385:14, 1386:11, 1548:12
Consulting [1] - 1387:7
consulting [7] - 1387:10, 1387:16, 1387:20, 1387:21, 1387:24, 1388:1,

1390:4
consumer [3] - 1381:19, 1433:9, 1568:9
contained [1] - 1571:3
containing [1] - 1448:15
contains [1] - 1307:6
contend [1] - 1314:24
content [17] - 1284:16, 1285:2, 1285:5, 1302:6, 1304:5, 1317:24, 1318:3, 1318:11, 1318:18, 1319:12, 1443:8, 1445:5, 1551:25, 1552:10, 1552:12, 1581:23
context [32] - 1279:13, 1279:19, 1283:20, 1284:20, 1285:13, 1301:18, 1302:7, 1306:1, 1307:14, 1316:23, 1317:1, 1317:9, 1317:21, 1318:8, 1318:24, 1319:11, 1319:16, 1329:6, 1338:17, 1341:10, 1343:22, 1346:8, 1364:19, 1397:15, 1398:18, 1413:17, 1414:15, 1434:3, 1501:1, 1553:3, 1554:6, 1555:5
contexts [1] - 1327:20
continue [5] - 1272:3, 1305:16, 1319:3, 1319:7, 1426:20
continued [1] - 1317:17
CONTINUED [1] - 1272:9
continues [5] - 1276:4, 1301:7, 1318:13, 1340:8, 1340:19
continuing [1] - 1321:10
continuous [1] - 1305:8
continuously [1] - 1304:14
contractor [2] - 1501:23, 1502:4
contribute [3] - 1531:25, 1539:1, 1581:24
contributed [9] - 1532:10, 1532:21, 1533:6, 1533:22, 1540:25, 1549:14, 1549:15, 1549:20, 1581:25
contribution [4] - 1325:24, 1325:25, 1458:21, 1459:19
contributions [9] - 1511:16, 1513:11, 1513:15, 1513:17, 1514:21, 1515:9, 1532:9, 1540:23, 1541:13
control [5] - 1478:3, 1523:12, 1526:9, 1547:7, 1586:14
controller [6] - 1316:24, 1317:10, 1318:9, 1319:14, 1319:17, 1338:18
controlling [1] - 1485:1
controls [5] - 1482:25, 1483:9, 1523:9, 1536:8, 1578:15
convenient [1] - 1423:10
convention [1] - 1323:4
conventional [5] - 1295:8, 1295:12, 1300:5, 1352:9, 1367:2
conversation [2] - 1369:24, 1370:5
conversations [1] - 1379:24
convey [1] - 1547:8
copies [3] - 1322:18, 1381:24, 1407:21
copy [16] - 1270:12, 1270:13, 1270:15, 1345:6, 1346:13, 1372:19, 1393:25, 1420:6, 1420:10, 1420:12, 1420:19,

1496:20, 1575:5, 1576:4, 1576:12, 1589:11
copying [1] - 1593:12
copyright [2] - 1596:4, 1596:5
copyrights [1] - 1387:9
CORDELL [47] - 1270:6, 1271:4, 1332:13, 1332:24, 1333:4, 1333:9, 1334:10, 1334:14, 1334:17, 1336:18, 1337:5, 1337:8, 1337:17, 1346:12, 1422:15, 1422:25, 1423:11, 1423:15, 1491:4, 1491:8, 1495:4, 1495:6, 1564:1, 1564:5, 1564:8, 1564:25, 1565:23, 1566:1, 1567:5, 1571:20, 1574:6, 1574:9, 1575:10, 1575:11, 1576:20, 1576:23, 1585:4, 1585:8, 1587:18, 1590:18, 1591:5, 1591:6, 1591:24, 1592:1, 1594:3, 1601:11, 1601:16
corner [5] - 1406:7, 1420:3, 1501:21, 1570:8, 1577:3
corp [1] - 1380:21
Corp [4] - 1380:21, 1381:25, 1382:6, 1382:10
corporate [5] - 1298:22, 1382:13, 1382:16, 1382:21, 1565:8
Corporation [2] - 1331:23, 1379:12
correct [190] - 1272:25, 1273:3, 1273:9, 1273:10, 1275:8, 1275:19, 1276:17, 1276:18, 1277:6, 1277:21, 1278:3, 1278:4, 1279:2, 1279:10, 1281:18, 1284:1, 1284:10, 1284:18, 1285:12, 1285:20, 1286:8, 1288:8, 1290:3, 1290:4, 1290:9, 1290:24, 1291:4, 1291:5, 1291:19, 1291:21, 1292:4, 1294:8, 1294:9, 1294:11, 1294:17, 1295:17, 1295:22, 1296:12, 1296:13, 1297:25, 1298:4, 1298:25, 1300:20, 1301:24, 1301:25, 1302:4, 1302:25, 1303:14, 1304:1, 1304:19, 1305:4, 1306:14, 1312:16, 1313:6, 1314:10, 1314:13, 1315:11, 1315:16, 1315:21, 1316:6, 1316:10, 1316:14, 1316:19, 1318:3, 1323:12, 1326:1, 1331:19, 1336:25, 1341:5, 1346:23, 1347:1, 1347:11, 1349:4, 1349:15, 1353:1, 1354:7, 1354:22, 1360:20, 1361:19, 1361:22, 1361:23, 1370:8, 1370:17, 1371:12, 1372:13, 1381:2, 1385:17, 1405:16, 1405:20, 1407:3, 1408:4, 1408:18, 1408:19, 1421:24, 1422:2, 1422:7, 1440:18, 1441:6, 1444:13, 1445:13, 1449:14, 1449:15, 1452:21, 1455:7, 1458:10, 1460:3, 1460:4, 1461:5, 1471:22, 1471:24, 1475:21, 1476:19, 1476:20, 1482:18, 1484:23, 1487:18, 1492:8, 1492:9, 1492:14, 1492:18, 1492:22, 1493:10, 1493:21, 1493:22, 1493:25, 1494:12, 1494:16, 1494:21, 1494:22, 1495:21, 1496:5, 1498:24, 1501:6, 1502:21, 1503:6, 1504:16, 1509:14, 1510:8, 1510:20, 1513:7, 1513:17, 1517:14, 1518:20,

1519:7, 1524:1, 1524:5, 1524:8, 1525:14, 1526:20, 1530:8, 1531:6, 1533:1, 1533:11, 1538:19, 1540:1, 1540:6, 1540:18, 1542:9, 1543:23, 1545:11, 1547:19, 1548:4, 1549:6, 1549:16, 1549:17, 1549:23, 1549:24, 1558:1, 1558:5, 1564:9, 1564:23, 1584:11, 1584:12, 1594:17, 1594:24, 1595:2, 1595:8, 1595:12, 1595:17, 1595:20, 1595:25, 1596:8, 1597:4, 1597:11, 1597:15, 1598:10, 1598:15, 1599:15, 1600:2

**CORRECT** [1] - 1601:22

**correctly** [9] - 1272:12, 1290:7, 1307:9, 1307:10, 1339:11, 1344:7, 1533:16, 1557:6, 1574:16

**corrects** [1] - 1372:18

**correspondence** [1] - 1493:18

**corresponding** [4] - 1273:8, 1355:10, 1355:15, 1357:7

**cost** [33] - 1294:6, 1356:22, 1357:1, 1430:19, 1456:2, 1456:8, 1456:10, 1456:14, 1461:16, 1462:12, 1462:14, 1462:15, 1462:16, 1462:19, 1463:4, 1463:11, 1463:25, 1464:22, 1465:23, 1466:8, 1467:9, 1467:22, 1467:24, 1468:2, 1468:6, 1468:12, 1484:15, 1485:8, 1508:22, 1520:20, 1520:24, 1520:25

**costs** [28] - 1435:12, 1454:9, 1454:10, 1454:14, 1454:16, 1454:17, 1454:18, 1456:10, 1456:12, 1456:16, 1457:7, 1457:18, 1457:21, 1458:18, 1459:20, 1460:24, 1460:25, 1464:7, 1465:11, 1465:13, 1467:10, 1467:11, 1467:20, 1468:11, 1469:3, 1504:8, 1520:23, 1520:25

**counsel** [28] - 1272:12, 1310:13, 1311:10, 1320:3, 1323:14, 1325:17, 1326:13, 1349:11, 1372:25, 1377:3, 1378:2, 1378:23, 1386:15, 1392:16, 1407:10, 1407:22, 1414:4, 1419:15, 1470:5, 1471:16, 1479:8, 1495:1, 1496:19, 1528:15, 1557:20, 1565:20, 1591:4, 1600:22

**count** [3] - 1524:4, 1525:22, 1526:15

**counterclockwise** [1] - 1587:10

**counting** [2] - 1523:24, 1524:22

**countries** [1] - 1390:10

**country** [5] - 1391:4, 1427:7, 1427:8, 1561:10, 1588:4

**couple** [30] - 1286:20, 1368:5, 1372:10, 1390:17, 1395:16, 1398:17, 1400:8, 1421:6, 1426:23, 1432:7, 1437:18, 1442:2, 1450:2, 1450:4, 1450:19, 1450:21, 1451:5, 1453:9, 1456:19, 1462:24, 1462:25, 1464:9, 1481:16, 1483:16, 1498:14, 1516:19, 1555:9, 1577:7, 1591:16, 1599:20

**course** [2] - 1320:20, 1390:12

**courses** [1] - 1316:15

**court** [52] - 1273:8, 1273:19, 1275:6, 1276:16, 1277:4, 1283:23, 1284:8, 1299:14, 1302:7, 1302:11, 1305:3, 1307:18, 1320:14, 1321:10, 1323:25, 1327:3, 1329:10, 1332:17, 1333:2, 1336:1, 1341:22, 1341:24, 1360:8, 1361:16, 1372:19, 1373:13, 1373:15, 1374:9, 1376:9, 1377:18, 1396:20, 1407:20, 1420:10, 1422:13, 1422:16, 1432:20, 1470:13, 1488:12, 1488:13, 1492:20, 1495:2, 1498:9, 1505:9, 1505:12, 1509:11, 1512:4, 1512:11, 1512:19, 1517:8, 1528:23, 1543:8, 1574:16

**COURT** [227] - 1270:4, 1270:12, 1271:13, 1271:25, 1272:2, 1274:5, 1274:20, 1274:25, 1275:17, 1280:19, 1287:18, 1299:16, 1299:19, 1299:21, 1303:6, 1303:10, 1311:10, 1320:3, 1320:8, 1320:16, 1321:12, 1322:4, 1322:12, 1322:16, 1323:1, 1323:7, 1323:13, 1323:19, 1324:11, 1324:17, 1324:19, 1324:22, 1325:7, 1325:11, 1325:16, 1326:23, 1327:6, 1327:18, 1327:24, 1328:8, 1328:17, 1329:24, 1330:7, 1330:9, 1330:15, 1330:17, 1330:20, 1330:21, 1331:22, 1332:1, 1332:11, 1332:22, 1333:2, 1333:7, 1333:22, 1334:11, 1334:16, 1335:13, 1336:20, 1336:23, 1337:4, 1337:7, 1337:13, 1337:19, 1337:22, 1337:25, 1341:21, 1342:6, 1344:11, 1344:13, 1344:15, 1344:19, 1344:21, 1344:25, 1345:5, 1346:14, 1349:11, 1349:18, 1350:18, 1358:22, 1359:19, 1360:3, 1362:14, 1362:18, 1362:22, 1363:3, 1363:5, 1363:8, 1371:5, 1372:8, 1372:21, 1372:24, 1373:20, 1373:25, 1374:19, 1375:5, 1375:21, 1376:3, 1376:7, 1376:13, 1376:25, 1377:3, 1377:8, 1377:13, 1378:9, 1378:24, 1384:9, 1384:11, 1385:8, 1386:18, 1389:8, 1392:16, 1393:14, 1394:6, 1394:9, 1407:8, 1407:14, 1408:7, 1408:10, 1409:20, 1410:1, 1410:4, 1413:23, 1414:3, 1414:8, 1419:15, 1419:22, 1419:25, 1420:6, 1420:11, 1420:14, 1420:19, 1420:22, 1420:24, 1421:14, 1421:16, 1421:18, 1421:21, 1421:25, 1422:3, 1422:8, 1422:18, 1423:5, 1423:12, 1423:14, 1423:16, 1423:17, 1423:18, 1423:20, 1431:10, 1433:14, 1433:19, 1433:22, 1444:8, 1446:18, 1446:20, 1448:6, 1448:9, 1448:17, 1448:23, 1449:5, 1449:9, 1458:1, 1463:17, 1464:14, 1466:16, 1468:21, 1470:5, 1470:10, 1470:15, 1471:4, 1471:7, 1471:12, 1471:16, 1479:10, 1491:6, 1494:4, 1494:8, 1495:3, 1495:5, 1495:8, 1496:19, 1496:25, 1506:21, 1506:24, 1511:13, 1514:2, 1528:15, 1528:20, 1554:11, 1558:23, 1559:2, 1559:23, 1560:5, 1560:16, 1560:21, 1561:2, 1561:14, 1561:17, 1562:9, 1562:12, 1563:10, 1563:12, 1563:17, 1563:20, 1563:22, 1563:25, 1564:3, 1564:7, 1564:12, 1564:16, 1564:19, 1564:24, 1565:2, 1565:25, 1567:2, 1585:6, 1590:13, 1590:19, 1594:5, 1598:24, 1600:22, 1601:4, 1601:9, 1601:13, 1601:18, 1601:21

**court's** [25] - 1272:13, 1273:12, 1273:13, 1274:3, 1275:13, 1307:24, 1308:12, 1308:18, 1308:19, 1312:19, 1327:16, 1332:14, 1355:14, 1355:15, 1358:9, 1358:11, 1360:8, 1360:25, 1361:3, 1423:3, 1470:24, 1509:17, 1564:9, 1591:19, 1600:13

**courtroom** [13] - 1272:1, 1320:7, 1337:24, 1375:20, 1377:2, 1419:21, 1423:19, 1470:9, 1471:15, 1488:25, 1528:19, 1546:24, 1601:3

**courts** [2] - 1326:15, 1410:21

**cover** [7] - 1421:12, 1421:20, 1464:23, 1505:16, 1505:17, 1546:17, 1585:19

**covered** [9] - 1312:20, 1327:16, 1337:23, 1378:15, 1378:18, 1420:4, 1431:9, 1537:20, 1601:15

**covers** [2] - 1368:12, 1452:20

**CPA** [7] - 1385:13, 1386:9, 1386:23, 1389:15, 1389:17, 1504:16

**CPAs** [1] - 1389:17

**CPU** [2] - 1300:4, 1357:7

**crack** [1] - 1601:7

**Crazy** [1] - 1585:20

**create** [16] - 1285:6, 1329:22, 1427:5, 1427:15, 1428:2, 1447:13, 1447:24, 1483:14, 1525:1, 1525:2, 1548:3, 1556:2, 1576:16, 1577:25, 1580:3

**created** [16] - 1415:12, 1525:19, 1526:13, 1526:19, 1526:21, 1526:23, 1526:24, 1526:25, 1527:2, 1536:13, 1542:5, 1548:5, 1548:6, 1552:2, 1552:5, 1552:6

**Created** [1] - 1552:8

**creates** [5] - 1426:18, 1427:6, 1427:9, 1427:14, 1556:8

**creating** [16] - 1447:5, 1448:14, 1477:13, 1483:5, 1483:6, 1524:3, 1524:23, 1524:25, 1525:16, 1525:20, 1526:1, 1552:14, 1552:23, 1553:9, 1562:22

**creation** [3] - 1478:22, 1526:6, 1527:1

**Creative** [2] - 1579:21, 1579:23

**credit** [7] - 1472:24, 1473:2, 1474:6, 1475:12, 1514:6, 1515:16, 1530:21

**credited** [2] - 1435:7, 1521:9

**Crew** [1] - 1333:18

**criteria** [3] - 1428:1, 1518:7, 1592:7

**critical** [1] - 1552:12

**cross** [11] - 1271:7, 1272:4, 1286:8,

1328:7, 1336:16, 1338:7, 1358:21,
1359:16, 1359:20, 1362:19, 1564:21
 **CROSS** [3] - 1272:9, 1491:21, 1594:8
 **cross-examination** [5] - 1271:7,
1272:4, 1328:7, 1336:16, 1338:7
 **CROSS-EXAMINATION** [3] - 1272:9,
1491:21, 1594:8
 **cross-examined** [1] - 1362:19
 **cross-referenced** [1] - 1286:8
 **crunching** [1] - 1453:17
 **Cube** - 1433:5, 1433:6, 1433:15
 **culmination** [1] - 1522:11
 **Cupertino** [1] - 1491:20
 **current** [1] - 1586:5
 **CurrentPlay** [6] - 1343:17, 1343:18,
1345:15, 1345:16, 1345:22, 1345:24
 **custom** [1] - 1476:8
 **customer** [8] - 1467:17, 1472:10,
1473:6, 1509:22, 1514:14, 1515:10,
1526:12, 1588:19
 **customers** [8] - 1514:25, 1515:1,
1515:3, 1545:24, 1580:15, 1581:11,
1595:21
 **customized** [1] - 1437:9
 **Cut** [1] - 1384:15
 **cut** [1] - 1384:17
 **cutaway** [1] - 1278:2

# D

 **daily** [2] - 1445:6, 1499:16
 **damage** [4] - 1327:21, 1410:20,
1410:23, 1508:19
 **damages** [44] - 1385:15, 1385:20,
1389:4, 1390:20, 1391:25, 1392:7,
1392:10, 1392:19, 1392:22, 1393:4,
1393:21, 1396:14, 1396:21, 1410:17,
1413:16, 1414:15, 1414:21, 1488:23,
1493:4, 1493:6, 1507:20, 1509:8,
1509:9, 1509:12, 1509:21, 1510:16,
1510:21, 1510:23, 1511:2, 1511:16,
1511:21, 1512:3, 1512:15, 1512:16,
1512:18, 1512:21, 1512:22, 1525:13,
1525:15, 1527:19, 1533:22, 1533:24,
1533:25, 1551:23
 **Dan** [1] - 1594:1
 **dash** [1] - 1294:4
 **Data** [1] - 1294:4
 **data** [19] - 1287:6, 1304:16, 1348:12,
1348:14, 1358:12, 1358:16, 1358:24,
1359:5, 1359:12, 1370:16, 1371:9,
1395:1, 1402:6, 1518:1, 1518:19,
1522:2, 1569:13, 1569:15, 1576:10
 **database** [11] - 1347:17, 1347:18,
1348:4, 1348:9, 1348:18, 1349:4,
1349:23, 1350:3, 1350:6, 1350:8,
1350:10
 **databases** [1] - 1582:7
 **date** [18] - 1289:2, 1313:4, 1332:23,
1333:16, 1333:17, 1354:23, 1354:25,

1363:11, 1363:19, 1412:12, 1418:4,
1418:5, 1422:6, 1465:19, 1595:2,
1595:3, 1595:5, 1595:11
 **DATE** [1] - 1601:21
 **dated** [1] - 1455:14
 **dates** [3] - 1290:24, 1364:19, 1595:1
 **Daubert** [2] - 1321:4, 1321:12
 **DAVID** [2] - 1567:3, 1594:8
 **David** [3] - 1564:2, 1565:1, 1567:10
 **days** [1] - 1437:4
 **Days** [1] - 1556:1
 **DDX** [4] - 1495:14, 1506:1, 1574:7,
1574:8
 **deal** [7] - 1345:8, 1384:17, 1434:24,
1502:10, 1519:1, 1534:6, 1580:18
 **dealing** [3] - 1320:17, 1434:20,
1434:21, 1448:20, 1516:1
 **deals** [3] - 1435:11, 1539:4, 1583:9
 **dealt** [3] - 1338:6, 1410:19, 1425:12
 **decent** [2] - 1284:17, 1285:3
 **decide** [4] - 1428:2, 1480:13, 1493:1,
1507:16
 **decided** [1] - 1370:6
 **decision** [12] - 1382:13, 1382:16,
1382:21, 1382:22, 1383:8, 1383:11,
1383:12, 1383:16, 1411:21, 1412:18,
1580:6, 1580:7
 **decisions** [2] - 1342:15, 1425:11
 **declaration** [5] - 1271:10, 1279:6,
1279:11, 1284:16, 1284:20
 **Declaration** [1] - 1284:22
 **decoders** [1] - 1462:7
 **decreased** [1] - 1432:7
 **deducted** [1] - 1504:7
 **deduction** [1] - 1550:16
 **deed** [1] - 1501:13
 **deem** [1] - 1505:13
 **deep** [1] - 1311:5
 **DEFENDANT** [1] - 1567:4
 **Defendant's** [43] - 1268:16, 1268:17,
1268:18, 1268:19, 1268:23, 1268:24,
1269:1, 1269:2, 1269:3, 1269:4, 1269:5,
1269:7, 1269:8, 1269:9, 1269:10,
1269:11, 1269:12, 1269:13, 1269:14,
1269:15, 1269:16, 1285:15, 1302:18,
1302:23, 1303:3, 1305:20, 1339:15,
1339:20, 1396:5, 1415:9, 1459:8,
1459:9, 1459:10, 1575:17, 1575:18,
1576:22, 1584:25, 1591:24, 1592:13,
1592:25, 1595:16, 1597:7, 1599:4
 **defendant's** [3] - 1506:22, 1506:23,
1506:25
 **defendants** [2] - 1390:21, 1423:14
 **defer** [2] - 1415:17, 1537:18
 **defined** [2] - 1360:7, 1590:22
 **defining** [1] - 1365:19
 **definition** [8] - 1331:12, 1356:14,
1356:25, 1357:17, 1358:9, 1358:11,
1358:14, 1375:8
 **definitions** [6] - 1275:13, 1355:15,

1357:14, 1358:1, 1369:7, 1375:11
 **delivering** [1] - 1285:1
 **demand** [2] - 1383:24, 1509:22
 **demanding** [1] - 1508:22
 **demo** [1] - 1420:15
 **demonstrate** [2] - 1365:25, 1584:16
 **demonstrated** [3] - 1346:16, 1346:19,
1537:11
 **demonstrating** [1] - 1346:17
 **demonstrating]** [1] - 1585:23
 **Demonstrative** [16] - 1266:6, 1272:7,
1275:24, 1277:11, 1285:16, 1393:19,
1398:14, 1409:15, 1450:10, 1458:9,
1480:13, 1484:6, 1484:22, 1486:16,
1488:17, 1523:1
 **demonstrative** [18] - 1273:10, 1273:22,
1273:23, 1274:1, 1276:20, 1277:7,
1296:25, 1353:8, 1355:14, 1393:13,
1393:20, 1409:18, 1453:15, 1457:13,
1479:9, 1486:10, 1520:6, 1600:10
 **demonstratives** [1] - 1496:21
 **Demonstratives** [1] - 1392:15
 **demos** [1] - 1419:25
 **denied** [1] - 1333:25
 **denying** [3] - 1301:20, 1301:21,
1301:22
 **department** [1] - 1449:19
 **dependent** [1] - 1490:25
 **depos** [1] - 1377:7
 **deposition** [32] - 1299:10, 1299:15,
1299:22, 1312:13, 1312:16, 1312:24,
1313:7, 1313:14, 1314:1, 1314:18,
1315:15, 1316:11, 1317:7, 1319:2,
1338:14, 1338:21, 1376:2, 1377:6,
1377:14, 1384:14, 1432:21, 1473:7,
1474:11, 1478:16, 1515:21, 1517:7,
1518:6, 1548:22, 1548:25, 1549:10,
1550:3
 **DEPOSITION** [1] - 1379:5
 **depositions** [2] - 1436:5, 1522:7
 **describe** [8] - 1291:20, 1351:9,
1351:16, 1361:12, 1406:6, 1555:10,
1572:6, 1588:23
 **described** [17] - 1278:5, 1278:14,
1278:21, 1279:2, 1279:5, 1287:3,
1295:1, 1304:22, 1304:23, 1307:1,
1307:5, 1315:24, 1316:20, 1360:16,
1367:8, 1439:23, 1498:23
 **describes** [4] - 1287:8, 1351:12,
1353:10, 1592:16
 **describing** [6] - 1286:21, 1291:24,
1367:6, 1424:2, 1590:12, 1598:3
 **description** [17] - 1273:6, 1273:11,
1278:25, 1287:3, 1291:23, 1292:23,
1292:25, 1295:1, 1295:21, 1306:25,
1307:2, 1307:12, 1307:17, 1308:14,
1353:4, 1368:25, 1403:24
 **Design** [3] - 1367:1, 1367:4, 1367:21
 **design** [7] - 1296:12, 1472:7, 1472:12,
1503:8, 1514:25, 1515:11, 1572:19

1616

**designed** [1] - 1555:3
**designing** [1] - 1568:23
**desire** [1] - 1434:7
**desired** [1] - 1578:6
**desktop** [10] - 1279:23, 1281:17,
1282:2, 1282:9, 1295:8, 1295:13,
1352:10, 1567:11, 1588:25, 1589:11
**desktops** [1] - 1279:20
**detail** [13] - 1302:4, 1302:6, 1307:5,
1307:20, 1355:9, 1379:25, 1394:20,
1402:11, 1402:20, 1431:11, 1434:23,
1438:5, 1549:7
**detailed** [5] - 1270:22, 1367:3, 1406:1,
1408:23, 1435:11
**details** [9] - 1284:12, 1339:25, 1370:9,
1428:11, 1454:12, 1456:18, 1460:23,
1466:12, 1522:24
**detection** [1] - 1276:24
**detects** [1] - 1592:17
**determination** [2] - 1488:12, 1509:11
**determinations** [1] - 1566:23
**determine** [14] - 1304:4, 1363:15,
1394:22, 1399:7, 1410:8, 1410:9,
1469:15, 1492:20, 1509:4, 1592:22
**determined** [3] - 1393:3, 1470:18,
1488:2
**determining** [4] - 1385:20, 1470:20,
1478:25, 1498:16
**develop** [2] - 1530:4, 1580:5
**developed** [4] - 1336:6, 1483:8,
1530:4, 1531:7
**development** [2] - 1459:21, 1583:3
**device** [125] - 1283:16, 1283:23,
1296:2, 1300:7, 1300:19, 1300:24,
1301:3, 1315:4, 1315:7, 1315:13,
1315:23, 1316:1, 1317:3, 1343:17,
1345:16, 1347:3, 1347:4, 1347:11,
1347:13, 1348:5, 1348:17, 1349:16,
1350:25, 1355:17, 1356:1, 1356:4,
1370:12, 1394:12, 1394:14, 1395:6,
1395:8, 1396:5, 1396:6, 1396:8,
1403:21, 1415:7, 1415:10, 1415:14,
1415:15, 1415:18, 1415:19, 1417:17,
1418:1, 1426:12, 1427:16, 1430:24,
1438:19, 1438:22, 1439:16, 1440:8,
1442:19, 1443:6, 1443:9, 1443:24,
1453:23, 1454:11, 1454:18, 1458:19,
1461:21, 1461:22, 1461:23, 1462:15,
1466:1, 1467:23, 1469:15, 1472:5,
1472:8, 1472:15, 1473:1, 1473:11,
1476:25, 1480:11, 1482:9, 1483:20,
1484:11, 1486:2, 1488:8, 1488:9,
1505:23, 1509:25, 1510:4, 1510:5,
1513:10, 1513:13, 1513:16, 1514:20,
1515:9, 1521:10, 1525:2, 1525:3,
1525:5, 1525:20, 1526:1, 1528:5,
1532:16, 1535:11, 1535:13, 1535:14,
1535:15, 1548:7, 1548:8, 1549:11,
1550:10, 1552:11, 1552:21, 1556:9,
1557:23, 1558:13, 1563:5, 1573:22,
1574:1, 1579:1, 1581:23, 1582:8,

1582:11, 1582:12, 1583:13, 1589:14,
1589:16, 1590:21, 1590:25, 1591:7,
1593:3, 1593:5
**devices** [48] - 1281:15, 1282:15,
1288:13, 1288:17, 1289:5, 1290:18,
1292:15, 1298:9, 1298:19, 1315:9,
1347:23, 1348:1, 1348:4, 1348:12,
1349:9, 1349:23, 1354:4, 1355:6,
1356:12, 1366:24, 1370:21, 1374:7,
1383:22, 1393:1, 1393:23, 1396:7,
1402:21, 1403:20, 1416:3, 1416:7,
1435:25, 1438:19, 1438:20, 1448:20,
1450:6, 1450:15, 1452:2, 1459:23,
1459:24, 1462:4, 1485:10, 1504:13,
1531:23, 1532:3, 1532:15, 1545:20,
1550:14, 1583:10
**diagram** [1] - 1278:2
**dialogue** [1] - 1593:8
**Diamond** [2] - 1579:20, 1579:22
**diary** [1] - 1365:21
**difference** [6] - 1323:7, 1330:11,
1375:8, 1530:18, 1530:20, 1545:22
**differences** [3] - 1270:11, 1271:2,
1289:1
**different** [110] - 1275:9, 1281:5,
1281:10, 1281:15, 1297:2, 1299:15,
1301:4, 1302:8, 1308:18, 1311:23,
1319:18, 1319:24, 1327:14, 1327:19,
1329:7, 1335:18, 1337:10, 1337:14,
1348:9, 1349:17, 1354:3, 1356:17,
1356:19, 1356:21, 1357:25, 1358:3,
1358:5, 1364:19, 1387:22, 1388:22,
1389:15, 1389:23, 1390:10, 1391:5,
1393:7, 1393:23, 1394:2, 1395:4,
1395:7, 1395:18, 1395:19, 1396:7,
1400:9, 1401:2, 1401:4, 1402:9, 1403:9,
1404:3, 1404:15, 1404:24, 1405:2,
1405:4, 1405:9, 1406:11, 1406:13,
1411:5, 1414:25, 1415:1, 1417:2,
1421:5, 1421:10, 1422:5, 1426:21,
1426:23, 1426:24, 1430:21, 1432:3,
1440:9, 1441:12, 1450:3, 1450:5,
1450:18, 1450:19, 1454:9, 1456:19,
1462:1, 1462:8, 1462:18, 1468:12,
1470:1, 1473:8, 1473:25, 1478:5,
1479:2, 1479:20, 1489:16, 1498:14,
1504:13, 1507:17, 1508:13, 1514:5,
1515:21, 1517:1, 1520:25, 1524:2,
1526:16, 1534:16, 1537:4, 1538:8,
1541:2, 1541:3, 1541:5, 1541:15,
1550:25, 1599:20
**differently** [1] - 1310:17
**differs** [1] - 1413:11
**difficult** [2] - 1469:17, 1472:24
**difficulty** [1] - 1329:15
**digital** [3] - 1367:8, 1456:7, 1575:2
**dimensions** [2] - 1287:21, 1356:20
**direct** [9] - 1359:15, 1361:5, 1363:7,
1498:9, 1538:23, 1564:11, 1576:19,
1591:22, 1595:17
**DIRECT** [2] - 1386:3, 1567:3

**directions** [1] - 1422:16
**directly** [1] - 1298:4
**director** [3] - 1390:14, 1552:19,
1567:10
**directors** [2] - 1382:24, 1383:1
**DirecTV** [1] - 1391:14
**disagree** [16] - 1279:25, 1280:4,
1282:25, 1283:1, 1283:3, 1318:22,
1318:25, 1319:5, 1319:8, 1319:13,
1319:25, 1339:10, 1367:13, 1516:19,
1531:14, 1537:15
**disagreed** [1] - 1367:12
**disagreeing** [2] - 1301:22, 1338:12
**disagreement** [1] - 1367:13
**disclaimer** [1] - 1343:8
**disclaiming** [1] - 1343:6
**disclosed** [1] - 1597:14
**Disconnect** [4] - 1589:4, 1589:5,
1589:25, 1591:14
**discontinuing** [1] - 1274:18
**discounted** [1] - 1429:9, 1489:22
**discovery** [1] - 1329:21
**discuss** [5] - 1379:21, 1419:19,
1451:24, 1600:25, 1601:1
**discussed** [26] - 1304:20, 1350:23,
1363:7, 1368:25, 1379:23, 1392:21,
1404:12, 1408:17, 1415:20, 1415:24,
1418:12, 1433:16, 1433:17, 1439:2,
1449:12, 1453:13, 1461:20, 1463:15,
1476:21, 1478:2, 1495:18, 1509:15,
1545:19, 1548:19, 1596:25, 1598:4
**discusses** [2] - 1294:14, 1559:13
**discussing** [2] - 1313:13, 1553:3
**discussion** [39] - 1270:7, 1318:13,
1327:19, 1346:8, 1355:9, 1357:6,
1364:20, 1367:16, 1369:3, 1375:7,
1408:25, 1411:3, 1411:13, 1415:12,
1415:15, 1418:14, 1429:12, 1443:5,
1461:24, 1475:10, 1477:19, 1489:1,
1489:4, 1489:6, 1489:7, 1489:10,
1489:13, 1489:25, 1492:25, 1537:3,
1546:18, 1547:13, 1550:3, 1566:10,
1596:19, 1596:20, 1599:19, 1600:5,
1600:11
**discussions** [4] - 1383:6, 1435:19,
1489:21, 1493:13
**disk** [39] - 1279:21, 1279:24, 1280:3,
1280:9, 1280:21, 1280:23, 1280:24,
1281:1, 1281:3, 1281:4, 1281:6,
1281:14, 1282:2, 1284:9, 1285:8,
1291:20, 1291:23, 1292:9, 1292:13,
1292:21, 1292:25, 1293:15, 1348:20,
1348:24, 1349:3, 1350:10, 1351:3,
1355:23, 1355:25, 1370:19, 1416:2,
1462:19, 1589:1, 1589:17, 1590:3,
1591:8, 1591:11, 1593:6, 1593:9
**disks** [3] - 1456:7, 1456:9, 1458:19
**dismissed** [2] - 1285:1, 1489:14
**dispersed** [1] - 1391:16
**display** [3] - 1298:8, 1462:1, 1589:24
**Display** [1] - 1300:6

**displayed** [1] - 1592:23
**dispute** [5] - 1299:7, 1323:10, 1323:22, 1378:16, 1391:12
**disputed** [1] - 1590:10
**dissolved** [1] - 1584:8
**distinct** [2] - 1340:21, 1342:2
**distinguish** [2] - 1549:13, 1549:19
**distinguished** [2] - 1281:5, 1435:9
**distribution** [1] - 1464:22
**divide** [1] - 1290:8
**division** [1] - 1272:23
**dizzying** [1] - 1566:9
**Doats** [1] - 1577:9
**doctrine** [9] - 1271:3, 1320:11, 1330:12, 1334:20, 1335:3, 1335:5, 1359:7, 1359:24, 1375:9
**document** [71] - 1287:13, 1287:14, 1303:15, 1305:16, 1306:3, 1306:10, 1306:12, 1306:18, 1306:21, 1309:13, 1310:14, 1310:19, 1312:22, 1325:14, 1363:22, 1365:23, 1365:25, 1372:11, 1387:3, 1402:19, 1402:20, 1417:10, 1417:11, 1418:13, 1436:13, 1436:15, 1436:17, 1442:3, 1442:21, 1445:14, 1455:5, 1455:13, 1455:23, 1455:24, 1463:15, 1464:13, 1465:5, 1468:6, 1474:14, 1474:19, 1475:4, 1475:21, 1475:22, 1475:23, 1476:18, 1479:3, 1484:14, 1501:14, 1515:23, 1516:11, 1517:24, 1518:5, 1518:18, 1518:21, 1519:4, 1519:16, 1521:6, 1521:7, 1522:14, 1542:10, 1542:12, 1542:15, 1553:8, 1554:16, 1554:18, 1555:4, 1559:8, 1559:24, 1576:19, 1595:19, 1596:11
**documentation** [1] - 1515:17
**documents** [43] - 1286:7, 1286:9, 1311:6, 1321:7, 1324:1, 1324:2, 1324:5, 1362:6, 1372:3, 1372:7, 1395:3, 1395:4, 1405:5, 1407:11, 1407:12, 1407:17, 1408:17, 1417:4, 1417:6, 1426:5, 1436:9, 1438:1, 1438:17, 1449:24, 1460:19, 1460:21, 1469:1, 1469:3, 1472:5, 1474:12, 1475:16, 1477:4, 1514:19, 1516:10, 1518:5, 1519:13, 1520:11, 1528:11, 1535:25, 1536:20, 1554:20, 1589:14
**dollar** [5] - 1400:13, 1489:12, 1489:23, 1489:24
**dollars** [2] - 1400:3, 1400:7
**Donahoe** [5] - 1553:24, 1555:9, 1556:6, 1556:16, 1557:11
**done** [46] - 1290:1, 1290:13, 1290:17, 1320:24, 1323:4, 1323:10, 1328:11, 1329:4, 1329:7, 1329:12, 1330:4, 1333:14, 1336:22, 1387:23, 1389:6, 1389:23, 1395:17, 1395:22, 1400:10, 1400:22, 1425:4, 1438:23, 1441:18, 1445:5, 1449:2, 1449:18, 1449:22, 1452:8, 1455:15, 1470:17, 1474:24, 1475:1, 1483:17, 1508:14, 1510:5,

1511:6, 1521:15, 1555:11, 1556:25, 1558:10, 1558:11, 1562:1, 1574:14, 1590:1
**door** [1] - 1330:2
**double** [10] - 1276:22, 1291:5, 1291:14, 1340:9, 1340:11, 1341:11, 1341:13, 1342:9, 1527:12, 1527:25
**Double** [1] - 1340:5
**double-check** [1] - 1341:11
**double-spaced** [1] - 1340:9
**doubt** [1] - 1451:6
**down** [77] - 1276:23, 1295:6, 1303:18, 1331:1, 1340:9, 1348:8, 1348:11, 1363:24, 1371:18, 1375:21, 1377:19, 1380:2, 1381:6, 1382:14, 1382:23, 1383:8, 1384:15, 1393:9, 1394:15, 1394:18, 1402:8, 1411:22, 1417:19, 1418:13, 1419:8, 1419:23, 1440:17, 1448:9, 1455:13, 1456:16, 1459:5, 1462:8, 1462:24, 1463:22, 1464:3, 1464:6, 1464:9, 1464:18, 1466:21, 1467:4, 1467:13, 1467:20, 1469:23, 1477:23, 1481:7, 1481:12, 1481:21, 1481:23, 1482:24, 1483:22, 1483:23, 1495:6, 1505:22, 1510:10, 1511:9, 1524:17, 1525:19, 1527:22, 1528:6, 1530:15, 1533:2, 1533:10, 1547:6, 1550:22, 1552:24, 1553:23, 1555:20, 1563:23, 1571:14, 1574:18, 1577:20, 1587:13, 1588:17, 1589:12, 1601:4
**download** [12] - 1285:6, 1308:3, 1415:11, 1416:14, 1418:2, 1418:8, 1419:3, 1535:12, 1535:13, 1545:16, 1573:19, 1596:14
**downloadable** [3] - 1490:23, 1534:8, 1543:4
**downloaded** [7] - 1381:21, 1415:13, 1443:8, 1445:4, 1483:2, 1532:16, 1537:21
**downloading** [7] - 1284:25, 1285:5, 1334:21, 1335:6, 1418:11, 1543:12, 1543:13
**downloads** [3] - 1308:2, 1417:20, 1417:22
**downward** [1] - 1587:15
**Dr** [84] - 1271:8, 1272:4, 1272:11, 1272:23, 1275:8, 1276:14, 1277:2, 1277:13, 1280:21, 1282:8, 1282:21, 1285:18, 1292:2, 1292:17, 1294:2, 1309:2, 1310:19, 1312:8, 1312:12, 1321:5, 1328:7, 1328:9, 1328:17, 1338:11, 1342:13, 1343:13, 1344:9, 1346:16, 1349:22, 1350:9, 1350:22, 1351:8, 1354:20, 1357:22, 1358:3, 1359:14, 1360:5, 1360:14, 1362:24, 1368:5, 1371:7, 1372:2, 1373:3, 1374:4, 1375:4, 1376:17, 1376:24, 1393:1, 1393:25, 1395:24, 1401:16, 1402:10, 1405:3, 1411:15, 1415:6, 1415:17, 1415:18, 1428:9, 1443:14, 1449:13, 1451:3, 1451:25, 1452:1, 1470:16,

1471:4, 1471:5, 1478:24, 1479:1, 1479:15, 1488:23, 1492:16, 1492:24, 1516:24, 1517:8, 1536:2, 1537:11, 1542:8, 1548:9, 1548:12, 1548:22, 1548:24, 1557:21, 1600:11
**drag** [1] - 1578:4
**dragging** [1] - 1577:20
**drained** [1] - 1557:4
**draining** [1] - 1557:10
**draw** [1] - 1419:13
**drawings** [1] - 1599:7
**drew** [1] - 1351:20
**drive** [46] - 1280:21, 1280:23, 1280:24, 1281:2, 1281:3, 1281:4, 1281:14, 1282:2, 1282:5, 1282:7, 1282:9, 1284:9, 1291:20, 1291:23, 1292:9, 1292:13, 1292:21, 1293:1, 1293:15, 1331:10, 1351:3, 1355:23, 1355:25, 1370:19, 1454:13, 1456:16, 1462:19, 1462:22, 1464:10, 1475:9, 1476:3, 1520:19, 1521:5, 1569:2, 1569:3, 1569:4, 1569:15, 1572:16, 1576:15, 1589:2, 1589:6, 1589:7, 1589:9, 1589:13, 1593:9
**driver** [1] - 1490:14
**drives** [11] - 1279:21, 1279:24, 1280:3, 1280:9, 1281:6, 1282:11, 1282:16, 1356:6, 1356:9, 1356:17
**driving** [1] - 1490:10
**drove** [2] - 1383:11, 1383:14
**DSP** [1] - 1367:8
**due** [2] - 1434:4, 1459:5
**Dulcimer** [3] - 1455:10, 1455:11, 1461:9
**duplicative** [1] - 1448:24
**during** [17] - 1270:19, 1303:13, 1303:25, 1305:23, 1307:8, 1311:17, 1348:3, 1349:4, 1350:5, 1361:18, 1553:10, 1553:13, 1556:17, 1556:22, 1557:1, 1584:11, 1599:24
**During** [1] - 1348:11
**DX** [10] - 1268:20, 1268:21, 1268:22, 1268:25, 1269:6, 1308:21, 1310:6, 1310:19, 1394:1, 1575:10

# E

**earbuds** [4] - 1466:5, 1467:5, 1467:7, 1468:12
**earliest** [1] - 1364:1
**early** [5] - 1284:25, 1364:2, 1364:25, 1390:3, 1432:15, 1492:2, 1581:17, 1581:20
**earned** [1] - 1540:22
**earnings** [1] - 1435:19
**earphones** [1] - 1466:5
**ease** [1] - 1416:18
**easier** [3] - 1406:5, 1418:24, 1425:4
**easiest** [1] - 1336:14
**easily** [8] - 1289:21, 1317:18, 1318:17,

1339:2, 1551:24, 1552:11, 1552:21, 1553:10

**easy** [11] - 1384:2, 1476:7, 1476:10, 1476:11, 1480:4, 1481:25, 1482:5, 1482:22, 1520:10, 1523:4, 1523:11

**economic** [1] - 1496:12

**effect** [4] - 1413:25, 1422:1, 1470:21, 1470:25

**effective** [1] - 1294:6

**efficiently** [1] - 1301:11

**efforts** [2] - 1473:8, 1514:14

**eight** [8] - 1360:11, 1370:14, 1371:7, 1373:7, 1374:10, 1374:11, 1557:2, 1557:9

**eighth** [1] - 1361:11

**Eighties** [1] - 1390:3

**either** [32] - 1280:15, 1318:19, 1327:4, 1355:23, 1363:7, 1370:19, 1374:11, 1378:21, 1389:23, 1400:1, 1416:17, 1427:14, 1430:21, 1437:5, 1440:6, 1442:20, 1445:6, 1449:25, 1456:23, 1461:11, 1477:17, 1478:22, 1488:12, 1501:7, 1532:2, 1548:15, 1550:2, 1580:4, 1589:4, 1596:5, 1599:20

**eject** [1] - 1593:9

**elected** [2] - 1310:8, 1312:9, 1510:6

**election** [1] - 1310:1

**Election/Restriction** [1] - 1309:11

**electrical** [1] - 1568:4

**Electrical** [1] - 1568:5

**electronic** [3] - 1388:17, 1395:1, 1402:6

**electronic-related** [1] - 1388:17

**electronics** [1] - 1391:19

**elects** [1] - 1310:20

**elements** [6] - 1373:14, 1374:9, 1435:9, 1470:1, 1560:24, 1571:3

**elicit** [1] - 1328:5

**eliminated** [1] - 1311:25

**Elmo** [1] - 1345:9

**elsewhere** [1] - 1576:11

**Elvis** [3] - 1586:4, 1588:8, 1588:10

**email** [4] - 1380:7, 1553:23, 1569:14

**emails** [2] - 1569:17, 1569:18

**embark** [2] - 1453:16, 1581:18

**embarking** [1] - 1424:25

**embodied** [1] - 1485:9

**embodiment** [6] - 1295:2, 1296:21, 1352:14, 1352:25, 1353:5, 1354:1

**embodying** [1] - 1424:23

**embrace** [1] - 1336:5

**emphasized** [1] - 1519:14

**employed** [3] - 1379:11, 1572:11, 1572:18

**employment** [1] - 1580:16

**en** [2] - 1333:25

**enclosure** [2] - 1456:7, 1572:20

**encoding** [1] - 1283:19

**encompass** [1] - 1557:24

**encrypt** [2] - 1569:14

**encrypting** [1] - 1569:17

**encryption** [2] - 1569:13, 1569:20

**end** [16] - 1337:2, 1345:2, 1345:3, 1346:22, 1346:24, 1361:10, 1385:22, 1418:17, 1437:8, 1490:16, 1524:16, 1524:19, 1530:24, 1578:2, 1579:7, 1584:7

**ended** [4] - 1579:11, 1580:6, 1580:8, 1581:4

**ending** [1] - 1374:1

**endless** [3] - 1304:15, 1304:25, 1305:4

**ends** [1] - 1576:21

**enforceable** [3] - 1385:18, 1392:6, 1413:6

**engineer** [3] - 1503:8, 1582:2, 1583:7

**engineering** [2] - 1567:11, 1568:4

**Engineering** [1] - 1568:5

**engineers** [5] - 1314:18, 1423:2, 1582:9, 1582:18

**enlarge** [1] - 1598:22

**entail** [1] - 1449:17

**enter** [4] - 1393:12, 1397:13, 1397:21, 1534:6

**entering** [1] - 1506:10

**enters** [5] - 1272:1, 1337:24, 1377:2, 1423:19, 1471:15

**entire** [11] - 1294:11, 1322:24, 1376:18, 1476:7, 1505:16, 1505:23, 1509:13, 1509:21, 1510:3, 1510:6, 1599:24

**entirely** [2] - 1271:24, 1568:12

**entirety** [1] - 1321:8

**entitled** [2] - 1377:20, 1511:16

**entry** [2] - 1442:12, 1443:18

**equal** [2] - 1400:5, 1520:15

**equally** [5] - 1478:10, 1482:4, 1482:10, 1482:11, 1518:14

**equals** [2] - 1481:8, 1484:3

**equitable** [1] - 1422:17

**equivalent** [12] - 1330:11, 1331:19, 1336:2, 1336:4, 1337:11, 1337:12, 1337:15, 1359:8, 1359:11, 1366:2, 1367:14, 1600:1

**equivalents** [24] - 1270:9, 1320:12, 1330:12, 1331:17, 1334:20, 1335:3, 1335:5, 1335:8, 1337:5, 1354:23, 1355:3, 1359:8, 1359:15, 1359:24, 1360:6, 1362:5, 1362:8, 1366:23, 1374:12, 1375:8, 1375:9, 1375:10

**era** [1] - 1570:22

**errors** [1] - 1372:18

**especially** [6] - 1284:17, 1285:3, 1285:4, 1330:24, 1343:3, 1565:8

**essentially** [1] - 1345:13

**establish** [3] - 1560:8, 1560:25, 1565:7

**established** [9] - 1304:15, 1310:13, 1430:10, 1430:13, 1434:25, 1452:23, 1493:20, 1494:10, 1560:5

**estimate** [11] - 1434:6, 1453:22, 1467:20, 1470:2, 1485:6, 1485:10, 1510:12, 1518:13, 1522:5, 1529:18,

1532:2

**estimated** [7] - 1454:2, 1454:14, 1454:19, 1454:25, 1469:8, 1472:2, 1511:7

**estimates** [4] - 1462:19, 1521:15, 1528:7, 1533:3

**estimating** [6] - 1454:6, 1454:22, 1457:7, 1457:21, 1465:1, 1467:24

**et** [7] - 1307:2, 1435:10, 1456:8, 1476:12, 1480:7, 1482:19, 1484:3

**evaluate** [1] - 1377:24

**evening** [1] - 1600:23

**event** [3] - 1383:13, 1396:22, 1504:23

**eventually** [5] - 1370:5, 1437:5, 1579:20, 1581:5, 1581:19

**evidence** [13] - 1315:16, 1321:19, 1329:10, 1329:18, 1362:17, 1366:21, 1367:10, 1453:6, 1453:8, 1564:22, 1566:9, 1566:16, 1566:22

**evidently** [2] - 1333:24, 1420:7

**evolved** [2] - 1388:13, 1391:17

**evolving** [2] - 1383:19, 1383:21

**exact** [5] - 1289:19, 1293:17, 1295:19, 1519:10, 1550:2

**exactly** [14] - 1274:16, 1284:3, 1288:9, 1291:13, 1292:5, 1303:15, 1328:13, 1342:1, 1369:9, 1432:14, 1432:22, 1560:6, 1566:14

**examination** [5] - 1271:7, 1272:4, 1328:7, 1336:16, 1338:7

**EXAMINATION** [7] - 1272:9, 1350:20, 1386:3, 1491:21, 1557:18, 1567:3, 1594:8

**examined** [1] - 1362:19

**examiner** [3] - 1341:3, 1341:16, 1342:12

**example** [89] - 1273:25, 1291:25, 1294:24, 1296:11, 1296:12, 1296:20, 1297:21, 1304:25, 1307:21, 1315:24, 1324:12, 1324:13, 1343:3, 1389:16, 1394:1, 1397:6, 1398:4, 1398:14, 1398:18, 1399:4, 1403:10, 1404:2, 1404:22, 1404:25, 1406:21, 1414:21, 1415:9, 1416:21, 1418:15, 1418:20, 1419:12, 1422:4, 1427:18, 1430:5, 1437:11, 1438:9, 1438:16, 1438:23, 1439:20, 1441:3, 1443:6, 1444:1, 1459:9, 1460:25, 1462:2, 1462:21, 1465:14, 1465:18, 1466:9, 1466:13, 1467:7, 1468:15, 1477:12, 1480:18, 1481:3, 1482:20, 1498:20, 1499:8, 1499:13, 1500:4, 1500:5, 1505:15, 1509:24, 1510:23, 1515:7, 1517:18, 1519:2, 1520:19, 1520:21, 1526:14, 1530:22, 1539:18, 1548:2, 1549:15, 1549:21, 1553:17, 1558:10, 1559:11, 1559:16, 1560:1, 1560:19, 1560:21, 1561:8, 1568:22, 1569:10, 1577:4, 1590:25, 1592:11

**examples** [9] - 1290:18, 1298:13, 1339:6, 1353:24, 1391:2, 1398:7,

1398:17, 1522:22, 1599:23
**exceeds** [1] - 1362:13
**excellent** [2] - 1334:14, 1337:17
**except** [3] - 1288:25, 1315:9, 1340:23
**exceptions** [1] - 1315:9
**excerpt** [1] - 1302:19
**excerpts** [1] - 1368:6
**exchanged** [2] - 1408:8, 1490:1
**exclude** [1] - 1321:3
**exclusive** [5] - 1495:22, 1495:25, 1496:3, 1496:4, 1496:6
**exclusively** [4] - 1380:3, 1380:15, 1380:18, 1502:24
**excuse** [7] - 1303:6, 1311:10, 1324:18, 1349:11, 1447:17, 1496:19, 1545:17
**excused** [1] - 1375:19
**executive** [2] - 1379:14, 1379:15
**Executives** [4] - 1389:15, 1389:24, 1390:1, 1390:2
**exemplary** [1] - 1353:25
**exercise** [3] - 1453:17, 1469:17, 1505:24
**exhaustive** [2] - 1496:7, 1496:8
**Exhibit** [247] - 1265:1, 1265:2, 1265:3, 1265:4, 1265:5, 1265:6, 1265:7, 1265:8, 1265:9, 1265:10, 1265:11, 1265:12, 1265:13, 1265:14, 1265:15, 1265:16, 1265:17, 1265:18, 1265:19, 1265:20, 1265:21, 1265:22, 1265:23, 1265:24, 1265:25, 1266:2, 1266:4, 1266:5, 1266:7, 1266:8, 1266:9, 1266:10, 1266:11, 1266:12, 1266:13, 1266:14, 1266:15, 1266:16, 1266:18, 1266:19, 1266:20, 1266:21, 1266:23, 1266:24, 1266:25, 1267:1, 1267:2, 1267:3, 1267:4, 1267:5, 1267:6, 1267:7, 1267:8, 1267:9, 1267:10, 1267:11, 1267:12, 1267:13, 1267:14, 1267:15, 1267:16, 1267:17, 1267:18, 1267:19, 1267:20, 1267:21, 1267:22, 1267:23, 1267:24, 1268:1, 1268:2, 1268:3, 1268:4, 1268:5, 1268:6, 1268:7, 1268:8, 1268:9, 1268:10, 1268:11, 1268:12, 1268:13, 1268:16, 1268:17, 1268:18, 1268:19, 1268:23, 1268:24, 1269:1, 1269:2, 1269:3, 1269:4, 1269:5, 1269:6, 1269:7, 1269:8, 1269:9, 1269:10, 1269:11, 1269:12, 1269:13, 1269:14, 1269:15, 1269:16, 1272:8, 1275:24, 1277:24, 1294:20, 1302:18, 1302:24, 1303:3, 1305:21, 1322:15, 1323:16, 1325:8, 1339:16, 1339:20, 1344:5, 1344:14, 1351:21, 1351:25, 1352:4, 1352:20, 1353:8, 1354:6, 1355:13, 1357:13, 1358:10, 1360:22, 1362:9, 1362:24, 1363:23, 1364:17, 1365:5, 1366:14, 1372:3, 1378:20, 1386:15, 1386:17, 1396:6, 1402:17, 1404:4, 1404:10, 1405:16, 1405:19, 1405:22, 1405:24, 1405:25, 1406:25, 1407:2, 1407:3, 1407:5, 1408:3, 1408:6, 1408:11,

1408:15, 1408:17, 1408:21, 1409:15, 1410:2, 1415:9, 1417:7, 1419:14, 1425:25, 1426:6, 1436:11, 1437:21, 1438:11, 1438:15, 1439:1, 1439:21, 1439:24, 1441:14, 1441:17, 1441:24, 1444:8, 1444:15, 1444:18, 1445:21, 1445:23, 1446:16, 1446:20, 1446:25, 1447:17, 1455:4, 1455:6, 1455:9, 1455:22, 1457:14, 1457:24, 1458:1, 1459:8, 1459:9, 1459:11, 1461:3, 1461:7, 1461:18, 1462:12, 1463:13, 1463:19, 1465:9, 1468:17, 1468:18, 1474:22, 1474:23, 1479:5, 1479:6, 1479:14, 1499:4, 1517:10, 1517:11, 1517:13, 1541:17, 1542:22, 1553:21, 1554:8, 1559:15, 1559:16, 1559:20, 1559:25, 1560:1, 1560:2, 1560:3, 1560:7, 1560:11, 1560:20, 1561:6, 1561:9, 1561:18, 1561:20, 1561:21, 1563:9, 1575:10, 1575:18, 1576:22, 1584:25, 1591:25, 1592:14, 1592:25, 1594:20, 1595:16, 1597:8, 1599:4, 1600:9
**exhibit** [5] - 1311:7, 1325:3, 1325:9, 1326:18, 1343:25, 1344:17, 1344:18, 1345:2, 1372:10, 1394:7, 1405:15, 1405:18, 1417:7, 1423:23, 1449:8, 1460:2, 1471:3, 1520:5, 1541:18, 1541:21, 1553:18, 1558:15, 1559:13, 1559:22, 1600:10
**exhibits** [5] - 1321:19, 1322:14, 1495:1, 1560:17, 1584:22
**Exhibits** [4] - 1266:17, 1444:5, 1445:11, 1446:11
**exist** [5] - 1381:10, 1381:11, 1381:13, 1388:15
**existed** [2] - 1281:6, 1363:18
**exists** [3] - 1381:9, 1403:22, 1411:17
**exits** [6] - 1320:7, 1375:20, 1419:21, 1470:9, 1528:19, 1601:3
**expect** [2] - 1278:16, 1328:6
**expectation** [1] - 1485:22
**expectations** [3] - 1460:17, 1541:7
**expensive** [1] - 1462:23
**experience** [3] - 1285:7, 1286:5, 1554:25
**expert** [20] - 1289:22, 1313:3, 1375:23, 1390:20, 1415:17, 1433:13, 1488:23, 1492:10, 1504:14, 1512:6, 1516:12, 1529:23, 1545:17, 1551:13, 1551:19, 1552:14, 1554:15, 1566:19, 1590:11, 1590:15
**expertise** [2] - 1371:22, 1492:21
**experts** [6] - 1320:21, 1410:20, 1421:2, 1537:18, 1590:16, 1594:24
**explain** [10] - 1353:17, 1362:20, 1366:4, 1366:17, 1371:16, 1481:5, 1523:18, 1553:11, 1575:23, 1592:15
**explained** [1] - 1566:5
**explains** [1] - 1355:15
**explanation** [1] - 1335:11

**explicit** [2] - 1292:23, 1292:25
**expressed** [1] - 1308:8
**extended** [2] - 1343:7, 1364:3
**extends** [1] - 1364:25
**extensive** [3] - 1429:7, 1439:17, 1445:19
**extensively** [1] - 1304:23
**extent** [22] - 1309:24, 1322:6, 1399:8, 1399:15, 1399:17, 1400:20, 1401:8, 1409:2, 1409:8, 1412:18, 1435:4, 1453:5, 1453:8, 1499:18, 1500:3, 1539:22, 1539:24, 1541:14, 1545:6, 1545:12, 1545:24, 1546:4
**Extent** [1] - 1409:1
**extra** [2] - 1550:23, 1593:11
**extra-special** [1] - 1593:11
**Exxon** [1] - 1391:7
**eye** [1] - 1474:5

# F

**F.3d** [1] - 1331:24
**face** [1] - 1588:23
**faceup** [1] - 1425:12
**facing** [1] - 1586:13
**fact** [48] - 1271:14, 1279:15, 1292:20, 1295:16, 1305:3, 1311:24, 1312:21, 1313:19, 1317:19, 1329:4, 1329:6, 1335:4, 1351:14, 1351:16, 1353:4, 1361:13, 1366:25, 1367:9, 1409:10, 1417:19, 1419:9, 1429:23, 1430:5, 1431:23, 1435:20, 1439:5, 1439:9, 1459:5, 1485:16, 1490:15, 1492:8, 1492:12, 1492:17, 1493:8, 1496:10, 1497:21, 1498:11, 1507:2, 1518:1, 1521:2, 1542:22, 1546:23, 1547:23, 1548:24, 1550:4, 1578:1, 1590:23, 1593:7
**Factor** [12] - 1424:7, 1424:12, 1434:21, 1435:3, 1452:25, 1453:3, 1453:4, 1453:5, 1496:14, 1497:3, 1507:2
**factor** [6] - 1424:8, 1435:6, 1452:21, 1489:4, 1506:13, 1528:3
**Factors** [1] - 1553:5
**factors** [35] - 1328:21, 1329:17, 1410:12, 1410:22, 1410:24, 1411:1, 1411:2, 1411:3, 1411:8, 1411:13, 1411:16, 1411:18, 1411:20, 1412:3, 1415:1, 1415:2, 1415:3, 1424:6, 1424:9, 1426:4, 1428:6, 1428:18, 1433:25, 1434:3, 1434:15, 1434:19, 1434:20, 1434:21, 1435:13, 1452:23, 1495:15, 1495:18, 1495:22, 1496:1
**facts** [2] - 1493:2, 1496:12
**Fadell** [11] - 1376:23, 1429:23, 1431:23, 1461:10, 1462:3, 1473:7, 1474:17, 1490:22, 1534:7, 1583:3, 1589:1
**Fadell's** [5] - 1330:25, 1432:19, 1516:9, 1516:21, 1517:6

**failure** [1] - 1429:22

**fair** [12] - 1287:7, 1413:19, 1434:13, 1485:17, 1497:17, 1498:23, 1509:5, 1529:15, 1534:12, 1538:10, 1549:1, 1549:5

**fairest** [1] - 1509:6

**fairly** [25] - 1270:10, 1306:10, 1309:23, 1317:18, 1318:17, 1334:1, 1335:14, 1339:2, 1391:16, 1410:17, 1416:2, 1431:20, 1439:15, 1439:17, 1440:16, 1443:15, 1445:19, 1447:6, 1462:23, 1465:11, 1474:15, 1513:19, 1520:19, 1534:18, 1579:19

**fairness** [2] - 1328:8, 1565:7

**fall** [2] - 1452:8, 1581:7

**familiar** [7] - 1341:13, 1379:18, 1391:11, 1440:8, 1500:1, 1537:17, 1596:11

**family** [3] - 1384:23, 1500:18, 1504:10

**Family** [7] - 1395:9, 1412:23, 1424:17, 1428:21, 1428:24, 1430:3, 1430:8

**fan** [1] - 1554:22

**far** [17] - 1279:8, 1283:5, 1283:13, 1299:3, 1300:18, 1330:23, 1383:9, 1395:7, 1407:19, 1418:12, 1421:1, 1516:6, 1516:23, 1522:23, 1523:3, 1582:4, 1589:15

**fashion** [1] - 1402:13

**fast** [3] - 1364:12, 1482:7, 1521:23

**faster** [1] - 1418:24

**favorite** [1] - 1301:8

**feature** [8] - 1294:7, 1450:13, 1451:11, 1509:22, 1583:13, 1587:16, 1588:13, 1592:6

**features** [33] - 1395:4, 1395:19, 1426:21, 1427:3, 1447:12, 1447:22, 1448:11, 1450:5, 1450:8, 1451:21, 1470:3, 1472:5, 1472:8, 1474:3, 1474:13, 1475:2, 1477:2, 1479:2, 1479:20, 1510:13, 1510:19, 1511:3, 1511:9, 1517:3, 1520:12, 1521:10, 1537:4, 1539:5, 1548:20, 1550:23, 1551:9, 1558:19, 1583:12

**February** [5] - 1363:11, 1363:18, 1364:4, 1364:8, 1582:17

**federal** [2] - 1299:21, 1341:22

**Federal** [4] - 1325:19, 1333:6, 1333:23, 1565:5

**fee** [1] - 1509:4

**feed** [1] - 1575:5

**fellow** [1] - 1583:5

**felt** [2] - 1485:22, 1486:2

**fetch** [3] - 1343:18, 1345:17, 1345:24

**few** [14] - 1350:22, 1390:6, 1391:2, 1401:21, 1417:19, 1432:23, 1433:7, 1433:10, 1447:8, 1455:14, 1462:13, 1491:19, 1570:6, 1592:9

**fictitious** [5] - 1277:20, 1278:3, 1278:18, 1278:22, 1296:25

**field** [1] - 1549:22

**fifth** [3] - 1325:3, 1325:14, 1380:2

**figure** [13] - 1275:10, 1294:24, 1329:3, 1353:4, 1368:20, 1460:2, 1469:23, 1482:16, 1484:12, 1490:9, 1490:10, 1577:2, 1577:18

**Figure** [21] - 1277:7, 1294:20, 1294:23, 1294:25, 1296:16, 1297:5, 1297:7, 1297:9, 1297:13, 1297:15, 1297:18, 1297:20, 1307:6, 1307:12, 1307:20, 1352:17, 1352:21, 1352:23, 1353:6, 1353:22, 1599:9

**figures** [9] - 1297:23, 1401:21, 1402:5, 1402:15, 1408:16, 1451:25, 1452:3, 1452:11

**figuring** [1] - 1582:10

**file** [43] - 1271:23, 1297:22, 1302:19, 1304:15, 1306:8, 1307:5, 1307:12, 1307:21, 1308:2, 1309:20, 1309:23, 1311:3, 1316:4, 1316:5, 1320:21, 1321:17, 1322:23, 1322:24, 1323:9, 1339:16, 1339:20, 1343:15, 1345:14, 1345:21, 1348:2, 1348:14, 1348:19, 1368:7, 1368:10, 1368:11, 1368:17, 1369:13, 1369:15, 1370:10, 1370:11, 1370:15, 1370:23, 1371:9, 1465:21, 1577:19, 1582:11, 1600:14

**filed** [7] - 1303:12, 1314:11, 1333:11, 1364:23, 1595:24, 1597:20, 1597:21

**files** [14] - 1284:16, 1285:2, 1307:4, 1308:4, 1340:25, 1415:16, 1569:2, 1569:7, 1569:14, 1575:6, 1576:12, 1580:3, 1589:11, 1589:13

**filing** [3] - 1332:21, 1333:16, 1595:11

**filled** [1] - 1450:23

**final** [6] - 1270:21, 1335:20, 1341:9, 1488:11, 1489:12, 1509:11

**finally** [1] - 1557:4

**Financial** [2] - 1387:7, 1388:25

**financial** [21] - 1385:13, 1386:10, 1387:10, 1387:15, 1387:21, 1387:24, 1388:2, 1389:6, 1390:3, 1407:12, 1407:17, 1411:17, 1431:17, 1433:17, 1434:17, 1434:20, 1434:21, 1451:6, 1456:1, 1491:13

**fine** [8] - 1346:14, 1365:16, 1379:1, 1420:22, 1491:8, 1502:17, 1564:24, 1577:15

**finger** [1] - 1587:9

**finish** [3] - 1348:17, 1366:16, 1483:21

**FireWire** [5] - 1401:13, 1477:24, 1598:15, 1598:16, 1599:21

**firm** [2] - 1406:1, 1406:9

**firms** [1] - 1387:20

**firmware** [1] - 1462:7

**first** [71] - 1274:17, 1282:25, 1301:15, 1304:12, 1307:15, 1311:16, 1315:2, 1321:2, 1338:1, 1338:16, 1341:21, 1353:18, 1380:11, 1389:1, 1393:24, 1398:17, 1399:22, 1400:16, 1403:3, 1403:11, 1403:12, 1404:10, 1404:23, 1404:25, 1412:12, 1412:14, 1426:10,

1442:12, 1445:16, 1458:22, 1465:24, 1467:10, 1481:15, 1481:17, 1483:21, 1489:9, 1489:15, 1495:17, 1502:6, 1502:7, 1507:11, 1513:5, 1520:8, 1531:18, 1546:5, 1550:21, 1554:14, 1554:21, 1559:6, 1560:24, 1565:10, 1565:20, 1568:13, 1568:25, 1570:9, 1570:14, 1570:20, 1571:5, 1571:8, 1572:15, 1572:20, 1573:5, 1580:23, 1580:25, 1584:19, 1587:17, 1592:18, 1595:21

**fiscal** [2] - 1403:16, 1458:25

**fit** [4] - 1283:24, 1284:9, 1501:2, 1505:13

**fits** [3] - 1335:24, 1368:1

**five** [2] - 1467:5, 1557:2

**fix** [3] - 1333:14, 1334:22, 1359:17

**fixed** [9] - 1332:20, 1333:10, 1333:11, 1333:15, 1336:7, 1499:22, 1499:24, 1500:7, 1500:8

**flash** [6] - 1355:23, 1356:3, 1356:11, 1356:22, 1356:23, 1370:20

**flashes** [1] - 1591:12

**flat** [3] - 1431:25, 1432:2, 1472:23

**flavor** [1] - 1460:24

**flip** [1] - 1484:18

**floor** [2] - 1274:6, 1396:23

**floppy** [3] - 1281:1, 1282:4, 1572:16

**flow** [4] - 1297:6, 1297:11, 1297:19, 1361:13

**focus** [9] - 1271:2, 1289:7, 1325:24, 1342:17, 1409:24, 1449:25, 1453:14, 1549:6, 1566:12

**focused** [1] - 1473:18

**focusing** [2] - 1296:7, 1334:7

**folders** [1] - 1571:6

**folks** [1] - 1570:2

**follow** [5] - 1334:3, 1360:8, 1396:15, 1527:15, 1563:17

**follow-up** [1] - 1563:17

**followed** [2] - 1410:6, 1410:7

**following** [6] - 1335:15, 1369:10, 1379:3, 1431:22, 1436:25, 1440:2, 1482:13, 1497:14

**fonts** [1] - 1571:18

**food** [2] - 1472:17, 1472:20

**foray** [1] - 1573:5

**forced** [1] - 1333:12, 1425:18

**forecast** [4] - 1323:23, 1434:5, 1465:1, 1530:20

**forecasted** [2] - 1513:6, 1530:18

**forecasts** [1] - 1463:10

**FOREGOING** [1] - 1601:22

**forget** [1] - 1282:7

**form** [5] - 1310:12, 1340:25, 1341:19, 1342:1, 1522:11

**formal** [4] - 1382:13, 1382:16, 1382:21, 1383:17

**formats** [1] - 1582:12

**formed** [2] - 1312:15, 1313:15

**forming** [2] - 1308:7, 1312:22
**forms** [1] - 1353:14
**formula** [4] - 1474:17, 1474:19, 1481:20, 1516:8
**forth** [9] - 1321:19, 1338:4, 1343:11, 1343:12, 1368:14, 1448:19, 1489:13, 1516:17, 1590:25
**forths** [1] - 1341:8
**Fortune** [1] - 1437:17
**forward** [19] - 1338:7, 1343:15, 1345:14, 1345:21, 1416:24, 1454:22, 1476:11, 1488:3, 1526:9, 1535:8, 1535:18, 1535:23, 1536:4, 1536:13, 1536:21, 1536:25, 1537:12, 1544:13, 1578:9
**foundation** [1] - 1562:11
**four** [18] - 1344:4, 1382:2, 1384:14, 1467:5, 1474:1, 1474:9, 1475:20, 1476:9, 1476:10, 1478:5, 1500:16, 1516:7, 1518:7, 1518:11, 1550:22, 1556:2, 1556:5
**four-hour** [1] - 1556:2
**four-to-seven-hour** [1] - 1384:14
**foursquare** [1] - 1332:17
**fourth** [5] - 1426:13, 1426:15, 1476:9, 1480:2, 1562:2
**frame** [3] - 1293:16, 1381:12, 1383:10
**Frank's** [1] - 1333:18
**frankly** [1] - 1376:21
**FRAPs** [1] - 1321:16
**free** [2] - 1381:16, 1573:20
**freight** [2] - 1464:22, 1467:14
**frequency** [1] - 1443:4
**frequently** [3] - 1442:6, 1442:13, 1544:12
**Friday** [4] - 1277:13, 1288:5, 1296:19, 1297:1
**FROM** [1] - 1601:22
**front** [17] - 1305:24, 1332:25, 1339:22, 1352:1, 1398:1, 1398:2, 1398:21, 1398:23, 1398:24, 1399:9, 1402:15, 1428:8, 1490:15, 1531:18, 1541:25, 1581:16, 1584:23
**fronts** [1] - 1398:9
**fruit** [2] - 1497:12, 1497:13
**fruition** [1] - 1504:11
**full** [3] - 1279:15, 1386:6, 1486:8
**function** [13] - 1331:1, 1335:10, 1335:12, 1367:24, 1373:9, 1373:15, 1373:16, 1374:5, 1374:6, 1374:9, 1401:24, 1469:15
**functionalities** [1] - 1562:23
**functionality** [28] - 1428:14, 1469:21, 1485:6, 1485:11, 1510:22, 1511:3, 1525:25, 1526:4, 1528:12, 1528:4, 1530:3, 1531:8, 1531:9, 1531:23, 1532:17, 1534:7, 1534:13, 1534:16, 1543:3, 1550:20, 1550:25, 1551:12, 1573:15, 1579:11, 1581:3, 1581:5, 1582:4, 1596:16

**functions** [8] - 1273:20, 1373:8, 1373:11, 1373:13, 1373:23, 1467:17, 1526:16, 1584:17
**Future** [1] - 1363:13
**future** [5] - 1434:5, 1434:6, 1485:25, 1552:15, 1552:22

# G

**GA** [3] - 1380:3, 1380:5, 1380:12
**gained** [1] - 1582:17
**gamble** [1] - 1572:17
**games** [7] - 1391:14, 1551:9, 1568:20, 1572:10, 1573:17, 1574:2, 1592:20
**gap** [2] - 1270:15, 1433:9
**Garth** [2] - 1427:3, 1427:5
**GartnerG2** [1] - 1552:20
**gas** [1] - 1326:4
**gathering** [1] - 1322:19
**gee** [1] - 1326:2
**general** [11] - 1288:6, 1323:3, 1357:11, 1357:15, 1357:17, 1384:3, 1396:14, 1427:2, 1501:1, 1552:19, 1600:6
**Generally** [1] - 1442:5
**generally** [13] - 1286:7, 1288:3, 1289:15, 1291:24, 1389:6, 1422:20, 1468:8, 1480:8, 1503:3, 1509:19, 1537:17, 1543:10, 1583:17
**generate** [1] - 1541:6
**generated** [1] - 1415:13
**generates** [1] - 1472:12
**Generation** [2] - 1404:25, 1405:1
**generation** [11] - 1405:13, 1407:4, 1407:25, 1408:1, 1426:13, 1426:15, 1490:17, 1550:21, 1584:21
**generations** [11] - 1394:2, 1401:17, 1402:9, 1403:10, 1404:16, 1404:25, 1405:2, 1406:16, 1408:23, 1545:20, 1550:23
**generic** [2] - 1547:5, 1547:8
**generically** [2] - 1547:16, 1590:12
**Genius** [7] - 1426:17, 1426:22, 1426:24, 1427:1, 1427:9, 1539:6
**genre** [1] - 1427:23
**genres** [1] - 1543:19
**gentlemen** [34] - 1272:3, 1311:16, 1320:5, 1337:25, 1375:5, 1377:9, 1378:10, 1384:11, 1385:10, 1407:16, 1419:17, 1470:7, 1491:10, 1493:1, 1504:22, 1507:6, 1509:9, 1514:19, 1515:18, 1516:17, 1517:24, 1518:18, 1519:7, 1522:2, 1528:17, 1538:3, 1547:17, 1553:12, 1565:2, 1566:1, 1567:9, 1578:24, 1590:19, 1600:24
**Georgia** [18] - 1385:19, 1410:12, 1410:15, 1411:8, 1412:3, 1414:25, 1424:6, 1434:19, 1495:11, 1495:15, 1496:10, 1496:18, 1497:3, 1498:9, 1506:3, 1507:3, 1546:3
**Georgia-Pacific** [18] - 1385:19,

1410:12, 1410:15, 1411:8, 1412:3, 1414:25, 1424:6, 1434:19, 1495:11, 1495:15, 1496:10, 1496:18, 1497:3, 1498:9, 1506:3, 1507:3, 1546:3
**germane** [1] - 1566:11
**GET** [1] - 1365:19
**gift** [1] - 1396:11
**gifts** [1] - 1396:3
**gist** [1] - 1555:16
**given** [25] - 1270:24, 1283:20, 1284:20, 1307:16, 1321:8, 1330:25, 1405:10, 1479:18, 1480:7, 1521:9, 1531:24, 1574:12, 1582:5
**glimpse** [1] - 1436:6
**glossary** [1] - 1335:16
**glosses** [1] - 1334:17
**GM** [1] - 1388:11
**Goessling** [2] - 1594:1, 1594:16
**goods** [1] - 1456:12
**Google** [1] - 1391:11
**Gotuit** [25] - 1303:21, 1303:24, 1310:9, 1310:14, 1310:16, 1378:12, 1378:17, 1379:11, 1379:16, 1380:5, 1380:12, 1380:15, 1380:17, 1380:19, 1380:21, 1380:23, 1380:25, 1381:3, 1381:24, 1381:25, 1382:6, 1382:10, 1382:14, 1382:23, 1384:4
**governing** [1] - 1326:16
**governs** [1] - 1326:15
**grabbing** [1] - 1577:19
**graduate** [1] - 1316:9
**graduated** [1] - 1387:18
**graduation** [2] - 1396:3, 1396:11
**grainy** [1] - 1442:9
**GRAMMY** [2] - 1574:11, 1574:12
**grand** [1] - 1456:14
**granted** [2] - 1368:13, 1571:7
**granular** [1] - 1402:11
**granularity** [5] - 1536:7, 1536:17, 1536:19, 1544:17
**graphical** [3] - 1301:11, 1571:6, 1571:9
**graphics** [2] - 1551:1, 1554:23
**great** [6] - 1307:20, 1426:19, 1429:23, 1573:8, 1573:25, 1594:7
**greater** [2] - 1279:9, 1283:5, 1283:13
**greatly** [1] - 1489:22
**grew** [3] - 1491:15, 1567:19, 1567:20
**gross** [7] - 1323:23, 1323:24, 1457:1, 1457:2, 1457:3, 1457:5, 1458:17, 1459:15, 1463:8, 1463:20, 1464:24, 1464:25, 1465:6, 1465:21, 1468:1, 1498:19, 1498:25
**ground** [2] - 1340:11, 1342:8
**grounds** [1] - 1338:6
**groundwork** [1] - 1582:11
**Group** [2] - 1310:9, 1310:21
**group** [2] - 1391:16, 1449:25
**groups** [10] - 1309:8, 1360:11, 1370:14, 1371:8, 1373:7, 1374:10, 1374:11, 1388:23, 1481:17, 1518:11

**guess** [13] - 1321:17, 1322:17, 1323:1, 1372:22, 1376:15, 1384:6, 1388:7, 1420:1, 1420:24, 1421:6, 1507:25, 1514:5, 1516:9
**guesswork** [2] - 1512:23, 1528:9
**guidance** [6] - 1321:9, 1396:18, 1504:25, 1505:9, 1505:12, 1512:9
**guidances** [1] - 1505:1
**guide** - 1396:15
**Guide** [3] - 1367:1, 1367:4, 1367:21
**guideline** [2] - 1320:11, 1336:12
**guidelines** [3] - 1410:6, 1410:7, 1410:11
**guild** [1] - 1330:3
**gut** [1] - 1383:18

# H

**half** [14] - 1280:2, 1280:6, 1280:15, 1282:4, 1282:6, 1282:7, 1290:15, 1421:7, 1464:20, 1465:1, 1466:21, 1514:12, 1521:2, 1523:19
**halfway** [1] - 1295:6
**hand** [14] - 1329:16, 1329:17, 1375:12, 1406:7, 1424:9, 1499:12, 1501:21, 1529:4, 1529:24, 1565:6, 1570:8, 1570:10, 1570:12, 1577:2
**hand-built** [1] - 1570:10, 1570:12
**handing** [2] - 1280:21, 1281:21
**handle** [3] - 1473:13, 1476:14, 1565:14
**handling** [1] - 1491:12
**hands** [2] - 1281:12, 1490:1
**handshake** [1] - 1506:5
**handy** [1] - 1298:14
**happy** [1] - 1371:3
**hard** [37] - 1280:24, 1281:3, 1281:14, 1282:6, 1282:9, 1282:11, 1282:16, 1306:20, 1331:10, 1334:25, 1355:23, 1355:25, 1356:6, 1356:8, 1356:17, 1370:19, 1431:19, 1454:13, 1462:19, 1462:22, 1464:9, 1475:9, 1476:3, 1520:19, 1521:5, 1554:22, 1566:3, 1569:2, 1569:3, 1569:4, 1569:15, 1589:2, 1589:6, 1589:7, 1589:8, 1589:12, 1593:6
**hard-pressed** [1] - 1554:22
**Hardware** [4] - 1367:1, 1367:4, 1367:21, 1517:13
**hardware** [4] - 1367:5, 1578:25, 1579:12, 1582:8
**Harvester** [1] - 1388:12
**harvesting** [1] - 1388:12
**hazard** [1] - 1384:6
**HD** [1] - 1464:9
**head** [1] - 1289:25
**headnotes** [1] - 1336:1
**headphone** [1] - 1291:3
**headphones** [1] - 1555:18
**headquarters** [1] - 1491:19
**headset** [1] - 1340:24

**hear** [4] - 1332:12, 1341:24, 1385:16, 1385:18
**heard** [31] - 1304:20, 1330:4, 1330:5, 1335:4, 1335:9, 1411:14, 1416:3, 1432:19, 1440:14, 1488:25, 1496:7, 1509:15, 1516:6, 1537:3, 1543:8, 1543:10, 1545:5, 1546:16, 1546:20, 1546:22, 1573:2, 1573:6, 1581:18, 1584:10, 1593:15, 1593:18, 1593:21, 1593:24, 1594:15, 1594:23, 1594:24
**hearsay** [2] - 1470:22, 1479:7
**heart** [5] - 1552:15, 1552:22, 1553:10, 1553:13, 1555:10
**held** [2] - 1490:18, 1540:8
**HELLER** [2] - 1567:3, 1594:8
**Heller** [19] - 1564:2, 1565:1, 1566:24, 1567:6, 1567:10, 1570:7, 1574:10, 1575:18, 1576:25, 1577:12, 1584:14, 1587:24, 1591:7, 1591:17, 1592:2, 1593:2, 1593:15, 1594:10, 1594:22
**help** [6] - 1276:20, 1277:8, 1333:5, 1333:7, 1334:19, 1396:15
**helpful** [2] - 1334:18, 1464:2
**HEREBY** [1] - 1601:21
**hermetically** [1] - 1556:13
**herself** [1] - 1491:7
**hidden** [2] - 1425:8, 1554:11
**hide** [2] - 1384:19, 1384:25
**high** [16] - 1341:15, 1355:16, 1365:2, 1432:22, 1435:23, 1475:9, 1476:3, 1490:19, 1515:12, 1516:1, 1520:20, 1562:2, 1572:7, 1572:11, 1573:7, 1585:3
**high-capacity** [2] - 1475:9, 1476:3
**high-cost** [1] - 1520:20
**high-level** [1] - 1341:15
**high-quality** [2] - 1572:7, 1572:11
**high-speed** [1] - 1355:16, 1365:2
**higher** [17] - 1326:15, 1387:3, 1465:3, 1468:8, 1486:23, 1487:9, 1487:10, 1487:12, 1487:13, 1498:18, 1519:2, 1533:12, 1538:24, 1540:22, 1541:6, 1541:9, 1541:11
**highlight** [3] - 1275:23, 1426:14, 1547:6
**highlighted** [3] - 1346:10, 1397:1, 1545:4
**highly** [1] - 1294:5, 1407:11
**himself** [1] - 1494:23
**hint** [1] - 1326:1
**hire** [2] - 1501:23, 1502:4
**hired** [5] - 1548:12, 1548:15, 1583:24, 1584:2, 1584:4
**histories** [2] - 1302:3, 1309:4
**history** [23] - 1271:23, 1302:10, 1302:14, 1302:19, 1303:16, 1304:3, 1304:6, 1306:5, 1306:9, 1309:21, 1309:24, 1311:4, 1339:16, 1339:20, 1342:18, 1342:21, 1343:10, 1368:7, 1368:10, 1368:12, 1368:17, 1369:13, 1369:15

**hit** [2] - 1586:10, 1587:5
**hitting** [1] - 1586:1
**hold** [9] - 1282:22, 1282:23, 1325:7, 1407:8, 1425:10, 1478:12, 1551:4, 1556:5, 1585:3
**holder** [4] - 1507:15, 1508:22, 1508:24, 1509:1
**holding** [1] - 1281:12
**HOLDREITH** [30] - 1271:17, 1271:21, 1275:12, 1275:20, 1286:15, 1286:18, 1287:12, 1299:13, 1310:12, 1341:19, 1341:25, 1350:17, 1350:19, 1350:21, 1359:2, 1360:1, 1360:4, 1362:23, 1371:3, 1371:6, 1372:9, 1372:17, 1373:2, 1374:2, 1420:5, 1420:9, 1420:13, 1420:16, 1420:20, 1420:23
**holds** [3] - 1475:9, 1476:2, 1518:8
**HON** [1] - 1270:3
**Honor** [147] - 1270:6, 1271:4, 1271:6, 1272:6, 1274:8, 1274:22, 1275:12, 1275:22, 1280:18, 1287:12, 1287:16, 1299:13, 1299:17, 1299:25, 1303:8, 1310:12, 1310:15, 1312:6, 1320:25, 1322:1, 1322:10, 1323:3, 1323:21, 1325:10, 1326:25, 1327:23, 1328:16, 1330:6, 1330:16, 1330:22, 1331:12, 1332:13, 1332:25, 1334:10, 1336:19, 1337:1, 1337:17, 1337:21, 1338:9, 1341:25, 1342:4, 1344:17, 1344:23, 1346:12, 1349:15, 1350:17, 1358:20, 1359:13, 1360:2, 1362:12, 1362:17, 1362:21, 1363:6, 1370:25, 1372:6, 1372:22, 1373:18, 1373:22, 1374:17, 1375:25, 1376:11, 1376:20, 1377:4, 1377:6, 1377:12, 1378:8, 1378:20, 1379:1, 1384:10, 1385:3, 1385:6, 1386:14, 1392:14, 1393:12, 1407:9, 1408:5, 1408:12, 1409:14, 1409:17, 1409:21, 1413:21, 1414:7, 1414:9, 1419:24, 1420:17, 1420:18, 1421:9, 1422:15, 1423:13, 1423:15, 1431:8, 1431:12, 1433:12, 1437:20, 1444:4, 1446:15, 1448:5, 1448:8, 1448:12, 1448:22, 1457:23, 1463:14, 1464:12, 1466:14, 1468:16, 1468:20, 1468:23, 1471:11, 1471:17, 1491:3, 1491:4, 1494:2, 1494:25, 1495:4, 1495:6, 1496:3, 1496:23, 1511:11, 1514:1, 1558:22, 1558:24, 1559:17, 1559:22, 1560:15, 1562:8, 1563:8, 1563:11, 1563:15, 1563:21, 1563:24, 1564:1, 1564:5, 1564:14, 1564:23, 1564:25, 1565:23, 1566:5, 1567:1, 1574:6, 1585:4, 1590:9, 1590:18, 1591:5, 1594:3, 1599:1, 1601:8, 1601:11
**Honor's** [1] - 1329:20
**hooking** [1] - 1585:10
**hope** [1] - 1566:21
**hopefully** [1] - 1585:22
**hopes** [1] - 1432:22

**hoping** [1] - 1523:18
**host** [10] - 1315:20, 1315:22, 1316:24, 1317:10, 1318:9, 1319:14, 1319:17, 1338:18, 1597:25, 1598:3
**hosted** [1] - 1500:18
**hour** [4] - 1384:14, 1423:7, 1525:9, 1556:2
**hours** [3] - 1556:5, 1557:2, 1557:10
**house** [17] - 1397:8, 1499:6, 1499:8, 1501:6, 1501:8, 1501:20, 1501:24, 1502:1, 1502:2, 1502:5, 1502:6, 1502:8, 1502:9, 1502:10, 1502:12, 1508:5
**housekeeping** [2] - 1372:2, 1563:7
**Houston** [7] - 1385:14, 1387:14, 1388:24, 1389:2, 1389:19, 1389:24, 1491:16
**HP** [2] - 1363:14, 1391:6
**HUANG** [86] - 1322:23, 1327:23, 1385:3, 1385:6, 1385:9, 1386:5, 1386:14, 1386:19, 1389:11, 1392:14, 1392:17, 1393:12, 1393:15, 1393:16, 1394:8, 1394:19, 1407:23, 1408:5, 1408:12, 1408:13, 1409:14, 1409:21, 1409:22, 1410:3, 1410:5, 1411:7, 1411:10, 1414:9, 1414:10, 1421:9, 1421:15, 1421:17, 1421:19, 1421:24, 1422:2, 1422:7, 1423:21, 1431:12, 1431:13, 1433:16, 1433:20, 1433:23, 1437:20, 1437:23, 1444:4, 1444:10, 1444:11, 1446:15, 1446:22, 1448:12, 1448:22, 1448:24, 1449:8, 1449:11, 1457:23, 1458:3, 1463:18, 1464:15, 1466:17, 1468:16, 1468:23, 1468:24, 1471:17, 1471:18, 1479:12, 1479:13, 1491:3, 1494:2, 1557:19, 1558:22, 1559:7, 1559:17, 1559:20, 1559:25, 1560:8, 1560:10, 1560:15, 1560:19, 1561:1, 1561:4, 1561:5, 1561:19, 1562:13, 1563:7, 1563:11, 1563:15
**Huang** [1] - 1385:10
**hundred** [9] - 1390:6, 1390:17, 1433:7, 1433:10, 1447:7, 1447:8, 1479:17, 1479:19
**hundred-point** [1] - 1479:17
**hundreds** [6] - 1285:8, 1343:9, 1368:11, 1390:18, 1445:17, 1573:18
**hungry** [1] - 1384:22
**HUNSACKER** [1] - 1505:25
**HUNSAKER** [98] - 1320:25, 1322:1, 1322:10, 1322:13, 1323:18, 1323:20, 1324:15, 1324:18, 1324:20, 1324:24, 1325:9, 1325:13, 1326:22, 1326:25, 1327:8, 1327:25, 1328:15, 1329:19, 1330:6, 1330:8, 1337:1, 1407:9, 1408:8, 1409:17, 1413:21, 1413:25, 1414:7, 1446:19, 1448:5, 1448:7, 1457:25, 1463:14, 1464:11, 1466:14, 1468:19, 1471:2, 1471:6, 1471:10, 1471:14, 1479:7, 1491:9, 1491:22, 1494:7, 1494:9, 1494:25, 1495:9, 1495:13,

1495:16, 1496:23, 1497:2, 1499:3, 1499:5, 1504:18, 1504:20, 1506:2, 1506:19, 1506:23, 1506:25, 1507:1, 1511:11, 1511:14, 1513:2, 1513:4, 1513:25, 1514:3, 1516:3, 1516:5, 1519:21, 1519:24, 1522:25, 1523:2, 1524:10, 1524:11, 1527:7, 1527:9, 1528:25, 1529:2, 1537:23, 1538:1, 1541:24, 1542:1, 1554:13, 1555:6, 1555:8, 1557:15, 1558:24, 1559:19, 1559:21, 1561:15, 1562:8, 1562:10, 1563:16, 1563:19, 1563:21
**Hunsaker** [2] - 1491:11, 1558:3
**hypothetical** [39] - 1411:21, 1411:23, 1412:7, 1412:10, 1412:11, 1413:16, 1414:12, 1414:17, 1423:24, 1424:2, 1424:4, 1424:5, 1424:7, 1424:13, 1425:9, 1425:16, 1425:17, 1432:5, 1453:22, 1455:18, 1460:11, 1460:13, 1460:18, 1474:25, 1485:18, 1493:9, 1494:19, 1498:1, 1498:22, 1506:4, 1506:18, 1507:14, 1507:18, 1507:20, 1508:8, 1529:16, 1534:4, 1538:24, 1550:19
**hypothetically** [1] - 1329:10

**I**

**icon** [4] - 1278:12, 1278:16, 1278:20, 1278:22
**ICU** [2] - 1556:12, 1557:3
**idea** [10] - 1270:16, 1304:2, 1311:12, 1317:2, 1323:13, 1328:25, 1335:17, 1384:3, 1555:12, 1578:13
**ideally** [4] - 1397:13, 1412:18, 1413:1, 1488:4
**identical** [4] - 1273:1, 1340:20, 1373:15, 1374:5
**identically** [2] - 1373:24, 1374:12
**identification** [5] - 1307:3, 1465:17, 1478:21, 1516:22
**identified** [23] - 1273:19, 1283:22, 1284:8, 1284:11, 1292:3, 1292:8, 1303:9, 1308:3, 1314:22, 1317:25, 1366:21, 1373:13, 1374:8, 1395:3, 1400:15, 1410:12, 1434:24, 1474:18, 1478:3, 1482:25, 1530:3, 1531:9, 1590:15
**identifiers** [1] - 1307:7
**identifies** [6] - 1428:3, 1475:6, 1476:22, 1477:10, 1479:16, 1530:2
**identify** [16] - 1314:14, 1358:14, 1405:11, 1427:22, 1427:23, 1456:5, 1466:25, 1467:12, 1475:13, 1475:18, 1475:19, 1477:10, 1478:1, 1480:19, 1518:7, 1559:6
**identifying** [3] - 1404:14, 1462:9, 1477:21
**IEEE** [2] - 1363:9, 1363:11
**II** [3] - 1431:21, 1570:19, 1570:20

**Illinois** [2] - 1386:25, 1389:17
**illustrate** [1] - 1360:15
**illustrated** [1] - 1599:14
**illustrative** [3] - 1353:5, 1353:24, 1354:1
**iMac** [2] - 1572:13, 1572:14
**imagine** [2] - 1384:15, 1407:16
**imagined** [1] - 1555:2
**impact** [2] - 1534:10
**implement** [1] - 1357:11
**implementation** [1] - 1352:15
**implemented** [6] - 1295:7, 1295:12, 1295:17, 1352:9, 1352:13, 1367:25
**implements** [1] - 1591:11
**implicate** [1] - 1474:7
**import** [1] - 1575:4
**importance** [7] - 1514:24, 1515:22, 1519:20, 1520:14, 1520:15, 1552:18
**important** [12] - 1305:14, 1308:19, 1328:20, 1367:24, 1428:12, 1475:2, 1482:4, 1482:11, 1517:3, 1520:16, 1534:17, 1534:18
**importantly** [1] - 1490:12
**importing** [1] - 1578:1
**impression** [1] - 1522:11
**improper** [1] - 1562:10
**in-court** [1] - 1407:20
**in-house** [1] - 1580:5
**in-your-lap** [1] - 1574:2
**Inc** [4] - 1381:1, 1381:3, 1382:14, 1384:4
**inches** [6] - 1282:4, 1282:6, 1282:7, 1287:21, 1287:22
**include** [1] - 1357:20, 1543:2
**included** [7] - 1291:23, 1395:1, 1524:20, 1525:21, 1543:4, 1545:21, 1580:18
**includes** [4] - 1368:15, 1387:8, 1394:5, 1401:19
**including** [6] - 1340:24, 1406:7, 1515:10, 1545:23, 1555:11, 1591:2
**inconsistent** [1] - 1291:11
**inconveniencing** [1] - 1423:10
**Incorporated** [1] - 1380:17
**incorporated** [2] - 1490:16, 1550:21
**incorporates** [1] - 1426:17
**increased** [1] - 1540:25
**increment** [1] - 1345:24
**incrementing** [3] - 1343:16, 1345:15, 1345:22
**increments** [2] - 1343:17, 1345:16
**index** [3] - 1372:3, 1372:7, 1479:25
**indicating** [13] - 1363:2, 1363:24, 1365:7, 1438:20, 1459:6, 1459:8, 1476:1, 1477:6, 1482:12, 1483:11, 1483:12, 1484:17, 1584:25, 1592:19
**indicating)** [3] - 1365:9, 1394:12, 1487:1
**indication** [1] - 1431:4
**individual** [5] - 1307:4, 1323:24,

1498:11, 1553:15, 1582:2
  **individuals** [1] - 1449:21
  **industrial** [3] - 1472:12, 1515:11, 1572:19
  **industries** [8] - 1387:23, 1388:4, 1388:6, 1388:8, 1388:11, 1388:16, 1391:16
  **industry** [4] - 1383:11, 1383:24, 1399:5, 1552:19
  **inference** [2] - 1326:1, 1326:9
  **influence** [3] - 1428:6, 1433:25, 1468:2
  **inform** [3] - 1411:20, 1411:21, 1412:18
  **information** [109] - 1286:6, 1291:12, 1353:19, 1363:17, 1391:24, 1394:22, 1394:24, 1395:2, 1395:8, 1395:12, 1395:13, 1400:25, 1401:12, 1402:12, 1405:11, 1406:2, 1406:10, 1406:11, 1406:25, 1407:1, 1408:19, 1408:20, 1408:22, 1408:24, 1409:13, 1411:17, 1411:18, 1412:5, 1412:16, 1416:15, 1419:6, 1425:6, 1425:8, 1429:10, 1430:12, 1430:19, 1431:5, 1435:12, 1435:16, 1435:18, 1436:2, 1436:9, 1438:4, 1438:7, 1440:25, 1444:21, 1445:25, 1446:3, 1446:9, 1446:13, 1447:4, 1447:10, 1448:21, 1448:25, 1450:25, 1451:6, 1453:12, 1453:25, 1455:22, 1456:17, 1456:20, 1458:12, 1458:24, 1460:10, 1460:15, 1462:12, 1462:14, 1462:16, 1463:5, 1463:7, 1463:9, 1463:11, 1463:25, 1464:19, 1465:23, 1466:25, 1468:2, 1468:5, 1469:5, 1473:20, 1475:15, 1477:13, 1478:4, 1478:11, 1480:9, 1483:8, 1487:7, 1488:7, 1514:6, 1517:9, 1518:6, 1518:13, 1518:24, 1521:16, 1522:6, 1522:12, 1522:19, 1522:20, 1522:23, 1528:13, 1550:6, 1558:7, 1558:11, 1559:9, 1561:21, 1562:18, 1576:7
  **informed** [1] - 1310:3
  **informing** [1] - 1343:1
  **infrared** [9] - 1290:23, 1294:5, 1361:18, 1361:21, 1361:25, 1362:15, 1362:19, 1363:18, 1600:15
  **Infrared** [1] - 1294:4
  **infringe** [4] - 1375:1, 1375:2, 1538:5, 1543:7
  **infringed** [8] - 1385:18, 1392:6, 1413:6, 1421:23, 1490:18, 1492:8, 1511:22, 1540:8
  **infringement** [35] - 1285:19, 1308:12, 1309:19, 1309:25, 1310:3, 1311:8, 1312:15, 1312:18, 1313:4, 1317:25, 1331:15, 1343:14, 1374:16, 1390:25, 1392:1, 1392:20, 1394:3, 1396:21, 1401:17, 1409:7, 1412:12, 1413:10, 1414:1, 1414:16, 1414:23, 1424:19, 1488:3, 1492:3, 1492:17, 1493:5, 1507:11, 1542:24, 1543:2, 1545:15, 1566:23
  **infringer** [5] - 1396:24, 1435:4, 1453:6,

  **infringing** [9] - 1331:12, 1331:13, 1413:14, 1414:20, 1510:21, 1510:22, 1511:3, 1590:22
  **initiate** [9] - 1316:4, 1358:12, 1358:16, 1358:19, 1358:24, 1359:4, 1359:5, 1359:10, 1359:12
  **initiates** [1] - 1349:25
  **initiative** [1] - 1382:14
  **initiatives** [1] - 1383:23
  **input/output** [1] - 1462:3
  **inside** [3] - 1283:24, 1284:9, 1367:5
  **installment** [2] - 1499:22, 1499:24
  **instance** [5] - 1316:19, 1362:4, 1436:20, 1533:17, 1545:2
  **instant** [1] - 1340:23
  **instantiation** [1] - 1332:14
  **instead** [10] - 1343:15, 1345:13, 1345:20, 1345:23, 1398:21, 1406:3, 1427:23, 1437:25, 1444:20, 1478:11
  **Institute** [1] - 1389:16
  **instruct** [1] - 1496:4
  **instructed** [4] - 1326:10, 1373:15, 1488:13, 1574:16
  **instruction** [7] - 1270:8, 1270:22, 1320:11, 1330:10, 1332:15, 1375:13, 1377:7
  **instructions** [16] - 1270:20, 1270:21, 1271:1, 1295:24, 1296:1, 1335:20, 1335:21, 1338:1, 1369:10, 1375:16, 1375:17, 1384:25, 1419:18, 1505:8, 1591:2, 1600:25
  **instructive** [1] - 1278:4
  **Instruments** [1] - 1391:6
  **integrated** [1] - 1465:25
  **integrates** [3] - 1475:12, 1477:9, 1518:10
  **integrating** [1] - 1477:8
  **integration** [12] - 1473:15, 1477:11, 1480:25, 1481:13, 1482:7, 1482:10, 1482:23, 1516:15, 1521:23, 1521:24, 1523:20
  **integration/syncing** [1] - 1558:12
  **Intel** [1] - 1296:5
  **Intellectual** [3] - 1387:7, 1389:1, 1389:19
  **intellectual** [8] - 1387:8, 1387:11, 1388:24, 1389:7, 1390:4, 1390:22, 1397:15, 1398:4
  **intention** [2] - 1327:20, 1361:4
  **interchange** [1] - 1338:12
  **interest** [4] - 1303:21, 1303:25, 1304:4, 1382:19
  **interesting** [2] - 1459:1, 1466:3
  **interface** [4] - 1301:12, 1571:6, 1571:10, 1583:11
  **interfaced** [1] - 1581:22
  **interfacing** [1] - 1583:2
  **interim** [8] - 1270:8, 1320:11, 1330:10, 1330:23, 1375:15, 1378:8, 1385:7,

1565:24
  **internally** [1] - 1395:18
  **International** [2] - 1331:24, 1388:11
  **Internet** [18] - 1353:21, 1381:22, 1388:17, 1391:9, 1391:19, 1395:12, 1395:13, 1450:1, 1450:19, 1450:20, 1450:22, 1450:23, 1549:3, 1549:18, 1569:19, 1574:1, 1576:8, 1600:17
  **Internet-type** [1] - 1391:19
  **interpret** [1] - 1505:20
  **interpretation** [3] - 1307:16, 1537:19, 1591:1
  **interrelated** [2] - 1472:20, 1478:15
  **interrogatories** [1] - 1536:3
  **interrogatory** [3] - 1404:11, 1406:17, 1408:2
  **interrupt** [2] - 1508:4, 1520:2
  **interviewed** [2] - 1449:25, 1450:21
  **interviews** [1] - 1439:11
  **introduce** [7] - 1335:3, 1335:8, 1426:9, 1491:5, 1491:6, 1565:9, 1567:8
  **introduced** [17] - 1395:6, 1412:13, 1413:8, 1417:12, 1417:15, 1418:21, 1419:10, 1425:7, 1434:12, 1436:7, 1437:18, 1439:6, 1453:24, 1455:16, 1459:7, 1512:8, 1571:8
  **introduces** [1] - 1426:15
  **introducing** [9] - 1426:12, 1432:12, 1432:14, 1432:15, 1455:12, 1455:20, 1458:16, 1463:6, 1475:3
  **introduction** [4] - 1273:15, 1426:11, 1438:25, 1455:25
  **invalidated** [1] - 1422:4
  **invalidity** [1] - 1414:1
  **Invention** [1] - 1304:8
  **invention** [33] - 1298:24, 1304:19, 1308:15, 1325:24, 1353:5, 1396:24, 1409:4, 1409:5, 1424:23, 1435:5, 1435:8, 1453:6, 1504:24, 1505:2, 1505:4, 1505:15, 1505:19, 1510:17, 1511:23, 1511:24, 1530:1, 1530:7, 1530:11, 1531:1, 1531:5, 1533:8, 1534:24, 1545:13, 1545:25, 1546:4, 1547:18, 1553:4
  **inventions** [3] - 1304:21, 1494:15, 1511:24
  **inventor** [3] - 1497:8, 1597:12, 1597:13
  **inventors** [6] - 1595:5, 1595:23, 1596:7, 1597:3, 1597:19, 1597:24
  **inverse** [1] - 1457:20
  **invested** [1] - 1384:4
  **investigate** [1] - 1288:4
  **investigation** [1] - 1581:19
  **involve** [1] - 1371:21
  **involved** [12] - 1387:12, 1389:14, 1389:22, 1390:17, 1391:10, 1431:7, 1487:16, 1543:11
  **involvement** [1] - 1389:25
  **involves** [1] - 1523:13
  **involving** [6] - 1328:11, 1388:24,

**Iowa** [1] - 1567:18
**iPad** [4] - 1573:21, 1573:22, 1573:24, 1573:25
**IPFC** [3] - 1387:6, 1387:13
**iPhone** [4] - 1573:11, 1573:12, 1583:25, 1584:9
**iPhones** [1] - 1431:18
**iPod** [156] - 1323:24, 1328:2, 1345:12, 1346:17, 1371:14, 1371:17, 1371:25, 1385:23, 1392:25, 1393:24, 1394:2, 1394:4, 1394:5, 1394:10, 1394:11, 1401:2, 1401:5, 1401:7, 1401:18, 1402:21, 1403:8, 1403:25, 1404:22, 1406:12, 1415:11, 1415:13, 1416:15, 1416:20, 1417:12, 1417:13, 1417:16, 1417:23, 1418:3, 1418:5, 1418:19, 1419:7, 1426:12, 1426:16, 1438:18, 1438:19, 1439:13, 1441:19, 1442:5, 1443:10, 1453:23, 1454:18, 1463:22, 1471:21, 1472:4, 1480:10, 1483:19, 1484:11, 1509:21, 1513:7, 1516:7, 1525:1, 1525:3, 1525:4, 1525:20, 1525:24, 1526:2, 1526:8, 1526:18, 1529:25, 1530:6, 1532:9, 1532:16, 1532:21, 1535:14, 1539:2, 1540:23, 1542:20, 1543:13, 1544:13, 1546:1, 1548:7, 1548:20, 1549:11, 1550:10, 1550:11, 1550:12, 1550:17, 1551:8, 1551:10, 1552:22, 1553:8, 1553:12, 1553:16, 1554:23, 1554:25, 1556:9, 1556:13, 1556:21, 1557:3, 1557:9, 1557:11, 1557:22, 1557:23, 1558:1, 1558:3, 1558:4, 1558:7, 1558:9, 1558:10, 1558:12, 1558:13, 1558:19, 1559:9, 1559:10, 1559:14, 1560:13, 1561:11, 1561:23, 1561:25, 1562:4, 1562:17, 1563:5, 1573:2, 1573:5, 1573:14, 1574:10, 1574:12, 1574:15, 1581:20, 1581:24, 1582:5, 1582:7, 1582:9, 1582:25, 1583:3, 1583:11, 1584:13, 1584:19, 1585:10, 1585:16, 1586:8, 1586:17, 1588:19, 1588:22, 1588:23, 1589:22, 1590:5, 1590:8, 1591:8, 1592:17, 1592:18, 1592:24
**iPod's** [1] - 1556:4
**iPods** [28] - 1323:24, 1347:17, 1348:16, 1355:21, 1358:18, 1360:11, 1370:14, 1371:8, 1373:7, 1373:14, 1374:10, 1374:11, 1396:1, 1396:10, 1416:19, 1437:10, 1451:7, 1504:9, 1544:24, 1551:4, 1551:6, 1558:2, 1581:15, 1583:10, 1587:16, 1590:22, 1592:18
**IR** [3] - 1294:5, 1363:12, 1365:8
**IrDA** [17] - 1294:5, 1363:18, 1363:23, 1363:25, 1364:1, 1364:11, 1364:12, 1364:24, 1365:2, 1365:17, 1366:1, 1366:20, 1376:16, 1376:17, 1376:19, 1376:23, 1600:3
**IrOBEX** [1] - 1365:18
**irrelevant** [3] - 1302:13, 1302:15,

1422:1
**IS** [1] - 1601:22
**issuance** [7] - 1332:16, 1332:21, 1332:23, 1336:3, 1336:6, 1336:8, 1422:6
**issue** [36] - 1327:3, 1328:6, 1329:16, 1331:5, 1334:6, 1354:25, 1369:25, 1372:2, 1378:12, 1378:16, 1383:14, 1393:7, 1399:16, 1399:24, 1402:22, 1409:6, 1415:5, 1415:8, 1415:14, 1421:12, 1435:25, 1469:21, 1470:4, 1474:7, 1486:18, 1486:25, 1487:17, 1489:17, 1510:13, 1528:2, 1533:3, 1539:9, 1541:14, 1558:14, 1599:25
**issued** [23] - 1302:8, 1302:11, 1307:19, 1307:24, 1311:22, 1312:1, 1312:10, 1312:19, 1331:3, 1331:8, 1331:9, 1331:18, 1331:21, 1333:11, 1334:9, 1335:24, 1341:4, 1363:20, 1369:17, 1370:2, 1370:3, 1493:24, 1539:10
**issues** [13] - 1308:3, 1311:1, 1321:1, 1322:11, 1329:22, 1331:14, 1338:6, 1343:4, 1411:14, 1411:16, 1415:18, 1470:20, 1491:13
**it'll** [1] - 1427:13
**item** [14] - 1324:16, 1324:21, 1325:4, 1325:15, 1383:14, 1389:1, 1393:24, 1405:1, 1459:15, 1462:23, 1463:22, 1465:24, 1520:20
**items** [21] - 1324:2, 1324:6, 1403:8, 1403:24, 1405:7, 1416:14, 1434:24, 1440:5, 1443:22, 1448:23, 1456:8, 1461:16, 1464:16, 1466:12, 1467:8, 1467:14, 1468:12, 1516:22, 1520:24, 1520:25, 1571:12
**itself** [4] - 1412:22, 1440:23, 1490:18, 1506:14
**iTunes** [66] - 1314:16, 1316:2, 1347:17, 1348:18, 1349:3, 1417:22, 1447:12, 1447:22, 1448:13, 1448:14, 1448:16, 1448:18, 1449:3, 1462:7, 1473:15, 1476:6, 1477:11, 1477:16, 1477:17, 1481:1, 1524:24, 1525:11, 1525:13, 1525:14, 1525:17, 1526:18, 1526:20, 1526:22, 1526:24, 1527:3, 1548:4, 1554:22, 1555:1, 1556:2, 1557:24, 1558:25, 1559:22, 1561:16, 1567:11, 1574:14, 1581:6, 1581:10, 1581:12, 1581:17, 1581:22, 1582:5, 1582:8, 1582:18, 1582:25, 1583:13, 1584:2, 1584:3, 1584:5, 1590:1, 1590:6, 1590:8, 1592:6, 1592:9, 1592:16, 1592:22, 1593:3, 1593:4, 1593:11
**iTunesDB** [2] - 1348:4, 1350:8

---

# J

**jack** [1] - 1291:3
**James** [5] - 1383:3, 1385:4, 1385:12, 1386:7, 1593:22

**JAMES** [3] - 1386:3, 1491:21, 1557:18
**January** [4] - 1441:18, 1581:11, 1581:12, 1581:17
**jazz** [1] - 1427:24
**Jeff** [4] - 1578:24, 1580:17, 1581:20, 1594:19
**Jesse** [1] - 1423:2
**Jim** [1] - 1593:22
**job** [4] - 1474:15, 1566:21, 1582:20
**Jobs** [7] - 1432:4, 1436:25, 1437:1, 1437:16, 1461:12, 1536:3, 1572:22
**jobs** [4] - 1461:12, 1568:6, 1568:22, 1569:10
**jobs'** [2] - 1438:1, 1440:21
**join** [2] - 1390:7, 1583:20
**joined** [3] - 1390:2, 1390:7, 1581:7
**journal** [2] - 1363:1, 1363:9
**journals** [1] - 1363:10
**Judge** [10] - 1334:5, 1356:14, 1356:25, 1357:14, 1357:17, 1369:7, 1369:10, 1369:15, 1369:17
**judging** [1] - 1331:17
**judgment** [1] - 1488:5
**judgments** [1] - 1528:7
**Jukebox** [2] - 1574:14, 1579:24
**jukebox** [9] - 1447:22, 1558:10, 1560:14, 1561:10, 1561:13, 1561:22, 1561:24, 1575:2
**jukeboxes** [1] - 1416:4
**July** [3] - 1474:25, 1500:19, 1553:24
**jumped** [1] - 1452:7
**jumps** [1] - 1384:12
**jumpy** [1] - 1384:20
**June** [10] - 1287:9, 1289:2, 1400:23, 1400:24, 1438:24, 1439:11, 1441:8, 1444:24, 1465:22, 1488:6
**JUNE** [2] - 1270:2, 1601:21
**juror** [2] - 1273:9, 1274:13, 1275:25
**jurors'** [2] - 1274:16, 1274:20
**JURY** [2] - 1270:2, 1270:4
**jury** [81] - 1270:6, 1270:8, 1270:19, 1271:1, 1271:25, 1272:1, 1273:15, 1276:20, 1277:8, 1311:12, 1320:7, 1320:14, 1324:6, 1326:10, 1329:5, 1330:14, 1334:18, 1336:11, 1337:23, 1337:24, 1375:20, 1376:9, 1376:12, 1377:2, 1377:7, 1419:20, 1419:21, 1422:13, 1422:18, 1422:23, 1423:10, 1423:16, 1423:19, 1470:9, 1470:13, 1470:19, 1471:15, 1488:12, 1492:20, 1493:1, 1493:6, 1496:4, 1504:22, 1505:5, 1505:8, 1507:6, 1509:9, 1512:3, 1514:20, 1515:18, 1516:17, 1517:24, 1518:18, 1519:7, 1522:2, 1522:21, 1528:19, 1528:23, 1536:1, 1538:3, 1547:17, 1553:12, 1554:15, 1567:9, 1568:6, 1568:22, 1569:10, 1572:6, 1573:4, 1575:23, 1578:20, 1582:13, 1583:5, 1584:17, 1585:9, 1589:7, 1590:16, 1592:2, 1592:15, 1601:3,

1601:6
**jury's** [1] - 1586:12

## K

**keep** [14] - 1270:18, 1270:25, 1271:14, 1321:18, 1326:18, 1329:13, 1375:15, 1418:3, 1447:8, 1472:17, 1474:4, 1527:20, 1531:18, 1569:20
**keeping** [2] - 1478:20, 1566:7
**keeps** [2] - 1418:5, 1593:3
**Kelly** [1] - 1491:11
**kept** [4] - 1349:13, 1370:10, 1370:11, 1490:21
**KEVIN** [2] - 1272:9, 1350:20
**key** [9] - 1475:5, 1475:24, 1516:7, 1516:9, 1517:20, 1521:22, 1550:22, 1595:1
**keyboard** [2] - 1300:6, 1456:7
**kid** [1] - 1500:15
**kids** [4] - 1396:2, 1491:18, 1500:15, 1500:16
**kilobits** [1] - 1364:21
**kilobytes** [4] - 1288:7, 1289:8, 1290:11, 1290:15
**kilohertz** [1] - 1289:16
**Kincaid** [2] - 1578:24, 1580:17
**kind** [49] - 1270:19, 1278:2, 1281:8, 1297:21, 1300:23, 1301:3, 1307:21, 1316:20, 1317:2, 1320:10, 1328:11, 1328:12, 1334:6, 1334:22, 1335:2, 1351:16, 1354:2, 1355:24, 1358:15, 1367:9, 1399:20, 1401:23, 1411:22, 1413:14, 1427:5, 1427:8, 1447:24, 1453:18, 1455:10, 1457:18, 1459:1, 1469:2, 1469:16, 1469:17, 1472:16, 1474:17, 1479:25, 1481:20, 1486:8, 1502:18, 1514:4, 1529:11, 1537:4, 1566:8, 1568:9, 1586:4, 1586:14, 1592:17, 1592:22
**kinds** [17] - 1281:5, 1281:10, 1281:15, 1282:11, 1283:19, 1291:25, 1311:1, 1316:15, 1317:23, 1322:8, 1342:21, 1351:3, 1353:14, 1354:3, 1358:4, 1358:5, 1571:19
**knocking** [1] - 1511:9
**knowing** [2] - 1371:21, 1432:22
**knowledge** [12] - 1288:6, 1362:5, 1380:16, 1380:20, 1380:22, 1380:24, 1381:10, 1381:12, 1382:7, 1489:18, 1494:17, 1502:22
**knowledgeable** [1] - 1583:17
**known** [6] - 1292:15, 1314:11, 1329:8, 1334:6, 1364:12, 1365:2
**knows** [2] - 1525:10, 1589:15

## L

**labeled** [3] - 1294:23, 1322:20, 1572:12

**Labs** [2] - 1363:14, 1579:21
**laches** [1] - 1422:17
**ladies** [33] - 1272:2, 1311:15, 1320:5, 1337:25, 1375:5, 1377:9, 1378:10, 1384:11, 1385:9, 1407:16, 1419:17, 1470:7, 1491:9, 1493:1, 1504:22, 1507:5, 1509:9, 1514:19, 1515:18, 1516:16, 1517:24, 1518:17, 1519:6, 1522:2, 1528:17, 1538:2, 1547:16, 1553:12, 1565:2, 1566:1, 1567:8, 1590:19, 1600:24
**land** [8] - 1397:8, 1497:11, 1497:12, 1497:13, 1497:19, 1499:8, 1501:13
**landlord** [2] - 1397:10, 1499:17
**landlord-tenant** [1] - 1499:17
**landscape** [1] - 1461:15
**language** [12] - 1273:1, 1273:8, 1275:4, 1283:8, 1331:22, 1342:1, 1342:3, 1345:19, 1354:2
**lap** [1] - 1574:2
**laptop** [5] - 1295:8, 1295:12, 1352:10
**large** [12] - 1281:15, 1284:17, 1285:2, 1300:12, 1322:2, 1391:5, 1391:7, 1490:9, 1513:19, 1513:22, 1573:22
**larger** [8] - 1280:9, 1280:11, 1280:14, 1282:16, 1282:17, 1390:18, 1438:19, 1442:25
**largest** [1] - 1440:6
**last** [24] - 1285:4, 1288:5, 1331:2, 1335:22, 1359:22, 1359:25, 1373:3, 1373:4, 1379:7, 1385:10, 1388:7, 1391:18, 1408:8, 1417:20, 1418:16, 1435:6, 1452:8, 1463:10, 1477:3, 1511:25, 1553:6, 1566:2, 1573:10
**lastly** [1] - 1276:21
**late** [3] - 1327:5, 1570:24, 1583:21
**latest** [2] - 1418:23, 1592:20
**law** [11] - 1326:14, 1332:20, 1334:3, 1334:8, 1389:4, 1413:22, 1414:1, 1506:9, 1510:15, 1510:16, 1511:25
**lawyers** [5] - 1338:3, 1377:15, 1384:14, 1384:24, 1565:16
**layer** [1] - 1339:7
**laying** [1] - 1582:11
**lays** [1] - 1367:5
**lease** [5] - 1397:13, 1398:23, 1500:6, 1500:22, 1501:11
**leasing** [1] - 1502:11
**least** [22] - 1286:2, 1289:1, 1308:14, 1309:12, 1311:7, 1318:14, 1336:11, 1340:24, 1343:20, 1350:4, 1351:8, 1379:18, 1443:11, 1443:12, 1443:21, 1443:25, 1444:2, 1460:23, 1488:13, 1525:10, 1548:1, 1597:3
**leave** [4] - 1502:13, 1505:9, 1512:4, 1512:19
**leaving** [1] - 1568:7
**lecturer** [2] - 1389:3, 1390:13
**led** [1] - 1550:7
**Led** [1] - 1427:12

**left** [20] - 1272:11, 1345:5, 1363:1, 1400:23, 1403:2, 1403:7, 1404:21, 1406:7, 1420:3, 1432:4, 1454:2, 1454:7, 1473:20, 1477:10, 1477:23, 1481:4, 1501:21, 1529:4, 1529:24, 1570:8
**left-hand** [5] - 1406:7, 1501:21, 1529:4, 1529:24, 1570:8
**legal** [15] - 1331:19, 1338:6, 1342:16, 1368:15, 1368:18, 1368:21, 1368:22, 1388:23, 1396:15, 1404:13, 1410:7, 1504:14, 1511:1, 1512:6, 1512:19
**length** [2] - 1415:6, 1415:21, 1439:14, 1439:15, 1443:14
**lengthy** [2] - 1270:10, 1447:6
**less** [11] - 1289:9, 1396:22, 1429:18, 1430:2, 1497:16, 1504:23, 1505:3, 1518:15, 1518:16, 1541:13
**lesser** [1] - 1480:7
**letter** [1] - 1369:12
**level** [12] - 1284:17, 1285:3, 1316:9, 1341:15, 1402:11, 1462:20, 1533:2, 1536:6, 1536:17, 1544:17
**levels** [1] - 1498:19
**libraries** [1] - 1592:11
**library** [12] - 1279:8, 1282:23, 1282:24, 1283:5, 1283:12, 1283:18, 1283:25, 1284:10, 1349:13, 1426:19, 1577:25, 1578:3
**license** [18] - 1327:10, 1327:14, 1328:2, 1328:11, 1395:2, 1397:21, 1424:22, 1424:24, 1489:20, 1493:12, 1493:15, 1501:5, 1501:11, 1502:14, 1502:18, 1502:22, 1503:3, 1509:4
**licensed** [7] - 1380:3, 1380:15, 1380:18, 1386:23, 1386:24, 1493:24, 1494:3
**licensee** [11] - 1378:17, 1397:21, 1424:17, 1425:16, 1494:24, 1496:11, 1496:16, 1497:5, 1502:3, 1506:6, 1509:2
**licenses** [9] - 1327:4, 1327:17, 1327:21, 1328:5, 1328:14, 1328:20, 1329:21, 1430:17, 1463:3
**Licensing** [4] - 1389:14, 1389:24, 1390:1, 1390:2
**licensing** [9] - 1390:17, 1411:16, 1411:17, 1428:18, 1428:20, 1428:23, 1433:24, 1434:2, 1434:15
**licensor** [10] - 1397:20, 1412:23, 1424:15, 1494:24, 1496:11, 1496:16, 1497:4, 1498:11, 1506:6, 1509:3
**life** [9] - 1343:7, 1434:11, 1451:20, 1472:6, 1476:25, 1479:23, 1480:23, 1557:8, 1573:8
**likely** [2] - 1336:15, 1382:16
**likewise** [2] - 1327:14, 1380:3
**lily** [1] - 1330:3
**limine** [8] - 1320:22, 1321:4, 1321:5, 1321:20, 1321:25, 1322:8, 1431:9
**Limine** [3] - 1327:10, 1327:12, 1327:17
**limitation** [1] - 1334:21, 1335:6,

1360:7, 1360:10
**limitations** [1] - 1340:22
**limitations'** [1] - 1335:10
**limited** [6] - 1285:7, 1309:23, 1352:16, 1368:3, 1570:10, 1579:19
**limits** [1] - 1333:13, 1591:1
**line** [50] - 1271:22, 1272:19, 1273:3, 1275:7, 1277:5, 1295:6, 1299:11, 1300:4, 1307:2, 1317:8, 1317:14, 1319:4, 1324:2, 1324:6, 1324:16, 1324:21, 1325:4, 1325:14, 1325:15, 1330:24, 1330:25, 1331:2, 1338:21, 1352:3, 1352:8, 1353:18, 1354:10, 1366:10, 1403:8, 1403:24, 1405:1, 1418:18, 1426:14, 1465:24, 1467:14, 1483:25, 1497:6, 1515:3, 1571:12, 1579:22, 1579:24, 1598:24, 1599:3, 1599:14, 1599:17
**lines** [21] - 1272:18, 1275:6, 1276:15, 1276:16, 1276:17, 1277:3, 1277:4, 1293:24, 1294:3, 1295:4, 1354:12, 1354:15, 1354:17, 1417:19, 1462:24, 1462:25, 1467:5, 1501:19, 1549:9, 1586:13
**link** [12] - 1361:18, 1361:22, 1361:25, 1598:18, 1599:12, 1599:15, 1599:21, 1600:1, 1600:4, 1600:15, 1600:19
**linked** [1] - 1600:17
**links** [1] - 1600:5
**lion's** [2] - 1473:4, 1473:6
**list** [23] - 1300:16, 1322:17, 1354:2, 1363:3, 1388:3, 1408:7, 1424:9, 1440:6, 1440:17, 1442:15, 1495:22, 1495:25, 1496:3, 1496:4, 1496:8, 1563:10, 1577:20, 1587:4, 1587:6, 1587:11, 1587:15, 1588:5
**listed** [1] - 1440:20, 1599:23
**listen** [4] - 1442:7, 1450:15, 1553:10, 1556:17
**listened** [3] - 1428:9, 1452:13, 1490:22
**listener** [6] - 1349:25, 1551:24, 1552:3, 1552:5, 1552:6, 1552:8
**listening** [7] - 1416:18, 1442:4, 1442:14, 1450:16, 1452:15, 1555:11, 1593:14
**lists** [2] - 1515:24, 1573:17
**literal** [1] - 1336:7
**literally** [9] - 1355:25, 1356:3, 1359:5, 1359:7, 1366:22, 1367:12, 1552:23, 1553:9, 1597:18
**Lithium** [1] - 1462:2
**litigating** [1] - 1412:1
**litigation** [9] - 1316:24, 1317:9, 1318:8, 1319:16, 1327:5, 1327:11, 1338:18, 1429:8, 1431:6
**live** [5] - 1377:22, 1377:23, 1378:1, 1491:18, 1582:7
**lived** [1] - 1491:16
**lives** [1] - 1566:4
**LLC** [1] - 1593:16
**LLM** [1] - 1389:2

**load** [5] - 1348:5, 1349:24, 1350:2, 1388:7, 1573:15
**loaded** [4] - 1350:6, 1350:12, 1350:14, 1588:19
**loading** [2] - 1348:2, 1350:2
**local** [2] - 1308:5, 1600:16
**locate** [3] - 1343:16, 1345:14, 1345:21
**located** [2] - 1387:13, 1387:14
**Logan** [37] - 1300:12, 1327:9, 1327:13, 1328:2, 1379:22, 1383:3, 1395:9, 1412:22, 1424:17, 1428:21, 1428:24, 1429:10, 1429:12, 1429:22, 1430:3, 1430:4, 1430:8, 1485:24, 1489:1, 1489:7, 1489:21, 1493:11, 1493:14, 1493:24, 1494:13, 1494:20, 1494:22, 1498:21, 1501:10, 1502:20, 1511:19, 1534:5, 1540:24, 1593:21, 1593:22, 1594:16
**Logan's** [2] - 1429:12, 1434:7
**Logic** [1] - 1365:24
**logistics** [1] - 1467:15
**logo** [1] - 1387:3
**look** [99] - 1270:24, 1278:7, 1280:17, 1283:9, 1284:21, 1293:8, 1293:10, 1296:15, 1296:18, 1296:24, 1298:7, 1299:9, 1299:11, 1304:3, 1305:11, 1305:15, 1306:3, 1306:8, 1308:16, 1317:5, 1320:9, 1329:5, 1332:1, 1340:1, 1340:2, 1341:7, 1341:8, 1343:25, 1344:20, 1346:2, 1358:9, 1367:10, 1369:14, 1369:15, 1372:25, 1380:1, 1380:10, 1388:5, 1393:10, 1399:15, 1400:18, 1402:14, 1402:17, 1405:6, 1417:6, 1426:5, 1431:19, 1431:25, 1436:4, 1438:3, 1439:3, 1439:25, 1440:10, 1441:13, 1442:5, 1442:9, 1443:17, 1443:20, 1444:24, 1446:23, 1447:24, 1451:13, 1451:18, 1454:11, 1458:4, 1459:3, 1459:23, 1460:19, 1460:22, 1462:16, 1464:4, 1464:16, 1465:12, 1465:16, 1469:25, 1470:2, 1475:25, 1476:5, 1481:24, 1484:11, 1487:7, 1498:5, 1498:18, 1518:13, 1518:22, 1522:8, 1526:6, 1529:13, 1529:16, 1534:12, 1535:4, 1553:23, 1555:4, 1576:7, 1586:11
**looked** [35] - 1281:19, 1306:19, 1310:16, 1310:22, 1310:24, 1313:24, 1327:7, 1342:17, 1362:6, 1370:21, 1372:3, 1395:11, 1417:4, 1430:13, 1430:17, 1431:5, 1438:6, 1444:22, 1444:23, 1445:11, 1446:10, 1456:17, 1456:18, 1458:7, 1458:24, 1460:13, 1460:20, 1463:9, 1468:25, 1488:7, 1514:10, 1514:11, 1514:23, 1581:2
**looking** [36] - 1270:17, 1276:23, 1286:8, 1305:16, 1306:22, 1311:6, 1318:4, 1325:11, 1331:16, 1368:23, 1394:6, 1395:5, 1405:15, 1405:18, 1412:9, 1424:1, 1429:13, 1429:15,

1430:8, 1434:2, 1434:14, 1446:8, 1451:5, 1454:21, 1458:15, 1460:10, 1463:5, 1463:24, 1475:2, 1498:4, 1506:13, 1537:24, 1580:1, 1580:4, 1587:4, 1596:10
**looks** [9] - 1291:18, 1329:12, 1348:19, 1441:4, 1457:6, 1547:20, 1554:8, 1572:23
**loop** [3] - 1304:15, 1304:25, 1305:4
**lose** [3] - 1416:20, 1498:17, 1507:24
**loses** [1] - 1509:3
**losses** [1] - 1432:7
**lost** [5] - 1432:8, 1498:4, 1498:5, 1498:12, 1498:15
**loud** [2] - 1585:22, 1585:24
**loudly** [1] - 1341:23
**love** [1] - 1554:23
**low** [4] - 1294:6, 1325:22, 1452:9, 1530:24
**low-cost** [1] - 1294:6
**lower** [6] - 1420:3, 1459:3, 1464:18, 1498:25, 1514:10, 1515:15
**loyalty** [4] - 1472:10, 1473:6, 1514:14, 1515:10
**lump** [12] - 1329:1, 1329:12, 1397:25, 1398:8, 1398:15, 1398:16, 1398:24, 1399:4, 1399:6, 1399:10, 1500:8, 1507:24
**lump-sum** [3] - 1398:15, 1398:24, 1399:10
**lunch** [6] - 1336:15, 1384:22, 1419:16, 1423:9, 1426:3, 1483:10

# M

**M25** [2] - 1404:7, 1404:10
**M26** [3] - 1403:10, 1403:25, 1404:2
**ma'am** [1] - 1423:20
**Mac** [17] - 1418:6, 1418:20, 1438:21, 1442:14, 1442:18, 1473:15, 1475:13, 1477:9, 1571:7, 1572:18, 1579:1, 1579:2, 1579:3, 1579:10, 1593:7
**machine** [1] - 1576:9
**Macintosh** [12] - 1432:1, 1433:8, 1568:11, 1568:12, 1571:1, 1571:2, 1572:3, 1574:14, 1575:3, 1579:4, 1579:15
**Macs** [1] - 1432:2
**Magazine** [1] - 1437:17
**magic** [3] - 1474:17, 1474:19, 1516:8
**magnitude** [1] - 1514:5
**mail** [1] - 1568:11
**mail-order** [1] - 1568:11
**Mairzy** [1] - 1577:9
**major** [5] - 1473:16, 1473:25, 1474:16, 1475:20, 1481:17
**majority** [2] - 1387:24, 1408:25
**mall** [1] - 1450:2
**manage** [2] - 1551:24, 1552:11
**managed** [1] - 1338:5

management [1] - 1382:17
manager [3] - 1582:16, 1582:18, 1583:8
manipulate [2] - 1571:12, 1571:17
manners [2] - 1445:2, 1446:5
manual [8] - 1316:2, 1575:19, 1576:24, 1577:13, 1596:3, 1596:6, 1596:17, 1596:19
manually [1] - 1316:3
manufacture [2] - 1424:22, 1521:3
manufacturer/seller [1] - 1300:13
manufacturers [3] - 1296:8, 1521:5, 1584:6
manufacturing [10] - 1388:13, 1435:10, 1454:10, 1457:17, 1457:21, 1460:24, 1463:2, 1464:7, 1467:11, 1469:3
map [1] - 1334:19
March [10] - 1356:8, 1356:11, 1356:18, 1357:10, 1487:5, 1539:4, 1539:10, 1540:12, 1541:2, 1582:17
margin [24] - 1323:23, 1456:2, 1457:1, 1457:3, 1457:5, 1457:19, 1457:20, 1458:17, 1458:21, 1459:19, 1463:8, 1463:20, 1464:13, 1464:19, 1464:24, 1464:25, 1465:6, 1465:21, 1468:1, 1468:7, 1498:19, 1498:25, 1513:6
margins [4] - 1323:24, 1457:2, 1468:7, 1468:9
Mark [3] - 1377:6, 1378:11, 1379:8
mark [1] - 1378:18
MARK [1] - 1379:5
marked [1] - 1382:3
market [20] - 1292:15, 1382:20, 1383:15, 1383:18, 1383:20, 1395:4, 1425:14, 1435:17, 1435:21, 1435:23, 1455:25, 1461:15, 1504:5, 1509:13, 1509:21, 1510:3, 1510:6, 1573:6, 1580:2
marketing [3] - 1395:3, 1449:19, 1554:24
marketplace [3] - 1494:21, 1497:22, 1502:2
Mary's [1] - 1387:18
mass [12] - 1347:18, 1348:18, 1349:6, 1349:8, 1355:10, 1355:17, 1355:24, 1355:25, 1356:3, 1356:23, 1357:1, 1570:22
mass-produced [1] - 1570:22
Master [1] - 1577:5
master [1] - 1578:3
match [5] - 1273:7, 1274:15, 1360:24, 1361:2, 1584:22
material [4] - 1302:12, 1466:8, 1467:9, 1556:13
materials [4] - 1373:6, 1436:7, 1502:4, 1548:21
math [4] - 1289:19, 1289:25, 1290:1, 1290:13, 1290:17
matter [14] - 1271:7, 1301:3, 1490:2, 1492:9, 1492:15, 1492:19, 1493:6,

1500:11, 1500:15, 1500:18, 1512:19, 1533:25, 1545:25, 1563:7
matters [4] - 1389:7, 1390:23, 1391:5, 1515:24
mean [40] - 1280:11, 1284:2, 1289:13, 1292:10, 1292:12, 1295:23, 1296:4, 1306:8, 1309:16, 1310:2, 1311:20, 1311:25, 1325:23, 1328:20, 1329:7, 1342:20, 1348:8, 1348:25, 1352:13, 1369:8, 1369:11, 1369:14, 1369:16, 1383:17, 1401:22, 1423:7, 1448:19, 1472:11, 1475:21, 1476:2, 1497:16, 1501:24, 1505:16, 1512:4, 1536:17, 1571:9, 1588:12, 1589:12, 1596:18
meaning [2] - 1336:7, 1535:20
meanings [1] - 1335:18
means [21] - 1274:17, 1276:2, 1276:24, 1305:7, 1331:1, 1335:12, 1352:14, 1361:15, 1364:9, 1364:12, 1365:1, 1373:9, 1373:14, 1374:6, 1374:9, 1381:19, 1414:2, 1416:13, 1509:20, 1547:10, 1600:14
means-plus-function [5] - 1331:1, 1335:12, 1373:9, 1374:6, 1374:9
meant [6] - 1273:10, 1273:11, 1278:12, 1292:18, 1341:16, 1350:2, 1361:15, 1369:18, 1547:11
meantime [1] - 1579:8
measured [2] - 1285:8, 1354:24
measuring [1] - 1355:4
media [4] - 1592:22, 1598:1, 1598:4, 1599:10
Media [17] - 1303:22, 1303:24, 1310:9, 1310:14, 1310:16, 1378:12, 1379:11, 1380:17, 1380:19, 1380:21, 1380:25, 1381:3, 1381:25, 1382:6, 1382:10, 1382:14, 1384:4
medical [1] - 1391:18
meet [1] - 1327:25
meeting [2] - 1390:12, 1390:13
meetings [5] - 1390:15, 1390:16, 1390:18, 1390:19
megabits [2] - 1364:5
megabytes [5] - 1285:8, 1287:25, 1288:2, 1288:3, 1288:7
member [1] - 1389:15
members [1] - 1390:5
memberships [1] - 1390:10
memorized [1] - 1343:12
memory [13] - 1287:24, 1288:25, 1289:6, 1289:8, 1290:15, 1306:11, 1348:3, 1348:13, 1349:7, 1350:3, 1350:14, 1355:24, 1589:23
mentality [1] - 1460:17
mention [18] - 1271:9, 1271:11, 1271:17, 1293:21, 1294:15, 1298:5, 1298:15, 1318:18, 1351:14, 1376:18, 1418:16, 1439:12, 1456:7, 1462:6, 1462:7, 1505:20, 1515:19, 1558:8
mentioned [37] - 1296:4, 1296:5, 1338:1, 1354:11, 1354:16, 1375:7,

1386:22, 1409:4, 1412:8, 1415:1, 1417:4, 1424:6, 1429:14, 1435:22, 1439:10, 1439:13, 1441:8, 1444:12, 1452:12, 1452:22, 1452:23, 1452:25, 1461:10, 1463:23, 1480:16, 1487:8, 1488:6, 1490:4, 1495:17, 1520:14, 1538:23, 1544:16, 1562:22, 1582:13, 1583:4, 1598:11, 1598:15
mentions [12] - 1293:13, 1293:14, 1294:10, 1298:8, 1298:10, 1354:7, 1417:19, 1461:23, 1461:25, 1476:6, 1558:18
menu [4] - 1347:15, 1371:18, 1476:11, 1587:5
mercifully [1] - 1584:10
message [2] - 1521:22, 1589:25
messages [11] - 1474:16, 1475:5, 1475:8, 1475:14, 1475:24, 1516:7, 1516:10, 1517:20, 1550:22, 1555:12, 1555:18
met [5] - 1327:1, 1360:11, 1360:13, 1491:10, 1594:12
metes [1] - 1501:14
Method [1] - 1542:3
method [6] - 1442:4, 1442:14, 1542:18, 1546:6, 1546:9, 1546:11
methodology [3] - 1439:9, 1441:22, 1527:18
methods [3] - 1445:1, 1446:3, 1546:12
MI [1] - 1288:1
mice [1] - 1301:5
microphone [1] - 1389:9
microprocessor [1] - 1296:6
MicroTouch [1] - 1327:10
mid [15] - 1279:7, 1279:20, 1279:23, 1280:23, 1281:9, 1281:11, 1281:17, 1282:3, 1282:10, 1282:22, 1283:24, 1284:16, 1364:20, 1364:22, 1452:9
middle [7] - 1340:9, 1403:2, 1423:7, 1439:8, 1444:23, 1464:8, 1556:11
midpoint [8] - 1485:20, 1529:8, 1529:10, 1529:21, 1530:14, 1530:16, 1533:9, 1533:12
might [43] - 1270:16, 1282:9, 1289:4, 1289:6, 1311:18, 1329:3, 1329:18, 1330:2, 1333:5, 1334:18, 1335:16, 1364:10, 1381:10, 1381:13, 1388:12, 1399:1, 1399:23, 1406:5, 1413:13, 1414:3, 1416:2, 1416:17, 1417:3, 1425:10, 1427:12, 1433:6, 1433:18, 1454:17, 1497:16, 1497:24, 1498:2, 1500:24, 1508:17, 1509:16, 1529:16, 1532:4, 1534:10, 1547:7, 1547:9, 1550:23, 1556:25, 1570:18, 1594:5
mile [1] - 1285:4
miles [1] - 1491:19
million [21] - 1290:2, 1384:7, 1392:8, 1393:2, 1394:3, 1394:4, 1394:11, 1394:13, 1400:15, 1401:6, 1401:7, 1401:8, 1403:13, 1403:14, 1403:16, 1486:15, 1490:8, 1490:13, 1504:12,

1580:11
  **millions** [3] - 1403:18, 1403:20, 1403:23
  **mind** [11] - 1270:18, 1270:25, 1309:17, 1321:18, 1375:15, 1455:19, 1478:20, 1484:18, 1527:21, 1531:18, 1566:8
  **mind-set** [1] - 1455:19
  **minds** [1] - 1334:22
  **mine** [3] - 1345:6, 1416:16, 1427:10
  **mini** [18] - 1374:25, 1393:11, 1394:5, 1394:10, 1396:8, 1401:2, 1401:6, 1402:22, 1404:22, 1405:12, 1430:25, 1438:19, 1439:13, 1441:19, 1442:5, 1443:11, 1452:5, 1459:7
  **minis** [2] - 1415:7, 1451:7
  **minus** [1] - 1401:25
  **minute** [9] - 1282:8, 1306:3, 1325:7, 1355:20, 1364:11, 1394:6, 1418:25, 1448:9, 1594:6
  **minutes** [5] - 1285:6, 1364:10, 1376:1, 1439:14
  **misplaced** [1] - 1420:7
  **miss** [1] - 1596:15
  **mission** [1] - 1413:18
  **misstating** [1] - 1413:22
  **mix** [1] - 1359:23
  **mixes** [1] - 1437:3
  **mobile** [2] - 1354:9, 1354:16
  **mode** [12] - 1346:17, 1347:2, 1347:4, 1347:5, 1371:14, 1543:17, 1589:2, 1589:17, 1590:3, 1591:8, 1591:11, 1593:13
  **model** [14] - 1284:2, 1284:12, 1293:15, 1393:9, 1402:8, 1404:3, 1404:21, 1405:9, 1406:13, 1432:14, 1463:23, 1463:24, 1467:25, 1584:19
  **models** [7] - 1393:10, 1401:2, 1402:9, 1403:10, 1404:15, 1408:23, 1432:15
  **modern** [1] - 1427:7
  **modification** [1] - 1323:5
  **moment** [5] - 1289:7, 1348:10, 1383:4, 1422:16, 1548:10
  **money** [6] - 1384:4, 1432:8, 1490:1, 1490:24, 1513:22, 1580:12
  **monitor** [1] - 1572:23
  **month** [23] - 1397:14, 1397:23, 1398:18, 1398:19, 1398:20, 1398:22, 1443:21, 1443:22, 1443:25, 1444:2, 1445:6, 1455:16, 1499:19, 1499:20, 1499:21, 1500:2, 1500:6, 1500:10, 1500:13, 1500:14, 1540:14, 1548:1
  **monthly** [4] - 1399:3, 1499:13, 1499:15, 1499:17
  **months** [7] - 1398:22, 1403:19, 1499:21, 1500:3, 1500:4, 1500:5
  **Moose** [1] - 1577:10
  **morning** [3] - 1272:2, 1379:6, 1385:9
  **mortgage** [1] - 1499:25
  **MORTON** [6] - 1330:22, 1331:25, 1332:5, 1336:19, 1336:22, 1337:21

**Most** [2] - 1442:13, 1542:3
**most** [38] - 1301:8, 1312:16, 1312:17, 1322:8, 1333:17, 1387:17, 1387:21, 1399:2, 1399:3, 1400:24, 1401:11, 1409:13, 1430:6, 1440:2, 1440:11, 1440:12, 1442:6, 1442:16, 1446:3, 1446:4, 1446:7, 1464:23, 1490:5, 1490:25, 1525:8, 1525:9, 1542:14, 1542:17, 1546:6, 1546:10, 1546:12, 1558:9, 1568:8, 1569:18, 1570:22, 1572:2, 1579:18
  **mostly** [2] - 1568:21, 1569:17
  **motherboards** [1] - 1570:12
  **Motion** [3] - 1327:9, 1327:12, 1327:17
  **motion** [3] - 1321:3, 1321:17, 1376:15
  **motions** [8] - 1320:22, 1321:3, 1321:5, 1423:4, 1423:8, 1431:9, 1565:4, 1565:14
  **Motorola** [3] - 1327:14, 1584:1, 1584:3
  **mouse** [6] - 1300:7, 1301:14, 1571:5, 1571:12, 1571:17, 1571:22
  **move** [30] - 1333:21, 1338:7, 1339:15, 1361:17, 1366:5, 1376:15, 1383:7, 1384:25, 1387:5, 1408:5, 1423:7, 1423:22, 1428:18, 1433:20, 1437:20, 1444:5, 1446:15, 1453:2, 1457:23, 1468:16, 1499:2, 1511:12, 1513:25, 1520:4, 1537:4, 1541:17, 1571:13, 1571:17, 1571:22, 1574:8
  **moved** [2] - 1311:20, 1563:8
  **movie** [2] - 1397:4, 1550:20
  **movies** [8] - 1550:11, 1550:12, 1550:13, 1550:15, 1550:18, 1550:23, 1574:1, 1592:21
  **moving** [7] - 1303:7, 1447:9, 1467:16, 1491:16, 1566:5, 1566:6, 1587:8
  **MP** [9] - 1575:3, 1575:14, 1575:15, 1575:19, 1580:13, 1580:19, 1580:21, 1581:1, 1581:3
  **MP3** [7] - 1417:16, 1435:23, 1573:6, 1575:6, 1580:2, 1580:3
  **MR** [198] - 1270:6, 1271:4, 1271:6, 1271:17, 1271:20, 1271:21, 1271:22, 1272:6, 1272:10, 1272:17, 1272:22, 1274:8, 1274:22, 1275:1, 1275:5, 1275:12, 1275:15, 1275:20, 1275:22, 1276:13, 1276:21, 1277:1, 1277:10, 1277:12, 1278:1, 1280:18, 1280:20, 1285:17, 1286:15, 1286:17, 1286:18, 1286:19, 1287:12, 1287:16, 1287:19, 1287:20, 1293:23, 1294:1, 1294:19, 1294:21, 1295:3, 1295:5, 1296:15, 1296:17, 1297:8, 1297:12, 1299:13, 1299:17, 1299:20, 1299:25, 1300:1, 1303:2, 1303:4, 1303:8, 1303:11, 1303:18, 1303:20, 1304:9, 1304:11, 1308:23, 1309:1, 1309:9, 1309:15, 1310:5, 1310:7, 1310:12, 1310:15, 1310:18, 1312:5, 1312:7, 1323:3, 1323:12, 1330:22, 1331:25, 1332:5, 1332:13, 1332:24, 1333:4, 1333:9,

1334:10, 1334:14, 1334:17, 1336:18, 1336:19, 1336:22, 1337:5, 1337:8, 1337:17, 1337:21, 1338:9, 1338:10, 1341:19, 1341:25, 1342:3, 1342:7, 1344:12, 1344:14, 1344:16, 1344:20, 1344:23, 1345:1, 1345:9, 1345:10, 1346:12, 1346:15, 1349:15, 1349:19, 1349:21, 1350:16, 1350:17, 1350:19, 1350:21, 1358:20, 1359:2, 1359:13, 1360:1, 1360:4, 1362:12, 1362:16, 1362:21, 1362:23, 1363:4, 1363:6, 1370:25, 1371:3, 1371:6, 1372:6, 1372:9, 1372:17, 1372:22, 1373:1, 1373:2, 1373:18, 1373:21, 1374:2, 1374:17, 1375:25, 1376:5, 1376:11, 1376:14, 1377:1, 1377:4, 1377:12, 1378:7, 1378:10, 1379:1, 1384:10, 1420:5, 1420:9, 1420:13, 1420:16, 1420:20, 1420:23, 1422:15, 1422:25, 1423:11, 1423:13, 1423:15, 1491:4, 1491:8, 1495:4, 1495:6, 1564:1, 1564:5, 1564:8, 1564:14, 1564:18, 1564:23, 1564:25, 1565:23, 1566:1, 1567:5, 1571:20, 1574:6, 1574:9, 1575:10, 1575:11, 1576:20, 1576:23, 1585:4, 1585:8, 1587:18, 1590:9, 1590:18, 1591:5, 1591:6, 1591:24, 1592:1, 1594:3, 1594:7, 1594:9, 1594:19, 1594:21, 1599:1, 1599:2, 1601:7, 1601:11, 1601:16
  **MS** [185] - 1320:25, 1322:1, 1322:10, 1322:13, 1322:23, 1323:18, 1323:20, 1324:15, 1324:18, 1324:20, 1324:24, 1325:9, 1325:13, 1326:22, 1326:25, 1327:8, 1327:23, 1327:25, 1328:15, 1329:19, 1330:6, 1330:8, 1337:1, 1385:3, 1385:6, 1385:9, 1386:5, 1386:14, 1386:19, 1389:11, 1392:14, 1392:17, 1393:12, 1393:15, 1393:16, 1394:8, 1394:19, 1407:9, 1407:23, 1408:5, 1408:8, 1408:12, 1408:13, 1409:14, 1409:17, 1409:21, 1409:22, 1410:3, 1410:5, 1411:7, 1411:10, 1413:21, 1413:25, 1414:7, 1414:9, 1414:10, 1421:9, 1421:15, 1421:17, 1421:19, 1421:24, 1422:2, 1422:7, 1423:21, 1431:8, 1431:12, 1431:13, 1433:12, 1433:16, 1433:20, 1433:23, 1437:20, 1437:22, 1437:23, 1444:4, 1444:7, 1444:10, 1444:11, 1446:15, 1446:19, 1446:22, 1448:5, 1448:7, 1448:12, 1448:22, 1448:24, 1449:8, 1449:11, 1457:23, 1457:25, 1458:3, 1463:14, 1463:18, 1464:11, 1464:15, 1466:14, 1466:17, 1468:16, 1468:19, 1468:23, 1468:24, 1471:2, 1471:6, 1471:10, 1471:14, 1471:17, 1471:18, 1479:7, 1479:12, 1479:13, 1491:3, 1491:9, 1491:22, 1494:2, 1494:7, 1494:9, 1494:25, 1495:9, 1495:13, 1495:16, 1496:23, 1497:2, 1499:3,

1499:5, 1504:18, 1504:20, 1505:25,
1506:2, 1506:19, 1506:23, 1506:25,
1507:1, 1511:11, 1511:14, 1513:2,
1513:4, 1513:25, 1514:3, 1516:3,
1516:5, 1519:21, 1519:24, 1522:25,
1523:2, 1524:10, 1524:11, 1527:7,
1527:9, 1528:25, 1529:2, 1537:23,
1538:1, 1541:24, 1542:1, 1554:13,
1555:6, 1555:8, 1557:15, 1557:19,
1558:22, 1558:24, 1559:7, 1559:17,
1559:19, 1559:20, 1559:21, 1559:25,
1560:8, 1560:10, 1560:15, 1560:19,
1561:1, 1561:4, 1561:5, 1561:15,
1561:19, 1562:8, 1562:10, 1562:13,
1563:7, 1563:11, 1563:15, 1563:16,
1563:19, 1563:21
   **Mullendore** [2] - 1270:13, 1375:12
   **Multimedia** [2] - 1579:20, 1579:22
   **multimedia** [4] - 1285:1, 1289:22,
1388:17, 1391:13
   **multipage** [2] - 1447:20, 1455:23
   **multiple** [1] - 1571:18
   **multiplied** [2] - 1482:15, 1484:1
   **multiplies** [1] - 1450:17
   **multiply** [1] - 1289:20
   **multistep** [1] - 1527:14
   **Music** [3] - 1542:3, 1592:9, 1592:12
   **music** [82] - 1283:25, 1284:10, 1351:4,
1416:1, 1416:10, 1417:2, 1417:16,
1417:25, 1418:9, 1418:25, 1419:2,
1426:18, 1438:9, 1440:3, 1440:7,
1440:13, 1442:4, 1442:7, 1442:14,
1442:17, 1445:3, 1445:5, 1445:9,
1446:4, 1446:6, 1447:25, 1450:15,
1452:13, 1452:15, 1475:9, 1476:2,
1476:7, 1476:15, 1477:18, 1477:20,
1478:3, 1478:12, 1478:13, 1483:1,
1483:13, 1485:1, 1518:8, 1518:10,
1526:10, 1526:13, 1542:14, 1542:18,
1542:19, 1542:23, 1543:16, 1543:21,
1543:22, 1544:3, 1544:6, 1544:24,
1545:1, 1546:2, 1547:24, 1550:10,
1552:15, 1552:22, 1555:13, 1555:22,
1556:5, 1572:9, 1573:14, 1574:13,
1575:5, 1575:7, 1576:2, 1577:25,
1585:21, 1586:8, 1586:25, 1588:18,
1589:24, 1590:5, 1592:19, 1592:21,
1593:14, 1596:21
   **must** [5] - 1331:2, 1332:15, 1335:23,
1336:2, 1593:9
   **muted** [1] - 1541:8

# N

**N33** [1] - 1465:17
**N36** [1] - 1405:7
**N46** [1] - 1405:7
**name** [23] - 1379:7, 1379:8, 1385:10,
1386:6, 1387:6, 1395:23, 1405:4,
1405:6, 1427:10, 1455:10, 1455:11,

1466:1, 1472:10, 1472:22, 1473:6,
1491:11, 1515:10, 1567:10, 1576:11,
1583:4, 1583:5, 1587:22
   **namely** [1] - 1322:8
   **names** [3] - 1383:4, 1404:15, 1405:4
   **NAND** [6] - 1355:23, 1356:3, 1356:11,
1356:22, 1356:23, 1370:20
   **nano** [26] - 1345:12, 1375:1, 1375:2,
1393:10, 1394:11, 1396:5, 1401:3,
1401:7, 1402:22, 1403:8, 1403:21,
1403:25, 1404:22, 1405:12, 1415:8,
1426:12, 1426:16, 1430:25, 1432:12,
1452:5, 1459:9, 1465:14, 1465:15,
1465:18, 1487:17
   **nano-type** [1] - 1396:5
   **nanos** [2] - 1415:8, 1451:8
   **narrative** [1] - 1442:25
   **nationwide** [1] - 1449:21
   **native** [2] - 1322:23, 1322:24
   **nature** [3] - 1321:8, 1321:20, 1387:25
   **navigable** [7] - 1535:12, 1535:20,
1537:8, 1537:9, 1537:19, 1545:16,
1596:14
   **navigate** [17] - 1416:8, 1416:9,
1416:24, 1428:16, 1476:7, 1482:1,
1520:17, 1535:7, 1535:17, 1535:21,
1535:22, 1551:25, 1552:12, 1553:13,
1553:14, 1553:16, 1586:19
   **navigated** [1] - 1553:15
   **navigation** [11] - 1473:12, 1480:22,
1481:11, 1481:25, 1482:5, 1482:16,
1482:22, 1520:10, 1523:4, 1523:11,
1536:23
   **navigation/controls** [1] - 1480:4
   **Nawrocki** [93] - 1320:17, 1321:2,
1321:3, 1321:4, 1321:6, 1322:14,
1326:8, 1326:11, 1327:21, 1328:6,
1328:10, 1328:15, 1375:24, 1376:5,
1385:4, 1385:12, 1386:6, 1386:7,
1386:20, 1391:21, 1392:18, 1393:5,
1393:17, 1393:19, 1396:1, 1407:24,
1408:15, 1409:24, 1414:11, 1419:13,
1423:22, 1425:23, 1433:17, 1436:11,
1441:15, 1444:3, 1444:12, 1446:23,
1447:14, 1448:13, 1449:12, 1450:11,
1452:21, 1453:15, 1458:4, 1463:19,
1468:25, 1471:19, 1474:21, 1480:19,
1482:21, 1484:4, 1485:12, 1486:17,
1487:15, 1487:20, 1488:22, 1490:7,
1491:2, 1491:23, 1493:14, 1498:8,
1499:1, 1508:2, 1510:14, 1511:10,
1511:15, 1513:20, 1514:17, 1515:4,
1518:9, 1520:2, 1520:10, 1521:6,
1521:25, 1524:4, 1529:3, 1545:7,
1549:25, 1551:13, 1553:11, 1557:16,
1557:20, 1558:17, 1558:25, 1559:8,
1560:11, 1561:6, 1561:20, 1562:14,
1563:1, 1563:6
   **NAWROCKI** [3] - 1386:3, 1491:21,
1557:18
   **Nawrocki's** [5] - 1324:7, 1324:25,

1325:5, 1386:2, 1386:16
   **near** [2] - 1302:22, 1418:17
   **Nearly** [1] - 1443:10
   **necessarily** [8] - 1279:25, 1288:15,
1308:10, 1311:13, 1444:1, 1495:24,
1520:23, 1536:13
   **necessary** [2] - 1540:14, 1540:15
   **need** [20] - 1278:10, 1292:24, 1305:11,
1319:9, 1321:21, 1322:17, 1324:11,
1338:2, 1344:16, 1413:5, 1448:18,
1448:20, 1469:14, 1478:17, 1494:6,
1518:12, 1536:10, 1554:3, 1579:10,
1585:6
   **needed** [9] - 1301:10, 1334:12, 1338:6,
1451:18, 1451:22, 1477:25, 1576:14,
1601:14
   **needing** [1] - 1545:6
   **needs** [3] - 1329:5, 1418:1, 1565:6
   **negative** [2] - 1401:24, 1402:1
   **negotiate** [2] - 1493:12, 1493:15
   **negotiating** [2] - 1501:5, 1534:5
   **negotiation** [43] - 1411:21, 1411:23,
1411:25, 1412:2, 1412:7, 1412:10,
1412:11, 1413:4, 1413:12, 1413:15,
1413:16, 1414:12, 1414:13, 1414:17,
1423:24, 1424:3, 1424:4, 1424:5,
1424:8, 1424:13, 1425:9, 1425:16,
1429:14, 1432:6, 1485:18, 1487:2,
1487:4, 1488:4, 1493:8, 1494:19,
1498:1, 1498:22, 1502:19, 1506:4,
1507:14, 1507:18, 1508:9, 1508:17,
1509:2, 1529:12, 1534:5, 1539:4,
1541:5
   **negotiations** [2] - 1506:12, 1538:9
   **networking** [1] - 1316:8
   **networks** [1] - 1285:4
   **never** [18] - 1295:16, 1298:10, 1299:3,
1328:11, 1329:12, 1330:3, 1330:4,
1348:19, 1362:16, 1418:24, 1546:14,
1555:2, 1570:18, 1584:8, 1594:12,
1594:15
   **new** [13] - 1312:19, 1320:23, 1327:7,
1351:9, 1351:16, 1426:9, 1426:12,
1426:15, 1426:16, 1477:16, 1569:3,
1572:21, 1578:4
   **newness** [1] - 1434:10
   **news** [3] - 1270:10, 1425:13
   **next** [91] - 1275:3, 1276:5, 1276:22,
1304:7, 1320:18, 1326:23, 1335:15,
1340:8, 1343:16, 1343:18, 1345:15,
1345:17, 1345:22, 1345:24, 1346:3,
1348:8, 1361:17, 1364:16, 1375:23,
1375:25, 1377:5, 1385:2, 1396:16,
1399:2, 1399:19, 1403:1, 1403:9,
1403:15, 1403:24, 1404:24, 1405:1,
1406:5, 1406:15, 1413:3, 1421:8,
1423:9, 1423:22, 1427:17, 1428:19,
1434:18, 1437:12, 1437:13, 1438:20,
1439:1, 1441:18, 1443:18, 1453:15,
1459:15, 1460:5, 1466:11, 1469:4,
1469:6, 1473:17, 1473:18, 1473:22,

1476:19, 1476:21, 1477:5, 1477:15,
1478:9, 1478:20, 1480:13, 1480:16,
1480:22, 1480:23, 1480:24, 1481:18,
1481:24, 1484:8, 1484:21, 1485:14,
1486:5, 1529:6, 1547:6, 1549:12,
1552:7, 1552:9, 1552:13, 1555:7,
1555:9, 1555:20, 1555:25, 1556:10,
1556:11, 1562:3, 1563:25, 1586:1,
1586:2, 1588:4

**Ng** [2] - 1475:1, 1517:2
**nice** [1] - 1364:18
**night** [1] - 1408:8
**nights** [1] - 1500:11
**nine** [2] - 1306:10, 1306:13
**Nineties** [5] - 1281:11, 1364:2, 1592:9,
1592:11, 1592:12
**nobody** [5] - 1299:4, 1300:18, 1301:16,
1437:2, 1451:11
**Nokia** [1] - 1364:24
**NOMAD** [2] - 1579:24
**non** [4] - 1513:10, 1513:15, 1514:20,
1515:9
**non-device** [4] - 1513:10, 1513:15,
1514:20, 1515:9
**nonaccused** [4] - 1448:7, 1448:11,
1448:23, 1525:23
**noncomparable** [1] - 1327:4
**none** [4] - 1429:3, 1430:19, 1535:25,
1544:12
**noninfringed** [1] - 1539:14
**nonpatented** [1] - 1435:9
**nonplaylist** [1] - 1545:4
**nonresponsive** [2] - 1511:11, 1514:1
**nonstatutory** [2] - 1340:11, 1342:9
**normal** [3] - 1349:4, 1371:24, 1593:6
**normally** [2] - 1349:16, 1569:4
**NOT** [1] - 1270:4
**note** [2] - 1334:4, 1337:2
**notebook** [5] - 1274:13, 1274:16,
1274:21, 1275:25, 1294:7
**notebooks** [1] - 1273:9
**NOTES** [1] - 1270:1
**nothing** [8] - 1430:12, 1431:3, 1516:16,
1519:9, 1584:10, 1589:20, 1590:4,
1594:3
**notice** [3] - 1372:10, 1384:12, 1569:6
**noticed** [1] - 1401:9
**November** [2] - 1419:11, 1441:9
**Number** [19] - 1311:17, 1327:10,
1340:12, 1342:10, 1351:23, 1378:15,
1378:16, 1380:1, 1420:18, 1436:23,
1497:3, 1499:4, 1507:2, 1513:3,
1517:17, 1517:21, 1519:22, 1523:1,
1592:14
**number** [34] - 1274:16, 1284:2,
1293:15, 1298:8, 1304:21, 1323:24,
1325:21, 1325:22, 1331:10, 1337:10,
1338:5, 1365:17, 1400:1, 1407:11,
1409:5, 1421:6, 1427:24, 1439:18,
1446:6, 1449:7, 1453:17, 1463:24,

1483:23, 1498:25, 1512:11, 1525:24,
1545:8, 1545:10, 1551:23, 1559:19,
1574:17, 1576:20, 1598:25
**number-crunching** [1] - 1453:17
**numbered** [2] - 1337:14, 1345:3
**numbering** [1] - 1312:1
**numbers** [29] - 1273:3, 1289:24,
1311:12, 1311:14, 1311:22, 1324:13,
1372:11, 1382:4, 1383:22, 1401:24,
1402:1, 1404:3, 1405:9, 1406:13,
1407:4, 1409:9, 1441:10, 1445:14,
1452:16, 1455:3, 1457:12, 1482:12,
1516:17, 1526:5, 1529:7, 1529:8,
1540:3, 1540:5, 1541:19
**numeric** [1] - 1518:24
**numerous** [4] - 1288:13, 1293:13,
1343:11, 1353:19


## O

**oath** [3] - 1279:7, 1385:5, 1565:22
**object** [10] - 1275:12, 1321:7, 1342:1,
1359:13, 1463:14, 1466:14, 1468:19,
1479:7, 1559:21, 1590:9
**objected** [1] - 1287:13
**objecting** [2] - 1323:15
**objection** [49] - 1275:21, 1287:13,
1310:12, 1321:8, 1321:10, 1321:13,
1321:21, 1323:20, 1326:7, 1326:9,
1326:21, 1332:7, 1336:17, 1337:19,
1341:19, 1342:5, 1358:20, 1362:12,
1370:25, 1372:21, 1374:17, 1384:23,
1386:16, 1408:9, 1413:21, 1423:6,
1431:8, 1433:12, 1437:22, 1444:7,
1446:18, 1446:19, 1448:5, 1448:6,
1449:10, 1457:25, 1464:11, 1470:22,
1470:23, 1494:2, 1558:24, 1559:1,
1559:4, 1561:14, 1561:17, 1562:9,
1563:13, 1563:16, 1590:11
**objections** [11] - 1320:17, 1320:21,
1322:2, 1322:7, 1330:18, 1332:3,
1336:21, 1336:24, 1338:2, 1378:4,
1384:16
**objectives** [1] - 1365:20
**obtain** [4] - 1424:21, 1434:8, 1478:4,
1486:14
**obtained** [2] - 1395:13, 1408:16
**obtains** [1] - 1477:20
**obviously** [3] - 1288:12, 1326:13,
1326:16
**obviousness** [2] - 1340:11, 1342:9
**obviousness-type** [2] - 1340:11,
1342:9
**occasionally** [1] - 1338:2
**occupation** [1] - 1386:8
**occur** [1] - 1300:17
**occurred** [2] - 1299:3, 1312:25
**occurs** [2] - 1348:5, 1349:24
**OCOGS** [1] - 1467:21
**October** [16] - 1314:12, 1412:13,

1417:14, 1439:6, 1453:21, 1458:13,
1460:14, 1469:8, 1487:3, 1514:9,
1539:10, 1541:7, 1595:2, 1595:11
**oddball** [1] - 1315:9
**OF** [11] - 1272:9, 1350:20, 1379:5,
1386:3, 1386:4, 1491:21, 1557:18,
1567:3, 1567:4, 1594:8, 1601:22
**offer** [3] - 1339:6, 1372:17, 1409:15
**offered** [7] - 1291:22, 1350:13,
1371:24, 1381:16, 1390:11, 1479:10,
1479:12
**offering** [1] - 1281:21
**office** [1] - 1309:4
**Office** [27] - 1271:9, 1271:18, 1303:14,
1304:19, 1306:17, 1306:25, 1307:11,
1309:2, 1309:5, 1309:6, 1309:12,
1339:19, 1339:21, 1339:24, 1341:9,
1342:16, 1368:8, 1369:4, 1369:24,
1370:5, 1595:6, 1595:24, 1596:8,
1597:14, 1597:23, 1597:24, 1598:21
**officer** [1] - 1379:14
**OFFICER** [3] - 1330:15, 1330:20,
1423:17
**Often** [1] - 1542:3
**often** [18] - 1440:3, 1440:15, 1445:5,
1446:4, 1447:5, 1447:12, 1448:1,
1448:4, 1453:11, 1483:12, 1483:13,
1542:14, 1542:17, 1546:6, 1546:10,
1546:12, 1562:4
**oftentimes** [3] - 1396:11, 1398:10,
1398:11
**oil** [1] - 1326:4
**old** [3] - 1311:24, 1410:18, 1547:10
**olden** [1] - 1437:4
**omit** [1] - 1336:4
**ON** [3] - 1386:4, 1567:4, 1601:21
**once** [18] - 1347:18, 1369:17, 1398:25,
1443:11, 1443:21, 1443:25, 1444:2,
1445:6, 1482:22, 1486:4, 1525:4,
1526:7, 1527:10, 1531:10, 1544:22,
1548:1, 1579:8
**one** [198] - 1270:13, 1270:13, 1275:17,
1276:2, 1276:7, 1276:10, 1276:23,
1281:12, 1281:14, 1282:11, 1289:1,
1292:3, 1293:13, 1293:14, 1297:7,
1300:22, 1302:21, 1306:9, 1308:14,
1309:7, 1310:4, 1312:1, 1317:6,
1322:13, 1325:7, 1327:1, 1329:12,
1329:16, 1330:2, 1330:5, 1330:23,
1334:13, 1335:1, 1335:15, 1336:23,
1339:18, 1340:24, 1343:19, 1343:20,
1345:23, 1351:8, 1352:15, 1353:9,
1355:14, 1357:14, 1358:7, 1363:10,
1364:11, 1365:3, 1365:8, 1365:10,
1365:11, 1365:18, 1371:20, 1372:2,
1376:11, 1380:1, 1383:13, 1384:13,
1390:5, 1400:12, 1401:9, 1403:1,
1403:5, 1403:14, 1412:13, 1412:24,
1416:16, 1416:17, 1416:18, 1416:19,
1417:24, 1418:1, 1418:11, 1419:25,
1421:12, 1421:19, 1423:2, 1424:5,

1425:16, 1426:19, 1427:2, 1435:2,
1438:17, 1439:19, 1439:20, 1440:1,
1440:2, 1440:6, 1440:11, 1440:12,
1440:21, 1442:16, 1444:20, 1444:23,
1445:2, 1445:16, 1446:1, 1446:5,
1447:22, 1451:9, 1452:21, 1455:15,
1456:14, 1463:24, 1464:2, 1465:13,
1465:18, 1466:12, 1467:16, 1476:9,
1480:22, 1480:23, 1480:24, 1483:1,
1485:9, 1486:25, 1492:16, 1493:9,
1495:14, 1497:16, 1498:15, 1500:6,
1500:9, 1500:15, 1501:7, 1502:6,
1502:24, 1504:1, 1505:1, 1505:21,
1507:21, 1507:22, 1508:11, 1514:12,
1516:23, 1521:4, 1521:22, 1524:3,
1525:10, 1525:15, 1525:20, 1526:13,
1526:18, 1529:15, 1530:20, 1531:16,
1534:23, 1537:20, 1538:21, 1539:13,
1545:14, 1545:20, 1546:11, 1548:21,
1552:1, 1552:22, 1553:8, 1557:12,
1558:9, 1558:18, 1560:1, 1560:23,
1561:23, 1562:3, 1562:16, 1562:21,
1563:2, 1563:7, 1567:23, 1568:13,
1568:22, 1570:11, 1572:17, 1575:7,
1575:19, 1576:6, 1578:2, 1584:7,
1584:22, 1584:24, 1586:7, 1587:17,
1588:15, 1591:12, 1592:20, 1592:25,
1595:1, 1597:6, 1597:8, 1598:7,
1598:10

 **one's** [3] - 1507:23, 1559:3
 **one-half** [1] - 1514:12
 **one-year** [1] - 1500:6
 **ones** [9] - 1276:25, 1308:9, 1327:7,
1434:20, 1478:20, 1515:12, 1515:25,
1526:21, 1548:3
 **ongoing** [5] - 1327:3, 1487:21, 1488:1,
1488:14, 1488:18
 **online** [2] - 1552:15, 1552:22
 **open** [11] - 1320:14, 1330:2, 1376:9,
1422:13, 1470:13, 1497:13, 1528:23,
1553:10, 1553:13, 1555:10, 1566:8
 **OPEN** [1] - 1270:4
 **open-heart** [3] - 1553:10, 1553:13,
1555:10
 **opening** [3] - 1537:6, 1566:17, 1594:23
 **operate** [2] - 1348:2, 1566:14
 **operating** [5] - 1454:16, 1503:2,
1504:7, 1555:13, 1555:22
 **operation** [3] - 1348:3, 1476:10,
1476:11
 **operations** [2] - 1365:20, 1388:2
 **opinion** [38] - 1292:2, 1310:3, 1311:2,
1324:8, 1324:25, 1325:5, 1334:1,
1334:4, 1343:1, 1348:25, 1350:7,
1350:13, 1367:10, 1385:15, 1391:24,
1392:10, 1399:11, 1399:13, 1421:4,
1428:6, 1468:3, 1485:12, 1486:18,
1486:21, 1486:22, 1487:21, 1487:24,
1487:25, 1488:18, 1490:7, 1492:11,
1492:14, 1492:16, 1492:19, 1512:16,
1528:10, 1543:6, 1546:8

 **opinions** [14] - 1308:8, 1308:11,
1312:15, 1312:18, 1312:22, 1312:23,
1313:4, 1313:15, 1359:14, 1362:7,
1433:25, 1492:7, 1492:17, 1590:21
 **opportunities** [2] - 1378:3, 1456:15
 **opportunity** [5] - 1320:20, 1383:19,
1383:21, 1461:9, 1461:15
 **opposed** [7] - 1348:13, 1383:12,
1408:22, 1486:25, 1510:4, 1549:14,
1549:21
 **opposing** [2] - 1378:22, 1495:1
 **opposite** [1] - 1457:18
 **option** [2] - 1371:18, 1576:3
 **Option** [1] - 1576:1
 **orange** [3] - 1497:15, 1497:16, 1497:18
 **order** [14] - 1285:5, 1304:15, 1307:3,
1410:9, 1470:17, 1471:8, 1493:4,
1514:5, 1564:4, 1565:11, 1568:11,
1578:5, 1586:3, 1586:8
 **ordered** [1] - 1407:15
 **orders** [2] - 1321:23, 1326:12
 **ordinary** [2] - 1292:1, 1331:17
 **organization** [2] - 1390:6, 1390:8
 **organizations** [1] - 1389:16
 **organize** [2] - 1437:8, 1575:7
 **original** [5] - 1290:22, 1322:21, 1419:7,
1448:4, 1572:18
 **originally** [2] - 1323:8, 1583:22
 **originated** [1] - 1578:21
 **otherwise** [3] - 1329:22, 1336:15,
1422:22
 **outline** [1] - 1270:21
 **output** [1] - 1340:23
 **outside** [15] - 1316:23, 1317:9, 1318:8,
1319:16, 1338:17, 1358:21, 1359:17,
1373:18, 1374:17, 1415:11, 1464:11,
1535:12, 1537:21, 1565:15, 1601:5
 **outweigh** [1] - 1470:25
 **outweighs** [1] - 1470:20
 **overall** [15] - 1393:8, 1396:18, 1410:10,
1451:23, 1453:20, 1459:4, 1459:12,
1459:25, 1473:20, 1505:9, 1505:10,
1522:5, 1524:8, 1528:2, 1574:13
 **overhead** [2] - 1394:17, 1410:15
 **overrule** [4] - 1359:20, 1362:15,
1362:22, 1363:8
 **overruled** [17] - 1287:18, 1299:19,
1334:2, 1358:22, 1372:8, 1374:1,
1374:19, 1376:25, 1409:20, 1463:17,
1464:14, 1466:16, 1468:21, 1511:13,
1514:2, 1561:18, 1562:12
 **oversight** [1] - 1382:18
 **overview** [4] - 1399:21, 1411:12,
1453:18, 1505:11
 **own** [20] - 1283:3, 1329:23, 1362:5,
1390:24, 1390:25, 1396:1, 1396:10,
1397:11, 1397:16, 1397:18, 1398:6,
1402:3, 1451:1, 1492:11, 1497:11,
1501:8, 1501:10, 1540:23, 1553:10
 **owned** [2] - 1412:24, 1502:1

 **owner** [10] - 1303:13, 1304:18,
1306:17, 1306:25, 1309:7, 1310:20,
1397:20, 1552:22, 1553:8, 1553:12
 **owner's** [1] - 1305:22
 **owners** [2] - 1442:6, 1443:11
 **owns** [3] - 1397:10, 1502:6, 1502:8

---

# P

 **P-A-S-C-A-R-E-L-L-A** [1] - 1379:9
 **p.m** [13] - 1419:21, 1422:12, 1423:19,
1470:9, 1470:12, 1471:15, 1528:19,
1528:22, 1601:3, 1601:20
 **P68** [3] - 1455:11, 1476:8, 1477:15
 **P95** [1] - 1463:23
 **P98** [1] - 1463:23
 **Pacific** [18] - 1385:19, 1410:12,
1410:15, 1411:8, 1412:3, 1414:25,
1424:6, 1434:19, 1495:11, 1495:15,
1496:10, 1496:18, 1497:3, 1498:9,
1506:3, 1507:3, 1546:3
 **pack** [1] - 1466:4
 **packs** [1] - 1417:16
 **Page** [2] - 1517:16, 1517:21
 **page** [119] - 1274:14, 1274:16, 1274:21,
1275:3, 1276:5, 1276:8, 1276:9,
1276:11, 1276:23, 1277:11, 1277:23,
1285:16, 1288:20, 1291:6, 1299:10,
1301:7, 1302:18, 1302:21, 1303:3,
1303:9, 1304:7, 1305:20, 1306:2,
1306:13, 1306:24, 1307:2, 1308:6,
1308:22, 1308:24, 1309:6, 1309:14,
1310:6, 1310:20, 1317:7, 1318:14,
1319:4, 1324:16, 1324:17, 1324:20,
1325:2, 1325:13, 1331:24, 1335:25,
1338:21, 1339:19, 1340:3, 1340:4,
1340:8, 1340:10, 1344:8, 1344:9,
1344:20, 1345:6, 1352:4, 1352:20,
1353:8, 1354:6, 1363:22, 1364:16,
1364:17, 1365:6, 1366:14, 1402:24,
1403:1, 1404:17, 1404:19, 1404:21,
1406:4, 1406:5, 1436:21, 1437:12,
1437:13, 1439:1, 1439:21, 1439:23,
1441:14, 1441:23, 1441:25, 1442:23,
1447:15, 1447:16, 1447:17, 1447:19,
1447:21, 1449:7, 1449:8, 1449:10,
1455:21, 1456:1, 1456:19, 1461:17,
1461:20, 1462:13, 1464:8, 1464:20,
1466:11, 1466:21, 1475:5, 1476:19,
1476:21, 1477:5, 1517:19, 1520:6,
1555:7, 1560:3, 1560:4, 1560:20,
1561:9, 1576:19, 1576:21, 1576:22,
1577:3, 1598:21, 1599:8
 **pagers** [1] - 1365:22
 **pages** [18] - 1285:22, 1286:20,
1286:22, 1286:23, 1293:5, 1302:24,
1306:9, 1306:11, 1306:13, 1343:10,
1368:10, 1368:11, 1368:16, 1447:7,
1447:8, 1462:13, 1517:18
 **paid** [7] - 1398:1, 1425:1, 1500:9,

1500:21, 1501:2, 1533:4, 1580:11
**painting** [1] - 1571:19
**pair** [1] - 1375:11
**Palm** [10] - 1286:11, 1288:8, 1288:12, 1288:13, 1288:17, 1289:8, 1290:14, 1350:25, 1351:2, 1351:11
**PalmPilot** [16] - 1280:10, 1282:23, 1283:25, 1284:6, 1284:9, 1286:21, 1287:4, 1287:8, 1288:4, 1288:21, 1290:10, 1290:19, 1290:22, 1298:1, 1354:21, 1355:4
**PalmPilots** [2] - 1284:7, 1289:5
**panel** [1] - 1361:11
**paper** [2] - 1342:20, 1346:13
**paragraph** [26] - 1279:15, 1283:21, 1284:23, 1284:25, 1285:25, 1292:14, 1304:12, 1331:1, 1343:21, 1346:3, 1346:4, 1347:21, 1347:24, 1349:1, 1365:6, 1417:21, 1418:4, 1551:19, 1552:13, 1554:14, 1554:21, 1555:20, 1555:25, 1556:11
**paragraphs** [3] - 1346:2, 1555:9, 1555:16
**parens** [1] - 1380:12
**parentheses** [3] - 1401:22, 1401:24, 1441:11
**Part** [1] - 1352:24
**part** [100] - 1273:25, 1277:18, 1279:11, 1282:25, 1283:1, 1286:2, 1297:4, 1300:21, 1302:6, 1303:16, 1304:2, 1304:18, 1304:22, 1304:24, 1304:25, 1306:23, 1307:17, 1308:10, 1308:14, 1309:12, 1309:20, 1309:23, 1310:24, 1311:3, 1314:24, 1315:22, 1318:13, 1319:9, 1319:10, 1322:2, 1327:21, 1331:1, 1332:14, 1334:24, 1335:8, 1342:21, 1343:20, 1346:7, 1347:19, 1357:23, 1359:1, 1364:7, 1367:11, 1370:22, 1371:8, 1373:17, 1375:13, 1382:22, 1382:23, 1388:20, 1389:12, 1390:22, 1399:5, 1404:13, 1410:13, 1410:22, 1410:24, 1412:5, 1416:23, 1417:21, 1419:5, 1422:17, 1425:5, 1440:1, 1448:14, 1448:25, 1450:9, 1451:22, 1459:5, 1467:18, 1468:13, 1472:11, 1472:18, 1505:2, 1505:10, 1505:18, 1505:23, 1524:22, 1525:18, 1527:1, 1537:1, 1537:15, 1546:14, 1550:7, 1551:22, 1552:24, 1553:1, 1559:12, 1564:17, 1566:6, 1567:13, 1570:13, 1570:22, 1572:2, 1572:17, 1576:24, 1577:3, 1582:22, 1583:3, 1589:22
**participants** [1] - 1558:21
**participating** [1] - 1441:11
**particular** [31] - 1273:19, 1275:9, 1277:17, 1284:11, 1284:19, 1292:9, 1292:10, 1292:12, 1293:15, 1296:7, 1306:2, 1321:19, 1321:21, 1327:4, 1329:11, 1329:21, 1331:9, 1331:10, 1332:14, 1334:7, 1351:19, 1357:1,

1358:14, 1424:22, 1497:23, 1513:9, 1514:18, 1586:19, 1589:9, 1592:5, 1596:3
**particularly** [2] - 1510:15, 1569:19
**parties** [31] - 1302:8, 1320:14, 1328:22, 1329:6, 1376:9, 1391:24, 1394:25, 1404:14, 1411:24, 1412:19, 1412:22, 1413:1, 1413:5, 1413:17, 1414:18, 1422:13, 1425:12, 1425:15, 1425:18, 1428:20, 1429:6, 1470:13, 1485:23, 1506:10, 1506:11, 1507:7, 1508:11, 1509:5, 1528:23, 1529:12, 1529:16
**PARTIES** [1] - 1270:4
**partly** [1] - 1565:16
**partner** [1] - 1491:5
**parts** [20] - 1337:10, 1337:15, 1342:14, 1342:25, 1343:11, 1350:4, 1365:17, 1368:18, 1368:19, 1368:21, 1368:22, 1368:24, 1369:2, 1396:25, 1475:2, 1475:19, 1549:13, 1549:15, 1549:19
**party** [7] - 1299:20, 1303:21, 1303:24, 1304:4, 1414:2, 1414:11, 1414:19
**Pascarella** [4] - 1377:6, 1378:11, 1379:6, 1379:8
**PASCARELLA** [1] - 1379:5
**pass** [2] - 1491:3, 1594:4
**passage** [3] - 1337:3, 1337:4, 1337:6
**passed** [1] - 1337:2
**past** [11] - 1271:13, 1321:20, 1346:24, 1363:12, 1375:15, 1375:19, 1432:23, 1470:8, 1470:11, 1531:15, 1556:25
**Patent** [26] - 1271:9, 1271:18, 1303:14, 1304:19, 1305:22, 1306:16, 1306:25, 1307:11, 1309:6, 1339:21, 1340:12, 1342:10, 1342:16, 1368:8, 1369:4, 1369:24, 1370:5, 1592:14, 1593:1, 1595:6, 1595:24, 1596:8, 1597:13, 1597:22, 1597:24, 1598:21
**patent** [194] - 1272:14, 1272:15, 1272:18, 1272:19, 1272:23, 1272:24, 1273:7, 1273:17, 1275:2, 1275:14, 1276:14, 1277:2, 1278:5, 1278:12, 1278:15, 1278:21, 1279:4, 1279:5, 1293:22, 1294:2, 1294:11, 1295:16, 1295:18, 1295:19, 1295:21, 1297:4, 1297:23, 1298:5, 1299:5, 1299:11, 1300:3, 1303:13, 1304:1, 1304:18, 1304:22, 1305:22, 1305:23, 1306:17, 1306:24, 1309:3, 1309:7, 1310:20, 1311:9, 1311:14, 1311:15, 1311:16, 1311:21, 1312:10, 1313:11, 1316:21, 1325:6, 1327:14, 1331:3, 1331:8, 1331:9, 1331:14, 1331:15, 1331:18, 1331:21, 1334:9, 1334:20, 1335:24, 1336:6, 1339:21, 1340:16, 1340:17, 1340:22, 1341:5, 1341:10, 1341:18, 1342:12, 1343:1, 1343:6, 1343:7, 1351:9, 1351:12, 1351:14, 1351:16, 1351:21, 1352:1, 1352:16, 1353:2, 1353:10, 1353:14, 1353:25, 1354:10, 1354:13, 1354:18, 1354:25, 1360:16,

1361:14, 1363:20, 1364:22, 1366:10, 1366:17, 1367:1, 1368:13, 1368:25, 1369:3, 1369:21, 1369:22, 1369:25, 1370:1, 1370:3, 1370:6, 1371:2, 1374:21, 1374:22, 1374:24, 1375:3, 1376:18, 1378:15, 1378:18, 1382:3, 1389:4, 1390:23, 1397:3, 1397:4, 1397:16, 1397:17, 1421:3, 1421:10, 1421:11, 1421:15, 1421:22, 1486:18, 1486:23, 1486:25, 1487:4, 1487:16, 1487:17, 1493:24, 1493:25, 1494:15, 1501:5, 1501:8, 1501:10, 1501:15, 1501:17, 1502:14, 1502:18, 1502:23, 1502:24, 1503:3, 1503:7, 1503:22, 1505:16, 1507:15, 1508:22, 1508:24, 1509:1, 1510:16, 1531:11, 1532:19, 1533:21, 1535:2, 1535:5, 1537:16, 1538:5, 1538:14, 1538:21, 1539:5, 1539:20, 1539:25, 1540:10, 1541:2, 1541:14, 1546:16, 1546:21, 1546:25, 1548:18, 1549:4, 1566:11, 1592:2, 1592:4, 1592:5, 1592:15, 1592:16, 1593:1, 1593:3, 1594:20, 1595:9, 1595:10, 1595:24, 1597:3, 1597:11, 1597:23, 1600:15
**patent's** [1] - 1490:18
**patent-in-suit** [1] - 1595:10
**patentable** [2] - 1341:17, 1370:7
**patentably** [2] - 1340:21, 1342:1
**patented** [11] - 1385:25, 1414:14, 1424:23, 1509:22, 1530:1, 1530:7, 1530:11, 1531:1, 1531:5, 1533:8, 1534:24
**patentee** [2] - 1424:16, 1425:2
**Patenting** [1] - 1340:6
**patenting** [3] - 1340:11, 1341:14, 1342:9
**patents** [53] - 1272:16, 1298:24, 1302:3, 1313:8, 1313:17, 1313:20, 1314:6, 1314:11, 1335:11, 1380:3, 1380:14, 1380:18, 1385:17, 1387:8, 1388:15, 1390:24, 1390:25, 1391:12, 1392:5, 1392:21, 1412:24, 1413:5, 1421:13, 1421:20, 1425:17, 1430:14, 1487:1, 1492:7, 1492:12, 1493:20, 1494:3, 1528:2, 1535:6, 1535:17, 1537:1, 1537:7, 1537:16, 1537:21, 1538:4, 1538:22, 1540:7, 1549:5, 1549:14, 1549:21, 1566:18, 1574:17, 1574:19, 1574:21, 1591:17, 1593:19, 1595:8, 1597:6, 1597:8
**patents-in-suit** [5] - 1313:17, 1492:7, 1492:12, 1535:6, 1595:8
**pathway** [1] - 1294:6
**patients** [1] - 1555:18
**Patsy** [4] - 1585:20, 1586:18, 1586:21, 1588:4
**pattern** [1] - 1483:25
**paused** [2] - 1585:18, 1586:18
**pay** [17] - 1397:14, 1397:17, 1397:19, 1397:22, 1398:23, 1398:24, 1399:1,

1399:3, 1399:9, 1430:2, 1499:19, 1499:21, 1500:8, 1503:18, 1507:25, 1580:10

**paying** [9] - 1326:2, 1397:12, 1398:6, 1398:19, 1398:21, 1484:15, 1501:9, 1503:5, 1503:7

**payment** [12] - 1397:2, 1397:3, 1397:4, 1397:7, 1398:5, 1398:24, 1399:9, 1414:24, 1429:18, 1499:22, 1499:25

**payments** [1] - 1397:24

**PC** [4] - 1353:21, 1433:7, 1515:1, 1515:3

**PCs** [6] - 1285:8, 1285:9, 1364:24, 1365:22, 1418:21, 1578:22

**PDA** [46] - 1277:14, 1277:16, 1277:17, 1277:19, 1278:3, 1278:18, 1278:22, 1279:5, 1286:6, 1291:20, 1291:23, 1291:25, 1292:7, 1292:9, 1292:10, 1292:12, 1292:13, 1292:21, 1292:25, 1293:13, 1293:21, 1294:10, 1294:13, 1294:16, 1295:13, 1295:17, 1295:22, 1295:25, 1296:11, 1296:12, 1296:18, 1296:24, 1296:25, 1297:5, 1297:13, 1297:14, 1297:15, 1297:17, 1297:18, 1297:20, 1297:22, 1351:14, 1354:8, 1354:11, 1354:21, 1376:18

**pdadb.net** [4] - 1285:19, 1286:5, 1286:11, 1286:20

**PDAs** [3] - 1294:8, 1294:14, 1365:21

**PDX** [1] - 1293:24

**peel** [1] - 1469:16

**pending** [1] - 1523:17

**people** [76] - 1292:24, 1301:4, 1301:5, 1301:8, 1321:14, 1328:25, 1365:25, 1387:12, 1390:7, 1390:9, 1390:17, 1390:19, 1390:24, 1391:7, 1395:5, 1395:19, 1399:2, 1399:3, 1413:12, 1415:25, 1416:8, 1416:11, 1428:16, 1432:2, 1437:2, 1437:7, 1437:25, 1438:8, 1439:16, 1440:7, 1440:12, 1440:15, 1440:23, 1441:11, 1442:16, 1442:17, 1443:18, 1443:23, 1443:24, 1445:2, 1445:17, 1445:18, 1446:5, 1447:4, 1447:12, 1450:5, 1450:14, 1450:20, 1450:21, 1479:17, 1480:10, 1483:12, 1484:15, 1496:1, 1516:25, 1523:14, 1542:16, 1542:23, 1543:14, 1544:3, 1548:1, 1550:4, 1550:9, 1562:5, 1564:20, 1569:18, 1569:25, 1574:4, 1577:21, 1579:1, 1582:16, 1583:10

**per** [51] - 1289:16, 1289:21, 1290:2, 1290:5, 1324:3, 1364:2, 1364:5, 1364:10, 1364:21, 1385:23, 1393:3, 1393:6, 1397:14, 1397:23, 1398:12, 1398:18, 1398:22, 1400:6, 1400:8, 1400:13, 1400:14, 1427:24, 1430:6, 1431:1, 1434:13, 1459:22, 1460:13, 1463:4, 1463:5, 1467:19, 1467:23, 1485:16, 1487:14, 1490:8, 1490:20, 1499:21, 1500:2, 1500:13, 1500:14, 1505:7, 1505:14, 1507:22, 1529:6,

1530:23, 1538:14, 1538:18, 1540:22

**per-month** [2] - 1397:23, 1398:18

**per-unit** [17] - 1324:3, 1385:23, 1397:23, 1398:12, 1400:6, 1400:8, 1400:14, 1431:1, 1459:22, 1460:13, 1463:4, 1463:5, 1467:19, 1490:8, 1505:7, 1505:14, 1507:22

**percent** [129] - 1350:14, 1400:4, 1435:23, 1442:15, 1443:11, 1443:18, 1443:19, 1443:23, 1443:24, 1445:6, 1450:16, 1452:4, 1452:5, 1452:11, 1454:10, 1454:15, 1454:19, 1454:20, 1454:24, 1457:3, 1457:6, 1457:18, 1457:19, 1457:20, 1457:22, 1458:20, 1458:21, 1459:18, 1459:21, 1460:1, 1460:3, 1465:2, 1465:4, 1468:7, 1469:9, 1471:21, 1471:23, 1473:5, 1473:10, 1473:23, 1478:11, 1478:18, 1478:19, 1480:17, 1480:18, 1480:19, 1480:21, 1480:23, 1480:24, 1481:1, 1481:3, 1481:6, 1481:9, 1481:13, 1481:14, 1482:15, 1482:18, 1482:19, 1483:8, 1483:9, 1484:1, 1484:2, 1504:3, 1510:2, 1513:10, 1513:12, 1513:16, 1514:4, 1514:13, 1514:20, 1515:9, 1515:24, 1516:12, 1516:13, 1516:14, 1516:15, 1518:2, 1518:4, 1519:10, 1520:9, 1521:23, 1521:24, 1522:10, 1523:9, 1523:12, 1523:21, 1526:23, 1530:8, 1530:12, 1530:22, 1530:25, 1531:19, 1531:21, 1533:7, 1533:13, 1533:15, 1533:18, 1533:21, 1534:2, 1534:3, 1541:10, 1542:13, 1544:5, 1544:8, 1544:10, 1544:25, 1545:3, 1545:4, 1545:23, 1548:1, 1550:5, 1551:11, 1558:20, 1561:11, 1562:1, 1562:2, 1562:3, 1563:3

**percentage** [17] - 1397:24, 1400:2, 1400:5, 1400:8, 1430:6, 1450:14, 1450:15, 1452:13, 1452:14, 1459:16, 1460:1, 1464:25, 1510:1, 1515:12, 1522:3, 1524:14, 1529:4

**percentages** [18] - 1452:6, 1452:7, 1465:3, 1481:2, 1515:15, 1516:23, 1517:5, 1518:12, 1518:19, 1519:5, 1519:16, 1519:18, 1520:12, 1520:13, 1522:15, 1522:17, 1522:18, 1550:25

**perceptible** [1] - 1341:1

**perfect** [1] - 1443:1

**performed** [1] - 1373:14

**performing** [1] - 1273:19

**performs** [1] - 1345:12

**perhaps** [10] - 1270:14, 1322:21, 1333:5, 1334:18, 1336:12, 1337:2, 1337:8, 1378:24, 1499:25, 1560:22

**period** [17] - 1388:13, 1400:24, 1401:10, 1401:11, 1409:12, 1409:13, 1412:9, 1412:17, 1439:10, 1441:5, 1459:4, 1459:24, 1460:20, 1487:3, 1514:11, 1540:12, 1542:2

**periods** [3] - 1441:7, 1488:9, 1541:15

**peripheral** [2] - 1598:22, 1599:5

**permission** [5] - 1385:6, 1386:16, 1392:14, 1558:22, 1559:17

**persistent** [14] - 1348:18, 1349:6, 1349:7, 1355:10, 1355:17, 1355:21, 1355:24, 1355:25, 1356:3, 1356:15, 1357:1, 1370:16, 1370:24, 1371:10

**persistently** [1] - 1348:14

**person** [5] - 1292:1, 1331:16, 1377:21, 1496:15, 1570:13

**personal** [15] - 1279:9, 1281:8, 1281:11, 1282:22, 1283:6, 1283:14, 1295:8, 1295:13, 1300:4, 1300:5, 1352:10, 1570:21, 1570:22, 1585:13, 1599:10

**PERSONAL** [1] - 1270:1

**Personal** [58] - 1298:22, 1299:2, 1322:19, 1323:25, 1325:17, 1327:2, 1327:20, 1328:1, 1328:4, 1336:21, 1337:20, 1363:10, 1377:5, 1380:2, 1380:14, 1380:18, 1385:3, 1385:11, 1385:16, 1385:24, 1392:10, 1392:19, 1395:9, 1395:22, 1407:12, 1419:22, 1424:16, 1428:22, 1428:24, 1429:1, 1430:9, 1436:18, 1494:13, 1509:8, 1512:2, 1512:15, 1530:12, 1531:12, 1531:25, 1532:11, 1532:22, 1533:5, 1533:7, 1535:6, 1535:17, 1537:7, 1539:1, 1540:24, 1548:13, 1548:15, 1549:4, 1549:14, 1549:20, 1549:22, 1564:12, 1593:16, 1601:6

**perspective** [8] - 1428:24, 1428:25, 1429:2, 1430:3, 1430:9, 1430:15, 1431:4, 1431:15

**perspectives** [2] - 1428:20, 1430:8

**persuade** [1] - 1522:21

**Perusing** [1] - 1554:20

**Peterson** [9] - 1321:5, 1395:24, 1449:13, 1462:1, 1517:8, 1536:2, 1548:12, 1548:24, 1557:21

**Peterson's** [13] - 1451:3, 1451:25, 1470:16, 1471:4, 1471:5, 1478:24, 1479:1, 1479:15, 1516:24, 1542:8, 1548:9, 1548:22, 1557:21

**Phoenix** [1] - 1567:20

**phone** [8] - 1573:12, 1573:13, 1573:20, 1573:23, 1583:25, 1584:2, 1584:3, 1584:9

**phones** [2] - 1365:21, 1584:5

**photos** [6] - 1480:7, 1551:4, 1551:6, 1551:7, 1551:9, 1592:20

**phrase** [3] - 1328:19, 1337:9, 1360:5

**physical** [4] - 1280:12, 1280:13, 1339:7, 1356:20

**picked** [2] - 1301:8, 1586:17

**Picnic** [1] - 1577:9

**picture** [8] - 1297:2, 1297:13, 1297:14, 1297:15, 1297:17, 1297:20, 1541:16, 1585:19

**piece** [6] - 1397:3, 1467:13, 1497:11, 1531:18, 1586:25

**pieces** [3] - 1369:13, 1466:20, 1472:3
**place** [4] - 1291:18, 1294:12, 1302:21, 1460:11
**placed** [1] - 1517:1
**places** [2] - 1294:13, 1361:14
**plaintiff** [2] - 1565:4, 1565:6
**PLAINTIFF** [1] - 1386:4
**Plaintiff's** [193] - 1265:1, 1265:2, 1265:3, 1265:4, 1265:5, 1265:6, 1265:7, 1265:8, 1265:9, 1265:10, 1265:11, 1265:13, 1265:17, 1265:18, 1265:19, 1265:20, 1265:21, 1265:22, 1265:23, 1265:24, 1265:25, 1266:2, 1266:4, 1266:5, 1266:6, 1266:7, 1266:8, 1266:9, 1266:10, 1266:11, 1266:12, 1266:13, 1266:14, 1266:15, 1266:16, 1266:17, 1266:18, 1266:19, 1266:20, 1266:21, 1266:23, 1266:24, 1266:25, 1267:1, 1267:2, 1267:3, 1267:4, 1267:5, 1267:6, 1267:7, 1267:8, 1267:9, 1267:10, 1267:11, 1267:12, 1267:13, 1267:14, 1267:15, 1267:16, 1267:17, 1267:18, 1267:20, 1267:21, 1267:22, 1267:23, 1267:24, 1268:1, 1268:2, 1268:3, 1268:4, 1268:5, 1268:6, 1268:7, 1268:8, 1268:9, 1268:10, 1268:11, 1268:12, 1268:13, 1272:7, 1274:10, 1275:24, 1277:11, 1277:23, 1294:20, 1322:15, 1323:16, 1325:8, 1351:21, 1351:25, 1352:4, 1352:20, 1353:7, 1354:6, 1355:13, 1357:13, 1358:10, 1360:21, 1362:9, 1362:24, 1363:23, 1364:17, 1365:5, 1366:13, 1386:17, 1405:15, 1405:19, 1405:21, 1405:24, 1405:25, 1406:25, 1407:1, 1407:3, 1407:5, 1408:3, 1408:6, 1408:11, 1408:14, 1408:17, 1408:21, 1409:15, 1410:2, 1417:6, 1419:14, 1425:25, 1426:6, 1436:10, 1437:21, 1438:10, 1438:15, 1439:21, 1439:23, 1441:14, 1441:17, 1441:24, 1444:5, 1444:8, 1444:18, 1445:11, 1445:20, 1445:23, 1446:10, 1446:16, 1446:20, 1446:24, 1447:17, 1455:3, 1455:9, 1455:21, 1457:14, 1457:24, 1458:1, 1458:9, 1461:2, 1461:7, 1461:18, 1462:11, 1463:13, 1463:19, 1465:8, 1468:17, 1468:18, 1474:22, 1479:6, 1484:5, 1484:22, 1486:16, 1488:17, 1499:4, 1504:18, 1513:2, 1517:10, 1517:11, 1517:13, 1522:25, 1541:17, 1542:22, 1553:21, 1554:8, 1559:16, 1559:20, 1560:2, 1560:3, 1560:7, 1560:11, 1560:19, 1561:9, 1561:18, 1563:9, 1594:20, 1600:9
**plaintiff's** [5] - 1449:8, 1506:21, 1520:6, 1529:1, 1541:21
**plaintiffs** [4] - 1390:21, 1423:1, 1423:12, 1548:16
**plan** [1] - 1293:6
**planning** [1] - 1336:13

**plastic** [1] - 1572:20
**platform** [1] - 1364:3
**play** [17] - 1346:21, 1440:3, 1536:12, 1536:15, 1550:12, 1550:15, 1550:17, 1557:9, 1572:4, 1574:1, 1574:2, 1575:7, 1576:13, 1578:5, 1585:21, 1586:8, 1586:19
**play/pause** [2] - 1476:11, 1586:10
**playback** [5] - 1307:4, 1348:12, 1349:25, 1350:5, 1579:10
**played** [4] - 1307:8, 1350:11, 1378:13, 1592:23
**player** [45] - 1294:22, 1295:7, 1295:11, 1304:14, 1308:2, 1349:13, 1351:17, 1352:8, 1352:24, 1353:3, 1353:11, 1353:14, 1353:21, 1354:9, 1354:15, 1402:21, 1415:7, 1415:10, 1415:14, 1415:19, 1417:16, 1430:24, 1461:21, 1461:22, 1462:9, 1494:22, 1503:14, 1511:4, 1511:6, 1535:11, 1535:12, 1537:21, 1573:6, 1573:7, 1576:2, 1578:22, 1579:2, 1580:2, 1586:15, 1589:22, 1589:23, 1596:13, 1598:1, 1598:4, 1599:10
**Player** [1] - 1295:17
**player's** [1] - 1308:5
**PlayerDone** [1] - 1582:4
**PlayerNext** [1] - 1582:4
**players** [13] - 1409:6, 1409:7, 1462:6, 1489:17, 1489:18, 1489:19, 1545:15, 1578:16, 1578:18, 1579:16, 1579:19, 1596:16
**playing** [6] - 1274:18, 1305:4, 1550:20, 1576:1, 1585:23, 1586:3
**playlist** [67] - 1313:8, 1313:12, 1313:16, 1346:21, 1346:25, 1348:2, 1349:24, 1350:5, 1350:11, 1350:12, 1416:12, 1416:16, 1418:8, 1427:6, 1427:9, 1427:14, 1427:16, 1428:2, 1428:4, 1440:5, 1440:10, 1441:2, 1445:4, 1449:1, 1450:13, 1450:17, 1452:1, 1452:4, 1452:10, 1478:22, 1525:4, 1525:16, 1526:10, 1526:14, 1527:1, 1534:9, 1535:13, 1535:14, 1536:4, 1536:5, 1536:14, 1537:19, 1543:4, 1544:11, 1546:11, 1546:15, 1546:20, 1546:24, 1547:7, 1547:10, 1548:17, 1549:7, 1553:9, 1553:13, 1553:14, 1553:16, 1556:2, 1556:7, 1556:8, 1556:17, 1557:9, 1576:17, 1577:4, 1578:3, 1592:8, 1592:12
**Playlist** [9] - 1426:22, 1426:24, 1426:25, 1427:1, 1427:9, 1427:19, 1577:5, 1592:4, 1592:6
**playlists** [172] - 1415:11, 1415:12, 1415:16, 1416:9, 1416:15, 1416:17, 1416:20, 1416:21, 1417:22, 1418:3, 1418:10, 1418:14, 1418:23, 1418:25, 1419:4, 1426:18, 1426:24, 1428:7, 1428:13, 1428:16, 1428:17, 1436:3, 1436:8, 1437:3, 1437:7, 1437:9,

1437:10, 1437:11, 1437:19, 1437:25, 1438:8, 1440:15, 1442:6, 1442:12, 1442:15, 1443:8, 1444:25, 1445:1, 1445:3, 1445:9, 1446:4, 1447:5, 1447:13, 1447:24, 1448:14, 1449:4, 1450:4, 1450:16, 1451:10, 1451:14, 1451:19, 1452:15, 1453:10, 1453:11, 1462:6, 1474:3, 1476:8, 1476:15, 1476:16, 1476:17, 1477:13, 1477:18, 1477:20, 1478:2, 1478:22, 1478:23, 1480:2, 1482:2, 1482:25, 1483:1, 1483:3, 1483:6, 1483:7, 1483:9, 1483:12, 1483:14, 1483:16, 1483:17, 1483:19, 1484:13, 1484:15, 1484:16, 1484:25, 1485:2, 1485:8, 1485:9, 1490:23, 1523:8, 1523:21, 1523:24, 1524:2, 1524:15, 1524:23, 1524:24, 1524:25, 1525:16, 1526:1, 1526:7, 1526:9, 1526:19, 1526:25, 1532:16, 1535:7, 1535:8, 1535:12, 1535:18, 1535:20, 1535:21, 1535:22, 1536:8, 1536:23, 1537:5, 1537:8, 1537:9, 1537:11, 1542:13, 1542:17, 1542:19, 1542:24, 1543:3, 1543:11, 1543:12, 1543:14, 1543:21, 1543:23, 1544:1, 1544:5, 1544:14, 1544:24, 1545:1, 1545:16, 1545:23, 1546:2, 1546:7, 1546:17, 1547:15, 1547:20, 1547:23, 1548:3, 1548:19, 1549:10, 1549:11, 1549:13, 1549:20, 1550:4, 1550:9, 1552:2, 1552:15, 1552:18, 1552:21, 1556:20, 1557:21, 1562:22, 1576:25, 1577:22, 1578:4, 1590:8, 1592:7, 1596:15, 1596:20, 1596:22
**Playlists** [4] - 1427:20, 1427:21, 1539:6, 1592:7
**playlists'** [1] - 1528:1
**plays** [3] - 1304:14, 1550:11, 1550:13
**plot** [1] - 1497:19
**plug** [11] - 1314:25, 1315:1, 1315:4, 1315:6, 1316:1, 1418:5, 1418:19, 1442:19, 1466:5, 1477:15, 1596:13
**plugging** [2] - 1443:6, 1482:9
**plus** [8] - 1331:1, 1335:10, 1335:12, 1373:9, 1374:6, 1374:9, 1531:22, 1532:7
**Plywood** [1] - 1410:16
**plywood** [2] - 1410:19
**pocket** [2] - 1475:11, 1543:15
**pocket-sized** [1] - 1475:11
**podcasts** [1] - 1550:12
**point** [70] - 1273:5, 1273:18, 1274:3, 1278:8, 1291:14, 1291:15, 1298:12, 1298:14, 1301:15, 1303:25, 1305:5, 1308:20, 1309:13, 1310:4, 1318:25, 1321:18, 1326:8, 1329:20, 1333:9, 1333:22, 1334:11, 1334:18, 1335:13, 1347:22, 1348:1, 1348:3, 1351:8, 1351:9, 1362:17, 1363:21, 1364:14, 1366:25, 1376:11, 1379:23, 1381:11, 1382:18, 1412:15, 1412:20, 1414:6,

1421:25, 1433:15, 1434:7, 1438:25, 1455:19, 1457:9, 1458:16, 1467:24, 1469:19, 1469:25, 1479:17, 1515:23, 1517:23, 1518:17, 1518:21, 1520:11, 1521:8, 1522:1, 1522:13, 1527:21, 1529:20, 1532:21, 1556:25, 1565:13, 1571:23, 1576:1, 1576:13, 1581:20, 1590:14

**point-and-click** [1] - 1571:23
**pointed** [2] - 1272:12, 1380:10
**pointer** [2] - 1469:6, 1481:5
**pointing** [5] - 1300:7, 1300:24, 1301:3, 1301:12, 1302:21
**points** [4] - 1441:12, 1479:19, 1480:1
**popular** [9] - 1431:18, 1440:11, 1440:12, 1440:16, 1442:16, 1443:15, 1445:3, 1472:22, 1478:14
**popularity** [2] - 1435:2, 1435:16
**port** [3] - 1290:19, 1290:23, 1291:17
**portability** [5] - 1473:14, 1474:5, 1478:14, 1480:23, 1516:14
**portable** [12] - 1364:23, 1365:22, 1417:17, 1475:11, 1476:23, 1518:8, 1552:21, 1573:7, 1578:17, 1578:22, 1579:16, 1579:19
**PortalPlayer** [1] - 1365:24
**portion** [36] - 1322:24, 1340:9, 1363:2, 1363:24, 1388:5, 1404:21, 1413:3, 1418:16, 1424:9, 1426:14, 1435:6, 1436:15, 1439:4, 1442:23, 1452:24, 1455:13, 1456:6, 1456:19, 1465:10, 1466:18, 1466:19, 1466:22, 1473:19, 1480:14, 1480:16, 1486:1, 1510:4, 1516:1, 1525:3, 1528:4, 1529:25, 1530:6, 1530:10, 1551:8, 1562:15
**position** [1] - 1510:7
**positive** [2] - 1555:12, 1555:18
**possible** [6] - 1283:8, 1377:21, 1377:24, 1378:5, 1507:17, 1527:13
**possibly** [1] - 1329:7
**potentially** [1] - 1331:13
**power** [1] - 1462:25
**PowerPoint** [1] - 1395:6
**practice** [1] - 1298:23
**practices** [1] - 1494:14
**precise** [2] - 1413:23, 1470:22
**predecessor** [1] - 1428:21
**predicate** [1] - 1560:24
**preferably** [2] - 1300:5, 1367:3
**preference** [2] - 1423:4, 1428:1
**preferences** [1] - 1301:4
**preferred** [7] - 1295:2, 1296:21, 1352:14, 1352:25, 1353:21, 1354:1, 1551:25
**prejudicial** [2] - 1470:21, 1470:25
**preliminary** [5] - 1270:20, 1330:10, 1347:22, 1348:1
**preparations** [1] - 1555:10
**prepare** [2] - 1393:5, 1446:8
**prepared** [11] - 1372:13, 1375:10,

1392:9, 1392:13, 1406:1, 1406:9, 1407:4, 1411:4, 1444:19, 1445:10, 1570:5
**presence** [2] - 1565:15, 1601:5
**PRESENT** [2] - 1270:4, 1270:5
**present** [17] - 1320:14, 1320:15, 1367:12, 1374:6, 1374:11, 1376:9, 1376:10, 1377:15, 1377:17, 1377:18, 1422:13, 1422:14, 1470:13, 1470:14, 1528:23, 1528:24, 1551:10
**Present** [1] - 1363:13
**presentation** [3] - 1384:8, 1461:11, 1499:10
**presentations** [5] - 1388:21, 1389:5, 1395:6, 1436:5, 1519:13
**presented** [4] - 1311:7, 1323:8, 1377:13, 1379:3
**Presents** [1] - 1417:13
**preserve** [1] - 1333:20
**preserved** [3] - 1321:18, 1333:22, 1334:11
**president** [1] - 1379:16
**PRESIDING** [1] - 1270:3
**press** [9] - 1417:11, 1426:7, 1536:3, 1586:9, 1587:3, 1587:25, 1588:3, 1588:7, 1589:18
**pressed** [1] - 1554:22
**presumably** [4] - 1500:23, 1536:15, 1556:8, 1556:24
**presumption** [1] - 1414:1
**Pretty** [1] - 1569:13
**pretty** [7] - 1289:20, 1312:23, 1329:12, 1330:23, 1388:6, 1502:9, 1534:22
**previous** [5] - 1274:15, 1326:12, 1405:18, 1460:2, 1586:5
**previously** [5] - 1279:6, 1407:14, 1409:3, 1417:7, 1426:10
**previously-admitted** [1] - 1417:7
**price** [28] - 1357:2, 1419:6, 1419:11, 1454:2, 1454:4, 1454:5, 1456:21, 1456:24, 1457:14, 1457:16, 1458:14, 1458:15, 1459:3, 1459:4, 1461:25, 1469:7, 1469:9, 1471:21, 1473:20, 1488:9, 1509:25, 1530:18, 1530:21, 1533:19, 1538:7
**prices** [2] - 1459:11, 1464:5
**primary** [3] - 1475:8, 1475:14, 1569:17
**print** [1] - 1574:3
**prior-type** [1] - 1415:24
**Privacy** [1] - 1569:13
**privacy** [1] - 1569:15
**probative** [3] - 1453:7, 1470:19, 1470:24
**problem** [3] - 1323:19, 1334:24, 1433:21
**problems** [1] - 1329:22
**procedure** [1] - 1299:22
**procedures** [1] - 1564:9
**proceed** [1] - 1350:17
**proceedings** [1] - 1271:18

**Proceedings** [1] - 1601:20
**PROCEEDINGS** [1] - 1601:22
**process** [7] - 1311:17, 1311:20, 1311:24, 1312:22, 1418:11, 1481:15, 1527:14
**processes** [1] - 1435:10
**processing** [2] - 1353:20, 1574:3
**processor** [9] - 1296:5, 1331:10, 1367:8, 1454:13, 1462:1, 1462:21, 1465:23, 1467:1, 1568:20
**processors** [1] - 1357:10
**produce** [1] - 1430:19
**produced** [19] - 1327:5, 1327:11, 1327:15, 1363:11, 1391:24, 1394:25, 1395:1, 1395:3, 1402:7, 1430:18, 1438:16, 1438:18, 1445:25, 1454:1, 1553:22, 1561:8, 1570:22
**Product** [2] - 1517:13
**product** [90] - 1378:14, 1379:18, 1381:20, 1382:3, 1385:23, 1391:18, 1393:22, 1395:20, 1396:9, 1403:25, 1404:6, 1404:8, 1405:12, 1411:19, 1413:8, 1414:5, 1424:24, 1426:21, 1431:21, 1432:11, 1432:12, 1433:5, 1433:6, 1433:8, 1433:9, 1433:10, 1434:11, 1435:1, 1436:7, 1436:8, 1439:6, 1448:7, 1451:23, 1455:11, 1455:16, 1455:20, 1456:15, 1458:16, 1459:6, 1459:7, 1459:10, 1461:8, 1461:9, 1463:6, 1465:15, 1465:16, 1467:16, 1467:18, 1474:24, 1475:3, 1489:17, 1494:14, 1503:9, 1503:12, 1504:1, 1505:16, 1505:18, 1507:16, 1513:23, 1515:3, 1517:9, 1525:23, 1530:19, 1557:14, 1561:16, 1568:25, 1569:1, 1569:12, 1569:14, 1570:9, 1570:10, 1570:15, 1573:13, 1578:25, 1579:13, 1579:14, 1580:14, 1580:16, 1580:21, 1581:1, 1581:2, 1581:5, 1583:1, 1583:22, 1583:25, 1584:9, 1595:19, 1595:20
**product's** [2] - 1425:7, 1451:7
**product..** [1] - 1371:2
**Products** [1] - 1579:23
**products** [45] - 1331:13, 1383:19, 1391:15, 1393:7, 1395:19, 1396:9, 1399:16, 1401:10, 1401:15, 1401:18, 1401:20, 1402:22, 1403:22, 1405:11, 1406:16, 1407:25, 1412:14, 1420:4, 1421:21, 1422:5, 1426:9, 1431:19, 1432:1, 1432:13, 1432:23, 1433:1, 1448:11, 1459:13, 1463:8, 1465:7, 1465:14, 1465:18, 1487:15, 1488:3, 1488:15, 1551:24, 1555:1, 1566:14, 1570:6, 1573:11, 1579:20, 1579:22, 1579:24, 1581:2
**products'** [2] - 1438:24, 1554:24
**profession** [2] - 1387:16, 1389:12
**professional** [1] - 1388:20
**professionally** [1] - 1568:14
**professor** [3] - 1395:23, 1449:18,

1548:14
  **profit** [39] - 1425:1, 1435:7, 1452:24, 1453:21, 1454:9, 1454:19, 1454:25, 1464:13, 1469:8, 1469:11, 1469:14, 1469:20, 1470:3, 1471:20, 1471:21, 1471:24, 1472:1, 1472:12, 1472:14, 1473:21, 1481:7, 1481:10, 1484:12, 1485:10, 1488:9, 1488:20, 1498:12, 1498:15, 1504:2, 1513:6, 1527:13, 1528:4, 1530:24, 1531:5, 1531:8, 1531:10, 1531:21, 1531:22, 1541:10
  **profitability** [32] - 1411:18, 1434:25, 1435:1, 1435:12, 1452:19, 1452:20, 1452:22, 1452:24, 1453:2, 1453:14, 1453:23, 1454:23, 1457:9, 1458:5, 1459:25, 1460:7, 1460:20, 1472:2, 1481:23, 1487:7, 1487:9, 1487:12, 1488:8, 1521:1, 1528:3, 1530:2, 1533:2, 1538:7, 1541:7, 1541:9, 1541:11, 1541:15
  **profitable** [1] - 1460:12
  **profits** [18] - 1459:16, 1459:17, 1473:5, 1485:4, 1510:10, 1529:25, 1530:7, 1530:10, 1531:13, 1532:8, 1532:20, 1532:22, 1533:7, 1534:2, 1534:3, 1538:24, 1540:22, 1550:17
  **program** [20] - 1274:19, 1301:10, 1304:14, 1307:3, 1307:6, 1307:7, 1308:3, 1340:25, 1389:2, 1390:14, 1447:4, 1447:23, 1467:19, 1575:2, 1575:4, 1575:12, 1580:2, 1582:19, 1589:24, 1591:10
  **programmed** [1] - 1347:5
  **programs** [7] - 1301:9, 1315:13, 1568:19, 1572:9, 1573:16, 1573:19, 1591:8
  **project** [8] - 1379:21, 1381:4, 1384:5, 1579:12, 1580:24, 1580:25, 1581:19, 1581:21
  **projected** [8] - 1453:21, 1458:7, 1458:13, 1460:5, 1460:9, 1460:16, 1469:11, 1469:13
  **projecting** [2] - 1460:15, 1468:6
  **projection** [4] - 1454:23, 1458:23, 1461:1, 1541:10
  **projects** [1] - 1572:2
  **prominently** [1] - 1478:13
  **promoted** [2] - 1428:8, 1480:11
  **promoting** [3] - 1417:24, 1426:8, 1497:8
  **promotional** [1] - 1436:6
  **prompted** [1] - 1555:21
  **proper** [1] - 1334:8
  **properly** [2] - 1409:18
  **Property** [3] - 1387:7, 1389:1, 1389:19
  **property** [15] - 1387:8, 1387:11, 1388:24, 1389:7, 1390:4, 1390:23, 1397:3, 1397:5, 1397:8, 1397:10, 1397:11, 1397:12, 1397:16, 1398:5, 1501:19
  **proposal** [2] - 1270:24, 1332:5

  **proposals** [2] - 1270:9, 1320:10
  **proposed** [2] - 1302:9, 1322:14
  **proposing** [1] - 1301:2
  **prosecution** [16] - 1298:24, 1302:3, 1302:10, 1302:14, 1303:13, 1303:16, 1303:25, 1304:3, 1304:6, 1305:23, 1306:5, 1309:4, 1341:10, 1342:18, 1342:21, 1343:10
  **protection** [1] - 1569:15
  **protocol** [1] - 1316:15
  **prototypes** [1] - 1381:7
  **Proud** [1] - 1577:10
  **prove** [2] - 1512:14, 1512:18
  **proven** [2] - 1580:5, 1580:15
  **provide** [15] - 1372:19, 1385:22, 1386:10, 1387:10, 1486:17, 1487:20, 1505:12, 1512:8, 1514:20, 1516:16, 1518:23, 1519:16, 1520:11, 1522:17, 1549:3
  **provided** [12] - 1315:22, 1351:22, 1369:6, 1386:15, 1400:25, 1416:12, 1428:15, 1434:5, 1487:25, 1496:20, 1518:12, 1526:17
  **provides** [7] - 1294:5, 1396:18, 1510:22, 1511:4, 1518:19, 1519:16, 1534:13
  **providing** [1] - 1513:21
  **proving** [1] - 1512:3
  **prudent** [2] - 1425:2, 1496:15
  **public** [2] - 1385:12, 1386:9
  **publication** [6] - 1316:17, 1316:23, 1317:9, 1318:8, 1319:16, 1338:17
  **publications** [1] - 1362:2
  **publish** [3] - 1386:16, 1392:14, 1559:18
  **publishing** [1] - 1559:21
  **pull** [13] - 1294:19, 1297:8, 1308:23, 1389:8, 1403:1, 1448:9, 1499:3, 1504:18, 1507:21, 1517:11, 1544:18, 1553:18, 1594:19
  **pulling** [1] - 1485:15
  **purchase** [1] - 1552:20
  **purchased** [1] - 1396:3
  **purpose** [6] - 1299:23, 1357:11, 1357:15, 1357:18, 1361:8, 1361:9
  **purposes** [4] - 1350:7, 1407:20, 1470:18, 1586:12
  **pursuant** [1] - 1564:9
  **pursue** [3] - 1310:21, 1310:25, 1382:20
  **pursuing** [1] - 1490:2
  **pushing** [1] - 1553:17
  **PUT** [1] - 1365:19
  **put** [42] - 1279:13, 1291:18, 1331:13, 1334:3, 1336:9, 1345:7, 1352:6, 1390:13, 1401:25, 1406:22, 1416:11, 1416:12, 1416:13, 1422:17, 1433:4, 1440:25, 1461:11, 1463:10, 1480:17, 1490:20, 1495:13, 1503:10, 1503:25, 1504:21, 1505:17, 1505:24, 1506:19, 1520:14, 1535:25, 1564:20, 1570:5,

1573:20, 1575:20, 1575:25, 1581:23, 1584:2, 1585:15, 1588:17, 1589:10, 1589:13, 1593:9, 1598:24
  **puts** [3] - 1364:18, 1428:3, 1503:24
  **putting** [6] - 1296:2, 1335:16, 1481:17, 1519:11, 1519:13, 1584:5
  **PX** [22] - 1267:25, 1365:6, 1392:15, 1392:18, 1393:20, 1396:16, 1399:19, 1400:19, 1402:5, 1411:9, 1411:11, 1424:1, 1434:18, 1457:13, 1460:3, 1469:2, 1471:25, 1480:13, 1488:17, 1537:24, 1544:18, 1554:11

## Q

  **qualifiers** [1] - 1283:9
  **quality** [12] - 1284:17, 1285:3, 1289:9, 1473:14, 1474:6, 1475:12, 1477:5, 1480:24, 1516:15, 1518:10, 1572:7, 1572:11
  **quarter** [19] - 1280:7, 1280:14, 1320:6, 1320:9, 1324:15, 1324:20, 1403:12, 1403:13, 1403:14, 1403:15, 1403:18, 1403:19, 1406:19, 1420:21, 1470:8, 1470:10, 1540:14, 1562:2, 1562:3
  **quarter-size** [1] - 1420:21
  **quarterly** [1] - 1406:11
  **quarters** [3] - 1290:11, 1514:13, 1562:16
  **question-and-answer** [1] - 1338:13
  **questioning** [2] - 1271:23, 1376:24
  **questionnaire** [1] - 1479:18, 1549:2
  **questionnaires** [1] - 1450:23
  **questions** [21] - 1271:12, 1291:11, 1309:25, 1321:7, 1328:19, 1338:15, 1339:11, 1350:16, 1350:24, 1359:23, 1366:6, 1373:5, 1374:14, 1377:19, 1384:21, 1440:1, 1441:21, 1450:20, 1564:10, 1570:6, 1591:16
  **queued** [1] - 1376:3
  **quick** [3] - 1369:19, 1370:9, 1419:3
  **quickly** [5] - 1368:6, 1371:13, 1371:16, 1372:5, 1484:19
  **quite** [14] - 1274:6, 1284:17, 1285:2, 1285:4, 1297:16, 1306:19, 1325:23, 1333:19, 1346:1, 1377:23, 1384:1, 1413:24, 1416:25, 1540:21
  **quote** [1] - 1440:21
  **quoting** [3] - 1536:3, 1552:17, 1553:7

## R

  **Rader** [2] - 1334:5
  **radio** [2] - 1600:15, 1600:19
  **raise** [2] - 1321:1, 1326:9
  **raised** [1] - 1332:7
  **RAM** [11] - 1348:19, 1349:14, 1355:16, 1370:10, 1370:11, 1370:18, 1370:23, 1370:24, 1371:9, 1371:10, 1464:7

**ran** [1] - 1520:25
**range** [46] - 1281:15, 1324:3, 1385:23, 1452:6, 1481:10, 1485:3, 1485:4, 1485:13, 1485:15, 1485:17, 1485:19, 1487:10, 1487:13, 1488:10, 1488:14, 1488:20, 1513:12, 1513:14, 1513:16, 1513:19, 1513:22, 1519:20, 1524:6, 1524:8, 1524:12, 1527:10, 1527:12, 1527:17, 1527:20, 1527:22, 1527:25, 1528:8, 1529:5, 1529:10, 1529:13, 1529:23, 1530:4, 1530:5, 1530:14, 1530:16, 1530:18, 1530:24, 1533:9, 1533:10, 1540:11, 1542:16
**ranged** [1] - 1280:6
**ranges** [2] - 1524:19, 1530:3
**rapidly** [1] - 1294:6
**rate** [42] - 1282:21, 1364:7, 1393:2, 1394:21, 1398:12, 1399:14, 1400:4, 1409:24, 1410:8, 1421:10, 1421:12, 1421:20, 1421:22, 1430:5, 1430:10, 1430:13, 1431:4, 1485:13, 1486:12, 1486:22, 1487:13, 1487:21, 1488:1, 1488:2, 1488:3, 1488:11, 1488:14, 1488:19, 1488:21, 1489:22, 1490:5, 1490:8, 1490:11, 1509:5, 1529:18, 1530:4, 1531:6, 1531:7, 1531:15, 1532:23, 1539:21, 1545:22
**rates** [3] - 1431:2, 1431:3, 1538:8
**rather** [4] - 1321:15, 1332:21, 1342:4, 1370:10
**re** [1] - 1320:24
**re-go** [1] - 1320:24
**reach** [3] - 1506:15, 1507:10, 1531:4
**reached** [4] - 1382:18, 1392:2, 1486:4, 1564:17
**reaching** [1] - 1362:7
**read** [46] - 1279:18, 1284:24, 1301:24, 1302:5, 1307:1, 1307:9, 1307:10, 1307:15, 1317:8, 1318:7, 1319:1, 1319:9, 1319:15, 1338:15, 1338:17, 1339:11, 1341:1, 1342:3, 1342:23, 1342:25, 1348:24, 1349:3, 1368:17, 1368:18, 1370:23, 1371:9, 1424:14, 1432:19, 1434:23, 1448:3, 1474:12, 1518:5, 1519:12, 1550:1, 1552:7, 1553:6, 1554:3, 1554:14, 1555:7, 1555:15, 1557:6, 1559:5, 1577:6, 1577:7, 1577:8
**readable** [1] - 1576:10
**readiness** [1] - 1455:12
**Reading** [2] - 1284:25, 1552:10
**reading** [34] - 1287:13, 1287:14, 1291:6, 1302:7, 1316:17, 1316:23, 1319:10, 1336:1, 1336:15, 1343:14, 1343:19, 1347:25, 1349:22, 1367:2, 1368:20, 1417:15, 1417:20, 1417:21, 1418:22, 1424:15, 1426:15, 1436:24, 1437:2, 1475:8, 1476:6, 1476:10, 1549:8, 1549:9, 1549:25, 1551:23, 1552:18, 1553:8, 1555:21
**reads** [3] - 1347:17, 1348:18, 1349:5

**ready** [1] - 1376:4
**real** [12] - 1277:16, 1303:21, 1303:24, 1304:4, 1332:22, 1371:13, 1397:8, 1413:11, 1413:12, 1425:9, 1507:19, 1508:18
**real-world** [1] - 1413:11
**realizable** [1] - 1435:7
**realize** [2] - 1313:16, 1494:25
**realized** [1] - 1472:25
**really** [40] - 1273:15, 1301:2, 1301:9, 1301:10, 1305:1, 1308:19, 1309:17, 1310:3, 1310:24, 1318:24, 1319:10, 1327:2, 1331:15, 1334:6, 1341:9, 1342:17, 1344:6, 1368:21, 1387:17, 1387:20, 1388:1, 1391:4, 1431:25, 1434:5, 1435:11, 1436:4, 1474:7, 1478:17, 1489:25, 1490:9, 1490:13, 1492:15, 1518:25, 1527:17, 1566:22, 1569:6, 1572:16, 1574:17, 1579:7, 1599:15
**rearrange** [1] - 1577:17
**reason** [9] - 1287:2, 1287:5, 1288:10, 1288:16, 1321:16, 1530:17, 1556:16, 1565:3, 1569:17
**reasonable** [34] - 1282:23, 1282:24, 1283:4, 1283:12, 1283:25, 1284:10, 1307:16, 1324:8, 1324:25, 1325:5, 1328:22, 1328:23, 1329:3, 1396:22, 1396:23, 1397:2, 1410:9, 1413:20, 1425:1, 1485:17, 1485:22, 1493:2, 1496:12, 1498:10, 1498:13, 1504:23, 1505:3, 1507:15, 1508:14, 1509:10, 1512:10, 1512:18, 1512:20, 1534:15
**reasonably** [6] - 1279:8, 1425:19, 1506:12, 1506:14, 1507:10, 1507:21
**reasons** [9] - 1321:24, 1384:13, 1463:15, 1466:15, 1468:19, 1472:4, 1504:2, 1507:22, 1569:15
**reassuring** [2] - 1555:14, 1555:23
**recalled** [2] - 1319:20, 1339:4
**receive** [6] - 1381:20, 1392:11, 1415:10, 1436:2, 1535:11, 1545:16
**received** [2] - 1551:25, 1568:4
**receives** [5] - 1316:24, 1317:10, 1318:9, 1319:17, 1338:18
**receiving** [2] - 1449:1, 1600:14
**recent** [7] - 1312:16, 1325:18, 1400:24, 1401:11, 1409:13, 1510:15, 1554:25
**Recently** [1] - 1592:10
**recently** [5] - 1334:1, 1336:1, 1433:3, 1435:22, 1463:7
**recess** [5] - 1320:8, 1376:7, 1422:11, 1470:10, 1528:20
**Recess** [5] - 1320:13, 1376:8, 1422:12, 1470:12, 1528:22
**recipe** [1] - 1481:20
**recipient** [1] - 1380:6
**recitation** [1] - 1520:24
**recognize** [1] - 1304:22
**recollection** [7] - 1306:4, 1381:16, 1381:21, 1382:15, 1383:3, 1550:19,

1600:8
**recommendations** [1] - 1367:3
**recommended** [1] - 1307:3
**reconfirm** [1] - 1554:19
**RECORD** [1] - 1601:22
**record** [22] - 1287:15, 1322:3, 1343:16, 1343:18, 1345:15, 1345:17, 1345:22, 1345:25, 1349:12, 1359:17, 1373:22, 1379:7, 1405:14, 1410:1, 1411:7, 1470:18, 1471:9, 1471:13, 1484:4, 1574:6, 1598:25, 1601:19
**recorders** [1] - 1383:23
**records** [1] - 1402:4
**recovery** [1] - 1557:5
**red** [2] - 1397:1, 1434:24
**redact** [1] - 1324:10
**redacted** [1] - 1322:21
**redaction** [1] - 1323:5
**redactions** [1] - 1322:14
**redirect** [1] - 1336:16
**REDIRECT** [2] - 1350:20, 1557:18
**reduce** [3] - 1481:22, 1545:8, 1545:10
**reduction** [2] - 1298:23, 1531:17
**reexamination** [1] - 1271:9
**refer** [5] - 1455:5, 1496:9, 1499:12, 1514:22, 1547:2
**reference** [7] - 1300:2, 1366:9, 1367:15, 1410:10, 1489:7, 1515:21, 1526:11
**referenced** [2] - 1286:8, 1460:8
**references** [1] - 1292:7
**referred** [14] - 1305:7, 1340:16, 1367:1, 1378:21, 1408:2, 1424:7, 1431:23, 1432:20, 1495:24, 1496:6, 1496:7, 1497:10, 1499:6, 1537:9
**referring** [17] - 1284:23, 1307:11, 1325:10, 1341:3, 1342:4, 1371:2, 1393:22, 1393:25, 1406:12, 1437:6, 1507:8, 1515:6, 1524:23, 1544:19, 1563:1, 1595:15, 1600:3
**refers** [7] - 1282:4, 1282:6, 1288:2, 1306:25, 1456:1, 1482:7, 1503:4
**reflect** [1] - 1324:2
**reflected** [2] - 1348:25, 1354:5
**reflects** [1] - 1506:5
**refresh** [3] - 1306:4, 1306:11, 1600:7
**regard** [1] - 1378:23
**regarding** [8] - 1321:11, 1324:8, 1383:6, 1383:24, 1413:25, 1495:10, 1517:16, 1561:15
**reincarnation** [1] - 1323:22
**rejected** [2] - 1340:10, 1342:8
**rejection** [1] - 1306:6, 1341:14
**relate** [13] - 1309:17, 1309:24, 1311:1, 1342:20, 1367:19, 1405:12, 1411:14, 1472:9, 1478:16, 1532:4, 1535:10, 1581:15, 1582:23
**related** [22] - 1275:16, 1304:5, 1321:4, 1343:1, 1384:1, 1388:17, 1389:6, 1429:8, 1431:6, 1435:14, 1450:3,

1450:4, 1450:5, 1462:9, 1481:10, 1484:13, 1528:1, 1528:2, 1528:4, 1539:8, 1558:1, 1562:19

**relates** [20] - 1311:8, 1343:21, 1389:7, 1404:7, 1415:6, 1416:7, 1424:13, 1435:8, 1438:18, 1465:13, 1465:22, 1472:25, 1520:18, 1528:3, 1532:3, 1533:3, 1547:23, 1551:12, 1559:22, 1597:25

**relating** [11] - 1381:9, 1387:10, 1390:23, 1406:16, 1430:24, 1460:25, 1483:3, 1509:17, 1525:14, 1532:15, 1543:3

**relation** [1] - 1322:13

**relationship** [6] - 1397:9, 1397:19, 1494:24, 1497:4, 1584:1, 1584:8

**relative** [5] - 1451:19, 1468:10, 1479:2, 1479:21, 1516:25

**relatively** [2] - 1402:1, 1432:2

**release** [3] - 1289:2, 1417:11, 1426:7

**released** [5] - 1287:8, 1570:24, 1572:21, 1575:15, 1581:17

**releases** [1] - 1536:3

**relevance** [1] - 1449:6

**relevant** [10] - 1305:6, 1334:20, 1350:4, 1351:12, 1353:13, 1366:3, 1378:12, 1448:10, 1540:7, 1566:22

**reliable** [1] - 1286:6

**relied** [4] - 1285:18, 1519:4, 1542:2, 1554:15

**rely** [2] - 1348:12, 1464:12

**relying** [2] - 1342:22, 1506:10

**remain** [1] - 1533:4

**remaining** [3] - 1473:10, 1531:20, 1531:22

**remember** [32] - 1277:14, 1288:9, 1289:23, 1298:8, 1303:15, 1305:10, 1306:9, 1306:20, 1316:12, 1316:16, 1317:19, 1327:18, 1341:9, 1343:24, 1352:18, 1358:1, 1361:10, 1371:15, 1388:12, 1419:18, 1431:20, 1431:21, 1432:14, 1433:6, 1469:12, 1474:16, 1495:11, 1495:20, 1504:24, 1535:8, 1583:23, 1600:24

**remembering** [1] - 1376:21

**remind** [3] - 1271:8, 1580:20, 1581:7

**removed** [1] - 1401:14

**removing** [1] - 1581:4

**render** [1] - 1391:24

**renew** [2] - 1321:2, 1376:14

**rent** [23] - 1397:7, 1397:14, 1397:17, 1397:19, 1397:24, 1398:18, 1398:19, 1499:6, 1499:13, 1499:15, 1499:16, 1499:17, 1499:21, 1499:24, 1500:1, 1500:21, 1500:24, 1501:3, 1501:11, 1502:9

**rental** [1] - 1501:1

**renter** [1] - 1502:11

**renting** [4] - 1500:13, 1500:14, 1501:8, 1501:9

**renumbered** [1] - 1312:9

**reorder** [1] - 1578:5

**repeat** [8] - 1346:16, 1346:20, 1371:14, 1371:17, 1371:19, 1371:20, 1374:3

**replace** [1] - 1574:4

**report** [34] - 1285:19, 1285:22, 1286:1, 1292:8, 1293:9, 1308:8, 1312:17, 1312:20, 1314:14, 1315:12, 1339:6, 1342:24, 1343:14, 1347:16, 1347:20, 1421:1, 1433:13, 1433:14, 1441:8, 1450:12, 1464:12, 1470:17, 1488:22, 1516:12, 1521:7, 1529:23, 1551:13, 1551:20, 1552:14, 1552:17, 1554:15, 1554:17, 1554:18, 1559:12

**REPORTER** [3] - 1341:20, 1571:14, 1587:12

**reporter** [2] - 1341:24, 1377:18

**REPORTER'S** [2] - 1270:1, 1601:21

**reports** [7] - 1291:21, 1313:3, 1323:23, 1465:6, 1468:2, 1517:9, 1556:12

**represent** [9] - 1277:17, 1277:18, 1281:25, 1285:23, 1361:15, 1403:12, 1441:11, 1454:16, 1474:2

**representation** [3] - 1278:14, 1285:14, 1577:19

**representative** [4] - 1279:4, 1298:22, 1299:2, 1565:9

**represented** [2] - 1323:25, 1328:4

**representing** [4] - 1278:12, 1278:20, 1278:22, 1491:12

**represents** [15] - 1392:25, 1394:1, 1396:23, 1401:8, 1405:2, 1411:24, 1454:5, 1454:21, 1456:11, 1457:15, 1488:18, 1506:7, 1526:23, 1526:25, 1534:2

**reproducing** [1] - 1340:25

**reproduction** [2] - 1274:18, 1305:8

**Request** [1] - 1436:23

**request** [37] - 1314:15, 1314:25, 1315:14, 1316:6, 1316:13, 1316:18, 1316:20, 1317:2, 1317:4, 1317:22, 1318:1, 1318:2, 1319:12, 1321:22, 1335:6, 1339:8, 1357:23, 1358:1, 1358:7, 1358:10, 1358:11, 1358:15, 1358:25, 1359:5, 1359:8, 1359:10, 1359:11, 1360:7, 1360:10, 1436:14, 1436:16, 1436:24, 1590:5, 1590:8, 1590:12

**requested** [2] - 1324:10, 1437:15

**requests** [12] - 1308:3, 1316:24, 1317:10, 1317:23, 1317:24, 1318:9, 1319:17, 1334:21, 1338:18, 1339:7, 1358:4, 1358:6

**require** [1] - 1505:14

**required** [8] - 1284:13, 1309:6, 1378:18, 1492:24, 1512:17, 1563:20, 1570:12

**requirement** [3] - 1310:22, 1370:20, 1395:4

**requirements** [7] - 1279:8, 1283:4, 1283:12, 1293:19, 1337:12, 1337:16,

1367:6

**requires** [2] - 1505:6, 1510:15

**requiring** [1] - 1305:4

**research** [5] - 1383:15, 1383:17, 1552:19, 1555:11, 1572:2

**reserved** [1] - 1421:8

**respect** [28] - 1305:1, 1308:11, 1309:18, 1310:1, 1310:3, 1317:22, 1321:5, 1321:10, 1325:2, 1327:3, 1327:13, 1327:16, 1328:1, 1328:7, 1329:19, 1329:20, 1335:5, 1335:12, 1343:3, 1356:19, 1362:7, 1363:25, 1367:10, 1369:1, 1525:16, 1536:1, 1538:4, 1566:17

**respond** [2] - 1307:23, 1450:20

**responded** [1] - 1343:5

**respondents** [10] - 1445:15, 1446:6, 1542:13, 1543:21, 1543:22, 1544:23, 1544:25, 1562:7, 1562:14, 1562:15

**response** [6] - 1310:22, 1319:14, 1319:15, 1366:19, 1404:14, 1436:23

**responsibility** [2] - 1583:8, 1583:14

**responsible** [1] - 1583:11

**responsive** [3] - 1274:17, 1276:2, 1276:24

**rest** [9] - 1272:20, 1301:24, 1418:4, 1423:1, 1460:9, 1460:14, 1503:20, 1514:15, 1564:22

**restated** [1] - 1322:7

**restating** [1] - 1322:2

**restaurant** [4] - 1472:16, 1472:18, 1472:19

**rested** [2] - 1564:7, 1564:8

**restrict** [1] - 1309:7

**restriction** [2] - 1310:1, 1310:22

**restrictions** [1] - 1500:23

**rests** [1] - 1565:4

**result** [5] - 1391:25, 1392:20, 1450:24, 1498:5, 1527:18

**resulted** [1] - 1595:7

**results** [8] - 1443:16, 1449:24, 1524:19, 1542:2, 1549:2, 1549:3, 1549:12, 1549:18

**resume** [1] - 1271:7

**resumé** [4] - 1386:12, 1386:16, 1386:20, 1388:3

**retail** [2] - 1419:11, 1454:5

**returned** [1] - 1402:2

**returning** [1] - 1348:13

**revenue** [1] - 1400:2

**review** [10] - 1391:23, 1394:21, 1395:15, 1435:16, 1451:2, 1455:12, 1461:8, 1517:9, 1522:19, 1534:14

**reviewed** [10] - 1302:2, 1394:24, 1395:2, 1395:14, 1395:25, 1488:22, 1514:7, 1521:16, 1548:21, 1559:8

**reviewing** [1] - 1372:11

**revisit** [1] - 1321:23

**revolutionary** [2] - 1571:3, 1572:14

**rid** [2] - 1338:5, 1572:16

**right-facing** [1] - 1586:13
**right-hand** [3] - 1424:9, 1499:12, 1577:2
**rights** [1] - 1502:23
**Rio** [4] - 1578:23, 1579:23
**ripping** [1] - 1576:3
**risk** [1] - 1508:24
**risks** [2] - 1472:10, 1515:10
**road** [2] - 1334:19, 1574:19
**Robbin** [5] - 1578:25, 1580:17, 1581:20, 1582:13, 1582:16
**Robbin's** [2] - 1582:14, 1582:23
**Robotics** [1] - 1288:21
**robust** [1] - 1432:9
**rock** [1] - 1427:11
**Rokr** [3] - 1584:3, 1584:7, 1584:11
**role** [4] - 1574:13, 1582:14, 1583:8, 1583:14
**roll** [1] - 1427:12
**RON** [1] - 1270:3
**room** [1] - 1419:20
**rough** [1] - 1452:6
**roughly** [2] - 1290:3, 1379:15
**row** [1] - 1444:24
**royalties** [7] - 1325:4, 1326:5, 1329:1, 1398:7, 1398:8, 1467:20, 1490:25
**royalty** [105] - 1324:1, 1324:3, 1324:6, 1324:9, 1324:21, 1324:22, 1324:25, 1325:6, 1325:15, 1325:21, 1326:2, 1326:3, 1328:12, 1385:23, 1392:23, 1393:2, 1393:4, 1394:21, 1396:22, 1396:23, 1397:1, 1397:2, 1397:5, 1397:18, 1397:22, 1398:12, 1398:13, 1398:15, 1398:20, 1399:12, 1399:13, 1399:14, 1399:17, 1399:19, 1399:22, 1400:4, 1400:9, 1400:14, 1400:16, 1400:17, 1400:21, 1409:23, 1409:24, 1410:8, 1410:10, 1410:13, 1410:23, 1421:10, 1421:12, 1421:22, 1425:1, 1429:19, 1429:25, 1434:9, 1464:23, 1485:13, 1486:2, 1486:7, 1486:12, 1486:13, 1486:22, 1487:13, 1487:21, 1488:1, 1488:11, 1488:18, 1490:8, 1493:2, 1493:20, 1494:11, 1495:19, 1497:15, 1497:18, 1498:10, 1498:13, 1498:16, 1499:13, 1499:14, 1504:23, 1505:3, 1505:7, 1505:15, 1509:10, 1530:12, 1530:25, 1531:6, 1531:7, 1531:11, 1531:15, 1532:12, 1532:23, 1533:13, 1533:15, 1533:16, 1533:18, 1533:19, 1533:20, 1534:15, 1538:8, 1538:21, 1539:13, 1539:21, 1545:6, 1545:8
**rule** [3] - 1378:5, 1509:13, 1510:7
**Rule** [1] - 1423:4
**ruled** [2] - 1320:21, 1320:22
**rules** [3] - 1299:21, 1321:16, 1590:20
**Rules** [1] - 1565:5
**ruling** [3] - 1322:22, 1327:16, 1369:17
**rulings** [6] - 1312:19, 1321:18, 1322:5,

1322:8, 1322:9, 1509:17
**run** [3] - 1500:25, 1568:19, 1573:23
**running** [18] - 1300:12, 1314:15, 1316:2, 1328:12, 1329:1, 1398:2, 1398:8, 1398:9, 1398:12, 1399:14, 1399:18, 1400:9, 1429:19, 1429:25, 1430:5, 1434:9, 1490:5, 1591:9
**runs** [1] - 1583:9
**Rust** [1] - 1388:10

# S

**safe** [1] - 1519:3
**sale** [3] - 1381:17, 1497:23, 1533:19
**sales** [38] - 1383:22, 1395:1, 1397:25, 1399:15, 1399:23, 1400:4, 1400:8, 1401:5, 1401:19, 1402:3, 1402:7, 1402:21, 1403:13, 1403:23, 1405:5, 1406:18, 1430:6, 1431:24, 1432:2, 1432:5, 1432:18, 1434:6, 1436:1, 1453:10, 1457:15, 1464:22, 1465:13, 1467:22, 1469:7, 1497:19, 1498:4, 1498:5, 1498:11, 1498:17, 1534:10, 1540:9, 1540:12
**sample** [1] - 1289:21
**samples** [1] - 1289:16
**San** [1] - 1387:18
**sat** [1] - 1599:24
**Saturday** [1] - 1419:11
**save** [1] - 1569:2
**saw** [27] - 1399:25, 1405:7, 1407:1, 1428:7, 1429:10, 1430:12, 1436:6, 1436:7, 1440:20, 1444:12, 1449:24, 1450:25, 1451:8, 1452:6, 1453:9, 1453:12, 1454:4, 1456:24, 1460:3, 1478:12, 1479:3, 1480:9, 1493:17, 1515:8, 1537:14, 1540:9, 1550:6
**scale** [1] - 1479:17
**scan** [4] - 1293:3, 1293:5, 1464:18, 1467:4
**scanning** [4] - 1343:15, 1345:14, 1345:21, 1346:5
**scenario** [6] - 1429:21, 1498:12, 1498:22, 1507:18, 1538:23, 1539:3
**schedule** [5] - 1307:5, 1307:12, 1308:2, 1406:24, 1540:9
**schedules** [1] - 1540:13
**schemes** [1] - 1353:20
**school** [1] - 1389:4
**Schutz** [1] - 1537:6
**SCHUTZ** [23] - 1323:3, 1323:12, 1363:4, 1375:25, 1376:5, 1377:4, 1377:12, 1378:7, 1378:10, 1379:1, 1384:10, 1423:13, 1564:14, 1564:18, 1564:23, 1590:9, 1594:7, 1594:9, 1594:19, 1594:21, 1599:1, 1599:2, 1601:7
**science** [1] - 1371:22
**Science** [1] - 1568:5
**scope** [8] - 1333:10, 1358:21, 1359:18,

1362:13, 1373:19, 1374:18, 1433:13, 1464:12
**scrap** [1] - 1464:23
**screen** [18] - 1303:3, 1306:24, 1345:7, 1352:6, 1377:22, 1394:17, 1475:6, 1480:6, 1529:5, 1529:24, 1551:1, 1554:4, 1571:13, 1571:18, 1573:22, 1588:25, 1589:3, 1589:18
**scroll** [4] - 1303:18, 1309:9, 1587:19, 1590:2
**SDRAM** [1] - 1462:20
**seal** [2] - 1407:10, 1407:19
**sealed** [3] - 1407:13, 1407:15, 1556:13
**seamless** [8] - 1473:14, 1480:25, 1481:13, 1482:6, 1482:7, 1516:15, 1521:23, 1569:5
**seamlessly** [3] - 1475:13, 1477:8, 1477:9
**searched** [1] - 1313:23
**searching** [1] - 1313:11
**season** [1] - 1419:10
**second** [34] - 1276:2, 1276:25, 1277:18, 1283:1, 1286:15, 1289:9, 1289:16, 1290:2, 1290:5, 1290:11, 1304:12, 1306:23, 1317:6, 1325:2, 1325:9, 1325:13, 1331:1, 1338:20, 1339:18, 1340:1, 1341:23, 1364:2, 1364:5, 1364:6, 1364:10, 1364:21, 1402:24, 1418:16, 1434:1, 1467:13, 1476:5, 1489:9, 1595:10, 1599:9
**second-to-last** [1] - 1418:16
**seconds** [2] - 1290:16, 1418:23
**secret** [2] - 1481:20, 1569:20
**Section** [2] - 1336:2, 1336:5
**section** [11] - 1274:13, 1275:8, 1305:21, 1335:3, 1396:17, 1396:19, 1406:11, 1439:8, 1507:9, 1523:25
**secure** [1] - 1569:19
**SECURITY** [3] - 1330:15, 1330:20, 1423:17
**see** [146] - 1280:24, 1281:19, 1286:1, 1286:4, 1286:13, 1286:21, 1286:22, 1287:9, 1287:25, 1291:17, 1293:13, 1293:16, 1295:9, 1295:10, 1297:5, 1297:7, 1300:9, 1303:22, 1304:16, 1304:17, 1306:4, 1309:8, 1310:9, 1310:11, 1317:1, 1322:17, 1333:23, 1340:6, 1340:14, 1340:15, 1341:7, 1341:8, 1342:20, 1343:25, 1345:18, 1345:19, 1348:6, 1375:22, 1377:9, 1377:22, 1378:11, 1383:22, 1383:23, 1383:25, 1387:3, 1388:6, 1388:25, 1393:25, 1395:20, 1399:4, 1401:4, 1401:21, 1403:5, 1403:7, 1403:23, 1404:1, 1405:7, 1406:12, 1406:21, 1407:21, 1417:8, 1420:6, 1420:11, 1420:19, 1428:12, 1434:24, 1435:25, 1438:1, 1438:7, 1439:18, 1440:5, 1440:16, 1441:10, 1444:25, 1445:14, 1445:16, 1446:6, 1448:3, 1451:9, 1452:8, 1453:8, 1454:1, 1454:12,

1455:13, 1456:13, 1456:19, 1457:1,
1460:4, 1463:3, 1463:7, 1463:21,
1464:1, 1464:4, 1464:7, 1464:9,
1464:19, 1464:21, 1464:24, 1465:2,
1465:6, 1465:22, 1466:6, 1466:24,
1467:4, 1467:15, 1473:19, 1474:4,
1475:7, 1479:3, 1479:22, 1495:7,
1501:2, 1523:5, 1538:15, 1550:2,
1551:21, 1552:4, 1552:16, 1553:24,
1554:3, 1554:4, 1554:5, 1554:10,
1554:12, 1555:19, 1555:23, 1555:25,
1556:14, 1559:9, 1562:6, 1570:7,
1577:2, 1581:16, 1586:14, 1588:23,
1589:18, 1596:4, 1596:15, 1596:19,
1597:8, 1599:19, 1600:7, 1600:8,
1600:17, 1601:1

**seeing** [3] - 1317:19, 1377:23, 1476:13
**seek** [3] - 1321:9, 1489:19, 1597:23
**seeking** [1] - 1424:24
**seem** [4] - 1329:9, 1536:9, 1557:8, 1566:10
**segment** [2] - 1274:19, 1308:4
**segments** [3] - 1304:14, 1307:7, 1583:11
**select** [1] - 1371:19
**selected** [2] - 1324:5, 1349:24
**selection** [1] - 1371:24
**selections** [1] - 1577:17
**sell** [7] - 1424:22, 1454:6, 1485:8, 1497:16, 1497:17, 1504:6, 1579:13
**selling** [12] - 1403:20, 1432:1, 1454:6, 1454:17, 1456:21, 1456:24, 1457:16, 1458:14, 1461:25, 1464:5, 1580:8
**semantics** [1] - 1365:19
**semiconductors** [2] - 1388:9, 1388:17
**seminars** [2] - 1389:23, 1390:11, 1390:14
**sense** [12] - 1402:23, 1402:25, 1414:24, 1429:21, 1430:7, 1434:3, 1434:4, 1434:9, 1490:5, 1496:17, 1507:23, 1583:25
**sensitive** [1] - 1298:9
**sent** [2] - 1317:3, 1569:18
**sentence** [13] - 1279:13, 1279:16, 1294:10, 1304:12, 1306:23, 1307:14, 1307:15, 1332:6, 1335:22, 1376:18, 1552:7, 1552:9, 1553:6
**sentences** [2] - 1279:12, 1284:21
**separate** [10] - 1271:23, 1302:19, 1427:9, 1428:4, 1442:18, 1513:23, 1539:15, 1539:20, 1539:21, 1552:1
**separated** [2] - 1313:12, 1539:25
**separately** [2] - 1345:4, 1442:10, 1539:12
**separates** [1] - 1393:6
**September** [5] - 1403:11, 1432:6, 1455:14, 1455:15, 1581:9
**seq** [1] - 1307:2
**sequel** [5] - 1349:23, 1350:2, 1350:6, 1350:8, 1350:10
**sequence** [3] - 1307:21, 1348:2, 1371:9

**sequences** [1] - 1365:19
**sequencing** [10] - 1297:21, 1304:16, 1316:5, 1343:15, 1345:14, 1345:21, 1348:14, 1370:15, 1370:23
**sequential** [1] - 1415:16
**serial** [1] - 1314:8
**series** [4] - 1383:6, 1392:12, 1398:3, 1406:13
**seriously** [1] - 1383:25
**serrated** [1] - 1410:19
**serve** [1] - 1389:12
**served** [2] - 1313:3, 1390:20
**server** [7] - 1316:13, 1316:18, 1334:21, 1335:6, 1353:21, 1552:1, 1600:16
**service** [1] - 1467:17
**services** [3] - 1386:10, 1387:10, 1580:16
**session** [5] - 1307:4, 1307:5, 1307:8, 1307:12, 1308:2
**set** [20] - 1311:14, 1313:3, 1321:24, 1326:14, 1337:16, 1338:13, 1347:15, 1368:15, 1375:16, 1445:25, 1455:19, 1476:1, 1477:4, 1477:18, 1478:8, 1532:19, 1538:11, 1542:15, 1585:10, 1592:7
**sets** [4] - 1312:23, 1456:19, 1460:10, 1516:17
**setting** [2] - 1347:15, 1543:11
**settings** [1] - 1347:7
**settle** [1] - 1326:17
**settled** [1] - 1343:4
**settlements** [2] - 1429:8, 1431:6
**seven** [2] - 1374:20, 1384:14
**Seventies** [2] - 1410:18, 1431:21
**several** [37] - 1309:8, 1341:7, 1389:5, 1389:15, 1389:20, 1390:9, 1395:6, 1395:16, 1411:4, 1411:13, 1416:6, 1416:17, 1417:18, 1418:16, 1426:23, 1432:3, 1434:19, 1439:4, 1440:9, 1442:3, 1445:17, 1451:17, 1452:22, 1454:11, 1461:23, 1462:18, 1463:10, 1467:3, 1477:10, 1516:20, 1517:18, 1555:17, 1559:10, 1572:9, 1586:4, 1595:3
**shall** [1] - 1396:20
**shape** [1] - 1354:3
**shapes** [2] - 1353:14, 1356:21
**share** [13] - 1429:15, 1429:16, 1429:21, 1429:22, 1430:4, 1434:8, 1435:17, 1435:21, 1435:23, 1473:4, 1473:6, 1531:12, 1554:25
**shareholders** [2] - 1382:19, 1435:20
**shares** [1] - 1416:19
**sheet** [1] - 1405:8
**shelved** [1] - 1381:6
**shifting** [1] - 1334:25
**shipped** [2] - 1581:11, 1595:21
**shipping** [1] - 1580:15
**ships** [1] - 1592:9
**shooting** [1] - 1459:18

**shopping** [3] - 1419:10, 1450:2, 1573:17
**short** [5] - 1327:1, 1335:14, 1376:1, 1385:13, 1391:2
**show** [53] - 1281:22, 1292:8, 1309:10, 1323:7, 1324:12, 1329:11, 1347:19, 1353:7, 1357:13, 1362:9, 1365:4, 1366:13, 1378:21, 1393:13, 1393:20, 1402:1, 1403:3, 1406:13, 1408:19, 1420:1, 1434:18, 1442:17, 1442:25, 1445:1, 1446:4, 1450:11, 1454:25, 1458:14, 1458:17, 1459:1, 1460:22, 1460:23, 1464:5, 1464:17, 1466:18, 1471:25, 1479:23, 1512:16, 1514:19, 1517:24, 1518:4, 1519:20, 1538:2, 1541:15, 1542:12, 1542:16, 1550:16, 1551:4, 1551:6, 1551:7, 1566:16, 1592:13
**showed** [14] - 1352:17, 1365:24, 1368:6, 1369:2, 1369:20, 1408:21, 1430:10, 1457:19, 1458:12, 1468:5, 1515:16, 1519:6, 1536:1, 1551:4
**showing** [13] - 1288:20, 1355:13, 1358:10, 1360:21, 1401:24, 1405:5, 1408:22, 1411:22, 1450:10, 1456:8, 1561:11, 1566:21, 1577:19
**shown** [24] - 1294:22, 1297:18, 1300:8, 1353:5, 1353:22, 1377:19, 1392:15, 1393:19, 1406:11, 1406:18, 1406:19, 1407:18, 1414:16, 1444:1, 1444:25, 1454:8, 1454:10, 1455:22, 1458:8, 1458:11, 1459:13, 1515:17, 1522:20, 1522:22, 1550:5, 1558:11, 1561:21
**shows** [52] - 1392:22, 1393:21, 1394:10, 1394:16, 1397:6, 1400:20, 1402:20, 1403:7, 1403:8, 1403:9, 1403:11, 1403:13, 1404:20, 1404:21, 1404:24, 1408:23, 1409:8, 1410:15, 1417:11, 1439:25, 1440:5, 1442:4, 1443:4, 1443:16, 1443:17, 1445:14, 1450:12, 1453:20, 1455:1, 1456:2, 1458:25, 1459:15, 1463:20, 1468:4, 1468:8, 1468:10, 1473:20, 1522:3, 1542:22, 1544:22, 1556:20, 1561:9, 1561:22, 1561:23, 1562:15, 1588:24, 1589:11
**shuffle** [4] - 1396:9, 1543:5, 1543:16, 1544:4
**shuffling** [1] - 1442:7
**sic** [1] - 1562:5
**side** [27] - 1294:22, 1305:10, 1395:10, 1400:23, 1401:3, 1403:2, 1403:7, 1405:10, 1406:4, 1412:24, 1412:25, 1425:8, 1425:16, 1436:17, 1452:3, 1454:2, 1454:7, 1462:5, 1465:20, 1477:11, 1481:4, 1481:16, 1529:4, 1529:24, 1566:7, 1582:25
**side's** [1] - 1508:14
**sides** [10] - 1270:9, 1378:3, 1391:1, 1407:17, 1425:3, 1425:6, 1425:20, 1434:14, 1565:5, 1574:17

**sideshow** [1] - 1300:23
**signal** [6] - 1315:6, 1315:23, 1315:25, 1316:6, 1317:4, 1367:8
**signaling** [8] - 1314:24, 1315:3, 1315:14, 1315:19, 1316:13, 1316:18, 1339:8, 1358:25
**signed** [1] - 1306:14
**significant** [7] - 1409:8, 1432:8, 1432:16, 1432:17, 1432:18, 1490:14, 1490:25
**similar** [19] - 1294:14, 1298:20, 1322:20, 1397:7, 1397:15, 1397:24, 1399:20, 1406:23, 1427:22, 1441:21, 1441:22, 1445:10, 1446:2, 1446:10, 1448:21, 1482:6, 1487:6, 1487:25, 1488:7
**similar-type** [1] - 1441:21
**similarly** [1] - 1346:24
**simple** [2] - 1271:12, 1476:9
**simplified** [2] - 1354:8, 1354:15
**simply** [7] - 1278:20, 1331:16, 1394:17, 1492:23, 1509:8, 1589:4, 1589:24
**single** [4] - 1276:2, 1285:6, 1383:13, 1515:23
**sit** [1] - 1486:1
**Site** [1] - 1331:23
**site** [4] - 1285:18, 1285:21, 1286:6, 1286:21
**sitting** [7] - 1422:22, 1429:13, 1494:20, 1534:4, 1550:22, 1586:17, 1594:22
**situation** [5] - 1429:4, 1430:20, 1430:24, 1499:18, 1543:11
**six** [1] - 1588:1
**sixth** [1] - 1584:21
**size** [20] - 1280:5, 1280:12, 1280:13, 1280:15, 1280:22, 1281:17, 1281:22, 1282:1, 1282:8, 1282:11, 1282:16, 1282:23, 1282:24, 1283:4, 1284:12, 1354:3, 1356:15, 1420:21, 1451:20, 1476:25
**sized** [5] - 1279:8, 1283:12, 1283:25, 1284:10, 1475:11
**sizes** [5] - 1282:14, 1285:8, 1356:17, 1356:19, 1356:21
**skill** [3] - 1292:1, 1331:17, 1365:25
**skimmed** [1] - 1368:21
**skip** [26] - 1274:10, 1274:13, 1275:1, 1346:25, 1416:24, 1526:9, 1535:7, 1535:8, 1535:18, 1535:22, 1535:23, 1536:13, 1536:21, 1544:13, 1556:17, 1578:7, 1578:9, 1578:11, 1578:13, 1586:4, 1588:1, 1588:4, 1588:8
**skipped** [2] - 1346:24, 1556:24
**skipping** [10] - 1536:4, 1536:5, 1536:25, 1537:12, 1556:19, 1556:21, 1556:22
**SKU** [1] - 1323:24
**sleep** [1] - 1349:17
**slept** [1] - 1500:11
**slice** [1] - 1473:23

**Slide** [9] - 1495:14, 1504:19, 1513:3, 1516:3, 1519:22, 1523:1, 1524:10, 1527:8, 1537:23
**slides** [2] - 1528:25, 1529:1
**slideware** [15] - 1278:9, 1412:21, 1413:3, 1424:1, 1424:20, 1434:18, 1469:1, 1478:9, 1480:17, 1499:9, 1504:21, 1506:5, 1529:6, 1538:2, 1538:11
**Slideware** [1] - 1499:4
**slightly** [4] - 1273:4, 1275:9, 1460:12, 1486:23
**slot** [1] - 1368:3
**slow** [5] - 1285:5, 1552:24, 1571:14, 1579:7, 1587:13
**slowly** [1] - 1572:6
**small** [7] - 1334:15, 1382:16, 1390:6, 1402:2, 1440:5, 1465:12, 1505:18
**smaller** [9] - 1280:16, 1283:18, 1390:16, 1394:12, 1416:7, 1459:10, 1459:12, 1505:22, 1569:8
**Smart** [8] - 1426:24, 1427:19, 1427:21, 1539:6, 1592:4, 1592:6
**smartphones** [1] - 1365:21
**smushed** [1] - 1569:7
**so..** [1] - 1413:24
**Society** [6] - 1389:15, 1389:17, 1389:24, 1390:1, 1390:2
**Software** [1] - 1574:25
**software** [33] - 1301:1, 1361:16, 1371:21, 1391:20, 1447:23, 1462:5, 1462:7, 1476:6, 1502:20, 1503:1, 1503:17, 1567:12, 1568:9, 1568:10, 1568:14, 1568:17, 1568:18, 1568:19, 1568:21, 1568:23, 1569:12, 1569:16, 1574:15, 1579:8, 1579:10, 1579:13, 1580:19, 1581:22, 1582:2, 1582:5, 1582:18, 1583:7, 1596:6
**sold** [15] - 1381:14, 1385:23, 1400:22, 1401:10, 1420:4, 1421:21, 1422:5, 1433:7, 1433:10, 1456:12, 1468:13, 1488:15, 1504:13, 1509:25, 1570:9
**solely** [1] - 1531:10
**solves** [1] - 1380:13
**someone** [9] - 1292:20, 1328:13, 1330:18, 1497:23, 1498:2, 1503:18, 1507:15, 1509:1, 1565:8
**sometimes** [17] - 1311:22, 1384:20, 1399:4, 1399:5, 1413:12, 1416:19, 1425:3, 1445:18, 1457:7, 1457:8, 1496:1, 1522:6, 1522:7, 1522:9, 1533:12, 1533:13
**somewhat** [4] - 1321:22, 1416:4, 1427:22, 1541:8
**somewhere** [5] - 1314:3, 1372:4, 1433:8, 1513:10, 1565:14
**son** [1] - 1396:6
**song** [19] - 1285:6, 1397:4, 1416:25, 1427:3, 1427:6, 1427:11, 1427:12, 1427:23, 1427:24, 1440:10, 1476:8, 1585:18, 1586:5, 1586:6, 1586:18,

1588:5, 1588:8, 1588:9, 1588:10
**SongCatcher** [12] - 1378:14, 1379:19, 1379:21, 1381:4, 1381:9, 1381:14, 1381:24, 1382:2, 1382:3, 1382:8, 1384:1, 1384:4
**songs** [46] - 1351:11, 1416:11, 1416:12, 1417:17, 1417:22, 1418:2, 1418:23, 1426:18, 1427:4, 1427:5, 1427:7, 1427:8, 1427:13, 1428:3, 1431:2, 1472:6, 1473:13, 1473:14, 1475:11, 1476:4, 1476:14, 1477:16, 1482:1, 1482:2, 1519:11, 1535:23, 1543:15, 1543:19, 1544:4, 1552:14, 1552:21, 1556:24, 1557:9, 1577:7, 1585:11, 1585:12, 1585:13, 1586:3, 1587:5, 1587:6, 1587:20, 1588:1, 1592:10
**SONICblue** [1] - 1579:21
**Sony** [1] - 1415:25
**soon** [2] - 1422:18, 1569:4
**sorry** [41] - 1276:1, 1276:7, 1289:18, 1302:20, 1317:5, 1317:14, 1323:15, 1339:17, 1341:20, 1347:24, 1362:14, 1362:17, 1365:10, 1366:3, 1373:20, 1404:9, 1406:4, 1421:14, 1436:17, 1465:21, 1471:2, 1475:22, 1508:4, 1508:7, 1511:6, 1519:25, 1520:1, 1520:3, 1520:5, 1523:16, 1527:15, 1530:9, 1532:25, 1541:21, 1541:23, 1552:25, 1559:16, 1575:12, 1582:24, 1583:2, 1587:12
**sort** [21] - 1321:10, 1332:19, 1333:18, 1383:15, 1401:23, 1411:17, 1417:2, 1428:5, 1428:18, 1467:17, 1469:15, 1571:4, 1571:6, 1572:14, 1572:20, 1573:5, 1577:24, 1578:2, 1579:6, 1579:12, 1580:25
**sorts** [1] - 1472:7
**Sound** [1] - 1575:13
**sound** [22] - 1290:12, 1366:6, 1366:18, 1366:20, 1366:22, 1367:2, 1367:7, 1367:11, 1367:21, 1367:23, 1368:2, 1427:13, 1473:14, 1474:6, 1475:12, 1477:4, 1480:24, 1516:15, 1518:10, 1572:4, 1572:7, 1572:11
**SoundJam** [20] - 1575:3, 1575:14, 1575:15, 1575:19, 1575:21, 1575:25, 1576:12, 1576:16, 1577:4, 1577:16, 1577:24, 1578:7, 1578:14, 1578:17, 1578:21, 1579:11, 1579:16, 1580:13, 1580:19, 1580:21, 1581:1, 1581:3, 1595:14, 1596:14, 1596:22
**sounds** [1] - 1588:12
**SoundStep** [6] - 1574:25, 1575:1, 1575:2, 1578:24, 1580:8, 1580:10
**source** [4] - 1286:6, 1381:8, 1580:19, 1582:3
**sources** [1] - 1445:13
**space** [3] - 1313:12, 1420:3, 1569:3
**spaced** [1] - 1340:9
**spaces** [1] - 1569:8

**speaker** [1] - 1340:24
**speakers** [1] - 1585:10
**speaking** [1] - 1509:20
**speaks** [1] - 1490:18
**spec** [2] - 1315:25, 1333:12
**special** [1] - 1593:11
**specific** [57] - 1284:2, 1284:12, 1296:11, 1296:12, 1296:16, 1314:3, 1316:19, 1321:7, 1331:20, 1350:9, 1368:2, 1402:8, 1403:10, 1408:23, 1443:16, 1445:8, 1445:14, 1462:14, 1463:23, 1465:14, 1465:25, 1466:24, 1466:25, 1467:25, 1469:16, 1474:7, 1476:1, 1477:12, 1477:18, 1489:11, 1504:4, 1510:12, 1510:13, 1515:5, 1518:12, 1518:18, 1518:19, 1519:4, 1519:16, 1519:18, 1520:13, 1521:6, 1521:7, 1522:2, 1522:8, 1522:10, 1522:13, 1522:14, 1535:23, 1536:21, 1537:18, 1540:14, 1549:4, 1553:15, 1560:3, 1596:16
**specifically** [40] - 1285:21, 1291:7, 1293:3, 1293:14, 1306:10, 1317:12, 1317:25, 1318:15, 1322:15, 1331:24, 1338:25, 1341:4, 1347:4, 1348:23, 1356:8, 1363:25, 1367:7, 1368:23, 1383:2, 1387:25, 1394:13, 1404:8, 1429:4, 1430:20, 1431:20, 1432:11, 1433:18, 1436:3, 1436:13, 1448:1, 1449:23, 1451:22, 1456:1, 1461:17, 1466:25, 1477:21, 1495:25, 1507:5, 1514:8, 1573:25
**specification** [3] - 1314:21, 1333:11, 1333:15
**specifications** [2] - 1273:1, 1582:6
**specifics** [6] - 1316:15, 1428:10, 1439:12, 1453:19, 1460:22, 1476:22
**specify** [1] - 1307:7
**speculation** [2] - 1512:23, 1528:9
**speeches** [1] - 1388:21
**speed** [4] - 1355:16, 1362:19, 1363:25, 1365:2
**speeds** [2] - 1361:21, 1361:24
**spell** [1] - 1379:7
**spelled** [1] - 1335:18
**spend** [1] - 1476:23
**spent** [3] - 1351:6, 1360:23, 1387:19
**split** [8] - 1478:10, 1482:4, 1482:10, 1482:11, 1483:12, 1528:25, 1543:25, 1555:6
**splits** [3] - 1524:14, 1524:15, 1529:4
**splitting** [1] - 1472:14
**spoken** [1] - 1388:23
**spontaneous** [1] - 1327:8
**sports** [1] - 1573:17
**spot** [1] - 1575:7
**spread** [1] - 1473:24
**spreadsheet** [1] - 1406:2
**SQL** [1] - 1349:23
**square** [1] - 1368:3

**SSP** [1] - 1456:20
**St** [1] - 1387:18
**staff** [1] - 1584:4
**Stan** [2] - 1475:1, 1517:2
**stand** [7] - 1321:2, 1321:6, 1341:22, 1497:12, 1497:13, 1534:22, 1585:6
**standard** [10] - 1280:22, 1294:5, 1294:7, 1300:6, 1364:8, 1364:13, 1365:17, 1456:10, 1578:15, 1587:16
**standards** [1] - 1365:18
**standpoint** [5] - 1427:2, 1451:6, 1511:1, 1521:1, 1589:15
**stands** [4] - 1314:8, 1387:6, 1456:12, 1508:24
**start** [16] - 1344:6, 1344:16, 1344:23, 1350:23, 1374:23, 1382:17, 1396:12, 1398:17, 1415:2, 1422:21, 1428:20, 1435:15, 1472:14, 1474:3, 1514:15, 1593:14
**start-up** [1] - 1382:17
**started** [17] - 1303:7, 1346:22, 1380:25, 1387:17, 1390:3, 1469:7, 1469:20, 1472:2, 1486:9, 1486:13, 1530:18, 1566:9, 1566:25, 1578:24, 1579:8, 1581:18, 1594:5
**starting** [14] - 1299:10, 1317:7, 1339:19, 1344:21, 1352:8, 1426:5, 1440:13, 1457:9, 1469:19, 1469:25, 1517:19, 1518:21, 1527:21, 1540:12
**starts** [7] - 1326:8, 1345:3, 1345:6, 1400:23, 1417:14, 1417:15, 1553:24
**state** [5] - 1363:17, 1386:6, 1386:24, 1386:25, 1593:4
**statement** [22] - 1283:3, 1283:9, 1283:15, 1283:17, 1283:18, 1283:19, 1284:24, 1326:1, 1330:23, 1334:8, 1378:8, 1385:7, 1436:25, 1437:14, 1437:16, 1438:2, 1440:23, 1491:5, 1497:17, 1537:7, 1550:2, 1565:24
**statements** [2] - 1271:19, 1594:23
**States** [1] - 1570:3
**statute** [3] - 1504:22, 1505:6, 1505:14
**stay** [4] - 1326:12, 1326:13, 1332:6, 1501:4
**step** [20] - 1346:5, 1375:21, 1385:22, 1419:23, 1473:18, 1481:15, 1481:17, 1481:18, 1485:14, 1513:5, 1517:25, 1518:20, 1519:17, 1520:8, 1522:15, 1523:3, 1563:22, 1586:7, 1601:4
**step-by-step** [1] - 1385:22
**Stephens** [22] - 1272:5, 1274:7, 1275:19, 1296:20, 1299:24, 1303:6, 1311:18, 1312:4, 1350:23, 1350:24, 1351:20, 1351:22, 1352:7, 1352:17, 1352:23, 1353:23, 1354:20, 1360:23, 1368:6, 1369:2, 1369:20, 1371:13
**STEPHENS** [92] - 1271:6, 1271:20, 1271:22, 1272:6, 1272:10, 1272:17, 1272:22, 1274:8, 1274:22, 1275:1, 1275:5, 1275:15, 1275:22, 1276:13, 1276:21, 1277:1, 1277:10, 1277:12,

1278:1, 1280:18, 1280:20, 1285:17, 1286:17, 1286:19, 1287:16, 1287:19, 1287:20, 1293:23, 1294:1, 1294:19, 1294:21, 1295:3, 1295:5, 1296:15, 1296:17, 1297:8, 1297:12, 1299:17, 1299:20, 1299:25, 1300:1, 1303:2, 1303:4, 1303:8, 1303:11, 1303:18, 1303:20, 1304:9, 1304:11, 1308:23, 1309:1, 1309:9, 1309:15, 1310:5, 1310:7, 1310:15, 1310:18, 1312:5, 1312:7, 1338:9, 1338:10, 1342:3, 1342:7, 1344:12, 1344:14, 1344:16, 1344:20, 1344:23, 1345:1, 1345:9, 1345:10, 1346:15, 1349:15, 1349:19, 1349:21, 1350:16, 1358:20, 1359:13, 1362:12, 1362:16, 1362:21, 1363:6, 1370:25, 1372:6, 1372:22, 1373:1, 1373:18, 1373:21, 1374:17, 1376:11, 1376:14, 1377:1
**Stephens'** [2] - 1373:5, 1374:14
**steps** [3] - 1345:12, 1361:15, 1481:16
**Steps** [4] - 1345:13, 1346:3, 1346:4, 1346:8
**stereo** [1] - 1289:17
**Steve** [8] - 1432:4, 1436:25, 1437:1, 1437:16, 1461:12, 1536:3, 1570:11, 1572:21
**still** [18] - 1276:10, 1277:7, 1285:2, 1312:21, 1316:7, 1337:10, 1337:15, 1351:22, 1381:9, 1382:11, 1501:10, 1501:23, 1502:3, 1503:8, 1503:10, 1564:12, 1591:9, 1597:2
**stocks** [1] - 1573:18
**stop** [5] - 1292:17, 1378:21, 1482:21, 1579:3, 1587:8
**storage** [39] - 1279:7, 1281:8, 1281:10, 1281:15, 1283:4, 1283:12, 1283:16, 1283:23, 1285:7, 1291:25, 1308:5, 1347:18, 1348:19, 1349:6, 1349:8, 1353:19, 1355:11, 1355:16, 1355:17, 1355:22, 1355:24, 1356:1, 1356:4, 1356:12, 1356:15, 1356:23, 1357:1, 1370:16, 1370:24, 1371:10, 1462:21, 1479:23, 1481:24, 1482:4, 1520:9, 1520:25, 1556:4, 1589:14, 1589:16
**store** [13] - 1283:25, 1284:10, 1290:10, 1351:4, 1351:11, 1370:15, 1417:25, 1454:5, 1481:25, 1568:10, 1568:19, 1576:8, 1588:20
**Store** [1] - 1419:12
**stored** [6] - 1289:11, 1304:15, 1307:4, 1348:12, 1348:14, 1552:10
**stores** [1] - 1281:20
**storing** [3] - 1475:10, 1476:3, 1600:14
**story** [2] - 1440:14, 1566:7
**straight** [2] - 1331:4, 1331:23
**straightforward** [1] - 1502:9
**strange** [1] - 1335:9
**strike** [3] - 1376:15, 1511:12, 1513:25
**structural** [15] - 1320:12, 1335:8, 1336:2, 1337:5, 1337:11, 1337:12,

1337:15, 1354:23, 1355:3, 1359:23, 1362:4, 1362:8, 1366:23, 1375:10, 1600:1
**structurally** [2] - 1366:1, 1367:14
**structure** [20] - 1271:3, 1273:9, 1273:18, 1330:11, 1331:2, 1332:8, 1335:23, 1336:5, 1337:9, 1337:14, 1348:4, 1349:23, 1350:3, 1350:6, 1355:10, 1355:16, 1357:7, 1366:22, 1373:11, 1600:15
**structures** [3] - 1330:11, 1374:8, 1374:10
**struggling** [2] - 1383:25, 1577:6
**students** [2] - 1316:9, 1316:12
**studied** [3] - 1306:5, 1361:24, 1568:4
**study** [1] - 1568:2
**stuff** [5] - 1368:7, 1411:14, 1413:15, 1572:10, 1593:11
**stunning** [1] - 1554:23
**stylistic** [1] - 1335:2
**sub** [3] - 1416:14, 1481:21, 1483:23
**sub-break** [1] - 1481:21
**sub-broken** [1] - 1483:23
**sub-collection** [1] - 1416:14
**subcomponents** [1] - 1477:1
**subdivided** [1] - 1483:23
**subgroup** [1] - 1583:9
**subject** [3] - 1327:9, 1362:3, 1502:19
**subjective** [2] - 1518:25, 1522:6
**submission** [1] - 1324:5
**submissions** [1] - 1404:13
**submitted** [6] - 1279:6, 1279:11, 1306:16, 1368:12, 1404:12, 1436:18
**subsequent** [1] - 1346:2
**subsequently** [1] - 1316:3
**substantially** [4] - 1470:20, 1470:25, 1507:17, 1508:23
**substantive** [1] - 1328:3
**substitute** [7] - 1331:2, 1332:8, 1335:23, 1337:9, 1337:14, 1372:13, 1372:18
**substituted** [2] - 1353:20, 1372:19
**subtract** [1] - 1458:18
**subtracting** [1] - 1459:20
**success** [14] - 1411:19, 1429:15, 1429:17, 1429:22, 1430:4, 1431:22, 1433:3, 1434:8, 1435:1, 1435:16, 1452:20, 1570:21, 1573:8, 1579:14
**successes** [1] - 1429:24
**successful** [6] - 1429:16, 1429:17, 1429:25, 1435:24, 1451:7, 1451:8
**sufficiently** [1] - 1430:23
**suggest** [6] - 1273:11, 1333:5, 1552:14
**suggested** [8] - 1299:4, 1300:18, 1301:16, 1381:5, 1419:11, 1430:13, 1456:21, 1461:25
**suggesting** [2] - 1505:5, 1540:3
**suggestion** [2] - 1335:1, 1540:10
**suggestions** [1] - 1330:9
**suggests** [1] - 1516:12

**suit** [7] - 1313:17, 1331:15, 1492:7, 1492:12, 1535:6, 1595:8, 1595:10
**sum** [10] - 1329:1, 1329:12, 1397:25, 1398:15, 1398:16, 1398:24, 1399:6, 1399:10, 1500:8, 1507:24
**summaries** [2] - 1446:17, 1542:16
**summarize** [4] - 1392:9, 1392:13, 1408:15, 1484:24
**summarized** [5] - 1402:12, 1447:11, 1484:17, 1559:11, 1560:2
**summarizes** [4] - 1406:1, 1411:4, 1411:6, 1450:13
**summarizing** [3] - 1406:10, 1411:3, 1446:13
**Summary** [1] - 1304:8
**summary** [30] - 1323:23, 1392:19, 1393:8, 1405:25, 1406:9, 1407:1, 1407:4, 1407:5, 1408:24, 1409:16, 1409:19, 1412:4, 1444:19, 1444:21, 1445:24, 1463:21, 1465:11, 1465:13, 1466:10, 1479:15, 1479:24, 1542:5, 1544:22, 1559:23, 1559:25, 1560:6, 1560:12, 1560:23, 1561:1, 1562:11
**sums** [2] - 1398:8, 1399:4
**sunk** [1] - 1562:5
**supplement** [2] - 1359:14, 1373:22
**supplied** [2] - 1315:19, 1596:3
**supply** [2] - 1420:10, 1462:25
**support** [6] - 1315:17, 1332:13, 1347:5, 1362:7, 1367:10, 1438:1
**suppose** [1] - 1383:18
**supposed** [8] - 1278:13, 1310:2, 1507:6, 1538:3, 1538:6, 1540:16, 1540:20, 1545:12
**supposedly** [1] - 1545:25
**surgery** [6] - 1553:10, 1553:13, 1555:11, 1556:18, 1557:1, 1557:3
**survey** [69] - 1395:21, 1395:24, 1395:25, 1439:10, 1439:17, 1440:2, 1440:11, 1441:4, 1441:12, 1441:13, 1441:19, 1445:7, 1445:19, 1445:24, 1446:12, 1446:13, 1446:23, 1447:3, 1447:6, 1447:10, 1447:20, 1449:12, 1449:16, 1449:18, 1449:20, 1449:21, 1449:22, 1449:23, 1450:1, 1450:2, 1450:3, 1450:9, 1450:24, 1451:1, 1451:3, 1451:25, 1452:8, 1471:5, 1475:19, 1475:21, 1478:24, 1478:25, 1479:1, 1479:4, 1479:15, 1479:17, 1479:18, 1515:8, 1515:25, 1516:25, 1526:11, 1542:2, 1542:13, 1543:20, 1544:19, 1544:23, 1546:5, 1548:9, 1548:17, 1548:19, 1549:19, 1557:21, 1557:24, 1558:21, 1559:24, 1560:1, 1562:24
**surveyed** [3] - 1439:17, 1445:18, 1562:17
**surveying** [1] - 1438:21
**surveys** [66] - 1395:15, 1395:16, 1395:17, 1428:12, 1438:4, 1438:5, 1438:8, 1438:16, 1439:18, 1444:13,

1444:20, 1445:11, 1445:15, 1445:16, 1445:25, 1446:9, 1446:10, 1446:17, 1449:2, 1450:18, 1450:19, 1451:2, 1451:3, 1451:13, 1453:12, 1475:16, 1483:3, 1483:10, 1483:11, 1514:23, 1515:6, 1515:13, 1515:16, 1515:19, 1515:20, 1517:8, 1518:22, 1518:23, 1522:7, 1528:12, 1536:1, 1536:2, 1536:21, 1536:22, 1542:6, 1542:7, 1542:8, 1542:16, 1542:18, 1542:7, 1544:8, 1544:12, 1544:17, 1545:9, 1547:22, 1550:7, 1557:24, 1558:8, 1558:25, 1559:10, 1560:12, 1560:17, 1561:6, 1561:15, 1562:19
**sustain** [3] - 1326:7, 1449:10, 1559:4
**sustained** [2] - 1559:1, 1590:13
**swear** [1] - 1565:21
**sworn** [2] - 1312:12, 1377:16, 1378:2
**Sync** [1] - 1418:15
**sync** [14] - 1418:9, 1427:17, 1443:11, 1443:24, 1447:13, 1482:10, 1483:14, 1525:2, 1535:13, 1548:1, 1558:19, 1584:3, 1593:13
**sync'd** [4] - 1451:15, 1453:11, 1483:18, 1525:1
**synchronization** [4] - 1316:3, 1316:4, 1365:21, 1563:4
**synchronize** [3] - 1348:20, 1477:16, 1477:17
**synchronized** [1] - 1349:13
**synchronizing** [1] - 1348:17
**Syncing** [1] - 1589:4
**syncing** [44] - 1436:8, 1443:5, 1443:7, 1443:13, 1445:4, 1447:5, 1449:3, 1451:16, 1478:3, 1478:22, 1480:25, 1483:1, 1483:5, 1483:6, 1483:17, 1485:2, 1521:25, 1522:9, 1523:20, 1526:7, 1536:23, 1543:12, 1547:21, 1547:24, 1548:6, 1548:7, 1550:7, 1558:4, 1558:7, 1558:9, 1558:10, 1558:12, 1559:9, 1559:10, 1559:14, 1560:13, 1561:11, 1561:23, 1561:25, 1562:17, 1562:20, 1562:22
**syncs** [2] - 1443:15, 1477:20
**system** [6] - 1485:7, 1503:21, 1571:23, 1577:24, 1582:22, 1582:24
**System** [2] - 1357:18, 1357:20
**System-on-Chip** [2] - 1357:18, 1357:20

**T**

**Tab** [3] - 1344:24, 1344:25, 1345:1
**tab** [7] - 1286:10, 1302:19, 1308:21, 1310:5, 1351:25, 1554:5, 1554:8
**tabbed** [1] - 1284:22
**Table** [1] - 1323:22
**table** [18] - 1364:17, 1364:18, 1414:18, 1442:1, 1442:3, 1442:8, 1442:10, 1442:25, 1443:3, 1443:16, 1443:17, 1443:20, 1450:12, 1476:18, 1479:15,

1494:20, 1534:5, 1559:11
  **tabs** [1] - 1541:19
  **talks** [30] - 1340:5, 1346:4, 1357:14,
1396:19, 1409:4, 1417:18, 1418:15,
1419:8, 1424:21, 1434:25, 1435:6,
1436:23, 1439:5, 1439:9, 1445:8,
1449:3, 1450:13, 1453:5, 1455:12,
1456:6, 1461:21, 1461:24, 1475:4,
1476:9, 1477:4, 1477:8, 1546:5,
1555:17, 1576:24, 1599:5
  **tape** [1] - 1578:16
  **target** [1] - 1457:3
  **targeting** [3] - 1457:5, 1457:21
  **tax** [1] - 1387:23
  **teach** [1] - 1316:15
  **teaching** [1] - 1316:12
  **team** [10] - 1581:25, 1582:1, 1582:5,
1582:8, 1582:10, 1582:15, 1583:9,
1584:5, 1601:7
  **Technical** [1] - 1574:11
  **technical** [23] - 1302:6, 1304:2, 1304:5,
1309:18, 1311:2, 1342:14, 1342:25,
1362:25, 1368:15, 1368:19, 1368:24,
1370:9, 1411:14, 1411:16, 1415:2,
1415:3, 1415:17, 1426:4, 1428:6,
1501:18, 1537:18, 1545:17, 1566:19
  **technically** [3] - 1331:7, 1332:8,
1564:14
  **technique** [1] - 1285:1
  **technological** [1] - 1549:22
  **technologies** [3] - 1401:12, 1550:17,
1580:5
  **technology** [44] - 1335:23, 1336:6,
1336:10, 1355:7, 1385:25, 1409:10,
1413:7, 1413:9, 1414:5, 1414:12,
1414:14, 1414:15, 1414:19, 1415:4,
1415:5, 1415:23, 1415:24, 1416:8,
1416:23, 1426:17, 1428:11, 1428:15,
1428:17, 1429:18, 1430:21, 1430:22,
1430:23, 1474:7, 1478:2, 1482:24,
1490:16, 1490:19, 1490:21, 1503:2,
1509:3, 1511:21, 1532:4, 1534:19,
1535:3, 1580:18, 1581:24, 1597:14,
1597:25, 1598:3
  **Technology** [1] - 1489:8
  **Teddy** [1] - 1577:9
  **telecommunications** [1] - 1388:9
  **telephone** [1] - 1439:10
  **television** [1] - 1383:24
  **ten** [9] - 1375:14, 1375:19, 1391:18,
1396:4, 1431:19, 1489:23, 1489:24,
1493:23, 1567:16
  **tenant** [3] - 1397:10, 1397:11, 1499:17
  **tend** [1] - 1417:1
  **term** [9] - 1294:12, 1343:6, 1381:17,
1533:16, 1547:4, 1547:5, 1548:18,
1590:10, 1590:15
  **terminal** [1] - 1343:8
  **terms** [31] - 1274:13, 1359:24, 1373:9,
1391:25, 1409:5, 1410:7, 1410:23,
1435:12, 1439:12, 1439:15, 1446:3,

1447:4, 1455:24, 1463:11, 1488:8,
1489:11, 1490:19, 1498:16, 1500:24,
1505:8, 1512:5, 1512:9, 1514:7,
1520:16, 1534:10, 1547:19, 1562:5,
1563:3, 1563:4, 1590:22
  **territory** [1] - 1497:6
  **testified** [23] - 1277:13, 1277:17,
1284:5, 1284:15, 1288:5, 1298:21,
1299:1, 1300:11, 1308:9, 1315:10,
1316:16, 1316:22, 1327:13, 1369:6,
1373:6, 1374:15, 1493:19, 1495:10,
1512:11, 1530:17, 1546:24, 1548:24,
1589:1
  **testifies** [1] - 1423:2
  **testify** [5] - 1321:13, 1326:8, 1385:16,
1432:20, 1594:24
  **testifying** [6] - 1299:14, 1377:25,
1378:2, 1385:14, 1517:16, 1558:25
  **testimony** [67] - 1270:19, 1283:23,
1299:6, 1299:8, 1300:20, 1304:21,
1312:13, 1321:9, 1321:11, 1322:3,
1326:20, 1327:9, 1328:3, 1328:5,
1330:1, 1330:25, 1335:4, 1335:9,
1349:19, 1361:19, 1376:16, 1376:22,
1377:13, 1377:20, 1377:25, 1378:15,
1378:19, 1379:3, 1386:2, 1401:16,
1411:15, 1418:7, 1420:25, 1422:3,
1426:25, 1428:9, 1429:12, 1432:19,
1443:14, 1474:11, 1478:17, 1489:1,
1489:10, 1492:2, 1512:8, 1515:21,
1516:6, 1516:9, 1516:21, 1517:2,
1517:6, 1518:7, 1518:23, 1518:24,
1519:4, 1519:8, 1522:14, 1528:12,
1535:9, 1543:8, 1543:10, 1546:16,
1546:22, 1547:12, 1565:7, 1565:12
  **TESTIMONY** [1] - 1379:5
  **testing** [1] - 1463:2
  **Texas** [6] - 1386:24, 1389:4, 1389:17,
1391:6, 1395:23, 1449:19
  **TEXAS** [1] - 1270:3
  **text** [2] - 1314:4, 1352:7
  **THAT** [1] - 1601:21
  **THE** [238] - 1270:12, 1271:13, 1271:16,
1271:25, 1272:2, 1274:5, 1274:20,
1274:25, 1275:17, 1280:19, 1287:18,
1299:16, 1299:19, 1299:21, 1303:6,
1303:10, 1311:10, 1320:3, 1320:8,
1320:16, 1321:12, 1322:4, 1322:12,
1322:16, 1323:1, 1323:7, 1323:13,
1323:19, 1324:11, 1324:17, 1324:19,
1324:22, 1325:7, 1325:11, 1325:16,
1326:23, 1327:6, 1327:18, 1327:24,
1328:8, 1328:17, 1329:24, 1330:7,
1330:9, 1330:17, 1330:21, 1331:22,
1332:1, 1332:11, 1332:22, 1333:2,
1333:7, 1333:22, 1334:11, 1334:16,
1335:13, 1336:20, 1336:23, 1337:4,
1337:7, 1337:13, 1337:19, 1337:22,
1337:25, 1341:20, 1341:21, 1342:6,
1344:11, 1344:13, 1344:15, 1344:19,
1344:21, 1344:25, 1345:5, 1346:14,

1349:11, 1349:18, 1350:18, 1358:22,
1359:19, 1360:3, 1362:14, 1362:18,
1362:22, 1363:3, 1363:5, 1363:8,
1371:5, 1372:8, 1372:21, 1372:24,
1373:20, 1373:25, 1374:19, 1375:5,
1375:21, 1376:3, 1376:7, 1376:13,
1376:25, 1377:3, 1377:8, 1377:13,
1378:9, 1378:24, 1384:9, 1384:11,
1385:8, 1386:4, 1386:18, 1389:8,
1389:10, 1392:16, 1393:14, 1394:6,
1394:9, 1407:8, 1407:14, 1408:7,
1408:10, 1409:20, 1410:1, 1410:4,
1413:23, 1414:3, 1414:8, 1419:15,
1419:22, 1419:24, 1419:25, 1420:6,
1420:11, 1420:14, 1420:19, 1420:22,
1420:24, 1421:14, 1421:16, 1421:18,
1421:21, 1421:25, 1422:3, 1422:8,
1422:18, 1423:5, 1423:12, 1423:14,
1423:16, 1423:18, 1423:20, 1431:10,
1433:14, 1433:19, 1433:22, 1444:8,
1446:18, 1446:20, 1448:6, 1448:9,
1448:17, 1448:23, 1449:5, 1449:9,
1458:1, 1463:17, 1464:14, 1466:16,
1468:21, 1470:5, 1470:10, 1470:15,
1471:4, 1471:7, 1471:12, 1471:16,
1479:10, 1491:6, 1494:4, 1494:8,
1495:3, 1495:5, 1495:8, 1496:19,
1496:25, 1506:21, 1506:24, 1511:13,
1514:2, 1528:15, 1528:20, 1554:11,
1554:12, 1557:17, 1558:23, 1559:2,
1559:23, 1560:5, 1560:16, 1560:21,
1561:2, 1561:14, 1561:17, 1562:9,
1562:12, 1563:10, 1563:12, 1563:17,
1563:20, 1563:22, 1563:24, 1563:25,
1564:3, 1564:7, 1564:12, 1564:16,
1564:19, 1564:24, 1565:2, 1565:25,
1567:2, 1567:4, 1571:14, 1571:16,
1585:6, 1585:7, 1587:12, 1587:14,
1590:13, 1590:19, 1594:5, 1598:24,
1600:22, 1601:4, 1601:9, 1601:13,
1601:18, 1601:22
  **theatre** [1] - 1555:13, 1555:22
  **themselves** [2] - 1272:16, 1521:3
  **then..** [1] - 1594:6
  **theoretically** [1] - 1440:25
  **theory** [1] - 1498:10
  **therefore** [4] - 1333:16, 1434:8,
1434:12, 1483:15
  **they've** [10] - 1324:5, 1329:24, 1392:15,
1433:3, 1435:24, 1459:24, 1463:2,
1490:21, 1540:24, 1546:14
  **thin** [1] - 1462:2
  **thinking** [4] - 1383:14, 1437:25,
1440:21, 1495:19
  **thinks** [1] - 1437:2
  **third** [7] - 1326:24, 1344:2, 1418:18,
1480:2, 1543:20, 1544:23, 1554:8
  **thirds** [4] - 1443:10, 1543:22, 1545:9,
1546:1
  **THIS** [1] - 1601:21
  **thoroughly** [1] - 1312:23

1646

**thousand** [15] - 1390:9, 1400:3, 1400:6, 1400:7, 1416:11, 1427:4, 1433:7, 1433:10, 1445:18, 1446:7, 1450:21, 1475:10, 1476:4, 1476:14, 1543:15

**thousands** [5] - 1285:9, 1343:10, 1368:11, 1416:12, 1573:19

**three** [25] - 1280:2, 1282:6, 1290:11, 1290:15, 1321:1, 1327:3, 1327:6, 1327:7, 1328:5, 1329:21, 1345:12, 1364:4, 1380:1, 1403:19, 1415:1, 1438:24, 1443:12, 1499:20, 1500:3, 1514:13, 1557:3, 1582:15, 1591:23, 1596:7

**three-and-a-half** [1] - 1280:2

**three-quarters** [2] - 1290:11, 1514:13

**throughout** [5] - 1390:11, 1401:10, 1401:17, 1409:11, 1525:6

**throwing** [1] - 1324:12

**tickers** [1] - 1573:18

**tie** [3] - 1354:2, 1548:17, 1566:20

**tied** [1] - 1510:16

**tiered** [1] - 1431:3

**ties** [1] - 1398:10

**timeline** [1] - 1570:5

**timely** [1] - 1423:8

**timing** [4] - 1332:20, 1336:17, 1383:7, 1383:9

**tired** [1] - 1586:21

**title** [3] - 1363:12, 1379:13, 1427:11

**titled** [2] - 1409:1, 1442:13

**titles** [1] - 1577:6

**today** [10] - 1381:9, 1381:11, 1381:13, 1381:24, 1382:10, 1417:15, 1570:16, 1571:4, 1571:7, 1583:9

**today's** [1] - 1285:9

**together** [23] - 1296:2, 1331:14, 1390:14, 1416:14, 1426:19, 1454:14, 1461:11, 1478:16, 1478:18, 1485:4, 1485:15, 1503:11, 1503:25, 1524:5, 1524:15, 1526:5, 1540:3, 1540:17, 1540:20, 1565:17, 1565:18, 1566:20

**tomorrow** [2] - 1423:3, 1601:2

**Tony** [1] - 1583:3

**took** [17] - 1285:5, 1312:12, 1313:25, 1321:2, 1377:18, 1408:20, 1426:4, 1452:12, 1464:16, 1469:14, 1472:11, 1479:16, 1529:13, 1530:16, 1552:23, 1553:8, 1569:7

**tools** [2] - 1528:11, 1529:17

**top** [49] - 1276:8, 1289:25, 1304:8, 1365:13, 1373:16, 1386:22, 1388:25, 1400:12, 1401:1, 1406:6, 1426:14, 1439:3, 1439:7, 1440:6, 1441:10, 1442:5, 1442:9, 1442:23, 1444:24, 1445:2, 1446:5, 1456:6, 1457:17, 1463:21, 1465:19, 1466:18, 1466:22, 1473:9, 1478:19, 1480:18, 1481:3, 1499:12, 1501:21, 1504:3, 1514:15, 1518:8, 1523:5, 1523:7, 1523:24, 1525:3, 1526:8, 1526:11, 1546:11,

**topic** [2] - 1298:22, 1361:17, 1373:4

**topics** [1] - 1343:13

**Toshiba** [2] - 1520:21, 1521:4

**total** [18] - 1325:20, 1393:4, 1394:15, 1401:3, 1406:21, 1409:9, 1439:11, 1456:10, 1456:14, 1463:3, 1464:24, 1466:8, 1467:9, 1467:21, 1467:22, 1485:3, 1486:14, 1525:24

**totalling** [1] - 1401:6

**totals** [2] - 1406:22, 1406:23

**touch** [5] - 1298:9, 1298:19, 1316:8, 1573:10, 1590:2

**touch-sensitive** [1] - 1298:9

**touch-type** [1] - 1298:19

**touchpad** [3] - 1298:10, 1300:7, 1300:24

**touchpads** [1] - 1301:5

**touchscreen** [13] - 1292:14, 1298:2, 1298:5, 1298:11, 1298:15, 1299:5, 1300:15, 1300:19, 1300:23, 1301:17, 1573:13, 1574:2

**touchscreens** [1] - 1300:13

**towards** [5] - 1365:5, 1411:22, 1460:13, 1498:4, 1554:7

**track** [2] - 1305:10, 1586:1

**trackball** [1] - 1300:7

**trackballs** [1] - 1301:6

**tracker** [1] - 1447:3

**trademarks** [1] - 1387:9

**transcript** [1] - 1547:14

**TRANSCRIPT** [1] - 1601:22

**transfer** [8] - 1358:13, 1358:17, 1358:24, 1359:6, 1359:12, 1419:3, 1515:2, 1521:23

**transferred** [5] - 1316:5, 1427:16, 1525:19, 1556:9, 1556:20

**transferring** [2] - 1482:8, 1526:1

**transitional** [1] - 1491:5

**transitioned** [1] - 1579:12

**translucent** [1] - 1572:19

**traps** [1] - 1321:15

**traveling** [1] - 1417:2

**trend** [1] - 1332:19

**TRIAL** [1] - 1270:2

**trial** [9] - 1407:18, 1421:8, 1525:7, 1573:7, 1582:3, 1584:11, 1594:12, 1599:25, 1600:6

**triangle** [1] - 1586:13

**tried** [3] - 1469:20, 1505:22, 1507:10

**triple** [2] - 1291:9, 1291:14

**true** [14] - 1275:15, 1277:18, 1282:20, 1314:7, 1328:10, 1328:13, 1335:7, 1348:22, 1380:9, 1420:16, 1492:18, 1505:19, 1508:25, 1512:2

**truly** [2] - 1476:23, 1518:8

**Trust** [7] - 1395:9, 1412:23, 1424:17, 1428:21, 1428:24, 1430:3, 1430:8

**trust** [1] - 1430:10

**truth** [2] - 1377:17, 1378:2

**try** [15] - 1308:17, 1329:25, 1333:8, 1334:12, 1334:19, 1335:14, 1360:1, 1422:20, 1453:17, 1481:21, 1482:23, 1489:19, 1518:13, 1578:25, 1592:25

**trying** [31] - 1270:7, 1270:18, 1273:5, 1281:24, 1311:11, 1318:24, 1320:23, 1353:23, 1359:17, 1360:24, 1361:2, 1361:6, 1366:16, 1368:18, 1373:21, 1384:19, 1384:24, 1413:1, 1421:2, 1433:9, 1484:12, 1485:6, 1506:15, 1507:20, 1507:24, 1509:4, 1509:19, 1527:25, 1529:18, 1538:10, 1538:11

**Tucson** [1] - 1568:1

**turn** [36] - 1302:17, 1305:20, 1308:21, 1325:13, 1347:14, 1352:3, 1369:19, 1404:4, 1404:17, 1405:21, 1425:24, 1436:10, 1436:21, 1437:12, 1438:10, 1439:1, 1441:14, 1441:23, 1444:15, 1445:20, 1446:24, 1447:14, 1455:3, 1455:21, 1461:2, 1461:17, 1463:13, 1465:8, 1474:21, 1479:5, 1512:25, 1551:19, 1566:19, 1566:24, 1581:1, 1598:20

**turned** [6] - 1347:10, 1347:12, 1349:14, 1349:16, 1370:12, 1573:8

**turning** [1] - 1585:24

**twice** [2] - 1526:15, 1537:13

**two** [57] - 1276:24, 1290:18, 1291:5, 1322:11, 1323:10, 1327:8, 1329:2, 1334:15, 1335:17, 1345:20, 1357:25, 1363:21, 1370:9, 1372:18, 1380:1, 1414:18, 1422:24, 1434:16, 1440:7, 1441:7, 1443:10, 1443:12, 1445:2, 1466:20, 1472:3, 1478:19, 1478:20, 1480:18, 1486:25, 1489:24, 1490:11, 1491:18, 1500:15, 1506:10, 1524:2, 1524:14, 1526:16, 1526:21, 1529:7, 1530:20, 1538:8, 1538:22, 1543:22, 1545:9, 1546:1, 1546:12, 1573:10, 1578:23, 1579:18, 1582:16, 1582:17, 1586:13, 1593:18, 1594:6, 1595:7, 1595:23, 1597:2

**two-thirds** [4] - 1443:10, 1543:22, 1545:9, 1546:1

**type** [37] - 1298:19, 1317:4, 1322:8, 1340:11, 1342:9, 1386:10, 1388:10, 1389:5, 1391:19, 1396:5, 1397:5, 1398:12, 1399:12, 1405:10, 1411:20, 1415:24, 1425:8, 1429:6, 1429:7, 1430:22, 1432:13, 1432:15, 1438:20, 1438:23, 1441:21, 1442:20, 1451:10, 1467:1, 1475:15, 1480:8, 1485:5, 1499:16, 1534:8, 1539:8, 1571:11, 1599:16

**types** [9] - 1282:14, 1324:5, 1358:5, 1387:11, 1410:22, 1416:22, 1426:24, 1454:18, 1562:4

**typical** [9] - 1279:7, 1279:20, 1279:23, 1282:1, 1282:8, 1283:4, 1283:10, 1283:11, 1470:23

**typically** [2] - 1282:4, 1282:16

**typographical** [1] - 1372:18
**typos** [1] - 1372:10

# U

**U.S** [10] - 1288:20, 1340:12, 1340:16, 1342:10, 1396:17, 1401:20, 1410:16, 1558:20, 1561:11, 1593:1
**U.T** [1] - 1479:16
**Ugone** [5] - 1328:7, 1328:9, 1328:17, 1488:23, 1492:24
**ultimately** [5] - 1312:9, 1383:7, 1492:25, 1509:7, 1579:17
**ultra** [1] - 1417:17
**un-tell** [1] - 1440:13
**unaccused** [1] - 1561:16
**uncertainty** [3] - 1432:10, 1432:16, 1434:4
**under** [21] - 1279:7, 1299:21, 1335:25, 1336:2, 1336:5, 1359:7, 1380:11, 1414:23, 1415:3, 1461:9, 1465:24, 1482:16, 1496:14, 1498:10, 1533:14, 1538:8, 1539:2, 1554:11, 1555:12, 1565:4, 1590:20
**undergraduates** [1] - 1316:9
**underlying** [1] - 1323:23
**underneath** [1] - 1324:21
**understood** [5] - 1298:25, 1318:5, 1330:6, 1342:23, 1353:19
**unfortunately** [4] - 1274:15, 1274:22, 1345:2, 1522:17
**unique** [1] - 1572:19
**unit** [43] - 1308:5, 1324:3, 1340:24, 1385:23, 1393:3, 1394:18, 1397:23, 1398:12, 1400:6, 1400:8, 1400:13, 1400:14, 1402:7, 1402:21, 1403:13, 1406:18, 1429:20, 1430:6, 1431:1, 1434:13, 1453:10, 1459:22, 1460:13, 1463:4, 1463:5, 1467:19, 1467:23, 1485:16, 1487:14, 1490:8, 1505:7, 1505:14, 1507:22, 1527:11, 1529:6, 1529:7, 1530:23, 1538:14, 1538:18, 1540:22, 1572:18, 1589:9
**United** [1] - 1570:2
**units** [35] - 1392:24, 1392:25, 1393:2, 1393:6, 1394:4, 1394:11, 1399:23, 1399:24, 1400:1, 1400:6, 1400:13, 1400:14, 1400:15, 1400:21, 1401:6, 1401:8, 1402:2, 1403:14, 1403:18, 1403:20, 1403:23, 1409:9, 1451:9, 1490:13, 1497:24, 1510:12, 1540:9, 1545:8, 1545:10, 1545:14
**universal** [1] - 1314:8
**universe** [1] - 1324:4
**universities** [1] - 1388:23
**University** [11] - 1387:18, 1388:24, 1389:2, 1389:3, 1389:18, 1389:23, 1395:23, 1449:18, 1567:24, 1567:25, 1568:2
**unknown** [1] - 1329:8

**unless** [1] - 1326:16
**unloaded** [1] - 1589:22
**unmount** [1] - 1593:10
**unpatentable** [3] - 1340:12, 1342:10, 1369:21
**unproduced** [1] - 1327:17
**unsure** [1] - 1376:21
**unusual** [2] - 1538:23, 1565:3
**up** [168] - 1270:8, 1270:9, 1272:7, 1272:11, 1272:18, 1274:12, 1276:5, 1277:10, 1285:15, 1286:16, 1293:24, 1294:19, 1297:9, 1304:10, 1306:24, 1307:4, 1308:24, 1309:9, 1322:6, 1322:17, 1323:10, 1325:7, 1325:22, 1326:16, 1326:20, 1332:25, 1338:3, 1344:2, 1345:7, 1350:22, 1352:6, 1353:18, 1355:19, 1359:23, 1360:24, 1361:3, 1363:1, 1364:5, 1364:25, 1365:7, 1365:9, 1372:25, 1376:3, 1378:24, 1382:17, 1383:4, 1387:5, 1398:1, 1398:2, 1398:9, 1398:21, 1398:23, 1398:24, 1399:9, 1400:17, 1401:21, 1402:23, 1403:1, 1403:8, 1404:20, 1405:5, 1406:2, 1406:3, 1406:6, 1406:13, 1417:16, 1418:4, 1418:5, 1418:25, 1421:16, 1424:10, 1428:8, 1436:15, 1440:5, 1442:9, 1442:24, 1443:22, 1445:1, 1446:4, 1452:1, 1454:12, 1456:4, 1456:9, 1464:2, 1464:18, 1465:10, 1465:19, 1467:3, 1468:8, 1471:23, 1472:13, 1473:23, 1473:25, 1475:10, 1477:18, 1478:9, 1481:10, 1482:9, 1482:11, 1483:21, 1484:24, 1485:2, 1485:16, 1487:13, 1488:8, 1491:15, 1495:13, 1499:3, 1501:20, 1504:18, 1504:21, 1505:24, 1506:20, 1507:9, 1513:2, 1515:15, 1516:18, 1516:25, 1517:11, 1518:4, 1522:18, 1523:20, 1524:6, 1524:7, 1527:10, 1527:13, 1527:17, 1529:5, 1529:19, 1530:15, 1535:25, 1538:11, 1541:24, 1543:11, 1544:2, 1544:18, 1551:1, 1551:14, 1551:22, 1553:18, 1561:23, 1562:17, 1563:17, 1567:19, 1567:20, 1570:5, 1570:25, 1573:15, 1576:7, 1578:2, 1579:11, 1580:6, 1580:8, 1581:4, 1584:5, 1585:3, 1585:6, 1585:10, 1586:17, 1587:11, 1588:25, 1589:11, 1591:2, 1593:8, 1594:19, 1595:3, 1600:9, 1601:5
**up-front** [8] - 1332:25, 1398:1, 1398:2, 1398:21, 1398:23, 1398:24, 1399:9, 1428:8
**up-fronts** [1] - 1398:9
**up-to-date** [2] - 1418:4, 1418:5
**up-to-the-minute** [1] - 1418:25
**upcoming** [1] - 1307:8
**updated** [4] - 1274:23, 1418:22, 1443:25, 1592:8
**updates** [1] - 1418:9
**upper** [3] - 1316:9, 1570:7, 1577:3

**upper-level** [1] - 1316:9
**usage** [3] - 1399:7, 1447:21, 1448:18
**usages** [2] - 1395:18, 1448:19
**USB** [27] - 1290:19, 1314:5, 1314:8, 1314:11, 1314:21, 1315:1, 1315:4, 1315:6, 1315:8, 1315:13, 1315:24, 1316:12, 1316:14, 1316:17, 1316:24, 1317:10, 1318:9, 1319:14, 1319:17, 1338:18, 1359:1, 1366:2, 1598:10, 1598:11, 1599:21, 1600:2
**USB-compliant** [2] - 1315:4, 1315:8
**useful** [2] - 1428:15, 1428:17
**usefulness** [4] - 1437:11, 1438:6, 1445:8, 1453:10
**user** [10] - 1285:7, 1301:11, 1304:13, 1341:1, 1350:11, 1371:16, 1371:25, 1571:6, 1571:9, 1583:11
**user's** [2] - 1285:7, 1428:1
**users** [12] - 1285:4, 1381:18, 1416:13, 1438:21, 1438:22, 1442:14, 1442:18, 1442:19, 1502:25, 1544:13, 1546:1, 1558:2
**Uses** [1] - 1476:10
**uses** [11] - 1294:12, 1298:16, 1298:19, 1349:6, 1353:25, 1404:3, 1416:25, 1560:13, 1561:22, 1561:24, 1562:5
**ushered** [1] - 1570:21
**utility** [1] - 1568:21
**utilization** [5] - 1450:13, 1450:18, 1452:1, 1452:4, 1452:11

# V

**vague** [1] - 1321:22
**valid** [12] - 1385:17, 1392:6, 1413:6, 1421:23, 1425:17, 1487:4, 1490:18, 1492:12, 1511:22, 1539:14, 1540:8, 1566:18
**validity** [10] - 1413:9, 1413:13, 1414:16, 1414:22, 1488:2, 1492:3, 1492:17, 1493:5, 1566:16, 1566:23
**valuable** [1] - 1451:12
**valuation** [4] - 1388:25, 1390:18, 1410:20, 1474:8
**Valuations** [1] - 1389:1
**value** [27] - 1322:4, 1324:2, 1435:5, 1451:19, 1451:23, 1453:7, 1470:19, 1470:25, 1478:5, 1478:10, 1478:18, 1478:19, 1478:25, 1479:20, 1479:21, 1480:21, 1509:13, 1509:21, 1510:3, 1510:7, 1510:17, 1511:7, 1516:12, 1520:22, 1533:21, 1546:1
**values** [7] - 1468:10, 1479:2, 1479:24, 1480:14, 1480:17, 1516:25, 1517:25
**variable** [5] - 1343:17, 1343:18, 1345:16, 1345:23, 1345:24
**varies** [4] - 1463:4, 1527:11, 1543:24, 1545:2
**variety** [19] - 1292:16, 1387:19, 1387:22, 1388:6, 1388:18, 1394:24,

1395:1, 1395:11, 1395:17, 1396:7, 1396:9, 1403:8, 1411:18, 1412:16, 1436:5, 1523:13, 1542:23, 1543:5, 1552:2

**various** [42] - 1311:13, 1388:3, 1391:9, 1393:10, 1395:2, 1396:3, 1401:17, 1402:21, 1406:18, 1409:6, 1412:5, 1428:12, 1444:19, 1445:15, 1455:24, 1456:8, 1460:21, 1461:14, 1461:16, 1462:8, 1464:1, 1464:6, 1464:21, 1465:2, 1465:23, 1472:4, 1475:1, 1477:1, 1514:22, 1514:23, 1522:6, 1527:22, 1540:13, 1558:8, 1560:12, 1560:17, 1561:9, 1561:11, 1561:22, 1584:5, 1584:6, 1592:18

**verbatim** [1] - 1343:24

**versa** [1] - 1329:14

**Version** [1] - 1322:17, 1580:14

**version** [11] - 1274:15, 1274:23, 1322:21, 1349:7, 1364:1, 1420:21, 1575:19, 1584:2, 1595:21, 1596:6

**versus** [1] - 1320:12, 1331:23, 1359:24, 1410:15, 1416:18, 1438:9, 1448:18, 1487:9, 1515:1, 1528:4, 1538:5

**vertical** [1] - 1586:13

**via** [3] - 1379:3, 1449:25, 1543:21

**vice** [2] - 1329:14, 1379:16

**vice-president** [1] - 1379:16

**video** [14] - 1300:6, 1376:2, 1377:11, 1377:14, 1378:21, 1382:20, 1383:12, 1383:19, 1383:20, 1383:23, 1383:24, 1384:8, 1384:18, 1391:14

**Video** [1] - 1380:23

**videographer** [1] - 1377:16

**videotape** [1] - 1379:4

**viewing** [1] - 1480:7

**volatile** [3] - 1348:3, 1348:13, 1350:3

**voltage** [4] - 1315:18, 1315:21, 1315:23, 1315:24

**VOLUME** [1] - 1270:2

**volume** [3] - 1497:23, 1497:24, 1585:24

**Volume** [2] - 1344:13, 1344:14

**voluntarily** [3] - 1506:15, 1507:7, 1507:10

**VSI** [1] - 1331:23

### W

**wait** [12] - 1317:14, 1332:1, 1341:21, 1344:12, 1347:24, 1394:6, 1552:24, 1558:23, 1562:9, 1564:3, 1589:25

**waiting** [1] - 1422:23

**walk** [11] - 1385:21, 1413:14, 1413:17, 1414:2, 1417:5, 1425:21, 1453:17, 1469:18, 1474:4, 1593:5, 1593:14

**walked** [2] - 1402:12, 1520:23

**walking** [1] - 1444:20

**Walkman** [1] - 1415:25

**walks** [2] - 1509:1, 1509:2

**wants** [2] - 1397:16, 1565:9

**waste** [2] - 1384:18, 1556:14

**wave** [3] - 1446:1, 1446:2

**waves** [1] - 1446:1

**ways** [18] - 1400:9, 1438:9, 1440:2, 1440:7, 1440:12, 1442:16, 1442:17, 1445:2, 1451:5, 1498:14, 1508:13, 1523:13, 1542:23, 1543:22, 1555:2, 1598:7, 1599:20

**wearing** [1] - 1555:18

**weather** [1] - 1573:18

**Web** [4] - 1285:18, 1285:21, 1286:6, 1286:21

**WEDNESDAY** [1] - 1270:2

**week** [5] - 1443:11, 1443:15, 1443:19, 1491:10, 1566:2

**weeks** [1] - 1443:12

**weight** [6] - 1377:20, 1476:24, 1480:7, 1518:14, 1518:16, 1519:11

**weighting** [2] - 1519:2, 1519:10

**welcome** [1] - 1272:3

**well-known** [2] - 1292:15, 1329:8

**western** [1] - 1588:5

**whatsoever** [1] - 1381:13

**wheel** [3] - 1585:24, 1587:22, 1590:2

**wheeled** [1] - 1556:12

**whereas** [1] - 1272:14

**whittle** [2] - 1530:15, 1533:10

**whittled** [2] - 1505:22, 1527:21

**whittles** [1] - 1528:6

**whittling** [2] - 1524:16, 1524:17

**whole** [27] - 1284:24, 1301:19, 1319:2, 1321:11, 1343:21, 1346:7, 1368:15, 1395:17, 1396:7, 1398:3, 1403:8, 1406:13, 1424:14, 1442:10, 1451:23, 1465:10, 1472:6, 1505:23, 1506:9, 1509:23, 1510:4, 1525:6, 1528:5, 1554:6, 1572:24, 1572:25, 1594:22

**Wicker** [1] - 1415:18

**wide** [4] - 1527:12, 1527:17, 1527:24, 1552:2

**wife** [5] - 1396:8, 1416:18, 1416:20, 1416:25, 1556:12

**willing** [5] - 1496:11, 1506:5, 1506:6, 1506:10

**win** [1] - 1507:23

**wind** [4] - 1382:14, 1382:23, 1383:8, 1591:2

**window** [1] - 1577:4

**windows** [2] - 1571:13, 1571:17

**Windows** [8] - 1301:9, 1301:10, 1301:15, 1438:22, 1442:14, 1442:19, 1571:7, 1593:7

**wireless** [7] - 1294:5, 1598:17, 1599:21, 1600:1, 1600:4, 1600:5, 1600:19

**wish** [3] - 1330:2, 1333:8, 1440:3

**withdraw** [2] - 1275:21, 1366:4

**withdrawing** [1] - 1305:17

**witness** [22] - 1299:15, 1299:16,

1320:18, 1376:1, 1377:5, 1377:10, 1377:15, 1377:16, 1377:24, 1378:6, 1378:10, 1385:2, 1385:10, 1491:3, 1495:7, 1560:5, 1560:8, 1560:22, 1561:2, 1563:25, 1565:21, 1594:4

**WITNESS** [9] - 1271:16, 1389:10, 1419:24, 1554:12, 1557:17, 1563:24, 1571:16, 1585:7, 1587:14

**witness'** [1] - 1377:25

**witnesses** [6] - 1349:20, 1564:10, 1565:18, 1590:20, 1590:23

**won** [2] - 1574:10, 1574:11

**wondering** [1] - 1496:21

**wooden** [1] - 1570:16

**word** [15] - 1298:16, 1313:8, 1313:11, 1313:16, 1313:24, 1314:3, 1318:11, 1318:18, 1368:18, 1376:19, 1546:20, 1546:24, 1568:20, 1574:3

**Word** [2] - 1589:12, 1589:13

**word-for-word** [1] - 1313:24

**words** [30] - 1278:24, 1279:17, 1279:18, 1283:14, 1283:20, 1285:11, 1291:22, 1295:18, 1295:19, 1296:13, 1301:20, 1301:21, 1304:17, 1307:22, 1307:23, 1308:6, 1309:13, 1312:2, 1318:2, 1335:17, 1342:20, 1343:23, 1346:9, 1346:10, 1353:25, 1395:5, 1398:10, 1425:7, 1432:21, 1509:24

**works** [9] - 1278:13, 1290:2, 1382:11, 1399:21, 1427:1, 1481:9, 1583:8, 1590:12, 1601:17

**workshops** [1] - 1390:11

**world** [5] - 1413:11, 1413:12, 1425:9, 1507:19, 1508:18

**worldwide** [1] - 1390:9

**worth** [1] - 1556:5

**wound** [1] - 1381:6

**Wozniak** [1] - 1570:11

**write** [4] - 1503:17, 1503:18, 1577:13

**writing** [1] - 1321:23

**written** [14] - 1307:2, 1307:17, 1312:17, 1326:6, 1334:4, 1363:13, 1365:1, 1368:24, 1375:17, 1470:17, 1471:7, 1471:8, 1572:9, 1573:25

**wrote** [1] - 1283:9

**Wysocki** [5] - 1583:5, 1583:6, 1583:7, 1583:20, 1584:1

**Wysocki's** [1] - 1583:15

### X

**Xbox** [1] - 1391:15

### Y

**y'all** [1] - 1326:17

**Yahoo** [1] - 1391:10

**yank** [2] - 1593:5, 1593:13

**year** [21] - 1312:25, 1363:19, 1383:10,

1649

1390:12, 1403:3, 1403:5, 1403:16,
1403:17, 1406:21, 1406:22, 1406:23,
1408:20, 1421:6, 1421:7, 1432:7,
1433:11, 1441:18, 1500:3, 1500:6,
1500:7, 1540:13
  **yearly** [2] - 1408:20, 1408:21
  **years** [25] - 1284:25, 1388:7, 1389:20,
1390:5, 1391:18, 1399:2, 1400:23,
1401:5, 1409:11, 1410:17, 1421:6,
1431:19, 1432:3, 1432:7, 1437:18,
1438:24, 1463:10, 1491:16, 1493:23,
1510:25, 1567:16, 1592:18, 1595:23,
1596:7, 1597:2
  **yell** [1] - 1601:16
  **yesterday** [5] - 1270:7, 1272:12,
1330:25, 1334:24, 1335:4
  **Yo** [6] - 1586:2, 1586:22, 1586:23
  **Yo-Yo** [3] - 1586:2, 1586:22, 1586:23
  **yourself** [5] - 1396:1, 1425:10, 1492:7,
1497:25, 1567:8
  **yourselves** [1] - 1419:19

## Z

**Zeppelin** [1] - 1427:12

## ¶

**¶6** [2] - 1333:10, 1333:13