2919

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

1
2

3  PERSONAL AUDIO, LLC          |  DOCKET 9:09CV111
                                |
4                               |  JULY 7, 2011
     VS.                        |
5                               |  8:31 A.M.
                                |
6  APPLE, INC., ET AL           |  BEAUMONT, TEXAS

7  ----------------------------------------------------------

8          VOLUME 10 OF __, PAGES 2919 THROUGH 3231

9          REPORTER'S TRANSCRIPT OF JURY TRIAL

10          BEFORE THE HONORABLE RON CLARK
        UNITED STATES DISTRICT JUDGE, AND A JURY

11  ----------------------------------------------------------

12

13

14  APPEARANCES:

15  FOR THE PLAINTIFF:      RONALD J. SCHUTZ
                            JACOB M. HOLDREITH
16                          CYRUS A. MORTON
                            PATRICK M. ARENZ
17                          ROBINS KAPLAN MILLER & CIRESI - MN
                            800 LASALLE AVENUE
18                          SUITE 2800
                            MINNEAPOLIS, MINNESOTA  55402
19
                            ANNIE HUANG
20                          ROBINS KAPLAN MILLER & CIRESI - NY
                            601 LEXINGTON AVENUE
21                          SUITE 3400
                            NEW YORK, NEW YORK  10022
22
                            LAWRENCE LOUIS GERMER
23                          GERMER GERTZ
                            550 FANNIN
24                          SUITE 400
                            BEAUMONT, TEXAS  77701
25

2920

```
 1  FOR THE DEFENDANTS:      RUFFIN B. CORDELL
                             FISH & RICHARDSON - WASHINGTON DC
 2                           1425 K STREET NW
                             SUITE 1100
 3                           WASHINGTON, DC  20005

 4                           GARLAND T. STEPHENS
                             BENJAMIN C. ELACQUA
 5                           FISH & RICHARDSON
                             1221 MCKINNEY
 6                           28TH FLOOR
                             HOUSTON, TEXAS  77010
 7
                             KELLY C. HUNSAKER
 8                           FISH & RICHARDSON
                             500 ARGUELLO STREET
 9                           SUITE 500
                             REDWOOD CITY, CALIFORNIA  94063
10
                             JUSTIN BARNES
11                           FISH & RICHARDSON
                             12390 EL CAMINO REAL
12                           SAN DIEGO, CALIFORNIA  92130

13                           J. THAD HEARTFIELD
                             THE HEARTFIELD LAW FIRM
14                           2195 DOWLEN ROAD
                             BEAUMONT, TEXAS  77706
15

16
    COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RMR
17                           FEDERAL OFFICIAL REPORTER
                             300 WILLOW, SUITE 221
18                           BEAUMONT, TEXAS  77701

19

20
      PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
21   TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

22

23

24

25
```

INDEX

                                                          PAGE

COURT'S INSTRUCTIONS TO THE JURY                          2923

CLOSING ARGUMENT BY MR. SCHUTZ                            2968

CLOSING ARGUMENT BY MR. CORDELL                           3002

REBUTTAL ARGUMENT BY MR. SCHUTZ                           3045

COURT FINAL INSTRUCTIONS TO THE JURY                      3050


BENCH TRIAL                                               3054

DIRECT EXAMINATION OF CHARLES CALL                        3054


JURY NOTE NUMBER 1                                        3055

JURY NOTE NUMBER 2                                        3055


CROSS-EXAMINATION OF CHARLES CALL                         3086


DIRECT EXAMINATION OF JAMES LOGAN                         3106

CROSS-EXAMINATION OF JAMES LOGAN                          3147


JURY NOTE NUMBER 3                                        3165

DEFENDANT RESTS                                           3170

JURY NOTE NUMBER 4                                        3181

CONCORDANCE INDEX                                         3192

2922

1                    <u>INDEX OF EXHIBITS</u>

2

3                                                         <u>PAGE</u>

4    Plaintiff's Exhibits 10 through 13           3137

5    Plaintiff's Exhibits 10 through 13           3143

6    Plaintiff's Exhibits 226, 227, 228, and 229  3170

7    Plaintiff's Exhibit 226                      3171

8

9

10   DX 62                                        3074

11   DX 116                                       3078

12   Defendant's Exhibit 1                        3094

13   Defendant's Exhibit 1                        3094

14   Defendant's Exhibit 1                        3099

15   Defendant's Exhibit 153                      3147

16   Defendant's Exhibit 270                      3159

17   DX 87                                        3167

18

19

20

21

22

23

24

25

2923

1          (REPORTER'S NOTES PERSONAL AUDIO V. APPLE,

2    JURY TRIAL, VOLUME 10, 8:31 A.M., THURSDAY, JULY 7, 2011,

3    BEAUMONT, TEXAS, HON. RON CLARK PRESIDING.)

4          (OPEN COURT, ALL PARTIES PRESENT, JURY

5    PRESENT.)

6          THE COURT:  We found, ladies and gentlemen,

7    just at the last minute, two exhibit numbers that were

8    incorrect in the jury instructions.  So, what we're going

9    to do is correct those with a pen correction on the

10   copies we're going to be reading and hand them out to you

11   in just a second.

12         Just so you don't think we were goofing off on

13   that, we were here until about 9:00 last night getting

14   this all ready and thought we had it completely

15   proofread.

16         All right.  Ladies and gentlemen, you've heard

17   the evidence in the case; and I'll now instruct you on

18   the law.  I've provided you with a copy; so, you can

19   follow along with me or you can just listen.  I've found

20   that different people listen in different ways, like you

21   sometimes see in church.  Some people follow the

22   readings, and some people just listen.  You've got your

23   choice.

24         It is your duty to follow the law as I give it

25   to you.  On the other hand, you, the jury, are the judges

2924

1  of the facts.  Do not consider any statement that I have

2  made during the course of the trial, or make in these

3  instructions, as an indication that I have any opinion

4  about the facts of this case.

5           After I instruct you on the law, the attorneys

6  will have an opportunity to make their closing arguments.

7  Statements and arguments of the attorneys are not

8  evidence and are not instructions on the law.  They are

9  intended only to assist the jury in understanding the

10  evidence and the parties' contentions.

11           Now, it is my duty as judge to explain what

12  some of the words used in the patent claims mean.

13  Attached as Appendix A to this charge -- which you'll get

14  when you go back to the jury room.  It's the same one

15  that was in your juror notebook -- are the claims I have

16  defined for you.  These are the same definitions found in

17  the "definitions" section of your juror notebooks.  You

18  must accept as correct the definitions contained in

19  Appendix A.

20           Attached as Appendix B to this charge is the

21  definition of a "person of ordinary skill in the art."

22  This is the same definition that is found in the

23  "glossary" section of your juror notebooks.  The words

24  and terms of the patents that I have not defined for you

25  in Appendix A are to be given their ordinary and

1  accustomed meaning as understood by a person of ordinary

2  skill in the art in the context of the patent

3  specifications and file history.

4          Now, when words in these instructions and in

5  the definitions in Appendix A are used in a sense that

6  varies from their commonly understood meaning, you are

7  given a proper legal definition which you are bound to

8  accept in place of any other meaning.  The other words in

9  these instructions and in the definitions I have provided

10 to you have the meaning commonly understood.

11         Answer each question based on the facts as you

12 find them.  Do not decide who you think should win and

13 then answer the questions accordingly.  Your answers and

14 your verdict must be unanimous.

15         Now, you will be instructed to answer some

16 questions based upon a preponderance of the evidence.

17 This means you must be persuaded by the evidence that

18 what the party seeks to prove is more likely true than

19 not true.  You will be instructed to answer other

20 questions by clear and convincing evidence.  This is a

21 higher burden than by a preponderance of the evidence,

22 but it does not require proof beyond a reasonable doubt.

23 Clear and convincing evidence is evidence that shows what

24 the party seeks to prove is highly probable.

25         In deciding whether any fact has been proved

1  in the case, you may, unless otherwise instructed,

2  consider the testimony of all witnesses, regardless of

3  who may have called them, and all exhibits received in

4  evidence, regardless of who may have produced them, and

5  the facts to which the parties have stipulated.

6          Attached as Appendix C to this charge is a

7  list of facts to which the parties have stipulated.  You

8  must treat all of the stipulated facts as having been

9  proved.

10         Now, in determining the weight to give to the

11 testimony of a witness, you should ask yourself whether

12 there was evidence tending to prove that the witness

13 testified falsely concerning some important fact or

14 whether there was evidence that at some other time the

15 witness said or did something, or failed to say or do

16 something, that was different from the testimony the

17 witness gave before you during the trial.

18         You should keep in mind, however, that a

19 simple mistake by a witness does not necessarily mean

20 that the witness was not telling the truth as he or she

21 remembers it, because people may forget some things or

22 remember other things inaccurately.  So, if a witness has

23 made a misstatement, you need to consider whether that

24 misstatement was an intentional falsehood or simply an

25 innocent lapse of memory; and the significance of that

1 may depend on whether it has to do with an important fact

2 or only with an unimportant detail.

3        Now, if scientific, technical, or other

4 specialized knowledge may be helpful to the jury, a

5 witness with special training or experience, sometimes

6 called an "expert," may testify and state an opinion

7 concerning such matters.  However, you are not required

8 to accept that opinion.  You should judge such testimony

9 like any other testimony.  You may accept it or reject it

10 and give it as much weight as you think it deserves,

11 considering the witness' education and experience, the

12 soundness of the reasons given for the opinion, and all

13 the other evidence in the case.  In deciding whether to

14 accept or rely upon the opinion of such a witness, you

15 may consider any bias of the witness, including any bias

16 you may infer from evidence that the witness has been or

17 will be paid for reviewing the case and testifying, or

18 from evidence that he or she testifies regularly.

19        In making up your mind and reaching your

20 verdict, do not make your decisions simply because there

21 were more witnesses on one side than the other.  Do not

22 reach a conclusion on a particular point just because

23 there were more witnesses testifying for one side on that

24 point.  The testimony of a single witness may be

25 sufficient to prove any fact, even if a greater number of

1  witnesses may have testified to the contrary, if after

2  considering all the other evidence, you believe that

3  single witness.

4       While you should consider only the evidence in

5  this case, you are permitted to draw such reasonable

6  inferences from the testimony and exhibits as you feel

7  are justified in light of common experience.  In other

8  words, you may make deductions and reach conclusions that

9  reason and common sense lead you to draw from the facts

10 that have been established by the testimony and evidence

11 in the case.

12      There are two types of evidence that you may

13 consider in properly finding the truth as to the facts in

14 the case.  One is direct evidence, such as testimony of

15 an eyewitness.  The other is indirect or circumstantial

16 evidence, the proof of a chain of circumstances that

17 indicates the existence or nonexistence of certain other

18 facts.  As a general rule, the law makes no distinction

19 between direct and circumstantial evidence but simply

20 requires that you find the facts from all the evidence,

21 both direct and circumstantial.

22      Now, during the trial, I sustained objections

23 to certain questions.  You must disregard those questions

24 entirely.  Do not speculate as to what the witness would

25 have said if he or she would have been permitted to

2929

1 answer the question.  I also sustained objections to

2 certain exhibits.  You must disregard these exhibits

3 entirely.  Do not speculate as to what facts or

4 information may have been supported by the exhibit if it

5 had been admitted into evidence.

6          Certain exhibits were admitted for a limited

7 purpose.  You should not consider these exhibits for any

8 purpose other than that for which they were admitted.

9          Now, these exhibits are:  Plaintiff's Exhibits

10 771A through Plaintiff's Exhibit 781A and Plaintiff's

11 Exhibit 748A, admitted only for the purpose of

12 summarizing or listing many of the exhibits upon which

13 Dr. Almeroth relied for his testimony.  These summary

14 exhibits are not themselves evidence and are intended

15 only to provide you with a guide to Dr. Almeroth's

16 testimony and point you to the relevant underlying

17 exhibits that have been admitted.

18          Plaintiff's Exhibit 10 through Plaintiff's

19 Exhibit 13, admitted for the purpose of background

20 information, but they are not admitted as comparable

21 license agreements.

22          Then we have DDX 608, 610, 611, DDX 616

23 through DDX 626, DDX 629 through DDX 634, DDX 636, 638

24 through 641, DDX 643, DDX 647 through DDX 655, DDX 657,

25 DDX 658, DDX 660 through DDX 663, and DDX 669 through

1  DDX 705.  These were admitted only for the purpose of

2  summarizing or listing many of the exhibits upon which

3  Dr. Wicker relied for his testimony.  These summary

4  exhibits are not themselves evidence and are intended

5  only to provide you with a guide to Dr. Wicker's

6  testimony and point you to the relevant underlying

7  exhibits that have been admitted.

8           And then, finally, DDX 827.  This was admitted

9  only for the purpose of summarizing or listing many of

10 the exhibits upon which Dr. Ugone relied for his

11 testimony.  DDX 827 is not in itself evidence and is

12 intended only to provide you with a guide to Dr. Ugone's

13 testimony and point you to the relevant underlying

14 exhibits that have been admitted.

15          On each of those limitations when I'm talking

16 about the underlying exhibits, those are in evidence.

17 You'll have them back there with an exhibit list.  You

18 can look up those numbers, and you can look at the

19 exact -- the actual exhibit.  And it's the actual exhibit

20 that's numbered and in evidence that you are to rely on.

21 Those summaries are there just to help provide you with a

22 guideline of who said what.

23          Also, do not assume from anything that I may

24 have done or said during the trial that I have any

25 opinion concerning any of the issues in this case.

2931

1  Except for the instructions to you on the law, you should
2  disregard anything I may have said during the trial in
3  arriving at your own findings as to the facts.

4        If you've taken notes, they are to be used
5  only as aids to your memory; and if your memory should be
6  different from your notes, you should rely on your
7  memory, not on your notes.  If you did not take notes,
8  rely on your own independent memory of the testimony.  Do
9  not be unduly influenced by the notes of other jurors.  A
10 juror's notes are not entitled to any greater weight than
11 the recollection of each juror concerning the testimony.

12       Now, the patents involved in this case are
13 referred to as the "'076 and the '178 patents."  The
14 plaintiff, Personal Audio, LLC, ("Personal Audio")
15 contends that the defendant, Apple, Inc., ("Apple")
16 infringes claims 1, 3, and 15 of the '076 patent and
17 claims 1, 6, 13, and 14 of the '178 patent.  Each of the
18 asserted patent claims is to be considered separately as
19 a separate invention.  Personal Audio contends that the
20 following Apple products infringe the asserted claims of
21 the patents-in-suit:

22       Group 1, iPod classic Generation 3.  There's
23 1,627,691 units sold.

24       And these listings of the numbers sold will
25 become relevant to you when you get the verdict form

2932

1  because you'll be asked to, if you get that far, if you

2  get that far, to make some damage calculations based on

3  these numbers.

4          Group 2, iPod mini Generations 1 and 2 and

5  iPod classic Generation 4.  11,433,022 units sold.

6          Group 2, iPod classic Generation 5.

7  15,219,066 units sold.

8          Group 4, iPod nano Generation -- 10,673,749

9  units sold.

10          Group 5, iPod nano Generation 2.  13,379,878

11  units sold.

12          Group 6, the iPod nano Generation 3 and iPod

13  classic Generation 6.  21,872,953 units sold.

14          Group 7, the iPod nano Generation 4.

15  10,946,988 units sold.

16          And Group 8, iPod nano Generation 5.

17  8,642,082 units sold.

18          Now, Apple denies that it is infringing the

19  patents-in-suit.  Apple also contends that the

20  patents-in-suit are invalid because the inventions in the

21  patents are described in one or more prior art

22  references.

23          You have the responsibility of deciding

24  whether Apple has infringed the asserted claims of the

25  patents-in-suit; and even though the PTO examiner has

2933

1  allowed the claims of the patents, you, as the jury, also

2  have the responsibility for deciding whether the claims

3  of the patents are invalid *[sic]*.

4          Now, to decide the questions of infringement

5  and invalidity, you must first understand what the claims

6  of the patent cover; that is, what they prevent anyone

7  else from doing.  This is called "claim interpretation."

8  You must use the same claim interpretation for both your

9  decisions on infringement and your decisions on

10  invalidity.  I instructed you earlier on the definitions

11  you must use in interpreting claims.

12          Now, the patent claims are the numbered

13  sentences at the end of the patents-in-suit.  Each claim

14  describes a separate invention.  The claims are word

15  pictures intended to define, in words, the boundaries of

16  the inventions.  Only the claims of a patent can be

17  infringed.  Neither the written description, sometimes

18  called the "specification," nor the drawings of a patent

19  can be infringed.  Each of the claims must be considered

20  individually.

21          The claims are divided into parts called

22  "limitations."  These limitations are also referred to as

23  "elements."  You shall give your decisions on

24  infringement based only on the asserted claims; namely,

25  claims 1, 3, and 15 of the '076 patent and claims 1, 6,

2934

1   13, and 14 of the '178 patent.

2          Patent claims exist in two forms, referred to

3   as "independent claims" and "dependent claims."  An

4   independent claim does not refer to any other claim of

5   the patent.  Thus, it is not necessary to look at any

6   other claim to determine what an independent claim

7   covers.  Claim 1 of the '076 patent and claims 1 and 14

8   of the '178 patent are independent claims.

9          Now, a dependent claim refers to at least one

10  other claim in the patent.  A dependent claim includes

11  each of the limitations of the other claim or claims to

12  which it refers as well as the additional limitations

13  recited in the dependent claim itself.  Therefore, to

14  determine what is covered by a dependent claim, it is

15  necessary to look both at the dependent claim itself and

16  the claim or claims to which it refers.  Claims 3 and 15

17  of the '076 patent and claims 6 and 13 of the '078 *[sic]*

18  patent are dependent claims.

19          So, claim 3 of the '076 patent depends from

20  claim 2, which depends from claim 1.

21          Claim 15 of the '076 patent depends from

22  claim 14.

23          Claim 6 of the '178 patent depends from

24  claim 5, which depends from claim 4, which depends from

25  claim 3, which depends from claim 2, which depends from

1  claim 1.

2           And claim 13 of the '178 patent depends from

3  claim 9, which depends from claim 1.

4           Now, the patent laws give the owner of a valid

5  patent the right to exclude others from making, using,

6  selling, or offering to sell the patented invention

7  within the United States during the term of the patent.

8  Any person or business entity that engages in any of

9  those acts without the patent owner's permission

10 infringes the patent.

11          Knowledge of the patent or intent to infringe

12 is immaterial.  Someone can infringe a patent without

13 knowing that what they are doing is an infringement of

14 the patent.  Someone may also infringe a patent even

15 though they believe in good faith that what they are

16 doing is not an infringement of any patent.  Someone can

17 also infringe a patent even if they have one or more of

18 their own patents covering parts or components of the

19 accused product.  On the other hand, someone does not

20 infringe by inventing a new and different way of

21 accomplishing the same result; that is, to create a

22 product that does not incorporate all of the limitations

23 of any claim of the patents-in-suit.

24          Now, only the claims of a patent can be

25 infringed.  You must compare the elements of the asserted

2936

1  claims to each accused product or product group to

2  determine whether or not there is infringement.  You

3  should not compare the accused products with any specific

4  example set out in the patents' specification.  The only

5  correct comparison is with the language of the asserted

6  claims themselves, with the meanings that I have given

7  you.

8        You must determine separately for each of the

9  asserted claims and separately for each accused product

10  group whether or not there is infringement.  Now, as I

11  have explained to you, a dependent claim includes all of

12  the requirements of the claim or claims to which it

13  refers plus additional requirements of its own.

14  Therefore, to find a dependent claim is infringed, you

15  must first find that any claim from which it depends is

16  infringed.  For example, to find that dependent claim 3

17  of the '076 patent is infringed, you must first find that

18  independent claim 1 and dependent claim 2 of the

19  '076 patent are infringed.  If you find that an

20  independent claim is infringed, you must then decide

21  separately whether the additional requirements of any

22  claims that depend from it have also been infringed.

23        There are two ways in which a patent claim can

24  be infringed:  One, literal infringement and, two,

25  infringement under the doctrine of equivalents.  I'll

1  first explain to you the circumstances under which you

2  may find literal infringement or infringement under the

3  doctrine of equivalents.  Then I'll explain to you a

4  particular kind of claim limitation called a

5  "means-plus-function" limitation and the circumstances

6  under which you may find infringement of a claim that

7  contains a means-plus-function limitation.

8           Now, to show literal infringement of a claim,

9  Personal Audio must prove by a preponderance of the

10  evidence that during the time the patent is in force,

11  Apple has made, used, sold, or offered to sell within the

12  United States a product that incorporates all of the

13  limitations of that claim and has done so without

14  Personal Audio's permission.  Personal Audio contends

15  that claims 1, 3, and 15 of the '076 patent are literally

16  infringed.  You must compare each of the accused products

17  separately with each and every one of the limitations of

18  each asserted claim to determine whether Personal Audio

19  has shown, by a preponderance of the evidence, that each

20  limitation of a claim is found in that product.

21           A claim limitation is present in an accused

22  product if it exists in the product just as it is

23  described in the claim language, either as I have defined

24  that language for you or, if I did not define it, as that

25  language is commonly understood.

1            In general, a product does not infringe if it

2    must be altered in order to satisfy all the limitations

3    of a claim.  However, if a product is sold or packaged

4    with components that are intended to be attached or

5    connected before operation and the seller provides

6    instructions for such attachment or connection, the

7    product may infringe if, when the components are attached

8    or connected as instructed, the product includes all the

9    limitations of the claim.

10            A claim limitation that describes the

11   capability for doing something is present in an accused

12   product if the accused product includes components or

13   structures capable of operating as described in the

14   claim, even if a user never actually operates the product

15   in the manner described.

16            If an accused product omits even a single

17   element recited in a claim, then you must find that with

18   respect to that product, Apple has not literally

19   infringed that claim.

20            If during the time a patent is in force

21   someone made, used, sold, offered to sell, or imported

22   within the United States a product that does not

23   incorporate all of the limitations of an asserted claim,

24   there can still be infringement if the product satisfies

25   that claim under the doctrine of equivalents.

1              Under the doctrine of equivalents, a product

2   satisfies a claim if, for each and every limitation of

3   the claim that is not literally present in the accused

4   product, the accused product includes some corresponding

5   alternative that is equivalent to the unmet claim

6   requirement.

7              Personal Audio contends that the "downloading

8   from one or more server computers" limitations of the

9   '178 patent, which are limitations number 1A in claim 1

10  and 14E in claim 14 in your juror notebooks, are not

11  literally present in the accused product but that the

12  accused products include an equivalent alternative.

13  Personal Audio, therefore, contends that claim 1 and the

14  asserted claims that depend from it, claims 6 and 13, as

15  well as claim 14 of the '178 patent are infringed under

16  the doctrine of equivalents.  As with literal

17  infringement, Personal Audio must prove infringement

18  under the doctrine of equivalents by a preponderance of

19  the evidence.

20             In making your decision as to whether or not

21  an accused product is equivalent under the doctrine of

22  equivalents, you must look at each and every limitation

23  of a claim and decide whether or not the accused product

24  includes that limitation or includes an alternative that

25  is equivalent to the unmet limitation.  If it does, the

2940

1  product satisfies the claim under the doctrine of

2  equivalents.  If instead, one, the product includes an

3  alternative to the unmet limitation but the alternative

4  is not equivalent to the unmet limitation or, two, the

5  product includes no corresponding alternative to the

6  unmet limitation, you must find that the limitation is

7  not satisfied under the doctrine of equivalents and there

8  is no infringement under the doctrine of equivalents.

9        Under the doctrine of equivalents, an

10  alternative is considered to be equivalent to an unmet

11  claim limitation if a person having ordinary skill in the

12  art, as I have defined that person for you, would have

13  considered the differences between the unmet limitation

14  and the alternative to be insubstantial at the time of

15  the alleged infringement.

16        In deciding whether an alternative in an

17  accused product is insubstantially different from an

18  unmet claim limitation, you may consider whether the

19  alternative and the unmet limitation, one, perform

20  substantially the same function and, two, work in

21  substantially the same way, three, to achieve

22  substantially the same result.

23        You may also consider whether, at the time of

24  the alleged infringement, a person having ordinary skill

25  in the art would have known of the interchangeability of

2941

the alternative and the unmet claim limitation.
Interchangeability at the present time is not sufficient.
Rather, in order for the alternative to be considered
interchangeable with the unmet limitation, the
interchangeability must have been known to persons of
ordinary skill in the art at the time of the infringement
and be only insubstantially different.

       The doctrine of equivalents must be applied to
the individual limitations of a claim, not to the
invention as a whole, because each limitation in a patent
claim is deemed material in defining the scope and limits
of the patented invention.  The public is entitled to
rely on the limitations of the claims in order to avoid
infringement.  Therefore, the doctrine of equivalents
cannot be used to eliminate a claim limitation or render
any claim limitation unnecessary.

       Means-plus-function limitations.  The claims
of the patents-in-suit contain what are called
"means-plus-function" limitations.  For each
means-plus-function limitation in issue, I have defined
for you the function to be performed.  Now, these are set
out in Appendix A.  For each means-plus-function
limitation in issue, I have also defined for you the
corresponding means or structures that were described in
the patents' specification for performing the claimed

2942

1  functions.  You will also find these in Appendix A.  You

2  must use my definitions of the means-plus-function

3  limitations in your deliberations regarding infringement

4  and validity.

5          To show that an accused product meets the

6  requirements of a means-plus-function limitation,

7  Personal Audio must show by a preponderance of the

8  evidence that, one, the accused product includes a

9  structure that performs the claimed function and, two,

10 that structure is either identical to or equivalent to a

11 structure I have defined for you.  You must consider each

12 product separately.

13         In deciding whether Personal Audio has shown

14 that a particular Apple product includes a structure

15 covered by a means-plus-function limitation, you must

16 first decide whether that product has a structure that

17 performs the function that I have defined for that

18 means-plus-function clause.  If not, the claim containing

19 that means-plus-function limitation is not infringed.

20         If you find that the accused product in

21 question does have a structure that performs the claimed

22 function, you must next identify that structure and you

23 must then determine whether Personal Audio has shown that

24 the structure in the accused product is either identical

25 to or equivalent to a structure that I have listed in

2943

1  Appendix A for performing the claimed function.  If the

2  structure is identical or equivalent, the

3  means-plus-function limitation is satisfied by that

4  structure of Apple's product.  If all the other

5  means-plus-function limitations in the claim are also

6  present in that particular product and all of the other

7  claim limitations that are not in means-plus-function

8  form are present in the product, either literally or

9  under the doctrine of equivalents, then that product

10 infringes the claim.

11       Now, a structure is considered to be

12 equivalent to a structure I have defined for you if a

13 person having ordinary skill in the art, as I have

14 defined that person for you, would have considered the

15 differences between the structure I have defined for you

16 and the substitute structure to be insubstantial at the

17 time the patent issued.  The substitute structure must

18 have been available technology at the time the patent

19 issued.

20       To be a structural equivalent, the substitute

21 structure must perform the identical function recited in

22 the claim as I have defined that function for you.  In

23 deciding whether a substitute structure in an accused

24 product is insubstantially different from a structure

25 that I have defined for you, you may consider whether the

1 two structures, one, work in substantially the same way,

2 two, to achieve substantially the same result.  The fact

3 that a structure may perform a function in addition to

4 the claimed function is irrelevant.

5          You may also consider whether, at the time the

6 patent issued, a person having ordinary skill in the art

7 would have known of the interchangeability of the two

8 structures for performing the claimed function.

9 Interchangeability at the present time is not sufficient.

10 Rather, in order for a substitute structure to be

11 considered interchangeable with a structure that I have

12 defined for you, the interchangeability must have been

13 known to persons of ordinary skill in the art at the time

14 the patent issued.  Further, while interchangeability is

15 an important factor, it is not dispositive since, by

16 definition, two structures that perform the same function

17 may be substituted for one another.

18          You may also consider whether the substitute

19 structure is claimed in a separate patent.  The grant of

20 a United States patent is relevant to the issue of

21 whether the differences between a structure that I have

22 defined for you and the substitute structure are

23 insubstantial.  However, the fact that a substitute

24 structure is separately patented does not automatically

25 negate infringement and creates no evidentiary

1  presumption of noninfringement.  You should consider and

2  weigh the fact that a substitute structure is separately

3  patented together with all the other evidence of the

4  differences or similarities between a structure I have

5  defined for you and the substitute structure.

6           The individual components, if any, of an

7  overall structure that I have defined for you as

8  corresponding to a claimed function are not claim

9  limitations.  You should not deconstruct a structure that

10 I have defined for you into component parts in order to

11 analyze equivalents.  A substitute structure with a

12 different number of component parts may still be a

13 structural equivalent if it complies with the

14 requirements I have just described.

15          Now, only a valid patent may be infringed.  To

16 be valid, the inventions claimed in a patent must be new

17 and nonobvious.  A patent cannot take away from people

18 their right to use what was known or what would have been

19 obvious when the invention was made.

20          Now, even though the PTO has allowed the

21 claims of the patents-in-suit, you, the jury, have the

22 responsibility for deciding whether each claim in

23 question is valid.  Apple must prove invalidity by clear

24 and convincing evidence.  I will now explain to you the

25 grounds for invalidity in detail.  In making your

1  determinations as to invalidity, you should consider each

2  claim separately.

3           For a patent to be valid, the invention

4  described in the patent must be new and nonobvious in

5  light of what came before.  That which came before is

6  referred to as the "prior art."  Apple contends that the

7  patents-in-suit are invalid because the inventions in the

8  suit *[sic]* are described in one or more prior art

9  references.  There are two ways in which a patent claim

10 can be invalid because of prior art references, one,

11 anticipation and, two, obviousness.  I'll describe these

12 for you below.  But before I discuss anticipation and

13 obviousness, I'll first instruct you on the prior art.

14          Apple is relying on the following items of

15 prior art:

16          One, DAD system, DX 87.

17          Two, DAD manual, DX 1.

18          Three, Sound Blaster 16 user's guide, DX 3.

19          Microsoft *Windows 95* Resource Kit, DX 9.

20          Sony Discman player, DX 32.

21          Sony Discman operating instructions, DX 33.

22          The Loeb article, DX 8.

23          And the Musicshop reference manual, DX 27.

24          Now, you have heard that the PTO did not have

25 the opportunity to evaluate some of the items of prior

2947

1  art.  You may, but are not required to, give more weight

2  to an item of prior art if that item was not considered

3  by the patent examiner before granting the patent.

4          I will now explain anticipation and

5  obviousness, the two ways in which a patent claim may be

6  invalid in light of the prior art.

7          Anticipation.  A patent claim is invalid if

8  the claimed invention is not new.  For a claim to be

9  invalid because it is not new, all of the claim's

10  limitations must have existed in a single item of prior

11  art.  If a patent claim is not new, we say it is

12  "anticipated" by a prior art reference.  Apple must prove

13  anticipation by clear and convincing evidence.

14          Now, Apple asserts that claims 1, 3, and 15 of

15  the '076 patent and claims 1, 6, 13, and 14 of the

16  '178 patent are anticipated by the DAD system and that

17  claims 1, 3, and 15 of the '076 patent and claims 1, 6,

18  13, and 14 of the '178 patent are anticipated by the

19  DAD manual.

20          A patent claim is anticipated by an item of

21  prior art if each and every limitation of the claim is

22  present in that item of prior art, arranged or combined

23  in the same way as recited in the claim.

24          Now, in deciding whether or not a single item

25  of prior art anticipates a patent claim, you should

2948

1  consider that which is expressly stated or present in the

2  item of prior art and also that which is inherently

3  present.  Something is inherent in an item of prior art

4  if it is always present in the prior art or always

5  results from the practice of the prior art and a person

6  of ordinary skill in the art would understand that to be

7  the case.

8        A patent claim is anticipated if each claim

9  element is disclosed, either expressly or inherently, in

10  a single prior art reference and the claimed arrangement

11  or combination of those items is also disclosed, either

12  expressly or inherently, in that same prior art

13  reference.  You may not find that the prior art

14  anticipates a patent claim by combining two or more items

15  of prior art.

16        A patent claim is invalid if it would have

17  been obvious to a person of ordinary skill at the time

18  the invention was made.  Unlike anticipation, obviousness

19  may be shown by considering multiple items of prior art

20  in combination with each other.  Apple must prove

21  obviousness by clear and convincing evidence.

22        Apple contends that, to a person of ordinary

23  skill in the art at the time the invention was made:

24        Claims 1, 3, and 15 of the '076 patent and

25  claims 6 and 14 of the '178 patent are obvious in light

2949

1  of the DAD system or DAD manual in combination with

2  either of the two Sony Discman references.

3         Claims 1, 3, and 15 of the '076 patent and

4  claims 6 and 14 of the '178 patent are obvious in light

5  of the DAD system or DAD manual in combination with the

6  Musicshop reference manual.

7         Three, claim 13 of the '178 patent is obvious

8  in light of the DAD system or DAD manual in combination

9  with the Loeb article.

10         Four, claims 1, 3, and 15 of the '076 patent

11  and claims 1, 6, 13, and 14 are obvious in light of the

12  Sound Blaster 16 user's guide in combination with the

13  Microsoft *Windows 95* Resource Kit.

14         Claims 1, 3, and 15 of the '076 patent and

15  claims 6 and 14 of the '178 patent are obvious in light

16  of the Sound Blaster 16 user's guide in combination with

17  the Microsoft *Windows 95* Resource Kit and either of the

18  two Sony Discman references.

19         Claims 1, 3, and 15 of the '076 patent and

20  claims 6 and 14 of the '178 patent are obvious in light

21  of the Sound Blaster 16 user's guide in combination with

22  the Microsoft *Windows 95* Resource Kit and the Musicshop

23  reference manual.

24         And, seven, claim 13 of the '178 patent is

25  obvious in light of the Sound Blaster 16 user's guide in

2950

1  combination with the Microsoft *Windows 95* Resource Kit

2  and the Loeb article.

3          The question is:  Would it have been obvious

4  to a person of ordinary skill in the art, who knew of

5  these particular items of prior art listed for a

6  particular claim, to make the invention described in the

7  claim at issue?  If the answer to that question is "yes,"

8  then that patent claim is invalid.

9          Obviousness is determined from the perspective

10 of a person of ordinary skill in the art.  The issue is

11 not whether the claimed invention would have been obvious

12 to you or to me as a judge or to a genius in the field of

13 the invention.  Rather, the question is whether or not

14 the invention would have been obvious to a person of

15 ordinary skill in the field of the invention.

16         You should not use hindsight when comparing

17 the claimed invention to the prior art for obviousness;

18 That is, when making a determination of obviousness or

19 nonobviousness, you must consider only what was known to

20 a person of ordinary skill in the art at the time the

21 invention was made.  You must not judge the invention in

22 light of what is known today.

23         In determining whether or not the asserted

24 claims of the patents-in-suit would have been obvious,

25 you should make the following determinations from the

1   perspective of a person of ordinary skill in the art as I

2   have previously defined that person for you.  First, what

3   is the scope and content of the prior art?  Second, what

4   are the differences, if any, between the claimed

5   invention and the prior art?  Third, what was the level

6   of ordinary skill in the art at the time the invention

7   was made?  And, fourth, what evidence is there, if any,

8   of certain additional considerations relating to the

9   obviousness or nonobviousness of the invention?

10            You must decide, in view of the evidence

11   presented to you on each of these factors, whether the

12   claimed inventions would have been obvious.  You must

13   make this determination separately for each asserted

14   claim in light of each combination listed above.  I will

15   now give you more detailed instructions on each of the

16   factors you must consider.

17            Determining the scope and content of the prior

18   art means that you should determine what is disclosed in

19   each combination of art relied upon by Apple.  You should

20   evaluate only those references that are listed in the

21   combinations above.

22            When evaluating what is disclosed in the prior

23   art combinations relied upon by Apple, you must decide

24   whether the prior art references were reasonably relevant

25   to the particular problem that the inventor faced in

2952

1 making the invention covered by the patent claim at

2 issue.  Relevant prior art includes prior art from the

3 field of the invention and also prior art from other

4 fields that a person of ordinary skill would look to when

5 attempting to solve the problem.

6           During the trial, Apple may have introduced

7 evidence of other items of art that are not listed in the

8 above combinations.  Those other items are not prior art

9 as that term is defined in these instructions, and you

10 should not consider those other items when determining

11 the scope and content of the prior art.

12           In determining whether there are any

13 differences between the inventions covered by the patent

14 claims and the prior art, you should not look at the

15 individual differences in isolation.  You must consider

16 each claimed invention as a whole and determine whether

17 or not it would have been obvious in light of the prior

18 art.

19           If you conclude that the prior art discloses

20 all the elements or steps of the claimed invention but

21 those elements or steps are found in separate items of

22 prior art, you may consider whether or not it would have

23 been obvious to combine those terms *[sic]*.  A claim is

24 not obvious merely because all the limitations of that

25 claim already existed in the prior art.

1            In deciding whether it would have been obvious

2    to combine what is described in various items of prior

3    art, you should consider whether or not there was some

4    motivation or suggestion for a person of ordinary skill

5    to make the combination covered by the claimed invention.

6    To determine whether there was an apparent reason to

7    combine the known elements or steps in the way a patent

8    claims, you can look to interrelated teachings of

9    multiple prior art references, to the effects of demands

10   known to the community or present in the marketplace, and

11   to the background knowledge possessed by a person of

12   ordinary skill in the art.  You should also consider

13   whether a person of ordinary skill in the art would have

14   been discouraged from following the path taken by the

15   inventor or whether a certain combination would have been

16   obvious to try.

17           Obviousness is determined from the perspective

18   of a person of ordinary skill in the art as I have

19   defined that person for you.  This person is presumed to

20   know all of the prior art, not just what the inventor may

21   have known.  When faced with a problem, the person of

22   ordinary skill in the art is able to apply his or her

23   experience and ability to the problem and also to look to

24   any available prior art to help solve the problem.  When

25   evaluating the level of ordinary skill in the art, you

1  may consider material that is not technically prior art

2  as that term is defined in these instructions; that is,

3  in addition to the items that are listed in the

4  combinations above, you may also consider the other items

5  introduced during the trial that are contemporaneous with

6  the date of invention of the claim at issue because these

7  other items may reflect the knowledge of a person of

8  ordinary skill in the art at the time.

9          You may also consider what are referred to as

10  "additional considerations" or "secondary

11  considerations."  Some of these considerations are:

12          Whether there was a long-felt but unmet need

13  in the art that was satisfied by the invention.

14          Two, whether others tried but failed to

15  achieve the results of the invention.

16          Three, whether the products covered by the

17  patent claims achieved commercial success.

18          Four, whether others in the field praised the

19  invention.

20          Five, whether those skilled in the art

21  expressed surprise or disbelief regarding the invention.

22          Six, whether the invention achieved any

23  unexpected results.

24          Seven, whether the inventors or the invention

25  proceeded in a direction contrary to accepted wisdom in

1   the field.

2            Eight, whether others copied or used the

3   invention.

4            And, nine, whether others have taken licenses

5   to use the invention.

6            Now, these considerations are only relevant to

7   obviousness if there is a connection or nexus between

8   them and the invention covered by the patent claims.  For

9   example, commercial success is relevant to obviousness

10  only if the success of the product is related to a

11  feature of the patent claims.  If the commercial success

12  is the result of something else, such as innovative

13  marketing, and not the result of a patented feature, then

14  you should not consider it to be an indication of

15  nonobviousness.

16           In conclusion, you must compare separately

17  each of the asserted claims of the patents-in-suit with

18  each combination of prior art references listed above in

19  light of the factors I have described for you to

20  determine whether Apple has proved by clear and

21  convincing evidence that one or more of the asserted

22  claims would have been obvious to a person of ordinary

23  skill in the art at the time the invention was made.

24           If you find by a preponderance of the evidence

25  that a claim has been infringed and you do not find by

1  clear and convincing evidence that the same claim is

2  invalid, then Personal Audio is entitled to an award of

3  damages adequate to compensate for the infringement, but

4  in no event less than a reasonable royalty for the use

5  made of the invention by Apple.  I will give you more

6  detailed instructions on the calculation of a reasonable

7  royalty shortly.  You may not add anything to the amount

8  of damages to punish Apple or to set an example.

9        You should not interpret the fact that I have

10  given instructions about damages as an indication in any

11  way that I believe that Personal Audio should or should

12  not win this case.  It is your task to first decide

13  whether Apple is liable.  I'm instructing you on damages

14  only so that you will have guidance in the event you

15  decide Apple is liable and that Personal Audio is

16  entitled to recover money from Apple.

17        Personal Audio has the burden to establish the

18  amount of its damages by a preponderance of the evidence.

19  Damages are limited to acts of infringement in the United

20  States.  You should award only those damages that

21  Personal Audio establishes that it has more likely than

22  not suffered.  Personal Audio is not entitled to damages

23  that are remote or speculative or based on guesswork.

24  While Personal Audio is not required to prove its damages

25  with mathematical precision, it must prove them with

1 reasonable certainty.

2      If you find that Personal Audio has

3 established infringement, it is entitled to at least a

4 reasonable royalty to compensate for that infringement.

5 A royalty is the amount of money a licensee pays to a

6 patent owner in exchange for the right to make, use, or

7 sell the claimed inventions under the patent.  A

8 reasonable royalty is the amount of money a patent owner

9 who was willing to grant a license to the patented

10 inventions and a prospective licensee who was willing to

11 pay for that license would have agreed upon at the time

12 the infringement first began.  It is the royalty that

13 would have resulted from an arm's-length negotiation

14 between a willing patent owner and a willing licensee,

15 assuming that both parties believed the claims in

16 question to be valid and infringed.

17      You must make two determinations regarding a

18 reasonable royalty:  One, the form of the royalty and,

19 two, the amount of the royalty.

20      One form of royalty is called a "running

21 royalty."  A running royalty is an ongoing royalty

22 payment made by the licensee based on the licensee's

23 sales or usage of the patented technology.  For instance,

24 a licensee may pay the patent holder a certain dollar

25 amount for each product that it sells that incorporates

2958

1  the patented technology.  Another form of royalty is

2  called a "lump-sum" royalty.  In a lump-sum royalty

3  agreement, the licensee must pay the entire royalty

4  amount up-front.  In exchange, the licensee is granted a

5  license to use the patented technology for the remainder

6  of the patent term without any further expenditure.  You

7  must first decide whether a running royalty or lump-sum

8  royalty would be adequate to compensate for any

9  infringement you have found.

10         After you determine the form of the reasonable

11  royalty, you must then determine the amount of the

12  royalty.  If you determine the parties would have agreed

13  to a running royalty, you will be asked to determine what

14  royalty amount per infringing product sold the parties

15  would have agreed to at the hypothetical negotiation and

16  the number of infringing units sold.  If you determine

17  that the parties would have agreed to a lump-sum royalty,

18  you will be asked to determine the up-front dollar amount

19  to which the parties would have agreed at the

20  hypothetical negotiation for a license to use the

21  patented technology for the life of the patent.

22         In making your determination of the form and

23  amount of a reasonable royalty, it is important that you

24  consider the date of the hypothetical negotiation and the

25  facts that existed at that time.  Now, the damages

2959

1  experts agree that the hypothetical negotiation would

2  have occurred in October, 2001, for infringement of the

3  '076 patent.  You should also consider when infringement

4  first began, which will depend on whether you have found

5  infringement of one or both of the patents-in-suit and on

6  which products you have found to infringe.  Infringement

7  began when Apple first made, used, sold, or offered to

8  sell an infringing product during the term of the patent

9  at issue.  The '178 patent issued on March 24, 2009; so,

10  infringement of that patent could not have begun before

11  that date.

12          During the trial, you have heard evidence of

13  events that occurred after the time the infringement

14  first began.  You may consider that evidence to the

15  extent it aids you in assessing what damages are adequate

16  to compensate for any infringement of a valid claim that

17  occurred.

18          Now, your determination does not depend on the

19  actual willingness of the parties to this lawsuit to

20  engage in negotiations.  Your focus should be on what the

21  parties' expectations would have been had they entered

22  negotiations at the time the infringing activity began

23  and the facts that existed at that time.  In determining

24  the reasonable royalty, you should consider all the facts

25  known and available to the parties at the time

1  infringement began.

2         I will now discuss some of the kinds of

3  factors you may consider in making your determination.

4  The first two facts are:

5         Whether the patent holder had an established

6  royalty for the invention or in the absence of such a

7  licensing hearing *[sic]*, any royalty arrangements that

8  were generally used and recognized in the particular

9  industry at the time.

10         And, two, the rates paid by the licensee for

11  the use of other patents comparable to the

12  patents-in-suit.

13         When evaluating evidence about amounts paid

14  under other licenses or sales, you should consider

15  whether and to what extent such licenses or sales were

16  comparable; that is, were the technology exchanged and

17  the terms of the license or sale similar in terms and

18  scope to the technology of the patents-in-suit and the

19  license for the patents in the hypothetical negotiation.

20  In evaluating whether other licenses or sales are

21  comparable to the hypothetical negotiation, you may

22  consider:

23         How many patents were licensed.

24         The type of technology licensed and whether it

25  is similar or dissimilar to the technology of the

1  patents-in-suit.

2          What products were discovered by the license.

3          Whether the licensed technology was essential

4  to the licensed product or was only a small component or

5  feature of the product.

6          The magnitude of the royalty rate in the

7  license as compared to the price or value of the licensed

8  product.

9          And whether the license provided for an

10  up-front lump-sum royalty payment or for an ongoing

11  royalty payment based on the licensee's sales or usage of

12  the licensed technology.

13          Some more of the factors that you may consider

14  in making your determination as to the form and amount of

15  a reasonable royalty are:

16          The terms and scope of the hypothetical

17  license, such as whether it is exclusive or nonexclusive

18  or subject to territorial restrictions.

19          Whether the patent owner had an established

20  policy of granting licenses or retaining the patented

21  invention as its exclusive right or whether the patent

22  holder had a policy of granting licenses under special

23  conditions designed to preserve its exclusivity.

24          Five, the nature of the commercial

25  relationship between the patent owner and the licensee,

2962

1  such as whether they were competitors or whether their

2  relationship was that of an inventor and a promoter.

3          Six, the duration of the patents and of the

4  license.

5          Seven, the established profitability of the

6  patented product or method, its commercial success, and

7  its popularity at the time.

8          Eight, the utility and advantages of the

9  patented property over the old products or methods, if

10  any, that had been used for accomplishing similar

11  results.

12          Nine, the nature of the patented invention,

13  the character of the commercial embodiment of it as owned

14  and produced by the licensor, and the benefits to those

15  who have used the invention.

16          Ten, the extent to which the infringer has

17  made use of the invention and any evidence probative of

18  the value of such use.

19          Eleven, the portion of the profit or of the

20  selling price that may be customary in the particular

21  business to allow for the use of the invention or

22  analogous inventions.

23          The portion of the profits that should be

24  credited to the invention as distinguished from

25  nonpatented elements, the manufacturing process, business

1  risks, or significant features or improvements added by

2  the infringer.

3           Thirteen, the opinion and testimony of

4  qualified experts and of the patent holder.

5           Fourteen, the amount for which a comparable

6  patent has sold.

7           And, 15, any other factors that, in your mind,

8  would have increased or decreased the royalty the

9  infringer would have been willing to pay and the patent

10  owner would have been willing to accept, acting as

11  normally prudent businesspeople.

12          No one factor is dispositive, and you can and

13  should consider the evidence that has been presented to

14  you in this case on each of these factors.  The final

15  factor establishes the framework that you should use in

16  determining a reasonable royalty, i.e., the payment that

17  would have resulted from a negotiation taking place at

18  the time when the infringement first began between a

19  patent holder, such as Personal Audio, and a licensee,

20  such as Apple, assuming that both were reasonably and

21  voluntarily trying to reach an agreement.

22          You may not base the amount of a reasonable

23  royalty on the total sales of, total profits from, or

24  entire market value of the accused products.  Instead, if

25  you find that a patent claim is infringed and do not find

2964

1    that claim invalid, Personal Audio may only recover based

2    on the value added to an accused product by that claim.

3    In other words, the amount of the reasonable royalty that

4    you determine may not be greater than the portion of the

5    value of the accused products that is attributed to the

6    claimed invention.

7            You must disregard any testimony or evidence

8    that Personal Audio is entitled to any damages based on

9    technology incorporated in or profits received from

10   *iTunes* or any other Apple product that is not included in

11   the eight groups of accused products that I have listed

12   for you above.

13           Now, you may also award Personal Audio damages

14   for any infringement that may occur in the future if

15   Apple continues to practice any claim that you have found

16   to be infringed and have not found to be invalid.  As

17   with past damages, the amount of future damages must be

18   adequate to compensate Personal Audio for the

19   infringement.  In awarding future damages, you should

20   determine what amount, if any, you find adequate to

21   compensate Personal Audio for the conduct you found to

22   infringe that may, in reasonable probability, occur in

23   the future.

24           All right.  Ladies and gentlemen, we're going

25   to go ahead and take a break for 15 minutes.  When you

2965

1  come back, Personal Audio's attorney will start with

2  final argument and then Apple's counsel will have final

3  argument and then Personal Audio will have a short time

4  for rebuttal.

5         I then have just a few instructions to read to

6  you on what you do when you go back to the jury room,

7  such as selecting a foreman and so forth; and then you

8  will retire to the jury room.  I'll give you copies of

9  the last couple of pages of instructions along with the

10  appendices that I mentioned here, and then you start

11  deliberation.

12        Please when you go out on this break, even

13  though you have my instructions, don't start to

14  deliberate because you don't have the verdict sheet yet.

15  You don't know the questions.  And just to let you know,

16  because the lawyers will be talking about it, you will

17  have a Jury Verdict Form when you go back.  It has a

18  series of questions on -- it starts off with "Did you

19  find that Apple literally infringes any of the following

20  claims of the '076 patent" and then it lists the claims

21  and goes across by group.  And, so, you'll do each of

22  those separately.

23        And then the same with the '178 patent.

24        Then there will be a page on anticipation

25  where you'll look at the claims versus the DAD system and

1 the DAD manual.

2           And then you'll have some pages on obviousness

3 where you'll go over the claims with each of the

4 combinations that I set out in the instructions.

5           So, I set out these combinations in the

6 instructions; and the verdict form will have places for

7 you to check each of those combos.

8           Then if you find that a particular claim was

9 infringed and you did not find it was invalid, you'll be

10 asked about damages.  As I said in the instructions,

11 you'll first decide whether it's going to be a per-unit

12 running royalty or a lump-sum royalty; and then depending

13 on which of those, you'll be asked to decide how much.

14 You're not going to do both.  It's not going to be a

15 running royalty and a lump sum.  It's going to be one or

16 the other, and there's two different pages there for

17 that.

18           You'll have more detailed instructions than

19 that in writing when you come back, but at this time you

20 are excused and I will ask you to be back at ten of.

21           (The jury exits the courtroom, 9:33 a.m.)

22           THE COURT:  All right.  Do we have all of the

23 exhibits ready to go back to them except for the DAD

24 system?

25           DEPUTY CLERK:  Yes, sir.

 1          THE COURT:  If they happen to ask to look at

 2  or examine the DAD system, do we have that somewhere?

 3          MR. STEPHENS:  We do, your Honor.

 4          THE COURT:  Okay.  So, it can be -- how long

 5  is it going to take to set it up or whatever?

 6          MR. STEPHENS:  I think just a few minutes.

 7          THE COURT:  All right.  Well, if we happen to

 8  get that note that they want to see the DAD system --

 9          MR. HEARTFIELD:  Your Honor, it's in Judge

10  Giblin's old chambers; so, it can be wheeled in or they

11  could go over there if they --

12          THE COURT:  Yeah.  If they actually want to

13  see it run, I'm not sure what I'm going to do.  We'll

14  have to talk about that.  We'll probably have to set it

15  up in here, bring them in here and let everybody leave

16  except maybe someone to run it without talking.  That's

17  going to be the tricky part.  If they ask for it, we'll

18  deal with it at that time.  I just wanted to be sure it's

19  around.

20          Okay.  We'll be in recess, then, until ten of;

21  and you can start setting up whatever charts or whatever

22  you're going to use for final argument.

23          (Recess, 9:35 a.m. to 9:50 a.m.)

24          (Open court, all parties present, jury

25  present.)

2968

1      THE COURT:  Ladies and gentlemen, before we
2  start the final argument, let me mention two typos that
3  I'm going to correct; and I'll state these for the
4  record.  On page 10, right at the bottom, it's stated and
5  I think may have read claims 6 and 13 of the '078 patent.
6  There is no '078 patent.  It's supposed to be claims 6
7  and 13 of the '178 patent are dependent claims.

8      And then on page 22, about a third of the way
9  from the bottom, it says, "But you are not required to
10 give more weight to an item of prior" -- blank -- and
11 that should have said "more weight to an item of prior
12 art."

13     And in the final -- you'll take back to the
14 jury room a final set of instructions, and those two
15 typographical corrections will be made.

16     So, that's on page 10, right at the last full
17 line, "claims 6 and 13 of the '178 patent"; and on
18 page 22, about seven lines from the bottom, that should
19 be "more weight to an item of prior art."

20     All right.  We will now hear the final
21 arguments of counsel.  Since Personal Audio starts off
22 with the burden of proof on infringement, they get to go
23 first.  Mr. Schutz.

24     MR. SCHUTZ:  Thank you, your Honor.  May it
25 please the court?

1              THE COURT:  Counsel.

2              MR. SCHUTZ:  Ladies and gentlemen, on behalf

3    of Mr. Logan, Mr. Call, and my colleagues, thank you very

4    much for your service.

5              This morning I'm going to start by stepping

6    back a little bit from the detail.  I mean, we have been

7    mired in a lot of detail for a couple of weeks; and I am

8    going to start and talk about a few big-picture items to

9    begin with.

10             I'm going to talk about these numbers.  These

11   numbers, I believe, are irrefutable truths as we step

12   back and we think about some of the bigger-picture

13   issues.  3,000 is the number that represents Apple's

14   patent portfolio.  You've heard them say they've got a

15   lot of patents.  They have 3,000 patents.  They came into

16   this courtroom with not a single one of those patents,

17   waved it in the air and said, "We have a patent on the

18   invention that Mr. Logan and his colleagues got before

19   they did."  And our date, remember, is October of 1996.

20   They could not come into this courtroom with a single one

21   of those 3,000 patents and claim that they invented what

22   we invented first.  And that's important not only when

23   you think about some of the bigger-picture issues of

24   what's happened in this case.  Apple is, of course,

25   claiming that our patent isn't infringed, it's not worth

1  much, it's invalid.  It's a little bit like saying "I did

2  not take your lawn mower, and it was broken anyway."  And

3  that's really what they're trying to say here.

4         And, so, 3,000 -- if you just wrap your mind

5  around the fact that Apple has 3,000 patents and not a

6  single one of them come into this courtroom and waved as

7  either a prior invention or prior art.

8         60,000.  Apple has, worldwide, 60,000

9  employees.  Not a single one of those people have come

10 into this courtroom and said, "I came up with the idea

11 before Mr. Logan and Mr. Call did it."  60,000 people;

12 and they couldn't find a one to come into this courtroom

13 and say that that person came up with the idea first.

14        6 million.  Patents are issued consecutively

15 by the United States Patent Office.  The '076 patent was

16 the 6,199,076 patent issued by the Patent Office.  Back

17 in October, 1996, when the patent was applied for, it was

18 something north of probably 5 and a half million patents

19 that had been issued at that time.  They have not come

20 into this courtroom with a single patent from the United

21 States Patent Office, not a single one, in the whole

22 history of every patent that was filed before

23 October 2nd, 1996, and said, "Somebody else got a patent

24 on this before you guys did."  They haven't come in here

25 with a single patent and said, "This patent, along with

2971

1  some other patents, if you put them together, it makes

2  your invention obvious."  Not a single one of the

3  millions and millions and millions of patents that have

4  been issued by the Patent Office.

5         16 million.  16 million is the number of lines

6  of software code that Dr. Almeroth reviewed, that he

7  reviewed when he looked at Apple's products and concluded

8  that they infringe the patents in this case.

9         Zero is the number of lines of software code

10 that we saw from Apple's key piece of prior art, the DAD

11 system.

12        I'd like to also talk briefly about a company

13 other than Apple, Sony.  Mr. Fadell mentioned one of the

14 concerns that they had when they were bringing out the

15 iPod was that somebody else would beat them first.  I

16 mean, he said that, of course, other people could do it;

17 and they were concerned about Sony beating them to it.

18 Sony.  What about Sony?  They were the world leader --

19 still are -- in consumer electronics.  Not a single

20 person from Sony came into this courtroom and said, "We

21 are the folks in consumer electronics, and we came up

22 with this idea first."  The best they've been able to do

23 is come in with a Sony Discman, and they're trying to

24 combine it with some other pieces of art to claim the

25 patent is obvious.  We call that, on my side of the

2972

1  aisle, "failures."  They've got people who did not come

2  up with the invention; but if you ram it all together,

3  they think that makes the invention.

4          I also want to talk a little bit about some of

5  the promises that Apple made during opening statement.

6  Here's one.  He said, "The one thing I'd like you to take

7  away" -- this is Mr. Cordell -- "is that Apple invented

8  the iPod."

9          Really?  There is no patent on the iPod.  They

10 designed a nice product.  They designed a very successful

11 product.  They packaged it.  They marketed it great.

12 They added some improvements to it, but they didn't

13 invent.  They have no patent on the iPod.

14         The best they have are some patents that came

15 along much later.  For example, one of the patents

16 they'll probably talk about is the scroll wheel patent.

17 That was filed, first of all, well after 1996; and all it

18 covers is a scroll wheel.  What that does, you take your

19 little finger and it goes up and down the menu.  That's

20 all the scroll wheel does, and that's the patent that

21 they bring into this courtroom.

22         Another promise they made -- this is about

23 Mr. Fadell.  And he said he had to find a way to create a

24 large storage device.

25         Well, the reality is Apple didn't create a

2973

1  large storage device; Toshiba did.  Apple borrowed or

2  used freely from the work and components that other

3  people came up with -- and again, they did a great job

4  assembling a product; but they overstate the invention

5  that they brought.

6          Now, here is another one.  On damages, "We

7  look to comparability."  And there are two licenses they

8  are talking about; and they said, "Both licenses that

9  Apple has taken from people with good technology, from

10 people that had real patents."  That's the E-Data and

11 Digeo licenses.

12         What do we know about those two licenses?

13 Remember my conversation I had with Dr. Ugone when he

14 testified?  Well, the E-Data patent, the only one

15 referenced and specified in the agreement, was expired

16 18 months before Apple even entered into a license

17 agreement and the license only related -- doesn't mention

18 anything about U.S. sales, only designated European

19 countries.  And they want that to be a comparable

20 license?  They're going to argue that that was a

21 comparable license; it was a lump sum; and you should

22 only award a lump sum in this case, not a running

23 royalty.

24         The other comparable license they've got is

25 this one to Digeo.  All right.  Well, a couple things

2974

1  about that.  Comparable technology.  That's a figure out

2  of the drawing.  We had testimony from Dr. Wicker where

3  he doesn't know whether that patent is valid, whether

4  Apple uses that technology, or whether it's infringed.

5            In this case, of course, if you get to the

6  damage question, you assume that the patent is valid and

7  infringed; and these are the only two licenses that they

8  relied upon for the comparability issue.

9            I'd also like to comment a little bit on who

10 Apple brought into the courtroom.  We've had experts that

11 have testified in this case, and almost every expert

12 that's testified on both sides gets paid about $500 an

13 hour.  That's a lot of money; but that's the going rate

14 for experts in patent cases, as you can see, because both

15 sides have paid their experts that kind of money.

16            But we've got other kinds of people that have

17 come in here to testify.  They're fact witnesses.  They

18 aren't people that have spent hundreds of hours studying

19 software code, plowing through manuals, that have PhDs in

20 this complicated stuff that charge $500 an hour.  They're

21 fact witnesses.  Mr. Tony Fadell came in here.  He's paid

22 $1,000 an hour; and, of course, this is an agreement that

23 Apple entered into on June 6th, 2011, merely weeks before

24 this trial started.  And as the judge instructed you, you

25 can take some of these factors into account when you're

2975

1  going to decide who to believe in this case and who not

2  to believe.

3          I'd also like to talk about Eugene Novacek.

4  Mr. Novacek is the person who built the DAD system.  What

5  do we know about Mr. Novacek?  Right?  He had a

6  deposition taken, and one of the things -- questions that

7  was asked him was, "In your deposition you were asked if

8  you wanted Apple to win this case.  Do you remember

9  that?"

10          He answered, "Yes.  I recall that question."

11          "What did you say?"

12          Answer, "Something to the effect that it

13  really didn't matter to me that Apple won, more

14  importantly that the plaintiff lose."

15          Right?  This is a guy that had an agenda.  He

16  had an axe to grind for whatever reason.  He's got an

17  agenda.  He's a fact witness.  He's paid $500 an hour,

18  and he came in here with this system.  He has charged

19  $100,000 for his work on this case, and he didn't review

20  a single line of software code.  I mean, Dr. Almeroth

21  charged a lot of money; but he reviewed 16 million lines

22  of software code.  This guy didn't review any.  He's paid

23  $100,000.

24          Not only that, Apple bought the DAD system and

25  owns it, for $75,000.  So, he's paid $500 an hour as a

1 fact witness.

2          Then what else do we know about Mr. Novacek?

3 Well, this is interesting.  You know, generally I'd cut a

4 guy a little slack for exaggerating on his resumé a

5 little bit.  Here, he did not have a master's degree; but

6 he put it on his LinkedIn profile.

7          But a couple other things that he did -- and

8 it's not only what he did, it's why he did it.  The

9 DAD manual, which they're relying on as prior art is

10 DDX 1; and there was a circle R which indicates, you

11 know, a registration on there.

12          And he's asked, "Do you know why the circle R

13 is on the front page of your manual?"

14          "Because my vice-president of sales and

15 marketing wanted it there to make it look more realistic

16 and impressive."

17          In other words, he was going to take something

18 and make it appear something that it was not.

19          Then -- but there's more.  ENCO is his

20 company.  "Did ENCO actually file any patent applications

21 at the time?"

22          "No, we did not."

23          And, so, we asked, question, "Now, at the

24 bottom of the page there, on Defendant's Exhibit 1, it

25 says 'U.S. and Foreign Patents Applied For.'  Do you see

2977

 1  that?"

 2              "Yes, I do."

 3              "Why does it say that?"

 4              "Honestly because we didn't know better."

 5          And then he blames it on somebody else and

 6  says, "My VP of sales and marketing wanted to make it

 7  look very real, impressive to potential clients like CNNs

 8  and things of the world," again trying to portray

 9  themselves as something they're not, which is exactly

10  what the DAD system was.

11              Okay.  Now, they've got other witnesses.

12  They've got Dr. Wicker.  When we put this together, it

13  was amazing to think about.  I mean, just step back and

14  kind of absorb this.  Dr. Wicker -- this is on the source

15  code issue.  "Now, Dr. Wicker, did you ask Mr. Novacek to

16  provide source code for you to look at?"

17              "Yes, I did," he says.

18              Mr. Novacek -- this is in this trial right

19  here.  "And I asked you if Dr. Wicker asked you to look

20  at any source code, if he can look at any DAD source

21  code; and you told me he had not asked you that, right?"

22              "That's correct."

23              So, Wicker's saying he asked; and Novacek is

24  saying he didn't ask.

25              Then we go back to work.  "Now, in this case

1  you did not look at any source code for the DAD?"

2           "That's right.  That source code was not

3  available."

4           He said that, I think, three times.

5           Back to Mr. Novacek.  "At the time I asked

6  you -- do you, Mr. Novacek, have in your possession now a

7  copy of the source code for any versions of the DADs?"

8  This is -- he's talking about his deposition.

9           And he said, "Yes, I do."

10          Do you know what this is, folks?  This is a "I

11  don't want to see any source code.  I don't want to hear

12  about any source code."  This is Apple's product they're

13  demonstrating.  They own the DAD, for $100,000 that they

14  paid Novacek and for the $75,000 they paid for the

15  machine; you'd think they would get the source code and

16  look at it.  They don't want to know what's in that

17  source code.

18          And this is just more.  This is just more

19  Dr. Wicker testimony saying that it wasn't available.

20  And then at the end he said -- he's confronted.  "Were

21  you here in court when he testified that it was

22  available?"

23          "It's my understanding that it was in a form

24  that I couldn't study."

25          So, first "I asked for it" and then he said he

1   didn't ask for it and then it wasn't available and,

2   "Well, maybe it's available but it's in a form I can't

3   study."  But this is a PhD, right?  And he can't get some

4   source code in a form that he can study?

5           You are entitled to think about -- you are

6   entitled to consider the credibility of witnesses here

7   that have come into this court; and I suggest that what I

8   just showed you impacts the credibility of Mr. Novacek

9   and Dr. Wicker, their two key technical people.

10          Now I want to move into a little more detail

11  on the issue of validity.  Okay?  And as you heard from

12  Judge Clark, there are two types of validity.  There's

13  anticipation -- two types of defenses, anticipation which

14  means everything is in one piece, either an article or a

15  manual; and Apple is contending that the system, the DAD

16  system all by itself, is the same as the patent or the

17  DAD manual all by itself is the same as the patent.

18  Those are the only two things they're claiming is the

19  same as the patent.  Again, no other patents, no other

20  articles, nobody else is going to come in here and claim

21  that they came up with this idea first.

22          And, again, because of limited time, I'm going

23  to jump into some technical things.  I'm going to

24  necessarily have to skim over the top of this stuff.

25  We've had days and days of it, but it's just to highlight

1  your recollection of some of the things that happened.

2      This is a quick set of bullet points on why

3  the DAD system is not the invention.  It doesn't have

4  skip commands, doesn't perform the claimed algorithms, no

5  source code, and then on the technical side of the

6  demonstration the playback_lookahead function transfers

7  audio files but not a playlist.  Then, of course, you

8  have this after the transfer there is something called

9  the "DAD source file" that comes from the server computer

10  to the on-air computer.  Remember the two computers that

11  were sitting here?  The one to your right was the server

12  computer; the one to your left was the on-air computer.

13  And there was a demonstration that purported to show that

14  something came across the server computer to the on-air

15  computer, and you heard Dr. Almeroth testify yesterday

16  that what came over was not the playlist used.  There had

17  to be a translation there.

18      And then I witnessed one of the most

19  incredible examinations I've -- cross-examinations I've

20  ever seen, which was Dr. Almeroth being questioned about

21  "Did you compare those files to see if they were the

22  same?"  It's like wait a minute.  It's their invention.

23  It's their DAD system.  They have the burden to prove to

24  show that it's the same as the patent, and they're asking

25  our expert if he compared it?  The question is why didn't

2981

1  their expert compare it?  Why didn't their expert come in

2  here and say it's the same?

3          Again, one of the themes that permeates this

4  case is Apple doesn't believe the rules apply to them.

5  The rules are if you want to kill a patent -- and that's

6  what they want to do; they want to kill these patents --

7  you have to do so by clear and convincing evidence.  And

8  it's your burden, and it's a different burden.  It's a

9  higher burden than our burden on infringement.

10          You may recall that during opening statement I

11  gave you just, you know, an example that might help you

12  understand a little bit how high of a burden that is and

13  how it's different than preponderance of the evidence,

14  and I used football scores with the -- I think it was the

15  2005 Texas National Championship team.  They won

16  everything, went 13 and 0 that year.  Four games they won

17  in which they scored 60 points.  They beat Colorado 70 to

18  3.  They beat Oklahoma 45 to 21.  Those are clear and

19  convincing wins; and, yet, they want you to think that

20  they've met their burden of clear and convincing evidence

21  on the validity issues when they haven't produced any

22  source code, looked at any source code, didn't do the

23  kind of mapping that we did on the infringement side.

24          Infringement and validity, the proofs are --

25  it's flip sides of the same coin.  And we'll get, in a

2982

1  minute, to the proof that we did on the infringement; and

2  you compare that to what they tried to do on the validity

3  side.

4          And, again, this is just some more testimony

5  about, you know, no skip commands.  We talked about that

6  a little bit.  Just to refresh your recollection that

7  there was testimony on that point.

8          And, of course, now let's get to some of the

9  other prior art.  I'm going to segue into some of that

10 other art.

11         Dr. Wicker didn't look at any prior art --

12 excuse me -- any source code.  We looked at a lot of

13 source code, went through the claims, mapped the source

14 code.  And one of the things you're going to hear from

15 Mr. Cordell -- I haven't seen his slides and I don't know

16 exactly what he's going to say, but I'll be willing to

17 bet a lot of money he's going to get up here and say they

18 don't do it the way the claims require on the source

19 code.  He's going to talk about some source code in the

20 means-plus-function, and he's going to claim that they

21 don't do it that way.  So, he's going to talk about

22 source code when it comes to infringement but he can't

23 talk about source code when it comes to validity because

24 they don't have it and their expert never looked at any.

25 And, yet, they want you to kill these patents.

2983

1        Now, some other prior art they're relying on,

2   Sound Blaster, for example.  Sound Blaster is not the

3   invention.  So, when you get to the obviousness question,

4   what you have are things that are not the invention that

5   they want to combine and claim that, "Well, if you put

6   them together, it's the invention."

7        So, what you've got here, Sound Blaster is not

8   the invention.  So, here we've got another technology

9   company that makes a product called "Sound Blaster"; and

10  nobody from Sound Blaster came into this court and said,

11  "Hey, we've got a patent that was first."  No employee of

12  Sound Blaster came in here and said, "Hey, we thought of

13  it first."

14        Sound Blaster is a failure to come up with the

15  invention.  That's what Sound Blaster is.

16        The Sony Discman also is not the invention.

17  You know, if you squish it together with some stuff, they

18  think it's the invention.  So, what is it?  It's a

19  failure to come up with the invention by Sony, not just

20  by any Tom, Dick, or Harry out there.  Sony didn't come

21  up with this invention either.

22        And then, of course, Dr. Almeroth says it

23  doesn't matter.  There is no combination out there that's

24  the invention because there was no source code provided

25  for anybody.  He had to go through source code to prove

2984

1  infringement, but Apple doesn't think the rules apply to

2  them and they don't have to go through source code to

3  prove invalidity.

4          This is a very interesting graphic and very

5  telling, I think.  Our patent application was filed on

6  October 2nd, 1996; and eventually MP3 players started

7  coming on the market.  The evidence that's in this trial

8  is that the first MP3 player that came on the market was

9  1998, this Rio 300.  And the Rio 300 did not have the

10 capability to download or receive navigable playlists.

11 That capability didn't come along until sometime in the

12 2000 time frame.  And, so, it's several years after our

13 patent application was filed that technology companies

14 finally got around to making audio players that could

15 receive or download these navigable playlists.

16         And just a comment on that phrase, too, by the

17 way.  Counsel tried to beat up Dr. Almeroth for using

18 that phrase.  It's not in the patent.  All right?  It's a

19 phrase that I came up with as a way to try to have a

20 shorthand for all the technology in there; and I think it

21 fairly characterizes really, at the big-picture level, of

22 what the technology is.  And we have to have some

23 shorthand, or we'd never get through this trial.  I mean,

24 we just have to have some way to communicate in a fashion

25 that allows us to say.  But it's what's in the claims

1 that count.  I'm just using shorthand when I use that

2 phrase, and it's kind of been picked up by various people

3 around the courtroom.

4         Now let's switch.  So, we've talked about

5 validity.  Now I want to switch to infringement.  And,

6 again, Apple had the burden to prove by clear and

7 convincing evidence.  We have the burden on infringement

8 by preponderance.  So, let's look at what we did to try

9 to meet that burden.

10        Here is just kind of a montage of the

11 materials that Dr. Almeroth looked at.  And you'll

12 remember he was on the stand for several days going

13 through this.  He looked at manuals.  He looked at

14 schematics.  He looked at parts lists.  He looked at the

15 devices themselves; and, of course, he looked at

16 16 million lines of software code.

17        This (indicating) is a chart that we put

18 together just to show that even though there's a lot of

19 moving pieces here and it's complicated the way the

20 things are set up, there is a bunch of overlap on how

21 these patent claims are set up; and we've broken this

22 down by patent group and by certain claim elements and

23 then where you find some of this information in the Apple

24 patents *[sic]*.  It's just to remind you a little bit

25 about what that testimony was like.

2986

1    So, first, let's start with this.  Dr. Wicker

2  admits that Dr. Almeroth is right about how the iPods

3  work, in terms of how the source code operates.  You will

4  have back in the jury room a series of exhibits -- They

5  may be about 20 pages even -- that are 771A through -- I

6  think it's 781A.  The numbers are in your jury

7  instructions.  And what these are are fairly

8  straightforward charts by Dr. Almeroth that Dr. Wicker

9  has agreed to are accurate summaries of how the source

10 code operates.  There is no dispute about how it

11 operates.

12    You'll also have some demonstratives that were

13 put together by Dr. Wicker.  And the judge instructed you

14 on what those are.  We don't agree with those, and

15 Dr. Almeroth doesn't agree with those either.

16    So, what you're going to have between the two

17 experts is you're going to have one that both of them

18 agree to and you're going to have one that only

19 Dr. Wicker thinks is correct.

20    Now, let's walk through some of the

21 infringement issues here.  And what I want to do is --

22 again, I've got some limited time; but I want to try to

23 be fair to Apple here.  So, I went to the slides that

24 Dr. Wicker used and tried to figure out, okay, what's the

25 real dispute here that Dr. Wicker is complaining about.

1 And, so, he said that -- well, I've got these three

2 questions that I have to answer.  So, Dr. Wicker only

3 challenged parts of what Dr. Almeroth went through.

4 Dr. Almeroth went through painstaking detail of every

5 single claim element in each of the two patents, and

6 Dr. Wicker did not do that.  He focused on a few things,

7 and that's what I'm going to try to do here in the

8 limited time I've got.

9         I'm going to start from Number 3 and work my

10 way back up because the next slide -- and, again, this

11 is -- I've decided to take their slides and put them in

12 my presentation here.  This is what Dr. Wicker thinks.

13 He's claiming that the structures are not equivalent.

14 You've got to remember these are 112 ¶6, these

15 means-plus-function claims.  And for many of them, the

16 issue is is the structure equivalent.  Dr. Wicker says

17 no; we say yes.  And I've used their slide to actually

18 kind of guide us through a little bit of what we're doing

19 here.

20         So, the first thing is the means for

21 receiving.  And you will remember the shorthand for that

22 is this IrDA link.  Is the USB cable that Apple uses to

23 connect their computers together, the iPod with the

24 computer that the playlists are downloaded from, is that

25 the equivalent of an IrDA link?  They say no; we say that

2988

1  it is equivalent.

2          Here's the court's claim construction.

3          But -- so, a couple things.  First, we've got

4  their -- the port is a port for connecting, that really

5  shouldn't be in any dispute at all.  That's out of their

6  documents.

7          Now, you don't have to take -- I think

8  Dr. Almeroth is right and you should believe him for

9  everything he says, but you don't have to limit your

10 conclusions here to what he said.  Look at what Mr. Dave

11 Heller said in a patent that he went to the Patent Office

12 and filed.  They're talking about this peripheral cable

13 212, that if you go back and remember the drawing, it

14 basically connects what looks like an iPod to a computer.

15 And he's saying that that can either be a FireWire or a

16 universal bus.  Alternatively, that cable can be replaced

17 by a wireless link.  Now, this is what he said to the

18 Patent Office; and this is important.  They said this to

19 the Patent Office before this lawsuit was filed, before

20 any lawyers got involved, and before anybody had to, you

21 know, kind of change their story a little bit.  But

22 there's more.

23         So, Dr. Wicker talked about Apple's scroll

24 wheel patent and then on cross-examination we pointed

25 out, "Oh, by the way, let's take another look at

2989

1  something in that scroll wheel patent."  And in the

2  scroll wheel patent, again that Apple took to the Patent

3  Office, it talked about a data port.  Remember that's

4  what we're talking about in the claims here.  And it says

5  the data port can be a USB port or a FireWire port.

6           Then it goes on and says it can be a radio

7  frequency link or optical infrared link to eliminate the

8  need for a cable.

9           So, Dr. Wicker apparently is willing to stake

10  his credibility by arguing that an IrDA link is not the

11  same, structurally equivalent, as that USB cable.

12           One of the things you heard them talk a lot

13  about is about the speed of data transfer.  If you look

14  at the claim construction definition, there is nothing in

15  there about speed of data transfer; and Apple doesn't

16  mention anything before the Patent Office and to say IrDA

17  won't work because it's too slow.  That's a red herring.

18           And then of course we've got the chip.  The

19  predecessor 7209 chip, one of the Cirrus chips that Apple

20  was considering for the iPod.  And it, of course, talks

21  about having an IrDA protocol encoder/decoder on that

22  chip as well.

23           Now let's talk about the NAND flash issue.

24  That's the persistent storage issue.  Dr. Wicker is

25  trying to claim that these later devices that don't have

1  a hard drive, a spinning hard drive, what's called "NAND

2  flash" are not structurally equivalent; but here is his

3  testimony.

4          I said, "You agree that NAND flash is

5  persistent mass storage?"  That's the claim term,

6  "persistent mass storage."

7          He said, "Yes.  Yes, definitely."

8          "Do you think this says that the persistent

9  mass storage device has to be a magnetic disk memory or

10  an equivalent?"

11          "No.  It simply says 'such as a magnetic disk

12  memory.'"

13          And then later on his opinion is that the NAND

14  flash doesn't satisfy the persistent memory claim

15  limitation.

16          Now let's go to the keyboard and the buttons.

17  Every time I've looked at a keyboard, it's got buttons on

18  it.  That's got a Z button, an X button, a C button,

19  et cetera, et cetera.  Keyboards just happen to have a

20  lot of buttons.  All you have to do is have a structural

21  equivalent.  You push a button; something happens.  This

22  is really another red herring.

23          There's testimony on that.

24          Now the sound card.  Right?  So, a sound

25  card -- let's go back and look at the court's claim

2991

1    construction.  One of the things it says is that it

2    includes a digital-to-analog converter.  A sound card is

3    a bunch of chips on a board and again things get smaller

4    and cheaper and it is now down to a codec.

5           Apple agrees -- this is their answer to

6    questions; they had to answer these questions that we

7    asked -- that all the iPods, in fact, have a

8    digital-to-analog converter.

9           This chart I put up here just to remind you

10   that there are some differences and some of these

11   limitations we've talked about are, in fact, not required

12   by all the claims.  At the end of the day, they're all

13   met.  But just to remind you that there are some

14   differences between these claims.

15          Now let's go to this downloading issue.  Apple

16   downloads playlists.  Here's the press release they put

17   out in October, 2001, when they announced to the

18   public -- and again this is before the lawsuit was filed,

19   before anybody had to go back and look, "Jeez, what do we

20   say in court?"  There were none of those considerations.

21          And they said, "Hey, plug your iPod in.  It

22   automatically downloads your playlist."

23          And they also put that in their manual.  Plug

24   it in; download your playlist.

25          And they put it in a patent, too.  Right?  And

1 they say that, you know -- I mean, you can see a picture

2 there, a scroll wheel.  Looks like an iPod.  Plug it in;

3 it downloads a playlist.  Right?

4          Now, one of the issues for -- I believe this

5 is the '178 patent only.  I'm going to go a little

6 technical here, a couple things.  As you heard from

7 Judge Clark, that is the claim element on the port for

8 downloading we are arguing is met by the doctrine of

9 equivalents, that it's -- the differences are

10 insubstantial, that it serves the same -- does the same

11 function in the same way to achieve the same result.

12          And iPods have a communications port, again

13 for doing the identical function and achieving the

14 identical result, which is (reading) transferring a

15 plurality of separate digital compressed audio files and

16 a separate sequencing file from the memory of one or more

17 separate computers to the memory of the player upon a

18 request by the player.

19          And you heard Dr. Almeroth talk about what

20 constitutes a request.  You plug it in and it says --

21 there is a voltage drop, and it's kind of the equivalent

22 of "here I am."  I'm just trying to refresh your

23 recollection that Dr. Almeroth went through that.  That's

24 met.

25          And again, so, it is a request to initiate a

1  transfer.

2           Again the iPod is programmed and designed upon

3  initiating the connection to receive the download from

4  the computer, including the songs and the playlists.

5           This is some more -- just to refresh your

6  recollection, some more of the information on that.

7           Now I want to move to some of these software

8  claims.  You remember that another part of what

9  Dr. Wicker talked about was that the software limitations

10 were not met.  Well, the judge has described for you what

11 an algorithm is; and you've got it here.  It's, you know,

12 a fairly broad statement, "a formula or series of steps

13 for accomplishing some purpose, for instance a series of

14 steps performed by a computer to accomplish some

15 function."  And it "may be expressed in many ways, such

16 as in a mathematical formula, in computer code, in words,

17 or as a flow chart."

18          Another thing you may hear during counsel's

19 closing argument is that the patent was written at the

20 time and that the software talked about in the patent is

21 written in a language called "Pascal."  The computer

22 language used by the iPod is either C or C++.  And there

23 is no distinction that it has to be a specific computer

24 language.  The key things are both computer languages and

25 most of us can't read them and that's why we need

2994

1  experts.  But there's no distinction; and Apple cannot

2  get off the hook here by claiming, "Well, ours is written

3  in C computer language and what Mr. Call talked about

4  when he drafted the patent application was Pascal."

5           So, now let's talk about one of the issues

6  that Apple has talked a lot about.  We're calling this

7  the "LocType issue."  All right?  And how that fits into

8  the claims are -- it's really skipping forward and you

9  can see that there is a three-step algorithm that the

10 judge talks about here in the claim construction and

11 basically it's -- the claim language is, you know,

12 (reading) means responsive to a first command for

13 discontinuing the reproduction of the current song and

14 instead going to the beginning of the next one.

15          So, that's the skip-ahead feature.  And it

16 also relates to the skip-back issue.  That's the LocType

17 issue.

18          So, what's the evidence on it?  Right?  Well,

19 first of all, we've got Apple agreeing that all the

20 iPods, in fact, have an algorithm for navigating through

21 a playlist.  They all have an algorithm for doing it.

22 They've admitted that.

23          You remember also that there was a lot of

24 discussion about Figure 5 of the patent and what's put up

25 here on the slide is not Figure 5 from the patent but a

2995

1  demonstrative showing that all of the items in that

2  sequencing file can be of the same type and can be songs

3  and that's exactly what Apple does.

4          Then if you go into the source code itself --

5  we presented a lot of evidence on this, folks.  You go

6  into the source code itself; and if you look at the top

7  box there, you can see that the first thing that you have

8  there is a comment.  It says, "Find the next song in the

9  playlist that is selectable."  Remember in software if

10 you've got the double hashes it doesn't start a command;

11 it's just a comment for the programmer so they know

12 what's going on.

13         Then you see the code, "GetNextPlaylistTrack."

14 So, that's the skip ahead.  All right?

15         And then later on, you go backwards with the

16 same software code.

17         So, we went into the software, went deep, and

18 they have exactly the same thing.  It doesn't have to say

19 "LocType."  There is no requirement that the word

20 "LocType" be found in the software.  It just has to be --

21 it has to do that.  It has to be the structural

22 equivalent of what's set forth there, and it is.

23         And here is some more of the same thing with

24 the skip backward function.

25         And then they made a lot of hay about the fact

1  that there is no R record.  There is no requirement for

2  an R record.  You can look through -- this is the court's

3  claim constructions.  You can look through there.  You

4  won't find anything.  It talks about LocType, doesn't

5  talk about R record.

6          And here's just a chart about the different

7  generations of iPods and models.

8          Now I'd like to spend a few minutes talking

9  about the profit apportionment and the damages issue.

10  Here's the debate.  We've got their expert saying, "If

11  you find infringement, the patents are valid, it's

12  $5 million lump sum.  That's it."

13          We believe that the appropriate measure of

14  damages in this case is a running royalty of an amount.

15  Mr. Nawrocki arrived at that amount by starting with

16  Apple's profits and giving Apple most of the credit for

17  everything.  Started out with profits of between $32 and

18  $34 and apportions all of that to come down to the profit

19  that's associated with the inventive contribution here

20  and he gives it to be 90 cents.  All right?  We can't ask

21  for, have not asked for -- not even close -- for all of

22  Apple's profits on the iPod.  We've asked for what we

23  think is the fair portion that our patent and our

24  technology contributes to it.

25          All right.  One of the complaints that Apple

2997

1  has about the work that Mr. Nawrocki did was the price of

2  iPods have gone down over time.  Yes, they have.  They

3  have gone down over time.  But what's happened is the

4  profits have gone up.

5          So, Mr. Nawrocki started with 32 to $34.  The

6  actual profit is 41 bucks.  So, if Mr. Nawrocki had said,

7  "Yep, you're right.  You're right.  The price has gone

8  up; so, what I'm going to do is redo my calculations

9  using a lower price but higher profits" -- because what

10 he apportioned was profits.  So, Apple got the benefit of

11 what Mr. Nawrocki did.  They got the benefit of

12 Mr. Nawrocki starting from a lower profit number than the

13 actual profit number even though the price of the device

14 went down.

15         And then part of what Mr. Nawrocki did was he

16 looked at a lot of surveys, looked at a lot of Apple

17 documents; and all of that went into his allocations of

18 how much to attribute to the various items.

19         Now, I'd like to talk just a little bit about

20 the lump-sum versus running royalty issue.  Apple --

21 first of all, on this issue, go back to -- remember what

22 I talked about, the Digeo agreement, E-Data agreement.

23 They're saying, "Okay.  Those were lump-sum deals that

24 Apple negotiated.  Just look at that.  Don't think about

25 anything else.  And that's why it should be a lump sum."

2998

1  That's one of the things they're arguing here.

2        Those are not comparable licenses, folks.

3  They're just simply not.  One is with an expired patent

4  only relating to Canadian/U.S. sales.  The other one,

5  Dr. Wicker had no idea whether Apple was using it,

6  whether it was infringed, whether it was valid.  The

7  technology was simply not comparable.

8        The point of this exhibit, Plaintiff's

9  Exhibit 745, is simply to show that Apple, in fact,

10  understands that in some circumstances they're going to

11  have to pay for stuff by the unit.  And they've got

12  licenses here where they have clearly, clearly thought

13  about and incorporated into their thinking early on that

14  they would have to pay by the unit.

15        And Dr. Ugone -- it depends on who's paying

16  his bill how he testifies, right?  When he's testifying

17  on behalf of the patent owner, he always gives the option

18  of a running royalty.  But when he's testifying on behalf

19  of the defendants, he comes in here and says, "No.  No

20  running royalty.  Simply not appropriate."

21        So, this is another slide that Dr. Ugone put

22  together.  The real-world facts are important.  "Well,

23  the real-world facts are not comparable here."  Apple

24  comparable licenses, they have E-Data and Digeo.  Those

25  are not comparable licenses.

1        And then Concert.  Let's talk about Concert a

2   little bit.  All right?  Concert Technology is a

3   5-million-dollar issue here.  Concert was a middleman.

4   Concert wasn't Apple.  Okay?  You will see all over these

5   jury instructions that it should be a reasonable royalty

6   for the use made of the invention.  I don't know how I

7   can stress it any more.  It's for the use made of the

8   invention.  Concert was not going to use the invention.

9   All right?  What they were going to do is take it and

10  then go to somebody and either sue them or try to license

11  to somebody that actually was going to use it.  Concert

12  simply wasn't in that business.  That's not comparable

13  and should not drive the decision in this case.

14        DEPUTY CLERK:  Mr. Schutz, you have ten

15  minutes.

16        MR. SCHUTZ:  Thank you.

17        And then the Made for iPod licenses, the only

18  point there is that when Apple is on the other side of

19  the bargaining table where somebody comes to them for

20  technology, they demand that they be paid by the unit

21  there.

22        Okay.  I'm not going to go through this again.

23  You've seen it.  I gave all their witnesses opportunities

24  to say this technology could be taken off, this

25  technology could be removed.  I asked Mr. Fadell that, I

1  asked Mr. Heller that, and I asked Mr. Ng that.  I kept

2  asking him, "Well, what could you take off?"  I didn't

3  suggest that they could take anything off.  I just asked

4  an open-ended question.  And none of them jumped and

5  said, "We'll get rid of the technology that's in dispute

6  in this case."  Didn't do that.

7              And, so, this (indicating) is what they would

8  take off.  That's it.

9              So, what do we have at the end of the day?

10  93,795,429 units sold.  And Mr. Nawrocki has given a

11  royalty rate range of 63 cents to $1.34 here for that.

12             Now I'd like to spend just a moment, ladies

13  and gentlemen, talking about the special verdict form.

14  Okay?  You're going to get this form; and, so, here's

15  what all of this means.  If you want Personal Audio to

16  win, this is how you're going to have to fill the form

17  out.  If you want Apple to win, Mr. Cordell is going to

18  tell you how the form should be filled out.

19             If you want us to win on the infringement

20  questions, you just check them "yes."  Okay?

21             And there are a couple of pages of

22  infringement questions; and, so, it's "yes" on all of

23  those.

24             And when you get to the validity questions,

25  where has Apple proved by clear and convincing evidence

1  that these patents should be killed, you'd check those

2  "no" if you want us to win.

3            And there are several pages of those with

4  different combinations that the judge has talked about.

5            Then when you get to the damages question,

6  you're going to be asked per-unit running royalty or

7  lump sum.  If you want to check the box "lump sum," which

8  they're going to ask you to check, that's it.  There's --

9  Apple can use this technology and they can sell a

10  hundred million, 200 million, a billion units.  They can

11  incorporate it into new devices in the future and

12  everything else; and whatever that lump sum, that's it.

13  There's no sharing in the success based on our

14  technology, which they have said they would not take off.

15  I mean, nobody's come in and said, "We've got another way

16  to do it; so, we can take it off."  They've all said, "We

17  need it, and we're not willing to take it off."  And in

18  that circumstance they should have to pay something for

19  that each time they sell one of these products.  And

20  we're not forcing them to keep it on.  They can take this

21  technology off if they need to.

22            Now, what I have not done here is this

23  93 million units and you've got to put a per-unit total

24  in there.  I try a lot of these cases.  I never, ever

25  suggest to the jury what number to put in there.  I go

1  through what our damage expert did.  You've heard the

2  evidence.  You can make the evaluation, and you put what

3  you think is a fair number in there.  I'm not going to

4  suggest a number that you should put in there.

5          Ladies and gentlemen, I've saved a few minutes

6  to talk to you at the end after Mr. Cordell is done.  So,

7  I will be back.  I'll give you an interim "thank you" at

8  this point and turn it over to Mr. Cordell.

9          THE COURT:  All right.  Mr. Cordell.

10          MR. CORDELL:  Thank you, your Honor.  May I

11  stand here?

12          THE COURT:  Yes.

13          MR. CORDELL:  Thank you.

14          THE COURT:  You can pull the microphone over

15  and it will pick you up.

16          Do you want to go ahead and get that chart

17  down, sir?

18          MR. SCHUTZ:  Oh, yes.

19          MR. CORDELL:  May it please the court?

20          THE COURT:  Counsel.

21          MR. CORDELL:  Ladies and gentlemen of the

22  jury, counsel, assembled visitors and observers, I'm

23  going to echo Mr. Schutz's comments about thanking you

24  for your service.  We understand this is a burden on you,

25  but we also understand that this is public service at its

3003

1   highest and a lofty kind of thing you could do.  So, we

2   really, really appreciate it and however your decision

3   comes out in this case, we know you'll be fair and again

4   we want to thank you for your service.

5           Somebody mentioned that when I gave my opening

6   statement, I failed to really introduce myself.  So, I

7   wanted to apologize about that.  I didn't tell you where

8   I was from or where I lived or anything like that.  I

9   actually grew up about two hours east of here in

10  Lafayette and then -- but I make my home now in Virginia.

11  I work in the Washington, DC, area; and my wife and I

12  have lived up there for a while now.  We've got three

13  kids and -- but I try to get back to Texas as often as I

14  can.

15          Let me first start by just telling you that,

16  you know, in these cases we're always taught as lawyers

17  that we're supposed to come up with something catchy and

18  witty at the beginning of our closing statements.  You

19  know, the other lawyers will laugh at you if you don't do

20  it.  So, I stayed up half the night last night because I

21  was trying to think of something that, you know, would be

22  witty or rhyme or, you know, something I could key off

23  of.  And, ladies and gentlemen, I just couldn't do it.  I

24  tried for three hours to think of something that would

25  rhyme with "algorithm," and there is no such word.  It

1  just doesn't exist.

2          But that's what this case is about.  It's not

3  about catchy slogans.  It's not about platitudes.  This

4  is about hard technology and whether or not Apple is

5  using this very dense, very, you know, difficult

6  technology.  And that's what we're here to talk about.

7          So, Mr. Schutz brought up quite a few things

8  in his closing and I won't be able to address them all,

9  but let me just speak to a couple of them.  He talked

10 about, "Well, Apple has 3,000 patents."  Ladies and

11 gentlemen, we're not here to talk about Apple's patents.

12 I wish we were.  I wish we were.

13          But one of the things that he said that struck

14 me is he said, "You know, there's no Apple patent on the

15 iPod."  Well, ladies and gentlemen, this is one of the

16 patents (indicating) that we're going to talk about

17 during my closing statement.  We're going to focus on

18 this quite a bit.  But look at the face of this.  I'm

19 going to leave it to you to decide whether or not Apple

20 has any patents on the iPod.

21          For the record, this is DX 199.

22          Now, there is a picture of the iPod right on

23 the face of the patent.

24          He said, you know, we have all these employees

25 and we didn't pull any of them in here to tell you that

1  the patent was invalid.  Well, ladies and gentlemen, we

2  brought you the best invalidity evidence we could; and we

3  chose those witnesses that had knowledge and could inform

4  this decision.  That's why.

5          So, those things are distractions.  Those are

6  distractions.  We need to get to the real issues, and we

7  need to talk about those.  And I'm not going to talk

8  about distractions.  I'm not going to bring up the fact

9  that, you know -- "Do you remember Personal Audio had

10 that little tax problem at the beginning of the case" or,

11 you know, this business about them coming down to Texas

12 when they had never been to their offices or don't know

13 where they are.  Those are distractions; and, so, I'm not

14 going to talk about that.

15          Instead, what I'm going to try to do is focus

16 on the issues and try to give you a review of the

17 evidence that we've seen and why we think it supports

18 Apple at the end of the day here.

19          So, let me get into it.

20          One thing that I think we have proven beyond a

21 shadow of a doubt -- and I dispute what Mr. Schutz

22 said -- is that in fact Apple did invent the iPod.

23 You've heard all of this evidence about the fact that the

24 iPod can hold 20,000 songs and 100 hours of movies and

25 has these patented controls.

1          You heard evidence about how it changed
2    people's lives.  Suddenly they could actually -- you
3    know, when they were in a job that was kind of boring and
4    they needed to listen to music, they could take their own
5    music with them.  They weren't tied to that radio
6    anymore.  It made people's lives better.
7          One of the other things that we heard is that
8    this technology, the technology that made this work,
9    really didn't exist before 2001, didn't exist.  And what
10   were those key features?  Those features were like the
11   1.8-inch hard drive.
12         And Mr. Schutz says, "Wait a minute.  Apple
13   didn't invent the 1.8-inch hard drive."
14         Ladies and gentlemen, the testimony, the
15   actual evidence, was that Toshiba had come up with it;
16   but nobody was using it.  Nobody had found any useful
17   purpose for it, and it was the Apple folks who decided
18   that they would make this new device using this
19   remarkable technology.
20         The accelerating scroll wheel, how hard would
21   it be -- we're going to talk about this a little later.
22   But imagine how hard it would be if you had a thousand
23   songs on your iPod, to press the "skip" button a thousand
24   times.  If you wanted to get to Song Number 647, you're
25   going to press it 647 times.  Wouldn't be workable.

1  Nobody would want to use it.  So, Apple had to come up

2  with a new way to do it; and they did with this

3  accelerating scroll wheel that lets you go through

4  hundreds of songs in a very short amount of time.

5            Fast connections.  If you're going to have a

6  thousand songs on an iPod -- we're going to talk about

7  this a little later -- you wouldn't sit there for 8 or 10

8  or 13 hours to let the music transfer over.  You've got

9  to do that in a reasonable amount of time; so, Apple had

10 to come up with new ways to connect the iPod to a

11 computer, things like the FireWire that you've heard

12 about.

13           And then, finally, the innovative design.  We

14 haven't talked very much about this, but you saw the

15 awards -- some of the awards that Apple won.  The reality

16 is, ladies and gentlemen, that it's kind of a neat little

17 device.  It's small.  It fits in your pocket, and it has

18 the kinds of features that people thought were good to

19 have.  And those are the things that made the iPod work

20 and made this invention, and I don't think there is any

21 dispute that this was Apple 's invention.

22           You heard from the engineers.  You heard from

23 Mr. Heller and Mr. Fadell and Mr. Ng and Mr. Boettcher.

24 And when they testified, they gave you a lot of useful

25 information.  I'm not trying to distract you from that

1 because that's what's really important, When they told

2 you about their products and how they worked.

3          But the one thing that struck me when they sat

4 in that witness chair was that every single one of

5 them -- and remember they didn't hear each other

6 testify -- I guess Mr. Heller heard the others because

7 he's here.  He is our corporate representative, but he

8 was the first one to testify.  And every single one of

9 those witnesses talked about one thing, how proud they

10 were of this device and how proud they were of this work.

11 It was almost like listening to somebody talk about their

12 children.

13          I'm sure they love their children more than

14 the device, but it had to strike you.  It just had to

15 strike you.

16          But what else did we hear from these guys?  We

17 heard the same messages over and over.  We heard they had

18 never heard of Personal Audio, they had never heard of

19 Personal Audio's patents.  And they did their own work

20 when they were developing and improving the iPod.

21          So, there's no suggestion in this case that

22 somehow Personal Audio taught Apple anything.  There is

23 no transfer of technology.

24          Mr. Schutz in his opening -- I guess now two

25 weeks ago -- said, "Well, you know, that doesn't matter.

1    That doesn't matter.  You don't have to show that

2    somebody copied or that they saw the Personal Audio

3    products."  And he's right about that.  He's right.

4            But, ladies and gentlemen, what he's got to

5    prove then is that somehow these very talented engineers,

6    as they were doing this difficult job of inventing this

7    iPod and developing this iPod, that these engineers

8    somehow stumbled into the same specific technology that's

9    in the Personal Audio patents.  And they've got to prove

10   that to you.  They've got to prove that.  And they can't

11   just throw up their hands, and they can't resort to

12   platitudes.  They've got to zero in and they've got to

13   convince you that, in fact, those very, very specific

14   claims somehow found their way into the iPod.

15           The fact of the matter is, ladies and

16   gentlemen, this iPod looks nothing like that patent,

17   absolutely nothing like it.  And if you look at Figure 1

18   of the patent -- and we've added a couple labels here

19   just to remind you of what's what.  The server side is

20   over here (indicating) on the left, and the player

21   computer side is over here (indicating) on the right.

22   And you can see it's got a keyboard and a display and a

23   CPU.  It's got all the stuff that a computer has.  That's

24   what they had.  That's what they invented.

25           But when you look at the claims, when you look

3010

1  at what really matters -- and we're going to talk a whole

2  lot about this, and I was kind of surprised that

3  Mr. Schutz didn't take you through this.  When you look

4  at what the judge has said these claims actually mean --

5  and this is one of the definitions that we're going to

6  talk about.  It's at page 3 of your juror notebook.

7  Remember this is the one I had you circle during the

8  opening.

9          When you look at this, this is not just a

10 player.  This is not a downloadable navigable playlist,

11 whatever it is that Mr. Schutz has used.  This is a very,

12 very specific algorithm, what computer people would call

13 a "structure."  This is a very, very specific method.

14 It's a recipe, if you will, for how the software

15 accomplishes a particular function.  This is what they

16 have to prove.  They don't get to walk in and say, "Hey,

17 you've got a player.  That must infringe."

18          They've got to look at this, and they've got

19 to convince you that this is actually being used.  And

20 remember it's their burden, ladies and gentlemen.  So, if

21 for some reason you don't believe one side or the other

22 or you can't figure it out, they have to lose, because

23 they've got to convince you that this is being used.

24          So, let me get into that.  I'm going to talk

25 about some other big differences, some of the structural

3011

1  differences that Mr. Schutz talked about; and we'll get

2  into those in a fair amount of detail.  And then I'm also

3  going to talk about this doctrine of equivalents issue

4  that he touched on.  I'm not going to spend a lot of time

5  on it here because I've used too much of my time already,

6  it turns out.

7          Let me just pause for a moment and address the

8  slogan that Mr. Schutz used, the shorthand, this idea

9  that this patent is really about an audio player that can

10  receive or download navigable playlists.  And I was glad

11  to hear him say in his remarks that of course his expert

12  never said anything about that because it's something

13  that he came up with.  And he did.  He did.  And I'm not

14  faulting him for that.

15          What I am faulting him for is suggesting to

16  you that that's enough, that you can look at that and

17  stop, that you can say, "Well, if they're downloading

18  playlists, there must be infringement" or "if you can

19  navigate through a playlist, there must be infringement,"

20  because that's not what this case is about.  Remember

21  what their witnesses said.  Remember what Mr. Call said.

22          We asked him, you know, "Did you invent the

23  idea of downloading audio files?"

24          And he said, "No."

25          We also said, "You also didn't invent the idea

3012

1   of storing downloaded audio files on a hard drive?"

2           "Right."

3           "You didn't invent sequential playback of

4   audio files?"

5           "Right."

6           So, this idea that you have an audio player

7   that can receive or download, that's not the invention.

8           This business about navigable playlists, we

9   said, "Hey, wait.  CD players from way back when could

10  skip forward or backward from a currently playing song."

11          He said, "Yep.  I suspect they could."

12          That was in the prior art.  That's not part of

13  the invention.

14          We also spoke with Mr. Goessling.  Remember

15  Mr. Goessling is the only inventor here who is not

16  connected to this case.  He's the only inventor who

17  doesn't stand to benefit anything from this case.

18          So, when we asked him, we said, "You know,

19  would you agree that there were software players in the

20  marketplace before you got involved that would allow you

21  to create playlists of audio files that you brought into

22  your PC from somewhere else and then skipped forward?"

23  So, you had to bring in those audio files and then skip

24  around through them.

25          "Sure looks that way," he says.

3013

1          "Okay.  So, you guys didn't invent that

2    notion, right?"

3          "I don't think we did."

4          "And similarly, the notion of skipping back,

5    you didn't invent that either, right?"

6          "As I said, this looks like it does those

7    things; so, probably not."  Probably not.

8          So, ladies and gentlemen, the shorthand we've

9    got to be real careful of and the fact of the matter is

10   that's not what the invention is and the time has come

11   for us to really focus on it.

12          Let me pause just briefly on playlists because

13   we've heard so much about playlists.  But the fact of the

14   matter is Mr. Call sat in that witness stand and he told

15   you that, in fact, in the 45 columns of dense text, that

16   thing that's so hard to read in this patent, the word

17   "playlist" doesn't occur even one time.

18          And more than that, he says, "I avoided it.  I

19   didn't want to use the word 'playlist' because I'm not

20   talking about any generic playlist here."

21          We asked him, "Why didn't you use the term

22   'playlist'?"

23          And he said, "Well, that's a generic term.

24   That's a generic term.  I was talking about something

25   very specific."

1          So, he purposely didn't use the word

2    "playlist."  This patent is not the playlist patent.

3    We're going to talk about that one later, too.

4          So, we have to look at the claims as actually

5    defined; and we're going to spend a lot of time on this

6    so let me get into it.

7          Let me just address one more point here; and

8    that is Dr. Almeroth, he had a problem in this case.  He

9    had a problem.  The point is, as an expert, he wants to

10   be able to stand before you and show you that the

11   patentee actually had a product and actually made

12   something everybody could touch and feel and look at so

13   he could hold it up and use it as part of his testimony.

14   But he didn't have that here because remember what the

15   patent shows is just this figure with a computer.  And he

16   didn't want to show you a computer.  So, what did he do?

17          I understand he had a problem.  But, ladies

18   and gentlemen, you can't just make things up; and that's

19   what he did.  He said, "Well, I'm going to go ahead and

20   come up with this PDA.  I'm going to make up this

21   device."

22          And if you remember, he had slide after slide

23   after slide where he walks through the invention using

24   this PDA; but it was made up.  It was made up.

25          And, so, on cross-examination we asked him;

3015

1  and sure enough he said -- you know, this doesn't

2  represent a particular PDA; and he said, "The second part

3  is true.  This doesn't represent any actual PDA.

4          "Okay.  So it's fictitious, right?

5          "That's correct."

6          That's correct.  And, you know, I can give him

7  a break on trying to explain things because this is hard

8  to do and sometimes you have to use analogies; but it

9  sounded like he was suggesting this is actually what the

10 patent looked like.

11          But, ladies and gentlemen, that wasn't true

12 because in 1996 PDAs didn't have a hard drive.  They had

13 no persistent memory that could store music.  The only

14 memory they had, if you got the best one that was

15 available -- if you remember this testimony -- it could

16 store 3 and a half seconds of music in total.  It would

17 take up the whole memory.

18          The one that people normally bought, sort of

19 the run-of-the-mill model, the Chevrolet, stored

20 0.7 seconds of music.  0.7 seconds of music.

21          Do any of you remember the old game show *Name*

22 *That Tune*?  Even on *Name That Tune* you got more than

23 0.7 seconds.  This is just not realistic.

24          And importantly here, ladies and gentlemen,

25 that iPod didn't have a headphone jack at all.  At all.

3016

1  There was no place to plug in headphones or a speaker or

2  anything else.  How in the world could that be the player

3  that they say is covered by the patent?  No music.  No

4  sound comes out of it at all.

5          All right.  So, let's get to infringement.

6  You'll remember this from my opening; and I just want to

7  review it briefly, that in order to show infringement,

8  every element of the claims has to be there.  If you

9  can't decide that every element is there -- or said

10  differently, if you find that one of the elements is

11  missing, there is no infringement.  That's the only point

12  of this slide.  You don't have to miss all of them, don't

13  have to miss three.  If you miss one, there can be no

14  infringement.

15          So, let's start with the biggest issue.  And

16  Mr. Schutz put this back into his remarks; and I was kind

17  of curious about that, too.  It's this algorithm for

18  skipping that we talked so much about in this case.  And

19  the reason why we both focused on it so much is that this

20  is the limitation that appears in all of the claims, all

21  of the claims.  So, if you find or you cannot conclude

22  that Apple is using this specific algorithm for skipping,

23  then there is no infringement of any of the claims in the

24  case.

25          I'm also going to talk about the algorithm for

3017

1   repeating, which is one of the things Mr. Schutz touched

2   on.  I'm going to go through these hardware differences I

3   told you about; and then we're going to talk about the

4   request to initiate transfer of a playlist, that doctrine

5   of equivalents issue that's in the case.

6            So, let's start with the algorithm for

7   skipping.  As I said, ladies and gentlemen, this appears

8   in every asserted claim in the case; and it comes in

9   different forms.  And you can go -- and if you look in

10  your jury notebooks, you'll find the construction, I

11  believe at the bottom of page 3.  This is the one that I

12  had you circle.  But there are also other forms of it as

13  you go through the jury notebook.  You'll see this

14  algorithm used over and over and over again.  And, so,

15  you'll see it in each one of the claims, again in

16  different forms; but it's in each and every one of them.

17           So, let's focus on the construction.

18  Remember, the judge told you when he just read his

19  instructions to you, that you have to use the definitions

20  that he gave you.  You have to.  That's what you have to

21  use to decide whether or not there is infringement in

22  this case.

23           And this particular one appears at the bottom

24  of the jury notebook at page 3, and this is the one that

25  I had you circle during the opening.  And, so, what you

1  find at the bottom of page 3 -- it's just the top half of

2  this, and then the bottom half -- I'm sorry, at the

3  bottom of page 2; and then the rest of it appears at the

4  top of page 3.

5           So, when we look at this algorithm, you have

6  to ask yourself, "Well, what do we have to do?  What is

7  it that the judge is talking about here?"  And what he's

8  talking about here is that the meaning of this claim

9  element that appears in a whole bunch of those claims is

10  as set forth here.  He gives you a definition; and he

11  says, "This is a means-plus-function limitation" -- we're

12  going to talk a little bit about those.  And he says,

13  "The function is 'in response to a 'skip' command,'"

14  et cetera.

15           And what you're going to find out and what

16  you've heard is that for a means-plus-function

17  limitation, you've got to go find exactly that function.

18  You've got to find that function.  And then once you find

19  that function, you have to find the structure, which in

20  software cases means the software that accomplishes that

21  function.  You don't get to back up and say, "It's in

22  there."  It's not pasta sauce.  You don't get to say,

23  "Yeah, it's in there somewhere."  You actually have to

24  pick it out.  You have to identify the structure.  And

25  then you have to ask yourself whether those two are

1  equivalent.  And I've actually got those rules laid out

2  in a little more detail, but that's what has to happen.

3           So, the first thing you have to do is

4  understand what it is the judge has said is this

5  algorithm, what is this construction that we've got to go

6  looking for.  And there are a couple of important parts

7  here.  One is he tells us (reading) the structure

8  corresponding to the claimed function is as follows and

9  equivalents thereof.

10          And he says it's "a general purpose computer

11 programmed to perform the algorithm" --

12          Remember this is in your definitions.  This is

13 the methods that are used to accomplish a software

14 function.

15          -- illustrated in this figure; and in

16 particular, Judge Clark points to a passage in the

17 patent, Column 34, line 28, to Column 35, line 48.

18          I'd like you to note that, ladies and

19 gentlemen.  I'd like you to note that so that you can go

20 and look at it in the patent because you're going to see

21 exactly the algorithm that he has set forth here at those

22 lines.

23          But it's very important because that part of

24 the construction -- that part of the specification gives

25 you a little more information about it.  It's not just

1  the steps.  It's important that you address the entirety

2  of that algorithm.  You've got to look at it as a whole.

3  You can't look at just one part or another part.  You've

4  got to look at that as a whole.

5          So, when we look at that -- let's first remind

6  ourselves of what we're talking about here.  Do you

7  remember Mr. Call's testimony?  Remember Mr. Call's

8  testimony?  Well, he talked about this skipping.  That's

9  what we're doing, the method that this patent uses for

10 skipping.

11         And the method this patent uses is -- if we go

12 back, we can see.  We've got to scan forward in something

13 called a "sequencing file" to locate the next

14 Selection_Record of the appropriate LocType.  Now,

15 Mr. Call told us what that was.  He said, you know, these

16 (indicating) are Selection_Records.  This whole thing is

17 a sequencing file.  And when you scan forward, he was

18 talking about a subject, a subject LocType.  You look for

19 the next matching code.

20         That's how the patent skips.  It doesn't just

21 go to the next one.  It doesn't just go in order, one

22 after the next.  It scans through the file to look for

23 the next appropriate LocType, just like the court says.

24 It scans forward looking for the next Selection_Record of

25 the appropriate LocType.

3021

1    When it finds that, it resets something called

2    the "CurrentPlay variable" to that record number.  So, it

3    doesn't just look for it.  When it gets there, it goes

4    ahead and puts that into the CurrentPlay variable.

5           And then it goes out and fetches something

6    corresponding to that CurrentPlay variable.  It fetches

7    this new program segment that's actually identified in

8    that Selection_Record.

9           It's complicated.  I admit that's complicated,

10   but that's what they patented.  That's what we're looking

11   for here.

12          So, Mr. Call again, he reminds us that when

13   you press that "skip" button, you have to start scanning

14   through the file until you find the next appropriate

15   LocType; and then you do those other things.  You go out

16   and you fetch the file.  You reset the CurrentPlay

17   variable.  You have to do all those steps.

18          And remember the court just told you you can't

19   deconstruct this.  You've got to look at it as a whole.

20   You can't just find one little piece and throw up your

21   hands.  You've got to look at it as a whole.

22          When we look at the specification, we look at

23   the patent -- remember that column and line number that I

24   read to you a few moments ago?  This is what you find

25   when you go look for it.  So, Column 34, lines 32 through

1  36, and 32, lines 1 through 9, this is what you see.

2  They're telling us what that LocType is, and it's a

3  character and an integer -- my apologies.

4          They actually tell us what those codes are,

5  And they tell us how they're used.  They say, look, the

6  Selection_Record is identified by the LocType S and a

7  location field.  Remember, that was the example that

8  Mr. Call took you through, too.  That's ^ subject.  You

9  look for that LocType.

10          But this is a part of the specification that

11  Mr. Schutz didn't pause on at all; and it's important

12  here, ladies and gentlemen.  It's right in the middle of

13  that passage that Judge Clark said that you should look

14  at, and it tells you why you're doing this.  It explains

15  the algorithm in a way that makes you understand what

16  this is really all about.  And it says that you skip to

17  the next subject, which is accomplished by scanning the

18  selection file until the next subject Selection_Record is

19  located.  So, you do exactly what it says; and that

20  causes the intervening material to be skipped.  You can

21  jump over things.  You're not just going to the next one.

22  You can jump over whatever happened to be in the middle

23  there.

24          So, you can see in Mr. Call's example that

25  when they go scanning for the next Selection_Record with

1 an S, you've skipped a whole bunch of those entries.

2 That's what we're talking about here. We're not talking

3 about just moving to the next one or moving to the one

4 before. This specific method is more powerful. It's

5 more powerful. It's got the ability to do these things,

6 And that's what we have to be looking for. That's the

7 algorithm as a whole. That's what the court's

8 construction really talks to.

9 So, what did Dr. Almeroth do? Well,

10 Dr. Almeroth knows that he can't show you that algorithm.

11 He can't. It's not there; so, he can't take that

12 specific set of steps and then show you where to find it

13 because it's just not there.

14 So, he does a couple of things. He said

15 first, just ignore it. You don't need it. You don't

16 need it because in the iPod they're all the same. You

17 know, you're just going from one to the next. So, who

18 cares that you -- you know, the fact that you can't scan

19 forward, it doesn't make any difference.

20 And the illustration of this -- I have to take

21 my friend Mr. Schutz to task for this.

22 Could I have the Elmo, please?

23 This is what he showed you. I don't have his

24 slides from this morning but this is what he showed you a

25 few minutes ago and he said, "Look, this is really what's

3024

1  going on here.  This is going on here."

2          Now, ladies and gentlemen, again, I'm not

3  complaining about somebody using analogies.  I use them,

4  too.  You have to.  This is hard stuff.  But this is kind

5  of made to look like a figure in the patent.  I mean,

6  they use the same font that the patent does; and they

7  make it look like Figure 5.  Well, that's not Figure 5.

8  Figure 5 doesn't look anything like this.  Figure 5 has

9  all those different kinds of LocTypes in it; and when you

10  scan forward, you skip over the intervening material.

11  This is a little out of balance, just a little out of

12  balance, because the reality is, ladies and gentlemen,

13  you do have to have the algorithm.

14          Dr. Almeroth is not right.  Just because Apple

15  doesn't use it doesn't make it useless.  Just because

16  Apple doesn't use it doesn't mean that you can ignore it.

17          So, if I can go back to the slides.

18          The fact is that what he says is, "Look, Apple

19  doesn't have this.  They don't have this physical

20  manifestation of a LocType; so, there's nothing for you

21  to be able to go and look for."  He says, "You don't need

22  to because the next thing is always a song; so, you don't

23  need to know what kind of program it is.  You don't need

24  a type code of any kind."  He says you have to have a

25  concept of a LocType but you don't really have to use it.

1  You never have to go looking for it.

2          But, ladies and gentlemen, that's not what the

3  claim says; and that's not what the law says.  The law

4  says if they're going to stand here and accuse Apple of

5  using their method, they've got to prove to you that

6  Apple actually uses it.

7          Now let's talk a little bit about

8  means-plus-function because Dr. Almeroth's other argument

9  is, "Well, you know, if they're doing it, it's in there

10  somewhere; but I'm just not going to tell you exactly

11  where it is."  But you can't do that.  You can't do that

12  under the law.

13          So, under the law what you have to do is

14  something very particular.  This is

15  means-plus-function -- this is the law of

16  means-plus-function infringement, and Judge Clark just

17  explained this to you.

18          The first thing you have to do -- and this is

19  at page 18 of your instructions.  He says you must

20  identify a structure in the accused device, here in the

21  iPod, that does the claimed function.  You have to do

22  that.

23          Number 2, you have to compare that structure

24  to what Judge Clark has said is in the patent, that

25  algorithm that we just went through.

1        Number 3, you've got to determine whether

2    those two are the same or not, whether they're an

3    equivalent.  And the law says he -- Judge Clark gives you

4    a couple of different methods.  He says you can look at

5    it to see if they do the substantially -- they do the

6    same thing in substantially the same way to achieve the

7    substantially same result.  It's kind of a mouthful, but

8    that's what he has in the instructions.  That's at

9    page 19.

10       And then importantly he says for

11   means-plus-function you have to rely on technology that

12   existed as of the date of the patent, March, 2001.  So,

13   remember that.  We're talking about the date of the

14   patent.

15       So, the fact of the matter is, ladies and

16   gentlemen -- is Dr. Almeroth simply just didn't do this.

17   He never put up the claim construction, Never put up the

18   structure in the patent side-by-side with something from

19   Apple's software and said, "Look, let me explain to you

20   why they're the same."  He just didn't do that.  He just

21   didn't do that.

22       I could tell you, "Look, two of my kids are

23   substantially similar"; and you could believe me or not,

24   I suppose.  But that doesn't let you evaluate my opinion.

25       On the other hand, if I were to say, "Look,

1 two of my kids -- you know, they both like watermelon.

2 They both play soccer.  They're both really loud.  They

3 both, you know, like *SpongeBob*," that would help.  But

4 then if I also told you that one of them is a 17-year-old

5 girl and the other is a 4-year-old boy, you might wonder

6 why my 17-year-old is watching *SpongeBob*; but the reality

7 is you could start to evaluate whether what I'm saying is

8 true or not.

9          The same thing is true in the law.  The same

10 thing is true in the law.  What the law says is that

11 experts like Dr. Almeroth and even Dr. Wicker -- I'll say

12 this about my own expert.  They can't just come before

13 you and say, "Look, these things are substantially

14 similar.  They're equivalent.  I'm going to sit down

15 now."  They've got to tell you exactly why.  They've got

16 to show you that comparison.  They've got to put up that

17 claim language, that claim element that's been construed.

18 They've got to put up the Apple software, and they've got

19 to show you what's similar and what's different.  And

20 Dr. Almeroth didn't even try.  He didn't even try.

21          So, ladies and gentlemen, I don't think there

22 is any evidence you can rely on here.  He just didn't

23 give you anything, despite the 900 hours of work.  And

24 Mr. Schutz took my witnesses to task for how much money

25 they've gotten; but I think Dr. Almeroth's the winner.

1 You know, I think that four-fifty is the biggest number

2 we've heard.

3          But I'm not holding -- I'm not criticizing him

4 for that because I understand he's an expert and people

5 get paid for their time.  But he's got to do his job.

6 He's got to show you that side-by-side comparison.  Where

7 is it?

8          Mr. Schutz used a word, "montage."  I had to

9 lean over and ask somebody what that meant.  He said,

10 "Dr. Almeroth used this montage of evidence."  A montage

11 is not going to do it.  You've got to have a comparison.

12 You've got to show us where that claim structure is so

13 that you can evaluate whether or not there is

14 equivalents.

15          He never talks about that algorithm.  He never

16 tells us anything about the similarities in way or

17 similarities in result, what the law says he's supposed

18 to do that would have been one of his choices.  He could

19 have talked about the insubstantiality of the differences

20 if he had wanted to, but he didn't do that.  He never

21 told you what was different or what was similar.

22          He says it's metaphysical and he says that

23 concept is in there somewhere, but that's not the same

24 thing.  Again, this isn't pasta sauce.  He can't just say

25 it's in there and walk away.  He's got to tell you why,

1  and he's got to convince you that those similarities are

2  so strong that you can conclude that they're an

3  equivalent.

4          The reality is, ladies and gentlemen, the

5  evidence in this case showed that Apple uses a

6  substantially different way, that it's impossible to skip

7  over songs, that you simply go from one song to the next.

8  So, I mean, we have a collection of songs here.  And the

9  fact of the matter is you're going to listen to "Leavin'

10 on Your Mind" by Patsy Cline and then "Blue Suede Shoes"

11 by Elvis and then we have -- the third one is actually a

12 book.  You're going to have to listen to *The Rainmaker* if

13 you're going in order.  If you're just pressing that

14 "skip" button, that's what you get.  That's just the way

15 it works.

16          One thing I should pause on quickly here is

17 just to comment on the fact that this playlist, if it

18 exists at all on the Apple device, it exists in memory.

19 I'm going to come back to that, but I want to just note

20 it here because you heard a lot of testimony about that.

21 It doesn't exist on the hard dive -- I'm sorry -- the

22 Dulcimer database is on the hard drive; but when it gets

23 in memory, it's just bits and pieces.  That file is

24 different when it gets there.

25          We heard from Mr. Boettcher that, in fact --

1 he took us through the code.  You remember how exciting

2 that was.  I know that was everybody's favorite part of

3 the case.  But he stepped us through and he sat there on

4 the stand and he was ready to be asked any question they

5 wanted to ask him.  So, if Dr. Almeroth couldn't find

6 something, they could have certainly asked Mr. Boettcher.

7 And they deposed him earlier in this case.  They could

8 have asked him then as well.

9              And he showed us that code, that

10 GetNextPlaylistTrack code.  And I asked him point-blank

11 does the iPod have any way for you to skip over songs,

12 and he said no.  He said no.

13              And, ladies and gentlemen, that turns out to

14 be a substantially different result.  So, you can't skip

15 over the songs the way that Mr. Call described with

16 respect to this patent.  You don't have that ability to

17 scan forward and load a new code in when you get to the

18 one that you -- the LocType or the other code that you

19 find that's similar.  You've got to go one after the

20 next, after the next.

21              And, ladies and gentlemen, just on this point,

22 let me just say one thing.  Mr. Schutz said that somehow

23 Dr. Wicker had endorsed this summary that Dr. Almeroth

24 had put together, the 771A.  I'm not sure how useful

25 those things are; but in no, way, shape, or form did

1  Dr. Wicker say that that analysis was correct.  What he

2  said was, "I don't know that we have a disagreement about

3  the way the software works."

4          But remember it was Dr. Wicker's opinion that

5  these were substantially different, substantially

6  different.  So, if Mr. Schutz will agree that the experts

7  are of one mind, then we ought to win this case pretty

8  easily, pretty easily.  But I don't want you to be misled

9  by this 771A business.

10          Okay.  Let me offer one more point about why

11  these are substantially different, and this again comes

12  from Mr. Goessling.  So, remember, this is that third

13  inventor that didn't testify in this case live but we had

14  him by depo.  Look at what he said about whether it's a

15  difference to have to go through one after the next,

16  after the next the way Apple does it versus the scanning

17  forward to the next appropriate LocType, the way the

18  patent does it.

19          And he says, well, you know -- he was asked

20  (reading) but I'm trying to understand how that differs

21  from the just "skip to the next track" button on a CD

22  player.  And that one goes one to the next, to the next.

23          And he says, "Well, if you did what you

24  described with the one-level controller" -- and that's

25  the CD player -- "and with what we wanted to do, you'd

3032

1  have an article with, you know, 50 tracks.  You'd have to

2  do 50 little jumps because it wouldn't know anything

3  about the hierarchy, where we might be able to do it in

4  two jumps because you'd skip all the detail and get to a

5  different topic."

6           So, what does that mean?  That if you use his

7  invention, you can just skip through 50 in just two

8  jumps.  Just two jumps.  But if you're going to use the

9  50 little jumps approach, that's not convenient.  It's a

10 different result.

11          And, ladies and gentlemen, that's real

12 evidence.  That's the kind of thing that you can use to

13 conclude that the method for skipping that Apple uses is

14 different from that algorithm that Judge Clark said the

15 claims use.

16          All right.  Let me get to the algorithm for

17 repeating.  This is also in "means for" format; and it

18 appears in these two claims, claim 1 of the '076 patent

19 and claim 1 of the '178 patent.  This is the construction

20 and Mr. Schutz didn't really show you this, but I'll

21 dwell on it for just a moment because the key here is

22 this final part of the limitation.  You've got to have

23 the whole algorithm.  I'm not walking away from that.

24 But the idea is that you repeat the steps until the last

25 Selection_Record is reached, and that has to reset the

1 CurrentPlay variable to 1.  So, you have to get to a

2 Selection_Record that tells you to go back to the

3 beginning.  That's sort of a way to summarize it.

4          Mr. Call explained this; and he said, well,

5 what we're talking about here -- I'm sorry.  Let me start

6 with the patent again.  This is the passage that the

7 court refers you to in that claim construction.  And

8 Mr. Schutz said the R record doesn't appear anywhere in

9 the claim construction.  That's not right.  That's not

10 right, because the court says, "Go look at this passage."

11 And when you go look at this passage you see that R

12 Selection_Record.  It's right in there.  He can argue

13 equivalents.  He can argue that you can use other codes

14 or something else like that, but he can't run away from

15 the construction.  That's what the construction is.

16          And we see that in Figure 5, that when you get

17 to the end of the file, there is an R; and that tells the

18 computer you've got to go back to the beginning.  And

19 Mr. Call confirmed that.  He talked about the R; and he

20 said, when you get to the R -- "Okay.  And it did that by

21 getting to the R record and the R record indicated that

22 you should interpret the integer to be 'go to the first

23 record in the selections table --'"

24          "Answer:  Right."

25          So, when you get to that R record, a

3034

1  Selection_Record with an R, you've got to go back to the

2  beginning.

3           What's the evidence show?  The evidence

4  doesn't show anything like that.  Mr. Boettcher said

5  there is a flag that you set in the settings application.

6  It's not in the playlist, which is what they say is the

7  sequence file or the Selection_Records.  There is nothing

8  in the Selection_Records that do this.  He said it's a

9  separate part of the iPod that you deal with, that the

10  user has to go in and set this flag.

11          Dr. Wicker confirms this and he said, "Look,

12  the Selection_Record is simply not there."  The Apple

13  products don't have this sequence file with a

14  Selection_Record.  They just use a different mechanism.

15          But again, ladies and gentlemen, where from

16  Dr. Almeroth is that side-by-side comparison?  Where does

17  he take the construction the judge gave us and compare it

18  to some code in the Apple devices?  It's just missing.

19  So, again, you can't make your equivalents determination.

20  He didn't even try.

21          So, I'm going to mark that one off as well.

22          Now let me go through the important hardware

23  differences here.  And I am running a little low on time;

24  so, I'll speed it up.  So, there were a number of

25  hardware things that we talked about in this case; and

3035

1  these are all means for limitations.  So, that same

2  equivalents analysis has to obtain.

3          We start with the means for -- you've seen

4  these.  These are the rules for equivalents.  You've got

5  to identify the structure, and then you've got to compare

6  them and make an equivalents determination.  So, let's do

7  that with each of them.

8          We start with the means for reproducing, and

9  that's a sound card versus a codec.  And this is in

10  claims 1 and 14 of the '076 and claim 1 of the '178.

11          Now, this one Dr. Almeroth actually did the

12  comparison on.  So, he knows how to do this.  He knows

13  how to do this.  He said, "Look, you've got a sound card.

14  That's what the court's claim construction talks about.

15  And in the Apple devices there is a codec chip."  And he

16  said, "I'm going to compare those two things."  So, he

17  did the first part of the means-plus-function analysis

18  correctly.

19          The problem is, ladies and gentlemen -- is

20  this really believable?  He said, "Look, a sound card,

21  which is this big card with lots of chips on it and lots

22  of interfaces, is the same thing as just one little

23  chip."  That's like saying that, you know, one piece of

24  furniture is the same as your whole house.  You know, the

25  furniture is inside the house; but it's not the same

3036

1   thing.

2           DEPUTY CLERK:  Mr. Cordell, you have ten

3   minutes.

4           MR. CORDELL:  And the sound cards are built

5   for computers, not for embedded music products; and that

6   means that it was just built for a different purpose.  We

7   got that from Mr. Fadell.

8           Remember that timing is important.  You've got

9   to make this determination in March, 2001.

10          I'd just like to point out quickly that there

11  are interfaces on the sound card.  You could plug

12  headphones into that sound card.  You can't do that with

13  a chip.  None whatsoever.

14          This means for receiving, ladies and

15  gentlemen, we had a lot of discussion about that; and

16  this has to do with an infrared link for downloading from

17  the Internet.

18          And you heard a lot of evidence about whether

19  IrDA is the same as FireWire.  Notice this, ladies and

20  gentlemen.  You're talking about a one-hundredfold

21  difference between the speeds of those two things.

22  One-hundredfold.

23          Mr. Schutz said, "Look at Apple's patents.

24  Apple's patents talk about those two issues."  Well,

25  ladies and gentlemen, look at those patents.  They're the

1  wrong dates.  They're the wrong dates.  They're too late.

2  Remember, March, 2001, is the date you've got to use.

3  March, 2001, is the date you've got to use.

4         And the fact of the matter is it's undisputed

5  that if you took eight minutes to download music using

6  FireWire, it would take you 800 minutes with IrDA.  It's

7  just not practical; and, so, it's not an equivalent at

8  the end of the day.

9         You can also consider patents.  The judge said

10  you can consider patents.  It's not dispositive; but if

11  Apple gets a patent, that means the two things are

12  different.  Well, ladies and gentlemen, there are 25

13  patents on this FireWire technology.

14         There is also this business about contact with

15  the Internet.  The evidence shows that an *iTunes* computer

16  could be set up completely with your own CDs.  It never

17  has to go to the Internet.  So, they never actually

18  offered you any evidence that these things go out to the

19  Internet.  That's another problem they've got.

20         The means for accepting, the keyboard versus a

21  quick wheel, ladies and gentlemen, I'm going to leave

22  that one to you because I just think that you can decide

23  whether a keyboard is the same thing as three buttons on

24  an accelerator wheel.  That's not a keyboard.

25         And remember Apple has got its own patent for

3038

1  this, and they don't give you a patent unless it's

2  different.  And you can use the fact that it's been

3  patented as evidence of the differences, that there is no

4  equivalents, that these two are not the same.

5         And the means for storing, ladies and

6  gentlemen, it's just one issue; and that is, remember the

7  time here.  It is March, 2001.  And in March, 2001, you

8  couldn't say these were the same.  The chips would cost

9  over $3,000.  The hard drive was 200.  That's a

10  substantial difference.

11        Let me get to validity quickly, ladies and

12  gentlemen, because I'm -- actually, I've got to do the

13  request to initiate.

14        This is the doctrine of equivalents issue

15  where -- remember the issue here is which part of the

16  system requests the transfer and this is the court's

17  actual construction.  The court's actual construction was

18  that the player has to request the transfer; and that's

19  what we see up on the screen, that the player makes the

20  request.

21        But Dr. Almeroth said, "Look, this is a USB

22  device; and in the USB device, it's not the player.  It's

23  the host that initiates all transfers.  So, it's exactly

24  backwards."

25        And, in fact, he even admitted it's the

1  computer that does it.  It's exactly backward.

2          These are USB devices, ladies and gentlemen.

3  He said they all work the same.  Well, ask yourself.

4  What is a mouse requesting from a computer?  What kind of

5  a request is the mouse sending out?  Because he said they

6  all work the same.

7          The fact of the matter is he never showed you

8  that comparison.  He never showed you why they were the

9  same or different, and he can't make out equivalents on

10 that case.

11         The evidence was undisputed that the iPod

12 never makes a request of any kind.  And Dr. Wicker tells

13 you that doing it exactly backwards, that's a substantial

14 difference.

15         Validity, ladies and gentlemen, I'm going to

16 have to go through quickly.  I apologize.  But you heard

17 the evidence.  You saw Mr. Novacek.  And, yes, he was

18 paid for his time.  He's a consultant here.  He's a

19 consultant.  But you saw the system.  You saw him take

20 you through it step by step by step, through every step

21 of those claims.

22         Mr. Schutz says there's no source code.  He

23 should know better than that, ladies and gentlemen,

24 because he knows that the source code that they were

25 talking about is different from what was running on the

1  machine in front of you, that that machine in front of

2  you, the source code was not available.  So, he shouldn't

3  suggest to you that somehow that source code was

4  someplace and nobody looked at it.  That's just not true.

5          But the reality is you saw Mr. Novacek and you

6  saw him take you through those one at a time and he took

7  you through every element of the claims.

8          We had a lot of discussion about the

9  downloading and whether or not DAD could download, and

10  you all saw it.  You saw the little red light flashing as

11  it was downloading the files.  So, ladies and gentlemen,

12  the reality is you heard the evidence.  You saw it, and

13  I'll leave it to you to determine whether or not these

14  patents remain valid.

15          One last point on DAD.  The Patent Office

16  didn't consider this; so, this wasn't prior art that was

17  put in front of the examiner.  They didn't have the DAD

18  system.  They didn't have that full DAD manual.  And, so,

19  that's information -- remember the instructions say you

20  can give that a little extra weight because the Patent

21  Office didn't get to see it.

22          Sound Blaster is another piece of the prior

23  art.  It shows you unequivocally that playlists were in

24  the prior art.  It's simply incorrect to suggest that

25  they weren't.

1          Let me get to damages in the last few minutes

2     that I have.  Remember Mr. Logan's testimony about the

3     fact that the Patent Office can make mistakes.  He's

4     right about that.

5          Let's talk about damages.  Let me say

6     absolutely positively we believe no damages are due.

7     That's an absolute.

8          But remember what we're doing.  We're

9     pretending we're at that negotiation between the two

10    parties, and they're having to discuss what might be due.

11    The first thing you take off the table is anything that

12    has nothing to do with the patent, the contributions that

13    Apple made.  They don't get money for that.  You can't

14    reap where you didn't sew.  So, they don't get money for

15    what Apple came up with.  They don't get money for what

16    other people came up with, the playlists that were in

17    Sound Blaster or the downloading that DAD showed you.

18         The reality is that iPod sales are driven by

19    all kinds of things that have nothing to do with these

20    patents.  So, when they are asking you for a per-unit

21    royalty, that doesn't make sense.  They shouldn't make

22    money because Apple is doing all these things and

23    reducing the prices and otherwise making the products

24    better.

25         We don't have an established royalty in this

3042

1  case.  Despite the eight years that went by, they can't

2  show you a license that happened in here or products that

3  were sold.  So, when we're looking for capability, the

4  Kelley Blue Book or comparability for real estate, we

5  don't have them.

6          Mr. Schutz doesn't like my licenses.  He

7  doesn't like the E-Data license or the Digeo license; but

8  he didn't show you any, not a single one, not one single

9  comparable license.  So, he may not like mine but that's

10  the evidence we have, ladies and gentlemen, and he didn't

11  come up with anything else.

12          Let me pause briefly on the playlist patent.

13  I think this is a compelling piece of damages evidence.

14  They got up in an auction, a free-market auction, and

15  sold this patent for $400,000.  $400,000.  And you can

16  consider that.

17          The Concert Technology business, they tried to

18  minimize it.  They said that wasn't any big deal.

19  Remember all the communications back and forth between

20  Mr. Logan and Mr. Farrelly and the other people at

21  Concert.  They had extensive discussions leading up to an

22  offer by Concert in the low millions and an offer by

23  Mr. Logan to sell for 5 million, all of the patents.

24          The reality is, ladies and gentlemen, that

25  their demand is off the chart.  $84 million is so much

3043

1  bigger than any of the other numbers that were in the

2  marketplace, it simply makes no sense.

3          Mr. Nawrocki included things in his

4  allocation -- It was a blur of evidence that he put up,

5  but he included things in his allocation that are not

6  proper.  He included playlists from *iTunes*, and the judge

7  just told you that's not proper.  You can't do that.  You

8  have to disregard evidence of damages based on *iTunes*.

9  And Mr. Nawrocki did that.  It's in his testimony.

10          He said, in fact, that --

11          "You count those twice?

12          "Yes.

13          "One on *iTunes* and one on the iPod?

14          "That's correct."

15          He included things within *iTunes* in this

16  25 percent allocation he did up here.  He's taking

17  damages on *iTunes*.  He can't do that.

18          So, with that, ladies and gentlemen, let me

19  just pause briefly about the verdict form.  We want you

20  to answer "no" on infringement.  I don't have time to go

21  through it on the Elmo.  We want you to say "no" to every

22  question on infringement.  Remember, you only heard

23  evidence about one claim.  One claim.  So, you could

24  decide, if you thought that evidence was sufficient, all

25  of the other claims were not infringed because they just

3044

1  didn't prove them.  They just didn't prove them.

2         We want you to answer "yes" on all of the

3  validity questions.

4         And then as to damages, you could put

5  $5 million in the lump-sum blank.  That's what we think

6  is appropriate here.  You heard all of this evidence

7  about a lump sum, and we think that's appropriate.

8         However, if you don't think 5 million is the

9  right number, that's okay.  Like Mr. Schutz, you can put

10 whatever number you want in there.  You might decide

11 that, in fact -- and I apologize.  Remember

12 Mr. Nawrocki's opinion?  I've got to comment about that.

13 He said for one patent -- for two patents it's 90 cents.

14 For one patent it's $1.30.  I guess if he was selling

15 apples, you'd get 90 cents for two apples, a

16 dollar-thirty for one apple; and if there's no apples, it

17 would be $2.  And that doesn't make sense, and you can

18 take that into account.

19        But remember all of the factors that they had

20 at the negotiation.  Remember the fact that they had the

21 playlist patent for $400,000.  Both sides knew that.

22 They knew that Mr. Logan had offered to sell the patents

23 for 5 million.  There were comparable agreements of five

24 hundred and seven-fifty.  Nobody knew if the product was

25 going to sell.  And remember that Apple was just renting

3045

1  here.  They weren't buying.  They weren't getting these

2  patents.  They weren't getting the patents the way they

3  were for four hundred here or 5 million.  So, you can

4  decide that it would be reasonable that 400,000 is a

5  right number or perhaps five hundred or seven-fifty or

6  $5 million.  I'll leave that to your judgment.  But one

7  thing that's clear is that $84 million is just way off

8  the charts.

9          And with that, ladies and gentlemen, I think

10 I've exhausted my time.  I won't argue the verdict form.

11 I just want to remind you again of the way those

12 witnesses treated that product, the way they looked at

13 this iPod and the way they told you about how they hoped

14 some day to tell both their kids and their grandkids that

15 they had a part in bringing this into all of our lives.

16 And with that, I ask you to -- again I thank you for your

17 time and patience and appreciate a fair verdict.  Thank

18 you.

19          THE COURT:  All right.  Mr. Schutz.

20          MR. SCHUTZ:  Thank you, your Honor.

21          Ladies and gentlemen, I just have a few

22 moments; and I guess I did forget to introduce myself.  I

23 have been married for 34 years, and I have 3 kids.  I may

24 win the longest marriage contest, although I can't

25 remember how long Larry has been married.

1    I grew up on a farm in southern Minnesota.

2  I'm not from Texas.  I have a daughter that lives here

3  but -- and I was the first one in my family to go to

4  college.  But despite my having gone to college and where

5  I grew up, the smartest, smartest person I ever met,

6  smartest person I know today, is my mom.  And my mom

7  always says to me, "Ron, you can listen to what people

8  say; but watch what they do."  All right?  And her

9  advice, I think, is well put when --

10    THE COURT:  Can we change the control on

11  the --

12    DEPUTY CLERK:  I'm sorry.

13    MR. SCHUTZ:  And, so, I'd like to put

14  something up here.  This is on the skip forward, the

15  LocType issue.  And this is the algorithm, and I believe

16  that Mr. Cordell said that they don't skip over anything.

17  Okay?  And if my mom would have heard that, she'd have

18  said, "Ron, he said it doesn't skip over.  Is that

19  required?"

20    I'd say, "Well, let's take a look.  Let me

21  see.  You scan forward.  You reset.  You fetch.  Nothing

22  about skipping over."

23    And then my mom might say, "Well, what about

24  this appropriate LocType?"

25    And I'd say, "Well, mom, the LocTypes can all

1  be the same kind.  There's been testimony that they can

2  all be songs."  Okay?  You don't have to have songs and

3  different things, and that was the purpose -- I made it

4  very clear that that little chart I put in there was not

5  from Figure 5, but it was based on Figure 5 because the

6  expert said it could all be a single LocType.

7           And I can't find an R in there, either, that

8  you've got to have this R.

9           Then on the software, well, there was this

10  statement made that Dr. Almeroth never, you know, showed

11  the claim limitation and where it's found in the

12  software.  We spent a ton of time on this chart.  We had

13  it up there a long time.  That's the claim language and

14  the court's definition.  Dr. Almeroth talked about this,

15  that they all have it.

16           And then I showed it to you -- went into the

17  actual source code and Dr. Almeroth did all those things

18  to show you that, in fact, it looks, scans ahead,

19  fetches, goes to the next Selection_Record, just exactly

20  the way the claims say it has to be done.

21           DEPUTY CLERK:  Mr. Schutz, you have four

22  minutes.

23           MR. SCHUTZ:  Thank you.

24           Ladies and gentlemen, you know, I also -- I

25  got my start as a lawyer in the Army and I was a

1  prosecutor in the Army with the 7th Infantry division and

2  when I was a prosecutor, it was a typical defense tactic

3  to try the victim, to try the victim.  And that happened

4  here, too.  The first chance, the first chance that an

5  Apple lawyer had to talk to Mr. Logan, he accused him of

6  being a tax cheat.  And then, of course, starts out the

7  argument saying, "You know, I'm not going to mention that

8  there is a pink elephant in the room.  Don't think about

9  a pink elephant.  Let me just call Mr. Logan a tax cheat

10 again."

11         Well, as we know, what happened -- and

12 Apple -- this is one of the most powerful, richest

13 corporations in the world -- accused Mr. Logan of being a

14 tax cheat, when what happened was Mr. Logan's company

15 failed to file a form that says they don't owe any taxes.

16 And overnight, overnight we were able to get that fixed,

17 put in evidence the certificate that said, "You don't owe

18 any taxes.  Everything is fine."  I thought that was the

19 end of it.

20         I've got to tell you, I was a little

21 flabbergasted to see him come in again and say, you know,

22 "I'm just not going to talk about the fact that Mr. Logan

23 cheated on his taxes."  Excuse me?  But, you know, I saw

24 that repeatedly when I was prosecuting criminals in the

25 Army.  It was blame the victim, and that's what -- that's

1    exactly how they started the case here.

2         One final thing, ladies and gentlemen, on the

3    iPod.  It's a great product.  I own a couple of them.

4    I've bought them for my kid.  We're not saying the iPod

5    isn't a great product.  All we're saying is, "Look, some

6    of what's in that iPod, we actually came up with that

7    first"; and the law says you don't have to copy.  We

8    don't have to prove they stole it.  We went to the Patent

9    Office first, way before anybody else and we got a piece

10   of the technology here and we should be compensated for

11   it and we should get some piece every time they sell one.

12   That would be fair.  That would be the fair thing to do.

13   And Apple doesn't want us to do that.

14        Let there be no doubt, ladies and gentlemen,

15   what they want you to do is they want you to kill these

16   patents.  They want you to take these patents; and they

17   want you to toss them in the wastebasket and say, "We'll

18   kill them even though we didn't look at any prior art,

19   even though the burden is by clear and convincing

20   evidence."

21        They want you to -- if you don't kill the

22   patents, they want you to award a lump-sum amount so that

23   there's no sharing in the success of the product even

24   though not a single Apple employee came in here and said,

25   "We don't need it.  Thank you very much.  We'll give you

1  a lump sum for what you did.  We're going to do something

2  different in the future.  We're going to take it off.  We

3  don't need it.  We're not willing to give you any credit,

4  any credit for the next million, 2 million, or 100

5  million units we sell, none, zippo, nada, even though we

6  won't take it off.

7          I think I'm out of time.  You guys have been

8  sitting there for a long time.  Again, there are very few

9  things that Mr. Cordell and I agree on.  Okay?  But one

10  thing we both agree on is that it's very important what

11  you do and we thank you very much for your service.

12          Thank you very much.

13          THE COURT:  All right.  Ladies and gentlemen,

14  this will be very brief.  It is your sworn duty as jurors

15  to discuss the case with one another in an effort to

16  reach agreement if you can do so.  I remind you of my

17  instruction on page 2.  Answer each question based on the

18  facts as you find them.  Do not decide who you think

19  should win and then answer the questions accordingly.

20  You need to go through these forms and answer the

21  questions based on the facts.

22          Each of you must decide the case for yourself,

23  but only after full consideration of the evidence with

24  other members of the jury.  While you are discussing the

25  case, do not hesitate to reexamine your own opinion and

3051

1  change your mind if you become convinced that you are

2  wrong.  However, don't give up your honest beliefs solely

3  because others think differently or merely to finish the

4  case.

5          Remember that in a very real way, you are the

6  judges.  You are the judges of the facts.

7          Don't let bias, prejudice, or sympathy play

8  any part in your deliberations.  This case should be

9  considered and decided by you as an action between

10  persons of equal standing in the community, of equal

11  worth, and holding the same or similar station in life.

12          A corporation is entitled to the same fair

13  trial at your hands as a private individual and should be

14  treated as such.  The law is no respecter of persons; all

15  persons, including corporations and other organizations,

16  stand equal before the law and are to be dealt with as

17  equals in a court of justice.

18          When you retire to the jury room to deliberate

19  on your verdict, you will take the charge with you as

20  well as the exhibits the court has admitted into

21  evidence.  When you go to the jury room, the first thing

22  you should do is select one of your number as foreperson

23  who will help guide your deliberations and will speak for

24  you in the courtroom.  The foreperson should read or have

25  another juror read the instructions to the jury, and you

1  should then begin your deliberations.

2        If you recess during your deliberations,

3  follow all of the instructions I've given you on your

4  conduct during the trial.  Don't discuss the case unless

5  all jurors are present in the jury room.  So, if there is

6  some kind of a break, wait until everybody is back before

7  you discuss.

8        After you have reached your unanimous verdict,

9  your foreperson should fill in your answers on the

10  original written question form, that verdict form I

11  showed you a copy of, and initial and date that verdict

12  form.  Do not reveal your answers until such time as you

13  are discharged unless otherwise directed by me.

14        You must never disclose to anyone, not even to

15  me, your numerical division on any question.  Now, if you

16  want to communicate with me at any time, give a note, a

17  written message or question to the court security officer

18  who will be outside the door.  He'll bring it to me.

19  I'll respond as promptly as possible, either in writing

20  or by having you brought back into the courtroom so I can

21  address you orally.

22        The presiding juror or any other juror who

23  observes a violation of the court's instructions shall

24  immediately warn the one who is violating the same and

25  caution the juror not to do so again.

1          Now, after you've reached a verdict, you are

2   not required to talk with anybody about the case unless

3   the court orders otherwise.  You may now retire to the

4   jury room to conduct your deliberations.

5          Ms. Mullendore will go ahead and give you the

6   additions so that you can each have your own copy.  You

7   can leave at this time.

8          (The jury exits the courtroom, 11:36 a.m.)

9          THE COURT:  Okay.  We need a break.

10          MR. CORDELL:  I apologize about that, your

11  Honor.

12          THE COURT:  No.  That worked out just fine,

13  too.  I was just trying to give each of you a break if

14  you needed it, but it worked out.

15          I think the smart thing to do, the way we are

16  now, is just go ahead and break for lunch and then come

17  back and start with the evidence on *laches* and

18  inequitable conduct.  So, what I'm going to do is we're

19  going to recess; and I'll ask you to be back here at 1:00

20  for us to get started.  Okay?  Is there anything --

21          MR. CORDELL:  No, your Honor.  Thank you.

22          THE COURT:  All right.  In that case we'll be

23  in recess until 1:00.

24          I do need somebody -- some unfortunate person

25  to remain around the courtroom in case a message comes

3054

 1  back because if a note comes from the jury, I'm going to

 2  be in chambers and we'll just deal with it right on the

 3  spot.

 4          MR. CORDELL:  We will, your Honor.

 5          (Recess, 11:37 a.m. to 1:02 p.m.)

 6          (Open court, all parties present, jury not

 7  present.)

 8          THE COURT:  Okay.  I think we're now ready for

 9  the bench portion on inequitable conduct and *laches*.  I

10  guess the burden is on Apple on these; so, who do you

11  want to call first?

12          MR. STEPHENS:  Your Honor, Apple calls

13  Mr. Charles Call.

14          THE COURT:  Okay.

15          You remember, sir, that you're still under

16  oath?

17          THE WITNESS:  I do.

18          THE COURT:  All right.  Please be seated.

19          Go ahead, counsel.

20          MR. STEPHENS:  Thank you, your Honor.

21          <u>DIRECT EXAMINATION OF CHARLES CALL</u>

22          <u>CALLED ON BEHALF OF THE DEFENDANT</u>

23  BY MR. STEPHENS:

24  Q.    Good afternoon, Mr. Call.

25  A.    Good afternoon, Mr. Stephens.

3055

1  Q.     You testified as Personal Audio's corporate

2  representative pursuant to Federal Rule 30(b)(6) on the

3  topic of the reasons for not filing suit on the

4  '076 patent earlier, right?

5  A.     I'm sorry.  I don't recall what the topics were.

6              MR. STEPHENS:  Your Honor, may I enlist

7  Mr. Nguyen to distribute some binders?

8              THE COURT:  Please.

9              MR. STEPHENS:  Your Honor, may I approach?

10             THE COURT:  No.  I want Mr. Nguyen or nobody.

11             (Mr. Nguyen enters courtroom.)

12             MR. STEPHENS:  Here he is.

13             Well, Mr. Cordell will be able to substitute.

14             MR. CORDELL:  I'll assist Mr. Nguyen, your

15 Honor.

16             MR. STEPHENS:  Thank you, your Honor.

17             THE COURT:  I've just received Jury Note

18 Number 2.

19             Jury Note Number 1 was the foreman, who was

20 Juror Number 4.

21             Jury Note Number 2 is a request for a

22 15-minute break.  What I propose to do is inform the

23 court security officer he can tell them they can take a

24 break but remind them not to deliberate until all of them

25 are back in the room.

3056

1        Any objection to me having the court security

2  officer handle it that way rather than by written note?

3            MR. SCHUTZ:  No objection from Personal Audio.

4            MR. CORDELL:  None from Apple, your Honor.

5            THE COURT:  Okay.  The court security officer

6  is here in the room.

7        Would you just please tell the jury they may

8  take a break, and for 15-minute breaks they can do that

9  when they wish.  If it's going to be like a dinner break

10  or an overnight break, I do need a note from you so I can

11  give them some instructions.

12            COURT SECURITY OFFICER:  Yes, sir.

13            THE COURT:  But just remind them please don't

14  deliberate until they're all back in the room.

15            COURT SECURITY OFFICER:  Yes, sir.

16            THE COURT:  Okay.

17        Go ahead, counsel.

18            MR. STEPHENS:  Thank you, your Honor.

19  BY MR. STEPHENS:

20  Q.   Mr. Call, near the back of the binder that you now

21  have before you, there is a tab that says "PA's

22  Objections to Apple's 30(b)(6) Depo Notice."  It's near

23  the very back.  It's the third tab from the end.

24            THE COURT:  I thought your point on this

25  one -- wasn't it that he didn't testify about a bunch of

1  things?

2          MR. STEPHENS:  Well, there is that, your

3  Honor; but this is affirmative testimony that he did not

4  know why Personal Audio did not --

5          THE COURT:  Oh, okay.

6          MR. STEPHENS:  -- file suit earlier.

7          THE COURT:  All right.  Because I wasn't

8  really too interested in what he refused to testify about

9  because he wasn't going to testify about it here either.

10          MR. STEPHENS:  Well, fair enough; but this is

11  a little bit different.

12          THE COURT:  All right.

13  BY MR. STEPHENS:

14  Q.     Are you with me, Mr. Call?

15  A.     I have the document in front of me, yes.

16  Q.     Okay.  If you'd turn to page 16 of that document.

17  A.     Okay.

18  Q.     About halfway down the page there are objections

19  to Topic 28; and just above that it refers to the topic

20  itself.  It says, "28.  The reasons for not filing suit

21  on the '076 patent earlier."  Do you see that?

22  A.     I do.

23  Q.     And then below that it gives the objections; and

24  it says, "Subject to Personal Audio, LLC's, general and

25  specific objections, it will designate Charles Call to

1  testify on this topic on either October 7 or 8, 2010."

2  Do you see that?

3  A.    I see that.

4  Q.    And you did, in fact, testify on that topic at

5  that deposition, right?

6  A.    I don't recall when I testified, but I did

7  testify.

8  Q.    Okay.  Well, at that deposition I asked you, "Why

9  Personal Audio waited until 2009 to file suit on the '076

10 patent against Apple?"

11         And you said you did not know, right?

12 A.    I -- if that's what I said, that's what I said.

13 Q.    Okay.  Let's take a look and make sure.  The next

14 tab is Volume 1 of your deposition.  And if you'll turn

15 to page 219, please, sir.

16 A.    Do I have the deposition?

17 Q.    Yes, the next tab in your binder after the tab we

18 were just at, near the back.

19 A.    What page?

20 Q.    219.

21 A.    I see the question by you, "Why did Personal Audio

22 wait until 2009 to file suit on the '076 patent against

23 Apple?"

24         There was an objection.

25         I said, "My difficulty with the question is

 1  privilege, and I think the fair answer is I don't know."

 2  Q.     And those are your words, right?

 3  A.     Yes, they were.

 4  Q.     Thank you.

 5         Now, when I asked you when Personal Audio

 6  decided to sue Apple on the '076 patent, you declined to

 7  answer on the ground of privilege, right?

 8  A.     Yes, sir.

 9  Q.     Okay.  Now, you were also Personal Audio's

10  corporate designee pursuant to Federal Rule 30(b)(6) on

11  another topic which I'll direct you to.  It's back in the

12  document we were just looking at, the objections, on

13  page 5, Topic Number 6.  And that topic is "All facts and

14  circumstances relating to how and when Personal Audio

15  (including, without limitation, Charles Call and James

16  Logan individually) first became aware of Apple's accused

17  products, including without limitation:  One, the date of

18  Personal Audio's first awareness of Apple's accused

19  products; two, any and all uses, analyses, examinations,

20  or investigations of Apple's accused products conducted

21  by or for Personal Audio prior to the assertion of its

22  claims against Apple; three, identification of all

23  persons with information relating to any such uses,

24  analyses, examinations or investigations."

25         Did I read that correctly?

3060

1  A.     I think you did.

2  Q.     And then down below that, it says that (reading)

3  subject to the objections, Personal Audio would designate

4  Charles Call to testify on this topic.

5         Right?

6  A.     That's right.

7  Q.     And you testified on this topic, right?

8  A.     Once again, I don't recall testifying on any

9  particular topic; but I testified at length for over two

10 days.

11 Q.     Okay.  And at that deposition you testified that

12 you did not remember when anyone involved with the

13 '076 patent became involved with any device that

14 potentially infringed, right?

15 A.     Yes, sir.

16 Q.     And you testified you did not remember whether

17 that happened before or after the '076 patent issued,

18 right?

19 A.     I don't recall that.

20 Q.     Okay.  Let's take a look.  It's at page 164 of

21 your deposition, starting at line 4.  I asked, "When, to

22 your knowledge, did anyone involved with the '076 patent,

23 after it issued in March of 2001, become aware of any

24 device that potentially infringed?"

25         You responded, "Are you asking for the first

 1  time?"

 2              And then I said, "Yes.  Actually, let me

 3  change the time limit there so it doesn't necessarily

 4  have to be before -- excuse me, after the issuance,

 5  because sometimes people --"

 6              And you said, "Right."

 7              And I said, "-- know what they have pending

 8  and start to think about products that might be out there

 9  that might infringe when it does issue."

10              And your answer was "Right.  I don't remember.

11  I don't remember."

12  A.    Yes.  You read that correctly.

13  Q.    Okay.  And, so, in fact, you could not remember

14  whether or not Personal Audio first became aware of

15  devices that potentially infringed even before or after

16  the '076 patent actually issued, right?  Well,

17  actually --

18  A.    Well, I think -- I certainly don't -- I did not

19  remember when I knew.

20  Q.    Okay.  And you were testifying on behalf of

21  Personal Audio as to --

22  A.    Yes, sir.

23  Q.    -- on that topic as well, right?

24  A.    Yes, sir.

25  Q.    Okay.  And just below the portion I read, I asked

1 you, "Do you remember whether it was before or after the

2 patent issued, the '076 patent?"

3          And you said, "Before what?"

4          And I said, "The time when someone who had --

5 who was involved with the '076 patent or its application

6 became aware of some device out there in the real world

7 that might infringe."

8          And your response, at the top of page 165, is,

9 "You know, I can't -- I don't remember."

10          Is that right?

11 A.     You've read that correctly, yes.

12 Q.     And those are your words, right?

13 A.     They are.

14 Q.     You also could not remember when you first became

15 aware of hardware or software systems that would allow

16 you to play back playlists, right?

17 A.     Yes, sir.

18 Q.     And you could not remember when you learned that

19 Apple products used playlists, right?

20 A.     That's correct.

21 Q.     You could not remember when you first became aware

22 of the iPod, right?

23 A.     Yes.  I don't know when I first became aware of

24 the iPod.

25 Q.     And you declined to tell me when anyone involved

1   in the '076 patent first began to believe that an iPod

2   might infringe, citing attorney-client privilege, right?

3   A.     That's correct.

4   Q.     You also declined to tell me whether anyone

5   involved with the '076 patent ever undertook an

6   investigation of the various players on the market to

7   determine if they infringe, again citing privilege,

8   right?

9   A.     I don't recall that.

10  Q.     Okay.  Well, let's take a look at page 170 of your

11  deposition.  And I asked you, at the top of the page,

12  starting at line 1, "Did anyone, to your knowledge,

13  involved with the '076 patent ever undertake an

14  investigation of the various players that were on the

15  market to determine whether or not they might infringe?"

16          And you answered, "Privileged."

17  A.     Yes, sir, I did.

18  Q.     Okay.  You also declined to tell me whether anyone

19  was ever tasked with policing the market for products

20  that infringe the '076 patent, again citing privilege.

21  A.     Yes, sir.

22  Q.     And when I asked you what kind of investigation

23  Personal Audio had undertaken to determine whether Apple

24  infringed, you declined to answer again on privileged

25  grounds.

3064

1  A.      Where are you now?

2  Q.      This is at page 219.

3  A.      Can you show me that?

4  Q.      Sure.

5          Starting at line 14, "What kind of

6  investigation of the iPod was undertaken in order to

7  determine whether or not to file suit?"

8          Answer, "I think that's privileged."

9  A.      Yes, sir, that's what I said.

10         MR. ARENZ:  Your Honor, I think I'm going to

11 object to this line of questioning to the extent

12 Mr. Stephens is trying to elicit some sort of adverse

13 inference based on a privileged objection.  He hasn't

14 challenged the privileged objection at any point in this

15 case.  I think it's incorrect to now use that against

16 Personal Audio.

17         THE COURT:  Well, don't you run into a problem

18 here?  When they send you a 30(b)(6) notice, you're

19 supposed to send the person who knows and then that

20 person doesn't answer.  I just sent a note to

21 Ms. Mullendore, "Does attorney-client privilege excuse

22 someone from complying with 30(b)(6) requirements?"

23         I mean, I think we're taking a long time to

24 get to it; but isn't that your point, Mr. Stephens, is

25 that basically they have no defense since you gave them a

1  30(b)(6) notice?  They gave someone who said he didn't

2  know or wouldn't answer; so, thus, given the presumption

3  of *laches*, they're doomed?

4          MR. STEPHENS:  Exactly right, your Honor.

5          THE COURT:  Okay.  And your point -- I mean,

6  how do you meet that?  You've got a 30(b)(6) notice.

7  Under the rules and the cases, under 30(b)(6) you're

8  bound by what is said.  You're required to come up with a

9  witness.  You're required to educate that witness and

10  give them all the information necessary.  If it's going

11  to take more than one witness, then you've got to

12  identify more than one.

13          And now we've got this problem of you put

14  forward a witness who -- and I can understand because he

15  was an attorney and he was also the trust's attorney.

16  But isn't the result then -- I actually -- I'm familiar

17  with 30(b)(6), and I'm familiar with the cases.  This

18  precise issue I've never seen when you've got an attorney

19  claiming privilege.  Too much to hope for that somebody

20  has that white-horse case they can hand it to me and --

21          MR. STEPHENS:  I'm sorry, your Honor; but

22  we're happy to take a look for it.

23          THE COURT:  Well, since it's your theory, I'd

24  have thought you would have been riding that horse real

25  hard and have it ready.

1          Let me ask you.  He's trying to put you in a

2  real hard spot.  I understand that.  So, how do you deal

3  with it?

4          MR. ARENZ:  I think to the extent the

5  responsive answer is privileged, that the Federal Rules

6  of Civil Procedure do not allow an entity to compel

7  Personal Audio or any party to disclose privileged

8  information.

9          THE COURT:  Right, but the 30(b)(6) notice

10  isn't "Give us privileged information."  It's "Give us

11  information that's relevant to the case."  I mean, it's

12  who has the information about these topics.

13          MR. ARENZ:  Well, on the topic of --

14          THE COURT:  That's what I'm saying.  Do you

15  have any authority for the proposition that you can

16  receive a 30(b)(6) notice and then have your attorney

17  show up and say, "Sorry, privileged" and then never come

18  up with another 30(b)(6) witness?

19          MR. ARENZ:  I'm referring to this question

20  which I think calls for privileged information, whether

21  Mr. Call or Mr. Logan were to testify, that some sort of

22  investigation to the extent it was done as part of an

23  attorney-client relationship is not subject to discovery.

24          THE COURT:  Well, aren't you actually required

25  under the rules to have conducted an investigation before

3067

1  filing a patent suit like this?

2          MR. ARENZ:  Yes.

3          THE COURT:  Okay.

4          MR. ARENZ:  But to the extent that --

5          THE COURT:  And then again -- I mean, I

6  understand.  He's an attorney, but you're the one who put

7  him up on the 30(b)(6) deposition -- maybe not you

8  personally but --

9          MR. ARENZ:  He was answering on behalf of an

10 entity.

11         THE COURT:  Yeah.

12         MR. ARENZ:  And my point is whether Mr. Call

13 who was an attorney would show up to give the answer or

14 Mr. Logan who is not an attorney -- the answer would be

15 the same because any sort of investigation would bring in

16 the attorney-client relationship and attorney-client

17 activities.

18         THE COURT:  Okay.

19         MR. ARENZ:  And, judge, if I may, I do want to

20 add that he's testifying on behalf of Personal Audio,

21 LLC, which was an entity that was established in 2009 and

22 not a broader scope; and, for that matter, Personal Audio

23 is two people.  Mr. Logan was deposed for two days.  They

24 asked him all the same questions.  So, they weren't

25 deprived of any ability to really get to the heart of

1  these issues.

2        MR. STEPHENS:  Your Honor, may I respond to

3  that?

4        THE COURT:  Well, wait.  How do you deal with

5  the 30(b)(6) -- are you familiar with the cases that talk

6  about how you're bound -- in fact, I even give a jury

7  instruction on that when requested.  If a witness on the

8  stand starts to hedge when they're a 30(b)(6), I tell the

9  jury that the defendant or the plaintiff, whoever it is,

10 was required to come forward with somebody -- I mean, the

11 standard instruction is "It's the responsibility of the

12 entity to identify the employee or employees who have

13 knowledge of these topics and to be sure they have access

14 to pertinent documents and have talked to other employees

15 if necessary so they are prepared to answer questions on

16 the specified topics."

17        And I guess what I'm wondering is is how do

18 you deal with -- you received these 30(b)(6) notices and,

19 so, instead of identifying Mr. Logan, you identify an

20 attorney, putting him in a bad spot perhaps.

21        MR. ARENZ:  My colleague is pointing out that

22 we don't have it on-hand; but we believe there is case

23 law that suggests if you do take a 30(b)(6) deposition

24 and they believe that the witness does not have

25 responsive answers, that they are then entitled to seek

 1  additional depositions later, which included Mr. Logan,

 2  in this case, for two days.

 3         THE COURT:  Well, they are entitled but --

 4  maybe.  I suppose they could move to compel; but on the

 5  other hand, I think the responsibility under the cases is

 6  on the party who receives it to make sure they have the

 7  person and they've educated that person or provided them

 8  with the information necessary.

 9         I think you've got your cases backwards.

10         And I guess my concern here is -- and I'm not

11  going to force him to answer a question over the

12  privilege, but the problem you still have is, all right,

13  how are you going to meet the *laches* -- how do you even

14  burst the bubble of *laches*?  How do you get any evidence

15  in when your 30(b)(6) representative says, "No.  No.

16  No"?

17         MR. ARENZ:  Well, first of all, I think they

18  still have to establish -- well, let me start over.

19         To burst the bubble to the extent of

20  presumption is in place.  We can do that by a showing of

21  no prejudice.

22         And on the issue of 30(b)(6) witnesses, Apple

23  did not designate a witness to testify on economic

24  prejudice or evidentiary prejudice.  So, that alone

25  bursts the bubble and places it back in Apple's court.

1          THE COURT:  Okay.  So, you agree, then, that

2    the burden is now on you?

3          MR. ARENZ:  No.  No, we do not.  You

4    suggested --

5          THE COURT:  How are you going to get beyond

6    that?  If your witness won't say anything at all about

7    reasons or anything else, why doesn't it just go to you?

8    Why don't we start -- I mean, we don't have a jury here.

9    Why should I spend a half an hour listening to an endless

10   rendition of a 30(b)(6) witness who wouldn't answer?

11         MR. ARENZ:  Well, again, first of all, our

12   30(b)(6) witness, he did answer some questions.  He --

13         THE COURT:  Well, not about why you didn't

14   file -- or why you didn't pursue the suit.

15         MR. ARENZ:  Well, first of all, the initial

16   inquiry to determine whether any sort of presumption

17   would arise is whether they knew or should have known of

18   infringement.  And again, Mr. Call was testifying on

19   behalf of Personal Audio, LLC.  Mr. Logan has plenty of

20   knowledge about his involvement with the trust back since

21   2001 and ongoing and onward.

22         THE COURT:  We've already -- we already have

23   testimony in the trial that -- from, I believe,

24   Mr. Logan, that back in 2001 he -- for that matter,

25   perhaps Mr. Dan Goessling; but I remember Mr. Logan

1  saying that yeah, they started to think about it in 2001.

2          MR. ARENZ:  I'm not familiar with that

3  testimony, sir.

4          THE COURT:  You probably have -- somebody was

5  saying that in 2001.

6          MR. STEPHENS:  Your Honor, certainly Mr. Logan

7  testified that he was aware of the iPod in 2001.  I don't

8  know if that's trial testimony or deposition testimony.

9  Ms. Hunsaker is going to --

10          THE COURT:  Well, I mean, it's come before me

11  somehow in one way or the other.

12          MR. STEPHENS:  We will certainly elicit it

13  here today, your Honor, if it's not --

14          THE COURT:  Well, let's see if we can maybe

15  save some time.  What is the point you're trying to --

16  any other point you're trying to make with this line of

17  questioning with this witness other than it's a 30(b)(6)

18  witness who did not -- or would not -- whether it's for

19  privilege or whatever, wouldn't answer any questions

20  about why suit wasn't filed, why there was any delay,

21  anything like that?

22          MR. STEPHENS:  That's right.  That's the only

23  point for that line of questioning, your Honor.

24          THE COURT:  Okay.  Any cross on that issue?

25          MR. ARENZ:  Your Honor, again, the point is

3072

 1  Mr. Call was designated as a representative of Personal

 2  Audio, LLC.

 3          THE COURT:  They're the plaintiff, aren't

 4  they?

 5          MR. ARENZ:  Yes, sir.  And that entity was

 6  formed in 2009, and he was testifying in that context.

 7          Before 2007, in fact, he never had any

 8  ownership interest or any stake in the patents and to the

 9  extent that Apple needed additional knowledge, they

10  needed to depose Mr. Logan, which they did and they asked

11  him these questions and we objected to the scope of the

12  30(b)(6) notice as not going beyond Personal Audio, LLC,

13  as an entity, that Mr. Call was not testifying about any

14  entity before Personal Audio, LLC.

15          THE COURT:  Well, hold on.

16          MR. STEPHENS:  Your Honor, I have the 30(b)(6)

17  notice here with the --

18          THE COURT:  I'm looking at it.

19          MR. STEPHENS:  Okay.  Definition Number 1,

20  you've probably already focused on that.

21          And I'd also point out that Mr. Logan was

22  never designated on this topic.

23          THE COURT:  What was the first topic you

24  talked about when you started this line off?  I've got

25  Number 6, but there was another one you had identified.

 1                    MR. ARENZ:  I believe 28 and 16.

 2                    MR. STEPHENS:  That's right.  That's correct.

 3   Page 9 of the notice.

 4                    THE COURT:  Well, okay.  Who is the next

 5   witness?

 6                    MR. STEPHENS:  Your Honor, I did have a few

 7   more questions on the question of evidentiary prejudice

 8   and on inequitable conduct for Mr. Call.

 9                    THE COURT:  Okay.

10                    MR. STEPHENS:  It should not take very long.

11   BY MR. STEPHENS:

12   Q.    Mr. Call, in your deposition you said you could

13   not remember if you performed any prior art investigation

14   in connection with filing the '076 patent, right?

15   A.    In connection with the filing, that's correct.  I

16   could not remember.

17   Q.    And you also could not remember -- well, in fact,

18   you never cited any prior art during the prosecution of

19   the '076 patent, right?

20   A.    That's correct.

21   Q.    Okay.  Now, you wrote a patent application

22   sometime before March 28th, 2000, that specifically

23   mentions playlist software used by radio stations, right?

24   A.    I'm -- that doesn't come to mind.  Can you direct

25   my attention to something?

3074

1  Q.    I can.  Exhibit DX 62 in your binder.

2          MR. ARENZ:  Your Honor, I object to this

3  because this exhibit was not disclosed ahead of this

4  bench trial when we exchanged exhibit lists last night.

5          MR. STEPHENS:  It should have been -- well, I

6  don't have to use the exhibit.  That's okay.  We can do

7  it from deposition testimony.

8          THE WITNESS:  Well, I've been examined on this

9  before.  I recognize the document, and I did -- I wrote

10  part of this, not all of it.

11          MR. STEPHENS:  Your Honor, I leave it up to

12  you.  I could do this with or without this exhibit.

13          THE COURT:  Well, what's the point?

14          MR. STEPHENS:  Well, the point is that this is

15  an application that Mr. Call drafted and reviewed and it

16  specifically mentions playlist software used by radio

17  stations and it was filed in 2000.

18          THE WITNESS:  Yes.

19          MR. STEPHENS:  And then I'll elicit some

20  testimony following that.  That's really the main point

21  for this particular patent.

22          MR. ARENZ:  Judge, I would also object.  This

23  is outside the scope of the proposed findings.  This is a

24  new allegation.  I've never heard of this before.

25          MR. STEPHENS:  Your Honor, there's --

 1            THE COURT:  Well, I'm going to overrule that.

 2            So, your point here is that if he knew this,

 3  he should have disclosed it?

 4            MR. STEPHENS:  Well, it's more than that, your

 5  Honor.  I think there is a fair inference here that

 6  Mr. Call or Mr. Logan or Mr. Goessling -- and likely all

 7  three -- knew about the DAD system and manual before the

 8  '076 patent was issued.  I think you can draw --

 9            THE COURT:  I thought there was evidence that

10  they -- somebody at least provided a brochure and then

11  later on they got dinged by PTO when they tried to get in

12  the manual.  They said, "No, you didn't use the right

13  form" or something.

14            MR. STEPHENS:  Well, that also happened, your

15  Honor.  That's part of the '178 file history.  I'm going

16  to cover that as well.

17            THE COURT:  Well, what about the brochure?

18  With which patent was that filed?

19            MR. STEPHENS:  The '178.

20            THE COURT:  Okay.

21            MR. STEPHENS:  There was no prior art filed by

22  the patent owner in connection with the '076 at all.

23            MR. ARENZ:  Your Honor, my objection is we

24  were in the middle of trial; and they had five different

25  inequitable conduct allegations.  On Monday they narrowed

3076

1  it down to one.  The allegations Mr. Stephens is talking

2  about right now was never part of this case, never pled,

3  never identified in interrogatory response; and, frankly,

4  it's unfair surprise.

5          MR. STEPHENS:  Your Honor, this is all about

6  whether or not the DAD reference was disclosed.  This has

7  been in the case from the beginning, or at least for a

8  long time now.

9          MR. ARENZ:  Well, he should identify that in

10  his pleading with specificity then because this

11  allegation was not included.  There has never been an

12  allegation against the DAD manual relating to the

13  '076 patent.

14          MR. STEPHENS:  Your Honor, we'll stand on our

15  pleadings; but I still think this is relevant even if --

16          THE COURT:  Okay.  Hold up, Mr. Stephens.  Let

17  me --

18          MR. STEPHENS:  I'm sorry.  I apologize.

19          Your Honor, after conferring with my

20  colleagues, I'll just move on and we'll deal with the

21  '178 patent.

22          THE COURT:  Okay.  Go ahead.

23          MR. STEPHENS:  Okay.  Give me one second here

24  to find my place, and I will.

25                          *

3077

1 BY MR. STEPHENS:

2 Q.    Okay.  Mr. Call, Robins Kaplan gave you a copy of

3 the DAD manual before the '178 patent claims were

4 allowed, right?

5 A.    I'm sorry.  Yes, they did.

6 Q.    Okay.  And that happened on or about December 11th

7 of 2008; is that right?

8 A.    That's correct.

9 Q.    And then the Patent Office issued a Notice of

10 Allowance on the '178 patent on January 28th, 2009; is

11 that right?

12 A.    I believe that's correct, yes.

13 Q.    Okay.  And you studied the DAD manual between the

14 time you received it and the time you got the Notice of

15 Allowance, right?

16 A.    Yes.

17 Q.    And it took you a while to study it because of its

18 bulk, right?

19 A.    Yes.

20 Q.    And you actually were aware of the Notice of

21 Allowance before you submitted the DAD manual to the

22 Patent Office, right?

23 A.    I was aware of it I think the day I submitted it.

24 I had checked online.  I was about to mail it, and I

25 checked online and found out that the Notice of Allowance

3078

1 had been mailed. I had not yet received it, but I knew

2 it had issued.

3 Q.     Okay. Now, the Notice of Allowance gave reasons

4 for allowance, right?

5 A.     Yes, it did.

6 Q.     And those reasons included downloading a

7 sequencing file in program segments from a server?

8 A.     The examiner states his reasons for allowance, and

9 it's in there. I don't recall the precise wording, but

10 it is in the Notice of Allowance.

11 Q.     Okay. But you recall they included downloading a

12 sequencing file from the server?

13 A.     I'm sorry. I don't remember the words used.

14 Q.     Well, let's take a look. DX 116 is in your book.

15 That's the file history for the '178 patent. If you'll

16 turn to page 374.

17          Are you with me, sir?

18 A.     Yes, I've found it.

19 Q.     Okay. And there is a statement of the examiner's

20 reasons for allowance near the bottom of the page?

21 A.     Yes.

22 Q.     And the second sentence says, "Specifically, the

23 prior art does not teach, suggest, or make obvious (in

24 combination with the other elements of the claims) an

25 audio program player that has a communications port to

3079

1  download from one or more server computers a sequencing

2  file and a plurality of audio program files" and then it

3  goes on, right?

4  A.    Yes.  You've read that correctly.

5  Q.    Okay.  Now, when you submitted the DAD manual to

6  the Patent Office, you directed the examiner to some

7  specific pages, right?

8  A.    I did.

9  Q.    Let's take a look at that.  That's at page 388 of

10  the '178 file history.

11  A.    What's the page number?

12  Q.    388.

13  A.    Yes.

14  Q.    And that's the Information Disclosure Statement

15  that you filed?

16  A.    It is.

17  Q.    And cite R-3 is for the DAD manual; is that right?

18  A.    That's correct.

19  Q.    And you directed the examiner specifically to

20  pages i-ii, I guess Roman Numerals i and ii, and then 3-1

21  to 3-15 and 5-1 to 5-16; is that right?

22  A.    I did.

23  Q.    And that's it.  Those are the only pages you

24  directed him to specifically, correct?

25  A.    Yes.

1  Q.     Now, those pages don't include page 7-11, right?

2  A.     They do not.  Yes.

3  Q.     Okay.  And the pages don't disclose -- the pages

4  that you cited don't disclose using the copy or move

5  commands to download audio files, right?

6  A.     I'm sorry.  When I put that indication in there, I

7  had reviewed the DAD manual.  I pointed the examiner to

8  the parts of it that I thought might be helpful to him to

9  look at.  I don't remember what is in or out of that

10 section.

11 Q.     Okay.  So, you don't remember whether you directed

12 him to any of the parts that describe downloading audio

13 files, right?

14 A.     I don't specifically remember what those sections

15 refer to or don't refer to, no.

16 Q.     Okay.  And the same would be true for downloading

17 playlists, right?

18 A.     I don't know what those sections refer to,

19 counsel.  I just don't remember.

20 Q.     Okay.  So, for me to go through and point out that

21 they don't specifically include the "import playlist"

22 command or the "playback_lookahead" or the "copy or move

23 for downloading audio files with a download playlist"

24 command, you're not going to remember whether that's in

25 those sections without actually --

3081

1  A.    Sitting here, I don't remember what's in those

2  sections, no.

3  Q.    Okay.  Well, I'll just walk through the citations.

4  It doesn't include 7-11, right?

5  A.    I agree with that.

6  Q.    Doesn't include --

7        THE COURT:  Counsel, I can read what it

8  doesn't include.  We could be here all night.  Doesn't

9  include *Encyclopedia Britannica*.

10       MR. STEPHENS:  Fair enough, your Honor.  I'll

11 wrap this up.

12 BY MR. STEPHENS:

13 Q.    Before the '178 patent issued, Mr. Call, you

14 learned that the examiner did not consider the

15 DAD manual, right?

16 A.    I did.

17 Q.    And at that point you could have withdrawn the

18 patent from issue and asked the examiner to consider the

19 DAD manual, right?

20 A.    That would have been possible.

21 Q.    Okay.  But you chose not to do that.

22 A.    I chose not to do that.

23 Q.    Okay.

24       MR. STEPHENS:  Your Honor, we're outside the

25 presence of the jury.  I would like to ask him a few

3082

1  questions about the reexamination if that's permissible.

2         THE COURT:  What's the point?  That they've

3  now disallowed those claims?

4         MR. STEPHENS:  To establish materiality, your

5  Honor.  I think you could take judicial notice of that,

6  but I could ask him the factual predicate if you'd like.

7         THE COURT:  Isn't materiality to be considered

8  at the time?

9         MR. STEPHENS:  Well, I think, your Honor,

10 materiality now had -- there is a "but for" requirement.

11 You have to establish --

12        THE COURT:  But isn't the -- whether or not it

13 was material depends on materiality at that time, not so

14 much whether it's material today.

15        MR. STEPHENS:  Well, sure, your Honor.  Of

16 course it would have had to have been material at the

17 time.

18        THE COURT:  Okay.  So, the fact that later on

19 someone decided it was material -- I mean, I suppose it

20 might be instructive that an administrative or quasi

21 judicial body found it material at some later date; but

22 isn't the issue whether it was material at the time he

23 didn't do it?

24        MR. STEPHENS:  Well, your Honor, the point I

25 guess is that the claims are identical.  The claims that

1  issued are the claims that have been rejected, and the

2  prior art dates are all the same.  The filing date for --

3  the priority date for the patent, the date for the

4  DAD manual, nothing has changed.  The only difference is

5  that it's before a different examiner.

6          THE COURT:  Well, one of skill -- I mean, I'm

7  not sure exactly what test they used; but if there had

8  been advances in technology -- what someone might think

9  is material today based on what we know today about

10  nuclear science, for example, would be a whole lot

11  different than what someone would have thought ten -- or,

12  heck, iPods.  What somebody thinks today is material in

13  the iPod industry is a whole lot different than what they

14  might have thought about, say, in the year 2000.

15          MR. STEPHENS:  Your Honor, the test I believe

16  is fixed in time and --

17          THE COURT:  Right.

18          MR. STEPHENS:  -- in 1996 when the original

19  priority application was filed.  So, the examiner should

20  be applying a materiality test, a patentability test,

21  when he is looking at the claims of prior art that's

22  fixed at that date.

23          THE COURT:  But I'm going to have to make the

24  decision.  So -- all right.  I know that they evidently

25  rejected the claims; but I can't see that that

3084

1 determination has much more effect on me than a district

2 court from another -- a federal district court in another

3 state.  Might be instructive, but --

4          MR. STEPHENS:  Well, your Honor, the question,

5 of course, of materiality is what would the patent

6 examiner have done, would the patent examiner have

7 rejected the claims over the DAD manual.  And the

8 reexamination I think, your Honor, is evidence that you

9 could consider to show that, in fact, an examiner has

10 done that and that would support the inference that the

11 examiner in that case would have --

12          THE COURT:  Okay.  Go ahead.

13          MR. STEPHENS:  Okay.  Go ahead and inquire

14 about the reexam or --

15          THE COURT:  Well, no.  I understand.  I've

16 read they have gone ahead and disallowed those claims.

17 That's --

18          MR. STEPHENS:  Fair enough.

19          THE COURT:  I understand that.

20          MR. STEPHENS:  I'll leave that at that, your

21 Honor.

22          Just a few more questions.

23 BY MR. STEPHENS:

24 Q.   Mr. Call, the '178 patent was abandoned during

25 prosecution, right?

1  A.     It was.

2  Q.     And you couldn't remember why that was, in your

3  deposition, right?

4  A.     I know why it was.  I failed to file a paper on

5  time.  I couldn't remember how it happened.

6  Q.     Well, let's take a look at your testimony.

7  A.     The file history reflects what happened.  I just

8  have no memory of those events.

9  Q.     So, you don't know why the paper wasn't filed on

10 time, right?

11 A.     That's correct.

12 Q.     Okay.

13        THE COURT:  Let me -- along that line, maybe

14 counsel know off the top of their head.  This rejection,

15 is it final?

16        MR. STEPHENS:  It is what they call an "action

17 closing prosecution," your Honor.  So, there is one

18 more -- there was one more ability for both sides to put

19 in some papers.  The next thing that will happen is the

20 right of appeal notice; and at that point the Patent

21 Office, except for the Board of Patent Appeals, is done

22 with it.

23        THE COURT:  Right.  But then the board of

24 appeals gets it, and then what?

25        MR. STEPHENS:  Assuming that Personal Audio

1  continues to pursue it, then they'll get to file a brief

2  appealing the examiner's final rejection under the right

3  of appeal notice and then the Board of Patent Appeals and

4  Interferences will hear that appeal and make a decision.

5            THE COURT:  And then --

6            MR. STEPHENS:  And then from there they appeal

7  to the Federal Circuit, I believe.

8            THE COURT:  Okay.  So, their decision, just

9  like the other ones -- and I'm just trying to -- I just

10  want to be clear it's in the record.  Their decision goes

11  up to the Federal Circuit just like my decision would,

12  right?

13            MR. STEPHENS:  They could be there at the same

14  time, your Honor.

15            THE COURT:  Okay.  All right.  Go ahead.

16            MR. STEPHENS:  That's all I have, your Honor.

17  Thank you.

18            MR. ARENZ:  Yes, your Honor.

19            <u>CROSS-EXAMINATION OF CHARLES CALL</u>

20  BY MR. ARENZ:

21  Q.    Mr. Call, how long have you been involved in

22  patent prosecution?

23  A.    Since mid 1960.

24  Q.    And I'm going to be clear about something.  Did

25  you intend to deceive the PTO about the DAD manual in

1  connection with the '178 patent?

2  A.     No, sir.

3  Q.     Just -- you received the DAD manual on

4  December 11, 2008, correct?

5  A.     Yes.

6  Q.     And did you receive any other documents that day?

7  A.     I did.  I received additional publications, and

8  then in early January I received a list of patents.

9  Q.     Will you please explain to Judge Clark or describe

10 those other publications you had received back in

11 December?

12 A.     I believe they were -- copies of the other

13 publications are attached to the Information Disclosure

14 Statement, and they're in the file history.  There were

15 five printed publications, two of which were quite bulky.

16 One of them was the DAD manual, and another one was a

17 book.

18 Q.     And about how big was that book?

19 A.     The book was 1,024 pages long.

20 Q.     And what about the DAD manual?

21 A.     You know, it's quite thick, too.

22 Q.     Okay.  What was the status of the prosecution at

23 the time you received those publications?

24 A.     I had filed a response to a prior Office Action in

25 October, and I was awaiting a further action from the

3088

1  Patent Office.

2  Q.     Did you know when or if the examiner would issue a

3  Notice of Allowance?

4  A.     No.

5  Q.     Now, what did you do after you received the

6  DAD manual and those other publications?

7  A.     I reviewed them, those and -- there's a list of

8  patents, I think 19 patents, that I also looked at.  I

9  put them together in a binder with this statement, and I

10 was ready to send them to the Patent Office.  I checked

11 online, as I could do at that time; and I found that the

12 office had issued the Notice of Allowance.  It hadn't

13 been received yet, but it was on its way.

14        So, then I had to redo the forms because after

15 the application is allowed, there is a different rule you

16 have to set yourself under.  So, I had to redo some

17 papers; but then I filed it.

18 Q.     What do you mean by you "filed" it?

19 A.     I put it in an Express Mail envelope and took it

20 to the post office and mailed it to the Patent Office.

21 Under the Patent Office rules, when the post office gets

22 it, that's like filing it in the Patent Office.  So, I

23 got the credit for that date.

24 Q.     Okay.  And -- well, why don't we take a look at

25 that date.  If you'll look at Exhibit 802, Tab 18.  Do

1 you have that in front of you, sir?

2 A.     Yes.  I have it in front of me.

3 Q.     And you referenced the date.  What does this stamp

4 indicate to you?

5 A.     The stamp in the upper left-hand corner, the

6 circular stamp, is the Patent Office's received stamp.

7 Almost certainly they actually got it later than that,

8 but they stamp it with the mail date.  So, you get credit

9 for the January 30th date.  That -- January 30th would

10 have been the date that I gave it to the post office.

11 Q.     And, sir, is this the IDS you prepared?

12 A.     It is.

13 Q.     Now, did you follow PTO guidelines and rules when

14 you submitted this IDS statement?

15 A.     I did.

16 Q.     And explain how you complied with those rules and

17 guidelines.

18 A.     Well, there is a standard form.  You list patents

19 separately.  Patents are just listed by number.  You

20 don't need to supply copies because the Patent Office has

21 copies of patents, obviously.

22         Publications, they typically don't have; so,

23 you're required to submit copies of the publications.

24         In this case -- and the reason I mailed this

25 rather than sending it in by fax or some other form was

1  that the DAD manual was very thick.  I actually got a

2  copy of -- two copies of this book from Amazon, and I

3  actually sent along a copy of the book as well as these

4  other materials in the same envelope with this to the

5  Patent Office on January 30th.

6  Q.    Do you know whether or not the PTO actually

7  received those publications including the DAD manual?

8  A.    They did receive everything.

9  Q.    I'm going to direct your attention now to

10  Exhibit 802, Tab 18, at 406 -- pardon me -- Tab 18,

11  page 408.

12  A.    Yes, the artifact sheet.  I have it in front of

13  me.

14  Q.    And what is an artifact sheet?

15  A.    When the Patent Office receives things in the

16  mail, they go into the file and it's their practice to

17  scan everything optically so they have a digital record.

18  When they have very bulky things or certain other things

19  that they can't scan, the paper handling folks are

20  supposed to put in an artifact sheet and indicate --

21  essentially as a substitute for the stuff that isn't

22  scanned that goes into the file.  So, this is a sheet

23  that they filled out; and it indicates that the two

24  books, indicated at the bottom of the page, were placed

25  in a folder with this number.  The number is the

1   application serial number followed by a code.  And those

2   two books then were placed in a folder, and they should

3   have gone with the other papers to the examiner.

4   Q.    And did you fill out this artifact sheet, or did

5   the PTO?

6   A.    No.  The Patent Office staff fills this out.

7   Q.    So, just so we're all clear, you submitted the

8   DAD manual in connection with prosecution of the

9   '178 patent?

10  A.    I did.

11  Q.    And the PTO actually received the DAD manual,

12  correct?

13  A.    They did.  But they separated out the two books

14  and did not scan them; and this is just a reflection of

15  the fact that they had it, they separated it out, and

16  they put it in this folder.

17  Q.    Now, Mr. Call, I want to go to page 407.  This is

18  the part of the IDS where you identify the publications

19  that you are submitting with the IDS, correct?

20  A.    Yes.

21  Q.    And Mr. Stephens directed your attention to your

22  identification of certain pages.  Do you remember that?

23  A.    Right.  I recall that.

24  Q.    Now, are you required to provide this

25  identification?

 1  A.     No.

 2  Q.     And let me ask a more general question.  Are

 3  patent prosecutors required to identify portions of a

 4  voluminous reference like this?

 5  A.     If you have a voluminous record -- for example, a

 6  journal with many articles in it -- you're required to

 7  identify the specific page where that article is but

 8  you're not --

 9            MR. STEPHENS:  Your Honor, I object.  He can

10  testify of what his knowledge of the requirements are,

11  but I don't think he can testify as to what the

12  requirements themselves are.  He's not been identified as

13  an expert in this case.

14            THE WITNESS:  This is in --

15            THE COURT:  Where are the requirements?  Are

16  they in the --

17            THE WITNESS:  They're in Title 37 CFR 1.97 and

18  around there.  It's the Patent Office rules of practice.

19            THE COURT:  That's what I was trying to drag

20  up.  We have a copy.

21            It's amazing how Ms. Mullendore can read my

22  mind and hand me exactly what we're talking about right

23  here.

24            Okay.  It's part of the *Manual of Patent*

25  *Examining Procedure*.  I'll overrule the objection, I

3093

1  mean, unless you think he's misstating what it states and

2  you can point it out to me.

3          MR. STEPHENS:  Not at all, your Honor.  I just

4  would object to him saying what the law is.

5          THE COURT:  No.  Just so everybody knows, I'm

6  not going to accept from any witness what the law is.

7  I've got to determine that.  I'm required to.  But I

8  think he is properly stating because I have a copy of it

9  here in front of me.  So, go ahead.

10          MR. STEPHENS:  Thank you, your Honor.

11  BY MR. ARENZ:

12  Q.    So, sir, do you understand that it is a suggested

13  practice but not a required practice?

14  A.    Well, you have to comply with the rules; and

15  that's what I was trying to do.  There is no requirement

16  that you point out to the examiner any specific passage.

17  Q.    And, so, why did you point out specific passages

18  in this instance?

19  A.    Because I had been given these books and I had to

20  go through them.  I thought it might be helpful if I give

21  them a pointer of where he might start looking.

22          The examiner is going to look at this for his

23  own purposes to try to find out what he's looking for and

24  then -- the examiner is going to do something, and I need

25  to respond to that.  By putting these in here, I'm not

3094

1  saying that they're material.  I'm just saying here it is

2  and the examiner knows what he's doing and I will respond

3  in due course to whatever he does with that.

4  Q.    Okay.  Mr. Call --

5              THE COURT:  Okay.  Let's hold up a second.

6              We had somewhere earlier in the evidence at

7  least one copy of the DAD manual, didn't we?

8              MR. STEPHENS:  Yes, your Honor, Defendant's

9  Exhibit 1.

10             MR. ARENZ:  There is an excerpt, your Honor,

11 in my binder in front of you.

12             THE COURT:  I have Defendant's Exhibit 1 right

13 here.  Thank you.

14             And it appears that I have the same one

15 referenced by Mr. Call, Version 6.0A, June 30, 1995.

16             You started off this -- I'll note for the

17 record this Section 3-1 to 3-15 is what's in the manual,

18 called the "tutorial"; and then it has subsections:  the

19 environment, the screen layout, tutorial, recording of

20 cut and audio cut and building a playlist, loading and

21 playing a playlist, what's next, exiting a program.

22             He also referenced the table of contents,

23 which pretty much covers all of it.

24             And then in particular this Section 5-1 to

25 5-16 goes over playback, playback functions and so forth.

1        THE WITNESS:  Your Honor, I have learned later

2   that there were more pages after 5-16 that I did not

3   have.  The copy that I had stopped at 5-16 and there were

4   missing pages and I think there are other pages that I

5   did not have at that time that are in -- that were in

6   other copies of that manual, but I didn't have them.

7        THE COURT:  All right.  And, Mr. Stephens, you

8   were pointing out that he didn't include 7-11 which has

9   the copy and move functions; and I thought you referenced

10  something else.

11       MR. STEPHENS:  Yeah.  Bear with me one second,

12  your Honor.  I'll give you that list.

13       7-11, 10-4, 5-18, 7-19, 7-20.  Those are

14  examples.  I think there's more.  The point was that it

15  didn't disclose the specific functionality that was the

16  subject of the trial.

17       THE COURT:  Okay.  And how do you respond to

18  the point that what the rules -- or CFR requires is that

19  the document be provided, the specific "see certain

20  pages" is not?

21       THE WITNESS:  That's right.  That was just

22  voluntary on my part --

23       THE COURT:  I'm asking the attorney.

24       THE WITNESS:  I'm sorry.

25       MR. STEPHENS:  Two ways, your Honor.  One is

1  that the document ultimately was not considered and

2  Mr. Call knew that and could have taken corrective action

3  and I have a case cite, your Honor, that shows that that

4  can support the inference of inequitable conduct.

5          THE COURT:  Okay.  He knew that the patent

6  examiner didn't work hard enough and he should have

7  called it to his attention?

8          MR. STEPHENS:  No.  I'm sorry.  And maybe I'm

9  confusing issues here.  So, that goes to the entire

10  manual.  The examiner specifically told him that he did

11  not get it because of this artifact issue and was not

12  going to consider it.

13          So, there is a later response from the Patent

14  Office that specifically says that this document was not

15  considered at all, not these pages, no pages.

16          And Mr. Call knew that before the patent

17  actually issued; and he could have withdrawn it from

18  issue, filed a request for continuing examination, and

19  had the examiner consider it.  And the law says that not

20  doing that can support an inference of inequitable

21  conduct.

22          THE COURT:  Okay.  And if we -- but the case

23  you're dealing with comes before or --

24          MR. STEPHENS:  It is before --

25          THE COURT:  -- before or after the string of

1  cases that -- there was a series of cases where

2  Judge Rader dissented on the overuse of inequitable

3  conduct.  Well, now he's the chief judge; and he's no

4  longer dissenting.  He's writing majority opinions on

5  this issue, such as *Therasense, Inc. v Becton,*

6  *Dickinson & Co.*, and even a somewhat dull judge can

7  figure out that he's not real happy with the overuse

8  of -- and this has been going on even since *Aukerman*.

9  Even since that there's been a long string of cases where

10  the court has been very concerned about the overuse of

11  this.  So, the case you're talking about, when was it

12  dated?

13             MR. STEPHENS:  It was dated in 1994, your

14  Honor.  It's an old case and we certainly have read

15  *Therasense* and these other cases -- at least some of the

16  other cases you mentioned, and taken them to heart.

17  That's why we dropped most of our inequitable conduct

18  allegations.

19             THE COURT:  All right.

20             MR. STEPHENS:  And I can't tell you with

21  certainty, your Honor, that *Therasense* might not have an

22  effect on this analysis.  I'm sure at a minimum it

23  significantly heightens the materiality requirement.  No

24  question about that.

25             THE COURT:  Okay.  All right.  Go ahead,

 1  counsel.

 2  BY MR. ARENZ:

 3  Q.    So, let's be clear, Mr. Call.  You didn't just

 4  submit portions of the DAD manual to the PTO, did you?

 5  A.    No.  I submitted the whole thing.

 6  Q.    Okay.  And --

 7  A.    With the exception of those missing pages that

 8  weren't in the copy I had.

 9  Q.    Do you recall where the missing pages started?

10  A.    I'm informed after 5-16 there were more pages.

11  Q.    Okay.  And Mr. Stephens identified 5-18 as

12  something that you may have somehow tried to withhold

13  from the examiner.

14  A.    That would have been a page I didn't have.

15  Q.    Do you know if Mr. Stephens knew that you did not

16  have a complete DAD manual when you submitted it at that

17  time?

18          MR. STEPHENS:  Objection, your Honor.  This

19  calls for hearsay.

20          MR. ARENZ:  Your Honor, we have --

21          THE COURT:  Well, wait a minute.  You're

22  asking him whether Mr. Stephens knew -- why does that

23  matter?

24          MR. ARENZ:  Well, I think it's an equitable

25  issue and the fact of the matter is that we asked Apple,

3099

1  when this case started, for a complete DAD manual; and

2  they refused to give it to us on multiple occasions until

3  March of this year.  And the fact that he's now using

4  this still as a basis, knowing that he didn't have a

5  complete manual, is surprising.  We've had conversations

6  with --

7              THE COURT:  All right.  Well, I'm not sure how

8  he's going to read somebody's mind; so, let's get on to

9  the next question.

10             MR. ARENZ:  Will do, your Honor.

11  BY MR. ARENZ:

12  Q.    Sir, when you identified certain sections to the

13  PTO, did you try and hide the idea of playlists from

14  them?

15  A.    No.

16  Q.    Let's look at Defendant's Exhibit 1 in your book.

17  And if you would go to page 65, This is one of the

18  sections that you, in fact, called to the examiner's

19  attention, correct?

20  A.    I'm sorry.  What page?

21  Q.    We're on page 65, and it's 3-9.

22  A.    Yes.  I see page 3-9 is devoted to playlists,

23  among other things.

24  Q.    And now if you go to the next page, 66, this, too,

25  is addressing playlist modification, right?

 1  A.     Yes.

 2  Q.     And that was also included in your identification,

 3  right?

 4  A.     Yes, it was.

 5  Q.     And what about if you jump to page 68?  Do you see

 6  the section that says "loading and playing a playlist"?

 7  A.     Yes.

 8  Q.     And did you direct the examiner to this portion of

 9  the manual?

10  A.     I did.

11  Q.     Let's go forward to page 108.  And do you see the

12  portion about the "N" button, at the top of the page?

13  A.     The "end" button?

14  Q.     "N," "N" as in "Nancy."

15  A.     Oh, yes.  "The next button (labeled N)," I see

16  that.

17  Q.     And, sir, were you here at the trial when that's

18  what Apple identified as what they believe is the "skip"

19  button?

20  A.     I was excluded from that part of the trial.

21  Q.     Okay.  But you did disclose this portion to the

22  PTO?

23  A.     I did.

24  Q.     And you identified it to the PTO?

25  A.     I did.

1  Q.    Sir, did you try and deceive in any way the PTO

2  about anything relating to the DAD manual?

3  A.    No.

4  Q.    And Mr. Stephens brought up the idea that you at

5  one point learned the PTO did not -- it believed it did

6  not receive the DAD manual.

7  A.    I did.

8  Q.    And what did you do after learning this --

9          THE COURT:  Believed they didn't receive it or

10 believed they weren't going to use it?

11         THE WITNESS:  I'd received a notification from

12 the examiner indicating that he believed that it had not

13 been submitted.  He sent a notification that said all of

14 the references that I had submitted had been considered

15 except two; and he had marked those out, saying that he

16 didn't get them.

17         When I got that, I went online and checked the

18 file history and found this artifact sheet, which

19 explained that, in fact, the Patent Office did get them

20 and it looked like the Patent Office got them but perhaps

21 the examiner never did.  So, I called the examiner --

22         MR. STEPHENS:  Objection, your Honor.  This is

23 hearsay.  I don't think he can testify about what the

24 examiner told him or any out-of-court statements of the

25 examiner.

3102

1          THE COURT:  Overruled.  I'm going to find out

2   what he said as -- go ahead.

3          THE WITNESS:  All right.  Well, I told the

4   examiner, "You say you didn't get these two volumes and

5   you did get them and, you know, check the record."

6          And the examiner checked and indicated that

7   indeed they did have them.

8   BY MR. ARENZ:

9   Q.    And did you have any other additional

10  conversations with the examiner on this issue?

11  A.    I did.

12  Q.    Please explain those.

13  A.    Well, I -- my concern was that I had submitted

14  these and I wanted to get them considered and they were

15  not considered and the examiner had now passed the

16  application on to publication and he indicated there

17  wasn't anything he could do about it.  Once it goes to

18  the publication branch, he essentially loses jurisdiction

19  over it and there wasn't any way that he could reel it

20  back in.

21  Q.    How did you respond to that?

22  A.    Well, I was disappointed.

23  Q.    Did you have any additional communications with

24  the examiner on this issue?

25  A.    Well, he said he was going to check with his

3103

1   supervisor and see if there was anything he could do.

2   And either he called me back or I called him back and he

3   indicated he didn't think there was anything he could do

4   about this.

5   Q.    Okay.  Mr. Call, did you believe you had any

6   obligation at that time to try and stop the patent from

7   somehow issuing?

8   A.    No.

9            MR. ARENZ:  And, judge, I think I just need to

10  ask this question to make the record clear.

11  BY MR. ARENZ:

12  Q.    Sir, when you answered questions at your 30(b)(6)

13  deposition, did you understand that you were answering on

14  behalf of Personal Audio, LLC, as an entity?

15  A.    I did, and I thought I was probably the person

16  most knowledgeable to address those topics.  So, you

17  know, if anybody would have had the answers, I think I

18  would have.

19  Q.    And they would have been just about that entity

20  which was formed in April, 2009?

21           MR. STEPHENS:  Objection, your Honor.

22  Objection.  The notice was for the entity and its

23  predecessors.  Mr. Call had personal knowledge --

24           THE COURT:  I know what the notice said.

25           MR. STEPHENS:  Okay.

1  BY MR. ARENZ:

2  Q.    And, sir, so, my question was just that you

3  answered -- your understanding is that you answered on

4  behalf of the entity that was formed in 2009.

5  A.    Yes.  But, you know, I think my problem was with

6  specific questions and not my role.

7  Q.    Sir, when did you -- from 2001 to 2005, did you

8  own an iPod?

9  A.    I did not.

10  Q.    And at that time did you serve as patent counsel

11  for the Logan Family Trust?

12  A.    I was representing the trust with respect to these

13  applications that were pending in the Patent Office, and

14  I was handling the Patent Office work on those patent

15  applications.

16  Q.    Did you have -- as part of your role as patent

17  attorney or for the trust, did you have any

18  responsibility for looking for potential infringers for

19  any of their patents?

20  A.    No.  I was not asked to do that.

21  Q.    Did you have that responsibility for any of your

22  other clients in the 2001 to Two Thousand --

23  A.    I don't recall ever investigating infringement for

24  clients.

25  Q.    And from 2001 to 2006, did you have any interest

1  in the patents, in the '076 patent?

2  A.    No.  I was just an outside lawyer working by the

3  hour.

4  Q.    Sir, do you have any access to Apple's proprietary

5  information?

6  A.    No.

7  Q.    Do you have any access to Apple's source code?

8  A.    No.

9         MR. ARENZ:  Your Honor, I pass the witness at

10  the moment.

11         MR. STEPHENS:  Your Honor, I have a case on

12  the 30(b)(6) notice; but I have no more questions for

13  Mr. Call.

14         THE COURT:  All right.  What's the case?

15         MR. CORDELL:  The case, your Honor -- and with

16  some trepidation to represent cases to the court that

17  I've just found while I was sitting here but with the

18  help of some of my partners.

19         It's a district court case out of Iowa; but

20  it's a very thorough opinion, *Engineered Products v*

21  *Donaldson Company*.  It's 313 F.Supp.2d 951.  And it's a

22  very, very thorough opinion, your Honor.  It goes through

23  a host of pretrial issues, one of which was the degree to

24  which a patentee could go into issues relating to *laches*

25  wherein a privileged objection had been maintained, at

1    least in part.  And the pin cites would be 1019 through

2    1023.

3            And again, your Honor, admittedly it's under

4    Eighth Circuit law and it's a district court opinion, but

5    it does appear to be very thorough.

6            THE COURT:  All right.  Who's -- any other

7    witnesses?

8            MR. STEPHENS:  Yes, your Honor.  Apple next

9    calls Mr. Logan, James Logan.

10           THE COURT:  Okay.

11           MR. STEPHENS:  Ms. Hunsaker will be examining.

12           THE COURT:  And you recall you're still under

13   oath, sir?

14           THE WITNESS:  Yes, sir.

15           MS. HUNSAKER:  Your Honor, may I have just a

16   moment to hand out the binders?

17              DIRECT EXAMINATION OF JAMES LOGAN

18              CALLED ON BEHALF OF THE DEFENDANT

19   BY MS. HUNSAKER:

20   Q.   Good afternoon, Mr. Logan.

21   A.   Good afternoon.

22   Q.   So, you and I have seen each other in court over

23   the last couple of weeks; but we haven't met before; is

24   that right?

25   A.   Yes.

3107

1  Q.     Okay.  Now, when is the first time that you ever

2  saw an iPod, whether in advertisement or in person or

3  otherwise?

4  A.     It's hard to say.  My most distant memory was

5  seeing a billboard in New York City sometime early in the

6  decade of the Two Thousands, but I couldn't tell you what

7  year that was.

8  Q.     So, do you recall in your deposition testifying

9  that you're sure that you saw one in 2001?

10  A.     I don't recall remembering that, but I might have

11  said that.

12  Q.     Okay.  When you did see the billboard that you

13  were referring to, what did you understand that billboard

14  to be?

15  A.     It was a very nice ad.  It was a silhouette and

16  somebody with some headphones.  I was thinking that they

17  do a nice job with ads.  I remember the "think different"

18  billboards that would catch my attention from time to

19  time and wondering why they forgot the L-Y, but it was

20  pretty effective, nevertheless.

21          MS. HUNSAKER:  And, so, could I ask you to

22  please pull up DDX 501?

23  BY MS. HUNSAKER:

24  Q.     And is this the silhouette ad that you were

25  referring to?

3108

1  A.    I remember a vertical aspect ratio, but it was

2  something similar.

3  Q.    Okay.  And just referring again to your memory of

4  when you would have first seen an advertisement for the

5  iPod, let me ask you to turn to your deposition which

6  should be in your notebook at page 224, beginning at

7  line 21.

8  A.    Is that the white one?

9  Q.    Yes.  Yes, sir, it is.

10  A.    I'm sorry.  Could you say that page number again?

11  Q.    Sure.  It is page 224.

12  A.    In my deposition?

13  Q.    Yes.  Beginning at line 21.

14  A.    224.

15         MS. HUNSAKER:  Can we pull that up on the

16  screen, please?  It's Mr. Logan's October 27th, Volume 1.

17  BY MS. HUNSAKER:

18  Q.    Have you found the page and line, sir?

19  A.    Yes.

20  Q.    And Mr. Stephens asked you, "When is the first

21  time you ever saw an iPod, whether in an advertisement or

22  in person?"

23         And your answer was, "I am sure I saw one in

24  2001."

25         Did I read that correctly?

1    A.    You did.

2    Q.    And what did you understand that to be at the

3    time?

4    A.    I'm sorry.  What did I understand the iPod to be?

5    Q.    Yes.

6    A.    A music player.

7    Q.    Did you understand it to be a portable device that

8    played music?

9    A.    Yes.

10   Q.    When did you first learn that iPods included

11   playlists of any kind?

12   A.    I would have to say that was -- let me think here.

13   I think that was in early 2008.

14   Q.    So, Mr. Logan, do you remember when you were

15   deposed in this case not remembering when you first

16   learned that the iPods included playlists of any kind?

17   A.    I -- I'm sorry.  Could you repeat the question?

18   Q.    I understand it's a strange question.

19   A.    Right.

20   Q.    Do you remember not remembering in your deposition

21   when you first learned that iPods included playlists?

22   A.    I do not remember not remembering.

23   Q.    So, why don't we take a look at your deposition.

24   A.    Okay.

25   Q.    Volume 1 again, please, sir, at page 227, lines 8

3110

1  through 18.

2         And the question was, "When did you first

3  learn that iPods included playlists of any kind?"

4         And your answer was, "I don't have memory of

5  that."

6         Do you see that?

7  A.    I see that.

8  Q.    And the next question was, "So, you're just not

9  sure when you first learned that?"

10         And the answer was, "I never even thought

11  about it, you know, played music, didn't concern me, and

12  I never thought about it, really."

13         Did I read that correctly?

14  A.    You did, ma'am.

15  Q.    And the next question was, "But you didn't know

16  when you learned about it?  Could have been 2001, could

17  have been later?

18         "Yeah, uh-huh."

19         Did I read that correctly?

20  A.    You did.

21  Q.    Mr. Logan, when Mr. Stephens took your deposition

22  last fall, in 2010, do you recall that he asked you a

23  number of questions about prototypes of the invention of

24  the '076 patent that you were working on back in the mid

25  1990s time frame?

3111

1  A.     I recall some questions in that area, yes.

2  Q.     And do you recall Mr. Stephens asking you to

3  describe what you did to build your invention?

4  A.     I don't remember that part of the deposition, no.

5  Q.     So, if we could go to page 235 in Volume 1 of your

6  deposition.

7  A.     Okay.

8  Q.     And take a look at line 16 through 25 and actually

9  bridging to the next page on 236, through line 6.

10         Let me know when you've found that, please,

11  sir.

12  A.     Okay.

13  Q.     So, line 17, you were asked, "I'm asking you to

14  tell me what you did to build your invention, as you

15  understand it."

16         "Answer:  What we did to build it?"

17         "Yes.

18         "You mean which steps we took along the way

19  and how far we got?

20         "Question:  No, I mean what the device was

21  that you built."

22         "Answer:  Well, to be quite frank, my memory

23  of what we actually built in the summer of '96 is not

24  that extensive.  So, when I read Dan's deposition" --

25         And would that have been Mr. Goessling?

3112

1  A.     Yes.

2  Q.     -- "it kind of reminded me how far we got.  I had

3  forgotten about the notebook demo that we put together

4  with the visual basic software, for instance.

5           "So, most of what I'm telling you is I'm just

6  reciting what I kind of read in Dan's deposition."

7           Did I read that correctly?

8  A.     You did.

9  Q.     You also, during your deposition, discussed a

10 number of the Personal Audio business plans.  Do you

11 recall that?

12 A.     Yes.

13 Q.     And Mr. Stephens examined you, asked you questions

14 about what Personal Audio was working on and what they

15 were trying to build and referenced some of those

16 business plans.  Do you recall that?

17 A.     Well, you're speaking of plural "business plans."

18 I don't recall if we went over different versions or not.

19 I forget that part.

20 Q.     Well, do you recall Mr. Stephens asking you if

21 those business plans were the best source for what you

22 had in mind in those days for building the invention in

23 the '076 patent and telling him that there wasn't too

24 much more independently floating around in your memory?

25 Do you recall that?

3113

1  A.      I don't.  You'd have to refresh my memory.

2  Q.      Okay.

3          MS. HUNSAKER:  So, why don't we pull up

4  Volume 1 again at page 56, lines 6 through 15.

5  BY MS. HUNSAKER:

6  Q.      "Question:  So, is the best source for what you

7  had in mind in those days the business plans?

8          "Answer:  You know, I read the deposition that

9  you took of Dan Goessling.  He seemed to have some pretty

10  good memories of what we were doing from a technical

11  perspective.  Quite frankly, they were kind of better

12  than my recollections at the time.

13          "So, I don't think there's too much more

14  independently floating around in my memory of -- of

15  that."

16          Did I read that correctly, sir?

17  A.      You did.

18  Q.      Okay.  I believe that some of the questions that

19  you were asked in your deposition also dealt with some of

20  the specifics about the product you were trying to bring

21  to market that would have been an embodiment of the

22  '076 patent.  Do you recall that?

23  A.      Again, if you could refresh my memory, that would

24  be helpful.

25  Q.      Okay.  Sure.  Again, this is Volume 1 of your

3114

1  deposition, on page 54, beginning at line 14 through the

2  bottom of the page.

3  A.    Okay.

4  Q.    So, why don't you go ahead and take a look at

5  line 14.  The question was, "Now, what was the physical

6  structure of the player you were working on?"

7  A.    Okay.

8  Q.    And your answer was, "The physical structure of

9  the player we were working on.  Can you be more specific?

10          "Question:  Well, I'm trying to be very

11  general, right.  I mean, how big was it?

12          "Answer:  When you say 'working on it,' do you

13  mean our development system or what we are proposing to

14  bring to market?

15          "What you were proposing to bring to market.

16          "Answer:  I don't think we had -- I don't have

17  a memory of a definitive size and shape."

18          Do you see that?

19  A.    I do.

20  Q.    And then take a look at page 55, lines 11 through

21  13.

22  A.    Yes.

23  Q.    And Mr. Stephens asked you, "And what was the form

24  that you had in mind?

25          "Answer:  I don't recall, quite frankly.  I

1  mean, obviously smaller is better, cheaper is better."

2          Do you see that?

3  A.    Yes.

4  Q.    So, is it fair to say that you have a hard time

5  today remembering what products you were working on, what

6  the details of the embodiments of the '076 patent were at

7  the time the alleged invention in this case was made?

8  A.    Well, you know, in intervening months since I did

9  this deposition and now I've reviewed a lot of documents

10 and, so, some of my memories have been refreshed and

11 sometimes I get confused with what my original memories

12 and what I've read, et cetera.  So, my memory is not

13 always perfect but --

14 Q.    It's hard to remember --

15 A.    It seems to change so -- you know, as I review

16 things and learn new things and -- but I digress; so, I

17 apologize.

18 Q.    Just a few more of these.  I promise.

19 A.    Okay.

20 Q.    Okay.  Now, you recall, sitting through the trial,

21 that there was testimony regarding claim 13 of the

22 '178 patent, right?

23 A.    Yes.

24 Q.    So, Mr. Logan, did you ever build anything that

25 generated personalized content on the way the user had

1  listened -- based on what the user had already listened

2  to?

3  A.    Like I said, I don't know how far we got in our

4  experiments.  You know, if we did something along those

5  lines, it would have been an experiment; but I can't

6  recall.

7  Q.    And did you ever --

8            THE COURT:  Could I ask Ms. Hunsaker what -- I

9  think you're going on *laches*, right?

10           MS. HUNSAKER:  Yes, your Honor.

11           THE COURT:  Okay.  Let's say he built a

12 working iPod and just forgot to market it.  Or let's say

13 he built nothing.  Under what element of *laches* does that

14 fall?

15           MS. HUNSAKER:  Well, under the element of

16 *laches*, we're looking at evidentiary prejudice, your

17 Honor.

18           THE COURT:  The inability to find from him the

19 things that he had built?

20           MS. HUNSAKER:  We would be looking for

21 embodiments of the invention, whether the ideas were

22 fully conceptualized, whether they were reduced to

23 practice, whether he was diligent in reducing them to

24 practice.

25           THE COURT:  But aren't you talking about time

1  after the application was filed?

2         MS. HUNSAKER:  I believe the time frame in

3  which the questions were being asked were around 1996,

4  with respect to the Personal Audio business plans.

5         THE COURT:  But at one time there was a

6  discussion or a thought that the date of the invention

7  might be important, but I don't recall any prior art

8  being blocked out on that basis since all of your prior

9  art was more than a year prior to the filing of the

10 application.  So, what you're talking about, I think,

11 would be -- if this was a case where it turned out that

12 conception, date of invention, a week here or a month

13 there was important -- help me out.  Let's assume that

14 had he filed it earlier, he might have had one of those

15 devices and it might have been built, say, a month before

16 the filing deadline.  How does that help you when

17 you're -- I mean, was there a piece of art that was kept

18 out on the -- where is the prejudice?

19        MS. HUNSAKER:  Well -- so, your Honor, I think

20 in addition to the invention date -- and I understand

21 your Honor's point, but I believe that it's also relevant

22 to whether Mr. Logan invented what he claims to have

23 invented.

24        We have passed the point of having 112

25 defenses and we think that whether he had this

1  evidence -- or whether he had these embodiments at the

2  time in 1996 would help demonstrate whether --

3          THE COURT:  But the thing is that we know -- I

4  mean, if you had someone running around saying -- and

5  I've had cases like this -- "Wait a minute.  Logan and I

6  worked together.  I'm the inventor.  Why isn't he sharing

7  with me," that would be important.  I'm just trying to

8  get -- I mean, I understand your line of questioning

9  which would be very appropriate in certain fact

10  situations; but right now we're dealing with patent

11  applications filed in October of 1996.  You've got in

12  plenty of -- you know, your prior art that was available

13  more than a year earlier.  No one has come forward and

14  said, "I'm a co-inventor" or "He stole from me."  I

15  haven't seen anything like that.

16          So, assume for the moment I'm convinced that,

17  yes, they had -- in fact, I think he stated in here they

18  did something on a laptop and he was running around in

19  his car trying to see what it would be like, hopefully

20  not driving off the road while he was playing with his

21  laptop, based on his deposition that I've read here.

22  Where do you get?

23          MS. HUNSAKER:  So, I mean, I think all of the

24  circumstances around the invention, what he was building

25  at the time are relevant particularly to 112 defenses in

1    addition to the prior art defenses.  So, we --

2            THE COURT:  But aren't we dealing with *laches*

3    right now?

4            MS. HUNSAKER:  We are, your Honor.  But, for

5    example, a best mode defense could depend in large part

6    on what embodiments the inventor was working on, what he

7    knew to be the best mode; and we were not able to explore

8    any of that without evidence in this case about what he

9    was working on.  And the reason we didn't have that

10   evidence is because of the passage of time and the lack

11   of memory of the witness.

12           THE COURT:  Okay.  So, if he had -- your

13   theory would be if he had built a 3-inch by 4-inch pocket

14   device with a battery that lasted ten hours and held a

15   thousand songs back in 1996 and then lost it somehow or

16   carelessly threw it away or didn't recognize what he had

17   and he merely described in his patent what you've claimed

18   to be something that works with a laptop computer or a

19   regular computer, you would have been able to show that

20   he didn't describe the best mode.  Is that --

21           MS. HUNSAKER:  So, I can't profess that it

22   would have come out exactly like that; but yes, your

23   Honor.  I mean, we don't -- the bottom line is we don't

24   know what he considered the best mode.

25           THE COURT:  Okay.  All right.  Go ahead.

1  BY MS. HUNSAKER:

2  Q.    So, Mr. Logan, did you ever build a system that

3  downloaded a playlist?

4  A.    I don't remember.

5  Q.    Did you ever build a system that could play a

6  playlist?

7  A.    I believe we had that on a prototype.

8  Q.    So, let's just take a look at your deposition.

9  This is at Volume 1, page 238, and lines 6 through 10,

10  please, sir.

11         So, you were asked, "Did you ever build a

12  system that could play a playlist?"

13         And your answer -- if you could read that,

14  please, on lines 8 to 10.

15  A.    Okay.

16  Q.    If you could read it out loud, sir, please.

17  A.    Oh, okay.  "Again, I do not recall that.  I don't

18  remember the prototype that we had in enough detail to

19  answer that."

20         But what I'm thinking now I think for the

21  first time is I do remember we were using the "skip"

22  button; so, we must have had a playlist of some sort to

23  skip to something.  So, I don't think -- I think my

24  answer now is perhaps a bit more accurate.

25         Yeah.  I say that in line 14 actually, where

3121

1  it says, "Did you build a system that would skip forward

2  and backwards?"

3            And I said, "I'm pretty sure that we did

4  that."

5            So, now, you know, I'm a bit more familiar

6  with playlists and so forth; and, so, I guess what I'm

7  saying is we would have had to have a playlist to have

8  been able to do that.

9  Q.    And then you were asked, at line 19, "But you

10  don't know whether it was skipping forward in a playlist

11  or not?"

12            And your answer was, "Yes, I couldn't tell

13  you."

14            Do you see that?

15  A.    All right.  Let me read this here.

16            Yeah.  I guess at that point I wasn't thinking

17  in terms of playlists, I guess.

18  Q.    So, Mr. Logan, we've had a lot of testimony in

19  this trial about value of the patents-in-suit.  Did you

20  have documents at some time that reflected communications

21  with the investigators concerning Personal Audio?

22  A.    Did I have documents with investors concerning --

23  I'm sorry.  Could you repeat that?

24  Q.    Yeah.  Did you at some point in time have

25  documents that reflected communications with angel

3122

1  investors concerning Personal Audio?

2  A.    We never had any angel investors in Personal

3  Audio.

4  Q.    So, do you recall -- let's take a look at your

5  deposition at page 63, lines 11 through 14.

6        And the question was, "Is it possible that you

7  once had documents that reflected communications with

8  angel investors concerning Personal Audio?"

9        And your answer was, "Yes, I'm sure I did."

10        Did I read that correctly?

11  A.    You did.

12  Q.    And then if you go on down, you were asked, "When

13  do you think that those documents were destroyed?

14        And your answer was, "Well, I'm not sure how

15  long they were ever saved for.  I would have no way of

16  answering that."

17        And then Mr. Stephens asked you, "So, you just

18  don't know when you ceased to have them?"

19        And your answer was, "Right, that's true."

20        Do you see that?

21  A.    Yes.

22  Q.    And then a little bit further down, Mr. Stephens

23  was asking you a little bit more about how long ago it

24  was that you would have had those materials and

25  specifically at lines -- starting at line 4, Mr. Stephens

3123

1  asked you when that was.

2          And at lines 9 and 10 you said, "But for all I

3  know, I threw stuff out along the way, too.  I don't

4  remember."

5  A.    I see that.

6  Q.    Mr. Logan, what was your net worth in 2001?

7  A.    I don't remember exactly.

8  Q.    So, could you take a look at Volume 2 of your

9  deposition on page 307?

10  A.    Okay.

11          THE COURT:  Could you hold up just one second?

12  Let me make a note.

13  BY MS. HUNSAKER:

14  Q.    I'm sorry, Mr. Logan.

15          MR. MORTON:  One second.  I was waiting for --

16          THE COURT:  Could you hold up one second?

17          MS. HUNSAKER:  Oh, yes.  I'm sorry.

18          THE COURT:  You've made a point.  I want to

19  make a note so I can remember the point that you've made.

20          MS. HUNSAKER:  Okay.

21          THE COURT:  This is actually working to your

22  benefit.

23          MS. HUNSAKER:  Okay.  I -- yes.  Sorry, your

24  Honor.

25          THE COURT:  Okay.  So, Mr. Morton, do you have

3124

 1  an objection?

 2          MR. MORTON:  Yes, your Honor.  I have an

 3  objection based on relevance to the question about

 4  Mr. Logan's net worth.

 5          THE COURT:  I'm sorry.  Relevance as to his

 6  memory?

 7          MR. MORTON:  No, as to just inquiring about

 8  his net worth in 2001.  It's not relevant.

 9          THE COURT:  And the relevance would be?

10          MS. HUNSAKER:  Whether he was capable of

11  bringing suit or not, your Honor.

12          THE WITNESS:  I didn't own the patents in

13  2001.

14          THE COURT:  Were you financially capable of

15  bringing suit in 2001?

16          THE WITNESS:  They weren't my assets in 2001.

17          THE COURT:  No, no.  If you wanted to bring

18  suit in 2001, could you have done it?

19          THE WITNESS:  Well, given what I know about

20  what a lawsuit costs today, if I had that knowledge back

21  then, the answer would have been no.  So, if I had done

22  the proper research, I wouldn't have brought suit.

23          THE COURT:  Okay.  Why don't you go on to your

24  next question.  I'll sustain any -- the relevance

25  objection as to any further pushing on his net worth at

 1  that time.

 2          MS. HUNSAKER:  Okay.

 3  BY MS. HUNSAKER:

 4  Q.    So, you testified on direct examination in this

 5  case about an agreement with Motorola.  Do you recall

 6  that?

 7  A.    I do.

 8  Q.    And specifically that related to the Pause patent;

 9  is that right?

10  A.    Yes.

11  Q.    And you testified that that involved a

12  6-million-dollar investment and a 15-cent running

13  royalty; is that right?

14  A.    I believe so.

15  Q.    And that Motorola agreement was not produced to

16  Apple in this case; is that right?

17  A.    I don't know if it was or wasn't.

18  Q.    Have you seen that agreement as an exhibit in this

19  case?

20  A.    I don't recall seeing it, no.

21  Q.    Have you seen it in preparing for your testimony

22  in this case?

23  A.    I don't recall seeing it, no.

24  Q.    Do you know where it is now?

25  A.    I don't exactly, no.  I assume Gotuit has that or

3126

1  I might someplace.  I don't know where it is.

2  Q.    So, in this case you're seeking a 90-cent per-unit

3  royalty; is that right?

4  A.    I believe so.

5  Q.    And the running royalty that you testified on

6  direct examination in the trial from the Motorola

7  agreement was a 15-cent running royalty; is that right?

8  A.    Well, it gets a bit complicated.  The $6 million

9  was actually sort of prepayment, if I recall this

10  correctly, on X number of units.  I think the rate might

11  have been 50 cents or something.  I don't remember

12  exactly; but there was some, you know, formula for how

13  they came up with the 6 million and so forth.

14  Q.    So, your previous testimony was that it was a

15  20 percent investment in the company.  Wasn't that what

16  the 6 million was for?

17  A.    They got stock in the company as well as a prepaid

18  license for a certain number of units or something and

19  then there was this residual of 15 cents a unit that was

20  on top of that, but I forget how it all rolled up.  There

21  were several layers to it.

22  Q.    And we can't verify any of this because you don't

23  know where that agreement is; is that right?

24  A.    It was -- I was not asked to produce it.

25  Q.    So, Robins Kaplan didn't ask you to search for

3127

1  that document?

2  A.    I -- I mean, I produced everything I was asked

3  for; so, I can't speak to, you know, if it was on the

4  list or not.  I mean, if it was, I would have given it to

5  them.  I was asked to produce a lot of documents; and,

6  you know, there were a lot of things that I produced.

7  Q.    But do you have a specific recollection of being

8  asked to produce the Motorola agreement?

9  A.    I don't have a specific recollection of that one

10 item, no.

11 Q.    But you were asked that question by Mr. Schutz on

12 direct examination.

13 A.    I don't -- I don't recall.

14 Q.    So, do you know where it is?

15 A.    Do I know where the original Motorola Pause

16 document is?

17 Q.    Yes.

18 A.    I don't know exactly where it is off the top of my

19 head.  I know some places to go look.

20 Q.    You know some places to go look, and you haven't

21 gone and looked in those places before this trial?

22 A.    I don't believe so.

23 Q.    And the per-unit running royalty in that agreement

24 you testified is 75 cents less than the per-unit royalty

25 that you're seeking in this case; is that right?

3128

1  A.      Depending on how you account for the $6 million.

2  Q.      But the per-unit running royalty that you

3  testified was in that agreement that has not been

4  produced or searched for was 75 cents less than the

5  per-unit royalty you're seeking in this case; is that

6  right?

7  A.      I think that's an inaccurate way to represent the

8  agreements because you're not accounting for the

9  $6 million.

10 Q.      But we don't know that because we don't have the

11 agreement; is that right?

12 A.      I don't know that because I haven't looked at the

13 agreement in a number of years; so, I can't recall the

14 specific details.

15          THE COURT:  Okay.  We're going to take a break

16 until 3:00.  Ms. Hunsaker, if you could provide

17 Ms. Mullendore with the citation to the direct testimony

18 where this came up, that would be helpful so I can go

19 back and take a look at it.

20          MS. HUNSAKER:  Yes, your Honor.  I have that

21 now if you'd like it.

22          THE COURT:  Oh, okay.  Sure.  What page of the

23 transcript?

24          MS. HUNSAKER:  So, this is in Volume 2 of the

25 transcript, which is page 392.

1          THE COURT:  Okay.  I'll take a look at that.

2          MS. HUNSAKER:  And page 7, all the way

3   through --

4          THE COURT:  Wait a minute.  Wait a minute.

5   Page 7 through 392?

6          MS. HUNSAKER:  Oh, I apologize, your Honor.  I

7   apologize.  If I could start over, I'll get it right this

8   time.

9          Page 392, line 7, through page 394, line 13.

10          THE COURT:  Okay.  That, I can look at.

11          MS. HUNSAKER:  Okay.  I apologize for that.

12          THE COURT:  We'll be in recess.

13          (Recess, 2:47 p.m. to 3:04 p.m.)

14          (Open court, all parties present, jury not

15   present.)

16          THE COURT:  Go ahead.

17          MR. MORTON:  Your Honor, if I could, I'd like

18   to point out a couple of things about a citation that was

19   provided on this Motorola license before the break.

20          First of all, your Honor, that was -- the

21   citation to page 393 of the transcript is actually to the

22   redirect.  That's not something that was elicited on

23   direct.  It was in response to Mr. Logan essentially

24   being attacked as a failure in business and in the Pause

25   litigation and, so, that's when that testimony came out.

1           And, of course, that also is not a Personal

2    Audio document.  That would come from Motorola or from

3    another entity, but that's -- this questioning about

4    whether he was asked to produce that document, I think,

5    was not proper.  And this is also something that's never

6    been raised before as far as the *laches* defense.

7           THE COURT:  All right.  And your point is that

8    because you brought it out -- or I guess Mr. Schutz

9    brought it out on redirect -- I shouldn't consider it?

10          MR. MORTON:  Well, this is -- I mean, this

11   agreement -- I think both sides have been opposed to it

12   and we haven't said we wanted to rely on it and did not

13   offer that in direct testimony.

14          But when he gets attacked as being a

15   failure --

16          THE COURT:  Okay.  But when you say both sides

17   were opposed to it, help me out with all those motions *in*

18   *limine* and objections.  Did both sides file objections to

19   it earlier or...

20          MR. SCHUTZ:  Your Honor, if I may jump in

21   here.

22          THE COURT:  Sure.

23          MR. SCHUTZ:  There seems to be an indication

24   that somehow they are prejudiced by failure to produce

25   the Motorola license.

1           THE COURT:  That's what they're saying all

2  right.  Sure.

3           MR. SCHUTZ:  I know, but our expert never

4  relied on the Motorola license.  We never solicited it in

5  direct examination.  I never argued it in closing.  It

6  was only after Mr. Logan was repeatedly attacked as being

7  everything from a tax cheat to somebody who destroys

8  documents to being a failed businessman to not being able

9  to put a company together --

10          THE COURT:  Okay.  But the point she's trying

11 to make, I think -- and you can correct me if I'm wrong,

12 Ms. Hunsaker -- is if they had this agreement and

13 document, which I guess the point they're trying to make

14 is it no longer exists -- their expert would have been

15 able to hammer on "Here we have a 15-cent royalty and you

16 want a 90-cent royalty and 15 cents is" -- you asked

17 several questions on this.  15 cents is less than

18 90 cents, and I'll take judicial notice of that.

19          MR. SCHUTZ:  But these patents -- the Pause

20 patent is not in the Personal Audio family.  It doesn't

21 relate to this technology at all.  Again, nobody sought

22 to rely on this document or this technology.  So, for

23 them to argue that there is somehow evidence prejudice

24 because the license with Motorola was not produced is

25 simply a spurious argument, your Honor; and that's the

3132

1  only thing I'm trying to -- only point I'm trying to

2  drive home.

3            THE COURT:  Well, she's allowed to try to

4  develop -- I mean, I'll take arguments; but to save a

5  little time, Ms. Hunsaker, okay, they didn't -- am I

6  correct that that's your reason to try to get in the --

7  or find out where this document is?  Or do you have --

8  was there some other reason since it came up on --

9  earlier in the testimony?

10            MS. HUNSAKER:  Well, your Honor, to be honest,

11 having never seen the document, I had no idea that it was

12 going to come up in Mr. Logan's testimony.  And if

13 your Honor could look at page 394, line 7 of the

14 transcript, Mr. Schutz specifically, after Mr. Logan

15 testified to the 6-million-dollar investment and -- of

16 Motorola, Mr. Schutz asked, "Was there some additional

17 consideration in that agreement for the Pause patent?"

18            And Mr. Logan said, "There was."

19            And he said, "What was that?"

20            And Mr. Logan said, "We wanted to participate

21 in the upside in case they sold a ton of these and we

22 were given a 15 cent per-unit royalty on each unit sold."

23            So, it seems very clear from the record that

24 Mr. Schutz was eliciting testimony about a running

25 royalty to support the form of royalty in this case.  We

3133

1  agree that their expert did not rely on that.  We agree

2  that Dr. Ugone did not rely on that.  However, the reason

3  for that is because the document was not produced.

4          MR. SCHUTZ:  I'll also note that this --

5          THE COURT:  Wait.  Wait.  I'm reading through

6  the testimony here.  When this came up, I don't see an

7  objection from Apple as to this wasn't produced or -- I

8  mean, the objections that are made are outside the scope.

9  I didn't ask anything about agreements.

10          And then I overruled that.

11          There was an objection that he is now giving

12  us testimony about what Motorola was thinking.  I

13  sustained that.

14          I'm going to object to the narrative.  We need

15  a specific question.  I sustained that.

16          Objection as to compound question.  I

17  overruled that one.

18          And then Mr. Schutz asked about the agreement,

19  and he starts going into the agreement.  No hearsay

20  objection, no "he's testifying about something that

21  wasn't produced in violation of the court order"

22  objection.

23          I mean, I've got to say whatever testimony it

24  was, while I could think of objections that might have

25  been raised, they weren't.  So, it came in basically

3134

1  without objection on any of the objections that might

2  have been sustained; so, it's there.  And you've

3  established it wasn't previously produced.

4          In terms of *laches*, is it your point that you

5  think it wasn't produced because it no longer exists?

6          MS. HUNSAKER:  Yes.  There's no evidence of

7  it.  It hasn't been produced.  It hasn't been searched

8  for.  It's evidence in the case that we don't have of an

9  agreement from some time ago that if this case was filed

10 earlier, we think we would have had discovery on.

11         THE COURT:  Or alternatively you should be

12 asking for sanctions because they hid an agreement?

13         MS. HUNSAKER:  Or alternatively that.  Or at

14 least search for it.

15         MR. CORDELL:  Your Honor, can I just add

16 one --

17         THE COURT:  Well, that's -- because right now

18 we're talking about *laches*; and *laches*, there has to be a

19 showing that it didn't exist.

20         Yes, sir?

21         MR. CORDELL:  Could I just add one point?  I

22 hear what Mr. Schutz is saying; and reading this

23 transcript again, it brings it all back.  That came out

24 of the clear-blue sky.  It was clearly something that

25 Mr. Schutz and the witness had worked out to talk about

1  ahead of time, and this Motorola agreement was blurted

2  into the record when it was something that did surprise

3  me.  I had never heard of it.  I turned to the trial team

4  and said, "What is this agreement?"  And they all looked

5  at me like I had two heads.

6           The reality is it wasn't.  And then on

7  redirect it was the first question I asked him -- I guess

8  at page 408, at the bottom.  And I specifically asked

9  him, I said, "You never produced that."

10          And he said, "Well, I don't know."

11          But I think he did know.  I think that he and

12  Mr. Schutz talked about this and I think he knew that it

13  wasn't produced and they decided to go ahead and blurt it

14  out.  So --

15          THE COURT:  Okay.  But keep in mind that's a

16  different issue than *laches*.  I mean, let's keep our

17  issues straight here.  That's a different issue than the

18  *laches* issue.  The *laches* issue is the delay caused this

19  unavailability, as opposed to secret nefarious deals

20  between counsel and witness caused it.  And, so, I need

21  to keep these two theories separate because it's

22  different.

23          MS. HUNSAKER:  And if I can say, your Honor,

24  you know, they say don't ask questions you don't know the

25  answer to on cross-examination.  I don't know the answer

3136

1  to these questions.  We haven't had the opportunity to

2  examine Mr. Logan.  So, when I asked Mr. Logan if he

3  knows where this document is or if he can't find it or if

4  he's tried, I'm asking that because we haven't had

5  discovery on this and because this is really the first

6  time we've heard of it.

7            MR. SCHUTZ:  Your Honor, I'm looking at the

8  concordance for his deposition.  Motorola is --

9            THE COURT:  All right.  What page of the

10  deposition are you --

11            MR. SCHUTZ:  Well, it's his Deposition

12  Volume 2; and I'm just looking at the word index.  I see

13  "Motorola" in the word index appears at pages 288, 293,

14  295 --

15            THE COURT:  Well, let's --

16            MS. HUNSAKER:  And I looked at that after his

17  trial testimony, and what does not appear is a 15-cent

18  running royalty.

19            THE COURT:  Okay.  Why don't we continue on

20  right now with the *laches* and inequitable conduct portion

21  and let me suggest that counsel for both sides look at

22  this deposition and if there is some motion that needs to

23  be filed based on some failure to disclose or some

24  reasons that it wasn't disclosed or whatever, I can deal

25  with that separately.

3137

1          I haven't heard evidence yet that the document

2   is missing because it no longer exists.  It sounds like

3   nobody looked for it yet.

4          Now, it may turn out it's missing because it

5   doesn't exist or it may turn out that it was improperly

6   not disclosed or it may turn out something else.  But

7   right now let me focus on the *laches* part of it.  Okay?

8          MS. HUNSAKER:  Yes, your Honor.

9   BY MS. HUNSAKER:

10  Q.    So, Mr. Logan, do you recall on direct exam in

11  your testimony in this case Mr. Schutz introduced some

12  Made for iPod licenses?  Do you recall that?

13  A.    Yes.

14          MS. HUNSAKER:  And for the record, those were

15  Plaintiff's Exhibits 10 through 13.

16  BY MS. HUNSAKER:

17  Q.    And do you recall in your testimony, when those

18  exhibits were admitted, that the exhibits plaintiffs put

19  into evidence were not signed by you?

20  A.    Yes.  I know they were not signed by me.

21  Q.    And you were here during closing arguments, and

22  you heard Mr. Schutz reference the 50 cents from those

23  agreements.  Do you recall that?

24  A.    I don't remember specifically.  I know he

25  mentioned those licenses.  I don't recall exactly what he

3138

1  was saying about that.

2  Q.    It was something like "When it's Apple on the

3  other side of the table, they demand" --

4           THE COURT:  It's a running royalty.  I don't

5  think he said 50 cents.  I think he said it's a running

6  royalty, not a lump.

7           MS. HUNSAKER:  Thank you, your Honor.

8           THE COURT:  He probably tried to slip in it's

9  15 -- or a thousand dollars, was what he was thinking of

10  doing; but he didn't.  And so --

11           You were thinking of that, weren't you,

12  Mr. Schutz?

13           MR. SCHUTZ:  Your Honor, I was very --

14           MR. GERMER:  Attorney-client privilege.

15           THE COURT:  Never mind.  I won't pin you on

16  that one.

17  BY MS. HUNSAKER:

18  Q.    So, the Made for iPod license exhibits,

19  Plaintiff's Exhibit 10 through 13, those did not come

20  into your hands until late last fall, is that correct,

21  Mr. Logan?

22  A.    That's true.

23  Q.    So, had the suit been brought earlier, those

24  exhibits wouldn't have existed at all; is that right?

25  A.    Yes.

3139

1  Q.    Were you -- did you travel to Lufkin last October,

2  Mr. Logan?

3  A.    I did not.

4  Q.    Have you heard of a case called *Affinity*?

5  A.    I have heard of it in this trial a few days ago,

6  yeah.

7  Q.    *Affinity versus Volkswagen*?

8  A.    Yes.

9  Q.    And are you aware that Made for iPod license was

10 discussed in that case?

11          THE COURT:  Wait a minute, Ms. Hunsaker.

12 Isn't that kind of like saying prejudice because if you

13 had just filed the suit earlier before *KSM* came out, we

14 could have had a different -- or before the Supreme Court

15 made its latest ruling or before -- I mean, that's almost

16 like, "Gee, if we had just gotten this over earlier, we

17 would have had a better law on our side."

18          MS. HUNSAKER:  I understand your point, your

19 Honor, and if you could just give me a little bit of

20 leeway on this.

21          THE COURT:  Okay.

22 BY MS. HUNSAKER:

23 Q.    So --

24          THE COURT:  Well, I'm just bringing it up

25 because your time is running.

3140

 1          MS. HUNSAKER:  Okay.  All right.  I'll move

 2   more quickly, then.

 3   BY MS. HUNSAKER:

 4   Q.    So, you signed up for the Made for iPod program on

 5   about October 18th of 2010.  Does that sound about right?

 6   A.    So, are you asking me if I signed those documents

 7   also?

 8   Q.    I'm going to ask you that.

 9   A.    Well, you were saying I --

10   Q.    Did you --

11   A.    I think your question implied I had signed the

12   documents.

13   Q.    Have you signed a version of those documents?

14   A.    I countersigned the documents that were sent to

15   me, yes.

16   Q.    Okay.  And prior to signing those documents, you

17   applied for the Made for iPod program around

18   October 18th, 2010.  Does that sound right?

19   A.    Well, I think we should get straight what entities

20   we're speaking of.  So, there's a company called "Bringrr

21   Systems"; and Bringrr Systems went through -- or tried to

22   go through that approval process.  So, just to get the

23   record straight on that.

24   Q.    Right.  And we heard some testimony about that in

25   your direct testimony in this case, right?

 1  A.     I forget if we discussed that or not.  I'm sorry.

 2  Q.     Okay.  Okay.  Fair enough.

 3         So, the program that you signed up for late in

 4  the fall of 2010, you testified you did receive that

 5  contract from Apple and you did sign that, correct?

 6  A.     I signed it on behalf of Bringrr Systems, yes.

 7  Q.     Okay.  And that signed version was not marked as

 8  an exhibit or introduced in this case; is that right?

 9  A.     Yes.  That was my mistake.  I turned over the

10  earlier set that was just signed by Apple.

11  Q.     And when did you turn that over?

12  A.     I don't know.  A couple weeks ago or something.

13  It was -- I'm not sure exactly when.

14  Q.     But you applied for it back in October of 2010?

15  A.     Yes.

16  Q.     And that's when you would have --

17  A.     I don't know if it was October.  It was late in

18  the year.

19  Q.     Okay.  And that's approximately when you would

20  have gotten the versions that are marked as an exhibit in

21  this case?

22  A.     I'm not sure when they signed them and sent them

23  back.

24  Q.     Okay.  Okay.  Does it sound like generally the

25  right time frame?  I'm not off by a year?

3142

1  A.     Right.  We were going back and forth last fall.

2  Q.     Okay.  So, last fall of 2010 was when these

3  documents came in existence?

4  A.     Right.

5  Q.     And last fall of 2010 was when you turned them

6  over to your counsel, or you turned them over more

7  recently?

8  A.     I think it was more recently.

9  Q.     Like in May of 2011?

10 A.     Potentially.  I forget exactly.

11 Q.     So, would it surprise you if those were produced

12 to us on May 11th of 2011?

13 A.     Would it surprise me if that was the date?

14 Q.     Yes.

15 A.     Not too much, no.

16 Q.     And do you know why the signed versions were not

17 provided?

18 A.     Because I had at that point kind of given up on

19 trying to figure out what all the paperwork meant without

20 having a legal budget at Bringrr and I decided to abandon

21 the program and I never labeled the files properly.  So,

22 I just threw them onto my computer without a label; and

23 the ones I had labeled were the ones that were just

24 signed by Apple.  And, so, when somebody asked me for

25 those papers, I gave the ones that had the label.

3143

1  Q.    Okay.  Now, you said that you applied for those

2  under the Bringrr entity; is that right?

3  A.    Yes.

4  Q.    Now, you -- and we're talking about the Made for

5  iPod licenses that are at Plaintiff's Exhibits 10 through

6  13.  You've not actually participated in the Made for

7  iPod program since signing up for that in the fall of

8  2010; is that correct?

9  A.    I have no idea what my legal standing is with

10 those contracts.

11          MR. MORTON:  Your Honor, I --

12 A.    I got an email from them recently telling me about

13 something.

14          THE COURT:  Wait.  Wait.  Let's hear the

15 objection.

16          MR. MORTON:  I know your Honor said there

17 would be some leeway on this; but I just don't understand

18 where this is going and how it's relevant to the *laches*

19 trial, your Honor.

20          THE COURT:  Overruled.  We'll take care of

21 that with the time limits.

22 BY MS. HUNSAKER:

23 Q.    Have you paid any royalties to Apple under the

24 Made for iPod license that you signed up for for Bringrr

25 in November of 2010?

3144

1   A.     I don't believe so.  I tried to get a woman on the

2   phone to ask some questions and I was never able to get

3   anybody on the phone and we just gave up trying to offer

4   an Apple product.

5   Q.     Mr. Logan, how did you hear about the Made for

6   iPod program?

7              THE COURT:  Okay.  Ma'am, look, how does this

8   deal with *laches*?  If you're trying to go into something

9   else, fine; but tell me what it is you're trying to go

10  into.

11             MS. HUNSAKER:  So --

12             THE COURT:  *Laches* has to do with delay six

13  years ago.

14             MS. HUNSAKER:  So, your Honor, the program

15  that Mr. Logan signed up for well into this case and

16  shortly before this trial and for which the exhibits have

17  been admitted into evidence in this case, Mr. Logan has

18  not actually participated in that program or paid any

19  royalties under that program and the evidence that is in

20  the case did not exist if the case had been brought

21  earlier.

22             THE COURT:  Okay.

23             MS. HUNSAKER:  I was actually at the end of my

24  questioning on this --

25             THE COURT:  All right.  All right.

1        MS. HUNSAKER:  -- and was about to pass the

2   witness.

3        THE COURT:  Let's just be real clear for the

4   record.

5        It's almost absurd, on its face, for modern

6   businesspeople to say that they have never heard of or

7   would never consider a lump-sum royalty or a running

8   royalty or anything else.  I mean, even if they are just

9   complete computer people and never went past high school,

10  at the level of something like Apple, they've got MBAs

11  there who are aware of all kinds of royalty and license

12  agreements and if the right case came along, they would

13  do what it takes to get what they want.

14       The idea of coming in and saying, "Oh, we've

15  never heard of these things.  We'd never consider these

16  things.  We'd never do these things" -- once you open the

17  door with that kind of testimony, you're almost begging

18  for a limited purpose.  Now, I've instructed the jury

19  that those were not comparable licenses so they don't

20  take it that way; but the idea that someone has never

21  heard of or never knew about or would never consider any

22  kind of a license is almost unbelievable on its face.

23       And, again, the idea that if this suit had

24  just been filed earlier, we would have had a different

25  Congress and the law would have been different or more

1  people would have been using -- I mean, that's kind of

2  like saying, "Gee, if they had just filed it earlier,

3  they wouldn't have gotten that last year of damages

4  because we wouldn't have sold those iPods."  That, I

5  don't think, is a proper showing of prejudice.  Maybe a

6  higher court will say different; but to me, that's not

7  evidentiary prejudice.

8          Now, you've brought up several more standard

9  items; and if you have more of those, those would be the

10 ones to go into.  But the fact that facts would have

11 changed over time and new events would have been

12 developed -- I mean, would you argue, for example, if --

13 I don't know -- Steve Jobs retired and Beyoncé took over

14 the company and -- or something like that and because

15 it's now a different witness *[sic]* people didn't like you

16 as much or whatever?  Maybe if she took over, they would

17 like you better.  I don't know.

18          I mean, facts change over time; but that's not

19 evidentiary prejudice.  So, I mean, I'll give you some

20 more leeway; but I'm not seeing where we're going on

21 things that happened in the last year to 18 months.

22          MS. HUNSAKER:  So, I was actually at the end

23 of my examination --

24          THE COURT:  Okay.

25          MS. HUNSAKER:  -- and ready to pass the

3147

 1  witness, your Honor.

 2              THE COURT:  All right.

 3              MS. HUNSAKER:  Thank you.

 4              CROSS-EXAMINATION OF JAMES LOGAN

 5  BY MR. MORTON:

 6  Q.    Good afternoon, Mr. Logan.

 7  A.    Good afternoon.

 8  Q.    Remind us again.  Who owned the '076 patent and

 9  the application that led to the '178 patent from 2001

10  through early 2009?

11  A.    That would have been the Logan Family Trust.

12  Q.    And I'm going to show you a document, Mr. Logan,

13  that's been marked Defendant's Exhibit 153.  Can you tell

14  us what that document is?

15  A.    That is the -- one of the earlier agreements.

16              Can you blow it up a bit?

17  Q.    Sure.  Sure.

18  A.    Thank you.

19              Yeah.  That's one of the agreements that the

20  trust made with Charlie Call and myself to become engaged

21  with monetizing these patents.

22  Q.    And what's the date on that agreement, sir?

23  A.    That is August 9th, 2007.

24  Q.    And is that the first time that you had a

25  contractual obligation with the trust related to the

3148

1  '076 patent?

2  A.    Yes.

3  Q.    And at that point in time, did you get some

4  interest in the patents?  Not ownership but an interest

5  in the patents.

6  A.    You mean previous to 2007?

7  Q.    No.  I mean at this -- in this agreement.

8  A.    I'm sorry.  Could you repeat that?  Oh, you're

9  asking if I got an interest in the patents at that point?

10 Q.    Yes.

11 A.    Yes.  That is true.

12 Q.    And from 2001 up until this agreement, did you

13 have a financial interest in the patents-in-suit?

14 A.    I did not, no.

15 Q.    Then I want to go back and ask you some more about

16 your own personal knowledge, starting back in 2001.

17        Did you know or believe in 2001 that the iPod

18 may infringe the '076 patent?

19 A.    I did not.

20 Q.    How about 2002?

21 A.    No.

22 Q.    How about 2003?

23 A.    No.

24 Q.    How about 2004?

25 A.    No.

1  Q.    And how about 2005?

2  A.    No.

3  Q.    All right.  And I think you -- that's enough

4  years.  Thank you, Mr. Logan.

5        Did you own an iPod when Apple released it in

6  2001?

7  A.    I did not.

8  Q.    When did you first own an iPod?

9  A.    I've never actually owned an iPod.

10  Q.    Why is that, sir?

11  A.    I have pretty simple music taste actually and I

12  just only listen to music when I'm in my car and I really

13  just listen to radio music, to be quite frank.

14  Q.    Okay.  So, when did you actually first hold an

15  iPod, the actual device, in your hand?

16  A.    Well, the -- believe it or not, the only time I

17  can remember ever holding an iPod is when my wife bought

18  one in 2005 and I was very curious about that capacity of

19  the touch wheel product because I was in the capacitive

20  touchscreen business earlier and just wanted to see that

21  work and I played with it for a minute to see what that

22  felt like basically and that was about it.  You know, she

23  complained that she had misplaced it around the house a

24  couple times but I don't think I was ever the one to find

25  it and, like I said, I never really -- I've never even

3150

1  listened to one, to be quite frank.

2  Q.    So, from 2001 to 2004, you had never touched or

3  used an iPod?

4  A.    Not that I can recall.

5  Q.    Had the iPod really gained in popularity by 2005

6  when you first actually saw one?

7  A.    Yes.  It was starting to become a pretty

8  mainstream product by that point.

9  Q.    All right.  Let's switch topics a little bit and

10  talk about what you were doing in 2001.  Were you working

11  on Personal Audio products in 2001?

12  A.    No, I was not.

13  Q.    And how about in 2002, '3, '4, '5, '6?  Were you

14  working on developing the Personal Audio products?

15  A.    No.

16  Q.    Were you instead working on a business called --

17        THE COURT:  Can you excuse me for just one

18  minute?  Hold on.

19        All right.  Go ahead, counsel.

20        MR. MORTON:  Thank you, your Honor.

21  BY MR. MORTON:

22  Q.    So, I think I was just going to ask you about the

23  Gotuit business starting in 2001.  2001 going forward,

24  what was -- well, what was your role at Gotuit?

25  A.    I was CEO of Gotuit Media for its first few years.

3151

1  Q.     And what product lines were you focused on?

2  A.     Well, we ^ had initially had done that SongCatcher

3  product and then we shut that down and switched over to

4  try and bring out products in the video space after we

5  got the Motorola investment.

6  Q.     Can you just describe the product that you were

7  working on trying to bring to market for Gotuit?

8  A.     Okay.  So, I think it was in the, I guess, 2001 to

9  2003 I was involved in the video efforts.  We were

10 working with set-top box companies as well as cable

11 companies to deliver an ability for consumers to

12 basically surf through Video on Demand content.  So, some

13 of the cable companies were putting, say, new shows up on

14 their video-on-demand servers.  So, you might come home

15 at night and want to watch the news and we had a service

16 that would tag the news stories so that you would know

17 what the beginning and end was and the software that we

18 would download to the set-top box and have on the server

19 could let the user just hit the "next" button and skip

20 from story to story.

21 Q.     And how far along did that product get as far as

22 bringing it to market?

23 A.     We had a pretty well-polished version that went

24 into trials at a few different cable companies and

25 several hundreds of thousands of people were using that

1    for a period of time.

2    Q.    And how long did you work on that product?

3    A.    Probably, you know, through 2003.

4    Q.    And what did you do after -- what product line

5    were you working on -- strike that.  Let me start over.

6    A.    Okay.

7    Q.    How long did you stay at Gotuit?

8    A.    Through 2004.

9    Q.    And what did you do after that?

10   A.    I moved into the incubator in New Hampshire and

11   started Emergent Technologies and worked on a few

12   start-up ideas and projects, ultimately ending up in the

13   Bringrr Systems endeavor I'm involved in now.

14   Q.    When you were working at Gotuit, did you consider

15   yourself to be in competition with Apple, Inc.?

16   A.    We never did, no.

17   Q.    I apologize, Mr. Logan.  I'm just going through my

18   notes trying to figure out how much we still have to

19   cover based on the direct.

20   A.    Sure.

21   Q.    Are you aware, Mr. Logan, if Pause Technology was

22   ever subpoenaed for documents in this case?

23   A.    Well, Pause Technology doesn't exist anymore.  I

24   don't believe there is any attempt to get any documents,

25   wherever they might be, from that entity or from the

1  remains of that entity.

2  Q.    Are you aware of whether or not Motorola was

3  subpoenaed for documents in this case?

4  A.    I am not aware that they were.

5  Q.    Can you turn to your deposition, sir?

6  A.    Yes.

7  Q.    Do you recall testifying about the Motorola

8  license in your deposition?

9  A.    I don't recall the specifics, no.

10 Q.    Can you turn to page 288?

11 A.    Okay.

12 Q.    And do you see there at line 23 -- well, we'll

13 start at line 18.

14 A.    Okay.

15 Q.    This is your answer.  You're saying, "Certainly

16 that's the mode of operation with the Pause patent.  Back

17 before the rules of the patent game changed, you were

18 able, as a small company, to go around the larger

19 companies and have conversations with them.  And, in

20 fact, that's the sort of conversation we had with

21 Motorola that worked out quite nicely, you know, in

22 roughly the same time frame."

23          Do you see that, sir?

24 A.    I do.

25 Q.    Does that refresh your recollection about

3154

1  testifying about Motorola in your deposition?

2  A.    Yes.

3  Q.    And can you turn ahead to page 293?

4  A.    Okay.

5  Q.    Do you see there starting at line 5 that you were

6  asked about your lawsuit against TiVo?

7  A.    Yes, I do.

8  Q.    And do you see your answer starting at line 6?

9  A.    I do.

10 Q.    "Well, first my negotiations with Motorola -- so I

11 had come across other players in that market" -- do you

12 see that?

13 A.    Yes, I do.

14 Q.    And then if we could turn to page 295.

15        MS. HUNSAKER:  Your Honor, I'm going to object

16 to impeaching Personal Audio's own witness.  It's

17 improper for him to be reading from Mr. Logan's

18 deposition.

19        THE COURT:  Well, it's before the court; and

20 if the question is did he -- you're trying to point out

21 that there were some discussions in the deposition about

22 Motorola?

23        MR. MORTON:  I'm actually trying to point out

24 that there were extensive discussions about Motorola, and

25 my next one I was going to go to would be the license.

1            THE COURT:  Which is where?

2            MR. MORTON:  Page 296 of the deposition,

3  starting at line 15.

4            THE COURT:  Okay.  This doesn't sound exactly

5  like what was testified to on -- during the trial.  I

6  mean, looking at page 296, we're talking about Motorola

7  buying a 20 percent interest in the Pause company and

8  investing money in Gotuit.  I certainly don't see

9  anything about a license or a 15-cent running royalty or

10 anything like that.

11           MR. SCHUTZ:  Well, your Honor, Mr. Cordell

12 said it was a surprise during my redirect that there had

13 been any dealings with Motorola.  Motorola is mentioned

14 during the transcript of Mr. Logan's deposition probably

15 20 different times.

16           THE COURT:  I guess the surprise -- and it's

17 actually the surprise I'm having now -- is, I mean, you

18 read what he says on 296.  (Reading) it was a combination

19 deal where Motorola put $6 million into the Pause company

20 in exchange for 20 percent ownership and they also

21 invested $4 million in Gotuit and are common

22 shareholders.  Good deal because they would have the

23 option later to use the technology.

24           And then all of a sudden during the trial we

25 have him popping out with $6 million plus 15 cents

1  running royalty.

2          MR. SCHUTZ:  Your Honor, it was their

3  deposition.  They never --

4          THE COURT:  I know it was their deposition,

5  and it was his answer.  He says one thing in deposition,

6  a stock purchase; and then all of a sudden at trial when

7  he's trying to make the point about running royalties, he

8  suddenly comes up with 15 cents running royalty which he

9  didn't hint at when he talked about it the first time.

10          MR. SCHUTZ:  I think the point, your Honor, is

11  they made an allegation that the fact of a license

12  agreement between Motorola and Pause was something they

13  did not know about.  This clearly -- they elicited

14  information about an agreement between Motorola and

15  Pause, never asked for a copy of it, never started asking

16  about any of the specific terms of it.  After he's then

17  attacked at trial repeatedly, only in redirect did this

18  come up.

19          I just think it's unfair for them to toss

20  these allegations out that they knew nothing about a deal

21  between Motorola and Pause Technology.

22          THE COURT:  Well, I'm not so worried about

23  knowing nothing about Motorola or evidentiary prejudice.

24  I'm now going into the...

25          Well, as I said, that may come up later.

3157

1  We're going into the *laches* issue right now.

2           MR. MORTON:  May I continue, your Honor?

3           THE COURT:  Yes.

4  BY MR. MORTON:

5  Q.    Mr. Logan, are you aware that the trust as well as

6  the trustee of the Logan Family Trust were subpoenaed in

7  this case?

8  A.    I -- are you asking me if the trustee was

9  subpoenaed?

10  Q.    Yes, sir.

11  A.    I -- I don't know actually.  I don't think that my

12  brother, who is the trustee, was deposed.  So, I -- is

13  that the same thing as being subpoenaed?

14  Q.    Well, the subpoena is one thing and the actual

15  deposition is another and that was going to be my next

16  question.  Are you aware if the trustee was ever deposed?

17  A.    I don't think he was deposed.  I know Apple called

18  some people up and talked to them and then didn't take

19  depositions.  So, I don't know if Apple or its lawyers

20  had talked to my brother and then he was never deposed;

21  but I don't think he went through the deposition process.

22  Q.    And you produced a number of documents in this

23  case from back in 1996 in the Personal Audio days, right?

24  A.    Yes, I did.

25  Q.    And where were those documents kept?

3158

1  A.     I had this filing cabinet which I have toted

2  around with me for, you know, 16 years; and they were in

3  the third drawer.

4  Q.     And you produced all of those documents that you

5  had about Personal Audio from 1996; is that right?

6  A.     Yes, I did.  Yes.

7              MR. MORTON:  Give me one moment, your Honor.

8              I have no further questions, your Honor.

9              Thank you, Mr. Logan.

10             Pass the witness.

11             MS. HUNSAKER:  No further questions, your

12  Honor.

13             THE COURT:  Okay.  You may step down.

14             Next?

15             MR. CORDELL:  Your Honor, we now have some

16  citations to the trial record that we believe are

17  relevant to *laches*.  Mr. Elacqua will present those.

18             THE COURT:  Let me hold up -- or if you'll

19  hold up for just a minute, let me look at...

20             Was there an exhibit somewhere or did somebody

21  have a demonstrative that went through the chain of

22  assignments of the patent and the patent application?

23  I've got the patent assignment abstract of title, but I'm

24  remembering another -- did either side have some kind of

25  document where he went through that -- went through Logan

1  trust, went back to Personal Audio, or how that went?

2           MR. SCHUTZ:  There were some -- there was an

3  issue related to SongCatcher and Gotuit, as to whether --

4  I can't remember if -- it's the '178 patent, I think.

5  And it was somehow assigned to Gotuit.  And we went back

6  to the original assignment from the Logan trust to

7  Personal Audio -- or no.  We went and looked at the

8  assignment from the Logan trust to Gotuit, and it did not

9  include any of the patents-in-suit.

10          THE COURT:  That's Defendant's Exhibit 270.

11  I've got that.

12          MR. SCHUTZ:  Okay.

13          THE COURT:  So, there was not a --

14          MR. MORTON:  Your Honor, because ownership was

15  stipulated to, we did not go forward and put, I don't

16  think, the entire chain of title.  We, of course, have

17  it.

18          THE COURT:  I mean, I'm sure counsel agrees

19  that it's somewhat important.  Well, first of all, the

20  cases hold quite clearly that you can't have *laches*

21  beginning before the patent issues.  And in this case it

22  looks like the patent issued and then shortly after iPod

23  comes out, or *vice versa*.  But the cases also say that

24  there is, in effect, a hooking.  *Laches* counts -- it

25  doesn't matter who owned it; *laches* is progressive.  And

3160

1  the defense seems to be that, well, Personal Audio has

2  only had this a short time; the trust had it earlier than

3  that.

4       My understanding of the cases is that -- of

5  the case law is that the *laches* hooks on and gets longer

6  and longer.  So, I was interested in -- I was still

7  interested in who owned what when, since I've heard

8  testimony from Mr. Logan as to what he remembers and

9  evidently Mr. Call didn't remember very much.

10       MR. MORTON:  Your Honor, a couple of points on

11  that.

12       THE COURT:  Uh-huh.

13       MR. MORTON:  I mean, I think it's been pretty

14  unrebutted testimony about who owned the patents in the

15  relevant time period and that it was the trust.  We're

16  happy to submit additional documents on the ownership

17  chain, although that was also stipulated that we have it

18  correct.

19       The thing that I would say --

20       THE COURT:  Is it in the stipulation as to

21  what the chain was or when it came over?

22       MR. CORDELL:  No, your Honor.  It's not.  So,

23  I mean --

24       THE COURT:  See, as I said before, the case

25  law I have -- unless somebody has something different --

3161

1   says that it really doesn't matter.  If the previous

2   person didn't file, then their *laches* hooks onto your

3   *laches* --

4            MR. CORDELL:  Correct.

5            THE COURT:  -- and so on.  But just as a

6   matter of getting it straight, the patent assignment

7   abstract of title seems to indicate that the trust did,

8   in fact, have this from the period of 2001 up until about

9   2009.  Is that about right?

10            MR. MORTON:  That is correct.

11            THE COURT:  Do you have anything to --

12   anything different than that?

13            MR. CORDELL:  Other than those spurious

14   assignments in there, your Honor, I believe that if we

15   dig down into it, that's what the facts will show that

16   the trust --

17            THE COURT:  Okay.  All right.  Okay.  So, you

18   then had some references to the trial?

19            MR. MORTON:  I have one other point --

20            THE COURT:  Okay.  Go ahead.

21            MR. MORTON:  -- if I could.

22            When your Honor was talking about the hooking

23   effect on *laches* -- and I'm sure the court is correct

24   about that.  The issue that I think that this pertains

25   to, though, is that what they would have to have shown is

3162

1 that the trust knew or should have known, whoever the

2 patent holder was at the time knew or should have known

3 in order to have any *laches* arise that could then be, you

4 know, hooked into a successor entity.

5          MR. CORDELL:  The evidence, your Honor, is

6 that Mr. Logan was active in the trust; so, I think the

7 evidence --

8          THE COURT:  I think I understand that part.

9          MR. CORDELL:  Thank you.

10          THE COURT:  Okay.  You had some references to

11 the transcript?

12          MR. ARENZ:  Your Honor, we would object to

13 this.  We exchanged exhibits last night; and they said,

14 "We're going to put in some deposition testimony of

15 Mr. Novacek."  And this morning they came in after

16 9:00 p.m. *[sic]*; and they said, "Well, he's not --

17 unavailable under the Rule."  So, we object.  And now we

18 don't -- I don't think they've told us about this

19 testimony before.

20          MR. ELACQUA:  Your Honor --

21          THE COURT:  Well -- wait.

22          Keep in mind I've been here throughout the

23 entire trial, and I'm assumed to have heard it all.  I

24 know sometimes people think judges just sit up here and

25 go to sleep, but I really do listen.  And, so, I don't

think it's improper for an attorney to remind me, "Do you

remember on page so-and-so" or "refer back to page

such-and-such."  I can't see that as being really unfair

because technically I'm supposed to have that instantly

at my fingertips.  And I'm sure Ms. Mullendore has it

memorized.

    MR. ARENZ:  I understand, your Honor.

    THE COURT:  So, I'd know it anyway.

    But, Mr. Elacqua, if you would help me out.

    MR. ELACQUA:  Yes, your Honor.  And I, you

know, apologize to counsel for the delay.  We were here

late with the charge conference; so, I'm not -- this

isn't an exhibit, your Honor.  This is something we'll

file, and it's all very specific citations to the trial

record over the last week.  There is additionally a

couple -- one citation from the deposition of Mr. Novacek

who testified in behalf of himself and as a 30(b)(6) of

ENCO systems and there is also a couple very specific

citations to Mr. Goessling's deposition as well and I

have those in a binder with the highlighted pieces of the

transcripts as well as a brief summary of what each

states.

    THE COURT:  Oh, okay.

    MR. ELACQUA:  We want to put that into the

record, and we'll file that as well.

1          THE COURT:  And I presume you've presented

2   counsel with a copy?

3          MR. ELACQUA:  Yes, your Honor.

4          THE COURT:  Okay.  Why don't you step up --

5          MR. MORTON:  Not yet, your Honor.  We haven't

6   seen this yet.

7          MR. ELACQUA:  Counsel's been here the whole

8   trial.  It is citations from the trial.  If they want to

9   supplement --

10         THE COURT:  Okay.  Am I going to get a copy?

11         MR. ELACQUA:  Yes, your Honor.  Right here

12  (indicating).

13         MR. ARENZ:  Your Honor, if I'm correct, some

14  of this is deposition testimony which we do object to

15  because Mr. Novacek isn't unavailable.

16         Moreover, if I may, his trial testimony wasn't

17  about *laches*; and we weren't going to cross-examine him

18  about *laches* in front of the jury.  In fact, that's what

19  your motion *in limine* ruling suggested.  So, we think

20  it's improper to offer his testimony now when we would

21  otherwise be able to cross-examine him on the relevant

22  issue today.  That's what we thought the bench trial was

23  about.

24         THE COURT:  Well, is he around or here or --

25         MR. ELACQUA:  He's not, your Honor.  He had a

1  prior engagement.  And, your Honor, if I can respond to

2  that, first, *laches* was not in the jury trial; so,

3  counsel would not have been asking Mr. Novacek questions

4  about *laches*.

5          There is one citation and it's on Exhibit 2

6  and that's the sole citation we're offering from his

7  deposition that counsel took.

8          THE COURT:  Okay.  We have Jury Note Number 3;

9  and it says, "We would like to see the demonstratives

10  concerning patent '178."

11          And I thought...

12          Well, I think both sides have put in some of

13  those in terms of the group that Dr. Almeroth had.  Can't

14  really tell whether they're looking at invalidity or

15  infringement.  And I think some of Dr. Wicker's talk

16  about it also.

17          I think the only response I can give them is

18  "You have all of the exhibits that were properly admitted

19  in evidence.  You'll have to rely on them subject to the

20  limitations that were given in the instructions."

21          I don't see any other answer that can be given

22  to that kind of a question.

23          MR. SCHUTZ:  It's not exactly clear what it is

24  they're asking for, and I think we've agreed what goes

25  back and what doesn't go back.  So, I'm not sure how we

3166

1  send anything back to them.

2          THE COURT:  Do you see any other way I can

3  answer that?

4          MR. CORDELL:  I don't, your Honor.

5          THE COURT:  Okay.

6          MR. SCHUTZ:  Your Honor, I have one additional

7  piece of information.

8          THE COURT:  About?

9          MR. SCHUTZ:  When they were asking for the

10 demonstrative relating to the '178, the other

11 demonstratives relating to the '076 patent are 771A and

12 then they click up to 781A.  The last three of those

13 actually relate to the '178 patent.  They may not have

14 seen that in the fine print; so, they may actually have

15 demonstratives back there so --

16         THE COURT:  I think they do.

17         MR. SCHUTZ:  Yeah.

18         THE COURT:  That's the point.

19         MR. SCHUTZ:  Okay.

20         THE COURT:  But --

21         MR. SCHUTZ:  I mean, you might want to point

22 them to those particular exhibits.  I think it's 778 --

23         MR. CORDELL:  But then, your Honor, we get

24 into pointing them to ours.

25         THE COURT:  No.  What I may say is "These

1  include" -- or "You have all of the exhibits and all of

2  the demonstrative summaries relating to the '178 patent

3  that were admitted.  You need to rely on these."

4          MR. CORDELL:  I think that's fine, your Honor.

5          THE COURT:  Did you include them in your index

6  at the bottom?

7          DEPUTY CLERK:  Yes, sir.

8          (Discussion off the record)

9          THE COURT:  If counsel would step forward and

10  read the note to be sure there are no objections.

11          MR. SCHUTZ:  I guess, your Honor, the only --

12  I would object to your inviting them to look at the DAD

13  system without them asking.  I think merely pointing out

14  that you have all of them except DX 87 -- so, I would

15  request that the last sentence that says, "If you want to

16  examine the DAD system, please let the court officer

17  know."

18          THE COURT:  The problem is that I don't know

19  what they were asking for or not asking for precisely,

20  and I don't want to leave the impression that they can't

21  have it.  For example, there's also this Sony Discman

22  that for some reason was used in closing and didn't go

23  down to them.  All of the other little physical objects

24  are there; and I don't want to leave the implication by

25  saying that you have them all except this one, because

3168

1  technically -- and it wouldn't be true to say they have

2  them all.  They don't have the DAD down there.

3          MR. SCHUTZ:  Right.  And you do say that, but

4  you're almost inviting them to come look at it; and, so,

5  I'm concerned about the court's imprimatur on the DAD

6  system.

7          THE COURT:  But the problem is if I don't have

8  that sentence in there, the implication to them is they

9  can't have that for some reason.  "You have them all

10  except this one" -- I was trying to think of a way of

11  writing it without -- I did not want to invite them to do

12  it, either, because it causes endless problems; but I

13  don't want them to think that they couldn't look at it if

14  they didn't [sic] want to.

15          MR. SCHUTZ:  Again, I'm concerned that the

16  court is inviting --

17          THE COURT:  What about this:  "Except for the

18  DAD system which is still in the court"?

19          MR. SCHUTZ:  I would agree to that.

20          MR. CORDELL:  "Except for the DAD system which

21  is available for review in the court"?

22          MR. SCHUTZ:  Again, I think that's inviting --

23          THE COURT:  No.  I could say "which is still

24  in the court."  If somebody really wants it, they can

25  ask.  They can ask for it.

1            The logistical problems of having them come

2    down and look at this thing, given the amount of

3    information they're likely to get out of it, is

4    difficult.  I mean, I'm not at all interested in having

5    Mr. -- is it Novacek? -- demonstrate that thing to them

6    without a gag on because he's a witness.

7            MR. STEPHENS:  He's a talker, your Honor.

8            MR. SCHUTZ:  And we would obviously object to

9    anybody demonstrating it.  That's testimony again, and

10   testimony is closed.

11           THE COURT:  Well, there is a problem with

12   that.  I mean, there are all kinds of problems with it;

13   so, I don't want an invitation -- let's just change it to

14   "which is still in the court."

15           DEPUTY CLERK:  And take out the last sentence?

16           THE COURT:  Yes.  And I am going to have --

17   since I didn't realize this hadn't gone down there, I'm

18   going to have Ms. Laurents give this to them and just

19   explain that it got pulled out.

20           MR. SCHUTZ:  We have no objection to that.

21           THE COURT:  And what I'm talking about when I

22   say "that," DX 32.

23           DEPUTY CLERK:  I'm going to let you read it

24   again with the removal and addition.

25           MR. SCHUTZ:  I think this works, your Honor.

 1  No objection to this.

 2          MR. CORDELL:  Could we just add two words,

 3  your Honor?  "You have all of the exhibits in the jury

 4  room" -- or maybe it should be at the very end.  So,

 5  "Except for the actual DAD system, DX 87, which is still

 6  in the court, you have all of the exhibits and all of the

 7  demonstrative summaries that relate to the '178 patent

 8  that were admitted, in the jury room."

 9          THE COURT:  That would work.

10          MR. SCHUTZ:  It's innocuous.  I don't care.

11          THE COURT:  Okay.  Put that in.

12          (Discussion off the record)

13          THE COURT:  Okay.  So, defendant is now

14  through with its presentation?

15          MR. CORDELL:  Yes, your Honor.  Defendant

16  rests on the equitable issues.

17          THE COURT:  Okay.  Personal Audio?

18          MR. MORTON:  Yes, your Honor.  A couple of

19  things.  I would like to offer Plaintiff's Exhibits 226,

20  227, 228, and 229.  These are on the admissible list

21  agreed to; and that is the chain of title, your Honor.

22          THE COURT:  Okay.  Do you have copies of those

23  or...

24          MR. MORTON:  I can give you my copy --

25          THE COURT:  Seeing as the deputy clerk just

3171

1  stepped out with that note.  If you want me to actually

2  look at them and read them.

3              MR. MORTON:  I'm happy to hand up my copies I

4  have here.

5              THE COURT:  Okay.  And for record purposes, I

6  do read all of the exhibits; so, we don't want an

7  inference that I don't.

8              MR. MORTON:  I apologize, your Honor.  They

9  didn't get on our exhibit list in order, but it's pretty

10  clear what they are and the transfer that occurs.

11              THE COURT:  All right.  Why don't we make this

12  easy for me.  Which one are we dealing with here?

13              All right.  So, Plaintiff's Exhibit 226 would

14  show that James Logan gave Personal Audio a dollar for --

15  no.  Personal Audio gave James Logan a dollar for the

16  '813 application?

17              MR. ARENZ:  That's 226, yes.

18              THE COURT:  Okay.  All right.  And that's

19  in --

20              MR. ARENZ:  That's in 1998, sir.

21              THE COURT:  Okay.  The 27th of May, 1998.  All

22  right.

23              MR. ARENZ:  I don't have the exhibits in front

24  of me.  I think 228 is the original assignment from the

25  inventors to Personal Audio, Inc.

3172

1          THE COURT:  All right, in '96.  Okay.

2          MR. ARENZ:  And then you have two more

3   assignments; and I know the last one goes from the trust

4   to Personal Audio, LLC.  That brings us to today.

5          THE COURT:  All right.

6          MR. ARENZ:  So, I believe 227 is -- I'm

7   presuming -- Mr. Logan to the trust; and that's also in

8   1998.

9          THE COURT:  Okay.  What else?

10         MR. ARENZ:  Well, just a couple of brief

11  things, your Honor.  On the topic of 30(b)(6) notices, we

12  had a motion *in limine*, Number 3, that we sought to have

13  Apple estopped from raising any issue over evidentiary

14  prejudice or economic prejudice because we noticed

15  depositions of Apple back last fall and they refused to

16  produce a witness on the topics we noticed.

17         And I have a copy of the notice if you would

18  like, if I can approach, your Honor.

19         THE COURT:  No.  I've got the motions *in*

20  *limine* you filed.  It should be attached in there.

21         MR. ARENZ:  And, so, your ruling just mentions

22  to raise objections at the bench trial; and I'd like to

23  do that.  I don't know yet what is in the trial

24  transcripts; but to the extent it goes to either economic

25  or evidentiary prejudice, we would, of course, object to

3173

1  that coming in or any other argument by Apple on those

2  two points.

3          THE COURT:  Okay.  Let me understand.  You

4  want to -- I'm taking a look at the response, and I don't

5  know if you have that in front of you.

6          MR. ARENZ:  I do not, your Honor.

7          THE COURT:  Well, maybe you'll want to obtain

8  a copy.  Might not be a bad idea to have what you filed

9  as your original motion *in limine* since I think that's

10 what you're going on.

11         MR. ARENZ:  While we're trying to find that,

12 your Honor, the point I also wanted to make was we would

13 like to make the objection regardless of the substance of

14 the motion -- we would like to make it currently as well.

15         THE COURT:  Because?

16         MR. ARENZ:  Well, for the same reasons that

17 there was -- there was a notice, there was a deposition

18 notice, and we wanted to --

19         THE COURT:  Well, counsel, the reason I think

20 it might be worthwhile for you to look at your own motion

21 and look at the response is I'm looking at the response

22 and one of the things that Apple provided me with was

23 deposition testimony from a witness going on about their

24 research and development and workaround and so forth

25 and -- so, at least there was something that was provided

1  by deposition.  That's -- if you'll have it in front of

2  you, we can then discuss what it is you think is missing.

3          MR. ARENZ:  I don't have the motion, but I do

4  think I have an idea of what you're talking about.

5          THE COURT:  Okay.

6          MR. ARENZ:  In terms of Topic Number 3 on

7  economic prejudice, which is just one of the many topics

8  they didn't produce a witness on, they said to the extent

9  it encompasses topics in yet a different 30(b)(6), which

10 was a financial representative who was not going to

11 address things like how Apple's economic position changed

12 as a result of the delay.  And I think what the case law

13 gets at is you really need to show, for economic

14 prejudice, some sort of change and not just what sort of

15 expenses you had; but you have to show that those

16 expenses would have been different if the lawsuit was

17 filed earlier.

18          And we don't have -- we didn't get a witness

19 on that topic.  And there was no witness at all on

20 evidentiary prejudice.

21          THE COURT:  Who is Charles Lancaster?

22          MR. ARENZ:  He's an Apple employee.  And we do

23 have a brief clip of his deposition to the extent they

24 are allowed to offer economic prejudice.  We think his

25 testimony wasn't sufficient to raise it, but we thought

1  we --

2           THE COURT:  Well, okay.  You're talking two

3  different things.  One, you're saying I should rule that

4  they get in nothing because they didn't respond to a

5  30(b)(6).  And then before you even argue that, you say,

6  "Oh, well, this clip from Lancaster isn't enough; so,

7  they should lose on the merits."

8           Now, which way are we going?

9           MR. ARENZ:  Well, I'll tell you, your Honor.

10 The position is we didn't get a full deposition on this

11 topic; so, they shouldn't -- it should be conclusively

12 established that they were not economically prejudiced.

13          To the extent that is denied, that motion and

14 that objection is denied, then we would offer the

15 deposition --

16          THE COURT:  What do you mean you didn't get a

17 full deposition?  I've read through the first few pages.

18 You asked this Mr. Lancaster these questions.  He gives

19 his answers.  Now, you may be correct that his -- in the

20 end there's not much there; but that's different than

21 saying kick them out entirely.  I mean, he just may not

22 know a lot.  That doesn't mean -- if that's the best

23 they've got, that's the best they've got.  I'm not going

24 to let in other witnesses on the change in financial

25 position, the evidentiary -- I mean, the economic

3176

1   prejudice.

2            MR. ARENZ:  So, here's the deal, judge.  I

3   think we're fine putting in the video, but my point is --

4            THE COURT:  Whose video?

5            MR. ARENZ:  Mr. Lancaster's -- or a clip.

6            THE COURT:  You're going to introduce the

7   video?

8            MR. ARENZ:  To the extent that my motion is

9   denied or my objection is overruled, we would, yes.

10           THE COURT:  Why on earth would you present

11  their evidence for them?

12           MR. ARENZ:  No.  It was our deposition, and we

13  think it shows they weren't prejudiced.  And my point --

14           THE COURT:  Oh, okay.

15           MR. ARENZ:  -- is we took a 30(b)(6) -- we had

16  a notice, and it was on a broad scope, on the full scope

17  of economic prejudice.

18           THE COURT:  Well, I'll tell you what.  It

19  seems fair -- and I'll let Mr. Elacqua address this --

20  that I limit their testimony on this issue to the

21  testimony that was given by the 30(b)(6) witness; but I

22  don't see how it's fair that I keep out the testimony

23  that he gave if he gave testimony under 30(b)(6).  I

24  mean, I --

25           MR. ARENZ:  Your Honor, my point is there was

3177

1  a broad topic; and they said, "We're not going to give

2  you a witness on this broad topic.  To the extent that it

3  overlaps with something else, we'll give a witness on

4  that."  And, so, it's not a full-scope deposition.  It's

5  not what we asked for.  I mean, and we were entitled to

6  it.

7           THE COURT:  But this is something they have

8  the burden of proof on.

9           MR. ARENZ:  That's exactly my point, judge.

10           THE COURT:  And, so, they get limited to what

11  they provide; and evidently you think you win on the

12  merits there.  So, why the -- where is the sanction?

13           MR. ARENZ:  My point is we weren't able to

14  cross-examine them fully on this and they have the burden

15  of proof and, so, to the extent that we can't get full

16  cross-examination, we've been prejudiced ourselves.  And

17  that's why it should just be resolved that there was no

18  economic prejudice in this case without further --

19           THE COURT:  I may be missing some subtle

20  point, but I don't see it is explained very clearly.  I'm

21  going to deny the request -- of course, they haven't even

22  offered this; so, I'm not sure why you're trying to keep

23  it out.  But if you're going to -- you've now presented

24  it to me or reminded me of it.  I'll go ahead and read

25  it.  I haven't heard them even try to get in other

3178

1  economic prejudice evidence, unless it's in those --

2  there wasn't any in the trial.

3           MR. ARENZ:  Okay, judge.  I think my

4  colleague, Mr. Schutz, has me on the right line here.  We

5  think Mr. Lancaster -- we'll put in the clip report of

6  his deposition, and that will be limited to economic

7  prejudice.

8           THE COURT:  Okay.

9           MR. ARENZ:  For evidentiary prejudice,

10  however, Apple refused to designate a witness; and our

11  objection continues to stand with that respect.

12          THE COURT:  All right.  And, Mr. Elacqua, I

13  think you were the one -- yes.  It was your declaration

14  that brought this in.  Let me first find the notice

15  again.

16          All right.  Mr. Arenz, where -- okay.  So

17  you're looking at your Topic 4, right, "all evidentiary

18  prejudice suffered," right?

19          MR. ARENZ:  That's correct, your Honor.

20          THE COURT:  Okay.  And then --

21          MR. ELACQUA:  Your Honor, I think I can maybe

22  short-circuit the evidentiary prejudice issue.

23          THE COURT:  All right.

24          MR. ELACQUA:  Just to save your Honor some

25  time.

1          As your Honor knows, we're primarily relying

2    on two factors relating to *laches*, Number 1, the

3    presumption and, Number 2, the evidentiary prejudice

4    relating to Mr. Logan, Mr. Call, and other related

5    testimony at trial.  We didn't designate a witness on

6    evidentiary prejudice, your Honor.  We obviously couldn't

7    designate, you know, Mr. Logan, Mr. Call, and other

8    evidentiary prejudice relating to plaintiff.  So, I

9    believe, your Honor, the issue is moot.

10          THE COURT:  All right.

11          MR. ELACQUA:  I don't think they're trying to

12   exclude --

13          THE COURT:  Why -- let me ask Mr. Arenz.  If

14   what their trial tactic is is to use their lawyer as part

15   of his trial strategy to cross-examine your corporate

16   representative plus Mr. Call about their failings, why

17   would they have to disclose a corporate witness of any

18   kind to say, "Yep, I've talked with the attorney and he

19   plans on doing a killer cross-examination of two of your

20   guys"?

21          MR. ARENZ:  We don't have an objection to

22   allegations of evidentiary prejudice with respect to

23   Personal Audio.

24          To the extent it's within Apple or --

25          THE COURT:  Okay.  But he hasn't tried to

 1  present any of that yet, has he?

 2           MR. ARENZ:  It was in the proposed findings of

 3  fact; so, that's where --

 4           THE COURT:  Well, we're doing the bench trial

 5  now; and they've already rested.

 6           MR. ELACQUA:  That was why I was trying to

 7  short-circuit the issue, your Honor, so -- we've rested.

 8           THE COURT:  All right.  They've rested.

 9  They're not bringing it in.  I don't think you need to

10  object --

11           Unless you want me to look at it.

12           MR. ARENZ:  No, sir.

13           THE COURT:  -- to what they haven't --

14           MR. ARENZ:  The last point and then I think we

15  can conclude.  I do have a couple of deposition clip

16  reports.  One is from our patent law expert Judge Andrew

17  Dillon.

18           THE COURT:  Clip report, which is...

19           MR. ARENZ:  We have a couple of options.

20  We're going to offer some deposition testimony.

21           THE COURT:  Okay.

22           MR. ARENZ:  We could play it if your Honor was

23  interested.  We also have the excerpts, which we call a

24  "clip report," so you don't have to --

25           THE COURT:  You're talking about a deposition

1  excerpt?

2          MR. ARENZ:  That's correct, sir.

3          THE COURT:  I'm sorry.  I'm not on the latest

4  terms, sir.

5          MR. ARENZ:  And then we have a DVD.  So, if

6  you wanted to bring it home tonight and watch the

7  deposition yourself, you could do it that way.

8          THE COURT:  My family might enjoy this.

9          MR. CORDELL:  Thursday is patent law expert

10 night, your Honor.

11         MR. ARENZ:  So, if I may approach --

12         (Discussion off the record)

13         THE COURT:  Okay.  All right.  So, you've got

14 some -- I can probably read faster than I can watch; so,

15 why don't you give me the excerpts, of course making sure

16 that Mr. Elacqua or somebody has -- on their side knows

17 which ones you're giving me.

18         MR. ARENZ:  Yeah.  They have

19 counter-designated as well.  May I approach, your Honor?

20         THE COURT:  Please do.

21         MR. ARENZ:  Okay.

22         THE COURT:  Okay.  We have Jury Note Number 4,

23 "We are requesting to leave at 5:00 p.m. to return

24 tomorrow morning."

25         So, regardless of all the bad publicity the

3182

1  Eastern District always gets about patent trials, once

2  again one of our juries is willing to work as hard as it

3  takes to get through it.  And I intend to call them in so

4  I can give them the typical instructions before they

5  leave, and I will ask them when they want to come back.

6  Sometimes they'll ask to come back at 9:00 instead of

7  8:30.

8            Any objection to that procedure from Personal

9  Audio?

10            MR. SCHUTZ:  None, your Honor.

11            THE COURT:  From Apple?

12            MR. CORDELL:  No, your Honor.

13            THE COURT:  Okay.  Then if you would please --

14  just for the record, I'm addressing the court security

15  officer.  If you would please inform them that if they

16  want to leave at 5:00, I'd like for them to come down

17  here at about five minutes of.  I need to give them a few

18  instructions before they leave.

19            COURT SECURITY OFFICER:  Yes, sir.

20            THE COURT:  Okay.

21            I'm reading through Mr. Dillon's testimony

22  here; and so far it -- and along with the PowerPoints or

23  slides he had -- all seemed to be dealing with the

24  equitable conduct issue about the alleged failure to

25  submit the DAD manual, right?

1          MR. ARENZ:  That's correct, your Honor.

2          THE COURT:  Dillon is not involved -- or

3   Mr. Dillon is not involved in the *laches*, right?

4          MR. ARENZ:  That's correct.

5          THE COURT:  Okay.  Then I read it correctly.

6          All right.  Anything else, then, from Personal

7   Audio?

8          MR. MORTON:  Just a little bit of procedure,

9   your Honor.  First, I know they handed up some trial

10  transcripts; and at least under the rule of completeness,

11  I'd like the opportunity to be able to look at those and

12  see what else should be cited.

13         THE COURT:  All right.  Well, since the jury

14  is coming back tomorrow morning and at least one attorney

15  on each side has to be here tomorrow morning to answer,

16  why don't you let me know in the morning if you want me

17  to consider additional references.

18         MR. MORTON:  Certainly, your Honor.

19         THE COURT:  Let me -- any other issues we need

20  to take up?  There were just the two equitable ones for

21  the bench trial, right?

22         MR. MORTON:  Yes.  My only other question was

23  going to be if we do revised proposed findings of fact in

24  light of the actual record at this point or not.

25         THE COURT:  Well, if you wanted to take a look

3184

1  at the ones you've already provided and cross out the

2  ones you don't think are really needed or are involved

3  right now, that would be fine.  That might help me some.

4  But to take the time of whole new ones, I don't think I

5  need that.

6         But if there is some really key point that is

7  going to come up in one of your -- the extracts you're

8  going to put -- or, for that matter, one of the ones

9  presented and you wanted to just let me know about it --

10  no, I'm not asking you to rewrite a huge, long findings

11  of fact; but if you had an extra finding based on "Look

12  at whatever it is we presented" or whatever, then sure,

13  let me know.

14         MR. MORTON:  Okay.  And I just asked

15  especially because we -- it's actually their burden and

16  we put out our findings first and then they put theirs

17  out a couple weeks later; so, I was just looking for some

18  way to be able to --

19         THE COURT:  Well -- did you have something you

20  wanted to add?

21         MR. CORDELL:  No, your Honor.

22         THE COURT:  All right.  I guess the concern I

23  have here is the presumption of six years.  And near as I

24  can tell, the patent was issued in 2001 and suit wasn't

25  filed until 2009.  Am I right about that?

1          MR. CORDELL:  Yes, your Honor.

2          THE COURT:  Okay.  During that entire time,

3  Mr. Logan has got his hand in there somewhere; and during

4  much of it, almost all of it, Mr. Call has his hand in

5  there somewhere and at the very least is attorney for the

6  trust.  I'm gathering that you're saying that the burden

7  doesn't shift and you don't need to focus on going ahead

8  and bursting -- I mean, as I understand it, it's a

9  bursting-bubble-type presumption, not one of the very

10  rare "never switches" kind.  Don't you feel that there

11  might be some burden to go ahead and attack the

12  evidentiary or economic prejudice prongs?

13          MR. MORTON:  First, your Honor, I don't think

14  that a presumption arises because there is no evidence

15  that the trust knew or should have known.

16          And I don't think there is -- even if you were

17  trying to impute to their patent attorney or Mr. Logan

18  who had no contractual obligation, if you were trying to

19  impute their knowledge, there is no evidence that they

20  knew or should have known and specifically knew or should

21  have known that the iPod infringed.  That's what the

22  cases say.  So, it is not enough to simply say the patent

23  was out and the product was out.  That's not the burden

24  that they have to show simply to get that initial bubble,

25  as you put it.

3186

1                  If they had that, then absolutely we would

2     burst the bubble with lack of prejudice, either economic

3     or evidentiary.

4                  THE COURT:  Okay.  And your side is that the

5     passage of time, the involvement of Mr. Call and

6     Mr. Logan shifts -- or brings into play the presumption,

7     right?

8                  MR. ELACQUA:  Yes, your Honor.  And we believe

9     that as a patent owner, Mr. Logan, who was obviously

10    involved the whole time, could not just lie in wait or

11    ignore the market.  There is an obligation there; and

12    because of the six-year -- more than six years, the

13    presumption should stand.

14                 THE COURT:  What would be your strongest case

15    on the "he can't ignore the market, he can't be willfully

16    blind," anything along that line?

17                 MR. ELACQUA:  I can cite that to you, your

18    Honor.  I believe it's in our proposed findings of law,

19    but let me pull that up right here.

20                 The primary case, your Honor, is the *Aukerman*

21    case and --

22                 THE COURT:  I have that.  I know the citation

23    to that.

24                 MR. ELACQUA:  Your Honor, for some reason I

25    don't have the proposed findings right in here; and I can

3187

1  provide the court with citation in the morning.

2          THE COURT:  I've got those.

3          Ready for the jury?

4          COURT SECURITY OFFICER:  Yes, sir.

5          THE COURT:  Please bring them in.

6          (The jury enters the courtroom, 4:56 p.m.)

7          THE COURT:  All right.  Mr. Dixon, I

8  understand that you are the foreperson.

9          THE FOREPERSON:  Yes, sir.

10          THE COURT:  Okay.  And I understand the jury

11  wishes to break for the evening and come back tomorrow

12  morning.

13          THE FOREPERSON:  That's correct.

14          THE COURT:  At what time?

15          THE FOREPERSON:  8:30 will be fine.

16          THE COURT:  Okay.  Then, ladies and gentlemen,

17  I'm going to -- and you may be seated, sir.

18          I'm going to go ahead and excuse you for the

19  evening and ask you to be back at 8:30.  Even though we

20  now have all of the evidence and you have, as I've told

21  you before, my instructions and the lawyers' arguments,

22  please remember all of the rules and the instructions

23  I've given you in the past about not doing outside

24  research, don't let anybody talk to you about this, don't

25  let anybody try to influence you, don't go do any

 1  reading.

 2          And most importantly, when you come back

 3  tomorrow morning, wait until all of you are together

 4  before you start to talk about it.  It would not be fair,

 5  proper, or anything else if five or six of you got

 6  together, made up your minds, and then just told

 7  everybody else, as they came in, what a decision on any

 8  issue was going to be.  Wait until you're all back

 9  together before you start discussing the case.

10          And at this time, then, please -- any

11  exhibits, notes, whatever, leave them there in the jury

12  room.  We'll lock them up.  At this time you are excused,

13  and I'll see you tomorrow at 8:30.

14          Actually you don't have to come to the

15  courtroom.  As soon as you all get there in the jury

16  room, you can start to deliberate.

17          (The jury exits the courtroom, 4:57 p.m.)

18          THE COURT:  Anything else, Mr. Elacqua?

19          MR. ELACQUA:  Your Honor, it is in the

20  proposed findings so --

21          THE COURT:  All right.  What is the case?

22          MR. ELACQUA:  There are a couple, your Honor.

23  The first one obviously is *Aukerman*; and the second would

24  be *Wanlass versus General Electric*, 148 F.3d 1334 at

25  1338, which discusses the fact that there is a duty on

3189

1  patentees to police their patent rights and, in the

2  absence of actual knowledge, impose constructive

3  knowledge.

4        In addition, *Hall versus Aqua Queen*, 93 F.3d

5  1548 at 1553, discusses the fact that a patentee must

6  investigate pervasive open and notorious activities that

7  a reasonable patentee would suspect were infringing; and

8  there are additional citations in that case as well.

9        THE COURT:  All right.

10       And if Personal Audio has a case -- I mean,

11  that's -- what Mr. Elacqua said is basically the

12  long-standing law.  There has always been some duty

13  there.  Now, if there is something -- you made the

14  argument that someone would have to show that the trust

15  knew.  I'm not sure I've had a case before involving a

16  trust or how they might be different than any other

17  entity that owned a patent or had an interest in a

18  patent.  Maybe -- I mean, I can imagine courts might be

19  more charitable towards trusts, just in the nature of

20  things.

21       I mean, if you've got a case along that line,

22  let me know about it tomorrow; and I'll certainly

23  consider it.  I just haven't seen one.  I think the cases

24  that were just cited -- I mean, it's an equitable thing

25  and I've got to balance it all out, but if you've got one

1  strongly going the other way, please bring that to my

2  attention.  Okay?

3        MR. MORTON:  We will look into the trust

4  issue, your Honor.  I think our first line of defense on

5  that is that there is just no evidence of what the trust

6  knew or should have known at all.

7        One case I will point the court to is -- it's

8  called *Bright Response*, at 730 F.Supp. 2d at 623; and the

9  issue that it goes to is whether or not even if you

10  looked, if you would know that it was infringement.

11  We've seen an awful lot about the source code in this

12  case and how you've got to have access to proprietary

13  information.  That is one of the bases to rebut any idea

14  that you knew or you should have known of the

15  infringement.

16        THE COURT:  Okay.  All right.  Anything else,

17  then, from Personal Audio's point of view that needs to

18  be taken up before we leave?

19        MR. SCHUTZ:  No, your Honor.

20        THE COURT:  From Apple?

21        MR. CORDELL:  No, your Honor.  Thank you.

22        THE COURT:  In that case, we'll be in recess.

23  I don't need the whole team tomorrow, but I will need

24  someone with authority to help answer notes starting at

25  8:30.

1          MR. CORDELL:  Thank you.

2          THE COURT:  We're in recess.

3          (Proceedings adjourned, 5:01 p.m.)

4   COURT REPORTER'S CERTIFICATION

5          I HEREBY CERTIFY THAT ON THIS DATE, JULY 7,

6   2011, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

7   RECORD OF PROCEEDINGS.

8   _Christina Bickham_

9   CHRISTINA L. BICKHAM,     CRR,     RMR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [1] - 2974:22
**$1.30** [1] - 3044:14
**$1.34** [1] - 3000:11
**$100,000** [3] - 2975:19, 2975:23, 2978:13
**$2** [1] - 3044:17
**$3,000** [1] - 3038:9
**$32** [1] - 2996:17
**$34** [2] - 2996:18, 2997:5
**$400,000** [3] - 3042:15, 3044:21
**$500** [4] - 2974:12, 2974:20, 2975:17, 2975:25
**$75,000** [2] - 2975:25, 2978:14
**$84** [2] - 3042:25, 3045:7

## '

**'076** [51] - 2931:13, 2931:16, 2933:25, 2934:7, 2934:17, 2934:19, 2934:21, 2936:17, 2936:19, 2937:15, 2947:15, 2947:17, 2948:24, 2949:3, 2949:10, 2949:14, 2949:19, 2959:3, 2965:20, 2970:15, 3032:18, 3035:10, 3055:4, 3057:21, 3058:9, 3058:22, 3059:6, 3060:13, 3060:17, 3060:22, 3061:16, 3062:2, 3062:5, 3063:1, 3063:5, 3063:13, 3063:20, 3073:14, 3073:19, 3075:8, 3075:22, 3076:13, 3105:1, 3110:24, 3112:23, 3113:22, 3115:6, 3147:8, 3148:1, 3148:18, 3166:11
**'078** [3] - 2934:17, 2968:5, 2968:6
**'178** [42] - 2931:13, 2931:17, 2934:1, 2934:8, 2934:23, 2935:2, 2939:9, 2939:15, 2947:16, 2947:18, 2948:25, 2949:4, 2949:7, 2949:15, 2949:20, 2949:24, 2959:9, 2965:23, 2968:7, 2968:17, 2992:5, 3032:19, 3035:10, 3075:15, 3075:19, 3076:21, 3077:3, 3077:10, 3078:15, 3079:10, 3081:13, 3084:24, 3087:1, 3091:9, 3115:22, 3147:9, 3159:4, 3165:10, 3166:10, 3166:13, 3167:2, 3170:7
**'813** [1] - 3171:16
**'96** [2] - 3111:23, 3172:1
**'go** [1] - 3033:22
**'in** [1] - 3018:13
**'playlist'** [2] - 3013:19, 3013:22
**'skip'** [1] - 3018:13
**'such** [1] - 2990:11
**'U.S** [1] - 2976:25
**'working** [1] - 3114:12

## 0

**0** [1] - 2981:16
**0.7** [3] - 3015:20, 3015:23

## 1

**1** [52] - 2922:12, 2922:13, 2922:14, 2931:16, 2931:17, 2931:22, 2932:4, 2933:25, 2934:7, 2934:20, 2935:1, 2935:3, 2936:18, 2937:15, 2939:9, 2939:13, 2946:17, 2947:14, 2947:15, 2947:17, 2948:24, 2949:3, 2949:10, 2949:11, 2949:14, 2949:19, 2976:10, 2976:24, 3009:17, 3022:1, 3032:18, 3032:19, 3033:1, 3035:10, 3055:19, 3058:14, 3063:12, 3072:19, 3094:9, 3094:12, 3099:16, 3108:16, 3109:25, 3111:5, 3113:4, 3113:25, 3120:9, 3179:2
**1,024** [1] - 3087:19
**1,627,691** [1] - 2931:23
**1.8-inch** [2] - 3006:11, 3006:13
**1.97** [1] - 3092:17
**10** [13] - 2922:4, 2922:5, 2923:2, 2929:18, 2968:4, 2968:16, 3007:7, 3120:9, 3120:14, 3123:2, 3137:15, 3138:19, 3143:5
**10,673,749** [1] - 2932:8
**10,946,988** [1] - 2932:15
**10-4** [1] - 3095:13
**100** [2] - 3005:24, 3050:4
**1019** [1] - 3106:1
**1023** [1] - 3106:2
**108** [1] - 3100:11
**11** [3] - 3087:4, 3114:20, 3122:5
**11,433,022** [1] - 2932:5
**112** [3] - 2987:14, 3117:24, 3118:25
**116** [2] - 2922:11, 3078:14
**11:36** [1] - 3053:8
**11:37** [1] - 3054:5
**11th** [2] - 3077:6, 3142:12
**13** [24] - 2922:4, 2922:5, 2929:19, 2931:17, 2934:1, 2934:17, 2935:2, 2939:14, 2947:15, 2947:18, 2949:7, 2949:11, 2949:24, 2968:5, 2968:7, 2968:17, 2981:16, 3007:8, 3114:21, 3115:21, 3129:9, 3137:15, 3138:19, 3143:6
**13,379,878** [1] - 2932:10
**1334** [1] - 3188:24
**1338** [1] - 3188:25
**14** [19] - 2931:17, 2934:1, 2934:7, 2934:22, 2939:10, 2939:15, 2947:15, 2947:18, 2948:25, 2949:4, 2949:11, 2949:15, 2949:20, 3035:10, 3064:5, 3114:1, 3114:5, 3120:25, 3122:5
**148** [1] - 3188:24
**14E** [1] - 2939:10
**15** [23] - 2931:16, 2933:25, 2934:16, 2934:21, 2937:15, 2947:14, 2947:17, 2948:24, 2949:3, 2949:10, 2949:14, 2949:19, 2967:7, 2964:25, 3113:4, 3126:19, 3131:16, 3131:17, 3132:22, 3138:9, 3155:3, 3155:25, 3156:8

**15,219,066** [1] - 2932:7
**15-cent** [5] - 3125:12, 3126:7, 3131:15, 3136:17, 3155:9
**15-minute** [2] - 3055:22, 3056:8
**153** [2] - 2922:15, 3147:13
**1548** [1] - 3189:5
**1553** [1] - 3189:5
**16** [13] - 2946:18, 2949:12, 2949:16, 2949:21, 2949:25, 2971:6, 2975:21, 2985:16, 3057:16, 3073:1, 3111:8, 3158:2
**164** [1] - 3060:20
**165** [1] - 3062:8
**17** [1] - 3111:13
**17-year-old** [2] - 3027:4, 3027:6
**170** [1] - 3063:10
**18** [8] - 2973:16, 3025:19, 3088:25, 3090:10, 3110:1, 3146:21, 3153:13
**18th** [2] - 3140:5, 3140:18
**19** [3] - 3026:9, 3088:8, 3121:9
**1960** [1] - 3086:23
**199** [1] - 3004:21
**1990s** [1] - 3110:25
**1994** [1] - 3097:13
**1995** [1] - 3094:15
**1996** [13] - 2969:19, 2970:17, 2970:23, 2972:17, 2984:6, 3015:12, 3083:18, 3117:3, 3118:2, 3118:11, 3119:15, 3157:23, 3158:5
**1998** [4] - 2984:9, 3171:20, 3171:21, 3172:8
**1:00** [2] - 3053:19, 3053:23
**1:02** [1] - 3054:5
**1A** [1] - 2939:9

## 2

**2** [18] - 2932:4, 2932:6, 2932:10, 2934:20, 2934:25, 2936:18, 3018:3, 3025:23, 3050:4, 3050:17, 3055:18, 3055:21, 3123:8, 3128:24, 3136:12, 3165:5, 3179:3
**20** [5] - 2986:5, 3126:15, 3155:7, 3155:15, 3155:20
**20,000** [1] - 3005:24
**200** [2] - 3001:10, 3038:9
**2000** [4] - 2984:12, 3073:22, 3074:17, 3083:14
**2001** [40] - 2959:2, 2991:17, 3006:9, 3026:12, 3036:9, 3037:2, 3037:3, 3038:7, 3060:23, 3070:21, 3070:24, 3071:1, 3071:5, 3071:7, 3104:7, 3104:22, 3104:25, 3107:9, 3108:24, 3110:16, 3123:6, 3124:8, 3124:13, 3124:15, 3124:16, 3124:18, 3147:9, 3148:12, 3148:16, 3148:17, 3149:6, 3150:2, 3150:10, 3150:11, 3150:23, 3151:8, 3161:8, 3184:24
**2002** [3] - 3148:20, 3150:13
**2003** [3] - 3148:22, 3151:9, 3152:3

**2004** [3] - 3148:24, 3150:2, 3152:8
**2005** [5] - 2981:15, 3104:7, 3149:1, 3149:18, 3150:5
**2006** [1] - 3104:25
**2007** [3] - 3072:7, 3147:23, 3148:6
**2008** [3] - 3077:7, 3087:4, 3109:13
**2009** [11] - 2959:9, 3058:9, 3058:22, 3067:21, 3072:6, 3077:10, 3103:20, 3104:4, 3147:10, 3161:9, 3184:25
**2010** [10] - 3058:1, 3110:22, 3140:5, 3140:18, 3141:4, 3141:14, 3142:2, 3142:5, 3143:8, 3143:25
**2011** [5] - 2923:2, 2974:23, 3142:9, 3142:12, 3191:6
**21** [3] - 2981:18, 3108:7, 3108:13
**21,872,953** [1] - 2932:13
**212** [1] - 2988:13
**219** [3] - 3058:15, 3058:20, 3064:2
**22** [2] - 2968:8, 2968:18
**224** [3] - 3108:6, 3108:11, 3108:14
**226** [5] - 2922:6, 2922:7, 3170:19, 3171:13, 3171:17
**227** [4] - 2922:6, 3109:25, 3170:20, 3172:6
**228** [3] - 2922:6, 3170:20, 3171:24
**229** [2] - 2922:6, 3170:20
**23** [1] - 3153:12
**235** [1] - 3111:5
**236** [1] - 3111:9
**238** [1] - 3120:9
**24** [1] - 2959:9
**25** [3] - 3037:12, 3043:16, 3111:8
**27** [1] - 2946:23
**270** [2] - 2922:16, 3159:10
**27th** [2] - 3108:16, 3171:21
**28** [4] - 3019:17, 3057:19, 3057:20, 3073:1
**288** [2] - 3136:13, 3153:10
**28th** [2] - 3073:22, 3077:10
**293** [2] - 3136:13, 3154:3
**295** [2] - 3136:14, 3154:14
**296** [3] - 3155:2, 3155:6, 3155:18
**2:47** [1] - 3129:13
**2d** [1] - 3190:8
**2nd** [2] - 2970:23, 2984:6

### 3

**3** [31] - 2931:16, 2931:22, 2932:12, 2933:25, 2934:16, 2934:19, 2934:25, 2936:16, 2937:15, 2946:18, 2947:14, 2947:17, 2948:24, 2949:3, 2949:10, 2949:14, 2949:19, 2981:18, 2987:9, 3010:6, 3015:16, 3017:11, 3017:24, 3018:1, 3018:4, 3026:1, 3045:23, 3150:13, 3165:8, 3172:12, 3174:6
**3,000** [6] - 2969:13, 2969:15, 2969:21, 2970:4, 2970:5, 3004:10
**3-1** [2] - 3079:20, 3094:17
**3-15** [2] - 3079:21, 3094:17

**3-9** [2] - 3099:21, 3099:22
**3-inch** [1] - 3119:13
**30** [1] - 3094:15
**30(b)(6** [31] - 3055:2, 3056:22, 3059:10, 3064:18, 3064:22, 3065:1, 3065:6, 3065:7, 3065:17, 3066:9, 3066:16, 3066:18, 3067:7, 3068:5, 3068:8, 3068:18, 3068:23, 3069:15, 3069:22, 3070:10, 3070:12, 3071:17, 3072:12, 3072:16, 3103:12, 3105:12, 3163:17, 3172:11, 3174:9, 3176:15, 3176:21
**30(b)(6)** [2] - 3175:5, 3176:23
**300** [2] - 2984:9
**307** [1] - 3123:9
**3074** [1] - 2922:10
**3078** [1] - 2922:11
**3094** [2] - 2922:12, 2922:13
**3099** [1] - 2922:14
**30th** [2] - 3089:9, 3090:5
**313** [1] - 3105:21
**3137** [1] - 2922:4
**3143** [1] - 2922:5
**3147** [1] - 2922:15
**3159** [1] - 2922:16
**3167** [1] - 2922:17
**3170** [1] - 2922:6
**3171** [1] - 2922:7
**32** [5] - 2946:20, 2997:5, 3021:25, 3022:1, 3169:22
**33** [1] - 2946:21
**34** [3] - 3019:17, 3021:25, 3045:23
**35** [1] - 3019:17
**36** [1] - 3022:1
**37** [1] - 3092:17
**374** [1] - 3078:16
**388** [2] - 3079:9, 3079:12
**392** [3] - 3128:25, 3129:5, 3129:9
**393** [1] - 3129:21
**394** [2] - 3129:9, 3132:13
**3:00** [1] - 3128:16
**3:04** [1] - 3129:13

### 4

**4** [11] - 2932:5, 2932:8, 2932:14, 2934:24, 3055:20, 3060:21, 3122:25, 3150:13, 3155:21, 3178:17, 3181:22
**4-inch** [1] - 3119:13
**4-year-old** [1] - 3027:5
**400,000** [1] - 3045:4
**406** [1] - 3090:10
**407** [1] - 3091:17
**408** [2] - 3090:11, 3135:8
**41** [1] - 2997:6
**45** [2] - 2981:18, 3013:15
**48** [1] - 3019:17
**4:56** [1] - 3187:6
**4:57** [1] - 3188:17

### 5

**5** [24] - 2932:6, 2932:10, 2932:16, 2934:24, 2970:18, 2994:24, 2994:25, 2996:12, 3024:7, 3024:8, 3033:16, 3042:23, 3044:5, 3044:8, 3044:23, 3045:3, 3045:6, 3047:5, 3059:13, 3150:13, 3154:5
**5-1** [2] - 3079:21, 3094:24
**5-16** [5] - 3079:21, 3094:25, 3095:2, 3095:3, 3098:10
**5-18** [2] - 3095:13, 3098:11
**5-million-dollar** [1] - 2999:3
**50** [7] - 3032:1, 3032:2, 3032:7, 3032:9, 3126:11, 3137:22, 3138:5
**501** [1] - 3107:22
**54** [1] - 3114:1
**55** [1] - 3114:20
**56** [1] - 3113:4
**5:00** [2] - 3181:23, 3182:16
**5:01** [1] - 3191:3

### 6

**6** [32] - 2931:17, 2932:12, 2932:13, 2933:25, 2934:17, 2934:23, 2939:14, 2947:15, 2947:17, 2948:25, 2949:4, 2949:11, 2949:15, 2949:20, 2968:5, 2968:6, 2968:17, 2970:14, 3059:13, 3072:25, 3111:9, 3113:4, 3120:9, 3126:8, 3126:13, 3126:16, 3128:1, 3128:9, 3150:13, 3154:8, 3155:19, 3155:25
**6,199,076** [1] - 2970:16
**6-million-dollar** [2] - 3125:12, 3132:15
**6.0A** [1] - 3094:15
**60** [1] - 2981:17
**60,000** [3] - 2970:8, 2970:11
**608** [1] - 2929:22
**610** [1] - 2929:22
**611** [1] - 2929:22
**616** [1] - 2929:22
**62** [2] - 2922:10, 3074:1
**623** [1] - 3190:8
**626** [1] - 2929:23
**629** [1] - 2929:23
**63** [2] - 3000:11, 3122:5
**634** [1] - 2929:23
**636** [1] - 2929:23
**638** [1] - 2929:23
**641** [1] - 2929:24
**643** [1] - 2929:24
**647** [3] - 2929:24, 3006:24, 3006:25
**65** [2] - 3099:17, 3099:21
**655** [1] - 2929:24
**657** [1] - 2929:24
**658** [1] - 2929:25
**66** [1] - 3099:24
**660** [1] - 2929:25

**663** [1] - 2929:25
**669** [1] - 2929:25
**68** [1] - 3100:5
**6th** [1] - 2974:23

## 7

**7** [8] - 2923:2, 2932:14, 3058:1, 3129:2, 3129:5, 3129:9, 3132:13, 3191:5
**7-11** [4] - 3080:1, 3081:4, 3095:8, 3095:13
**7-19** [1] - 3095:13
**7-20** [1] - 3095:13
**70** [1] - 2981:17
**705** [1] - 2930:1
**7209** [1] - 2989:19
**730** [1] - 3190:8
**745** [1] - 2998:9
**748A** [1] - 2929:11
**75** [2] - 3127:24, 3128:4
**771A** [5] - 2929:10, 2986:5, 3030:24, 3031:9, 3166:11
**778** [1] - 3166:22
**781A** [3] - 2929:10, 2986:6, 3166:12
**7th** [1] - 3048:1

## 8

**8** [6] - 2932:16, 2946:22, 3007:7, 3058:1, 3109:25, 3120:14
**8,642,082** [1] - 2932:17
**800** [1] - 3037:6
**802** [2] - 3088:25, 3090:10
**827** [2] - 2930:8, 2930:11
**87** [4] - 2922:17, 2946:16, 3167:14, 3170:5
**8:30** [5] - 3182:7, 3187:15, 3187:19, 3188:13, 3190:25
**8:31** [1] - 2923:2

## 9

**9** [5] - 2935:3, 2946:19, 3022:1, 3073:3, 3123:2
**90** [4] - 2996:20, 3044:13, 3044:15, 3131:18
**90-cent** [2] - 3126:2, 3131:16
**900** [1] - 3027:23
**93** [2] - 3001:23, 3189:4
**93,795,429** [1] - 3000:10
**95** [5] - 2946:19, 2949:13, 2949:17, 2949:22, 2950:1
**951** [1] - 3105:21
**9:00** [3] - 2923:13, 3162:16, 3182:6
**9:33** [1] - 2966:21
**9:35** [1] - 2967:23
**9:50** [1] - 2967:23
**9th** [1] - 3147:23

## A

**A.M** [1] - 2923:2
**a.m** [5] - 2966:21, 2967:23, 3053:8, 3054:5
**abandon** [1] - 3142:20
**abandoned** [1] - 3084:24
**ability** [6] - 2953:23, 3023:5, 3030:16, 3067:25, 3085:18, 3151:11
**able** [19] - 2953:22, 2971:22, 3004:8, 3014:10, 3024:21, 3032:3, 3048:16, 3055:13, 3119:7, 3119:19, 3121:8, 3131:8, 3131:15, 3144:2, 3153:18, 3164:21, 3177:13, 3183:11, 3184:18
**absence** [2] - 2960:6, 3189:2
**absolute** [1] - 3041:7
**absolutely** [3] - 3009:17, 3041:6, 3186:1
**absorb** [1] - 2977:14
**abstract** [2] - 3158:23, 3161:7
**absurd** [1] - 3145:5
**accelerating** [2] - 3006:20, 3007:3
**accelerator** [1] - 3037:24
**accept** [7] - 2924:18, 2925:8, 2927:8, 2927:9, 2927:14, 2963:10, 3093:6
**accepted** [1] - 2954:25
**accepting** [1] - 3037:20
**access** [4] - 3068:13, 3105:4, 3105:7, 3190:12
**accomplish** [2] - 2993:14, 3019:13
**accomplished** [1] - 3022:17
**accomplishes** [2] - 3010:15, 3018:20
**accomplishing** [3] - 2935:21, 2962:10, 2993:13
**accordingly** [1] - 2925:13, 3050:19
**account** [3] - 2974:25, 3044:18, 3128:1
**accounting** [1] - 3128:8
**accurate** [2] - 2986:9, 3120:24
**accuse** [1] - 3025:4
**accused** [31] - 2935:19, 2936:1, 2936:3, 2936:9, 2937:16, 2937:21, 2938:11, 2938:12, 2938:16, 2939:3, 2939:4, 2939:11, 2939:12, 2939:21, 2939:23, 2940:17, 2942:5, 2942:8, 2942:20, 2942:24, 2943:23, 2963:24, 2964:2, 2964:5, 2964:11, 3025:20, 3048:5, 3048:13, 3059:16, 3059:18, 3059:20
**accustomed** [1] - 2925:1
**achieve** [5] - 2940:21, 2944:2, 2954:15, 2992:11, 3026:6
**achieved** [2] - 2954:17, 2954:22
**achieving** [1] - 2992:13
**acting** [1] - 2963:10
**action** [4] - 3051:9, 3085:16, 3087:25, 3096:2
**Action** [1] - 3087:24
**active** [1] - 3162:6
**activities** [2] - 3067:17, 3189:6

**activity** [1] - 2959:22
**acts** [2] - 2935:9, 2956:19
**actual** [15] - 2930:19, 2959:19, 2997:6, 2997:13, 3006:15, 3015:3, 3038:17, 3047:17, 3149:15, 3157:14, 3170:5, 3183:24, 3189:2
**ad** [2] - 3107:15, 3107:24
**add** [6] - 2956:7, 3067:20, 3134:15, 3134:21, 3170:2, 3184:20
**added** [3] - 2963:1, 2964:2, 2972:12, 3009:18
**addition** [6] - 2944:3, 2954:3, 3117:20, 3119:1, 3169:24, 3189:4
**additional** [15] - 2934:12, 2936:13, 2936:21, 2951:8, 2954:10, 3069:1, 3072:9, 3087:7, 3102:9, 3102:23, 3132:16, 3160:16, 3166:6, 3183:17, 3189:8
**additionally** [1] - 3163:15
**additions** [1] - 3053:6
**address** [8] - 3004:8, 3011:7, 3014:7, 3020:1, 3052:21, 3103:16, 3174:11, 3176:19
**addressing** [2] - 3099:25, 3182:14
**adequate** [5] - 2956:3, 2958:8, 2959:15, 2964:18, 2964:20
**adjourned** [1] - 3191:3
**administrative** [1] - 3082:20
**admissible** [1] - 3170:20
**admit** [1] - 3021:9
**admits** [1] - 2986:2
**admitted** [19] - 2929:5, 2929:6, 2929:8, 2929:11, 2929:17, 2929:19, 2929:20, 2930:1, 2930:7, 2930:8, 2930:14, 2994:22, 3038:25, 3051:20, 3137:18, 3144:17, 3165:18, 3167:3, 3170:8
**admittedly** [1] - 3106:3
**ads** [1] - 3107:17
**advances** [1] - 3083:8
**advantages** [1] - 2962:8
**adverse** [1] - 3064:12
**advertisement** [3] - 3107:2, 3108:4, 3108:21
**advice** [1] - 3046:9
**Affinity** [2] - 3139:4, 3139:7
**afternoon** [6] - 3054:24, 3054:25, 3106:20, 3106:21, 3147:6, 3147:7
**agenda** [2] - 2975:15, 2975:17
**ago** [8] - 3008:25, 3021:24, 3023:25, 3122:23, 3134:9, 3139:5, 3141:12, 3144:13
**agree** [14] - 2959:1, 2986:14, 2986:15, 2986:18, 2990:4, 3012:19, 3031:6, 3050:9, 3050:10, 3070:1, 3081:5, 3133:1, 3168:19
**agreed** [8] - 2957:11, 2958:12, 2958:15, 2958:17, 2958:19, 2986:9, 3165:24, 3170:21
**agreeing** [1] - 2994:19
**agreement** [32] - 2958:3, 2963:21,

2973:15, 2973:17, 2974:22, 2997:22, 3050:16, 3125:5, 3125:15, 3125:18, 3126:7, 3126:23, 3127:8, 3127:23, 3128:3, 3128:11, 3128:13, 3130:11, 3131:12, 3132:17, 3133:18, 3133:19, 3134:9, 3134:12, 3135:1, 3135:4, 3147:22, 3148:7, 3148:12, 3156:12, 3156:14

**agreements** [8] - 2929:21, 3044:23, 3128:8, 3133:9, 3137:23, 3145:12, 3147:15, 3147:19

**agrees** [2] - 2991:5, 3159:18

**ahead** [32] - 2964:25, 2994:15, 2995:14, 3002:16, 3014:19, 3021:4, 3047:18, 3053:5, 3053:16, 3054:14, 3056:17, 3074:3, 3076:22, 3084:12, 3084:13, 3084:16, 3086:15, 3093:9, 3097:25, 3102:2, 3114:4, 3119:25, 3129:16, 3135:1, 3135:13, 3150:19, 3154:3, 3161:20, 3177:24, 3185:7, 3185:11, 3187:18

**aids** [2] - 2931:5, 2959:15

**air** [4] - 2969:17, 2980:10, 2980:12, 2980:14

**aisle** [1] - 2972:1

**algorithm** [26] - 2993:11, 2994:9, 2994:20, 2994:21, 3003:25, 3010:12, 3016:17, 3016:22, 3016:25, 3017:6, 3017:14, 3018:5, 3019:5, 3019:11, 3019:21, 3020:2, 3022:15, 3023:7, 3023:10, 3024:13, 3025:25, 3028:15, 3032:14, 3032:16, 3032:23, 3046:15

**algorithms** [1] - 2980:4

**ALL** [1] - 2923:4

**allegation** [4] - 3074:24, 3076:11, 3076:12, 3156:11

**allegations** [5] - 3075:25, 3076:1, 3097:18, 3156:20, 3179:22

**alleged** [4] - 2940:15, 2940:24, 3115:7, 3182:24

**allocation** [3] - 3043:4, 3043:5, 3043:16

**allocations** [1] - 2997:17

**allow** [4] - 2962:21, 3012:20, 3062:15, 3066:6

**Allowance** [8] - 3077:10, 3077:15, 3077:21, 3077:25, 3078:3, 3078:10, 3088:3, 3088:12

**allowance** [3] - 3078:4, 3078:8, 3078:20

**allowed** [6] - 2933:1, 2945:20, 3077:4, 3088:15, 3132:3, 3174:24

**allows** [2] - 2984:25

**Almeroth** [33] - 2929:13, 2971:6, 2975:20, 2980:15, 2980:20, 2983:22, 2984:17, 2985:11, 2986:2, 2986:8, 2986:15, 2987:3, 2987:4, 2988:8, 2992:19, 2992:23, 3014:8, 3023:9, 3023:10, 3024:14, 3026:16, 3027:11, 3027:20, 3028:10, 3030:5, 3030:23, 3034:16, 3035:11, 3038:21, 3047:10,

3047:14, 3047:17, 3165:13

**Almeroth's** [3] - 2929:15, 3025:8, 3027:25

**almost** [9] - 2974:11, 3008:11, 3089:7, 3139:15, 3145:5, 3145:17, 3145:22, 3168:4, 3185:4

**alone** [1] - 3069:24

**altered** [1] - 2938:2

**alternative** [12] - 2939:5, 2939:12, 2939:24, 2940:3, 2940:5, 2940:10, 2940:14, 2940:16, 2940:19, 2941:1, 2941:3

**alternatively** [3] - 2988:16, 3134:11, 3134:13

**amazing** [2] - 2977:13, 3092:21

**Amazon** [1] - 3090:2

**amount** [24] - 2956:7, 2956:18, 2957:5, 2957:8, 2957:19, 2957:25, 2958:4, 2958:11, 2958:14, 2958:18, 2958:23, 2961:14, 2963:5, 2963:22, 2964:3, 2964:17, 2964:20, 2996:14, 2996:15, 3007:4, 3007:9, 3011:2, 3049:22, 3169:2

**amounts** [1] - 2960:13

**analog** [2] - 2991:2, 2991:8

**analogies** [2] - 3015:8, 3024:3

**analogous** [1] - 2962:22

**analyses** [2] - 3059:19, 3059:24

**analysis** [4] - 3031:1, 3035:2, 3035:17, 3097:22

**analyze** [1] - 2945:11

**Andrew** [1] - 3180:16

**angel** [3] - 3121:25, 3122:2, 3122:8

**announced** [1] - 2991:17

**answer** [49] - 2925:11, 2925:13, 2925:15, 2925:19, 2929:1, 2950:7, 2987:2, 2991:5, 2991:6, 3043:20, 3044:2, 3050:17, 3050:19, 3050:20, 3059:1, 3059:7, 3061:10, 3063:24, 3064:20, 3065:2, 3066:5, 3067:13, 3067:14, 3068:15, 3069:11, 3070:10, 3070:12, 3071:19, 3108:23, 3110:4, 3110:10, 3114:8, 3120:13, 3120:19, 3120:24, 3121:12, 3122:9, 3122:14, 3122:19, 3124:21, 3135:25, 3153:15, 3154:8, 3156:5, 3165:21, 3166:3, 3183:15, 3190:24

**Answer** [9] - 2975:12, 3033:24, 3064:8, 3111:16, 3111:22, 3113:8, 3114:12, 3114:16, 3114:25

**answered** [5] - 2975:10, 3063:16, 3103:12, 3104:3

**answering** [3] - 3067:9, 3103:13, 3122:16

**answers** [6] - 2925:13, 3052:9, 3052:12, 3068:25, 3103:17, 3175:19

**anticipated** [5] - 2947:12, 2947:16, 2947:18, 2947:20, 2948:8

**anticipates** [2] - 2947:25, 2948:14

**anticipation** [9] - 2946:11, 2946:12, 2947:4, 2947:7, 2947:13, 2948:18,

2965:24, 2979:13

**anyway** [2] - 2970:2, 3163:8

**apologies** [1] - 3022:3

**apologize** [12] - 3003:7, 3039:16, 3044:11, 3053:10, 3076:18, 3115:17, 3129:6, 3129:7, 3129:11, 3152:17, 3163:11, 3171:8

**apparent** [1] - 2953:6

**appeal** [4] - 3085:20, 3086:3, 3086:4, 3086:6

**appealing** [1] - 3086:2

**Appeals** [2] - 3085:21, 3086:3

**appeals** [1] - 3085:24

**appear** [4] - 2976:18, 3033:8, 3106:5, 3136:17

**appendices** [1] - 2965:10

**Appendix** [5] - 2924:13, 2924:19, 2924:20, 2924:25, 2925:5, 2926:6, 2941:22, 2942:1, 2943:1

**apple** [1] - 3044:16

**Apple** [149] - 2931:15, 2931:20, 2932:18, 2932:19, 2932:24, 2937:11, 2938:18, 2942:14, 2945:23, 2946:6, 2946:14, 2947:12, 2947:14, 2948:20, 2948:22, 2951:19, 2951:23, 2952:6, 2955:20, 2956:5, 2956:8, 2956:13, 2956:15, 2956:16, 2959:7, 2963:20, 2964:10, 2964:15, 2965:19, 2969:24, 2970:5, 2970:8, 2971:13, 2972:5, 2972:7, 2972:25, 2973:1, 2973:9, 2973:16, 2974:4, 2974:10, 2974:23, 2975:8, 2975:13, 2975:24, 2979:15, 2981:4, 2984:1, 2985:6, 2985:23, 2986:23, 2987:22, 2989:2, 2989:15, 2989:19, 2991:5, 2991:15, 2994:1, 2994:6, 2994:19, 2995:3, 2996:16, 2996:25, 2997:10, 2997:16, 2997:20, 2997:24, 2998:5, 2998:9, 2998:23, 2999:4, 2999:18, 3000:17, 3000:25, 3001:9, 3004:4, 3004:10, 3004:14, 3004:19, 3005:18, 3005:22, 3006:12, 3006:17, 3007:1, 3007:9, 3007:15, 3007:21, 3008:22, 3016:22, 3024:14, 3024:16, 3024:18, 3025:4, 3025:6, 3027:18, 3029:5, 3029:18, 3031:16, 3032:13, 3034:12, 3034:18, 3035:15, 3037:11, 3037:25, 3041:13, 3041:15, 3041:22, 3044:25, 3048:5, 3048:12, 3049:13, 3049:24, 3054:10, 3054:12, 3056:4, 3058:10, 3058:23, 3059:6, 3059:22, 3062:19, 3063:23, 3069:22, 3072:9, 3098:25, 3100:18, 3106:8, 3125:16, 3133:7, 3138:2, 3141:5, 3141:10, 3142:24, 3143:23, 3144:4, 3145:10, 3149:5, 3152:15, 3157:17, 3157:19, 3172:13, 3172:15, 3173:1, 3173:22, 3174:22, 3178:10, 3179:24, 3182:11, 3190:20

**APPLE** [1] - 2923:1

**Apple's** [21] - 2943:4, 2965:2, 2969:13, 2971:7, 2971:10, 2978:12, 2988:23,

2996:16, 2996:22, 3004:11, 3026:19, 3036:23, 3036:24, 3056:22, 3059:16, 3059:18, 3059:20, 3069:25, 3105:4, 3105:7, 3174:11

**apples** [1] - 3044:15, 3044:16

**application** [16] - 2984:5, 2984:13, 2994:4, 3034:5, 3062:5, 3073:21, 3074:15, 3083:19, 3088:15, 3091:1, 3102:16, 3117:1, 3117:10, 3147:9, 3158:22, 3171:16

**applications** [4] - 2976:20, 3104:13, 3104:15, 3118:11

**applied** [5] - 2941:8, 2970:17, 3140:17, 3141:14, 3143:1

**Applied** [1] - 2976:25

**apply** [3] - 2953:22, 2981:4, 2984:1

**applying** [1] - 3083:20

**apportioned** [1] - 2997:10

**apportionment** [1] - 2996:9

**apportions** [1] - 2996:18

**appreciate** [2] - 3003:2, 3045:17

**approach** [5] - 3032:9, 3055:9, 3172:18, 3181:11, 3181:19

**appropriate** [11] - 2996:13, 2998:20, 3020:14, 3020:23, 3020:25, 3021:14, 3031:17, 3044:6, 3044:7, 3046:24, 3118:9

**approval** [1] - 3140:22

**April** [1] - 3103:20

**Aqua** [1] - 3189:4

**area** [2] - 3003:11, 3111:1

**Arenz** [2] - 3178:16, 3179:13

**ARENZ** [77] - 3064:10, 3066:4, 3066:13, 3066:19, 3067:2, 3067:4, 3067:9, 3067:12, 3067:19, 3068:21, 3069:17, 3070:3, 3070:11, 3070:15, 3071:2, 3071:25, 3072:5, 3073:1, 3074:2, 3074:22, 3075:23, 3076:9, 3086:18, 3086:20, 3093:11, 3094:10, 3098:2, 3098:20, 3098:24, 3099:10, 3099:11, 3102:8, 3103:9, 3103:11, 3104:1, 3105:9, 3162:12, 3163:7, 3164:13, 3171:17, 3171:20, 3171:23, 3172:2, 3172:6, 3172:10, 3172:21, 3173:6, 3173:11, 3173:16, 3174:3, 3174:6, 3174:22, 3175:9, 3176:2, 3176:5, 3176:8, 3176:12, 3176:15, 3176:25, 3177:9, 3177:13, 3178:3, 3178:9, 3178:19, 3179:21, 3180:2, 3180:12, 3180:14, 3180:19, 3180:22, 3181:2, 3181:5, 3181:11, 3181:18, 3181:21, 3183:1, 3183:4

**argue** [7] - 2973:20, 3033:12, 3033:13, 3045:10, 3131:23, 3146:12, 3175:5

**argued** [1] - 3131:5

**arguing** [3] - 2989:10, 2992:8, 2998:1

**argument** [10] - 2965:2, 2965:3, 2967:22, 2968:2, 2993:19, 3025:8, 3048:7, 3131:25, 3173:1, 3189:14

**arguments** [6] - 2924:6, 2924:7, 2968:21, 3132:4, 3137:21, 3187:21

**arise** [2] - 3070:17, 3162:3

**arises** [1] - 3185:14

**arm's** [1] - 2957:13

**arm's-length** [1] - 2957:13

**Army** [3] - 3047:25, 3048:1, 3048:25

**arranged** [1] - 2947:22

**arrangement** [1] - 2948:10

**arrangements** [1] - 2960:7

**arrived** [1] - 2996:15

**arriving** [1] - 2931:3

**art** [98] - 2924:21, 2925:2, 2932:21, 2940:12, 2940:25, 2941:6, 2943:13, 2944:6, 2944:13, 2946:6, 2946:8, 2946:10, 2946:13, 2946:15, 2947:1, 2947:2, 2947:6, 2947:11, 2947:12, 2947:21, 2947:22, 2947:25, 2948:2, 2948:3, 2948:4, 2948:5, 2948:6, 2948:10, 2948:12, 2948:13, 2948:15, 2948:19, 2948:23, 2950:4, 2950:5, 2950:10, 2950:17, 2950:20, 2951:1, 2951:3, 2951:5, 2951:6, 2951:18, 2951:19, 2951:23, 2951:24, 2952:2, 2952:3, 2952:7, 2952:8, 2952:11, 2952:14, 2952:18, 2952:19, 2952:22, 2952:25, 2953:3, 2953:9, 2953:12, 2953:13, 2953:18, 2953:20, 2953:22, 2953:24, 2953:25, 2954:1, 2954:8, 2954:13, 2954:20, 2955:18, 2955:23, 2968:12, 2968:19, 2970:7, 2971:10, 2971:24, 2976:9, 2982:9, 2982:10, 2982:11, 2983:1, 3012:12, 3040:16, 3040:23, 3040:24, 3049:18, 3073:13, 3073:18, 3075:21, 3078:23, 3083:2, 3083:21, 3117:7, 3117:9, 3117:17, 3118:12, 3119:1

**article** [6] - 2946:22, 2949:9, 2950:2, 2979:14, 3032:1, 3092:7

**articles** [2] - 2979:20, 3092:6

**artifact** [6] - 3090:12, 3090:14, 3090:20, 3091:4, 3096:11, 3101:18

**aspect** [1] - 3108:1

**assembled** [1] - 3002:22

**assembling** [1] - 2973:4

**asserted** [15] - 2931:18, 2931:20, 2932:24, 2933:24, 2935:25, 2936:5, 2936:9, 2937:18, 2938:23, 2939:14, 2950:23, 2951:13, 2955:17, 2955:21, 3017:8

**assertion** [1] - 3059:21

**asserts** [1] - 2947:14

**assessing** [1] - 2959:15

**assets** [1] - 3124:16

**assigned** [1] - 3159:5

**assignment** [5] - 3158:23, 3159:6, 3159:8, 3161:6, 3171:24

**assignments** [3] - 3158:22, 3161:14, 3172:3

**assist** [2] - 2924:9, 3055:14

**associated** [1] - 2996:19

**assume** [5] - 2930:23, 2974:6, 3117:13, 3118:16, 3125:25

**assumed** [1] - 3162:23

**assuming** [3] - 2957:15, 2963:20, 3085:25

**at..** [1] - 3158:19

**attached** [4] - 2924:13, 2924:20, 2926:6, 2938:4, 2938:7, 3087:13, 3172:20

**attachment** [1] - 2938:6

**attack** [1] - 3185:11

**attacked** [4] - 3129:24, 3130:14, 3131:6, 3156:17

**attempt** [1] - 3152:24

**attempting** [1] - 2952:5

**attention** [7] - 3073:25, 3090:9, 3091:21, 3096:7, 3099:19, 3107:18, 3190:2

**attorney** [2] - 2965:1, 3063:2, 3064:21, 3065:15, 3065:18, 3066:16, 3066:23, 3067:6, 3067:13, 3067:14, 3067:16, 3068:20, 3095:23, 3104:17, 3138:14, 3163:1, 3179:18, 3183:14, 3185:5, 3185:17

**attorney-client** [6] - 3063:2, 3064:21, 3066:23, 3067:16, 3138:14

**attorneys** [2] - 2924:5, 2924:7

**attribute** [1] - 2997:18

**attributed** [1] - 2964:5

**auction** [2] - 3042:14

**AUDIO** [1] - 2923:1

**Audio** [81] - 2931:14, 2931:19, 2937:9, 2937:14, 2937:18, 2939:7, 2939:13, 2939:17, 2942:7, 2942:13, 2942:23, 2956:2, 2956:11, 2956:15, 2956:17, 2956:21, 2956:22, 2956:24, 2957:2, 2963:19, 2964:1, 2964:8, 2964:13, 2964:18, 2964:21, 2965:3, 2968:21, 3000:15, 3005:9, 3008:18, 3008:22, 3009:2, 3009:9, 3056:3, 3057:4, 3057:24, 3058:9, 3058:21, 3059:5, 3059:14, 3059:21, 3060:3, 3061:14, 3061:21, 3063:23, 3064:16, 3066:7, 3067:20, 3067:22, 3070:19, 3072:2, 3072:12, 3072:14, 3085:25, 3103:14, 3112:10, 3112:14, 3117:4, 3121:21, 3122:1, 3122:3, 3122:8, 3130:2, 3131:20, 3150:11, 3150:14, 3157:23, 3158:5, 3159:1, 3159:7, 3160:1, 3170:17, 3171:14, 3171:15, 3171:25, 3172:4, 3179:23, 3182:9, 3183:7, 3189:10

**audio** [16] - 2980:7, 2984:14, 2992:15, 3011:9, 3011:23, 3012:1, 3012:4, 3012:6, 3012:21, 3012:23, 3078:25, 3079:2, 3080:5, 3080:12, 3080:23, 3094:20

**Audio's** [8] - 2937:14, 2965:1, 3008:19, 3055:1, 3059:9, 3059:18, 3154:16, 3190:17

**August** [1] - 3147:23

**Aukerman** [3] - 3097:8, 3186:20, 3188:23

**authority** [2] - 3066:15, 3190:24
**automatically** [2] - 2944:24, 2991:22
**available** [12] - 2943:18, 2953:24, 2959:25, 2978:3, 2978:19, 2978:22, 2979:1, 2979:2, 3015:15, 3040:2, 3118:12, 3168:21
**avoid** [1] - 2941:13
**avoided** [1] - 3013:18
**awaiting** [1] - 3087:25
**award** [5] - 2956:2, 2956:20, 2964:13, 2973:22, 3049:22
**awarding** [1] - 2964:19
**awards** [2] - 3007:15
**aware** [17] - 3059:16, 3060:23, 3061:14, 3062:6, 3062:15, 3062:21, 3062:23, 3071:7, 3077:20, 3077:23, 3139:9, 3145:11, 3152:21, 3153:2, 3153:4, 3157:5, 3157:16
**awareness** [1] - 3059:18
**awful** [1] - 3190:11
**axe** [1] - 2975:16

## B

**background** [2] - 2929:19, 2953:11
**backward** [3] - 2995:24, 3012:10, 3039:1
**backwards** [5] - 2995:15, 3038:24, 3039:13, 3069:9, 3121:2
**bad** [3] - 3068:20, 3173:8, 3181:25
**balance** [3] - 3024:11, 3024:12, 3189:25
**bargaining** [1] - 2999:19
**base** [1] - 2963:22
**based** [22] - 2925:11, 2925:16, 2932:2, 2933:24, 2956:23, 2957:22, 2961:11, 2964:1, 2964:8, 3001:13, 3043:8, 3047:5, 3050:17, 3050:21, 3064:13, 3083:9, 3116:1, 3118:21, 3124:3, 3136:23, 3152:19, 3184:11
**bases** [1] - 3190:13
**basic** [1] - 3112:4
**basis** [2] - 3099:4, 3117:8
**battery** [1] - 3119:14
**bear** [1] - 3095:11
**beat** [4] - 2971:15, 2981:17, 2981:18, 2984:17
**beating** [1] - 2971:17
**BEAUMONT** [1] - 2923:3
**became** [7] - 3059:16, 3060:13, 3061:14, 3062:6, 3062:14, 3062:21, 3062:23
**become** [5] - 2931:25, 3051:1, 3060:23, 3147:20, 3150:7
**Becton** [1] - 3097:5
**began** [8] - 2957:12, 2959:4, 2959:7, 2959:14, 2959:22, 2960:1, 2963:19, 3063:1
**begging** [1] - 3145:17
**begin** [2] - 2969:9, 3052:1

**beginning** [12] - 2994:14, 3003:18, 3005:10, 3033:3, 3033:18, 3034:2, 3076:7, 3108:6, 3108:13, 3114:1, 3151:17, 3159:21
**begun** [1] - 2959:10
**BEHALF** [2] - 3054:22, 3106:18
**behalf** [11] - 2969:2, 2998:17, 2998:18, 3061:20, 3067:9, 3067:20, 3070:19, 3103:14, 3104:4, 3141:6, 3163:17
**beliefs** [1] - 3051:2
**believable** [1] - 3035:20
**below** [4] - 2946:12, 3057:23, 3060:2, 3061:25
**bench** [6] - 3054:9, 3074:4, 3164:22, 3172:22, 3180:4, 3183:21
**benefit** [4] - 2997:10, 2997:11, 3012:17, 3123:22
**benefits** [1] - 2962:14
**best** [12] - 2971:22, 2972:14, 3005:2, 3015:14, 3112:21, 3113:6, 3119:5, 3119:7, 3119:20, 3119:24, 3175:22, 3175:23
**bet** [1] - 2982:17
**better** [9] - 2977:4, 3006:6, 3039:23, 3041:24, 3113:11, 3115:1, 3139:17, 3146:17
**between** [23] - 2928:19, 2940:13, 2943:15, 2944:21, 2945:4, 2951:4, 2952:13, 2955:7, 2957:14, 2961:25, 2963:18, 2986:16, 2991:14, 2996:17, 3036:21, 3041:9, 3042:19, 3051:9, 3077:13, 3135:20, 3156:12, 3156:14, 3156:21
**Beyoncé** [1] - 3146:13
**beyond** [4] - 2925:22, 3005:20, 3070:5, 3072:12
**bias** [3] - 2927:15, 3051:7
**big** [7] - 2969:8, 2984:21, 3010:25, 3035:21, 3042:18, 3087:18, 3114:11
**big-picture** [2] - 2969:8, 2984:21
**bigger** [3] - 2969:12, 2969:23, 3043:1
**bigger-picture** [2] - 2969:12, 2969:23
**biggest** [2] - 3016:15, 3028:1
**bill** [1] - 2998:16
**billboard** [3] - 3107:5, 3107:12, 3107:13
**billboards** [1] - 3107:18
**billion** [1] - 3001:10
**binder** [6] - 3056:20, 3058:17, 3074:1, 3088:9, 3094:11, 3163:20
**binders** [2] - 3055:7, 3106:16
**bit** [25] - 2969:6, 2970:1, 2972:4, 2974:9, 2976:5, 2981:12, 2982:6, 2985:24, 2987:18, 2988:21, 2997:19, 2999:2, 3004:18, 3018:12, 3025:7, 3057:11, 3120:24, 3121:5, 3122:22, 3122:23, 3126:8, 3139:19, 3147:16, 3150:9, 3183:8
**bits** [1] - 3029:23
**blame** [1] - 3048:25

**blames** [1] - 2977:5
**blank** [3] - 2968:10, 3030:10, 3044:5
**Blaster** [15] - 2946:18, 2949:12, 2949:16, 2949:21, 2949:25, 2983:2, 2983:7, 2983:9, 2983:10, 2983:12, 2983:14, 2983:15, 3040:22, 3041:17
**blind** [1] - 3186:16
**blocked** [1] - 3117:8
**blow** [1] - 3147:16
**blue** [1] - 3134:24
**Blue** [2] - 3029:10, 3042:4
**blur** [1] - 3043:4
**blurt** [1] - 3135:13
**blurted** [1] - 3135:1
**board** [2] - 2991:3, 3085:23
**Board** [2] - 3085:21, 3086:3
**body** [1] - 3082:21
**Boettcher** [4] - 3007:23, 3029:25, 3030:6, 3034:4
**book** [8] - 3029:12, 3078:14, 3087:17, 3087:18, 3087:19, 3090:2, 3090:3, 3099:16
**Book** [1] - 3042:4
**books** [4] - 3090:24, 3091:2, 3091:13, 3093:19
**boring** [1] - 3006:3
**borrowed** [1] - 2973:1
**bottom** [15] - 2968:4, 2968:9, 2968:18, 2976:24, 3017:11, 3017:23, 3018:1, 3018:2, 3018:3, 3078:20, 3090:24, 3114:2, 3119:23, 3135:8, 3167:6
**bought** [4] - 2975:24, 3015:18, 3049:4, 3149:17
**bound** [3] - 2925:7, 3065:8, 3068:6
**boundaries** [1] - 2933:15
**box** [4] - 2995:7, 3001:7, 3151:10, 3151:18
**boy** [1] - 3027:5
**branch** [1] - 3102:18
**break** [15] - 2964:25, 2965:12, 3015:7, 3052:6, 3053:9, 3053:13, 3053:16, 3055:22, 3055:24, 3056:8, 3056:9, 3056:10, 3128:15, 3129:19, 3187:11
**breaks** [1] - 3056:8
**bridging** [1] - 3111:9
**brief** [5] - 3050:14, 3086:1, 3163:21, 3172:10, 3174:23
**briefly** [5] - 2971:12, 3013:12, 3016:7, 3042:12, 3043:19
**Bright** [1] - 3190:8
**bring** [15] - 2967:15, 2972:21, 3005:8, 3012:23, 3052:18, 3067:15, 3113:20, 3114:14, 3114:15, 3124:17, 3151:4, 3151:7, 3181:6, 3187:5, 3190:1
**bringing** [7] - 2971:14, 3045:15, 3124:11, 3124:15, 3139:24, 3151:22, 3180:9
**Bringrr** [7] - 3140:20, 3140:21, 3141:6, 3142:20, 3143:2, 3143:24, 3152:13
**brings** [3] - 3134:23, 3172:4, 3186:6

**Britannica** [1] - 3081:9
**broad** [4] - 2993:12, 3176:16, 3177:1, 3177:2
**broader** [1] - 3067:22
**brochure** [2] - 3075:10, 3075:17
**broken** [2] - 2970:2, 2985:21
**brother** [2] - 3157:12, 3157:20
**brought** [14] - 2973:5, 2974:10, 3004:7, 3005:2, 3012:21, 3052:20, 3101:4, 3124:22, 3130:8, 3130:9, 3138:23, 3144:20, 3146:8, 3178:14
**bubble** [6] - 3069:14, 3069:19, 3069:25, 3185:9, 3185:24, 3186:2
**bucks** [1] - 2997:6
**budget** [1] - 3142:20
**build** [9] - 3111:3, 3111:14, 3111:16, 3112:15, 3115:24, 3120:2, 3120:5, 3120:11, 3121:1
**building** [3] - 3094:20, 3112:22, 3118:24
**built** [10] - 2975:4, 3036:4, 3036:6, 3111:21, 3111:23, 3116:11, 3116:13, 3116:19, 3117:15, 3119:13
**bulk** [1] - 3077:18
**bulky** [2] - 3087:15, 3090:18
**bullet** [1] - 2980:2
**bunch** [5] - 2985:20, 2991:3, 3018:9, 3023:1, 3056:25
**burden** [24] - 2925:21, 2956:17, 2968:22, 2980:23, 2981:8, 2981:9, 2981:12, 2981:20, 2985:6, 2985:7, 2985:9, 3002:24, 3010:20, 3049:19, 3054:10, 3070:2, 3177:8, 3177:14, 3184:15, 3185:6, 3185:11, 3185:23
**burst** [3] - 3069:14, 3069:19, 3186:2
**bursting** [2] - 3185:8, 3185:9
**bursting-bubble-type** [1] - 3185:9
**bursts** [1] - 3069:25
**bus** [1] - 2988:16
**business** [19] - 2935:8, 2962:21, 2962:25, 2999:12, 3005:11, 3012:8, 3031:9, 3037:14, 3042:17, 3112:10, 3112:16, 3112:17, 3112:21, 3113:7, 3117:4, 3129:24, 3149:20, 3150:16, 3150:23
**businessman** [1] - 3131:8
**businesspeople** [2] - 2963:11, 3145:6
**button** [14] - 2990:18, 2990:21, 3006:23, 3021:13, 3029:14, 3031:21, 3100:12, 3100:13, 3100:15, 3100:19, 3120:22, 3151:19
**buttons** [3] - 2990:16, 2990:17, 2990:20, 3037:23
**buying** [2] - 3045:1, 3155:7
**BY** [30] - 3054:23, 3056:19, 3057:13, 3073:11, 3077:1, 3081:12, 3084:23, 3086:20, 3093:11, 3098:2, 3099:11, 3102:8, 3103:11, 3104:1, 3106:19, 3107:23, 3108:17, 3113:5, 3120:1, 3123:13, 3125:3, 3137:9, 3137:16,

3138:17, 3139:22, 3140:3, 3143:22, 3147:5, 3150:21, 3157:4

# C

**C++** [1] - 2993:22
**cabinet** [1] - 3158:1
**cable** [8] - 2987:22, 2988:12, 2988:16, 2989:8, 2989:11, 3151:10, 3151:13, 3151:24
**calculation** [1] - 2956:6
**calculations** [2] - 2932:2, 2997:8
**CALL** [2] - 3054:21, 3086:19
**call's** [2] - 3020:7, 3022:24
**CALLED** [2] - 3054:22, 3106:18
**Canadian/U.S** [1] - 2998:4
**cannot** [4] - 2941:15, 2945:17, 2994:1, 3016:21
**capability** [4] - 2938:11, 2984:10, 2984:11, 3042:3
**capable** [3] - 2938:13, 3124:10, 3124:14
**capacitive** [1] - 3149:19
**capacity** [1] - 3149:18
**car** [2] - 3118:19, 3149:12
**card** [9] - 2990:24, 2990:25, 2991:2, 3035:9, 3035:13, 3035:20, 3035:21, 3036:11, 3036:12
**cards** [1] - 3036:4
**care** [2] - 3143:20, 3170:10
**careful** [1] - 3013:9
**carelessly** [1] - 3119:16
**cares** [1] - 3023:18
**case** [123] - 2923:17, 2924:4, 2926:1, 2927:13, 2927:17, 2928:5, 2928:11, 2928:14, 2950:25, 2931:12, 2948:7, 2956:12, 2963:14, 2969:24, 2971:8, 2973:22, 2974:5, 2974:11, 2975:1, 2975:8, 2975:19, 2977:25, 2981:4, 2996:14, 2999:13, 3000:6, 3003:3, 3004:2, 3005:10, 3008:21, 3011:20, 3012:16, 3012:17, 3014:8, 3016:18, 3016:24, 3017:5, 3017:8, 3017:22, 3029:5, 3030:3, 3030:7, 3031:7, 3031:13, 3034:25, 3039:10, 3042:1, 3049:1, 3050:15, 3050:22, 3050:25, 3051:4, 3051:8, 3052:4, 3053:2, 3053:22, 3053:25, 3064:15, 3065:20, 3066:11, 3068:22, 3069:2, 3076:2, 3076:7, 3084:11, 3089:24, 3092:13, 3096:3, 3096:22, 3097:11, 3097:14, 3099:1, 3105:11, 3105:14, 3105:15, 3105:19, 3109:15, 3115:7, 3117:11, 3119:8, 3125:5, 3125:16, 3125:19, 3125:22, 3126:2, 3127:25, 3128:5, 3132:21, 3132:25, 3134:8, 3134:9, 3137:11, 3139:4, 3139:10, 3140:25, 3141:8, 3141:21, 3144:15, 3144:17, 3144:20, 3145:12, 3152:22, 3153:3, 3157:7, 3157:23, 3159:21, 3160:5,

3160:24, 3174:12, 3177:18, 3186:14, 3186:20, 3186:21, 3188:9, 3188:21, 3189:8, 3189:10, 3189:15, 3189:21, 3190:7, 3190:12, 3190:22
**cases** [21] - 2974:14, 3001:24, 3003:16, 3018:20, 3065:7, 3065:17, 3068:5, 3069:5, 3069:9, 3097:1, 3097:9, 3097:15, 3097:16, 3105:16, 3118:5, 3159:20, 3159:23, 3160:4, 3185:22, 3189:23
**catch** [1] - 3107:18
**catchy** [2] - 3003:17, 3004:3
**caused** [2] - 3135:18, 3135:20
**causes** [2] - 3022:20, 3168:12
**caution** [1] - 3052:25
**CD** [3] - 3012:9, 3031:21, 3031:25
**CDs** [1] - 3037:16
**ceased** [1] - 3122:18
**cent** [1] - 3132:22
**cents** [15] - 2996:20, 3000:11, 3044:13, 3044:15, 3126:11, 3126:19, 3127:24, 3128:4, 3131:16, 3131:17, 3131:18, 3137:22, 3138:5, 3155:25, 3156:8
**CEO** [1] - 3150:25
**certain** [14] - 2928:17, 2928:23, 2929:2, 2929:6, 2951:8, 2953:15, 2957:24, 2985:22, 3000:18, 3091:22, 3095:19, 3099:12, 3118:9, 3126:18
**certainly** [9] - 3030:6, 3061:18, 3071:6, 3071:12, 3089:7, 3097:14, 3155:8, 3183:18, 3189:22
**Certainly** [1] - 3121:10
**certainty** [2] - 2957:1, 3097:21
**certificate** [1] - 3048:17
**CERTIFICATION** [1] - 3191:4
**CERTIFY** [1] - 3191:5
**cetera** [4] - 2990:19, 3018:14, 3115:12
**CFR** [2] - 3092:17, 3095:18
**chain** [6] - 2928:16, 3158:21, 3159:16, 3160:17, 3160:21, 3170:21
**chair** [1] - 3008:4
**challenged** [2] - 2987:3, 3064:14
**chambers** [2] - 2967:10, 3054:2
**Championship** [1] - 2981:15
**chance** [2] - 3048:4
**change** [9] - 2988:21, 3046:10, 3051:1, 3061:3, 3115:15, 3146:18, 3169:13, 3174:14, 3175:24
**changed** [5] - 3006:1, 3083:4, 3146:11, 3153:17, 3174:11
**character** [2] - 2962:13, 3022:3
**characterizes** [1] - 2984:21
**charge** [6] - 2924:13, 2924:20, 2926:6, 2974:20, 3051:19, 3163:12
**charged** [2] - 2975:18, 2975:21
**charitable** [1] - 3189:19
**Charles** [5] - 3054:13, 3057:25, 3059:15, 3060:4, 3174:21
**CHARLES** [2] - 3054:21, 3086:19
**Charlie** [1] - 3147:20

**chart** [8] - 2985:17, 2991:9, 2993:17, 2996:6, 3002:16, 3042:25, 3047:4, 3047:12

**charts** [3] - 2967:21, 2986:8, 3045:8

**cheaper** [2] - 2991:4, 3115:1

**cheat** [4] - 3048:6, 3048:9, 3048:14, 3131:7

**cheated** [1] - 3048:23

**check** [7] - 2966:7, 3000:20, 3001:1, 3001:7, 3001:8, 3102:5, 3102:25

**checked** [5] - 3077:24, 3077:25, 3088:10, 3101:17, 3102:6

**Chevrolet** [1] - 3015:19

**chief** [1] - 3097:3

**children** [2] - 3008:12, 3008:13

**chip** [6] - 2989:18, 2989:19, 2989:22, 3035:15, 3035:23, 3036:13

**chips** [4] - 2989:19, 2991:3, 3035:21, 3038:8

**choice** [1] - 2923:23

**choices** [1] - 3028:18

**chose** [3] - 3005:3, 3081:21, 3081:22

**church** [1] - 2923:21

**circle** [5] - 2976:10, 2976:12, 3010:7, 3017:12, 3017:25

**circuit** [2] - 3178:22, 3180:7

**Circuit** [3] - 3086:7, 3086:11, 3106:4

**circular** [1] - 3089:6

**circumstance** [1] - 3001:18

**circumstances** [6] - 2962:18, 2937:1, 2937:5, 2998:10, 3059:14, 3118:24

**circumstantial** [3] - 2928:15, 2928:19, 2928:21

**Cirrus** [1] - 2989:19

**citation** [8] - 3128:17, 3129:18, 3129:21, 3163:16, 3165:5, 3165:6, 3186:22, 3187:1

**citations** [6] - 3081:3, 3158:16, 3163:14, 3163:19, 3164:8, 3189:8

**cite** [3] - 3079:17, 3096:3, 3186:17

**cited** [4] - 3073:18, 3080:4, 3183:12, 3189:24

**cites** [1] - 3106:1

**citing** [3] - 3063:2, 3063:7, 3063:20

**City** [1] - 3107:5

**Civil** [1] - 3066:6

**claim** [146] - 2933:7, 2933:8, 2933:13, 2934:4, 2934:6, 2934:7, 2934:9, 2934:10, 2934:11, 2934:13, 2934:14, 2934:15, 2934:16, 2934:19, 2934:20, 2934:21, 2934:22, 2934:23, 2934:24, 2934:25, 2935:1, 2935:2, 2935:3, 2935:23, 2936:11, 2936:12, 2936:14, 2936:15, 2936:16, 2936:18, 2936:20, 2936:23, 2937:4, 2937:6, 2937:8, 2937:13, 2937:18, 2937:20, 2937:21, 2937:23, 2938:3, 2938:9, 2938:10, 2938:14, 2938:17, 2938:19, 2938:23, 2938:25, 2939:2, 2939:3, 2939:5, 2939:9, 2939:10, 2939:13, 2939:15,

2939:23, 2940:1, 2940:11, 2940:18, 2941:1, 2941:9, 2941:11, 2941:15, 2941:16, 2942:18, 2943:5, 2943:7, 2943:10, 2943:22, 2945:8, 2945:22, 2946:2, 2946:9, 2947:5, 2947:7, 2947:8, 2947:11, 2947:20, 2947:21, 2947:23, 2947:25, 2948:8, 2948:14, 2948:16, 2949:7, 2949:24, 2950:6, 2950:7, 2950:8, 2951:14, 2952:1, 2952:23, 2952:25, 2954:6, 2955:25, 2956:1, 2959:16, 2963:25, 2964:1, 2964:2, 2964:15, 2968:8, 2969:21, 2971:24, 2979:20, 2982:20, 2983:5, 2985:22, 2987:5, 2988:2, 2989:14, 2989:25, 2990:5, 2990:14, 2990:25, 2992:7, 2994:10, 2994:11, 2996:3, 3017:8, 3018:8, 3025:3, 3026:17, 3027:17, 3028:12, 3032:18, 3032:19, 3033:7, 3033:9, 3035:10, 3035:14, 3043:23, 3047:11, 3047:13, 3115:21

**claim's** [1] - 2947:9

**claimed** [24] - 2941:25, 2942:9, 2942:21, 2943:1, 2944:4, 2944:8, 2944:19, 2945:8, 2945:16, 2947:8, 2948:10, 2950:11, 2950:17, 2951:4, 2951:12, 2952:16, 2952:20, 2953:5, 2957:7, 2964:6, 2980:4, 3019:8, 3025:21, 3119:17

**claiming** [5] - 2969:25, 2979:18, 2987:13, 2994:2, 3065:19

**claims** [111] - 2924:12, 2924:15, 2931:16, 2931:17, 2931:18, 2931:20, 2932:24, 2933:1, 2933:2, 2933:5, 2933:11, 2933:12, 2933:14, 2933:16, 2933:19, 2933:21, 2933:24, 2933:25, 2934:2, 2934:3, 2934:7, 2934:8, 2934:11, 2934:16, 2934:17, 2934:18, 2935:24, 2936:1, 2936:6, 2936:9, 2936:12, 2936:22, 2937:15, 2939:14, 2941:13, 2941:17, 2945:21, 2947:14, 2947:15, 2947:17, 2948:24, 2948:25, 2949:3, 2949:4, 2949:10, 2949:11, 2949:14, 2949:15, 2949:19, 2949:20, 2950:24, 2952:14, 2953:8, 2954:17, 2955:8, 2955:11, 2955:17, 2955:22, 2957:15, 2965:20, 2965:25, 2966:3, 2968:5, 2968:6, 2968:7, 2968:17, 2982:13, 2982:18, 2984:25, 2985:21, 2987:15, 2989:4, 2991:12, 2991:14, 2993:8, 2994:8, 3009:14, 3009:25, 3010:4, 3014:4, 3016:8, 3016:20, 3016:21, 3016:23, 3017:15, 3018:9, 3032:15, 3032:18, 3035:10, 3039:21, 3040:7, 3043:25, 3047:20, 3059:22, 3077:3, 3078:24, 3082:3, 3082:25, 3083:1, 3083:21, 3083:25, 3084:7, 3084:16, 3117:22

**CLARK** [1] - 2923:3

**Clark** [9] - 2979:12, 2992:7, 3019:16, 3022:13, 3025:16, 3025:24, 3026:3, 3032:14, 3087:9

**classic** [4] - 2931:22, 2932:5, 2932:6, 2932:13

**clause** [1] - 2942:18

**clear** [25] - 2925:20, 2925:23, 2945:23, 2947:13, 2948:21, 2955:20, 2956:1, 2981:7, 2981:18, 2981:20, 2985:6, 3000:25, 3045:7, 3047:4, 3049:19, 3086:10, 3086:24, 3091:7, 3098:3, 3103:10, 3132:23, 3134:24, 3145:3, 3165:23, 3171:10

**clear-blue** [1] - 3134:24

**clearly** [6] - 2998:12, 3134:24, 3156:13, 3159:20, 3177:20

**clerk** [1] - 3170:25

**CLERK** [8] - 2966:25, 2999:14, 3036:2, 3046:12, 3047:21, 3167:7, 3169:15, 3169:23

**click** [1] - 3166:12

**client** [6] - 3063:2, 3064:21, 3066:23, 3067:16, 3138:14

**clients** [3] - 2977:7, 3104:22, 3104:24

**Cline** [1] - 3067:6

**clip** [7] - 3174:23, 3175:6, 3176:5, 3178:5, 3180:15, 3180:18, 3180:24

**close** [1] - 2996:21

**closed** [1] - 3169:10

**closing** [9] - 2924:6, 2993:19, 3003:18, 3004:8, 3004:17, 3085:17, 3131:5, 3137:21, 3167:22

**CNNs** [1] - 2977:7

**Co** [1] - 3097:6

**co** [1] - 3118:14

**co-inventor** [1] - 3118:14

**code** [54] - 2971:6, 2971:9, 2974:19, 2975:20, 2975:22, 2977:15, 2977:16, 2977:20, 2977:21, 2978:1, 2978:2, 2978:7, 2978:11, 2978:12, 2978:15, 2978:17, 2979:4, 2980:5, 2981:22, 2982:12, 2982:13, 2982:14, 2982:19, 2982:22, 2982:23, 2983:24, 2983:25, 2984:2, 2985:16, 2986:3, 2986:10, 2993:16, 2995:4, 2995:6, 2995:13, 2995:16, 3020:19, 3024:24, 3030:1, 3030:9, 3030:10, 3030:17, 3030:18, 3034:18, 3039:22, 3039:24, 3040:2, 3040:3, 3047:17, 3091:1, 3105:7, 3190:11

**codec** [2] - 2991:4, 3035:9, 3035:15

**codes** [2] - 3022:4, 3033:13

**coin** [1] - 2981:25

**colleague** [2] - 3068:21, 3178:4

**colleagues** [3] - 2969:3, 2969:18, 3076:20

**collection** [1] - 3029:8

**college** [2] - 3046:4

**Colorado** [1] - 2981:17

**column** [1] - 3021:23

**Column** [3] - 3019:17, 3021:25

**columns** [1] - 3013:15

**combination** [17] - 2948:11, 2948:20,

2949:1, 2949:5, 2949:8, 2949:12, 2949:16, 2949:21, 2950:1, 2951:14, 2951:19, 2953:5, 2953:15, 2955:18, 2983:23, 3078:24, 3155:18

  **combinations** [7] - 2951:21, 2951:23, 2952:8, 2954:4, 2966:4, 2966:5, 3001:4

  **combine** [5] - 2952:23, 2953:2, 2953:7, 2971:24, 2983:5

  **combined** [1] - 2947:22

  **combining** [1] - 2948:14

  **combos** [1] - 2966:7

  **coming** [5] - 2984:7, 3005:11, 3145:14, 3173:1, 3183:14

  **command** [5] - 2994:12, 2995:10, 3018:13, 3080:22, 3080:24

  **commands** [3] - 2980:4, 2982:5, 3080:5

  **comment** [6] - 2974:9, 2984:16, 2995:8, 2995:11, 3029:17, 3044:12

  **comments** [1] - 3002:23

  **commercial** [6] - 2954:17, 2955:9, 2955:11, 2961:24, 2962:6, 2962:13

  **common** [3] - 2928:7, 2928:9, 3155:21

  **commonly** [3] - 2925:6, 2925:10, 2937:25

  **communicate** [2] - 2984:24, 3052:16

  **communications** [7] - 2992:12, 3042:19, 3078:25, 3102:23, 3121:20, 3121:25, 3122:7

  **community** [2] - 2953:10, 3051:10

  **companies** [6] - 2984:13, 3151:10, 3151:11, 3151:13, 3151:24, 3153:19

  **Company** [3] - 3105:21

  **company** [12] - 2971:12, 2976:20, 2983:9, 3048:14, 3126:15, 3126:17, 3131:9, 3140:20, 3146:14, 3153:18, 3155:7, 3155:19

  **comparability** [3] - 2973:7, 2974:8, 3042:4

  **comparable** [18] - 2929:20, 2960:11, 2960:16, 2960:21, 2963:5, 2973:19, 2973:21, 2973:24, 2974:1, 2998:2, 2998:7, 2998:23, 2998:24, 2998:25, 2999:12, 3042:9, 3044:23, 3145:19

  **compare** [11] - 2935:25, 2936:3, 2937:16, 2955:16, 2980:21, 2981:1, 2982:2, 3025:23, 3034:17, 3035:5, 3035:16

  **compared** [2] - 2961:7, 2980:25

  **comparing** [1] - 2950:16

  **comparison** [7] - 2936:5, 3027:16, 3028:6, 3028:11, 3034:16, 3035:12, 3039:8

  **compel** [2] - 3066:6, 3069:4

  **compelling** [1] - 3042:13

  **compensate** [6] - 2956:3, 2957:4, 2958:8, 2959:16, 2964:18, 2964:21

  **compensated** [1] - 3049:10

  **competition** [1] - 3152:15

  **competitors** [1] - 2962:1

  **complained** [1] - 3149:23

  **complaining** [2] - 2986:25, 3024:3

  **complaints** [1] - 2996:25

  **complete** [4] - 3098:16, 3099:1, 3099:5, 3145:9

  **completely** [2] - 2923:14, 3037:16

  **completeness** [1] - 3183:10

  **complicated** [5] - 2974:20, 2985:19, 3021:9, 3126:8

  **complied** [1] - 3089:16

  **complies** [1] - 2945:13

  **comply** [1] - 3093:14

  **complying** [1] - 3064:22

  **component** [3] - 2945:10, 2945:12, 2961:4

  **components** [6] - 2935:18, 2938:4, 2938:7, 2938:12, 2945:6, 2973:2

  **compound** [1] - 3133:16

  **compressed** [1] - 2992:15

  **computer** [30] - 2980:9, 2980:10, 2980:12, 2980:14, 2980:15, 2987:24, 2988:14, 2993:4, 2993:14, 2993:16, 2993:21, 2993:23, 2993:24, 2994:3, 3007:11, 3009:21, 3009:23, 3010:12, 3014:15, 3014:16, 3019:10, 3033:18, 3037:15, 3039:1, 3039:4, 3119:18, 3119:19, 3142:22, 3145:9

  **computers** [6] - 2939:8, 2980:10, 2987:23, 2992:17, 3036:5, 3079:1

  **concept** [2] - 3024:25, 3028:23

  **conception** [1] - 3117:12

  **conceptualized** [1] - 3116:22

  **concern** [4] - 3069:10, 3102:13, 3110:11, 3184:22

  **concerned** [4] - 2971:17, 3097:10, 3168:5, 3168:15

  **concerning** [9] - 2926:13, 2927:7, 2930:25, 2931:11, 3121:21, 3121:22, 3122:1, 3122:8, 3165:10

  **concerns** [1] - 2971:14

  **Concert** [10] - 2999:1, 2999:2, 2999:3, 2999:4, 2999:8, 2999:11, 3042:17, 3042:21, 3042:22

  **conclude** [5] - 2952:19, 3016:21, 3029:2, 3032:13, 3180:15

  **concluded** [1] - 2971:7

  **conclusion** [2] - 2927:22, 2955:16

  **conclusions** [2] - 2928:8, 2988:10

  **conclusively** [1] - 3175:11

  **concordance** [1] - 3136:8

  **conditions** [1] - 2961:23

  **conduct** [12] - 2964:21, 3052:4, 3053:4, 3053:18, 3054:9, 3073:8, 3075:25, 3096:4, 3096:21, 3097:3, 3097:17, 3136:20, 3182:24

  **conducted** [2] - 3059:20, 3066:25

  **conference** [1] - 3163:12

  **conferring** [1] - 3076:19

  **confirmed** [1] - 3033:19

  **confirms** [1] - 3034:11

  **confronted** [1] - 2978:20

  **confused** [1] - 3115:11

  **confusing** [1] - 3096:9

  **Congress** [1] - 3145:25

  **connect** [2] - 2987:23, 3007:10

  **connected** [3] - 2938:5, 2938:8, 3012:16

  **connecting** [1] - 2988:4

  **connection** [8] - 2938:6, 2955:7, 2993:3, 3073:14, 3073:15, 3075:22, 3087:1, 3091:8

  **connections** [1] - 3007:5

  **connects** [1] - 2988:14

  **consecutively** [1] - 2970:14

  **consider** [53] - 2924:1, 2926:2, 2926:23, 2927:15, 2928:4, 2928:13, 2929:7, 2940:18, 2940:23, 2942:11, 2943:25, 2944:5, 2944:18, 2945:1, 2946:1, 2948:1, 2950:19, 2951:16, 2952:10, 2952:15, 2952:22, 2953:3, 2953:12, 2954:1, 2954:4, 2954:9, 2955:14, 2958:24, 2959:3, 2959:14, 2959:24, 2960:3, 2960:14, 2960:22, 2961:13, 2963:13, 2979:6, 3037:9, 3037:10, 3040:16, 3042:16, 3081:14, 3081:18, 3084:9, 3096:12, 3096:19, 3130:9, 3145:7, 3145:15, 3145:21, 3152:14, 3183:17, 3189:23

  **consideration** [2] - 3050:23, 3132:17

  **considerations** [2] - 2951:8, 2954:10, 2954:11, 2955:6, 2991:20

  **considered** [17] - 2931:18, 2933:19, 2940:10, 2940:13, 2941:3, 2943:11, 2943:14, 2944:11, 2947:2, 3051:9, 3082:7, 3096:1, 3096:15, 3101:14, 3102:14, 3102:15, 3119:24

  **considering** [4] - 2927:11, 2928:2, 2948:19, 2989:20

  **constitutes** [1] - 2992:20

  **construction** [19] - 2988:2, 2989:14, 2991:1, 2994:10, 3017:10, 3017:17, 3019:5, 3019:24, 3023:8, 3026:17, 3032:19, 3033:7, 3033:9, 3033:15, 3034:17, 3035:14, 3038:17

  **constructions** [1] - 2996:3

  **constructive** [1] - 3189:2

  **construed** [1] - 3027:17

  **consultant** [2] - 3039:18, 3039:19

  **consumer** [2] - 2971:19, 2971:21

  **consumers** [1] - 3151:11

  **contact** [1] - 3037:14

  **contain** [1] - 2941:18

  **contained** [1] - 2924:18

  **containing** [1] - 2942:18

  **contains** [1] - 2937:7

  **contemporaneous** [1] - 2954:5

  **contending** [1] - 2979:15

  **contends** [8] - 2931:15, 2931:19, 2932:19, 2937:14, 2939:7, 2939:13, 2946:6, 2948:22

**content** [5] - 2951:3, 2951:17, 2952:11, 3115:25, 3151:12

**contentions** [1] - 2924:10

**contents** [1] - 3094:22

**contest** [1] - 3045:24

**context** [2] - 2925:2, 3072:6

**continue** [2] - 3136:19, 3157:2

**continues** [3] - 2964:15, 3086:1, 3178:11

**continuing** [1] - 3096:18

**contract** [1] - 3141:5

**contracts** [1] - 3143:10

**contractual** [2] - 3147:25, 3185:18

**contrary** [2] - 2928:1, 2954:25

**contributes** [1] - 2996:24

**contribution** [1] - 2996:19

**contributions** [1] - 3041:12

**control** [1] - 3046:10

**controller** [1] - 3031:24

**controls** [1] - 3005:25

**convenient** [1] - 3032:9

**conversation** [2] - 2973:13, 3153:20

**conversations** [3] - 3099:5, 3102:10, 3153:19

**converter** [2] - 2991:2, 2991:8

**convince** [4] - 3009:13, 3010:19, 3010:23, 3029:1

**convinced** [2] - 3051:1, 3118:16

**convincing** [13] - 2925:20, 2925:23, 2945:24, 2947:13, 2948:21, 2955:21, 2956:1, 2981:7, 2981:19, 2981:20, 2985:7, 3000:25, 3049:19

**copied** [2] - 2955:2, 3009:2

**copies** [10] - 2923:10, 2965:8, 3087:12, 3089:20, 3089:21, 3089:23, 3090:2, 3095:6, 3170:22, 3171:3

**copy** [22] - 2923:18, 2978:7, 3049:7, 3052:11, 3053:6, 3077:2, 3080:4, 3080:22, 3090:2, 3090:3, 3092:20, 3093:8, 3094:7, 3095:3, 3095:9, 3098:8, 3156:15, 3164:2, 3164:10, 3170:24, 3172:17, 3173:8

**Cordell** [11] - 2972:7, 2982:15, 3000:17, 3002:6, 3002:8, 3002:9, 3036:2, 3046:16, 3050:9, 3055:13, 3155:11

**CORDELL** [31] - 3002:10, 3002:13, 3002:19, 3002:21, 3036:4, 3053:10, 3053:21, 3054:4, 3055:14, 3056:4, 3105:15, 3134:15, 3134:21, 3158:15, 3160:22, 3161:4, 3161:13, 3162:5, 3162:9, 3166:4, 3166:23, 3167:4, 3168:20, 3170:2, 3170:15, 3181:9, 3182:12, 3184:21, 3185:1, 3190:21, 3191:1

**corner** [1] - 3089:5

**corporate** [5] - 3008:7, 3055:1, 3059:10, 3179:15, 3179:17

**corporation** [1] - 3051:12

**corporations** [2] - 3048:13, 3051:15

**correct** [40] - 2923:9, 2924:18, 2936:5, 2968:3, 2977:22, 2986:19, 3015:5, 3015:6, 3031:1, 3043:14, 3062:20, 3063:3, 3073:2, 3073:15, 3073:20, 3077:8, 3077:12, 3079:18, 3079:24, 3085:11, 3087:4, 3091:12, 3091:19, 3099:19, 3131:11, 3132:6, 3138:20, 3141:5, 3143:8, 3160:18, 3161:4, 3161:10, 3161:23, 3164:13, 3175:19, 3178:19, 3181:2, 3183:1, 3183:4, 3187:13

**CORRECT** [1] - 3191:6

**correction** [1] - 2923:9

**corrections** [1] - 2968:15

**corrective** [1] - 3096:2

**correctly** [13] - 3035:18, 3059:25, 3061:12, 3062:11, 3079:4, 3108:25, 3110:13, 3110:19, 3112:7, 3113:16, 3122:10, 3126:10, 3183:5

**corresponding** [6] - 2939:4, 2940:5, 2941:24, 2945:8, 3019:8, 3021:6

**cost** [1] - 3038:8

**costs** [1] - 3124:20

**counsel** [24] - 2965:2, 2968:21, 2969:1, 2984:17, 3002:20, 3002:22, 3054:19, 3056:17, 3080:19, 3081:7, 3085:14, 3098:1, 3104:10, 3135:20, 3136:21, 3142:6, 3150:19, 3159:18, 3163:11, 3164:2, 3165:3, 3165:7, 3167:9, 3173:19

**counsel's** [2] - 2993:18, 3164:7

**count** [2] - 2985:1, 3043:11

**counter** [1] - 3181:19

**counter-designated** [1] - 3181:19

**countersigned** [1] - 3140:14

**countries** [1] - 2973:19

**counts** [1] - 3159:24

**couple** [26] - 2965:9, 2969:7, 2973:25, 2976:7, 2988:3, 2992:6, 3000:21, 3004:9, 3009:18, 3019:6, 3023:14, 3026:4, 3049:3, 3106:23, 3129:18, 3141:12, 3149:24, 3160:10, 3163:16, 3163:18, 3170:18, 3172:10, 3180:15, 3180:19, 3184:17, 3188:22

**course** [21] - 2924:2, 2969:24, 2971:16, 2974:5, 2974:22, 2980:7, 2982:8, 2983:22, 2985:15, 2989:18, 2989:20, 3011:11, 3048:6, 3082:16, 3084:5, 3094:3, 3130:1, 3159:16, 3172:25, 3177:21, 3181:15

**court** [43] - 2967:24, 2968:25, 2978:21, 2979:7, 2983:10, 2991:20, 3002:19, 3020:23, 3021:18, 3033:7, 3033:10, 3051:17, 3051:20, 3052:17, 3053:3, 3054:6, 3055:23, 3056:1, 3056:5, 3069:25, 3084:2, 3097:10, 3101:24, 3105:16, 3105:19, 3106:4, 3106:22, 3129:14, 3133:21, 3146:6, 3154:19, 3161:23, 3167:16, 3168:16, 3168:18, 3168:21, 3168:24, 3169:14, 3170:6, 3182:14, 3187:1, 3190:7

**COURT** [283] - 2923:4, 2923:6, 2966:22, 2967:1, 2967:4, 2967:7, 2967:12, 2968:1, 2969:1, 3002:9, 3002:12, 3002:14, 3002:20, 3045:19, 3046:10, 3050:13, 3053:9, 3053:12, 3053:22, 3054:8, 3054:14, 3054:18, 3055:8, 3055:10, 3055:17, 3056:5, 3056:12, 3056:13, 3056:15, 3056:16, 3056:24, 3057:5, 3057:7, 3057:12, 3064:17, 3065:5, 3065:23, 3066:9, 3066:14, 3066:24, 3067:3, 3067:5, 3067:11, 3067:18, 3068:20, 3069:9, 3070:1, 3070:5, 3070:13, 3070:22, 3071:4, 3071:10, 3071:14, 3071:24, 3072:3, 3072:15, 3072:18, 3072:23, 3073:4, 3073:9, 3074:13, 3075:1, 3075:9, 3075:17, 3075:20, 3076:16, 3076:22, 3081:7, 3082:2, 3082:7, 3082:12, 3082:18, 3083:6, 3083:17, 3083:23, 3084:12, 3084:15, 3084:19, 3085:13, 3085:23, 3086:5, 3086:8, 3086:15, 3092:15, 3092:19, 3093:5, 3094:5, 3094:12, 3095:7, 3095:17, 3095:23, 3096:5, 3096:22, 3096:25, 3097:19, 3097:25, 3098:21, 3099:7, 3101:9, 3102:1, 3103:24, 3105:14, 3106:6, 3106:10, 3106:12, 3116:8, 3116:11, 3116:18, 3116:25, 3117:5, 3118:3, 3119:2, 3119:12, 3119:25, 3123:11, 3123:16, 3123:18, 3123:21, 3123:25, 3124:5, 3124:9, 3124:14, 3124:17, 3124:23, 3128:15, 3128:22, 3129:1, 3129:4, 3129:10, 3129:12, 3129:16, 3130:7, 3130:16, 3130:22, 3131:1, 3131:10, 3132:3, 3133:5, 3134:11, 3134:17, 3135:15, 3136:9, 3136:15, 3136:19, 3138:4, 3138:8, 3138:15, 3139:11, 3139:21, 3139:24, 3143:14, 3143:20, 3144:7, 3144:12, 3144:22, 3144:25, 3145:3, 3146:24, 3147:2, 3150:17, 3154:19, 3155:1, 3155:4, 3155:16, 3156:4, 3156:22, 3157:3, 3158:13, 3158:18, 3159:10, 3159:13, 3159:18, 3160:12, 3160:20, 3160:24, 3161:5, 3161:11, 3161:17, 3161:20, 3162:8, 3162:10, 3162:21, 3163:8, 3163:23, 3164:1, 3164:4, 3164:10, 3164:24, 3165:8, 3166:2, 3166:5, 3166:8, 3166:16, 3166:18, 3166:20, 3166:25, 3167:5, 3167:9, 3167:18, 3168:7, 3168:12, 3168:23, 3169:11, 3169:16, 3169:21, 3170:9, 3170:11, 3170:13, 3170:17, 3170:22, 3170:25, 3171:5, 3171:11, 3171:18, 3171:21, 3172:1, 3172:5, 3172:9, 3172:19, 3173:3, 3173:7, 3173:15, 3173:19, 3174:5, 3174:21, 3175:2, 3175:16, 3176:4, 3176:8, 3176:10, 3176:14, 3176:18, 3177:7, 3177:10, 3177:19, 3178:8, 3178:12, 3178:20, 3178:23, 3179:10, 3179:13, 3179:25,

3180:4, 3180:8, 3180:13, 3180:18,
3180:21, 3180:25, 3181:3, 3181:8,
3181:13, 3181:20, 3181:22, 3182:11,
3182:13, 3182:19, 3182:20, 3183:2,
3183:5, 3183:13, 3183:19, 3183:25,
3184:19, 3184:22, 3185:2, 3186:4,
3186:14, 3186:22, 3187:2, 3187:4,
3187:5, 3187:7, 3187:10, 3187:14,
3187:16, 3188:18, 3188:21, 3189:9,
3190:16, 3190:20, 3190:22, 3191:2,
3191:4
   **Court** [1] - 3139:14
   **court's** [10] - 2988:2, 2990:25, 2996:2,
3023:7, 3035:14, 3038:16, 3038:17,
3047:14, 3052:23, 3168:5
   **courtroom** [19] - 2966:21, 2969:16,
2969:20, 2970:6, 2970:10, 2970:12,
2970:20, 2971:20, 2972:21, 2974:10,
2985:3, 3051:24, 3052:20, 3053:8,
3053:25, 3055:11, 3187:6, 3188:15,
3188:17
   **courts** [1] - 3189:18
   **cover** [3] - 2933:6, 3075:16, 3152:19
   **covered** [8] - 2934:14, 2942:15,
2952:1, 2952:13, 2953:5, 2954:16,
2955:8, 3016:3
   **covering** [1] - 2935:18
   **covers** [3] - 2934:7, 2972:18, 3094:23
   **CPU** [1] - 3009:23
   **create** [4] - 2935:21, 2972:23, 2972:25,
3012:21
   **creates** [1] - 2944:25
   **credibility** [3] - 2979:6, 2979:8,
2989:10
   **credit** [5] - 2996:16, 3050:3, 3050:4,
3088:23, 3089:8
   **credited** [1] - 2962:24
   **criminals** [1] - 3048:24
   **criticizing** [1] - 3028:3
   **CROSS** [2] - 3086:19, 3147:4
   **cross** [12] - 2980:19, 2988:24, 3014:25,
3071:24, 3135:25, 3164:17, 3164:21,
3177:14, 3177:16, 3179:15, 3179:19,
3184:1
   **CROSS-EXAMINATION** [2] - 3086:19,
3147:4
   **cross-examination** [5] - 2988:24,
3014:25, 3135:25, 3177:16, 3179:19
   **cross-examinations** [1] - 2980:19
   **cross-examine** [4] - 3164:17, 3164:21,
3177:14, 3179:15
   **curious** [2] - 3016:17, 3149:18
   **current** [1] - 2994:13
   **CurrentPlay** [5] - 3021:2, 3021:4,
3021:6, 3021:16, 3033:1
   **customary** [1] - 2962:20
   **cut** [3] - 2976:3, 3094:20

## D

   **DAD** [69] - 2946:16, 2946:17, 2947:16,
2947:19, 2949:1, 2949:5, 2949:8,
2965:25, 2966:1, 2966:23, 2967:2,
2967:8, 2971:10, 2975:4, 2975:24,
2976:9, 2977:10, 2977:20, 2978:1,
2978:13, 2979:15, 2979:17, 2980:3,
2980:9, 2980:23, 3040:9, 3040:15,
3040:17, 3040:18, 3041:17, 3075:7,
3076:6, 3076:12, 3077:3, 3077:13,
3077:21, 3079:5, 3079:17, 3080:7,
3081:15, 3081:19, 3083:4, 3084:7,
3086:25, 3087:3, 3087:16, 3087:20,
3088:6, 3090:1, 3090:7, 3091:8,
3091:11, 3094:7, 3098:4, 3098:16,
3099:1, 3101:2, 3101:6, 3167:12,
3167:16, 3168:2, 3168:5, 3168:18,
3168:20, 3170:5, 3182:25
   **DADs** [1] - 2978:7
   **damage** [3] - 2932:2, 2974:6, 3002:1
   **damages** [29] - 2956:3, 2956:8,
2956:10, 2956:13, 2956:18, 2956:19,
2956:20, 2956:22, 2956:24, 2958:25,
2959:15, 2964:8, 2964:13, 2964:17,
2964:19, 2966:10, 2973:6, 2996:9,
2996:14, 3001:5, 3041:1, 3041:5,
3041:6, 3042:13, 3043:8, 3043:17,
3044:4, 3146:3
   **Dan** [2] - 3070:25, 3113:9
   **Dan's** [2] - 3111:24, 3112:6
   **data** [4] - 2989:3, 2989:5, 2989:13,
2989:15
   **Data** [5] - 2973:10, 2973:14, 2997:22,
2998:24, 3042:7
   **database** [1] - 3029:22
   **DATE** [1] - 3191:5
   **date** [26] - 2954:6, 2958:24, 2959:11,
2969:19, 3026:12, 3026:13, 3037:2,
3037:3, 3052:11, 3059:17, 3082:21,
3083:2, 3083:3, 3083:22, 3088:23,
3088:25, 3089:3, 3089:8, 3089:9,
3089:10, 3117:6, 3117:12, 3117:20,
3142:13, 3147:22
   **dated** [2] - 3097:12, 3097:13
   **dates** [2] - 3037:1, 3083:2
   **daughter** [1] - 3046:2
   **Dave** [1] - 2988:10
   **days** [10] - 2979:25, 2985:12, 3060:10,
3067:23, 3069:2, 3112:22, 3113:7,
3139:5, 3157:23
   **DC** [1] - 3003:11
   **DDX** [19] - 2929:22, 2929:23, 2929:24,
2929:25, 2930:1, 2930:8, 2930:11,
2976:10, 3107:22
   **deadline** [1] - 3117:16
   **deal** [14] - 2967:18, 3034:9, 3042:18,
3054:2, 3066:2, 3068:4, 3068:18,
3076:20, 3136:24, 3144:8, 3155:19,
3155:22, 3156:20, 3176:2

   **dealing** [5] - 3096:23, 3118:10, 3119:2,
3171:12, 3182:23
   **dealings** [1] - 3155:13
   **deals** [2] - 2997:23, 3135:19
   **dealt** [2] - 3051:16, 3113:19
   **debate** [1] - 2996:10
   **decade** [1] - 3107:6
   **deceive** [2] - 3086:25, 3101:1
   **December** [3] - 3077:6, 3087:4,
3087:11
   **decide** [22] - 2925:12, 2933:4, 2936:20,
2939:23, 2942:16, 2951:10, 2951:23,
2956:12, 2956:15, 2958:7, 2966:11,
2966:13, 2975:1, 3004:19, 3016:9,
3017:21, 3037:22, 3043:24, 3044:10,
3045:4, 3050:18, 3050:22
   **decided** [7] - 2987:11, 3006:17, 3051:9,
3059:6, 3082:19, 3135:13, 3142:20
   **deciding** [10] - 2925:25, 2927:13,
2932:23, 2933:2, 2940:16, 2942:13,
2943:23, 2945:22, 2947:24, 2953:1
   **decision** [5] - 2930:2, 2999:13,
3003:2, 3005:4, 3083:24, 3086:4,
3086:8, 3086:10, 3086:11, 3188:7
   **decisions** [4] - 2927:20, 2933:9,
2933:23
   **declaration** [1] - 3178:13
   **declined** [5] - 3059:6, 3062:25, 3063:4,
3063:18, 3063:24
   **deconstruct** [2] - 2945:9, 3021:19
   **decreased** [1] - 2963:8
   **deductions** [1] - 2928:8
   **deemed** [1] - 2941:11
   **deep** [1] - 2995:17
   **DEFENDANT** [2] - 3054:22, 3106:18
   **defendant** [4] - 2931:15, 3068:9,
3170:13, 3170:15
   **Defendant's** [11] - 2922:12, 2922:13,
2922:14, 2922:15, 2922:16, 2976:24,
3094:8, 3094:12, 3099:16, 3147:13,
3159:10
   **defendants** [1] - 2998:19
   **defense** [6] - 3048:2, 3064:25, 3119:5,
3130:6, 3160:1, 3190:4
   **defenses** [4] - 2979:13, 3117:25,
3118:25, 3119:1
   **define** [2] - 2933:15, 2937:24
   **defined** [23] - 2924:16, 2924:24,
2937:23, 2940:12, 2941:20, 2941:23,
2942:11, 2942:17, 2943:12, 2943:14,
2943:15, 2943:22, 2943:25, 2944:12,
2944:22, 2945:5, 2945:7, 2945:10,
2951:2, 2952:9, 2953:19, 2954:2,
3014:5
   **defining** [1] - 2941:11
   **definitely** [1] - 2990:7
   **definition** [8] - 2924:21, 2924:22,
2925:7, 2944:16, 2989:14, 3018:10,
3047:14, 3072:19
   **definitions** [10] - 2924:16, 2924:17,

2924:18, 2925:5, 2925:9, 2933:10, 2942:2, 3010:5, 3017:19, 3019:12

**definitive** [1] - 3114:17

**degree** [2] - 2976:5, 3105:23

**delay** [5] - 3071:20, 3135:18, 3144:12, 3163:11, 3174:12

**deliberate** [5] - 2965:14, 3051:18, 3055:24, 3056:14, 3188:16

**deliberation** [1] - 2965:11

**deliberations** [6] - 2942:3, 3051:8, 3051:23, 3052:1, 3052:2, 3053:4

**deliver** [1] - 3151:11

**demand** [4] - 2999:20, 3042:25, 3138:3, 3151:14

**Demand** [1] - 3151:12

**demands** [1] - 2953:9

**demo** [1] - 3112:3

**demonstrate** [2] - 3118:2, 3169:5

**demonstrating** [2] - 2978:13, 3169:9

**demonstration** [2] - 2980:6, 2980:13

**demonstrative** [5] - 2995:1, 3158:21, 3166:10, 3167:2, 3170:7

**demonstratives** [4] - 2986:12, 3165:9, 3166:11, 3166:15

**denied** [3] - 3175:13, 3175:14, 3176:9

**denies** [1] - 2932:18

**dense** [2] - 3004:5, 3013:15

**deny** [1] - 3177:21

**dependent** [12] - 2934:3, 2934:9, 2934:10, 2934:13, 2934:14, 2934:15, 2934:18, 2936:11, 2936:14, 2936:16, 2936:18, 2968:7

**depo** [1] - 3031:14

**Depo** [1] - 3056:22

**depose** [1] - 3072:10

**deposed** [7] - 3030:7, 3067:23, 3109:15, 3157:12, 3157:16, 3157:17, 3157:20

**deposition** [70] - 2975:6, 2975:7, 2978:8, 3058:5, 3058:8, 3058:14, 3058:16, 3060:11, 3060:21, 3063:11, 3067:7, 3068:23, 3071:8, 3073:12, 3074:7, 3085:3, 3103:13, 3107:8, 3108:5, 3108:12, 3109:20, 3109:23, 3110:21, 3111:4, 3111:6, 3111:24, 3112:6, 3112:9, 3113:8, 3113:19, 3114:1, 3115:9, 3118:21, 3120:8, 3122:5, 3123:9, 3136:8, 3136:10, 3136:22, 3153:5, 3153:8, 3154:1, 3154:18, 3154:21, 3155:12, 3155:14, 3156:3, 3156:4, 3156:5, 3157:15, 3157:21, 3162:14, 3163:16, 3163:19, 3164:14, 3165:7, 3173:17, 3173:23, 3174:1, 3174:23, 3175:10, 3175:15, 3175:17, 3176:12, 3177:4, 3178:6, 3180:15, 3180:20, 3180:25, 3181:7

**Deposition** [1] - 3136:11

**depositions** [3] - 3069:1, 3157:19, 3172:15

**deprived** [1] - 3067:25

**DEPUTY** [8] - 2966:25, 2999:14, 3036:2, 3046:12, 3047:21, 3167:7, 3169:15, 3169:23

**deputy** [1] - 3170:25

**describe** [6] - 2946:11, 3080:12, 3087:9, 3111:3, 3119:20, 3151:6

**described** [15] - 2932:21, 2937:23, 2938:13, 2938:15, 2941:24, 2945:14, 2946:4, 2946:8, 2950:6, 2953:2, 2955:19, 2993:10, 3030:15, 3031:24, 3119:17

**describes** [2] - 2933:14, 2938:10

**description** [1] - 2933:17

**deserves** [1] - 2927:10

**design** [1] - 3007:13

**designate** [6] - 3057:25, 3060:3, 3069:23, 3178:10, 3179:5, 3179:7

**designated** [4] - 2973:18, 3072:1, 3072:22, 3181:19

**designed** [4] - 2961:23, 2972:10, 2993:2

**designee** [1] - 3059:10

**despite** [3] - 3027:23, 3042:1, 3046:4

**destroyed** [1] - 3122:13

**destroys** [1] - 3131:7

**detail** [10] - 2927:2, 2945:25, 2969:6, 2969:7, 2979:10, 2987:4, 3011:2, 3019:2, 3032:4, 3120:18

**detailed** [3] - 2951:15, 2956:6, 2966:18

**details** [2] - 3115:6, 3128:14

**determination** [10] - 2950:18, 2951:13, 2958:22, 2959:18, 2960:3, 2961:14, 3034:19, 3035:6, 3036:9, 3084:1

**determinations** [3] - 2946:1, 2950:25, 2957:17

**determine** [26] - 2934:6, 2934:14, 2936:2, 2936:8, 2937:18, 2942:23, 2951:18, 2952:16, 2953:6, 2955:20, 2958:10, 2958:11, 2958:12, 2958:13, 2958:16, 2958:18, 2964:4, 2964:20, 3026:1, 3040:13, 3063:7, 3063:15, 3063:23, 3064:7, 3070:16, 3093:7

**determined** [2] - 2950:9, 2953:17

**determining** [7] - 2926:10, 2950:23, 2951:17, 2952:10, 2952:12, 2959:23, 2963:16

**develop** [1] - 3132:4

**developed** [1] - 3146:12

**developing** [3] - 3008:20, 3009:7, 3150:14

**development** [2] - 3114:13, 3173:24

**device** [20] - 2972:24, 2973:1, 2990:9, 2997:13, 3006:18, 3007:17, 3008:10, 3008:14, 3014:21, 3025:20, 3029:18, 3038:22, 3060:13, 3060:24, 3062:6, 3109:7, 3111:20, 3119:14, 3149:15

**devices** [8] - 2985:15, 2989:25, 3001:11, 3034:18, 3035:15, 3039:2, 3061:15, 3117:15

**devoted** [1] - 3099:22

**Dick** [1] - 2983:20

**Dickinson** [1] - 3097:6

**difference** [6] - 3023:19, 3031:15, 3036:21, 3038:10, 3039:14, 3083:4

**differences** [12] - 2940:13, 2943:15, 2944:21, 2945:4, 2951:4, 2952:13, 2952:15, 2991:10, 2991:14, 2992:9, 3010:25, 3011:1, 3017:2, 3028:19, 3034:23, 3038:3

**different** [62] - 2923:20, 2926:16, 2931:6, 2935:20, 2940:17, 2941:7, 2943:24, 2945:12, 2966:16, 2981:8, 2981:13, 2996:6, 3001:4, 3017:9, 3017:16, 3024:9, 3026:4, 3027:19, 3028:21, 3029:6, 3029:24, 3030:14, 3031:5, 3031:6, 3031:11, 3032:5, 3032:10, 3032:14, 3034:14, 3036:6, 3037:12, 3038:2, 3039:9, 3039:25, 3047:3, 3050:2, 3057:11, 3075:24, 3083:5, 3083:11, 3083:13, 3088:15, 3107:17, 3112:18, 3135:16, 3135:17, 3135:22, 3139:14, 3145:24, 3145:25, 3146:6, 3146:15, 3151:24, 3155:15, 3160:25, 3161:12, 3174:9, 3174:16, 3175:3, 3175:20, 3189:16

**differently** [2] - 3016:10, 3051:3

**differs** [1] - 3031:20

**difficult** [3] - 3004:5, 3009:6, 3169:4

**difficulty** [1] - 3058:25

**dig** [1] - 3161:15

**Digeo** [5] - 2973:11, 2973:25, 2997:22, 2998:24, 3042:7

**digital** [4] - 2991:2, 2991:8, 2992:15, 3090:17

**digital-to-analog** [2] - 2991:2, 2991:8

**digress** [1] - 3115:16

**diligent** [1] - 3116:23

**Dillon** [3] - 3180:17, 3183:2, 3183:3

**Dillon's** [1] - 3182:21

**dinged** [1] - 3075:11

**dinner** [1] - 3056:9

**direct** [17] - 2928:14, 2928:19, 2928:21, 3059:11, 3073:24, 3090:9, 3100:8, 3125:4, 3126:6, 3127:12, 3128:17, 3129:23, 3130:13, 3131:5, 3137:10, 3140:25, 3152:19

**DIRECT** [2] - 3054:21, 3106:17

**directed** [6] - 3052:13, 3079:6, 3079:19, 3079:24, 3080:11, 3091:21

**direction** [1] - 2954:25

**disagreement** [1] - 3031:2

**disallowed** [2] - 3082:3, 3084:16

**disappointed** [1] - 3102:22

**disbelief** [1] - 2954:21

**discharged** [1] - 3052:13

**disclose** [8] - 3052:14, 3066:7, 3080:3, 3080:4, 3095:15, 3100:21, 3136:23, 3179:17

**disclosed** [9] - 2948:9, 2948:11, 2951:18, 2951:22, 3074:3, 3075:3,

3076:6, 3136:24, 3137:6
**discloses** [1] - 2952:19
**Disclosure** [2] - 3079:14, 3087:13
**Discman** [7] - 2946:20, 2946:21, 2949:2, 2949:18, 2971:23, 2983:16, 3167:21
**discontinuing** [1] - 2994:13
**discouraged** [1] - 2953:14
**discovered** [1] - 2961:2
**discovery** [3] - 3066:23, 3134:10, 3136:5
**discuss** [7] - 2946:12, 2960:2, 3041:10, 3050:15, 3052:4, 3052:7, 3174:2
**discussed** [3] - 3112:9, 3139:10, 3141:1
**discusses** [2] - 3188:25, 3189:5
**discussing** [3] - 3050:24, 3188:9
**Discussion** [3] - 3167:8, 3170:12, 3181:12
**discussion** [4] - 2994:24, 3036:15, 3040:8, 3117:6
**discussions** [3] - 3042:21, 3154:21, 3154:24
**disk** [2] - 2990:9, 2990:11
**display** [1] - 3009:22
**dispositive** [3] - 2944:15, 2963:12, 3037:10
**dispute** [6] - 2986:10, 2986:25, 2988:5, 3000:5, 3005:21, 3007:21
**disregard** [3] - 2928:23, 2929:2, 2931:2, 2964:7, 3043:8
**dissented** [1] - 3097:2
**dissenting** [1] - 3097:4
**dissimilar** [1] - 2960:25
**distant** [1] - 3107:4
**distinction** [3] - 2928:18, 2993:23, 2994:1
**distinguished** [1] - 2962:24
**distract** [1] - 3007:25
**distractions** [4] - 3005:5, 3005:6, 3005:8, 3005:13
**distribute** [1] - 3055:7
**District** [1] - 3182:1
**district** [4] - 3084:1, 3084:2, 3105:19, 3106:4
**dive** [1] - 3029:21
**divided** [1] - 2933:21
**division** [2] - 3048:1, 3052:15
**Dixon** [1] - 3187:7
**doctrine** [18] - 2936:25, 2937:3, 2938:25, 2939:1, 2939:16, 2939:18, 2939:21, 2940:1, 2940:7, 2940:8, 2940:9, 2941:8, 2941:14, 2943:9, 2992:8, 3011:3, 3017:4, 3038:14
**document** [21] - 3057:15, 3057:16, 3059:12, 3074:9, 3095:19, 3096:1, 3096:14, 3127:1, 3127:16, 3130:2, 3130:4, 3131:13, 3131:22, 3132:7, 3132:11, 3133:3, 3136:3, 3137:1, 3147:12, 3147:14, 3158:25

**documents** [25] - 2988:6, 2997:17, 3068:14, 3087:6, 3115:9, 3121:20, 3121:22, 3121:25, 3122:7, 3122:13, 3127:5, 3131:8, 3140:6, 3140:12, 3140:13, 3140:14, 3140:16, 3142:3, 3152:22, 3152:24, 3153:3, 3157:22, 3157:25, 3158:4, 3160:16
**dollar** [5] - 2957:24, 2958:18, 3044:16, 3171:14, 3171:15
**dollar-thirty** [1] - 3044:16
**dollars** [1] - 3138:9
**Donaldson** [1] - 3105:21
**done** [12] - 2930:24, 2937:13, 3001:22, 3002:6, 3047:20, 3066:22, 3084:6, 3084:10, 3085:21, 3124:18, 3124:21, 3151:2
**doomed** [1] - 3065:3
**door** [2] - 3052:18, 3145:17
**double** [1] - 2995:10
**doubt** [3] - 2925:22, 3005:21, 3049:14
**down** [23] - 2972:19, 2985:22, 2991:4, 2996:18, 2997:2, 2997:3, 2997:14, 3002:17, 3005:11, 3027:14, 3057:18, 3060:2, 3076:1, 3122:12, 3122:22, 3151:3, 3158:13, 3161:15, 3167:23, 3168:2, 3169:2, 3169:17, 3182:16
**download** [12] - 2984:10, 2984:15, 2991:24, 2993:3, 3011:10, 3012:7, 3037:5, 3040:9, 3079:1, 3080:5, 3080:23, 3151:18
**downloadable** [1] - 3010:10
**downloaded** [3] - 2987:24, 3012:1, 3120:3
**downloading** [14] - 2939:7, 2991:15, 2992:8, 3011:17, 3011:23, 3036:16, 3040:9, 3040:11, 3041:17, 3078:6, 3078:11, 3080:12, 3080:16, 3080:23
**downloads** [3] - 2991:16, 2991:22, 2992:3
**Dr** [74] - 2929:13, 2929:15, 2930:3, 2930:5, 2930:10, 2930:12, 2971:6, 2973:13, 2974:2, 2975:20, 2977:12, 2977:14, 2977:15, 2977:19, 2978:19, 2979:9, 2980:15, 2980:20, 2982:11, 2983:22, 2984:17, 2985:11, 2986:1, 2986:2, 2986:8, 2986:13, 2986:15, 2986:19, 2986:24, 2986:25, 2987:2, 2987:3, 2987:4, 2987:6, 2987:12, 2987:16, 2988:8, 2988:23, 2989:9, 2989:24, 2992:19, 2992:23, 2993:9, 2998:5, 2998:15, 2998:21, 3014:8, 3023:9, 3023:10, 3024:14, 3025:8, 3026:16, 3027:11, 3027:20, 3027:25, 3028:10, 3030:5, 3030:23, 3031:1, 3031:4, 3034:11, 3034:16, 3035:11, 3038:21, 3039:12, 3047:10, 3047:14, 3047:17, 3133:2, 3165:13, 3165:15
**drafted** [2] - 2994:4, 3074:15
**drag** [1] - 3092:19
**draw** [3] - 2928:5, 2928:9, 3075:8
**drawer** [1] - 3158:3

**drawing** [2] - 2974:2, 2988:13
**drawings** [1] - 2933:18
**drive** [10] - 2990:1, 2999:13, 3006:11, 3006:13, 3012:1, 3015:12, 3029:22, 3038:9, 3132:2
**driven** [1] - 3041:18
**driving** [1] - 3118:20
**drop** [1] - 2992:21
**dropped** [1] - 3097:17
**due** [3] - 3041:6, 3041:10, 3094:3
**Dulcimer** [1] - 3029:22
**dull** [1] - 3097:6
**duration** [1] - 2962:3
**during** [30] - 2924:2, 2926:17, 2928:22, 2930:24, 2931:2, 2935:7, 2937:10, 2938:20, 2952:6, 2954:5, 2959:8, 2959:12, 2972:5, 2981:10, 2993:18, 3004:17, 3010:7, 3017:25, 3052:2, 3052:4, 3073:18, 3084:24, 3112:9, 3137:21, 3155:5, 3155:12, 3155:14, 3155:24, 3185:2, 3185:3
**duty** [5] - 2923:24, 2924:11, 3050:14, 3188:25, 3189:12
**DVD** [1] - 3181:5
**dwell** [1] - 3032:21
**DX** [17] - 2922:10, 2922:11, 2922:17, 2946:16, 2946:17, 2946:18, 2946:19, 2946:20, 2946:21, 2946:22, 2946:23, 3004:21, 3074:1, 3078:14, 3167:14, 3169:22, 3170:5

**E**

**E-Data** [5] - 2973:10, 2973:14, 2997:22, 2998:24, 3042:7
**early** [5] - 2998:13, 3087:8, 3107:5, 3109:13, 3147:10
**earth** [1] - 3176:10
**easily** [2] - 3031:8
**east** [1] - 3003:9
**Eastern** [1] - 3182:1
**easy** [1] - 3171:12
**echo** [1] - 3002:23
**economic** [14] - 3069:23, 3172:14, 3172:24, 3174:7, 3174:11, 3174:13, 3174:24, 3175:25, 3176:17, 3177:18, 3178:1, 3178:6, 3185:12, 3186:2
**economically** [1] - 3175:12
**educate** [1] - 3065:9
**educated** [1] - 3069:7
**education** [1] - 2927:11
**effect** [5] - 2975:12, 3084:1, 3097:22, 3159:24, 3161:23
**effective** [1] - 3107:20
**effects** [1] - 2953:9
**effort** [1] - 3050:15
**efforts** [1] - 3151:9
**eight** [5] - 2955:2, 2962:8, 2964:11, 3037:5, 3042:1
**Eighth** [1] - 3106:4

either [25] - 2937:23, 2942:10, 2942:24, 2943:8, 2948:9, 2948:11, 2949:2, 2949:17, 2970:7, 2979:14, 2983:21, 2986:15, 2988:15, 2993:22, 2999:10, 3013:5, 3047:7, 3052:19, 3057:9, 3058:1, 3103:2, 3158:24, 3168:12, 3172:24, 3186:2

ELACQUA [16] - 3162:20, 3163:10, 3163:24, 3164:3, 3164:7, 3164:11, 3164:25, 3178:21, 3178:24, 3179:11, 3180:6, 3186:8, 3186:17, 3186:24, 3188:19, 3188:22

Elacqua [7] - 3158:17, 3163:9, 3176:19, 3178:12, 3181:16, 3188:18, 3189:11

Electric [1] - 3188:24

electronics [2] - 2971:19, 2971:21

element [11] - 2938:17, 2948:9, 2987:5, 2992:7, 3016:8, 3016:9, 3018:9, 3027:17, 3040:7, 3116:13, 3116:15

elements [9] - 2933:23, 2935:25, 2952:20, 2952:21, 2953:7, 2962:25, 2985:22, 3016:10, 3078:24

elephant [2] - 3048:8, 3048:9

eleven [1] - 2962:19

elicit [3] - 3064:12, 3071:12, 3074:19

elicited [2] - 3129:22, 3156:13

eliciting [1] - 3132:24

eliminate [2] - 2941:15, 2989:7

Elmo [2] - 3023:22, 3043:21

Elvis [1] - 3029:11

email [1] - 3143:12

embedded [1] - 3036:5

embodiment [2] - 2962:13, 3113:21

embodiments [4] - 3115:6, 3116:21, 3118:1, 3119:6

Emergent [1] - 3152:11

employee [4] - 2983:11, 3049:24, 3068:12, 3174:22

employees [4] - 2970:9, 3004:24, 3068:12, 3068:14

ENCO [3] - 2976:19, 2976:20, 3163:18

encoder/decoder [1] - 2989:21

encompasses [1] - 3174:9

Encyclopedia [1] - 3081:9

end [16] - 2933:13, 2978:20, 2991:12, 3000:9, 3002:6, 3005:18, 3033:17, 3037:8, 3048:19, 3056:23, 3100:13, 3144:23, 3146:22, 3151:17, 3170:4, 3175:20

endeavor [1] - 3152:13

ended [1] - 3000:4

ending [1] - 3152:12

endless [2] - 3070:9, 3168:12

endorsed [1] - 3030:23

engage [1] - 2959:20

engaged [1] - 3147:20

engagement [1] - 3165:1

engages [1] - 2935:8

Engineered [1] - 3105:20

engineers [3] - 3007:22, 3009:5, 3009:7

enjoy [1] - 3181:8

enlist [1] - 3055:6

entered [3] - 2959:21, 2973:16, 2974:23

enters [2] - 3055:11, 3187:6

entire [6] - 2958:3, 2963:24, 3096:9, 3159:16, 3162:23, 3185:2

entirely [3] - 2928:24, 2929:3, 3175:21

entirety [1] - 3020:1

entities [1] - 3140:19

entitled [13] - 2931:10, 2941:12, 2956:2, 2956:16, 2956:22, 2957:3, 2964:8, 2979:5, 2979:6, 3051:12, 3068:25, 3069:3, 3177:5

entity [10] - 2935:8, 3066:6, 3067:10, 3067:21, 3068:12, 3072:5, 3072:13, 3072:14, 3103:14, 3103:19, 3103:22, 3104:4, 3130:3, 3143:2, 3152:25, 3153:1, 3162:4, 3189:17

entries [1] - 3023:1

envelope [2] - 3088:19, 3090:4

environment [1] - 3094:19

equal [3] - 3051:10, 3051:16

equals [1] - 3051:17

equitable [5] - 3098:24, 3170:16, 3182:24, 3183:20, 3189:24

equivalent [27] - 2939:5, 2939:12, 2939:21, 2939:25, 2940:4, 2940:10, 2942:10, 2942:25, 2943:2, 2943:12, 2943:20, 2945:13, 2987:13, 2987:16, 2987:25, 2988:1, 2989:11, 2990:2, 2990:10, 2990:21, 2992:21, 2995:22, 3019:1, 3026:3, 3027:14, 3029:3, 3037:7

equivalents [28] - 2936:25, 2937:3, 2938:25, 2939:1, 2939:16, 2939:18, 2939:22, 2940:2, 2940:7, 2940:8, 2940:9, 2941:8, 2941:14, 2943:9, 2945:11, 2992:9, 3011:3, 3017:5, 3019:9, 3028:14, 3033:13, 3034:19, 3035:2, 3035:4, 3035:6, 3038:4, 3038:14, 3039:9

especially [1] - 3184:15

essential [1] - 2961:3

essentially [3] - 3090:21, 3102:18, 3129:23

establish [4] - 2956:17, 3069:18, 3082:4, 3082:11

established [9] - 2928:10, 2957:3, 2960:5, 2961:19, 2962:5, 3041:25, 3067:21, 3134:3, 3175:12

establishes [2] - 2956:21, 2963:15

estate [1] - 3042:4

estopped [1] - 3172:13

et [4] - 2990:19, 3018:14, 3115:12

Eugene [1] - 2975:3

European [1] - 2973:18

evaluate [5] - 2946:25, 2951:20,

3026:24, 3027:7, 3028:13

evaluating [4] - 2951:22, 2953:25, 2960:13, 2960:20

evaluation [1] - 3002:2

evening [2] - 3187:11, 3187:19

event [2] - 2956:4, 2956:14

events [3] - 2959:13, 3085:8, 3146:11

eventually [1] - 2984:6

evidence [112] - 2923:17, 2924:8, 2924:10, 2925:16, 2925:17, 2925:20, 2925:21, 2925:23, 2926:4, 2926:12, 2926:14, 2927:13, 2927:16, 2927:18, 2928:2, 2928:4, 2928:10, 2928:12, 2928:14, 2928:16, 2928:19, 2928:20, 2929:5, 2929:14, 2930:4, 2930:11, 2930:16, 2930:20, 2937:10, 2937:19, 2939:19, 2942:8, 2945:3, 2945:24, 2947:13, 2948:21, 2951:7, 2951:10, 2952:7, 2955:21, 2955:24, 2956:1, 2956:18, 2959:12, 2959:14, 2960:13, 2962:17, 2963:13, 2964:7, 2981:7, 2981:13, 2981:20, 2984:7, 2985:7, 2994:18, 2995:5, 3000:25, 3002:2, 3005:2, 3005:17, 3005:23, 3006:1, 3006:15, 3027:22, 3028:10, 3029:5, 3032:12, 3034:3, 3036:18, 3037:15, 3037:18, 3038:3, 3039:11, 3039:17, 3040:12, 3042:10, 3042:13, 3043:4, 3043:8, 3043:23, 3043:24, 3044:6, 3048:17, 3049:20, 3050:23, 3051:21, 3053:17, 3069:14, 3075:9, 3084:8, 3094:6, 3118:1, 3119:8, 3119:10, 3131:23, 3134:6, 3134:8, 3137:1, 3137:19, 3144:17, 3144:19, 3162:5, 3162:7, 3165:19, 3176:11, 3178:1, 3185:14, 3185:19, 3187:20, 3190:5

evidentiary [20] - 2944:25, 3069:24, 3073:7, 3116:16, 3146:7, 3146:19, 3156:23, 3172:13, 3172:25, 3174:20, 3175:25, 3178:9, 3178:17, 3178:22, 3179:3, 3179:6, 3179:8, 3179:22, 3185:12, 3186:3

evidently [3] - 3083:24, 3160:9, 3177:11

exact [1] - 2930:19

exactly [28] - 2977:9, 2982:16, 2995:3, 2995:18, 3018:17, 3019:21, 3022:19, 3025:10, 3027:15, 3038:23, 3039:1, 3039:13, 3047:19, 3049:1, 3065:4, 3083:7, 3092:22, 3119:22, 3123:7, 3125:25, 3126:12, 3127:18, 3137:25, 3141:13, 3142:10, 3155:4, 3165:23, 3177:9

exaggerating [1] - 2976:4

exam [1] - 3137:10

examination [11] - 2988:24, 3014:25, 3096:18, 3125:4, 3126:6, 3127:12, 3131:5, 3135:25, 3146:23, 3177:16, 3179:19

EXAMINATION [4] - 3054:21, 3086:19, 3106:17, 3147:4

**examinations** [4] - 2980:19, 3059:19, 3059:24
**examine** [7] - 2967:2, 3136:2, 3164:17, 3164:21, 3167:16, 3177:14, 3179:15
**examined** [2] - 3074:8, 3112:13
**examiner** [36] - 2932:25, 2947:3, 3040:17, 3078:8, 3079:6, 3079:19, 3080:7, 3081:14, 3081:18, 3083:5, 3083:19, 3084:6, 3084:9, 3084:11, 3088:2, 3091:3, 3093:16, 3093:22, 3093:24, 3094:2, 3096:6, 3096:10, 3096:19, 3098:13, 3100:8, 3101:12, 3101:21, 3101:24, 3101:25, 3102:4, 3102:6, 3102:10, 3102:15, 3102:24
**examiner's** [3] - 3078:19, 3086:2, 3099:18
**examining** [1] - 3106:11
**Examining** [1] - 3092:25
**example** [14] - 2936:4, 2936:16, 2955:9, 2956:8, 2972:15, 2981:11, 2983:2, 3022:7, 3022:24, 3083:10, 3092:5, 3119:5, 3146:12, 3167:21
**examples** [1] - 3095:14
**except** [10] - 2931:1, 2966:23, 2967:16, 3085:21, 3101:15, 3167:14, 3167:25, 3168:10, 3168:17, 3168:20
**Except** [1] - 3170:5
**exception** [1] - 3098:7
**excerpt** [2] - 3094:10, 3181:1
**excerpts** [2] - 3180:23, 3181:15
**exchange** [3] - 2957:6, 2958:4, 3155:20
**exchanged** [3] - 2960:16, 3074:4, 3162:13
**exciting** [1] - 3030:1
**exclude** [2] - 2935:5, 3179:12
**excluded** [1] - 3100:20
**exclusive** [2] - 2961:17, 2961:21
**exclusivity** [1] - 2961:23
**excuse** [6] - 2982:12, 3048:23, 3061:4, 3064:21, 3150:17, 3187:18
**excused** [2] - 2966:20, 3188:12
**exhausted** [1] - 3045:10
**Exhibit** [23] - 2922:7, 2922:12, 2922:13, 2922:14, 2922:15, 2922:16, 2929:10, 2929:11, 2929:18, 2929:19, 2976:24, 2998:9, 3074:1, 3088:25, 3090:10, 3094:9, 3094:12, 3099:16, 3138:19, 3147:13, 3159:10, 3165:5, 3171:13
**exhibit** [16] - 2923:7, 2929:4, 2930:17, 2930:19, 2998:8, 3074:3, 3074:4, 3074:6, 3074:12, 3125:18, 3141:8, 3141:20, 3158:20, 3163:13, 3171:9
**exhibits** [33] - 2926:3, 2928:6, 2929:2, 2929:6, 2929:7, 2929:9, 2929:12, 2929:14, 2929:17, 2930:2, 2930:4, 2930:7, 2930:10, 2930:14, 2930:16, 2966:23, 2986:4, 3051:20, 3137:18, 3138:18, 3138:24, 3144:16, 3162:13, 3165:18, 3166:22, 3167:1, 3170:3, 3170:6, 3171:6, 3171:23, 3188:11
**EXHIBITS** [1] - 2922:1

**Exhibits** [7] - 2922:4, 2922:5, 2922:6, 2929:9, 3137:15, 3143:5, 3170:19
**exist** [9] - 2934:2, 3004:1, 3006:9, 3029:21, 3134:19, 3137:5, 3144:20, 3152:23
**existed** [6] - 2947:10, 2952:25, 2958:25, 2959:23, 3026:12, 3138:24
**existence** [2] - 2928:17, 3142:3
**exists** [6] - 2937:22, 3029:18, 3131:14, 3134:5, 3137:2
**exiting** [1] - 3094:21
**exits** [3] - 2966:21, 3053:8, 3188:17
**expectations** [1] - 2959:21
**expenditure** [1] - 2958:6
**expenses** [2] - 3174:15, 3174:16
**experience** [4] - 2927:5, 2927:11, 2928:7, 2953:23
**experiment** [1] - 3116:5
**experiments** [1] - 3116:4
**expert** [19] - 2927:6, 2974:11, 2980:25, 2981:1, 2982:24, 2996:10, 3002:1, 3011:11, 3014:9, 3027:12, 3028:4, 3047:6, 3092:13, 3131:3, 3131:14, 3133:1, 3180:16, 3181:9
**experts** [9] - 2959:1, 2963:4, 2974:10, 2974:14, 2974:15, 2986:17, 2994:1, 3027:11, 3031:6
**expired** [2] - 2973:15, 2998:3
**explain** [11] - 2924:11, 2937:1, 2937:3, 2945:24, 2947:4, 3015:7, 3026:19, 3087:9, 3089:16, 3102:12, 3169:19
**explained** [5] - 2936:11, 3025:17, 3033:4, 3101:19, 3177:20
**explains** [1] - 3022:14
**explore** [1] - 3119:7
**Express** [1] - 3088:19
**expressed** [2] - 2954:21, 2993:15
**expressly** [3] - 2948:1, 2948:9, 2948:12
**extensive** [3] - 3042:21, 3111:24, 3154:24
**extent** [17] - 2959:15, 2960:15, 2962:16, 3064:11, 3066:4, 3066:22, 3067:4, 3069:19, 3072:9, 3172:24, 3174:8, 3174:23, 3175:13, 3176:8, 3177:2, 3177:15, 3179:24
**extra** [2] - 3040:20, 3184:11
**extracts** [1] - 3184:7
**eyewitness** [1] - 2928:15

## F

**F.3d** [3] - 3188:24, 3189:4
**F.Supp** [1] - 3190:8
**F.Supp.2d** [1] - 3105:21
**face** [4] - 3004:18, 3004:23, 3145:5, 3145:22
**faced** [2] - 2951:25, 2953:21
**fact** [66] - 2925:25, 2926:13, 2927:1, 2927:25, 2944:22, 2944:23, 2945:2, 2956:9, 2970:5, 2974:17, 2974:21,

2975:17, 2976:1, 2991:7, 2991:11, 2994:20, 2995:25, 2998:9, 3005:8, 3005:22, 3005:23, 3009:13, 3009:15, 3013:9, 3013:13, 3013:15, 3023:18, 3024:18, 3026:15, 3029:9, 3029:17, 3029:25, 3037:4, 3038:2, 3038:25, 3039:7, 3041:3, 3043:10, 3044:11, 3044:20, 3047:18, 3048:22, 3058:4, 3061:13, 3068:6, 3072:7, 3073:17, 3082:18, 3084:9, 3091:15, 3098:25, 3099:3, 3099:18, 3101:19, 3118:9, 3118:17, 3146:10, 3153:20, 3156:11, 3161:8, 3164:18, 3180:3, 3183:23, 3184:11, 3188:25, 3189:5
**factor** [3] - 2944:15, 2963:12, 2963:15
**factors** [10] - 2951:11, 2951:16, 2955:19, 2960:3, 2961:13, 2963:7, 2963:14, 2974:25, 3044:19, 3179:2
**facts** [25] - 2924:1, 2924:4, 2925:11, 2926:5, 2926:7, 2926:9, 2928:9, 2928:13, 2928:18, 2928:20, 2929:3, 2931:3, 2958:25, 2959:23, 2959:24, 2960:4, 2998:22, 2998:23, 3050:18, 3050:21, 3051:6, 3059:13, 3146:10, 3146:18, 3161:15
**factual** [1] - 3082:6
**Fadell** [6] - 2971:13, 2972:23, 2974:21, 2999:25, 3007:23, 3036:7
**failed** [6] - 2926:15, 2954:14, 3003:6, 3048:15, 3085:4, 3131:8
**failings** [1] - 3179:16
**failure** [7] - 2983:14, 2983:19, 3129:24, 3130:15, 3130:24, 3136:23, 3182:24
**failures** [1] - 2972:1
**fair** [19] - 2986:23, 2996:23, 3002:3, 3003:3, 3011:2, 3045:17, 3049:12, 3051:12, 3057:10, 3059:1, 3075:5, 3081:10, 3084:18, 3115:4, 3141:2, 3176:19, 3176:22, 3188:4
**fairly** [3] - 2984:21, 2986:7, 2993:12
**faith** [1] - 2935:15
**fall** [9] - 3110:22, 3116:14, 3138:20, 3141:4, 3142:1, 3142:2, 3142:5, 3143:7, 3172:15
**falsehood** [1] - 2926:24
**falsely** [1] - 2926:13
**familiar** [5] - 3065:16, 3065:17, 3068:5, 3071:2, 3121:5
**family** [3] - 3046:3, 3131:20, 3181:8
**Family** [3] - 3104:11, 3147:11, 3157:6
**far** [9] - 2932:1, 2932:2, 3111:19, 3112:2, 3116:3, 3130:6, 3151:21, 3182:22
**farm** [1] - 3046:1
**Farrelly** [1] - 3042:20
**fashion** [1] - 2984:24
**fast** [1] - 3007:5
**faster** [1] - 3181:14
**faulting** [2] - 3011:14, 3011:15
**favorite** [1] - 3030:2
**fax** [1] - 3089:25

**feature** [4] - 2955:11, 2955:13, 2961:5, 2994:15
**features** [4] - 2963:1, 3006:10, 3007:18
**federal** [1] - 3084:2
**Federal** [5] - 3055:2, 3059:10, 3066:5, 3086:7, 3086:11
**felt** [2] - 2954:12, 3149:22
**fetch** [2] - 3021:16, 3046:21
**fetches** [3] - 3021:5, 3021:6, 3047:19
**few** [22] - 2965:5, 2967:6, 2969:8, 2987:6, 2996:8, 3002:5, 3004:7, 3021:24, 3023:25, 3041:1, 3045:21, 3050:8, 3073:6, 3081:25, 3084:22, 3115:18, 3139:5, 3150:25, 3151:24, 3152:11, 3175:17, 3182:17
**fictitious** [1] - 3015:4
**field** [6] - 2950:12, 2950:15, 2952:3, 2954:18, 2955:1, 3022:7
**fields** [1] - 2952:4
**fifty** [3] - 3028:1, 3044:24, 3045:5
**Figure** [10] - 2994:24, 2994:25, 3009:17, 3024:7, 3024:8, 3033:16, 3047:5
**figure** [9] - 2974:1, 2986:24, 3010:22, 3014:15, 3019:15, 3024:5, 3097:7, 3142:19, 3152:18
**file** [38] - 2925:3, 2976:20, 2980:9, 2992:16, 2995:2, 3020:13, 3020:17, 3020:22, 3021:14, 3021:16, 3022:18, 3029:23, 3033:17, 3034:7, 3034:13, 3048:15, 3057:6, 3058:9, 3058:22, 3064:7, 3070:14, 3075:15, 3078:7, 3078:12, 3078:15, 3079:2, 3079:10, 3085:4, 3085:7, 3086:1, 3087:14, 3090:16, 3090:22, 3101:18, 3130:18, 3161:2, 3163:14, 3163:25
**filed** [20] - 2970:22, 2972:17, 2984:5, 2984:13, 2988:12, 2988:19, 2991:18, 3071:20, 3074:17, 3075:18, 3075:21, 3079:15, 3083:19, 3085:9, 3087:24, 3088:17, 3088:18, 3096:18, 3117:1, 3117:14, 3118:11, 3134:9, 3136:23, 3139:13, 3145:24, 3146:2, 3172:20, 3173:8, 3174:17, 3184:25
**files** [14] - 2980:7, 2980:21, 2992:15, 3011:23, 3012:1, 3012:4, 3012:21, 3012:23, 3040:11, 3079:2, 3080:5, 3080:13, 3080:23, 3142:21
**filing** [10] - 3055:3, 3057:20, 3067:1, 3073:14, 3073:15, 3083:2, 3088:22, 3117:9, 3117:16, 3158:1
**fill** [3] - 3000:16, 3052:9, 3091:4
**filled** [2] - 3000:18, 3090:23
**fills** [1] - 3091:6
**final** [12] - 2963:14, 2965:2, 2967:22, 2968:2, 2968:13, 2968:14, 2968:20, 3032:22, 3049:2, 3085:15, 3086:2
**finally** [3] - 2930:8, 2984:14, 3007:13
**financial** [3] - 3148:13, 3174:10, 3175:24
**financially** [1] - 3124:14

**findings** [9] - 2931:3, 3074:23, 3180:2, 3183:23, 3184:10, 3184:16, 3186:18, 3186:25, 3188:20
**fine** [8] - 3048:18, 3053:12, 3144:9, 3166:14, 3167:4, 3176:3, 3184:3, 3187:15
**finger** [1] - 2972:19
**fingertips** [1] - 3163:5
**finish** [1] - 3051:3
**FireWire** [6] - 2988:15, 2989:5, 3007:11, 3036:19, 3037:6, 3037:13
**first** [90] - 2933:5, 2936:15, 2936:17, 2937:1, 2942:16, 2946:13, 2951:2, 2956:12, 2957:12, 2958:7, 2959:4, 2959:7, 2959:14, 2960:4, 2963:18, 2966:11, 2968:23, 2969:22, 2970:13, 2971:15, 2971:22, 2972:17, 2978:25, 2979:21, 2983:11, 2983:13, 2984:8, 2986:1, 2987:20, 2988:3, 2994:12, 2994:19, 2995:7, 2997:21, 3003:15, 3008:8, 3019:3, 3020:5, 3023:15, 3025:18, 3033:22, 3035:17, 3041:11, 3046:3, 3048:4, 3049:7, 3049:9, 3051:21, 3054:11, 3059:16, 3059:18, 3060:25, 3061:14, 3062:14, 3062:21, 3062:23, 3063:1, 3069:17, 3070:11, 3070:15, 3072:23, 3107:1, 3108:4, 3108:20, 3109:10, 3109:15, 3109:21, 3110:2, 3110:9, 3120:21, 3129:20, 3135:7, 3136:5, 3147:24, 3149:8, 3149:14, 3150:6, 3150:25, 3154:10, 3156:9, 3159:19, 3165:2, 3175:17, 3178:14, 3183:9, 3184:16, 3185:13, 3188:23, 3190:4
**fits** [2] - 2994:7, 3007:17
**five** [8] - 2954:20, 2961:24, 3044:23, 3045:5, 3075:24, 3087:15, 3182:17, 3188:5
**fixed** [3] - 3048:16, 3083:16, 3083:22
**flabbergasted** [1] - 3048:21
**flag** [2] - 3034:5, 3034:10
**flash** [4] - 2989:23, 2990:2, 2990:4, 2990:14
**flashing** [1] - 3040:10
**flip** [1] - 2981:25
**floating** [2] - 3112:24, 3113:14
**flow** [1] - 2993:17
**focus** [7] - 2959:20, 3004:17, 3005:15, 3013:11, 3017:17, 3137:7, 3185:7
**focused** [4] - 2987:6, 3016:19, 3072:20, 3151:1
**folder** [3] - 3090:25, 3091:2, 3091:16
**folks** [6] - 2971:21, 2978:10, 2995:5, 2998:2, 3006:17, 3090:19
**follow** [5] - 2923:19, 2923:21, 2923:24, 3052:3, 3089:13
**followed** [1] - 3091:1
**following** [6] - 2931:20, 2946:14, 2950:25, 2953:14, 2965:19, 3074:20
**follows** [1] - 3019:8
**font** [1] - 3024:6

**football** [1] - 2981:14
**force** [3] - 2937:10, 2938:20, 3069:11
**forcing** [1] - 3001:20
**FOREGOING** [1] - 3191:6
**Foreign** [1] - 2976:25
**foreman** [2] - 2965:7, 3055:19
**FOREPERSON** [3] - 3187:9, 3187:13, 3187:15
**foreperson** [4] - 3051:22, 3051:24, 3052:9, 3187:8
**forget** [6] - 2926:21, 3045:22, 3112:19, 3126:20, 3141:1, 3142:10
**forgot** [2] - 3107:19, 3116:12
**forgotten** [1] - 3112:3
**form** [28] - 2931:25, 2943:8, 2957:18, 2957:20, 2958:1, 2958:10, 2958:22, 2961:14, 2966:6, 2978:23, 2979:2, 2979:4, 3000:13, 3000:14, 3000:16, 3000:18, 3030:25, 3043:19, 3045:10, 3048:15, 3052:10, 3052:12, 3075:13, 3089:18, 3089:25, 3114:23, 3132:25
**Form** [1] - 2965:17
**format** [1] - 3032:17
**formed** [3] - 3072:6, 3103:20, 3104:4
**forms** [6] - 2934:2, 3017:9, 3017:12, 3017:16, 3050:20, 3088:14
**formula** [3] - 2993:12, 2993:16, 3126:12
**forth** [10] - 2965:7, 2995:22, 3018:10, 3019:21, 3042:19, 3094:25, 3121:6, 3126:13, 3142:1, 3173:24
**forward** [21] - 2994:8, 3012:10, 3012:22, 3020:12, 3020:17, 3020:24, 3023:19, 3024:10, 3030:17, 3031:17, 3046:14, 3046:21, 3065:14, 3068:10, 3100:11, 3118:13, 3121:1, 3121:10, 3150:23, 3159:15, 3167:9
**four** [6] - 2949:10, 2954:18, 2981:16, 3028:1, 3045:3, 3047:21
**four-fifty** [1] - 3028:1
**fourteen** [1] - 2963:5
**fourth** [1] - 2951:7
**frame** [5] - 2984:12, 3110:25, 3117:2, 3141:25, 3153:22
**framework** [1] - 2963:15
**frank** [3] - 3111:22, 3149:13, 3150:1
**frankly** [3] - 3076:3, 3113:11, 3114:25
**free** [1] - 3042:14
**free-market** [1] - 3042:14
**freely** [1] - 2973:2
**frequency** [1] - 2989:7
**friend** [1] - 3023:21
**FROM** [1] - 3191:6
**front** [17] - 2958:4, 2958:18, 2961:10, 2976:13, 3040:1, 3040:17, 3057:15, 3089:1, 3089:2, 3090:12, 3093:9, 3094:11, 3164:18, 3171:23, 3173:5, 3174:1
**full** [8] - 2968:16, 3040:18, 3050:23, 3175:10, 3175:17, 3176:16, 3177:4,

3177:15
**full-scope** [1] - 3177:4
**fully** [2] - 3116:22, 3177:14
**function** [50] - 2937:5, 2937:7, 2940:20, 2941:17, 2941:19, 2941:20, 2941:21, 2941:22, 2942:2, 2942:6, 2942:9, 2942:15, 2942:17, 2942:18, 2942:19, 2942:22, 2943:1, 2943:3, 2943:5, 2943:7, 2943:21, 2943:22, 2944:3, 2944:4, 2944:8, 2944:16, 2945:8, 2980:6, 2982:20, 2987:15, 2992:11, 2992:13, 2993:15, 2995:24, 3010:15, 3018:11, 3018:13, 3018:16, 3018:17, 3018:18, 3018:19, 3018:21, 3019:8, 3019:14, 3025:8, 3025:15, 3025:16, 3025:21, 3026:11, 3035:17
**functionality** [1] - 3095:15
**functions** [3] - 2942:1, 3094:25, 3095:9
**furniture** [2] - 3035:24, 3035:25
**future** [4] - 2964:14, 2964:17, 2964:19, 2964:23, 3001:11, 3050:2

## G

**gag** [1] - 3169:6
**gained** [1] - 3150:5
**game** - 3015:21, 3153:17
**games** [1] - 2981:16
**gathering** [1] - 3185:6
**Gee** [2] - 3139:16, 3146:2
**general** [6] - 2928:18, 2938:1, 3019:10, 3057:24, 3092:2, 3114:11
**General** [1] - 3188:24
**generally** [3] - 2960:8, 2976:3, 3141:24
**generated** [1] - 3115:25
**Generation** [9] - 2931:22, 2932:5, 2932:6, 2932:8, 2932:10, 2932:12, 2932:13, 2932:14, 2932:16
**generations** [1] - 2996:7
**Generations** [1] - 2932:4
**generic** [3] - 3013:20, 3013:23, 3013:24
**genius** [1] - 2950:12
**gentlemen** [56] - 2923:6, 2923:16, 2964:24, 2968:1, 2969:2, 3000:13, 3002:5, 3002:21, 3003:23, 3004:11, 3004:15, 3005:1, 3006:14, 3007:16, 3009:4, 3009:16, 3010:20, 3013:8, 3014:18, 3015:11, 3015:24, 3017:7, 3019:19, 3022:12, 3024:2, 3024:12, 3025:2, 3026:16, 3027:21, 3029:4, 3030:13, 3030:21, 3032:11, 3034:15, 3035:19, 3036:15, 3036:20, 3036:25, 3037:12, 3037:21, 3038:6, 3038:12, 3039:2, 3039:15, 3039:23, 3040:11, 3042:10, 3042:24, 3043:18, 3045:9, 3045:21, 3047:24, 3049:2, 3049:14, 3050:13, 3187:16
**GERMER** [1] - 3138:14
**GetNextPlaylistTrack** [2] - 2995:13,

3030:10
**Giblin's** [1] - 2967:10
**girl** [1] - 3027:5
**given** [18] - 2924:25, 2925:7, 2927:12, 2936:6, 2956:10, 3000:10, 3052:3, 3065:2, 3093:19, 3124:19, 3127:4, 3132:22, 3142:18, 3165:20, 3165:21, 3169:2, 3176:21, 3187:23
**glad** [1] - 3011:10
**glossary** [1] - 2924:23
**Goessling** [7] - 3012:14, 3012:15, 3031:12, 3070:25, 3075:6, 3111:25, 3113:9
**Goessling's** [1] - 3163:19
**goofing** [1] - 2923:12
**Gotuit** [12] - 3125:25, 3150:23, 3150:24, 3150:25, 3151:7, 3152:7, 3152:14, 3155:8, 3155:21, 3159:3, 3159:5, 3159:8
**grandkids** [1] - 3045:14
**grant** [2] - 2944:19, 2957:9
**granted** [1] - 2958:4
**granting** [3] - 2947:3, 2961:20, 2961:22
**graphic** [1] - 2984:4
**great** [4] - 2972:11, 2973:3, 3049:3, 3049:5
**greater** [3] - 2927:25, 2931:10, 2964:4
**grew** [3] - 3003:9, 3046:1, 3046:5
**grind** [1] - 2975:16
**ground** [1] - 3059:7
**grounds** [2] - 2945:23, 3063:25
**group** [5] - 2936:1, 2936:10, 2965:21, 2985:22, 3165:13
**Group** [8] - 2931:22, 2932:4, 2932:6, 2932:8, 2932:10, 2932:12, 2932:14, 2932:16
**groups** [1] - 2964:11
**guess** [19] - 3008:6, 3008:24, 3044:14, 3045:22, 3054:10, 3068:17, 3069:10, 3079:20, 3082:25, 3121:6, 3121:16, 3121:17, 3130:8, 3131:13, 3135:7, 3151:8, 3155:16, 3167:11, 3184:22
**guesswork** [1] - 2956:23
**guidance** [1] - 2956:14
**guide** [10] - 2929:15, 2930:5, 2930:12, 2946:18, 2949:12, 2949:16, 2949:21, 2949:25, 2987:18, 3051:23
**guideline** [1] - 2930:22
**guidelines** [2] - 3089:13, 3089:17
**guy** [3] - 2975:15, 2975:22, 2976:4
**guys** [5] - 2970:24, 3008:16, 3013:1, 3050:7, 3179:20

## H

**half** [6] - 2970:18, 3003:20, 3015:16, 3018:1, 3018:2, 3070:9
**halfway** [1] - 3057:18
**Hall** [1] - 3189:4
**hammer** [1] - 3131:15

**Hampshire** [1] - 3152:10
**hand** [14] - 2923:10, 2923:25, 2935:19, 3026:25, 3065:20, 3068:22, 3069:5, 3089:5, 3092:22, 3106:16, 3149:15, 3171:3, 3185:3, 3185:4
**handed** [1] - 3183:9
**handle** [2] - 3056:2
**handling** [2] - 3090:19, 3104:14
**hands** [4] - 3009:11, 3021:21, 3051:13, 3138:20
**happy** [4] - 3065:22, 3097:7, 3160:16, 3171:3
**hard** [22] - 2990:1, 3004:4, 3006:11, 3006:13, 3006:20, 3006:22, 3012:1, 3013:16, 3015:12, 3024:4, 3029:21, 3029:22, 3038:9, 3065:25, 3066:2, 3096:6, 3107:4, 3115:4, 3115:14, 3182:2
**hardware** [4] - 3017:2, 3034:22, 3034:25, 3062:15
**Harry** [1] - 2983:20
**hashes** [1] - 2995:10
**hay** [1] - 2995:25
**head** [2] - 3085:14, 3127:19
**headphone** [1] - 3015:25
**headphones** [3] - 3016:1, 3036:12, 3107:16
**heads** [1] - 3135:5
**hear** [11] - 2968:20, 2978:11, 2982:14, 2993:18, 3008:5, 3008:16, 3011:11, 3086:4, 3134:22, 3143:14, 3144:5
**heard** [46] - 2923:16, 2946:24, 2959:12, 2969:14, 2979:11, 2980:15, 2989:12, 2992:6, 2992:19, 3002:1, 3005:23, 3006:1, 3006:7, 3007:11, 3007:22, 3008:6, 3008:17, 3008:18, 3013:13, 3018:16, 3028:2, 3029:20, 3029:25, 3036:18, 3039:16, 3040:12, 3043:22, 3044:6, 3046:17, 3074:24, 3135:3, 3136:6, 3137:1, 3137:22, 3139:4, 3139:5, 3140:24, 3145:6, 3145:15, 3145:21, 3160:7, 3162:23, 3177:25
**hearing** [1] - 2960:7
**hearsay** [3] - 3098:19, 3101:23, 3133:19
**heart** [2] - 3067:25, 3097:16
**HEARTFIELD** [1] - 2967:9
**heck** [1] - 3083:12
**hedge** [1] - 3068:8
**heightens** [1] - 3097:23
**held** [1] - 3119:14
**Heller** [4] - 2988:11, 3000:1, 3007:23, 3008:6
**help** [13] - 2930:21, 2953:24, 2981:11, 3027:3, 3051:23, 3105:18, 3117:13, 3117:16, 3118:2, 3130:17, 3163:9, 3184:3, 3190:24
**helpful** [5] - 2927:4, 3080:8, 3093:20, 3113:24, 3128:18
**HEREBY** [1] - 3191:5

**herring** [2] - 2989:17, 2990:22
**hesitate** [1] - 3050:25
**hid** [1] - 3134:12
**hide** [1] - 3099:13
**hierarchy** [1] - 3032:3
**high** [2] - 2981:12, 3145:9
**higher** [4] - 2925:21, 2981:9, 2997:9, 3146:6
**highest** [1] - 3003:1
**highlight** [1] - 2979:25
**highlighted** [1] - 3163:20
**highly** [1] - 2925:24
**himself** [1] - 3163:17
**hindsight** [1] - 2950:16
**hint** [1] - 3156:9
**history** [8] - 2925:3, 2970:22, 3075:15, 3078:15, 3079:10, 3085:7, 3087:14, 3101:18
**hit** [1] - 3151:19
**hold** [12] - 3005:24, 3014:13, 3072:15, 3076:16, 3094:5, 3123:11, 3123:16, 3149:14, 3150:18, 3158:18, 3158:19, 3159:20
**holder** [6] - 2957:24, 2960:5, 2961:22, 2963:4, 2963:19, 3162:2
**holding** [3] - 3028:3, 3051:11, 3149:17
**home** [4] - 3003:10, 3132:2, 3151:14, 3181:6
**HON** [2] - 2923:3
**honest** [2] - 3051:2, 3132:10
**honestly** [1] - 2977:4
**Honor** [173] - 2967:3, 2967:9, 2968:24, 3002:10, 3045:20, 3053:11, 3053:21, 3054:4, 3054:12, 3054:20, 3055:6, 3055:9, 3055:15, 3055:16, 3056:4, 3056:18, 3057:3, 3064:10, 3065:4, 3065:21, 3068:2, 3071:6, 3071:13, 3071:23, 3071:25, 3072:16, 3073:6, 3074:2, 3074:11, 3074:25, 3075:5, 3075:15, 3075:23, 3076:5, 3076:14, 3076:19, 3081:10, 3081:24, 3082:5, 3082:9, 3082:15, 3082:24, 3083:15, 3084:4, 3084:8, 3084:21, 3085:17, 3086:14, 3086:16, 3086:18, 3092:9, 3093:3, 3093:10, 3094:8, 3094:10, 3095:1, 3095:12, 3095:25, 3096:3, 3097:14, 3097:21, 3098:18, 3098:20, 3099:10, 3101:22, 3103:21, 3105:9, 3105:11, 3105:15, 3105:22, 3106:3, 3106:8, 3106:15, 3116:10, 3116:17, 3117:19, 3119:4, 3119:23, 3123:24, 3124:2, 3124:11, 3128:20, 3129:6, 3129:17, 3129:20, 3130:20, 3131:25, 3132:10, 3132:13, 3134:15, 3135:23, 3136:7, 3137:8, 3138:7, 3138:13, 3139:19, 3143:11, 3143:16, 3143:19, 3144:14, 3147:1, 3150:20, 3154:15, 3155:11, 3156:2, 3156:10, 3157:2, 3158:7, 3158:8, 3158:12, 3158:15, 3159:14, 3160:10, 3160:22, 3161:14, 3161:22, 3162:5, 3162:12, 3162:20,

3163:7, 3163:10, 3163:13, 3164:3, 3164:5, 3164:11, 3164:13, 3164:25, 3165:1, 3166:4, 3166:6, 3166:23, 3167:4, 3167:11, 3169:7, 3169:25, 3170:3, 3170:15, 3170:18, 3170:21, 3171:8, 3172:11, 3172:18, 3173:6, 3173:12, 3175:9, 3176:25, 3178:19, 3178:21, 3178:24, 3179:1, 3179:6, 3179:9, 3180:7, 3180:22, 3181:10, 3181:19, 3182:10, 3182:12, 3183:1, 3183:9, 3183:18, 3184:21, 3185:1, 3185:13, 3186:8, 3186:18, 3186:20, 3186:24, 3188:19, 3188:22, 3190:4, 3190:19, 3190:21
**Honor's** [1] - 3117:21
**hook** [1] - 2994:2
**hooked** [1] - 3162:4
**hooking** [2] - 3159:24, 3161:22
**hooks** [2] - 3160:5, 3161:2
**hope** [1] - 3065:19
**hoped** [1] - 3045:13
**hopefully** [1] - 3118:19
**horse** [2] - 3065:20, 3065:24
**host** [2] - 3038:23, 3105:23
**hour** [7] - 2974:13, 2974:20, 2974:22, 2975:17, 2975:25, 3070:9, 3105:3
**hours** [7] - 2974:18, 3003:9, 3003:24, 3005:24, 3007:8, 3027:23, 3119:14
**house** [3] - 3035:24, 3035:25, 3149:23
**huge** [1] - 3184:10
**hundred** [4] - 3001:10, 3044:24, 3045:3, 3045:5
**hundredfold** [2] - 3036:20, 3036:22
**hundreds** [3] - 2974:18, 3007:4, 3151:25
**HUNSAKER** [54] - 3106:15, 3106:19, 3107:21, 3107:23, 3108:15, 3108:17, 3113:3, 3113:5, 3116:10, 3116:15, 3116:20, 3117:2, 3117:19, 3118:23, 3119:4, 3119:21, 3120:1, 3123:13, 3123:17, 3123:20, 3123:23, 3124:10, 3125:2, 3125:3, 3128:20, 3128:24, 3129:2, 3129:6, 3129:11, 3132:10, 3134:6, 3134:13, 3135:23, 3136:16, 3137:8, 3137:9, 3137:14, 3137:16, 3138:7, 3138:17, 3139:18, 3139:22, 3140:1, 3140:3, 3143:22, 3144:11, 3144:14, 3144:23, 3145:1, 3146:22, 3146:25, 3147:3, 3154:15, 3158:11
**Hunsaker** [7] - 3071:9, 3106:11, 3116:8, 3128:16, 3131:12, 3132:5, 3139:11
**hypothetical** [7] - 2958:15, 2958:20, 2958:24, 2959:1, 2960:19, 2960:21, 2961:16

**I**

**i-ii** [1] - 3079:20
**i.e** [1] - 2963:16

**idea** [20] - 2970:10, 2970:13, 2971:22, 2979:21, 2998:5, 3011:8, 3011:23, 3011:25, 3012:6, 3032:24, 3099:13, 3101:4, 3132:11, 3143:9, 3145:14, 3145:20, 3145:23, 3173:8, 3174:4, 3190:13
**ideas** [2] - 3116:21, 3152:12
**identical** [7] - 2942:10, 2942:24, 2943:2, 2943:21, 2992:13, 2992:14, 3082:25
**identification** [4] - 3059:22, 3091:22, 3091:25, 3100:2
**identified** [9] - 3021:7, 3022:6, 3072:25, 3076:3, 3092:12, 3098:11, 3099:12, 3100:18, 3100:24
**identify** [11] - 2942:22, 3018:24, 3025:20, 3035:5, 3065:12, 3068:12, 3068:19, 3076:9, 3091:18, 3092:3, 3092:7
**identifying** [1] - 3068:19
**IDS** [4] - 3089:11, 3089:14, 3091:18, 3091:19
**ignore** [4] - 3023:15, 3024:16, 3186:11, 3186:15
**ii** [2] - 3079:20
**illustrated** [1] - 3019:15
**illustration** [1] - 3019:15
**imagine** [2] - 3006:22, 3189:18
**immaterial** [1] - 2935:12
**immediately** [1] - 3052:24
**impacts** [1] - 2979:8
**impeaching** [1] - 3154:16
**implication** [2] - 3167:24, 3168:8
**implied** [1] - 3140:11
**import** [1] - 3080:21
**important** [19] - 2926:13, 2927:1, 2944:15, 2958:23, 2969:22, 2988:18, 2998:22, 3008:1, 3019:6, 3019:23, 3020:1, 3022:11, 3034:22, 3036:8, 3050:10, 3117:7, 3117:13, 3118:7, 3159:19
**importantly** [4] - 2975:14, 3015:24, 3026:10, 3188:2
**imported** [1] - 2938:21
**impose** [1] - 3189:2
**impossible** [1] - 3029:6
**impression** [1] - 3167:20
**impressive** [2] - 2976:16, 2977:7
**imprimatur** [1] - 3168:5
**improper** [3] - 3154:17, 3163:1, 3164:20
**improperly** [1] - 3137:5
**improvements** [2] - 2963:1, 2972:12
**improving** [1] - 3008:20
**impute** [2] - 3185:17, 3185:19
**inability** [1] - 3116:18
**inaccurate** [1] - 3128:7
**inaccurately** [1] - 2926:22
**Inc** [4] - 2931:15, 3097:5, 3152:15, 3171:25

**include** [11] - 2939:12, 3080:1, 3080:21, 3081:4, 3081:6, 3081:8, 3081:9, 3095:8, 3159:9, 3167:1, 3167:5

**included** [14] - 2964:10, 3043:3, 3043:5, 3043:6, 3043:15, 3069:1, 3076:11, 3078:6, 3078:11, 3100:2, 3109:10, 3109:16, 3109:21, 3110:3

**includes** [13] - 2934:10, 2936:11, 2938:8, 2938:12, 2939:4, 2939:24, 2940:2, 2940:5, 2942:8, 2942:14, 2952:2, 2991:2

**including** [6] - 2927:15, 2993:4, 3051:15, 3059:15, 3059:17, 3090:7

**incorporate** [3] - 2935:22, 2938:23, 3001:11

**incorporated** [2] - 2964:9, 2998:13

**incorporates** [2] - 2937:12, 2957:25

**incorrect** [3] - 2923:8, 3040:24, 3064:15

**increased** [1] - 2963:8

**incredible** [1] - 2980:19

**incubator** [1] - 3152:10

**indeed** [1] - 3102:7

**independent** [7] - 2931:8, 2934:3, 2934:4, 2934:6, 2934:8, 2936:18, 2936:20

**independently** [2] - 3112:24, 3113:14

**index** [3] - 3136:12, 3136:13, 3167:5

**INDEX** [1] - 2922:1

**indicate** [3] - 3089:4, 3090:20, 3161:7

**indicated** [5] - 3033:21, 3090:24, 3102:6, 3102:16, 3103:3

**indicates** [3] - 2928:17, 2976:10, 3090:23

**indicating** [7] - 2985:17, 3000:7, 3004:16, 3009:20, 3009:21, 3020:16, 3101:12

**indicating)** [1] - 3164:12

**indication** [5] - 2924:3, 2955:14, 2956:10, 3080:6, 3130:23

**indirect** [1] - 2928:15

**individual** [4] - 2941:9, 2945:6, 2952:15, 3051:13

**individually** [2] - 2933:20, 3059:16

**industry** [2] - 2960:9, 3083:13

**inequitable** [9] - 3053:18, 3054:9, 3073:8, 3075:25, 3096:4, 3096:20, 3097:2, 3097:17, 3136:20

**Infantry** [1] - 3048:1

**infer** [1] - 2927:16

**inference** [6] - 3064:13, 3075:5, 3084:10, 3096:4, 3096:20, 3171:7

**inferences** [1] - 2928:6

**influence** [1] - 3187:25

**influenced** [1] - 2931:9

**inform** [3] - 3005:3, 3055:22, 3182:15

**Information** [2] - 3079:14, 3087:13

**information** [20] - 2929:4, 2929:20, 2985:23, 2993:6, 3007:25, 3019:25, 3040:19, 3059:23, 3065:10, 3066:8,

3066:10, 3066:11, 3066:12, 3066:20, 3069:8, 3105:5, 3156:14, 3166:7, 3169:3, 3190:13

**informed** [1] - 3098:10

**infrared** [2] - 2989:7, 3036:16

**infringe** [19] - 2931:20, 2935:11, 2935:12, 2935:14, 2935:17, 2935:20, 2938:1, 2938:7, 2959:6, 2964:22, 2971:8, 3010:17, 3061:9, 3062:7, 3063:2, 3063:7, 3063:15, 3063:20, 3148:18

**infringed** [31] - 2932:24, 2933:17, 2933:19, 2935:25, 2936:14, 2936:16, 2936:17, 2936:19, 2936:20, 2936:22, 2936:24, 2937:16, 2938:19, 2939:15, 2942:19, 2945:15, 2955:25, 2957:16, 2963:25, 2964:16, 2966:9, 2969:25, 2974:4, 2974:7, 2998:6, 3043:25, 3060:14, 3060:24, 3061:15, 3063:24, 3185:21

**infringement** [69] - 2933:4, 2933:9, 2933:24, 2935:13, 2935:16, 2936:2, 2936:10, 2936:24, 2936:25, 2937:2, 2937:6, 2937:8, 2938:24, 2939:17, 2940:8, 2940:15, 2940:24, 2941:6, 2941:14, 2942:3, 2944:25, 2956:3, 2956:19, 2957:3, 2957:4, 2957:12, 2958:9, 2959:2, 2959:3, 2959:5, 2959:6, 2959:10, 2959:13, 2959:16, 2960:1, 2963:18, 2964:14, 2964:19, 2968:22, 2981:9, 2981:23, 2981:24, 2982:1, 2982:22, 2984:1, 2985:5, 2985:7, 2986:21, 2996:11, 3000:19, 3000:22, 3011:18, 3011:19, 3016:5, 3016:7, 3016:11, 3016:14, 3016:23, 3017:21, 3025:16, 3043:20, 3043:22, 3070:18, 3104:23, 3165:15, 3190:10, 3190:15

**infringer** [3] - 2962:16, 2963:2, 2963:9

**infringers** [1] - 3104:18

**infringes** [4] - 2931:16, 2935:10, 2943:10, 2965:19

**infringing** [6] - 2932:18, 2958:14, 2958:16, 2959:8, 2959:22, 3189:7

**inherent** [1] - 2948:3

**inherently** [3] - 2948:2, 2948:9, 2948:12

**initial** [3] - 3052:11, 3070:15, 3185:24

**initiate** [3] - 2992:25, 3017:4, 3038:13

**initiates** [1] - 3038:23

**initiating** [1] - 2993:3

**innocent** [1] - 2926:25

**innocuous** [1] - 3170:10

**innovative** [2] - 2955:12, 3007:13

**inquire** [1] - 3084:13

**inquiring** [1] - 3124:7

**inquiry** [1] - 3070:16

**inside** [1] - 3035:25

**instance** [4] - 2957:23, 2993:13, 3093:18, 3112:4

**instantly** [1] - 3163:4

**instead** [7] - 2940:2, 2963:24, 2994:14,

3005:15, 3068:19, 3150:16, 3182:6

**instruct** [3] - 2923:17, 2924:5, 2946:13

**instructed** [8] - 2925:15, 2925:19, 2926:1, 2933:10, 2938:8, 2974:24, 2986:13, 3145:18

**instructing** [1] - 2956:13

**instruction** [3] - 3050:17, 3068:7, 3068:11

**instructions** [36] - 2923:8, 2924:3, 2924:8, 2925:4, 2925:9, 2931:1, 2938:6, 2946:21, 2951:15, 2952:9, 2954:2, 2956:6, 2956:10, 2965:5, 2965:9, 2965:13, 2966:4, 2966:6, 2966:10, 2966:18, 2968:14, 2986:7, 2999:5, 3017:19, 3025:19, 3026:8, 3040:19, 3051:25, 3052:3, 3052:23, 3056:11, 3165:20, 3182:4, 3182:18, 3187:21, 3187:22

**instructive** [2] - 3082:20, 3084:3

**insubstantial** [4] - 2940:14, 2943:16, 2944:23, 2992:10

**insubstantiality** [1] - 3028:19

**insubstantially** [3] - 2940:17, 2941:7, 2943:24

**integer** [2] - 3022:3, 3033:22

**intend** [2] - 3086:25, 3182:3

**intended** [6] - 2924:9, 2929:14, 2930:4, 2930:12, 2933:15, 2938:4

**intent** [1] - 2935:11

**intentional** [1] - 2926:24

**interchangeability** [7] - 2940:25, 2941:2, 2941:5, 2944:7, 2944:9, 2944:12, 2944:14

**interchangeable** [2] - 2941:4, 2944:11

**interest** [8] - 3072:8, 3104:25, 3148:4, 3148:9, 3148:13, 3155:7, 3189:17

**interested** [5] - 3057:8, 3160:6, 3160:7, 3169:4, 3180:23

**interesting** [2] - 2976:3, 2984:4

**interfaces** [2] - 3035:22, 3036:11

**Interferences** [1] - 3086:4

**interim** [1] - 3002:7

**Internet** [4] - 3036:17, 3037:15, 3037:17, 3037:19

**interpret** [2] - 2956:9, 3033:22

**interpretation** [2] - 2933:7, 2933:8

**interpreting** [1] - 2933:11

**interrelated** [1] - 2953:8

**interrogatory** [1] - 3076:3

**intervening** [3] - 3022:20, 3024:10, 3115:8

**introduce** [3] - 3003:6, 3045:22, 3176:6

**introduced** [4] - 2952:6, 2954:5, 3137:11, 3141:8

**invalid** [15] - 2932:20, 2933:3, 2946:7, 2946:10, 2947:6, 2947:7, 2947:9, 2948:16, 2950:8, 2956:2, 2964:1, 2964:16, 2966:9, 2970:1, 3005:1

**invalidity** [8] - 2933:5, 2933:10, 2945:23, 2945:25, 2946:1, 2984:3,

3005:2, 3165:14

**invent** [8] - 2972:13, 3005:22, 3006:13, 3011:22, 3011:25, 3012:3, 3013:1, 3013:5

**invented** [6] - 2969:21, 2969:22, 2972:7, 3009:24, 3117:22, 3117:23

**inventing** [2] - 2935:20, 3009:6

**invention** [84] - 2931:19, 2933:14, 2935:6, 2941:10, 2941:12, 2945:19, 2946:3, 2947:8, 2948:18, 2948:23, 2950:6, 2950:11, 2950:13, 2950:14, 2950:15, 2950:17, 2950:21, 2951:5, 2951:6, 2951:9, 2952:1, 2952:3, 2952:16, 2952:20, 2953:5, 2954:6, 2954:13, 2954:15, 2954:19, 2954:21, 2954:22, 2954:24, 2955:3, 2955:5, 2955:8, 2955:23, 2956:5, 2960:6, 2961:21, 2962:12, 2962:15, 2962:17, 2962:21, 2962:24, 2964:6, 2969:18, 2970:7, 2971:2, 2972:2, 2972:3, 2973:4, 2980:3, 2980:22, 2983:3, 2983:4, 2983:6, 2983:8, 2983:15, 2983:16, 2983:18, 2983:19, 2983:21, 2983:24, 2999:6, 2999:8, 3007:20, 3007:21, 3012:7, 3012:13, 3013:10, 3014:23, 3032:7, 3110:23, 3111:3, 3111:14, 3112:22, 3115:7, 3116:21, 3117:6, 3117:12, 3117:20, 3118:24

**inventions** [19] - 2932:20, 2933:16, 2945:16, 2946:7, 2951:12, 2952:13, 2957:7, 2957:10, 2962:22

**inventive** [1] - 2996:19

**inventor** [10] - 2951:25, 2953:15, 2953:20, 2962:2, 3012:15, 3012:16, 3031:13, 3118:6, 3118:14, 3119:6

**inventors** [2] - 2954:24, 3171:25

**invested** [1] - 3155:21

**investigate** [1] - 3189:6

**investigating** [1] - 3104:23

**investigation** [8] - 3063:6, 3063:14, 3063:22, 3064:6, 3066:22, 3066:25, 3067:15, 3073:13

**investigations** [2] - 3059:20, 3059:24

**investigators** [1] - 3121:21

**investing** [1] - 3155:8

**investment** [4] - 3125:12, 3126:15, 3132:15, 3151:5

**investors** [4] - 3121:22, 3122:1, 3122:2, 3122:8

**invitation** [1] - 3169:13

**invite** [1] - 3168:11

**inviting** [4] - 3167:12, 3168:4, 3168:16, 3168:22

**involved** [18] - 2931:12, 2988:20, 3012:20, 3060:12, 3060:13, 3060:22, 3062:5, 3062:25, 3063:5, 3063:13, 3086:21, 3125:11, 3151:9, 3152:13, 3183:2, 3183:3, 3184:2, 3186:10

**involvement** [2] - 3070:20, 3186:5

**involving** [1] - 3189:15

**Iowa** [1] - 3105:19

**iPod** [80] - 2931:22, 2932:4, 2932:5, 2932:6, 2932:8, 2932:10, 2932:12, 2932:14, 2932:16, 2971:15, 2972:8, 2972:9, 2972:13, 2987:23, 2988:14, 2989:20, 2991:21, 2992:2, 2993:2, 2993:22, 2996:22, 2999:17, 3004:15, 3004:20, 3004:22, 3005:22, 3005:24, 3006:23, 3007:6, 3007:10, 3007:19, 3008:20, 3009:7, 3009:14, 3009:16, 3015:25, 3023:16, 3025:21, 3030:11, 3034:9, 3039:11, 3041:18, 3043:13, 3045:13, 3049:3, 3049:4, 3049:6, 3062:22, 3062:24, 3063:1, 3064:6, 3071:7, 3083:13, 3104:8, 3107:2, 3108:5, 3108:21, 3109:4, 3116:12, 3137:12, 3138:18, 3139:9, 3140:4, 3140:17, 3143:5, 3143:7, 3143:24, 3144:6, 3148:17, 3149:5, 3149:8, 3149:9, 3149:15, 3149:17, 3150:3, 3150:5, 3159:22, 3185:21

**iPods** [12] - 2986:2, 2991:7, 2992:12, 2994:20, 2996:7, 2997:2, 3083:12, 3109:10, 3109:16, 3109:21, 3110:3, 3146:4

**IrDA** [7] - 2987:22, 2987:25, 2989:10, 2989:16, 2989:21, 3036:19, 3037:6

**irrefutable** [1] - 2969:11

**irrelevant** [1] - 2944:4

**IS** [1] - 3191:6

**is..** [1] - 3180:18

**isolation** [1] - 2952:15

**issuance** [1] - 3061:4

**issue** [59] - 2941:20, 2941:23, 2944:20, 2950:7, 2950:10, 2952:2, 2954:6, 2959:9, 2974:8, 2977:15, 2979:11, 2987:16, 2989:23, 2989:24, 2991:15, 2994:7, 2994:16, 2994:17, 2996:9, 2997:20, 2997:21, 2999:3, 3011:3, 3016:15, 3017:5, 3038:6, 3038:14, 3038:15, 3046:15, 3061:9, 3065:18, 3069:22, 3071:24, 3081:18, 3082:22, 3088:2, 3096:11, 3096:18, 3097:5, 3098:25, 3102:10, 3102:24, 3135:16, 3135:17, 3135:18, 3157:1, 3159:3, 3161:24, 3164:22, 3172:13, 3176:20, 3178:22, 3179:9, 3180:7, 3182:24, 3188:8, 3190:4, 3190:9

**issued** [22] - 2943:17, 2943:19, 2944:6, 2944:14, 2959:9, 2970:14, 2970:16, 2970:19, 2971:4, 3060:17, 3060:23, 3061:16, 3062:2, 3075:8, 3077:9, 3078:2, 3081:13, 3083:1, 3088:12, 3096:17, 3159:22, 3184:24

**issues** [18] - 2930:25, 2969:13, 2969:23, 2981:21, 2986:21, 2992:4, 2994:5, 3005:6, 3005:16, 3036:24, 3068:1, 3096:9, 3105:23, 3105:24, 3135:17, 3159:21, 3170:16, 3183:19

**issuing** [1] - 3103:7

**item** [12] - 2947:2, 2947:10, 2947:20, 2947:22, 2947:24, 2948:2, 2948:3,

2968:10, 2968:11, 2968:19, 3127:10

**items** [18] - 2946:14, 2946:25, 2948:11, 2948:14, 2948:19, 2950:5, 2952:7, 2952:8, 2952:10, 2952:21, 2953:2, 2954:3, 2954:4, 2954:7, 2969:8, 2995:1, 2997:18, 3146:9

**itself** [8] - 2930:11, 2934:13, 2934:15, 2979:16, 2979:17, 2995:4, 2995:6, 3057:20

**iTunes** [7] - 2964:10, 3037:15, 3043:6, 3043:8, 3043:13, 3043:15, 3043:17

## J

**jack** [1] - 3015:25

**JAMES** [2] - 3106:17, 3147:4

**James** [4] - 3059:15, 3106:9, 3171:14, 3171:15

**January** [5] - 3077:10, 3087:8, 3089:9, 3090:5

**Jeez** [1] - 2991:19

**job** [5] - 2973:3, 3006:3, 3009:6, 3028:5, 3107:17

**Jobs** [1] - 3146:13

**journal** [1] - 3092:6

**judge** [24] - 2924:11, 2927:8, 2950:12, 2950:21, 2974:24, 2986:13, 2993:10, 2994:10, 3001:4, 3010:4, 3017:18, 3018:7, 3019:4, 3034:17, 3037:9, 3043:6, 3067:19, 3074:22, 3097:3, 3097:6, 3103:9, 3176:2, 3177:9, 3178:3

**Judge** [12] - 2967:9, 2979:12, 2992:7, 3019:16, 3022:13, 3025:16, 3025:24, 3026:3, 3032:14, 3087:9, 3097:2, 3180:16

**judges** [4] - 2923:25, 3051:6, 3162:24

**judgment** [1] - 3045:6

**judicial** [3] - 3082:5, 3082:21, 3131:18

**JULY** [2] - 2923:2, 3191:5

**jump** [5] - 2979:23, 3022:21, 3022:22, 3100:5, 3130:20

**jumped** [1] - 3000:4

**jumps** [5] - 3032:2, 3032:4, 3032:8, 3032:9

**June** [2] - 2974:23, 3094:15

**juries** [1] - 3182:2

**jurisdiction** [1] - 3102:18

**Juror** [1] - 3055:20

**juror** [10] - 2924:15, 2924:17, 2924:23, 2931:11, 2939:10, 3010:6, 3051:25, 3052:22, 3052:25

**juror's** [1] - 2931:10

**jurors** [3] - 2931:9, 3050:14, 3052:5

**JURY** [2] - 2923:2, 2923:4

**Jury** [6] - 2965:17, 3055:17, 3055:19, 3055:21, 3165:8, 3181:22

**jury** [47] - 2923:8, 2923:25, 2924:9, 2924:14, 2927:4, 2933:1, 2945:21, 2965:6, 2965:8, 2966:21, 2967:24, 2968:14, 2986:4, 2986:6, 2999:5,

3001:25, 3002:22, 3017:10, 3017:13, 3017:24, 3050:24, 3051:18, 3051:21, 3051:25, 3052:5, 3053:4, 3053:8, 3054:1, 3054:6, 3056:7, 3068:6, 3068:9, 3070:8, 3081:25, 3129:14, 3145:18, 3164:18, 3165:2, 3170:3, 3170:8, 3183:13, 3187:3, 3187:6, 3187:10, 3188:11, 3188:15, 3188:17
**justice** [1] - 3051:17
**justified** [1] - 2928:7

## K

**Kaplan** [2] - 3077:2, 3126:25
**keep** [8] - 2926:18, 3001:20, 3135:15, 3135:16, 3135:21, 3162:22, 3176:22, 3177:22
**Kelley** [1] - 3042:4
**kept** [3] - 3000:1, 3117:17, 3157:25
**key** [7] - 2971:10, 2979:9, 2993:24, 3003:22, 3006:10, 3032:21, 3184:6
**keyboard** [6] - 2990:16, 2990:17, 3009:22, 3037:20, 3037:23, 3037:24
**keyboards** [1] - 2990:19
**kick** [1] - 3175:21
**kid** [1] - 3049:4
**kids** [5] - 3003:13, 3026:22, 3027:1, 3045:14, 3045:23
**kill** [6] - 2981:5, 2981:6, 2982:25, 3049:15, 3049:18, 3049:21
**killed** [1] - 3001:1
**killer** [1] - 3179:19
**kind** [40] - 2937:4, 2974:15, 2977:14, 2981:23, 2985:2, 2985:10, 2987:18, 2988:21, 2992:21, 3003:1, 3006:3, 3007:16, 3010:2, 3016:16, 3024:4, 3024:23, 3024:24, 3026:7, 3032:12, 3039:4, 3039:12, 3047:1, 3052:6, 3063:22, 3064:5, 3109:11, 3109:16, 3110:3, 3112:2, 3112:6, 3113:11, 3139:12, 3142:18, 3145:17, 3145:22, 3146:1, 3158:24, 3165:22, 3179:18, 3185:10
**kinds** [7] - 2960:2, 2974:16, 3007:18, 3024:9, 3041:19, 3145:11, 3169:12
**Kit** [5] - 2946:19, 2949:13, 2949:17, 2949:22, 2950:1
**knowing** [3] - 2935:13, 3099:4, 3156:23
**knowledge** [17] - 2927:4, 2935:11, 2953:11, 2954:7, 3005:3, 3060:22, 3063:12, 3068:13, 3070:20, 3072:9, 3092:10, 3103:23, 3124:20, 3148:16, 3185:19, 3189:2, 3189:3
**knowledgeable** [1] - 3103:16
**known** [19] - 2940:25, 2941:5, 2944:7, 2944:13, 2945:18, 2950:19, 2950:22, 2953:7, 2953:10, 2953:21, 2959:25, 3070:17, 3162:1, 3162:2, 3185:15, 3185:20, 3185:21, 3190:6, 3190:14

**knows** [10] - 3023:10, 3035:12, 3039:24, 3064:19, 3093:5, 3094:2, 3136:3, 3179:1, 3181:16
**KSM** [1] - 3139:13

## L

**label** [2] - 3142:22, 3142:25
**labeled** [3] - 3100:15, 3142:21, 3142:23
**labels** [1] - 3009:18
**laches** [38] - 3053:17, 3054:9, 3065:3, 3069:13, 3069:14, 3105:24, 3116:9, 3116:13, 3116:16, 3119:2, 3130:6, 3134:4, 3134:18, 3135:16, 3135:18, 3136:20, 3137:7, 3143:18, 3144:8, 3144:12, 3157:1, 3158:17, 3159:20, 3159:24, 3159:25, 3160:5, 3161:2, 3161:3, 3161:23, 3162:3, 3164:17, 3164:18, 3165:2, 3165:4, 3179:2, 3183:3
**lack** [2] - 3119:10, 3186:2
**ladies** [56] - 2923:6, 2923:16, 2964:24, 2968:1, 2969:2, 3000:12, 3002:5, 3002:21, 3003:23, 3004:10, 3004:15, 3005:1, 3006:14, 3007:16, 3009:4, 3009:15, 3010:20, 3013:8, 3014:17, 3015:11, 3015:24, 3017:7, 3019:18, 3022:12, 3024:2, 3024:12, 3025:2, 3026:15, 3027:21, 3029:4, 3030:13, 3030:21, 3032:11, 3034:15, 3035:19, 3036:14, 3036:19, 3036:25, 3037:12, 3037:21, 3038:5, 3038:11, 3039:2, 3039:15, 3039:23, 3040:11, 3042:10, 3042:24, 3043:18, 3045:9, 3045:21, 3047:24, 3049:2, 3049:14, 3050:13, 3187:16
**Lafayette** [1] - 3003:10
**laid** [1] - 3003:12
**Lancaster** [4] - 3174:21, 3175:6, 3175:18, 3178:5
**Lancaster's** [1] - 3176:5
**language** [11] - 2936:5, 2937:23, 2937:24, 2937:25, 2993:21, 2993:22, 2993:24, 2994:3, 2994:11, 3027:17, 3047:13
**languages** [1] - 2993:24
**lapse** [1] - 2926:25
**laptop** [3] - 3118:18, 3118:21, 3119:18
**large** [3] - 2972:24, 2973:1, 3119:5
**larger** [1] - 3153:18
**Larry** [1] - 3045:25
**last** [26] - 2923:7, 2923:13, 2965:9, 2968:16, 3003:20, 3032:24, 3040:15, 3041:1, 3074:4, 3106:23, 3110:22, 3138:20, 3139:1, 3142:1, 3142:2, 3142:5, 3146:3, 3146:21, 3162:13, 3163:15, 3166:12, 3167:15, 3169:15, 3172:3, 3172:15, 3180:14
**lasted** [1] - 3119:14
**late** [5] - 3037:1, 3138:20, 3141:3,

3141:17, 3163:12
**latest** [2] - 3139:15, 3181:3
**laugh** [1] - 3003:19
**Laurents** [1] - 3169:18
**law** [33] - 2923:18, 2923:24, 2924:5, 2924:8, 2928:18, 2931:1, 3025:3, 3025:12, 3025:13, 3025:15, 3026:3, 3027:9, 3027:10, 3028:17, 3049:7, 3051:14, 3051:16, 3068:23, 3093:4, 3093:6, 3096:19, 3106:4, 3139:17, 3145:25, 3160:5, 3160:25, 3174:12, 3180:16, 3181:9, 3186:18, 3189:12
**lawn** [1] - 2970:2
**laws** [1] - 2935:4
**lawsuit** [6] - 2959:19, 2988:19, 2991:18, 3124:20, 3154:6, 3174:16
**lawyer** [4] - 3047:25, 3048:5, 3105:2, 3179:14
**lawyers** [5] - 2965:16, 2988:20, 3003:16, 3003:19, 3157:19
**lawyers'** [1] - 3187:21
**layers** [1] - 3126:21
**layout** [1] - 3094:19
**lead** [1] - 2928:9
**leader** [1] - 2971:18
**leading** [1] - 3042:21
**lean** [1] - 3028:9
**learn** [3] - 3109:10, 3110:3, 3115:16
**learned** [8] - 3062:18, 3081:14, 3095:1, 3101:5, 3109:16, 3109:21, 3110:9, 3110:16
**learning** [1] - 3101:8
**least** [12] - 2934:9, 2957:3, 3075:10, 3076:7, 3094:7, 3097:15, 3106:1, 3134:14, 3173:25, 3183:10, 3183:14, 3185:5
**leave** [16] - 2967:15, 3004:19, 3037:21, 3040:13, 3045:6, 3053:7, 3074:11, 3084:20, 3167:20, 3167:24, 3181:23, 3182:5, 3182:16, 3182:18, 3188:11, 3190:18
**Leavin'** [1] - 3029:9
**led** [1] - 3147:9
**leeway** [3] - 3139:20, 3143:17, 3146:20
**left** [3] - 2980:12, 3009:20, 3089:5
**left-hand** [1] - 3089:5
**legal** [3] - 2925:7, 3142:20, 3143:9
**length** [2] - 2957:13, 3060:9
**less** [4] - 2956:4, 3127:24, 3128:4, 3131:17
**level** [5] - 2951:5, 2953:25, 2984:21, 3031:24, 3145:10
**liable** [2] - 2956:13, 2956:15
**license** [36] - 2929:21, 2957:9, 2957:11, 2958:5, 2958:20, 2960:17, 2960:19, 2961:2, 2961:7, 2961:9, 2961:17, 2962:4, 2973:16, 2973:17, 2973:20, 2973:21, 2973:24, 2999:10, 3042:2, 3042:7, 3042:9, 3126:18, 3129:19, 3130:25, 3131:4, 3131:24,

3138:18, 3139:9, 3143:24, 3145:11, 3145:22, 3153:8, 3154:25, 3155:9, 3156:11

**licensed** [6] - 2960:23, 2960:24, 2961:3, 2961:4, 2961:7, 2961:12

**licensee** [10] - 2957:5, 2957:10, 2957:14, 2957:22, 2957:24, 2958:3, 2958:4, 2960:10, 2961:25, 2963:19

**licensee's** [2] - 2957:22, 2961:11

**licenses** [21] - 2955:4, 2960:14, 2960:15, 2960:20, 2961:20, 2961:22, 2973:7, 2973:8, 2973:11, 2973:12, 2974:7, 2998:2, 2998:12, 2998:24, 2998:25, 2999:17, 3042:6, 3137:12, 3137:25, 3143:5, 3145:19

**licensing** [1] - 2960:7

**licensor** [1] - 2962:14

**lie** [1] - 3186:10

**life** [2] - 2958:21, 3051:11

**light** [16] - 2928:7, 2946:5, 2947:6, 2948:25, 2949:4, 2949:8, 2949:11, 2949:15, 2949:20, 2949:25, 2950:22, 2951:14, 2952:17, 2955:19, 3040:10, 3183:24

**likely** [4] - 2925:18, 2956:21, 3075:6, 3169:3

**limine** [5] - 3130:18, 3164:19, 3172:12, 3172:20, 3173:9

**limit** [3] - 2988:9, 3061:3, 3176:20

**limitation** [38] - 2937:4, 2937:5, 2937:7, 2937:20, 2937:21, 2938:10, 2939:2, 2939:22, 2939:24, 2939:25, 2940:3, 2940:4, 2940:6, 2940:11, 2940:13, 2940:18, 2940:19, 2941:1, 2941:4, 2941:10, 2941:14, 2941:16, 2941:20, 2941:23, 2942:6, 2942:15, 2942:19, 2943:3, 2947:21, 2990:15, 3016:20, 3018:11, 3018:17, 3032:22, 3047:11, 3059:15, 3059:17

**limitations** [27] - 2930:15, 2933:22, 2934:11, 2934:12, 2935:22, 2937:13, 2937:17, 2938:2, 2938:9, 2938:23, 2939:8, 2939:9, 2941:9, 2941:13, 2941:17, 2941:19, 2942:3, 2943:5, 2943:7, 2945:9, 2947:10, 2952:24, 2991:11, 2993:9, 3035:1, 3165:20

**limited** [8] - 2929:6, 2956:19, 2979:22, 2986:22, 2987:8, 3145:18, 3177:10, 3178:6

**limits** [2] - 2941:11, 3143:21

**line** [39] - 2968:17, 2975:20, 3019:17, 3021:23, 3060:21, 3063:12, 3064:5, 3064:11, 3071:16, 3071:23, 3072:24, 3085:13, 3108:7, 3108:13, 3108:18, 3111:8, 3111:9, 3111:13, 3114:1, 3114:5, 3118:8, 3119:23, 3120:25, 3121:9, 3122:25, 3129:9, 3132:13, 3152:4, 3153:12, 3153:13, 3154:5, 3154:8, 3155:3, 3178:4, 3186:16, 3189:21, 3190:4

**lines** [18] - 2968:18, 2971:5, 2971:9,

2975:21, 2985:16, 3019:22, 3021:25, 3022:1, 3109:25, 3113:4, 3114:20, 3116:5, 3120:9, 3120:14, 3122:5, 3122:25, 3123:2, 3151:1

**link** [7] - 2987:22, 2987:25, 2988:17, 2989:7, 2989:10, 3036:16

**LinkedIn** [1] - 2976:6

**list** [9] - 2926:7, 2930:17, 3087:8, 3088:7, 3089:18, 3095:12, 3127:4, 3170:20, 3171:9

**listed** [9] - 2942:25, 2950:5, 2951:14, 2951:20, 2952:7, 2954:3, 2955:18, 2964:11, 3089:19

**listen** [10] - 2923:19, 2923:20, 2923:22, 3006:4, 3029:9, 3029:12, 3046:7, 3149:12, 3149:13, 3162:25

**listened** [3] - 3116:1, 3150:1

**listening** [2] - 3008:11, 3070:9

**listing** [3] - 2929:12, 2930:2, 2930:9

**listings** [1] - 2931:24

**lists** [3] - 2965:20, 2985:14, 3074:4

**literal** [4] - 2936:24, 2937:2, 2937:8, 2939:16

**literally** [6] - 2937:15, 2938:18, 2939:3, 2939:11, 2943:8, 2965:19

**litigation** [1] - 3129:25

**live** [1] - 3031:13

**lived** [2] - 3003:8, 3003:12

**lives** [4] - 3006:2, 3006:6, 3045:15, 3046:2

**LLC** [8] - 2931:14, 3067:21, 3070:19, 3072:2, 3072:12, 3072:14, 3103:14, 3172:4

**LLC's** [1] - 3057:24

**load** [1] - 3030:17

**loading** [2] - 3094:20, 3100:6

**locate** [1] - 3020:13

**located** [1] - 3022:19

**location** [1] - 3022:7

**lock** [1] - 3188:12

**LocType** [20] - 2994:7, 2994:16, 2995:19, 2995:20, 2996:4, 3020:14, 3020:18, 3020:23, 3020:25, 3021:15, 3022:2, 3022:6, 3022:9, 3024:20, 3024:25, 3030:18, 3031:17, 3046:15, 3046:24, 3047:6

**LocTypes** [2] - 3024:9, 3046:25

**Loeb** [3] - 2946:22, 2949:9, 2950:2

**lofty** [1] - 3003:1

**Logan** [72] - 2969:3, 2969:18, 2970:11, 3042:20, 3042:23, 3044:22, 3048:5, 3048:9, 3048:13, 3048:22, 3059:16, 3066:21, 3067:14, 3067:23, 3068:19, 3069:1, 3070:19, 3070:24, 3070:25, 3071:6, 3072:10, 3072:21, 3075:6, 3104:11, 3106:9, 3106:20, 3109:14, 3110:21, 3115:24, 3117:22, 3118:5, 3120:2, 3121:18, 3123:6, 3123:14, 3129:23, 3131:6, 3132:14, 3132:18, 3132:20, 3136:2, 3137:10, 3138:21,

3139:2, 3144:5, 3144:15, 3144:17, 3147:6, 3147:11, 3147:12, 3149:4, 3152:17, 3152:21, 3157:5, 3157:6, 3158:9, 3158:25, 3159:6, 3159:8, 3160:8, 3162:6, 3171:14, 3171:15, 3172:7, 3179:4, 3179:7, 3185:3, 3185:17, 3186:6, 3186:9

**LOGAN** [2] - 3106:17, 3147:4

**Logan's** [7] - 3041:2, 3048:14, 3108:16, 3124:4, 3132:12, 3154:17, 3155:14

**logistical** [1] - 3169:1

**long-felt** [1] - 2954:12

**long-standing** [1] - 3189:12

**longest** [1] - 3045:24

**Look** [13] - 3023:25, 3024:18, 3026:19, 3026:22, 3026:25, 3027:13, 3034:11, 3035:13, 3035:20, 3036:23, 3038:21, 3049:5, 3184:11

**look** [109] - 2930:19, 2934:5, 2934:15, 2939:22, 2952:4, 2952:14, 2953:8, 2953:23, 2965:25, 2967:1, 2973:7, 2976:15, 2977:7, 2977:16, 2977:19, 2977:20, 2978:1, 2978:16, 2982:11, 2985:8, 2988:10, 2988:25, 2989:13, 2990:25, 2991:19, 2995:6, 2996:2, 2996:3, 2997:24, 3004:18, 3009:17, 3009:25, 3010:3, 3010:9, 3010:18, 3011:16, 3014:4, 3014:12, 3017:9, 3018:5, 3019:20, 3020:2, 3020:3, 3020:4, 3020:5, 3020:18, 3020:22, 3021:3, 3021:19, 3021:21, 3021:22, 3021:25, 3022:5, 3022:9, 3022:13, 3024:5, 3024:7, 3024:8, 3024:21, 3026:4, 3031:14, 3033:10, 3033:11, 3036:25, 3046:20, 3049:18, 3058:13, 3060:20, 3063:10, 3065:22, 3078:14, 3079:9, 3080:9, 3085:6, 3088:24, 3088:25, 3093:22, 3099:16, 3109:23, 3111:8, 3114:4, 3114:20, 3120:8, 3122:4, 3123:8, 3127:19, 3127:20, 3128:19, 3129:1, 3129:10, 3132:13, 3136:21, 3144:7, 3158:19, 3167:12, 3168:4, 3168:13, 3169:2, 3171:2, 3173:4, 3173:20, 3173:21, 3180:11, 3183:11, 3183:25, 3190:3

**looked** [25] - 2971:7, 2981:22, 2982:12, 2982:24, 2985:11, 2985:13, 2985:14, 2985:15, 2990:17, 2997:16, 3015:10, 3040:4, 3045:12, 3088:8, 3101:20, 3127:21, 3128:12, 3135:4, 3136:16, 3137:3, 3159:7, 3190:10

**looking** [21] - 3019:6, 3020:24, 3021:10, 3023:6, 3025:1, 3042:3, 3059:12, 3072:18, 3083:21, 3093:21, 3093:23, 3104:18, 3116:16, 3116:20, 3136:7, 3136:12, 3155:6, 3165:14, 3173:21, 3178:17, 3184:17

**looks** [7] - 2988:14, 2992:2, 3009:16, 3012:25, 3013:6, 3047:18, 3159:22

**lose** [3] - 2975:14, 3010:22, 3175:7

**loses** [1] - 3102:18
**lost** [1] - 3119:15
**loud** [2] - 3027:2, 3120:16
**love** [1] - 3008:13
**low** [2] - 3034:23, 3042:22
**lower** [2] - 2997:9, 2997:12
**Lufkin** [1] - 3139:1
**lump** [22] - 2958:2, 2958:7, 2958:17, 2961:10, 2966:12, 2966:15, 2973:21, 2973:22, 2996:12, 2997:20, 2997:25, 3001:7, 3001:12, 3044:5, 3044:7, 3049:22, 3050:1, 3138:6, 3145:7
**lump-sum** [11] - 2958:2, 2958:7, 2958:17, 2961:10, 2966:12, 2997:20, 2997:23, 3044:5, 3049:22, 3145:7
**lunch** [1] - 3053:16
**LY** [1] - 3107:19

# M

**ma'am** [2] - 3110:14, 3144:7
**machine** [3] - 2978:15, 3040:1
**magnetic** [2] - 2990:9, 2990:11
**magnitude** [1] - 2961:6
**Mail** [1] - 3088:19
**mail** [3] - 3077:24, 3089:8, 3090:16
**mailed** [3] - 3078:1, 3088:20, 3089:24
**main** [1] - 3074:20
**mainstream** [1] - 3150:8
**maintained** [1] - 3105:25
**majority** [1] - 3097:4
**manifestation** [1] - 3024:20
**manner** [1] - 2938:15
**Manual** [1] - 3092:24
**manual** [49] - 2946:17, 2946:23, 2947:19, 2949:1, 2949:5, 2949:6, 2949:8, 2949:23, 2966:1, 2976:9, 2976:13, 2979:15, 2979:17, 2991:23, 3040:18, 3075:7, 3075:12, 3076:12, 3077:3, 3077:13, 3077:21, 3079:5, 3079:17, 3080:7, 3081:15, 3081:19, 3083:4, 3084:7, 3086:25, 3087:3, 3087:16, 3087:20, 3088:6, 3090:1, 3090:7, 3091:8, 3091:11, 3094:7, 3094:17, 3095:6, 3096:10, 3098:4, 3098:16, 3099:1, 3099:5, 3100:9, 3101:2, 3101:6, 3182:25
**manuals** [2] - 2974:19, 2985:13
**manufacturing** [1] - 2962:25
**mapped** [1] - 2982:13
**mapping** [1] - 2981:23
**March** [5] - 2959:9, 3026:12, 3036:9, 3037:2, 3037:3, 3038:7, 3060:23, 3073:22, 3099:3
**mark** [1] - 3034:21
**marked** [3] - 3101:15, 3141:7, 3141:20, 3147:13
**market** [16] - 2963:24, 2984:7, 2984:8, 3042:14, 3063:6, 3063:15, 3063:19,

3113:21, 3114:14, 3114:15, 3116:12, 3151:7, 3151:22, 3154:11, 3186:11, 3186:15
**marketed** [1] - 2972:11
**marketing** [3] - 2955:13, 2976:15, 2977:6
**marketplace** [3] - 2953:10, 3012:20, 3043:2
**marriage** [1] - 3045:24
**married** [2] - 3045:23, 3045:25
**mass** [3] - 2990:5, 2990:6, 2990:9
**master's** [1] - 2976:5
**matching** [1] - 3020:19
**material** [13] - 2941:11, 2954:1, 3022:20, 3024:10, 3082:13, 3082:14, 3082:16, 3082:19, 3082:21, 3082:22, 3083:9, 3083:12, 3094:1
**materiality** [7] - 3082:4, 3082:7, 3082:10, 3082:13, 3083:20, 3084:5, 3097:23
**materials** [3] - 2985:11, 3090:4, 3122:24
**mathematical** [2] - 2956:25, 2993:16
**matter** [19] - 2975:13, 2983:23, 3008:25, 3009:1, 3009:15, 3013:9, 3013:14, 3026:15, 3029:9, 3037:4, 3039:7, 3067:22, 3070:24, 3098:23, 3098:25, 3159:25, 3161:1, 3161:6, 3184:8
**matters** [2] - 2927:7, 3010:1
**MBAs** [1] - 3145:10
**mean** [69] - 2924:12, 2926:19, 2969:6, 2971:16, 2975:20, 2977:13, 2984:23, 2992:1, 3001:15, 3010:4, 3024:5, 3024:16, 3029:8, 3032:6, 3064:23, 3065:5, 3066:11, 3067:5, 3068:10, 3070:8, 3071:10, 3082:19, 3083:6, 3088:18, 3093:1, 3111:18, 3111:20, 3114:11, 3114:13, 3115:1, 3117:17, 3118:4, 3118:8, 3118:23, 3119:15, 3145:8, 3146:1, 3146:12, 3146:18, 3146:19, 3148:6, 3148:7, 3155:6, 3155:17, 3159:18, 3160:13, 3160:23, 3166:21, 3169:4, 3169:12, 3175:16, 3175:21, 3175:22, 3175:25, 3176:24, 3177:5, 3185:8, 3189:10, 3189:18, 3189:21, 3189:24
**meaning** [5] - 2925:1, 2925:6, 2925:8, 2925:10, 3018:8
**meanings** [1] - 2936:6
**means** [40] - 2925:17, 2937:5, 2937:7, 2941:17, 2941:19, 2941:20, 2941:22, 2941:24, 2942:2, 2942:6, 2942:15, 2942:18, 2942:19, 2943:3, 2943:5, 2943:7, 2951:18, 2979:14, 2982:20, 2987:15, 2987:20, 2994:12, 3000:15, 3018:11, 3018:16, 3018:20, 3025:8, 3025:15, 3025:16, 3026:11, 3032:17, 3035:1, 3035:3, 3035:8, 3035:17,

3036:6, 3036:14, 3037:11, 3037:20, 3038:5
**means-plus-function** [23] - 2937:5, 2937:7, 2941:17, 2941:19, 2941:20, 2941:22, 2942:2, 2942:6, 2942:15, 2942:18, 2942:19, 2943:3, 2943:5, 2943:7, 2982:20, 2987:15, 3018:11, 3018:16, 3025:8, 3025:15, 3025:16, 3026:11, 3035:17
**meant** [2] - 3028:9, 3142:19
**measure** [1] - 2996:13
**mechanism** [1] - 3034:14
**Media** [1] - 3150:25
**meet** [3] - 2985:9, 3065:6, 3069:13
**meets** [1] - 2942:5
**members** [1] - 3050:24
**memories** [3] - 3113:10, 3115:10, 3115:11
**memorized** [1] - 3163:6
**memory** [28] - 2926:25, 2931:5, 2931:7, 2931:8, 2990:9, 2990:12, 2990:14, 2992:16, 2992:17, 3015:13, 3015:14, 3015:17, 3029:18, 3029:23, 3085:8, 3107:4, 3108:3, 3110:4, 3111:22, 3112:24, 3113:1, 3113:14, 3113:23, 3114:17, 3115:12, 3119:11, 3124:6
**mention** [4] - 2968:2, 2973:17, 2989:16, 3048:7
**mentioned** [6] - 2965:10, 2971:13, 3003:5, 3097:16, 3137:25, 3155:13
**mentions** [3] - 3073:23, 3074:16, 3172:21
**menu** [1] - 2972:19
**merely** [5] - 2952:24, 2974:23, 3051:3, 3119:17, 3167:13
**merits** [2] - 3175:7, 3177:12
**message** [2] - 3052:17, 3053:25
**messages** [1] - 3008:17
**met** [7] - 2981:20, 2991:13, 2992:8, 2992:24, 2993:10, 3046:5, 3106:23
**metaphysical** [1] - 3028:22
**method** [7] - 2962:6, 3010:13, 3020:9, 3020:11, 3023:4, 3025:5, 3032:13
**methods** [3] - 2962:9, 3019:13, 3026:4
**microphone** [1] - 3002:14
**Microsoft** [5] - 2946:19, 2949:13, 2949:17, 2949:22, 2950:1
**mid** [2] - 3086:23, 3110:24
**middle** [3] - 3022:12, 3022:22, 3075:24
**middleman** [1] - 2999:3
**might** [37] - 2981:11, 3027:5, 3032:3, 3041:10, 3044:10, 3046:23, 3061:8, 3061:9, 3062:7, 3063:2, 3063:15, 3080:8, 3082:20, 3083:8, 3083:14, 3084:3, 3093:20, 3093:21, 3097:21, 3107:10, 3117:7, 3117:14, 3117:15, 3126:1, 3126:10, 3123:34, 3134:1, 3151:14, 3152:25, 3166:21, 3173:8, 3173:20, 3181:8, 3184:3, 3185:11, 3189:16, 3189:18

**mill** [1] - 3015:19
**million** [29] - 2970:14, 2970:18, 2971:5, 2975:21, 2985:16, 2996:12, 3001:10, 3001:23, 3042:23, 3042:25, 3044:5, 3044:8, 3044:23, 3045:3, 3045:6, 3045:7, 3050:4, 3050:5, 3126:8, 3126:13, 3126:16, 3128:1, 3128:9, 3155:19, 3155:21, 3155:25
**millions** [4] - 2971:3, 3042:22
**Mind** [1] - 3029:10
**mind** [15] - 2926:18, 2927:19, 2963:7, 2970:4, 3031:7, 3051:1, 3073:24, 3092:22, 3099:8, 3112:22, 3113:7, 3114:24, 3135:15, 3138:15, 3162:22
**minds** [1] - 3188:6
**mine** [1] - 3042:9
**mini** [1] - 2932:4
**minimize** [1] - 3042:18
**minimum** [1] - 3097:22
**Minnesota** [1] - 3046:1
**minute** [12] - 2923:7, 2980:22, 2982:1, 3006:12, 3098:21, 3118:5, 3129:4, 3139:11, 3149:21, 3150:18, 3158:19
**minutes** [12] - 2964:25, 2967:6, 2996:8, 2999:15, 3002:5, 3023:25, 3036:3, 3037:5, 3037:6, 3041:1, 3047:22, 3182:17
**mired** [1] - 2969:7
**misled** [1] - 3031:8
**misplaced** [1] - 3149:23
**miss** [3] - 3016:12, 3016:13
**missing** [9] - 3016:11, 3034:18, 3095:4, 3098:7, 3098:9, 3137:2, 3137:4, 3174:2, 3177:19
**misstatement** [2] - 2926:23, 2926:24
**misstating** [1] - 3093:1
**mistake** [2] - 2926:19, 3141:9
**mistakes** [1] - 3041:3
**mode** [5] - 3119:5, 3119:7, 3119:20, 3119:24, 3153:16
**model** [1] - 3015:19
**models** [1] - 2966:7
**modern** [1] - 3145:5
**modification** [1] - 3099:25
**mom** [5] - 3046:6, 3046:17, 3046:23, 3046:25
**moment** [7] - 3000:12, 3011:7, 3032:21, 3105:10, 3106:16, 3118:16, 3158:7
**moments** [2] - 3021:24, 3045:22
**Monday** [1] - 3075:25
**monetizing** [1] - 3147:21
**money** [13] - 2956:16, 2957:5, 2957:8, 2974:13, 2974:15, 2975:21, 2982:17, 3027:24, 3041:13, 3041:14, 3041:15, 3041:22, 3155:8
**montage** [4] - 2985:10, 3028:8, 3028:10
**month** [2] - 3117:12, 3117:15
**months** [3] - 2973:16, 3115:8, 3146:21

**moot** [1] - 3179:9
**moreover** [1] - 3164:16
**morning** [10] - 2969:5, 3023:24, 3162:15, 3181:24, 3183:14, 3183:15, 3183:16, 3187:1, 3187:12, 3188:3
**MORTON** [32] - 3123:15, 3124:2, 3124:7, 3129:17, 3130:10, 3143:11, 3143:16, 3147:5, 3150:20, 3150:21, 3154:23, 3155:2, 3157:2, 3157:4, 3158:7, 3159:14, 3160:10, 3160:13, 3161:10, 3161:19, 3161:21, 3164:5, 3170:18, 3170:24, 3171:3, 3171:8, 3183:8, 3183:18, 3183:22, 3184:14, 3185:13, 3190:3
**Morton** [1] - 3123:25
**most** [9] - 2980:18, 2993:25, 2996:16, 3048:12, 3097:17, 3103:16, 3107:4, 3112:5, 3188:2
**motion** [9] - 3136:22, 3164:19, 3172:12, 3173:9, 3173:14, 3173:20, 3174:3, 3175:13, 3176:8
**motions** [2] - 3130:17, 3172:19
**motivation** [1] - 2953:4
**Motorola** [31] - 3125:5, 3125:15, 3126:6, 3127:8, 3127:15, 3129:19, 3130:2, 3130:25, 3131:4, 3131:24, 3132:16, 3133:12, 3135:1, 3136:8, 3136:13, 3151:5, 3153:2, 3153:7, 3153:21, 3154:1, 3154:10, 3154:22, 3154:24, 3155:6, 3155:13, 3155:19, 3156:12, 3156:14, 3156:21, 3156:23
**mouse** [2] - 3039:4, 3039:5
**mouthful** [1] - 3026:7
**move** [8] - 2979:10, 2993:7, 3069:4, 3076:20, 3080:4, 3080:22, 3095:9, 3140:1
**moved** [1] - 3152:10
**movies** [1] - 3005:24
**moving** [2] - 2985:19, 3023:3
**mower** [1] - 2970:2
**MP3** [2] - 2984:6, 2984:8
**MR** [274] - 2967:3, 2967:6, 2967:9, 2968:24, 2969:2, 2999:16, 3002:10, 3002:13, 3002:18, 3002:19, 3002:21, 3036:4, 3045:20, 3046:13, 3047:23, 3053:10, 3053:21, 3054:4, 3054:12, 3054:20, 3054:23, 3055:6, 3055:9, 3055:12, 3055:14, 3055:16, 3056:3, 3056:4, 3056:18, 3056:19, 3057:2, 3057:6, 3057:10, 3057:13, 3064:10, 3065:4, 3065:21, 3066:4, 3066:13, 3066:19, 3067:4, 3067:9, 3067:12, 3067:19, 3068:2, 3068:21, 3069:17, 3070:3, 3070:11, 3070:15, 3071:2, 3071:6, 3071:12, 3071:22, 3071:25, 3072:5, 3072:16, 3072:19, 3073:1, 3073:2, 3073:6, 3073:10, 3073:11, 3074:2, 3074:5, 3074:11, 3074:14, 3074:19, 3074:22, 3074:25, 3075:4, 3075:14, 3075:19, 3075:21, 3075:23, 3076:5, 3076:9, 3076:14,

3076:18, 3076:23, 3077:1, 3081:10, 3081:12, 3081:24, 3082:4, 3082:9, 3082:15, 3082:24, 3083:15, 3083:18, 3084:4, 3084:13, 3084:18, 3084:20, 3084:23, 3085:16, 3085:25, 3086:6, 3086:13, 3086:16, 3086:18, 3086:20, 3092:9, 3093:3, 3093:10, 3093:11, 3094:8, 3094:10, 3095:11, 3095:25, 3096:8, 3096:24, 3097:13, 3097:20, 3098:2, 3098:18, 3098:20, 3098:24, 3099:10, 3099:11, 3101:22, 3102:8, 3103:9, 3103:11, 3103:21, 3103:25, 3104:1, 3105:9, 3105:11, 3105:15, 3106:8, 3106:11, 3123:15, 3124:2, 3124:7, 3129:17, 3130:10, 3130:20, 3130:23, 3131:3, 3131:19, 3133:4, 3134:15, 3134:21, 3136:7, 3136:11, 3138:13, 3138:14, 3143:11, 3143:16, 3147:5, 3150:20, 3150:21, 3154:23, 3155:2, 3155:11, 3156:2, 3156:10, 3157:2, 3157:4, 3158:7, 3158:15, 3159:2, 3159:12, 3159:14, 3160:10, 3160:13, 3160:22, 3161:4, 3161:10, 3161:13, 3161:19, 3161:21, 3162:5, 3162:9, 3162:12, 3162:20, 3163:7, 3163:10, 3163:24, 3164:3, 3164:5, 3164:7, 3164:11, 3164:13, 3164:25, 3165:23, 3166:4, 3166:6, 3166:9, 3166:17, 3166:19, 3166:21, 3166:23, 3167:4, 3167:11, 3168:3, 3168:15, 3168:19, 3168:20, 3168:22, 3169:7, 3169:8, 3169:20, 3169:25, 3170:2, 3170:10, 3170:15, 3170:18, 3170:24, 3171:3, 3171:8, 3171:17, 3171:20, 3171:23, 3172:2, 3172:6, 3172:10, 3172:21, 3173:6, 3173:11, 3173:16, 3174:3, 3174:6, 3174:22, 3175:9, 3176:2, 3176:5, 3176:8, 3176:12, 3176:15, 3176:25, 3177:9, 3177:13, 3178:3, 3178:9, 3178:19, 3178:21, 3178:24, 3179:11, 3179:21, 3180:2, 3180:6, 3180:12, 3180:14, 3180:19, 3180:22, 3181:2, 3181:5, 3181:9, 3181:11, 3181:18, 3181:21, 3182:10, 3182:12, 3183:1, 3183:4, 3183:8, 3183:18, 3183:22, 3184:14, 3184:21, 3185:1, 3185:13, 3186:8, 3186:17, 3186:24, 3188:19, 3188:22, 3190:3, 3190:19, 3190:21, 3191:1
**MS** [54] - 3106:15, 3106:19, 3107:21, 3107:23, 3108:15, 3108:17, 3113:3, 3113:5, 3116:10, 3116:15, 3116:20, 3117:2, 3117:19, 3118:23, 3119:4, 3119:21, 3120:1, 3123:13, 3123:17, 3123:20, 3123:23, 3124:10, 3125:2, 3125:3, 3128:20, 3128:24, 3129:2, 3129:6, 3129:11, 3132:10, 3134:6, 3134:13, 3135:23, 3136:16, 3137:8, 3137:9, 3137:14, 3137:16, 3138:7, 3138:17, 3139:18, 3139:22, 3140:1, 3140:3, 3143:22, 3144:11, 3144:14,

3144:23, 3145:1, 3146:22, 3146:25, 3147:3, 3154:15, 3158:11
**Mullendore** [5] - 3053:5, 3064:21, 3092:21, 3128:17, 3163:5
**multiple** [3] - 2948:19, 2953:9, 3099:2
**music** [16] - 3006:4, 3006:5, 3007:8, 3015:13, 3015:16, 3015:20, 3016:3, 3036:5, 3037:5, 3109:6, 3109:8, 3110:11, 3149:11, 3149:12, 3149:13
**Musicshop** [3] - 2946:23, 2949:6, 2949:22
**must** [62] - 2924:18, 2925:14, 2925:17, 2926:8, 2928:23, 2929:2, 2933:5, 2933:8, 2933:11, 2933:19, 2935:25, 2936:8, 2936:15, 2936:17, 2936:20, 2937:9, 2937:16, 2938:2, 2938:17, 2939:17, 2939:22, 2940:6, 2941:5, 2941:8, 2942:2, 2942:7, 2942:11, 2942:15, 2942:22, 2942:23, 2943:17, 2943:21, 2944:12, 2945:16, 2945:23, 2946:4, 2947:10, 2947:12, 2948:20, 2950:19, 2950:21, 2951:10, 2951:12, 2951:16, 2951:23, 2952:15, 2955:16, 2956:25, 2957:17, 2958:3, 2958:7, 2958:11, 2964:7, 2964:17, 3010:17, 3011:18, 3011:19, 3025:19, 3050:22, 3052:14, 3120:22, 3189:5

## N

**nada** [1] - 3050:5
**Name** [2] - 3015:21, 3015:22
**namely** [1] - 2933:24
**Nancy** [1] - 3100:14
**NAND** [4] - 2989:23, 2990:1, 2990:4, 2990:13
**nano** [5] - 2932:8, 2932:10, 2932:12, 2932:14, 2932:16
**narrative** [1] - 3133:14
**narrowed** [1] - 3075:25
**National** [1] - 2981:15
**nature** [3] - 2961:24, 2962:12, 3189:19
**navigable** [5] - 2984:10, 2984:15, 3010:10, 3011:10, 3012:8
**navigate** [1] - 3011:19
**navigating** [1] - 2994:20
**Nawrocki** [10] - 2996:15, 2997:1, 2997:5, 2997:6, 2997:11, 2997:12, 2997:15, 3000:10, 3043:3, 3043:9
**Nawrocki's** [1] - 3044:12
**near** [5] - 3056:20, 3056:22, 3058:18, 3078:20, 3184:23
**neat** [1] - 3007:16
**necessarily** [3] - 2926:19, 2979:24, 3061:3
**necessary** [5] - 2934:5, 2934:15, 3065:10, 3068:15, 3069:8
**need** [33] - 2926:23, 2954:12, 2989:8, 2993:25, 3001:17, 3001:21, 3005:6, 3005:7, 3023:15, 3023:16, 3024:21, 3024:23, 3049:25, 3050:3, 3050:20, 3053:9, 3053:24, 3056:10, 3089:20, 3093:24, 3103:9, 3133:14, 3135:20, 3167:3, 3174:13, 3180:9, 3182:17, 3183:19, 3184:5, 3185:7, 3190:23
**needed** [5] - 3006:4, 3053:14, 3072:9, 3072:10, 3184:2
**needs** [2] - 3136:22, 3190:17
**nefarious** [1] - 3135:19
**negate** [1] - 2944:25
**negotiated** [1] - 2997:24
**negotiation** [10] - 2957:13, 2958:15, 2958:20, 2958:24, 2959:1, 2960:19, 2960:21, 2963:17, 3041:9, 3044:20
**negotiations** [3] - 2959:20, 2959:22, 3154:10
**net** [4] - 3123:6, 3124:4, 3124:8, 3124:25
**never** [64] - 2938:14, 2982:24, 2984:23, 3001:24, 3005:12, 3008:18, 3011:12, 3025:1, 3026:17, 3028:15, 3028:20, 3037:16, 3037:17, 3039:7, 3039:8, 3039:12, 3047:10, 3052:14, 3065:18, 3066:17, 3072:7, 3072:22, 3073:18, 3074:24, 3076:2, 3076:3, 3076:11, 3101:21, 3110:10, 3110:12, 3122:2, 3130:5, 3131:3, 3131:4, 3131:5, 3132:11, 3135:3, 3135:9, 3138:15, 3142:21, 3144:2, 3145:6, 3145:7, 3145:9, 3145:15, 3145:16, 3145:20, 3145:21, 3149:9, 3149:25, 3150:2, 3152:16, 3156:3, 3156:15, 3157:20, 3185:10
**nevertheless** [1] - 3107:20
**new** [17] - 2935:20, 2945:16, 2946:4, 2947:8, 2947:9, 2947:11, 3001:11, 3006:18, 3007:2, 3007:10, 3021:7, 3030:17, 3074:24, 3115:16, 3146:11, 3151:13, 3184:4
**New** [2] - 3107:5, 3152:10
**news** [2] - 3151:15, 3151:16
**next** [46] - 2942:22, 2987:10, 2994:14, 2995:8, 3020:13, 3020:19, 3020:21, 3020:22, 3020:23, 3020:24, 3021:14, 3022:17, 3022:18, 3022:21, 3022:25, 3023:3, 3023:17, 3024:22, 3029:7, 3030:20, 3031:15, 3031:16, 3031:17, 3031:21, 3031:22, 3047:19, 3050:4, 3058:13, 3058:17, 3073:4, 3085:19, 3094:21, 3099:9, 3099:24, 3100:15, 3106:8, 3110:8, 3110:15, 3111:9, 3124:24, 3151:19, 3154:25, 3157:15, 3158:14
**nexus** [1] - 2955:7
**Ng** [2] - 3000:1, 3007:23
**Nguyen** [4] - 3055:7, 3055:10, 3055:11, 3055:14
**nice** [3] - 2972:10, 3107:15, 3107:17
**nicely** [1] - 3153:21
**night** [8] - 2923:13, 3003:20, 3074:4, 3081:8, 3151:15, 3162:13, 3181:10
**nine** [2] - 2955:4, 2962:12
**nobody** [10] - 2979:20, 2983:10, 3006:16, 3007:1, 3040:4, 3044:24, 3055:10, 3131:21, 3137:3
**nobody's** [1] - 3001:15
**none** [6] - 2991:20, 3000:4, 3036:13, 3050:5, 3056:4, 3182:10
**nonexclusive** [1] - 2961:17
**nonexistence** [1] - 2928:17
**noninfringement** [1] - 2945:1
**nonobvious** [2] - 2945:17, 2946:4
**nonobviousness** [3] - 2950:19, 2951:9, 2955:15
**nonpatented** [1] - 2962:25
**normally** [2] - 2963:11, 3015:18
**north** [1] - 2970:18
**Note** [5] - 3055:17, 3055:19, 3055:21, 3165:8, 3181:22
**note** [15] - 2967:8, 3019:18, 3019:19, 3029:19, 3052:16, 3054:1, 3056:2, 3056:10, 3064:20, 3094:16, 3123:12, 3123:19, 3133:4, 3167:10, 3171:1
**notebook** [6] - 2924:15, 3010:6, 3017:13, 3017:24, 3108:6, 3112:3
**notebooks** [4] - 2924:17, 2924:23, 2939:10, 3017:10
**NOTES** [1] - 2923:1
**notes** [9] - 2931:4, 2931:6, 2931:7, 2931:9, 2931:10, 3152:18, 3188:11, 3190:24
**nothing** [13] - 2989:14, 3009:16, 3009:17, 3024:20, 3034:7, 3041:12, 3041:19, 3046:21, 3083:4, 3116:13, 3156:20, 3156:23, 3175:4
**notice** [21] - 3036:19, 3064:18, 3065:1, 3065:6, 3066:9, 3066:16, 3072:12, 3072:17, 3073:3, 3082:5, 3085:20, 3086:3, 3103:22, 3103:24, 3105:12, 3131:18, 3172:17, 3173:17, 3173:18, 3176:16, 3178:14
**Notice** [9] - 3056:22, 3077:9, 3077:14, 3077:20, 3077:25, 3078:3, 3078:10, 3088:3, 3088:12
**noticed** [2] - 3172:14, 3172:16
**notices** [2] - 3068:18, 3172:11
**notification** [2] - 3101:11, 3101:13
**notion** [2] - 3013:2, 3013:4
**notorious** [1] - 3189:6
**Novacek** [18] - 2975:3, 2975:4, 2975:5, 2976:2, 2977:15, 2977:18, 2977:23, 2978:5, 2978:6, 2978:14, 2979:8, 3039:17, 3040:5, 3162:15, 3163:16, 3164:15, 3165:3, 3169:5
**November** [1] - 3143:25
**nuclear** [1] - 3083:10
**number** [32] - 2927:25, 2939:9, 2945:12, 2958:16, 2969:13, 2971:5, 2971:9, 2997:12, 2997:13, 3001:25, 3002:3, 3002:4, 3021:2, 3021:23, 3028:1, 3034:24, 3044:9, 3044:10,

3045:5, 3051:22, 3079:11, 3089:19, 3090:25, 3091:1, 3108:10, 3110:23, 3112:10, 3126:10, 3126:18, 3128:13, 3157:22

**Number** [17] - 2987:9, 3006:24, 3025:23, 3026:1, 3055:18, 3055:19, 3055:20, 3055:21, 3059:13, 3072:19, 3072:25, 3165:8, 3172:12, 3174:6, 3179:2, 3179:3, 3181:22

**numbered** [2] - 2930:20, 2933:12

**numbers** [8] - 2923:7, 2930:18, 2931:24, 2932:3, 2969:10, 2969:11, 2986:6, 3043:1

**Numerals** [1] - 3079:20

**numerical** [1] - 3052:15

# O

**oath** [2] - 3054:16, 3106:13

**object** [14] - 3064:11, 3074:2, 3074:22, 3092:9, 3093:4, 3133:14, 3154:15, 3162:12, 3162:17, 3164:14, 3167:12, 3169:8, 3172:25, 3180:10

**objected** [1] - 3072:11

**objection** [30] - 3056:1, 3056:3, 3058:24, 3064:13, 3064:14, 3075:23, 3092:25, 3098:18, 3101:22, 3103:21, 3103:22, 3105:25, 3124:1, 3124:3, 3124:25, 3133:7, 3133:11, 3133:16, 3133:20, 3133:22, 3134:1, 3143:15, 3169:20, 3170:1, 3173:13, 3175:14, 3176:9, 3178:11, 3179:21, 3182:8

**objections** [14] - 2928:22, 2929:1, 3057:18, 3057:23, 3057:25, 3059:12, 3060:3, 3130:18, 3133:8, 3133:24, 3134:1, 3167:10, 3172:22

**Objections** [1] - 3056:22

**objects** [1] - 3167:23

**obligation** [4] - 3103:6, 3147:25, 3185:18, 3186:11

**observers** [1] - 3002:22

**observes** [1] - 3052:23

**obtain** [2] - 3035:2, 3173:7

**obvious** [23] - 2945:19, 2948:17, 2948:25, 2949:4, 2949:7, 2949:11, 2949:15, 2949:20, 2949:25, 2950:3, 2950:11, 2950:14, 2950:24, 2951:12, 2952:17, 2952:23, 2952:24, 2953:1, 2953:16, 2955:22, 2971:2, 2971:25, 3078:23

**obviously** [6] - 3089:21, 3115:1, 3169:8, 3179:6, 3186:9, 3188:23

**obviousness** [14] - 2946:11, 2946:13, 2947:5, 2948:18, 2948:21, 2950:9, 2950:17, 2950:18, 2951:9, 2953:17, 2955:7, 2955:9, 2966:2, 2983:3

**occasions** [1] - 3099:2

**occur** [3] - 2964:14, 2964:22, 3013:17

**occurred** [3] - 2959:2, 2959:13, 2959:17

**occurs** [1] - 3171:10

**October** [15] - 2959:2, 2969:19, 2970:17, 2970:23, 2984:6, 2991:17, 3058:1, 3087:25, 3108:16, 3118:11, 3139:1, 3140:5, 3140:18, 3141:14, 3141:17

**OF** [8] - 2922:1, 3054:21, 3054:22, 3086:19, 3106:17, 3106:18, 3147:4, 3191:7

**offer** [10] - 3031:10, 3042:22, 3130:13, 3144:3, 3164:20, 3170:19, 3174:24, 3175:14, 3180:20

**offered** [6] - 2937:11, 2938:21, 2959:7, 3037:18, 3044:22, 3177:22

**offering** [2] - 2935:6, 3165:6

**Office** [33] - 2970:15, 2970:16, 2970:21, 2971:4, 2988:11, 2988:18, 2988:19, 2989:3, 2989:16, 3040:15, 3040:21, 3041:3, 3049:9, 3077:9, 3077:22, 3076:9, 3085:21, 3087:24, 3088:1, 3088:10, 3088:20, 3088:21, 3088:22, 3089:20, 3090:5, 3090:15, 3091:6, 3092:18, 3096:14, 3101:19, 3101:20, 3104:13, 3104:14

**office** [4] - 3088:12, 3088:20, 3088:21, 3089:10

**Office's** [1] - 3089:6

**OFFICER** [4] - 3056:12, 3056:15, 3182:19, 3187:4

**officer** [6] - 3052:17, 3055:23, 3056:2, 3056:5, 3167:16, 3182:15

**offices** [1] - 3005:12

**often** [1] - 3003:13

**Oklahoma** [1] - 2981:18

**old** [4] - 2962:9, 2967:10, 3015:21, 3097:14

**omits** [1] - 2938:16

**ON** [3] - 3054:22, 3106:18, 3191:5

**on-air** [3] - 2980:10, 2980:12, 2980:14

**on-hand** [1] - 3068:22

**once** [6] - 3018:18, 3060:8, 3102:17, 3122:7, 3145:16, 3182:1

**one** [204] - 2924:14, 2927:21, 2927:23, 2928:14, 2932:21, 2934:9, 2935:17, 2936:24, 2937:17, 2939:8, 2940:2, 2940:19, 2942:8, 2944:1, 2944:17, 2946:8, 2946:10, 2946:16, 2955:21, 2957:18, 2957:20, 2959:5, 2963:12, 2966:15, 2969:16, 2969:20, 2970:6, 2970:9, 2970:12, 2970:21, 2971:2, 2971:13, 2972:6, 2972:15, 2973:6, 2973:14, 2973:25, 2975:6, 2979:14, 2980:11, 2980:12, 2980:18, 2981:3, 2982:14, 2986:17, 2986:18, 2989:12, 2989:19, 2991:1, 2992:4, 2992:16, 2994:5, 2994:14, 2996:25, 2998:1, 2998:3, 2998:4, 3001:19, 3004:13, 3004:15, 3005:20, 3006:7, 3008:3, 3008:4, 3008:8, 3008:9, 3010:5, 3010:7, 3010:21, 3013:17, 3014:3, 3014:7, 3015:14, 3015:18, 3016:10, 3016:13,

3017:1, 3017:11, 3017:15, 3017:16, 3017:23, 3017:24, 3019:7, 3020:3, 3020:21, 3021:20, 3022:21, 3023:3, 3023:17, 3027:4, 3028:18, 3029:7, 3029:11, 3029:16, 3030:18, 3030:19, 3030:22, 3031:7, 3031:10, 3031:15, 3031:22, 3031:24, 3034:21, 3035:11, 3035:22, 3035:23, 3036:20, 3037:22, 3038:6, 3040:6, 3040:15, 3042:8, 3043:13, 3043:23, 3044:13, 3044:14, 3044:16, 3045:6, 3046:3, 3048:12, 3049:2, 3049:11, 3050:9, 3050:15, 3051:22, 3052:24, 3056:25, 3059:17, 3065:11, 3065:12, 3067:6, 3071:11, 3072:25, 3076:1, 3076:23, 3079:1, 3083:6, 3085:17, 3085:18, 3087:16, 3094:7, 3094:14, 3095:11, 3095:25, 3099:17, 3101:5, 3105:23, 3107:9, 3108:8, 3108:23, 3117:5, 3117:14, 3118:13, 3123:11, 3123:15, 3123:16, 3127:9, 3133:17, 3134:16, 3134:21, 3138:16, 3147:15, 3147:19, 3149:18, 3149:24, 3150:1, 3150:6, 3150:17, 3154:25, 3156:5, 3157:14, 3158:7, 3161:19, 3163:16, 3165:5, 3166:6, 3167:25, 3168:10, 3171:12, 3172:3, 3173:22, 3174:7, 3175:3, 3178:13, 3180:16, 3182:2, 3183:14, 3184:7, 3184:8, 3185:9, 3188:23, 3189:23, 3189:25, 3190:7, 3190:13

**One** [1] - 3036:22

**one-hundredfold** [1] - 3036:20

**One-hundredfold** [1] - 3036:22

**one-level** [1] - 3031:24

**ones** [11] - 3086:9, 3142:23, 3142:25, 3146:10, 3181:17, 3183:20, 3184:1, 3184:2, 3184:4, 3184:8

**ongoing** [3] - 2957:21, 2961:10, 3070:21

**online** [4] - 3077:24, 3077:25, 3088:11, 3101:17

**onward** [1] - 3070:21

**open** [6] - 2967:24, 3000:4, 3054:6, 3129:14, 3145:16, 3189:6

**OPEN** [1] - 2923:4

**open-ended** [1] - 3000:4

**opening** [7] - 2972:5, 2981:10, 3003:5, 3008:24, 3010:8, 3016:6, 3017:25

**operates** [4] - 2938:14, 2986:3, 2986:10, 2986:11

**operating** [2] - 2938:13, 2946:21

**operation** [2] - 2938:5, 3153:16

**opinion** [15] - 2924:3, 2927:6, 2927:8, 2927:12, 2927:14, 2930:25, 2963:3, 2990:13, 3026:24, 3031:4, 3044:12, 3050:25, 3105:20, 3105:22, 3106:4

**opinions** [1] - 3097:4

**opportunities** [1] - 2999:23

**opportunity** [4] - 2924:6, 2946:25, 3136:1, 3183:11

**opposed** [3] - 3130:11, 3130:17,

3135:19

**optical** [1] - 2989:7
**optically** [1] - 3090:17
**option** [2] - 2998:17, 3155:23
**options** [1] - 3180:19
**or..** [2] - 3130:19, 3170:23
**orally** [1] - 3052:21
**order** [12] - 2938:2, 2941:3, 2941:13, 2944:10, 2945:10, 3016:7, 3020:21, 3029:13, 3064:6, 3133:21, 3162:3, 3171:9
**orders** [1] - 3053:3
**ordinary** [27] - 2924:21, 2924:25, 2925:1, 2940:11, 2940:24, 2941:6, 2943:13, 2944:6, 2944:13, 2948:6, 2948:17, 2948:22, 2950:4, 2950:10, 2950:15, 2950:20, 2951:1, 2951:6, 2952:4, 2953:4, 2953:12, 2953:13, 2953:18, 2953:22, 2953:25, 2954:8, 2955:22
**organizations** [1] - 3051:15
**original** [7] - 3052:10, 3083:18, 3115:11, 3127:15, 3159:6, 3171:24, 3173:9
**otherwise** [6] - 2926:1, 3041:23, 3052:13, 3053:3, 3107:3, 3164:21
**ought** [1] - 3031:7
**ourselves** [2] - 3020:6, 3177:16
**out-of-court** [1] - 3101:24
**outside** [6] - 3052:18, 3074:23, 3081:24, 3105:2, 3133:8, 3187:23
**overall** [1] - 2945:7
**overlap** [1] - 2985:20
**overlaps** [1] - 3177:3
**overnight** [1] - 3048:16, 3056:10
**overrule** [2] - 3075:1, 3092:25
**overruled** [5] - 3102:1, 3133:10, 3133:17, 3143:20, 3176:9
**overstate** [1] - 2973:4
**overuse** [3] - 3097:2, 3097:7, 3097:10
**owe** [2] - 3048:15, 3048:17
**own** [21] - 2931:3, 2931:8, 2935:18, 2936:13, 2978:13, 3006:4, 3008:19, 3027:12, 3037:16, 3037:25, 3049:3, 3050:25, 3053:6, 3093:23, 3104:8, 3124:12, 3148:16, 3149:5, 3149:8, 3154:16, 3173:20
**owned** [7] - 2962:13, 3147:8, 3149:9, 3159:25, 3160:7, 3160:14, 3189:17
**owner** [10] - 2935:4, 2957:6, 2957:8, 2957:14, 2961:19, 2961:25, 2963:10, 2998:17, 3075:22, 3186:9
**owner's** [1] - 2935:9
**ownership** [5] - 3072:8, 3148:4, 3155:20, 3159:14, 3160:16
**owns** [1] - 2975:25

## P

**p.m** [8] - 3054:5, 3129:13, 3162:16,

3181:23, 3187:6, 3188:17, 3191:3
**PA's** [1] - 3056:21
**packaged** [2] - 2938:3, 2972:11
**PAGE** [1] - 2922:3
**page** [76] - 2965:24, 2968:4, 2968:8, 2968:16, 2968:18, 2976:13, 2976:24, 3010:6, 3017:11, 3017:24, 3018:1, 3018:3, 3018:4, 3025:19, 3026:9, 3050:17, 3057:16, 3057:18, 3058:15, 3058:19, 3059:13, 3060:20, 3062:8, 3063:10, 3063:11, 3064:2, 3073:3, 3078:16, 3078:20, 3079:9, 3079:11, 3080:1, 3090:11, 3090:24, 3091:17, 3092:7, 3098:14, 3099:17, 3099:20, 3099:21, 3099:22, 3099:24, 3100:5, 3100:11, 3100:12, 3108:6, 3108:10, 3108:11, 3108:18, 3109:25, 3111:5, 3111:9, 3113:4, 3114:1, 3114:2, 3114:20, 3120:9, 3122:5, 3123:9, 3128:22, 3128:25, 3129:2, 3129:5, 3129:9, 3129:21, 3132:13, 3135:8, 3136:9, 3153:10, 3154:3, 3154:14, 3155:2, 3155:6, 3163:2
**pages** [25] - 2965:9, 2966:2, 2966:16, 2986:5, 3000:21, 3001:3, 3079:7, 3079:20, 3079:23, 3080:1, 3080:3, 3087:19, 3091:22, 3095:2, 3095:4, 3095:20, 3096:15, 3098:7, 3098:9, 3098:10, 3136:13, 3175:17
**paid** [16] - 2927:17, 2960:10, 2960:13, 2974:12, 2974:15, 2974:21, 2975:17, 2975:22, 2975:25, 2978:14, 2999:20, 3028:5, 3039:18, 3143:23, 3144:18
**painstaking** [1] - 2987:4
**paper** [3] - 3085:4, 3085:9, 3090:19
**papers** [4] - 3085:19, 3088:17, 3091:3, 3142:25
**paperwork** [1] - 3142:19
**pardon** [1] - 3090:10
**part** [34] - 2967:17, 2993:8, 2997:15, 3012:12, 3014:13, 3015:2, 3019:23, 3019:24, 3020:3, 3022:10, 3030:2, 3032:22, 3034:9, 3035:17, 3038:15, 3045:15, 3051:8, 3066:22, 3074:10, 3075:15, 3076:2, 3091:18, 3092:24, 3095:22, 3100:20, 3104:16, 3106:1, 3111:4, 3112:19, 3119:5, 3137:7, 3162:8, 3179:14
**participate** [1] - 3132:20
**participated** [2] - 3143:6, 3144:18
**particular** [19] - 2927:22, 2937:4, 2942:14, 2943:6, 2950:5, 2950:6, 2951:25, 2960:8, 2962:20, 2966:8, 3010:15, 3015:2, 3017:23, 3019:16, 3025:14, 3060:9, 3074:21, 3094:24, 3166:22
**particularly** [1] - 3118:25
**parties** [13] - 2926:5, 2926:7, 2957:15, 2958:12, 2958:14, 2958:17, 2958:19, 2959:19, 2959:25, 2967:24, 3041:10, 3054:6, 3129:14

**PARTIES** [1] - 2923:4
**parties'** [2] - 2924:10, 2959:21
**partners** [1] - 3105:18
**parts** [9] - 2933:21, 2935:18, 2945:10, 2945:12, 2985:14, 2987:3, 3019:6, 3080:8, 3080:12
**party** [4] - 2925:18, 2925:24, 3066:7, 3069:6
**Pascal** [2] - 2993:21, 2994:4
**pass** [4] - 3105:9, 3145:1, 3146:25, 3158:10
**passage** [8] - 3019:16, 3022:13, 3033:6, 3033:10, 3033:11, 3093:16, 3119:10, 3186:5
**passages** [1] - 3093:17
**passed** [2] - 3102:15, 3117:24
**past** [3] - 2964:17, 3145:9, 3187:23
**pasta** [2] - 3018:22, 3028:24
**patent** [282] - 2924:12, 2925:2, 2931:16, 2931:17, 2931:18, 2933:6, 2933:12, 2933:16, 2933:18, 2933:25, 2934:1, 2934:2, 2934:5, 2934:7, 2934:8, 2934:10, 2934:17, 2934:18, 2934:19, 2934:21, 2934:23, 2935:2, 2935:4, 2935:5, 2935:7, 2935:9, 2935:10, 2935:11, 2935:12, 2935:14, 2935:16, 2935:17, 2935:24, 2936:17, 2936:19, 2936:23, 2937:10, 2937:15, 2938:20, 2939:9, 2939:15, 2941:10, 2943:17, 2943:18, 2944:6, 2944:14, 2944:19, 2944:20, 2945:15, 2945:16, 2945:17, 2946:3, 2946:4, 2946:9, 2947:3, 2947:5, 2947:7, 2947:11, 2947:15, 2947:16, 2947:17, 2947:18, 2947:20, 2947:25, 2948:8, 2948:14, 2948:16, 2948:24, 2948:25, 2949:3, 2949:4, 2949:7, 2949:10, 2949:14, 2949:15, 2949:19, 2949:20, 2949:24, 2950:8, 2952:1, 2952:13, 2953:7, 2954:17, 2955:8, 2955:11, 2957:6, 2957:7, 2957:8, 2957:14, 2957:24, 2958:6, 2958:21, 2959:3, 2959:8, 2959:9, 2959:10, 2960:5, 2961:19, 2961:21, 2961:25, 2963:4, 2963:6, 2963:9, 2963:19, 2963:25, 2965:20, 2965:23, 2968:5, 2968:6, 2968:7, 2968:17, 2969:14, 2969:17, 2969:25, 2970:15, 2970:16, 2970:17, 2970:20, 2970:22, 2970:23, 2970:25, 2971:25, 2972:9, 2972:13, 2972:16, 2972:20, 2973:14, 2974:3, 2974:6, 2974:14, 2976:20, 2979:16, 2979:17, 2979:19, 2980:24, 2981:5, 2983:11, 2984:5, 2984:13, 2984:18, 2985:21, 2985:22, 2988:11, 2988:24, 2989:1, 2989:2, 2991:25, 2992:5, 2993:19, 2993:20, 2994:4, 2994:24, 2994:25, 2996:23, 2998:3, 2998:17, 3004:14, 3004:23, 3005:1, 3009:16, 3009:18, 3011:9, 3013:16, 3014:2, 3014:15, 3015:10, 3016:3, 3019:17, 3019:20, 3020:9, 3020:11, 3020:20,

3021:23, 3024:5, 3024:6, 3025:24, 3026:12, 3026:14, 3026:18, 3030:16, 3031:18, 3032:18, 3032:19, 3033:6, 3037:11, 3037:25, 3038:1, 3041:12, 3042:12, 3042:15, 3044:13, 3044:14, 3044:21, 3055:4, 3057:21, 3058:10, 3058:22, 3059:6, 3060:13, 3060:17, 3060:22, 3061:16, 3062:2, 3062:5, 3063:1, 3063:5, 3063:13, 3063:20, 3067:1, 3073:14, 3073:19, 3073:21, 3074:21, 3075:8, 3075:18, 3075:22, 3076:13, 3076:21, 3077:3, 3077:10, 3078:15, 3081:13, 3081:18, 3083:3, 3084:5, 3084:6, 3084:24, 3086:22, 3087:1, 3091:9, 3092:3, 3096:5, 3096:16, 3103:6, 3104:10, 3104:14, 3104:16, 3105:1, 3110:24, 3112:23, 3113:22, 3115:6, 3115:22, 3118:10, 3119:17, 3125:8, 3131:20, 3132:17, 3147:8, 3147:9, 3148:1, 3148:18, 3153:16, 3153:17, 3158:22, 3158:23, 3159:4, 3159:21, 3159:22, 3161:6, 3162:2, 3165:10, 3166:11, 3166:13, 3167:2, 3170:7, 3180:16, 3181:9, 3182:1, 3184:24, 3185:17, 3185:22, 3186:9, 3189:1, 3189:17, 3189:18

**Patent** [36] - 2970:15, 2970:16, 2970:21, 2971:4, 2988:11, 2988:18, 2988:19, 2989:2, 2989:16, 3040:15, 3040:20, 3041:3, 3049:8, 3077:9, 3077:22, 3079:6, 3085:20, 3085:21, 3086:3, 3088:1, 3088:10, 3088:20, 3088:21, 3088:22, 3089:6, 3089:20, 3090:5, 3090:15, 3091:6, 3092:18, 3092:24, 3096:13, 3101:19, 3101:20, 3104:13, 3104:14

**patentability** [1] - 3083:20

**patented** [17] - 2935:6, 2941:12, 2944:24, 2945:3, 2955:13, 2957:9, 2957:23, 2958:1, 2958:5, 2958:21, 2961:20, 2962:6, 2962:9, 2962:12, 3005:25, 3021:10, 3038:3

**patentee** [4] - 3014:11, 3105:24, 3189:5, 3189:7

**patentees** [1] - 3189:1

**patents** [87] - 2924:24, 2931:12, 2931:13, 2931:21, 2932:19, 2932:20, 2932:21, 2932:25, 2933:1, 2933:3, 2933:13, 2935:18, 2935:23, 2941:18, 2945:21, 2946:7, 2950:24, 2955:17, 2959:5, 2960:11, 2960:12, 2960:18, 2960:19, 2960:23, 2961:1, 2962:3, 2969:15, 2969:16, 2969:21, 2970:5, 2970:14, 2970:18, 2971:1, 2971:3, 2971:8, 2972:14, 2972:15, 2973:10, 2979:19, 2981:6, 2982:25, 2985:24, 2987:5, 2996:11, 3001:1, 3004:10, 3004:11, 3004:16, 3004:20, 3008:19, 3009:9, 3036:23, 3036:24, 3036:25, 3037:9, 3037:10, 3037:13, 3040:14, 3041:20, 3042:23, 3044:13, 3044:22,

3045:2, 3049:16, 3049:22, 3072:8, 3087:8, 3088:8, 3089:18, 3089:19, 3089:21, 3104:19, 3105:1, 3121:19, 3124:12, 3131:19, 3147:21, 3148:4, 3148:5, 3148:9, 3148:13, 3159:9, 3160:14

**Patents** [1] - 2976:25

**patents'** [2] - 2936:4, 2941:25

**patents-in-suit** [18] - 2931:21, 2932:19, 2932:20, 2932:25, 2933:13, 2935:23, 2941:18, 2945:21, 2946:7, 2950:24, 2955:17, 2959:5, 2960:12, 2960:18, 2961:1, 3121:19, 3148:13, 3159:9

**path** [1] - 2953:14

**patience** [1] - 3045:17

**Patsy** [1] - 3029:10

**pause** [6] - 3011:7, 3013:12, 3022:11, 3029:16, 3042:12, 3043:19

**Pause** [13] - 3125:8, 3127:15, 3129:24, 3131:19, 3132:17, 3152:21, 3152:23, 3153:16, 3155:7, 3155:19, 3156:12, 3156:15, 3156:22

**pay** [7] - 2957:11, 2957:24, 2958:3, 2963:9, 2998:11, 2998:14, 3001:18

**paying** [1] - 2998:15

**payment** [4] - 2957:22, 2961:10, 2961:11, 2963:16

**pays** [1] - 2957:5

**PC** [1] - 3012:22

**PDA** [4] - 3014:20, 3014:24, 3015:2, 3015:3

**PDAs** [1] - 3015:12

**pen** [1] - 2923:9

**pending** [2] - 3061:7, 3104:13

**people** [31] - 2923:20, 2923:21, 2923:22, 2926:21, 2945:17, 2970:9, 2970:11, 2971:16, 2972:1, 2973:3, 2973:9, 2973:10, 2974:16, 2974:18, 2979:9, 2985:2, 3007:18, 3010:12, 3015:18, 3028:4, 3041:16, 3042:20, 3046:7, 3061:5, 3067:23, 3145:9, 3146:1, 3146:15, 3151:25, 3157:18, 3162:24

**people's** [2] - 3006:2, 3006:6

**per** [11] - 2958:14, 2966:11, 3001:6, 3001:23, 3041:20, 3126:2, 3127:23, 3127:24, 3128:2, 3128:5, 3132:22

**per-unit** [10] - 2966:11, 3001:6, 3001:23, 3041:20, 3126:2, 3127:23, 3127:24, 3128:2, 3128:5, 3132:22

**percent** [4] - 3043:16, 3126:15, 3155:7, 3155:20

**perfect** [1] - 3115:13

**perform** [6] - 2940:19, 2943:21, 2944:3, 2944:16, 2980:4, 3019:11

**performed** [3] - 2941:21, 2993:14, 3073:13

**performing** [3] - 2941:25, 2943:1, 2944:8

**performs** [3] - 2942:9, 2942:17, 2942:21

**perhaps** [5] - 3045:22, 3068:20, 3070:25, 3101:20, 3120:24

**period** [3] - 3152:1, 3160:15, 3161:8

**peripheral** [1] - 2988:12

**permeates** [1] - 2981:3

**permissible** [1] - 3082:1

**permission** [2] - 2935:9, 2937:14

**permitted** [2] - 2928:5, 2928:25

**persistent** [6] - 2989:24, 2990:5, 2990:6, 2990:8, 2990:14, 3015:13

**person** [42] - 2924:21, 2925:1, 2935:8, 2940:11, 2940:12, 2940:24, 2943:13, 2943:14, 2944:6, 2948:5, 2948:17, 2948:22, 2950:4, 2950:10, 2950:14, 2950:20, 2951:1, 2951:2, 2952:4, 2953:4, 2953:11, 2953:13, 2953:18, 2953:19, 2953:21, 2954:7, 2955:22, 2970:13, 2971:20, 2975:4, 3046:5, 3046:6, 3053:24, 3064:19, 3064:20, 3069:7, 3103:15, 3107:2, 3108:22, 3161:2

**Personal** [89] - 2931:14, 2931:19, 2937:9, 2937:14, 2937:18, 2939:7, 2939:13, 2939:17, 2942:7, 2942:13, 2942:23, 2956:2, 2956:11, 2956:16, 2956:17, 2956:21, 2956:22, 2956:24, 2957:2, 2963:19, 2964:1, 2964:8, 2964:13, 2964:18, 2964:21, 2965:1, 2965:3, 2968:21, 3000:15, 3005:9, 3008:18, 3008:19, 3008:22, 3009:2, 3009:9, 3055:1, 3056:3, 3057:4, 3057:24, 3058:9, 3058:21, 3059:5, 3059:9, 3059:14, 3059:18, 3059:21, 3060:3, 3061:14, 3061:21, 3063:23, 3064:16, 3066:7, 3067:20, 3067:22, 3070:19, 3072:1, 3072:12, 3072:14, 3085:25, 3103:14, 3112:10, 3112:14, 3117:4, 3121:21, 3122:1, 3122:2, 3122:8, 3130:1, 3131:20, 3150:11, 3150:14, 3154:16, 3157:23, 3158:5, 3159:1, 3159:7, 3160:1, 3170:17, 3171:14, 3171:15, 3171:25, 3172:4, 3179:23, 3182:8, 3183:6, 3189:10, 3190:17

**PERSONAL** [1] - 2923:1

**personal** [2] - 3103:23, 3148:16

**personalized** [1] - 3115:25

**personally** [1] - 3067:8

**persons** [6] - 2941:5, 2944:13, 3051:10, 3051:14, 3051:15, 3059:23

**perspective** [4] - 2950:9, 2951:1, 2953:17, 3113:11

**persuaded** [1] - 2925:17

**pertains** [1] - 3161:24

**pertinent** [1] - 3068:14

**pervasive** [1] - 3189:6

**PhD** [1] - 2979:3

**PhDs** [1] - 2974:19

**phone** [2] - 3144:2, 3144:3

**phrase** [4] - 2984:16, 2984:18, 2984:19, 2985:2

**physical** [4] - 3024:19, 3114:5, 3114:8, 3167:23
**pick** [2] - 3002:15, 3018:24
**picked** [1] - 2985:2
**picture** [6] - 2969:8, 2969:12, 2969:23, 2984:21, 2992:1, 3004:22
**pictures** [1] - 2933:15
**piece** [10] - 2971:10, 2979:14, 3021:20, 3035:23, 3040:22, 3042:13, 3049:9, 3049:11, 3117:17, 3166:7
**pieces** [4] - 2971:24, 2985:19, 3029:23, 3163:20
**pin** [2] - 3106:1, 3138:15
**pink** [2] - 3048:8, 3048:9
**place** [5] - 2925:8, 2963:17, 3016:1, 3069:20, 3076:24
**placed** [2] - 3090:24, 3091:2
**places** [5] - 2966:6, 3069:25, 3127:19, 3127:20, 3127:21
**plaintiff** [5] - 2931:14, 2975:14, 3068:9, 3072:3, 3179:8
**plaintiff's** [2] - 2929:9, 2929:18
**Plaintiff's** [13] - 2922:4, 2922:5, 2922:6, 2922:7, 2929:10, 2929:18, 2998:8, 3137:15, 3138:19, 3143:5, 3170:19, 3171:13
**plaintiffs** [1] - 3137:18
**plans** [5] - 3112:10, 3112:16, 3112:17, 3112:21, 3113:7, 3117:4, 3179:19
**platitudes** [2] - 3004:3, 3009:12
**play** [7] - 3027:2, 3051:7, 3062:16, 3120:5, 3120:12, 3180:22, 3186:6
**playback** [3] - 3012:3, 3094:25
**playback_lookahead** [2] - 2980:6, 3080:22
**played** [3] - 3109:8, 3110:11, 3149:21
**player** [19] - 2946:20, 2984:8, 2992:17, 2992:18, 3009:20, 3010:10, 3010:17, 3011:9, 3012:6, 3016:2, 3031:22, 3031:25, 3038:18, 3038:19, 3082:22, 3078:25, 3109:6, 3114:6, 3114:9
**players** [7] - 2984:6, 2984:14, 3012:9, 3012:19, 3063:6, 3063:14, 3154:11
**playing** [4] - 3012:10, 3094:21, 3100:6, 3118:20
**playlist** [32] - 2980:7, 2980:16, 2991:22, 2991:24, 2992:3, 2994:21, 2995:9, 3010:10, 3011:19, 3013:17, 3013:20, 3014:2, 3017:4, 3029:17, 3034:6, 3042:12, 3044:21, 3073:23, 3074:16, 3080:21, 3080:23, 3094:20, 3094:21, 3099:25, 3100:6, 3120:3, 3120:6, 3120:12, 3120:22, 3121:7, 3121:10
**playlists** [25] - 2984:10, 2984:15, 2987:24, 2991:16, 2993:4, 3011:10, 3011:18, 3012:8, 3012:21, 3013:12, 3013:13, 3040:23, 3041:16, 3043:6, 3062:16, 3062:19, 3080:17, 3099:13, 3099:22, 3109:11, 3109:16, 3109:21, 3110:3, 3121:6, 3121:17

**pleading** [1] - 3076:10
**pleadings** [1] - 3076:15
**pled** [1] - 3076:2
**plenty** [2] - 3070:19, 3118:12
**plowing** [1] - 2974:19
**plug** [6] - 2991:21, 2991:23, 2992:2, 2992:20, 3016:1, 3036:11
**plural** [1] - 3112:17
**plurality** [2] - 2992:15, 3079:2
**plus** [26] - 2936:13, 2937:5, 2937:7, 2941:17, 2941:19, 2941:20, 2941:22, 2942:2, 2942:6, 2942:15, 2942:18, 2942:19, 2943:3, 2943:5, 2943:7, 2982:20, 2987:15, 3018:11, 3018:16, 3025:8, 3025:15, 3025:16, 3026:11, 3035:17, 3155:25, 3179:16
**pocket** [2] - 3007:17, 3119:13
**point** [79] - 2927:22, 2927:24, 2929:16, 2930:6, 2930:13, 2982:7, 2998:8, 2999:18, 3002:8, 3014:7, 3014:9, 3016:11, 3030:10, 3030:21, 3031:10, 3036:10, 3040:15, 3056:24, 3064:14, 3064:24, 3065:5, 3067:12, 3071:15, 3071:16, 3071:23, 3071:25, 3072:21, 3074:13, 3074:14, 3074:20, 3075:2, 3080:20, 3081:17, 3082:2, 3082:24, 3085:20, 3093:2, 3093:16, 3093:17, 3095:14, 3095:18, 3101:5, 3117:21, 3117:24, 3121:16, 3121:24, 3123:18, 3123:19, 3129:18, 3130:7, 3131:10, 3131:13, 3132:1, 3134:4, 3134:21, 3139:18, 3142:18, 3148:3, 3148:9, 3150:8, 3154:20, 3154:23, 3156:7, 3156:10, 3161:19, 3166:18, 3166:21, 3173:12, 3176:3, 3176:13, 3176:25, 3177:9, 3177:13, 3177:20, 3180:14, 3183:24, 3184:6, 3190:7, 3190:17
**point-blank** [1] - 3030:10
**pointed** [2] - 2988:24, 3080:7
**pointer** [1] - 3093:21
**pointing** [4] - 3068:21, 3095:8, 3166:24, 3167:13
**points** [5] - 2980:2, 2981:17, 3019:16, 3160:10, 3173:2
**police** [1] - 3189:1
**policing** [1] - 3063:19
**policy** [2] - 2961:20, 2961:22
**polished** [1] - 3151:23
**popping** [1] - 3155:25
**popularity** [2] - 2962:7, 3150:5
**port** [9] - 2988:4, 2989:3, 2989:5, 2992:7, 2992:12, 3078:25
**portable** [1] - 3109:7
**portfolio** [1] - 2969:14
**portion** [10] - 2962:19, 2962:23, 2964:4, 2996:23, 3054:9, 3061:25, 3100:8, 3100:12, 3100:21, 3136:20
**portions** [2] - 3092:3, 3098:4
**portray** [1] - 2977:8
**position** [3] - 3174:11, 3175:10,

3175:25
**positively** [1] - 3041:6
**possessed** [1] - 2953:11
**possession** [1] - 2978:6
**possible** [3] - 3052:19, 3081:20, 3122:6
**post** [3] - 3088:20, 3088:21, 3089:10
**potential** [2] - 2977:7, 3104:18
**potentially** [4] - 3060:14, 3060:24, 3061:15, 3142:10
**powerful** [4] - 3023:4, 3023:5, 3048:12
**PowerPoints** [1] - 3182:22
**practical** [1] - 3037:7
**practice** [8] - 2948:5, 2964:15, 3090:16, 3092:18, 3093:13, 3116:23, 3116:24
**praised** [1] - 2954:18
**precise** [2] - 3065:18, 3078:9
**precisely** [1] - 3167:19
**precision** [1] - 2956:25
**predecessor** [1] - 2989:19
**predecessors** [1] - 3103:23
**predicate** [1] - 3082:6
**prejudice** [34] - 3051:7, 3069:21, 3069:24, 3073:7, 3116:16, 3117:18, 3131:23, 3139:12, 3146:5, 3146:7, 3146:19, 3156:23, 3172:14, 3172:25, 3174:7, 3174:14, 3174:20, 3174:24, 3176:1, 3176:17, 3177:18, 3178:1, 3178:7, 3178:9, 3178:18, 3178:22, 3179:3, 3179:6, 3179:8, 3179:22, 3185:12, 3186:2
**prejudiced** [4] - 3130:24, 3175:12, 3176:13, 3177:16
**prepaid** [1] - 3126:17
**prepared** [2] - 3068:15, 3089:11
**preparing** [1] - 3125:21
**prepayment** [1] - 3126:9
**preponderance** [10] - 2925:16, 2925:21, 2937:9, 2937:19, 2939:18, 2942:7, 2955:24, 2956:18, 2981:13, 2985:8
**presence** [1] - 3081:25
**present** [23] - 2937:21, 2938:11, 2939:3, 2939:11, 2941:2, 2943:6, 2943:8, 2944:9, 2947:22, 2948:1, 2948:3, 2948:4, 2953:10, 2967:24, 2967:25, 3052:5, 3054:6, 3054:7, 3129:14, 3129:15, 3158:17, 3176:10, 3180:1
**PRESENT** [2] - 2923:4, 2923:5
**presentation** [2] - 2987:12, 3170:14
**presented** [7] - 2951:11, 2963:13, 2995:5, 3164:1, 3177:23, 3184:9, 3184:12
**preserve** [1] - 2961:23
**president** [1] - 2976:14
**presiding** [1] - 3052:22
**PRESIDING** [1] - 2923:3
**press** [4] - 2991:16, 3006:23, 3006:25, 3021:13

**pressing** [1] - 3029:13
**presume** [1] - 3164:1
**presumed** [1] - 2953:19
**presuming** [1] - 3172:7
**presumption** [10] - 2945:1, 3065:2, 3069:20, 3070:16, 3179:3, 3184:23, 3185:9, 3185:14, 3186:6, 3186:13
**pretending** [1] - 3041:9
**pretrial** [1] - 3105:23
**pretty** [11] - 3031:7, 3031:8, 3094:23, 3107:20, 3113:9, 3121:3, 3149:11, 3150:7, 3151:23, 3160:13, 3171:9
**prevent** [1] - 2933:6
**previous** [3] - 3126:14, 3148:6, 3161:1
**previously** [2] - 2951:2, 3134:3
**price** [6] - 2961:7, 2962:20, 2997:1, 2997:7, 2997:9, 2997:13
**prices** [1] - 3041:23
**primarily** [1] - 3179:1
**primary** [1] - 3186:20
**print** [1] - 3166:14
**printed** [1] - 3087:15
**priority** [2] - 3083:3, 3083:19
**private** [1] - 3051:13
**privilege** [10] - 3059:1, 3059:7, 3063:2, 3063:7, 3063:20, 3064:21, 3065:19, 3069:12, 3071:19, 3138:14
**Privileged** [1] - 3063:16
**privileged** [10] - 3063:24, 3064:8, 3064:13, 3064:14, 3066:5, 3066:7, 3066:10, 3066:17, 3066:20, 3105:25
**probability** [1] - 2964:22
**probable** [1] - 2925:24
**probative** [1] - 2962:17
**problem** [18] - 2951:25, 2952:5, 2953:21, 2953:23, 2953:24, 3005:10, 3014:8, 3014:9, 3014:17, 3035:19, 3037:19, 3064:17, 3065:13, 3069:12, 3104:5, 3167:18, 3168:7, 3169:11
**problems** [3] - 3168:12, 3169:1, 3169:12
**Procedure** [2] - 3066:6, 3092:25
**procedure** [2] - 3182:8, 3183:8
**proceeded** [1] - 2954:25
**PROCEEDINGS** [1] - 3191:7
**Proceedings** [1] - 3191:3
**process** [3] - 2962:25, 3140:22, 3157:21
**produce** [7] - 3126:24, 3127:5, 3127:8, 3130:4, 3130:24, 3172:16, 3174:8
**produced** [19] - 2926:4, 2962:14, 2981:21, 3125:15, 3127:2, 3127:6, 3128:4, 3131:24, 3133:3, 3133:7, 3133:21, 3134:3, 3134:5, 3134:7, 3135:9, 3135:13, 3142:11, 3157:22, 3158:4
**product** [74] - 2935:19, 2935:22, 2936:1, 2936:9, 2937:12, 2937:20, 2937:22, 2938:1, 2938:3, 2938:7, 2938:8, 2938:12, 2938:14, 2938:16,

2938:18, 2938:22, 2938:24, 2939:1, 2939:4, 2939:11, 2939:21, 2939:23, 2940:1, 2940:2, 2940:5, 2940:17, 2942:5, 2942:8, 2942:12, 2942:14, 2942:16, 2942:20, 2942:24, 2943:4, 2943:6, 2943:8, 2943:9, 2943:24, 2955:10, 2957:25, 2958:14, 2959:8, 2961:4, 2961:5, 2961:8, 2962:6, 2964:2, 2964:10, 2972:10, 2972:11, 2973:4, 2978:12, 2983:9, 3014:11, 3044:24, 3045:12, 3049:3, 3049:5, 3049:23, 3113:20, 3144:4, 3149:19, 3150:8, 3151:1, 3151:3, 3151:6, 3151:21, 3152:2, 3152:4, 3185:23
**products** [29] - 2931:20, 2936:3, 2937:16, 2939:12, 2954:16, 2959:6, 2961:2, 2962:9, 2963:24, 2964:5, 2964:11, 2971:7, 3001:19, 3008:2, 3009:3, 3034:13, 3036:5, 3041:23, 3042:2, 3059:17, 3059:19, 3059:20, 3061:8, 3062:19, 3063:19, 3115:5, 3150:11, 3150:14, 3151:4
**Products** [1] - 3105:20
**profess** [1] - 3119:21
**profile** [1] - 2976:6
**profit** [6] - 2962:19, 2996:9, 2996:18, 2997:6, 2997:12, 2997:13
**profitability** [1] - 2962:5
**profits** [9] - 2962:23, 2963:23, 2964:9, 2996:16, 2996:17, 2996:22, 2997:4, 2997:9, 2997:10
**program** [15] - 3021:7, 3024:23, 3078:7, 3078:25, 3079:2, 3094:21, 3140:4, 3140:17, 3141:3, 3142:21, 3143:7, 3144:6, 3144:14, 3144:18, 3144:19
**programmed** [2] - 2993:2, 3019:11
**programmer** [1] - 2995:11
**progressive** [1] - 3159:25
**projects** [1] - 3152:12
**promise** [2] - 2972:22, 3115:18
**promises** [1] - 2972:5
**promoter** [1] - 2962:2
**promptly** [1] - 3052:19
**prongs** [1] - 3185:12
**proof** [6] - 2925:22, 2928:16, 2968:22, 2982:1, 3177:8, 3177:15
**proofread** [1] - 2923:15
**proofs** [1] - 2981:24
**proper** [7] - 2925:7, 3043:6, 3043:7, 3124:22, 3130:5, 3146:5, 3188:5
**properly** [4] - 2928:13, 3093:8, 3142:21, 3165:18
**property** [1] - 2962:9
**propose** [1] - 3055:22
**proposed** [6] - 3074:23, 3180:2, 3183:23, 3186:18, 3186:25, 3188:20
**proposing** [2] - 3114:13, 3114:15
**proposition** [1] - 3066:15
**proprietary** [2] - 3105:4, 3190:12

**prosecuting** [1] - 3048:24
**prosecution** [6] - 3073:18, 3084:25, 3085:17, 3086:22, 3087:22, 3091:8
**prosecutor** [2] - 3048:1, 3048:2
**prosecutors** [1] - 3092:3
**prospective** [1] - 2957:10
**protocol** [1] - 2989:21
**prototype** [2] - 3120:7, 3120:18
**prototypes** [1] - 3110:23
**proud** [2] - 3008:9, 3008:10
**prove** [23] - 2925:18, 2925:24, 2926:12, 2927:25, 2937:9, 2939:17, 2945:23, 2947:12, 2948:20, 2956:24, 2956:25, 2980:23, 2983:25, 2984:3, 2985:6, 3009:5, 3009:9, 3009:10, 3010:16, 3025:5, 3044:1, 3049:8
**proved** [4] - 2925:25, 2926:9, 2955:20, 3000:25
**proven** [1] - 3005:20
**provide** [9] - 2929:15, 2930:5, 2930:12, 2930:21, 2977:16, 3091:24, 3128:16, 3177:11, 3187:1
**provided** [12] - 2923:18, 2925:9, 2961:9, 2983:24, 3069:7, 3075:10, 3095:19, 3129:19, 3142:17, 3173:22, 3173:25, 3184:1
**provides** [1] - 2938:5
**prudent** [1] - 2963:11
**PTO** [15] - 2932:25, 2945:20, 2946:24, 3075:11, 3086:25, 3089:13, 3090:6, 3091:5, 3091:11, 3098:4, 3099:13, 3100:22, 3100:24, 3101:1, 3101:5
**public** [3] - 2941:12, 2991:18, 3002:25
**publication** [2] - 3102:16, 3102:18
**publications** [10] - 3087:7, 3087:10, 3087:13, 3087:15, 3087:23, 3088:6, 3089:22, 3089:23, 3090:7, 3091:18
**publicity** [1] - 3181:25
**pull** [6] - 3002:14, 3004:25, 3107:22, 3108:15, 3113:3, 3186:19
**pulled** [1] - 3169:19
**punish** [1] - 2956:8
**purchase** [1] - 3156:6
**purported** [1] - 2980:13
**purpose** [12] - 2929:7, 2929:8, 2929:11, 2929:19, 2930:1, 2930:9, 2993:13, 3006:17, 3019:10, 3036:6, 3047:3, 3145:18
**purposely** [1] - 3014:1
**purposes** [2] - 3093:23, 3171:5
**pursuant** [2] - 3055:2, 3059:10
**pursue** [2] - 3070:14, 3086:1
**push** [1] - 2990:21
**pushing** [1] - 3124:25
**put** [54] - 2971:1, 2976:6, 2977:12, 2983:5, 2985:17, 2986:13, 2987:11, 2991:9, 2991:16, 2991:23, 2991:25, 2994:24, 2998:21, 3001:23, 3001:25, 3002:2, 3002:4, 3016:16, 3026:17, 3027:16, 3027:18, 3030:24, 3040:17,

3043:4, 3044:4, 3044:9, 3046:9, 3046:13, 3047:4, 3048:17, 3065:13, 3066:1, 3067:6, 3080:6, 3085:18, 3088:9, 3088:19, 3090:20, 3091:16, 3112:3, 3131:9, 3137:18, 3159:15, 3162:14, 3163:24, 3165:12, 3170:11, 3178:5, 3184:8, 3184:16, 3185:25

**puts** [1] - 3021:4
**putting** [4] - 3068:20, 3093:25, 3151:13, 3176:3

## Q

**qualified** [1] - 2963:4
**quasi** [1] - 3082:20
**Queen** [1] - 3189:4
**questioned** [1] - 2980:20
**questioning** [6] - 3064:11, 3071:17, 3071:23, 3118:8, 3130:3, 3144:24
**questions** [42] - 2925:13, 2925:16, 2925:20, 2928:23, 2933:4, 2965:15, 2965:18, 2975:6, 2987:2, 2991:6, 3000:20, 3000:22, 3000:24, 3044:3, 3050:19, 3050:21, 3067:24, 3068:15, 3070:12, 3071:19, 3072:11, 3073:7, 3082:1, 3084:22, 3103:12, 3104:6, 3105:12, 3110:23, 3111:1, 3112:13, 3113:18, 3117:3, 3131:17, 3135:24, 3136:1, 3144:2, 3158:8, 3158:11, 3165:3, 3175:18
**quick** [2] - 2980:2, 3037:21
**quickly** [5] - 3029:16, 3036:10, 3038:11, 3039:16, 3140:2
**quite** [11] - 3004:7, 3004:18, 3087:15, 3087:21, 3111:22, 3113:11, 3114:25, 3149:13, 3150:1, 3153:21, 3159:20

## R

**R-3** [1] - 3079:17
**Rader** [1] - 3097:2
**radio** [5] - 2989:6, 3006:5, 3073:23, 3074:16, 3149:13
**Rainmaker** [1] - 3029:12
**raise** [2] - 3172:22, 3174:25
**raised** [2] - 3130:6, 3133:25
**raising** [1] - 3172:13
**ram** [1] - 2972:2
**range** [1] - 3000:11
**rare** [1] - 3185:10
**rate** [4] - 2961:6, 2974:13, 3000:11, 3126:10
**rates** [1] - 2960:10
**rather** [5] - 2941:3, 2944:10, 2950:13, 3056:2, 3089:25
**ratio** [1] - 3108:1
**reach** [4] - 2927:22, 2928:8, 2963:21, 3050:16

**reached** [3] - 3032:25, 3052:8, 3053:1
**reaching** [1] - 2927:19
**read** [41] - 2965:5, 2968:5, 2993:25, 3013:16, 3017:18, 3021:24, 3051:24, 3051:25, 3059:25, 3061:12, 3061:25, 3062:11, 3079:4, 3081:7, 3084:16, 3092:21, 3097:14, 3099:8, 3108:25, 3110:13, 3110:19, 3111:24, 3112:6, 3112:7, 3113:8, 3113:16, 3115:12, 3118:21, 3120:13, 3120:16, 3121:15, 3122:10, 3155:18, 3167:10, 3169:23, 3171:2, 3171:6, 3175:17, 3177:24, 3181:14, 3183:5
**reading** [12] - 2923:10, 2992:14, 2994:12, 3019:7, 3031:20, 3060:2, 3133:5, 3134:22, 3154:17, 3155:18, 3182:21, 3188:1
**readings** [1] - 2923:22
**ready** [8] - 2923:14, 2966:23, 3030:4, 3054:8, 3065:25, 3088:10, 3146:25, 3187:3
**real** [15] - 2973:10, 2977:7, 2986:25, 2998:22, 2998:23, 3005:6, 3013:9, 3032:11, 3042:4, 3051:5, 3062:6, 3065:24, 3066:2, 3097:7, 3145:3
**real-world** [2] - 2998:22, 2998:23
**realistic** [2] - 2976:15, 3015:23
**reality** [10] - 2972:25, 3007:15, 3024:12, 3027:6, 3029:4, 3040:5, 3040:12, 3041:18, 3042:24, 3135:6
**realize** [1] - 3169:17
**really** [38] - 2970:3, 2972:9, 2975:13, 2984:21, 2988:4, 2990:22, 2994:8, 3003:2, 3003:6, 3006:9, 3008:1, 3010:1, 3011:9, 3013:11, 3022:16, 3023:8, 3023:25, 3024:25, 3027:2, 3032:20, 3035:20, 3057:8, 3067:25, 3074:20, 3110:12, 3136:5, 3149:12, 3149:25, 3150:5, 3161:1, 3162:25, 3163:3, 3165:14, 3168:24, 3174:13, 3184:2, 3184:6
**reap** [1] - 3041:14
**reason** [14] - 2928:9, 2953:6, 2975:16, 3010:21, 3016:19, 3089:24, 3119:9, 3132:6, 3132:8, 3133:2, 3167:22, 3168:9, 3173:19, 3186:24
**reasonable** [20] - 2925:22, 2928:5, 2956:4, 2956:6, 2957:1, 2957:4, 2957:8, 2957:18, 2958:10, 2958:23, 2959:24, 2961:15, 2963:16, 2963:22, 2964:3, 2964:22, 2999:5, 3007:9, 3045:4, 3189:7
**reasonably** [2] - 2951:24, 2963:20
**reasons** [10] - 2927:12, 3015:3, 3057:20, 3070:7, 3078:3, 3078:6, 3078:8, 3078:20, 3136:24, 3173:16
**rebut** [1] - 3190:13
**rebuttal** [1] - 2965:4
**receive** [11] - 2984:10, 2984:15, 2993:3, 3011:10, 3012:7, 3066:16, 3087:6, 3090:8, 3101:6, 3101:9, 3141:4

**received** [17] - 2926:3, 2964:9, 3055:17, 3068:18, 3077:14, 3078:1, 3087:3, 3087:7, 3087:8, 3087:10, 3087:23, 3088:5, 3088:13, 3089:6, 3090:7, 3091:11, 3101:11
**receives** [2] - 3069:6, 3090:15
**receiving** [2] - 2987:21, 3036:14
**recently** [3] - 3142:7, 3142:8, 3143:12
**recess** [7] - 2967:20, 3052:2, 3053:19, 3053:23, 3129:12, 3190:22, 3191:2
**Recess** [3] - 2967:23, 3054:5, 3129:13
**recipe** [1] - 3010:14
**recited** [4] - 2934:13, 2938:17, 2943:21, 2947:23
**reciting** [1] - 3112:6
**recognize** [2] - 3074:9, 3119:16
**recognized** [1] - 2960:8
**recollection** [8] - 2931:11, 2980:1, 2982:6, 2992:23, 2993:6, 3127:7, 3127:9, 3153:25
**recollections** [1] - 3113:12
**record** [31] - 2968:4, 2996:1, 2996:2, 2996:5, 3004:21, 3021:2, 3033:8, 3033:21, 3033:23, 3033:25, 3086:10, 3090:17, 3092:5, 3094:17, 3102:5, 3103:10, 3132:23, 3135:2, 3137:14, 3140:23, 3145:4, 3158:16, 3163:15, 3163:25, 3167:8, 3170:12, 3171:5, 3181:12, 3182:14, 3183:24
**RECORD** [1] - 3191:7
**recording** [1] - 3094:19
**recover** [2] - 2956:16, 2964:1
**red** [3] - 2989:17, 2990:22, 3040:10
**redirect** [5] - 3129:22, 3130:9, 3135:7, 3155:12, 3156:17
**redo** [3] - 2997:8, 3088:14, 3088:16
**reduced** [1] - 3116:22
**reducing** [2] - 3041:23, 3116:23
**reel** [1] - 3102:19
**reexam** [1] - 3084:14
**reexamination** [2] - 3082:1, 3084:8
**reexamine** [1] - 3050:25
**refer** [5] - 2934:4, 3080:15, 3080:18, 3163:2
**reference** [9] - 2946:23, 2947:12, 2948:10, 2948:13, 2949:6, 2949:23, 3076:6, 3092:4, 3137:22
**referenced** [6] - 2973:15, 3089:3, 3094:15, 3094:22, 3095:9, 3112:15
**references** [13] - 2932:22, 2946:9, 2946:10, 2949:2, 2949:18, 2951:20, 2951:24, 2953:9, 2955:18, 3011:14, 3161:18, 3162:10, 3183:17
**referred** [5] - 2931:13, 2933:22, 2934:2, 2946:6, 2954:9
**referring** [4] - 3066:19, 3107:13, 3107:25, 3108:3
**refers** [6] - 2934:9, 2934:12, 2934:16, 2936:13, 3033:7, 3057:19
**reflect** [1] - 2954:7

**reflected** [3] - 3121:20, 3121:25, 3122:7
**reflection** [1] - 3091:14
**reflects** [1] - 3085:7
**refresh** [6] - 2982:6, 2992:22, 2993:5, 3113:1, 3113:23, 3153:25
**refreshed** [1] - 3115:10
**refused** [4] - 3057:8, 3099:2, 3172:15, 3178:10
**regarding** [4] - 2942:3, 2954:21, 2957:17, 3115:21
**regardless** [4] - 2926:2, 2926:4, 3173:13, 3181:25
**registration** [1] - 2976:11
**regular** [1] - 3119:19
**regularly** [1] - 2927:18
**reject** [1] - 2927:9
**rejected** [3] - 3083:1, 3083:25, 3084:7
**rejection** [2] - 3085:14, 3086:2
**relate** [3] - 3131:21, 3166:13, 3170:7
**related** [6] - 2955:10, 2973:17, 3125:8, 3147:25, 3159:3, 3179:4
**relates** [1] - 2994:16
**relating** [13] - 2951:8, 2998:4, 3059:14, 3059:23, 3076:12, 3101:2, 3105:24, 3166:10, 3166:11, 3167:2, 3179:2, 3179:4, 3179:8
**relationship** [4] - 2961:25, 2962:2, 3066:23, 3067:16
**release** [1] - 2991:16
**released** [1] - 3149:5
**relevance** [4] - 3124:3, 3124:5, 3124:9, 3124:24
**relevant** [18] - 2929:16, 2930:6, 2930:13, 2931:25, 2944:20, 2951:24, 2952:2, 2955:6, 2955:9, 3066:11, 3076:15, 3117:21, 3118:25, 3124:8, 3143:18, 3158:17, 3160:15, 3164:21
**relied** [7] - 2929:13, 2930:3, 2930:10, 2951:19, 2951:23, 2974:8, 3131:4
**rely** [13] - 2927:14, 2930:20, 2931:6, 2931:8, 2941:13, 3026:11, 3027:22, 3130:12, 3131:22, 3133:1, 3133:2, 3165:19, 3167:3
**relying** [4] - 2946:14, 2976:9, 2983:1, 3179:1
**remain** [2] - 3040:14, 3053:25
**remainder** [1] - 2958:5
**remains** [1] - 3153:1
**remarkable** [1] - 3006:19
**remarks** [2] - 3011:11, 3016:16
**remember** [99] - 2926:22, 2969:19, 2973:13, 2975:8, 2980:10, 2985:12, 2987:14, 2987:21, 2988:13, 2989:3, 2993:8, 2994:23, 2995:9, 2997:21, 3005:9, 3008:5, 3010:7, 3010:20, 3011:20, 3011:21, 3012:14, 3014:14, 3014:22, 3015:15, 3015:21, 3016:6, 3017:18, 3019:12, 3020:7, 3021:18, 3021:23, 3022:7, 3026:13, 3030:1,

3031:4, 3031:12, 3036:8, 3037:2, 3037:25, 3038:6, 3038:15, 3040:19, 3041:2, 3041:8, 3042:19, 3043:22, 3044:11, 3044:19, 3044:20, 3044:25, 3045:25, 3051:5, 3054:15, 3060:12, 3060:16, 3061:10, 3061:11, 3061:13, 3061:19, 3062:1, 3062:9, 3062:14, 3062:18, 3062:21, 3070:25, 3073:13, 3073:16, 3073:17, 3078:13, 3080:9, 3080:11, 3080:14, 3080:19, 3080:24, 3081:1, 3085:2, 3085:5, 3091:22, 3107:17, 3108:1, 3109:14, 3109:20, 3109:22, 3111:4, 3115:14, 3120:4, 3120:18, 3120:21, 3123:4, 3123:7, 3123:19, 3126:11, 3137:24, 3149:17, 3159:4, 3160:9, 3163:2, 3187:22
**remembering** [6] - 3107:10, 3109:15, 3109:20, 3109:22, 3115:5, 3158:24
**remembers** [2] - 2926:21, 3160:8
**remind** [11] - 2985:24, 2991:9, 2991:13, 3009:19, 3020:5, 3045:11, 3050:16, 3055:24, 3056:13, 3147:8, 3163:1
**reminded** [2] - 3112:2, 3177:24
**reminds** [1] - 3021:12
**remote** [1] - 2956:23
**removal** [1] - 3169:24
**removed** [1] - 2999:25
**render** [1] - 2941:15
**rendition** [1] - 3070:10
**renting** [1] - 3044:25
**repeat** [4] - 3032:24, 3109:17, 3121:23, 3148:8
**repeatedly** [3] - 3048:24, 3131:6, 3156:17
**repeating** [2] - 3017:1, 3032:17
**replaced** [1] - 2988:16
**report** [3] - 3178:5, 3180:18, 3180:24
**REPORTER'S** [2] - 2923:1, 3191:4
**reports** [1] - 3180:16
**represent** [4] - 3015:2, 3015:3, 3105:16, 3128:7
**representative** [6] - 3008:7, 3055:2, 3069:15, 3072:1, 3174:10, 3179:16
**representing** [1] - 3104:12
**represents** [1] - 2969:13
**reproducing** [1] - 3035:8
**reproduction** [1] - 2994:13
**request** [13] - 2992:18, 2992:20, 2992:25, 3017:4, 3038:13, 3038:18, 3038:20, 3039:5, 3039:12, 3055:21, 3096:18, 3167:15, 3177:21
**requested** [1] - 3068:7
**requesting** [2] - 3039:4, 3181:23
**requests** [1] - 3038:16
**require** [2] - 2925:22, 2982:18
**required** [17] - 2927:7, 2947:1, 2956:24, 2968:9, 2991:11, 3046:19, 3053:2, 3065:8, 3065:9, 3066:24, 3068:10, 3089:23, 3091:24, 3092:3, 3092:6, 3093:7, 3093:13

**requirement** [6] - 2939:6, 2995:19, 2996:1, 3082:10, 3093:15, 3097:23
**requirements** [9] - 2936:12, 2936:13, 2936:21, 2942:6, 2945:14, 3064:22, 3092:10, 3092:12, 3092:15
**requires** [2] - 2928:20, 3095:18
**research** [3] - 3124:22, 3173:24, 3187:24
**reset** [3] - 3021:16, 3032:25, 3046:21
**resets** [1] - 3021:1
**residual** [1] - 3126:19
**resolved** [1] - 3177:17
**resort** [1] - 3009:11
**Resource** [5] - 2946:19, 2949:13, 2949:17, 2949:22, 2950:1
**respect** [6] - 2938:18, 3030:16, 3104:12, 3117:4, 3178:11, 3179:22
**respecter** [1] - 3051:14
**respond** [8] - 3052:19, 3068:2, 3093:25, 3094:2, 3095:17, 3102:21, 3165:1, 3175:4
**responded** [1] - 3060:25
**Response** [1] - 3190:8
**response** [10] - 3018:13, 3062:8, 3076:3, 3087:24, 3096:13, 3129:23, 3165:17, 3173:4, 3173:21
**responsibility** [7] - 2932:23, 2933:2, 2945:22, 3068:11, 3069:5, 3104:18, 3104:21
**responsive** [3] - 2994:12, 3066:5, 3068:25
**rest** [1] - 3018:3
**rested** [3] - 3180:5, 3180:7, 3180:8
**restrictions** [1] - 2961:18
**rests** [1] - 3170:16
**result** [13] - 2935:21, 2940:22, 2944:2, 2955:12, 2955:13, 2992:11, 2992:14, 3026:7, 3028:17, 3030:14, 3032:10, 3065:16, 3174:12
**resulted** [2] - 2957:13, 2963:17
**results** [4] - 2948:5, 2954:15, 2954:23, 2962:11
**resumé** [1] - 2976:4
**retaining** [1] - 2961:20
**retire** [3] - 2965:8, 3051:18, 3053:3
**retired** [1] - 3146:13
**return** [1] - 3181:23
**reveal** [1] - 3052:12
**review** [6] - 2975:19, 2975:22, 3005:16, 3016:7, 3115:15, 3168:21
**reviewed** [7] - 2971:6, 2971:7, 2975:21, 3074:15, 3080:7, 3088:7, 3115:9
**reviewing** [1] - 2927:17
**revised** [1] - 3183:23
**rewrite** [1] - 3184:10
**rhyme** [2] - 3003:22, 3003:25
**richest** [1] - 3048:12
**rid** [1] - 3000:5
**riding** [1] - 3065:24
**rights** [1] - 3189:1

**Rio** [2] - 2984:9
**risks** [1] - 2963:1
**road** [1] - 3118:20
**Robins** [2] - 3077:2, 3126:25
**role** [3] - 3104:6, 3104:16, 3150:24
**rolled** [1] - 3126:20
**Roman** [1] - 3079:20
**RON** [1] - 2923:3
**Ron** [2] - 3046:7, 3046:18
**room** [17] - 2924:14, 2965:6, 2965:8, 2968:14, 2986:4, 3048:8, 3051:18, 3051:21, 3052:5, 3053:4, 3055:25, 3056:6, 3056:14, 3170:4, 3170:8, 3188:12, 3188:16
**roughly** [1] - 3153:22
**royalties** [3] - 3143:23, 3144:19, 3156:7
**royalty** [71] - 2956:4, 2956:7, 2957:4, 2957:5, 2957:8, 2957:12, 2957:18, 2957:19, 2957:20, 2957:21, 2958:1, 2958:2, 2958:3, 2958:7, 2958:8, 2958:11, 2958:12, 2958:13, 2958:14, 2958:17, 2958:23, 2959:24, 2960:6, 2960:7, 2961:6, 2961:10, 2961:11, 2961:15, 2963:8, 2963:16, 2963:23, 2964:3, 2966:12, 2966:15, 2973:23, 2996:14, 2997:20, 2998:18, 2998:20, 2999:5, 3000:11, 3001:6, 3041:21, 3041:25, 3125:13, 3126:3, 3126:5, 3126:7, 3127:23, 3127:24, 3128:2, 3128:5, 3131:15, 3131:16, 3132:22, 3132:25, 3136:18, 3138:4, 3138:6, 3145:7, 3145:8, 3145:11, 3155:9, 3156:1, 3156:8
**Rule** [3] - 3055:2, 3059:10, 3162:17
**rule** [4] - 2928:18, 3088:15, 3175:3, 3183:10
**rules** [15] - 2981:4, 2981:5, 2984:1, 3019:1, 3035:4, 3065:7, 3066:25, 3088:21, 3089:13, 3089:16, 3092:18, 3093:14, 3095:18, 3153:17, 3187:22
**Rules** [1] - 3066:5
**ruling** [3] - 3139:15, 3164:19, 3172:21
**run** [5] - 2967:13, 2967:16, 3015:19, 3033:14, 3064:17
**run-of-the-mill** [1] - 3015:19
**running** [31] - 2957:20, 2957:21, 2958:7, 2958:13, 2966:12, 2966:15, 2973:22, 2996:14, 2997:20, 2998:18, 2998:20, 3001:6, 3034:23, 3039:25, 3118:4, 3118:18, 3125:12, 3126:5, 3126:7, 3127:23, 3128:2, 3132:24, 3136:18, 3138:4, 3138:5, 3139:25, 3145:7, 3155:9, 3156:1, 3156:7, 3156:8

## S

**sale** [1] - 2960:17
**sales** [11] - 2957:23, 2960:14, 2960:15, 2960:20, 2961:11, 2963:23, 2973:18,
2976:14, 2977:6, 2998:4, 3041:18
**sanction** [1] - 3177:12
**sanctions** [1] - 3134:12
**sat** [3] - 3008:3, 3013:14, 3030:3
**satisfied** [3] - 2940:7, 2943:3, 2954:13
**satisfies** [3] - 2938:24, 2939:2, 2940:1
**satisfy** [2] - 2938:2, 2990:14
**sauce** [2] - 3018:22, 3028:24
**save** [3] - 3071:15, 3132:4, 3178:24
**saved** [2] - 3002:5, 3122:15
**saw** [17] - 2971:10, 3007:14, 3009:2, 3039:17, 3039:19, 3040:5, 3040:6, 3040:10, 3040:12, 3048:23, 3107:2, 3107:9, 3108:21, 3108:23, 3150:6
**scan** [9] - 3020:12, 3020:17, 3023:18, 3024:10, 3030:17, 3046:21, 3090:17, 3090:19, 3091:14
**scanned** [1] - 3090:22
**scanning** [4] - 3021:13, 3022:17, 3022:25, 3031:16
**scans** [3] - 3020:22, 3020:24, 3047:18
**schematics** [1] - 2985:14
**school** [1] - 3145:9
**Schutz** [39] - 2968:23, 2999:14, 3004:7, 3005:21, 3006:12, 3008:24, 3010:3, 3010:11, 3011:1, 3011:8, 3016:16, 3017:1, 3022:11, 3023:21, 3027:24, 3028:8, 3030:22, 3031:6, 3032:20, 3033:8, 3036:23, 3039:22, 3042:6, 3044:9, 3045:19, 3047:21, 3127:11, 3130:8, 3132:14, 3132:16, 3132:24, 3133:18, 3134:22, 3134:25, 3135:12, 3137:11, 3137:22, 3138:12, 3178:4
**SCHUTZ** [38] - 2968:24, 2969:2, 2999:16, 3002:18, 3045:20, 3046:13, 3047:23, 3056:3, 3130:20, 3130:23, 3131:3, 3131:19, 3133:4, 3136:7, 3136:11, 3138:13, 3155:11, 3156:2, 3156:10, 3159:2, 3159:12, 3165:23, 3166:6, 3166:9, 3166:17, 3166:19, 3166:21, 3167:11, 3168:3, 3168:15, 3168:19, 3168:22, 3169:8, 3169:20, 3169:25, 3170:10, 3182:10, 3190:19
**Schutz's** [1] - 3002:23
**science** [1] - 3083:10
**scientific** [1] - 2927:3
**scope** [13] - 2941:11, 2951:3, 2951:17, 2952:11, 2960:18, 2961:16, 3067:22, 3072:11, 3074:23, 3133:8, 3176:16, 3177:4
**scored** [1] - 2981:17
**scores** [1] - 2981:14
**screen** [3] - 3038:19, 3094:19, 3108:16
**scroll** [9] - 2972:16, 2972:18, 2972:20, 2988:23, 2989:1, 2989:2, 2992:2, 3006:20, 3007:3
**search** [3] - 3126:25, 3134:14
**searched** [2] - 3128:4, 3134:7
**seated** [2] - 3054:18, 3187:17
**second** [11] - 2923:11, 2951:3, 3015:2,
3076:23, 3078:22, 3094:5, 3095:11, 3123:11, 3123:15, 3123:16, 3188:23
**secondary** [1] - 2954:10
**seconds** [4] - 3015:16, 3015:20, 3015:23
**secret** [1] - 3135:19
**Section** [2] - 3094:17, 3094:24
**section** [4] - 2924:17, 2924:23, 3080:10, 3100:6
**sections** [6] - 3080:14, 3080:18, 3080:25, 3081:2, 3099:12, 3099:18
**SECURITY** [4] - 3056:12, 3056:15, 3182:19, 3187:4
**security** [5] - 3052:17, 3055:23, 3056:1, 3056:5, 3182:14
**see** [66] - 2923:21, 2967:8, 2967:13, 2974:14, 2976:25, 2978:11, 2980:21, 2992:1, 2994:9, 2995:7, 2995:13, 2999:4, 3009:22, 3017:13, 3017:15, 3019:20, 3020:12, 3022:1, 3022:24, 3026:5, 3033:11, 3033:16, 3038:19, 3040:21, 3046:21, 3048:21, 3057:21, 3058:2, 3058:3, 3058:21, 3071:14, 3083:25, 3095:19, 3099:22, 3100:5, 3100:11, 3100:15, 3103:1, 3107:12, 3110:6, 3110:7, 3114:18, 3115:2, 3118:19, 3121:14, 3122:20, 3123:5, 3133:6, 3136:12, 3149:20, 3149:21, 3153:12, 3153:23, 3154:5, 3154:8, 3154:12, 3155:8, 3160:24, 3163:3, 3165:9, 3165:21, 3166:2, 3176:22, 3177:20, 3183:12, 3188:13
**seeing** [5] - 3107:5, 3125:20, 3125:23, 3146:20, 3170:25
**seek** [1] - 3068:25
**seeking** [3] - 3126:2, 3127:25, 3128:5
**seeks** [2] - 2925:18, 2925:24
**segment** [1] - 3021:7
**segments** [1] - 3078:7
**segue** [1] - 2982:9
**select** [1] - 3051:22
**selectable** [1] - 2995:9
**selecting** [1] - 2965:7
**selection** [1] - 3022:18
**Selection_Record** [13] - 3020:14, 3020:24, 3021:8, 3022:6, 3022:18, 3022:25, 3032:25, 3033:2, 3033:12, 3034:1, 3034:12, 3034:14, 3047:19
**Selection_Records** [3] - 3020:16, 3034:7, 3034:8
**selections** [1] - 3033:23
**sell** [12] - 2935:6, 2937:11, 2938:21, 2957:7, 2959:8, 3001:9, 3001:19, 3042:23, 3044:22, 3044:25, 3049:11, 3050:5
**seller** [1] - 2938:5
**selling** [3] - 2935:6, 2962:20, 3044:14
**sells** [1] - 2957:25
**send** [4] - 3064:18, 3064:19, 3088:10, 3166:1

**sending** [2] - 3039:5, 3089:25

**sense** [5] - 2925:5, 2928:9, 3041:21, 3043:2, 3044:17

**sent** [5] - 3064:20, 3090:3, 3101:13, 3140:14, 3141:22

**sentence** [4] - 3078:22, 3167:15, 3168:8, 3169:15

**sentences** [1] - 2933:13

**separate** [9] - 2931:19, 2933:14, 2944:19, 2952:21, 2992:15, 2992:16, 2992:17, 3034:9, 3135:21

**separated** [2] - 3091:13, 3091:15

**separately** [14] - 2931:18, 2936:8, 2936:9, 2936:21, 2937:17, 2942:12, 2944:24, 2945:2, 2946:2, 2951:13, 2955:16, 2965:22, 3089:19, 3136:25

**sequence** [2] - 3034:7, 3034:13

**sequencing** [7] - 2992:16, 2995:2, 3020:13, 3020:17, 3078:7, 3078:12, 3079:1

**sequential** [1] - 3012:3

**serial** [1] - 3091:1

**series** [5] - 2965:18, 2986:4, 2993:12, 2993:13, 3097:1

**serve** [1] - 3104:10

**server** [9] - 2939:8, 2980:9, 2980:11, 2980:14, 3009:19, 3078:7, 3078:12, 3079:1, 3151:18

**servers** [1] - 3151:14

**serves** [1] - 2992:10

**service** [6] - 2969:4, 3002:24, 3002:25, 3003:4, 3050:11, 3151:15

**set** [22] - 2936:4, 2941:21, 2956:8, 2966:4, 2966:5, 2967:5, 2967:14, 2968:14, 2980:2, 2985:20, 2985:21, 2995:22, 3018:10, 3019:21, 3023:12, 3034:5, 3034:10, 3037:16, 3088:16, 3141:10, 3151:10, 3151:18

**set-top** [2] - 3151:10, 3151:18

**setting** [1] - 2967:21

**settings** [1] - 3034:5

**seven** [5] - 2949:24, 2954:24, 2962:5, 2968:18, 3044:24, 3045:5

**seven-fifty** [2] - 3044:24, 3045:5

**several** [7] - 2984:12, 2985:12, 3001:3, 3126:21, 3131:17, 3146:8, 3151:25

**sew** [1] - 3041:14

**shadow** [1] - 3005:21

**shall** [2] - 2933:23, 3052:23

**shape** [2] - 3030:25, 3114:17

**shareholders** [1] - 3155:22

**sharing** [3] - 3001:13, 3049:23, 3118:6

**sheet** [7] - 2965:14, 3090:12, 3090:14, 3090:20, 3090:22, 3091:4, 3101:18

**shift** [1] - 3185:7

**shifts** [1] - 3186:6

**Shoes** [1] - 3029:10

**short** [5] - 2965:3, 3007:4, 3160:2, 3178:22, 3180:7

**short-circuit** [2] - 3178:22, 3180:7

**shorthand** [2] - 2984:20, 2984:23, 2985:1, 2987:21, 3011:8, 3013:8

**shortly** [3] - 2956:7, 3144:16, 3159:22

**show** [36] - 2937:8, 2942:5, 2942:7, 2980:13, 2980:24, 2985:18, 2998:9, 3009:1, 3014:10, 3014:16, 3015:21, 3016:7, 3023:10, 3023:12, 3027:16, 3027:19, 3028:6, 3028:12, 3032:20, 3034:3, 3034:4, 3042:2, 3042:8, 3047:18, 3064:3, 3066:17, 3067:13, 3084:9, 3119:19, 3147:12, 3161:15, 3171:14, 3174:13, 3174:15, 3185:24, 3189:14

**showed** [11] - 2979:8, 3023:23, 3023:24, 3029:5, 3030:9, 3039:7, 3039:8, 3041:17, 3047:10, 3047:16, 3052:11

**showing** [4] - 2995:1, 3069:20, 3134:19, 3146:5

**shown** [5] - 2937:19, 2942:13, 2942:23, 2948:19, 3161:25

**shows** [7] - 2925:23, 3014:15, 3037:15, 3040:23, 3096:3, 3151:13, 3176:13

**shut** [1] - 3151:3

**sic** [6] - 2934:17, 2946:8, 2960:7, 3146:15, 3162:16, 3168:14

**sic]** [3] - 2933:3, 2952:23, 2985:24

**side** [22] - 2927:21, 2927:23, 2971:25, 2980:5, 2981:23, 2982:3, 2999:18, 3009:19, 3009:21, 3010:21, 3026:18, 3028:6, 3034:16, 3138:3, 3139:17, 3158:24, 3181:16, 3183:15, 3186:4

**side-by-side** [3] - 3026:18, 3028:6, 3034:16

**sides** [10] - 2974:12, 2974:15, 2981:25, 3044:21, 3085:18, 3130:11, 3130:16, 3130:18, 3136:21, 3165:12

**sign** [1] - 3141:5

**signed** [15] - 3137:19, 3137:20, 3140:4, 3140:6, 3140:11, 3140:13, 3141:3, 3141:6, 3141:7, 3141:10, 3141:22, 3142:16, 3142:24, 3143:24, 3144:15

**significance** [1] - 2926:25

**significant** [1] - 2963:1

**significantly** [1] - 3097:23

**signing** [2] - 3140:16, 3143:7

**silhouette** [2] - 3107:15, 3107:24

**similar** [10] - 2960:17, 2960:25, 2962:10, 3026:23, 3027:14, 3027:19, 3028:21, 3030:19, 3051:11, 3108:2

**similarities** [4] - 2945:4, 3028:16, 3028:17, 3029:1

**similarly** [1] - 3013:4

**simple** [2] - 2926:19, 3149:11

**simply** [11] - 2926:24, 2927:20, 2928:19, 2990:11, 2998:3, 2998:7, 2998:9, 2998:20, 2999:12, 3026:16, 3029:7, 3034:12, 3040:24, 3043:2, 3131:25, 3185:22, 3185:24

**single** [23] - 2927:24, 2928:3, 2938:16, 2947:10, 2947:24, 2948:10, 2969:16,

2969:20, 2970:6, 2970:9, 2970:20, 2970:21, 2970:25, 2971:2, 2971:19, 2975:20, 2987:5, 3008:4, 3008:8, 3042:8, 3047:6, 3049:24

**sit** [3] - 3007:7, 3027:14, 3162:24

**sitting** [5] - 2980:11, 3050:8, 3081:1, 3105:17, 3115:20

**situations** [1] - 3118:10

**six** [7] - 2954:22, 2962:3, 3144:12, 3184:23, 3186:12, 3188:5

**six-year** [1] - 3186:12

**size** [1] - 3114:17

**skill** [27] - 2924:21, 2925:2, 2940:11, 2940:24, 2941:6, 2943:13, 2944:6, 2944:13, 2948:6, 2948:17, 2948:23, 2950:4, 2950:10, 2950:15, 2950:20, 2951:1, 2951:6, 2952:4, 2953:4, 2953:12, 2953:13, 2953:18, 2953:22, 2953:25, 2954:8, 2955:23, 3083:6

**skilled** [1] - 2954:20

**skim** [1] - 2979:24

**skip** [27] - 2980:4, 2982:5, 2994:15, 2994:16, 2995:14, 2995:24, 3006:23, 3012:10, 3012:23, 3021:13, 3022:16, 3024:10, 3029:6, 3029:14, 3030:11, 3030:14, 3031:21, 3032:4, 3032:7, 3046:14, 3046:16, 3046:18, 3100:18, 3120:21, 3120:23, 3121:1, 3151:19

**skip-ahead** [1] - 2994:15

**skip-back** [1] - 2994:16

**skipped** [3] - 3012:22, 3022:20, 3023:1

**skipping** [10] - 2994:8, 3013:4, 3016:18, 3016:22, 3017:7, 3020:8, 3020:10, 3032:13, 3046:22, 3121:10

**skips** [1] - 3020:20

**sky** [1] - 3134:24

**slack** [1] - 2976:4

**sleep** [1] - 3162:25

**slide** [8] - 2987:10, 2987:17, 2994:25, 2998:21, 3014:22, 3014:23, 3016:12

**slides** [6] - 2982:15, 2986:23, 2987:11, 3023:24, 3024:7, 3182:23

**slip** [1] - 3138:8

**slogan** [1] - 3011:8

**slogans** [1] - 3004:3

**slow** [1] - 2989:17

**small** [3] - 2961:4, 3007:17, 3153:18

**smaller** [2] - 2991:3, 3115:1

**smart** [1] - 3053:15

**smartest** [3] - 3046:5, 3046:6

**so-and-so** [1] - 3163:2

**soccer** [1] - 3027:2

**software** [28] - 2971:6, 2971:9, 2974:19, 2975:20, 2975:22, 2985:16, 2993:7, 2993:9, 2993:20, 2995:9, 2995:16, 2995:17, 2995:20, 3010:14, 3012:19, 3018:20, 3019:13, 3026:19, 3027:18, 3031:3, 3047:9, 3047:12, 3062:15, 3073:23, 3074:16, 3112:4, 3151:17

**sold** [22] - 2931:23, 2931:24, 2932:5, 2932:7, 2932:9, 2932:11, 2932:13, 2932:15, 2932:17, 2937:11, 2938:3, 2938:21, 2958:14, 2958:16, 2959:7, 2963:6, 3000:10, 3042:3, 3042:15, 3132:21, 3132:22, 3146:4

**sole** [1] - 3165:6

**solely** [1] - 3051:2

**solicited** [1] - 3131:4

**solve** [2] - 2952:5, 2953:24

**someone** [16] - 2935:12, 2935:14, 2935:16, 2935:19, 2938:21, 2967:16, 3062:4, 3064:22, 3065:1, 3082:19, 3083:8, 3083:11, 3118:4, 3145:20, 3189:14, 3190:24

**someplace** [2] - 3040:4, 3126:1

**sometime** [3] - 2984:11, 3073:22, 3107:5

**sometimes** [8] - 2923:21, 2927:5, 2933:17, 3015:8, 3061:5, 3115:11, 3162:24, 3182:6

**somewhat** [2] - 3097:6, 3159:19

**somewhere** [9] - 2967:2, 3012:22, 3018:23, 3025:10, 3028:23, 3094:6, 3158:20, 3185:3, 3185:5

**song** [5] - 2994:13, 2995:8, 3012:10, 3024:22, 3029:7

**Song** [1] - 3006:24

**SongCatcher** [2] - 3151:2, 3159:3

**songs** [13] - 2993:4, 2995:2, 3005:24, 3006:23, 3007:4, 3007:6, 3029:7, 3029:8, 3030:11, 3030:15, 3047:2, 3119:15

**Sony** [14] - 2946:20, 2946:21, 2949:2, 2949:18, 2971:13, 2971:17, 2971:18, 2971:20, 2971:23, 2983:16, 2983:19, 2983:20, 3167:21

**soon** [1] - 3188:15

**sorry** [24] - 3018:2, 3029:21, 3033:5, 3046:12, 3055:5, 3065:21, 3076:18, 3077:5, 3078:13, 3080:6, 3095:24, 3096:8, 3099:20, 3108:10, 3109:4, 3109:17, 3121:23, 3123:14, 3123:17, 3123:23, 3124:5, 3141:1, 3148:8, 3181:3

**Sorry** [1] - 3066:17

**sort** [11] - 3015:18, 3033:3, 3064:12, 3066:21, 3067:15, 3070:16, 3120:22, 3126:9, 3153:20, 3174:14

**sought** [2] - 3131:21, 3172:12

**sound** [14] - 2990:24, 2991:2, 3016:4, 3035:9, 3035:13, 3035:20, 3036:4, 3036:11, 3036:12, 3140:5, 3140:18, 3141:24, 3155:4

**Sound** [15] - 2946:18, 2949:12, 2949:16, 2949:21, 2949:25, 2983:2, 2983:7, 2983:9, 2983:10, 2983:12, 2983:14, 2983:15, 3040:22, 3041:17

**sounded** [1] - 3015:9

**soundness** [1] - 2927:12

**sounds** [1] - 3137:2

**source** [39] - 2977:14, 2977:16, 2977:20, 2978:1, 2978:2, 2978:7, 2978:11, 2978:12, 2978:15, 2978:17, 2979:4, 2980:5, 2980:9, 2981:22, 2982:12, 2982:13, 2982:18, 2982:19, 2982:22, 2982:23, 2983:24, 2983:25, 2984:2, 2986:3, 2986:9, 2995:4, 2995:6, 3039:22, 3039:24, 3040:2, 3040:3, 3047:17, 3105:7, 3112:21, 3113:6, 3190:11

**southern** [1] - 3046:1

**space** [1] - 3151:4

**speaker** [1] - 3016:1

**speaking** [2] - 3112:17, 3140:20

**special** [2] - 2927:5, 2961:22, 3000:13

**specialized** [1] - 2927:4

**specific** [26] - 2936:3, 2993:23, 3009:8, 3009:13, 3010:12, 3010:13, 3013:25, 3016:22, 3023:4, 3023:12, 3057:25, 3079:7, 3092:7, 3093:16, 3093:17, 3095:15, 3095:19, 3104:6, 3114:9, 3127:7, 3127:9, 3128:14, 3133:15, 3156:16, 3163:14, 3163:18

**specifically** [14] - 3073:22, 3074:16, 3079:19, 3079:24, 3080:14, 3080:21, 3096:10, 3096:14, 3122:25, 3125:8, 3132:14, 3135:8, 3137:24, 3185:20

**Specifically** [1] - 3078:22

**specification** [6] - 2933:18, 2936:4, 2941:25, 3019:24, 3021:22, 3022:10

**specifications** [1] - 2925:3

**specificity** [1] - 3076:10

**specifics** [2] - 3113:20, 3153:9

**specified** [2] - 2973:15, 3068:16

**speculate** [2] - 2928:24, 2929:3

**speculative** [1] - 2956:23

**speed** [3] - 2989:13, 2989:15, 3034:24

**speeds** [1] - 3036:21

**spend** [5] - 2996:8, 3000:12, 3011:4, 3014:5, 3070:9

**spent** [2] - 2974:18, 3047:12

**spinning** [1] - 2990:1

**SpongeBob** [2] - 3027:3, 3027:6

**spot** [3] - 3054:3, 3066:2, 3068:20

**spurious** [2] - 3131:25, 3161:13

**squish** [1] - 2983:17

**staff** [1] - 3091:6

**stake** [2] - 2989:9, 3072:8

**stamp** [5] - 3089:3, 3089:5, 3089:6, 3089:8

**stand** [12] - 2985:12, 3002:11, 3012:17, 3013:14, 3014:10, 3025:4, 3030:4, 3051:16, 3068:8, 3076:14, 3178:11, 3186:13

**standard** [3] - 3068:11, 3089:18, 3146:8

**standing** [3] - 3051:10, 3143:9, 3189:12

**start** [31] - 2965:1, 2965:10, 2965:13, 2967:21, 2968:2, 2969:5, 2969:8,

2986:1, 2987:9, 2995:10, 3003:15, 3016:15, 3017:6, 3021:13, 3027:7, 3033:5, 3035:3, 3035:8, 3047:25, 3053:17, 3061:8, 3069:18, 3070:8, 3093:21, 3129:7, 3152:5, 3152:12, 3153:13, 3188:4, 3188:9, 3188:16

**start-up** [1] - 3152:12

**started** [13] - 2974:24, 2984:6, 2996:17, 2997:5, 3049:1, 3053:20, 3071:1, 3072:24, 3094:16, 3098:9, 3099:1, 3152:11, 3156:15

**starting** [3] - 2915:10, 2997:12, 3060:21, 3063:12, 3064:5, 3122:25, 3148:16, 3150:7, 3150:23, 3154:5, 3154:8, 3155:3, 3190:24

**starts** [5] - 2965:18, 2968:21, 3048:6, 3068:8, 3133:19

**state** [3] - 2927:6, 2968:3, 3084:3

**Statement** [2] - 3079:14, 3087:14

**statement** [10] - 2924:1, 2972:5, 2981:10, 2993:12, 3003:6, 3004:17, 3047:10, 3078:19, 3088:9, 3089:14

**statements** [3] - 2924:7, 3003:18, 3101:24

**States** [7] - 2935:7, 2937:12, 2938:22, 2944:20, 2956:20, 2970:15, 2970:21

**states** [3] - 3078:8, 3093:1, 3163:22

**stating** [1] - 3093:8

**station** [1] - 3051:11

**stations** [2] - 3073:23, 3074:17

**status** [1] - 3087:22

**stay** [1] - 3152:7

**stayed** [1] - 3003:20

**step** [10] - 2969:11, 2977:13, 2994:9, 3039:20, 3158:13, 3164:4, 3167:9

**STEPHENS** [78] - 2967:3, 2967:6, 3054:12, 3054:20, 3054:23, 3055:6, 3055:9, 3055:12, 3055:16, 3056:18, 3056:19, 3057:2, 3057:6, 3057:10, 3057:13, 3065:4, 3065:21, 3068:2, 3071:6, 3071:12, 3071:22, 3072:16, 3072:19, 3073:2, 3073:6, 3073:10, 3073:11, 3074:5, 3074:11, 3074:14, 3074:19, 3074:25, 3075:4, 3075:14, 3075:19, 3075:21, 3076:5, 3076:14, 3076:18, 3076:23, 3077:1, 3081:10, 3081:12, 3081:24, 3082:4, 3082:9, 3082:15, 3082:24, 3083:15, 3083:18, 3084:4, 3084:13, 3084:18, 3084:20, 3084:23, 3085:16, 3085:25, 3086:6, 3086:13, 3086:16, 3092:9, 3093:3, 3093:10, 3094:8, 3095:1, 3095:25, 3096:8, 3096:24, 3097:13, 3097:20, 3098:18, 3101:22, 3103:21, 3103:25, 3105:11, 3106:8, 3106:11, 3169:7

**Stephens** [20] - 3054:25, 3064:12, 3064:24, 3076:1, 3076:16, 3091:21, 3095:7, 3098:11, 3098:15, 3098:22, 3101:4, 3108:20, 3110:21, 3111:2, 3112:13, 3112:20, 3114:23, 3122:17, 3122:22, 3122:25

**stepped** [2] - 3030:3, 3171:1
**stepping** [1] - 2969:5
**steps** [10] - 2952:20, 2952:21, 2953:7, 2993:12, 2993:14, 3020:1, 3021:17, 3023:12, 3032:24, 3111:18
**Steve** [1] - 3146:13
**still** [15] - 2938:24, 2945:12, 2971:19, 3054:15, 3069:12, 3069:18, 3076:15, 3099:4, 3106:12, 3152:18, 3160:6, 3168:18, 3168:23, 3169:14, 3170:5
**stipulated** [5] - 2926:5, 2926:7, 2926:8, 3159:15, 3160:17
**stipulation** [1] - 3160:20
**stock** [2] - 3126:17, 3156:6
**stole** [2] - 3049:8, 3118:14
**stop** [2] - 3011:17, 3103:6
**stopped** [1] - 3095:3
**storage** [6] - 2972:24, 2973:1, 2989:24, 2990:5, 2990:6, 2990:9
**store** [2] - 3015:13, 3015:16
**stored** [1] - 3015:19
**stories** [1] - 3151:16
**storing** [2] - 3012:1, 3038:5
**story** [3] - 2988:21, 3151:20
**straight** [4] - 3135:17, 3140:19, 3140:23, 3161:6
**straightforward** [1] - 2986:8
**strange** [1] - 3109:18
**strategy** [1] - 3179:15
**stress** [1] - 2999:7
**strike** [3] - 3008:14, 3008:15, 3152:5
**string** [2] - 3096:25, 3097:9
**strong** [1] - 3029:2
**strongest** [1] - 3186:14
**strongly** [1] - 3190:1
**struck** [2] - 3004:13, 3008:3
**structural** [5] - 2943:20, 2945:13, 2990:20, 2995:21, 3010:25
**structurally** [2] - 2989:11, 2990:2
**structure** [44] - 2942:9, 2942:10, 2942:11, 2942:14, 2942:16, 2942:21, 2942:22, 2942:24, 2942:25, 2943:2, 2943:4, 2943:11, 2943:12, 2943:15, 2943:16, 2943:17, 2943:21, 2943:23, 2943:24, 2944:3, 2944:10, 2944:11, 2944:19, 2944:21, 2944:22, 2944:24, 2945:2, 2945:4, 2945:5, 2945:7, 2945:9, 2945:11, 2987:16, 3010:13, 3018:19, 3018:24, 3019:7, 3025:20, 3025:23, 3026:18, 3028:12, 3035:5, 3114:6, 3114:8
**structures** [6] - 2938:13, 2941:24, 2944:1, 2944:8, 2944:16, 2987:13
**studied** [1] - 3077:13
**study** [4] - 2978:24, 2979:3, 2979:4, 3077:17
**studying** [1] - 2974:18
**stuff** [8] - 2974:20, 2979:24, 2983:17, 2998:11, 3009:23, 3024:4, 3090:21, 3123:3

**stumbled** [1] - 3009:8
**Subject** [1] - 3057:24
**subject** [10] - 2961:18, 3020:18, 3022:8, 3022:17, 3022:18, 3060:3, 3066:23, 3095:16, 3165:19
**submit** [4] - 3089:23, 3098:4, 3160:16, 3182:25
**submitted** [10] - 3077:21, 3077:23, 3079:5, 3089:14, 3091:7, 3098:5, 3098:16, 3101:13, 3101:14, 3102:13
**submitting** [1] - 3091:19
**subpoena** [1] - 3157:14
**subpoenaed** [5] - 3152:22, 3153:3, 3157:6, 3157:9, 3157:13
**subsections** [1] - 3094:18
**substance** [1] - 3173:13
**substantial** [3] - 3038:10, 3039:13
**substantially** [15] - 2940:20, 2940:21, 2940:22, 2944:1, 2944:2, 3026:5, 3026:6, 3026:7, 3026:23, 3027:13, 3029:6, 3030:14, 3031:5, 3031:11
**substitute** [13] - 2943:16, 2943:17, 2943:20, 2943:23, 2944:10, 2944:18, 2944:22, 2944:23, 2945:2, 2945:5, 2945:11, 3055:13, 3090:21
**substituted** [1] - 2944:17
**subtle** [1] - 3177:19
**success** [7] - 2954:17, 2955:9, 2955:10, 2955:11, 2962:6, 3001:13, 3049:23
**successful** [1] - 2972:10
**successor** [1] - 3162:4
**such-and-such** [1] - 3163:3
**sudden** [2] - 3155:24, 3156:6
**suddenly** [2] - 3006:2, 3156:8
**sue** [2] - 2999:10, 3059:6
**Suede** [1] - 3029:10
**suffered** [2] - 2956:22, 3178:18
**sufficient** [5] - 2927:25, 2941:2, 2944:9, 3043:24, 3174:25
**suggest** [8] - 2979:7, 3000:3, 3001:25, 3002:4, 3040:3, 3040:24, 3078:23, 3136:21
**suggested** [3] - 3070:4, 3093:12, 3164:19
**suggesting** [2] - 3011:15, 3015:9
**suggestion** [2] - 2953:4, 3008:21
**suggests** [1] - 3068:23
**suit** [36] - 2931:21, 2932:19, 2932:20, 2932:25, 2933:13, 2935:23, 2941:18, 2945:21, 2946:7, 2946:8, 2950:24, 2955:17, 2959:5, 2960:12, 2960:18, 2961:1, 3055:3, 3057:6, 3057:20, 3058:9, 3058:22, 3064:7, 3067:1, 3070:14, 3071:20, 3121:19, 3124:11, 3124:15, 3124:18, 3124:22, 3138:23, 3139:13, 3145:23, 3148:13, 3159:9, 3184:24
**sum** [21] - 2958:2, 2958:7, 2958:17, 2961:10, 2966:12, 2966:15, 2973:21,

2973:22, 2996:12, 2997:20, 2997:23, 2997:25, 3001:7, 3001:12, 3044:5, 3044:7, 3049:22, 3050:1, 3145:7
**summaries** [4] - 2930:21, 2986:9, 3167:2, 3170:7
**summarize** [1] - 3033:3
**summarizing** [3] - 2929:12, 2930:2, 2930:9
**summary** [4] - 2929:13, 2930:3, 3030:23, 3163:21
**summer** [1] - 3111:23
**supervisor** [1] - 3103:1
**supplement** [1] - 3164:9
**supply** [1] - 3089:20
**support** [4] - 3084:10, 3096:4, 3096:20, 3132:25
**supported** [1] - 2929:4
**supports** [1] - 3005:17
**suppose** [3] - 3026:24, 3069:4, 3082:19
**supposed** [6] - 2968:6, 3003:17, 3028:17, 3064:19, 3090:20, 3163:4
**Supreme** [1] - 3139:14
**surf** [1] - 3151:12
**surprise** [5] - 2954:21, 3076:4, 3135:2, 3142:11, 3142:13, 3155:12, 3155:16, 3155:17
**surprised** [1] - 3010:2
**surprising** [1] - 3099:5
**surveys** [1] - 2997:16
**suspect** [2] - 3012:11, 3189:7
**sustain** [1] - 3124:24
**sustained** [5] - 2928:22, 2929:1, 3133:13, 3133:15, 3134:2
**switch** [3] - 2985:4, 2985:5, 3150:9
**switched** [1] - 3151:3
**switches** [1] - 3185:10
**sworn** [1] - 3050:14
**sympathy** [1] - 3051:7
**system** [33] - 2946:16, 2947:16, 2949:1, 2949:5, 2949:8, 2965:25, 2966:24, 2967:2, 2967:8, 2971:11, 2975:4, 2975:18, 2975:24, 2977:10, 2979:15, 2979:16, 2980:3, 2980:23, 3038:16, 3039:19, 3040:18, 3075:7, 3114:13, 3120:2, 3120:5, 3120:12, 3121:1, 3167:13, 3167:16, 3168:6, 3168:18, 3168:20, 3170:5
**systems** [2] - 3062:15, 3163:18
**Systems** [4] - 3140:21, 3141:6, 3152:13

**T**

**Tab** [3] - 3088:25, 3090:10
**tab** [5] - 3056:21, 3056:23, 3058:14, 3058:17
**table** [5] - 2999:19, 3033:23, 3041:11, 3094:22, 3138:3
**tactic** [2] - 3048:2, 3179:14

**tag** [1] - 3151:16
**talented** [1] - 3009:5
**talker** [1] - 3169:7
**talks** [6] - 2989:20, 2994:10, 2996:4, 3023:8, 3028:15, 3035:14
**task** [3] - 2956:12, 3023:21, 3027:24
**tasked** [1] - 3063:19
**taste** [1] - 3149:11
**taught** [2] - 3003:16, 3008:22
**tax** [5] - 3005:10, 3048:6, 3048:9, 3048:14, 3131:7
**taxes** [3] - 3048:15, 3048:18, 3048:23
**teach** [1] - 3078:23
**teachings** [1] - 2953:8
**team** [3] - 2981:15, 3135:3, 3190:23
**technical** [6] - 2927:3, 2979:9, 2979:23, 2980:5, 2992:6, 3113:10
**technically** [3] - 2954:1, 3163:4, 3168:1
**Technologies** [1] - 3152:11
**technology** [42] - 2943:18, 2957:23, 2958:1, 2958:5, 2958:21, 2960:16, 2960:18, 2960:24, 2960:25, 2961:3, 2961:12, 2964:9, 2973:9, 2974:1, 2974:4, 2983:8, 2984:13, 2984:20, 2984:22, 2996:24, 2998:7, 2999:20, 2999:24, 2999:25, 3000:5, 3001:9, 3001:14, 3001:21, 3004:4, 3004:6, 3006:8, 3006:19, 3008:23, 3009:8, 3026:11, 3037:13, 3049:10, 3083:8, 3131:21, 3131:22, 3155:23
**Technology** [5] - 2999:2, 3042:17, 3152:21, 3152:23, 3156:21
**ten** [7] - 2962:16, 2966:20, 2967:20, 2999:14, 3036:2, 3083:11, 3119:14
**tending** [1] - 2926:12
**term** [9] - 2935:7, 2952:9, 2954:2, 2958:6, 2959:8, 2990:5, 3013:21, 3013:23, 3013:24
**terms** [12] - 2924:24, 2952:23, 2960:17, 2961:16, 2986:3, 3121:17, 3134:4, 3156:16, 3165:13, 3174:6, 3181:4
**territorial** [1] - 2961:18
**test** [4] - 3083:7, 3083:15, 3083:20
**testified** [23] - 2926:13, 2928:1, 2973:14, 2974:11, 2974:12, 2978:21, 3007:24, 3055:1, 3058:6, 3060:7, 3060:9, 3060:11, 3060:16, 3071:7, 3125:4, 3125:11, 3126:5, 3127:24, 3128:3, 3132:15, 3141:4, 3155:5, 3163:17
**testifies** [2] - 2927:18, 2998:16
**testify** [18] - 2927:6, 2974:17, 2980:15, 3008:6, 3008:8, 3031:13, 3056:25, 3057:8, 3057:9, 3058:1, 3058:4, 3058:7, 3060:4, 3066:21, 3069:23, 3092:10, 3092:11, 3101:23
**testifying** [14] - 2927:17, 2927:23, 2998:16, 2998:18, 3060:8, 3061:20, 3067:20, 3070:18, 3072:6, 3072:13, 3107:8, 3133:20, 3153:7, 3154:1

**testimony** [80] - 2926:2, 2926:11, 2926:16, 2927:8, 2927:9, 2927:24, 2928:6, 2928:10, 2928:14, 2929:13, 2929:16, 2930:3, 2930:6, 2930:11, 2930:13, 2931:8, 2931:11, 2963:3, 2964:7, 2974:2, 2978:19, 2982:4, 2982:7, 2985:25, 2990:3, 2990:23, 3006:14, 3014:13, 3015:15, 3020:7, 3020:8, 3029:20, 3041:2, 3043:9, 3047:1, 3057:3, 3070:23, 3071:3, 3071:8, 3074:7, 3074:20, 3085:6, 3115:21, 3121:18, 3125:21, 3126:14, 3128:17, 3129:25, 3130:13, 3132:9, 3132:12, 3132:24, 3133:6, 3133:12, 3133:23, 3136:17, 3137:11, 3137:17, 3140:24, 3140:25, 3145:17, 3160:8, 3160:14, 3162:14, 3162:19, 3164:14, 3164:16, 3164:20, 3169:9, 3169:10, 3173:23, 3174:25, 3176:20, 3176:21, 3176:22, 3176:23, 3179:5, 3180:20, 3182:21
**Texas** [4] - 2981:15, 3003:13, 3005:11, 3046:2
**TEXAS** [1] - 2923:3
**text** [1] - 3013:15
**thanking** [1] - 3002:23
**THAT** [1] - 3191:5
**THE** [298] - 2923:6, 2966:22, 2967:1, 2967:4, 2967:7, 2967:12, 2968:1, 2969:1, 3002:9, 3002:12, 3002:14, 3002:20, 3045:19, 3046:10, 3050:13, 3053:9, 3053:12, 3053:22, 3054:8, 3054:14, 3054:17, 3054:18, 3054:22, 3055:8, 3055:10, 3055:17, 3056:5, 3056:13, 3056:16, 3056:24, 3057:5, 3057:7, 3057:12, 3064:17, 3065:5, 3065:23, 3066:9, 3066:14, 3066:24, 3067:3, 3067:5, 3067:11, 3067:18, 3068:4, 3069:3, 3070:1, 3070:5, 3070:13, 3070:22, 3071:4, 3071:10, 3071:14, 3071:24, 3072:3, 3072:15, 3072:18, 3072:23, 3073:4, 3073:9, 3074:8, 3074:13, 3074:18, 3075:1, 3075:9, 3075:17, 3075:20, 3076:16, 3076:22, 3081:7, 3082:2, 3082:7, 3082:12, 3082:18, 3083:6, 3083:17, 3083:23, 3084:12, 3084:15, 3084:19, 3085:13, 3085:23, 3086:5, 3086:8, 3086:15, 3092:14, 3092:15, 3092:17, 3092:19, 3093:5, 3094:5, 3094:12, 3095:1, 3095:7, 3095:17, 3095:21, 3095:23, 3095:24, 3096:5, 3096:22, 3096:25, 3097:19, 3097:25, 3098:21, 3099:7, 3101:9, 3101:11, 3102:1, 3102:3, 3103:24, 3105:14, 3106:6, 3106:10, 3106:12, 3106:14, 3106:18, 3116:8, 3116:11, 3116:18, 3116:25, 3117:5, 3118:3, 3119:2, 3119:12, 3119:25, 3123:11, 3123:16, 3123:18, 3123:21, 3123:25, 3124:5, 3124:9, 3124:12, 3124:14, 3124:16, 3124:17,

3124:19, 3124:23, 3128:15, 3128:22, 3129:1, 3129:4, 3129:10, 3129:12, 3129:16, 3130:7, 3130:16, 3130:22, 3131:1, 3131:10, 3132:3, 3133:5, 3134:11, 3134:17, 3135:15, 3136:9, 3136:15, 3136:19, 3138:4, 3138:8, 3138:15, 3139:11, 3139:21, 3139:24, 3143:14, 3143:20, 3144:7, 3144:12, 3144:22, 3144:25, 3145:3, 3146:24, 3147:2, 3150:17, 3154:19, 3155:1, 3155:4, 3155:16, 3156:4, 3156:22, 3157:3, 3158:13, 3158:18, 3159:10, 3159:13, 3159:18, 3160:12, 3160:20, 3160:24, 3161:5, 3161:11, 3161:17, 3161:20, 3162:8, 3162:10, 3162:21, 3163:8, 3163:23, 3164:1, 3164:4, 3164:10, 3164:24, 3165:8, 3166:2, 3166:5, 3166:8, 3166:16, 3166:18, 3166:20, 3166:25, 3167:5, 3167:9, 3167:18, 3168:7, 3168:17, 3168:23, 3169:11, 3169:16, 3169:21, 3170:9, 3170:11, 3170:13, 3170:17, 3170:22, 3170:25, 3171:5, 3171:11, 3171:18, 3171:21, 3172:1, 3172:5, 3172:9, 3172:19, 3173:3, 3173:7, 3173:15, 3173:19, 3174:5, 3174:21, 3175:2, 3175:16, 3176:4, 3176:6, 3176:10, 3176:14, 3176:18, 3177:7, 3177:10, 3177:19, 3178:8, 3178:12, 3178:20, 3178:23, 3179:10, 3179:13, 3179:25, 3180:4, 3180:8, 3180:13, 3180:18, 3180:21, 3180:25, 3181:3, 3181:8, 3181:13, 3181:20, 3181:22, 3182:11, 3182:13, 3182:20, 3183:2, 3183:5, 3183:13, 3183:19, 3183:25, 3184:19, 3184:22, 3185:2, 3186:4, 3186:14, 3186:22, 3187:2, 3187:5, 3187:7, 3187:9, 3187:10, 3187:13, 3187:14, 3187:15, 3187:16, 3188:18, 3188:21, 3189:9, 3190:16, 3190:20, 3190:22, 3191:2, 3191:6
**the..** [1] - 3156:24
**theirs** [1] - 3184:16
**themes** [1] - 2981:3
**themselves** [6] - 2929:14, 2930:4, 2936:6, 2977:9, 2985:15, 3092:12
**theories** [1] - 3135:21
**theory** [2] - 3065:23, 3119:13
**Therasense** [3] - 3097:5, 3097:15, 3097:21
**therefore** [3] - 2934:13, 2936:14, 2939:13, 2941:14
**thereof** [1] - 3019:9
**they've** [33] - 2969:14, 2971:22, 2972:1, 2973:24, 2977:11, 2977:12, 2981:20, 2994:22, 2998:11, 3001:16, 3009:9, 3009:10, 3009:12, 3010:18, 3010:23, 3025:5, 3027:15, 3027:16, 3027:18, 3027:25, 3037:19, 3069:7, 3082:2, 3145:10, 3162:18, 3175:23, 3180:5, 3180:8

**thick** [2] - 3087:21, 3090:1

**thinking** [7] - 2998:13, 3107:16, 3120:20, 3121:16, 3133:12, 3138:9, 3138:11

**thinks** [3] - 2986:19, 2987:12, 3083:12

**third** [6] - 2951:5, 2968:8, 3029:11, 3031:12, 3056:23, 3158:3

**Thirteen** [1] - 2963:3

**thirty** [1] - 3044:16

**THIS** [1] - 3191:5

**thorough** [3] - 3105:20, 3105:22, 3106:5

**thought..** [1] - 3165:11

**Thousand** [1] - 3104:22

**thousand** [5] - 3006:22, 3006:23, 3007:6, 3119:15, 3138:9

**Thousands** [1] - 3107:6

**thousands** [1] - 3151:25

**three** [14] - 2940:21, 2946:18, 2949:7, 2954:16, 2978:4, 2987:1, 2994:9, 3003:12, 3003:24, 3016:13, 3037:23, 3059:22, 3075:7, 3166:12

**three-step** [1] - 2994:9

**threw** [3] - 3119:16, 3123:3, 3142:22

**throughout** [1] - 3162:22

**throw** [2] - 3009:11, 3021:20

**THURSDAY** [1] - 2923:2

**Thursday** [1] - 3181:9

**tied** [1] - 3006:5

**timing** [1] - 3036:8

**title** [4] - 3158:23, 3159:16, 3161:7, 3170:21

**Title** [1] - 3092:17

**TiVo** [1] - 3154:6

**today** [11] - 2950:22, 3046:6, 3071:13, 3082:14, 3083:9, 3083:12, 3115:5, 3124:20, 3164:22, 3172:4

**together** [18] - 2945:3, 2971:1, 2972:2, 2977:12, 2983:6, 2983:17, 2985:18, 2986:13, 2987:23, 2998:22, 3030:24, 3088:9, 3112:3, 3118:6, 3131:9, 3188:3, 3188:6, 3188:9

**Tom** [1] - 2983:20

**tomorrow** [8] - 3181:24, 3183:14, 3183:15, 3187:11, 3188:3, 3188:13, 3189:22, 3190:23

**ton** [2] - 3047:12, 3132:21

**tonight** [1] - 3181:6

**Tony** [1] - 2974:21

**took** [15] - 2989:2, 3022:8, 3027:24, 3030:1, 3037:5, 3040:6, 3077:17, 3088:19, 3110:21, 3111:18, 3113:9, 3146:13, 3146:16, 3165:7, 3176:15

**top** [12] - 2979:24, 2995:6, 3018:1, 3018:4, 3062:8, 3063:11, 3085:14, 3100:12, 3126:20, 3127:18, 3151:10, 3151:18

**Topic** [4] - 3057:19, 3059:13, 3174:6, 3178:17

**topic** [19] - 3032:5, 3055:3, 3057:19,

3058:1, 3058:4, 3059:11, 3059:13, 3060:4, 3060:7, 3060:9, 3061:23, 3066:13, 3072:22, 3072:23, 3172:11, 3174:19, 3175:11, 3177:1, 3177:2

**topics** [9] - 3055:5, 3066:12, 3068:13, 3068:16, 3103:16, 3150:9, 3172:16, 3174:7, 3174:9

**Toshiba** [2] - 2973:1, 3006:15

**toss** [2] - 3049:17, 3156:19

**total** [4] - 2963:23, 3001:23, 3015:16

**toted** [1] - 3158:1

**touch** [2] - 3014:12, 3149:19

**touched** [3] - 3011:4, 3017:1, 3150:2

**touchscreen** [1] - 3149:20

**towards** [1] - 3189:19

**track** [1] - 3031:21

**tracks** [1] - 3032:1

**training** [1] - 2927:5

**TRANSCRIPT** [1] - 3191:6

**transcript** [7] - 3128:23, 3128:25, 3129:21, 3132:14, 3134:23, 3155:14, 3162:11

**transcripts** [3] - 3163:21, 3172:24, 3183:10

**transfer** [10] - 2980:8, 2989:13, 2989:15, 2993:1, 3007:8, 3008:23, 3017:4, 3038:16, 3038:18, 3171:10

**transferring** [1] - 2992:14

**transfers** [2] - 2980:6, 3038:23

**translation** [1] - 2980:17

**travel** [1] - 3139:1

**treat** [1] - 2926:8

**treated** [2] - 3045:12, 3051:14

**trepidation** [1] - 3105:16

**trial** [52] - 2924:2, 2926:17, 2928:22, 2930:24, 2931:2, 2952:6, 2954:5, 2959:12, 2974:24, 2977:18, 2984:7, 2984:23, 3051:13, 3052:4, 3070:23, 3071:8, 3074:4, 3075:24, 3095:16, 3100:17, 3100:20, 3115:20, 3121:19, 3126:6, 3127:21, 3135:3, 3136:17, 3139:5, 3143:19, 3144:16, 3155:5, 3155:24, 3156:6, 3156:17, 3158:16, 3161:18, 3162:23, 3163:14, 3164:8, 3164:16, 3164:22, 3165:2, 3172:22, 3172:23, 3178:2, 3179:5, 3179:14, 3179:15, 3180:4, 3183:9, 3183:21

**TRIAL** [1] - 2923:2

**trials** [2] - 3151:24, 3182:1

**tricky** [1] - 2967:17

**tried** [13] - 2954:14, 2982:2, 2984:17, 2986:24, 3003:24, 3042:17, 3075:11, 3098:12, 3136:4, 3138:8, 3140:21, 3144:1, 3179:25

**true** [13] - 2925:18, 2925:19, 3015:3, 3015:11, 3027:8, 3027:9, 3027:10, 3040:4, 3080:16, 3122:19, 3138:22, 3148:11, 3168:1

**trust** [23] - 3070:20, 3104:12, 3104:17, 3147:20, 3147:25, 3157:5, 3159:1,

3159:6, 3159:8, 3160:2, 3160:15, 3161:7, 3161:16, 3162:1, 3162:6, 3172:3, 3172:7, 3185:6, 3185:15, 3189:14, 3189:16, 3190:3, 3190:5

**Trust** [2] - 3104:11, 3147:11, 3157:6

**trust's** [1] - 3065:15

**trustee** [4] - 3157:6, 3157:8, 3157:12, 3157:16

**trusts** [1] - 3189:19

**truth** [2] - 2926:20, 2928:13

**truths** [1] - 2969:11

**try** [24] - 2953:16, 2984:19, 2985:8, 2986:22, 2987:7, 2999:10, 3001:24, 3003:13, 3005:15, 3005:16, 3027:20, 3034:20, 3048:3, 3093:23, 3099:13, 3101:1, 3103:6, 3132:3, 3132:6, 3151:4, 3177:25, 3187:25

**trying** [43] - 2963:21, 2970:3, 2971:23, 2977:8, 2989:25, 2992:22, 3003:21, 3007:25, 3015:7, 3031:20, 3053:13, 3064:12, 3066:1, 3071:15, 3071:16, 3086:9, 3092:19, 3093:15, 3112:15, 3113:20, 3114:10, 3118:7, 3118:19, 3131:10, 3131:13, 3132:1, 3142:19, 3144:3, 3144:8, 3144:9, 3151:7, 3152:18, 3154:20, 3154:23, 3156:7, 3168:10, 3173:11, 3177:22, 3179:11, 3180:6, 3185:17, 3185:18

**Tune** [2] - 3015:22

**turn** [13] - 3002:8, 3057:16, 3058:14, 3078:16, 3108:5, 3137:4, 3137:5, 3137:6, 3141:11, 3153:5, 3153:10, 3154:3, 3154:14

**turned** [5] - 3117:11, 3135:3, 3141:9, 3142:5, 3142:6

**turns** [2] - 3011:6, 3030:13

**tutorial** [2] - 3094:18, 3094:19

**twice** [1] - 3043:11

**two** [77] - 2923:7, 2928:12, 2934:2, 2936:23, 2936:24, 2940:4, 2940:20, 2942:9, 2944:1, 2944:2, 2944:7, 2944:16, 2946:9, 2946:11, 2946:17, 2947:5, 2948:14, 2949:2, 2949:18, 2954:14, 2957:17, 2957:19, 2960:4, 2960:10, 2966:16, 2968:2, 2968:14, 2973:7, 2973:12, 2974:7, 2979:9, 2979:12, 2979:13, 2979:18, 2980:10, 2986:16, 2987:5, 3003:9, 3008:24, 3018:25, 3026:2, 3026:22, 3027:1, 3032:4, 3032:7, 3032:8, 3032:18, 3035:16, 3036:21, 3036:24, 3037:11, 3038:4, 3041:9, 3044:13, 3044:15, 3059:19, 3060:9, 3067:23, 3069:2, 3087:15, 3090:2, 3090:23, 3091:2, 3091:13, 3095:25, 3101:15, 3102:4, 3135:5, 3135:21, 3170:2, 3172:2, 3173:2, 3175:2, 3179:2, 3179:19, 3183:20

**Two** [2] - 3104:22, 3107:6

**type** [4] - 2960:24, 2995:2, 3024:24, 3185:9

**types** [3] - 2928:12, 2979:12, 2979:13
**typical** [2] - 3048:2, 3182:4
**typically** [1] - 3089:22
**typographical** [1] - 2968:15
**typos** [1] - 2968:2

# U

**U.S** [1] - 2973:18
**Ugone** [5] - 2930:10, 2973:13, 2998:15, 2998:21, 3133:2
**Ugone's** [1] - 2930:12
**ultimately** [2] - 3096:1, 3152:12
**unanimous** [2] - 2925:14, 3052:8
**unavailability** [1] - 3135:19
**unavailable** [2] - 3162:17, 3164:15
**unbelievable** [1] - 3145:22
**under** [37] - 2936:25, 2937:1, 2937:2, 2937:6, 2938:25, 2939:1, 2939:15, 2939:18, 2939:21, 2940:1, 2940:7, 2940:8, 2940:9, 2943:9, 2957:7, 2960:14, 2961:22, 3025:12, 3025:13, 3054:15, 3065:7, 3066:25, 3069:5, 3086:2, 3088:16, 3088:21, 3106:3, 3106:12, 3116:13, 3116:15, 3143:2, 3143:23, 3144:19, 3162:17, 3176:23, 3183:10
**underlying** [4] - 2929:16, 2930:6, 2930:13, 2930:16
**understood** [4] - 2925:1, 2925:6, 2925:10, 2937:25
**undertake** [1] - 3063:13
**undertaken** [2] - 3063:23, 3064:6
**undertook** [1] - 3063:5
**undisputed** [2] - 3037:4, 3039:11
**unduly** [1] - 2931:9
**unequivocally** [1] - 3040:23
**unexpected** [1] - 2954:23
**unfair** [3] - 3076:4, 3156:19, 3163:3
**unfortunate** [1] - 3053:24
**unimportant** [1] - 2927:2
**unit** [15] - 2966:11, 2998:11, 2998:14, 2999:20, 3001:6, 3001:23, 3041:20, 3126:2, 3126:19, 3127:23, 3127:24, 3128:2, 3128:5, 3132:22
**United** [7] - 2935:7, 2937:12, 2938:22, 2944:20, 2956:19, 2970:15, 2970:20
**units** [15] - 2931:23, 2932:5, 2932:7, 2932:9, 2932:11, 2932:13, 2932:15, 2932:17, 2958:16, 3000:10, 3001:10, 3001:23, 3050:5, 3126:10, 3126:18
**universal** [1] - 2988:16
**unless** [9] - 2926:1, 3038:1, 3052:4, 3052:13, 3053:2, 3093:1, 3160:25, 3178:1, 3180:11
**unlike** [1] - 2948:18
**unmet** [12] - 2939:5, 2939:25, 2940:3, 2940:4, 2940:6, 2940:10, 2940:13, 2940:18, 2940:19, 2941:1, 2941:4, 2954:12

**unnecessary** [1] - 2941:16
**unrebutted** [1] - 3160:14
**up** [125] - 2927:19, 2930:18, 2958:4, 2958:18, 2961:10, 2967:5, 2967:15, 2967:21, 2970:10, 2970:13, 2971:21, 2972:2, 2972:19, 2973:3, 2979:21, 2982:17, 2983:14, 2983:19, 2983:21, 2984:17, 2984:19, 2985:2, 2985:20, 2985:21, 2987:10, 2991:9, 2994:24, 2997:4, 2997:8, 3002:15, 3003:9, 3003:12, 3003:17, 3003:20, 3004:7, 3005:8, 3006:15, 3007:1, 3007:10, 3009:11, 3011:13, 3014:13, 3014:18, 3014:20, 3014:24, 3015:17, 3018:21, 3021:20, 3026:17, 3027:16, 3027:18, 3034:24, 3037:16, 3038:19, 3041:15, 3041:16, 3042:11, 3042:14, 3042:21, 3043:4, 3043:16, 3046:1, 3046:5, 3046:14, 3047:13, 3049:6, 3051:2, 3065:8, 3066:17, 3066:18, 3067:7, 3067:13, 3074:11, 3076:16, 3081:11, 3086:11, 3092:20, 3094:5, 3101:4, 3107:22, 3108:15, 3113:3, 3123:11, 3123:16, 3126:13, 3126:20, 3128:18, 3132:8, 3132:12, 3133:6, 3139:24, 3140:4, 3141:3, 3142:18, 3143:7, 3143:24, 3144:3, 3144:15, 3146:8, 3147:16, 3148:12, 3151:13, 3152:12, 3156:8, 3156:18, 3156:25, 3157:18, 3158:18, 3158:19, 3161:8, 3162:24, 3164:4, 3166:12, 3171:3, 3183:9, 3183:20, 3184:7, 3186:19, 3188:6, 3188:12, 3190:18
**up-front** [3] - 2958:4, 2958:18, 2961:10
**upper** [1] - 3089:5
**upside** [1] - 3132:21
**usage** [2] - 2957:23, 2961:11
**USB** [6] - 2987:22, 2989:5, 2989:11, 3038:21, 3038:22, 3039:2
**useful** [3] - 3006:16, 3007:24, 3030:24
**useless** [1] - 3024:15
**user** [5] - 2938:14, 3034:10, 3115:25, 3116:1, 3151:19
**user's** [5] - 2946:18, 2949:12, 2949:16, 2949:21, 2949:25
**uses** [9] - 2974:4, 2987:22, 3020:9, 3020:11, 3025:6, 3029:5, 3032:13, 3059:19, 3059:23
**utility** [1] - 2962:8

# V

**valid** [12] - 2935:4, 2945:15, 2945:16, 2945:23, 2946:3, 2957:16, 2959:16, 2974:3, 2974:6, 2996:11, 2998:6, 3040:14
**validity** [12] - 2942:4, 2979:11, 2979:12, 2981:21, 2981:24, 2982:2, 2982:23, 2985:5, 3000:24, 3038:11, 3039:15, 3044:3

**value** [6] - 2961:7, 2962:18, 2963:24, 2964:2, 2964:5, 3121:19
**variable** [5] - 3021:2, 3021:4, 3021:6, 3021:17, 3033:1
**varies** [1] - 2925:6
**various** [5] - 2953:2, 2985:2, 2997:18, 3063:6, 3063:14
**Verdict** [1] - 2965:17
**verdict** [14] - 2925:14, 2927:20, 2931:25, 2965:14, 2966:6, 3000:13, 3043:19, 3045:10, 3045:17, 3051:19, 3052:8, 3052:10, 3052:11, 3053:1
**verify** [1] - 3126:22
**versa** [1] - 3159:23
**version** [3] - 3140:13, 3141:7, 3151:23
**Version** [1] - 3094:15
**versions** [2] - 2978:7, 3112:18, 3141:20, 3142:16
**versus** [8] - 2965:25, 2997:20, 3031:16, 3035:9, 3037:20, 3139:7, 3188:24, 3189:4
**vertical** [1] - 3108:1
**vice** [2] - 2976:14, 3159:23
**vice-president** [1] - 2976:14
**victim** [3] - 3048:3, 3048:25
**video** [6] - 3151:4, 3151:9, 3151:14, 3176:3, 3176:4, 3176:7
**Video** [1] - 3151:12
**video-on-demand** [1] - 3151:14
**view** [2] - 2951:10, 3190:17
**violating** [1] - 3052:24
**violation** [3] - 3052:23, 3133:21
**Virginia** [1] - 3003:10
**visitors** [1] - 3002:22
**visual** [1] - 3112:4
**Volkswagen** [1] - 3139:7
**voltage** [1] - 2992:21
**VOLUME** [1] - 2923:2
**Volume** [10] - 3058:14, 3108:16, 3109:25, 3111:5, 3113:4, 3113:25, 3120:9, 3123:8, 3128:24, 3136:12
**volumes** [1] - 3102:4
**voluminous** [2] - 3092:4, 3092:5
**voluntarily** [1] - 2963:21
**voluntary** [1] - 3095:22
**VP** [1] - 2977:6

# W

**wait** [17] - 2980:22, 3012:9, 3052:6, 3058:22, 3068:4, 3098:21, 3129:4, 3133:5, 3139:11, 3143:14, 3162:21, 3186:10, 3188:3, 3188:3, 3188:8
**Wait** [2] - 3006:12, 3118:5
**waited** [1] - 3058:9
**waiting** [1] - 3123:15
**walk** [4] - 2986:20, 3010:16, 3028:25, 3081:3
**walking** [1] - 3032:23

**walks** [1] - 3014:23
**Wanlass** [1] - 3188:24
**wants** [2] - 3014:9, 3168:24
**warn** [1] - 3052:24
**Washington** [1] - 3003:11
**wastebasket** [1] - 3049:17
**watch** [4] - 3046:8, 3151:15, 3181:6, 3181:14
**watching** [1] - 3027:6
**watermelon** [1] - 3027:1
**waved** [2] - 2969:17, 2970:6
**ways** [7] - 2923:20, 2936:23, 2946:9, 2947:5, 2993:15, 3007:10, 3095:25
**week** [2] - 3117:12, 3163:15
**weeks** [6] - 2969:7, 2974:23, 3008:25, 3106:23, 3141:12, 3184:17
**weigh** [1] - 2945:2
**weight** [8] - 2926:10, 2927:10, 2931:10, 2947:1, 2968:10, 2968:11, 2968:19, 3040:20
**well-polished** [1] - 3151:23
**whatsoever** [1] - 3036:13
**wheel** [12] - 2972:16, 2972:18, 2972:20, 2988:24, 2989:1, 2989:2, 2992:2, 3006:20, 3007:3, 3037:21, 3037:24, 3149:19
**wheeled** [1] - 2967:10
**wherein** [1] - 3105:25
**white** [2] - 3065:20, 3108:8
**white-horse** [1] - 3065:20
**whole** [22] - 2941:10, 2952:16, 2970:21, 3010:1, 3015:17, 3018:9, 3020:2, 3020:4, 3020:16, 3021:19, 3021:21, 3023:1, 3023:7, 3032:23, 3035:24, 3083:10, 3083:13, 3098:5, 3164:7, 3184:4, 3186:10, 3190:23
**Wicker** [29] - 2930:3, 2974:2, 2977:12, 2977:14, 2977:15, 2977:19, 2978:19, 2979:9, 2982:11, 2986:1, 2986:8, 2986:13, 2986:19, 2986:24, 2986:25, 2987:2, 2987:6, 2987:12, 2987:16, 2988:23, 2989:9, 2989:24, 2993:9, 2998:5, 3027:11, 3030:23, 3031:1, 3034:11, 3039:12
**Wicker's** [4] - 2930:5, 2977:23, 3031:4, 3165:15
**wife** [2] - 3003:11, 3149:17
**willfully** [1] - 3186:15
**willing** [11] - 2957:9, 2957:10, 2957:14, 2963:9, 2963:10, 2982:16, 2989:9, 3001:17, 3050:3, 3182:2
**willingness** [1] - 2959:19
**win** [11] - 2925:12, 2956:12, 2975:8, 3000:16, 3000:17, 3000:19, 3001:2, 3031:7, 3045:24, 3050:19, 3177:11
**Windows** [5] - 2946:19, 2949:13, 2949:17, 2949:22, 2950:1
**winner** [1] - 3027:25
**wins** [1] - 2981:19
**wireless** [1] - 2988:17

**wisdom** [1] - 2954:25
**wish** [3] - 3004:12, 3056:9
**wishes** [1] - 3187:11
**withdrawn** [2] - 3081:17, 3096:17
**withhold** [1] - 3098:12
**witness** [54] - 2926:11, 2926:12, 2926:14, 2926:17, 2926:19, 2926:20, 2926:22, 2927:5, 2927:14, 2927:15, 2927:16, 2927:24, 2928:3, 2928:24, 2975:17, 2976:1, 3008:4, 3013:14, 3065:9, 3065:11, 3065:14, 3066:18, 3068:7, 3068:24, 3069:23, 3070:6, 3070:10, 3070:12, 3071:17, 3071:18, 3073:5, 3093:6, 3105:9, 3119:11, 3134:25, 3135:20, 3145:2, 3146:15, 3147:1, 3154:16, 3158:10, 3169:6, 3172:16, 3173:23, 3174:8, 3174:18, 3174:19, 3176:21, 3177:2, 3177:3, 3178:10, 3179:5, 3179:17
**WITNESS** [14] - 3054:17, 3074:8, 3074:18, 3092:14, 3092:17, 3095:1, 3095:21, 3095:24, 3101:11, 3102:3, 3106:14, 3124:12, 3124:16, 3124:19
**witness'** [1] - 2927:11
**witnessed** [1] - 2980:18
**witnesses** [17] - 2926:2, 2927:21, 2927:23, 2928:1, 2974:17, 2974:21, 2977:11, 2979:6, 2999:23, 3005:3, 3008:9, 3011:21, 3027:24, 3045:12, 3069:22, 3106:7, 3175:24
**witty** [2] - 3003:18, 3003:22
**woman** [1] - 3144:1
**won** [4] - 2975:13, 2981:15, 2981:16, 3007:15
**wonder** [1] - 3027:5
**wondering** [2] - 3068:17, 3107:19
**word** [9] - 2933:14, 2995:19, 3003:25, 3013:16, 3013:19, 3014:1, 3028:8, 3136:12, 3136:13
**wording** [1] - 3078:9
**words** [13] - 2924:12, 2924:23, 2925:4, 2925:8, 2928:8, 2933:15, 2964:3, 2976:17, 2993:16, 3059:2, 3062:12, 3078:13, 3170:2
**workable** [1] - 3006:25
**workaround** [1] - 3173:24
**works** [4] - 3029:15, 3031:3, 3119:18, 3169:25
**world** [7] - 2971:18, 2977:8, 2998:22, 2998:23, 3016:2, 3048:13, 3062:6
**worldwide** [1] - 2970:8
**worried** [1] - 3156:22
**worth** [6] - 2969:25, 3051:11, 3123:6, 3124:4, 3124:8, 3124:25
**worthwhile** [1] - 3173:20
**wrap** [2] - 2970:4, 3081:11
**writing** [4] - 2966:19, 3052:19, 3097:4, 3168:11
**written** [7] - 2933:17, 2993:19, 2993:21, 2994:2, 3052:10, 3052:17,

3056:2
**wrote** [2] - 3073:21, 3074:9

## Y

**year** [11] - 2981:16, 3083:14, 3099:3, 3107:7, 3117:9, 3118:13, 3141:18, 3141:25, 3146:3, 3146:21, 3186:12
**years** [10] - 2984:12, 3042:1, 3045:23, 3128:13, 3144:13, 3149:4, 3150:25, 3158:2, 3184:23, 3186:12
**yesterday** [1] - 2980:15
**York** [1] - 3107:5
**yourself** [8] - 2926:11, 3018:6, 3018:25, 3039:3, 3050:22, 3088:16, 3152:15, 3181:7

## Z

**zero** [2] - 2971:9, 3009:12
**zippo** [1] - 3050:5

## ¶

**¶6** [1] - 2987:14